**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| CAROL AND ROBERT TESTWUIDE, et al. | ) | |
| Plaintiffs, | ) | |
| v. | ) | No.: 01-201L |
| | ) | (Honorable Victor J. Wolski) |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**PLAINTIFFS' OPPOSITION TO REQUESTED PROTECTIVE ORDER**
**IN RESPECT OF SUBPOENA TO WYLE LABORATORIES**

**Background**

In 1995 the Base Realignment and Closing Commission ("BRAC") directed the Department of Defense to close Cecil Field, a Naval Air Station in Jacksonville, Florida, and to realign the 180 F/A-18 Hornet aircraft[1] which were based at Cecil Field to other facilities. This required the Navy to move 12 squadrons of F/A-18s. The Navy then determined to study three potential sites for all or some of the aircraft: (a) Oceana Naval Air Station in Virginia Beach; (b) Marine Corps Air Station, Cherry Point, North Carolina; and (c) Marine Corps Air Station Beaufort, South Carolina.

Under the National Environmental Policy Act ("NEPA") 42 U.S.C. 4331, *et seq*. a move of this magnitude required that an Environmental Impact Study be done, assessing the effects on the environment of the various potential moves.

One of the significant environmental impacts of any move of jet aircraft would be the noise that the aircraft would impose on the area surrounding the air station. To study that impact

[1] The aircraft were all models "C" or "D" of the F/A-18.

under NEPA, the Navy contracted with Wyle Laboratories, a company which has experience in noise studies of both military and civilian airfields.

Wyle, working under contract number N68925-96-D-A538, studied the then present state of the noise surrounding the three airfields in question, and the probable effects of the movement of the F/A-18s according to a series of five "scenarios" which involved different levels of aircraft arriving at one or more of the three air stations. In February 1998, Wyle issued its "Research Report WR 97-10". The cover and table of contents of that study are attached as Exhibit 1.[2]

Ultimately, in the final Environmental Impact Statement issued in March 1998, the Navy first recommended and then implemented scenario number 2. The cover and executive summary of that Environmental Impact Statement (which contains over 2400 pages) are attached as Exhibit 2. The Navy then chose scenario number 2 in its Record of Decision which involved the movement of ten squadrons of F/A-18s to Oceana (156 total aircraft), and two squadrons to Marine Corps Air Station, Beaufort, South Carolina.

As part of its responsibilities under the NEPA contract, Wyle studied both a baseline year for which it chose 1997, and an affected year, for which it chose 1999 (after the aircraft move would have been finalized) to compare the noise impact before and after. Among a number of other studies, it developed noise contours for both the baseline year (Exhibit 3) and for the affected year for <u>each</u> of the potential scenarios in the study. The Oceana contours for scenario 2, the one ultimately chosen, is Exhibit 4. Thereafter ten squadrons moved to Oceana between November, 1998 and July, 1999.

In the year 2000, the Navy initiated another Environmental Impact Statement to study the effect of the introduction of eleven <u>additional</u> F/A-18 E/F Super Hornet squadrons to the same

[2] The report itself is 379 pages long.

three potential sites on the East Coast. This new aircraft is bigger, heavier and louder than the F/A-18 C/D aircraft which had been the subject of the prior EIS.

Again, as part of the requirement to issue an Environmental Impact Statement under NEPA, the Navy contracted with Wyle Laboratories, this time under contract No. N62477-00-D-0056, to assess the effect of noise on the various sites under the scenarios being studied. In April, 2003, Wyle issued its report WR 02-08 (the Table of Contents is Exhibit 5). In the same fashion as had been done in the first Report, the 2003 Wyle Report studied a baseline year for each of the Air Stations under consideration. For Oceana the baseline year chosen was the year 2000. Among other portions of the study, Wyle published projected, or modeled, noise contours for that baseline year, a copy of which is Exhibit 6.

**The Subpoena**

The differences between the projected 1999 noise contours in the 1997 Noise Study (Exhibit 4), and the projected 2000 contours in the subsequent Noise Study (Exhibit 6) is of interest to Plaintiffs and clearly relevant to the issues in this case. Accordingly, on February 7, 2006, Plaintiffs served a subpoena on Wyle Laboratories to produce internal documents and communications bearing on the differences between those two modeled (projected) situations. The terms of the subpoena are as follows:

**EXHIBIT A TO THE SUBPOENA DUCES TECUM**
**DIRECTED TO WYLE ENGINEERING**

> 1. All internal memoranda or internal communications (including emails) between or among employees, agents or contractors of Wyle Engineering from January, 2000 to the present concerning the review, revision or alteration of 1999 noise contours, flight profiles, parameters and/or flight tracks for NAS Oceana and NALF Fentress, which resulted in or concern revised noise contours and flight tracks submitted in March of 2002 to the Court in *Testwuide v. United States* (CFC No. 01-201L) as Revised Exhibits 49 and 49A.

