**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **CAROLE AND ROBERT TESTWUIDE, Et. Al.,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **No. 01-201 L** |
| | ) | **Honorable Victor J. Wolski** |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S MOTION TO DISMISS OR, ALTERNATIVELY, FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT THEREOF**

Dated: April 28, 2006

Respectfully submitted,

Steven D. Bryant
Kelle S. Acock
Environmental & Natural Resources Division
United States Department of Justice
601 D Street, NW, Rm. 3205
Washington, D.C. 20004
Counsel for Defendants
202-305-0424

Of Counsel:
Robert J. Smith
Mary Raivel
Navy Litigation Office
720 Kennon Street
Washington Navy Yard, D.C. 20374

CDR Dominick Yacono
JAGC, USN
Commander Navy region
Mid-Atlantic, Code (00LE)
1510 Gilbert Street
Norfolk, VA 23511-2737

## TABLE OF CONTENTS


MOTION . . . . . 1

MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS AND FOR SUMMARY JUDGMENT . . . . . 1

STATEMENT OF FACTS . . . . . 1

I. History of Naval Air Station Oceana . . . . . 1

II. NAS OCEANA Aircraft Operations . . . . . 3

A. Annual Operations . . . . . 3

B. NAS Oceana Runways . . . . . 4

C. Flight Procedures . . . . . 5

D. Aircraft Flown at NAS Oceana . . . . . 9

E. Aircraft Operations at Test Plaintiff Properties . . . . . 11

1. Group 1 (Capps, Hill, Hoag, and Dingle Properties) . . . . . 11

a. Capps/Hill Properties . . . . . 11

b. Hoag/Dingle Properties . . . . . 12

2. Group 2 (Leary, Riddick, Levenson, Lindsay, Van Nostrand, and Waterman Properties . . . . . 12

a. Learly/Riddick Properties . . . . . 13

b. Levenson Property . . . . . 13

c. Lindsay Property . . . . . 14

d. Van Nostrand Property . . . . . 15

e. Waterman Property . . . . . 16

3. Group 3 (May and Ryan Properties) . . . . . 16

a. May Property . . . . . 16

b. Ryan Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

I. Standards for Dismissal and Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . 18

II. Test Plaintiffs' Claims Are Barred By The Six Year Statute Of Limitations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

A. Legal Standards For An Overflight Taking . . . . . . . . . . . . . . . . . . . . . . . 22

B. Legal Standard For The Statute Of Limitations In An Overflight Takings Case Where There Is Prior Overflight Interference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

1. Same Flight Path And Same Elevation . . . . . . . . . . . . . . . . . . . . 27

2. Same or Greater Numbers of Flights . . . . . . . . . . . . . . . . . . . . . . 28

3. Same or Similar Aircraft in Terms of Noise Impacts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

4. Permanent Intent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

5. Significant Diminution in Property Value . . . . . . . . . . . . . . . . . 32

III. Test Plaintiffs Fail to State An Overflight Takings Claim Under <u>Causby v. United States</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

A. Test Plaintiff Properties From Group 2 and Group 3 Have Not Been Exposed To Low And Frequent Overflights . . . . . . . . . . . . . . 36

B. The Distinctive Circumstances Is Branning and Argent Are Not Present At NAS Oceana . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

# TABLE OF AUTHORITIES

## CASES

A.J. Hodges Indus., Inc. v. United States,
355 F.2d 592 (1966) . . . . . 22, 26

Aaron v. United States,
160 Ct.Cl. 295, 311 F.2d 798 (1963) . . . . . 18, 23, 25

Aaron v. United States,
340 F.2d 655 (Ct. Cl. 1964) . . . . . 23, 24, 33

Alder Terrace, Inc. v. United States,
161 F.3d 1372 (Fed. Cir. 1998) . . . . . 18

Allied General Nuclear Services v. United States,
839 F.2d 1572 (Fed. Cir.), cert. denied, 488 U.S. 819 (1988) . . . . . 20

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) . . . . . 19

Argent v. United States,
124 F.3d 1277 (Fed. Cir. 1997) . . . . . 38, 40

Ater v. United States,
6 Cl.Ct. 344 (1984), aff'd, 770 F.2d 182 (Fed. Cir. 1985) . . . . . 25

Avery v. United States,
330 F.2d 640 (Ct. Cl. 1964) . . . . . 26, 27, 28, 33

Avia Group Int'l, Inc. v. L.A. Gear California, Inc.,
853 F.2d 1557 (Fed. Cir. 1988) . . . . . 20

Bacon v. United States,
295 F.2d 936 (1961) . . . . . 27, 30

Boardman v. United States,
180 Ct. Cl. 264 (1967) . . . . . 27, 33

Bond v. United States,
47 Fed. Cl. 641 (2000) . . . . . 19

Branning v. United States,
228 Ct. Cl. 240, 654 F.2d 88 (1981) . . . . . . . . . . 9, 38

Brin v. United States,
159 Ct. Cl. 332 (1962) . . . . . . . . . . 25

Briscoe v. LaHue,
663 F.2d 713 (7th Cir 1981), aff'd, 460 U.S. 325 (1983) . . . . . . . . . . 19

Caguas Cent. Fed. Sav. Bank v. United States,
215 F.3d 1304 (Fed. Cir. 2000) . . . . . . . . . . 25

Celotex v. Catrett,
477 U.S. 317 (1986) . . . . . . . . . . 20

C.W. Over & Sons, Inc. v. United States,
44 Fed. Cl. 18 (1999) . . . . . . . . . . 20

Cavin v. United States,
956 F.2d 1131 (Fed. Cir. 1992) . . . . . . . . . . 18

Cedars-Sinai Med. Ctr. v. Watkins,
11 F.3d 1573 (Fed. Cir. 1993) . . . . . . . . . . 19

Cloutier v. United States,
19 Cl. Ct. 326 (1990), aff'd mem., 937 F.2d 622 (Fed. Cir. 1991) . . . . . . . . . . 20

Davis v. United States,
155 Ct. Cl. 418 (1961) . . . . . . . . . . 23, 24

Davis v. United States,
295 F.2d 931 (1961) . . . . . . . . . . 30

Ferreiro v. United States,
350 F.3d 1318 (Fed. Cir. 2003) . . . . . . . . . . 19

Figuera v. United States,
57 Fed. Cl. 488 (2003) . . . . . . . . . . 19

Griggs v. Allegheny County,
369 U.S. 84 (1962) . . . . . . . . . . 22

Heim v. United States,
50 Fed. Cl. 225 (2001) . . . . . . . . . . 25

Hero Lands Co. v. United States,
1 Ct. Cl. 102 (1983) . . . . . . . . . . 30

Hopland Band of Pomo Indians v. United States,
855 F.2d 1573 (Fed. Cir. 1988) . . . . . . . . . . 26

Japanese War Notes Claimants Ass'n v. United States,
178 Ct. Cl. 630, 373 F.2d 356 (1967) . . . . . . . . . . 26

Jones v. United States,
801 F.2d 1334 (Fed. Cir. 1986) . . . . . . . . . . 25

Klein v. United States,
152 Ct. Cl. 221 (1961) . . . . . . . . . . 27

Klein v. United States,
153 Ct. Cl. 221 (1961) . . . . . . . . . . 33

Lacey v. United States,
219 Ct.Cl. 551, 595 F.2d 614 (1979) . . . . . . . . . . 18, 22, 23, 25, 26, 31

McNutt v. General Motors Acceptance Corp.,
298 U.S. 178 (1936) . . . . . . . . . . 19

Menominee Tribe v. United States,
726 F.2d 718 (Fed. Cir. 1984) . . . . . . . . . . 26

Mid-States Fats & Oils Corp. v. United States,
159 Ct. Cl. 301 (1962) . . . . . . . . . . 23

Mingus Constructors, Inc. v. United States,
812 F.2d 1387 (Fed. Cir. 1987) . . . . . . . . . . 19, 21

Persyn v. United States,
34 Fed. Cl. 187 (1995) . . . . . . . . . . 22, 27, 28, 33

Pixton v. B & B Plastics, Inc.,
291 F.3d 1324 (Fed. Cir. 2002) . . . . . . . . . . 19

Powell v. United States,
1 Ct. Cl. 669 (1983) . . . . . . . . . . 25, 26, 30

Pure Gold, Inc. v. Syntex (U.S.A.), Inc.,
739 F.2d 624 (Fed. Cir. 1984) . . . . . . . . . . 21

Reynolds v. Army & Air Force Exchange Serv.,
846 F.2d 746 (Fed. Cir. 1988) . . . . . . . . . . 19

Robertson v. United States,
173 Ct. Cl. 621 (1965) . . . . . . . . . . 26

Sheuer v. Rhodes,
416 U.S. 232 (1974) . . . . . . . . . . 19

Speir v. United States,
485 F.2d 643 (1973) . . . . . . . . . . 26, 32

Stephens v. United States,
11 Cl. Ct. 352 (1986) . . . . . . . . . . 23

Tabb Lakes v. United States,
26 Cl. Ct. 1334 (1992), aff'd, 10 F.3d 796 (Fed. Cir. 1993) . . . . . . . . . . 21

Town & Country Motor Hotel v. United States,
180 Ct. Cl. 563 (1967) . . . . . . . . . . 26

Truckee-Carson Irrigation Dist. v. United States,
14 Cl. Ct. 361 (1988) . . . . . . . . . . 19

Tucker Act.@ Caguas Cent. Fed. Sav. Bank v. United States,
215 F.3d 1304 (Fed. Cir. 2000) . . . . . . . . . . 25

United States v. Causby,
328 U.S. 256 (1946) . . . . . . . . . . 17, 23, 39

United States v. Diebold, Inc.,
369 U.S. 654 (1961) (per curiam) . . . . . . . . . . 20

**STATUTES**

28 U.S.C. § 2501 . . . . . . . . . . 17, 40
28 U.S.C. § 1491 (1988) . . . . . . . . . . 34

**RULES**

RCFC 12(b)(1) . . . . . . . . . . 18
RCFC 12(b)(6) . . . . . . . . . . 18
RCFC 56 . . . . . . . . . . 18

**REGULATIONS**

14 C.F.R. § 91.1119 (1996) . . . . . . . . . . 23

# LIST OF EXHIBITS

| Exhibit No. | Exhibit Description |
|---|---|
| Exhibit A | Declaration of Captain Thomas F. Keeley |
| Exhibit B | Declaration of Commander Stephen G. Riley III |
| Exhibit C | Plaintiffs' Answers to Interrogatory No. 2 |
| Exhibit D | Declaration of Commander Richard S. Erie |
| Exhibit E | Revised Report of Dr. Sanford Fidell, 29 March 2006 |
| Exhibit F | Map of Test Plaintiff Properties, Virginia Beach, Virginia |
| Exhibit G | Declaration of Commander Dirk Hebert |
| Exhibit H | Letter dated April 27, 2006, from Plaintiffs' counsel Jack Ferrebee to Defendant's counsel Steven Bryant |
| Exhibit I | Letter dated March 30, 2006, from Plaintiffs' counsel Jack Ferrebee to Defendant's counsel Steven Bryant |
| Exhibit J | Final Environmental Impact Statement (FEIS) for the Introduction of F/A-18 E/F (Super Hornet) Aircraft to the East Coast of the United States, Department of the Navy, July 2003, page15-3 |
| Exhibit K | Excerpts from the Deposition Transcript of Dr. Jon Nelson |
| Exhibit L | Excerpts from the Deposition Transcript of Eileen May |
| Exhibit M | Table 3.1.1-1 Annual Basic Operations at NAS Oceana for Baseline |

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **CAROLE AND ROBERT TESTWUIDE, Et. Al.,**<br>**Plaintiffs,**<br>v.<br>**THE UNITED STATES,**<br>**Defendant.** | **No. 01-201 L**<br>**Honorable Victor J. Wolski** |

**DEFENDANT'S MOTION TO DISMISS OR, ALTERNATIVELY, FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT THEREOF**

**MOTION**

Defendant, United States, hereby moves pursuant to RCFC 12(b)(1) to dismiss, or alternatively, pursuant to RCFC 56 for summary judgment, concerning the claims of the 12 test plaintiffs as there are no genuine issues of material fact, and this Court lacks jurisdiction over the test plaintiffs' claims because the claims are time-barred under the mandatory six-year statute of limitations of 28 U.S.C. §2501. Defendant also moves under RCFC 12(b)(6) to dismiss the claims of certain plaintiffs who lack standing because they did not own their property at the time of the alleged taking. A memorandum in support of this motion follows.

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS OR FOR SUMMARY JUDGMENT**

**STATEMENT OF FACTS**

**I. <u>History of Naval Air Station Oceana</u>**

Naval Air Station ("NAS") Oceana is located in Virginia's southeastern coastal region within the City of Virginia Beach, Virginia. Declaration of Captain Thomas F. Keeley ("Keeley

Decl."), Exhibit A, ¶ 6. Virginia Beach is part of the Hampton Roads region, which includes six counties and seven cities in addition to Virginia Beach, Chesapeake, and Norfolk. Keeley Decl., ¶ 6. Located south of the Chesapeake Bay and west of the Atlantic Ocean, NAS Oceana is approximately 100 miles southeast of Richmond, Virginia, and 200 miles northeast of Raleigh, North Carolina. Keeley Decl., ¶ 6. For over sixty-five years, NAS Oceana has been vital to U.S. Naval aviation and of strategic importance to national defense. Keeley Decl., ¶ 6.

NAS Oceana was commissioned on August 17, 1943, and designated a Master Jet Base in 1957.[1] Keeley Decl., ¶ 7. The United States Navy's ("Navy") finest tactical jet aircraft have been flown by squadrons assigned to NAS Oceana, including the A-4 Skyhawk, the F-4 Phantom, the A-6 Intruder, the F-14 Tomcat, and the F/A-18 Hornet. Keeley Decl., ¶ 7. The facility currently serves as home base for 16 F/A-18 squadrons, including 10 squadrons of F/A-18 C/D Hornet aircraft[2] that were realigned to NAS Oceana from NAS Cecil Field in Florida as a result of the Navy's implementation of the 1995 round of base closures that were conducted pursuant to the Defense Base Closure and Realignment Act of 1990, as amended (10 U.S.C. § 2687 note) ("BRAC Law"). Keeley Decl., ¶ 8. The mission of all NAS Oceana squadrons is to be prepared to conduct timely, sustained combat operations from the sea, in support of our Nation's interests, whenever called upon to do so. Keeley Decl., ¶ 8.

NAS Oceana is located on nearly 5,400 acres and employs over 12,000 Navy employees. Keeley Decl., ¶ 10. The base spends approximately $400 to $500 million per year in goods and services and has a gross annual payroll of over $773 million, with a total economic impact on the

---

[1] A Master Jet Base is a location with permanent basing of carrier air groups, including in some cases the provision of auxiliary landing fields to conduct Field Carrier Landing Practice ("FCLP") exercises. Keeley Decl., ¶¶ 7, 9.

[2] The C/D designation represents a particular version of F/A-18 aircraft. Keeley Decl., Footnote 1.

Hampton Roads region exceeding $1 billion annually. Keeley Decl., ¶ 10. NAS Oceana is the largest employer in Virginia Beach. Keeley Decl., ¶ 10.

To train for operating from an aircraft carrier at sea, squadrons stationed at NAS Oceana typically use nearby Naval Auxiliary Landing Field ("NALF") Fentress for Field Carrier Landing Practice ("FCLP") operations.[3] Keeley Decl., ¶ 9. FCLPS are touch-and-go operations performed on a runway designed to simulate landing on an aircraft carrier. Keeley Decl., ¶ 9. NALF Fentress was established in 1940 and is located approximately seven miles southwest of NAS Oceana in Chesapeake, Virginia. NALF Fentress is under the command of NAS Oceana. Keeley Decl., ¶ 9.

## II. NAS OCEANA Aircraft Operations

### A. Annual Operations

Flight operations at NAS Oceana, as with any naval air station, are reported annually in the air station's Air Traffic Activity Reports ("ATARs"). Declaration of Commander Stephen G. Riley III ("Riley Decl."), Exhibit B, ¶¶ 6, 7. Until 1996, NAS Oceana ATARs were single-page forms that reflected the number of aircraft operations that occurred at the NAS Oceana airfield on an annual basis.[4] Riley Decl., ¶¶ 7, 15. Beginning in 1996, ATARs, including those for NAS Oceana, were separated into two forms. Riley Decl., ¶ 20. One ATAR form, "Control Tower Operations," reported the number of aircraft operations in the air space controlled by NAS Oceana's air traffic control tower. Riley Decl., ¶ 20. The second ATAR form, "Approach

---

[3] Many of the plaintiffs in this consolidated action assert takings claims based on overflight activity emanating from NALF Fentress; however, none of the test plaintiffs assert such claims, and the resolution of claims arising from NALF Fentress have been deferred to a later date. See generally Court Order, dated December 20, 2004.

[4] Operations at NALF Fentress were documented in the "Remarks" section of ATARs prepared before 1996. See also Riley Decl., Footnote 2 (some earlier ATARs cover periods of less than one year, in which case one must add the data from the two or more ATARs that, together, cover that year).

Control Operations," recorded the number of aircraft operations counted by radar room personnel. Riley Decl., ¶ 21. The NAS Oceana air traffic control tower air space includes a limited geographic area surrounding the air station. Riley Decl., ¶ 9. It extends to distances of 4.3 to 5 nautical miles away from the air station, depending upon direction, and up to an altitude of 2,500 feet. Riley Decl., ¶ 9. Conversely, the air space controlled by radar is far greater, extending in some cases many miles, and up to an altitude of 23,000 feet, but does not include the control tower's air space. Riley Decl., ¶ 10.

Plaintiffs allege a July 1999 date of taking, asserting that a dramatic increase in overflight activity – as compared to historic overflight activity – occurred at that time. Testwuide Compl. ¶¶ 14-15, 17-20; Plaintiffs' Answers to Interrogatory No. 2, Exhibit C. Compared to many prior years, however, 1999 was a year of relatively light flight activity – less than 133,000 operations as indicated by the 1999 ATAR forms. Riley Decl., ¶ 22, Table 1. By comparison, in 1981 the reported number of operations was 231,753. Riley Decl., Table 1.[5] And in 1982, there were close to 178,000 operations. See Riley Decl., Table 1. The high operations continued between 1989 and 1995 as well with annual operations consistently approaching or exceeding 200,000 operations, including a high of over 229,000 operations in 1992. See Riley Decl., Table 1.

### B. NAS Oceana Runways

NAS Oceana has four runways that operate in both directions. Declaration of Commander Richard S. Erie ("Erie Decl."), Exhibit D, ¶ 6. The dual intersecting runways are

[5] As CDR Stephen Riley indicates in his declaration, the older ATARs are not precisely an "apples-to-apples" comparison with the newer (1996 and thereafter) ATARs in terms of the number of operations that occurred in the control tower's airspace. Riley Decl., ¶¶ 15-22. Nevertheless, the bottom line number on the older forms is a "reasonably close approximation" of the operations in the control tower's airspace that year. Riley Decl., ¶ 18.

designated Runways 5/23 Left and Right and Runways 14/32 Left and Right as follows[6]:




The designation of the runway depends on which way the runway is to be approached. The primary factor dictating runway use is wind direction. Erie Decl., ¶ 9. As reflected in studies at NAS Oceana, the relative frequency of the use of each runway has remained generally the same, consistent with the following approximate percentages[7]:

Runway 5L/R – 50%
Runway 23L/R – 34%
Runway 32L/R – 14%
Runway 14L/R – 2%

### C. Flight Procedures

NAS Oceana provides for the safe operation of its aircraft with "course rules" that provide guidance for the basic departure, arrival and landing procedures pilots follow. Erie Decl., ¶ 10. The course rules incorporate guidance on altitude and flight tracks to provide sufficient separation of aircraft out of and back into the air station. Erie Decl., ¶¶ 11, 12. As is

[6] See Erie Decl., ¶ 8.
[7] See Erie Decl., ¶ 25.

the case with any Navy or Marine Corps air station to which carrier-based aircraft are assigned, the shore-based landing procedures and patterns at NAS Oceana are designed to mirror the procedures and pattern used when landing on an aircraft carrier at sea. Erie Decl., ¶ 13.

Landing an aircraft on a moving (sometimes pitching and rolling) ship in daylight hours is an extremely difficult endeavor; at night it becomes arguably the most challenging maneuver in aviation. Erie Decl., ¶ 14. The patterns flown day and night around the aircraft carrier are designed to maneuver each aircraft into a position behind the ship where the pilot can land the aircraft through use of the Fresnel Lens Optical Landing System ("FLOLS"). Erie Decl., ¶ 14. The FLOLS is a series of lights that allow the pilot to observe his position so that he may make the appropriate adjustments to land safely. Erie Decl., ¶ 14. While the basic "stick and rudder" skills required are acquired early in a flying career, the fine motor skills to do it safely and successfully every time are perishable, necessitating continuous refresher training. Erie Decl., ¶ 14. Consequently, every runway in use at a Navy field has a FLOLS at the approach end so that pilots may always practice "flying the ball," and pilots practice shipboard landing every time they land an aircraft. Erie Decl., ¶ 14.

The VFR ("Visual Flight Rules") landing pattern is a left-hand racetrack or oval pattern oriented along a runway heading with one end of that oval being a descent to landing. Erie Decl., ¶ 15. When landing at sea, the altitude of the landing pattern is 600 feet. Erie Decl., ¶ 15. As a noise mitigation measure, the pattern at NAS Oceana was elevated to 1,000 feet many years ago. Erie Decl., ¶ 15. In general, pilots strive to recreate the "approach turn" to landing in the same manner every time, from a location 1.1 to 1.5 nautical miles abeam (directly to the side) of the intended point of landing, at 1,000 feet above ground. Erie Decl., ¶ 15. Each position

along the racetrack pattern has specific aircraft parameters that the pilot is looking to maintain. Erie Decl., ¶ 15. The diagram below is illustrative of the VFR landing pattern[8]:




Aircraft enter the pattern by performing "the break," which means they fly upwind in the direction of the runway heading and then execute the "crosswind turn" to head downwind.[9] Erie Decl., ¶ 17. At NAS Oceana, "the break" is performed at an altitude of 1,500 feet. Erie Decl., ¶ 17. Once on the downwind heading, aircraft descend to a pattern altitude of 1,000 feet and decelerate as they move towards "the 180" (the point at which the aircraft begins its turn to

---

[8] See Erie Decl., ¶ 16.

[9] The location of the "crosswind turn" will vary depending, in part, upon the number of aircraft in the pattern. Erie Decl., ¶ 18. In general, the more aircraft in the pattern, the more the oval will extend. Erie Decl., ¶ 18.

land). Erie Decl., ¶ 17. "The 90" is the point halfway through the approach turn.[10] Erie Decl., ¶ 17.

Because of the requirement for continuous training in carrier landing, "touch-and-go" operations are performed regularly at NAS Oceana. Keeley Decl., ¶ 15. As the name implies, a touch-and-go involves a practice takeoff and landing. Keeley Decl., ¶ 15. Aircraft will typically perform one to three touch-and-go operations upon arrival at the station. Keely Decl., ¶¶ 16, 19.

As noted, supra, FCLP exercises, formerly known as Field Mirror Landing Practice, typically are not performed at NAS Oceana. FCLPs do, however, share some similarities with touch-and-go operations.[11] Keeley Decl., ¶ 18. The basic geometry of the touch-and-go and FCLP patterns is the same. Keeley Decl., ¶ 17. At NAS Oceana the pattern altitude for both touch-and-gos and FCLPs is 1,000 feet. Keeley Decl., ¶ 18. However, there is a critical difference between touch-and-gos and FCLPs, namely the intensity and duration of FCLP's versus touch-and-go landings. Keeley Decl., ¶ 18. An FCLP pattern can have as many as five aircraft in it at one time. FCLPs are prescheduled, graded training periods, that normally last approximately 45 minutes, during which each aircraft will conduct from seven to ten touch-and-gos. Keeley Decl., ¶ 19. In contrast, an individual aircraft would typically perform approximately one to three touch-and-gos, and, while it is not uncommon to have more than one

[10] The "approach turn" will also vary, but to a lesser degree than the "crosswind turn." Erie Decl., ¶ 19. For example, the position of "the 180" will vary based on winds in the upwind direction. Erie Decl., ¶¶ 19-20. When winds in the upwind direction are light, the aircraft will have to fly a longer downwind leg before it begins its approach turn, to allow enough room for the aircraft to still have the required 15-18 seconds for the final approach heading. Erie Decl., ¶ 19. When this occurs the "approach turn" end of the oval will lengthen. Erie Decl., ¶ 19. Conversely, with higher winds in the upwind direction, the "approach turn" will occur closer to the ideal abeam position, because when the plane turns to head upwind it will require less space in which to line up for final approach. Erie Decl., ¶ 19.

[11] See generally Branning v. United States, 654 F.2d 88 at 91 (Cl. Ct. 1981).

aircraft in the pattern performing touch-and-gos at the same time, it is generally one to three aircraft. Keeley Decl., ¶ 19. FCLP operations are primarily conducted at Naval Auxiliary Landing Field ("NALF") Fentress rather than NAS Oceana. Keeley Decl., ¶ 9.