> 2. All memoranda or communications (including emails) from January, 2000 to the present between employees, agents or contractors of Wyle Engineering and employees of ATAC concerning the revision or alteration of 1999 noise contours, flight tracks, flight profiles, and/or flight parameters for NAS Oceana and NALF Fentress, which resulted in or concern revised noise contours and flight tracks submitted in March of 2002 to the Court in *Testwuide v. United States* (CFC No. 01-201L) as Revised Exhibits 49 and 49A.
>
> **PLEASE BE ADVISED THAT PRODUCTION OF THE DOCUMENTS PRIOR TO THE TIME AND PLACE SET FORTH ON THE FACE OF THE SUBPOENA WILL REMOVE THE NECESSITY OF A PERSONAL APPEARANCE OF A WITNESS. CONTACT KIERON QUINN OR MARTIN WOLF AT 410 825 2300 TO DISCUSS ARRANGEMENTS.**

**The Controversy**

After the subpoena was served, Counsel for the Defendant demanded that the subpoena be withdrawn, stating Defense Counsel would respond "for" Wyle and that "non-privileged" documents which the subpoena would cover would be produced if they had not been produced before. Plaintiffs have never received any internal documents of Wyle Laboratories and objected both to the demand that the subpoena be withdrawn and to the announcement that Defense Counsel was going to act as a filter to "cull out" relevant documents. An exchange of communications then ensued[3] in which Plaintiffs' Counsel attempted to get Defense Counsel to describe what it was that they believed they could direct Wyle not to produce. At the end of that exchange Plaintiffs declined to withdraw the subpoena and declined to agree that Defense Counsel could determine what documents Wyle would and would not produce.

---

[3] Letters and emails on this subject are attached to Defendant's memorandum supporting its request for a protective order.

**Argument**

Protective orders covering clearly relevant documents and information are rare, and should be rare. It is the burden of the party seeking the protective order to clearly demonstrate the reason why one should be issued.

Throughout its memorandum, Defendant simply assumes that which it has to prove – that Wyle Laboratories' internal memoranda and documents contain, or even could contain, privileged material that Defendant would have a right to withhold from discovery.[4] That assumption is wrong and the lack of any clarity on what documents supposedly are covered by such a privilege by itself mandates that the protective order not be issued.

In general, if a client makes or receives a communication to or from his attorney in the presence of a third party the communication is not confidential and is not entitled to the protection accorded by the privilege. Similarly, if a genuinely privileged communication is in a document which is deliberately or accidentally given to a third party, the communication loses its privileged status and is subject to discovery. Under very limited factual circumstances the courts have extended the privilege to certain third parties (an interpreter or the law clerk of the attorney). However, the general rule still applies and the burden falls on the party asserting the privilege to demonstrate all the elements required for its application. In this matter, Defendant has proven nothing, resting instead solely on argument.

On the first level Defendant is required to establish that the relationship between Wyle and the Navy was such that Wyle's internal documents, generated in preparation for two Environmental Impact Statements, should be included within the protection of the attorney-client privilege. Plaintiffs suggest that to state that proposition is to answer it. Wyle was engaged to

---

[4] Defense Counsel has repeatedly stated that they would respond to the subpoena "on behalf of" Wyle. Defense Counsel does not have that right and, in fact, Plaintiffs have been contacted by counsel for Wyle.

perform statutorily required studies in connection with two Environmental Impact Statements. The National Environmental Policy Act specifically requires that studies of the kind at issue be undertaken and published. 42 U.S.C. § 4332. If, for some reason, the Navy generated truly privileged internal documents, which it then gave to Wyle, then that privilege is lost. "The attorney-client privilege evaporates upon any voluntary disclosure of confidential information to a third party." *Carter v. Gibbs*, 909 F.2d 1450, 1451 (Fed. Cir. 1990) (*en banc).*

Moreover, as demonstrated, (1) Wyle was accomplishing statutorily required tasks, and (2) internal Wyle documents relating to those tasks are the sole subject of the subpoena under question. One of the two cases relied on by Defendant makes this fact clear:

> In this setting (where there is a clear business purpose in the environment in which the communications occurred), the courts should sustain an assertion of privilege only when there is a clear evidentiary predicate for concluding that *each* communication in question was made *primarily* for the purpose of generating legal advice. No privilege can attach to any communication as to which a business purpose would have served as a sufficient cause… . (emphasis in original)
>
> ***
>
> Similarly, <u>privilege cannot attach to any communication that was compelled by a statute or regulation and whose confidentiality was not clearly preserved by the statutory or regulatory scheme</u>. This follows because the privilege "applies only where necessary to achieve its purpose. Accordingly, it protects only those disclosures necessary to obtain informed legal advice – which might not have been made absent the privilege." (Citations omitted) (emphasis added).