The departure, arrival, and landing patterns at NAS Oceana have remained generally the same over the years. Keeley Decl., ¶ 12. The altitudes at which these patterns were flown in the last three decades have changed somewhat, in that some pattern elevations have been raised, but these changes only served to reduce noise impacts on the ground and did not affect the nominal flight tracks or altitude that the aircraft flew when in the landing patterns. Keeley Decl., ¶ 13. Notwithstanding the relative consistency of the predominant flight tracks, no two flights, even of the same aircraft flown by the same pilot, are identical; nor does each flight proceed at precisely the same altitude throughout the flight or cover precisely the same track over the ground. Keeley Decl., ¶ 20. None of the changes in flight operations since at least 1979 would have affected any of the flight operations with respect to the test plaintiffs' properties. Keeley Decl., ¶ 13.

**D. Aircraft Flown at NAS Oceana**

The predominant aircraft that have operated at NAS Oceana have included the F-4 Phantom, the A-6 Intruder, the F-14 Tomcat, and the F/A-18 Hornet. Keeley Decl., ¶ 7. The F-4 Phantom operated in the 1960s, 1970s, and early 1980s. Keeley Decl., ¶ 7. The A-6 Intruder operated from the 1970s through the mid-1990s. Keeley Decl., ¶ 7. The F-14 Tomcat has operated at NAS Oceana from the mid-1970s until the present. Keeley Decl., ¶ 7. Although one squadron of F/A-18 A aircraft was present at NAS Oceana since the mid-1990's, the first F/A-18 C/D Hornet squadrons arrived at NAS Oceana in December, 1998. Keeley Decl., ¶ 7.

These various fighter jets produce different noise levels for a variety of reasons, such as size, weight, design, and engine type. Revised Report of Sanford Fidell, 29 March 2006, ("Fidell Report"), Exhibit E, p. 15.[12] A relative comparison of the perceived[13] single event noise level produced by these aircraft can be found in NOISEMAP, the computer program relied upon by the Department of Defense to estimate noise exposure surrounding military air stations. Fidell Report, p. 3. NOISEMAP contains the most consistent and comprehensive database of field measurements of noise produced by military aircraft in various modes, including departure, approach, and pattern operations.[14] Fidell Report, p. 15. The following table provides the maximum tone-corrected PNLs for the various aircraft, which reflects the greatest single value measured in decibels ("dB") at any instant during a flyover[15]:

| AIRCRAFT | DEPARTURE | APPROACH | PATTERN |
|---|---|---|---|
| A6-A | 120.7 | 116.1 | No data |
| F-4C | 123.2 | 112.6 | 114.5 |
| F-14A | 118.2 | 102.4 | 103.2 |
| F-14B | 120.9 | 99.2 | 101.9 |
| F/A-18 C/D | 121.9 | 116.5 | 102.2 |

Aircraft single event noise levels are also measured in terms of the sound exposure level (SEL), which reflects the total energy produced in a single flyover, normalized to a hypothetical one-second duration.[16] Fidell Report, p. 14, 23. The following table lists the tone-corrected[17],

[12] For ease of reference, defendant included in Exhibit E the Table of Contents and pages of the Fidell report defendant cited in its brief. Should the Court desire, defendant will supplement Exhibit E and submit the entire Fidell Report. Plaintiffs have been provided the entire report.

[13] The most widely accepted frequency-weighting procedure for annoyance comparisons is the Perceived Noise Level ("PNL"), which accords more weight to the more annoying high frequency sound bands. Fidell Report, p. 14.

[14] The database does not have measurements for all the variant aircraft in all operations. Fidell Report, p. 15. It is common to substitute one aircraft's noise measurements for another, particularly when the aircraft share the same engines and are similar in weight. Fidell Report, p. 15.

[15] This table was extracted from the Fidell Report, p. 15.

[16] The sound pressure level at the measurement point on the ground initially rises to a maximum as an aircraft approaches, then declines as the airplane flies away. Fidell Report, p. 23. Since the sound pressure levels vary

A-weighted SELs for the predominant aircraft at NAS Oceana from the 1970s to 2000[18]:

| AIRCRAFT | DEPARTURE | APPROACH | PATTERN |
|---|---|---|---|
| A-6A | 113.7 | 110.7 | No data |
| F-4C | 116.7 | 106.8 | 108.5 |
| F-14A | 107.9 | 96.2 | 90.6 |
| F-14B | 109.8 | 94.5 | 89.7 |
| F/A-18 C/D | 118.2 | 110.9 | 94.5 |

## E. Aircraft Operations at Test Plaintiff Properties

The following discussion separates the test plaintiffs' properties into three groups based on the flight operations to which the test plaintiffs historically have been exposed going back to at least the late 1970s. The properties are grouped in descending order from those experiencing the most frequent and lowest altitude flight operations activity in Group 1 to those exposed to the least flight activity in Group 3.

### 1. Group 1 (Capps, Hill, Hoag, and Dingle Properties)

For decades Group 1 properties have experienced frequent overflights at low altitudes.

#### a. Capps/Hill Properties

When the VFR pattern was flown from Runway 5L/R, the Capps and Hill properties experienced frequent overflights. Erie Decl., ¶¶ 29, 57. On the downwind leg, aircraft in this pattern would have regularly flown over or within approximately one-half mile of the Capps property at an altitude of approximately 1,000 feet. Erie Decl., ¶ 29. The Hill property is located on the approach turn for Runway 5L/R. Erie Decl., ¶¶ 56, 57; see also Exhibit F. It is

throughout the overflight, and since the durations of different overflights also vary, no single number can usefully characterize the moment-to-moment changes in sound levels. Fidell Report, p. 23. The usual method for representing the sound energy produced during the entire overflight is therefore to "normalize" the measurement to a standard time period (one second). Fidell Report, p. 23.

[17] Tone-corrections further assist in accounting for the contribution of prominent tones to the annoyance of aircraft noise. Fidell Report, p. 14.

just past the "180 position" and therefore would have been routinely overflown by aircraft in the landing pattern. Erie Decl., ¶¶ 56, 57. These aircraft would have passed directly over or within approximately one-half mile of this property at an altitude of approximately 700-800 feet as they descended into the "approach turn." Erie Decl., ¶ 57; see generally Declaration of Commander Dirk Hebert ("Hebert Decl."), Exhibit G.

In addition to overflights in the downwind pattern from Runway 5L/R, the Capps property is also underneath the VFR landing pattern for Runway 14L/R. Erie Decl., ¶ 31; see also Exhibit F. It is near "the 90" (halfway through the approach turn), so during the roughly two percent of the time when Runway 14L/R was in use aircraft would have flown over or within approximately one-half mile of the Capps property at an altitude of approximately 450-500 feet. Erie Decl., ¶ 31; see generally Hebert Decl..

**b. Hoag/Dingle Properties**

The Hoag and Dingle properties have also been exposed to low and frequent aircraft operations, though to a somewhat lesser degree than the Capps and Hill properties. When Runway 23L/R was in use, approximately 34 percent of the time, aircraft would have routinely flown over or nearly over the Hoag and Dingle properties during the approach to landing. Erie Decl., ¶¶ 25, 34, 37-38; see also Exhibit F. The aircraft would have been at an altitude of approximately 500-800 feet. Erie Decl., ¶¶ 34, 38; see generally Hebert Decl.

**2. Group 2 (Leary, Riddick, Levenson, Lindsay, Van Nostrand, and Waterman Properties)**

Group 2 properties have historically been exposed to flight activity, but not at both the low altitude and regularity of Group 1.

---

[18] This table was extracted from the Fidell Report, p. 16.

**a. Leary/Riddick Properties**

The Leary and Riddick properties are both south of Runway 5L/R and would regularly have experienced noise from aircraft landing on that runway either in the visual landing pattern or on straight in approaches; however, it would have been unusual for these properties to be overflown when a visual landing pattern was being used. Erie Decl., ¶61; see also Exhibit F. Aircraft in the visual landing pattern for Runway 5L/R would have been no closer than one-half mile of these properties at an altitude of 400 to 800 feet. Erie Decl., ¶61. Aircraft on a straight in approach to Runway 5L/R would have flown within approximately one-half to one mile of these properties, at an altitude of approximately 500 to 1,000 feet, but would not normally have directly overflown the properties. Erie Decl., ¶61. When Runway 23L/R was in use both properties would have routinely been overflown on departures, but at an altitude of approximately 1,500 to 2,000 feet. Erie Decl., ¶62. Also, aircraft departing from Runway 23L/R on their way to NALF Fentress to conduct FCLPs would have flown within approximately one-half mile of these properties at an altitude of approximately 1,000 feet. Erie Decl., ¶62; see generally Hebert Decl.

**b. Levenson Property**

When Runway 5L/R was in use, aircraft in the downwind leg would routinely have flown within approximately one-half to one mile of the Levenson property at an altitude of approximately 1,000 feet. Erie Decl., ¶ 42; see also Exhibit F. Only if aircraft were extremely wide abeam, however, would they have directly overflown the Levenson property, which would have been unusual. Erie Decl., ¶ 42. The Levenson property would also have experienced noise from aircraft in "the break" for Runway 5L/R, but at an altitude of approximately 1,500 feet.

Erie Decl., ¶ 42. During the roughly two percent of the time that Runway 14L/R was being used, aircraft flying the VFR landing pattern would fly over or within one-half mile of the Levenson property during the approach turn at an altitude of approximately 450 to 550 feet. Erie Decl., ¶ 43. This property would also have experienced noise from aircraft departing on Runway 32L/R, which was in use roughly 14% of the time. Erie Decl., ¶¶ 25, 44. These aircraft would climb from 1,000 to 4,000 feet and their ground track would vary greatly, so it is possible that the Levenson property may have been overflown during these operations on occasion by aircraft turning right after departure, but this would not have been a regular event. Erie Decl., ¶ 44.

**c. Lindsay Property**

When Runway 5L/R was in use, aircraft in the downwind leg would routinely have flown within approximately three-quarters to one mile of the Lindsay property at an altitude of approximately 1,000 feet. Erie Decl., ¶ 46; see also Exhibit F. Only if aircraft were extremely wide abeam (even wider abeam than in the case of the Levenson property) would they have directly overflown the Lindsay property, and it would have been even more unusual for an aircraft to be this wide abeam than it would have been with the Levenson property. Erie Decl., ¶ 46. Additionally, aircraft entering the pattern via the break maneuver would fly a similar ground track as above, but at 1,500 feet and at a significantly lower power setting. Erie Decl., ¶ 46. This property would also have experienced noise from aircraft departing from Runway 32L/R, as the aircraft climbed from 1,000 feet to 4,000 feet. Erie Decl., ¶ 47. The ground track of these aircraft would have varied, so it is possible that on occasion the Lindsay property may have been overflown during these operations (in the case of the Lindsay property by aircraft turning left after departure), but, based on the location of the property, any direct overflights would have

been rare. Erie Decl., ¶ 47. During those very infrequent occasions when Runway 14L/R was in use and the airfield was also in Instrument Flight Rules ("IFR") conditions, the Lindsay property would have experienced noise from aircraft on straight-in IFR radar-controlled approaches to Runway 14L/R as they passed by at an altitude of approximately 1,000 feet, but the property would not typically have been overflown during those operations. Erie Decl., ¶ 48. The Lindsay property would have also experienced noise from aircraft entering the visual landing pattern for Runway 14L/R via "the break" on an infrequent basis. Erie Decl., ¶ 48. The aircraft conducting this maneuver would fly over or nearly over (within one-half to one mile) the Lindsay property at an altitude of 1,500 feet. Erie Decl., ¶ 48; see generally Hebert Decl.

**d. Van Nostrand Property**

When Runway 5 L/R was in use, aircraft in the downwind leg would routinely have flown within approximately three-quarters to one mile of the Van Nostrand property at an altitude of approximately 1,000 feet. Erie Decl., ¶ 50; see also Exhibit F. Only if aircraft significantly deviated from the VFR pattern would they have overflown this property. Erie Decl., ¶ 50. This property would also have experienced noise from aircraft in "the break" for Runway 5L/R at an altitude of approximately 1,500 feet, but would have been directly overflown only if the aircraft was extremely wide abeam, which would have been unusual. Erie Decl., ¶ 50. The Van Nostrand property would also have experienced noise from aircraft departing NAS Oceana on Runway 32 L/R that turned left (toward the south) and were flying at approximately 2,000 feet while climbing to assigned altitude, but this property would not have been routinely overflown during these departures. Erie Decl., ¶ 51. This property would also have experienced noise from aircraft entering the visual landing pattern for Runway 14L/R via "the break" on a

very infrequent basis. Erie Decl., ¶ 52. Aircraft in this pattern may very infrequently overfly the Van Nostrand property at approximately 1,500 feet. Erie Decl., ¶ 52.

**e. Waterman Property**

Aircraft may have flown over or within a mile of the Waterman property when using the IFR/radar training pattern for Runways 5L/R and 23L/R, but would have done so at an altitude of 2,000 feet. Erie Decl., ¶ 64; see also Exhibit F. Aircraft departing Runway 5L/R on the way to NALF Fentress would have flown over or within one to two miles of the Waterman property at an altitude of approximately 1,500 feet. Erie Decl., ¶ 65. Aircraft departing Runway 23L/R for areas to the east may have overflown directly over or within one to two miles of this property at an altitude of approximately 1,500 to 2,000 feet as they climbed to 4,000 feet. Erie Decl., ¶ 65.

**3. Group 3 (May and Ryan Properties)**

Group 3 properties have been exposed to the least flight activity of the test plaintiffs with no history of routine overflights at low altitudes.

**a. May Property**

The May property is located approximately four miles away from the NAS Oceana runways, barely inside the NAS Oceana tower-controlled airspace. Erie Decl., ¶ 53; see also Exhibit F. The May property may have experienced minimal aircraft noise when Runway 14L/R was in use, roughly two percent of the time, but these aircraft would usually have passed well south of the property on the way to the airfield. Erie Decl., ¶¶ 25, 54. On the very infrequent occasions when Runway 14L/R was in use and NAS Oceana was in IFR conditions, aircraft on IFR/Radar approaches to NAS Oceana would have flown within three-quarters to one mile of the

property, but not over it, at an altitude of approximately 1,500 to 2,000 feet. Erie Decl., ¶ 55. It is also possible that aircraft flying between NAS Norfolk and NAS Oceana would have flown within one to two miles of the May property at approximately 2,000 feet, but this would have been extremely infrequent, perhaps once per month. Erie Decl., ¶ 55; see generally Hebert Decl.

**b. Ryan Property**

Aircraft may have flown directly over or within a mile of the Ryan property when the IFR/radar training pattern for Runways 5L/R and 23L/R, but at an altitude of 2,000 feet. Erie Decl., ¶ 68; see also Exhibit F. This property would also have experienced noise from aircraft on their way to NALF Fentress to conduct FCLPs after departing NAS Oceana Runway 5L/R and turning right toward the ocean; however, the aircraft would have been at an altitude of 1,500 feet and would not have routinely overflown the Ryan property. Erie Decl., ¶ 69; but see Hebert Decl., ¶ 2.

**SUMMARY OF ARGUMENT**

The evidence demonstrates that the Group 1 test plaintiff properties have long been exposed to low and frequent aircraft operations that substantially interfered with the use and enjoyment of these properties. If a taking of an avigation easement occurred, it occurred at these properties at least as early as 1981 when aircraft operations far exceeded the operations in July 1999, plaintiffs' alleged date of taking; therefore, the Group 1 test plaintiffs' claims are barred by the mandatory six-year statute of limitations, 28 U.S.C. § 2501.

Although the Group 2 properties have also been exposed to flight activity for decades, they have never been overflown with the requisite frequency and altitude to establish an overflight taking. United States v. Causby, 328 U.S. 256 (1946). Alternatively, even if the level

of flight activity to which the Group 2 properties were exposed to in July 1999 could suffice for a taking of an avigation easement, that level of flight activity has existed at least since 1981, and thus these claims, like the Group 1 claims, would be barred by the mandatory six-year statute of limitations. Stated differently, an avigation easement would have been acquired at least as early as 1981 as a result of the prior overflight activity, approximately twenty years before plaintiffs filed their complaints in this Court. As such, their claims must be dismissed as time-barred.

Finally, the Group 3 properties historically have been exposed to even less flight activity than the other test plaintiff properties. On the occasions that these properties may have been overflown, the flights were at altitudes exceeding 1,000 feet; therefore, the flights were neither low nor frequent, and cannot form the basis of a successful takings claim. Alternatively, even assuming these infrequent and high altitude flights could establish a taking of an avigation easement, then as with Groups 1 and 2, the overflight takings would have occurred by 1981, and their claims would be also be time-barred. For these reasons, the claims of the 12 test plaintiffs are appropriate for dismissal pursuant to RCFC 12(b)(1) and RCFC 56.[19]

**ARGUMENT**

**I. <u>Standards for Dismissal and Summary Judgment</u>**

Plaintiffs bear the burden of establishing subject matter jurisdiction by a preponderance

---

[19] This motion primarily addresses the claims of the 12 test plaintiffs. Defendant respectfully reserves the right to file additional dispositive motions concerning the remaining plaintiffs in this consolidated action. It appears that some non-test plaintiff properties were purchased after July 1999, the alleged date of taking. As such, those non-test plaintiffs asserting an ownership interest over these properties fail to state a claim upon which relief can be granted because they cannot establish that they owned a compensable property interest on the alleged date of taking. These claims must be dismissed pursuant to RCFC 12(b)(6). "Without undisputed ownership of the ... property at the time of the taking[], the [plaintiffs] cannot maintain a suit alleging that the Government took their property without just compensation." <u>Cavin v. United States</u>, 956 F.2d 1131, 1134 (Fed. Cir. 1992); <u>see also</u> <u>Lacey v. United States</u>, 595 F.2d 614 (Ct. Cl. 1979); <u>Aaron v. United States</u>, 340 F.2d 655, 663 (Ct. Cl. 1964) (ownership as of the date of alleged taking is necessary to maintain action for an avigation easement).

of the evidence. Alder Terrace, Inc. v. United States, 161 F.3d 1372, 1377 (Fed. Cir. 1998) (citing McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 189 (1936)). "[C]onclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss." Bond v. United States, 47 Fed. Cl. 641, 647 (2000) (quoting Briscoe v. LaHue, 663 F.2d 713, 723 (7th Cir. 1981), aff'd, 460 U.S. 325 (1983)). In ruling on a motion to dismiss for lack of subject matter jurisdiction, a court must accept as true the complaints' undisputed factual allegations and construe the facts in the light most favorable to the plaintiffs. Figuera v. United States, 57 Fed. Cl. 488, 492 (2003) (citing Sheuer v. Rhodes, 416 U.S. 232, 236 (1974)); Pixton v. B & B Plastics, Inc., 291 F.3d 1324, 1326 (Fed. Cir. 2002). However, if a motion to dismiss challenges the truth of jurisdictional facts alleged in the complaints, the allegations in the complaints are not controlling, and the court may consider relevant evidence in order to resolve the factual dispute. Ferreiro v. United States, 350 F.3d 1318, 1324 (Fed. Cir. 2003) ("A trial court may weigh relevant evidence when it considers a motion to dismiss that challenges the truth of jurisdictional facts alleged in a complaint."); Cedars-Sinai Med. Ctr. v. Watkins, 11 F.3d 1573, 1584 (Fed. Cir. 1993); Reynolds v. Army & Air Force Exchange Serv., 846 F.2d 746, 747 (Fed. Cir. 1988). Where, as here, the Court lacks jurisdiction over subject matter of the complaint, the correct remedy is dismissal of the action. "[U]nder [Court of Federal Claims] Rule 12(h)(3), this court is mandated to. . . dismiss the action '[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter. . . ." Truckee-Carson Irrigation Dist. v. United States, 14 Cl. Ct. 361, 368 (1988) (alteration in original).

Summary judgment is proper where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. See Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 248 (1986); Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed. Cir. 1987). Although the facts "must be viewed in the light most favorable to the party opposing the motion," United States v. Diebold, Inc., 369 U.S. 654, 655 (1961) (per curiam), "a mere 'metaphysical doubt' will not prevent the granting of a summary judgment motion." Cloutier v. United States, 19 Cl. Ct. 326, 328 (1990), aff'd mem., 937 F.2d 622 (Fed. Cir. 1991). The evidence presented "must be more than merely colorable." C.W. Over & Sons, Inc. v. United States, 44 Fed. Cl. 18, 22 (1999) (citing Celotex v. Catrett, 477 U.S. 317, 323 (1986)); Avia Group Int'l, Inc. v. L.A. Gear California, Inc., 853 F.2d 1557, 1560 (Fed. Cir. 1988) ("If the evidence [of the non-movant] is merely colorable, or is not significantly probative, summary judgment may be granted.").

The summary judgment procedure "must be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and in which that party will bear the burden of proof at trial. A complete failure of proof concerning an essential element of the non-movant's case entitles the movant to judgment as a matter of law." Cloutier, 19 Cl. Ct. at 328 (citing Celotex, 477 U.S. at 323-24). In this regard, summary judgment "'is properly regarded not as a disfavored procedural shortcut but, rather, as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action. . . .'" Tabb Lakes v. United States, 26 Cl. Ct. 1334, 1344 (1992) (quoting Celotex, 477 U.S. at 327), aff'd, 10 F.3d 796 (Fed. Cir. 1993).

The "fact-intensive" nature of takings cases is not a basis for denying summary judgment. In the appropriate case, such as here, summary judgment can isolate and dispose of factually unsupported claims. See Celotex, 477 U.S. at 323-24; see also Allied General Nuclear Services

v. United States, 839 F.2d 1572 (Fed. Cir.) (affirming summary judgment of takings claim), cert. denied, 488 U.S. 819 (1988); Tabb Lakes, 10 F.3d 796 (Fed. Cir. 1993) (same). When the material facts are adequately developed in the papers and no additional evidence could reasonably be expected to change the outcome, summary judgment is proper. Pure Gold, Inc. v. Syntex (U.S.A.), Inc., 739 F.2d 624, 626 (Fed. Cir. 1984).

## II. Test Plaintiffs' Claims Are Barred By The Six Year Statute Of Limitations

Plaintiffs allege that an overflight taking occurred in July 1999 stemming from the transfer and operations of nine F/A-18 C/D squadrons and the F/A-18 C/D Fleet Replacement Squadron ("FRS") to NAS Oceana from NAS Cecil Field, Florida. Testwuide Compl. ¶¶ 14-15, 17-20; Plaintiffs' Answers to Interrogatory No. 2, Exhibit C. Plaintiffs have filed eight related complaints, the first of which, Testwuide v. United States, was filed on April 5, 2001.[20] The statue of limitations for Tucker Act claims, 28 U.S.C. § 2501, provides as follows: "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." Thus, unless the claims accrued within six years of being filed, they must be dismissed.

Defendant's recorded aircraft operations at NAS Oceana with respect to the test plaintiffs' properties reflect far higher aircraft operations in 1981 than in July 1999. See Riley Decl., Table 1. Thus, since all the complaints were filed more than six years after 1981, any claims asserted in this case are barred by the statute of limitations. Moreover, plaintiffs cannot

[20] The other cases are: Burlage v. United States, No. 04-120L (Filed January 29, 2004); Adams v. United States, No. 04-279L (Filed March 02, 2004) (Leary property); Anderson v. United States, No. 04-333L (Filed March 08, 2004) (Riddick and Waterman properties); Beagle v. United States, No. 04-1176L (Filed July 19, 2004) (Lindsay, Van Nostrand and Ryan properties); Aralar v. United States, No. 04-1280L (Filed August 13, 2004); Whitley v. United States, No. 04-1331L (Filed August 16, 2004) (May, Hoag, Hill, Levenson, Capps, and Dingle properties); Price v. United States, No. 04-1718L (Filed November 29, 2004); and Mack v. United States, No. 05-628L (Filed June 16,

avoid the statute of limitations by simply tying their claim to a more recent event – in this case the arrival of the F/A-18 C/D squadrons in 1999. This is because, as discussed infra, the test plaintiffs cannot establish a second incremental taking.

## A. Legal Standard For An Overflight Taking

The seminal case establishing the test for an alleged Fifth Amendment taking of property due to aircraft overflights is United States v. Causby, 328 U.S. 256 (1946). That case established four elements, which must be shown to prove a taking as a result of aircraft overflights:

(1) the aircraft flights must "directly" invade the airspace over the property;
(2) the flights must be "low";
(3) the flights must be "frequent"; and
(4) the flights meeting the above criteria must substantially destroy the use and enjoyment of the property.

Id. All four of these requirements must be met. Id.

The first criterion, as it states, requires overflights directly over the property to support a taking. In Causby, the Supreme Court specifically underscored this point by noting that the landowner owns "the space above the ground [that] can [be] occup[ied] or use[d] in connection with the land." 328 U.S. at 264. "[The] cases make it clear that the invasion must be in airspace directly over the complainants' land." Stephens v. United States, 11 Cl. Ct. 352, 358 (1986).

Regarding the second criterion, the Causby Court and subsequent decisions have set the demarcation between public airspace (not subject to a Fifth Amendment taking) and the portion protected as incident to land ownership as the minimum safe altitude for flight designated by the Civil Aeronautics Authority (now the Federal Aviation Administration). Griggs v. Allegheny County, 369 U.S. 84 (1962); Persyn v. United States, 34 Fed. Cl. 187 (1995); Lacey v. United

---

2005).

States, 219 Ct.Cl. 551, 595 F.2d 614, 616 (1979); A.J. Hodges Indus., Inc. v. United States, 355 F.2d 592 (1966). For congested areas, such as the community surrounding NAS Oceana, the minimum altitude for safe flight is 1,000 feet. See, e.g., Stephens v. United States, 11 Cl.Ct. 352, 359 (1986); Aaron v. United States, 160 Ct.Cl. 295, 311 F.2d 798, 801 (1963); see also 14 C.F.R. § 91.1119 (1996). Thus, flights at an altitude below 1,000 feet at NAS Oceana are "low" for purposes of evaluating whether an overflight taking has occurred.