*McCaugherty v. Sifferman*, 132 F.R.D. 234, 238 (N.D. Cal. 1990).

Similarly Defendant cannot suppress relevant internal documents of Wyle by simply asserting that they are work product:

> If the primary motivating purpose behind the creation of the document is not to assist in pending or impending litigation, then a finding that the document enjoys work product immunity is not mandated.

*United States v. Gulf Oil Corp.*, 760 F.2d 292, 296 (Emer. App. 1985); *Cabot v. United States*, 35 Fed. Cl. 442, 445 (1996). Because Wyle's activities were mandated by statute, then the "primary motivating purpose" of the document cannot be to help the United States win a legal case, or an anticipated legal case. *McCaugherty*, 132 F.R.D. at 245-246.

The only other case cited by Defendant, *In Re Bieter*, 16 F.3d 929 (8th Cir. 1994), is of no assistance. The question there was whether an individual, employed as an independent consultant by a real estate development firm, could reasonably be covered by the attorney-client privilege. The Court in *Bieter* stated that, under the narrow circumstances of this case, the individual concern (Mr. Klohs) could be so covered:

> … The affidavits discussed above amply support the view that Klohs has the same sort of relationship as was present in *McCaugherty* and as envisioned by Dean Sexton. Klohs has been involved on a daily basis with the principals of Bieter and on Bieter's behalf in the unsuccessful development that serves as the basis for this litigation. Bieter was formed with a single objective and Klohs has been intimately involved in the attempt to achieve that objective. As Bieter's sole representative at meetings with potential tenants, and with local officials he likely possesses information that is possessed by no other.

16 F.3d at 938. Clearly, Wyle was acting under a statute, which not only does not confer confidentiality, but mandates that the results be published to the public. If, somehow, (and Defendant has not in any way established that there is such a document) some of the Navy legal counsel's internal musing were transmitted to Wyle then the Defendant has simply and voluntarily made what otherwise might be privileged documents into public documents.

In addition, Defendant has not event attempted to demonstrate that any communications in question were privileged even if the relationship with Wyle conferred a potential privilege. Again, the case relied on by the United States contains the refutation of Defendant's argument. The nature of the communication, which might be covered by a privilege is set out in *Bieter* as follows:

> [T]he attorney-client privilege is applicable to an employee's communication if (1) the communication was made for the purpose of securing legal advice; (2) the employee making the communication did so at the direction of its corporate superior; (3) the superior made the request so that the corporation could secure legal advice; (4) the subject matter of the communication is within the scope of the employee's corporate duties; and (5) the communication is not disseminated beyond those persons who, because of the corporate structure, need to know its contents.

*Bieter*, 16 F.3d at 936, quoting *Diversified Indus., Inc. v. Meredith*, 572 F.2d 596, 609 (8th Cir. 1977).

Finally, Wyle is a necessary factual witness in this case. Plaintiffs intend to demonstrate that the Noise Study of 2003 (Exhibit 5) lacks probity and is subject to challenge. The work under NEPA that produced this flawed document cannot be protected from scrutiny in this case by arguing that it is "privileged".

**Conclusion**

For the reasons stated Plaintiffs request that the requested protective order be denied.

Respectfully,

_______________/s/_________________

Jack E. Ferrebee
Hofheimer/Ferrebee, P.C.
1060 Laskin Road, Suite 12-B
Virginia Beach, Virginia 23451
(757) 425-5200
jferrebee@hoflaw.com

Counsel of Record for Plaintiffs

Of Counsel:

Kieron F. Quinn
Martin E. Wolf
Quinn, Gordon & Wolf, Chtd.
102 W. Pennsylvania Avenue
Suite 402
Towson, Maryland 21204
(410) 825-2300
kfquinn@quinnlaw.com
mwolf@quinnlaw.com

Charles R. Hofheimer
Kristen D. Hofheimer
Hofheimer/Ferrebee, P.C.
1060 Laskin Road, Suite 12-B
Virginia Beach, Virginia 23451
(757) 425-5200
chofheimer@hoflaw.com
khofheiemer@hoflaw.com

Thomas Shuttleworth
Stephen C. Swain
Lawrence Woodward
Charles B. Lustig
Shuttleworth, Ruloff, Giordano & Swain
4525 South Blvd., Suite 300
Virginia Beach, Virginia 23452
(757) 671-6000
tshuttleworth@srgslaw.com
sswain@srgslaw.com
lwoodward@srgslaw.com
clustig@srgslaw.com