In contrast to the altitude of flights, the third criterion, the frequency of low, direct overflights, has not been specifically defined. The relevant case law, however, indicates that overflights must be in the thousands – and more likely tens of thousands – in order to find an overflight taking. See, e.g., Stephens v. United States, 11 Cl.Ct. at 356, 359 (70 to 100 overflights per day, which equals approximately 25,550 to 36,500 annually, is sufficiently frequent); Lacey v United States, 219 Ct.Cl. 551, 557, 595 F.2d 614, 616 (1979) (approximately 19,000 to 71,000 annual overflights); Davis v. United States, 155 Ct. Cl. 418, 428 (1961) (approximately 39,000 to 53,000 annual overflights of B-52 and KC-135 bombers); Mid-States Fats & Oils Corp. v. United States, 159 Ct. Cl. 301, 308, 327-28 (1962) (monthly overflights ranging from 761 to 5,821, which resulted in approximately 17,000 to 52,000 annual overflights); but see Aaron v. United States, 160 Ct. Cl. 295, 299, 304-05 (1962) (Air Force acquired avigation easement with 10-12 overflights below 500 feet of test aircraft jets per day, but also included "substantial numbers" of overflights from other aircraft).

The fourth criterion, substantial loss of the use and enjoyment of one's property, requires a showing by the plaintiffs of a very significant burden on the property. For example, in Causby, the Supreme Court found a taking because overflights destroyed the landowner's poultry

business. Approximately 150 frightened chickens were killed from flying into the walls when aircraft flew 63 feet above plaintiff's barn. 328 U.S. at 259. This element has also been substantiated when overflights have caused buildings to shake, interfered with radio and television reception, and negated the ability to use the telephone or conduct conversations. Aaron v. United States, 340 F.2d 655, 659 (Ct. Cl. 1964). See Davis v. United States, 155 Ct. Cl. 418, 420 (1961) (change from B-36 jet aircraft to B-52s substantially interfered with the use and enjoyment of the plaintiffs' property, because it made it impossible for the plaintiffs to sleep and rendered their home uninhabitable).

The evidence demonstrates that the Group 1 properties have long been exposed to low and frequent aircraft operations. Even assuming, arguendo, that the Group 1 properties satisfy the requisite four elements for an overflight taking, that taking would have occurred by at least 1981, given the level and type of historic aircraft operations in relation to these properties.[21] To avoid being barred by the statute of limitations, the Group 1 test plaintiffs would have to show that operations in 1999 were more burdensome than at any prior time, thus establishing a second incremental taking in July 1999.

The Group 2 properties have experienced jet noise historically, and in some cases have been directly overflown, but not with the frequency and low altitude necessary to establish an overflight taking under the Causby analysis either in July 1999 or historically. The location of the Group 3 properties makes their claim of an overflight taking even more attenuated because they are infrequently overflown – if at all – and at high altitudes. Nevertheless, to the extent that the level of flight activity to which the Group 2 and Group 3 properties were exposed in July

[21] As discussed infra, for the vast majority of years between 1980 and 1995 where recorded operations exceeded or

1999 could somehow be construed as supporting the taking of an avigation easement, then the previous avigation easement would have been acquired no later than 1981. Given this assumption, the Group 2 and Group 3 test plaintiffs (like the Group 1 test plaintiffs) would also have to establish a second incremental taking or their claims are time-barred.

## B. Legal Standard For The Statute Of Limitations In An Overflight Takings Case Where There Is Prior Overflight Interference

The six year limitations period is "jurisdictional, because filing within the six-year period was a condition of the waiver of the sovereign immunity in the Tucker Act." Caguas Cent. Fed. Sav. Bank v. United States, 215 F.3d 1304, 1310 (Fed. Cir. 2000). Given the jurisdictional nature of the defense, the limitations period is strictly construed and may not be waived. Jones v. United States, 801 F.2d 1334 (Fed. Cir. 1986); Ater v. United States, 6 Cl.Ct. 344, 348-9 (1984), aff'd, 770 F.2d 182 (Fed. Cir. 1985); Heim v. United States, 50 Fed. Cl. 225, 236 (2001).

Takings claims against the United States must be initiated within six years of accrual. 28 U.S.C. § 2501. Accrual occurs when regular and frequent intrusions by noisy aircraft into the airspace above the land begin to interfere seriously with the use and enjoyment of the land. Powell v. United States, 1 Cl. Ct. 669 (1983); Hero Lands Co. v. United States, 554 F. Supp. at 1266; Brin v. United States, 159 Ct. Cl. 332, 339 (1962). See also Lacey v. United States, 595 F.2d at 618 (a claim for a taking of an avigation easement first accrues "when the government begins to operate aircraft regularly and frequently over a parcel of land at low altitudes with the intention of continuing such flights indefinitely") (emphasis added). If aircraft flights occurring before the six year statute of limitations create substantially the same level of interference as alleged in this instance, and if the earlier flights were not intended to be temporary in nature,

---

were comparable to 1999. See Riley Decl., Table 1.

plaintiffs' claims are barred. Hero Lands Co., at 1267-68; A.J. Hodges Industries, Inc., v. United States, 355 F.2d 592, 594 (Ct. Cl. 1966).[22]

Plaintiffs may argue that, while a taking did occur in 1981, there has been an increase in overflight activity since then that results in a taking of an additional incremental easement on top of the existing easement taken in 1981. The following factors have been used by this Court in the overflight context to determine whether a second incremental taking has occurred: (1) whether the flight path has remained the same in terms of elevation and location, Robertson v. United States, 173 Ct. Cl. 621 (1965); (2) whether the numbers of flights over the pertinent properties have increased since the earlier taking, Lacey v. United States, 595 F.2d at 560, Town & Country Motor Hotel v. United States, 180 Ct. Cl. 563, 569 (1967); (3) whether the type of aircraft have remained the same, or whether the prior aircraft were as loud or louder than the aircraft flying at the time of the earlier taking, Powell v. United States, 1 Ct. Cl. 669, 674 (1983); Avery v. United States, 330 F.2d 640, 643 (Ct. Cl. 1964); Lacey v. United States, 595 F.2d at 560; and (4) whether the earlier operations indicated a permanent intent to use the affected airspace and such use has not been abandoned, Speir v. United States, 485 F.2d 643, 648 (1973). In order to establish a second, incremental taking plaintiffs must prove either (1), (2), or (3) above, and (4) that there was no abandonment of the prior avigation easement. Plaintiffs must also prove a significant depreciation in the market value of the property resulting

[22] A claim does not accrue "unless the claimant knew or should have known that the claim existed." Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1577 (Fed. Cir. 1988). To evidence lack of knowledge, a plaintiff must demonstrate ignorance of its claim by either showing that "defendant has concealed its acts with the result that plaintiff was unaware of their existence or that [plaintiff's] injury was 'inherently unknowable' at the accrual date." Japanese War Notes Claimants Ass'n., 178 Ct. Cl. at 634, 373 F.2d at 359; Menominee Tribe v. United States, 726 F.2d 718, 721-22 (Fed. Cir. 1984). There can be no allegation that a previous overflight taking of the test plaintiffs' properties was unknowable considering that NAS Oceana has been in continuous operation since 1943, and as a master jet base since 1957. Nor are the activities plaintiffs complain of capable of concealment.

from the recent additional overflights in order to establish a second, incremental taking. Persyn v. United States, 34 Fed. Cl. at 207; Boardman v. United States, 180 Ct. Cl. 264, 271 (1967); Avery v. United States, 330 F.2d at 643.

Thus, the burden of proof for a second incremental taking requires a substantial increase in impacts on the property. Changes in flight patterns must "materially increase the noise and vibration and the consequent inconvenience, discomforts, and uneasiness suffered by plaintiffs." Klein v. United States, 152 Ct. Cl. 221, 223 (1961). See also Bacon v. United States, 295 F.2d 936, 938 (1961) (while earlier aircraft aggravated plaintiffs' property, their property use "was not seriously interfered with until" operation of the new aircraft, the B-52, which was exceptionally loud and the noisiest of planes to have operated at the base).

**1. Same Flight Path And Same Elevation**

As discussed above, although no two flights are identical, the landing patterns have remained generally the same since the late 1970s in terms of the nominal track the aircraft flew over the ground in the landing pattern. Keeley Decl., ¶¶ 12, 20. The altitude of certain flight patterns has increased over the years; however, higher altitudes would reduce the adverse impacts of overflights. Keeley Decl., ¶ 12. Moreover, the factors that cause variations in the location of the crosswind and approach turns, such as number of aircraft in the pattern and wind-speed, have been present since at least the late 1970s. Keeley Decl., ¶ 20. Finally, the relative frequency of runway use, which is a function of wind, has remained generally consistent over the years, as well. Erie Decl., ¶ 25, Keeley Decl., ¶ 11. As such, the location of NAS Oceana aircraft in relation to the test plaintiff properties has remained generally consistent for more than two decades before the date of the alleged taking.

**2. Same or Greater Number of Flights**

In order to succeed on a "second taking" theory, the test plaintiffs must show a substantial increase in aircraft operations within six years of filing suit. See Avery v. United States, 330 F.2d at 643; Persyn v. United States, 34 Fed. Cl. 187, 207 (1995) (the nature and degree of disturbance must substantially worsen to establish second taking). Plaintiffs allege a July 1999 date of taking. See Plaintiffs' Answers to Interrogatories, No. 2, Exhibit C. Thus, the Court must focus its attention on July 1999 and determine whether the United States sufficiently increased overflight activity at that time to warrant a finding of a second incremental taking. Clearly, the answer to that question is "no." In fact, in historic terms 1999 was a year of relatively light flight activity when compared with the vast majority of prior years for which there are operations recorded on ATARs. See Riley Decl., Table 1.

As discussed above, air traffic control tower air space extends approximately 4.3 to 5.0 nautical miles from the NAS Oceana runways up to an altitude of 2500 feet, an area that includes all the test plaintiff properties. Riley Decl., ¶ 9. The NAS Oceana records in its ATARs the information necessary to determine whether there has been an increase in the most relevant aircraft operations (i.e., operations occurring within the air traffic control tower's airspace; see Riley Dec., Table 1) within six years of filing suit, and therefore the information can be used to determine whether an overflight taking has occurred at the test plaintiff properties. The 1999 ATAR reflects approximately 133,000 operations in NAS Oceana air traffic control tower air space. See Riley Decl., Table 1. That number of operations provides a reference point for evaluating whether a second, incremental taking has occurred, and must be compared to ATARs from other years at NAS Oceana.

NAS Oceana ATARs exist for 14 of the years between 1980 and 1998. See Riley Decl., ¶¶ 6-7, 22. The ATARs from 11 of these years show jet operations that were comparable or exceeded, in some cases by a wide margin, the 133,000 operations in 1999. Riley Decl., Table 1. Thus, in the years that recorded data are available between 1980 and 1998 operations were comparable to or exceeded 1999 data approximately 79% of the time. Monthly ATARs from January through November 1980 total approximately 131,000 operations reflecting a year of comparable flight activity to that in 1999. See Riley Decl., Table 1. The operational tempo intensified significantly in 1981 when NAS Oceana reached the two and one-half decade high point of nearly 232,000 operations. See Riley Decl., Table 1. In the following year, 1982, there were close to 178,000 operations. See Riley Decl., Table 1. NAS Oceana again experienced a high operational tempo between 1989 and 1995, when annual operations consistently approached or exceed 200,000 operations, including a high of over 229,000 operations in 1992. See Riley Decl., Table 1. The following three years, 1996-1998, saw a significant drop off in flight activity, ranging from approximately 46,000 to 77,000 operations. See Riley Decl., Table 1. Operational tempo began to pick up again in 1999 and 2000 with approximately 133,000 and 160,000 operations, respectively, but did not reach the highs recorded in the 1980s and early to mid-1990s. See Riley Decl., Table 1. This data demonstrates that aircraft overflight activity has equaled or exceeded the 1999 flight levels on numerous prior occasions. Thus, the 133,000 operations in NAS Oceana control tower airspace in 1999 do not support a second taking.

**3. Same or Similar Aircraft in Terms of Noise Impacts**

If plaintiffs cannot show that the number of flight operations in 1999 exceeded the number of flight operations in all prior years – which they cannot – they would have to establish

that the F/A-18 C-D is substantially noisier than all previous aircraft to prove a second taking. Hero Lands Co. v. United States, 1 Ct. Cl. 102, 107 (1983); Powell v. United States, 1 Ct. Cl. 669, 674 (1983); Davis v. United States, 295 F.2d 931, 932-33 (1961); Bacon v. United States, 295 F.2d 936, 937 (1961).

The predominant aircraft that have operated at NAS Oceana at various times from the late 1970s to the alleged date of taking, including in 1981, were the F-4 Phantom, the A-6 Intruder, and the F-14 Tomcat. Keeley Decl., ¶ 7. A comparison of the perceived single event noise levels produced by these aircraft in various modes, including departure, approach, and pattern operations reveals that the F/A-18 C-D is not a substantially louder aircraft than historically predominant aircraft at NAS Oceana. The maximum tone-corrected PNL for the F-4C is the loudest of the aircraft in departure, followed by the F/A-18 C/D, A6-A and F-14B, which are within approximately 1dB of each other in departure. (See table supra, at 10). On approach, the F/A-18 C/D and A6-A are virtually the same, exceeding the F-4C by approximately 4dB, and are substantially higher than the F-14 A&B. In pattern mode, the F-4C is by far the loudest, followed by the F-14 A&B and F/A-18 C/D, which are within 1dB of each other. See table supra, at 11).

Another method of measuring aircraft single event noise levels is the sound exposure level (SEL), which reflects the total energy produced in a single flyover, normalized to a hypothetical one-second duration. Fidell Report, p. 14, 23. On departure, the F/A-18 C/D and F-4C tone-corrected SELs are within 2dBs of each other, followed by the A-6A, which is approximately 5dBs lower. (See table supra, at p. 11). On approach, the F/A-18 C/D and the A-6A have comparable tone-corrected SELs, followed by the F-4C, which is approximately 4dBs

lower. In pattern mode, the F-4C has the highest tone-corrected SEL by a wide margin.

Thus, whether measured by the maximum perceived noise level the aircrafts generated in an overflight, or the total tone-corrected sound energy produced in a flyover if condensed into one second, the F/A-18C/D is not substantially louder than all of the various predominant aircraft that preceded it at NAS Oceana. Regardless of which of these metrics is considered, the F/A-18 C/D is either comparable to or less than at least one of the other predominant aircraft.

**4. Permanent Intent**

As with any military air station, there have been fluctuations in the number of operations over the years, but there certainly has been no abandonment of aircraft overflights at NAS Oceana. As discussed earlier, the historic number of recorded aircraft operations in NAS Oceana tower-controlled air space has in the vast majority of years for which records exist equaled or exceeded the number of operations in 1999. See Riley Decl., Table 1. Thus, this case is similar to Lacey v. United States, where the court found that the greatest number of overflights occurred eight years before the petition was filed, and the action was therefore time-barred:

> [t]he NALF-Orange was constructed as a permanent naval facility; the use of the facility had reached the point by 1960 that there were approximately 19,429 flights throughout the airspace above the ranch by aircraft operating at the landing field; although the number of overflights above the ranch was greater than 14,429 every year after 1960 (except 1975, when the NALF-Orange Grove was closed for some months while the runways were being repaired), the greatest number of overflights occurred in 1968, some 8 years before the petition was filed by the plaintiffs; and the aircraft flying in the 1960-68 period were just as noisy and were flying just as low as the aircraft operating in the 6-year period immediately preceding the filing of the petition. Therefore, the permanence and degree of the impairment of the landowner's rights by overflights above the ranch were readily ascertainable long before the beginning of the 6-year period that immediately preceded the filing of the petition.

595 F.2d at 619 (emphasis added). In contrast, in Speir v. United States, 485 F.2d 643, 648 (Ct.

Cl. 1973), the court addressed a situation where the increases in overflight activities was intended to be only temporary. Speir concerned helicopter flights begun in October 1967 at a staging field in Chatham County, Georgia, to train pilots for the Vietnam war. The staging field in question in Speir, referred to as Cu Chi, operated from 1967 until 1972.

In determining that the government had taken only a temporary easement ending in 1972, the court noted:

> The facilities at Cu Chi were temporary, with no running water and no indoor plumbing. Also, the Army dismantled the control tower and painted the runways with X's when the field closed. The court thus concluded that even at the time the flights began, the United States did not intend to utilize the airspace for such flights on a permanent basis. Instead, "it was the defendant's intention to utilize Cu Chi only so long as there was a heavy demand for Army helicopter pilots in Vietnam."

485 F.2d at 647.

Here, there is no evidence that the overflights are temporary in nature. The evidence overwhelmingly demonstrates that NAS Oceana has been operating for decades. Indeed, NAS Oceana was commissioned in 1943 and became a permanent master jet base in 1957. The base has operated continuously since.

**5. Significant Diminution in Property Value**

In addition to proving that the flight paths or altitudes have significantly changed, or a substantial increase in the number of operations, or substantially louder aircraft, and that a previous avigation easement has not been abandoned, to establish a second, incremental taking plaintiffs must also prove that there was a diminution in property value. This factor is measured as the difference between the fair market property value before the taking and after the taking. Aaron v. United States, 340 F.2d 655, 659-60 (Ct. Cl. 1964); Klein v. United States, 153 Ct. Cl.

221, 224 (1961) (the diminution in value of residential property that became uninhabitable because of overflight taking is the difference between the before value of the property and the value after the taking). Moreover, with regard to an alleged second taking:

> a significant depreciation in the market value of the property as a direct result of the overflights is not only a prerequisite to recovery of just compensation but also marks the date of taking from which applicable statutes of limitations commence to run and valuations for damage purposes are to be measured.

Persyn v. United States, 34 Fed. Cl. 187, 207 (1995) (quoting Boardman v. United States, 180 Ct. Cl. at 27); see also Avery v. United States, 330 F.2d at 643 ("a subsequent loss in property value may be an essential factor in determination of a subsequent taking") (emphasis in original).

Plaintiffs are apparently relying on two appraisers to calculate the diminution in value of the 11 of the 12 test plaintiffs' properties. While defendant disagrees with their analysis and conclusions and will refute them should this case proceed to trial, defendant acknowledges that their allegations create a factual dispute concerning whether these 11 test plaintiff properties have experienced a diminution in value.[23] This factual dispute, however, is not dispositive for this motion, because the Court need not reach this issue unless plaintiffs can prove one of the first three elements for a second taking, as well as lack of abandonment of the previous avigation easement.[24] In other words, even if, for the purpose of this motion, we accept the analysis and conclusions of plaintiffs' appraisers as true, and all plaintiffs' other material factual assertions as

---

[23] Plaintiffs provided supplemental responses to discovery requests on these 11 properties the day before this brief was filed. See Letter dated April 27, 2006, Exhibit H. The supplemental responses mirror Ms. May's in seeking "just compensation" in the amount of $30,000 based on the same speculative generic noise mitigation costs, unspecified testimony of other property owners, and the report of Dr. Jon Nelson, as well as $50,000 for the "loss of use and enjoyment of her property." As discussed, infra, these claims are not available under the Fifth Amendment. In due course, defendant will move to strike these claims.

[24] This assumes, of course, that plaintiffs can first satisfy the four elements set forth in Causby.

true, plaintiffs still fail as a matter of law to meet the criteria for a second overflight taking for each of the 11 test plaintiffs' properties.

Plaintiffs have not even offered an opinion on any alleged diminution in value of the May property. Moreover, test plaintiff Eileen May has failed to assert in response to discovery requests a diminution in property value at all. Instead, in a supplemental response to interrogatories, Ms. May has suggested that she is entitled to $30,000, apparently based on speculative generic costs to perform work on houses to reduce noise impacts inside those houses, as well as on the unspecified testimony of other property owners in the NAS Oceana community and the report of Dr. Jon Nelson. See Letter dated March 30, 2006, Exhibit I. Ms. May is now demanding an additional $50,000 for the "loss of use and enjoyment of her property." Exhibit I. The costs for potential mitigation measures (e.g., additional insulation, upgraded windows) and compensation for the loss of use and enjoyment of one's property are plainly not cognizable claims under the Fifth Amendment. Thus, plaintiffs fail to demonstrate the difference in value of the May property before and after the alleged taking. At most, plaintiffs present demands for damages that could arguably be sought under a tort theory over which this Court has no jurisdiction. See 28 U.S.C. §1491 (1988).

The testimony of other property owners fails to substantiate any claim of diminution in value to the May property. Certain property owners have testified in their depositions that they believe that property values have been negatively impacted as a result of F/A-18 C/D operations from NAS Oceana; however, none of these property owners has conducted a formal study of Virginia Beach sales data. Additionally, none of these property owners has offered an opinion specifically about the May property.

Dr. Nelson's opinion is equally unsupportive of Ms. May's claim. Dr. Nelson claims that houses exposed to a Day-Night Average Sound Level ("DNL")[25] level equal to or higher than 65dBs experience a depreciation in value. Nelson Transcript p. 107-08, 148-49, Exhibit K. The May property is not exposed to aircraft noise equal to or greater than 65dBs (DNL). Moreover, Dr. Nelson admitted during his deposition that he has no opinion as to the specific diminution in value at any of the test plaintiff properties. Nelson Transcript p. 62, 65-66, Exhibit K.

The only deposition testimony specifically tied to value of the property was Ms. May's, and when asked whether the fiscal year 2006 tax appraisal of her home indicating $198,983 was a fair representation of the appraisal of her home, Ms. May replied as follows:

> A. No.
> Q. Is it too high or too low?
> A. Way too low.
> Q. Why do you say that?
> A. Just because of the market and the fact that I live in a very – people stay in my area . . . ." May Transcript, p. 32, Exhibit L.

Later in her deposition, May clarified that she believed she would not have trouble selling her home. She stated, "[B]ecause of the fact we're in a high demand area, I probably wouldn't have any trouble selling my house." May Transcript, p. 45, Exhibit L. Based on the foregoing, Ms. May fails to even assert the requisite "significant depreciation" in the market value of her property to support a claim of a second taking.

For the foregoing reasons, the test plaintiffs' claims are barred by the statute of limitations as they cannot prove a second, incremental taking. Indeed, the test plaintiffs cannot establish that there has been a substantial change in flight paths or altitudes, a substantial

[25] DNL is a noise metric combining the levels and durations of noise events and the number of events over an extended period. It is a cumulative average computed over a 24-hour period to represent total noise exposure. Exhibit J.

increase in flight operations, or that the F/A-18 C/D is significantly louder than the predominant aircraft that operated in 1981 at NAS Oceana.

## III. Test Plaintiffs Fail to State An Overflight Takings Claim Under Causby v. United States

### A. Test Plaintiff Properties From Group 2 and Group 3 Have Not Been Exposed To Low And Frequent Overflights

The Group 2 and Group 3 properties fail to state a claim because they have not been exposed to the frequent and low direct overflights that would substantially interfere with the use and enjoyment of those properties. The Group 2 properties have been exposed to varying degrees of aircraft flight activity. See generally Riley and Erie Declarations. Certain of the Group 2 properties have been directly overflown by "low" flights, but not with sufficient regularity to support an overflight taking. Other Group 2 properties may have been exposed to frequent overfights, but not at an altitude below 1,000 feet, which likewise would not establish an overflight taking. The Group 3 properties have not been exposed to either low or frequent flights.

The Levenson property (Group 2) falls under the Runway 14L/R VFR landing pattern. Erie Decl., ¶ 43. Aircraft flying in this pattern would directly fly over or within one-half mile of the Levenson property at an altitude of approximately 450 to 550 feet. Erie Decl., ¶ 43. These direct overflights would meet the first and second elements in the Causby analysis. However, these flights do not occur frequently enough to support a taking. As discussed supra, Runway 14 L/R is in use only two percent of the time. Erie Decl., ¶ 25. Given that there were approximately 133,000 reported operations in NAS Oceana tower-controlled air space in 1999, then roughly 2,660 operations could be attributed to Runway 14L/R. See Riley Decl., Table 1.

If approximately 55% of those operations were VFR pattern flights then it can be inferred that roughly 1500 touch-and-gos and FCLPs from Runway 14L/R in 1999.[26] That number must be further reduced because touch-and-gos and FCLPs are counted as two operations (departure and landing) by the control tower, leaving approximately 750 VFR flights that passed over or near the Levenson property in 1999. See Riley Decl., ¶ 12. As discussed earlier, overflight takings involve thousands (and more likely tens of thousands) of annual overflights, not hundreds. Two other Group 2 properties, Lindsay and Van Nostrand, would have been directly overflown even less than Levenson, primarily when aircraft were far outside the standard abeam distance in the Runway 5L/R VFR pattern.

The Leary/Riddick (Group 2) claims of an overflight taking suffer from a different, but equally fatal deficiency. These properties were directly and frequently overflown, but at altitudes well above the 1,000 feet ceiling necessary to satisfy the second element in the Causby analysis. Specifically, when Runway 23L/R was in use, approximately 34% of the time, these properties would have been overflown routinely on departures, but at an altitude of approximately 1,500-2,000 feet. Erie Decl., ¶62. As such, they cannot establish an overflight taking under the Causby analysis either.

**B. The Distinctive Circumstances In Branning and Argent Are Not Present At NAS Oceana**

The test plaintiffs who cannot state a cause of action under Causby likely will attempt to rely on the limited exception carved out in Branning v. United States, 228 Ct. Cl. 240, 654 F.2d

---

[26] It can be estimated that approximately 55% of total NAS Oceana operations are touch-and-gos and FCLPs. As reflected in Wyle Report 02-08, the noise study supporting the Final Environmental Impact Statement for the Introduction of the F/A-18 E/F aircraft, the total number of modeled touch-and-gos and FCLPs for the baseline year 2000 equals 114,548 (101,276 + 13,272). Dividing this number by the total number of modeled operations at NAS Oceana for that year – 207,722 – equals 55%. See Exhibit M.

88 (1981), and Argent v. United States, 124 F.3d 1277, 1278 (Fed. Cir. 1997), for peculiarly burdensome overflight activity.[27] In Branning, the Court found a taking where military aircraft conducted FCLP overflights at an altitude of 600 feet in a noncongested area based on the "peculiar facts" of that case. 654 F.2d at 90. Significant to the Court's decision was that "plaintiff was consciously singled out or selected to bear a burden which defendant also consciously elected not to impose on others, even others otherwise similarly situated." Id.

The Argent decision was similar to Branning in that it also involved a noncongested area that was exposed to FCLP training exercises. The property at issue in Argent was in close proximity to the Outlying Landing Field, Coupeville (OLF Coupeville) where the Navy conducted FCLPs. Argent v. United States, 124 F.3d supra, at 1278. The court concluded that "where as here, plaintiffs complain of a peculiarly burdensome pattern of activity, including both intrusive and non-intrusive flights, that significantly impairs their use and enjoyment of their land, those plaintiffs may state a cause of action." Id. at 1284. Recognizing that the case was factually similar to Branning, the court stated that the United States could not succeed on summary judgment "merely by pointing out that most of [the] flights do not pass over the Argents' land." Id. The court, however, also noted that aircraft noise alone could not support a takings claim: "where a plaintiff complains only of noise resulting from normal aircraft operations, not passing directly overhead, this court follows the general rules springing from

[27] As discussed, supra, the Supreme Court's decision in Causby is clear that in order for aircraft overflights to constitute a Fifth Amendment taking, the aircraft must pass directly and frequently over the property and so low that they physically intrude upon that airspace necessary for the landowner's use and enjoyment of the property (i.e. below the navigable airspace). Although Branning and Argent involved peculiarly burdensome aircraft activity, the decisions are nevertheless erroneous attempts at expansion of overflight takings law in that they countenance a finding of an overflight taking in situations where the clear elements of liability set forth in Causby are not present. Defendant notes its disagreement with the decisions in Argent and Branning, for the purpose of preserving the possibility of arguing to the court of appeals that the reasoning in those cases was in error.

Causby to deny recovery." 124 F.3d at 1284.

The peculiar facts in Branning and Argent are not present in this case. Although FCLPs occur at NAS Oceana periodically, it is not a dedicated FCLP "bounce field" (such as NALF Fentress) where FCLP training exercises are routinely conducted as was the case in Branning and Argent. Keeley Decl., ¶ 9. As discussed earlier, FCLPs are more intense and last longer than touch-and-gos. Keeley Decl., ¶¶ 18-19. The intensity of FCLP activity was underscored in Branning, "aircraft followed one another almost nose to tail in an unvarying loop over plaintiff's land…" 654 F.2d at 90. Clearly such is not the case here.

In contrast, touch-and-gos, which have long been performed at NAS Oceana, involve fewer aircraft in the pattern and for a shorter period of time. Keeley Decl., ¶ 19. They are basic operations that have always been part of the normal part of the operation of any Navy or Marine Corps Air Station at which carrier-based aircraft operate. Keeley Decl., ¶ 15. Additionally, the VFR pattern (whether touch and go or FCLP) at NAS Oceana is flown at 1,000 feet, significantly higher than the 600 feet found in Branning. see Keeley Decl., ¶ 18.

Unlike in Branning and Argent, the Navy did not consciously select any of the test plaintiffs' properties to be exposed to egregiously burdensome aircraft overflights. The exposure to aircraft flight activity at NAS Oceana is predicated on which runway is in use on a given day (and can change a number of times during a day depending upon wind conditions) and runway selection is a function of wind rather than a conscious decision to expose certain properties to overflights as opposed to others. See Erie Decl., ¶¶ 9, 26. Conversely, the plaintiffs' property in Branning was selectively burdened:

> Defendant could have performed this exercise elsewhere but selected airspace over plaintiffs' land for it because alternative locations were deemed even more

> objectionable. Thus, plaintiff was consciously singled out or selected to bear a burden which defendant also consciously elected not to impose on others, even others otherwise similarly situated.

Branning, supra, 654 F.2d at 90. Similarly, the Navy's selection of a remote site for its OLF in Argent likewise singled out the plaintiffs' properties in that case.

Based on the foregoing, neither the Group 2 nor the Group 3 test plaintiff properties are subject to the peculiarly burdensome flight activity found in Branning and Argent.

## CONCLUSION

The test plaintiffs' claims are time-barred under the mandatory six-year statute of limitations of 28 U.S.C. §2501 and therefore should be dismissed pursuant to RCFC 12(b)(1), or alternatively, summary judgment should be granted in favor of the United States pursuant to RCFC 56. Defendant also moves under RCFC 12(b)(6) to dismiss the claims of certain plaintiffs who lack standing because they did not own their property at the time of the alleged taking.

Dated: April 28, 2006

Respectfully submitted,

/s/ Steven D. Bryant
Steven D. Bryant
Kelle S. Acock
Environmental & Natural Resources Division
United States Department of Justice
601 D Street, NW, Rm. 3205
Washington, D.C. 20004
Counsel for Defendants
202-305-0424

Of Counsel:
Robert J. Smith
Mary Raivel
Navy Litigation Office
720 Kennon Street
Washington Navy Yard, D.C. 20374

CDR Dominick Yacono
JAGC, USN
Commander Navy region
Mid-Atlantic, Code (00LE)
1510 Gilbert Street
Norfolk, VA 23511-2737

# EXHIBIT A

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **CAROLE AND ROBERT TESTWUIDE, et. al.,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **No. 01-201 L** |
| | ) | **Honorable Victor J. Wolski** |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

**DECLARATION OF CAPTAIN THOMAS F. KEELEY, UNITED STATES NAVY**

I, Captain Thomas F. Keeley, United States Navy, state as follows:

**INTRODUCTION AND QUALIFICATIONS**

1. My name is Thomas F. Keeley. I am a Captain in the U.S. Navy and currently assigned as Special Assistant to Commander, Naval Air Force Atlantic, Norfolk, Virginia. Prior to this present assignment, I was Commanding Officer of Naval Air Station (NAS) Oceana, Virginia Beach, Virginia, from 29 April 2003 until 07 October 2005.

2. I graduated from the United States Naval Academy in 1977 with a Bachelor of Science Degree in Engineering Management. I graduated from Old Dominion University in 1993 with a Master of Science in Education. I graduated with distinction from the Naval War College in 2001 with a Master of Arts degree in National Security and Strategic Studies.

3. I am designated a Naval Flight Officer with more than 3,000 hours of flight time in the A-6E Intruder aircraft. I have served five squadron tours (4 active, 1 reserve) of duty along with two shipboard tours of duty, which afforded me the opportunity to fly

out of NAS Oceana regularly at various periods from 1979 through 1997. I also had occasions to fly out of NAS Oceana while assigned as the Commanding Officer during the period noted above.

4. As NAS Oceana's Commanding Officer, I had overall responsibility for all daily operations on and around NAS Oceana, NAS Oceana's Dam Neck Annex, and Naval Auxiliary Landing Field (NALF) Fentress. I was also designated as Air Operations Program Director for the Navy's Mid Atlantic Region, responsible for air operations and related matters for all installations in the Mid Atlantic Region capable of conducting aviation operations and the Navy Dare County target range in North Carolina.

5. As Commanding Officer at NAS Oceana, I was also responsible for implementation and direction of the Air Installations Compatible Use Zones (AICUZ) Program for NAS Oceana and the other Navy airfields in the Mid Atlantic Region.

**History of Naval Air Station Oceana**

6. Naval Air Station ("NAS") Oceana is located in Virginia's southeastern coastal region within the City of Virginia Beach, Virginia. Virginia Beach is part of a larger community known as the Hampton Roads region, which includes six counties and seven cities in addition to the cities of Virginia Beach, Chesapeake, and Norfolk. Located south of the Chesapeake Bay and west of the Atlantic Ocean, NAS Oceana is approximately 100 miles southeast of Richmond, Virginia, and 200 miles northeast of Raleigh, North Carolina. For over sixty-five years, NAS Oceana has been vital to naval aviation and of strategic importance to national defense.

7. NAS Oceana was commissioned on August 17, 1943, and designated a Master Jet Base in 1957. A Master Jet Base is a location which provides permanent home

porting of carrier air wings, and is capable of providing necessary support requirements such as aircraft maintenance and field carrier landing practice facilities for the carrier air wings' squadrons to use when stationed ashore. The Navy's finest tactical jet aircraft have been flown by squadrons assigned to NAS Oceana, including the A-4 Skyhawk (from 1957 until 1994), the F-4 Phantom (from the early 1960s until 1983), the A-6 Intruder (from 1963 until 1997), the F-14 Tomcat (from 1974 until 2006), and the F/A-18 Hornet (from 1994 when one squadron of the F/A-18 A[1] aircraft went into service as the adversary squadron [an adversary squadron engages in mock air-to-air combat with the Navy's other squadrons, using aircraft painted to resemble those of potentially hostile forces] followed by the F/A-18 C/D aircraft, the first squadrons of which arrived at NAS Oceana in December 1998).

8. NAS Oceana is currently home base for 5 carrier air wings, one F-14 squadron and sixteen F/A-18 fighter/attack squadrons assigned to Commander, Fleet Forces Command. These include nine carrier-based F/A-18 C/D squadrons plus one land-based F/A-18 C/D fleet replacement squadron. The F/A-18 C/D squadrons were relocated to NAS Oceana as a result of the 1995 Base Realignment and Closure process. The primary mission of all NAS Oceana carrier based squadrons is to be prepared to conduct timely, sustained combat operations from the sea, in support of our Nation's interests, whenever called upon to do so.

---

[1] The designation of an aircraft, for example, F/A-18 C/D, is known as its "type/model/series." The "type" specifies the aircraft's mission; "F/A" means the aircraft fulfills both a fighter and attack (bombing) mission. The "model" simply refers to when an aircraft went into service; the A-6 went into service before the F/A-18, for example. The "series" simply refers to the version of the aircraft in question; the F/A-18 A version preceded the F/A-18 C/D version, for example. The F/A-18 C is a single seat version of the F/A-18. The F/A-18 D is a two-seat version of the aircraft.

9. As a critical part of the training for this carrier based mission, squadrons stationed at NAS Oceana typically use nearby Naval Auxiliary Landing Field ("NALF") Fentress for Field Carrier Landing Practice ("FCLP") operations (FCLP operations are conducted at NAS Oceana, particularly when multiple air wings are preparing to deploy or based on weather constraints, but NAS Oceana is not a dedicated "bounce field" where FCLP operations are routinely conducted). FCLPs are touch-and-go operations performed on a runway designed to simulate landing on an aircraft carrier. FCLPs are graded by a landing signals officer (LSO). NALF Fentress was established in 1940 and is located approximately 7 miles southwest of NAS Oceana in Chesapeake, Virginia. NALF Fentress is under the command of NAS Oceana.

10. NAS Oceana is located on nearly 5,400 acres and employs over 12,000 Department of the Navy employees. The base spends approximately $400 to $500 million per year in goods and services and has a gross annual payroll of over $773 million, with a total economic impact on the Hampton Roads region exceeding $1.0 billion annually. NAS Oceana is the largest employer in Virginia Beach.

**NAS OCEANA OPERATIONS**

11. I have read the declaration of CDR Richard Erie, the current Air Operations Officer at NAS Oceana, and I agree with his general description of operations at NAS Oceana, including the relative frequency with which the various runways are used. I can say also, based on my long-time personal experience flying in and out of NAS Oceana between 1979 and 1997, that during that entire time the relative frequency of runway use, whatever the precise percentages for any given period, remained generally the same, that

is, Runway 5 was used with the greatest frequency, Runway 23 was the next most frequently used, followed by Runway 32, with Runway 14 being the least used.

12. I can also say, based on my long-time experience flying in and out of NAS Oceana from 1979 to 1997, that landing pattern procedures have remained generally the same. Some changes were made during that time to the altitudes and direction at which the arrival and departure patterns were flown, for example, elevating the altitude of patterns to reduce noise impact, but these changes did not affect the nominal track the aircraft flew over the ground when in the landing patterns. The 1,000 feet altitude for the landing pattern at NAS Oceana has been in effect since at least 1979.

13. I also agree with CDR Erie's description of flight operations as they would have affected the 12 test plaintiffs' properties in July 1999. None of the changes that were made between the times I began flying in and out of NAS Oceana in 1979 and July 1999 would have affected any of the flight operations CDR Erie describes with respect to the 12 test plaintiffs' properties.

**TOUCH AND GO LANDINGS AND FIELD CARRIER LANDING PRACTICE**

14. AS CDR Erie notes in his declaration, NAS Oceana's primary mission is to support naval aviation carrier-based operations and training requirements. I agree with him that landing an aircraft on a moving aircraft carrier at sea is extremely challenging, that this skill is perishable, and that it requires continuous practice.

15. Arrivals and departures are obviously a normal part of the operation of any air station. Because of the requirement for continuous training in carrier landing, touch and go operations – basically practice takeoffs and landings - also are a normal part of the operation of any Navy or Marine Corps air station at which carrier-based aircraft operate

from, because they offer the opportunity for critically-needed practice of the perishable skills of landing at sea. The importance of touch-and-go operations as a normal routine has always been ingrained in the training of naval aviators learning to fly carrier-based aircraft. For this reason, touch-and-go operations have always constituted a substantial portion of the operations at NAS Oceana during the time I am familiar with, going back to 1979.

16. While there is no set number of touch and go landings, it has been my experience that carrier based aircraft will typically perform 1 to 3 touch and go's upon arrival back at the air station if time, fuel, and airfield operations permit.

17. The basic geometry of a carrier based landing pattern, touch and go flight pattern and FCLP patterns for individual aircraft is the same. In my years of flight experience during actual carrier based operations, the at sea parameters of those patterns (the way the patterns are flown at sea) have never changed and are clearly listed in CV NATOPS (NAVAIR 00-80T-105, page 5-19, figure 5-6).

18. A casual observer on the ground outside NAS Oceana would not be able to tell the difference between an individual aircraft flying a touch and go at the station and an individual aircraft flying an FCLP there, not even in terms of altitude, since at NAS Oceana the pattern altitude for both touch-and-gos and FCLPs is 1000 feet. There is a difference in the intensity and duration of FCLP's versus touch and go landings, however.

19. The FLCP periods are normally 45 minutes in duration, in which each aircraft will perform from 7 up to 10 touch and go's or low approaches to a wave off. Since pilots must be prepared to wave off an approach to the ship at the LSO's command,

low approaches (not actually touching down) to a wave off command are part of an FCLP practice too. An FCLP pattern can have as many as 5 aircraft in it at one time. In contrast, an individual aircraft, as I noted above, will typically perform approximately 1-3 touch-and-gos, and, while it is not uncommon to have more than one aircraft in the pattern performing touch-and-gos at the same time, it is generally more on the order of 1-3 aircraft.

**VARIATIONS IN FLIGHT OPERATIONS**

20. During my years flying in and out of NAS Oceana prior to the time of the alleged taking in July 1999, there has always been variation in the way in which aircraft fly the landing pattern. No two flights, even of the same aircraft flown by the same pilot, are identical, nor does each flight proceed at precisely the same altitude throughout the flight or cover precisely the same track over the ground. Some of the variables which can affect each flight include, but are not limited to, the direction and speed of the winds, how many aircraft are in the different patterns, aircraft weight, aircraft configuration, and pilot experience level. Because of the variations I describe above, the actual flight paths are better described as a band rather than a single line. With regard to the "abeam position," i.e., the area directly to the side of the intended point of landing, the area within that band where operations most frequently occur, both in July 1999 and historically, would have depended upon a number of factors, not just those I have already listed, but also the type of aircraft. Some aircraft, such as the F-4 and F/A-18 C/D, tended to fly towards the outer portion of the band. The A-6 and F-14 aircraft tended to fly more towards the inner portion of the band. When there were three or more aircraft in the pattern, aircraft, including the F/A-18 C/D, might fly as much as 2 nautical miles

abeam at the "abeam position" at times depending upon factors such as the ones I listed above.

**Historic Aircraft Noise at NAS Oceana**

21. In addition to having flown in and out of NAS Oceana for years, and having been the Commanding Officer, I have also lived under or near some of the flight patterns, so I understand the issues surrounding aircraft noise from many different perspectives. As a resident of the Pine Ridge neighborhood (the same neighborhood as the Waterman family) for fifteen years, I was often approached by neighbors concerned with the noise from the A-6 Intruder. The design of the A-6 Intruder caused it to fly a slower approach and departure speeds than any of the other jet aircraft I experienced during my years at NAS Oceana, which meant that the aircraft lingered over an area a little longer. Also, the engine exhaust was canted 12 degrees downward from level to help with overall aircraft performance. These two simple factors caused many people to complain about the noise from the A-6 since the loudest noise from A-6 operations lasted longer than with faster and sometimes louder aircraft like the F-4 Phantom.

I hereby swear under penalty of perjury pursuant to 28 U.S.C. 1746 that the foregoing information is true and accurate to the best of my knowledge and belief.

T. Keeley CAPT, USN
Captain ~~Thomas Keeley~~ USN

27 APRIL 2006
Date

# EXHIBIT B

I, Commander Stephen G. Riley III, United States Navy, pursuant to 28 U.S.C. 1746, Declare as follows:

INTRODUCTION AND QUALIFICATIONS

1. My name is Stephen G. Riley III. I am a Commander in the U.S. Navy and have been selected for promotion to Captain. I have been on continuous active duty in the Navy for 35 years as an Air Traffic Controller. I started off my military career in 1971 as an enlisted man and was commissioned an Ensign via the Limited Duty Officer Program (LDO) in 1984. I am the senior Air Traffic Controller in the Navy and am assigned as Head, Airspace and Air Traffic Control Programs, in the office of the Chief of Naval Operations, Pentagon, Washington D.C.

2. As the Head, Airspace and Air Traffic Control Programs, I am responsible for the standardization of Air Traffic Control ("ATC") services being provided to Military and Civil aircraft within airspace delegated to the Navy and Marine Corps by the Federal Aviation Administration (FAA), and for validating the need for and obtaining sufficient funding for all Navy and Marine Corps shore and sea-based air traffic control equipment, including radars, radios, and training simulators. My responsibilities also include developing and implementing air traffic control policy for the Navy.

3. I graduated from Embry-Riddle Aeronautical University, Magna Cum Laude, in 1996 with a B.S. in Professional Aeronautics. In 1998 I received a double Masters degree in Aeronautical Science and Aerospace Operations and Aerospace Management from Embry-Riddle with Highest Honors and was also the class Valedictorian. I have completed most of my class work for a Ph.D. in Professional Aeronautics from Embry-Riddle.

4. My assignments while on active duty as an enlisted controller were at Naval Air Station (NAS) Glynco, Georgia; NAS Patuxent River, Maryland; Tactical Air Control Squadron 22, Naval Amphibious Base Little Creek,Virginia and NAS Oceana, Va. While at NAS Oceana from 1979 to 1984 I served as a controller and progressed to management positions. I was selected to be the Tower Chief (the Tower Chief assists the ATC Facility Officer in managing the control tower, including qualifying and recommending certification of new personnel) in 1979, Radar Chief (the Radar Chief assists the ATC Facility Officer in managing radar operations, including qualifying and recommending certification of new personnel) in 1982 and Training Chief (the Training Chief assists the ATC Facility Officer in training matters, including establishing and maintaining an on the job training program for air traffic controllers) in 1983. There were times that I held any two or all three positions simultaneously.

5. As an Officer my previous assignments included Assistant ATC Facility Officer, NAS Lemoore, Ca; Carrier Air Traffic Control Officer, USS Coral Sea (CV-43), Norfolk, Va; Operations Officer and ATC Facility Officer, Fleet Area Control and Surveillance Facility (FACSFAC), VACAPES, Virginia Beach, Virginia; ATC Facility Officer, NAS Chase Field, Tx; ATC Procedures Specialist, FAA Headquarters, Special MilitaryOPS/Airspace Procedures ATM-420, Washington D.C.; Staff ATC Officer, Commander Naval Air Forces Atlantic, Va; and Navy Liaison Officer, FAA Headquarters Washington, D.C.

AIRCRAFT OPERATIONS COUNTS

6. All Navy/Marine Corps Air Traffic Control Facilities are required to maintain and report the number of aircraft operations conducted at their respective facilities.

Aircraft operations numbers are required to be reported on an annual basis. The requirements for the reporting of aircraft operations, including the appropriate method for counting aircraft operations, were originally contained in Operational Navy Instruction 3721.1 (series). This instruction eventually evolved into the current NATOPS Air Traffic Control Facilities manual, also known as NAVAIR 00-80T-114. The method for counting aircraft operations has not changed in the last 35 years, although as I will explain, the format in which the operations were reported changed beginning with 1996.

7. The form for reporting these aircraft operations numbers is the Air Traffic Activity Report ("ATAR"). The annual ATARs for each Navy and Marine Corps air installation are provided to my office as well as to others, including the FAA. As I will explain below, these reports reflect the number of aircraft *operations* conducted at the airfield in question, not a count of the number of aircraft operating that year at the airfield.

ENTITIES RESPONSIBLE FOR COUNTING AIRCRAFT OPERATIONS

8. Navy and Marine Corps airfields normally have two separate entities that are responsible for air traffic control, although the personnel who work for these two entities are often co-located. These two entities are the control tower and Radar Operations. The control tower and Radar Operations (radar room) each count aircraft operations in a different manner, due to their differing responsibilities.

9. The control tower is responsible for all arrivals and departures at the principal airfield (not any outlying field, such as Naval Auxiliary Landing Field [NALF] Fentress in the case of NAS Oceana) and for other aircraft that pass through the airspace for which the control tower is responsible. Generally speaking, the airspace for which the control

tower is responsible is a circular area extending outward for 5 nautical miles (nm) from the airfield and up to an altitude of 2,500 feet. In the case of NAS Oceana, the airspace for which the Control Tower is responsible generally extends out 5 nm, except that it extends only 4.3 nm in that portion of the NAS Oceana airspace that abuts the airspace for which Norfolk International Airport is responsible (generally north and northwest of NAS Oceana). The control tower personnel only count and report operations flying on Visual Flight Rules ("VFR") that occur in the airspace for which the control tower is responsible. As I will explain below, there are other operations, in addition to VFR operations, that occur in the airspace for which the control tower is responsible, specifically Instrument Flight Rules ("IFR") operations, but these operations are counted by radar room personnel, not control tower personnel.

10. The radar room counts and is responsible for all air traffic control services that the radar room provides to aircraft in the airspace for which the radar room is responsible. The radar room airspace surrounds the airspace for which the control tower is responsible and does not include the airspace for which the control tower is responsible. In other words, the airspace for which the radar room is responsible and the airspace for which the control tower is responsible do not overlap. The exact dimensions of the airspace for which the radar room is responsible for each airfield are spelled out in Letters of Agreement with the FAA. In the case of NAS Oceana, this area varies depending upon a number of factors, including which runway is in use, but it extends well beyond the airspace for which the control tower is responsible, in some cases many miles out, and up to 23,000 feet. Radar room personnel provide separation service (that

is, they ensure adequate separation) for en route aircraft as well as arriving and departing aircraft that pass through the airspace for which the radar room is responsible.

11. Radar room personnel count and are also responsible for providing certain services to aircraft operating in the control tower's airspace. Specifically, the radar room is responsible for providing services to all aircraft that are operating on Instrument Flight Rules ("IFR") in the control tower's airspace, including aircraft arriving on IFR Rules, departing on IFR Rules, and simply passing through the control tower's airspace on IFR Rules. In addition, the radar room provides services to aircraft flying on VFR rules in airspace for which the radar room is responsible, although the number of such VFR operations is relatively small when compared with the VFR operations occurring in the control tower's airspace.

HOW THE CONTROL TOWER COUNTS AIRCRAFT OPERATIONS

12. The control tower counts aircraft operations as follows:

Single aircraft

An arrival (a landing) by a single aircraft is counted as one operation;

A departure (a takeoff) by a single aircraft is counted as one operation;

A single aircraft passing through the airspace for which the control tower is responsible, but with no intentions of making an approach or landing, is counted as one operation;

A single aircraft performing a touch-and-go, low approach or field carrier landing practice is counted as two operations, even though the aircraft never stops moving, because the aircraft is in essence doing both an arrival (in the case of a touch-and-go and FCLP) or near arrival (in the case of a low approach) and a departure.

Multiple Aircraft

A group of two aircraft departing is counted as two operations (three aircraft departing is three operations and so on);

A group of two aircraft arriving is counted as two operations;

A group of two aircraft passing through the airspace for which the tower is responsible, but with no intentions of making an approach or an arrival, is counted as one operation.

HOW THE RADAR ROOM COUNTS AIRCRAFT OPERATIONS

13. The radar room counts aircraft operations differently. Each time the radar room provides assistance to aircraft in its airspace it is counted as one operation. No distinction is made between single and multiple aircraft. In other words, individual aircraft in a group of aircraft being provided service by the radar room are not counted separately. For example, a flight of two aircraft flying together that pass through the airspace for which the radar room is responsible would be counted as only one operation.

AN AIRCRAFT MAY BE COUNTED BY BOTH THE CONTROL TOWER AND THE RADAR ROOM

14. Because the airspace for which the radar room is responsible surrounds the airspace for which the control tower is responsible, an aircraft that enters the airspace of both the control tower and the radar room will be counted by both. For example, an aircraft that is approaching NAS Oceana to land will be counted first by the radar room as one operation when it enters the radar room's airspace and is provided service by radar room personnel, then will be counted again as at least one additional operation (and, in the case of an aircraft entering the control tower's airspace to conduct a touch-and-go, for

example, counted as two additional operations) by the control tower room after completion of the touch-and-go's.

AIRCRAFT OPERATIONS REPORTING BEFORE AND AFTER 1995

15. Prior to 1996 the ATAR was comprised of only one form per airfield, which identified the total number of "aircraft operations," both those conducted on VFR Rules and IFR Rules. The "VFR" number included all VFR operations that occurred in the control tower's airspace as well as a relatively small percentage of VFR operations that occurred in the airspace for which the radar room is responsible. The "IFR" number were all operations counted by the radar room, but, as I said earlier, many IFR operations, while counted by the radar room, in fact occur in the control tower's airspace.

16. For these reasons, it is not possible to determine with precision from the single-form ATARs the total number of aircraft operations that occurred in the airspace for which NAS Oceana control tower was responsible. We can only estimate that number. In order to arrive at that estimate, you would add (1) The "VFR" Total, (2) The "Radar Approaches" Total (which is included in the "IFR" total but was also separately identified on the pre-1996 ATAR), (3) The "ACLS approaches" Total (also included in the "IFR" total; "ACLS" stands for Automatic Carrier Landing System, which is a computer-controlled approach that was reported separately from other "Radar Approaches"), and (4) a large but unspecified portion of the remaining "IFR" Total (by "remaining" I mean the "IFR" total minus the "Radar Approaches" and "ACLS approaches" total).

17. That unspecified portion of the IFR total would include the portion of the IFR operations that are IFR departures (not specified on the ATAR), plus the portion of the

IFR operations that are IFR overflights that enter the Control Tower's airspace (also not specified on the ATAR). A large majority of IFR operations are IFR departures.

18. Because the vast majority of VFR operations on the pre-1996 ATARs occurred in airspace for which the control tower was responsible, and because a large portion of the "IFR" operations total in fact occurred in the airspace for which the control tower is responsible, simply adding the VFR and IFR operations should give you a reasonably close approximation of the total number of reported operations that occurred in the Control Tower airspace. Therefore, when evaluating historical numbers of operations, the "Total" column in block 5 in the pre-1996 ATAR (which combines the VFR and IFR operations) provides a reasonably close approximation of the number of reported aircraft operations that occurred in the Control Tower airspace for a particular year.

19. To take a concrete example, the last line of block 5 on the 1992 ATAR for Oceana has the number 229,384 in the Total column.[1] That number should be reasonably close to the total number of reported operations that occurred in the NAS Oceana Control Tower's airspace that year.[2]

20. Beginning in 1996, however, the ATAR for each airfield has been comprised of two forms. One of these forms explicitly identifies the total number of air operations that occurred within the Control Tower's airspace ("Control Tower Operations"). That number is located in the "Control Tower Operations" ATAR. The total number of

[1] This line totals the two previous lines (IFR and VFR).

[2] When dealing with earlier ATARs (such as those from 1981) that cover periods of less than one year, one must add the data from the two or more ATARS that, together, cover that year. For example, the Total column of the last line of block 5 on the 1 Jan - 30 June 1981 ATAR for Oceana has the number 106,728. The Total column in the last line of block 5 on the 1 Jul 81 - 31 Dec 81 ATAR for Oceana has the number 125,025. Together, those total 231,753 operations reported for 1981 at the NAS Oceana airfield.

aircraft operations in the airspace for which the control tower was responsible would be in the "Total" column of last line of Block 5 of the "Control Tower Operations" ATAR. So, for example, the Total column of the last line of block 5 on the year 2000 "Control Tower Operations" ATAR for NAS Oceana identifies 159, 647 as the number of operations reported that year that occurred in the airspace for which the NAS Oceana Control Tower was responsible.

21. The second form identifies the total number of air operations counted by the radar room ("Approach Control Operations"), whether they occurred in the control tower's airspace or in the radar room's airspace.

22. I have attached a table to my declaration that includes the number of aircraft operations at NAS Oceana as reported on ATARs for all of the years 1980 through 2000 for which the numbers are available. For the years 1981, 1982, 1987 and 1989-1995, the number shown in the table is the number shown in the Total column of Block 5 of the available single-form ATARs for NAS Oceana. For the years 1996-2000, the number shown is the number of aircraft operations in the Total column from Block 5 on the "Control Tower" ATARs for NAS Oceana. For 1980, the number shown on the table is the combined number of aircraft operations in the Total Column from Block 5 from the monthly ATARs for January through November 1980 (NAS Oceana also maintained monthly ATARs). The monthly report for December 1980 is not available.

I hereby swear under penalty of perjury pursuant to 28 U.S.C. 1746 that the foregoing information is true and correct to the best of my Knowledge.

Stephen G. Riley III

Commander Stephen G. Riley III

21 April 2006

Date

Declaration of CDR Stephen G. Riley III

Table 1

| | |
|---|---|
| 1980: | 131,284 |
| 1981: | 231,753 |
| 1982: | 177,508 |
| 1987: | 142,053 |
| 1989: | 190,555 |
| 1990: | 194,655 |
| 1991: | 219,610 |
| 1992: | 229,384 |
| 1993: | 202,812 |
| 1994: | 166,055 |
| 1995: | 198,953 |
| 1996: | 45,990 |
| 1997: | 53,121 |
| 1998: | 76,559 |
| 1999: | 132,892 |
| 2000: | 159,647 |

# EXHIBIT C

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| CAROL AND ROBERT TESTWUIDE, et. al.,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | No.: 01-201L<br>Judge Victor J. Wolski |

**PLAINTIFFS' ANSWERS TO INTERROGATORIES**

COMES NOW the Plaintiff, Carroll Lindsay, and in response to Defendant's First Set of Interrogatories, states as follows:

**INTRODUCTORY STATEMENT AND GENERAL OBJECTIONS**

These answers represent the efforts of Plaintiffs in the presently pending test case to respond to Defendant's written discovery based on the investigation which Plaintiffs' counsel have thus far been able to carry out in connection with the facts relative to this litigation. Unless otherwise stated or suggested "Plaintiffs" refers to those twelve identified properties.

There may exist further information responsive to discovery that is not within Plaintiffs' present knowledge or reasonably available to Plaintiffs. There exist documents relating to the subject matter of Defendants' discovery which Plaintiffs have not yet been given access to, identified, or reviewed, despite their best efforts to do so. There are certainly persons with knowledge relating to the subject matter of Defendant's discovery of whom Plaintiffs are not presently aware. Accordingly, these responses are based upon those facts and information now known to Plaintiffs as well as Plaintiffs' counsels'

**INTERROGATORY NO. 2 -**

For each of the residential properties that are the subject of the test case, please provide a precise description of the interest in that property which you contend was taken by defendant, including in the description:

a. the type of property interest allegedly taken (e.g., fee simple, avigation easement, clearance or clear-zone easement);

b. the month, day, and year you contend that interest was taken by defendant;

c. the factual basis for determining the date you contend the property interest was taken; and

d. the factual basis for your contention that the property interest has been taken by defendant;

**RESPONSE –**

a. Avigation easement.

b. July 1999 and thereafter.

c. The F/A-18 aircraft that were transferred to Oceana produced noise and vibration such that the use and enjoyment of our property was severely impacted. When the last of the F/A-18s arrived in July 1999, the noise level (which had become increasingly disruptive over time from approximately the middle of to late 1998) from these aircraft has made it difficult, if not impossible, to carry on a conversation outside or inside the home of the plaintiff or to talk on the telephone, or to hear the television or radio during flight operations. When these aircraft are operating in a pattern with several aircraft circling every few minutes directly over and around the plaintiff's home, plaintiff find it extremely uncomfortable to be outside. Plaintiff also suffers from these operations when he is inside his home. Before the F/A-18s arrived, the sound of aircraft did not disrupt the use and enjoyment of the plaintiff's home, whether outside or inside.

d. The F/A-18 aircraft responsible for the loss of use and enjoyment of the plaintiff's home are owned and operated by the United States.

# EXHIBIT D

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **CAROLE AND ROBERT TESTWUIDE, et. al.,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **No. 01-201 L** |
| | ) | **Honorable Victor J. Wolski** |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

## DECLARATION OF COMMANDER RICHARD S. ERIE

PROFESSIONAL BACKGROUND

1. My name is Richard S. Erie. I am a Commander in the United States Navy and I am currently assigned as Air Operations Officer, Naval Air Station Oceana in Virginia Beach, VA.

2. As the Air Operations Officer, I am responsible for airfield and operations management of both Naval Air Station (NAS) Oceana and Naval Auxiliary Landing Field (NALF) Fentress. My responsibilities include policy and procedures oversight for both airfields; operations scheduling; air traffic control supervision; arresting gear and visual landing aids maintenance and operations; fire protection and aircraft crash and salvage services; radar/electronics/communications systems maintenance and operations; and the direct supervision of approximately 300 personnel in the safe and orderly operation of air traffic control and training within the NAS Oceana and NALF Fentress areas of responsibility.

3. I graduated from San Diego State University in 1988 with a BA in Geography and received my commission through the NROTC program.

4. My assignments while on active duty have included Student Naval Aviator in training squadrons VT-2, VT-23 and VT-21; F-14 Tomcat flight training in VF-124; a fleet tour [which means my squadron was deployed on an aircraft carrier, in this case the USS NIMITZ (CVN-65)] with Fighter Squadron VF-24, where my duties included being the Maintenance Division Officer and Pilot Training Officer; Instructor Pilot in fighter squadron VF-101 (the F-14 Fleet Replacement Squadron) at NAS Oceana where I was an instructor pilot in the F-14 Tomcat, as well as Maintenance Division Officer and Quality Assurance Officer; another fleet tour in Fighter Squadron VF-154 based in Atsugi, Japan, during which I deployed on the USS KITTY HAWK (CV-63); on the staff of Commander, Fighter Wing Atlantic staff, where I was the Assistant Readiness Officer; and NAS Oceana Assistant Air Operations Officer and Air Show Director. I held that position from August, 2003 to January 2006. I have been serving as the Air Operations Officer since January 2006. My cumulative assignments at NAS Oceana have totaled approximately seven years, during much of which I have dealt with flight operations on a daily basis. I am now medically disqualified from flying.

5. I have flown a total of 2,200 hours in different aircraft, including 1,850 hours in the F-14 A and F-14 B Tomcat, and have approximately 500 carrier landings in the F-14 A. I flew

extensively from and around NAS Oceana from 1996 to 1998 during my tour as an instructor pilot in VF-101.

NAS OCEANA OPERATIONS

6. I have reviewed the declaration of my predecessor as the NAS Oceana Operations Officer, CDR Dirk Hebert, which was dated March 6, 2002, and which I understand was submitted to the court shortly afterward. I agree with CDR Hebert's description of the runway layout and usage of runways at NAS Oceana, which is in paragraph 3 of his declaration, but will provide more detail in order to assist the court in understanding the remainder of my declaration.

7. As CDR Hebert stated, NAS Oceana has two sets of parallel runways that intersect each other at a right angle. The nomenclature used to describe each runway is derived from its relationship to a compass. A heading of due north is termed "360 degrees" or "THREE SIX ZERO" when spoken; a heading of due east is "090 degrees" or "ZERO NINE ZERO" when spoken. When describing a runway, its name is taken from its heading on the compass and shortened for brevity by removing the "zero" on either end. Because every runway operates in both directions, every runway will have two names with each name being 180 degrees opposite on the compass. For example:

A runway heading 030 degrees and 210 degrees (030 deg + 180 deg = 210 deg)

*Written name – Runway 3/21*

*Spoken name – "RUNWAY THREE" or "RUNWAY TWO ONE"*

8. Further, many large airfields will have two runways constructed side by side that run in the same direction and are parallel to each other. This necessitates specificity with respect to which runway one is talking about and the convention is to use the term "left" or "right" when referring to each runway. This adds an extra layer of complexity to runway nomenclature but is clear with careful consideration. In the above example, if this notional runway had a parallel runway with it, the example would become:

Two parallel runways heading 030 degrees and 210 degrees

*Written name – Runway 3R/21L and Runway 3L/21R*

*Spoken name – "RUNWAY THREE RIGHT/TWO ONE LEFT"*

*or*

*"RUNWAY THREE LEFT /TWO ONE RIGHT"*

Based on the above discussion, the dual intersecting runways at NAS Oceana are Runways 5/23 Left and Right (oriented northeast/southwest) and Runways 14/32 Left and Right (oriented northwest/southeast).




9. The runway in use at NAS Oceana at any given time, including at any given time during July 1999, would have been a function of the winds at the time. The Air Operations Manual in effect in July 1999, NAS Oceana Instruction (NASOCEANAINST) 3710.1Q, which is dated 5 June 1998, stated that when the wind velocity was 10 knots or less, the active runway would be either 5L/R or 23L/R, "as determined by wind direction and forecast wind direction/velocity." When the winds were more than 10 knots, the instruction stated that the active runway would be the runway "most nearly aligned with the wind."

10. In addition to understanding the layout and nomenclature of an airfield's runways, it is equally important to understand the basic departure, arrival and landing procedures used by aircraft operating out of an airfield. While the specific departure and arrival procedures will vary from airfield to airfield based on numerous factors (airspace constraints, proximity of other airfields & flight routes, geography, terrain, cultural features, etc), they all share the common purpose of providing for the safe sequencing (that is, providing sufficient separation) of aircraft out of and back into an airfield. Commonly called "course rules," these procedures are locally generated based on the factors listed above in addition to many others.

11. Departure course rules typically incorporate directions to be followed immediately after takeoff such as heading/turn information and altitude guidance (level off or climb). For example, when departing from Runways 5L/R or 14L/R at NAS Oceana, aircraft headed for southerly destinations or training ranges are directed after takeoff that "upon commencing right turn out, climb to 4000 and turn to a heading of 210 degrees."

12. Arrival course rules are intended to deconflict departing and arriving traffic (laterally and in altitude) and to allow for the safe sequencing of the aircraft arriving for landing at the airfield. They normally incorporate guidance to fly to specific navigation fixes (or positions) at specific altitudes and to fly specific headings to arrive at a position to enter the "overhead pattern" or VFR (Visual Flight Rules) landing pattern.

13. I am familiar with the VFR landing patterns and Instrument Flight Rules (IFR) radar approach patterns at NAS Oceana based on my extensive personal experience flying those

patterns and based on my responsibilities first as Assistant Air Operations Officer and now Air Operations Officer. As is the case with any Navy or Marine Corps air station at which carrier-based aircraft are stationed, the shore-based VFR landing procedures and pattern at NAS Oceana are designed to mirror the procedures and pattern used when landing on an aircraft carrier at sea.

14. Landing a tactical aircraft on a moving (sometimes pitching and rolling) ship in daylight hours is an extremely difficult endeavor; at night it becomes arguably the most challenging maneuver in aviation. The patterns flown day and night around the aircraft carrier are designed to maneuver each aircraft into a position behind the ship where the pilot can visually acquire the "ball" or FLOLS (Fresnel Lens Optical Landing System). The FLOLS is a series of lights that allow the pilot to determine visually with great accuracy his position relative to the 3.5-degree glide slope. It is this system that allows him to make the appropriate power setting and control surface inputs to maneuver to a safe landing. While the basic "stick and rudder" skills required to perform this feat are learned early in a flying career, the fine motor skills to do it safely and successfully every time are perishable, necessitating continuous refresher training. As a result, it has become an institution in Naval Aviation that one practices for shipboard landing on every shore-based landing, hence the fact that every runway in use at a Navy field has a FLOLS at the approach end so that pilots may always practice "flying the ball". A major component of these practices for shipboard landing is performing touch-and-go operations, since they provide further, critically-needed, practice of these skills. Touch-and-go operations are a normal part of the operation of NAS Oceana.

15. The VFR landing pattern can be best characterized as a left-hand turning racetrack or oval pattern oriented along a runway heading with one end of that oval being a descent to landing. When landing at sea, the altitude of the landing pattern is 600 feet. The landing pattern altitude at NAS Oceana is 1,000 feet and has been that altitude for many years. The dimensions of portions of this oval pattern may vary to a minor degree, but in general, all carrier aviators strive to recreate the "approach turn" or turn to landing in the exact dimensions every time, endeavoring to consistently arrive at a position 1.1 to 1.5 nautical miles abeam (directly to the side) of the intended point of landing, at 1,000 feet above ground (1.25 to 1.70 statute miles).

16. Specific positions along the pattern have specific names and are important to understand because each position has its own aircraft parameters that the pilot is looking to maintain. The diagram below is illustrative of a notional landing pattern.




17. Aircraft enter the pattern by performing "the break," which means they fly upwind in the direction of the runway heading and then execute a level turn (the "crosswind turn") to head downwind. At NAS Oceana, "the break" is performed at an altitude of 1,500 feet. Once on the downwind heading, aircraft descend to pattern altitude and decelerate to landing configuration as they move towards "the 180" (the point at which the aircraft begins its turn to land). "The 90" is the point halfway through the approach turn.

18. The location where the "crosswind turn" takes place will vary depending upon a number of factors, including the number of aircraft in the pattern. In general, the more aircraft in

the pattern, the more the oval will extend. In my notional pattern diagram, this means that the crosswind turn would move up toward the top of the page. When this occurs, the length of the downwind leg lengthens as well.

19. At the other end of the pattern, the location where the "approach turn" takes place will also vary, but to a much lesser degree than with the "crosswind turn." Once at the "abeam position" (directly to the side of the intended point of landing), the pilot will need to extend for a period of seconds based on wind speed in the upwind direction. When winds in the upwind direction are light, the aircraft will have to fly a longer *downwind* leg before it begins its approach turn, to allow enough room for the aircraft to still have the required 15-18 seconds for the final approach heading. When this occurs the "approach turn" end of the oval will lengthen. Conversely, with higher winds in the upwind direction, the "approach turn" turn will occur closer to the ideal abeam position, because the winds will help create the desired 15-18 seconds on final approach heading.

20. In addition, the lateral distance of "the 180" from the intended touchdown point will also vary within a targeted range of 1.1 to 1.5 nautical miles depending upon factors such as winds, the type of aircraft being flown and how experienced the pilot is.

21. Aircraft at NAS Oceana (and all other air stations I'm familiar with where Navy carrier-based aircraft are stationed) fly primarily left hand patterns, since the landing pattern at the aircraft carrier during the day is a left hand pattern. It is possible to conduct a right hand landing pattern but since this is not the pattern flown at sea, any training that results is of little to no benefit and as a result right hand patterns are rarely used.

22. The following diagram depicts the notional landing patterns for each of the runways at NAS Oceana. This diagram is not drawn to scale, it is simply offered to help explain in general terms the visual landing patterns for the runways at NAS Oceana.




23. The landing patterns depicted above are flown routinely around NAS Oceana and are used exclusively when weather conditions permit flying by VFR or "Visual Flight Rules." When

weather conditions require the field to be under IFR (Instrument Flight Rules) all approaches to landing are conducted by a "straight-in" pattern.

24. For these straight in approaches, each aircraft is radar vectored to arrive on a final approach heading to the active runway at approximately 7-10 miles from the touchdown point and at an altitude of 2,000 feet. At 6-7 miles from the touchdown point, the aircraft intercepts a 3.5-degree glide slope and descends at a nearly constant rate until touchdown. Aircraft will receive azimuth (heading) guidance and glide slope information ("high" or "low") until they have the field in sight at which time they'll proceed visually to land utilizing the FLOLS. This straight-in pattern is required during actual IFR conditions but is routinely practiced in day or night VFR conditions to maintain proficiency in performing landings in IFR conditions at sea.

25. The degree to which each runway is used at NAS Oceana has remained generally consistent for the entire period I'm familiar with, with Runway 5L/R being the most used, followed by Runway 23L/R, then to a significantly lesser extent by Runway 32L/R and finally, least of all (approximately 2% of the time), Runway 14L/R. This runway usage is consistent with published documents related to NAS Oceana I am aware of. For example, the Airfield and Airspace Operational Studies published by ATAC Corporation in 1998 as part of the Environmental Impact Statement process leading up to the relocation of the F/A-18 C/D aircraft, and in 2002 as part of the F/A-18 E/F East Coast basing process, both state that runway usage for runways 5L/R, 23L/R, 32L/R and 14L/R was 50%, 34%, 14% and 2% respectively.

26. The runway in use on any given day can change a number of times during that day depending on wind conditions. As a result, it is not possible to determine the precise number of operations on a specific runway by simply using the runway utilization percentages above with the total number of daily/monthly/annual operations for the airfield. In general, though, the percentages should hold true for any period of time and can provide a rough indicator of how many operations were conducted on a given runway.

EFFECT OF FLIGHT OPERATIONS ON THE TEST PLAINTIFFS' PROPERTIES

27. I will address the relationship of flight operations to each of the 12 test plaintiffs' properties at the time of the alleged taking in July 1999 below. Unlike the above discussion of the dimensions and specifics of the VFR landing pattern, all distances below are in statute rather than nautical miles.

CAPPS PROPERTY

28. This property is located approximately 0.75 miles from the approach end of runway 14R, approximately 0.3 miles from the extended centerline of that runway, and approximately 1.5 miles abeam (to the side of) runway 5L and 23R (the term "extended centerline" refers to an imaginary line extending from the approach end of a runway a nominal distance. This term is generally used to assist in describing whether an aircraft coming in for a landing is lined up with the centerline of the runway itself). This property is roughly under the "downwind" for Runway 5L/R and "the 90" for Runway 14L/R.

RUNWAY 5L/R

29. When Runway 5L/R was in use, aircraft entering the landing pattern for this runway via "the break" would regularly have flown directly over or within approximately ½ mile laterally of the Capps property at an altitude of approximately 1,500 feet. These aircraft would have had less of a noise impact on the ground since they would have been at very low or idle power settings during this maneuver. Once on the downwind leg, aircraft in the VFR landing pattern for Runway 5L/R would have regularly flown over or within approximately ½ mile laterally of the Capps property at an altitude of approximately 1,000 feet.

RUNWAY 32L/R

30. Aircraft departing on Runway 32L/R and headed north or east would have turned right and flown over or within approximately one mile laterally of the Capps property at an altitude of approximately 1,500 feet or higher as they climbed out. Aircraft departing on Runway 32L/R and headed towards the south would have turned left on takeoff and would have been flying at an altitude of approximately 1,500 feet or higher. Aircraft in these operations would not have overflown this property, although the property would have experienced noise from these operations from the aircraft pointing their exhaust nozzles towards the property during the departure turn.

RUNWAY 14L/R

31. This property is also underneath the VFR landing pattern for Runway 14L/R. It is near "the 90" (again, the point halfway through the "approach turn") for those runways, so during the roughly 2% of the time when Runway 14L/R was in use aircraft would have flown over or within approximately ½ mile laterally of the Capps property at an altitude of approximately 450-500 feet.

32. When weather conditions do not allow for safe operations under VFR conditions and it is necessary to go to IFR ("Instrument Flight Rules"), aircraft typically fly a straight-in radar-controlled approach, as opposed to flying the oval pattern I've described above. During those very infrequent occasions when Runway 14L/R was being used AND NAS Oceana was in IFR conditions, aircraft using the straight-in IFR radar approach to Runway 14L/R would not have directly overflown this property, but would have flown within approximately 0.3 miles laterally of it, at an altitude of approximately 800 feet, as they were on glide slope for final approach.

HOAG PROPERTY

33. The Hoag property is approximately 1.4 miles northeast and approximately 1.0 mile east of the extended centerline of Runway 23L. It is very near the "approach turn" for Runway 23.

RUNWAY 23L/R

34. When Runway 23L/R was in use, and because this property is near the "approach turn" for Runway 23L/R, aircraft would have routinely flown over or nearly over this property within ½ mile at an altitude of 500-800 feet during approach to landing.

RUNWAY 5L/R

35. Aircraft departing NAS Oceana on Runway 5L/R generally proceed straight ahead towards the ocean or turn right towards the south. The track for these departures would not typically be closer than 1 - 2 miles to the Hoag property and at their nearest approach to this property, the aircraft would be at an altitude of approximately 1,500 to 2000 feet as they climbed out to 4,000 feet.

RUNWAY 14L/R

36. During the roughly 2% of the time that Runway 14 L/R was in use, aircraft in the break at 1,500 feet and aircraft on the downwind leg at 1,000 feet may have flown within approximately ½ mile laterally of the Hoag property.

DINGLE PROPERTY

37. The Dingle property is approximately 1.6 miles northeast and approximately 1.4 mile east of the extended centerline of Runway 23L/R. Like the Hoag property, it is very near the "approach turn" for Runway 23L/R, although it is slightly further away from Runway 23L/R than is the Hoag property.

RUNWAY 23 L/R

38. When Runway 23 L/R was in use, it would not have been unusual for aircraft wider than normal on the downwind leg and just beyond a nominal "180 position" to have flown over or within approximately ½ mile laterally of the Dingle property, at an altitude of approximately 500-800 feet

RUNWAY 5L/R

39. Aircraft departing NAS Oceana on Runway 5L/R generally proceed straight ahead towards the ocean or turn right towards the south. The track for these departures would not typically be closer than 1 - 2 miles to the Dingle property and at their nearest approach to this property, the aircraft would be at an altitude of approximately 1,500 to 2000 feet as they climbed out to 4,000 feet.

RUNWAY 14L/R

40. During the roughly 2% of the time that Runway 14L/R was in use, aircraft in the break at 1,500 feet and aircraft on the downwind leg at 1,000 feet may have flown within approximately ½ mile laterally of the Dingle property.

LEVENSON PROPERTY

41. The Levenson property is approximately 2.25 miles abeam Runway 5L/23R. This places the property outside the visual landing pattern for Runway 5L/R. It is also at just past the "180" position for the visual landing pattern for Runway 14L/R.

RUNWAY 5L/R

42. When Runway 5L/R was being used, aircraft in the downwind leg would routinely have flown within approximately ½ to 1 miles of the Levenson property at an altitude of approximately 1,000 feet. Only if aircraft were extremely wide abeam, however, would they have directly overflown the Levenson property, and it would have been unusual for an aircraft to be that wide abeam. The Levenson property would also have experienced noise from aircraft in "the break" for Runway 5L/R at an altitude of approximately 1,500 feet, but again the property would have been directly overflown only if the aircraft was extremely wide abeam, which would have been unusual, and any noise impact on the ground would have been less than from an aircraft flying the downwind leg for 5L/R since the aircraft would have been higher and typically would have been flown at a very low or idle power setting.

RUNWAY 14L/R

43. Since the Levenson property is located near the nominal "90 position" for Runway 14L/R, then during the roughly 2% of the time when that Runway was being used, aircraft flying the VFR landing pattern for this runway would fly over or within ½ mile of it during the approach turn. The aircraft in both situations would be at an altitude of approximately 450 to 550 feet. In light of the infrequent usage of Runway 14L/R, and the variations I have described, any direct overflight of the Levenson property would have been very infrequent.

RUNWAY 32L/R

44. This property would also will have experienced noise from aircraft departing on Runway 32L/R and turning left or right on departure course rules. These aircraft would be climbing through 1,000 feet to 4,000 feet and their ground track would vary greatly, so it is certainly possible the Levenson property would have been overflown during these operations (by aircraft turning right after departure), but it would not have been a regular event.

LINDSAY PROPERTY

45. The Lindsay property is approximately 2.5 miles abeam Runway 5L/23R. This places the property well outside the visual landing pattern for Runway 5L/R.

RUNWAY 5L/R

46. When Runway 5L/R was being used, aircraft in the downwind leg would routinely have flown within approximately ¾ mile to 1 mile of the Lindsay property at an altitude of approximately 1,000 feet. Only if aircraft were extremely wide abeam (even wider abeam than in the case of the Levenson property, which is slightly closer to NAS Oceana) would they have directly overflown the Lindsay property, however, and it would have been even more unusual for an aircraft to be wider abeam than it would have been in the case of the Levenson property. Additionally, aircraft entering the pattern via the break maneuver would fly a similar ground track as above, but at 1,500 feet and at a significantly lower power setting.

RUNWAY 32L/R

47. This property would also have experienced noise from aircraft departing from Runway 32L/R and turning left or right. These aircraft would have been climbing through 1,000 feet to 4,000 feet and their ground track would have varied, so it is certainly possible, as it was with the Levenson property, that the Lindsay property would have been overflown during these operations (in the case of the Lindsay property by aircraft turning left after departure), but based on the location of the Lindsay property with respect to Runway 32L/R any direct overflights would have been rare.

RUNWAY 14L/R

48. This property would have experienced noise from aircraft entering the visual landing pattern for Runway 14L/R via "the break" on an infrequent basis. Aircraft entering the break for Runway 14 would fly to the west of the airfield (remaining within 4.3 nautical miles, the westernmost extent of NAS Oceana air space) and then execute a turn to line up with the runway. This maneuver requires a fairly tight turn because of the airspace constraints unique to Runway 14 and the ground track of aircraft executing this maneuver would vary greatly depending on angle of arrival, number of aircraft in the flight (larger formations requiring a wider turn to line up) and pilot technique. The Lindsay property's position relative to the arrival end of Runway 14, however, would indicate that aircraft conducting this maneuver would fly over or nearly over (within ½ to 1 mile) at an altitude of 1,500 feet. During those very infrequent occasions when Runway 14L/R was in use AND the airfield was also in IFR conditions, the Lindsay property would have experienced noise from aircraft on straight-in IFR radar-controlled approaches to Runway 14L/R as they passed by at an altitude of approximately 1,000 feet. The property would not typically have been overflown during those operations, however.

VAN NOSTRAND PROPERTY

49. The Van Nostrand property is approximately 2.5 miles abeam Runway 5L/23R and is well outside the visual landing pattern.

RUNWAY 5L/R

50. When Runway 5 L/R was in use, aircraft in the downwind leg would routinely have flown within approximately 3/4 to 1 miles of the Van Nostrand property at an altitude of approximately 1,000 feet. For an aircraft to fly over the Van Nostrand property when landing on Runway 5L, it would have to be extremely wide abeam and well past the turn point for the approach turn. For an aircraft to fly over this property when landing on Runway 5R, it would have to be extremely wide abeam. In either case, a significant deviation from the VFR pattern would be required for direct over flight of the Van Nostrand property. This property would also have experienced noise from aircraft in "the break" for Runway 5L/R at an altitude of approximately 1,500 feet, but would have been directly overflown only if the aircraft was extremely wide abeam, which would have been unusual, and any noise experienced on the

ground would have been less than from an aircraft flying the downwind leg for 5L/R, since the aircraft would have been higher and typically would have been flown at a very low or idle power setting, since the aircraft is decelerating during this maneuver.

RUNWAY 32L/R

51. The Van Nostrand property would also have experienced noise from aircraft departing NAS Oceana on Runway 32 L/R that turned left (toward the south) and were flying at approximately 2,000 feet while climbing to assigned altitude, but this property would not have been routinely overflown during these departures.

RUNWAY 14L/R

52. Much like the Lindsay property, this property would also have experienced noise from aircraft entering the visual landing pattern for Runway 14L/R via "the break" on a very infrequent basis. Based on the position of the Van Nostrand property with respect to the approach end of Runway 14, and the fact that the arrival ground tracks would vary more with increased distance from the airfield (due to angle of arrival, number of aircraft in the flight, pilot technique, etc), any over-flight or near over-flight (at 1,500 feet) would be unpredictable and very infrequent.

MAY PROPERTY

53. The May property is nearly 4 miles abeam Runway 5L/23R and so is nearly outside NAS Oceana tower-controlled airspace.

RUNWAY 14L/R

54. The May property would have experienced some very infrequent and minimal noise from aircraft headed towards "the break" for Runway 14L/R. These aircraft would have been flying at an altitude of approximately 1,500 to 2,000 feet and would usually have passed well south of the property on the way to the airfield.

55. On the very infrequent occasions when Runway 14L/R was in use AND NAS Oceana was also in IFR conditions, aircraft on IFR/Radar approaches to NAS Oceana would have flown within ¾ to 1 mile of the May property, but not over it, at an altitude of approximately 1,500-2,000 feet. Finally, it is possible that aircraft flying between Chambers Field (Naval Air Station Norfolk) and NAS Oceana would have flown within 1 or 2 miles of the May property at an altitude of approximately 2,000 feet, but this would have happened very infrequently, maybe once per month.

HILL PROPERTY

56. The Hill property is approximately 1.7 miles West and approximately 1.2 miles North of the extended centerline of Runway 5L/R.

RUNWAY 5L/R

57. The Hill property is just past the "180 position" for Runway 5L/R and so would have been routinely overflown by aircraft in the landing pattern for Runway 5L/R. These aircraft would have passed directly over or within approximately 1/2 mile of this property at an altitude of approximately 700-800 feet as they descended in the "approach turn."

RUNWAY 32L/R

58. This property would occasionally have experienced aircraft noise from traffic departing from Runway 32L/R making left turns towards the south. These aircraft would be in a climbing turn to 4,000 feet and may have passed within ½ to 1 miles of the property at an altitude of approximately 2,000-3,000 feet, but the property would not typically have been overflown during these flights.

Runway 14L/R

59. The Hill property would very infrequently have also experienced aircraft noise from arriving traffic heading for the visual landing pattern for Runway 14L/R. These aircraft would be at approximately 1,500-2,000 feet and flying to line themselves up with Runway 14 for the overhead break maneuver. The flight track of these aircraft would have varied depending upon a number of factors, including how experienced the pilot was and how many aircraft were in the pattern, so it is certainly possible that the property would have been overflown. Given the combination of the low percentage use of Runway 14L/R and the variation in flight tracks, any such overflights would not have occurred often.

RIDDICK & LEARY PROPERTIES

60. These properties are approximately 2.5 and 2.8 miles respectively from the approach end of Runway 5R and approximately 0.5 miles laterally to the south of the extended centerline of Runway 5R.

RUNWAY 5L/R

61. These properties would regularly have experienced noise from aircraft landing on Runway 5L/R either in the visual landing pattern or on straight in approaches. It would have been unusual for these properties to be overflown when a visual landing pattern was being used as these properties are on the opposite side of the left hand racetrack pattern; however, the Riddick and Leary properties certainly would have seen and heard aircraft in their approach turn to Runway 5L/R. Aircraft in the visual landing pattern for Runway 5L/R would have been no closer than ½ mile from these properties at an altitude of 400-800 feet. Aircraft on a straight in approach would have flown within approximately ½ - 1 mile of these properties, at an altitude of approximately 500-1,000 feet, but would not normally have directly overflown the properties.

RUNWAY 23L/R

62. Both properties are near the departure route for aircraft taking off from Runway 23L/R and aircraft would routinely have flown directly over or within approximately ½ mile of this property as they climbed out at an altitude of approximately 1,500-2,000 feet. Also, when aircraft departed NAS Oceana from Runway 23L/R to make the short trip to NALF Fentress to perform Field Carrier Landing Practices (FCLPs) on Runway 23 there, these aircraft would have flown within approximately ½ mile of these properties at an altitude of approximately 1,000 feet.

WATERMAN PROPERTY

63. The Waterman property is approximately 1.1 miles West and approximately 2.4 miles South of the approach end of Runway 5R and is not directly underneath any visual landing patterns.

RUNWAYS 5L/R AND 23L/R

64. Aircraft may have flown directly over or within a mile of this property when conducting IFR/radar approaches to Runway 5L/R and Runway 23L/R. These patterns are used on a regular basis (nearly daily) for training purposes, whether or not the airfield is in IFR conditions. These IFR/radar patterns, which are East of the airfield, are racetrack-shaped, as are the visual landing patterns, but are at a higher altitude, 2,000 feet. Any overflights that would have occurred from aircraft in those patterns would therefore have occurred at approximately 2,000 feet.

65. Aircraft departing from NAS Oceana Runway 5L/R making the short trip to NALF Fentress would have flown over or within 1 to 2 miles of the Waterman property at an altitude of approximately 1,500 feet. Also, aircraft departing on Runway 23L/R for areas to the East may have overflown directly over or within 1 to 2 miles of this property at an altitude of approximately 1,500-2,000 feet as they climbed to 4,000 feet.

66. Aircraft on an extremely wide downwind leg for Runway 23L/R may have flown within 1 mile of this property, but they would not have regularly overflown it.

RYAN PROPERTY

67. The Ryan property is approximately 3.5 miles south of the approach end of Runway 32 and is not near any visual landing patterns at NAS Oceana.

RUNWAY 5L/R

68. Similar to the Waterman property, aircraft may have flown directly over or within 1 mile of this property at an altitude of 2,000 feet when conducting IFR/radar approaches to Runway 5L/R and Runway 23L/R.

69. This property would also have experienced noise from aircraft departing Runway 5L/R and turning toward the south. These aircraft would have passed within approximately 1

mile of the Ryan property at an altitude of approximately 3,000 feet as they climbed up to 4,000 feet on departure course rules, but would not have routinely overflown it. The Ryan property would also have experienced noise from aircraft departing NAS Oceana Runway 5L/R and making the short trip to NALF Fentress to conduct FCLPs on Runway 5 there. When this pattern was being flown, aircraft would have departed on Runway 5L/R at Oceana, turned right (toward the ocean), and climbed to 1,500 feet for the flight to Fentress. This property would not routinely have been overflown during these flights, however.

RUNWAY 23L/R

70. This property would have experienced noise from aircraft departing from Runway 23L/R that turned toward the ocean, flying at an altitude of approximately 3,000 to 4,000 feet, but the property would not have been routinely overflown during these flights

I hereby swear under penalty of perjury pursuant to 28 U.S.C. 1746 that the foregoing information is true and accurate to the best of my knowledge and belief.

Commander Richard Erie, USN

27 April 2006

Date

# EXHIBIT E

# REVISED REPORT OF SANFORD FIDELL

**IN TESTWUIDE *et al.* *v.* THE UNITED STATES OF AMERICA**
**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

29 March 2006

Prepared for:

**U.S. DEPARTMENT OF JUSTICE**
Environment and Natural Resources Division
601 D Street, NW
Washington, D.C. 20004

Prepared by:

Sanford Fidell
**FIDELL ASSOCIATES, INC.**
23139 Erwin Street
Woodland Hills, California 91367

# Table of Contents


1 **INTRODUCTION AND SUMMARY** . . . . 1
- 1.1 PURPOSE OF REVISED REPORT . . . . 1
- 1.2 SUMMARY OF OPINIONS . . . . 1
- 1.3 PERSONAL BACKGROUND . . . . 2

2 **RECONSTRUCTION OF AIRCRAFT NOISE EXPOSURE AT TEST PLAINTIFFS' HOMES** . . . . 3
- 2.1 USE OF NOISEMAP SOFTWARE TO CALCULATE AIRCRAFT NOISE EXPOSURE LEVELS . . . . 3
- 2.2 INFORMATION AVAILABLE FOR RECONSTRUCTION OF AIRCRAFT NOISE EXPOSURE AT TEST PLAINTIFFS' HOMES . . . . 4
  - 2.2.1 1972, 1975 and 1978 Noise Exposure Contours . . . . 4
  - 2.2.2 1982 "OC600" Retrospective Analysis . . . . 5
  - 2.2.3 1988 "OC1" Retrospective Analysis . . . . 5
  - 2.2.4 1993 "Baseline" Case . . . . 5
  - 2.2.5 1997 "Baseline" Case . . . . 6
  - 2.2.6 2000 "OCSBLRD" Retrospective Analysis . . . . 6
  - 2.2.7 Summary of Noise Exposure Estimates . . . . 6
- 2.3 SUMMARY OF HISTORICAL NOISE EXPOSURE LEVELS AT TEST PLAINTIFFS' HOMES . . . . 7
  - 2.3.1 Plaintiff 1 . . . . 7
  - 2.3.2 Plaintiff 2 . . . . 7
  - 2.3.3 Plaintiff 3 . . . . 9
  - 2.3.4 Plaintiff 4 . . . . 9
  - 2.3.5 Plaintiff 5 . . . . 9
  - 2.3.6 Plaintiff 6 . . . . 9
  - 2.3.7 Plaintiff 8 . . . . 9
  - 2.3.8 Plaintiff 9 . . . . 9
  - 2.3.9 Plaintiff 10 . . . . 9
  - 2.3.10 Plaintiff 11 . . . . 10
  - 2.3.11 Plaintiff 12 . . . . 10
  - 2.3.12 Plaintiff 13 . . . . 10
- 2.4 NOTICEABILITY OF CHANGES IN AIRCRAFT NOISE EXPOSURE . . . . 10

3 **ADDITIONAL INFORMATION ABOUT FLUCTUATIONS IN THE AIRCRAFT NOISE ENVIRONMENT AT NAS OCEANA** . . . . 13
- 3.1 Single event measures of aircraft noise . . . . 13
- 3.2 Sources of variability in single event measurements of aircraft noise . . . . 14
- 3.3 NOISEMAP-based comparisons of single event aircraft noise levels . . . . 15

4 **PUBLIC RECORD OF ADVERSE COMMUNITY REACTION TO AIRCRAFT NOISE** . . . . 17
- 4.1 JUNE-AUGUST, 1966 . . . . 17

4.2 JANUARY - MARCH, 1975 . . . . . . 17
4.3 AUGUST, 1977 . . . . . . 18
4.4 JANUARY, 1978 . . . . . . 18
4.5 MAY, 1987 . . . . . . 18

**5 REFERENCES** . . . . . . 19

**APPENDIX A BACKGROUND INFORMATION ABOUT AIRCRAFT NOISE MEASUREMENT AND EFFECTS OF AIRCRAFT NOISE ON PEOPLE** . . . . . . 21
A.1 LOGARITHMIC NATURE OF ENVIRONMENTAL NOISE MEASUREMENT . . . . . . 21
A.1.1 decibel Notation . . . . . . 21
A.1.2 Duration-Related Measurement Conventions . . . . . . 23
A.2 PRIMARY EFFECTS OF ENVIRONMENTAL NOISE ON PEOPLE . . . . . . 25
A.2.1 Annoyance . . . . . . 25
A.2.2 Federal Land Use Compatibility Guidance . . . . . . 26
A.2.3 Speech Interference . . . . . . 28
A.2.4 Sleep Disturbance . . . . . . 30

**APPENDIX B HISTORICAL NEWSPAPER AND OTHER ACCOUNTS OF ADVERSE COMMUNITY REACTION TO AIRCRAFT NOISE AT NAS OCEANA** . . . . . . 33

**APPENDIX C PROFESSIONAL RÉSUMÉ OF SANFORD FIDELL** . . . . . . 45

# List of Figures


**Figure 1** Location of test plaintiffs' homes with respect to NAS Oceana. . . . . . . . . . . . . . . . . . . . . 8
**Figure 2** Illustration of basic difference between linear and decibel-like measurement scales.. . . 22
**Figure 3** Relationship of sound exposure level (SEL) to time history of an aircraft overflight. . . 24
**Figure 4** Day-Night Average Sound Level (DNL) defines one nighttime aircraft noise event as contributing as much to 24 hour noise exposure levels as ten daytime aircraft. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
**Figure 5** Dosage-response relationship adopted by the Federal Interagency Committee on Noise (FICON, 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
**Figure 6** Summary of standardized guidance on compatibility of land uses with noise exposure. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
**Figure 7** Relationship between the A-weighted level of continuous background noise and sentence intelligibility. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
**Figure 8** Relationship between articulation index and speech intelligibility. . . . . . . . . . . . . . . . . 29
**Figure 9** Summary of data from field studies of noise-induced sleep disturbances. . . . . . . . . . . 32


# List of Tables


**Table 1** Summary of estimated aircraft noise exposure (DNL, in dB) at test plaintiffs' homes. . . 7
**Table 2** Identification and geographic coordinates of Plaintiffs' homes. . . . . . . . . . . . . . . . . . . . . 8
**Table 3** Comparison of maximum tone corrected perceived noise levels of five aircraft in three flight regimes, per FLIGHT01.DAT, dated 27 March 2003. . . . . . . . . . . . . . . . . . 15
**Table 4** Comparison of tone-corrected, A-weighted sound exposure levels for five aircraft in three flight regimes, per FLIGHT01.DAT, dated 27 March 2003. . . . . . . . . . . . . . . . 16
**Table 5** Relationship of arithmetic, logarithmic, and decibel notation. . . . . . . . . . . . . . . . . . . . . 23

# 2 RECONSTRUCTION OF AIRCRAFT NOISE EXPOSURE AT TEST PLAINTIFFS' HOMES

## 2.1 USE OF NOISEMAP SOFTWARE TO CALCULATE AIRCRAFT NOISE EXPOSURE LEVELS

New aircraft noise contours are typically prepared for DoD air installations once or twice per decade, or when operational changes are likely to substantially modify prior noise exposure estimates. NOISEMAP is the computer program on which the Department of Defense relies to estimate the geographic distribution of aircraft noise exposure in the vicinity of military airfields. The program operates on input files that specify numbers, types, and times of day of aircraft operations, flight paths, runway use, and other factors that affect cumulative noise exposure levels. Originally developed in the early 1970s for the U.S. Air Force, this software may be used not only to produce noise exposure contours, but also to estimate noise levels at particular locations.

Since the measure of greatest concern for evaluating aircraft noise impacts ("Day-Night Average Sound Level", discussed in Section A.1.2.2) is by definition a 24-hour measure, noise is modeled for a representative 24 hour period. Noise modeling for military airfields in the past has customarily been undertaken on an "annual average busy day" (five day work week) basis, since the operational pace at most locations slows considerably on weekends. NOISEMAP is also capable of calculating noise exposure on an "annual average day" basis, however.

The U.S. Air Force has developed several versions of NOISEMAP and the databases on which it operates for various computing platforms and operating systems over the last three decades. Four generations of NOISEMAP software have been developed and applied at NAS Oceana since the 1970s. These include 1970s-era noise modeling exercises conducted first manually and then on a CDC 7600 mainframe computer; 1980s-era cases produced under NOISEMAP Versions 4.0 and 5.2; and later noise modeling exercises conducted in NOISEMAP Versions 6 and 7.

NOISEMAP algorithms, computing platforms, input formats and specifications have varied considerably over this time. The Air Force's software development strategy has not maintained backward compatibility across major releases of NOISEMAP, so not all of these noise modeling exercises can run under recent versions of NOISEMAP. When the original input files were available from older versions of NOISEMAP to identify runway usage, numbers, and types and times of day of aircraft operations on specific flight tracks, these input files were converted into NOISEMAP 6.5 file formats to yield as consistent a set of noise exposure calculations as possible. Version 7.0 of NOISEMAP was used to estimate noise exposure for the most recent (2000 baseline) case.

The magnitude of military aircraft noise exposure in the vicinity of NAS Oceana has varied with the operational pace and types of aircraft and training missions at least since the 1970s. Although little detailed information exists for reconstruction of aircraft noise exposure prior to the late 1970s, variability in operations at NAS Oceana since the 1940s must also have produced changes in the aircraft noise exposure in surrounding areas.

Another common metric of a single noise event is its sound exposure level: that is, a measure of the total energy in the noise event, normalized to a hypothetical one-second duration. All other things being equal, the sound exposure level of a noise event lasting 2 seconds is 3 dB greater than the sound exposure level of a noise event lasting 1 second.

Whether comparing momentary (*e.g.*, maximum) or integrated (duration-adjusted) measures, it is also important for present purposes to account for the annoyance rather than the A-weighted magnitude of overflight noise. The most widely accepted frequency-weighting procedure for annoyance comparisons is the Perceived Noise Level (PNL). (The PNL frequency weighting accords more weight to several of the more annoying, high frequency bands than does the A-weighting network.) To further account for the contribution of prominent tones to the annoyance of aircraft noise, a "tone adjustment" is added when one-third octave bands which contain 5 dB more acoustic energy than adjacent bands are detected. Thus, when attempting to account more fully for the annoyance of noise exposure created by individual overflights of different aircraft types, it is useful to compare tone-corrected PNL values of single events.

Tables 3 and 4 in Section 3.3 contain tone-corrected maximum and integrated PNL values of single event level data, respectively.

## 3.2 Sources of variability in single event measurements of aircraft noise

Several factors related to the geometry of an aircraft's flight path with respect to the measurement point affect measured single event levels. These include the elevation angle between the aircraft and the microphone; the direction of travel and orientation of the aircraft with respect to the microphone; and the slant range of the aircraft from the microphone at the point of closest approach. Single event levels also vary with the manner of operation of the aircraft (trim configuration, power settings, and airspeed), and with the vagaries of atmospheric propagation (*e.g.*, wind speed and direction, temperature gradients, temperature and humidity, *etc.*) and terrain conditions (*e.g.*, ground cover, nearby reflecting surfaces, *etc.*).

Field measurements of aircraft noise levels can be made under more or less rigorously controlled conditions. For aircraft noise certification purposes (as under Part 36 of the Federal Aviation Regulations), and for compiling entries for aircraft noise modeling databases, close coordination is maintained between aircraft and field measurement crews so that measurements can be made for well-defined conditions and precise flight paths. When aircraft noise measurements are made under less rigorously controlled conditions, it is common to have little knowledge and no control over aircraft flight paths and operating conditions, only meager knowledge of atmospheric and terrain conditions, and no fixed geometry of flight paths with respect to the microphone.

Single event noise levels made under different field conditions can vary considerably for all of the reasons noted above. Even under highly controlled conditions, it can be difficult to repeat single event levels to the nearest decibel from day to day. Thus, it is hardly surprising for field measurements made under loosely controlled conditions to differ from those made under more tightly constrained conditions. When comparing single event levels created by individual aircraft types, it is therefore important to base the comparisons on a consistent source of noise measurements.

## 3.3 NOISEMAP-based comparisons of single event aircraft noise levels

The most consistent and comprehensive collection of measurements of military aircraft noise is that contained in the database portion of the NOISEMAP software suite.[8] This database summarizes field measurements of aircraft noise emissions in a variety of operating modes, including departure, approach, and "pattern work" (that is, low altitude flight in the vicinity of airfields after takeoff, but before landing). The NOISEMAP database does not, however, contain exhaustive sets of measurements for all distinct and variant aircraft under all operating conditions. Substitutions of one aircraft's noise emissions for that of another are routinely made for predictive purposes in NOISEMAP, particularly when the aircraft share engines and are of similar gross weight.[9] Thus, for example, it is common practice in aircraft noise modeling to represent the noise emissions of one aircraft model (such as the F-4J) by those of another very similar model (such as the F-4C).

Table 3 compares maximum tone-corrected perceived noise levels for several of the aircraft that have operated at Oceana since the 1960s. On departure, the maximum PNLT values for A-6 and F-4 aircraft are not substantially different from those of the F/A-18 C/D models. Likewise, the maximum PNLT values for the A6-A and F-14B are not meaningfully different from one another. Similarly small differences in maximum PNLT values are apparent among the A-6 and F/A-18 C/D model aircraft on approach. In pattern flying, the maximum PNLT value produced by an F-4 was far greater than that produced by F-14 and F-18 aircraft.

**Table 3** Comparison of maximum tone corrected perceived noise levels of five aircraft in three flight regimes, per FLIGHT01.DAT, dated 27 March 2003.

| AIRCRAFT | DEPARTURE | APPROACH | PATTERN |
|---|---|---|---|
| A6-A | 120.7 | 116.1 | No data |
| F-4C | 123.2 | 112.6 | 114.5* |
| F-14A | 118.2 | 102.4 | 103.2 |
| F-14B | 120.9 | 99.2 | 101.9 |
| F/A-18 C/D | 121.9 | 116.5 | 102.2 |

* Value from NM64FLY1, dated 24 July 1997, from noise measurements made 30 March 1988, not contained in later NOISEFILE entries.

Table 4 compares tone-corrected sound exposure levels created by the same aircraft types seen in Table 3. Note that on departure, the sound exposure levels produced by the F-4 are less than 2 dB different from those produced by F/A-18 C/D, and the A-6A and F-14B also produce very similar tone corrected sound exposure levels. Likewise, tone-corrected sound exposure levels produced by the F/A-18 C/D models

[8] The NOISEFILE database in NOISEMAP is periodically updated by adding new aircraft models and eliminating aircraft that are no longer in common service. Recent updates of the database occurred in 1997 and 2003.

[9] For example, the F-4C and F-4J share the same basic turbojet engine (GE's J79), but the J model's engine (the J79-GE-10) produced 820 pounds more thrust than the 17,000 pounds of the C model's J79-GE-15 engine. Likewise A-6A and A-6E both flew with the same basic Pratt and Whitney J52 engine.

on approach differ very little from those of the A-6. As flown in pattern work, tone-corrected sound exposure levels produced by the F-4 were much greater than those of F-14 and F-18 aircraft.

**Table 4** Comparison of tone-corrected, A-weighted sound exposure levels for five aircraft in three flight regimes, per FLIGHT01.DAT, dated 27 March 2003.

| AIRCRAFT | DEPARTURE | APPROACH | PATTERN |
|---|---|---|---|
| A-6A | 113.7 | 110.7 | No data |
| F-4C | 116.7 | 106.8 | 108.5* |
| F-14A | 107.9 | 96.2 | 90.6 |
| F-14B | 109.8 | 94.5 | 89.7 |
| F/A-18 C/D | 118.2 | 110.9 | 94.5 |

* Value from NM64FLY1, dated 24 July 1997, from noise measurements made 30 March 1988, not contained in later NOISEFILE entries.

**Table 5** Relationship of arithmetic, logarithmic, and decibel notation.

| [redacted] | | | |
|---|---|---|---|
| One hundred times smaller | 1:100 | -2 | -20 dB |
| Ten times smaller | 1:10 | -1 | -10 dB |
| Same | 1:1 | 0 | 0 dB |
| Ten times greater | 10:1 | 1 | 10 dB |
| One hundred times greater | 100:1 | 2 | 20 dB |
| One thousand times greater | 1,000:1 | 3 | 30 dB |

#### *A.1.1.2 decibel arithmetic*

One of the consequences of the logarithmic basis for decibel notation is that the addition of quantities expressed in decibels does not follow familiar arithmetic conventions. For example, if one aircraft overflight produces a peak level of 60 dB at a point on the ground, then two simultaneous overflights by identical aircraft produce a peak level of 63 dB, not 120 dB.[11] This is because a factor of two is represented in decibel notation as 3 dB ($10 \log_{10} 2 = 3$).

Likewise, 60 dB + 60 dB + 60 dB — a factor of three — is only 65 dB, and 60 dB + 60 dB + 60 dB + 60 dB — a factor of four (or equivalently, two factors of two, or 63 dB + 63 dB) — is only 66 dB. It also follows that 40 dB + 60 dB is only 60 dB, because a quantity two orders of magnitude (powers of ten) smaller than another adds very little to the value of the quantity that is already two orders of magnitude greater.

### A.1.2 Duration-Related Measurement Conventions

#### *A.1.2.1 Family of "Equivalent Level" Noise Metrics*

The noise produced by aircraft overflights at a given point on the ground can vary considerably in level and duration, depending on the altitude and speed of the aircraft. Figure 3 shows the characteristic form of a time history of sound levels produced during an aircraft overflight of a fixed point on the ground. The sound pressure level at the measurement point initially rises to a maximum as an aircraft approaches, then declines as the airplane flies away. Since the sound pressure levels vary throughout the overflight, and since the durations of different overflights also vary, no single number can usefully characterize the moment-to-moment changes in sound levels. The usual method for representing the sound energy produced during the entire overflight is therefore to "normalize" the measurement to a standard time period (one second). This measure, "sound exposure level" (abbreviated SEL), simplifies the comparison of noise events of

[11] Recall that 60 dB is another way of representing a ratio of $10^6$, or one million (1,000,000) to one. One million plus one million is two million (2,000,000, or 2 X $10^6$), not one trillion (1,000,000,000,000, or $10^{12}$).


TEST PLAINTIFFS
VIRGINIA BEACH, VIRGINIA
Test Plaintiffs
Miltary Installation
Municipal Boundary
Miles
Kilometers
May
Levenson
Capps
Lindsay
Hoag
Dingle
Van Nostrand
NAS OCEANA
Hill
Ryan
Riddick
Waterman
Leary

# EXHIBIT G

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **CAROLE AND ROBERT TESTWUIDE, et. al.,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **No. 01-201 L** |
| | ) | **Honorable Victor J. Wolski** |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

**<u>Declaration of Commander Dirk Hebert</u>**

I, Commander Dirk Hebert, United States Navy, pursuant to 28 U.S.C. 1746, Declare as follows:

1. I am a Commander in the United States Navy, currently serving as the NJROTC Area Manager for Area SEVEN in Florida. I previously served as the Air Operations Officer of Naval Air Station (NAS) Oceana from July 1999 until March 2003. I am a qualified Naval Flight Officer and have logged in excess of 3500 hours in F-14 strike-fighter aircraft. Over the course of my career, I have served six tours of duty at NAS Oceana, including five operational flying tours from 1979 through 1997 where I personally participated in flight operations at NAS Oceana on a day-to-day basis.

2. I have reviewed the declaration by my successor CDR Richard Erie and agree with what he says in that declaration, including (with one minor exception) his description of the effects of flight operations on the 12 test plaintiffs. The minor exception is that with respect to the Ryan property, I would add that during arrival on Runway 23 at NAS Oceana under Visual Flight Rules conditions, aircraft in July 1999 might have flown over the Ryan property at altitudes between 1500 -2000 feet as aircraft were approaching the field to be sequenced for landing (entering the break). Such overflights would not have been routine, however, given the variation of flight tracks at that point in the approach pattern.

3. I further specifically agree, with the one addition noted above, that CDR Erie's description of the effects of flight operations on the properties of the 12 test plaintiffs accurately describes those effects as of July 1999 and thereafter, while I was Air Operations Officer at NAS Oceana.

I hereby swear under penalty of perjury pursuant to 28 U.S.C. 1746 that the foregoing information is true and accurate to the best of my knowledge and belief.

Commander Dirk Hebert, USN

4-27-2006

Date

# EXHIBIT H

HOFHEIMER/FERREBEE, P.C.
ATTORNEYS AND COUNSELORS AT LAW
1060 LASKIN ROAD, SUITE 12B
SANDPIPER KEY
VIRGINIA BEACH, VIRGINIA 23451-6365

MARY ELIZABETH DAVIS
JACK E. FERREBEE
SHEERA R. HERRELL
CHARLES R. HOFHEIMER
KRISTEN D. HOFHEIMER
JEFFREY D. TARKINGTON

TELEPHONE (757) 425-5200
FACSIMILE (757) 425-6100
*E-mail: jferrebee@hoflaw.com*
Our File No. 034233

April 27, 2006

VIA EMAIL ONLY

Steven D. Bryant, Esquire
Department of Justice, Environmental & Natural Resources Division
P.O. Box 663
Washington, DC 20044-0663

RE: Testwuide v. US

Dear Steve:

I am writing in response to your letter dated March 31, 2006.

This letter serves as a supplemental response to Defendant's Interrogatories 3 and 4 concerning the remaining test case properties.

**Supplemental Response to Interrogatory No. 3:**

All test case plaintiffs are entitled to $30,000 in just compensation as a result of the taking of the avigation easement. This amount is based on the noise mitigation study prepared by Wyle Laboratories for CDR Jeffrey T. Borowy, CDR Jeffrey T. Borowy's report to the CNO, the testimony of the property owners identified by Plaintiffs and the expert report of Dr. Jon Nelson. You are in possession of all of these documents.

Additionally, all test case plaintiffs should be compensated in the amount of $50,000.00 for the loss of the use and enjoyment of their properties.

**Supplemental Response to Interrogatory No. 4:**

See the appraisals of the test case plaintiffs.

Plaintiffs object to providing additional discovery responses beyond the deadline, and your letter raises a series of new requests, which are beyond the discovery schedule cutoff.

With kind regards, I remain

Very truly yours,

Jack E. Ferrebee

cc: Counsel

# EXHIBIT I

HOFHEIMER/FERREBEE, P.C.
ATTORNEYS AND COUNSELORS AT LAW
1060 LASKIN ROAD, SUITE 12B
SANDPIPER KEY
VIRGINIA BEACH, VIRGINIA 23451-6365

MARY ELIZABETH DAVIS
JACK E. FERREBEE
SHEERA R. HERRELL
CHARLES R. HOFHEIMER
KRISTEN D. HOFHEIMER
JEFFREY D. TARKINGTON

TELEPHONE (757) 425-5200
FACSIMILE (757) 425-6100
*E-mail: jferrebee@hoflaw.com*
Our File No. 034233

March 30, 2006

VIA EMAIL ONLY

Steven D. Bryant, Esquire
Department of Justice, Environmental & Natural Resources Division
P.O. Box 663
Washington, DC 20044-0663

RE: Testwuide v. US

Dear Steve:

I am writing in response to your email dated March 24, 2006.

This letter serves as a supplemental response to Defendant's Interrogatories 3 and 4 concerning the May Property.

**Supplemental Response to Interrogatory No. 3:**

Ms. May is entitled to $30,000 in just compensation as a result of the taking of the avigation easement. This amount is based on the noise mitigation studies prepared by Wyle Laboratories, CDR Jeffrey T. Borowy, the testimony of the property owners identified by Plaintiffs and the expert report of Dr. Jon Nelson.

Additionally, Ms. May should be compensated in the amount of $50,000.00 for the loss of the use and enjoyment of her property.

**Supplemental Response to Interrogatory No. 4:**

Plaintiffs have not appraised the before and after values of the May Property.

If you have any further questions or concerns regarding Ms. May's property, please do not hesitate to contact me.

With kind regards, I remain

Very truly yours,

Jack E. Ferrebee

cc: Counsel

# EXHIBIT J

# Final Environmental Impact Statement (FEIS) for the Introduction of F/A-18 E/F (Super Hornet) Aircraft to the East Coast of the United States




Cooperating Agencies:

Federal Aviation Administration

Department of the Air Force

Department of the Navy

July 2003

***Cultural Resource:*** Cultural resources are any prehistoric or historic district, site, or building, structure, or object considered important to a culture, subculture, or community for scientific, traditional, religious, or other purposes.

***Day-Night Average Sound Level (DNL):*** DNL is a noise metric combining the levels and durations of noise events and the number of events over an extended period. It is a cumulative average computed over a 24-hour period to represent total noise exposure. DNL also accounts for the more intrusive nighttime noise by adding a 10 dB penalty for noise events after 10:00 pm and before 7:00 am. DNL is used at all U.S. airports with the exception of those in California, which use a similar metric.

***Decibel (dB):*** A sound measurement.

***Endangered Species***: The Endangered Species Act (ESA) (16 U.S.C. 1531, *et seq.*) of 1973 defined the term "endangered species" to mean any species (including any subspecies of fish or wildlife or plant, and any distinct population segment of any species or vertebrate fish or wildlife which breeds when mature) that is in danger of extinction throughout all or a significant portion of its range.

***Environmental Justice:*** As defined by Presidential Executive Order 12898, *Federal actions to Address Environmental Justice in Minority and Low-Income Populations*, review must be made as to whether an action disproportionately impacts minority and/or low-income populations.

***Field Carrier Landing Practice (FCLP):*** FCLP consists of touch-and-go operations on a runway designed to simulate aircraft carrier landings. Aircraft will touch down on a simulated carrier deck and take off again into a left-hand pattern. The pilots are graded on their landings by the Landing Signals Officer (LSO).

***Indirect Economic Impacts:*** As defined in the IMPLAN model, changes in purchases made between industries as they respond to the new demands of the directly affected industry.

***Induced Economic Impacts:*** As defined in the IMPLAN model, typically reflects changes in spending from households as income increases or decreases due to the changes in the directly affected industry.

***Inert Ordnance:*** Ordnance (bombs, rockets, or artillery shells) without high explosive materials.

***Instrument Flight Rules (IFR):*** A standard set of rules that all pilots must follow when operating under conditions more stringent than visual flight rules. These conditions include operating an aircraft in clouds or above certain altitudes prescribed by FAA regulations and operating in some locations, such as major civilian airports. ATC agencies ensure separation of all aircraft operating under IFR.

# EXHIBIT K

could obtain that would you recommend conducting a hedonic study of Virginia Beach as opposed to relying on your estimated NDI for a meta analysis?

MR. QUINN: Same objection.

A. By recommendation, I'm going to assume that you mean that this is a requirement of this case and I don't think it's a requirement of this case.

MR. QUINN: Excuse me, don't interrupt him, please.

A. Because all the previous studies have obtained a negative result. My understanding is that the way this case is now going forward is that my expertise will establish a negative impact and other analyses of these properties will determine the exact damages. So at this juncture, with hindsight as perfect, at this juncture my expertise is to determine the negative effect of aircraft noise. I believe I have done that to my satisfaction. And other testimony will establish the exact magnitude of the impact.

unlikely that that would result for Virginia Beach or any other airport.

Q. Given the fact that it is possible, however unlikely, given the fact that it is possible that there could be no relationship between aircraft noise and property values, residential property values would you recommend, sitting here now, conducting a hedonic study of Virginia Beach with empirical data from Virginia Beach and Chesapeake rather than relying on your meta analysis?

MR. QUINN: Excuse me. Objection. I think counsel has ruled on and answered his own question and then based the question on his ruling, and I object for that reason.

A. I believe that's not necessary because my expertise is being used to establish that there is a negative impact of noise on property values. I believe I've done that to my satisfaction. To my professional, in terms of my professional judgment and expertise in this area. And that other

testimony will establish the magnitude of the damages for the 14 or so properties in question.

Q. Okay. Getting back to my other question I don't think you answered is there anything preventing you from obtaining the data that you would need from Virginia Beach to conduct a hedonic study?

A. I don't know the full answer to that question whether or not Virginia Beach would object to my doing so or have restrictions on the use of their data. I just have not investigated the issue at all.

Q. Have you ever encountered a community anywhere where that situation has occurred that you just suggested that you couldn't get the data that you needed to conduct your hedonic study?

A. Well, I've certainly been denied data on other issues.

Q. I'm talking about aircraft noise on residential property values.

A. Not in my experience have I been refused

calculate what would be the effect on the residential property value. So it's not being claimed that there is a noise impact at 61 dB. Rather, that's the unaffected property that's being used as the basis for measuring the impact of noise at the alternative location which is 72 dB.

Q. So for a nonscientist that South Gate properties in the South Gate neighborhood, those would be sort of the control, the unaffected properties, is that --

A. That would be one way of thinking about it, yeah.

Q. And do you agree with that?

A. I agree that there is a background noise level at which aircraft noise should have little or no impact, and what I've stated repeatedly I believe both in my reports and in prior writings is that that's about 55 to 60 dB.

Q. Okay. Is 61 dB close enough to that where you would, you're satisfied that the South Gate neighborhood was sort of the control, the

unaffected neighborhood?

A. Yes.

Q. Because of the background ambient noise?

A. Yes.

**(Whereupon, Deposition Exhibit Number DX 118, The Effect of Airport Noise on Housing Values, a Summary Report, marked.)**

Q. Now showing you another Booz Allen and Hamilton study entitled The Effect of Airport Noise on Housing Values, a Summary Report. I believe this is a summary of the four reports that Booz Allen and Hamilton engaged in their four studies of BWI, Los Angeles, JFK and LaGuardia. Do you agree with that?

MR. QUINN: My copy ends in midsentence.

MR. BRYANT: I know. I only gave you a portion. Do you have the same problem of getting a headache with the stuff? I only incorporated part of it.

MR. QUINN: So you don't mean that this is the whole thing?

Q. Okay. So the airport's there, the houses are there, and based on that noise depreciation index is determined based on which contour you're in and exposure you're experiencing.

A. But let me, if I could correct that, the noise depreciation index applies to a range of noise outcomes, roughly 65 to 79.9 dB. It doesn't depend on which noise contour you're in. It is a value expressed per decibel of noise exposure.

Q. Okay.

A. There's probably some variation that over the studies because people have tried to do things like investigating the effects of accessibility as you're closer or further away from the airport. But the values I have recorded are not tied to a particular noise contour.

Q. And when someone buys a property at whatever one dB increment is within one of those contours they, according to your theory, would be buying it at a discount depending on whether it was 65, 70, or 75 one dB per, I guess one dB increase

from -- what would be the threshold, the beginning of that, where the NDI would begin?

A. Well, I'll stick to 65 because that's the basis for the complaint and I think that the 55 to 60 is background noise levels in most areas. The upper limit that I have applied the values in these tables to, with some modification, would be 79.9 dB if I can use that fineness of measurement. For reasons I tried to indicate in my reports there's just a lack of abundant data on 80 decibels and above.

Q. So someone buys a property in this 70 contour, at 70 we'll say, so that's 5 whatever the NDI is, let's say it's one percent per dB, so they get a 5 percent discount on their house of what it would be outside of the contours or, you know, on the 55 to 60 as you said. None of these studies, is it correct to say none of these studies are measuring okay, then the airport expands over the next year, new airplanes come in and the noise exposure changes, that house that was at 70 is now

# EXHIBIT L

as the next defense exhibit.

(Notice of Appraisal for Fiscal Year 2006 marked as Defense Exhibit Number 147)

BY COMMANDER YACONO:

Q. Well, Defendant's Exhibit 147 is the Notice of the Appraisal for fiscal year 2006, effective July 1, 2005 to June 30, 2006. It lists the current total new appraisal being 198,983.

Do you think that's a fair representation of the appraisal of your home?

A. No.

Q. Is it too high or too low?

A. Way too low.

Q. Why do you say that?

A. Just because of the market and the fact that I live in a very -- people stay in my area. So when a house comes up, it's -- and I know what my neighbor's house sold for.

Q. In other words, are there houses up for resale in your area? Are they on the market for long?

A. Oh, no.

Q. Doesn't sound like it from what you're telling me.



ERSON!
L
NG 18
56-9054
2006
30, 2006
OTAL
198983
176958
SED VALUE
RCH 18
ISCUSS THE
DINTMENT.
L104551

Q. Okay. You mentioned previously that you don't think -- if you had to put the house on the market, you don't think you would get as much as you would want?

A. I don't recall mentioning -- saying that.

Q. Well --

A. I think what you are referring to is the tax assessment, and I said I believe it's worth more than that; isn't that what I said?

Q. Well, I did ask you about the taxes and you said -- you said in your opinion the appraisal that was given by the City you thought was much less than the current value of the home.

A. Yes.

Q. Then I asked you more recently, if you had to -- if you had decided to put your house on the market currently, in terms of do you believe you can -- how long would it be on the market, would you have any difficulty selling your home. And I thought you said --

A. I thought I said -- maybe I didn't -- I thought I said because of the fact we're in a high demand area, I probably wouldn't have any trouble selling my house.

# EXHIBIT M

# Table 3.1.1-1. Annual Basic Operations at NAS Oceana for Baseline

| Operation | F-14 Fleet | | | F-14 FRS | | | F/A-18 Fleet | | | F/A-18 FRS | | | Adversary | | | Transient Jet | | | Transient Propeller [1] | | | All Aircraft | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type | Day | Night | Total | Day | Night | Total | Day | Night | Total | Day | Night | Total | Day | Night | Total | Day | Night | Total | Day | Night | Total | Day | Night | Total |
| Southeasterly Departures @ 60% | 6,588 | 308 | 6,896 | 3,239 | 51 | 3,290 | 8,487 | 1,548 | 10,035 | 5,490 | 69 | 5,559 | 478 | 1 | 479 | 51 | 1 | 52 | 226 | 2 | 228 | 22,195 | 385 | 22,580 |
| Northeasterly Departures @ 40% | 2,943 | 77 | 3,020 | 967 | 1 | 968 | 276 | 12 | 288 | 1,076 | 1 | 1,077 | 557 | 2 | 559 | 906 | 10 | 916 | 1,437 | 31 | 1,468 | 14,797 | 256 | 15,053 |
| Interfacility Departures to Fentress | 1,350 | 835 | 2,185 | 849 | 250 | 1,099 | 825 | 835 | 1,660 | 1,269 | 345 | 1,614 | | | | | | | | | | 4,293 | 2,265 | 6,558 |
| Interfacility Arrival from Fentress With an Overhead Approach | 1,069 | 864 | 1,933 | 368 | 140 | 508 | 665 | 814 | 1,479 | 751 | 193 | 944 | | | | | | | | | | 2,853 | 2,011 | 4,864 |
| Interfacility Arrival from Fentress With a Straight-In Approach | 91 | 161 | 252 | 366 | 225 | 591 | 30 | 151 | 181 | 360 | 310 | 670 | | | | | | | | | | 847 | 847 | 1,694 |
| Visual Straight-In/Full-Stop Arrival from S | 90 | 28 | 118 | 214 | 1 | 215 | 108 | 42 | 150 | 234 | 14 | 248 | 5 | | 5 | 18 [3] | [3] | 18 [3] | 50 [3] | 1 [3] | 51 [3] | 718 | 86 | 804 |
| Visual Straight-In/Full-Stop Arrivals from NE | 64 | | 64 | 270 | | 270 | 48 | | 48 | 65 | | 65 | 11 | | 11 | | | | | | | 459 | | 459 |
| Instrument Arrivals | 269 | 26 | 295 | 869 | 197 | 1,066 | | | | 1,412 | 292 | 1,704 | 85 | | 85 | 280 | 2 | 282 | 652 | 10 | 662 | 3,567 | 527 | 4,094 |
| Overhead Arrivals at Oceana from S | 6,473 | 436 | 6,909 | 2,213 | 18 | 2,231 | 5,820 | 1,886 | 7,706 | 1,826 | 93 | 1,919 | 367 | | 367 | 664 [4] | 4 [4] | 668 [4] | 973 [4] | 10 [4] | 983 [4] | 18,336 | 2,447 | 20,783 |
| Overhead Arrivals at Oceana from NE | 2,527 | | 2,527 | 450 | | 450 | 2,354 | | 2,354 | 2,700 | | 2,700 | 570 | | 570 | | | | | | | 8,601 | | 8,601 |
| Depart and Reenter to Overhead | 50 | | 50 | 935 | 158 | 1,093 | 1 | | 1 | 930 | 224 | 1,154 | | | | | | | | | | 1,916 | 382 | 2,298 |
| Touch & Go [2] | 18,049 | 971 | 19,020 | 19,812 | 2,592 | 22,404 | 14,792 | 3,674 | 18,466 | 32,536 | 2,276 | 34,812 | 2,334 | | 2,334 | 1,110 | | 1,110 | 3,088 | 42 | 3,130 | 91,721 | 9,555 | 101,276 |
| GCA Box [2] | 280 | 52 | 332 | 2,474 | 1,170 | 3,644 | | | | 1,216 | 156 | 1,372 | | | | 714 | 4 | 718 | 2,090 | 28 | 2,118 | 6,774 | 1,410 | 8,184 |
| FCLP [2] | 4,512 | 720 | 5,232 | 1,030 | 2,570 | 3,600 | 2,016 | 184 | 2,200 | 2,064 | 176 | 2,240 | | | | | | | | | | 9,622 | 3,650 | 13,272 |
| **GRAND TOTAL** | 44,355 | 4,478 | 48,833 | 34,056 | 7,373 | 41,429 | 35,422 | 9,146 | 44,568 | 51,929 | 4,149 | 56,078 | 4,407 | 3 | 4,410 | 3,743 | 21 | 3,764 | 8,516 | 124 | 8,640 | 186,699 | 23,821 | 207,722 |

Source: ATAC, 2002
[1] Not Modeled.
[2] Counted as two operations.
[3] Includes Visual Straight-in/Full Stop (from NE) and Instrument Arrivals.
[4] Includes Overhead Arrivals at Oceana (from NE).

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **CAROLE AND ROBERT TESTWUIDE, et. al.,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **No. 01-201 L** |
| | ) | **Honorable Victor J. Wolski** |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT IN SUPPORT OF ITS MOTION TO DISMISS OR, ALTERNATIVELY, FOR SUMMARY JUDGMENT**

Pursuant to Rule 56(h)(1) of the Rules of the Court of Federal Claims, Defendant United States of America submits the following proposed findings of uncontroverted fact in support of its Motion to Dismiss or, alternatively, for Summary Judgment. The exhibits cited below are being submitted electronically as attachments to Defendant's motion.

1. Naval Air Station ("NAS") Oceana is located in Virginia's southeastern coastal region within the City of Virginia Beach, Virginia. Declaration of Captain Thomas F. Keeley ("Keeley Decl."), Exhibit A, ¶ 6. Virginia Beach is part of the Hampton Roads region, which includes six counties and seven cities in addition to Virginia Beach, Chesapeake, and Norfolk. Keeley Decl., ¶ 6. Located south of the Chesapeake Bay and west of the Atlantic Ocean, NAS Oceana is approximately 100 miles southeast of Richmond, Virginia, and 200 miles northeast of Raleigh, North Carolina. Keeley Decl., ¶ 6. For over sixty-five years, NAS Oceana has been vital to U.S. Naval aviation and of strategic importance to national defense. Keeley Decl., ¶ 6.

2. NAS Oceana was commissioned on August 17, 1943, and designated a Master Jet Base in 1957. Keeley Decl., ¶ 7. A Master Jet Base is a location with permanent basing of carrier air groups, including in some cases the provision of auxiliary landing fields to conduct Field Carrier Landing Practice ("FCLP") exercises. Keeley Decl., ¶¶ 7, 9.

3. The United States Navy's ("Navy") finest tactical jet aircraft have been flown by squadrons assigned to NAS Oceana, including the A-4 Skyhawk, the F-4 Phantom, the A-6 Intruder, the F-14 Tomcat, and the F/A-18 Hornet. Keeley Decl., ¶ 7. The facility currently serves as home base for 16 F/A-18 squadrons, including 10 squadrons of F/A-18 C/D Hornet aircraft that were realigned to NAS Oceana from NAS Cecil Field in Florida as a result of the Navy's implementation of the 1995 round of base closures that were conducted pursuant to the Defense Base Closure and Realignment Act of 1990, as amended (10 U.S.C. § 2687 note) ("BRAC Law"). Keeley Decl., ¶ 8. The mission of all NAS Oceana squadrons is to be prepared to conduct timely, sustained combat operations from the sea, in support of our Nation's interests, whenever called upon to do so. Keeley Decl., ¶ 8.

4. NAS Oceana is located on nearly 5,400 acres and employs over 12,000 Navy employees. Keeley Decl., ¶ 10. The base spends approximately $400 to $500 million per year in goods and services and has a gross annual payroll of over $773 million, with a total economic impact on the Hampton Roads region exceeding $1 billion annually. Keeley Decl., ¶ 10. NAS Oceana is the largest employer in Virginia Beach. Keeley Decl., ¶ 10.

5. To train for operating from an aircraft carrier at sea, squadrons stationed at

NAS Oceana typically use nearby Naval Auxiliary Landing Field ("NALF") Fentress for Field Carrier Landing Practice ("FCLP") operations. Keeley Decl., ¶ 9. FCLPS are touch-and-go operations performed on a runway designed to simulate landing on an aircraft carrier. Keeley Decl., ¶ 9. NALF Fentress was established in 1940 and is located approximately seven miles southwest of NAS Oceana in Chesapeake, Virginia. NALF Fentress is under the command of NAS Oceana. Keeley Decl., ¶ 9.

6. Flight operations at NAS Oceana, as with any naval air station, are reported annually in the air station's Air Traffic Activity Reports ("ATARs"). Declaration of Commander Stephen G. Riley III ("Riley Decl."), Exhibit B, ¶¶ 6, 7. Until 1996, NAS Oceana ATARs were single-page forms that reflected the number of aircraft operations that occurred at the NAS Oceana airfield on an annual basis. Riley Decl., ¶¶ 7, 15. Operations at NALF Fentress were documented in the "Remarks" section of ATARs prepared before 1996. See also Riley Decl., Footnote 2 (some earlier ATARs cover periods of less than one year, in which case one must add the data from the two or more ATARs that, together, cover that year).

7. Beginning in 1996, ATARs, including those for NAS Oceana, were separated into two forms. Riley Decl., ¶ 20. One ATAR form, "Control Tower Operations," reported the number of aircraft operations in the air space controlled by NAS Oceana's air traffic control tower. Riley Decl., ¶ 20.

8. The second ATAR form, "Approach Control Operations," recorded the number of aircraft operations counted by radar room personnel. Riley Decl., ¶ 21. The NAS Oceana air traffic control tower air space includes a limited geographic area surrounding the air station. Riley Decl., ¶ 9. It extends to distances of 4.3 to 5 nautical

miles away from the air station, depending upon direction, and up to an altitude of 2,500 feet. Riley Decl., ¶ 9. Conversely, the air space controlled by radar is far greater, extending in some cases many miles, and up to an altitude of 23,000 feet, but does not include the control tower's air space. Riley Decl., ¶ 10.

9. Compared to many prior years, however, 1999 was a year of relatively light flight activity − less than 133,000 operations as indicated by the 1999 ATAR forms. Riley Decl., ¶ 22, Table 1. By comparison, in 1981 the reported number of operations was 231,753. Riley Decl., Table 1. As CDR Stephen Riley indicates in his declaration, the older ATARs are not precisely an "apples-to-apples" comparison with the newer (1996 and thereafter) ATARs in terms of the number of operations that occurred in the control tower's airspace. Riley Decl., ¶¶ 15-22. Nevertheless, the bottom line number on the older forms is a "reasonably close approximation" of the operations in the control tower's airspace that year. Riley Decl., ¶ 18.

10. And in 1982, there were close to 178,000 operations. See Riley Decl., Table 1. The high operations continued between 1989 and 1995 as well with annual operations consistently approaching or exceeding 200,000 operations, including a high of over 229,000 operations in 1992. See Riley Decl., Table 1.

11. NAS Oceana has four runways that operate in both directions. Declaration of Commander Richard S. Erie ("Erie Decl."), Exhibit D, ¶ 6. The dual intersecting runways are designated Runways 5/23 Left and Right and Runways 14/32 Left and Right as follows[1]:

[1] See Erie Decl., ¶ 8.




12. The designation of the runway depends on which way the runway is to be approached. The primary factor dictating runway use is wind direction. Erie Decl., ¶ 9. As reflected in studies at NAS Oceana, the relative frequency of the use of each runway has remained generally the same, consistent with the following approximate percentages[2]:

Runway 5L/R – 50%
Runway 23L/R – 34%
Runway 32L/R – 14%
Runway 14L/R – 2%

13. NAS Oceana provides for the safe operation of its aircraft with "course rules" that provide guidance for the basic departure, arrival and landing procedures pilots follow. Erie Decl., ¶ 10. The course rules incorporate guidance on altitude and flight tracks to provide sufficient separation of aircraft out of and back into the air station. Erie Decl., ¶¶ 11, 12.

[2] See Erie Decl., ¶ 25.

14. As is the case with any Navy or Marine Corps air station to which carrier-based aircraft are assigned, the shore-based landing procedures and patterns at NAS Oceana are designed to mirror the procedures and pattern used when landing on an aircraft carrier at sea. Erie Decl., ¶ 13.

15. Landing an aircraft on a moving (sometimes pitching and rolling) ship in daylight hours is an extremely difficult endeavor; at night it becomes arguably the most challenging maneuver in aviation. Erie Decl., ¶ 14. The patterns flown day and night around the aircraft carrier are designed to maneuver each aircraft into a position behind the ship where the pilot can land the aircraft through use of the Fresnel Lens Optical Landing System ("FLOLS"). Erie Decl., ¶ 14. The FLOLS is a series of lights that allow the pilot to observe his position so that he may make the appropriate adjustments to land safely. Erie Decl., ¶ 14.

16. While the basic "stick and rudder" skills required are acquired early in a flying career, the fine motor skills to do it safely and successfully every time are perishable, necessitating continuous refresher training. Erie Decl., ¶ 14. Consequently, every runway in use at a Navy field has a FLOLS at the approach end so that pilots may always practice "flying the ball," and pilots practice shipboard landing every time they land an aircraft. Erie Decl., ¶ 14.

17. The VFR ("Visual Flight Rules") landing pattern is a left-hand racetrack or oval pattern oriented along a runway heading with one end of that oval being a descent to landing. Erie Decl., ¶ 15. When landing at sea, the altitude of the landing pattern is 600 feet. Erie Decl., ¶ 15.

18. As a noise mitigation measure, the pattern at NAS Oceana was elevated to

1,000 feet many years ago. Erie Decl., ¶ 15.

19. In general, pilots strive to recreate the "approach turn" to landing in the same manner every time, from a location 1.1 to 1.5 nautical miles abeam (directly to the side) of the intended point of landing, at 1,000 feet above ground. Erie Decl., ¶ 15. Each position along the racetrack pattern has specific aircraft parameters that the pilot is looking to maintain. Erie Decl., ¶ 15. The diagram below is illustrative of the VFR landing pattern[3]:




20. Aircraft enter the pattern by performing "the break," which means they fly upwind in the direction of the runway heading and then execute the "crosswind turn" to head downwind. Erie Decl., ¶ 17. The location of the "crosswind turn" will vary

[3] See Erie Decl., ¶ 16.

depending, in part, upon the number of aircraft in the pattern. Erie Decl., ¶ 18. In general, the more aircraft in the pattern, the more the oval will extend. Erie Decl., ¶ 18.

21. At NAS Oceana, "the break" is performed at an altitude of 1,500 feet. Erie Decl., ¶ 17. Once on the downwind heading, aircraft descend to a pattern altitude of 1,000 feet and decelerate as they move towards "the 180" (the point at which the aircraft begins its turn to land). Erie Decl., ¶ 17. "The 90" is the point halfway through the approach turn. Erie Decl., ¶ 17.

22. Because of the requirement for continuous training in carrier landing, "touch-and-go" operations are performed regularly at NAS Oceana. Keeley Decl., ¶ 15. As the name implies, a touch-and-go involves a practice takeoff and landing. Keeley Decl., ¶ 15. Aircraft will typically perform one to three touch-and-go operations upon arrival at the station. Keely Decl., ¶¶ 16, 19.

23. FCLPs do, however, share some similarities with touch-and-go operations. Keeley Decl., ¶ 18. The basic geometry of the touch-and-go and FCLP patterns is the same. Keeley Decl., ¶ 17. At NAS Oceana the pattern altitude for both touch-and-gos and FCLPs is 1,000 feet. Keeley Decl., ¶ 18. However, there is a critical difference between touch-and-gos and FCLPs, namely the intensity and duration of FCLP's versus touch-and-go landings. Keeley Decl., ¶ 18.

24. The "approach turn" will also vary, but to a lesser degree than the "crosswind turn." Erie Decl., ¶ 19. For example, the position of "the 180" will vary based on winds in the upwind direction. Erie Decl., ¶¶ 19-20. When winds in the upwind direction are light, the aircraft will have to fly a longer downwind leg before it begins its approach turn, to allow enough room for the aircraft to still have the required

15-18 seconds for the final approach heading. Erie Decl., ¶ 19. When this occurs the "approach turn" end of the oval will lengthen. Erie Decl., ¶ 19. Conversely, with higher winds in the upwind direction, the "approach turn" will occur closer to the ideal abeam position, because when the plane turns to head upwind it will require less space in which to line up for final approach. Erie Decl., ¶ 19.

25. An FCLP pattern can have as many as five aircraft in it at one time. FCLPs are prescheduled, graded training periods, that normally last approximately 45 minutes, during which each aircraft will conduct from seven to ten touch-and-gos. Keeley Decl., ¶ 19. In contrast, an individual aircraft would typically perform approximately one to three touch-and-gos, and, while it is not uncommon to have more than one aircraft in the pattern performing touch-and-gos at the same time, it is generally one to three aircraft. Keeley Decl., ¶ 19.

26. FCLP operations are primarily conducted at Naval Auxiliary Landing Field ("NALF") Fentress rather than NAS Oceana. Keeley Decl., ¶ 9.

27. The departure, arrival, and landing patterns at NAS Oceana have remained generally the same over the years. Keeley Decl., ¶ 12. The altitudes at which these patterns were flown in the last three decades have changed somewhat, in that some pattern elevations have been raised, but these changes only served to reduce noise impacts on the ground and did not affect the nominal flight tracks or altitude that the aircraft flew when in the landing patterns. Keeley Decl., ¶ 13.

28. Notwithstanding the relative consistency of the predominant flight tracks, no two flights, even of the same aircraft flown by the same pilot, are identical; nor does each flight proceed at precisely the same altitude throughout the flight or cover precisely

the same track over the ground. Keeley Decl., ¶ 20. None of the changes in flight operations since at least 1979 would have affected any of the flight operations with respect to the test plaintiffs' properties. Keeley Decl., ¶ 13.

29. The predominant aircraft that have operated at NAS Oceana have included the F-4 Phantom, the A-6 Intruder, the F-14 Tomcat, and the F/A-18 Hornet. Keeley Decl., ¶ 7. The F-4 Phantom operated in the 1960s, 1970s, and early 1980s. Keeley Decl., ¶ 7. The A-6 Intruder operated from the 1970s through the mid-1990s. Keeley Decl., ¶ 7. The F-14 Tomcat has operated at NAS Oceana from the mid-1970s until the present. Keeley Decl., ¶ 7. Although one squadron of F/A-18 A aircraft was present at NAS Oceana since the mid-1990's, the first F/A-18 C/D Hornet squadrons arrived at NAS Oceana in December, 1998. Keeley Decl., ¶ 7.

30. These various fighter jets produce different noise levels for a variety of reasons, such as size, weight, design, and engine type. Revised Report of Sanford Fidell, 29 March 2006, ("Fidell Report"), Exhibit E, p. 15. A relative comparison of the perceived single event noise level produced by these aircraft can be found in NOISEMAP, the computer program relied upon by the Department of Defense to estimate noise exposure surrounding military air stations. Fidell Report, p. 3.

31. The most widely accepted frequency-weighting procedure for annoyance comparisons is the Perceived Noise Level ("PNL"), which accords more weight to the more annoying high frequency sound bands. Fidell Report, p. 14.

32. NOISEMAP contains the most consistent and comprehensive database of field measurements of noise produced by military aircraft in various modes, including departure, approach, and pattern operations. Fidell Report, p. 15. The database does not

have measurements for all the variant aircraft in all operations. Fidell Report, p. 15. It is common to substitute one aircraft's noise measurements for another, particularly when the aircraft share the same engines and are similar in weight. Fidell Report, p. 15.

33. The following table provides the maximum tone-corrected PNLs for the various aircraft, which reflects the greatest single value measured in decibels ("dB") at any instant during a flyover[4]:

| AIRCRAFT | DEPARTURE | APPROACH | PATTERN |
|---|---|---|---|
| A6-A | 120.7 | 116.1 | No data |
| F-4C | 123.2 | 112.6 | 114.5 |
| F-14A | 118.2 | 102.4 | 103.2 |
| F-14B | 120.9 | 99.2 | 101.9 |
| F/A-18 C/D | 121.9 | 116.5 | 102.2 |

34. Aircraft single event noise levels are also measured in terms of the sound exposure level (SEL), which reflects the total energy produced in a single flyover, normalized to a hypothetical one-second duration. Fidell Report, p. 14, 23.

35. The sound pressure level at the measurement point on the ground initially rises to a maximum as an aircraft approaches, then declines as the airplane flies away. Fidell Report, p. 23. Since the sound pressure levels vary throughout the overflight, and since the durations of different overflights also vary, no single number can usefully characterize the moment-to-moment changes in sound levels. Fidell Report, p. 23. The usual method for representing the sound energy produced during the entire overflight is therefore to "normalize" the measurement to a standard time period (one second). Fidell Report, p. 23.

36. Tone-corrections further assist in accounting for the contribution of prominent tones to the annoyance of aircraft noise. Fidell Report, p. 14. The following

[4] This table was extracted from the Fidell Report, p. 15.

table lists the tone-corrected, A-weighted SELs for the predominant aircraft at NAS Oceana from the 1970s to 2000[5]:

| AIRCRAFT | DEPARTURE | APPROACH | PATTERN |
|---|---|---|---|
| A-6A | 113.7 | 110.7 | No data |
| F-4C | 116.7 | 106.8 | 108.5 |
| F-14A | 107.9 | 96.2 | 90.6 |
| F-14B | 109.8 | 94.5 | 89.7 |
| F/A-18 C/D | 118.2 | 110.9 | 94.5 |

37. When the VFR pattern was flown from Runway 5L/R, the Capps and Hill properties experienced frequent overflights. Erie Decl., ¶¶ 29, 57. On the downwind leg, aircraft in this pattern would have regularly flown over or within approximately one-half mile of the Capps property at an altitude of approximately 1,000 feet. Erie Decl., ¶ 29. The Hill property is located on the approach turn for Runway 5L/R. Erie Decl., ¶¶ 56, 57; see also Exhibit F. It is just past the "180 position" and therefore would have been routinely overflown by aircraft in the landing pattern. Erie Decl., ¶¶ 56, 57. These aircraft would have passed directly over or within approximately one-half mile of this property at an altitude of approximately 700-800 feet as they descended into the "approach turn." Erie Decl., ¶ 57; see generally Declaration of Commander Dirk Hebert ("Hebert Decl."), Exhibit G.

38. In addition to overflights in the downwind pattern from Runway 5L/R, the Capps property is also underneath the VFR landing pattern for Runway 14L/R. Erie Decl., ¶ 31; see also Exhibit F. It is near "the 90" (halfway through the approach turn), so during the roughly two percent of the time when Runway 14L/R was in use aircraft would have flown over or within approximately one-half mile of the Capps property at an

5 This table was extracted from the Fidell Report, p. 16.

altitude of approximately 450-500 feet. Erie Decl., ¶ 31; see generally Hebert Decl..

39. When Runway 23L/R was in use, approximately 34 percent of the time, aircraft would have routinely flown over or nearly over the Hoag and Dingle properties during the approach to landing. Erie Decl., ¶¶ 25, 34, 37-38; see also Exhibit F. The aircraft would have been at an altitude of approximately 500-800 feet. Erie Decl., ¶¶ 34, 38; see generally Hebert Decl.

40. The Leary and Riddick properties are both south of Runway 5L/R and would regularly have experienced noise from aircraft landing on that runway either in the visual landing pattern or on straight in approaches; however, it would have been unusual for these properties to be overflown when a visual landing pattern was being used. Erie Decl., ¶61; see also Exhibit F. Aircraft in the visual landing pattern for Runway 5L/R would have been no closer than one-half mile of these properties at an altitude of 400 to 800 feet. Erie Decl., ¶61. Aircraft on a straight in approach to Runway 5L/R would have flown within approximately one-half to one mile of these properties, at an altitude of approximately 500 to 1,000 feet, but would not normally have directly overflown the properties. Erie Decl., ¶61.

41. When Runway 23L/R was in use the Leary and Riddick properties would have routinely been overflown on departures, but at an altitude of approximately 1,500 to 2,000 feet. Erie Decl., ¶62. Also, aircraft departing from Runway 23L/R on their way to NALF Fentress to conduct FCLPs would have flown within approximately one-half mile of these properties at an altitude of approximately 1,000 feet. Erie Decl., ¶62; see generally Hebert Decl.

42. When Runway 5L/R was in use, aircraft in the downwind leg would

routinely have flown within approximately one-half to one mile of the Levenson property at an altitude of approximately 1,000 feet. Erie Decl., ¶ 42; see also Exhibit F. Only if aircraft were extremely wide abeam, however, would they have directly overflown the Levenson property, which would have been unusual. Erie Decl., ¶ 42.

43. The Levenson property would also have experienced noise from aircraft in "the break" for Runway 5L/R, but at an altitude of approximately 1,500 feet. Erie Decl., ¶ 42. During the roughly two percent of the time that Runway 14L/R was being used, aircraft flying the VFR landing pattern would fly over or within one-half mile of the Levenson property during the approach turn at an altitude of approximately 450 to 550 feet. Erie Decl., ¶ 43.

44. The Levenson property would also have experienced noise from aircraft departing on Runway 32L/R, which was in use roughly 14% of the time. Erie Decl., ¶¶ 25, 44. These aircraft would climb from 1,000 to 4,000 feet and their ground track would vary greatly, so it is possible that the Levenson property may have been overflown during these operations on occasion by aircraft turning right after departure, but this would not have been a regular event. Erie Decl., ¶ 44.

45. When Runway 5L/R was in use, aircraft in the downwind leg would routinely have flown within approximately three-quarters to one mile of the Lindsay property at an altitude of approximately 1,000 feet. Erie Decl., ¶ 46; see also Exhibit F. Only if aircraft were extremely wide abeam (even wider abeam than in the case of the Levenson property) would they have directly overflown the Lindsay property, and it would have been even more unusual for an aircraft to be this wide abeam than it would have been with the Levenson property. Erie Decl., ¶ 46. Additionally, aircraft entering

the pattern via the break maneuver would fly a similar ground track as above, but at 1,500 feet and at a significantly lower power setting. Erie Decl., ¶ 46.

46. The Lindsay property would also have experienced noise from aircraft departing from Runway 32L/R, as the aircraft climbed from 1,000 feet to 4,000 feet. Erie Decl., ¶ 47. The ground track of these aircraft would have varied, so it is possible that on occasion the Lindsay property may have been overflown during these operations (in the case of the Lindsay property by aircraft turning left after departure), but, based on the location of the property, any direct overflights would have been rare. Erie Decl., ¶ 47.

47. During those very infrequent occasions when Runway 14L/R was in use and the airfield was also in Instrument Flight Rules ("IFR") conditions, the Lindsay property would have experienced noise from aircraft on straight-in IFR radar-controlled approaches to Runway 14L/R as they passed by at an altitude of approximately 1,000 feet, but the property would not typically have been overflown during those operations. Erie Decl., ¶ 48.

48. The Lindsay property would have also experienced noise from aircraft entering the visual landing pattern for Runway 14L/R via "the break" on an infrequent basis. Erie Decl., ¶ 48. The aircraft conducting this maneuver would fly over or nearly over (within one-half to one mile) the Lindsay property at an altitude of 1,500 feet. Erie Decl., ¶ 48; see generally Hebert Decl.

49. When Runway 5 L/R was in use, aircraft in the downwind leg would routinely have flown within approximately three-quarters to one mile of the Van Nostrand property at an altitude of approximately 1,000 feet. Erie Decl., ¶ 50; see also Exhibit F. Only if aircraft significantly deviated from the VFR pattern would they have

overflown this property. Erie Decl., ¶ 50.

50. The Van Nostrand property would also have experienced noise from aircraft in "the break" for Runway 5L/R at an altitude of approximately 1,500 feet, but would have been directly overflown only if the aircraft was extremely wide abeam, which would have been unusual. Erie Decl., ¶ 50. The Van Nostrand property would also have experienced noise from aircraft departing NAS Oceana on Runway 32 L/R that turned left (toward the south) and were flying at approximately 2,000 feet while climbing to assigned altitude, but this property would not have been routinely overflown during these departures. Erie Decl., ¶ 51.

51. The Van Nostrand property would also have experienced noise from aircraft entering the visual landing pattern for Runway 14L/R via "the break" on a very infrequent basis. Erie Decl., ¶ 52. Aircraft in this pattern may very infrequently overfly the Van Nostrand property at approximately 1,500 feet. Erie Decl., ¶ 52.

52. Aircraft may have flown over or within a mile of the Waterman property when using the IFR/radar training pattern for Runways 5L/R and 23L/R, but would have done so at an altitude of 2,000 feet. Erie Decl., ¶ 64; see also Exhibit F. Aircraft departing Runway 5L/R on the way to NALF Fentress would have flown over or within one to two miles of the Waterman property at an altitude of approximately 1,500 feet. Erie Decl., ¶ 65. Aircraft departing Runway 23L/R for areas to the east may have overflown directly over or within one to two miles of this property at an altitude of approximately 1,500 to 2,000 feet as they climbed to 4,000 feet. Erie Decl., ¶ 65.

53. The May property is located approximately four miles away from the NAS Oceana runways, barely inside the NAS Oceana tower-controlled airspace. Erie Decl., ¶

53; see also Exhibit F. The May property may have experienced minimal aircraft noise when Runway 14L/R was in use, roughly two percent of the time, but these aircraft would usually have passed well south of the property on the way to the airfield. Erie Decl., ¶¶ 25, 54.

54. On the very infrequent occasions when Runway 14L/R was in use and NAS Oceana was in IFR conditions, aircraft on IFR/Radar approaches to NAS Oceana would have flown within three-quarters to one mile of the May property, but not over it, at an altitude of approximately 1,500 to 2,000 feet. Erie Decl., ¶ 55. It is also possible that aircraft flying between NAS Norfolk and NAS Oceana would have flown within one to two miles of the May property at approximately 2,000 feet, but this would have been extremely infrequent, perhaps once per month. Erie Decl., ¶ 55; see generally Hebert Decl.

55. Aircraft may have flown directly over or within a mile of the Ryan property when the IFR/radar training pattern for Runways 5L/R and 23L/R, but at an altitude of 2,000 feet. Erie Decl., ¶ 68; see also Exhibit F. This property would also have experienced noise from aircraft on their way to NALF Fentress to conduct FCLPs after departing NAS Oceana Runway 5L/R and turning right toward the ocean; however, the aircraft would have been at an altitude of 1,500 feet and would not have routinely overflown the Ryan property. Erie Decl., ¶ 69; but see Hebert Decl., ¶ 2.