**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| CAROL AND ROBERT TESTWUIDE, *et al.*,<br><br>*Plaintiffs,*<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>*Defendant.* | No.: 01-201L<br>(Honorable Victor J. Wolski) |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR, ALTERNATIVELY, FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT THEREOF**

Dated: May 26, 2006

Jack E. Ferrebee
Hofheimer/Ferrebee, P.C.
1060 Laskin Road, Suite 12-B
Virginia Beach, Virginia 23451
(757) 425-5200
jferrebee@hoflaw.com

Counsel of Record for Plaintiffs

Of Counsel:

Kieron F. Quinn
Martin E. Wolf
Quinn, Gordon & Wolf, Chtd.
102 W. Pennsylvania Avenue
Suite 402
Towson, Maryland 21204
(410) 825-2300

Charles R. Hofheimer
Kristen D. Hofheimer
Hofheimer/Ferrebee, P.C.
1060 Laskin Road, Suite 12-B
Virginia Beach, Virginia 23451
(757) 425-5200

Thomas Shuttleworth
Stephen C. Swain
Lawrence Woodward
Charles B. Lustig
Shuttleworth,Ruloff,Giordano&Swain
4525 South Blvd., Suite 300
Virginia Beach, Virginia 23452
(757) 671-6000

# TABLE OF CONTENTS

Page(s)

**INTRODUCTION**………………………………………………………………. 1

I. STANDARD FOR SUMARY JUDGMENT…………………………… 2

II. STANDARDS FOR TAKING OF AVIGATION EASEMENT………. 3

**ARGUMENT**…………………………………………………………………... 12

III. PLAINTIFFS' TESTIMONY………………………………………….. 12

A. Test Case Plaintiffs…………………………………………….. 12

B. Other Witnesses………………………………………………... 17

IV. THE DECLARATION OF COMMANDER RICHARD ERIE HAS NO PROBATIVE VALUE………………………………………. 22

V. STATUTE OF LIMITATIONS……………………………………….. 25

VI. THE F/A-18s CREATED UNPRECEDENTED NOISE……………… 27

VII. PROFFERED TESTIMONY OF SANFORD FIDELL……………….. 32

A. Dr. Fidell's Testimony in *Vivian's Island* Case………………... 33

B. Dr. Fidell's Testimony in *Testwuide* Case……………………... 34

C. Dr. Noral Stewart…………………………………………….... 37

**CONCLUSION**…………………………………………………………………… 37

# TABLE OF AUTHORITIES

## Cases

Page(s)

*Aaron v. United States*, 160 Ct. Cl. 295 (1963) ........................................................5, 6

*Anchor Estates, Inc. v. United States*, 9 Cl. Ct. 618 (1986), *aff'd* 835 F.2d 871 (Fed. Cir. 1987), *cert. denied* 485 U.S. 989 (1988) .................3

*Argent v. United States*, 124 F.3d 1277 (Fed. Cir. 1997) ........................................*passim*

*Branning v. United States*, 228 Ct. Cl. 240, 654 F.2d 88 (1981)..............................*passim*

*Brunner v. United States*, ___ Fed. Cl. ___, 2006 WL 1189492 (Fed. Cl.) (2006) ..................................................................................................2

*Celanese Corp. & Consol. Subsidiaries v. United States*, 9 Cl. Ct. 45 (1985)..........................................................................................................24, 25

*Clearwater Constructors, Inc. v. United States*, ___ Fed. Cl. ___, 2006 WL 1134478 (Fed. Cl.) (2006) ...........................................................................2

*Esposito v. United States*, ___ Fed. Cl. ___, 2006 WL 800757 (Fed. Cl.) (2006) ..................................................................................................2

*Halliday v. United States*, 7 Cl. Ct. 315 ( 1985) .......................................................23, 24

*McMurray v. United States*, 15 Cl. Ct. 323 (1988)...................................................23

*Palahnuk v. United States*, 70 Fed. Cl. 87 (2006)....................................................2

*SRI International v. Matsushita Elec. Corp.*, 775 F.2d 1107 (Fed. Cir. 1985)..........................................................................................................3

*United States v. Causby*, 328 U.S. 256 (1946).........................................................*passim*

*Vivian's Island, et al. v. United States,* COFC # 1:02-cv-00756-RHH .....................*passim*

*Yuba Goldfields, Inc. v. United States*, 723 F.2d 884 (Fed. Cir. 1983) .....................2

## Rules

RCFC Rule 56..........................................................................................*passim*
RCFC Rule 37..........................................................................................26

# LIST OF EXHIBITS

| **Exhibit No.** | **Exhibit Description** |
|---|---|
| Exhibit 1A | Summary of the Deposition Transcript of Betty Capps |
| Exhibit 1B | Excerpts from the Deposition Transcript of Betty Capps |
| Exhibit 1C | Plaintiffs William and Betty Capps's Supplemental Response to Defendant's Interrogatory Number 20 |
| Exhibit 2A | Summary of the Deposition Transcript of Herbert Stokely |
| Exhibit 2B | Excerpts from the Deposition Transcript of Herbert Stokely |
| Exhibit 3A | Summary of the Deposition Transcripts of Herbert and Betty Van Nostrand |
| Exhibit 3B | Excerpts from the Deposition Transcript of Betty Van Nostrand |
| Exhibit 3C | Excerpts from the Deposition Transcript of Herbert Van Nostrand |
| Exhibit 4A | Summary of the Deposition Transcripts of Thomas Askins |
| Exhibit 4B | Excerpts from the Deposition Transcript of Thomas Askins |
| Exhibit 5A | Summary of the Deposition Transcript of Sean Ryan |
| Exhibit 5B | Excerpts from the Deposition Transcript of Sean Ryan |
| Exhibit 6A | Summary of the Deposition Transcript of Eddie Waterman |
| Exhibit 6B | Excerpts from the Deposition Transcript of Eddie Waterman |
| Exhibit 7A | Summary of the Deposition Transcript of James Riddick |
| Exhibit 7B | Excerpts from the Deposition Transcript of James Riddick |
| Exhibit 8A | Summary of the Deposition Transcript of Kenneth Hill |
| Exhibit 8B | Excerpts from the Deposition Transcript of Kenneth Hill |
| Exhibit 9A | Summary of the Deposition Transcript of Eileen May |
| Exhibit 9B | Excerpts from the Deposition Transcript of Eileen May |
| Exhibit 10A | Summary of the Deposition Transcript of Carroll Lindsay |
| Exhibit 10B | Excerpts from the Deposition Transcript of Carroll Lindsay |
| Exhibit 11A | Summary of the Deposition Transcript of Harold Levenson |
| Exhibit 11B | Excerpts from the Deposition Transcript of Harold Levenson |
| Exhibit 12A | Summary of the Deposition Transcript of Michael Leary |
| Exhibit 12B | Excerpts from the Deposition Transcript of Michael Leary |
| Exhibit 13A | Summary of the Deposition Transcript of Sara Hoag (Lynch) |
| Exhibit 13B | Excerpts from the Deposition Transcript of Sara Hoag (Lynch) |

| | |
|---|---|
| Exhibit 14A | Summary of the Deposition Transcript of John Shick |
| Exhibit 14B | Excerpts from the Deposition Transcript of John Shick |
| Exhibit 15A | Summary of the Deposition Transcript of Charles Nash |
| Exhibit 15B | Excerpts from the Deposition Transcript of Charles Nash |
| Exhibit 16A | Summary of the Deposition Transcript of Jeffery McCreary |
| Exhibit 16B | Excerpts from the Deposition Transcript of Jeffery McCreary |
| Exhibit 17A | Summary of the Deposition Transcript of Robert Goodwin |
| Exhibit 17B | Excerpts from the Deposition Transcript of Robert Goodwin |
| Exhibit 18A | Summary of the Deposition Transcript of Louis Figari |
| Exhibit 18B | Excerpts from the Deposition Transcript of Louis Figari |
| Exhibit 19A | Summary of the Deposition Transcript of Nancy Darling |
| Exhibit 19B | Excerpts from the Deposition Transcript of Nancy Darling |
| Exhibit 20A | Summary of the Deposition Transcript of Carl Helvie |
| Exhibit 20B | Excerpts from the Deposition Transcript of Carl Helvie |
| Exhibit 21A | Summary of the Deposition Transcript of Bonnie Youngberg |
| Exhibit 21B | Excerpts from the Deposition Transcript of Bonnie Youngberg |
| Exhibit 22A | Summary of the Deposition Transcript of Theodore Dingle |
| Exhibit 22B | Excerpts from the Deposition Transcript of Theodore Dingle |
| Exhibit 23A | Summary of the Deposition Transcript of Kimberly Johnson |
| Exhibit 23B | Excerpts from the Deposition Transcript of Kimberly Johnson |
| Exhibit 24 | Excerpts pertaining to NAS Oceana and NALF Fentress from the Final Environmental Impact Statement for Realignment of F/A-18 C/D Aircraft and Operational Functions from Naval Air Station Cecil Field, Florida to Other East Coast Installations. |
| Exhibit 25 | Record of Decision, May 18, 1998. |
| Exhibit 26 | Excerpts from ATAC Corp., Airfield and Airspace Operational Study, February 18, 1998. |
| Exhibit 27 | Excerpts from Wyle Laboratories, Aircraft Noise Study, February 1998. |
| Exhibit 28 | Air Installation Compatible Use Zones (AICUZ) Program; Operational Naval Instruction (OPNAVINST) 11010.36B, December 19, 2002. |
| Exhibit 29 | Table, Suggested Land Use Compatibility in Noise Zones Excerpted from Air Installation Compatible Use Zones (AICUZ) Program; Operational Naval Instruction (OPNAVINST) 11010.36B, December 19, 2002. |

| | |
|---|---|
| Exhibit 30 | Excerpts from Aviation Noise Effects, Federal Aviation Administration, March, 1985. |
| Exhibit 31 | Steven Bryant Email to Kieron Quinn regarding the Number of Field Carrier Landing Practice (FCLP) and Touch and Go Operations at Naval Air Station Oceana in 1999, dated May 22, 2006. |
| Exhibit 32 | Emails between Eric Boyajian, ATAC Corporation, and Raymond Firenze regarding "OP COUNT AT NTU/NFE," dated December 2000 |
| Exhibit 33 | Capt. Thomas Keeley letter to Barbara Duke, Planning Department, City of Virginia Beach, dated October 7, 2003 |
| Exhibit 34 | Jack Ferrebee letter to Steven Bryant, dated May 12, 2006. |
| Exhibit 35 | Raymond Firenze Comments to the Virginia Beach Planning Commission regarding "Item #25, Near Post L.L.C.", dated October 28, 2003 |
| Exhibit 36 | "Beach Council Approves Condominium Project," the Virginian Pilot, November 26, 2003 |
| Exhibit 37 | Excerpts from a Power Point Presentation by Captain Thomas Keeley to Virginia Beach City Council, dated March 16, 2004. |
| Exhibit 38 | Spreadsheets Entitled "Test Plaintiffs Coordinates" and "Additional Test Plaintiff Coordinates" prepared by Lisa Matthies, Ecology and Environment, Inc. with data from Dr. Micah Downing, Wyle Laboratories, dated March 31, 2005 and January 30, 2006 respectively. |
| Exhibit 39 | Excerpts from the Deposition Transcript of Sanford Fidell, dated December 16, 2005. |
| Exhibit 40 | Excerpts from Federal Agency Review of Selected Airport Noise Analysis Issues, Federal Interagency Committee on Noise, August, 1992. |
| Exhibit 41 | Email from Dan Cecchini to Shawn Smith and Phillip Logan regarding "RE: Op count at NTU," dated November 27, 2000. |
| Exhibit 42 | CDR. Dirk Hebert email to Alan Zusman dated March 13, 2000. |
| Exhibit 43 | Declaration of Dirk P. Hebert dated March 6, 2002. |
| Exhibit 44 | Excerpts from the Deposition Transcript of Dirk Hebert |
| Exhibit 45 | Defendant's Supplemental Response to Interrogatory Number 3, Dated May 5, 2006 |
| Exhibit 46 | Excerpts from the Deposition Transcript of Stephen Riley |
| Exhibit 47 | Complaint Graphs for Years 1973 through 2000 |
| Exhibit 48 | Steve Bryant letter to Jack Ferrebee, dated May 16, 2006 |
| Exhibit 49 | Declaration of Dr. Noral Stewart, dated May 23, 2006. |

| | |
|---|---|
| Exhibit 50 | Excerpts from the Declaration of Sanford Fidell in *Vivian's Island* |
| Exhibit 51 | Excerpts from the Report of Sanford Fidell in *Vivian's Island, et. al. v. The United States*, dated November 25, 2003. |
| Exhibit 52 | Map of Virginia Beach with Test Plaintiff and Non-Test Plaintiff Witness Designations |
| Exhibit 53 | Excerpts from Capt. Thomas Keeley Briefing to Virginia Beach City Council Members, dated November 18, 2003. |
| Exhibit 54 | Glossary of Terminology from the Final Environmental Impact Statement (FEIS) for the Introduction of the FA-18 EF to the East Coast of the United States |
| Exhibit 55 | Daniel Cecchini email to Pamela Anderson, dated January 9, 1996. |
| Exhibit 56 | Excerpt from Air Traffic Control Facility Manual, dated October 1, 2004 |
| Exhibit 57 | Capt. S.E. Benson Memorandum to Office of the Assistant Secretary |
| Exhibit 58 | Capt. S.E. Benson letter to Senator John Warner dated April 30, 1998 |
| Exhibit 59 | John C. Shick Affidavit dated November 24, 1998 |
| Exhibit 60 | Duncan Holaday, Assistant Secretary of the Navy, Memorandum for Deputy Chief of Naval Operations dated December 3, 1997 |
| Exhibit 61 | Alan Zusman Note to Joseph Czech, dated December 12, 1997 |
| Exhibit 62 | Excerpts from the Deposition Transcript of Joseph Czech |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| CAROL AND ROBERT TESTWUIDE, *et al.*,<br><br>*Plaintiffs,*<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>*Defendant.* | No.: 01-201L<br>(Honorable Victor J. Wolski) |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR, ALTERNATIVELY, FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT THEREOF**

**INTRODUCTION**

Between December 1998 and June of 1999, the United States Navy moved 156 F/A-18 C/D aircraft from their prior home base in Florida to the smallest master jet base that the Navy possesses, Oceana Naval Air Station. Oceana is located in a densely populated area of Virginia Beach, Virginia. The F/A-18 is the most powerful and the most modern carrier based jet that the Navy possesses. The arrival of the jets caused an enormous increase in noise in the neighborhood surrounding the airfield. Residents of those neighborhoods have recorded levels of noise in their backyard that are at the threshold of pain. The complex story of how the jets came to be at Oceana is more fully set out in the Plaintiffs' Proposed Findings of Uncontroverted Fact in Opposition to Defendant's Motion for Summary Judgment, which is filed contemporaneously with this memorandum.

In April 2001, Plaintiffs filed an action seeking class certification of residents whose homes sustained certain high levels of noise. Certification was denied by this

Court and, as a consequence, approximately 2,000 residents are pursuing individual actions in this case, alleging that their property has been taken in contravention to the United States Constitution. Trial in a test case is scheduled for October 2006. The Government has filed a motion for dismissal or for summary judgment and this memorandum is filed by the Plaintiffs in opposition to that motion.

## I. STANDARD FOR SUMMARY JUDGMENT

A party is entitled to summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." RCFC 56(c); *Palahnuk v. United States*, 70 Fed. Cl. 87, 90 (2006). The party moving for summary judgment bears the burden of demonstrating that there is an absence of a genuine dispute of material fact, and that he is entitled to judgment as a matter of law. *Esposito v. United States*, ___ Fed. Cl. ___, 2006 WL 800757 (Fed. Cl.) at p. 3 (2006). To demonstrate a genuine dispute of material fact, the nonmoving party need not present evidence in a form that would be admissible at trial. The moving party, however, must file with the Court the documentary evidence that supports his assertion that the material facts are beyond reasonable dispute. *Brunner v. United States*, ___ Fed. Cl. ___, 2006 WL 1189492 (Fed. Cl.) at p. 4 (2006). In analyzing a motion for summary judgment, the Court must interpret the facts and inferences in favor of the non-moving party. *Brunner* at p. 4; *Clearwater Constructors, Inc. v. United States*, ___ Fed. Cl. ___, 2006 WL 1134478 (Fed. Cl.) at p. 4 (2006).

Inverse condemnation cases, by their nature, are extremely fact intensive and militate against disposition by summary judgment. *Yuba Goldfields, Inc. v. United*

*States*, 723 F.2d 884, 887 (Fed. Cir. 1983); *Anchor Estates, Inc. v. United States*, 9 Cl. Ct. 618, 621 (1986). This sensitivity is heightened when the bulk of evidence supporting summary judgment is testimony from an expert witness. *Anchor Estates* at 622. It is particularly inappropriate to foreclose a party's opportunity to cross-examine key expert witnesses. Moreover, this Court has also expressed its concern about foregoing its own opportunity to question expert witnesses in order to understand highly technical testimony in a fact-intensive case. *id*. As the Court of Appeals cautions in similar cases, "experience has shown that a trial often establishes facts and inferences not gleanable from papers submitted pre-trial." *SRI International v. Matsushita Elec. Corp*., 775 F.2d 1107, 1116 (Fed. Cir. 1985).

## II. STANDARDS FOR TAKING OF AVIGATION EASEMENT

In the present motion, the Government argues that the elements of Plaintiffs' claims are only set forth in *United States v. Causby*, 328 U.S. 256 (1946) (Def. Mem. at 22). and also argues that the decisions of this Court in *Branning v. United States*, 228 Ct. Cl. 240, 654 F.2d 88 (1981), and the Federal Circuit in *Argent v. United States*, 124 F.3d 1277 (Fed. Cir. 1997), are erroneous and should not be followed. (Def. Mem. at 38 n. 27). The Government also asserts that *Branning* and *Argent* do not apply in any event because the course of operations at NAS Oceana does not constitute a burdensome pattern of activity, a concept discussed in both cases. (Def. Mem. at 37-40). The evidence before the Court, however, demonstrates that the loudness of the F/A-18, coupled with the course of flight activity at NAS Oceana, imposes a peculiarly burdensome pattern of activity on the people who live near the airfield. That is particularly true of the Field Carrier Landing Practice ("FCLP") and touch and go flight

patterns. At the very least, the evidence raises genuine disputes of material fact, which must be resolved in favor of denying summary judgment.

In July 2004, at the Court's request, the parties filed briefs in which they set forth the status of the law of inverse condemnation at that time. In their memorandum Plaintiffs traced the development of this area of law from *Causby*, through *Branning* and *Argent*, demonstrating that *Causby* continues to set forth a valid, but not exclusive, type of taking from flights of military aircraft. Without repeating their prior memorandum, Plaintiffs will summarize their analysis for the Court's convenience.

*Causby* established that an avigation easement could be taken, in the Constitutional sense, by frequent low-level flights of military aircraft over private property. In *Causby*, the Plaintiff owned a 2.8 acre parcel of land on which he lived and operated a commercial chicken farm. Beginning in 1942, military aircraft began to fly over Plaintiff's property at low altitudes. Plaintiff sued alleging a taking. The United States argued that its aircraft were flying in navigable airspace, both during flight and while in the approved glide path for take offs and landings, and that "when flights are made within the navigable airspace ***without any physical invasion of the property of the landowners***, there has been no taking of property." 328 U.S. at 260 (emphasis supplied).

The Supreme Court disagreed with the characterization that the flights were in navigable airspace. At that time, Congress had established minimum altitudes for safe flight for commercial air carriers through the Civil Aeronautics Authority: 500 feet during the day, and 1,000 feet at night, and over areas of dense popultion. 328 U.S. at 263. The Court held that under those facts the glide path for take offs and landings was

not in navigable airspace, rather it was in Mr. Causby's airspace and such physical invasion of the Causby airspace constituted a taking.

In the wake of *Causby*, courts often mechanically applied a physical-invasion-of-navigable-airspace analysis as a required element. In 1963, this Court[1] recognized that the law was moving beyond the simplistic and mechanical *Causby* analysis. In *Aaron v. United States*, 160 Ct. Cl. 295, 300-301 (1963), certain property owners complained of the negative impact on their properties from flight activity entirely within navigable airspace. In holding that the property owners could not recover under those facts, the Court observed the inevitable development of the law to allow such recoveries:

> It is true that the inconvenience and annoyance experienced from the passage of a plane at 501 feet above a person's property is hardly distinguishable from that experienced from the passage of a plane at, say, 490 feet, but the extent of a right-of-way, whether on the ground or on water or in the air, has to be definitely fixed. Acts that are permissible within the limits of the right-of-way are forbidden beyond its limits, and vice versa. Congress has fixed 500 feet as the lower limit of navigable air space; hence, what may be permissible above 500 feet is forbidden below it, unless compensation is paid therefor.
>
> ***This is not to say that a case could not arise where the unavoidable damage to a person's property occasioned by travel in the navigable air space would be so severe as to amount to a practical destruction or a substantial impairment of it. When such a case arises we would then have to consider whether the relevant statutes and regulations violated the property owners' constitutional rights***; but plaintiffs have not made out such a case.

*id.* (emphasis supplied).

[1] Plaintiffs' use of the phrase "this Court" is intended to identify the United States Court of Federal Claims under both its current name and prior name, the United States Claims Court, and its predecessor, the United States Court of Claims.

What the Court predicted in *Aaron* occurred in *Branning v. United States*, 228 Ct. Cl. 240 (1981). *Branning*, decided in 1981, first extended the analysis beyond that of *Causby's* physical invasion approach. This Court described its decision in this way:

> The novelty of this decision is in its holding that defendant's use of airspace at altitudes above 500 feet, and independent of landing and takeoff, may be a taking of land beneath if the use is peculiarly burdensome.

228 Ct. Cl. at 242. In *Branning*, property owners near MCAS Beaufort, South Carolina claimed a taking as a result of the noise from flight training operations, including FCLPs, over their property. According to the Government's own published AICUZ (Air Installation Compatible Use Zones) regulations then in force and the Tracor Report (an acoustical engineering contractor similar to Wyle Labs), plaintiff's property was in a high noise zone regarded as unsuitable for residential use.[2] However, the training flights in question were wholly conducted at or above 600 feet, which, the United States argued, precluded liability for a taking under the *Causby* paradigm.

This Court, after a lengthy analysis of existing case law, held:

> This is a case of first impression in which ***the court may consider the altitude of flights over the property, but must give primary consideration to the effect of aircraft noise where the Government itself has adopted and published standards of compatibility of use of the subadjacent property.***

228 Ct. Cl. at 262 (emphasis supplied). Specifically, the Court relied extensively upon the AICUZ maps, noise contours and similar materials, and held that a taking had occurred as a result of the noise from flight operations even though the flights took place wholly in navigable airspace. Thus, in *Branning,* this Court formally adopted the noise-

[2] Currently, that would be the 65 dB DNL noise zone and above. *See* Ex. 29.

impact analysis in avigation easement takings cases that involve particularly burdensome patterns of activity.

The shift in focus that began in *Branning* in 1981 was completed in 1997 with the Court of Appeals' decision in *Argent*. In *Argent*, the Court was faced with claims from property owners that the noise and other impacts from the overall pattern of Naval aircraft training at OLF Coupeville in Washington State, including but not limited to FCLPs, constituted the taking of an avigation easement. There, the plaintiffs were not complaining of certain discrete flights that may or may not have passed over their properties at any particular altitude. Rather, the allegations were that noise from the training regimen as a whole, which included flights of unknown altitude over ***adjacent*** land, was so intrusive as to substantially affect the use and enjoyment of the plaintiffs' property. Thus, the facts in *Argent* did not include either element from the *Causby* paradigm that resulted in a physical invasion: (1) direct overflight, or (2) flights less than 500 feet in altitude.

After first describing the *Causby* case and the factual underpinnings of the decision, the Court of Appeals continued (124 F.3d at 1282-1286) (emphasis supplied):

> Although federal courts have, by and large, required the facts of a case to match the Causby paradigm before allowing recovery, ***nothing in Causby or the intervening precedent limits a takings claim to only those facts. Indeed, overflight takings disputes defy per se rules or classification***. [citations omitted] Rather, precedent requires, consistent with the purpose of the Takings clause, a remedy for government action that singles out a private landowner to bear a disproportionate burden for a public benefit. [citation omitted] ***Thus, while the facts, reasoning, and rules of Causby have always guided this corner of takings law, they do not imprison it.***

* * *

> ***While physical invasion of private property remains an especially notorious category of takings,*** [citation omitted] ***the law is flexible enough to recognize non-invasive Governmental action that nonetheless threatens to destroy the owner's enjoyment of his estate.***
>
> * * *
>
> [W]here, as here, plaintiffs complain of a peculiarly burdensome pattern of activity, including both intrusive and non-intrusive flights, that ***significantly impairs their use and enjoyment of their land***, those plaintiffs may state a cause of action. [citations omitted] ***The Argents are not before this court to complain of individual flights, which may or may not pass over their property. Rather, they complain of the entire course of operation at OLF Coupeville that entails hundreds of flights per week – an allegedly constant source of noise and disruption. If true, this activity is a peculiar burden imposed on the Argents and their neighbors by the United States' selection of a remote site for aircraft training operations. [citations omitted] The Government cannot defeat such a claim merely by pointing out that most of its flights do not pass over the Argents' land.***

*Argent* leaves no doubt that physical invasion of airspace is not necessary to state a claim for a taking of an avigation easement.

The issue before the Court is whether the course of operations at NAS Oceana since the arrival of the F/A-18s is a "peculiarly burdensome pattern of activity" such that it can constitute a taking without frequent direct overflights at low altitude.[3] In both *Branning* and *Argent*, FCLPs at the respective airfields was held to be just such a pattern of activity. The Government argues that the entire course of operations at NAS Oceana does not constitute a peculiarly burdensome pattern of activity because: (1) although NAS Oceana conducts FCLPs, it is not a "bounce" field (Def. Mem. at 39); and (2)

[3] It should be pointed out that each of the Test Case Plaintiffs have testified under oath to a significant number of direct overflights since the arrival of the F/A-18s. This is also supported by the sworn testimony of a number of witnesses.

Defendant did not single out these Plaintiffs to bear the burden of exposure to the flight activity. (Def. Mem. at 39-40).

Nothing in *Branning* or *Argent* necessarily limits a peculiarly burdensome pattern of activity to FCLPs only. The issue is whether the course of operations, whatever that may be, by the specific type of aircraft involved, constitutes a peculiar burden. The answer at NAS Oceana is an unequivocal "yes."

First, the number of FCLPs at NAS Oceana is significant in and of itself. Beginning in at least the summer of 1999, one-third of all FCLPs for the entire Oceana community were performed at NAS Oceana 7-10 days per month. (Ex. 42, Email from Cdr. Hebert, March 13, 2000). Although the Government alleges that it does not know the number of actual FCLPs conducted at NAS Oceana for 1999 (Ex. 31, Email from Steve Bryant to Kieron Quinn, May 22, 2006), there were more than 20,000 FCLPs in 2000, the first full year after the arrival of the F/A-18s. (Ex. 32, Emails between Eric Boyajian, ATAC, and Raymond Firenze, December, 2000).

Second, the flight characteristics for FCLPs are identical to the flight characteristics for a touch and go. In opposition to the motion for class certification, the Defendant filed the Declaration of Cdr. Dirk Hebert dated March 6, 2002. (Ex. 43, Hebert Declaration, March 6, 2002). Cdr. Hebert was the Air Operations Officer at NAS Oceana from July 1999 until replaced by Cdr. Erie. In his March 6, 2002 declaration, Cdr. Hebert states that "The only difference between the two is that during FCLP landings an observer is present near the touch down point in order to 'grade' the landing." (*id.* at ¶ 8). Nearly all touch and gos performed by the Oceana community are at NAS Oceana. (*id.* at ¶ 11). Defendant now asserts that there are material differences between

the flight patterns; that FCLPs have more aircraft in the pattern and longer duration. This blanket assertion, made through a declaration of Capt. Keeley, is contradicted by Cdr. Hebert. At his deposition on July 18, 2002, Cdr. Hebert testified under oath that he personally witnessed "a number of FCLP operations with a single aircraft" and that he could not state that it was more or less common to have more than one aircraft in the FCLP pattern. (Ex. 44, Hebert depos. p. 74-77).

Even if Capt. Keeley were correct with regard to the number of aircraft in a given operation and the duration of an FCLP session for a squadron, it is a distinction without a difference for purposes of this case. The sheer number of FCLPs and touch and gos performed at NAS Oceana on a regular basis insures that the tempo and duration will be burdensome, regardless of which pattern is being flown. In discussing the planned FCLP/touch and go activity for 1999 as set forth in the C/D EIS, David Cecchini, a civilian employee in charge of the EIS process, admitted that there would be 300-400 aircraft per day flying the exact same pattern, whether they were part of an FCLP session or a touch and go session. He also candidly admitted that, "The public has no idea what the difference is between the two." (Ex. 41, Email from Cecchini, November 27, 2000). Indeed, Capt. Keeley contradicts himself. Three hundred to four hundred "rock concerts"[4] per day flying overhead can hardly be described as anything except a "peculiarly burdensome pattern of activity." Capt. Keeley's newly discovered distinctions between the patterns is a thinly veiled attempt to minimize the impact of touch and go flight activity. The Court sould reject such self-serving rhetoric.

---

[4] Capt. Keeley has described the noise from an F/A-18 at 1,000 ft. altitude (the FCLP / touch and go pattern altitude) as the equivalent of a "rock concert" passing overhead. (Ex. 33, Keeley letter, October 7, 2003).

Moreover, the decision in *Argent* is significant because it also reversed summary judgment against a group of claimants whose claims had been dismissed on statute of limitation grounds. In this case, the Government has made the same argument; that an avigation easement was "taken" by flight activity from a period more than six years prior to the filing of this case. (Def. Mem. at 21-22).

In *Argent*, this Court entered summary judgment against a group of claimants who lived in the Admiral's Cove neighborhood because the Navy conducted a large number of training flights over that area in 1967 due to combat activity in Vietnam. 124 F.3d at 1285. The Court of Appeals reversed, noting that the government had failed to meet its burden of establishing either the prior easement or the scope of the prior easement. That remaining issue could not be decided simply by looking at the number of flight operations in a given year. Instead, the Court of Appeals held that spikes in activity from a prior year or group of years (1967-1968 as alleged in that case) do not necessarily establish the scope of an easement. 124 F.3d at 1286. The Court also held that the evidence of noisier aircraft post-1986 could also help the Plaintiffs establish a "second taking" and explain why activity levels from the pre-1986 era might not define the scope of an easement. 124 F.3d at 1286-1287.

The Government is attempting to repeat what failed in *Argent* which forces the Defendant to insist that this Court should not follow *Argent*. Defendant has offered nothing more than gross numbers of operations from 1981. There is no evidence of the number of FCLPs, touch and gos, or any other burdensome flight pattern. There is no evidence of the mix of aircraft at NAS Oceana, the duration of the 1981 flight activity, the patterns flown by each aircraft type, the effect on the property owners in 1981, or any

other information necessary to prove either that a taking of an easement occurred or the scope of that easement. After five years of litigation and extensive attempts by Plaintiffs to have the Defendant specify its allegation concerning the statute of limitations (*See* Plaintiffs' Motion for Sanctions, Docket No.148) Defendant waited until its Motion for Summary Judgment to choose 1981, a year never mentioned before in that connection. Subsequently, Plaintiffs specifically requested a breakdown of the aircraft involved and the type and number of operations in 1981 (Ex. 34, Letter from Jack Ferrebee May 12, 2006). Defendant's astounding response is that they do not have this information. (Ex. 48, Letter from Steve Bryant, May 16, 2006). Simply stated, Defendant has provided no evidence to support its claim that a taking occurred in 1981. In fact, Defendant denies even having such evidence.

## ARGUMENT

## III. PLAINTIFFS' TESTIMONY

The best evidence of the effect of the arrival of the F/A 18s on Plaintiffs' properties is the sworn testimony of the Plaintiffs themselves and others who live near Oceana. In support of their opposition to summary judgment, Plaintiffs have attached excerpts of deposition testimony of Test Case Plaitiffs and witnesses who live nearby. A map depicting the location of each Test Case Plaintiff and each witness referred to below is Exhibit 52. A summary of the pertinent testimony is in the exhibit, followed by the actual pages of the deposition. A capsule of the testimony of each is as follows:

### A. Test Case Plaintiffs

**Betty Capps** (Ex. 1A,B,C) Betty Capps and her husband lived in Virginia Beach from 1981 through 2005. Mrs. Capps never had any difficulty or indeed paid any

attention to the jet noise at her home until after the F/A-18s arrived in 1999. She estimates that of the jets that fly in the general direction of her house, approximately 40% pass directly over her house now. Since the F/A-18s arrived, she cannot conduct phone conversations or hear the television. She also wore earplugs when outside until a doctor told her to stop wearing them because they irritated her ears to the point of bleeding. Vibration has also been a serious problem. Mr. and Mrs. Capps moved to Chesapeake, Virginia in 2005, solely because of the intolerable jet noise.

**Sara Hoag** (Ex. 13 A,B) Ms. Hoag resumed her maiden name of Lynch in August 2003. Ms. Lynch moved into her present home in 1990. Since the arrival of the F/A-18s the jets fly directly over her home "very frequently" both during the day and the evening. If the jets are flying she cannot keep her windows open, cannot hear the television and cannot enjoy her yard or anything outdoors. She is also subject to a great deal of vibration. Ms. Hoag is blind. She cannot listen to her Cds or her books on tape when the jets are flying, despite the fact that she wears headphones when listening to books on tape.

**Sean Ryan** (Ex. 5 A, B) Mr. and Mrs. Ryan have lived at their house since 1996. Before they bought that home they went into the neighborhood 10-15 times and never noticed any objectionable noise. Prior to their present home, they lived on 23rd Street and experienced overflights from both F-14s and A-6s. Starting in the summer of 1999, the noise at their home became "unbearable". They cannot talk on the phone or hear the TV and the noise wakes them up at night. Starting in the summer of 1999, the Ryans estimate that of the flights that fly near their neighborhood 46-48% fly directly over their house.

**Herbert and Betty Van Nostrand** (Ex. 3 A, B, C) Mr. and Mrs. Van Nostrand have lived in their present house since 1967, almost forty years. Mrs. Van Nostrand testified that prior to the arrival of the F/A-18s they were comfortable with the location of Oceana and with whatever small amount of jet noise they were subject to. The noise became a major problem in 1999 when the F/A-18s arrived. In the summer of 1999, the noise got really bad. Telephone conversations would have to stop and television could not be heard.

**Kenneth Hill** (Ex. 8 A, B) Kenneth Hill retired from active duty in the Navy and is a civilian employee at the Norfolk Naval Shipyard. The Hills have lived in their home since 1992. They have always heard jets from Oceana but overflights are now an even more regular occurrence. Mr. Hill describes the sound of the F/A-18s as a "thunder". Since the arrival of the F/A-18s no volume control on his television can turn it up loud enough to be heard, and when he is in his yard he has to put his fingers in his ears because it actually is painful. His house has also been subject to a good deal of vibration.

**Harold Levenson** (Ex. 11 A, B) Mr. Levenson is retired. The Levenson's bought their home in 1986. Since 1986 they have been aware of jet noise from Oceana, and the planes have flown near their house when the wind was blowing from a particular direction. Until the arrival of the F/A-18s the jet noise was not "interrupting" or "interfering".

Today the pilots fly directly over their house or sometimes 100-400 feet on either side. When the F/A-18s are flying near his property it is difficult to have a conversation or to talk on the telephone or to hear the television. In fact, he uses headsets so that he can watch TV or listen to the radio. Mr. Levenson is also a founding member of CCAJN

and believes that the F/A-18s have suppressed the natural increase in the value of his property.

**Eddie Waterman** (Ex. 6 A, B) Mr. and Mrs. Waterman moved into their present home in 1993. Mr. Waterman is retired. Prior to the arrival of the F/A-18s the noise from Oceana was bearable and "not bad". Today the aircraft often pass both close by their house and directly over their home. The percent of overflights has increased. Since the arrival of the F/A-18s they cannot conduct a conversation in their yard and cannot continue a conversation on the phone inside their house or hear the radio or television. In addition their home has been subject to vibration.

**James Riddick** (Ex. 7 A, B) Mr. and Mrs. Riddick built their home in 1992. They were unbothered by any jet noise until 1999. At that time Mr. Riddick was outside with his grandson and a plane flew directly overhead. The child was scared by the loudness and they had to go inside the house. Since 1999 their whole house shakes at times, they cannot hear the television and they have to stop talking on the telephone. The number of planes that fly directly over their house has increased since the arrival of the F/A-18s. Mr. Riddick has also replaced all the windows in his home in part to attempt to mitigate the noise.

**Theodore Dingle** (Ex. 22 A, B) Mr. Dingle and his ex-wife purchased their home in Virginia Beach in 1983. Mr. Dingle joined the Navy in 1974 and often was away from home on active duty. During the 1990s, after he separated from his wife, the house at 912 Carolina Avenue was often rented, including for the period when the F/A-18s arrived. He states that the noise since the F/A-18s arrived is "extremely noticeable"

compared to the early 1990s. He describes the "intensity" of the noise level as "vastly increased" from prior to the time that the F/A-18s arrived.

**Eileen May** (Ex. 9 A, B) Eileen May is a widow who has lived in her present home since 1996. She was not bothered by the jet noise at all until the F/A-18s arrived. The jets now fly directly over her house as well as in front and in back of her house. The noise prevents her from enjoying her pool, gardening or doing anything outside. When the jets are flying she has to come inside her house because it's "ear piercing and it's just annoying."

**Carroll Lindsay** (Ex. 10 A, B) Carroll Lindsay and his wife Brenda have lived in Virginia Beach since 1994. Mr. Lindsay testified that the noise became "intolerable" after the arrival of the F/A-18s in the fall of 1998. He cannot even hear his wife when he is trying to talk to her in their yard. The jets fly low over his house, close to the top of the trees, sometimes directly over and sometimes to the left or right of the house. Mr. Lindsay has sought, but has been unable to afford, mitigation measures to his house for the noise.

**Michael Leary** (Ex. 12 A, B) Michael Leary is retired after 20 years active duty in the Navy. Prior to the arrival of the F/A-18s, the Learys and their children had no difficulty with the jet noise, but beginning in 1999 the noise became louder. It was a "dramatic difference". The planes often fly directly over their house or immediately adjacent to it. He describes the effect of the planes when they are operating as "constant bombardment". His home has also been subject to a vibration problem since the F/A-18s arrived.

**B. Other Witnesses**

**Thomas Askins** (Ex 4 A,B) Thomas Askins has lived at 879 Winwood Drive in Virginia Beach since 1976. He lives near the homes of Plaintiffs Capps and Levenson. He retired as an airline pilot from Trans World Airlines after 32 years and prior to that time he was a pilot in the United States Navy. Both from his service in the Navy and from his living near Oceana for 30 years, he is familiar with the planes that have flown from Oceana including the A-6, the F-4, the F-14 and F/A-18. Starting in 1999 the noise became very loud and "and I mean it's so loud that you just can't function." In his opinion the A-6 and the F-4 were louder than the F-14 but the loudest plane of all is the F/A-18. "I don't know of any airplane that is that loud. Maybe the Concorde." Mr. Askins is not a plaintiff in this case but is a member of CCAJN.

**John Shick** (Ex. 14 A,B) John Shick is a retired Captain in the United States Navy whose home in Virginia Beach is not far from Plaintiff Levenson and is about 1.5 – 2 miles from Oceana. He has lived there since the 1980s. In the 1980s his home experienced overflights by both A-6s and some F-14s. He had no complaints about the noise over his house until the arrival of the F/A-18s. He then purchased a noise meter and has measured the sound level of the F/A-18s C/D when they were flying patterns over his house between 108 and 110 dB. He has also made measurements of the Super Hornets (F/A-18 E/F) in the same location and they are above 120 dB. During the period from late 1998 through mid-1999 as the squadrons of F/A-18s were arriving in Oceana the noise became progressively more disturbing and more annoying, and became an increasing problem "both for the community and noticeably in my home and my

neighborhood." He was a founding member of CCAJN which was organized prior to the issuance of the Cecil Field EIS. Captain Shick is not a plaintiff in this litigation.

**Herk Stokely** (Ex. 2 A,B) Herk Stokely and his family have lived in their home near Oceana since 1967. Mr. Stokely was a pilot in the Navy in the 1960s and after he left active duty he flew in the Reserves, out of Oceana, mostly in A-4 jets. He has flown all the patterns at Oceana. After active duty he worked as an aeronautical engineer at the Naval Aviation Depot in Norfolk from which he retired. His home is near Plaintiffs Capps and the Levenson. Mr. Stokely is not a plaintiff in this case, but he is a member of CCAJN. The most dramatic noise event that he can recall since 1967, before the arrival of the F/A-18s, was the preparation for the First Gulf War in 1991 which involved constant deployment preparation of A-6 and F-14 aircraft. It was very loud and constant for a relatively short period of time. Mr. Stokely knows that the planes from Oceana fly far outside the patterns because his home is quite distant from the oval FCLP patterns, but planes regularly fly directly over his house and even beyond his house. Despite the fact that the published pattern calls for a maximum altitude of 1,000 feet, he has regularly triangulated the height of planes near his home at 600 - 800 feet.

Prior to the arrival of the F/A-18s, almost all FCLPs were flown at Fentress. Although the EIS predicted a very small number of FCLPs at Oceana following the move, in fact, there have been substantial and increasing numbers of FCLPs at Oceana. Indeed Mr. Stokely asked the commanding officer of Oceana, Captain Zobel, why this was happening and Captain Zobel advised that there had already been 20,000 FCLPs flown in Oceana for that year. The planes also fly over his house when they perform touch and go operations. Mr. Stokely regularly works in his garden and uses earmuff

type noise suppressors. He has purchased a competent decibel meter and has recorded noise levels as high as 117 dB in his yard.

**Nancy Darling** (Ex. 19 A,B) Nancy Darling has lived at her home in Virginia Beach since 1993. Her home is not far from Plaintiffs Hoag (Lynch) and Dingle. Ms. Darling is a plaintiff in this case. Until the F/A-18s, arrived Ms. Darling had little or no difficulty with aircraft noise. She had no problem with phone conversations or being able to watch television or keep her windows open. Her experience changed "significantly and intolerably" when the F/A-18s were moved from Cecil Field. Since then, she cannot keep her windows open, or have a telephone conversation or conduct business outside her home. She cannot sit outside and read or garden or entertain people on the patio when the planes are flying. Sometimes the planes fly directly over her house and sometimes to one side or the other. She purchased a decibel meter and has recorded 123 dB near her home. She is considering selling her home. The only reason she would do so is the recent jet noise.

**Louis Figari** (Ex. 18 A,B) Mr. Figari lives with his wife at a home in Virginia Beach they moved into in December 1991. Mr. and Mrs. Figari live not far from Plaintiffs Dingle and Hoag (Lynch). Mr. Figari is a commercial airline pilot with Continental Airlines and when he was in the Navy he flew the F-4 Phantom. After active duty he stayed in the Naval Reserves for 20 years. He built his present home and before he purchased the lot he paid careful attention to the noise from Oceana. The planes flying out of Oceana prior to the arrival of the F/A-18s were the A-6 and the F-14. His home is not supposed to be near a pattern. Prior to the arrival of the F/A-18s, a plane would fly over his house only very occasionally. After the arrival of the F/A-18s, the

planes regularly fly directly over his house at a height of 800 – 1,000 feet. Since that time it has affected his ability to listen to radio and television and conduct conversations.

**Carl Helvie** (Ex. 20 A,B) Carl Helvie is retired Professor Emeritus at Old Dominion University. For 28 years he lived at 421 Lake Drive in Virginia Beach which is not far from Plaintiffs Dingle and Hoag (Lynch). In December 2000 he moved from his home to Hampton, Virginia solely to get away from the jet noise. Prior to the arrival of the F/A-18s, his home was quiet and only occasionally did he hear jets at all. During the period after the arrival of the F/A-18s, overflights of his house became common and very intrusive. He could not carry on a conversation, talk on the phone, watch television or concentrate on his class work or research. Mr. Helvie is a plaintiff in the case.

**Kimberly Johnson** (Ex. 23 A,B) Kim Johnson lived at 3220 Sugar Creek Drive in Virginia Beach, not far from Plaintiff Kenneth Hill, until 2000. She is a real estate investor and broker and her office was in her home. After the arrival of the F/A-18s she could no longer conduct business because she could no longer talk on the telephone when the planes were flying. Similarly, it was difficult or impossible to do anything outdoors. After the arrival of the F/A-18s, many more planes flew directly over her house. She is also presently chair of CCAJN. The CCAJN board has met on a number of occasions at the Levenson home and she knows from experience that the Levensons suffer loud and frequent noisy overflights.

**Jeffrey McCreary** (Ex. 16 A,B) Mr. McCreary and his wife have lived at 804 Lord Leighton Court since 1996. That address is near Plaintiffs Capps and Levenson. Prior to 1996 they lived in a mobile home community close to Oceana, where they moved in 1976 when Mr. McCreary was an Aviation Administration Maintenance Technician at

Oceana. In 1996 they moved to their present address specifically to get away from the noise and to move to a quiet neighborhood. They researched the neighborhood using maps in the library, talked to people in the neighborhood and rode their bicycles in the area. It was a quiet neighborhood until the arrival of the F/A-18s. However, planes are now flying directly over and adjacent to their home, which had not happened before, and the effect is extremely disturbing. They have replaced all of the windows in their home and largely given up gardening which both Mr. McCreary and his wife enjoy a great deal.

**Charles Nash** (Ex.15 A,B) Charles Nash retired from the Navy after 22 years. He was a crew member on various patrol aircraft. When he and his family moved into their home in 1993, he reviewed an AICUZ map and determined that his home was on the outer fringes of the lowest noise zone. Between 1993 and the arrival of the F/A-18s, the noise didn't bother the Nashes. After the arrival of the F/A-18s the noise became extremely intrusive and they have replaced all of the windows in their house and added insulation to their attic. The F/A-18 is much louder than the F-14 and its noise is "piercing" … "The F/A-18 hurts." The F/A-18 is also a good deal louder than the A-6. Mr. Nash is a plaintiff in the present litigation. He lives near Test Case Plaintiffs Lindsay and Capps.

**Robert Goodwin** (Ex. 17 A,B) Robert Goodwin spent 20 years on active duty in the Navy and then worked as a civilian with the Navy. He has lived in Virginia Beach for 29 years, near Plaintiff Levenson. The noise from Oceana aircraft became louder and louder over the period of 1998-1999 as the F/A-18 squadrons moved in. He experiences some direct overflights over his home. Between 1999 and 2002, Mr. Goodwin replaced all of the windows in his home. He rates the F/A-18 as the noisiest Naval aircraft.

**Bonnie Youngberg** (Ex. 21 A,B) Bonnie Youngberg is a psychotherapist in Virginia Beach. From 1997 through 2002, she lived at 913 Earl of Essex Arch, not far from the Capps and the Levensons. After the arrival of the F/A-18s, the noise became so upsetting and intrusive that she sold her house. Planes were flying directly over her home, and so low that she could look directly up and see the "belly of the plane." She has also seen the planes fly directly overhead when she has been at Lynnhaven Mall which is even further outside the theoretical flight patterns than Ms. Youngberg's home.

## IV. THE DECLARATION OF COMMANDER RICHARD ERIE HAS NO PROBATIVE VALUE

Throughout its memorandum, Defendant relies extensively on the declaration of Commander Richard S. Erie (Erie Decl., Exh. D to Def.s Mem) to make factual assertions about historical aircraft operations and noise at test plaintiffs' properties. See Def. Mem. at 11-17, 36-37. Cdr. Erie served as Assistant Air Operations Officer at NAS Oceana between August 2003 and January 2006, then as Operations Officer from January 2006 to the present. Erie Decl. at 1. Therefore, Erie did not serve as an operations officer at any time relevant to this case. Erie begins his declaration with a hypothetical assertion that [t]he runway in use at NAS Oceana at any given time, including at any given time during July 1999, would have been a function of the winds at the time". *id.* at 3 (emphasis supplied). Despite the fact that Erie does not demonstrate any personal knowledge of aircraft operations at test plaintiffs' properties during 1999, his declaration purports to address the relationship of flight operations to each of the 12 test plaintiffs' properties at the time of the alleged taking in July 1999. *id.* at 8.

Erie couches his supposed factual assertions with language that demonstrates his lack of personal knowledge. With respect to each of the Test Case plaintiffs' properties,

Erie speculates on what jet operations and overflights would have or may have occurred.[5] Conspicuously, Erie fails to state that he has personal knowledge relating to operations and overflights which actually occurred in 1999. Because Erie lacks personal knowledge regarding overflights and operations at the relevant time, because his vague factual assertions contain numerous opaque suggestions about what would have and may have happened at test plaintiffs' properties, and because Erie is not legally competent under RCFC 56 (e) to make even the conclusory assertions contained in his affidavit, his declaration has no probative value for summary judgment purposes and the Court should decline to consider it.

According to RCFC 56(e), an affidavit, or declaration, must satisfy a three-prong test to merit consideration for summary judgment: [s]upporting and opposing affidavits shall be made upon personal knowledge, shall set forth facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to matters stated therein. This Court, interpreting the predecessor to RCFC 56(e), has required that affidavits in support of summary judgment comply with all three prerequisites and held that affidavits that fail to satisfy the foregoing three-prong test of Rule 56(f) have no probative value in deciding a summary judgment motion. *McMurray v. United States*, 15 Cl. Ct. 323, 331-332 (1988) Similarly, in *Halliday v. United States*, 7 Cl. Ct. 315, 322( 1985) this Court held that an affidavit filed in support of summary judgment was not in

[5]Erie's use of this speculative language is too numerous to recite *seriatim*. Erie's analysis of each property contains numerous examples of what would have occurred, not what did occur. His analysis of one property, Theodore Dingle, is a good example . When runway 23 L/R was in use it would not have been unusual for aircraft to have flown within one half mile of the property, *id.* at 10. When runway 5L/R was in use, the track for departure would not typically be closer than 1-2 miles to the Dingle property. *id* at 10. When runway 14L/R was in use, aircraft may have flown within approximately mile laterally of the Dingle property. *id*. at 10

compliance with Rule 56(e) where the affidavit did not show affirmatively that the affiant is competent to testify to the matters stated therein. Additionally, the court refused to consider an affidavit asserting that there was no discrimination against Halliday because the affidavit does not show that he (the affiant) knows the circumstances, *id.*, regarding the treatment of those similarly situated to Halliday.

In *Celanese Corp. & Consol. Subsidiaries v. United States*, 9 Cl. Ct. 45, 48-49 (1985), this Court found that a lengthy affidavit did not meet the requirements of Rule 56(e) because the affidavit did not show that he (the affiant) has personal knowledge of the events set forth in each of the 237 paragraphs contained in the affidavit. The court emphasized that an affidavit is deficient where it recites facts about transactions and events in which, apparently, he did not participate. *id.* Reliance on such affidavits to prove undisputed facts is simply inappropriate where the the submissions to which the affiant attests are replete with hearsay, relating a chronology beyond his personal knowledge and about which his knowledge was acquired' from other than personal participation. *id.*.

This Court should likewise decline to consider Erie′s declaration because it fails to meet the requirements of RCFC Rule 56(e) and case law. Erie's declaration is fatally flawed in several respects. First, Erie′s allegations concerning operations and overflights at Oceana in 1999 are clearly not based on his personal knowledge because he has been an air operations officer at Oceana only since August 2003. Second, as in *Celanes*e, Erie's declaration recites facts about transactions and events in which, apparently, he did not participate. *Celanese*, 9 Cl. Ct. at 49. If Erie had actively participated in events sufficient to trigger personal knowledge of overflights and

operations in 1999, he would have made factual allegations about what operations actually occurred, not about operations which would have or may have occurred. Finally, as in *Celanese*, Erie′s declaration is replete with hearsay, relating a chronology beyond his personal knowledge and about which his knowledge was acquired from other than personal knowledge. *id.* Because Erie′s declaration regarding operations and overflights at test plaintiffs′ properties in 1999 fails to meet each of the three prerequisites for admissibility prescribed by Rule 56(e), it has no probative value and the court should not consider it to support Defendant′s motion for summary judgment.

## V. STATUTE OF LIMITATIONS

The Government alleges that if a taking of an avigation easement occurred, it occurred at these properties at least as early as 1981 ... . Def. Mem. at 17. Defendant filed its Motion for Summary Judgment and accompanying memorandum on April 28, 2006. This document for the first time specified that the government alleges that the statute of limitations began to run on Plaintiffs' properties in 1981. On May 5, one week <u>after</u> filing for summary judgment, Defendant finally responded to Plaintiffs' interrogatory relating to the statute of limitations, first propounded almost <u>five years earlier</u>, and served its Supplemental Response to Interrogatory 3. (Ex. 45)**.**

For almost five years, as more fully spelled out in Plaintiffs' Motion for Sanctions and supporting Memorandum, filed with this court on February 23, 2006 (this motion is still pending before the Court), Plaintiffs had repeatedly sought to elicit precisely this information through formal and informal means. The Government repeatedly refused to provide any information relating to its statute of limitations defense on the grounds that it needed to conduct "further discovery" in order to determine what noise level <u>each</u> test

case plaintiffs' property was exposed to during years prior to the relocation of the F/A 18's to NAS Oceana in 1999. *See, e.g.,* Exh. I to Defendant's Mem. in Support of Motion for Sanctions. Yet, the Government's statute of limitations argument in its summary judgment pleadings has absolutely nothing to do with noise exposure experienced by the Test Case Plaintiffs or by any individual properties. Instead, Defendant relies exclusively on the absolute (and far from certain) number of aircraft operations purportedly occurring in 1981 as contrasted with 1999. According to Defendant, the statute of limitations began to run "at least as early 1981 when aircraft operations far exceeded the operations in July 1999. (Def. Mem. at 17). Similarly, the Government states that Defendants recorded aircraft operations at NAS Oceana with respect to the test case plaintiffs' properties reflect far higher aircraft operations in 1981 than in July 1999. (Def. Mem. at 21).

Thus, the Government clearly acted in bad faith in refusing to answer statute of limitations interrogatories for five years under the false pretense that it needed further discovery from each Plaintiff in order to assess the noise levels experienced by test case plaintiffs in earlier years. In fact, Defendant's statute of limitations argument is based on information - total aircraft operations at NAS Oceana in 1981 and 1999 - requiring no discovery by Defendant and wholly within the control of NAS Oceana officials who recorded this data. Defendant's disingenuous tactics provide additional reason for the court to strike Defendant's statute of limitations defense pursuant to both RCFC 37 and its inherent power to sanction discovery misconduct.[6] Alternatively, because of

---

[6]Additionally, as delineated elsewhere in this memorandum, Defendant cannot even begin to establish that a taking occurred in 1981. Defendant has offered no breakdown of operations for 1981, no evidence of the type of the aircraft performing those operations, and no evidence of the effect of operations on Plaintiffs' properties. In fact it denies even having the information. In short, Defendant has fallen well short of

Defendant's dilatory tactics, the court should decline to hear any summary judgment argument pertaining to this issue.

## VI. THE F/A-18s CREATED UNPRECEDENTED NOISE

Plaintiffs' claim that the arrival and subsequent operations of the F/A-18s in 1998 and 1999 imposed an enormous burden on the neighborhoods surrounding Oceana does not rest solely on the sworn testimony of Plaintiffs and non-test-case witnesses. The Navy knows full well that a tidal wave of noise has engulfed Virginia Beach.

On November 18, 2003, Captain Thomas Keeley, the Commanding Officer of NAS Oceana at the time, appeared before the Virginia Beach City Council to brief Council members on AICUZ recommendations for compatible residential development near Oceana. Captain Keeley, contrary to his 2006 declaration, described the expected noise at the site to be at the level of 110 db, a level he analogized to "a rock concert". (Ex. 53, Keeley Briefing, November 18, 2003, p. 12). Raymond Firenze echoed that description when he appeared on October 28, 2003 before the Virginia Beach Planning Commission in opposition to the residential development of a piece of property <u>2.5 miles northeast of Oceana</u>. He reported that 102,000 of the total 218,000 annual operations at Oceana in 2002 passed over the property, exposing it to 114 dB at an altitude of 800 feet, 4 decibels over the noise level of a rock concert. (Ex. 35, Firenze comments to Virginia Beach Planning Commission, October 28, 2003). In another appearance before the Virginia Beach City Council, Captain Keeley again described the anticipated noise over a proposed development to be up to 114 db, 102,000 times a year, roughly equivalent to "100,000 rock concerts" over the property. (Ex. 36, <u>Virginian Pilot,</u> November 26, 2003,

---

meeting its summary judgment burden of proving beyond material, factual dispute that a taking occurred in 1981.

Hampton Roads Section, p. 19). On March 16, 2004, Captain Keeley gave a power-point presentation to the Virginia Beach AICUZ Task Force. (Ex. 37, Excerpts from Keeley Presentation, March 16, 2004). In the presentation, he published a comparison of the SEL dB levels of the F/A-18 C/D, F-14, and F/A-18 E/F on approach, departure and FCLP operations. His assertions for the noise FCLP operations of the aircraft were:

FCLP Oceana at 1000'

| | |
|---|---|
| F-14A | 93 dB |
| F-14B/D | 95 dB |
| F/A-18 C/D | 108 dB |

Remember that a <u>three</u> dB increase is a <u>doubling</u> of the noise energy of a sound and a ten dB increase is a doubling of an individual's sense of the sound. (Ex. 27, Wyle Report, p. A-2).

In September, 2005, Wyle Laboratories and Ecology & Environment, Inc., published specific DNL values for each of the test-case Plaintiffs' properties, comparing the DNL values for the baseline year chosen for the EIS (1997) with the post-F/A-18 noise. (Ex. 38, Point Specific DNL Spreadsheets, March 31, 2005 and January 30, 2006). The column in that table labeled the 2000 baseline figures represents the Government's "reconsideration" of the noise levels it published to the public in the 1998 EIS. The "reconsideration" is based upon alleged changes in the F/A-18 and F-14 flight profiles at Oceana and an alleged recount of flight operations at Oceana. Under these allegations the Government now contends it over-counted flight operations at Oceana by approximately 88,000 operations in 1999. Although the Government asserts that it knows enough to reduce the total operations count at Oceana for 1999, it now denies

knowing either the number of FCLPs or the number of touch and go operations it conducted at Oceana in 1999. (Ex. 31, Email from Steve Bryant, May 22, 2006). At the trial of this case, Plaintiffs expect to demonstrate that these "reconsidered" profiles and operations are bogus and constructed for the purpose of influencing this litigation.

As of December 1, 2000, however, the Navy had 20,940 FCLP operations at Oceana so far that year. (Ex. 32, Email exchange, Firenze and Boyajian, December, 2000). According to Eric Boyajian of ATAC, the ARS2 projection was that only .019 percent of the total FCLP operations in 1999 would be performed at Oceana. (*id.)* This would have resulted in only 2,907 FCLP operations at Oceana in all of 1999. (*id.*).

There is no record or assertion that the government miscounted flight operations in any year at Oceana other than 1999. For reasons unexplained, the Government's "psycho-acoustician", Dr. Sanford Fidell, in drafting his expert report, deleted the ARS2 column from the Wyle report using only the very suspect "reconsidered" 2000 figures. But Plaintiffs prefer Wyle's comparison of the projected 1999 ARS2 DNL values with those of 1997 (pre-F/A-18) values which shows the following (Ex. 38, Point Specific DNL Spreadsheets, March 31, 2005 and January 30, 2006):

| | **1997** | **1999** | **INCREASE UNDER ARS2** |
|---|---|---|---|
| Lindsey | 58.5 | 75.3 | +16.7 |
| Waterman | 59.6 | 72.8 | +13.2 |
| Levenson | 62.3 | 76.4 | +14.1 |
| VanNostrand | 56.1 | 71.3 | +15.2 |

| | | | |
|---|---|---|---|
| Riddick | 58.1 | 71 | +12.9 |
| Hill | 68.3 | 78.1 | +9.8 |
| Leary | 59.4 | 73.3 | +13.9 |
| Hoag | 66.6 | 79.2 | +12.6 |
| Ryan | 56.2 | 72.1 | +15.9 |
| Dingle | 61.6 | 75.2 | +13.6 |
| Capps | 71.3 | 89.7 | +18.4 |
| May | 45.7 | 60.43 | +14.73 |

In view of the undisputed fact that a 3 dB increase is a doubling of noise energy and a 10 dB increase in noise represents a doubling in perceived noise (Ex. 27, Wyle Report, p. A-2), the increases in noise around the Plaintiffs homes shown for 1999 under ARS2 for the test-case Plaintiffs are enormous.

The Government has recorded the number of noise complaints at Oceana for each year beginning in 1973. (Ex. 47, Complaint Graphs). In 1981, there were 303 noise complaints at Oceana. (*id.)*. In 1999, there were 1,789 complaints. In 2000, the last year reported by the Government, there were 2,326 complaints. (*id.*). The highest number of complaints in any year prior to 1999 was 730 in 1987. (*id.*).

The planes from Oceana regularly fly beyond the prescribed flight tracks. (Ex. 55, Email from Cecchini, dated January 9, 1996). The Defendant acknowledges this fact, but tries to minimize its significance. For example, the government's Air Traffic Control Manual (NAVAIR 00-80T-114) acknowledges that there are deviations from the prescribed paths, particularly during FCLP operations. (Ex. 56, Air Traffic Control Facility Manual, dated October 1, 2004, p. 5-19). In a memorandum to the Assistant

Secretary of the Navy for Installation and Environment, Captain S.E. Benson, the Commanding Officer of NAS Oceana, informed the Secretary that "[a]ircraft do not fly a fine line in the sky but fly within a corridor." (Ex. 57, Memo from Capt. Benson, December 5, 1997). In a letter to Senator John Warner on April 30, 1998, Captain Benson, in response to a noise complaint, explained to the Senator that "the patterns are not fine lines in the sky…." (Ex. 58, Letter from Capt. Benson, April 30, 1998). Capt. John Shick (Retired) met with Captain Benson and the Community Liaison Officer, Fred Pierson, concerning overflights. (Ex. 59, John Shick Affidavit, November 24, 1998). Captain Benson informed him that aircraft may fly outside the prescribed flight paths because of the varying skill and experience levels of pilots, and also for safety. *id.*

This vague acknowledgement of deviation from published flight tracks, however, ignores the significance such deviations can have regarding noise exposure. For instance, on December 3, 1997, Deputy Assistant Secretary for the Navy Duncan Holaday wrote:

> Recently, the CNCLANTFLT Deputy Director, Shore Resources, raised a serious issue regarding the flight paths used in the Cecil Field Draft Environmental Impact Statement. In brief, the concern (as I understand it) is that the flight paths reflect flight patterns with turns significantly tighter than are actually being flown today and that they are well beyond the capabilities of the students in the F-14 and F-18 Fleet Replacement Squadron.
>
> These flight paths form the basis for the DEIS noise and safety analyses; noise levels are the most significant environmental impact associated with the proposed action (especially NAS Oceana, but also MCAS Cherry Point and MCAS Beaufort). Expanded flight paths would probably expose more people to high noise levels and might also expand the accident potential zones.

(Ex. 60, Holaday Memo, December 3, 1997).

The Secretary's concerns were well founded, yet it appears that little, if any, consideration was given to such variations in analyzing the noise impact on the property owners surrounding NAS Oceana. Around the time of Assistant Secretary Holaday's communication, Alan Zusman posed the question to Mr. Czech of Wyle Labs asking about the aircraft deviation from the flight tracks. This inquiry was apparently at the behest of RADM Smith:

> Question RADM Smith wants answered is where are the planes flying. E.g. Figure 3-10 of Wyle Noise Report identifies T&Gs. We know that when the pattern is saturated, ATC usually extends downwind leg of the patter. Need to have ATC look at track 5LT1, for example, and say that when the pattern is saturated the downwind leg is extended _X_ ft from that shown. Same kind of question applies to all tracks. In other words, what variability is there in the tracks?

(Ex. 61, Note from Alan Zusman, December 12, 1997). Despite the observations of an Assistant Secretary of the Navy, and the inquiries of an Admiral, Mr. Czech testified in his deposition that he made no investigation into the variability or how it might effect noise exposure, other than the same generic acknowledgement that the flight tracks are "average[s]." (Ex. 62, Czech Deposition, p 58-60).

## VII. PROFERRED TESTIMONY OF SANFORD FIDELL

In this case a substantial portion of the Navy's argument supporting its assertion that the Plaintiffs' claims should be dismissed rests on the expert opinion of Dr. Sanford Fidell, a self-described "psycho – acoustician". (Ex. 39, Fidell Depo., p. 11-12). As will be seen, Dr. Fidell is a witness upon whom the Court should not rely. Moreover, the fashion in which his fourth and latest report was created and filed justifies the complete dismissal of his opinion.

The Department of the Navy's AICUZ program requires and is based upon the measurement of "annual average noise environment over a 24-hour day. It is the 24-hour energy-averaged A-weighted sound level with a 10 dB penalty applied to the nighttime levels which occur between 10:00 p.m. to 7:00 a.m." (Ex. 54, Glossary of terms from F/18 E&F EIS). The measurement is commonly referred to as DNL or Ldn**.** (Ex. 27, Wyle Report, p. 1-4). Correspondingly, the Navy's environmental analysis of the noise impact on citizens residing around NAS Oceana, under the requirements of National Environmental Policy Act of 1972, relies upon the DNL measurement for reporting the environmental impact of aircraft noise. (Ex. 24, EIS)

**A. Dr. Fidell's Testimony in *Vivian's Island* Case**

*Vivian's Island, et al. v. The United States* COFC # 1:02-cv-00756-RHH was another inverse condemnation action arising from the transfer of two squadrons of F/A-18 aircraft from Cecil Field which were not moved to Oceana but rather sent to MCAS Beaufort in South Carolina. (Ex. 25, Record of Decision). On October 16, 2003, Dr. Fidell filed a report in the *Vivian's Island* case supporting the Government's position that military flight operations at Beaufort over the years had already significantly affected the plaintiffs' property before they acquired it.

Dr. Fidell was deposed in *Vivian's Island* on November 21, 2003. On November 25, 2003, just five days after his deposition, Dr. Fidell filed yet another report in that case. In his November 25 report, he used the DNL noise exposure in opining on alleged historical adverse impact on plaintiffs' properties, stating that in accordance with federal policy, DNL values in excess of 65 dB are incompatible with residential uses. (Ex. 51, Fidell Report in Vivian's Island, November 25, 2003).

On January 12, 2004, Dr. Fidell then filed a Declaration in *Vivian's Island*, in which, for the first time, he used "tone-corrected PNL" metric in asserting that the F/A-18 is quieter than the F-4 in the FCLP pattern. (Ex. 50, Fidell Declaration in Vivian's Island, January 12, 2004, p. 7). Twenty-two days later, on January 30, 2004, the government filed its Motion to Dismiss and for Summary Judgment, relying substantially on Dr. Fidell's latest report.

This deplorable tactic repeated itself in the present case.[7]

**B. Dr. Fidell's Testimony in *Testwuide* Case**

Dr. Fidell's first appearance in the present case was on March 12, 2002, when the Government filed Dr. Fidell's Declaration (dated February 17, 2002) in the class certification phase of this proceeding. (Defendant's Opposition to Plaintiffs' Motion to Certify the Class, Docket No. 53, Ex. L). In the face of Plaintiffs' proposal to divide putative Plaintiffs into classes within DNL noise exposure zones, Dr. Fidell argued that the same DNL noise exposure of two separate pieces of property does not mean that the two properties were necessarily exposed to the same number or types of operations, and that the case was therefore not appropriate for class treatment. Nowhere in that report is PNL or PNLT used or even mentioned.

In the test case portion of the present case, the Government served another report by Dr. Fidell dated September 30, 2005. In that report, Dr. Fidell stated at p. 3:

> Since the measure of greatest concern for evaluating aircraft noise impacts ("Day-Night Average Sound Level", discussed in Section A.1.2.2) is by definition a 24-hour measure, noise is modeled for a representative 24 hour period. Noise modeling for military airfields is generally undertaken on an "annual average busy day" (five day work week) basis, since the operational pace at most locations slows considerably on weekends.

---

[7] After the Pre-Trial Conference and after trial briefs had been filed the parties in *Vivian's Island* settled the case for a substantial payment.

> NOISEMAP is also capable of calculating noise exposure on an "annual average day" basis, however.

Using different iterations of NOISEMAP software, so-called extrapolations from earlier software, and the published AICUZ noise zones around Oceana, Dr. Fidell purported to estimate the DNL noise exposure of each of the Test Case Plaintiffs' homes for 1972, 1975, 1978, 1982, 1988, 1993, 1997 and 2000. He made no estimate either for the years 1981 or 1999, nor was that omission explained. Neither PNL nor PTNL was mentioned in that report.

Plaintiffs took Dr. Fidell's deposition on December 16, 2005. At no time during his deposition did he mention or use PNL or PNLT as a method of single event noise measurement or for any other purpose. Dr. Fidell did not make any visits to Oceana in preparation of his 2002 or 2005 report. (Ex. 39, Fidell Depo., p. 31). He has never undertaken to do any field studies of the noise in or around Oceana. (*id.* p.33). The scope of his employment in this case is as a "psycho-acoustician". (*id.* p. 35). When asked if he disagreed with the Navy's AICUZ program, his response was:

> There is no perfect predictor of—no perfect acoustic predictor of the effects of noise on people, because the effects of noise on people are not uniquely determined by any acoustic measure, and DNL is among those that have been studied more carefully than other measures and is highly correlated with other reasonable metrics.
>
> However, it is not a perfect predictor of noise impacts. If there were a clearly superior metric, then I suppose I would prefer that be used rather than DNL, but since there isn't a clearly superior metric to DNL, I don't know that I formally disagree with its uses as a less than perfect measure of noise impact.

(*id.* p. 49-50).

****

> The day-night average sound level did not gain currency as a universal summary of noise exposure due to aircraft and other sources until its adoption by the Environmental Protection Agency in 1974, and it shortly thereafter swept the field and supplanted both noise exposure forecasts in this country, although not in others. And community noise rating—community noise rating now is simply a historical curiosity that is not calculated by any software these days that's used to predict aircraft noise exposure.

(*id.* p. 53).

On February 15, 2006, Dr. Fidell filed a revised report, to include the test case plaintiff, Eileen May. Again, nothing was said about PNL or PNLT.

On March 29, 2006, Dr. Fidell filed a "second revised report" (his fourth in this case), adding a new section, entitled "Additional Information About Fluctuations in the Aircraft Noise Environment at NAS Oceana." (Def. Memo. Ex. E, p. 13). In this new section, he added a method of single-event noise analysis ("perceived noise levels (PNL) and tone-corrected perceived noise levels (PNLT)"), never previously mentioned in this case, but which had been used by him in his eleventh hour declaration in the *Vivian's Island* case in January, 2004.

On April 28, 2006, the Government filed its present Motion to Dismiss or for Summary Judgment.

If Dr. Fidell's latest method of measuring aircraft noise levels has utility in this proceeding, it is inexplicable why Dr. Fidell would wait until after all depositions and discovery had ended, and all expert and rebuttal reports exchanged (as he did in *Vivian's Island*), to publish a new set of noise levels for all the various jet aircraft that have operated at NAS Oceana over thirty years, and which conflicts with the Navy's published noise measurements of its own aircraft.

One explanation would be that Dr. Fidell didn't recall that there was a "more appropriate" noise metric than DNL until March of 2006 and consequently, his post-discovery, post-deposition modification of his opinion was regrettable but not in bad faith. That explanation cannot stand, however, in view of the fact that he used the exact same tactic in *Vivian's Island* in January 2004.

This Court should completely reject the various reports of Sanford Fidell. The tactics under which those opinions came to be filed alone justify denying Defendant's Motion for Summary Judgment.

**C. Dr. Noral Stewart**

Dr. Noral Stewart has been retained by Plaintiffs. He holds a Phd in Mechanical Engineering from North Carolina State University. (Ex. 49, Stewart Dec., ¶1). His graduate specialty was in acoustics and noise control. (*id.*, ¶1). Dr. Stewart finds inexplicable Dr. Fidell's dramatic shift from his earlier DNL based analysis to one based on "tone-corrected perceived noise level (PNLT)". (*id.*, ¶8). PNLT has only been used rarely since the adoption of DNL by the EPA in 1974 and the subsequent adoption by federal agencies. (*id.*, ¶8). The determination of PNLT requires a good deal of <u>subjective</u> estimation as to "noisiness" (*id.*). Given Dr. Fidell's belated change in methodology to one that has not been used for AICUZ noise contours at military airfields for over 25 years, Dr. Stewart finds the meaningfulness of his tone-corrected comparisons among the various aircraft questionable (*id.*, ¶10).

**CONCLUSION**

To win its motion the Government has the burden of demonstrating beyond factual dispute that the Test Case Plaintiffs' properties were subject to a taking of an

avigation easement in 1981. Not only has the Government not met that burden, it has entirely failed to produce any admissible evidence that a prior taking occurred in 1981. Indeed Defendant has admitted that it does not even have any particularized data upon which the Court could make an undisputed factual finding that an earlier taking occurred in 1981. Plaintiffs respectfully request that the Court deny the Government's motion for dismissal and summary judgment.

Dated: May 26, 2006

Respectfully submitted,

/s/ Jack E. Ferrebee

Jack E. Ferrebee
Hofheimer/Ferrebee, P.C.
1060 Laskin Road, Suite 12-B
Virginia Beach, Virginia 23451
(757) 425-5200
jferrebee@hoflaw.com

Counsel of Record for Plaintiffs

Of Counsel:

Kieron F. Quinn
Martin E. Wolf
Quinn, Gordon & Wolf, Chtd.
102 W. Pennsylvania Avenue
Suite 402
Towson, Maryland 21204
(410) 825-2300
kfquinn@quinnlaw.com
mwolf@quinnlaw.com

Charles R. Hofheimer
Kristen D. Hofheimer
Hofheimer/Ferrebee, P.C.
1060 Laskin Road, Suite 12-B
Virginia Beach, Virginia 23451
(757) 425-5200
chofheimer@hoflaw.com

khofheimer@hoflaw.com

Thomas Shuttleworth
Stephen C. Swain
Lawrence Woodward
Charles B. Lustig
Shuttleworth, Ruloff, Giordano & Swain
4525 South Blvd., Suite 300
Virginia Beach, Virginia 23452
(757) 671-6000
tshuttleworth@srgslaw.com
sswain@srgslaw.com
lwoodward@srgslaw.com
clustig@srgslaw.com

**<u>Betty Capps - Test Case Plaintiff</u>**

Betty Capps lived in Virginia Beach from 1975, (Exhibit 1B, Capps Deposition p. 5) when she was twelve years old, through 2005 when she and her husband, William, moved to Chesapeake, Virginia (Exhibit 1C, Capps Answers to Interrogatories 10/31/05 p. 6). Mr. and Mrs. Capps moved to the Point O'Woods neighborhood at 409 Pallets Road when recently married in 1980 or 1981.

When Mr. & Mrs. Capps first moved in to Point O'Woods they rented their present house for more than eleven years. During that time they experienced direct overflight from jets. Despite that, they purchased the house in the early 1990s. When Mrs. Capps gave her deposition in April of 2005, about 40% of the jets that were flying near her house were flying directly over her house and most of the remainder were flying within a ten block radius of her house. In the 1980s the percentage of planes that were direct overflights of her house was in the 10-20% range (Exhibit 1B, Capps Deposition. p. 23-24).

Q. And in those first, '81 through '83 when there was a high level of operation, then it went down, what impact did that have on your daily lives? If you were outside, could you talk to one another?
A. Yes.
Q. You could talk without having to talk loud or anything of that nature when the jets were going over your house?
A. Yes.
Q. Did you have to turn up the volume of your television, or anything of that nature, at that time frame?
A. I don't remember ever having to do that at that time, no.
Q. Now, I think you said '99 is when the operations spiked again. Is that the time you said? Or when did it spike again?
A. To be honest with you, I never paid any attention until the noise level grew to an uncomfortable level. We always could operate our lives like we've always operated them until after '99.
Q. And when you say after '99, can you tell me what month when that happened?
A. I can't tell you the month. I think it was in the fall.
Q. Fall of?
A. '99.

Q. Okay. And why do you think it was the fall of '99? Why does that jump out to you?
A. The first time I was out in the yard talking to my brother, and for the first time ever we could not communicate. We could not talk. And I remember looking up, going, what is that? And it just shocked me.

(*id.* p. 26-27)

Prior to the arrival of the F/A-18 in approximately 1999, she could always have phone conversations when the jets were overflying her house. When the F/A-18s arrived, she could no longer conduct phone conversations. In addition, vibrations from the F/A-18s caused photographs and the like to vibrate to the edge of a table and fall. That never happened with the F-14s or the A-6s. (*id.* p. 62-64).

She believes that her property value has been affected since 1999 because of the jet noise:

Q. Do you believe your property value has diminished because of the jet noise?
A. Yes.
Q. Why do you believe that?
A. Because it's -- when you discuss with people about the noise, they go, How do you stand to live in that neighborhood? And I think people think the same thing when they are thinking about purchasing a home out there.

(*id.* p. 71).

At one point she had taken to wearing earplugs, but they caused her ears to bleed and the doctor told her to stop using them. (*id.* p. 73). Her husband works shifts so sometimes he sleeps during the day. If the planes were flying patterns he was not able to sleep (*id.* p. 76).

In 2005, Mr. and Mrs. Capps sold their home and moved to Chesapeake, Virginia. Their decision to move was "based solely on the substantial increase in jet noise in 1999 and subsequent years from aircraft operations at NAS Oceana that made living in their home intolerable" (Ex. 1C, Capps Answers to Interrogatories 10/31/05 p. 6).

00001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, )
et al., )
)
Plaintiffs, )
)
v. ) NO. 01-201L
) Judge Victor J. Wolski
THE UNITED STATES OF AMERICA, )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION
OF BETTY J. CAPPS,
TAKEN ON BEHALF OF THE DEFENDANT

Virginia Beach, Virginia

April 28, 2005

Appearances:

SHUTTLEWORTH, RULOFF GIORDANO & SWAIN, P.C.
By: STEPHEN C. SWAIN, ESQUIRE
Counsel for the Plaintiffs

U. S. DEPARTMENT OF JUSTICE
By: STEVEN D. BRYANT, ESQUIRE
DOMINICK G. YACONO, ESQUIRE
Counsel for the Defendant

00005

A. Dodge's Store. That's what it is.

Q. Like the car?

A. Yes.

Q. And how long have you been doing that?

A. 16 years. Just about. Almost 16 years.

Q. And how long have you lived in -- what did you do before that, I'll ask.

A. I did not work.

Q. Okay. And how long have you lived in Virginia Beach?

A. Since 1975.

Q. And why did you move here?

A. My father was in the military and we retired here. He retired here.

Q. What -- he was in the Navy I assume?

A. Yes, sir.

Q. And what rank did he retire as?

A. I'm not certain. I think it was an E-6. I don't know. I have no idea. I don't remember.

Q. All right. Was he enlisted, though?

A. Yes, sir.

Q. And he was at some point a noncommissioned officer. Is that fair?

A. That's correct.

Q. All right. And does he still live in the area?

00023

don't remember them ever being as close as they are now back then. I just don't recall. I mean, I'm sorry. That's all I can remember.

Q. That's okay.

When you look -- let's first talk about that.

A. Okay.

Q. What percentage of, let's say present day, what percentage of the jets that fly over your house fly directly over your house?

A. 40 percent.

Q. Less than half. And the remaining 60 percent, roughly. How many blocks are we talking in a radius away from your house, and you're still hearing those impacts?

A. 10 blocks.

Q. 10 block radius.

Has that spatial relationship to your house, has that remained consistent from when you moved in in 1981 in terms of roughly 40 percent directly over, and the remaining roughly 60 percent within that 10 block radius?

A. If I can recall in the '80s, I wouldn't say 40 percent were overflights back then. I think they were more the 10 blocks away or -- you know, 10 blocks away in a circumference.

Does that make sense?

Q. I think so.

00024

Are you saying that 40 percent would have been in the wider 10 percent -- I mean 10 block radius. What percentage would have been directly over your house in the '80s?

A. 10, 20 percent.

Q. 10, 20 percent.

Was there -- when you say the '80s, was it the same consistent throughout the entire '80s that you were there, '81 to '90? When did it change from 10 to 20 percent flying directly over your house to what you describe now as 40 percent flying directly over your house? When did that happen?

A. In the early '80s, the jets were a little bit more abundant. Then it seemed to slack off to the point that we didn't really pay any attention to them. And then they picked up after 1999. So it's varied over 24 1/2 years. It's varied over how often the jets and where they fly and where they are in relationship to our home.

Q. Okay.

A. So that's hard to answer because it's been such a long period of time. In the '80s, they were much more prevalent. In late '80s, early '90s, they were not.

Q. Okay. Well, then -- fair enough.

So in the -- you moved in about '81?

A. Right. '81. It was '81.

flights and that kind of thing before you moved in?
A. No.
Q. Why didn't you do that?
A. You mean before we rented it?
Q. Yes.
A. Oh, because we were kids, and we needed a house, and it was cheap, and we moved into it.
Q. And how old were you at that time frame?
A. I was 21.
Q. And you had just gotten married I guess?
A. We had been married, yes.
Q. And in those first, '81 through '83 when there was a high level of operation, then it went down, what impact did that have on your daily lives? If you were outside, could you talk to one another?
A. Yes.
Q. You could talk without having to talk loud or anything of that nature when the jets were going over your house?
A. Yes.
Q. Did you have to turn up the volume of your television, or anything of that nature, at that time frame?
A. I don't remember ever having to do that at that time, no.
Q. Now, I think you said '99 is when the operations

spiked again. Is that the time you said? Or when did it spike again?

A. To be honest with you, I never paid any attention until the noise level grew to an uncomfortable level. We always could operate our lives like we've always operated them until after '99.

Q. And when you say after '99, can you tell me what month when that happened?

A. I can't tell you the month. I think it was in the fall.

Q. Fall of?

A. '99.

Q. Okay. And why do you think it was the fall of '99? Why does that jump out to you?

A. The first time I was out in the yard talking to my brother, and for the first time ever we could not communicate. We could not talk. And I remember looking up, going, what is that? And it just shocked me.

Q. Does your brother live in the neighborhood also?

A. He lives in Windsor Woods. He was visiting me that day.

Q. Where is Windsor Woods?

A. Here we go again.

Q. I mean roughly?

A. Roughly it's near where I used to live on Chester

demand for the houses in your neighborhood from what you described of the one-day sales and bidding above the asking price and that kind of thing. Is that a correct statement?

A. Yes. Yes.

Q. Do you -- you identified the fall '99 time frame as to when things changed in terms of you can go longer have conversations when the jets were overflying your house?

A. Exactly.

Q. And did you ever experience that before when you lived in the house, whether you owned it or rented it?

A. I don't remember it not being able to have a conversation.

Q. Okay. And could you have phone conversations outside of your house before 1999?

A. Yes.

Q. You could?

A. Yes.

Q. And could you do it after '99?

A. When the jets are flying, no.

Q. That's what I mean. The jets are flying?

A. No.

Q. And my question is before '99 when the jets are flying, could you have a phone conversation outside?

A. Yes.

Q. You could.

Do you have any experience with vibrations from the jets flying over the house?

A. You mean like my house vibrating?

Q. Or things within the house?

A. Yes.

Q. Has anything ever broken?

A. No. No.

Q. Has anything ever fallen off, a picture?

A. We've had pictures fall. Not off the wall, but like a table that is near a window, it will vibrate. If you don't watch them they will work their way to the edge and fall off.

Q. But nothing has ever broken because of that?

A. No.

Q. Did you have vibrations before '99?

A. Occasionally, like the huge jet would come over. That C -- whatever that thing -- that would vibrate the house. The helicopters would vibrate the house.

Q. And did you have any break at those times?

A. No.

Q. What about when the F-14 flew over your house?

A. I don't remember their vibrating the home.

Q. And the A-6?

A. That was in the '80s. I don't remember -- we never broke anything. I don't remember any vibrations

00064

per se back then.

Q. Do you view your house as unsuitable for residential living based on the noise you are experiencing from the F-18s?

A. Yes.

Q. You view it as unsuitable for living?

A. Yes.

Q. And you viewed it to be unsuitable for residential living since 1999?

A. Off and on since 1999. We go through spells, yes.

Q. And what do you mean by off and on?

A. Sometimes the jet activity is so bad it goes on for weeks that you go, this is it, we've got to move, and then it gets better and you think oh, thank God, and you make peace with it again, and it starts up again and you think, well, it's bad again.

Q. Well, in light of the fact that you have these sort of surges and down times, and that kind of thing, considering that, is it unsuitable for residential living, based on it goes up sometimes and then it goes down?

A. It's hard to say. Because when it's bad it's so bad that you lose perspective. So I guess it's not unsuitable for residential living. It's uncomfortable for residential living.

A. If I recall, yes, it had to be.
Q. Do you believe your property value has diminished because of the jet noise?
A. Yes.
Q. Why do you believe that?
A. Because it's -- when you discuss with people about the noise, they go, How do you stand to live in that neighborhood? And I think people think the same thing when they are thinking about purchasing a home out there.
Q. How do you reconcile that with what you said earlier in terms of it's a relatively small neighborhood and there's a high demand for homes in that neighborhood?
A. Because the homes in that neighborhood are very close to Oceana, and I think a lot of military move out there, but I don't think that we would receive as much money for our home if it was in an area without jet noise. I don't think people with children want to live someplace where their kids are playing having their ear drums blasted out of their head.
Are you talking like the house selling in a day across the street.
Q. Sure.
A. I also know there are not a lot of homes available in that price income right now. But I think if it had been someplace else they probably would have gotten more

00073

Q. Have you ever gone to the doctor and inquired about this pain in your ears, this discomfort as you describe it?

A. What, from the noise?

Q. Yes.

A. No. I did go to the doctor one time when I had the earplugs in my ears that I was wearing because it started to make my ear bleed, but besides that, that's the only time I have been to the doctor for my ears.

Q. Why were you using earplugs?

A. They were flying constantly, sometimes all day long and into the evening, and I have to get up to go to work at 4:30. They were flying after 10. I was trying to get to sleep. And I was wearing earplugs every night.

Q. And the earplug itself was causing your ear to bleed?

A. It caused it to break the little membranes inside of my ears, and I had to take the earplugs out, yes.

Q. And when did that happen?

A. 2005. It was probably 2002, 2003.

Q. Can you see the pilots when they are flying over your house?

A. I can see the head of the pilot, yes.

Q. And is that all the time or every time it flies over?

00076

MR. BRYANT: Off the record.

(Mr. Ferrebee left the deposition room.)

(Recess)

BY MR. BRYANT:

Q. I think you said earlier that your husband sleeps during the day and works at night?

A. Yes, he does.

Q. What does he do?

A. He works at Nova Chemicals. He works shift work. So sometimes he sleeps during the day and sometimes he's working during the day.

Q. Is he able to sleep?

A. No.

Q. With the jet noise?

A. When the jets are flying, no.

Q. Okay. So how often goes that happen?

A. If the jets are flying, he works -- 30 percent of what he works is nighttime work. So I would say a good 20 percent, if they are flying low. It depends how they are flying. If they are flying a little bit away, then he can sleep. If they are right over the top of us, it's impossible to sleep.

Q. And has that caused any problems for him at work and that kind of thing?

A. No.

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| CAROL AND ROBERT TESTWUIDE, et. al., Plaintiffs, | ) | |
| v. | ) | No.: 01-201L<br>Judge Victor J. Wolski |
| THE UNITED STATES OF AMERICA, Defendant. | ) | |

**PLAINTIFFS' SUPPLEMENTAL RESPONSE TO INTERROGATORY NUMBERS 1, 10 AND 20**

COMES NOW the Plaintiffs and in supplementary response to Defendant's First Set of Interrogatories, states as follows:

**INTRODUCTORY STATEMENT AND GENERAL OBJECTIONS**

These answers represent the efforts of Plaintiffs in the presently pending test case to respond to Defendant's written discovery based on the investigation which Plaintiffs' counsel have thus far been able to carry out in connection with the facts relative to this litigation. Unless otherwise stated or suggested "Plaintiffs" refers to those twelve identified properties.

There may exist further information responsive to discovery that is not within Plaintiffs' present knowledge or reasonably available to Plaintiffs. There exist documents relating to the subject matter of Defendants' discovery, which Plaintiffs have not yet been given access to, identified, or reviewed, despite their best efforts to do so. There are certainly persons with knowledge relating to the subject matter of Defendant's discovery of whom Plaintiffs are not presently aware. Accordingly, these responses are based upon

**INTERROGATORY 20 –**

For each of the test plaintiffs, explain all of the reasons why you have not moved from your residence (the residential property that is the subject of this litigation) in the time since the F/A-18 C/D aircraft were relocated from NAS Cecil Field, Florida to NAS Oceana. If the costs associated with moving and/or purchasing a new home was a factor in your decision to remain in your residence provide the following:

a. A list of all your assets and their value, including, but not limited to financial assets (investment accounts, including, but not limited to stocks, bonds mutual funds, retirement accounts (401 K, IRA, bank accounts), college savings accounts (529, Coverdell), real property assets other than your principal residence.

b. A list of all of your debts (secured or unsecured) and to what entities and/or persons the debts are owed, including, but not limited to all credit cards lines of credit, loans (home equity, personal, automobile, or otherwise), mortgages (other than those you have previously identified in response to previous discovery requests).

c. Your annual income from 1999 to the present, including, but not limited to all personal income, investment income, capital gains, and business income alimony and/or child support, gifts (exceeding $1 000), and inheritance.

d. A copy of your federal and state income tax returns from 1999 to 2004.

RESPONSE:

William and Betty Capps - Plaintiffs object to this interrogatory on the grounds that it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs further object to this interrogatory on the grounds that financial information, including a litigants net worth, is only discoverable when punitive damages is an issue. Without waiving such objection, plaintiffs respond that their decision to move was based solely on the substantial increase in jet noise in 1999 and subsequent years from aircraft operations at NAS Oceana that made living in their home intolerable.

ON BEHALF OF TEST CASE PLAINTIFFS

/s/ Jack E. Ferrebee
Jack E. Ferrebee
1060 Laskin Road, Suite 12B
Virginia Beach, Virginia 23451
(757) 425-1539
jferrebee@hoflaw.com

**Herk Stokely**

Herk Stokely flew for the Navy for a single tour after graduation from college. He left the Navy in 1963, and in 1965 he went to work for the Naval Aviation Depot in Norfolk, Virginia as an aeronautical engineer. (Exhibit 2B, Stokely Deposition. p. 5-7). His primary responsibility as a civilian Navy employee was maintenance of Navy aircraft. He worked extensively on the F-8, the A-6 and the F-14. (*id.* p. 9).

He and his family have lived at 1504 North Horseshoe Circle since 1967. His home is about two miles to the center of Oceana and about a mile and a half from its perimeter. (*id.* p. 9-10).

After he left active duty he flew in the reserves and operated out of Oceana, mostly flying A-4s (*id.* p. 10-11).

He is familiar with the flight paths and operational requirements at Oceana because he has flown them all and because they have changed very little since he flew there (*id.* p. 15, 22).

Despite the fact that his house is well outside the stated flight patterns, planes fly directly over his house when they are using runway 5 and conducting FCLPs. If he is outside working in his garden he puts on "earmuff type" ear protection. He has a competent sound meter and has recorded decibel levels in his yard up to 117 dB for the F/A-18s. (*id.* p. 24-25).

When the planes are conducting FCLPs he tries not to go to bed until after 11 which is when Oceana is supposed to stop operating. If he does go to bed before 11 p.m., it is difficult or even impossible to fall asleep. (*id.* p. 26).

The only plaintiff that he knows in the case is Hal Levenson who was also active in CCAJN. He is familiar with Mr. Levenson's property because the CCAJN board met at Mr.

Levenson's house on occasion. From Mr. Stokely's observations the noise at the Levenson house is very similar to his own.

The most dramatic noise events prior to the arrival of the F/A-18 was the preparation for the first Gulf War in 1991which involved A-6s and F-14s. It was very loud and constant but for a "relatively short period of time" however in 1991. (*id.* p. 30-33).

Q. Would you say that your experience with the jet noise now is similar to 1991?
A. At times, yes.
Q. What do you mean at times?
A Primarily when they are conducting FCLP operations, and when the wind is tending towards the east, which is the pattern that brings the planes over and around and near my home.
Q. When the planes are coming over or near your home, do you know which runway they are using at Oceana?
A. Yes. That would be runway 5. Although other runways, particularly 32, brings them over my home on take off. But the FCLP pattern over my home is when they are using runway 5.

(*id.* p. 32)

He has performed sound readings at his home since CCAJN was formed prior to the arrival of the F/A-18s.

Q. Have the sound readings stayed the same on average over the last nine years?
A. No. No.
Q. Can you describe how they have changed over time?
A. There are more single noise events that are louder.
Q. What do you mean by single noise event?
A. That one airplane going overhead making its own noise.
Q. And can you give me a comparison of sound readings of a single noise event in '96 and a single noise event now?
A. Before the F-18s came, it was very unusual to see a sound reading much over 100 decibels. After the F-18s came, it was quite common to experience sound readings at my house well above 100 decibels.
Q. How much above 100 decibels?
A. The highest one I have read was 117. So they would fall in the range between 100 and 117.

(*id.* p. 42-43)

Mr. Stokely is not a plaintiff in the lawsuit. He feels that because he had a career with the Navy, and he is a Navy annuitant, he has no desire to receive money from the Navy other than his retirement. (*id.* p. 45)

Q. When did you -- from your home, when did you first notice that FCLPs were being flown at Oceana?
A. The Navy flew FCLPs at Oceana on occasion the entire time that I have lived at my house.
Q Why did you ask Captain Zobel, I believe, if they were moving FCLPs from Fentress to Oceana?
A. I asked him that question because FCLPs at Oceana had been an exceptional event in the past. And at -- and in that time, which was between the two EIS, somewhere in there, FCLP at Oceana became routine almost. It seemed to me routine. They were there doing FCLPs very frequently; whereas, in the past it had been relatively infrequent.

(*id.* p. 45) [the First EIS was 1998; the Second was EIS 2002]

He knows that the altitude during the FCLP is supposed to be 1,000 feet but many of the planes fly between 600 and 800 feet. (*id.* p. 49-50).

Q. Somewhere between 600 and 1,000?
A. Yes. There are just enough of them that fly at 1,000 you can really tell.
Q. How can you tell the difference between 600, 800, or 1,000?
A. Well, there are two ways. One is to use my experience as an observer. The other way is to, since you know how long the plane is, it's fairly easy to construct a small device which allows you to essentially measure the length of the aircraft, the apparent length of the aircraft when it's overhead to get a distance. Something about this big, at about 30 inches.
Q. Okay. We're going to have to describe what you are doing for the court reporter.
A. Something that is about an inch long and about a distance close to 30 inches would represent an F-18 at about 1,000 feet if the plane fit between the markers.
Q. How do you know that?
A. It's geometry. If the airplane is 60 feet long, for small angles it's just proportionate. So 3 feet or 1,000 feet it's just a simple proportion.
Q. So you would have to know how long an F/A-14 was or F/A-18 was to get that calculation?
A. Yes.

(*id.* p. 50-51)

The planes at Oceana also fly over his house often when conducting touch and go operations.

Q If they are not flying FCLPs in or around your home, how are they flying around your home?
A Well, they still do landing practice. They do -- pilots returning from their training missions, if they have time in their schedule and sufficient fuel remaining, will often do a few touch and goes at the end of their flight. And Navy pilots, in essence, every landing is FCLP, but they only have a limited time and a limited amount of fuel, so they will make two or three or four and land. And it's not like grinding around the pattern for hours as it is when there's FCLP practice.
Q. When they are doing this landing practice, the planes are still flying in and around your home?
A Oh, yes. If they are using runway 5.

****

Q. We were talking about the FCLPs and the landing practice in and around your home. Do you believe that an FCLP and a touch and go are essentially the same thing?
A. Well, I think I made the statement that for a Navy pilot every landing is FCLP. Landing on a carrier in a high performance airplane is so demanding that nobody passes up an opportunity to practice a carrier landing. And the runway has the carrier landing device set up on it all the time. And if it's not operating, the pilots would consider it unusual and not a desirable situation. So the short answer to your question is, yes, they are essentially the same except for the duration and the intensity of the operation. However, with that said, generally when planes are coming back from an operational training flight, not FCLP, there are a smaller number of planes in the landing pattern, probably one or two, possibly maybe three at a time, and since the planes have to take their spacing off one another, they would tend to be further from my house because the pattern would not have expanded so dramatically beyond the one that's specified in the EIS. See, patterns in the EIS are no where near my home. But once you get more than a few planes in the pattern, and they have to take their interval off one another, the pattern expands and the next thing you know it's over my house. I have even seen them substantially beyond my house, especially at night. I have seen them flying directly over the Virginia Beach General Hospital.
Q. So do you believe the patterns in the EIS are not accurate?
A. The pattern in the EIS is highly idealized, the pattern that would be flown by a single plane flown by an expert pilot who observed all the approach

speeds and that sort of thing. The way they are idealized makes it very unrealistic for real operations. However, it does make the noise zones much smaller on the map.

Q. Why do you say that?

A. What?

Q. That the flight pattern in the EIS makes the noise zone smaller?

A. Because the flight pattern is much smaller than the pattern that the Navy actually flies, and because of the fact that the noise zones are based on the pattern in the EIS, the patterns being smaller, thus the noise zones are smaller.

(*id.* p. 56-59)

He knows that the Navy actually flies far outside the patterns because they are coming directly over his house, yet his house is more than a mile from the nearest flight pattern. Moreover, if the planes are a mile away from his house the noise level on his sound meter is far below that which he has recorded when they pass directly over his house (*id.* p. 59)

Q. And I think you mentioned that there was – it just seemed like there was an increase in FCLPs. Do you remember when that occurred?

A. Let me see how specific I can be about that. The first EIS, the one for the F-18 C and D coming from Cecil Field, the basis of that EIS was that only occasionally FCLP would be done at Oceana. And only when it was necessary for one of those exceptional reasons that I mentioned. There was actually a statement in the EIS that said that. And the number of FCLP operations that were estimated in that first EIS was something between 4 and 5,000 per year. 4,400, 4,500, something like that. At the time that I asked Captain Zobel that question, the intensity of FCLP at Oceana had increased dramatically. It prompted my question. The answer Captain Zobel gave us at that time was that in that particular year, over 20,000 had been conducted at Oceana.

(*id.* p. 62-63)

00001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, )
et al., )
)
Plaintiffs, )
)
v. ) NO. 01-201L
) Judge Victor J. Wolski
THE UNITED STATES OF AMERICA, )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION
OF HERBERT A. STOKELY
TAKEN ON BEHALF OF THE DEFENDANT

Virginia Beach, Virginia

July 25, 2005

Appearances:

HOFHEIMER/FERREBEE, P.C.
By: KRISTEN D. HOFHEIMER, ESQUIRE
And

00005

a number of legal matters in which I gave depositions, but I don't remember them very well.
Q. And what Navy facility?
A. Naval Aviation Depot in Norfolk, now closed as a result of a BRAC decision.
Q. And were you stationed at Norfolk?
A. I was a civilian manager.
Q. And have you ever been in the Navy before?
A. Yes.
Q. Can you tell me about your Navy career?
A. I went through college on the Holloway plan. I went to flight training after college, became a Naval aviator, left active duty in the Navy after my obligation expired, and flew in the Navy Reserves about four years after that.
Q. Can you give me the time frames of when you first joined when you went to college?
A. Went to college in 1954, graduated in 1958, went to flight training that year.
Q. In 1958?
A. Uh huh.

00006

Q. Were you flying planes between '59 and '63?

A. Yes.

Q. What planes were you flying?

A. A large number. Do you want a list of all of them.

Q. Yes.

A. Okay. My primary aircraft was H-34. I flew the H-19, the H-25, H-13, T-1A, TC-45, as pilot in command. I flew in other aircraft as participant but not as pilot in command.

Q. What other aircraft did you participate in but not command?

A. S-2 -- I remember the old designations. I can't remember the new ones. The old designation was the AD. And what did that become? We'll have to go with the AD. They changed designations from the Navy designations to Air Force compatible division so that HSS2N became the HS -- H-34, and things like that. So I remember the old designation better. Grumman Albatross. I can't remember what the Navy called that. DC-3, C-47. That's probably about it.

Q. And you said you were active duty in Rhode Island

at Rhode Island in '59.

A. I got out of the Navy in Rhode Island in 1963. I flew helicopters commercially for two years. 1965 I went to work for the Naval Aviation Depot as an aeronautical engineer.

Q. So from '63 to '65 is when you flew commercial helicopters?

A. Uh huh.

Q. Where did you fly out of?

A. In Rhode Island first and here in Norfolk second.

Q. Who was your employer?

A. Copters Unlimited in Rhode Island. And Colonial Helicopters in Norfolk.

Q. And then '65 you came to Norfolk?

A. I came here in '63. I flew commercially in Rhode Island the rest of 1963 after I got out of the Navy, and then I came here the end of the year in 1963, and went to work for Colonial Helicopters and essentially worked for them off and on until I went to work for the Navy as an engineer in 1965.

Q. How long were you an engineer for the Navy?

Q. What types of aircraft did you work on?

A. Very wide range of aircraft.

You want another list?

Q. Yes, please.

A. My primary responsibilities when I first got there were on the F-9. Later the F-8. A long period of responsibilities on the F-8. Later the A-6. And then my unit shepherded the F-14 through its entire development and acceptance and on through its service in the Navy until it was moved to another facility when ours closed. So I essentially had experience with most of the development and service life of the F-14s. Also worked on a lot of other planes off and on. When they were damaged and they were at our facility we would often be called to come up with repair procedures. S-2, P-2, C-118, C-54, C-47. Oh, lots of airplanes. I can't remember all the airplanes that were broken that we had to fix.

Q. Are you currently employed?

A. No. I'm retired.

Q. And do you live in Virginia Beach?

A. Yes.

A. 23451, same as here.

Q. How long have you lived there?

A. I moved into that house in 1967.

Q. Did you live anywhere else in Virginia Beach before this address?

A. Yes. I lived in the Witchduck Point area and I lived at the north end for short periods of time. The north end would be 88th Street, and the Witchduck Point area, Richardson Road. That's your rentals before I bought my house.

Q. Why did you move to Horseshoe Circle?

A. It was a house that I liked and that I could afford. I was determined to buy a house. Tired of renting.

Q. And by your estimation, how close is your home at Horseshoe Circle to Naval Air Station Oceana?

A. Well, if you mean to the nearest edge of the field or the center of the field.

Q. Or both.

A. The center of the field, about two miles. And to the nearest edge of the field, something less than a mile and a half.

reserve unit was stationed was the air station in Norfolk, which is not an operating base, so we were not allowed to do practice flying at that base. It's a service base, and practice operations are restricted there, so we did a lot of practice at Oceana.

Q. You mentioned a short period of time at Oceana. Do you remember when those time periods were?

A. Well, the last one was two weeks. You know the reserves normally have once a year a two-week training period. The last one of those was 1967. Did I mention I was flying A-4s at the time? I think I listed the planes that I flew when I was at Quonset Point for you, but I don't think I mentioned the plane I flew in the reserves, which was the A-4 and the T-1 and the T-33. But during those four years or so I was in the reserves operating out of Norfolk, the A-4 was my primary aircraft.

Q. So when you were in the reserves for four years, you were stationed at Norfolk, but you would spend your two weeks at Oceana; is that right?

A. We did two of those at Oceana. We did one at

00015

Q. So you are familiar with flight paths and operational requirements?

A. Generally.

Q. How are you familiar with flight paths and operational requirements?

A. Well, they changed very little since I flew there.

Q. Are you referring to Oceana specifically?

A. Oceana specifically, yes. Not exclusively, but specifically.

Q. And when you say they have changed very little since you have been there, are you referring to the time you started flying there in the reserves in 1967?

A. Yes.

Q. You mentioned you were treasurer of CCAJN, how long have you been a member of CCAJN?

A. Since it formed.

Q. And when did it form?

A. I think it was 1996, but I'm not positive I remember that clearly.

Q. Were you a founding member?

noise?
A. Yes. After the politicians were done, those who weren't exhausted generally went up and spoke. So -- but I was not one of them.
Q. Who spoke?
A. I don't remember.
Q. You don't remember?
A. I'm sure Hal Levinson did.
Q. Do you remember what they said?
A. No. Just the same sort of things that have been written I guess, although I don't remember specifically.
Q. We talked about flight paths earlier. Are you familiar with the flight paths at Oceana?
A. Generally.
Q. How are you familiar with the flight paths?
A. Well, I have flown them all. And the Navy has made changes. Those changes were published in the EIS, plus the Navy gave us their copies of their operational instructions to the pilots at Oceana. They generally define their procedures that are published procedures that the pilots are supposed to follow. So I had an opportunity at

00024

impact because of noise due to speed, power settings, and altitudes. There are a lot of those tracks. They are somewhat detailed. I believe the Navy refined a lot of them, but I can't give you the specifics.

Q. What makes you believe the Navy has refined flight paths?

A. Because their EIS said they have.

Q. Do you remember jet noise at your home?

A. Yes.

Q. Would you say that planes fly directly over your house?

A. At times they do.

Q. Can you describe when a plane is flying around your home what that's like?

A. Well, when they fly over my house, most frequently when they are doing FCLP practice, and if I happen to be working in my yard or garden at the time, I wear hearing protection. You know the Mickey Mouse things that people -- interesting thing to be out in your garden pulling out weeds with a Mickey Mouse on, but I do that because the noise is very intense.

hearing, and I'm trying to preserve what I have left.
Q. Did you say you were using a sound meter?
A. Uh huh.
Q. What type of sound meter do you measure the noise with?
A. Well, I don't remember the make and model of it, but it's a digital sound meter that seems to be quite capable and consistent. A little handheld battery powered unit.
Q. And it's something that you purchased?
A. Yes. I bought it.
Q. Have you taken pictures of planes flying in or around your house?
A. Videos.
Q. Videos. What time of day do you think the planes fly over your house?
A. They normally start up about 7 in morning. You can hear their engines starting. Somewhere between 7 and 8 they begin their routine operations, and generally continue operating until about 11 at night. After that the routine operations seem to settle down.

00026

11 at night, depending on the weather and the wind direction so on and so forth, the planes will often be over my house, or nearby. On the other hand, if the wind is from another direction, they are over other people's houses.

Q. Have you ever been woken up at night by the jets?

A. I'm a very good sleeper. I do often defer my bedtime until they quiet down because it is disturbing to try to go to sleep when they are flying, so I would normally try to go to sleep after 11. If I did need to go to sleep earlier, the answer to your question is yes, it has disturbed me. If not impossible.

Q. To fall asleep?

A. When the planes are directly overhead during FCLP.

Q. Do you know the plaintiffs in this case?

A. Hal Levinson told me that he was a plaintiff. Other than that, no, I don't. Or I don't know who they are. So I may know them, but I don't know who they are.

Q. Do you know where Mr. Levinson lives?

A. Yes.

Q. Would you say you are familiar with his property?

environmental impact statement. Those were our big agenda issues as CCAJN.

Q. What do you mean by lobby?

A. Primarily communicating with the Navy to ask them to -- and the politicians actually -- to ask them to see that an outlying field was included in the EIS.

Q. When you say EIS, which EIS are you referring to?

A. The more recent one.

Q. And when CCAJN was first formed, the agenda?

A. It was the former EIS.

Q. And that was before the F/A-18s came to Oceana?

A. Yes.

Q. So would you say that -- how would you describe the noise environment at that time?

MR. QUINN: At what time? I'm sorry. I don't understand the question.

BY MS. ACOCK:

Q. Well, do you understand the question?

A. Would you repeat it?

Q. Sure. We have talked about CCAJN's agenda before the F/A-18s came. That was dealing with the previous EIS,

00031

up to the first Gulf war. And it was like being in a war zone day and night. After that, not long after that, the Navy began talking about bringing the F-18s to Oceana. And with that experience under our belt a lot of us felt that it would go back to being extremely unpleasant.

Q. The work up to the first Gulf war, when was that?

A. 1991. As I remember.

Q. Do you remember what planes were flying?

A. A-6s, F-14s primarily. Although during a work up they often bring in entire flight groups so there would be other aircraft involved.

Q. How would you describe the noise? You mentioned it was like being in a war zone. What do you mean?

A. It was continuous and very, very loud. Very intrusive. It essentially dominated everything for those who were near it.

Q. When you say those who were near it, you mean near the base?

A. Or near the flight path, yes.

Q. What was the experience like at your home?

A. Well, you couldn't talk to people. You couldn't

in and day out. It was just for a few months.

Q. A few months in 1991?

A. I believe it was 1991.

Q. Would you say that your experience with the jet noise now is similar to 1991?

A. At times, yes.

Q. What do you mean at times?

A. Primarily when they are conducting FCLP operations, and when the wind is tending towards the east, which is the pattern that brings the planes over and around and near my home.

Q. When the planes are coming over or near your home, do you know which runway they are using at Oceana?

A. Yes. That would be runway 5. Although other runways, particularly 32, brings them over my home on take off. But the FCLP pattern over my home is when they are using runway 5.

Q. Did you fly FCLPs when you were a pilot?

A. Oh, yes.

Q. Did you ever fly FCLPs out of Fentress?

A. That's the only place I have ever flown them.

A. That the Navy has actually -- changes that the Navy has actually attempted to implement?
Q. Yes.
A. Well, I talked about the departure. I didn't mention the hush house, did I?
Q. No.
A. Before the hush house was built, the Navy at Oceana did all of the high powered engine testing outside on the field. Sometimes those high powered engine tests would go for long periods of time and, depending on the atmospheric conditions, the noise from those was very intrusive and very prolonged.
The Navy eventually did build the hush house at Oceana, and now they test the engines in an environment in a very big building with a big muffler that the airplane discharges its engines into, and that has made a big difference.
Q. How do you know that's what they do at the hush house at Oceana?
A. I'm familiar with hush houses.
I'm not sure I understand your question.

would be quieter. If they stopped using the overhead break and just came in straight instead of circling over the community.

Q. Is that a regulation that they have or a regulation you would like to see? You would propose?

A. If they did FCLPs at more remote locations instead of at Oceana that would be a good regulation.

Q. That would be one that you propose?

A. Yes.

Q. Are you aware of any of the other Oceana's regulations that you would like to see followed?

A. None that come to mind right now.

Q. You mentioned earlier that you had performed sound readings at your home?

A. (Deponent nodded head.)

Q. When did you start doing that?

A. When we were in the work up to the first EIS, the F-18 C and D EIS.

Q. What year was that?

A. I think it was '96. I don't remember clearly, but I think it was '96. It was in that time frame. Not

00043

Q. Can you describe how they have changed over time?

A. There are more single noise events that are louder.

Q. What do you mean by single noise event?

A. That one airplane going overhead making its own noise.

Q. And can you give me a comparison of sound readings of a single noise event in '96 and a single noise event now?

A. Before the F-18s came, it was very unusual to see a sound reading much over 100 decibels. After the F-18s came, it was quite common to experience sound readings at my house well above 100 decibels.

Q. How much above 100 decibels?

A. The highest one I have read was 117. So they would fall in the range between 100 and 117.

Q. Have you conducted sound readings anywhere else besides your home?

A. Yes.

Q. Where else?

A. Lynnhaven Mall.

anywhere else?

A. I don't believe so. I don't remember if I did. I could have. No.

Q. Why are you not a plaintiff in this lawsuit?

A. I'm a Navy annuitant. I have had a career with the Navy. I'm a member of the Navy community. And I have no desire to receive any money from the Navy other than my annuity.

Q. Do you believe that your house has gone down in value because of jet noise?

A. I have no idea. I bought any house in 1967. I have no idea what impact this change would have made on the value of my house.

Q. When did you -- from your home, when did you first notice that FCLPs were being flown at Oceana?

A. The Navy flew FCLPs at Oceana on occasion the entire time that I have lived at my house.

Q. Why did you ask Captain Zobol, I believe, if they were moving FCLPs from Fentress to Oceana?

A. I asked him that question because FCLPs at Oceana had been an exceptional event in the past. And at -- and in

00049

A. There is no muffler except for the hush house. The hush house is the muffler.

Q. You had mentioned earlier that you had gone to school on the Holloway plan?

A. Yes.

Q. What is the Holloway plan?

A. The Navy paid my way through college. They paid all of my tuitions, and I spent every summer in training, and at the end of my college career when I graduated I was commissioned an ensign.

Q. Where did you go to college?

A. Rensselaer Polytechnic Institute, Troy, New York.

Q. What did you study?

A. Aeronautical engineering.

Q. Did you always know you wanted to be a pilot?

A. Yes.

Q. When the planes are flying in or around your home, you mentioned at the school that they flew lower. Can you describe the altitude they fly in or around your home?

A. When they are doing FCLP, the part of the flight path that is over my home is supposed to be at 1,000 feet.

believe.

Q. You say they are supposed to be at 1,000 feet. Do you not think they fly at 1,000 feet?

A. Many of the planes come below 1,000 feet. Their best training altitude, the altitude they use for a ship would be 600 feet. It would be unusual for them to come that low but they do slip down. Quite often I see them at what I would estimate to be about 800.

Q. Somewhere between 600 and 1,000?

A. Yes. There are just enough of them that fly at 1,000 you can really tell.

Q. How can you tell the difference between 600, 800, or 1,000?

A. Well, there are two ways. One is to use my experience as an observer. The other way is to, since you know how long the plane is, it's fairly easy to construct a small device which allows you to essentially measure the length of the aircraft, the apparent length of the aircraft when it's overhead to get a distance. Something about this big, at about 30 inches.

Q. Okay. We're going to have to describe what you

Q. How do you know that?

A. It's geometry. If the airplane is 60 feet long, for small angles it's just proportionate. So 3 feet or 1,000 feet it's just a simple proportion.

Q. So you would have to know how long an F/A-14 was or F/A-18 was to get that calculation?

A. Yes.

Q. You mentioned from your observation you can also tell?

A. As an experienced observer of aircraft, yes.

Q. Do you use a landmarks around your home to do that?

A. No. It's the apparent size of the aircraft.

Q. Okay.

Do you -- would you ever say that planes flew at tree top level at your home?

A. Yes. When -- this is something that is a new subject I haven't mentioned, but when they do air show practice at Oceana, there is -- particularly during the summer air show season, there are designated pilots who take aircraft to air shows and put on demonstrations. Those

Q. If they are not flying FCLPs in or around your home, how are they flying around your home?
A. Well, they still do landing practice. They do -- pilots returning from their training missions, if they have time in their schedule and sufficient fuel remaining, will often do a few touch and goes at the end of their flight. And Navy pilots, in essence, every landing is FCLP, but they only have a limited time and a limited amount of fuel, so they will make two or three or four and land. And it's not like grinding around the pattern for hours as it is when there's FCLP practice. I'm dropping my voice. Can you hear me okay?
Q. When they are doing this landing practice, the planes are still flying in and around your home?
A. Oh, yes. If they are using runway 5.
Q. If they are using a different runway would they still be in or around your home?
A. No. Unless they are using runway 32 and taking off, the planes leaving the base often are over my house.
Q. On take off?
A. On take off. But not in a touch and go pattern.

enough to make it clear how dramatic the difference is.

Q. Would you prefer that they -- you already answered that.

A. Do you mind if I go and get a break?

MS. ACOCK: Oh, no. That's fine. We can take a break.

(Recess)

BY MS. ACOCK:

Q. We were talking about the FCLPs and the landing practice in and around your home. Do you believe that an FCLP and a touch and go are essentially the same thing?

A. Well, I think I made the statement that for a Navy pilot every landing is FCLP. Landing on a carrier in a high performance airplane is so demanding that nobody passes up an opportunity to practice a carrier landing. And the runway has the carrier landing device set up on it all the time. And if it's not operating, the pilots would consider it unusual and not a desirable situation. So the short answer to your question is, yes, they are essentially the same except for the duration and the intensity of the operation.

time, and since the planes have to take their spacing off one another, they would tend to be further from my house because the pattern would not have expanded so dramatically beyond the one that's specified in the EIS.

See, patterns in the EIS are no where near my home. But once you get more than a few planes in the pattern, and they have to take their interval off one another, the pattern expands and the next thing you know it's over my house. I have even seen them substantially beyond my house, especially at night. I have seen them flying directly over the Virginia Beach General Hospital.

Q. So do you believe the patterns in the EIS are not accurate?

A. The pattern in the EIS is highly idealized, the pattern that would be flown by a single plane flown by an expert pilot who observed all the approach speeds and that sort of thing. The way they are idealized makes it very unrealistic for real operations. However, it does make the noise zones much smaller on the map.

Q. Why do you say that?

A. What?

fact that the noise zones are based on the pattern in the EIS, the patterns being smaller, thus the noise zones are smaller.

Q. How would you describe or compare how you think the Navy actually flies to the flight patterns in the EIS?

A. It would be unusual, actually, for a plane to actually observe the flight patterns that are in the EIS, if we are talking about touch and go landing practice. Keep in mind that the EIS has many flight patterns in it for approaching the field, for leaving the field, the box patterns for GCA training, those kind of things. But if we are talking about touch and go landings, the planes seldom are following the track that is established in the EIS. And it's interesting too because that track is what establishes both the noise zones and the crash zones.

Q. How do you know that what the Navy actually flies is different than what is in the EIS?

A. Well, because they are coming directly over my house and beyond my house, and yet my house is something in the range of a mile from the nearest flight pattern. If

A. It was CCAJN meeting with Captain Zobol and his staff.

Q. Does CCAJN keep records of their meetings with the Navy?

A. Well, I don't. Someone else may have, but I didn't keep records of them.

Q. Do you know if it's the group's practice to keep records of meetings?

A. I don't know.

Q. You mentioned earlier that you wear hearing protection now when you are outside gardening. Have you always done that?

A. If they are conducting FCLP.

Q. Other times you don't wear protection?

A. No.

Q. And that is something that you have done the entire time you lived at your home?

A. No.

Q. When did you start wearing hearing protection?

A. When they started doing extended FCLP on a routine basis at Oceana.

The first EIS, the one for the F-18 C and D coming from Cecil Field, the basis of that EIS was that only occasionally FCLP would be done at Oceana. And only when it was necessary for one of those exceptional reasons that I mentioned.

There was actually a statement in the EIS that said that. And the number of FCLP operations that were estimated in that first EIS was something between 4 and 5,000 per year. 4,400, 4,500, something like that.

At the time that I asked Captain Zobol that question, the intensity of FCLP at Oceana had increased dramatically. It prompted my question. The answer Captain Zobol gave us at that time was that in that particular year, over 20,000 had been conducted at Oceana.

Q. Do you remember what year that was?

A. I keep telling you I don't. I'm trying to place it as close as I can.

Q. I'm sorry?

A. But it was after the first EIS. It was before the second. And it was not all that long after. But I do remember thinking to myself when he answered the question

**<u>Herbert and Betty Van Nostrand - Test Case Plaintiffs</u>**

**Betty Van Nostrand**

Mr. and Mrs. Van Nostrand live at 305 Corvette Lane in Virginia Beach. They bought the house soon after they were married and moved in in 1967, almost forty years ago. They knew where Oceana was and knew it was a jet base.

Q. And were you aware that jets flew in and out of there on a daily basis?
A. Yes, but it wasn't bad. Now it's really bad.

****

Q. Did you – were you comfortable with the airport, or the jet noise and overflights at that time before moving in?
A. Oh, yes. Oh, yes.
Q. and why were you comfortable with it before moving in?
A. They were never that loud. And maybe not as many airplanes.

(Exhibit 3B, Betty Van Nostrand Deposition. p. 8)

The noise became a problem in 1999 when the F/A-18s arrived. (*id*. p. 13-14, 17).

Starting in the summer of 1999 the noise got "really bad". Even with all of the windows closed and the air conditioning on the planes sounded like a roar. Telephone conversations would have to stop and the television could not be heard. (*id.* 29-30).

Q. And would that be – and would it be sort of evenly spread from one side of your house to the other side of your house, you know, in terms of those flights that you would experience?
A. Well, I guess so, but they were one right after the other. You know, round and round. They would touch down at the base and come back around. Like three or four planes.

Mr. and Mrs. Van Nostrand normally go to sleep early and if the planes are flying late, sometimes after 11:00 at night, they wake them up. In fact, they sometimes wake Mr. Van Nostrand up and his hearing has deteriorated dramatically, so it takes quite a bit to wake him up. (*id.* p. 48-49)

**Herbert Van Nostrand**

After the Van Nostrands moved into their home in 1967 they noticed overflights of their property by planes from Oceana "quite often". (Exhibit 3C, Herbert Van Nostrand Deposition. p. 12-14). The overflights occurred on a regular basis, and by that Mr. Van Nostrand means that they flew directly over his house "straight up." (*id.* p. 14)

After the arrival of the F/A-18s the noise became "terrible" and disruptive. (*id.* p. 32-33). When the planes are flying a pattern operation there are often three or more planes in the pattern, and they fly within two blocks of the Van Nostrand home. (*id.* p. 34).

The Van Nostrand's house on Corvette Lane is the first and only house that they have ever owned and lived in. When asked why they didn't move because of the noise, Mr. Van Nostrand had the following to say:

> Q. Why are you not considering putting your house on the market and moving somewhere else in Virginia Beach.
>
> A. I have got my life there. You know, I have got everything I ever had in my life sitting right there on that one lot. And I just, you know, I'd fight four bulls to keep it. And it's just something that, you know, you just don't give up any kind of way.

(*id.* p. 88).

00001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, )
et al., )
)
Plaintiffs, )
)
v. ) NO. 01-201L
) Judge Victor J. Wolski
THE UNITED STATES OF AMERICA, )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION
OF BETTY A. VAN NOSTRAND
TAKEN ON BEHALF OF THE DEFENDANT

Virginia Beach, Virginia

July 27, 2005

Appearances:

SHUTTLEWORTH, RULOFF GIORDANO & SWAIN, P.C.
By: STEPHEN C. SWAIN, ESQUIRE

00008

Q. But you and your husband both had the sort of skills to fix the house up, that kind of thing?
A. Oh, yes.
Q. I believe your husband was a plumber at one time?
A. Yes.
Q. So he's very handy I assume?
A. Yes.
Q. And how many bedrooms and bath and that kind of thing was in the house at the time?
A. Three bedrooms and two baths.
Q. Has that expanded any since you bought the house?
A. No. As far as the bedrooms and baths, no.
Q. But you have done renovations on the bath?
A. A lot, yes.
Q. Now, when you bought the house in 1967, were you aware that Naval Air Station Oceana -- were you aware of where it is at that time?
A. Oh, yes.
Q. And were you aware that jets flew in and out of there on a daily basis?
A. Yes, but it wasn't bad. Now it's really bad.

00013

MR. SWAIN: What do you mean by overflights?

MR. BRYANT: Well, let's just see if the witness understands the question.

A. Well, the planes started getting bad in the '90s, that I remember. And I think it was about '99 when they really started to get bad when I think it was the F-18s or something came in. Then it was almost unbearable.

Q. Now you say in the '90s, it got bad. And even you said in '99 or at some point around there it really got bad?

A. Yes.

Q. When you say it got bad in the '90s, when did that happen?

A. I don't remember the dates at all.

Q. Why do you say the '90s, then? What about the '90s?

A. Well, it just kept building up, the airplanes, until later when the big airplanes came. More airplanes came in around '98 to '99.

Q. '98 to '99?

A. And it was real bad. And it is now.

00014

or a problem?
A. Well, in '99 when they sent these F-18s in.
Q. Well, yes, and you mentioned in your testimony a minute ago that it really got bad in the time when the F-18s arrived, I believe was your description?
A. Yes.
Q. But I believe you said before that that it got bad in the '90s, it was progressively worse?
A. Yes, it did. The airplanes were different. But then as they moved more airplanes in it steadily got worse.
Q. And what I'm trying to understand is in the time preceding when you say it really got bad, was it -- you said it was bad in the '90s, also. When did that part -- when did it become a problem at all? When in the '90s?
A. Well, I don't remember it really being a problem. I just remember the airplanes getting louder.
Q. And when did that start, that they started getting louder?
A. Like I said, in '98 and '99. I think they came in around July, August, or something, of '98. But it was '99 that we really noticed it real bad.

00017

did you keep a log of suddenly it's getting louder?
A. No.
Q. Something that sort of defines that time period.
That's what I'm getting at.
A. No.
Q. But your recollection is, it's about six years to
seven -- well, I guess five to six years before the '99 time
frame when you say it really got bad?
A. Yes.
Q. It was steadily progressing and getting worse?
A. Yes, sir. But '99 they really start -- was bad.
Q. And before '93, '94 time frame, before that, as
you said steadily progressed and got louder?
A. Yes.
Q. From 1967 until then, was it -- was the jet
noise, the overflights about the same from that period, '67
until '93?
A. Yes. They never bothered us much.
Q. And so they first started bothering you in '93,
'94, and it got worse and worse through '99?
MR. SWAIN: Objection to form.

MR. BRYANT: Your objection is noted.

BY MR. BRYANT:

Q. From '93 to '99, in that period, did you experience, if you recall, an increase in flights during that period?

A. I really don't remember. I don't remember.

Q. But you do remember that, at least your recollection is it got progressively worse from '93 to '99 when it, as you said, got really bad?

A. Yes, sir.

MR. SWAIN: Objection. Asked and answered.

BY MR. BRYANT:

Q. Now, going back to 1967, to 1993 -- I'm sorry. Strike that. Starting in -- you said it really got bad you said in June, July of '99. Is that right?

A. Yes.

Q. And tell me how it was -- what you mean by really got bad. How was it different?

A. Airplanes were so much louder. Even with all the windows closed and the air on, I could still hear the

when a jet's flying over.

A. I would have to tell the person to hold on for a few minutes, even in the house. That's not outside.

Q. In the house. And you say a few minutes?

A. A minute, you know.

Q. What about, do you watch television, you and your husband?

A. Some, yes.

Q. Would it have any impact on your watching television?

A. Well, yes, if we were watching the evening news, it does.

Q. Tell me how it does?

A. Well, you can't hear it.

Q. For how long?

A. You can't hear the television.

Q. For however long it takes for the jet to fly over?

A. Yes.

Q. And going back to '93 to '98 time frame, before '93, could you hear the television when you had jets flying

Q. Do the flights ever wake you up when you are asleep at night?

A. Yes, they do. Because we go to bed extremely early. And they are still flying sometimes after 11 o'clock.

Q. What time do you go to bed, if I may ask?

A. I think 9:30, 10 o'clock. We get up at 5:30 or 6 every morning.

Q. That would probably normally be a good time to beat the heat, but it's not right now.

A. Not right now.

Q. So you will go to bed at 9:30 or 10 and can you fall asleep and then the jets would wake you up later?

A. Yes.

Q. About how often does that happen?

A. Well, I can't say. Maybe once every two weeks. Sometimes it's real bad. Sometimes it's twice a week.

Q. And do they wake up your husband too, or just you?

A. Well, they do wake him up occasionally. He is deaf, so it does get bad.

00049

A. I don't remember.

Q. You don't remember. So they could have woken you up, but you just don't remember?

A. That's right.

Q. And what about from 1967 until 1993. Do you recall if flights woke you up then?

A. No. No.

Q. And is it that you don't remember?

A. I don't think they did.

Q. You don't think they did. But you are not certain?

A. Well, I'm sure they didn't wake us up then. They were never that loud is what I tried to say.

Q. Could they have woken you up back from 1967 to 1993 and you just don't remember it? Is that possible?

A. No. I don't remember, but I'm sure they didn't wake us up.

Q. And you are drawing that conclusion because of your perception of how loud the planes were then versus how loud they are now?

A. Well, back then the planes, like I said, were not

00001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, )
et al., )
)
Plaintiffs, )
)
v. ) NO. 01-201L
) Judge Victor J. Wolski
THE UNITED STATES OF AMERICA, )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION
OF HERBERT VAN NOSTRAND
TAKEN ON BEHALF OF THE DEFENDANT

Virginia Beach, Virginia
April 27, 2005

Appearances:

SHUTTLEWORTH, RULOFF, GIORDANO & SWAIN, P.C.
By: STEPHEN C. SWAIN, ESQUIRE

Q. In 1967 we're talking about, that time frame.
You were aware of jets flying near your house at that time?
A. Yes.
Q. Okay. And when you say -- could you describe that again in terms of when you are on your front porch where the aircraft would be flying?
A. Well, if I'm sitting on my front porch, I'm more or less looking right towards the base just about, you know.
Q. Okay.
A. Then when the planes like circle around, it come my way and go on over like the mall, you know, there, and going to land.
Q. And when you say the mall, do you mean the Lynnhaven Mall?
A. Yes, sir.
Q. Was that in existence in 1967?
A. I don't think -- I don't know. I don't exactly remember when it was. No, I don't think it was.
Q. But you mean that general area?
A. Yes, sir.
Q. And when you say that general area, are you

00013

Q. How far is the mall from your house approximately?

A. About three miles, two and a half, three miles.

Q. Okay.

Did the jets -- did the jets ever at that time frame fly directly over your house?

A. They have, yes, at one time or another.

Q. Now going back to the 1967 time frame when you first moved into the house, were they flying over your house then?

A. You know, I -- you know, I'd have to say yes because there's jets flying, you know. And I would have to say yes.

Q. All right. About how often did the jets fly over, directly over your house in that time frame of 1967 through the '70s, that time frame?

A. Well, that's another question. You know, just -- I just hear air pattern, I guess you call it.

Q. But when you were sitting on your porch back when you first moved in your house, back in that time frame on occasion --

often did that happen where it would be right above your house? When I say above, it could be how high?
A. Quite often. Quite often.
Q. Quite often back then?
A. Yes.
Q. When you say quite often do you mean -- how many times a month, approximately?
A. Oh, lord! 180.
Q. Oh, so very often then. Quite often?
A. Yes. Yes.
Q. So on a regular basis?
A. Yes.
Q. It was flying directly over your house?
A. At times directly over.
Q. Okay.
A. I mean when you say directly over, I'm talking right straight up.
Q. That's what I'm talking too, so we're having a mind meld here, so that's good. We're talking about the same thing.
You said about 180 in terms of flights a month.

A. Yes.

Q. How do you know that, that it became disruptive at that time? How do you know that? I mean why that -- why do you say mid to late 1998?

A. That it became noisier?

Q. Yes.

A. Because you hear them up there flying.

Q. And you are certain it was in the middle to late 1998 that that happened?

A. I'd say, yes.

Q. Can you guesstimate -- well, do you recall about what month that started happening that it really started becoming disruptive?

A. I couldn't put the month to it, but it was in the summer, you know.

Q. The summer of '98?

A. Yes.

Q. And in the summer of 1998 -- and correct me if I am wrong -- it was difficult, if not impossible, to carry on a conversation outside or inside your home, or to talk on the telephone or to hear the television or radio during

00033

Q. Well, let me ask you this: What was it like
before 1998?
A. It was still noisy, but not as noisy.
Q. Okay. And could you carry on conversations
outside of your house before 1998?
A. Better.
Q. Better. Well, describe that to me.
A. Well, it just seemed to me like they didn't have
the umph then that the planes later had, you know. Bearing
down and -- I mean it would burn you down like. You know
what I mean.
Q. Well, left me ask you this: The summer of 1998,
at that time frame, when you had just one airplane flying
over, was that one airplane enough to make it where you
couldn't carry on a conversation?
A. If it came right, yes.
Q. When you say came right, what do you mean?
A. Well, the closer it came like over the house, if
it come -- you know they sometimes -- they come different
directions.
Q. Okay. Well, when it was directly over your house

00034

Q. Then you could carry on a conversation?
A. That one, yes.
Q. You could carry on a conversation?
A. Yes, yes. If it's over that way, yes.
Q. Now, were there times when there were more than one plane in a pattern going over your house?
A. Oh, yes.
Q. Directly over your house?
A. Not directly all the time. Off. Just, you know, like sitting on the porch you look up, you know.
Q. And when you say -- when there's multiple planes in a pattern, how far away from directly above your house would that be? Two blocks, three blocks? Half a mile?
A. How many --
Q. If you can say?
A. Say two blocks.
Q. Oh, so pretty close then?
A. Yes.
Q. And how many planes would be in a pattern?
A. Most of the time, really, like, when they come around -- well, three or more.

Q. Why are you not considering putting your house on the market and moving somewhere else in Virginia Beach?

A. I have got my life there. You know, I have got everything I ever had in my life sitting right there on that one lot. And I just, you know, I'd fight four bulls to keep it. And it's just something that, you know, you just don't give up any kind of way.

Q. Did you ever keep any sort of log or documentation of when -- of when the jets became to this level?

A. When what came?

Q. When it became this level of impact that you are talking about, of phone conversations and that kind of thing?

A. That's for a while. But I didn't never keep nothing, you know.

Q. You never kept a log?

A. No. No.

Q. And you have never called the air station about the jet noise?

A. No.

**Thomas Askins**

Thomas Askins lives at 879 Wynwood Drive in Virginia Beach. He built his house in 1976 and has lived there ever since. Mr. Askins retired as an airline pilot from Trans World Airlines after 32 years from 1966 until 1998. (Exhibit 4B, Askins Deposition. p. 5-6).

From 1961 until 1966 Mr. Askins was a pilot in the United States Navy. During his single term in the Navy he was stationed in Jacksonville, Florida and at Naval Air Station Norfolk.

Q. Can you just describe your personal experience when you got here, when you built that home in 1976 and moved there, what in your opinion – in terms of your specific home, tell me what your experience was in terms of the noise from the military jets that were based at Oceana?
A. Well, it was evident that jets were here. We were living near an airport.
Q. Obviously, you were based at Oceana?
A. I was based at NAS Norfolk. Of course, I knew Oceana was here. I knew all about it, exactly where it was. The home I moved from Kings Grant probably doesn't have any jet noise at all. It's a pretty good distance from here. I don't ever remember hearing a plane flying over that. When I moved here, the jets were here.
Q. What jets do you recall?
A. Probably the Phantom, F-4s, and the Intruder, A-6. I just don't – in that period of time, I just don't remember the noise being as intrusive, as loud as it became after all of the Hornets started coming in from Jacksonville.

(*id.* p. 8-9)

****

Q. What was your experience with jet noise or the frequency of the overflights or the military jets flying by your home; did it increase or the noise level change?
A. When the F-14s came in relation to the F-4s and A-6s? Probably about the same frequency. The F-14 seems to be a somewhat quieter airplane.
Q. In comparison to which jet?
A. Probably somewhat quieter than the A-6. It was a little bit louder. The F-4 when it took off on afterburner, it was fairly loud. But I don't think any – in my opinion neither of these airplanes are as loud as the current Hornet and Super Hornet, which it seems to be louder.

(*id.* p. 10)

Between 1976 and 1998 Mr. Askins never called Oceana to complain about noise. (*id.* p. 13). Starting in 1998 the overflights of Mr. Askins' home seemed to have increased (*id.* p. 15). Since 1998 the noise has been "very, very loud." So loud that one cannot talk on the phone, outside and "I mean it's so loud that you just can't function." (*id.* p. 15-16).

Since 1998 Mr. Askins may have called Oceana complaining of noise but doesn't remember the details.

A. Yes. In fact, I can't – I might have even called them a time or two. I really can't remember. I discussed doing it but just never did it. I think I even tried a couple of times when you couldn't get in. The lines were – they weren't answering or it was busy, one of the two.

Q. Can you recall when you were tempted to make those phone calls what you were experiencing – what you were experiencing or what was of concern to you? Was it a time of day? Was it the frequency of the overflights. Just the noise?

A. About -- I think it was two years ago. Might have been three years ago, they were doing one of the air shows. A jet flew right over my house and they – something went supersonic. I think it was probably the gases coming out of the engine, and I thought the jet had crashed in our yard. It was like a huge, thunderous crash, and we all just ducked for cover, and I looked up just in time to see the jet taking off here with full afterburner. You could see the trail. It just like disappeared. It was extremely loud. That's when I really -- that was the scariest maneuver that I ever saw. It seems like during the air show practice it's really horrendous because they come over at huge -- at great air speed with full power at very low altitudes. And it's a little scary.

(*id.* p. 18-19)

Mr. Askins accurately describes the difference between FCLP and Touch and Go as follows:

A. The FCLP is carrier landing practice. It's designed to teach the, either the novice aviator or the guys trying to go back and requalify to fly very precisely onto the carrier and to get him acclimated to flying down a precise glide slope. When I was in we used a meatball. I don't know what they use any more. It's monitored by an officer who is the – they used to call him paddles. Now it's the – I can't remember what they call him now. Anyway, he's the guy who grades the approach. And then if you pass and you are ready to go, then you go to the ship and land. A touch and go could be the same thing. It's a random event, really.

> You make your approach, touch down, reconfigure the airplane for take off, add power, go around, take off again.

(*id.* p. 19).

Mr. Askins is not a plaintiff in the litigation. (*id.* p. 31).

Mr. Askins compares the F/A-18 C/D to the A-6 as follows:

A. The A-6 –
Q. Let's do A-6 comparison?
A. -- was a fairly loud airplane.
Q. In comparison to the F-14?
A. I think of it as being louder than the F-14.
Q. How about in comparison to the F-18C/Ds.
A. I don't know of any airplane that is that loud. Maybe the Concorde.

(*id.* p. 34)

00001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, )
et al., )
)
Plaintiffs, )
)
v. ) NO. 01-201L
) Judge Victor J. Wolski
THE UNITED STATES OF AMERICA, )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION
OF THOMAS H. ASKINS, JR.,
TAKEN ON BEHALF OF THE DEFENDANT

Virginia Beach, Virginia

August 2, 2005

Appearances:

HOFHEIMER/FERREBEE, P.C.
By: KRISTEN D. HOFHEIMER, ESQUIRE
Counsel for the Plaintiffs

00005

A. Okay.

Q. If you need to take any breaks during this pretty much question and answer period, let me know and we'll stop, whatever we need to do. If at any point in time, Miss Hofheimer interjects, let her -- you pretty much stop what you have to say. Let her talk. She will either have a comment for the record so the court reporter can actually type it down -- if, in fact, Ms. Hofheimer directs you not to answer that's a different story, but pretty much she will make a comment for the court reporter to comment on the record and you can go ahead and answer.

A. Okay.

Q. Any questions?

A. I don't think so.

Q. Good. Mr. Askew, can you please tell me your name and current address, right now?

A. Thomas Hamilton Askins, Jr.

Q. And your current home address?

A. 879 Winwood Drive, Virginia Beach, Virginia, 23451.

Q. And is that in -- what subdivision is that in?

A. It's in the Linlier subdivision of Virginia Beach. It's right down the road here.

Q. How long have you been living at that residence?

A. We built the house in 1976. And I was the

00006

builder and the original owner and still live there.
Q. Prior to that, what was your address?
A. I lived in Kings Grant area of Virginia Beach.
Q. How long were you at that residence?
A. A couple of years.
Q. Okay. And prior to that?
A. Kansas City. I moved from Kansas City to Virginia Beach in about 1974.
Q. What's your current occupation or profession?
A. I'm retired.
Q. Prior to retirement what was your --
A. I was an air line pilot, Trans World Airlines.
Q. And how long did you do that?
A. 32 years.
Q. From what year to what year?
A. 1966 until 1998.
Q. And what jets were you pretty much qualified to fly?
A. Well, when I went to work with TWA, of course I was hired as a flight engineer, which all young, new pilots are; and I checked out on the Convair 880 as a flight engineer, and then I went to the 707 as a co-pilot, and then I went to the 727 as a flight engineer. And the company would go up and down. When the times were good, you'd be a co-pilot, and then you would go back to flight engineer. I

Q. What was your degree from Florida State University?
A. I had a Bachelor of Science degree/business.
Q. Now I'd like to go back to your current residence, since you moved into that residence in 1976.
A. Yes.
Q. And then we'll work chronologically to the present day. And pretty much most of my questions at this point will be dealing with and concerning aviation jet noise and the flight tracks, the flight path that you see the military jets emanating or coming from based at Oceana. Can you just describe your personal experience when you got here, when you built that home in 1976 and moved there, what in your opinion -- in terms of your specific home, tell me what your experience was in terms of the noise from the military jets that were based at Oceana?
A. Well, it was evident the jets were here. We were living near an airport.
Q. Obviously, you were based at Oceana?
A. I was based at NAS Norfolk. Of course, I knew Oceana was here. I knew all about it, exactly where it was. The home I moved from Kings Grant probably doesn't have any jet noise at all. It's a pretty good distance from here. I don't ever remember hearing a plane flying over that. When I moved here, the jets were here.

Q. What jets do you recall?
A. Probably the Phantom, F-4s, and the Intruder, A-6. I just don't -- in that period of time, I just don't remember the noise being as intrusive, as loud as it became after all of the Hornets started coming in from Jacksonville.
Q. Okay. Let's put it between -- let's try, from 19 -- let's then put it in time segments to try to distinguish the time periods we're talking about. So obviously from 1976, did you experience in 1976 overflights, at least, directly over your home or one mile either side?
A. Yes.
Q. Okay. Did at least the overflights or the flying off the side of your home by a mile or so, did that change at any point in time from 1976 to the present day?
A. Yes, it did.
Q. Okay. In terms of what point in time. Describe what?
A. Well, when the jets are flying sometimes they are gone. They deploy. They fly a different pattern. Might be on the other side of town coming in. We'll go for a period of time and not hear anything. Or very little.
Q. Well, let's put it like this: In terms of 1976 to the present day let's talk about overflights and planes flying on either side of your home. In your mind did the

00010

frequency of those overflights, or the frequency of the military jets flying near your home, has that increased since 1976?

A. It seems that in some of the periods it does.

Q. Episodic, up and down?

A. Yes.

Q. Would that be episodic up and down since 1976 to the present day?

A. Yes.

Q. You talk about the A-6 and the F-4. What about the F-14, when the F-14 was introduced?

A. Yes. The F-14.

Q. What was your experience with jet noise or the frequency of the overflights or the military jets flying by your home; did it increase or the noise level change?

A. When the F-14s came in relation to the F-4s and A-6s? Probably about the same frequency. The F-14 seems to be a somewhat quieter airplane.

Q. In comparison to which jet?

A. Probably somewhat quieter than the A-6. It was a little bit louder. The F-4 when it took off on afterburner, it was fairly loud. But I don't think any -- in my opinion neither of these airplanes are as loud as the current Hornet and Super Hornet, which it seems to be louder.

Q. At what point in time then would you say did your

00013

trying to watch the television, same thing?
A. Yes.
Q. Did you have to raise the volume of the TV or not, on occasions?
A. Maybe occasionally.
Q. What about telephone conversations inside your home? Did you have to pause at times if a jet flew by?
A. If it flew directly over the house occasionally.
Q. From the period of 1976 to 1998 any time during that period, did you have to call the Naval Air Station Oceana to file -- make a complaint regarding jet noise or regarding the flight tracks or regarding the fact that the flight was just flying too close to your home any time during that period of time, 1976 to 1998?
A. No.
Q. Do you recall from 1976 to 1998 we talked about the flight overtracks, the noise, the viscidity, maybe the frequency. What about the altitude of the planes. Let's say has that changed from '76 to the present day, the altitude of the planes flying around your home?
A. My understanding is they have changed the flight patterns. But you mean from just my observation of it, I couldn't tell. I wouldn't be able to answer that.
Q. Now we'll go to 1998 when you retired and you were back at home, and you are associating the F-18 being

F-18s -- the F-14s are still flying in the area too?
A. Right. Seemed to have.
MS. HOFHEIMER: Can I just clarify, are you saying before 1998?
BY COMMANDER YAKONO:
Q. Starting in 1998. Let's say, did the flight overtrack, the overflights over your home, did the frequency of those increase? And keeping in mind that the F-14 is still flying around Oceana too.
A. Did the overflight of --
Q. Over your home?
A. -- all airplanes or just --
Q. Overflight over your home? Specifically over your home, or let's say a mile each side of your home?
A. A mile each side is fairly close. So -- I think so. Seems to have.
Q. What about, let's talk about the, again, your experience or your perception of the environmental noise outside and inside your home starting in 1998, and let's go to the present day. Starting in 1998, if you were outside your home having a barbecue, talking to a neighbor, working out in the garden, if you are trying to hold a conversation with your neighbor or your wife, what would be your experience starting in 1998?
A. That's if the air planes are flying?

00016

Q. If the airplane is flying over your home?

A. Well, very, very loud. So loud you can't talk. If you are outside you can't speak on the phone. You can't -- I mean it's so loud that you just can't function. Not too long ago, within the last couple of weeks they were flying over, and every two minutes, two and a half minutes they would come right over and it was just like you couldn't hear anything outside. Inside you are somewhat buffered by the house itself. You can hear. I mean it's not quite as loud inside but it's pretty loud. It's very loud. You almost can't hear the TV set. If you are talking on the phone, they fly right over, you might have to tell them to wait just a second.

Q. Earlier, starting quite a while ago you said from 1976 even to the present day it's been somewhat episodic?

A. Yes.

Q. Assuming what you just told me regarding with the F-18 and your experience at least outside with the noise inside and outside of your home, again, it's been episodic?

A. Yes.

Q. You mentioned every two minutes, whatever, in terms of the jet coming by. How long would that last, would you say?

A. It could last an hour or two. Then you have a

to?

A. Yes. In fact, I can't -- I might have even called them a time or two. I really can't remember. I discussed doing it but just never did it. I think I even tried a couple of times when you couldn't get in. The lines were -- they weren't answering or it was busy, one of the two.

Q. Can you recall when you were tempted to make those phone calls what you were experiencing -- what you were experiencing or what was of concern to you? Was it a time of day? Was it the frequency of the overflights. Just the noise?

A. About -- I think it was two years ago. Might have been three years ago, they were doing one of the air shows. A jet flew right over my house and they -- something went supersonic. I think it was probably the gases coming out of the engine, and I thought the jet had crashed in our yard. It was like a huge, thunderous crash, and we all just ducked for cover, and I looked up just in time to see the jet taking off here with full afterburner. You could see the trail. It just like disappeared. It was extremely loud. That's when I really -- that was the scariest maneuver that I ever saw.

It seems like during the air show practice it's really horrendous because they come over at huge -- at great

air speed with full power at very low altitudes. And it's a little scary.

Q. You mentioned FCLPs. Do you know the difference between an FCLP and a touch and go, the difference?

A. Yes.

Q. Could you, just for the record, tell what the difference is between the FCLP and tough and go?

A. The FCLP is carrier landing practice. It's designed to teach the, either the novice aviator or the guys trying to go back and requalify to fly very precisely onto the carrier and to get him acclimated to flying down a precise glide slope. When I was in we used a meatball. I don't know what they use any more. It's monitored by an officer who is the -- they used to call him paddles. Now it's the -- I can't remember what they call him now. Anyway, he's the guy who grades the approach. And then if you pass and you are ready to go, then you go to the ship and land.

A touch and go could be the same thing. It's a random event, really. You make your approach, touch down, reconfigure the airplane for take off, add power, go around, take off again.

Q. From your home when you are outside your home, or let's say inside your home, but let's start from the outside of your home. If you're standing on -- you're outside, can

00031

usually writes the -- he's written a very comprehensive
flight operations scenario that CCAJN recommends. And I
have talked to him from time to time about that.
Q. What does that state? What does that flight
operations that Mr. Stokely drafted, what does that say?
A. Pretty much what I said.
Q. Are you currently a plaintiff right now in this
litigation?
A. No.
Q. And why not?
A. When they started, the lawsuit started, I decided
not to do it for a lot of reasons. One is I just didn't
want to get involved with it. I just did not want to go
through this, really. Depositions and go on and on. I just
didn't want to do it. And that was pretty much it. I was
former Navy. I just didn't want to do it.
Q. Of the recommendations that you, in terms of
trying to reduce jet noise, do you believe that -- well,
obviously, you don't recall having any one-on-one meetings.
Do you believe that any of those recommendations have been
acted on by the Navy? Not all -- I mean you can't recall
any specific?
A. No. I understand they have instituted some
flight operations procedures that are designed to make the
airplanes fly quieter. I mean I haven't seen them. Is it

00034

Q. All right. Can you distinguish the noise between an F-18 Super Hornet versus a regular F-18C/D?

A. It's hard for me to do it because I can't really tell the airplanes. I can't visually -- I don't know what a Super Hornet looks like compared to a regular Hornet. They look pretty close like the same airplane.

Q. What about the A-6? That's the only thing we haven't mentioned, really.

A. The A-6 --

Q. Let's do A-6 comparison?

A. -- was a fairly loud airplane.

Q. In comparison to the F-14?

A. I think of it as being louder than the F-14.

Q. How about in comparison to the F-18C/Ds.

A. I don't know of any airplane that is that loud. Maybe the Concorde.

Q. Okay. Let's go back to 1998 because you mentioned that's when you recall the Hornet being in the air because you are now retired and at home. When did you officially retire in 1998, do you recall? At least a month?

A. June.

Q. It was June?

A. June 1st.

Q. Okay. Now, you mentioned while you were still working for TWA you were either three days home or four days

**Sean Ryan - Test Case Plaintiff**

Mr. Ryan and his wife, Graciela, have lived at their house at 1856 Pathfinder Drive since 1996. Before they bought the home they went to the neighborhood ten to fifteen times and never noticed any objectionable noise. (Exhibit 5B, Ryan Deposition, p. 31).

Prior to their present home they lived intermittently in a rental cottage on Mr. Ryan's mother's property on 23rd Street. They experienced overflights in that home and in fact, Mr. Ryan remembered that there were F-14's and A-6's flying at that time. He specifically remembers the A-6 because two A-6 crewmen ejected and one of them landed in his mother's backyard (*id*. p. 39-40).

According to Mr. Ryan, the arrival of the F/A-18s introduced an intolerable amount of noise into their lives:

Q. Well, I think you said earlier – I think you said a couple of times that the jet aircraft overflights, and I guess attendant noise with that, has become unbearable, I think is the word you used, right?
A. It's becoming unbearable, yes.
Q. Becoming unbearable? Just now, or when did it become unbearable?
A. Well, I guess it all started around '99.
Q. When in '99?
A. I don't know. Probably the summertime.

****

Q. Okay, Well, what do you mean by the noise is unbearable then?
A. Well, when they fly over, you have got to stop talking. You can't listen to the phone. We wouldn't be able to talk. You'd have to stop what you're doing. You know, the – you have got to raise and lower the volume of the TV. You can't – you know, it wakes you up at night. It's getting to be unbearable.

(*id*. p. 62, 63, 66)

The planes fly directly over their house. (*id*. p. 78).

Q. Okay. What percentage of the flights are directly over your house? Starting in 1999 when you said it became unbearable.
A. I would say like about 46, 48 percent.

(*id*. p. 81).

00001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, )
et al., )
)
Plaintiffs, )
)
v. ) NO. 01-201L
) Judge Victor J. Wolski
THE UNITED STATES OF AMERICA, )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION
OF SEAN M. RYAN
TAKEN ON BEHALF OF THE DEFENDANT

Virginia Beach, Virginia
April 27, 2005

Appearances:

SHUTTLEWORTH, RULOFF GIORDANO & SWAIN, P.C.
By: STEPHEN C. SWAIN, ESQUIRE
Counsel for the Plaintiffs

U. S. DEPARTMENT OF JUSTICE
By: STEVEN D. BRYANT, ESQUIRE
DOMINICK G. YACONO, ESQUIRE
Counsel for the Defendant

there. I can't read that.
Q. That's enough.
Did you learn what aircraft noise zone 2 meant?
A. No, I did not.
Q. Did you ask?
A. No, I did not.
Q. Why didn't you ask about that?
A. Well, because the noise level at the time was bearable.
Q. How did you know it was bearable there?
A. Because we spent time around in the neighborhood looking at houses.
Q. How much time did you spend there?
A. Off and on, on different days, we would ride through the neighborhood, and -- I don't know, maybe an hour or two each time we went there. We probably went -- there were a lot of houses for sale in that area. We probably did that 10 or 15 times.
Q. You say you went to that neighborhood 10 to 15 times for an hour or so each time?
A. Right.
Q. So you spent about 10 to 15 hours there?
A. Basically, yes. Something like that, you know.
Q. And where would you spend the time when you were there?

00039

small bits of time, how much would it add up to?
A. I don't know. Maybe a year.
Q. Okay. So about a year from 1982, what was the overall time period, and then within that added up it would be a year. Trying to get that whole time frame?
A. It might have been more than a year.
Q. Fair enough. I understand. It's hard to know exactly. But from 1982 what was sort of the final time you would have lived in there?
A. Until we bought this house.
Q. Oh, in '96?
A. Right.
Q. So that 16-year period, the various times that you lived in there would have added up to about a year or maybe a little more?
A. Right.
Q. Did you experience overflights when you lived in that house?
A. Yes.
Q. And what kind of aircraft was it? Or were they?
A. Well, I guess there were Tomcats, A-6s.
Q. Were there F-4s also, or not?
A. I don't know.
Q. Not sure.
A. I know there were A-6s because two guys ejected

and one of them landed in my back yard on 23rd Street.

Q. Well, that's an interesting thing.

A. Yes, it was. Lucky he didn't die because of all the electrical wires.

Q. How often did you -- were the overflights when you lived there?

A. I don't know. Every once in a while.

Q. Every once in a while?

A. Yes. Whenever they flew. It's just hard to say, because sometimes they -- they will go three or four days without, or a week without flying over. Then all of a sudden, kaboom, kaboom. You know, it's 24 hours for two days, or whatever. You know, it's hard to say.

Q. Okay. So --

A. I don't know their flight schedules, you know.

Q. And with that, I understand. But I'm just trying to -- what your experiences were when you lived there from that '80 to '96 period, you know, the interspersed periods of time, there were times you're saying the aircraft would be operating even 24 hours a day?

A. Oh, I don't know -- I don't remember if it was 24 hours a day. It might have been. Every once in a while you get woke up in the morning one o'clock as they launch the alert, or whatever. I don't know, you know. But they fly later than they are supposed to, sure.

farther in time than right now. So Mr. Wall. If you will go to again OCE223278, the very bottom, the section on comments. Just read that.
I meant the very last sentence there. I'm sorry.
I didn't mean read the whole section.
A. Okay. Yes, I have read it.
Q. Okay. And does that -- you didn't remember it.
Does that refresh your recollection that you spoke with Mr. Wall?
A. Like I said, I probably did.
Q. It would have been you or your wife?
A. It would have been me.
Q. Okay. And did you talk to him about aircraft noise, the jets flying over?
A. Sir, I don't really remember what we discussed.
I mean, a couple of years ago. I don't remember. It might have come up in the conversation.
Q. Okay.
A. You know. Certainly if one flew over, we probably would have said something, I'm sure. I don't remember.
Q. Well, I think you said earlier -- I think you said a couple of times that the jet aircraft overflights, and I guess attendant noise with that, has become unbearable, I think is the word you used, right?

00063

A. It's becoming unbearable, yes.

Q. Becoming unbearable? Just now, or when did it become unbearable?

A. Well, I guess it all started around '99.

Q. When in '99?

A. I don't know. Probably the summertime.

Q. Summer of '99?

A. Yes. Just around there.

Q. Are you sure about that?

A. Yes. I think so.

Q. Could it have been summer of '98?

A. Well, it was getting -- it was getting worse. I guess around '99. That's my estimate, that it was really getting worse.

Q. Well, if -- that is obviously well before Mr. Wall came out, so if it's something that is making life unbearable for you, would that be the kind of thing you would talk to him about. I mean he says there that there are no known adverse environmental conditions that would have negative impact on the value of the subject property. Would you view the aircraft noise as environmental condition?

A. Okay. Tell you the truth.

Q. Yes?

A. Maybe they weren't flying for a couple of days

That's all I can say.
Q. I thought you said it was unbearable before.
A. Not to live in. The noise. I was talking about the noise.
Q. Yes.
A. It's getting unbearable. But the house, to live in the house, no.
Q. Okay. Well, what do you mean by the noise is unbearable then?
A. Well, when they fly over, you have got to stop talking. You can't listen to the phone. We wouldn't be able to talk. You'd have to stop what you're doing. You know, the -- you have got to raise and lower the volume of the TV. You can't -- you know, it wakes you up at night. It's getting to be unbearable.
Q. Okay.
A. But then I said, it's --
Q. No. Go on?
A. No. That's okay.
MR. SWAIN: Wait for the question.
THE DEPONENT: Wait for the question.
BY MR. BRYANT:
Q. You said it's getting to be. What is it getting to be? You were starting to say it's getting to be something?

signature.

A. No. I guess we forgot that one.

Q. Well, what I'm trying to get at is, I'd like you, with that said, I'd like you to review the document and see if you have ever seen it and if you agree to the answers that are in there on your behalf.

MR. SWAIN: Would, after you finish the question about the interrogatories, be a good time to take a break?

MR. BRYANT: Absolutely.

BY MR. BRYANT:

Q. Take your time reviewing that. Don't let me rush it.

A. Well, I remember talking to Jack about this. I don't know why I didn't sign it.

Q. Did you see this document?

A. I do believe so.

Q. All right. I'd like you to turn -- once you are done -- let me know when you are done reviewing it.

A. Okay. I have seen it before.

Q. And you agree with the contents?

A. Yes.

Q. Okay. On page 6, if you would go to -- it discusses in the middle of subparagraph C in the response about aircraft operating in a pattern with several aircraft circling every few minutes, do you experience that at your

heights. I really don't know.
Q. Okay. What percentage of the flights are directly over your house? Starting in 1999 when you said it became unbearable.
A. I would say like about 46, 48 percent. Not all of them. And not quite half of them.
Q. So just under half -- just under 50 percent of the flights were directly over your house?
A. Right. The small half.
Q. I understand. Just under. So the remaining 60 whatever percentage?
A. They were --
Q. Or 55, whatever?
A. They were not -- they were like over a little bit.
Q. And when you say over a little bit, blocks?
A. Sir, I don't know. Maybe a block over.
Q. Within a couple of blocks?
A. Yes, sir. Street, you know.
Q. So, in other words, all the flights that you experienced are either directly over your house or within a couple of blocks of your house?
A. From my house being the center. Okay? You probably could go five blocks each way. Okay?
Q. And that includes all the flights that you are

**Eddie Waterman - Test Case Plaintiff**

Mr. and Mrs. Waterman live at 2244 Windy Pines Bend, in Virgin Beach in a home they purchased in 1993.

Mr. Waterman has lived in Virginia Beach for about 35 years and he is retired from the publishing industry (Exhibit 6B, Waterman Deposition. p. 5). Mr. and Mrs. Waterman lived in a townhouse prior to their present home, and they were aware of the presence of Oceana and were aware that the new home on Windy Pines Bend was in a noise zone because one of the closing documents for their house stated that they were in a "D2" level noise zone. Neither one of them knew what that meant. They had visited their new home about three times before they put in an offer, and no planes were flying when they were there. (*id.* p. 15, 22-26).

After they moved into their new home the aircraft operations from Oceana were louder and noisier than the location of their townhouse but it was not bad and was bearable. (*id.* p. 19). The aircraft operations in the vicinity of their house pass "laterally" close by and sometimes directly over their home. Recently, the percent of overflights has increased. (*id.* p. 36-37).

The principal difference between the period prior to the arrival of the F/A-18 and since that arrival is the loudness of the aircraft. They cannot conduct a conversation in their yard and cannot continue a conversation on the phone inside the house or hear the television or the radio. In addition, their home has been subject to vibration and they have had several pictures fall off the wall during the overflights. (*id.* p. 43-45).

00001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, )
et al., )
)
Plaintiffs, )
)
v. ) NO. 01-201L
) Judge Victor J. Wolski
THE UNITED STATES OF AMERICA, )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION
OF EDDIE WATERMAN
TAKEN ON BEHALF OF THE DEFENDANT

Virginia Beach, Virginia
June 9, 2005

Appearances:

HOFHEIMER / FERREBEE, P.C.
By: KRISTEN HOFHEIMER, ESQUIRE
Counsel for the Plaintiffs

00005

please wait until I finish my question before responding, and if you need any break during this period, just say the word and we'll go off. Off the record.

And if you don't understand the question that I ask, please ask me to clarify it and I'll be happy to do so.

Do you understand all that?

A. I understand.

Q. All right. Great.

Please state your name and address?

A. Eddie J. Waterman, 2244 Windy Pines Bend, in Virginia Beach, Virginia.

Q. And how long have you lived there?

A. It will be 12 years in June.

Q. And did you live in Virginia Beach before there?

A. Yes.

Q. You did. How long have you lived in Virginia Beach?

A. I grew up in Norfolk and moved -- I have been in Virginia Beach about 35 years.

Q. Before we get into all that, could you please state your occupation?

A. I'm currently retired from the publishing industry.

Q. What did you do in the publishing industry?

A. I was in sales and marketing.

A. Yes.

Q. Is it still a three-bedroom two-bath house?

A. Yes.

Q. Do you have any association with the Navy in your career?

A. No.

Q. Are either of your parents, were they in the Navy, or any other military, for that matter?

A. No.

Q. What about your wife?

A. No.

Q. Her family, none of that?

A. None.

Q. What about any of your kids? How many children do you have?

A. Just one daughter.

Q. Just the daughter?

A. Yes.

Q. Was she in the military at all?

A. No.

Q. Did you -- were you aware of -- you lived here for 35 years you said. I assume you were aware of the air station when you bought the house in '93?

A. Yes.

Q. And were you aware of the jet operations out of

A. Correct.
Q. So that would have been '92 to '93 or something?
A. Yes.
Q. Did you experience jet noise, or aircraft noise of any kind in the first house at Five Point Road?
A. No.
Q. You did not?
A. No.
Q. What about the -- and jet noise, could you see aircraft from your house when you lived there?
A. No.
Q. No. What about the house at Whisper Circle?
A. No.
Q. What about the townhouse off of Wolfsnare Road?
A. Yes.
Q. Yes. Okay.
And it was immediately preceding '93, so '92, '93. Did you -- how did the jet noise you experienced off of Wolfsnare Road -- how did it compare with that -- the house you live in now when you first moved in from '92 to '95, '97, whenever that was.
A. I would say it was probably about one-tenth of what it is now.
Q. Well, I'm not so much asking that. I'm asking you to compare the townhouse that you lived in, the third

Q. Got it. But it was something that obviously impacted a conversation you were having?
A. Yes.
Q. Now, were you aware that the house on Windy Pines Bend, that it was in a noise zone when you bought it?
A. Yes.
Q. You were. And how did you become aware of that?
A. My wife brought it to our attention on the sales contract that was an area that we had to initial.
Q. Okay. And did you -- it sounds like there weren't very many neighborhoods -- well, tell me. I mean Pineridge was a neighborhood that met the criteria that you mentioned earlier. Were there any other neighborhoods that met the criteria that were close to your daughter?
A. I'm not sure, because we really didn't look that long when this came on the market, and we more or less proceeded with that because of the fact that it was a good deal and it did meet the criteria so we had -- if we hadn't found that, I'm sure we would have looked at a lot more homes in the neighborhoods.
Q. Now, the Southgate where you looked at about four houses, or three houses, whatever it was, is it located in a noise zone as far as you know? Or was it at the time?
A. I don't really know.
Q. What sort of research did you do into Pineridge

to evaluate what kind of jet noise was happening there in 1993?

A. We didn't do any research.

Q. Did the noise at, when you were at the townhouse, if you were outside grilling, or whatever, on those occasions where it was directly over your house, it would impact the conversation or that kind of thing, did you consider that something that was bothersome?

A. No, because of the elevation of the aircraft in that particular part of the city. It was up pretty high, so it really didn't -- we didn't consider that a factor and -- but it may be because we knew that we weren't going to be there very long.

Q. In the townhouse?

A. That's correct. We purchased the townhouse from my daughter to help them to buy a larger house in the area that they moved to. So rather than renting it out right away, we moved in there for convenience.

Q. But your experience with the jet noise when you lived there, was it something you -- that you didn't like, or how did you feel about it? You said the altitude was pretty high, the elevation of the jets were pretty high, I think you described it?

A. Yes.

Q. So did that -- how did that affect you? Was it a

problem? Did you -- what did you think of it?
A. It wasn't a problem for us at the time, because the jets very seldom flew directly over. And that was the only time when it was rather bothersome.
Q. So when they flew directly over, it was problematic, and presumably if it -- the lower the altitude, it would have been a problem?
A. I would say yes.
Q. You would anticipate it. So in light of that knowledge, why didn't you investigate what the jet noise exposure was and overflight exposure was with the house at Windy Pines Bend to see if -- see if it's a lower altitude than what you experienced before, to see if there were a greater number of direct overflights, that kind of a thing?
A. It was something that we didn't actually think about. We were out there on several occasions, so obviously there weren't any planes flying because we didn't hear anything.
Q. You say you were out there on several occasions. Can you define that for me, about how many times that would have been?
And if I can interrupt, when you say several occasions you mean before you put in the offer, before you closed on the house?
A. Several occasions before we actually put in the

00025

offer.
Q. Okay. About how many times is several occasions?
A. I would say approximately three.
Q. And I know we're going back 13 years, but were those three times, approximately three times, were they on the weekend, during the week? Do you remember?
A. I don't remember.
Q. Okay. But you didn't experience any overflights on any of those approximately three times that you went out there?
A. No.
Q. And when you went out those three times, about how long did you spend out there approximately?
A. Approximately an hour.
Q. An hour each time or so?
A. Yes.
Q. And on those three times, did you go into the house each time, or were you driving through the neighborhood? Did you have a picnic? What were you doing?
A. I remember distinctly on one occasion we went into the back yard because it backs up to some woods and a horse farm adjacent, and we wanted to check out the fencing situation and what it might cost us to put in a privacy fence.
On another occasion, we did look at the inside of

the house again. And I do recall riding around the neighborhood one time.

Q. Now, the -- just for clarification, when you were thinking about the privacy fence, was that a concern of the horses coming on the property or something, or what was -- are you just -- what was your intent there?

A. Actually, there is a chain link fence there, but it was -- it was open. And we were looking into putting a privacy fence where no one could see through it, the chain link.

Q. So for aesthetic purposes and privacy purposes?

A. Yes.

Q. What -- you said your wife was a real estate agent part-time. What was the time -- what years, period of years was she doing that?

A. Off and on for approximately five years prior to us purchasing that house, purchasing the house on Windy Pines.

Q. Did you ever have any discussions about not wanting to live too close to the base because of jet noise?

A. No. Because we actually never -- we were never exposed to aircraft noise to any point where it really affected us adversely. I know that we, on the contract we initialed something that said I think it was D2, but we had no idea what that meant in terms of the noise level.

Q. Did you talk to the appraiser when he or she came to your house and inspected it?
A. Yes.
Q. You did. Was it a he or a she?
A. It was a he.
Q. Do you recall his name?
A. (Deponent shook head.)
Q. Do you have any -- in the records that you looked at, is there any reference or documentation of who the appraiser might have been or the company that he was associated with?
A. No.
Q. Now, when you moved into the house in 1993, when did you start experiencing jet overflights?
A. I would say probably within -- within several months. Within two to three months.
Q. Okay. And tell me about that experience with the overflights?
A. Initially, we didn't feel that it was a burden unless we were outside, either working in the yard or cooking out. We could hear the aircraft inside. But it wasn't to the point where we had to talk louder on the phone, or we had to cut the TV up.
Q. Where were the overflights in relation to your house? And when I ask that, I mean were they directly

00037

flying over your house, or a certain distance away?
A. They were flying on a lateral basis, and only on occasion did they fly directly over.
Q. When you say a lateral basis, it was to the side of the house, about how many blocks, if you can -- away from your house, if you can describe that?
A. I don't know how I could describe that in terms of blocks, with the aircraft being up in the air. It's kind of hard to judge.
Q. Well, was it a mile away and up, or closer than that?
A. I don't know how to judge that.
Q. Is it -- today are the flights in the same sort of rough location laterally to your house?
A. Today, it's more over my house.
Q. Okay.
A. I made a note as of the 1st of April, the aircraft are flying probably 75 percent more over my house than they were since we've been there the whole time.
Q. So when did that start, this 75 percent, you know, rough -- obviously, it's a rough number, directly over your house, when did that begin?
A. The 75 percent I would say the 1st of April.
Q. Oh, so -- and that's why you documented it?
A. Correct.

Q. -- outside.
Now, what about when the December of '98 to April Fools Day 2005, when the flights were directly over your house, how would that impact conversations outside?
A. We had to stop talking until they flew away.
Q. Let's go inside the house now. When you had the lateral flights starting December of '98, could you still listen to the television, talk on the phone, that kind of thing.
A. Yes. But we had to speak louder that I recall, then we had to either cut the TV up louder or -- you're talking about lateral flights, right?
Q. Yes, I am.
A. It was certainly bearable, but it was uncomfortable unless we talked -- spoke louder, or cut the TV up louder.
Q. What about, when you had direct overflights at that time, December '98 to April 1st of this year, directly over your house? How would that impact the TV, phone conversations?
A. We just -- we stopped talking on the phone until they passed over and in terms of the TV, listened to the radio, we just didn't hear it.
Q. No matter how high you turned it up?
A. Well, we didn't turn it all the way up as far as

00044
it could go.
Q. How would you -- I think you said bearable is the word you used. How would you describe the jet noise when you first moved into the house?
A. It was definitely bearable. It was uncomfortable at times outside. It really didn't affect us inside the house. It didn't adversely. Just strictly outside.
Q. And how would you describe it since, from the 1st of December of '98 through April 1, 2005? If -- you know, I should have clarified that too.
Has it been, the noise impacts, consistent from April 1st -- sorry, December 1, 1998 to April 1, 2005?
A. Has the noise been consistent?
Q. Consistent from that time period?
A. Yes.
Q. It has. So with that said, how would you describe the noise impacts and living there in that house in that time period?
A. I would say it was at times extremely uncomfortable. Particularly when the aircraft flew right directly over the house.
More so outside than inside.
Q. And how would you describe it from April 1st, 2005, until today?
A. I don't get to sleep late any more, and as a

00045

result of the aircraft flying directly over the house.

Q. I gather you would prefer to sleep late if you could?

A. At times.

Q. How do you define sleeping late?

A. I would say probably up to 9 o'clock. 9 a.m.

Q. That can be a very nebulous term. When I was in college sleeping late could mean 2 in the afternoon. So with that said, what time do you wake up now when the flights happen? What time does it wake you up?

A. Anywhere between 8 a.m. and 9 a.m.

Q. Okay. Now, preApril 1st, 2005, could you sleep late, to 9 a.m.?

A. Yes.

Q. Other than the sleeping late, sleeping until 9 a.m., TV, phone, any other impacts when you are indoors?

A. We've had several pictures to fall off the wall from vibration.

Q. Has anything broken?

A. Nothing has broken. The glass, actually. The position that it fell on the carpet, it didn't break.

Q. That's good. When did -- when did that start happening?

A. That -- that's been happening on and off for four to five years I know.

**James Riddick - Test Case Plaintiff**

Mr. Riddick and his wife moved into their home at 1805 Loganberry Court in 1992. They purchased the lot and had the home built.

> Q When is the first time you remember experiencing the jet noise in your home on Loganberry Court?
> A. I would probably say bout '99 – yes. '99, 2000. That's when I really, really noticed it.
> Q. Do you remember about what time in '99?
> A. No. I don't. I would say it was warm because we was outside and the planes came across and my grandson came in the house running because the planes were so loud and it scared him and he didn't want to stay outside.
> Q. What did he tell you?
> A. He just, noise, noise, noise. And he pointed up into the sky.

(Exhibit 7B, Riddick Deposition. p. 13)

Sometimes the whole house shakes. Mr. Riddick can't hear his television and he has to stop talking on the telephone. (*id.* p. 15).

> Q. Going back to 1992, when you moved into the home, or late '92 in November, and you mentioned that planes would fly around your home, can you be more specific? I mean you talked about standing in your front yard and seeing them fly, but do you think they fly directly over your house or – I'm sorry. Did they fly directly over your house?
> A. At that particular time?
> Q. At that time.
> A. I think they fly over the house sometime now more so than at that particular time.
> Q. So in late 1992 they flew over your home, directly over your home?
> A. No. It was more over my home now than they did in '92.

(*id.* p. 46-47)

Since the F/A-18s arrived many more planes fly directly over this house than was true prior to that time. (*id.* p. 47-48).

Mr. Riddick also put new windows in his home, in part, to attempt to mitigate the noise. (*id.* p. 51).

00001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, )
et al., )
)
Plaintiffs, )
)
v. ) NO. 01-201L
) Judge Victor J. Wolski
THE UNITED STATES OF AMERICA, )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION
OF JAMES E. RIDDICK
TAKEN ON BEHALF OF THE DEFENDANT

Virginia Beach, Virginia
June 10, 2005

Appearances:

SHUTTLEWORTH, RULOFF GIORDANO & SWAIN, P.C.
By: STEPHEN C. SWAIN, ESQUIRE
Counsel for the Plaintiffs

I'm very sure they might have some planes going over, but I just didn't remember too much if it was bad or what.

Q. When is the first time you remember experiencing the jet noise in your home on Loganberry Court?

A. I would probably say about '99 -- yes. '99, 2000. That's when I really, really noticed it.

Q. Do you remember about what time in '99?

A. No, I don't. I would say it was warm because we was outside and the planes came across and my grandson came in the house running because the planes were so loud and it scared him and he didn't want to stay outside.

Q. What did he tell you?

A. He just, noise, noise, noise. And he pointed up into the sky.

Q. Is that the first time you remember?

A. No. It's not the first time I have heard the planes, but that was the first time it was so loud that it really frightened him, the kids, and you know it was coming over -- the planes were going over before.

Q. What do you mean before?

A. I mean they was going before, but it didn't affect me as much as it would when it affected the grand kids.

Q. How old was your grandson?

A. He was probably about 2, 3 at the time.

A. Well, sometimes even the whole house shakes. Sometimes the house shakes. Sometimes you're on the telephone, you can't talk. You have to stop talking and wait until the plane goes by, or if you are watching television, you can't hear what they are saying because the noise is so loud until the plane goes by.

Q. So even inside your home you have to stop conversations on the telephone?

A. Sometimes you do, yes.

Q. Can you have a conversation with your wife while the plane is --

A. Even sometimes talking with my wife, she can't hear because of the planes. It all depends on that particular moment.

Q. And you have to stop watching TV?

A. Well, you can watch it, but you just can't hear what they are saying, you know.

Q. And what do you mean by your house shakes? Can you describe it?

A. The house just vibrates. You know, you can feel the house vibrating sometimes when they come across there. I guess they are real low. I don't know.

Q. Does that happen often?

A. Not often, but it happens. Not every week, not every day, but occasionally it could happen like that.

MR. BRYANT: There better not be.
A. Better not be.
BY MS. ACOCK:
Q. Have you received your most recent tax assessment for your property?
A. I'm pretty sure I did. I'm pretty sure I did.
Q. Do you remember what the most recent tax assessment was?
A. You know, I couldn't tell you right now, but I'm pretty sure I received it.
Q. Do you remember -- you mentioned you can't remember what the amount was. But do you remember whether or not you agreed with the assessment?
A. I don't think I ever agree with the city assessment. I don't think I ever agreed with it, because I want my house to cost more than what they say it is. But I guess -- I guess it's pretty close.
Q. Going back to 1992, when you moved into the home, or late '92, in November, and you mentioned that planes would fly around your home, can you be more specific? I mean you talked about standing in your front yard and seeing them fly, but do you think they fly directly over your house or -- I'm sorry. Did they fly directly over your house?
A. At that particular time?
Q. At that time.

00047

A. I think they fly over the house sometime now more
so than at that particular time.
Q. So in late 1992 they flew over your home,
directly over your home?
A. No. It was more over my home now than they did in
'92.
Q. Okay. If they don't fly directly over your home,
can you be more specific about how they fly a couple of
streets over, a couple of blocks over?
A. Well, it's hard to say, you know, because they
are up like. But it looks like maybe a couple of blocks
over to the right or the left, whatever. But I can still
see them either way.
Q. And that's how they flew in '92?
A. They flew more than that. There's more that
comes -- seems there's more that comes, seems directly over
the house than it was in '92. '92 they were more like to
the left or to the right. But now it seems like for some
reason more are coming over the top of the house also.
Q. And so when you say more, you don't mean that --
A. Say if I'm sitting in my back yard like this
here, I would see them coming over like this area here, this
area here, but now there's more that comes in like directly
over the house then.
Q. Okay. So I'm going to just describe for

Mrs. Zahn so she can type what you just said. You're saying
if you are sitting in your back yard that sometimes -- and
I'm trying to remember what you said and describe that?
A. Okay.
Q. So if I summarize --
A. Okay.
Q. So sometimes you would say they flew more to the
right of your home and more to the left of your home than
directly over your home?
A. Right. This is in '92 when I first purchased the
house in '92, '93. Right.
Q. Do you think they fly the same way now in terms
of where they fly? Are you saying there are just more of
them flying?
A. I'm saying there's more of them and more of them
come directly over the house now than they did in '92, '93.
Q. So it seems to be they are flying in the same
pattern, just basically more planes?
A. Basically it's more planes and louder planes.
Q. All right. When do you think planes started --
you mentioned more planes. When do you think more planes
started flying?
A. I would say everything, the loudness and the
planes and everything, is like in '99, 2000, up until the
present.

would mitigate noise?
A. Not that I know. I don't know.
Q. Have you done anything to your home that would mitigate noise?
A. Well, no. I had new windows put in.
Q. Why did you have new windows put in?
A. Well, you know, first of all, I did it for the comfort. And they said the windows would keep out some of the noise also. And it would keep the heat in. It would keep the heat from coming in and make your house warmer in the wintertime.
Q. So that's what you mean by comfort?
A. Right. They said it would make it a little bit more comfortable. You won't be as cold, you won't be as hot, and it eliminates a little bit of the noise.
Q. And that, the windows, that is part of the remodeling?
A. No. This was just done -- the windows were just done like a couple of months ago.
Q. Okay. This is June, so March or April?
A. April, somewhere along in there.
Q. And who installed the windows?
A. Window World? I believe it was Window World.
Q. Do you remember how much it cost?
A. About $4,000.

**<u>Kenneth Hill - Test Case Plaintiff</u>**

Kenneth Hill is a civilian machinist at the Norfolk Naval Shipyard. He retired from active duty in the Navy after 20 years. Mr. Hill lives at 925 Lamplight Lane in Virginia Beach in the Princess Anne subdivision. (Exhibit 8B, Hill Deposition. p. 5). The Hills have lived in their home since 1992. Since they have lived there, there have always been overflights by jets from Oceana. Overflights are now an even more regular occurrence than in the past (*id.* p. 56). The flights often pass approximately two blocks on either side of the Hill home. (*id.* p. 58, 61)

Q. And did you notice a difference when the F/A-18s started flying?
A. Absolutely.
Q. Absolutely. Why do you say absolutely?
A. Because the jet engines, they have a different sound to them. The Tomcat whistles more, and a Hornet has more of a thunder sound to it.

(*id.* p. 67)

Prior to the arrival of the F/A-18s the overflights (mostly by F-14s) were loud. If you were inside you had to turn up the television. Since the arrival of the F/A-18s no amount of volume control on the television suffices. In fact, "… now when you are out in the yard you have to put your fingers in your ears when they are flying over, I mean because it comes to the point where it is painful." (*id.* p. 69-70).

The F/A-18s also created a good deal of vibration to the point that Mr. Hill described that his house "started falling apart." (*id.* p. 69). Pieces of drywall from the ceiling fell and cracks developed in the house (*id.* p. 70-71).

Q. Now that the F-18s – when the F-18s arrived, you started experiencing that jet noise, how would you describe it? Would you describe it as intolerable?
A. At times.
Q. Okay. What do you mean by intolerable?
A. Well, at times when they are flying directly over your house, that's when it becomes intolerable. When they cease flight operations, it's livable there.

(*id.* p. 129)

00001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, )
et al., )
)
Plaintiffs, )
)
v. ) NO. 01-201L
) Judge Victor J. Wolski
THE UNITED STATES OF AMERICA, )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION
OF KENNETH A. HILL
TAKEN ON BEHALF OF THE DEFENDANT

Virginia Beach, Virginia
June 9, 2005

Appearances:

HOFHEIMER / FERREBEE, P.C.
By: KRISTEN HOFHEIMER, ESQUIRE
Counsel for the Plaintiffs

00005

Also, she can't type down what we are both saying at the same time so please don't talk over me and I'll try not to do that with you. So just make sure of that.

Also, if you do -- if you don't understand a question that I ask, please say so and I'll clarify it at any time.

And then, lastly, if you need a break any time during this, just say the word and we'll take a few minute break then. Just let me know. Okay?

A. Okay.

Q. Understand all that?

A. Yes.

Q. All right. What is your name and address?

A. Kenneth A. Hill, 925 Lamplight Lane, Virginia Beach, Virginia 23452.

Q. And what is your occupation?

A. I'm a machinist at Norfolk Naval Shipyard.

Q. And how long have you done that?

A. Two and a half years.

Q. And what did you do before that?

A. I was in the Navy for 20 years.

Q. So you retired?

A. That's correct.

Q. Did you go right into that position as a machinist after you retired?

00056

looking for a week or --

Q. No. Not that much. I'm trying to get an idea how often this occurred, how often you experienced it? Just something you never experienced, or is it --

A. Well, how many people experience jets flying over your home. I couldn't possibly give you day or week or a month. They fly constantly. I mean, you're asking for me to pinpoint a time frame of when the day I moved in until my first overhead flight was. I don't remember.

Q. What I'm trying to get -- you just said they fly constantly?

A. Yes.

Q. So it's a regular occurrence?

A. Now more than ever, yes.

Q. Was it a regular occurrence when you moved in?

A. I considered it that they were doing work ups. That's the only thing I could, you know, understand why sometimes they would fly on a regular basis and then they would have a lull in the action, and then once again fly a bunch of times. You know what I mean? Like, to the best of my recollection, I would take into consideration as that they were doing work-ups to go on deployments, just like a ship would do, do exercises.

Q. So you experienced that at some point after moving in?

television?
A. If I turned it up.
Q. What if they were directly overhead, could you hear the television?
A. No.
Q. And so sometimes they were directly above your house, the jets?
A. Absolutely.
Q. And other times they were on one side of the house?
A. Yes.
Q. And other times they would be on the other side of the house?
A. Yes.
Q. What, if you could, in blocks for example, sort of give me an idea of what the flight path would be over your house and around your house?
A. I would say two blocks either side.
Q. And is that the same today as well?
A. Yes.
Q. Was that the same in -- was that the same throughout the period of time you lived in your house?
A. Yes.
Q. And how would you -- in rough percentages, did the distribution of directly over your house versus two

was between those particular hours you just stated, I couldn't possibly tell you. Because I didn't roll over and look at the alarm clock, I would just go back to sleep.
Q. What time did you go to bed? You got up pretty early.
A. About 9, 9:30.
Q. What about the rest of your family?
A. I would say about the same.
Q. Were you ever able to sleep through the flights? Or did it always wake you up?
A. Oh, it wakes you up.
Q. And I'm talking about the early '90 time frame?
A. Yes.
Q. Wakes you up.
Did you experience back then FCLP operations, pattern operations, touch and go over your house. Do you know if you are in that flight path?
A. I believe I'm in the flight path, yes.
Q. Why do you believe you're in that flight path?
A. Because I can see them doing circles over the neighborhood.
Q. And that was back then also?
A. Yes.
Q. Is that true today?
A. Yes.

aircrafts were you hearing above -- aircraft were you
hearing above your house?
A. F-14 Tomcats.
Q. Anything else?
A. I think they call them EC-2 Hawkeyes. I'm not
that familiar with all the jets' names.
Q. And did you notice a difference when the F-18s
started flying?
A. Absolutely.
Q. Absolutely. Why do you say absolutely?
A. Because the jet engines, they have a different
sound to them. The Tomcat whistles more, and a Hornet has
more of a thunder sound to it.
Q. And when did you first notice that change?
A. I would say around '97, '98, approximately.
Q. What -- was there some sort of -- is there
anything else beyond that difference in terms of the Tomcat
has that whistling sound and the F-18 has the thunder type
sound you mentioned, anything else about the F-18 that was
different, that you experienced?
A. As in noise or size or appearance?
Q. No. I mean noise.
A. No, I would say that would be the fundamental
differences, as far as I'm concerned.
Q. How does the thunder noise versus the whistling

F-18?

A. No. You can't hear the TV.

Q. Is there a difference between the -- in terms of noise, the F-18CD versus the F-18EF, that you know?

A. Well, just recently it seems like it's been getting louder, so I don't know when the CD and the EF are flying, but now when you are out in the yard you have to put your fingers in your ears when they are flying over, I mean because it comes to the point where it's painful.

Now, whether or not the planes are flying lower or the CD as you say -- I take that that's a class of the F-18 I guess.

Q. Hornet?

A. Okay. And EF.

Q. Super Hornet?

A. Okay. Now, when they are flying and the difference between them, it's hard to tell. I mean, I know now, though, when the planes -- when the Hornets are flying over my house, I have to stop what I'm doing and put my fingers in my ear.

Q. What about when the F-18s first started flying -- let's first start with this. You said you were -- you estimated '97 to '98 when you first started hearing the F-18s. Why do you pick that particular time? Did something happen? Did you have a party outside?

A. Well, my house started falling apart.
Q. And when did it start falling apart?
A. Approximately '97, '98 time frame.
Q. How is the house -- do you attribute the F-18s to causing your house to fall apart?
A. I would say yes.
Q. And in what way was it falling apart?
A. Ceilings were dropping in my home.
Q. Are they ceiling tiles or is it drywall ceilings? What is it?
A. Drywall.
Q. And when you say dropping, do you mean patches of the -- or pieces of the drywall are actually falling?
A. Well, I would catch it, you know. They wouldn't actually fall completely to the floor. Like, for instance, my kitchen dropped about a foot, and I had to prop it up with 2-by-4s, because I couldn't push the wood all the way up to screw it in. My bathroom is dropping currently. My den, I caught it dropping, propped it up, screwed it back up, repaired it, it dropped again.
Let's see. Cracks developing all through my house. I'd fix them, they would develop again.
Q. When did the cracks start happening?
A. '97, '98.
Q. Is there something about -- you said '97, '98.

00071

Is there something about that time frame? Did you go out
and hire a contractor, or do something that makes you
remember that time frame specifically?
A. I --
Q. I mean the short question is, why do you say '97,
'98?
A. I guess that's when the jets were getting louder.
And, for instance, I would walk through my den when the jets
were flying and the plaster would fall, literally fall on
your head, so -- that's why I attribute it to that.
Q. Pieces like?
A. Like where seams had been patched or where the
house was originally built, where they taped the seams.
That would start to fall apart.
Q. Start to split?
A. Start to split.
Q. And joint compound or plaster would fall out on
your head or something?
A. Fall on your head, on your furniture and carpet.
Q. Would these be big pieces or little granules
or --
A. That's safe to say, granular.
Q. -- is there something -- so what did you do about
this when it started happening? Like, to correct the
problem with ceilings stuff, what did you do?

00129

A. You have the BP is a gas card. Texaco is a gas card.
Q. One of the cars in the auto loan, obviously?
A. Possibly.
Q. Okay. And then there is a real estate loan, Washington Mutual, outstanding of '76,100?
A. Yes.
Q. And then a CFCU?
A. I think that was -- I think that was the second mortgage there.
Q. For 23,894. And then it says a proposed, which the cash out is 35,650.
So were these debts or similar debts in existence back in '97? Or do you know?
A. I couldn't speculate.
Q. Now that the F-18s -- when the F-18s arrived, you started experiencing that jet noise, how would you describe it? Would you describe it as intolerable?
A. At times.
Q. Okay. What do you mean by intolerable?
A. Well, at times when they are flying directly over your house, that's when it becomes intolerable. When they cease flight operations, it's livable there.
Q. Well, in light of the fact that you have operations at times and not at other times, is the overall

**Eileen May - Test Case Plaintiff**

Eileen May has lived in Virginia Beach since 1979, and has lived in her present home at 620 Little Neck Road since her husband died (in 1996). She was not bothered by the jet noise for quite a while after she moved in. (Exhibit 9B, May Deposition. p. 24).

Ms. May has a pool in her back yard (*id*. p. 35) and she likes to spend time outside. The noise of the jets makes it impossible for her to enjoy life outside her home:

> " … I would like to be able to enjoy my home, enjoy my back yard. I spend a lot of money to get it the way – the pool. I spend a lot of time out there gardening in the summertime and I would like to be able to do that in a peaceful environment."

(*id*. p. 50).

The jets fly directly over her house as well as in front of and behind the house. (*id*. p. 36). Her description of the effect of the noise is as follows:

> Q. What about in the summer?
> A. Last summer – on a day-to-day basis, I would say I still use my backyard, but I've had to get out of my pool. I've had to leave my deck. I've had to come inside when it got where they were flying overhead and overhead and overhead, because it just – it's ear piercing and it's just annoying.
> Q. How long would that go on for, what you just described?
> A. 20, 30 minutes maybe.

(*id*. p. 35).

00001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, )
et al., )
Plaintiffs, )
)
v. ) No. 01-201L
)Judge Victor J. Wolski
THE UNITED STATES OF AMERICA, )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION OF

EILEEN MAY

TAKEN ON BEHALF OF THE DEFENDANT

VIRGINIA BEACH, VIRGINIA

MARCH 9, 2006

Q. And this is 1993?
A. -- three. He died November 12, 1993.
Q. So in terms of your house-hunting, you pretty -- you limited yourself to this Kingston area?
A. Yes, I sure did.
Q. Before you decided to purchase the home on 620 Little Neck Road, did you notice military jets flying around that home or hear the noise at that home before you purchased the home?
A. No.
Q. Okay. When you moved into the residence at 620 Little Neck Road, how soon after you moved in did you hear military jet noise?
A. I lived there for a while before I really noticed jet noise.
Q. When was -- just estimate what year you think you first heard jet noise.
A. It was years. It was a couple years. Probably in 1997/'98.
Q. Okay. Why does '97/'98 stand out to you? Do you recall anything specific?
A. I put a pool in, inground pool in my yard. I remember for years nothing bothered me. I'm just guessing a couple years. It didn't bother me. I

Q. What about in the summer?

A. Last summer -- on a day-to-day basis, I would say I still use my backyard, but I've had to get out of my pool. I've had to leave my deck. I've had to come inside when it got where they were flying overhead and overhead and overhead, because it just -- it's ear piercing and it's just annoying.

Q. How long would that go on for, what you just described?

A. 20, 30 minutes maybe.

Q. Would that happen both day and night?

A. I don't recall ever at night being outside and coming in because of jet noise.

Q. Okay. Let's say how -- how late in the evening would you basically hear the jet noise, whether inside or outside your home?

A. It was dark, summertime, eight, nine -- well, probably 9 o'clock, 9 p.m.

Q. That's the latest.

How early in a day would you hear the jet noise, whether inside or outside your home?

A. Yes; I want to say 9 a.m. maybe.

Q. From '97/'98 to the present day, you mentioned you can -- on occasions you've been able to see the jets?

00036

A. Right.

Q. Are they directly over-flying your home or are they off to the sides, would you say?

A. Well, if I'm sitting in my backyard on my deck, they kind of -- pretty close to being over, but not like -- they kind of come -- I'm real bad at directions. They come, like slice right through on the -- like in front of me or behind me, around the house sort of.

Q. All right.

A. I don't know how to explain it.

Q. It's around?

A. Yes. And they've come over, I mean, they've come over as well. But I'm just saying the vicinity is not just -- not limited to being strictly overhead.

Q. Okay. So sometimes it's overhead, but then sometimes it's off to the sides?

A. Exactly.

Q. With regard to your children, how old are your children?

A. At this time?

Q. Yes.

A. 23 and 26.

Q. Are they still living at home with

Q. Obviously you're listed as one of the test plaintiff cases for trial for this coming fall.

A. Yes.

Q. In terms of your own personal opinion, what is -- what would you like to see as the outcome of the trial?

A. Well, to make the noise go away. I mean -- or -- I don't know what the answer is for that, to be honest with you. I don't know.

Q. You said to make the noise go away?

A. Yes.

Q. Would you like to see the jets just --

A. Disappear?

Q. Yes.

A. I guess the answer to that question would just be that I would like to be able to enjoy my home, enjoy my backyard. I spent a lot of money to get it the way -- the pool. I spend a lot of time out there gardening in the summertime and I would like to be able to do that in a peaceful environment.

Q. And so far, since '97/'98 to the present day, at least your ability to use your pool and your outdoor -- your backyard, you don't think you've been able to fully enjoy it?

A. No, I don't.

**Carroll Lindsay - Test Case Plaintiff**

Carroll Lindsay and his wife Brenda have lived at 2709 East Kings Road in Virginia Beach since 1994. (Exhibit 10B, Lindsay Deposition. p. 11, 74).

The first time Mr. Lindsay noticed that the noise from the jets at Oceana was becoming "intolerable" was after the arrival of the F/A-18s in the fall of 1998 (*id.* p. 20).

Q. When you first came to Virginia Beach in 1979, did you know the Naval Air Station Oceana was here?
A. Yes.
Q. Did you know that they flew jets in and out of the base?
A. Oh, of course.
Q. Did you ever experience jet noise at any of the other homes that you lived at in Virginia Beach?
A. I'm sure I did. But was it anything significant? No.
Q. What do you mean by significant?
A. Significant means to the point where it was bothersome.
Q. That is bothersome?
A. Bothersome in that context to me would mean something that would interrupt my daily routine, my life, or something of that nature.
Q. Okay. Can you give me an example?
A. An example of something that would interfere with my life?
Q. Yes.
A. I'm standing out in my yard talking to my wife and suddenly we can't hear each other. We just have to stop because you can't hear.
Q. Has that happened to you in your current home?
A. Most definitely.

(*id.* p. 21-22).

The jets fly low over his house, close to the top of the trees (*id.* p. 23). Sometimes they fly directly over the house and sometimes to the left or right of the house.

Q. So by directly over your house you mean like over the rooftop?
A. Yes.

(*id.* p. 23).

Prior to the arrival of the F/A-18s the noise was acceptable. The operations of the F-14's and other aircraft did not disrupt Mr. Lindsay's lifestyle or prohibit ordinary conversation, both of which he experiences with the F/A-18s (*id.* p. 71-72). He has sought, but has been unable to afford, mitigation measures for the noise. About two years ago he sought a quote for replacing the windows in his home and received a bid of approximately $10,000, a sum which he cannot afford. (*id.* p. 80-81).

00001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, )
et al., )
)
Plaintiffs, )
)
v. ) NO. 01-201L
) Judge Victor J. Wolski
THE UNITED STATES OF AMERICA, )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION
OF CARROLL LINDSAY
TAKEN ON BEHALF OF THE DEFENDANT

Virginia Beach, Virginia
June 9, 2005

Appearances:

HOFHEIMER / FERREBEE, P.C.
By: KRISTEN HOFHEIMER, ESQUIRE
Counsel for the Plaintiffs

00011

Q. And why did you sell your home on Royal Palm?
A. It was a divorce situation, and the ex-wife forced the issue.
Q. So when you moved into the rental home on Mornay Drive, were you the only one living in that house?
A. I had a girlfriend.
Q. And then you went from the rental home and you bought the current home that you have now?
A. Correct.
Q. When did you buy the house?
A. In 1994.
Q. Okay.
A. July. June or July.
Q. Okay. Mr. Lindsay, I'm showing you, this is marked Defendant's Exhibit 10. And what I'd like you to do, if you can -- sorry. Is that -- there you go. If you could show me on the map where you have lived in Virginia Beach in terms of the first home that you lived at on Independence Boulevard, or in that area. And if you could just show me?
A. My eyes, nor my neck is going to reach that far.
Q. No. That's fine.
A. Laskin Road. North Great Neck. It's not on the map. Independence Boulevard is further west towards Norfolk.
Q. Okay. What about your home, the first home that

June of 1998 was when the first cancer was detected,
diagnosed, whatever.
Q. And so after June '98 you were here in Virginia
Beach during the week?
A. Correct. With an occasional trip up to
Cincinnati, the home office, because theoretically I was
still on the payroll.
Q. Okay.
A. Not theoretically. I was on the payroll.
Q. You mentioned earlier that when you first moved
into the home, you didn't think the jet noise was
insignificant. When do you think --
A. I'm sorry. When I first moved into the home, I
thought the jet noise --
Q. Was not significant?
A. Correct.
Q. Do you remember when you noticed the jet noise
becoming more significant?
A. Well, with the coming of the F-18s, without
doubt, without any question, reservation, whatsoever,
without doubt, that was when that first occurred. And it
was in the time frame of when I was I'll call it
recuperating or recovering from the first cancer operation
that I had, and the subsequent radiation treatment that I
had, which went over a period of three or four months, which

would have been the fall of 1998.
Q. The fall of '98?
A. Correct. The surgery was in June, July of 1998.
Q. And that coincides with increased jet noise that you experienced in your home?
A. I was home. Yes.
Q. When you first came to Virginia Beach in 1979, did you know the Naval Air Station Oceana was here?
A. Yes.
Q. Did you know that they flew jets in and out of the base?
A. Oh, of course.
Q. Did you ever experience jet noise at any of the other homes that you lived at in Virginia Beach?
A. I'm sure I did. But was it anything significant? No.
Q. What do you mean by significant?
A. Significant means to the point where it was bothersome.
Q. What is bothersome?
A. Bothersome in that context to me would mean something that would interrupt my daily routine, my life, or something of that nature.
Q. Okay. Can you give me an example?
A. An example of something that would interfere with

my life?
Q. Yes.
A. I'm standing out in my yard talking to my wife and suddenly we can't hear each other. We just have to stop because you can't hear.
Q. Has that happened to you in your current home?
A. Most definitely.
Q. Do you remember the first time that happened?
A. I couldn't tell you exactly. It was sometime in the 1998 time frame.
Q. What about when you are inside your home? Can you hear jets?
A. It's muffled somewhat. But when you are watching a TV program and you have got the volume so loud that it's -- I'm going to say almost vibrating the floor, the volume is so loud, and you still can't hear the TV, that's bothersome to me.
Q. You mean the TV volume vibrates the floor?
A. Yes.
Q. Or the jet --
A. Well, the jet noise too. Windows have shaken in my house. And I don't think that was because of the volume of the TV.
Q. Okay. You mentioned that you and your wife would be having a conversation outside. Does she live with you

now?
A. Yes. She is my wife now. When I referred to girlfriend earlier, it's my wife now.
Q. Have you seen jets fly over your property?
A. Numerous times.
Q. Can you describe that for me?
A. Oh, I mean I don't know exactly how to describe it. Jets -- I mean I'm not trying to give you a smart answer. Here's a plane. I'm standing outside. I hear the noise, a tremendous noise coming, and I look up and there's a jet plane. I recognize a jet plane. Sometimes they are very low.
Q. Can you tell me, or can you describe how low?
A. I don't know. I can't judge distances looking up in the air. I don't know. Low. To me, very low.
Q. You mentioned you have trees on your property?
A. Yes.
Q. Do they fly close to the trees?
A. Yes.
Q. To the tops of the trees?
A. Yes.
Q. Do you know about how far?
A. I can't give you a number of feet. I don't know.
Q. They seem to be close?
A. They seem pretty darned close to me, yes. Using

00071

about the jet noise?

A. I don't know that it will.

Q. What would eliminate your concerns?

A. To eliminate the jet noise, or to make the jet noise I'll call it tolerable.

Q. You described the noise a few minutes ago as intolerable?

A. Yes.

Q. What would be your opinion of what is tolerable?

A. I'm sorry.

Q. Well, what is the difference between what is intolerable and what is tolerable?

A. The difference between tolerable and intolerable, as it relates to jet noise, is the difference between, as an example, something that disrupts my life-style as opposed to something that does not disrupt my life-style. Something that interferes with my conversation with my wife or my neighbor or someone that is visiting, and prohibits that conversation from taking place, as opposed to the opposite of that. To me, that's what I mean by tolerable or intolerable. Or not tolerable.

Q. Do you think the noise was tolerable before the fall of '98?

A. I do not recall the disruption and the noise level being to anywhere near the extent prior to the arrival

of the F/A-18s. Or putting it a different way: The activity with the F/A -- with the F-14s as an example, the Tomcats, there was noise levels there, but that I did not necessarily put in the intolerable category.

Q. Why is that?

A. For the reasons that I have already stated. It was -- the noise level is -- it's certainly there with the F-14s. But it is not intolerable to the extent that it disrupts my life-style, to the extent that it keeps -- prohibits me from carrying on a conversation when they are flying.

Q. When the F-14s are flying, how do you know F-14s were flying before the F-18s?

A. Well, generally speaking, I can tell the difference between -- visually, between an F-14 and an F-18.

Q. So did you see F-14s flying near your property before you saw F-18s flying?

A. Yes.

Q. When did you see F-14s flying?

A. I don't recall. I mean I couldn't tell you a date. I don't know. I can't remember.

Q. Would it be before the fall of '98?

A. Yes.

Q. And when you saw those F-14s flying, could you have a conversation outdoors then?

less frequently?
A. The noise level was not as high. The noise level was not as high. I don't know how else to answer that question. It was not as disruptive.
Q. Did you have conversations outside your house when the F-14s were flying?
A. I don't remember.
Q. Do you know if you were ever watching TV when the F-14s were flying over?
A. I couldn't answer that definitively, one way or the other. I don't have a schedule of when F-14s fly. That in relation to when I watch TV. My life is not structured that way.
Q. You mentioned earlier that you are married. What is your wife's name?
A. Brenda.
Q. Is she a plaintiff in this lawsuit?
A. No.
Q. Have you ever taken any video recordings, tape-recordings, or photographs of the jets?
A. No. Sorry. No.
Q. Going back to the F-14s for just a moment.
A. Okay.
Q. Would you agree that most of the time while those planes were flying prior to the fall of '98 that you were

conference room. Can you just describe the window that you pointed to behind you?

A. That window is approximately four feet in height. I would say my windows are three feet maybe. Three feet in height.

Q. And what about the width?

A. It varies. I assume the windows -- the width of the windows are -- that window is approximately, in terms of the glass, is approximately 18 inches. The windows in my house are approximately 18 inches wide as well. But again they vary because of different size windows depending on the amount of opening. And there are certain windows -- I'll call them windows, glass, that do not open or close at all. They are just pieces of solid glass that's inserted in a hole in the wall.

Q. If you wanted to replace your windows in your home, do you think you could afford to do that?

A. Absolutely not.

Q. Why not?

A. I can't afford it. We're talking about -- maybe I shouldn't anticipate your question. But we're talking about thousands of dollars. I had quotes. I don't recall the amount of money right now, but we're talking about approximately $10,000.

Q. When did you have the quotes?

00081

A. I don't remember. Two years ago. Three years ago. Maybe five years ago. I don't remember.
Q. Do you remember who did the quotes?
A. I don't remember the name of the company.
Q. Why did you have the quotes done?
A. Two reasons. Number one, possibly to eliminate some noise. Number two, there is some -- obviously some degradation in the windows, in the casings around the windows, being that they are 30 years old or so. So age, and better insulation from the elements outside. Not just noise, but the elements outside to give better insulation.
Q. What other elements outside?
A. The cold, the heat, to better insulate your home.
Q. So if you replace the windows with windows that you would like, what percentage of the noise from the jets do you think would be eliminated?
A. It's some positive number. I wouldn't venture to guess.
Q. Five percent, ten percent?
MS. HOFHEIMER: Objection. Calls for speculation.
A. Yes.
MS. HOFHEIMER: He can't answer if he doesn't know.
A. You can guess whatever number you want to use. I

**Harold Levenson - Test Case Plaintiff**

Mr. and Mrs. Levenson live at 2004 Brickell Court in Virginia Beach. Mr. Levenson is retired having worked for more than 20 years in television and after that for Harris Publishing Company (Exhibit 11B, Levenson Deposition. p. 5-6).

The Levensons bought their home in 1986. They were generally aware of the existence of Oceana Naval Air Station and knew it was somewhere in Virginia Beach when they came from the Washington, DC area in 1986.

They soon became aware of overflights from aircraft from Oceana but it was not an issue in their lives at all until the arrival of the F/A-18s in 1999. (*id.* p. 28).

Q. Before the F-18 arrived, did that impact your life-style at all?
A. Not – not in any significant way. Did they fly over my house? Sure. They have to. Because there's two runways at Oceana, and when the wind is blowing in a certain way and they are using the short runway, which is the runway that affects our neighborhood, the planes will land and the flight path is pretty directly over our house. But in case you are not aware of it – I can't imagine you are – but the Hornet is about 20 dB at worst louder than the Tomcat is.

****

Q. There were overflights over your house?
A. Of Tomcats, sure.
Q. How often did that occur?
A. I really can't tell you honestly, because it wasn't anything that was interrupting. It wasn't anything that was interfering. It wasn't anything that was really horribly meaningful in our life at the time. So we didn't pay to much attention to it. As a matter of fact, I can remember saying to the other people who formed CCAJN, I said, Are you really sure that the F/A-18s are going to be as loud as you say they are going to be when they come? Oh, yes, they are going to be very loud. Because I mean it was something that wasn't an issue for me prior to the arrival of the F/A-18s.

(*id.* p. 30-31)

Sometimes the pilots fly directly over their house, sometimes 100-400 feet on either side of it. (*id.* p. 32)

Levenson is one of the founding members CCAJN (Citizens Concerned About Jet Noise) a local community group that formed when the Navy was studying whether to move all of the F/A-18s from Cecil Field in Florida to Virginia. CCAJN was formed in the fall of 1997, and Mr. Levenson was one of the original members of the Board of Directors. (*id.* p. 41-42)

Mr. Levenson does not know the precise percentage of flights from Ocean that pass directly over his house but he can say that there is a "goodly amount" of such flights (*id.* p. 35).

Q. Did – you said it wasn't – I don't want – what was your exact words in terms of it wasn't a significant issue, it wasn't a general –
A. The noise from the Tomcats was not a significant public issue.
Q. And for you personally and your family?
A. Was not a significant personal issue either.
Q. Did you all talk about it at all?
A. About the Tomcat noise?
Q. Whatever jet noise.
A. Not that I recall.

(*id.* p. 37-38).

When the F/A-18s pass over his property it is difficult to have a conversation, to talk on the telephone, or to hear the television. In fact, when he wants to watch television he puts headsets on and does the same for an AM/FM radio. (*id.* p. 44).

Since the arrival of the F/A-18s he has called the Noise Complaint Hotline on a number of occasions, and he never called that Hotline at any time prior to the arrival of the F/A-18s (*id.* p. 49).

Mr. Levenson believes that the value of his home is suppressed by the level of noise created by the F/A-18s. "I mean, let's be reasonable about it. If somebody saw an F/A-18 fly 400 or 500 feet over my house on the day they were considering buying it, why in God's name would they buy the house?" (*id.* p. 61).

00001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, )
et al., )
)
Plaintiffs, )
)
v. ) NO. 01-201L
) Judge Victor J. Wolski
THE UNITED STATES OF AMERICA, )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION
OF HAROLD LEVENSON
TAKEN ON BEHALF OF THE DEFENDANT

Virginia Beach, Virginia
June 8, 2005

Appearances:

SHUTTLEWORTH, RULOFF GIORDANO & SWAIN, P.C.
By: STEPHEN C. SWAIN, ESQUIRE
Counsel for the Plaintiffs

00005

BY MR. BRYANT:

Q. And please don't nod your head or say uh huh, the like. Please respond with yes or no, or whatever answer you are going to say?

A. Fine. If I fail to do that, you'll call it to my attention, right.

Q. I'll certainly try to.

You mentioned a break if it rains. You can take a break at any time. Just let me know.

A. Okay.

Q. And if you don't understand a question I ask or something is confusing, whatever, please ask me to rephrase and I'll be happy.

A. Okay.

Q. What is your name, address, and occupation?

A. My legal name is Harold Levenson. I'm known as Hal. My address is 2004 Brickell Court, Virginia Beach, Virginia. 23454.

Q. And your occupation?

A. I work part time for Harris Publishing Company.

Q. And what do you do for Harris Publishing Company?

A. We take information and sell alumni directories for colleges and high schools.

Q. In other words, address, contact information, that kind of thing?

00006

A. No. What happens is that we work in a call center in Chesapeake. I do this 20 hours a week. And what happens is the company has sent out notices to client schools that are doing their alumnae directories every five years or so. People call in, give us updated information, and we offer the directory for sale.

Q. I see.

Do you do anything else besides that position?

A. Not in the way of earned income, you know.

Passive income. Not earned income.

Q. And how long have you been working for Harris Publishing?

A. About 10 years.

Q. 10 years?

A. Yes.

Q. Do you --

A. I consider myself semiretired.

Q. And what did you do before you retired?

A. I was a television news professional for about 25 years.

Q. And what did you do as a TV news professional?

A. Jobs ranged from, you know, the early days, when I was a copy boy up through being a news director and the Washington Bureau Chief of the National News Service.

Q. And when did you semiretire from that?

00028

have studied the F/A-18 situation for 7 years now. So when you do that in a serious kind of way you obtain a book of knowledge that I certainly didn't have when I first came to Virginia Beach. And that's what I mean by that.

Q. When did you first experience jet noise or overflights in this house?

A. After we bought -- first of all, we didn't experience any overflights when we -- prior to going to closing on the house. Okay? And typically what happens is that people from out of town, you know, will look at a house, look at it a second time, buy it. They normally visit the house on a day when there are no overflights. Okay? That's typically what happens.

I don't know really how my awareness of that situation evolved after 1986. And I want to tell you why. Jet noise was not an issue of any consequence in this community prior to the relocation of the F/A-18 from Cecil Field. It really wasn't. The Tomcats are no where near as noisy as the Hornets are. And I think it is fair to say -- and I have said this publicly on many occasions. I do a lot of public speaking, obviously, and I get interviewed frequently on this subject. Jet noise was not an issue, a public issue in Virginia Beach prior to the arrival of the Hornets. And the reason it wasn't is because the Tomcat noise was tolerable. It was acceptable.

Q. Before the F-18 arrived, did that impact your life-style at all?
A. Not -- not in any significant way. Did they fly over my house? Sure. They have to. Because there's two runways at Oceana, and when the wind is blowing in a certain way and they are using the short runway, which is the runway that affects our neighborhood, the planes will land and the flight path is pretty directly over our house. But in case you are not aware of it -- I can't imagine you are -- but the Hornet is about 20 dB at worst louder than the Tomcat is.
Q. Okay.
A. Are you aware of that? You're asking the questions.
Q. I'm going to ask the questions.
A. All right.
Q. Okay. So getting back to that --
A. Sure.
Q. There were overflights over your house?
A. Of Tomcats, sure.
Q. How often did that occur?
A. I really can't tell you honestly, because it wasn't anything that was interrupting. It wasn't anything that was interfering. It wasn't anything that was really horribly meaningful in our life at the time. So we didn't

00031

pay too much attention to it.
As a matter of fact, I can remember saying to the other people who formed CCAJN, I said, Are you really sure that the F/A-18s are going to be as loud as you say they are going to be when they come? Oh, yes, they are going to be very loud. Because I mean it was something that wasn't an issue for me prior to the arrival of the F/A-18s.
Q. Has -- you mentioned the two runways, and there's a shorter runway?
A. Yes.
Q. When they are using the shorter runway and the winds are changing, that is when it affects your house?
A. Right. That's when it affects our house most often. Okay? When touch-and-go's, and SCLPs are being done, that's when the traffic is the heaviest over our house. When the short runway is being used, and the wind is in whatever direction.
Q. Was it -- is it roughly used the same, that short runway --
A. No. No.
Q. -- now as it was back then?
A. No. No. Thank God. The other runway is used more often than this. This runway is used more often than our runway.
Q. Actually, what I'm asking is back before the

F-18s got there --

A. Right.

Q. -- when it was the Tomcat and --

A. Whatever aircraft.

Q. -- whatever other aircraft may have been flying --

A. I'm sorry.

Q. -- your experience has been in terms of flying over when the winds were changed, was it roughly the same, you know, amount of time, experience of overflights, as you do --

A. I don't remember.

Q. You don't remember?

A. No.

Q. Okay.

A. And I don't remember because, as I mentioned to you, it was not something that I took any notice of. Okay? The Tomcat overflights, no.

Q. Do you recall in terms of flight patterns, you said sometimes it goes directly over your house?

A. Sometimes.

Q. And --

A. Sometimes 50 feet to one side or the other side of the house. Sometimes 100 feet, or 100 feet on either side. 200 feet, 300 feet, 400 feet. The pilots are not as

00035
feet, or 150 feet. Is that what you want to know?
Q. Yes.
A. To be honest with you I really wouldn't want to guess. I mean have I kept statistics? No. Do I have a clear recollection? You know, have I modeled in my head, you know, what the percentages are of that? No. All I can tell you is a certain amount of time, a goodly amount of the time they fly directly over my house.
And that shouldn't be a surprise to anybody, because, as I am sure you know by now, the purpose of the training at Oceana is to get the pilots to make a perfect landing on a carrier. If they make a perfect landing they would -- it doesn't happen this way, but they would fly in a certain trajectory, and that trajectory, as I have experienced it myself, and as the gist of the discussion was that day with Rountree and Ray -- Ray was just listening; Rountree was doing most of the talking -- comes over my house, yes.
Q. Now going back to before you bought the house?
A. Yes.
Q. You mentioned that you were aware of NAS Oceana?
A. I was aware only in my capacity as the news director of WAVY that periodically in our newscast there were stories about NAS Oceana. That's all I knew.
Q. And did you know where the location of Naval Air

operations?

A. Absolutely not.

MR. SWAIN: He didn't finish his question. I know you know what he's going to say but let him finish the question.

THE DEPONENT: I'm sorry.

MR. SWAIN: Don't be sorry. Just listen.

Q. Did you do anything to find out about jet operations before buying the house?

A. No. I wasn't aware of jet operations in the vicinity of the house when we bought it.

Q. Why didn't you inquire about that to find out if it was?

A. It didn't occur to me.

Q. Going back to before the F-18s arrived?

A. Yes.

Q. And you have lived in the home consecutively since that period of time?

A. Absolutely.

Q. Did -- you said it wasn't -- I don't want -- what was your exact words in terms of it wasn't a significant issue, it wasn't a general --

A. The noise from the Tomcats was not a significant public issue.

Q. And for you personally and your family?

A. Was not a significant personal issue either.
Q. Did you all talk about it at all?
A. About the Tomcat noise?
Q. Whatever jet noise.
A. Not that I recall.
Q. Did you ever have barbecues or outdoor parties or anything of that?
A. Infrequently. We don't do that. Very infrequently.
Q. And in doing so, before the F-18s arrived, were there ever occasions where there were overflights?
A. I'm sure there were, but I don't have any particular recollection of it, no. And the reason I don't have any recollection of it is, as I mentioned to you, is that it just wasn't -- it wasn't that bothersome. Okay? It wasn't that intrusive.
Q. Okay.
Well, you did recognize it occurred obviously back then?
A. I'm sure I did. But, you know, I guess I'm a kind of a one dimensional individual. I tend to pay attention to things I really care about. And I tend not to pay attention to things that I consider immaterial or inconsequential.
Q. And so if -- you mentioned the altitude of I

noise, any more than the guy mowing his lawn next door, you know. Sure, you hear the guy mowing his lawn next door.
Q. You can still have a conversation outside if somebody is mowing their lawn I guess?
A. Yes, you can. Although sometimes I guess if the mowing is going on on this side of the house and you are over on that side of the house, it might be a little difficult. But, yes, as I said to you, jet noise was not an issue in Virginia Beach prior to the arrival of the Hornets.
Q. So if it's equivalent, something akin to mowing your -- a neighbor mowing his lawn, that wouldn't require you to turn up the TV or any of those kinds of things either, I guess, if you are in your house?
A. I don't have any recollection of jet noise being such, prior to the arrival of the F/A-18s, that we couldn't have telephone conversations easily, that we couldn't listen to the TV easily, that people were in the great room and couldn't hear what they were saying in the great room. Okay? I don't recall that kind of problem during the Tomcat period, prior to the arrival of the Hornets.
Q. Let's talk about the Hornet period now.
A. Right.
Q. When -- when did you notice that there was a change? When did it become --
A. Well, CCAJN was formed late in 1997 out of

concern for what was going to happen. And the Hornets arrived sometime during 1999. And I don't remember when. And once we had a chance to experience the noise levels from the Hornets, it became very clear that the concern that some people in the original CCAJN group had about the situation had come to pass with the noise level substantially -- substantially louder than the Hornet level -- than the Tomcat noise level, and it was going to be very different for us.

Q. You lost me there.

A. It was going to be very different. The experience of having overflights over the house. The experience of having Tomcat overflights over the house is what I already told you it was. Once the Hornets were flying, sometime in '99, whenever it was, it became clear that that aircraft was much, much louder than the F-14.

Q. When did that happen?

A. Sometime in '99. I don't recall.

Q. Was there some sort of defining moment? You were outside, or inside?

A. Not that I recall, no.

I was hoping the concern of some other people on the original CCAJN board was wrong. I was hoping -- I was hoping that their concerns were misplaced about the noise level of the Hornets. I really was. I remember asking, you

00044

Q. What changed?
A. The level of noise that occurred over our house. In fact, the level of noise that occurred all over the high noise zone in the city of Virginia Beach.
Q. Let's discuss your property specifically?
A. Yes.
Q. Conversations, how did that affect those?
A. When an F/A-18 flies four to five feet over our house --
Q. Four to five?
A. 400 to 500 feet over our house. Sorry. It is very difficult to have a conversation and be heard. It is very difficult to talk on the telephone. It is very difficult to hear the TV. In fact, if there is a sustained operational activity that day, in which, you know, sometimes the overflights would occur every 30 to 40 seconds, okay? When I want to watch TV, I have to put head sets on. I have both the TV head set and I have an AM-FM radio head set. So if I want to attempt to escape from the noise, that's what I will do. At its worse. It's not that way all the time. At its worse.
Q. And you said it's difficult to watch TV aside from having head sets on?
A. Yes.
Q. Or difficult to have a telephone conversation?

00049

All our Navy friends get the e-mail service too.
So if you want to know what CCAJN has said for the past seven years, I am sure there's a very good file.

Q. What have you done to document the jet noise over your house?

A. Nothing.
Well, except for this. I call the hotline when I feel sufficiently annoyed, and when I feel sufficiently -- I haven't called them recently. When I'm not involved in having to get something else done I will call the hotline.
Of course, you get tired of calling the Hotline because you call the hotline and there is no indication that anything happens after that, none whatsoever.

Q. How many times have you called the Hotline?

A. Over a period of seven years? Well, since -- well, not seven years. Since 1999, many times. Many.

Q. And I think you said that you didn't call before.

A. Oh, no. I never called the Hotline prior to the F/A-18s. I have no recollection of ever having called. I don't think I even knew the hotline number before the F/A-18s arrived.

Q. Did you ever speak with anybody at -- you said you had a conversation with.

A. Oh, I used to talk to Ray Furenzi frequently. I have talked to Bobby Rountree a little bit. You know, we

00061

real estate gets transacted in Virginia Beach, people who are buying a house in a high noise zone customarily visit the house on days when there are no overflights. There are exceptions. There are exceptions. When a local person buys a house in a high noise zone, the local person knows the situation, so there are exceptions. But out-of-towners? Out-of-towners will customarily buy a house when there are no overflights on the days that you are looking at the house.

I mean, let's be reasonable about it. If somebody saw an F/A-18 fly 400 or 500 feet over my house on the day they were considering buying it, why in God's name would they buy the house?

Q. And going back to your -- you used the word if the F-18S went away permanently?

A. If the government -- if the Navy --

MR. SWAIN: Wait a minute. Let him finish.

MR. BRYANT: Thank you.

A. I'm sorry.

BY MR. BRYANT:

Q. If the F-18s went away permanently, the word you used, you believe your house value would increase significantly?

A. Yes.

Q. What do you mean by significantly?

**Michael Leary - Test Case Plaintiff**

Michael Leary retired after 20 years on active duty in the Navy (Exhibit 12B, Leary Deposition p.5). He and his family live at 3209 Chicory Court in the Landsdown Meadows subdivision of Virginia Beach, which they purchased in 1995. Their house has always been near or under a flight pattern. Prior to the arrival of the F/A-18s their children had no difficulty with the jet noise, which they heard often (*id.* p. 34). Beginning in 1999, with the arrival of the F/A-18s, the noise became significantly louder. It was a "dramatic difference." (*id.* p. 42). The planes quite often fly low directly over their house or immediately adjacent to the house. (*id.* p. 44-45).

Mr. Leary believes that his house has become unsuitable for residential living since 1999 (*id.* p. 50-51).

Q. Why do you say it's unsuitable for residential living?
A. Well, it's –you can't enjoy your yard. Invariably – and I guess it's probably because of safety reasons, they fly on nice days when, you know, you want to be outside in your yard; and it makes it rather unpleasant to deal with the constant bombardment of the jet noise.

(*id.* p. 52)

****

Q. Okay. So at what level – strike that. Explain why it's – why its' approaching this – or it's unsuitable for residential living, intolerable when you are doing essentially the same things to deal with aircraft noise. Plugging your ears, going inside for phone calls as we discussed, those things. Those are essentially the same sorts of inconveniences as before the Tomcat. Why is it shifting over to being intolerable and unsuitable for residential living?
A. Because in the past, you would only have to do those things if the aircraft was directly or – directly above your house or one of your neighbor's houses, but now you have to do that if they are anywhere in the neighborhood.

(*id.* p. 58).

Mr. Leary's home also has suffered from vibrations since 1999 when the F/A-18s are operating. Prior to that time there was no vibration problem. (*id.* p. 66-67)

00001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, )
et al., )
)
Plaintiffs, )
)
v. ) NO. 01-201L
) Judge Victor J. Wolski
THE UNITED STATES OF AMERICA, )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION
OF MICHAEL J. LEARY,
TAKEN ON BEHALF OF THE DEFENDANT

Virginia Beach, Virginia

April 28, 2005

Appearances:

SHUTTLEWORTH, RULOFF GIORDANO & SWAIN, P.C.
By: STEPHEN C. SWAIN, ESQUIRE
Counsel for the Plaintiffs

U. S. DEPARTMENT OF JUSTICE
By: STEVEN D. BRYANT, ESQUIRE
DOMINICK G. YACONO, ESQUIRE
Counsel for the Defendant

those. Work with curriculum, training guides, that type of thing.

Q. What type of supply?

A. Naval Supply.

Q. I understand that. But I mean is it foodstuffs? Is it weaponry?

A. Parts.

Q. Parts. Okay.

And how long have you been doing that?

A. About three and a half years.

Q. Three and a half years with Serco or with Resource Consultants?

A. Most of it was with Resource Consultants. Just the past couple of months Serco was acquired.

Q. And what did you do before that -- before you were in this position?

A. I was a storekeeper in the Navy for 20 years.

Q. Storekeeper. So you retired from the Navy?

A. Yes, sir.

Q. What was your rank when you retired?

A. Senior chief.

Q. Senior chief.

Okay. If you would, go through your assignments in terms of where you were located with the Navy throughout the whole course of the 20 years?

Do your children still -- is it two daughters, a son and daughter?

A. Son and daughter.

Q. Do they still live at home now?

A. Yes, sir.

Q. And how old are they now? 17 and 16?

A. Yes, sir. Golly. I know he's 17. Yes. She's 16. She'll be 17 later on. Yes.

Q. And tell me about, has the noise from when you first moved in, starting in -- was that '95 -- 1995 you moved in the house?

A. Yes, sir.

Q. Did your kids have any -- experience any problems with the jet noise?

A. No, sir.

Q. And did they have any problems in terms of being woken up or anything? Any sort of problems at all from the jet noise from then until now?

A. No. By that age they were out of the Knapp stage. You know, they didn't typically -- none that I can remember any flying late at night. So that wasn't an issue.

Q. Have they ever had any problems from the jet noise?

A. Other than periodically, you know, holding their hands over their ears when a jet flies over.

'95. I mean they have just always flown a lot. I just never really kept track.

Q. And you said that they are louder. I think you said today they are louder. When did they become louder? The jets?

A. Exactly -- '99, but exactly when I don't know.

Q. And how is it louder? How is it different?

A. It's hard to explain but the noise from the jets is significantly louder than it used to be with the F-14s that they used to fly.

Q. And was it a -- I mean was it sort of a night and day thing? Was it a dramatic difference that you noticed?

A. Yes.

Q. So when did you notice a dramatic difference? What happened? Was anything going on?

A. No.

Q. That stands out?

A. I knew that they were -- they had to bring up these planes from Cecil Field, I believe it was in Florida. You know, you hear on the news, you know, they were different type plane, louder. And they sure were.

Q. So you heard on the news that a louder aircraft was coming? Is that what you said?

A. Yes.

Q. And when did you hear that on the news?

house from the Tomcat to the Hornet? Was there any change?
A. No. They appeared to be flying similar flight paths.
Q. And can you estimate now the altitude of the jets that are flying in relation to your house?
A. No. I'd hate to -- they are low. That's all -- that's the best estimation I can give you.
Q. Let's say if you had to put it in football fields, for example. How many football fields? Stack them up.
A. I'd hate to say. I really can't judge distance that way. But they are close.
Q. Can you read the lettering on the jets?
A. At times, yes, sir.
Q. At times. Explain how at times -- how there's a difference between the certain times you can read the lettering and other times you can't?
A. Well, the closeness. If they are going over like my next door neighbor's house, sure, I can pick it out. But if they are just flying somewhere else over my subdivision, my eyesight can't.
Q. And so you just said that at times the planes are flying over your neighbor's -- your immediate neighbor's house?
A. Or my house.

Q. Or your house. And other times it's flying somewhere else in the neighborhood, above. Are they sometimes flying directly over your house?

A. Oh, absolutely, yes, sir.

Q. How would you distribute that proportion in terms of directly above and then elsewhere above the neighborhood?

A. I don't understand.

Q. Okay. Some of the times the jets -- you just said some of the times the jets are flying directly over your house?

A. Yes.

Q. And other times it's not directly over your house?

A. Right.

Q. What are the relative percentages of that? Is it 50/50? Is it 20/80?

A. The percentages that they fly over my house compared to elsewhere that I can see them flying?

Q. In and around your neighborhood? I don't mean like if it's 10 miles away you can see one in the air. I mean in the immediate vicinity of where you live?

MR. SWAIN: How immediate?

BY MR. BRYANT:

Q. Let's say -- well, we'll go through each level. Let's say start with a mile.

what effect it did have in 1999 when they started flying?
A. No effect other than that they are just significantly louder than what I remember.
Q. Has it -- did it change anything about the way you lived in your house, the increased noise, being significantly louder?
A. Other than, you know, having to raise the volume on the TV, at different times, you know. You know, you'd have to take all your phone calls inside. You know, you obviously couldn't talk outside.
Q. Can you have conversations -- well, I guess you're indicating that you could have a phone call inside the house when the planes are going over and hear the other person?
A. Yes, sir.
Q. So you can obviously have this type of conversation with somebody in your house when the planes are going over and hear each other?
A. You might have to take a brief pause, especially if it's going fairly close to your house.
Q. What about when you're outside in the 1999 time frame and -- well, we're talking about the 1999 time frame. What about outside? How would it affect you when you're outside?
A. If you saw it coming, you would, you know, brace

for it. You would put your fingers in your ears, that type of thing.

Q. Okay. So a conversation you were having would cease until it passed over?

A. Oh, absolutely.

Q. Anything else besides raising the volume on the TV, phone calls inside the house, any other -- and then, as you said, putting your fingers in your ears while you are outside. Any other sort of effects that the noise would have?

A. Not that I can think of.

Q. Would you describe that sort of an impact as making your house unsuitable for living, residential living?

A. Let's just say it's less enjoyable.

Q. So if it's less enjoyable, then you still enjoy your house but just not to the same level you would enjoy it without the noise?

A. Well, it's, you know, it may be unsuitable. I mean, it's just, you know, unfortunately something that I have had to live with.

Q. Well, you said it may be unsuitable. I'm going to explore this in terms of --

A. That's just a broad definition.

Q. I mean is your house with the noise with the F-18s flying over it, which is, it's in the flight path, or

below the flight path, so that is something you are going to experience. Recognizing that, is your house unsuitable for residential living?

A. I believe where someone could get that interpretation.

Q. Well, I'm asking you. What's your view of it? Not someone else.

A. If I had to go one way or the other, I would say unsuitable.

Q. Why do you say it's unsuitable for residential living?

A. Well, it's -- you can't enjoy your yard. Invariably -- and I guess it's probably because of safety reasons, they fly on nice days when, you know, you want to be outside in your yard; and it makes it rather unpleasant to deal with the constant bombardment of the jet noise.

Q. Now, when you say constant, you mean when they are flying? There's times when they are flying a couple of weeks, and they won't fly for a couple of weeks. That still holds true, right?

A. Pretty much, yes.

Q. And that was also true in 1999?

A. Right.

Q. Let's go back to when you moved in in '95 and up until '99. And there was obviously jet noise as you

we're putting them on a continuum. You're saying unbearable is the worst?

A. Unbearable would be if I was like being tortured.

Q. Okay. So at what level -- strike that.

Explain why it's -- why it's approaching this -- or it's unsuitable for residential living, intolerable when you are doing essentially the same things to deal with the aircraft noise. Plugging your ears, going inside for phone calls as we discussed, those things. Those are essentially the same sorts of inconveniences as before the Tomcat. Why is it shifting over to being intolerable and unsuitable for residential living?

A. Because in the past, you would only have to do those things if the aircraft was directly or -- directly above your house or one of your neighbor's houses, but now you have to do that if they are anywhere in the neighborhood.

Q. Okay. Okay. Do you sort of have an idea -- like when houses in the neighborhood are going up for sale, when there's a sign out front of their homes, do you keep an eye on that?

A. Do I see for sale signs in my --

Q. Yes.

A. Absolutely.

Q. How many are there now approximately that you are

they have got some kind of head gear on. I don't know what all they wear, but --

Q. Is that every time the jets are flying over your house, your immediate neighbor's house, or is that only certain times?

A. Only certain times. They would have to be fairly low. Sometimes they fly much higher. So, you know, I can't --

Q. What percentage of the time are they flying so low that you can see what you describe as a silhouette or this helmet gear kind of thing?

A. A percentage? Maybe a quarter of the time.

Q. About 25 percent of the time. And would that have been true, or was that true also for the Tomcats back in '95, '96, '97, '98?

A. I would say that's fair.

Q. What about vibrations? Do you experience vibrations in your house when the jets are flying over your house?

A. Occasionally.

Q. Do you experience them when they are directly above the house?

Let me strike that. Go back.

Do you experience the vibrations if they are a few blocks over and in the sky, obviously?

A. In relation to the proximity, yes. That would increase the vibrations.

And also it has to deal with, I guess, the speed and, you know -- I don't know aviation. But sometimes they get like afterburners or, you know -- and maybe even the wind has something to do with it. But, yes, occasionally there are vibrations.

Q. Has anything in your house broken or anything because of the vibrations?

A. No, sir.

Q. Has anything fallen off a shelf or anything of that nature?

A. No.

Q. And did you experience those vibrations with the Tomcats?

A. Not that I recall, no, sir.

Q. Have you ever called into the air station to complain about noise or vibrations or any sort of impacts from the jets?

A. Never.

Q. Why have you not done that?

A. Because it's pointless.

Q. Why do you view it as pointless?

A. Because they are not going to stop flying because I ask them to.

**Sara Hoag (Lynch) - Test Case Plaintiff**

Ms. Lynch resumed her maiden name in August, 2003. She moved to Virginia Beach with her husband and children in September 1968 (Exhibit 13B, Lynch Deposition p. 8). Her husband was an aviation mechanic and she was and is a Licensed Practical Nurse. She retired in 1999 because of failing vision. (*id.* p. 8,13).

Q. You moved into your current home at 1301 Brant
Road in 1990; is that right?
A. Correct.
Q. And do you remember the first time you
experienced jet noise there?
A. Well, yes. Right away. I always heard jet
noises, because they were.
Q. And how would you characterize that noise in
comparison to where you have lived before in Virginia Beach?
A. It was about the same as Ship Shoal Way.
Q. Okay. Do you think that jets fly directly over
your home on Brant Avenue?
A. Yes, they do.
Q. When do you think they fly directly over your
home?
A. Very frequently.
Q. During the day?
A. Yes.
Q. What about at night?
A. Yes.

(*id.* p. 19)

****

Q. Would you -- how would you describe your
experience with jet noise at your home in terms of its
interference with your day-to-day activities?
A. Well, on nice days, I like to open up the house,
and you can't. I open it up, windows, door, sliding door,
and if they are flying, then in a few minutes I have to
close it again.
And sometimes I do that several times during the
day because I want the fresh air in, but if they are flying
steadily-- and sometimes they might start flying at 8

> o'clock in the morning and it might be 11 o'clock at night then they stop -- you can't hear the television at all, and unless you're sitting there with the remote on the volume control in your hand, you know, and it really is loud enough that you turn up the television or the DVD music, the CDs to full volume, and you can't hear it.
> Going outside when they are flying is just useless. If you are out there with friends, family, you can't talk. There is no conversing at all.
> Sometimes, I'm embarrassed to say, that the noise, as loud noise will do sometimes to us, I get very hostile. It's very -- there are times when it is so loud that inside you vibrate. Inside your chest you can feel vibrations.

(*id.* p. 42-43).

Ms. Hoag is blind. (*id.* p.32). She also cannot listen to Cds or her books on tape when the jets are flying and she wears headphones when listening to books on tape. (*id.* p. 44-45).

00001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, )
et al., )
)
Plaintiffs, )
)
v. ) NO. 01-201L
) Judge Victor J. Wolski
THE UNITED STATES OF AMERICA, )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION
OF SARA ANNE LYNCH HOAG
TAKEN ON BEHALF OF THE DEFENDANT

Virginia Beach, Virginia
June 10, 2005

Appearances:

SHUTTLEWORTH, RULOFF GIORDANO & SWAIN, P.C.
By: STEPHEN C. SWAIN, ESQUIRE
Counsel for the Plaintiffs

Beach?
A. September 1968.
Q. And why did you move here?
A. Navy transfer.
Q. Were you in the Navy?
A. No.
Q. Did you come with a family member?
A. Yes.
Q. Who did you come with?
A. My husband and my children.
Q. Was your husband in the Navy?
A. Yes.
Q. And what did he do in the Navy?
A. He was an aviation mechanic.
Q. I'm sorry. Did you say aviation?
A. Mechanic.
Q. Okay. And how long did he do that?
A. 30 years.
Q. Before you came to Virginia Beach where did you live?
A. Jacksonville, Florida.
Q. Is that the first place that your husband was stationed?
A. No.
Q. If you could, just summarize where you have

A. September of '52 until June of '52. '53; pardon
me. I'm sorry.
Q. That's okay. And did you live on a Navy base
then or a military base?
A. No.
Q. So you have never lived on a military base?
A. No. No.
Q. What is your current occupation?
A. I don't work. I'm retired. I was an LPN. I
guess I still am.
Q. What is an LPN?
A. Licensed practical nurse.
Q. And what do you do?
A. Right now?
Q. Or what does a licensed practical nurse do. If
you could just describe your job?
A. Almost as much as an RN, working in hospitals,
nursing homes, Doctor's offices.
Q. Visiting with patients and --
A. Hands-on care. Yes.
Q. And when did you retire?
A. I stopped working in 1999.
Q. And why did you stop working?
A. My vision.
Q. Did you have problems with your vision before

00019

you think that the noise was louder, or a combination of both?

A. At that period of time I don't -- I don't know, but I don't think more jets were flying. It was that it was the flight path.

Q. You moved into your current home at 1301 Brant Road in 1990; is that right?

A. Correct.

Q. And do you remember the first time you experienced jet noise there?

A. Well, yes. Right away. I always heard jet noises, because they were.

Q. And how would you characterize that noise in comparison to where you have lived before in Virginia Beach?

A. It was about the same as Ship Shoal Way.

Q. Okay. Do you think that jets fly directly over your home on Brant Avenue?

A. Yes, they do.

Q. When do you think they fly directly over your home?

A. Very frequently.

Q. During the day?

A. Yes.

Q. What about at night?

A. Yes.

00032

Q. Who lived --

A. My oldest son was in and out, in and out, intermittently.

Q. Do you have any intentions to sell your home?

A. No.

Q. Do you talk to any of your neighbors about jet noise?

A. No.

Q. Do you talk to anyone about jet noise?

A. Not in depth.

Q. When you do talk about it, what do you talk about?

A. I don't really talk. It would be if a jet was going over and then we just kind of look and, or just don't talk, you know. I don't elaborate on it with anyone, no.

Q. You mentioned that you stopped working in 1999 because of your vision?

A. Yes.

Q. And are you legally blind?

A. Yes.

Q. And is -- what was the medical diagnosis?

A. Glaucoma.

Q. And when did you get that diagnosis?

A. 1974 or '75.

Q. So is that something that your vision has gotten

Heat for purchase and installation of a new heat pump system. And it's a receipt for -- well, the total cost was $1,540?

A. Yes.

Q. And the balance was $1,040. It's dated June 17, I believe, 2005. But I'm not sure. Does that sound right?

A. No. No.

Q. When was that work done?

A. I don't know exactly. But the original is around.

Q. Oh, that's okay.

A. It was -- I'm really sorry. I don't remember, but it was 2000 or 2001. It was --

Q. 2000 or 2001?

A. Close.

Q. Okay. Was it about the same time you had some other work done?

A. I really have had trouble remembering exactly when I had the things done.

Q. Would you -- how would you describe your experience with jet noise at your home in terms of its interference with your day-to-day activities?

A. Well, on nice days, I like to open up the house, and you can't. I open it up, windows, door, sliding door, and if they are flying, then in a few minutes I have to

close it again.
And sometimes I do that several times during the day because I want the fresh air in, but if they are flying steadily -- and sometimes they might start flying at 8 o'clock in the morning and it might be 11 o'clock at night when they stop -- you can't hear the television at all, and unless you're sitting there with the remote on the volume control in your hand, you know, and it really is loud enough that you turn up the television or the DVD music, the CDs to full volume, and you can't hear it.
Going outside when they are flying is just useless. If you are out there with friends, family, you can't talk. There is no conversing at all.
Sometimes, I'm embarrassed to say, that the noise, as loud noise will do sometimes to us, I get very hostile. It's very -- there are times when it is so loud that inside you vibrate. Inside your chest you can feel vibrations.
Q. Would you say then that the jet noise is intolerable?
A. When they are doing their stuff, yes. You can't hear the phone ring. The doorbell ring. You can't talk on the phone. And, as I said before, it takes a long time for them -- for the noise to subside. And I know a minute doesn't sound like a long time, but it can be. And then

sometimes they just, the next one comes and then the next one comes.

Q. Can you listen to the radio when the jets fly over or around you?

A. No. No. And I listen to audio books, CDs or books on tape. And, no. No. It -- if they were going to -- if you knew that it wasn't just a couple of them were going to fly over and that was it, but if they -- if it was going to be a day of flying, there would be no sense in getting into a book.

One of the ways I have a little problem, we have cluster mailboxes in the neighborhood, and my mailbox is across the street and down the block. So for me to cross the street, it has to be dead silent so that I can tell if a car is coming. And sometimes I can walk out there and a plane will be coming over. It could be quiet and I think, okay, I can go to the mailbox now. And then here they come. And I -- I have to stand on the street corner going to and coming back until there is absolute silence. And it -- it's just -- it just lasts so long.

Q. When you --

A. And they are so low.

Q. When you are listening to the books on tape, are you wearing head phones?

A. Yes. Yes and no. Sometimes I do, sometimes I

don't. And I do prefer head phones when I listen.
Q. And does the noise interfere with your ability to hear the books on tape when you're wearing head phones?
A. I hear all noises with the head phones, yes. Any noise.
Q. Do you listen to the radio with head phones?
A. No. No.
Q. Would you say that the jet noise makes it impossible for you to listen to the books on tape or listen to the radio?
A. Yes. If I was going to listen to a book.
Q. What kind of head phones do you use when you use them to listen to the books on tape?
A. Just -- they are Sony.
Q. Do they cover your ears entirely?
A. Yes. Yes.
Q. And between 1990 and 2000 when you were living in your home, did you experience the same type of interruptions when you were listening to books on tape or the radio or trying to cross the street?
A. No. I didn't.
Throughout the early '90s, I didn't listen to books on tape or have problems crossing the street. I could do that by myself with no problem.
Could you ask me that question again, please?

**John Shick**

John Shick is a retired Captain in the United States Navy who lives at 912 Duke of Suffolk Drive in Virginia Beach not far from Plaintiffs Mr. and Mrs. Levenson (Exhibit 14B, Shick Deposition. p. 5-7). Captain Shick spent his Navy career in explosive ordinance disposal. (*id.* p. 5).

His home is approximately one and one-half to two miles from Oceana, and he has lived there since the mid-1980s. (*id.* p. 9). In the mid-1980s his home experienced overflights by A-6s and some F-14s. Some flights were directly over his house and some on either side. (*id.* p. 10-11). In the time he has lived in his house he made only one complaint about noise at Oceana and that was a time in approximately the year 2000 when the overflights were very low (*id.* p. 11-12).

Captain Shick was one of the organizing leaders of Citizens Concerned About Jet Noise (CCAJN), which formed in 1997 as the Navy began publicly to prepare the Environmental Impact Statement for the closure of Cecil Field. Prior to the arrival of the F/A-18s and about the time that CCAJN was formed:

> My experience with the overflights were that they were annoying at times, not distressful. I recognized the Navy had a mission, and that the communities that had military in their vicinity had to accommodate some of these annoyances or inconvenience at that time, of the existing – which existed.
>
> The plan to bring an additional 156 planes I thought merited additional consideration and additional study. And that's what my neighbors were echoing, or I was echoing their concerns.

(*id.* p. 21).

He purchased a noise meter and has taken measurements since the arrival of the F/A-18s. Several members of CCAJN bought meters so that they could talk to the Navy and attend public meetings with some reliable information. (*id.* p. 28-29).

The readings that Captain Shick made for the Hornet (the F/A-18 C/D) while they were flying patterns over his house were between 108 and 110 dB. The readings that he made for the Super Hornets (F/A-18 E/F) were in the 120 dBs causing him to conclude that the Super Hornets were either lower or louder. (*id.* p. 30).

Q. Well, let's turn now to after the F-18s arrived and began flying. What was your experience in your home at that point?
A. When they began flying, we did – we recognized a significant difference in the impact, particularly in the evenings when they were doing FCLPs, that it was louder. It was noticeably louder. And the disturbances, particularly at meal time, on the telephone, the TV, it was more disruptive than we had noticed before.
Q. And how is it more disruptive in terms of watching television, for example?
A. Well, you couldn't hear it for longer periods of time and you had to turn the TV up louder if there was something that you wanted to catch. I don't know if the frequency of overflights increased or not from the additional aircraft. It became noticeably more annoying.
Q. And when you say – I think you said it was longer. The overflights, the noise was longer than you had experienced?
A. Right.
Q. What – how is it different?
A. I think because it's louder, the noise starts to bother you further in advance of the plane arriving and longer in advance of the – after it departs an overhead flight, let's say, or one that is next to your property.

(*id.* p. 36-37).

In addition, the F/A-18s caused greater vibrations in his house. (*id.* p. 38).

A. Well, as more and more aircraft, they were located here from Cecil Field, the issue of noise became an increasing problem, both for the community and noticeably in my home and in my neighborhood.
Q. And that began when?
A. Well, the planes didn't all come at once. They didn't pick up 160 planes and move them here. I think the first squadron came I December of '98. I'm not sure. But I know it took 8 to 10 months or maybe longer for all squadrons to relocate to Virginia Beach.
Q. And for you the experience with the aircraft or the annoyance that you dealt with, was it progressively increasing over those months of change?
A. Yes. As more and more planes were sited here, you could – the distinction, the noise level distinction was a distinct increase in noise and annoyance.

(*id*. p. 44-45).

Captain Shick is not a plaintiff in the present litigation. His rationale is that he is drawing his retirement from the government, has a strong loyalty to the Navy and does not want to put himself in a position of having his motives questioned when he spoke for CCAJN (*id.* p. 52).

00001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, )
et al., )
)
Plaintiffs, )
)
v. ) NO. 01-201L
) Judge Victor J. Wolski
THE UNITED STATES OF AMERICA, )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION
OF JOHN C. SHICK
TAKEN ON BEHALF OF THE DEFENDANT

Virginia Beach, Virginia

July 25, 2005

Appearances:

HOFHEIMER/FERREBEE, P.C.
By: KRISTEN D. HOFHEIMER, ESQUIRE
And
QUINN, GORDON & WOLF
By: KIERON QUINN, ESQUIRE
Counsel for the Plaintiffs

00005

for water, a bathroom break, whatever it is, just let me know and we'll be happy to take a break. And if you don't understand any of my questions, please ask me to rephrase the question and I will be happy to do so. Hopefully to a point where you can understand it.
A. Very well.
Q. Okay. If you could please state your name, address, and occupation?
A. My name is John Charles Schick. I live at 912 Duke of Suffolk Drive, Virginia Beach, Virginia, 23454. I am a retired Naval officer.
Q. Are you currently employed or no?
A. No.
Q. Okay. And can you please go through your Navy career, where you were assigned and the positions you held and that kind of thing. From the beginning?
A. From the beginning. Okay.
I went through OCS at Newport, Rhode Island. 1967 I believe was probably the date. My dates may get a little mixed up here. But from OCS I went to diver training school in Key West, Florida, and EOD school in Indian Head, Maryland. Served a tour at Fort Story, Virginia at the EOD GRPLANT at the time.
Q. What does EOD stand for?
A. Explosive ordnance disposal.

Did a ship board tour on the USS TIDEWATER, a destroyer tender. From there I went to Naval Air Station Moffett Field, California as officer in charge of an explosive ordnance disposal attachment. From there I went to postgraduate school at Ohio State.

Q. And what years were you in postgraduate school?

A. 1972 to '74.

From postgraduate school I went back to Fort Story, Virginia for a follow on explosive ordnance disposal tour. Did a period of time in Egypt participating in the Suez Canal clearance. Came back to Fort Story. Completed that tour. From there I went to the Pentagon and served a tour in op 411, which is the ordnance management side of the Chief Naval Operations.

Also served at that same time about an 18-month period of time at the Naval lab at White Oak, Maryland, which is just outside the beltway. From there I went to Seal Beach, California as the ordnance officer, and subsequently as executive officer. Returned as chief staff officer for explosive ordnance disposal group II at Fort Story. Went from that billet to explosive ordnance disposal group I as the commodore, and finished my career as the commanding officer of Naval Weapons Station Earle at Colts Neck, New Jersey.

Q. Naval Weapons Station?

A. Earle, E-a-r-l-e.
Q. And I think I gathered from -- before I go there.
What did you retire as? What rank?
A. An O-6, Navy captain.
Q. I think I gathered from your assignments that you
were at Fort Story three times, three different tours?
A. Yes.
Q. And I think you also said Moffett Field,
California?
A. That's correct.
Q. Is that an air station?
A. Naval Air Station Moffett Field, the home of the
P-3 aircraft. It was the home.
Q. At that time. I understand. When you were there
did any other aircraft besides the P-3 operate out of
Moffett Field?
A. Other aircraft came in, but P-3s were the
predominant aircraft, yes.
Q. And what years were you at Moffett Field?
Approximately, I understand.
A. 1972 to '74, I believe. 1970 to '72, I think.
Q. That's fine.
A. I should have brought my bio.
Q. And then returning to Fort Story, the three
separate times you were stationed, or assigned to Fort

A. It would be northwest.

Q. About roughly how many miles?

A. Four miles. Three to four miles.

Q. And then what other places did you live?

A. Where I live now is 912 Duke of Suffolk Drive.

Q. Yes. And about how far is that from the air station? The way a crow flies?

A. A mile and a half, two -- yes.

Q. In what direction from the air station?

A. North.

Q. Okay. So 504 Kingston Drive, and then -- was that the first time you were stationed at Fort Story you lived there?

A. Yes.

Q. What about the second time?

A. The second time I was stationed I would have been at 912 Duke of Suffolk Drive.

Q. Okay. So you bought the house?

A. Yes.

Q. What year did you buy the 912 Duke of Suffolk home? Approximately?

A. Mid '80s.

Q. Mid '80s?

A. Yes. I will get you some dates if you want.

Q. That's fine.

00010

And you haven't lived anywhere else in the Oceana
area other than Duke of Suffolk since then?
A. Yes. Off and on between the other duty stations,
right, came back to it.
Q. So you bought the house in the mid '80s at some
time. About how long would you have been stationed and
lived in the house that first period of time?
A. Probably about five or six years.
Q. And then you went to another assignment?
A. Right. And then I was gone for the period of 10
years and then came back on my retirement.
Q. So it was five to six year stretch where you
lived there consecutively?
A. Yes.
Q. And then you went to other assignments and came
back to retire?
A. That's right.
Q. And what year did you retire?
A. 19 -- official retirement was October of '97.
Q. And when you lived there in the mid '80s, did you
experience aircraft overflights at that time of your house?
A. Certainly, there were overflights at that time.
Q. And what type of aircraft were those, if you
recall?
A. Probably A-6s, maybe some F-14s. And, of course,

the cats and dogs that people fly.

Q. I understand. Mix and match here and there kind of thing.

And were those flights back in that time frame, the mid '80s time frame, would they have been directly over your house, or a certain distance away from your house?

A. I'm sure that at that time they occurred pretty much as they occur now. Some are directly over the house and some are on either side of the house.

Q. Okay. So it's your recollection that at least the location of the aircraft in terms of flight paths in relation to your house hasn't changed since that time until now?

A. My house hasn't moved, so --

Q. In the flight path?

A. I mean whether the flight paths have changed anywhere else with respect to my house, I don't know. But the ones that are coming over my house come over my house. Those that come near it come near it.

Q. In roughly the same way they did back in the mid '80s?

A. As far as I can recollect.

Q. Did you ever file any noise complaints or anything of that nature?

A. No.

00012

Q. Associated with -- or at all?
A. Sorry. I didn't mean to interrupt you. No, I did not.
Q. And you haven't in recent years either at any time?
A. Since I've been at -- since I have returned after my retirement, I think I have called one time when I thought the overflights were low, I think.
Q. And do you remember when that was?
A. No, I don't.
Q. And just to try to delve into this a little further, was it within the last year?
A. No.
Q. Last two years?
A. No.
Q. Three years?
A. No. I think it was further back. I think it was maybe -- let's see. CCAJN has been in existence for about seven years, seven and a half years. Probably around the two-year point. I personally felt it wasn't necessary for me to call, that calls were being made by other people and my voice was being heard at a different level so I didn't need to call.
Q. I see. So the complaint would have been roughly five to six years ago?

00021

Leading up to before the F-18s arrived, what was
your experience with overflights where you lived, Duke of
Suffolk Drive?
A. My experience with the overflights were that they
were annoying at times, not distressful. I recognized the
Navy had a mission, and that the communities that had
military in their vicinity had to accommodate some of those
annoyances or inconvenience at that time, of the existing --
which existed.
The plan to bring an additional 156 planes I
thought merited additional consideration and additional
study. And that's what my neighbors were echoing, or I was
echoing their concerns.
Q. How did you hear from your neighbors? How did
you have occasion to talk to them about this? Just on the
street?
A. Yes. They are neighbors. We get together. We
used to get together, have a cul-de-sac party every Labor
Day, Memorial Day and 4th of July; and there would be 20, 30
families there.
Q. And what about neighbors, or community people,
residents within the community outside of Wellington Woods.
How did you have occasion to talk to those folks?
A. As we -- as CCAJN grew, we did a certain amount
of outreach to see who else was out there in the community

when I was home and paying attention. Whether it was going all day, I don't know.
Q. I see. And did you ever take any sound readings or anything like that at your house?
A. Have I taken sound readings?
Q. Yes.
A. I have but not of the engine run-ups. Not of the maintenance activity but only the overflights.
Q. And when did you take those sound readings?
A. I took them within the last six years or so.
Q. So since '99 at some time?
A. Yes.
Q. Do you know about what time of the year in '99?
A. No. I couldn't tell you what time of the year.
Q. Try to explore that a little further. What about, winter, summer, spring? Does that narrow it down at all?
A. Well, I took them on several occasions. So it could have been -- and I took them more when I first got the sound meter than I have recently. I have only done it once in, say, the last two or three years.
Q. Do you recall when you got the sound meter?
A. Yes. Probably in '98, '99 time frame.
Q. Okay. And why did you buy the sound meter?
A. We wanted to -- this was part of CCAJN. We

00029

wanted to be able to identify to a reasonable degree of accuracy the sounds that we were hearing in a number of places in the community. Several individuals bought sound meters about the same time. The gentleman who I couldn't remember his name, John Mapp, was the one who donated the money for us to buy the sound meters.
Q. I see. And did you take all of your sound readings at your home or did your take them in other locations?
A. I took them all inside my home or just outside my home.
Q. And about how many times have you done that, sound reading measurements?
A. Oh, maybe over the course of owning the meter, maybe two dozen times.
Q. And have you kept any sort of record of those readings?
A. No.
Q. Is there a reason why you didn't keep sort of a log of that?
A. No. It probably would have been a good idea. I was just trying to get an idea of whether the numbers in the Navy's documents and what we were seeing on the ground were reasonably close.
Q. And what was your conclusion about that?

A. My conclusion was that the Hornet aircraft noise levels were about what I would expect from what the Navy documents, between 107 and 110 decibels. I was surprised -- this is not this case -- but I was surprised that the Super Hornets were louder by more than I expected.

Q. And what was the reading you would get from the Super Hornet?

A. I got readings in the 120s for the Super Hornets. So either they were lower than they should have been and I was closer than their 1,000 feet, or they were louder. You know, that is hard to call.

Q. And what about any other aircraft. Would you take sound readings of any other aircraft besides the Hornet and Super Hornet?

A. F-14s.

Q. And what readings did you get for that?

A. They would probably be in the '90s, someplace in the '90s, mid to high '90s.

Q. Mid to high '90s. And you mentioned altitude. Are you able to estimate what the altitude the aircraft fly over your house, say now for example?

A. As I said, I believe that the -- the Navy's documents that document the Super Hornet noise are probably accurate. I have no reason to believe that the numbers they

00036

Q. I think you said you may have done some voluntary work. Is that what you said, or not?

A. No. I have done CCAJN work which took a lot of time for the first -- particularly, the first six years when I was chairman. No. I have retired. I retired.

Q. Do you play golf?

A. Badly. You could add a very in front of that.

Q. I can relate to that.

A. It's because I didn't try to learn it until after I retired.

Q. Well, let's turn now to after the F-18s arrived and began flying. What was your experience in your home at that point?

A. When they began flying, we did -- we recognized a significant difference in the impact, particularly in the evenings when they were doing FCLPs, that it was louder. It was noticeably louder. And the disturbances, particularly at meal time, on the telephone, the TV, it was more disruptive than we had noticed before.

Q. And how is it more disruptive in terms of watching television, for example?

A. Well, you couldn't hear it for longer periods of time and you had to turn the TV up louder if there was something that you wanted to catch. I don't know if the frequency of overflights increased or not from the

additional aircraft. It became noticeably more annoying.
Q. And when you say -- I think you said it was longer. The overflights, the noise was longer than you had experienced?
A. Right.
Q. What -- how is it different?
A. I think because it's louder, the noise starts to bother you further in advance of the plane arriving and longer in advance of the -- after it departs an overhead flight, let's say, or one that is next to your property.
Q. And I think you described sort of the time interval like for a flight being about 10 to 15 seconds?
A. Yes. Normally. I have never --
Q. Timed it. I understand.
A. Never clocked it.
Q. But just sort of a rough -- to get a comparison, where would you place an F-14, for example, in terms of that, it's annoying, you have to turn up the TV, how long that lasts? And I realize you didn't time it.
A. Yes.
Q. But let's say 10, 15 seconds, how would you compare the F-14 to that?
A. Probably 80 percent as long. I mean duration.
Q. Okay. So if it were 10 seconds, 8 seconds, if it were 15 seconds, 11 or 12?

00038

A. Yes. Something.

Q. Let me ask you this: How do you know -- if you're 8 o'clock at night watching a program or something with your family and a flight goes over, how do you know if it's an F-14 or F-18? If you are in your house, you don't actually look outside and see which plane it is, do you know the difference?

A. It depends on where the plane is. If I knew that both planes were coming right over the house, I probably could make the distinction. If the F-14 came right over the house and the F-18 was 100 yards to my left, I might not notice the difference. Okay?

Q. Okay. Was there anything different about being 20 percent longer in terms of the noise being annoying to you with the F-18 in your house watching the TV, or whatever you are doing with your family, is there anything else about it that's different, that overflight experience, if it is directly over your house, for example, an F-18, as compared to an F-14?

A. You experience greater vibrations in your house. The windows, the -- if you have any -- particularly, if in you have a plate hung on the wall or something. The vibrations on the wall would be more noticeable.

Q. So if the F-18, for example, were -- what did you say, half a mile away or something?

thing. But that is not exactly what you were looking for I don't think. You were looking for more about when the aircraft were coming and that type of thing?
Q. Yes.
A. Those were probably the --
Q. Did you, aside from reading the newspaper, EIS, and those kind of things, and going to community meetings, did your experience with the aircraft themselves, did that change at some point in a fundamental way that was different than what you were experiencing before?
A. Well, as more and more aircraft, they were located here from Cecil Field, the issue of noise became an increasing problem, both for the community and noticeably in my home and in my neighborhood.
Q. And that began when?
A. Well, the planes didn't all come at once. They didn't pick up 160 planes and move them here. I think the first squadron came in December of '98. I'm not sure. But I know it took 8 to 10 months or maybe longer for all the squadrons to relocate to Virginia Beach.
Q. And for you the experience with the aircraft or the annoyance that you dealt with, was it progressively increasing over those months of change?
A. Yes. As more and more planes were sited here, you could -- the distinction, the noise level distinction

00045

was a distinct increase in noise and annoyance.

Q. What about the sort of number of operations that you experienced at your house. You obviously had some overflights directly over your house, you said, and then some, a couple hundred yards on each side. Is that a fair description?

A. Yes. I mean it could go miles. It could go a long way either side.

Q. Has that been roughly the same since you have been there, since '97? I mean, irrespective of the type of aircraft, has the level of operations been the same roughly?

A. I can only speculate. I don't know.

Q. But there at no point did you sit down and say, oh, my gosh, the operations over my house have doubled or tripled, or whatever, have increased significantly? You have never sort of had that kind of thought?

A. I have never made that particular analysis. What analysis I do is I go back to the Navy's information. We stuck very closely to Navy information in anything we did. If the Navy says they were doing 320,000 overflights in this community, I believe that Navy figure. If that was bigger than -- if that figure was bigger than it was prior, then I would have to say there were more overflights.

Q. And why would you believe what the Navy would put out in terms of the numbers and say, 300,000, whatever the

it's maintenance or doing an evolution or something like that. They are in training.

Q. Okay. And would you get home in the evenings at 6, 7 in the evening?

A. Yes.

Q. Something like that?

A. 6 o'clock.

Q. 6 o'clock. Okay.

Are you a plaintiff in this litigation?

A. No.

Q. And why not?

A. When I took up the gauntlet, so to speak, I made a determination that I was not going to put myself in a position of having my motives questioned by asking for -- putting claims on the government for monies when I was drawing my retired salary from the government. So I just kept with that. It's a --

I also felt that I had a loyalty to the Navy. My participation in CCAJN wasn't to hurt the Navy in any way. I had a great career. I loved every minute. Would have stayed longer. But hopefully to make them -- to encourage them to look at the problems of jet noise, accident risk, health and education, and say, yes, we have some serious issues here that have to be addressed. And that's what I took on to do.

**Charles K. Nash**

Charles Nash lives at 2617 Boush Quarter in Virginia Beach where he has lived since 1993. (Exhibit 15B, Nash Deposition. p. 4-5).

After the arrival of the F/A-18s in 1998-1999, Mr. Nash replaced all of the windows in his house with double-pane, gas filled windows, and he also added insulation in the attic. After the arrival of the F/A-18s but prior to the new windows and insulation, he could not talk on the telephone or watch television. The noise becomes most intense when the jets are using runway 14 left and 14 right. When the jets use runway 5 they will pass to the east of his house but when they use runway 14 they come directly overhead at very low altitude. (*id.* p. 9-12).

Mr. Nash was in the Navy from 1963 to 1985. He was a Sensor operator on various patrol aircraft. (*id.* 13-14). He looked at an older AICUZ map when he purchased his home, which depicted his address to be on the outer fringes of the lower noise zone. (*id.* p. 18).

Between 1993 and the fall of 1998 the noise wasn't bad. When the F/A-18s came in the noise became very intrusive and it was at that time that he decided they had to add the windows and the insulation. (*id*. p. 21).

Mr. Nash is a plaintiff in the present litigation, and he is also a member of CCAJN.

The difference between the noise produced by the F-14 and that of the F/A-18 is that the F/A-18 is louder. It is "piercing." "I can't quite describe it. It's – you could have a very loud noise and then you could have one that really hurts. And the F/A-18s hurt." (*id.* p. 40). In comparing the F/A-18 to the A-6 he says that the A-6s are "pretty loud" airplanes but that the F/A-18s are "not just loud, but they are painful." (*id*. p. 41).

00001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, )
et al., )
)
Plaintiffs, )
)
v. ) NO. 01-201L
) Judge Victor J. Wolski
THE UNITED STATES OF AMERICA, )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION
OF CHARLES K. NASH
TAKEN ON BEHALF OF THE DEFENDANT

Virginia Beach, Virginia
January 13, 2006

Appearances:

SHUTTLEWORTH, RULOFF GIORDANO & SWAIN, P.C.
By: CHARLES LUSTIG, ESQUIRE
Counsel for the Plaintiffs

U. S. DEPARTMENT OF JUSTICE
By: KELLE S. ACOCK, ESQUIRE
And
DEPARTMENT OF THE NAVY
COMMANDER NAVY REGION ATLANTIC
By: DOMINICK G. YACONO, ESQUIRE
Counsel for the Defendant

00004

If you need a break at any time please feel free to let me know and we'll take a break.
Can you state your name and address for the record?
A. Charles K. Nash, 2617 Boush Quarter, B-o-u-s-h, in Virginia Beach, Virginia 23452.
Q. And have you ever been involved in a lawsuit or litigation before?
A. No.
Q. Have you ever testified under oath before?
A. Yes.
Q. And when was that?
A. Oh, goodness. Early 1988.
Q. And what was that in relation to?
A. At a service station robbery. I was a witness.
Q. Was that here in Virginia Beach?
A. Yes.
Q. And were you a witness for the prosecution or the defense?
A. The prosecution
Q. Do you remember the outcome of that?
A. The party was guilty.
Q. And did you bring anything with you today?
A. Like?
Q. Documents.

A. Oh, no.
Q. How long have you lived in Virginia Beach?
A. Since 1976.
Q. And since 1976, have you lived at 2617 Boush?
A. No.
Q. Where did you live -- if you could just walk through all your addresses here in Virginia Beach?
A. Okay. Some of them I may not be too accurate on. When I first came down in '76 I was stationed out at Dam Neck and lived in the barracks out there and aboard ship. It was the USS AMERICA then. Then we moved to Beach Walk Drive. I'm trying to think. That was probably about '81. And then in '85, went to Drew Drive. And then I guess in '93 moved into this house in Boush Quarter.
Q. I'm going to show you what we've previously marked as Defendant's Exhibit exhibit 122. And if you could walk through -- you can use my pen -- and locate those four addresses on the map. And we have just been placing a letter there and circling. So our next letter would be L.
A. Okay. Well, when I lived in the barracks, I was out about here.
Q. Okay.
A. Just put an L there?
Q. Yes. If you could just place an L with a circle around it.

A. From what I understand it had been on the market for over a year.
Q. Okay. Was that typical in '93 that houses would stay on the market for about a year?
A. I don't have any idea.
Q. Since you and your wife own the home, have there been any legal actions associated with the property?
A. Not against us.
Q. And has the home been appraised since you purchased it?
A. Yes.
Q. If you could, just tell me the years that it's been appraised and the value?
A. I wish I had my wife here for that one. She keeps track of those sort of things. The latest one was during the last refinance. I believe that was -- I believe appraised it at 480. And that was about two years ago.
Q. In '03 or '04?
A. Yes. About that.
Q. Any other appraisals?
A. I think we did it once before and I can't remember when. It was in between.
Q. In between the purchase and the --
A. Right. Whenever the interest rate was favorable.
Q. Was there an appraisal associated with your

00010

purchase of the property?
A. Yes. I believe there was.
Q. Do you remember the appraised value?
A. I think it appraised at the 260.
Q. 260. Have you made any improvements to the home or the property?
A. Yes.
Q. Could you walk me through those, please?
A. I don't know whether -- well, we've added a bathroom upstairs, remodeled all the bathrooms downstairs, carpet and tile. I guess the major one was ripping all the windows out and putting new ones in back in '99.
Q. What prompted you to put new windows in?
A. The arrival of the F-18s.
Q. What about the arrival of the F/A-18s made you want to put new windows in your home?
A. Well, we had the old single pane windows with storms over the top of them and in reading I found out that you could cut the noise down by putting in these double pane gas filled windows, and so forth, and so that's what we did.
Q. When you refer to your by reading, what did you read that suggested that?
A. Anything I could find on the internet and so forth about noise reduction.
Q. And did the windows in your opinion help to

decrease the noise?
A. Dramatically. Plus we added insulation in the attic wherever we could.
Q. Can you describe what you would perceive the noise to be like before the new windows and the insulation and what you experienced after? You mentioned it dramatically changed.
A. Well, before you couldn't talk on the telephone if they were flying overhead, and now you can still carry on a conversation there. That's the biggest thing.
Q. Are you able to watch television and hear the television?
A. For the most part, yes. Every now and then somebody takes the roof off.
Q. Not literally?
A. No. Well, every now and then we get an overflight that is more than normal. If you look at the pattern and where we're located, we don't normally, because they use this runway most of the time.
Q. And which, just for the record and Mrs. Zahn, you are pointing at Defendant's Exhibit 122?
A. Yes. I'm trying to think what runway that is. They are normally using 5 right or left. And it's not, you know, until they start using 14 left and right. When they use 14 left and right, that's when it gets really obnoxious.

Q. And how do you know which runway the jets are using?

A. Well, when they come in to go to runway 5, they will be cycling around over towards Lynnhaven Mall off to the east of us and when they come in to use runway 14 they come directly overhead.

Q. Directly over your home?

A. At very low altitude.

Q. How often would you say -- you could use percentages of 100 percent -- would you say that the flights are directly over your home as compared to when they were using runway 5?

A. I couldn't tell you, but I'm sure that Oceana could. I mean they can tell you how many times a year they use that runway. I think we are probably in the 10 -- about 10 percent. Maybe less.

Q. 10 percent of?

A. Of their landings when they use that runway. They don't use that very often.

Q. I'm sorry. Which runway are you talking about?

A. The 14. That's very fortunate for us.

Q. What is your current occupation?

A. I'm a combat systems engineer.

Q. I'm sorry. I didn't quite hear you. Combat?

A. No. Combat systems engineer.

00013

Q. Can you explain that?
A. Well, we design combat systems for the Navy, concentrating right now on aircraft carriers.
Q. Who is your employer?
A. Technology Management Group.
Q. And how long have you been with them?
A. Been with them for six years.
Q. Since 2000 or '99?
A. About 2000, yes.
Q. And what did you do before that?
A. The same thing. Just a different company.
Q. And what company was that?
A. That would have been C-Cubed.
Q. Could you spell that?
A. C-Cubed.
Q. How long were you with --
A. C-Cubed. I think five years.
Q. Have you ever been in the military?
A. Yes.
Q. Can you give me the dates that you were in the military and what branch of service?
A. I was in the Navy from 1963 to 1985.
Q. And where were you stationed?
A. All over the place. From '76 until I retired here in the local area on ships and shore stations. You

want the specific ones?
Q. Yes, please.
A. I was on -- let me see. To work backwards from '85, I was at the Navy Manpower Engineering Center from '83 to '85.
Q. Where was that located?
A. That was located in the College Park section of Virginia Beach.
And I was on the USS KING prior to that from '81 on. And from '78 to '81 I was at Dam Neck as an instructor.
Q. What did you teach?
A. I taught the Naval tactical data system. NTDS.
Q. And before that?
A. USS AMERICA from '77 to -- I'd say '78, '79, somewhere in there. And then in '76, I was a student.
Q. And from '63 to '76?
A. In, let's see, from '70 to '76 I was stationed in Brunswick, Maine, VP-10. And in '69 and '70 I was in Patuxent River, Maryland in VP-30. From, I guess '67 through '69, into '69 I was in VP-50. Most of that Vietnam. And part of that in school in Memphis.
Q. I think you mentioned VP 10, 30, and 50. What does that stand for?
A. Patrol squadrons. Fixed wing patrol aircraft.
Q. So were you a pilot of the aircraft?

00018

Q. Did they tell you anything about Oceana before you purchased the property?

A. They showed me a map very similar to this one, and we looked at it and noticed that, if I'm not mistaken, this map is more recent than the one that used to be out there.

Q. This is an AICUZ map, Defendant's exhibit 122 is an AICUZ map, and I believe it's dated 2005.

A. Right. And if I'm not mistaken, the one that used to be out there did not have these outer bands, these last two. The only thing it showed was that we were on the fringe of the only -- you know, there was like a pink area that showed some jet noise and so forth. And we were on the outer side of the thing. There was nothing indicating any of these bands out here as far as I knew.

Q. When you are referring to these bands, the one that is labeled 65 and 70 on Defendant's Exhibit 122?

A. I do not believe those were shown on the map that they showed us. Because they did point out, because you know we were concerned about the noise and the impacts and so forth. But we were outside of it. And --

Q. What were your concerns about the noise when you purchased the property?

A. Well, we had only looked at it a couple of times and if you visit a thing on Sunday, when the Navy is not

00021

the carrier?

A. Every chance you get.

Q. You mentioned earlier that when you installed the windows and the insulation, that after the -- after the new windows and insulation, that you were able to have the conversation for the most part inside your home. Before that time, can you tell me what -- between '93 and I believe you said in '99 when the windows were installed, what noise did you experience at your home? In terms of being able to have a conversation. Could you watch the television?

A. Between '93 and I guess the fall of '98, it wasn't too bad. You'd get an occasional loud A-6 coming over that would interrupt a phone call or television or something, but between '93 and the fall of '98 it wasn't too bad. It was when the F-18s came that the noise level got to the point where you would have to say, wait a minute, there's an airplane going over. That's when we decided to put the windows in. It was -- I guess it really was the spring of '99 that we first decided we had to do something about it, because that's at the end of winter. We open the windows to get some fresh air in at night or something like that. And if they are flying, we close the windows up again, turn the air conditioning back on because we couldn't stand the noise.

Q. How long would you say it was when you noticed

to the same kind of patterns most of the time. Except that you can't really count on them staying in the pattern. I mean, it's just -- if there are six flights come around then there will be the seventh one that comes out of no where. He's obviously way out of where he's supposed to be. I don't know what they are doing.

Q. And in terms of the F-14s that were flying before the F-18s came, when those jets were flying that pattern, would you experience the same thing about not being able to have a conversation, or having to pause during the conversation, or not being able to hear the television?

A. Every now and then. But it's a different -- it's a different noise from the F-14s.

Q. How is it different?

A. The F-18 is not just louder. It's -- I don't know, piercing. I can't quite describe it. It's -- you can have a very loud noise and then you can have one that really hurts. And the F-18s hurt.

Q. Did you remember when the change in the noise occurred?

A. When the airplanes arrived. '99, I guess.

Q. How did you locate Tignor Construction for the windows?

A. They are a friend of ours.

Q. Are you aware of other homes that they have

00041

installed new windows and insulation?

A. They are primarily a new construction business rather than that. I have known Steve's wife for years, so --

Q. We talked earlier about your time on some of the air stations, and I think you may have even mentioned that in '93 when you first moved into the home. Were there any other aircraft, aircraft noise that you were exposed to besides the F-14?

A. When I first moved in?

Q. Yes.

A. Yes. A-6s.

Q. How could you compare the noise from the A-6 to the F-14?

A. A-6s are louder.

Q. Louder than the F-14?

A. Yes. I think. And again it's a different -- it's a different noise.

Q. A different noise?

A. Yes.

Q. How would you compare the A-6 to the F-18?

A. Again, it's a different kind of noise that -- an A-6 is a pretty loud airplane, but these F-18s are not just loud, but they are painful.

Q. What do you mean by painful?

**Jeffrey McCreary**

Mr. McCreary and his wife have lived at 804 Lord Leighton Court in Virginia Beach since 1996. Prior to that time they lived for 20 years in a mobile home community at 2901 Finch Avenue in Virginia Beach close to Oceana. (Exhibit 16B, McCreary Deposition. p. 4).

When they moved into their present residence in 1996 the flight patterns at Oceana kept the aircraft well away from the McCreary's residence – probably more than a mile (*id*. p. 8). Beginning in mid-1997 the aircraft began to fly wider and wider until, in the summer of 1999, the flight patterns often brought the aircraft directly over the McCreary's home. (*id*.. p. 11-12). He can pinpoint the summer of 1999 because he was giving an outdoor party for one of his children who was graduating from school and the children had to come indoors because of the noise of the planes flying directly over their house (*id.* p. 12-13, 18-19).

When he moved into the mobile home community on Finch Avenue in 1976 he worked at Oceana Naval Air Station as an Aviation Administration Maintenance Man, Second Class. He and his wife purchased that mobile home because the price was low and it was close to Oceana where he worked. They simply put up with the high noise. (*id.* p. 27-28).

Mr. and Mrs. McCreary moved to the present address on Lord Leighton Court specifically to get away from the noise and to move to a quiet neighborhood. Before they moved Mr. McCreary researched the neighborhood using the maps in the local library, talked to people in the vicinity of the home that was for sale, and rode their bicycles in the area. (*id.* p. 36, 38-40).

Since the planes began to fly directly over and adjacent to their new home they have replaced all of the windows and despite the fact that they love to garden, they spend less time outside. (*id.* p. 12-13, 44)

While he was in the Navy as an aviation maintenance man, he worked on a number of naval aircraft. He considers the F-14 to be louder than the F-4. (*id*. p. 31-32).

00001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, )
et al., )
Plaintiffs, )
)
v. ) No. 01-201L
)Judge Victor J. Wolski
THE UNITED STATES OF AMERICA, )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION OF

JEFFREY McCREARY

TAKEN ON BEHALF OF THE DEFENDANT

VIRGINIA BEACH, VIRGINIA

JANUARY 13, 2006

Appearances:

HOFHEIMER/FERREBEE, PC
By: JACK E. FERREBEE, ESQUIRE
Counsel for Plaintiffs

U.S. DEPARTMENT OF JUSTICE
By: STEVEN D. BRYANT, ESQUIRE
Counsel for Defendant

00004

you're done responding before I ask another question.
Please also articulate your answers because nods of the head are not going to be reflected when she's typing.
Also, if you need a break at any time, please let me know. And if you don't understand a question that I ask, please ask me to rephrase it and I'll be happy to do so. Okay?
A. Okay.
Q. All right. Please first state your name, address, and occupation.
A. My name is Jeffrey Earl McCreary. I reside at 804 Lord Leighton Court in Virginia Beach, and I'm an information specialist of the public library system at the oceanfront branch.
Q. Okay. And how long have you lived at Lord Leighton Court?
A. Since November of '96.
Q. And where did you live before that?
A. In Cardinal Estates, 2901 Finch Avenue. I moved there in August of 1976.
Q. Okay. How long have you lived in Virginia Beach, since '76?
A. October/November '76.
Q. What is the address that you lived in in

Q. The Learys?

A. I know Mr. Leary, who is a library patron and picks up his books; that's about it.

Q. Michael Leary, or you're just not sure?

A. I think it's Michael. I'm not certain.

Q. We'll go back to that.

And the Ryans?

A. No.

Q. For Michael Leary, have you had any conversations with him other than --

A. No.

Q. -- checking out a book?

A. No. Just exchanging books through the drive-up window.

Q. And it's, again, just a reminder, it's important -- I tend to do this, too, to anticipate what the person is going to ask and go ahead and answer it. Just please be sure to wait until I'm finished with the questions so she can take them down.

A. Okay.

Q. I'd first like to talk about the Lord Leighton Court residence. When you moved in in November of '96, were you aware that Naval Air Station Oceana was in existence?

00011

Q. Okay. And when you said -- I believe you said a few months it started getting closer and closer?

A. Um-hum.

Q. So would that have been sometime in early 1997?

A. Well, we moved in in November of '96. I couldn't pinpoint the exact time, sometime, I would imagine, mid 1997.

Q. Okay.

A. Towards the end of summer.

Q. Sometime in early to mid 1997?

A. Yes.

Q. And how close did they -- did the flights start approaching your house?

A. I didn't keep a record, where whereas they used to be farther away to be able to be within sight, they are now flying closer to where they are flying overhead now.

Q. Directly over your property?

A. Sometimes they fly directly overhead.

Q. And these direct flights over the property, did that start whenever it happened in '97, whether it was the beginning of '97 or the mid part of '97?

00012

A. It was incremental. It was farther away in '97; I would think probably in '98 they were closer; '99 a little closer; and today they are directly over our house.

Q. When did they start flying directly over your house, approximately?

A. I couldn't say the exact time frame. Somewhere in the range of 1999, summer of '99, I would think. I'm trying to think of outdoor activities.

Q. And that's what I was going to ask you is why do you say summer of 1999? Did something happen?

A. We do a lot of gardening. We have boy scout troops. We have outdoor cookouts. We have gatherings, and I remember the summer of '99 is when, now, we would have to go inside because it got too loud, too bothersome.

Q. So did you have some particular boy scout event or barbecue or something that you recall from that summer, that year, that sparks your mind?

A. I think it was an end of school party and my children had some friends over, and they came inside because it was too loud.

Q. And at that time they were flying directly over your house?

00013

A. Overhead, yes.
Q. And the flights had not, as far as you know, had not done that before?
A. Farther away. The same apparent pattern, but never overhead. But just kept getting closer. And I remember summer of '99, now they are flying overhead.
Q. Summer of '99 they started flying overhead on a regular basis?
A. Yes.
Q. Okay. So just to clarify, when you first moved in in '96, a few to several months thereafter, they started -- you saw jets flying farther away, a mile or two, and then they started coming closer in perhaps mid '97?
A. Yes.
Q. And then '98 closer -- was it sort of closer each year?
A. Each year. We tend to not notice because they are there, but we tend to notice when you can't be outside any longer --
Q. Okay.
A. -- when things start to bother you.
Q. Do the flights -- well, the flights back in '97, if you could, on the map here, there's F1 just

A. At the time, yes.
Q. And talk on the phone?
A. If we were not anywhere under the flight pattern. If the other person was under the flight pattern, they would have to stop talking.
Q. I'm sort of --
A. Yes, but on our end of the line we would be fine.
Q. Okay. Tell me now, if you would -- first, in the summer of '99, and you recall an after-school type party, does something stand out in your mind about one of your children's ages at that point or a grade that they were graduating from or something that sort of pinpoints that year?
A. It's just we were active with the scouts. They were in school. They had an after school party. I couldn't remember any particular instance, it's just that they seemed to be outside, which we were glad for.
Q. I guess what I'm trying to do with -- not very articulately, but the focus of the question is how you know it was the summer of '99 versus the summer of 2000 or something of that nature. Was there something about the age of your children or some event that stands out for that summer?

A. Well, our children are two years apart in each age, so most of my -- at the time, I think he was 14; my oldest son did not want his younger brother's friends associating with him, at the time. So they wanted to be outside having their party because they were older.

Q. Okay.

A. And it was middle school/high school situation.

Q. Okay. And that's why --

A. I remember that.

Q. That's one of the reasons you can identify that as '99 versus another year?

A. Yes.

Q. All right. Now, tell me about when those flights started happening at that point, what impact that had on -- let's start with outside.

A. We used to be able to stay outside and garden quite a bit. And as the flights became noisier, it was less of an enjoyable hobby and more of a -- something to be tolerated.

Q. And this is when the flights were directly over the house at that point?

A. Starting to fly, yes.

Q. Okay. And it's the sort of thing that

home all day?
A. She's at work but she gets home about 20 after noon.
Q. What does she do for a living?
A. She's a research biologist for the City.
Q. In turning now to your home in -- Finch Avenue, Cardinal Estates, where it's marked G1, did you experience flight operations when you lived there?
A. Constantly, yes.
Q. Constantly.
A. (Nodding)
Q. And that was -- you lived there from 1976 through when you moved to this house, about 20 years?
A. That's correct.
Q. When you say "constantly," was that everyday all day long?
A. Not all day, on a daily occurrence there was some noise. Whether from flight operations or testings of engines.
Q. And how did that affect your lives in terms of gardening and the other things that you did?
A. We didn't garden. We spent a lot of

time, if it was loud, you left. You went to the movies, you went somewhere else, another part of the city.

Q. So the noise was bothersome, I gather?

A. Bothersome, yes.

Q. Was this a house or an apartment?

A. It was a mobile home place.

Q. Okay.

A. We knew when we moved in where it was, but we were willing to put up with it because of the location and the price.

Q. What was good about the location?

A. Price and location, because I worked at Naval Station Oceana.

Q. Do you still work there?

A. No.

Q. How long did you work at Naval Station Oceana?

A. Two years. Until 1978.

Q. What did you do at the air station?

A. I was an Aviation Administration Maintenance Man, Second Class.

Q. So you were in the Navy?

A. I was stationed in the Navy, yes.

Q. So are you retired?

background --

A. I was a Yeoman for the airplanes.

Q. Yeoman. That's E something?

A. E5.

Q. So like a sergeant. I don't know any of these Navy designations, unfortunately.

Can you tell me why you got out after eight years?

A. I wanted to remain if I could go somewhere else in the world, and they insisted on me staying stateside. I don't care for stateside service. Not enough to do.

Q. And your wife was in Spain?

A. My wife was in Spain.

Q. For those eight years, where were you stationed?

A. In Quonset Point, Rhode Island, about a year, six years in Spain, then a year at Oceana.

Q. What type of aircraft did you work on, I guess?

A. Our squadron had EP-3s and EC-121Ms and A-3s in Spain.

Q. Okay.

A. Then in Oceana the squadron had left for a Med deployment but they were flying F-4s.

Q. F-4 is a pretty loud aircraft; is that
right?

A. Yes, they were.

Q. How would you compare the F-4 to, say,
the F-14 for loudness?

A. F-4 is -- generally were a lot quicker
in flying around, I didn't notice them because of
where I worked. I didn't notice them circling or
anything. They could be loud, but airplanes today
seem to be much louder.

Q. But in terms of the F-4 versus the F-14,
do you have a view as to which is louder out of those
two aircraft?

A. I think the F-14 is much louder today.

Q. The F-14?

A. Or whatever. Any other aircraft that
flies over our house. I don't know the designation of
the aircraft that fly over our house anymore, but the
aircraft today flying over our house seem to be louder
than what I remember the F-4 as being.

Q. And do you remember A-6s at all, did you
have any exposure to them?

A. I remember them flying over the house in
Cardinal Estates.

Q. And the F-14 is the Tom Cat; right?

00036

A. Not usually.

Q. And why the difference?

A. Because we don't expect them to be flying overhead the way they do and it's more of an intrusion now. At the old location on Finch Avenue, it was an accepted norm of the location and where we chose to live because of the proximity to the base. And where we live now, it's not part of the flight pattern. So when the flights do fly overhead, it's more bothersome.

Q. So I guess what I'm trying to figure out then is, are the flights over your house not very regular right now or is it a regular occurrence?

A. As I said before, I'm not always home at the same time so I can only respond to the fact that when they do fly overhead, they are more of a bother because we don't expect them to be flying over our house.

Q. But I thought you said earlier that it's sort of been roughly consistent, the flight activity in the vicinity of your home, since the summer of '99.

A. Consistent for the time that I'm home; yes.

Q. Okay. So in light of that, have you not gotten used to it being that this is what it is?

location than you used to be?

A. Yes.

Q. Okay. And what about your wife; you said she was able to, I think, to also block it out, zone it out in the Cardinal Estates location. And she doesn't have the same ability to do that in the current house?

A. Because of where we lived, we accepted the fact that there was going to be noise. And where we live now, we purposely moved there to get out of the range -- not all noise, but the range.

So now that we're farther out and the jets are flying farther and farther away from the field, closer overhead, I don't think she's willing to try to block anything out because we've moved and the noise has followed us.

Q. So you -- did you target this particular move or house to get away from the jet noise?

A. To get farther away, yes.

Q. Okay. Did you, in doing that, did you look at noise contours on -- what did you do to sort of target that neighborhood to get away from the jet noise?

A. Looking at the local library, the maps and the real estate agents and by knowing where the

noisiest neighborhoods seem to be, we settled in on that part of the area.

Q. You looked at -- what maps did you look at at the library?

A. Just the local area maps. And knowing where the landing patterns and landing fields were at.

Q. So you looked at -- did you look at local area maps that had noise contours on them like this one does?

A. I can't say they had maps of noise contours on them. But looking at the maps, we would know that we would not want to be where we had been. We would not want to be near Fentress Airfield. We wouldn't want to be at the other end of Oceana, in the Oceana Gardens area, because you knew where the noise patterns where, so we tried to avoid those.

Q. And Oceana Gardens is off the end of the runway that runs from 5 to 23, towards the ocean?

A. Yes.

Q. So where the planes would take off?

A. We wanted to avoid buying in those areas.

Q. And Oceana Gardens is sort of right on the cusp of the air station's property; is that right?

00040

A. Yes.

Q. Which is very similar to where you were at Cardinal Estates?

A. We didn't want to trade one bad site for another bad site.

Q. What sort of investigation did you do other than looking at maps to identify the noise environment?

A. Talked to neighbors, talked to real estate agents, our own experience of riding bicycles in the area, knowing what the flight patterns seemed to have been.

Q. Did you talk to neighbors -- what is your neighborhood that you're in now have?

A. Wellington Woods.

Q. Did you go and talk to neighbors in Wellington Woods?

A. Talked to the neighbors in Wellington Woods and they said they don't even notice the airplanes, at the time.

Q. And what neighbors were those that you talked to?

A. Most of the folks on Lord Leighton Court.

Q. So you found a house, it had a "for

00044

sent to Oceana. There was nothing to do there. The squadron was on a Med cruise so they left me there and, as a second class AZ with nothing to do but watch an empty barracks, so I decided to get out. There was nothing to do.

Q. In other words, when you say nothing to do, was it not sort of the social life outside the military?

A. There was no squadron there except a few people to maintain the hangar. I was used to port and starboard duty; I was used to doing things.

Q. Okay.

A. I wanted something to do.

Q. You were bored?

A. No. I just -- there was nothing to do. There was no work. There was no maintenance. There was no paperwork. There was nothing to do, and that's not why I joined the Navy.

Q. I understand.

And, so, when you returned from Spain to Oceana, how long were you assigned at Oceana before you got out?

A. Two years.

Q. Two years.

I'd like to go back to the discussion

**Robert Goodwin**

Robert Goodwin has lived for 29 years at 909 Pillow Drive in Virginia Beach in the Southern Points neighborhood. He spent 20 years on active duty in the Navy, retiring in 1973. He then worked as a civilian with the Navy, retiring again in 1995. (Exhibit 17B, Goodwin Deposition. p. 4-5).

When he purchased his home in 1976 it was quiet and peaceful, and was about three to four miles from Naval Air Station Oceana, which at the time consisted mostly of A-6s and A-4s. (*id.* p. 6-7). In 1976 he had occasional disruptions due to aircraft operations. Those disruptions increased somewhat when the F-14 aircraft was delivered and then more when the F/A-18s came to Oceana. (*id.* p. 9). The noise became "louder and louder" over the period of 1998-1999 as the F/A-18 squadrons moved to Oceana. (*id.* p. 13). He experiences some direct overflights over his home. (*id.* p. 15).

Toward the end of the period of the arrival of the F/A-18s in 1998-1999 he began the process of replacing all of the windows in his home, a project that was finished in 2002. (*id.* p. 25).

In his knowledge of the various Naval aircraft he would rate the A-6 as the least noisy followed by the F-14, then the F-4 with the noisiest being the F/A-18. (*id.* p. 29).

00001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, )
et al., )
)
Plaintiffs, )
)
v. ) NO. 01-201L
) Judge Victor J. Wolski
THE UNITED STATES OF AMERICA, )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION
OF ROBERT GOODWIN
TAKEN ON BEHALF OF THE DEFENDANT

Virginia Beach, Virginia

January 31, 2006

Appearances:

HOFHEIMER/FERREBEE, P.C.
By: JACK E. FERREBEE, ESQUIRE
Counsel for the Plaintiffs

U. S. DEPARTMENT OF JUSTICE
By: KELLE S. ACOCK, ESQUIRE
And
DEPARTMENT OF THE NAVY
COMMANDER NAVY REGION ATLANTIC
By: DOMINICK G. YACONO, ESQUIRE
Counsel for the Defendant

00004

question and I'll be glad to rephrase it.
As we go along in terms of the questions and answers, if at any point before you respond Mr. Ferrebee will interject, say something for the record, please stop, allow Mr. Ferrebee to go forward, state what he needs to state for the record, and then normally he will just say proceed with the answer. Unless he instructs you otherwise.
If at any point in time today you need to stop to use the restroom, get a glass of water, whatever, just let me know and we'll be glad to stop.
Mr. Goodwin, could you please state your full name and your current home address for the record?
A. Robert Goodwin, 909 Pillow Drive, P-i-l-l-o-w, Virginia Beach, Virginia. 23454-2624.
Q. And how long have you been at that home address?
A. Approximately 29 years.
Q. And what residential neighborhood or subdivision is that home located in?
A. Southern Points.
Q. And prior to the home -- prior to your residence at the 909 Pillow Drive did you live elsewhere in Virginia Beach?
A. No.
Q. Where was your address prior to that?
A. Bells Farm in Norfolk.

Q. Do you have any prior military experience?

A. Yes.

Q. Can you please state that from the beginning when you signed up?

A. Military and civilian, 40 years with the U. S. Navy. 20 years enlisted beginning in 1955, ending in 1973.

Q. Okay.

A. And then civil service beginning in '73, '74 through 1995. About half of it with Naval aviation, and the other half with surface warfare and science and technology.

Q. Was your active duty military service -- was that in surface, aviation, sub service?

A. Half and half.

Q. Half and half?

A. Half and half.

Q. Explain -- okay. Explain a little bit -- explain your entire military career record?

A. Initial duty stations included maintenance operation and instructor duties for tactical aircraft and then for administrative aircraft. And then duties on a type commander staff. And surface warfare experience was at the Navy's then two antisubmarine warfare training centers.

Q. So that would include both Norfolk and San Diego?

A. That's correct.

Q. In terms of your military -- experience with

00006

military aviation, can you explain what platforms you are familiar -- that you were working at that time?
A. Very early on, it would have been the AD5N, which was later designated the A1G I believe it was. And the administrative aircraft were T-28s and the SMB, twin engine Beechcraft.
Q. Were you ever stationed at the Naval Air Station here at Oceana or down at Chambers Field in Norfolk?
A. Neither one as a duty station.
Q. In what capacity, though?
A. A lieutenant command aboard NAS Norfolk.
Q. In terms of the military, the Naval Air Station or air fields, which ones were you stationed at?
A. Norfolk and North island.
Q. And the training aircraft was at which place? Norfolk and North Island or just one place?
A. A1G at North Island. The others were at -- I'm sorry. It was another air station. NAS Anacostia in Washington, D. C. That's where the administrative aircraft were and also Naval Air Facilities Andrews. Same aircraft.
Q. When you moved into your current home -- would you say you have been there 30 years approximately? 1975, '76?
A. September '76.
Q. Tell me about, in terms of why did you -- why did

00007

you pick your current home right now? What were --
basically what were the factors that attracted you in
purchasing that home?
A. Number one, it's on a fresh water lake.
Another one I had three kids in private school in
Norfolk and using that tuition money for a house payment
turned out to be a smarter and better idea. Commuting
expenses and all, it was an additional $50 a month expense
to me.
Q. Anything else attracted you to that area?
A. It was quiet, peaceful, located on a two-lane pig
track called Great Neck Road, which has changed quite a bit
since then.
Q. At the time were you married when you purchased
the home?
A. Yes.
Q. Was it a joint decision to purchase that home
between you and your wife?
A. Yes, it was.
Q. Did your wife have -- according to the best of
your knowledge, did your wife have any other factors that
attracted her to the home, or pretty much the same you did?
A. Pretty much the same.
Good schools -- better schools was another.
Q. You mentioned private schools. So in terms of

00009

A. Say that again.

Q. Going back to the '75, '76 time frame, can you recall whether or not you experienced or heard military aviation jets?

A. Yes.

Q. Noise?

A. Yes.

Q. When -- prior to purchasing the home, did you hear the noise from military aviation jets, or was it after you had moved in? Can you recall, was it --

A. It would have been before. We were a frequent visitor to Oceana.

Q. Now, in terms of your personal daily living experience at that home and with relationship to the noise generated by military aircraft, going back to the '76 time frame -- and I'll leave it up to you to determine when it, in your mind, it changed. Describe in terms of what you experience, in terms of your daily life experiences in terms of the impact of military jet noise back then starting in the '76 time frame whenever you believe it changed?

A. Back in the '76 time frame, occasional disruptions, if you will, caused predominantly, during carrier qualifications, CYCLOP operations, telephone conversations difficult to hear. Television difficult to watch. Not only because of the sound but also we didn't

00013

Q. I mean, in other words, let's say, let's take, you know, I can go back to the early '80s, when -- early '80s with conflicts, potential conflicts with Libya, and go, you know, to early 1991 with the first Gulf war, and then with the second Gulf war, would you say that the intensity of what you experienced in terms of the noise at your home -- would you say that it increased during those geopolitical events or pretty much always been the same no matter what?

A. I would have to kind of guess at that. But I would say it's been fairly constant throughout the years.

Q. Okay.

A. Or if not constant at least averaged out. I don't know if I'm saying two different things there or not.

Q. Okay. You mentioned earlier that back in the '76 time frame, your experience in terms of your daily life experience at home in terms of phone conversations, watching television -- in terms of sleeping, were you ever disturbed from sleep, routed out of your sleep?

A. In the early years I would say occasionally. Nice cool night, windows open, hard to sleep.

Q. With the introduction of the F-14s in the '70s, did that change pretty much or was it pretty much the same?

A. I closed the windows and turned on the air conditioning.

Mr. Goodwin is marking -- has marked an X at the approximate location of his home and has placed the letter A right next to it.

BY COMMANDER YACONO:

Q. So in terms of -- now, in terms of what I asked you earlier in terms of other flights directly overhead, or in relation to Oceana or to the sides, how would you describe what you experienced at that home in terms of --

A. Where the flights are?

Q. Yes. From your home?

A. They are coming here, here, and here.

Q. Are you experiencing some direct overflights over your home?

A. Yes, occasionally.

Q. And has that changed over the 30 years at all?

A. No. I don't think so. Not the best of my recollection.

Q. Have you ever seen an Air Installation Compatible Use Zone Map before?

A. Yes.

Q. Specifically -- well, can you tell me when was the first time you ever looked at it?

A. I spent 13 1/2 years on the COMNAVAIRLANT staff. I saw the first one when we made it.

Q. Okay. That would be when? Do you recall

00025

Q. Do you -- it's your personal opinion that the jet noise from the operations of the F-18 Hornets Cs and Ds, has had an impact on the value of your current home?
A. I believe so.
Q. Can you explain why?
A. Sure.
Toward the end of the C and D deliveries and probably the beginning of the E/F deliveries, I found the noise objectionable enough to replace all the windows in my house. I feel that had I not done so I would not have been able to continue to enjoy my house as much, and I'm not sure that I would be able to receive the same price for it in a sale.
Q. You replaced the windows of your home -- do you recall what year did you do that?
A. Yes. Exactly what year. 2002 is when I finished the project. I started in 2000, 2001, and finished in 2002.
Q. Do you believe then the replacement of the windows has helped, somehow dampened the impact of the noise?
A. Oh, yes.
Q. You do believe that?
A. Yes.
Q. Can you describe what kind of windows you had installed?

recorded any -- have you taken or recorded any pictures or images of Naval aircraft flying in or around your home?

A. No.

Q. Have you kept a logbook or anything else, a logbook or some type of personal log or diary in terms of recording times of maybe flight operations, anything else like that?

A. The answer is no.

Q. I notice that with the -- that you have listed down a Goodwin Associates LLC with the State Corporation Commission. Can you tell me what type of business that is?

A. It is no longer in existence.

Q. What type of business was it?

A. Consulting. Marketing military systems in Latin America.

Q. Now, again, this is again to the best of your knowledge. In terms of the noise impacts generated from the engines let's say on the A-6, the F-4, the F-14 and the F-18 Cs and Ds, and then the F-18 Es and Fs, can you rank them in order in terms of noise impacts generated, or how loud they are?

A. The best of my recollection is probably the A-6 the least, F-4 being greater, and afterburner much greater. And then the F/A-18 C/D, and then the E/F.

Q. Where does the F-14 fall in there?

**Louis Figari**

Mr. and Mrs. Figari live at 624 Secotan Road in Virginia Beach where they have lived since December 1991. (Exhibit 18B, Figari Deposition. p. 5).

Mr. Figari is a commercial airline pilot with Continental Airlines, and when he was in the Navy he flew the F-4 Phantom. (*id.* p. 7). After he left active duty in the Navy he stayed in the Naval Reserves for 20 years. (*id.* p. 12).

He built his present home, and before he purchased the lot he observed flight activity nearby. Very seldom did the flights overfly his home site. (*id.* p. 22-23). From the time he moved into the home until the F/A-18s arrived, noise was not a problem. The planes flying out of Oceana prior to that time were the A-6 and F-14. (*id.* p. 24-25).

Mr. Figari's home in the Croatan neighborhood is not supposed to be in a flight pattern, but very occasionally prior to the F/A-18, when there were numerous airplanes in the pattern, a plane would fly over or near his house. (*id.* p. 27-28).

After the arrival of the F/A-18s, the noise has affected his ability to listen to the radio and television and conduct phone conversations. When the F/A-18s fly over and around his house they are flying at between 800 and 1,000 feet. (*id.* p. 29-30).

He describes the current living conditions in his home as tolerable until an F/A-18 flies over. (*id*. p. 37).

00001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, )
et al., )
Plaintiffs, )
)
v. ) No. 01-201L
)Judge Victor J. Wolski
THE UNITED STATES OF AMERICA, )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION OF

LOUIS G. FIGARI

TAKEN ON BEHALF OF THE DEFENDANT

VIRGINIA BEACH, VIRGINIA

MARCH 9, 2006

00005

If at any point in time during this morning you need to take a break, use the restroom, water break, or anything else like that, please let me know and we'll stop.

During the questions and answers this morning, there may come a point in time where Mr. Ferrebee may interject before you respond. If so, please don't say anything; let Mr. Ferrebee go forward. He'll make a comment for the record, then he will either instruct you to go forward and answer the question or not.

For the record, Mr. Figari, can you please state your name and address?

A. Louis G. Figari. I live at 624 Secotan Road, Virginia Beach.

Q. And, Mr. Figari, how long have you lived at that residence?

A. We moved there December '91, I believe it was.

Q. And prior to that address where did you live?

A. Blue Pete Road. I'm not sure of the number.

Q. How long were you at the --

A. Salt Marsh Point.

00007

temporary.

A. Oh, gosh. I want to say less than a year. I can't give you an exact.

Q. So it seems that the Carolina Avenue address was in between the Blue Pete Road and the Secotan from what you're describing?

A. Yes, while the house was being built in Croatan.

Q. Okay. Prior to the Blue Pete Road address, where did you live?

A. Spent some time at -- I want to say at my in-laws when we first moved back down here. 936 Bingham Street. Again, that was approximately a year.

Q. So you're talking about 198 --

A. '84.

Q. And where did you move from when you came down here in 1984?

A. Prior to that I was living on Long Island.

Q. Okay. It's my understanding that you're a commercial airline pilot; correct?

A. Yes.

Q. What airline do you fly?

A. Continental Airlines.

flight tracks, the approaches and departure at Oceana when you were flying back here in the late '70s out of Oceana, can you describe briefly what you recall about what the arrival and the departure flight paths were at that time?

A. Recall in what way?

Q. In terms of -- okay. Let's talk about flying from -- let's say from Fentress, in terms of doing -- completing FCLC practices at Fentress and coming back to Oceana. Can you recall, what were the rules of the road in terms of arrivals and departures from -- let's say Oceana to Fentress?

A. The rules of the road? Basically, it was just a VFR flight.

Q. Do you remember let's say the altitudes in terms of departure from Oceana in terms of what the climb rate was and how far you had to be --

A. I can't recall the exact altitudes. The climb rate was very rapid because the airplane was so light. It was a right turn out, normally, if you were taking off on Runway 5 and head directly to Fentress field.

Q. And on arrivals back to Oceana from Fentress?

A. Again, from what I remember, we'd just

the time.

Q. Okay.

A. They were just putting in the improvements, which was a dirt road.

Q. Okay.

A. And it was all vacant land. And I saw the sign up for the individual who was, I guess, selling the lots, and I just called up, went down, started talking to him and tried to work out a deal.

Q. Okay. Do you recall what you paid for the lot back at that time?

A. No. I would be pulling it out just to give you a number. I can't give it to you now, no.

Q. In terms of the -- you had a home constructed on that -- pretty much did you have -- was it a custom built home to the point where you had enough say as to what you wanted in that home?

A. Yes.

Q. Okay. With regard to the Secotan home, before it was built, at that address, what was -- what was the experience that you at least observed of the tactical jets that were flying in and out of Oceana in terms of the noise impacts, let's say, with regard to Secotan?

A. What home are you talking about?

Q. Secotan.

Before you purchased the lot in terms of what did you observe at that address, at that lot, basically, at that point?

A. Well, you could observe over-flights. Not direct over-flights.

Q. Okay.

A. Seldom over -- directly over-flighting.

Q. Did you talk to any other -- did you talk to any other residents in the Croatan area before you purchased that lot in terms of jet noise or noise impacts?

A. No.

Q. You said while the house was being built you had to live at a temporary address on Carolina Avenue?

A. Carolina Avenue.

Q. How long did the house take to be built, do you recall?

A. Approximately six months.

Q. Was the address at Carolina Avenue an apartment or was that a home?

A. That was a home.

Q. In terms of when you were looking for this temporary residence, were you anywhere particular

in terms of finding something close to where you were building your home or did it really even matter to you? Why did you settle on the Carolina home?

A. Most rentals wanted a full year; I was able to get this for a six-month time frame.

Q. Okay. Let's go -- the six -- the time period that you were living at the Carolina Avenue address, in terms of your noise experience that you felt there, in terms of -- again, let's start with the interior environment; radio and televisions.

A. I don't recall.

Q. Were you raising --

A. I don't recall any noise problems. I don't recall any.

Q. How about telephones where you had to pause your conversations?

A. I don't remember any.

Q. Okay. When you moved into the Secotan Road, I think we said it was approximately -- well, by the time the house was constructed and you got to closing and you moved in, what year was it?

A. December; I've always gotten it confused which year. I believe it was December of '91.

Q. When you were living now at the Secotan address, again, now let's go toward -- again, your

00025

noise experience at that home now.

A. Um-hum.

Q. When you initially moved in, and, basically, from the time you moved in until the present day, describe -- let's go through time periods when you may have observed some noticeable change.

A. Initially, it was not a problem.

Q. Okay.

A. Noise was not a problem there.

Q. Okay. When do you think it changed?

A. I know when it changed; the F-18s started flying.

Q. Okay. So can you estimate what year we're talking about?

A. Oh, gosh. Approximately '88/'89 time frame.

Q. Okay.

A. I'm sorry, '98/'99.

Q. So prior to '98/'99, can you recall what kind of -- what types of jets were pretty much flying in and out of Oceana?

A. A-6 and the F-14.

Q. Okay. Prior to 1998 and 1999 when the F-18s arrived at Oceana -- I'm going to show you something we'll mark as the next exhibit, which is

A. No, I did not.

Q. Okay. There's a couple things in the letter I'd like to ask you about.

From the period that you moved into the home in Secotan, from '91 until about 1998/1999 when you noticed a noticeable difference in the noise impacts, at that point in time, during that period '91 to about '98/'99, did you ever file a noise complaint with Oceana?

A. I can't recall if I did or not.

Q. You mentioned in the letter, However -- and this as of October 31, 1997 -- however, we often have jets stray over when the pattern gets a little busy. What was going on or how often was that -- when you say "often," is this a daily? Was it daily or every other week or --

A. That's kind of hard to say. During busy operations at Oceana Air Station, whenever they were doing that, when planes were flying on a regular basis, it would often happen. If they weren't having any operations, obviously it wasn't happening. I can't tell you if it was every day or every other day.

Q. Well, between '91 and '98, were the jets from in and out of Oceana, were they directly over-flying your home back then during that period of

00028

time? You said occasionally.

A. Again, Oceana -- I mean Croatan is not in the pattern, supposedly not in the pattern. Occasionally, when numerous airplane would show up in the pattern, they would fly over the house.

Q. Okay. When you say -- okay. On those occasions when it was over-flying the house, what were you estimating the altitude to be?

A. Approximately 800 feet.

Q. Okay. The last sentence in that second paragraph, Additionally, the F-18 is by far the noisiest aircraft to ever fly around here.

As of October 31, 1997, you made that statement in the letter. What were you basing that statement on?

A. Articles I had been reading about the airplane.

Q. Articles you were reading from --

A. Well, just in the newspaper.

Q. Were you familiar enough with what type of engines were in the F-18 and thrust ratios?

A. No.

Q. Okay. When you said you noticed it, the noise change in and around your home in Secotan, it was around '98/'99. Can you recall what the occasion

00029

was? Were you indoors? Were you outdoors? Or what time of day was this?

A. No; whenever over-flights would occur, whether I was indoor or outdoor.

Q. Let's go back and try to describe; with the arrival of the F-18 in the '98/'99 time frame, what was -- say the impacts on your indoor, let's say with the radio and television. Can you describe, were there times when you had to raise up the volume --

A. Yes.

Q. -- on the radio and television?

What about with telephone conversations --

A. Yes.

Q. -- you had to stop and pause to let the jets pass by?

A. Yes.

Q. When you were outdoors in '98/'99, can you -- when you were outside, could you tell a noticeable -- could you determine what jets were flying in and around your home, what type of jets were flying?

A. Yes.

Q. With the F-18, what altitude would you say that they were flying in and around your home,

00030

could you recall?

A. About 800. 800 to 1000 feet.

Q. Were they directly over-flying your home at least with the F-18s or were they off to the sides in the distance?

A. It would vary. Sometimes they would be well inside, flying over my previous house probably in Salt Marsh. And other times they would be on the outside of Croatan, over on the east side, sometimes over top.

Q. Obviously -- I should have asked you this question, too: In terms of when you started flying for People Express and then you obviously worked for Continental, when you moved to Virginia Beach in '85 -- say the '91 time frame, your first residence, how often were you at home in Virginia Beach? What was your work schedule back in that time period?

A. Probably, on average, three-and-a-half to four days a week I might be out of town.

Q. In terms of the three to four times a week you were out of town, was there a specific type of schedule -- you were always out of town on weekdays but home on weekends -- or did it vary?

A. It was random. It varied.

00037

A. Not the commissary. I do use the exchange.

Q. How would you describe your current living conditions right now in terms of your home on Secotan Road in terms of noise impacts? Is it tolerable? Intolerable?

A. It's tolerable until an F-18, in particular, flies over.

Q. And this is what I'm trying to figure out; when you say when they fly over, has that become a regular, frequent practice on a daily practice or is it basically the stray jet that you were saying?

A. Again, we are not in the pattern, so, what happens is when one stray jet normally flies over, there's several stray jets that fly over.

Q. Okay.

A. It's not usually just one.

Q. Has that -- does that happen on a daily basis, to the best of your knowledge? When you're home. When you're home.

A. When I'm home, I wouldn't say a daily basis, no.

Q. How often would you say that happens in a week then?

A. Several times.

**Nancy Darling**

Nancy Darling has lived at 909 Goldsboro Avenue in Virginia Beach since 1993. When she purchased the house she believes that the closing documents indicated that she was in the second "noise zone" under AICUZ. (Exhibit 19B, Darling Deposition. p. 4, 10).

Until the F/A-18s arrived in 1998-1999, Ms. Darling had little difficulty with aircraft noise. She had no problem with phone conversations or being able to watch television, or keep her windows open during the day or at night. Her experience changed "significantly and intolerably" in 1998 and 1999 when the eight squadrons of F/A-18s were moved from Cecil Field. (*id.* p. 13-15). After they arrived she could not keep her windows open, have a telephone conversation or conduct business outside of her home. It is virtually impossible to be outside gardening, reading or entertaining people on the patio when the jets are flying. (*id.* p. 15-16).

She believes that the homes in her neighborhood have not appreciated nearly as much as other homes in Virginia Beach outside of the noise zones and does not believe that she could get a comparable house in a quiet area of Virginia Beach for the same price that she could sell hers for. (*id.* p. 22, 26-27).

Sometimes the planes fly directly over her home and sometimes to either the left or the right. (*id.* p. 25).

She has purchased a decibel meter and has recorded 123 dB recently near her home. (*id.* p. 28-29). She also believes that the hearing loss she has suffered is a result of the jet noise. (*id.* p. 31). She is considering selling her house and moving and the only reason she would do so is the jet noise. (*id.* p. 33). Her address puts her close to the property of the test case Plaintiff, Theodore Dingle on Carolina Avenue (*id.* p. 36). Ms. Darling is a Plaintiff in this case.

00001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, )
et al., )
)
Plaintiffs, )
)
v. ) NO. 01-201L
) Judge Victor J. Wolski
THE UNITED STATES OF AMERICA, )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION
OF NANCY DARLING
TAKEN ON BEHALF OF THE DEFENDANT

Virginia Beach, Virginia

February 1, 2006

Appearances:

HOFHEIMER/FERREBEE, P.C.
By: JACK E. FERREBEE, ESQUIRE
Counsel for the Plaintiffs

U. S. DEPARTMENT OF JUSTICE
By: KELLE S. ACOCK, ESQUIRE
And
DEPARTMENT OF THE NAVY
COMMANDER NAVY REGION ATLANTIC
By: DOMINICK G. YACONO, ESQUIRE
Counsel for the Defendant

00004

understand a question, please ask me to rephrase the question or repeat the question.
If at any point in time Mr. Ferrebee interjects, please stop whatever you are saying and let Mr. Ferrebee finish his thoughts, whatever he has to say for the record. And then either he will instruct you to go ahead and answer the question or not to answer the question.
A. Okay.
Q. If at any point in time you need to take a break to use the restroom, to get a cup of water, please let me know and we will take a break.
A. Thank you.
Q. Can you state your full name for the record and your current home address.
A. My name is Nancy Darling. N-a-n-c-y D-a-r-l-i-n-g. And my address is 909 Goldsboro Avenue, Virginia Beach, Virginia 23451.
Q. How long have you lived at that address?
A. A little over 12 years.
Q. And prior to that, the 909 Goldsboro Avenue address, where did you live?
A. I lived at 1644 Bay Point Drive in Virginia Beach, and that is in the Great Neck area.
Q. How long were you living at the 1644 Bay Point Drive address?

00010

A. Yes. I have a contemporary house which is about 2,100 square feet. The property is about 50 by 100. And I love my house. I love it very much. It's been perfect for me in many ways.

Q. Do you have a pool or anything in your back yard?

A. No. My back yard is very small.

Q. Now, when you purchased that house in 1993, did you use a realtor at that time?

A. I did.

Q. Do you recall the name of the realtor?

A. Gail Garrington.

Q. And she is affiliated with what?

A. William E. Wood.

Q. Do you recall how much you paid for that home?

A. $160,000.

Q. Now, when you purchased that home in 1993, did you see an AICUZ map at that point?

A. No, I don't believe I did.

Q. Do you recall AICUZ ever being discussed or being part of the real estate transaction?

A. Yes, because it was part of the disclosure.

Q. Do you recall what was the noise contour that home or property was listed in?

A. I am almost certain but not positive -- I looked for my contract but I couldn't find it -- that I was in the

the 70 to 75 decibel level, or you can't really recall?
A. I don't believe so. I know when the AICUZ maps were redrawn it then put me into a higher -- the highest category. And that was -- that happened after I moved into Goldsboro Avenue.
Q. Okay. When the -- do you recall when the maps were redrawn or anything you can associate as to when the AICUZ map was redrawn?
A. I'm guessing around 1998, but I'm not sure.
Q. When you first moved into the home in 1993, can you describe the impact of military jet noise on your daily life experiences in terms of phone conversations? I'll start off with that.
A. When I first moved in, I didn't have very much of a problem with phone conversations. It was, if anything, it was occasional. And I can't even recall way back then having it be an issue at all that I could not conduct phone conversations or watch TV.
Q. Okay. That was my next question. How about TV?
A. I don't remember it being an issue way back then.
Q. Did you have to raise the volume up, anything like that?
A. Probably occasionally but not anything like today.
Q. How about the ability to keep your windows open

during the daytime or at nighttime?
A. When I first moved in I could, but not now.
Q. Back in 1993?
A. Yes.
Q. How about stay outside and working out in your yard or in the back yard?
A. It was not an issue back then.
Q. When did -- what we just described as your daily life experiences, when do you believe that changed in terms of time?
A. Significantly and intolerably at the time the eight squadrons of Super Hornets were placed in Oceana.
Q. You mentioned Super Hornets. Can you associate a time with this?
A. A couple of years ago I believe. Like two years ago, whenever they came in.
Q. Super Hornets -- you mentioned the words, Super Hornets. Super hornets is a variant of an F/A-18?
A. F/A 14 or 18.
Q. A Hornet is a variant of an F/A-18 E/F, which was introduced in the Virginia Beach last summer?
A. It was noisy prior to that.
Q. Okay. Let's -- you mentioned '98 and '99?
A. Yes.
Q. Okay. An F/A-18 C/D, a Hornet type of jet was

introduced in that area from Cecil Field to Oceana. Is that what you're referring to?
A. Most likely. I'm not going to say I can identify jet planes, but I can identify noise.
Q. So you are saying somewhere in the 1998/1999 time frame is when --
A. Things got louder.
Q. Prior to the arrival of the F-18 Cs and Ds, were you aware that -- were you aware of the introduction of those aircraft or the pending introduction of aircraft into the area?
A. Are you talking about the 8 squadrons that came recently?
Q. Not -- the Cs and Ds, not the recent ones?
A. Was I aware that they were talking about that they were coming?
Q. Yes.
A. Yes, I certainly was.
Q. How were you aware of that?
A. Newspaper, TV, basically. I kept up with it.
Q. Did you attend any of the public hearings, the scope or EPA hearings that are required under the National Policy Act?
A. Yes, I did.
Q. Did you provide any type of public comment?

A. Yes, did.

Q. In writing or verbally?

A. Both.

Q. Can you just briefly provide a quick summary of what your comments were back at that time?

A. Yes. My comments were how the negative impact the loud noise had on my life. My concern of loss of hearing for myself and people who, young children especially who would visit me, the fact that I could not keep my windows open. The fact that I could not have a telephone conversation, and that I conducted business outside of my house and that was extremely difficult to manage. How it was virtually impossible to be outside when the jets were flying to do either gardening, to do reading on my front porch, to entertain people on my back patio. Just can't do it when the jets are flying.

Q. You mentioned the way you just described it was -- again, back at the public hearing time, so we're talking about 1996, 1997 time frame?

A. No. I'm sorry. We're -- I'm talking about the public hearings that were held before the 8 squadrons of Super Hornets came here. It wasn't that long ago. It was a few years ago. I didn't go to any meetings before that.

Q. Did you attend a Navy public scoping hearing in the years 1996 or 1997?

are being able -- their ability to sell or how long they
have been on the market?
A. I can't say I've followed the market that
closely, even in my area. I believe that the homes have appreciated. I don't think that they have appreciated nearly as much as other homes in Virginia Beach have. I clearly don't believe that. In other words, if I had to move out of my house now because of the noise, I don't think I could get a comparable house in another area of Virginia Beach for that same price. I would pay a lot more.
Q. Are one of the factors, at least in that Shadowlawn area, is the proximity you can actually walk to the beach?
A. Exactly. Exactly. And if I did the same thing on the north end, looked for the same exact house on the north end, which is also assessable to the beach I believe I would pay about twice as much.
Q. Is there a homeowners' or a civic association associated with the Shadowlawn area?
A. Yes.
Q. Have you attended any of those meetings at all?
A. No.
Q. Has the issue of the jet noise from the aircraft flying in and out of NAS Oceana ever been a topic of discussion or a topic of a meeting for the civic league

00025

think they aren't flying. But I have heard them flying at 2 a.m. I can't swear that I have heard them after that. And I have heard them start flying as early as 6 a.m., but it always varies.

Q. In terms of estimating the altitude of the jets that are flying in the vicinity of your home, can you estimate what that's about?

A. I can't in any measurement, except that I can say when I'm up in my bedroom, even with the windows closed sometimes it sounds like they are going to come through my window. They fly very close over my house, just over the tree line. Now, I couldn't estimate that in feet.

Q. Are the planes -- are the jets always directly overflying your home?

A. No. Sometimes they are. Sometimes they are a little over to the left. Sometimes they are over to the right.

Q. Have you observed what pattern the planes are flying in and around your home? Are they flying in a straight line? Are they circling? Have you noticed what kind of patter --

A. I don't believe they are circling. They seem to be taking off and going to some destination and then coming back in. They may swerve a little when -- after they pass my home, but I don't know. I wouldn't say they are

00026

circling.

Q. Going back to, as you said, things started to change in terms of the noise environment starting in 1988, 1999?

A. Yes.

Q. Let's -- from that time up to the present has the noise -- has the frequency of the noise, or what you just described, has it varied? Has it been somewhat up and down? Sometimes it's really noisy. Sometimes there's a lull in terms of one year to the next year. Are you talking about --

A. Yes. Yes. Certainly. The fact that when the ships are deployed, the aircraft carriers, it gets less and less frequent. When they are all here and they are all practicing, it increases again.

Q. So you are saying it's episodic?

A. Absolutely.

Q. In terms of -- are you currently a plaintiff in this current litigation against the government?

A. Yes, I am.

Q. Do you believe that the noise that is emanating from military jets that are operating in and out of Oceana has had an impact in terms of a monetary impact on the value of your current home?

A. Yes, I do.

Q. Why is that?

A. Well, as I said before, I believe that homes in other areas of Virginia Beach that are equal to mine in type of housing, square footage and other amenities, will sell for a great deal more money because they are not affected by the loud jet noise.

I also believe that if I ever sat down with a potential owner or a potential buyer and explained to them what the life-style was in my house, I wouldn't have a buyer at all. Nobody would subject themselves to this willingly.

Q. Have you seen homes for sale -- basically, have you seen homes for resale in your neighborhood in the block?

A. Yes, I have.

Q. Have you noticed how long those homes are on the market?

A. No, I haven't. I have noticed in my particular little area that a lot of people have kind of, within the neighborhood, switched houses. Like they went from one to another. People in my area. But, no, I don't know that they stay on the market any longer. I just am not so sure that willing buyers are apprised of the situation.

Q. Do you know anything about the school district for that Shadowlawn neighborhood? Is it a very good school district, average?

A. Oh, I think it's excellent. They have a

beautiful new middle school. My children are well out of school, so that just doesn't affect me, but they are very good schools. In my opinion.

Q. Was that a decision back in 1993 when you moved in?

A. No. My children were grown and in college.

Q. Have you seen any academic studies, any reports from the realtor board or anything that would associate -- that would show the impact, or try to associate the impact or show the value of what would happen to a home that is subjected to jet noise?

A. I haven't seen anything like that.

Q. Have you taken any type of -- have you taken pictures or videotape of any of the military jets that are flying in or around your home?

A. No, I haven't. But I did buy a decibel meter to calculate the decibels of the noise.

Q. When did you do that?

A. About, I would say, April of last year. April of 2005.

Q. In terms of the decibel meter do you keep a log or a diary?

A. I did.

Q. Have you continued to do that until the present day?

00029

A. Yes. Occasionally.

Q. All times of day or night have you been taking those recordings?

A. Yes. Yes. And I have the time.

Q. What have you noticed in terms of being the highest decibel level?

A. I believe it was about 123 decibels.

Q. Do you recall what time of day that was?

A. No. I don't. I believe it was in the daytime.

Q. Do you have an opinion on whether the current AICUZ noise disclosure that is part of now of the real estate transactions in the City of Virginia Beach, do you have an opinion as to whether that's adequate -- is it adequate for a home buyer making a decision, whether that's adequate or not?

A. I do have an opinion and I do not believe it's adequate at all.

Q. Why not?

A. Because they put down the average jet noise as 75 plus. No realtor is going to tell a prospective buyer that in actuality you are being subjected to decibels over 120, which one incident of that can cause permanent hearing loss. I don't -- that is not ever disclosed to anybody. And giving an average daily decibel count of 75 plus is, I believe, a misrepresentation because it takes

right ear. And I haven't been tested in several years. I have an appointment in March to see if I have any further hearing loss.

Q. You believe that hearing loss in your right ear is somewhat attributable to the jet noise?

A. Yes, I do.

Q. Have you ever had your hearing tested?

A. Yes.

Q. Okay. So you do -- you understand what the word baseline means?

A. Yes.

Q. Do you have a baseline in terms of a medical record, a base line for your hearing?

A. I believe so.

Q. When was that done? Do you recall?

A. About four years ago, I believe. I can't give you an exact date.

Q. So it's after 2000?

A. It might have been -- yes. It might have been in 2000 or 2001, the first one.

Q. Do you have a hearing baseline -- to the best of your knowledge --

A. I saw an ear, nose, and throat specialist for my ears, so I presume I have a baseline reading.

Q. Prior to 1998, to the best of your knowledge,

Q. Other than your current home address on Goldsboro, are you familiar -- do you experience jet noise at any other locations in or around Virginia Beach?
A. Occasionally if I visit a friend, but I don't have too many friends that live in jet noise areas. I can't say I never do. But certainly -- nothing at the same level as at my house. It's always less.
Q. Do you have any intention right now of putting your home up for sale on the market?
A. I had -- last year I was -- because of the jet noise I was going to sell my house, but I had some personal things occur in my life that I couldn't go forward with that plan.
Q. What about in the pending future, like this year or --
A. I certainly might.
Q. What are the factors why you would put the house on the market?
A. Why I would? Jet noise. Only jet noise.
Q. Would you stay still in the Virginia Beach area?
A. I doubt it.
Q. And why not?
A. Number one, I don't think I can afford it. I can't afford to have the same thing I have here at this house at another location because it costs more.

00036

event, the noise event?

A. Actually, I did take an audio recording which I brought to the public meeting, which I was told I was not allowed to play. And I don't believe I have that tape any more.

Q. Okay.

A. I was hoping that somebody -- somebody would demonstrate the noise level.

Q. I'm going to read you some names and addresses right now. I'm just going to ask you whether you are familiar with the individual or the address?

A. Okay.

Q. Ms. Eileen Coogan May at 620 Little Neck Road?

A. No.

Q. Mr. and Mrs. William Capps -- Williams Capps, 409 Pallets Road?

A. No.

Q. Theodore Dingle, 912 Carolina Avenue?

A. No.

Q. How far is Carolina Avenue from your home?

A. I'd say about a quarter of a mile.

Q. Are the noise impacts pretty much in your opinion -- noise impacts from military jets from your -- that you experience from your home, would they be pretty much similar you think to Carolina Avenue?

**Carl Helvie**

Carl Helvie is a retired Professor Emeritus at Old Dominion University. For 28 years, until 2000, he lived at 421 Lake Drive in Virginia Beach, (Exhibit 20B, Helvie Deposition. p.3, 5-6). He has a Bachelors Degree in Nursing and a Doctorate in Public Health from the Johns Hopkins School of Public Health.

In December 2000 he moved from his home to Hampton, Virginia solely to get away from the jet noise. (*id.* p. 5, 36). Except for the last two years, his Lake Drive home was quiet and only occasionally did he hear any jets at all. (*id*. p. 13, 17).

During the last two years at Lake Drive, from December 1998 through December 2000, there was a dramatic change. The first time he noticed it was when one of the jets flew directly over his house so low that he thought it was going to hit a tree in his yard. (*id*. p. 21-23). During that two-year period, overflights became common and very intrusive. Inside his house he could not carry on a conversation, talk on the phone or watch television. Similarly he could not concentrate on developing his classes or research papers. (*id*. p. 25-26). Mr. Helvie is a plaintiff in this case.

00001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, )
et al., )
Plaintiffs, )
)
v. ) No. 01-201L
)Judge Victor J. Wolski
THE UNITED STATES OF AMERICA, )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION OF

CARL HELVIE

TAKEN ON BEHALF OF THE DEFENDANT

VIRGINIA BEACH, VIRGINIA

JANUARY 12, 2006

Appearances:

HOFHEIMER/FERREBEE, PC
By: JACK E. FERREBEE, ESQUIRE
Counsel for Plaintiffs

U.S. DEPARTMENT OF JUSTICE
By: STEVEN D. BRYANT, ESQUIRE
Counsel for Defendant

00003

Deposition upon oral examination of CARL HELVIE, taken on behalf of the Defendant, before Kerry E. Zahn, Registered Merit Reporter, Certified Realtime Reporter, a Notary Public for the Commonwealth of Virginia at large, taken pursuant to notice, commencing at 2:30 p.m. on January 12, 2006, at the offices of Hofheimer/Ferrebee, PC, 1060 Laskin Road, Virginia Beach, Virginia.

CARL HELVIE was sworn and deposed on behalf of the Defendant as follows:

EXAMINATION

BY MR. BRYANT:

Q. Good afternoon, Mr. Helvie. My name is Steve Bryant with the Department of Justice. I'm going to be asking some questions today. If, first, you'll state your name, address, and occupation.

A. Carl Helvie. 9 Riley's Way, Hampton, Virginia 23664, Professor Emeritus - Old Dominion University.

Q. Have you ever been deposed before, Mr. Helvie?

A. No.

Q. Sort of the ground rules of it is we

Q. Is it north?

A. Hampton. Well, I live north of Hampton. I live on a little island called Grand View, but it's a Hampton address and it would be -- it's toward Richmond from here, but it's just on the other side of the water.

Q. And what body of water is that?

A. What body of water --

Q. If you don't know --

A. I don't know.

Q. That's fine.

Why did you move to that house?

A. Because of the jet noise.

Q. That's the reason you moved; any other reason?

A. Definitely not. I loved my house.

Q. All right. Let's talk about your previous residence.

A. Okay.

Q. What was that address?

A. That was 421 Lake Drive.

Q. Okay.

A. Virginia Beach 23451.

Q. And how long did you live there?

A. Twenty -- I believe it was 26 or 28

years.

Q. A long time.

A. Right.

Q. Do you recall approximately the year that you moved in? Was it about -- was it about '72 or something?

A. It was, yes, right.

Q. I'm going to ask you -- I have a map here, it's DX 10, and I'm going to ask you to point out for me -- here's a pen -- where 421 Lake Drive is. If you could hold it down so I could see.

A. Let's see. Let's see. I lived right here.

Q. If you could do me a favor and next to that write the letter B and the number 1. B1.

A. (Complying)

Q. Okay. Thank you.

What I'm going to do is write on the bottom of this, and I should have been doing it the whole time, but I'm going to write your name, Helvie, and then B1, and Lake Drive for that address.

So you lived in that location for approximately 28 years or so?

A. Right. Yes.

Q. Did you live anywhere else in Virginia

00013

with jet noise in your house or being outside of your house --

A. No.

Q. -- when you rented that property for a year?

A. No.

Q. When you bought the property at Lake Drive, which was several blocks south of there, you moved in there in 19 --

A. '7 --

Q. -- '72?

A. Right.

Q. And did you experience any flight operations/jet noise when you moved into that house?

A. Occasionally, for the first -- well, the last two years is when it got very, very bad, but before that it was just occasionally. Not very often.

Q. Okay. So the Lake Drive home, when you say you would experience flight operations occasionally, up until --

A. Up until the last couple of years, right.

Q. For that fairly long period of time, 26 years or so?

A. (Nodding)

00017

Q. That 26-year period again before the last two, did you hear flight operations while you were inside your house ever?

A. I don't remember that either.

Q. You don't remember ever being on the phone and having to stop a conversation because of flights?

A. The only thing I remember is that, you know, when I discussed with my neighbors, they always said that we were not in the flight path then. And, so, I didn't have the loud, loud noise right over my house.

Q. Well, when you say you discussed it with your neighbors, I'm inferring that that was in the last two-year period when things changed; is that correct? Or would you have had that conversation that you're now --

A. I think we had a conversation, you know, with neighbors on either side of me before, because the noise was in the distance and they had said we weren't in the flight path.

Q. I see. Okay.

A. I think. But it could have been after, but I think we had had that conversation before.

Q. Do you know what neighbor that would

that 26-year period; is that correct?

A. I don't remember ever seeing them; no.

Q. Okay. Let's now turn to the last two years you were in the house, and you said you -- I believe you sold that house in -- or you moved into the other house in December of 2000?

A. I believe that was when I moved, right.

Q. And did you move directly from the Lake Drive house to the Hampton Roads (sic) home?

A. Yes.

Q. So when you say the last two years, you would be talking December 1998 through December 2000?

A. I'm not definite on the time, you know, but it -- it was a year or two years. It was that last period when I lived in the house, and I -- I said, I've got to get away from this, I can't take it anymore.

Q. Okay. And in that period of time, when did you first notice a change, what event, what happened where you -- how did you first notice it, that something was different?

A. Well, I think maybe the first time I noticed it was when someone flew over and I thought they were going to hit the tree in my front yard

00022

because they were just above the tree when they went over. And you could, you know, see the people in the planes flying over, they were so low and so loud.

Q. And do you remember what time of year this was?

A. No.

Q. And you say there was -- there was a tree in your yard?

A. Two big oak trees in my front yard.

Q. Oak trees.

And did the aircraft graze the top of the trees or just over?

A. They were just over the top of the trees.

Q. And when you say "just over," are we talking a few feet, a hundred feet?

A. Oh, a few feet.

Q. Oh, just over?

A. Right.

Q. Okay. Did the -- did the trees sway and bend as a result of the jets flying over?

A. I don't remember that. I don't remember whether they did or not.

Q. But you remember specifically the aircraft flying --

A. Right.
Q. -- just a few feet over the trees?
A. Right. Right.
Q. But you don't recall what else happened in terms of --
A. No.
Q. -- did any tree limbs fall out of the tree or anything of that nature?
A. Tree limbs fell, but I don't know if they were related to that or if they just fell because it was a very, very old tree.
Q. Well, I mean in terms of at the time that that aircraft was flying --
A. Oh, you mean when it was flying?
Q. Yes.
A. I went in the house, so I don't know.
Q. You didn't observe any tree branches fall or anything of that nature?
A. You mean when the plane was going over? No. Because once I saw the plane right up on top, I went in the house.
Q. Okay. And what did you do next when you went in the house?
A. Held my ears.
Q. Okay.

00025

that had come.

Q. Okay.

A. But it also was obvious that the flight pattern had also changed.

Q. Because these flights were now over your house?

A. Right.

Q. And they weren't before?

A. No.

Q. So if it became a common occurrence for the flights -- for the jets to fly over and sort of graze over the top of that oak -- those two oak trees, I think you said?

A. Right.

Q. -- about how often did you see that happen?

A. I don't know how often they were over the trees, but I know that it was a daily occurrence, the noise, daily and nightly, because there were nights when there was no way to get rid of the noise. And then I would go to school the next day and try to teach, and I was tired.

Q. But sort of going back to the -- so there were other operations that weren't that low --

A. Right.

00026

Q. -- where the trees --

What would be -- in relation to that level, the other operations that you had experienced daily and nightly, what altitude would those flights be?

A. A lot of times I was inside my house, so I didn't go out to see how high they were. I only knew that they were very loud and that the noise was -- you couldn't carry on a conversation. I couldn't talk on the phone. I couldn't catch television. I mean, I couldn't concentrate on developing my classes, or research papers, or anything else. It was just too noisy.

Q. And did you ever -- were you ever outside and observing flights coming over your house?

A. Sometimes very low, right, and sometimes a little bit higher. And there were a couple times when it looked like fire was coming out of the planes and I was afraid it was going to set the ground on fire or catch the house on fire. I don't know what that was.

Q. Okay.

A. And, also, I noticed that my roof got very in dark color, and I don't know if that was from

Q. Okay.

A. The house I sold.

Q. Okay.

A. So there was still value in the house.

Q. Okay. So, then, what do you mean by the loss of the house? What exactly do you mean by that?

A. By the loss of the house, I mean that I was forced out of my house because of jet noise, a house that I had that was paid for, that was secure primarily from hurricanes. I never had a problem with hurricanes. A house that I didn't have house payments because, as I say, it was paid for, I was very comfortable in. I was comfortable in my neighborhood. I knew everyone there. I was President of the civic league. I was very happy in my neighborhood. But I was forced out of the house because of the jet noise. I could not stand the jet noise anymore.

Q. Okay. And in terms of the compensation you're seeking, what would happen if there is to be recovery in this case would be any diminution in value, property value, of the house.

A. What do you mean? I don't know what "diminution" means.

Q. A reduction --

**Bonnie M. Youngberg**

Bonnie Youngberg is a psychotherapist in Virginia Beach. From 1997 through 2002 she lived at 1038 Colonial Meadows Way in Southall Quarter subdivision of Virginia Beach. Ms. Youngberg is a Plaintiff in this case. (Exhibit 21B, Youngberg Deposition. p. 4, 11-12)

After the arrival of the F/A-18s the noise became so upsetting and intrusive that she sold her house. (*id*. p. 18) In fact, the planes were flying so low over her house in Southall Quarter that you could look directly up and see the belly of the plane. (*id*. p. 26).

The planes often flew directly overhead and she could not hear the television or talk on the phone. They often flew at night, later than her bedtime and she would not be able to sleep until they stopped. (*id.* p. 27-28).

She has also seen the planes fly directly overhead when she has been at Lynnhaven Mall. (*id*. p. 47).

One of the things that she remembers specifically about the noise after the F/A-18s arrived was that she and her grandson were at a neighborhood park and when the planes started to go over they had to go back to her home. It was far too loud to be outdoors. Her grandson was about two years old at the time. (*id.* p. 78-79).

00001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, )
et al., )
Plaintiffs, )
)
v. ) No. 01-201L
) Judge Victor J. Wolski
THE UNITED STATES OF AMERICA, )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION OF

BONNIE YOUNGBERG

TAKEN ON BEHALF OF THE DEFENDANT

VIRGINIA BEACH, VIRGINIA

JANUARY 11, 2006

Appearances:

HOFHEIMER/FERREBEE, PC
By: JACK E. FERREBEE, ESQUIRE
Counsel for Plaintiffs

U.S. DEPARTMENT OF JUSTICE
By: STEVEN D. BRYANT, ESQUIRE
Counsel for Defendant

talk over each other. I have a tendency to do that myself, but we'll try to keep a check on that because it's important. If we're both talking at the same time, she can't take down what we're both saying.

The other thing is I'll obviously be asking you questions today. If you don't understand a question I ask or if you need clarification, please let me know.

If you need a break at any time, just let me know. We can take a break, just say the word; I may not think of it, so I'll rely on you to let me know.

Any other questions preliminarily at this point?

A. No.

Q. Okay. If you could just state your name, address, and occupation, please.

A. Bonnie M. Youngberg, 2801 Shearwater Cove, Virginia Beach 23454, and I am a licensed professional counselor.

Q. And what kind of counselor are you?

A. Psychotherapy.

Q. Okay.

A. Mental health.

Q. Any particular specialty for that?

00011

Q. Approximately.

A. -- several years until I bought at South -- Southall Quarter.

Q. Is River Cove still in the Hilltop area?

A. It's all in the same zip code.

Q. All in the same zip code.

A. That's not in Hilltop. River Cove is out by Heron's Cove.

Q. Okay. Laurel Cove and Southall Quarter are both in the Hilltop area?

No?

A. No. I don't think Laurel Cove would be in the Hilltop area; it's on Great Neck Road.

Q. So all of these places are in the same zip code?

A. Yes.

Q. Which ones are in Hilltop?

A. Just Southall Quarter.

Q. Just the current one?

A. That's not my current one.

Q. That's not the current one.

So you were in River Cove, the condo, from '91 to we'll say about '97, roughly?

A. Yes.

00012

Q. And then the Southall Quarter from '97 to --

A. To the early 2000s. I think I moved to my current residence in 2002, but I would have to look up the records to be sure.

Q. That's fair enough.

So your current house, you said that was -- I forgot the -- Sea something? What was name of the road again? The current house.

A. Oh. It's Heron's Cove. I have circled back to Heron's Cove where I rented; now I own.

Q. Now you own there?

A. Um-hum.

Q. Okay. And the Southall Quarter location, what is -- do you remember the name of the street you lived on? Or the address would be even better.

A. Wow. I really don't.

Q. That's fine.

A. I'm sorry.

Q. Now, the condo at River Cove, do you recall the street that it's located on or the address?

A. That's where I live now, at 2801 Shearwater.

Q. 2801 Shearwater. I thought it was

00018

And you moved there, again, that was in 2002, roughly?

A. It might be 2003. This is 2006. I've been there two-and-a-half years.

Q. Okay. Is there a reason why you bought the house -- well, why did you sell the house at Southall Quarter? Why did you move out of that house?

A. It was too noisy.

Q. Because of the jet noise?

A. Yes.

Q. Was that the only reason or were there any other reasons?

A. Well, no. It was a nice place.

Q. How many bedrooms and bathrooms was that, was that property?

A. That was two master bedrooms.

Q. Okay. And bathrooms?

A. Oh. Bathrooms, two-and-a-half.

Q. Okay. And what other amenities about that property led you to buy it initially?

A. It was all brick.

Q. Okay.

A. The neighborhood was a very nice neighborhood of -- shall we say mature adults. Very

00026

louder. They are much louder. So I cannot be outside
when those jets are flying.
Q. And when you say they are much louder, are they much louder than when you were in Southall Quarter or about the same in terms of the loudness?
A. I think they are louder. I think they are louder.
Q. Louder now than they were then?
A. Yes. But they would fly very low over Hilltop, over the Southall Quarter. You could look directly up and see the belly of the plane.
Q. And speaking of that, did you -- can you estimate the altitude of the flights over the Southall Quarter?
A. I would have no way to do that.
Q. Fair enough.
A. Yes.
Q. With that said, if you can answer, are the flights over the -- your current location, do they appear to be the same altitude, you know, irrespective of whether you can judge what the altitude is?
A. No. They are not quite as low to the ground. Okay? So they seem to fly a little bit higher than what I experienced at Southall Quarter. But they are loud and they will drive me in the house,

and I can't hear the TV, and talking on the phone is difficult.

Q. And is that true, the talking on the phone, if the windows are closed --

A. Um-hum.

Q. -- and the doors are closed and everything else?

A. Um-hum.

Q. Do the flights, are they directly over your condo?

A. Sometimes they are, but most of the time they are not directly overhead. They are close enough, I mean, they are just slightly south.

Q. Okay. And when you were in the Southall Quarter location, were those directly over your townhouse?

A. They were often directly overhead.

Q. And when they were directly overhead at that location and you were inside, what was -- what sort of impacts in terms of use of your house --

A. Well, again, you couldn't hear the TV, you couldn't talk on the phone -- you couldn't talk on the phone; you would just have to stop and wait until the plane went over and then you could resume your conversation.

People on the other end of the phone could hear the plane over my townhouse. So it interrupted that.

Sometimes they flew at night, and that was horrible. They would fly way past my bedtime. I would go to bed at 10 or 10:30 and they'd still be flying, and there was no way to get any sleep until they stopped.

Q. And what time would they stop?

A. Well, it would vary a lot. I mean, sometimes they stopped by midnight, sometimes they flew past midnight. It just varied. There was never a consistent pattern that you could predict.

Q. And how often would they fly at night past your bedtime?

A. All I can say is too often. I don't know.

Q. Do you know if it would -- if it were once a month or once every couple months?

A. You know, I tried to keep records for a while, and I think I did keep records for a while, and it was just so unpredictable.

Like one month they flew a lot and I was writing something down frequently, and then another month, you know, just a few times. And, so, the

A. It varies. Here's what I think -- where were we? Okay. I'm over here.

Q. T.

A. Yes.

I think they come out and curve over here. See, this is Chesopian Colony, so they curve over here.

Q. And when you're saying "curve over here," you are sort of doing it --

A. And they go pretty close to N. They go pretty close to N.

Q. And what I'm sort of getting at, though, is have you ever sort of been in that location right around N in your car or wherever where you're seeing them fly directly over you, or are you estimating that that's where they turn based on sitting on your deck?

A. Sitting on my deck, yes.

Q. Okay.

A. Now, they have been directly overhead when I have gone to the Lynnhaven Mall.

Q. And the Lynnhaven Mall is -- I used to know where the Lynnhaven Mall was. Can you identify it?

A. Well, let's see if I can find it.

did it increase and then go back down or did it just steadily increase from when you moved in there?

A. It's never seemed to have gone down. It's so hard to tell you these things because it's episodic, and, so, there are times when it's peaceful and then there are times when it's just very problematic. But, overall, it has increased in both the number of times when I'm disturbed by the jets and the loudness of the jets has certainly increased.

Q. And has it -- has it plateaued now, is it at its highest point, roughly speaking, now or -- or when did it get to the point where it was sort of --

A. I don't know. I'd love to know if it has plateaued.

Q. So I'm gathering from that comment that it's still increasing in your mind?

A. It seems that way, but I don't know if I'm just more sensitized to it and I've had enough, you know, you sort of hit the threshold where you just don't want to do this anymore.

Q. Did anything in particular happen when you moved into the Southall Quarter location where you sort of looked up and said, Wow, this is -- this is different? Did something --

A. Yes. The jets were flying pretty directly overhead, and I remember one time when my grandson was visiting, and I took him to the little neighborhood park. We couldn't be in the park. We had to go back home; it was just -- it was way too loud to be outdoors.

Q. Do you recall how old your grandson was at that time?

A. Well, he was playground-age. He probably would have been maybe two; he's seven now.

Q. Was he your son's son?

A. Yes.

Q. Okay. Congratulations.

So he was -- he was a toddler? He was two years old?

A. Yes. I'm -- you know, we went to the park many times, whenever he would come visit. But there were a couple of times when we had to go back.

Q. Okay. So that would be five years ago, so roughly 2001.

But you moved in there -- hang on.

A. In '97.

Q. -- in '97.

A. That's the one date I'm sure of.

Q. Yes; Thanksgiving.

**Theodore Dingle - Test Case Plaintiff**

Mr. Dingle and his wife Susan purchased their home on 912 Carolina Avenue in the Shadowlawn subdivision of Virginia Beach in 1983. (Exhibit 22B, Dingle Deposition. p. 26-27). Mr. Dingle began a career in the Navy in 1974. (*id.* p. 20). He worked as an active duty bomb disposal specialist. (*id.* p. 5). From 1993 to 2003, Mr. and Mrs. Dingle rented out their home while Mr. Dingle was working for the Navy. (*id.* p. 66-67).

Mr. Dingle lived on the property in the mid-1980s during which time he found the operations from Naval Air Station Oceana to be less frequent than they were following the arrival of the F-18s. (*id.* p. 97). In the early 1990s, Mr. Dingle returned to the home and remembers "intense" operations in the run up to the first Gulf War (*id.* p 97-98). In 1995-1996, Mr. Dingle was enrolled in the Navy's hearing conservation program following work on the flight deck of the USS AMERICA, a period of time Mr. Dingle believes damaged his hearing. (*id.* p. 100). In 2004, Mr. Dingle returned to live on his property (*id.* p. 98). When asked whether he was able to distinguish between the noise during the 1990s and the noise he experiences now, he had the following to say:

> "… a comparison of the intensity from what I remember back in the '90s, when I had good hearing to the absolute perceived increase of intensity that I have now with worse hearing is extremely noticeable. I think that was the track I was getting onto when I mentioned that I have had a decrease in my hearing capabilities. But the intensity is just so much more noticeable now. The intensity, the level of sound."

(*id.* p. 101-102).

****

> "…The intensity of the noise level that I currently experience at my property since moving back -- associated with my property in 2003, having moved back in and stayed in the property in 2004, the intensity -- my perception of the intensity of the noise level has vastly increased from the time that I remember in the early '90s, when I last lived there."

(*id.* p. 137).

00001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, )
et al., )
)
Plaintiffs, )
)
v. ) NO. 01-201L
) Judge Victor J. Wolski
THE UNITED STATES OF AMERICA, )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION
OF THEODORE RANKIN DINGLE
TAKEN ON BEHALF OF THE DEFENDANT

Virginia Beach, Virginia
June 8, 2005

Appearances:

SHUTTLEWORTH, RULOFF GIORDANO & SWAIN, P.C.
By: STEPHEN C. SWAIN, ESQUIRE
Counsel for the Plaintiffs

A. My name is Theodore Rankin Dingle. I live at 912 Carolina Avenue, Virginia Beach.

Q. And what is your occupation?

A. My occupation right now is part-time restaurant bookkeeping. I'm hoping for jobs coming up. I retired from the military about a year ago, and due to some medical joint issues, I sort of got -- the job bypassed me and I'm waiting for other employment.

Q. When you say the job bypassed you, what are you referring to?

A. Well, when -- I was supposed to start when I retired, and in January I had a shoulder operation. In March I had a knee operation. So I was pretty well laid up most of the summer.

Q. And what position was that?

A. It would have been for, I guess, a research analyst of some sort. I have a bomb disposal specialty, and that would have been AMTI, was the company name.

Q. Does AMTI stand for something?

A. AMTI. It's Advanced Maritime Technologies Incorporated, I believe.

Q. And where is that located?

A. It's located in Lynnhaven. It's on Lynnhaven Boulevard.

Q. So basically the Virginia Beach area?

through?

A. E-3, E-4, E-5, E-6, E-7, W2, W3, W4.

Q. And when did your military career end?

A. April 1st of 2004.

Q. So it was roughly 29 years?

A. 30 years and some odd months. I believe that was the -- I became a diver in '75. I entered the Navy, started boot camp in January of '73. Or '74. January of '74.

Q. What assignments did you have? What locations throughout your career?

A. I was --

Q. And the time periods too, please.

A. I was in Norfolk on a tender from '74 until '76.

Q. And if I could interject, what is a tender?

A. A surface tender. It's a ship that repairs other ships. I was part of a dive team there that was located at NOB.

Q. NOB?

A. Naval Operations Base, which is now NAVSEA Norfolk now, I guess.

Q. Okay. And then after 1976?

A. '76 I went to -- I was in training at Indian Head, Maryland. I returned to Fort Story for a brief -- about two years.

I deployed to Sigonella, Sicily for three years.

Q. Leading petty officer. Where were you assigned?
A. The first time I had -- well, Sigonella I was a leading petty officer of the detachment for the last six months I was there. Three to six months.
Q. So in Sigonella --
A. But now cyclical operations in Sigonella were different, I think, than what you're talking about squadron operations. We had squadrons there, but they were mostly off the aircraft. The flight operations at Sigonella were fairly steady. They were not cyclical as I recall.
Q. And how did you come to learn in being that high a rank of the sort of episodic nature?
A. At the training unit I would say when I was at the training unit at Fort Story.
Q. And is Fort Story an air station?
A. No. Fort Story is an Army base, and we had our training there. Now, I was specifically a diving instructor. So if I had been in another department I would have been making, taking teams for training at Oceana specifically, but I wasn't. I was -- I just, from talking to other instructors, I guess would probably be my source.
Q. Let's turn now to when you bought your house.
A. 1984. 1984. I returned from Sigonella in November of '82, December of '82. '83 I was with the training unit. And I believe it was in the spring or early

summer of '84 that we bought the house.
Q. Does August 15, 1983 ring a bell?
A. Well, it does. I mean August -- was it '84? August of '83 would have been -- you know, that could have been the date that we bought the house, '83 -- no. '84 I thought we bought the house.
Q. Just so we get this locked down --
A. I'd have to go back and look at the documents that I gave the law firm, but I think it was '84.
MR. BRYANT: Would you mark this as DX 25.
MR. SWAIN: What are you marking it?
MR. BRYANT: 025. What is called I guess 25, 26, and 27. And she will put the zero in.
A. Now, one of the documents I gave -- if I might say this was the sales agreement. Because I remember being asked these were the people you bought the house from. So I know you have that. So whatever date was on there I guess. But I thought it was in '84.
MR. SWAIN: Here it is. What he's handing you is this one, "For each of the residential properties that are the subject of the test case, please furnish the following information: The date the test plaintiff or plaintiffs acquired title to property." And then for A, you have answered: "August 15, 1993."
MR. BRYANT: 1983, actually.

Q. What sort of military records do you have in those boxes?

A. My evaluations, my fit reps.

Q. Okay.

A. And actually most of the information would be included in those.

Q. Would you keep like leave statements and those kind of things as well?

A. Not so much leave statements, no. Financial records.

Q. Exclusive to the military or all your --

A. Pretty much all I had. Talking about your monthly statements.

Q. So you kept all of that.
Now let's turn to the time period when you -- from 1993 to 2003 when you rented the property?

A. Okay.
What was your first date that you mentioned?

Q. I thought you said 1993 to 2003 you were away?

A. Yes.

Q. So you were renting property?

A. Actually, 2002 is when I moved back into the area, but I lived in a trailer at Fort Story for that period of time, and I was commuting to Little Creek at that time.

Q. But when you first started renting the property,

can you chronologically --

A. First started renting the property, I was overseas. I was over in Sigonella and my wife took care of that. In '93 approximately.

Q. Who did you rent the property through?

A. Through Remax. Dawn Crawford was the agent. Remax. They are located right where the old credit union -- well, you are not from here. But very close to here. Across Independence Boulevard.

Q. I know you have answered this, but when did you and your wife become separated? Was that '92?

A. '92. I mean unofficially separated. I left for Sigonella. She stayed with the kids in Norfolk. Or in Virginia Beach.

Q. When did she move out of the house?

A. When she built the new house, which was in -- I believe she moved in January of '94. You'd have to ask her again. Like I say, I was overseas at this time. I came back to do training. So I was in the area intermittently. But most of the time I was overseas and doing a lot of travel.

Q. And do you recall the name of the tenants that you had in your home?

A. I do, but I couldn't bring them up from memory. I gave -- one name I know I gave to, with the rest of the

00097

A. Pretty much the same.
Q. Now, going back to when you first moved in in the early '80s?
A. Yes. Just a difference of aircraft, I think.
Q. Fair enough. And is the -- is it the same in terms of the percentage that go directly over Carolina, directly over your house, and directly over Rudee Avenue. Is that roughly the same?
A. The distribution of patterns is approximately the same.
Q. That's a much better way to phrase it. What about the number of operations. How would you compare that?
A. When, before -- well, let's see. Before -- I didn't move back in until after the ROOSEVELT. Rephrase the question. Or say the question one more time, please. Just so I'm clear on it.
Q. The number of operations that you experience now versus going back to historically the '80s, and up until --
MR. SWAIN: What part of the '80s?
Q. When you moved into the house?
A. Well, the '80s were less frequent. I remember less frequent operations in the mid '80s.
Q. All right.
A. In the '90s, again, we were there during the

first build up for the first Gulf war. Operations were intense. Flights were frequent. If I were to guess, I would say that probably the tempo of the flight operations was the same from when I was there in '90, '91, to the time I was -- when we were back in the house at that time period, until -- and when I was just back off the ROOSEVELT. Or when I moved back in in 2004.
Q. How would you compare the number of operations when the air station and the rest of the military is ramping up for the Gulf war, that time period, versus now?
A. Oh, right now?
Q. Yes.
A. I would guess that they would probably be a little less. They are still fairly frequent, though. I mean, I'm not sure why but they seem to be fairly frequent at the moment.
Q. And what about in 2004 when you moved in?
A. As I recall, they were still pretty frequent.
Q. Very similar to the Gulf war time period, or --
A. Fairly frequent. You know, now we're getting to really splitting hairs subjectively. It's still pretty frequent. In 2004, I remember thinking to myself they really, it's like ramping up for the war. Now, whether they are still doing it because of what's going on in Iraq I don't know.

exclusively to I think the time was 1991?

A. The time on the flight deck of the AMERICA is my logical conclusion. Because I had very good hearing up to that point in time.

Q. When was the hearing test that discovered the loss?

A. That was in '95, '96 time frame when I was in Sigonella.

Q. And did you have any subsequent hearing tests after that?

A. Several, right. And the most recently being just prior to discharge, or retirement.

Q. And was it -- was there additional loss in the subsequent hearing tests, or was it roughly the same?

A. Not that I know of. I think of it was pretty much constant. It was like a one-time -- because they put me in the hearing conservation program after '95, '96 when they first found out.

Q. So you don't attribute any of your hearing loss to jet operations where you live now?

A. I wouldn't be able to say that, I don't think.

Q. Do you believe that?

A. No. I wouldn't believe it either. I don't think.

Q. How would you compare the level of noise when you

00101
are on the flight deck with that carrier, versus --
A. Carolina Avenue.
Q. -- versus living on Carolina?
A. No comparison. Of course, I'm wearing double hearing protection on the flight deck. And usually if I'm doing anything, I'm doing this.
Q. And with that -- with that in mind, in terms of having hearing protection when you're on the flight deck, because that is the environment, that's the way you're experiencing the noise, I think.
A. That's correct. When I was up on the flight launch.
Q. When you are at Carolina Avenue you are not going to have hearing protection on all the time I don't think?
A. Usually, no. Other than what you can get to your ear, if it's very low.
Q. So with that relative comparison, how would you -- how does one compare to the other?
A. I think you're talking apples and oranges if you compare the flight deck of the carrier and the overflights. But the intensity, a comparison of the intensity from what I remember back in the '90s, when I had good hearing to the absolute perceived increase of intensity that I have now with worse hearing is extremely noticeable. I think that was the track I was getting onto when I mentioned that I

00102

have had a decrease in my hearing capabilities. But the intensity is just so much more noticeable now. The intensity, the level of sound.

MR. BRYANT: This would be a good time to take a break I think.

(Recess)

THE DEPONENT: Craig and Jenny Howlin. H-o-w-l-i-n.

MR. SWAIN: Who is that?

THE DEPONENT: They were people that rented before I moved back in.

BY MR. BRYANT:

Q. Back when your wife decided to buy the house in Chesapeake --

A. Yes.

Q. -- why did she decide to go there with the family instead of the family just staying -- she and the kids, why didn't they just stay in the house?

A. Well, like I said, she was in a wheelchair. Had been since before we were married. Her ultimate goal was to get a house that was truly accessible. Now, the slab was accessible; however, she couldn't get out to the back yard, for instance. So she -- she had always wanted to design a house for, specifically for her mobility issues, and I think that is probably the main motivating reason.

Q. That's what I'm trying to get at. What would you say? What would your response now be?

A. Well, I would have to say from the time that -- my experience of the intensity of noise level prior to the arrival of the F-18s as opposed to when I moved back in in 2003, 2004 when they obviously were there, is vastly different.

Q. Okay. And so you would -- so the sentence that begins, the second sentence begins with "when, " and that full sentence, would you just remove that?

A. I would modify it the way I told you.

Q. So how would it read then?

MR. SWAIN: He told you.

A. Let me see if I can put it in comprehensible English.

Q. We're still on these words; that's why.

A. The intensity of the noise level that I currently experience at my property since moving back -- associated with my property in 2003, having moved back in and stayed in the property in 2004, the intensity -- my perception of the intensity of the noise level has vastly increased from the time that I remember in the early '90s, when I last lived there.

Q. Okay. That part of it I understand.

A. Yes.

**Kimberly Johnson**

Kimberly Johnson lived at 3220 Sugar Creek Drive from 1991 until 2000. (Exhibit 23B, Johnson Deposition. p. 5, 7).

She first became involved with Citizens Concerned About Jet Noise (CCAJN) in 1999 when the newly arrived F/A-18s were so loud at her home that she could not hear on the telephone. Ms. Johnson is a real estate investor and broker and her office was in her home. She was sitting trying to talk to a client and was embarrassed when she had to terminate the call because she could not hear. (*id*. p. 9-10).

She said the noise after the arrival of the F/A-18s in 1998 and 1999 occasioned a "tremendous difference." (*id.* p. 12-13). Prior to that time the jet noise did not bother her. (*id.* p. 13-14). After the F/A-18s arrived there was difficulty performing almost any kind of task outdoors without discomfort. There was difficulty hearing on the telephone, carrying on a conversation, listening to television and trying to get to sleep at night. (*id.* p. 19-20).

As a real estate broker Ms. Johnson is also convinced that the noise has suppressed the sales price of property in noisy areas. (*id.* p. 25-26, 47).

After the arrival of the F/A-18s many more planes flew directly over and close to her house. (*id.* p. 36-37).

Ms. Johnson became Chair of CCAJN in 2003. The CCAJN Board has met on a number of occasions at the Levenson home and she knows from personal experience that the Levenson home suffers loud and frequent noisy overflights. (*id.* p. 59-60). She is convinced that the impact of the F/A-18s effected a taking of her property and that the government has to be held accountable for it. (*id.* p. 126).

00001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, )
)
Plaintiffs, )
)
v. ) NO. 01-201L
) Judge Victor J. Wolski
THE UNITED STATES OF AMERICA, (
)
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION
OF KIMBERLY JOHNSON
TAKEN ON BEHALF OF THE DEFENDANT

Virginia Beach, Virginia

November 30, 2005

Appearances:

HOFHEIMER/FERREBEE, P.C.
By: JACK E. FERREBEE, ESQUIRE
Counsel for the Plaintiffs

00005

understand, even if it is only a part of my question that
you don't understand, please say so and I will rephrase it
until you do understand it. If you do answer my question, I
will assume that you've understood it. Is that fair?
A. Sure.
Q. What did you do to prepare for your deposition
today?
A. I looked up the date at which I purchased my home
in the noise areas. And that was it.
Q. All right. Where do you live right now?
A. I live at 4412 Reynolds Drive. Virginia Beach,
Virginia. 23455.
Q. How long have you lived in that home?
A. Since 2000.
Q. Do you remember the month in 2000?
A. I believe it was in the fall, but I don't
remember the exact month.
Q. Let me back up just a little bit. Could you tell
me about your education after high school?
A. I attended Allegheny College, A-l-l-e-g-h-e-n-y,
in Meadville, Pennsylvania. Meadville is all one word. I
began that directly after high school in 1975. I completed
my degree early in 1978.
Then I also attended Loyola College in Baltimore,
Maryland for my Master's degree in counseling psychology.

And the dates were, I believe, 1981 through '83.
Q. When did you -- go ahead. I am sorry.
A. And then just workshops and various continuing education credits.
I also have a degree, or a license in Virginia to practice real estate, which I obtained in 1999.
Q. When did you first move to the Hampton Roads area?
A. 1986.
Q. And where did you live at that time?
A. Portsmouth, Virginia.
Q. How long did you live in Portsmouth, please?
A. Until 1990.
Q. Where did you go at that point?
A. North end of Virginia Beach. Well, actually no. Before that Hilltop. In 1990 I moved to an apartment, Chase Pointe apartments. Chase with an e on the end and Pointe with a e, in the Hilltop area.
Q. Is that in Virginia Beach?
A. Correct. I believe the name has changed since then.
Q. The name of the apartment complex has changed?
A. Right. I think they switched over to condos right now.
Q. Do you know the name now?

A. No.
Q. What time did you live in those apartments?
A. Until mid 1991.
Q. Then where did you move?
A. 203 85th Street in Virginia Beach at the north end.
Q. How long were you at that location?
A. Until I moved to 3220 Sugar Creek Drive ten years ago today, which is the date that I looked up.
Q. Sugar Creek Drive?
A. Sugar Creek, all one word, Drive.
Q. So from 1991 until 2000?
A. Correct.
Q. All right.
A. Well, let's see. Yes. Well, I sold the property -- I moved out in 2000. That is correct. Yes.
Q. Did you move out of the Sugar Creek Drive residence before you sold it?
A. Yes.
Q. When did you actually sell the Sugar Creek Drive residence?
A. In 2000. Let me see. I sold Sugar Creek, I believe it was 2001, but I don't remember the month.
Q. I have -- I've brought with me here a map. This is one of the recently published joint land use study maps.

know if you did that, but if you could put a number 2 by
that?
A. 2?
Q. Yes, ma'am.
Now, you have marked with respect to the Reynolds Drive an area in Thoroughgood -- is that how it is pronounced -- neighborhood.
A. Yes.
Q. And that's the neighborhood that you live in at the moment?
A. Currently, yes.
Q. In 1999 you lived at the Sugar Creek Drive residence?
A. Yes.
Q. When did you first become involved with Citizens Concerned About Jet Noise?
A. Early in 1999.
Q. Do you recall what the motivating event was, if there was one?
A. Yes.
Q. Can you tell me what that was, please?
A. I was sitting at my desk trying to talk to a client. I could not hear on the telephone. It was embarrassing to me. I had to hang up and tell them that I would call them back later. And I decided in that moment

00010

that if I was not part of the solution I was part of the problem.

Q. Do you work out of your home?

A. Yes.

Q. Did you at that time?

A. Yes.

Q. So the incident that you were describing occurred at your house on Sugar Creek Drive?

A. Correct.

Q. Have you continued to work out of your home since then?

A. Yes.

Q. Which ever home it was at the time, Sugar Creek Drive, Reynolds?

A. Predominantly, yes.

Q. Has CCAJN, as citizens concerned about jet noise is generally called, has CCAJN provided as a group any assistance to this lawsuit?

A. Not to the best of my knowledge.

Q. Do you know a gentleman named Noral, N-o-r-a-l, Stewart. S-t-e-w-a-r-t?

A. No.

Q. Mr. Stewart, as I understand it, is an acoustical consultant.

A. He may be, but I don't know him.

00012

that was in 1999. Do you recall when in 1999?
A. Spring.
Q. Did you know what kind of aircraft it was?
A. I was really ignorant about the aircraft at that time.
Q. Do you have a better understanding of what the different aircraft types are now?
A. Somewhat.
Q. If you saw the various kinds of aircraft that you see flying nearby or overhead would you know the difference?
A. Depending upon the altitude and the situation, you know, with the weather conditions, probably.
Q. Did there come a time after the realignment of the F/A-18 C/D aircraft that you noticed a greater impact from aircraft operations?
A. See, I was hazy as to what jets were flying overhead at the time. All I knew was that new jets were coming to the area and that the quality of the noise had changed.
Q. What do you mean by the quality of the noise?
A. Louder.
Q. So you are referring strictly to the level, I suppose, to some other components of sound?
A. I know that I was hearing a different sound. And the event that occurred was so loud and so frequent that

00013

that was like when I decided that I was going to take a stand.

Q. Did you notice a change from the time that you moved into the Sugar Creek Drive residence, and if so when did you notice that change?

A. The biggest change for me started in the spring of 1999. So whatever those planes were, that's when I noticed there was a tremendous difference.

Q. And that change again was specifically what?

A. Frequency, duration, the decibels themselves, and then the quality of the sounds. There were overflights. Nearby flights. As well as a low intensity sound, a rumbling sound which I've since learned are jet engine work-ups on the ground.

Q. Not from overflights?

A. Correct.

Q. Before you noticed this change in 1999, I think you said the spring of 1999, was your house on Sugar Creek Drive overflown directly by aircraft from the air station?

A. Yes.

Q. How frequently?

A. Daily.

Q. Do you have a sense of how many times a day?

A. I was home primarily early evenings, late afternoons, when I would notice the frequency being the

greatest. But I really didn't pay much attention because the sound didn't bother me, so I didn't look up in the sky and count or care.

Q. I think you indicated they were overflying your house directly. Do you mean straight overhead or --

A. Sometimes, yes.

MR. FERREBEE: Make sure you let him finish the question before you answer.

A. I am sorry.

MR. FERREBEE: It makes it hard for the court reporter. Okay. I am sorry. Go ahead.

BY MR. SMITH:

Q. Are you able to characterize what percentage of the time the planes were flying directly overhead?

A. Not at that time because they really weren't bothering me. So I didn't count or make a log or anything like that.

Q. Do you have any idea what altitude the planes were flying?

A. I could only guess.

Q. What is your guess?

A. It was in the landing pattern. And they would turn to go in on runway, I believe it is 4 or 5 I've since learned, and they would be descending, and so the altitude really varied a great deal.

00019

the obligation on the part of the people described there, including real estate agents for disclosure of what is described there?

A. That's what I have been told.

Q. Is that your understanding as an agent?

A. Yes.

Q. Was that, to your knowledge, the requirement in 1995 when you bought the Sugar Creek Drive residence?

A. Yes.

Q. Does that accurately describe what Ms. Hurst provided by way of disclosure to you and to your husband?

A. I was not married at the time. Yes.

Q. Okay.

What other impacts, if any, did the changes that you have described in 1999 and the impact of operations have on your use of the property at Sugar Creek Drive.

A. There was difficulty performing almost any type of task outdoors without discomfort when they were flying overhead or nearby. Difficulty hearing on the phone. Carrying on a conversation. Listening to the television. And most definitely difficulty trying to get to sleep at night. And waking up in the middle of the night due to aircraft operations.

Q. The difficulty that you had talking on the phone that you just described, for example, now was that true with

the windows of the house open, shut, or did it matter?
A. If they were shut it was still very bad. Open, worse.
Q. Did it have any impact on your ability to conduct activities outside?
A. Yes.
Q. What was the nature of that impact?
A. I used to garden outdoors and could spend the whole day gardening, for example, on a weekend, or a weekday, for that matter, and not have any discomfort whatsoever. But after the influx from Cecil, I really couldn't spend much time in my yard at all.
Q. When you say the influx from Cecil, what are you describing?
A. Jets that they brought up from Cecil.
Q. So if I say the realignment of the F/A-18 C/D aircraft, and you say the influx from Cecil, we are talking about the same thing?
A. I believe so.
Q. What motivated you to move out of that property on Sugar Creek Drive?
A. Sleep deprivation predominantly. And overall general physical difficulties with the jet noise that we were experiencing.
Q. Was the sleep deprivation true both for you and

A. I'm not sure from that property. We have overflights where we live and I have retained those, yes.
Q. Do you know if your husband has any of whatever kind of records he may have kept for the Sugar Creek Drive property?
A. No.
Q. No, you don't know?
A. Correct.
Q. I believe you said that you sold that property in 2001?
A. Yes.
Q. Do you recall how much you paid for the property in the first place?
A. Eighty nine nine.
Q. Okay. And how much did you sell it for?
A. $95,000.
Q. Do you believe that the operations of the F/A-18 C/D aircraft at Oceana had an impact on the sales price of the property?
A. Yes.
Q. What do you think the impact was?
A. I think that a property of equal square footage, composition, year built, et cetera, would have yielded more money in a different part of the city further away from Oceana in a different noise zone.

00026

Q. Do you think though that the arrival of the aircraft F/A-18 C/D aircraft, that event, caused an impact to the sales price?
A. Yes.
Q. Why do you believe that?
A. Because the noise became much more intolerable. And as with anything, when you are given two choices, noise or no noise, all of the other things being equal, you are going to get a better price for your home.
Q. Did you sell the property yourself, or did you have an agent do it?
A. I had it listed in the Multiple Listing Service and I was the listing agent.
Q. So you sold the property yourself?
A. Correct.
Q. What did you ask as a price for it?
A. The $95,000.
Q. So you didn't attempt to market it for higher than that?
A. Actually I may have put $98,000. I don't recall. I would have to look at my records.
Q. How long was the property on the market?
A. I don't remember. I would say less than a month.
Q. From your experience as an agent in the area, is that typical?

00036

who specialize in that area?
A. I do not specialize in an area.
Q. Do other agents specialize in that geographic area?
A. I don't know.
Q. Getting back to the Torres to whom you sold the Sugar Creek Drive property, you said earlier that they were not -- my word not yours -- deterred by your description of the impact of operations. My question is whether that reaction, in your experience as an agent in this area, whether it is personally or not, is typical? That is people knew about the potential impact and bought the property anyway?
A. I have heard of instances where this has occurred.
Q. Does that occur frequently?
A. I don't know.
Q. After the realignment of the F/A-18 C/D aircraft did you notice any other changes from what had occurred prior to that in terms of aircraft operations other than what you have already described?
A. Yes.
Q. Tell me about that, please?
A. Greater variation in the pattern. More to the left. More to the right. More over the house. Lower.

That sort of thing.

Q. You mean the F/A-18 C/D aircraft were more varied in the way they flew than the aircraft that preceded them?

A. I believe the pilots that were flying them created situations for greater variance, whatever it was.

Q. But was that true with respect to the F/A-18 C/D aircraft, or do you know?

A. I don't know.

Q. At the time that you were living in Sugar Creek Drive, did you, if an F-14 had flown nearby, would you have known the difference between that or an F/A-18 C/D aircraft?

A. When I first lived there it was only F-14s. And then when the other jets started flying I could hear a noticeable difference.

Q. I am talking about the pattern variation that you described?

A. It appeared to me that the F-14s would fly a tighter pattern than the other aircraft.

Q. Is this an observation that you made while you were living at that property, Sugar Creek Road?

A. Yes.

Q. Did you, therefore, recognize the difference looking at the airplane between an F-14 and some other sort of airplane?

A. Yes.

00047

yourself?

A. I have done a rudimentary analysis of some of the neighborhoods that I know to have similar types of construction and were built about the same time. Similar to the home that I lived in.

Q. On Sugar Creek Drive?

A. Sugar Creek Drive versus another part of the city further away in the 65 and under DB, and I was able to quantify to my own satisfaction there was a pretty good price variation.

Q. Price variation in what?

A. In that the homes closer to Oceana of similar size, age and construction, were selling for less than their counterparts outside of the 65 DB noise zone.

Q. Do you know if those properties sold for less before the C/D aircraft arrived, all things being equal?

A. I wasn't able to log into the computer far back enough in order to obtain that information.

Q. The rudimentary analysis --

A. Yes.

Q. -- that you described, do you still have that?

A. I didn't write that down anywhere. I went into the computer, pulled the information, looked at it and satisfied my curiosity. It is not like I had a lot of time to be doing that sort of thing.

00059

Q. Did you know the Levinsons before then at all?
A. No.
Q. Are you the chair of CCAJN right now?
A. Yes.
Q. How long have you been the chair of CCAJN?
A. Since John Shick stepped down. I would have to go back to my records. It was in the fall. It seems like it has been a very long time.
Q. Fall of which year?
A. I want to say '03, but I am not sure. It has been awhile.
Q. Is Mr. Levinson an officer in CCAJN?
A. No.
Q. Was he?
A. I don't think so.
Q. He has never been, to your knowledge?
A. He is a board member and a spokesperson.
Q. Why were the CCAJN meetings in the Levinson home as opposed to some other location?
A. Convenience.
Q. In terms of what?
A. Location.
Q. You mean it was convenient for the members?
A. Yes.
Q. A central location?

00060

A. Correct.
Q. Could you please just indicate for me on the map where the Levinson home is?
A. They live in Great Neck Meadows, which is east of Great Neck Road, west of First Colonial Road, and very close to Old Donation Road.
Q. So in the, at least generally in the neighborhood on this map that's called Great Neck Meadows?
A. Yes.
Q. North of the air station?
A. Yes.
Q. What, if anything, do you remember about F/A-18 C/D aircraft operations with respect to that property?
A. Low, loud and frequent.
Q. Are they underneath the touch and go pattern?
A. I believe they are in the flight pattern.
Q. Are they underneath the touch and go pattern in particular, if you know?
A. I believe so.
Q. Is that -- was your experience of F/A-18 C/D aircraft operations at that house different in any way from your experience at the Sugar Creek Drive residence that you lived in?
A. Yes.
Q. How so?

when you first became involved in this lawsuit, and as I recall you didn't remember.

Different question now. Why did you get involved in the lawsuit? And again I am not asking about any communications you had with your lawyer. I am asking about your particular motivation.

A. I became involved in this lawsuit because I believe a taking has occurred. I believe that the level of, the capacity to be able to sleep and enjoy the quiet of your home, let alone be able to go outside, is something that should remain close to constant. Within a range, let's say. But that when it becomes so detrimental to -- when it became so detrimental to my health and my life-style that these jets were flying over my home and around my home with the frequency and intensity and the noise levels that were being created, that it was incompatible with human life, that it is so bad and so detrimental that somebody needs to be held accountable for it, and that if this is what it takes, then so be it.

Q. Have you had any health problems related to operations of the F/A-18 C/D aircraft at Oceana?

A. I was having trouble sleeping at night and I was very agitated. I went outside my home one day when I couldn't hear in my home to conduct business, and when I walked outside a jet flew over so low and so loud that I



# FINAL ENVIRONMENTAL IMPACT STATEMENT

## Realignment of F/A-18 Aircraft and Operational Functions from Naval Air Station (NAS) Cecil Field, Florida, to Other East Coast Installations

DEPARTMENT OF THE NAVY · UNITED STATES OF AMERICA

# Executive Summary

## Name of Action

The action evaluated in this environmental impact statement (EIS) is the realignment of Atlantic Fleet F/A-18 fleet and FRS aircraft (i.e., F/A-18 fleet squadrons and the F/A-18 Fleet Replacement Squadron [FRS]) and operational functions from Naval Air Station (NAS) Cecil Field to other Navy and Marine Corps air stations on the east coast of the United States.

The action is an administrative action, undertaken by the U.S. Department of the Navy (DoN, which includes the Navy and Marine Corps) to accommodate the realignment mandated by the U.S. Department of Defense's (DoD's) base closure and realignment process.

This EIS was prepared in accordance with the National Environmental Policy Act (NEPA) of 1969, the Council on Environmental Quality (CEQ) regulations implementing NEPA (40 Code of Federal Regulations [CFR] 1500-1508), Chief of Naval Operations Instruction (OPNAVINST) 5090.1B - Chapter 2, and the Defense Base Closure and Realignment Act (DBCRA) of 1990 (P.L. 101-510, Title XXIX).

## Description of the Proposed Action

Based on the DoD's assessment of its military force structure, NAS Cecil Field is to be closed and its critical functions and assets transferred to other installations with excess capacity and support infrastructure. The F/A-18 fleet squadrons and FRS from NAS Cecil Field total 180 aircraft (11 squadrons of 12 aircraft each [132 total aircraft] and an FRS of 48 aircraft), and are supported by 4,200 military and civilian personnel. Installations that are being considered in five separate alternative realignment scenarios (ARSs) are: NAS Oceana, Virginia; Marine Corps Air Station (MCAS) Beaufort, South Carolina; and MCAS Cherry Point, North Carolina.

The proposed action for each ARS includes an operational scenario to accommodate F/A-18 squadrons in existing regional airspace structures, construction of new facilities, and

renovation of existing facilities in order to accommodate the Atlantic Fleet F/A-18 squadrons and support personnel.

## Alternatives

The 1993 Defense Closure and Realignment (BRAC) Commission directed the closure of NAS Cecil Field, Florida, and realigned its aircraft and personnel to MCAS Cherry Point, North Carolina, and MCAS Beaufort, South Carolina, and NAS Oceana, Virginia. The 1995 BRAC Commission redirected the realignment of NAS Cecil Field aircraft to "*...other naval air stations, primarily [NAS] Oceana; [MCAS] Beaufort, South Carolina; [NAS] Jacksonville, Florida; [NAS] Atlanta, Georgia; or other Navy and Marine Corps Air Stations with the necessary capacity and support infrastructure.*" This change was based on the Commission's intent to retain only that infrastructure necessary to support the Department of Defense's (DoD's) Force Structure Plan without impeding operational flexibility for deployment of that force. The overall goal was to optimize use of existing infrastructure, thereby reducing additional investment and ensuring that taxpayer dollars are spent in the most efficient way possible. The 1995 BRAC findings specifically stated that the Commission's intention was to avoid the substantial construction at MCAS Cherry Point required to support relocating F/A-18 aircraft under the 1993 BRAC mandates.

The DoN conducted a multi-stage screening process to identify reasonable and feasible alternatives that would complete the realignment in a manner consistent with the 1995 BRAC Commission recommendations, which have the force and effect of law. Installations were screened for necessary capacity and support infrastructure as well as the installation's ability to meet operations criteria. Specifically, this screening process consisted of a capacity analysis, an infrastructure analysis, and an operational readiness analysis. One-time costs and life-cycle costs necessary to implement the relocation of F/A-18 fleet and FRS aircraft were also considered. Numerous alternative basing options were examined; however, only five were determined to be reasonable and feasible alternatives. These five reasonable and feasible alternatives were given a full comparative analysis, and economic, environmental, and social concerns were evaluated.

The capacity analysis paralleled that of the BRAC process by using available hangar capacity, measured in "hangar modules", as the primary indicator of whether existing capacity was present at a particular installation. Again parallel to the BRAC process, necessary support infrastructure at each installation was examined and issues such as runway capacity, maintenance and training infrastructure, and other support facilities were considered. Finally,

the operational analysis examined issues such as access to training ranges, airspace availability, Field Carrier Landing Practice (FCLP) requirements, safety, effects on combat readiness, and implementation life-cycle costs.

The DoN used Naval Facilities Engineering Command (NAVFAC) P-80 guidelines (P-80), the common standard for construction at Navy and Marine Corps air stations, to evaluate capacity and infrastructure. This publication provides planning guidance for determining the requirements for shore-based facilities needed to support Navy and Marine Corps operations. In addition, these guidelines are used to evaluate the adequacy of existing facilities, identify facility deficiencies or excesses, and validate construction project submittals. Thus, P-80 is the planning guidance that sets general standards for construction of Navy and Marine Corps facility infrastructure. Identification and application of these guidelines enabled the DoN to identify potential receiving installations and determine those ARSs considered reasonable for further comparison.

All ARSs had to be operationally and functionally acceptable. Additionally, all ARSs had to be consistent with the BRAC recommendation to utilize excess capacity and infrastructure at potential receiving installations. The following basic considerations, in addition to those discussed in Section 2.1, were used to develop the ARSs:

- At least one ARS had to consider siting all F/A-18 fleet and FRS aircraft at one installation to replace to the greatest extent practicable the operational and logistical characteristics currently experienced with all Atlantic Fleet F/A-18 fleet and FRS aircraft stationed at NAS Cecil Field. From operations, logistics support, and life-cycle cost perspectives, single-siting all F/A-18 aircraft is preferred to siting aircraft in multiple locations. Multiple locations complicate required logistics and degrades synergism (i.e., interrelationships between various functions associated with training, deployment, and maintenance of Navy F/A-18 fleet and FRS squadrons).

- An ARS consisting of splitting Atlantic Fleet F/A-18 fleet and FRS assets among more than two locations was considered unacceptable because of operational constraints and high support costs associated with maintaining and operating Navy F/A-18 assets in multiple locations. Further, it would sacrifice the readiness levels and effectiveness of training for Navy F/A-18 pilots and support personnel. The Navy's current authorized personnel levels, and the funding ceilings for such levels, as well as the Navy's inventory of F/A-18 parts and equipment, would not be able to fully support such a separation. The technical, logistical, and economic problems resulting from the dispersal of F/A-18 aircraft to multiple receiving sites were considered so undesirable that they precluded relocation of the Atlantic Fleet Navy F/A-18 assets to more than two locations.

- Consideration had to be given to the implications of "carrier air wing" configurations, which are subsets of the overall Atlantic Fleet strike/fighter wing consisting of groupings of aircraft squadrons to facilitate deployment with aircraft carriers. A normal carrier air wing includes two or three Navy F/A-18 squadrons, depending on the availability of other fighter/attack aircraft (e.g., Navy F-14s, Marine Corps F/A-18s). Therefore, ARSs could not include the relocation of only one F/A-18 fleet squadron to a particular location.

- An ARS consisting of splitting the F/A-18 FRS from the majority of Navy fleet squadrons was considered unacceptable because of specific training, logistical, and maintenance interrelationships between the FRS and fleet squadrons. Within the past 30 years, the FRS has never been separated from Navy operational squadrons of the same type/model/series aircraft, except for short-term training detachments. Separating the FRS from the majority of the Navy fleet squadrons would detract significantly from the ability of the FRS and fleet squadrons to support each other, which has proven to be of great value. For example, the practice of loaning aircraft or parts to provide the needed capability for deploying squadrons would be rendered very costly and difficult. Maintenance parts, equipment, and personnel do not currently exist in the Navy's inventory to fully support such a separation. Squadron training requires use of the two-seat version of the F/A-18 aircraft assigned to the FRS, and necessary training on night vision equipment would likewise be significantly impacted. Finally, the Navy would incur significant cost increases and management difficulties associated with the assignment of personnel. The degraded capabilities resulting from separating the FRS from the majority of the fleet aircraft are thus considered unacceptable.

The DoN conducted an initial screening analysis on 20 Navy and Marine Corps air installations located along the Atlantic coast and the Gulf of Mexico. Many of the installations identified as potential receiving sites failed to meet more than one of the screening criteria. The installations were evaluated on capacity; infrastructure, including airfield criteria, training, maintenance, and ancillary facility infrastructure; and operational readiness factors such as proximity to ranges, FCLP requirements, and compatibility of F/A-18 operations with other airfield operations. Section 2.2 summarizes the screening process, and discusses installations that did not meet specific criteria.

Three installations met all required criteria and were identified as reasonable candidate installations for receiving F/A-18 fleet and FRS aircraft: NAS Oceana, MCAS Beaufort, and MCAS Cherry Point. Of the three candidate installations identified in Section 2.2, NAS Oceana has the greatest amount of excess hangar capacity (8 modules), followed by MCAS Cherry Point (3 modules), and MCAS Beaufort (2 modules). From an operational

perspective, the best configuration of the Atlantic Fleet F/A-18 strike/fighter wing would result from relocating all the F/A-18 fleet squadrons and the FRS to a single installation as they are currently based together at NAS Cecil Field. Reasons for this include:

- Training efficiencies are maximized through direct interaction among all F/A-18 fleet squadrons and the FRS, and avoidance of either the cost of transporting trainees to a remote training location or constructing flight simulator facilities at multiple locations.

- Maintenance efficiencies are maximized through single siting all maintenance facilities and related support organizations such as Naval Air Maintenance Training Group Detachment (NAMTRAGRUDET). Additionally, the need for multiple spare parts/equipment stocks is eliminated and all fleet squadrons have access to the FRS in the event there is an immediate need for replacement aircraft to meet operational commitments.

- Personnel efficiencies are maximized through the ability to move personnel directly from the FRS to fleet squadrons without moving families and household goods. Additionally the duplication of personnel to provide maintenance, ground support and flight control functions is eliminated.

The three candidate receiving installations were examined to determine if all F/A-18 aircraft could be relocated within the parameters of the 1995 BRAC mandate. In doing so, adjustments were made to projected needs based on typical deployment schedules. As discussed above, hangar space occupied by deployed squadrons would be used by squadrons remaining at the installation (typically referred to as "hot racking"). Such hangar module utilization practices are normal at most Naval and Marine Corps air stations.

Even with adjustments for deployments, none of the three installations would be able to house all F/A-18 fleet and FRS aircraft to P-80 guidelines. Given the need for 11 available hangar modules in place at any one time and the operational preference for a single site, NAS Oceana is the only reasonable single-site location due to its available capacity and the relative costs involved. With the creation of an additional 3-module hangar and aircraft parking apron, NAS Oceana could house all the F/A-18 aircraft to P-80 guidelines.

Single-siting would not be possible at either MCAS Beaufort or MCAS Cherry Point, even with an additional 3-module hangar. MCAS Beaufort would still be deficient by six modules; MCAS Cherry Point would still be deficient by five modules; and NAS Oceana's capacity would remain completely underutilized.

Taking into account these factors, the following three ARSs were developed:

- **ARS 1:** Relocating all 11 F/A-18 fleet squadrons and the FRS to NAS Oceana.
- **ARS 2:** Relocating two F/A-18 fleet squadrons to MCAS Beaufort and nine fleet squadrons and the FRS to NAS Oceana.
- **ARS 3:** Relocating three fleet squadrons to MCAS Cherry Point and eight fleet squadrons and the FRS to NAS Oceana.

During the development of these ARSs, it became apparent that relocating the F/A-18 aircraft to NAS Oceana would result in significant aircraft noise impacts associated with the large increase in airfield operations. Therefore, the Navy decided to consider other operationally feasible scenarios that could potentially reduce noise impacts.

- **ARS 4:** Relocating five F/A-18 fleet squadrons to MCAS Beaufort and six fleet squadrons and the FRS to NAS Oceana.
- **ARS 5:** Relocating five F/A-18 fleet squadrons to MCAS Cherry Point and six fleet squadrons and the FRS to NAS Oceana.

As has been noted, no ARS would meet P-80 guidelines without some additional construction. While the 1995 BRAC mandates are intended to maximize use of existing resources and minimize creation of new facilities, the most efficient use of existing resources would still necessitate some additional construction regardless of where the F/A-18 aircraft are relocated. It should be noted that by adding alternatives that place five F/A-18 fleet squadrons at MCAS Beaufort or MCAS Cherry Point, the capacity of NAS Oceana, defined by P-80 as eight hangar modules, would be fully utilized by the remaining six fleet squadrons and the FRS. MCAS Beaufort and MCAS Cherry Point each possess some available unused hangar capacity and are otherwise acceptable as receiving sites. Additional construction at either of these sites would allow capacity at NAS Oceana to be fully utilized, would use existing capacity at one of the two Marine Corps air stations, and would result in the most noise mitigation possible, consistent with operational requirements. Therefore, additional hangar module construction at MCAS Beaufort or MCAS Cherry Point is considered reasonable in the context of providing an alternative that mitigates noise impacts at NAS Oceana.

Conversely, major expansion at an installation not already having some existing capacity or requiring acquisition of real estate and construction of additional infrastructure would be unreasonable as long as other installations exist that could provide the infrastructure without degrading operational requirements.

The five ARSs are described in the following paragraphs.

### ARS 1: Transfer of 11 F/A-18 Fleet Squadrons (132 Aircraft) and F/A-18 FRS (48 Aircraft) to NAS Oceana, Virginia

This alternative would maximize the use of existing hangar and apron capacity at NAS Oceana. Eight hangar modules of existing excess capacity would be utilized.

Historic operations at NAS Oceana indicate that 11 squadrons could be accommodated, although at somewhat less than P-80 guidelines, even without construction of additional hangars and aircraft parking. To meet P-80 criteria, a 3-module hangar would be required. Other construction projects would be needed to support operation and maintenance of F/A-18 aircraft and training of F/A-18 personnel. These projects are primarily reuse/renovation of existing facilities or building additions.

From an operational perspective, ARS 1 provides the best configuration of the Atlantic Fleet F/A-18 strike/fighter wing, since all F/A-18 fleet squadrons and the FRS are located at a single installation (COMNAVAIRLANT 1997). All training, maintenance, and personnel efficiencies discussed in Section 2.3 are realized in ARS 1.

Implementation of ARS 1 would require 14 construction projects, primarily consisting of reuse/renovation of existing facilities and/or additions to existing facilities. These would consist of the following:

- Minor parking apron alterations, including installation of steel plates along the flight line to protect the pavement and 400-hertz (Hz) converters to provide additional power for parked aircraft;
- Two-story addition to Building 140 for an F/A-18 flight simulator facility;
- One-story addition and interior modifications to Building 140 for a Naval Maintenance Training Group Detachment (NAMTRAGRUDET) training facility;
- Three additions to Building 137 for a Strike Fighter Weapons School facility and parking lot;
- A series of small additions and freestanding construction projects to support F/A-18 maintenance facilities, and two parking lots;

- Construction of a new hangar facility for corrosion control and aircraft painting;
- Installation of vaults in Buildings 111 and 122 for classified document storage;
- Renovations to Building 122, including installation of interior walls and utilities to the hangar;
- A new 230-unit bachelor enlisted quarters (BEQ), a new 55-unit BEQ, and parking lot;
- Renovation of Building 1100 for jet engine testing;
- A new one-story aircraft acoustical enclosure to test high-powered in-aircraft engine run-ups;
- Construction of a new three-module aircraft hangar; and
- Expansion of the aircraft parking apron to provide additional space for F/A-18 aircraft.

The one-time cost associated with ARS 1 would be approximately $99 million. The net present value of 30-year life-cycle costs of implementing ARS 1 would be approximately $285 million in 1998 dollars.

### ARS 2: Transfer of Two F/A-18 Fleet Squadrons (24 Aircraft) to MCAS Beaufort, South Carolina, and Transfer of Nine F/A-18 Fleet Squadrons (108 Aircraft) and the F/A-18 FRS (48 Aircraft) to NAS Oceana, Virginia

This alternative would maximize the use of existing hangar and apron capacity at MCAS Beaufort and sends the remaining F/A-18 assets, including the FRS, to NAS Oceana. It would have the added advantage of collocating the Navy and Marine Corps F/A-18 squadrons, which comprise one carrier airwing, at MCAS Beaufort. Although there is excess capacity using P-80 guidelines for two fleet squadrons at MCAS Beaufort, it would be necessary to accept slight deviations from P-80 guidelines to accommodate aircraft on the station's parking apron. However, overall airfield efficiency would be maintained.

This scenario would also maximize the use of existing excess hangar and apron capacity at NAS Oceana. However, construction of a three module hangar would still be required at NAS Oceana for periods when the MCAS Beaufort carrier air wing would be deployed (i.e., approximately 20% of deployment schedules). Ten hangar modules of existing excess capacity (eight modules at NAS Oceana and two modules at MCAS Beaufort) would be utilized.

Two fleet squadrons can be absorbed at MCAS Beaufort without any significant aircraft maintenance facility (i.e., AIMD) expansions, because there are available Marine Corps mobile AIMD facilities that can support the two additional squadrons. Because of maintenance requirements, relocating more than two F/A-18 fleet squadrons at MCAS Beaufort would require the construction of an AIMD and new hangar modules (COMNAVAIRLANT 1996a).

From an operational perspective, several of the benefits in a single site alternative are realized in ARS 2 due to the joint basing of Navy F/A-18 aircraft with existing Marine Corps F/A-18 aircraft at MCAS Beaufort. Benefits include: (1) training efficiency through the use of the existing flight simulator facility at MCAS Beaufort; (2) maintenance efficiency through utilization of existing MCAS Beaufort F/A-18 maintenance assets, thereby eliminating the need for multiple spare part/equipment stocks or turnaround times necessary to get parts to and from a single repair site; and (3) personnel efficiency by eliminating the duplication in personnel inherent to siting aircraft at locations without existing F/A-18s.

The following projects would be necessary at MCAS Beaufort to implement ARS 2:

- Parking apron alterations, including installation of steel plates along the flight line to protect the pavement, 400-Hz converters to provide additional power for parked aircraft, and construction of a 390,000-square-foot Mobile Facilities (MF) Pad;

- Construction of a crew, equipment, and administrative building adjacent to the MF Pad; and

- Hangar renovations to Building 729.

Under ARS 2, the large majority of F/A-18 assets would still be transferred to NAS Oceana. Therefore, it would still be the logical location of the majority of F/A-18 maintenance, training, and personnel support facilities. The transfer of 24 aircraft to MCAS Beaufort would not proportionately reduce the size or number of facilities that would be required to conduct these activities. Therefore, with the exception of a reduction in the size of one BEQ, projects at NAS Oceana under ARS 2 would be the same as ARS 1.

The one-time cost associated with ARS 2 would be approximately $95 million for NAS Oceana and $12 million for MCAS Beaufort for a total of $107 million. The net present value of the 30-year life-cycle costs of implementing ARS 2 would be approximately $307 million in 1998 dollars.

**ARS 3: Transfer of Three F/A-18 Fleet Squadrons (36 Aircraft) to MCAS Cherry Point, North Carolina, and Transfer of Eight F/A-18 Fleet Squadrons (96 Aircraft) and the F/A-18 FRS (48 Aircraft) to NAS Oceana, Virginia**

This alternative would maximize the use of excess hangar and apron capacity at MCAS Cherry Point by sending one three-squadron carrier airwing to MCAS Cherry Point and the remaining F/A-18 assets, including the FRS, to NAS Oceana. As with ARS 2, accommodating three squadrons at MCAS Cherry Point would require deviations from P-80 guidelines with regard to parking apron requirements; however, these deviations would not significantly affect airfield efficiency.

This scenario would reduce the hangar module deficiency at NAS Oceana compared to ARS 1 or 2. NAS Oceana would be deficient by only two modules for periods when the MCAS Cherry Point fleet squadrons would be deployed (i.e. approximately 20% of deployment schedules). Construction of a two-module hangar would be required at NAS Oceana. Eleven modules of existing excess capacity (eight modules at NAS Oceana and three modules at MCAS Cherry Point) would be utilized.

AIMD activities at MCAS Cherry Point are assigned to Marine Aircraft Logistical Squadron (MALS)-14. Currently, there is no F/A-18 repair capability at MCAS Cherry Point (LANTDIV 1996a). Therefore, a stand-alone F/A-18 AIMD facility would be required to support the realignment of three fleet squadrons of Navy F/A-18 aircraft to this station (COMNAVAIRLANT 1997).

From an operational perspective, the overall cost of transporting trainees to NAS Oceana is lower for MCAS Cherry Point than for MCAS Beaufort. However, very few other training, maintenance, or personnel benefits achieved in a single-site alternative are realized in ARS 3 because there are no existing F/A-18 facilities at MCAS Cherry Point.

The following projects would be necessary at MCAS Cherry Point to implement ARS 3:

- Parking apron alterations, including installation of steel plates along the flight line to protect the pavement, 400-Hz converters to provide additional power for parked aircraft;
- Hangar renovations to Buildings 1665W, 131S, and 1700; and
- The construction of an AIMD facility consisting of specialized shops for F/A-18 aircraft.

Similar to ARS 2, ARS 3 would still involve the majority of F/A-18 assets being transferred to NAS Oceana. With the exception the second BEQ and the smaller parking

### Master Jet Base Master Plan

The station master plan sets forth broad development policies for NAS Oceana to provide planning guidance. The plan encompasses several background studies regarding development constraints, regional development, operational requirements, and capital improvements. The future development plan indicates a general continuation of current functional land use arrangements at the station, with minor extensions into relatively undeveloped areas (LANTDIV 1985).

### AICUZ Program

When Congress enacted the Noise Control Act of 1972, it exempted military aircraft. However, in the spirit of the Act, DoD established the AICUZ program in 1973. By working with local governments, the AICUZ program fosters compatible development around military airfields to protect the health, safety, and welfare of those living in nearby communities while enabling DoD to safely conduct its flight operations. The program defines areas around the station that are exposed to increased levels of aircraft noise and the potential for aircraft accidents. The AICUZ study includes a detailed analysis of aircraft noise, accident potential, land use compatibility, operational procedures, and recommendations for compatible development in the vicinity of the installation.

Aircraft noise impacts are quantified and depicted through noise exposure contours, which are developed by computer modeling of aircraft operations at the installation. These contours reflect installation-specific operation data such as flight tracks, type and mix of aircraft, frequency/times of operations, altitude profiles, and aircraft performance parameters (power and airspeed). Noise exposure contours, measured in day-night average sound level (Ldn), are developed using either annual average day (AAD) or average busy day (ABD) operations where appropriate (see Section 3.1.8). The Ldn noise metric places more weight on measurements for night operations (10:00 p.m. to 7:00 a.m.) because of the higher annoyance associated with night operations when ambient noise levels are low (see Appendix H).

Noise exposure areas are divided into three noise zones. Noise Zone 1 (less than 65 dB Ldn) is essentially an area of minimal noise impact. Noise Zone 2 (65 to 75 dB Ldn) is an area of moderate noise impact. Noise Zone 3 (greater than 75 dB Ldn) is the area most severely impacted by noise (U.S. Navy 1988). When aircraft operations or aircraft type change, a new aircraft noise study is typically performed to accurately assess the potential change in noise exposure.

**Table 3.1-21**

**GEOGRAPHICAL DISTRIBUTION OF PERSONS EMPLOYED AT NAS OCEANA**

| Geographical Area | Percentage of Personnel |
|---|---|
| City of Virginia Beach | 74.2 |
| City of Chesapeake | 9.3 |
| City of Norfolk | 5.9 |
| City of Portsmouth | 2.5 |
| City of Suffolk | 0.9 |
| Total in South Hampton Roads | 92.8 |
| All Other Locations | 7.2 |

Source: Countryman 1995.

population by 500 military personnel. As shown in Table 3.1-20, without the proposed action, the station population increased to approximately 8,800 military and civilian personnel by the end of FY 1996, increased to approximately 9,500 personnel by the end of FY 1997 (September 30, 1997), and is projected to decline to 9,000 personnel by the end of FY 1998.

NAS Oceana is located in the City of Virginia Beach in southeastern Virginia. The area immediately surrounding the station is known as south Hampton Roads, which consists of the cities of Chesapeake, Norfolk, Portsmouth, Suffolk, and Virginia Beach. Data from civilian personnel employed at NAS Oceana were used to estimate the geographical distribution of all personnel (military and civilian) employed at NAS Oceana. As shown on Table 3.1-21, the majority of civilian and military personnel stationed at NAS Oceana are assumed to live in south Hampton Roads, with the largest portion of these personnel residing in the City of Virginia Beach (74%), distantly followed by the City of Chesapeake (9%).

According to the U.S. Bureau of the Census, the total 1990 population of the City of Virginia Beach was 393,069 persons, making it the largest city in south Hampton Roads (U.S. Bureau of the Census 1992). The 1993 population in the city was estimated to be 416,200 persons (Hampton Roads Planning District Commission 1995). The 1993 population in Chesapeake was estimated to be 170,400 persons, making it the third largest city in south Hampton Roads, after Virginia Beach and Norfolk (Hampton Roads Planning District Commission 1995).

Virginia Beach, Chesapeake, and south Hampton Roads as a whole experienced rapid growth during the 1980s. From 1980 to 1990, the total population in Virginia Beach increased by nearly 50% over the 1980 population level of 262,199 persons. Chesapeake's total population increased by over 32% from 1980 to 1990, growing from 114,486 to 151,976 total persons. During the same time period, south Hampton Roads expanded approximately 21%, from 795,862 residents in 1980 to 962,322 residents in 1990 (see Table 3.1-22).

The total population of Virginia Beach, Chesapeake, and south Hampton Roads as a whole is projected to continue to grow. By the end of this decade, the total population of Virginia Beach is expected to reach 440,024 residents; by the year 2015, the total population is projected to reach 505,522 persons. The population of the City of Chesapeake is projected to grow to 210,271 by 2000, and 253,535 by 2015. South Hampton Roads as a whole is expected to experience population increases over the next 20 years, with total population projected to reach 1,095,280 residents in the year 2000. By 2015, the total population of the region is expected to climb to 1,239,625 persons (see Table 3.1-23).

**Table 3.1-22**

**TOTAL POPULATION OF THE CITIES LOCATED IN SOUTH HAMPTON ROADS DURING 1980, 1990, AND CURRENT CONDITIONS**

| | Total Population | | | Percent Change 1980 to 1990 |
|---|---|---|---|---|
| | 1980 | 1990 | Current Conditions[a] | |
| City of Chesapeake | 114,486 | 151,976 | 170,400 | 32.7 |
| City of Norfolk | 266,979 | 261,229 | 245,300 | -2.2 |
| City of Portsmouth | 104,577 | 103,907 | 103,600 | -0.6 |
| City of Suffolk | 47,621 | 52,141 | 53,800 | 9.5 |
| City of Virginia Beach | 262,199 | 393,069 | 416,200 | 49.9 |
| South Hampton Roads | 795,862 | 962,322 | 989,300 | 20.9 |

[a]Current population estimated as of 1993.

Source: Hampton Roads Planning District Commission 1995.

02: OV8903\5321\OV8_3121.CDR

| NOISE SOURCE (at a given distance) | A-WEIGHTED SOUND LEVEL SCALE (dBA) | NOISE ENVIRONMENT | HUMAN JUDGMENT OF NOISE LOUDNESS (1) |
|---|---|---|---|
| Civil Defense Siren (100 ft) | 130 | Carrier Flight Deck | |
| | 120 | | Threshold of Pain<br>32 Times as Loud |
| Pile Driver (50 ft) | 110 | Rock Music Concert | 16 Times as Loud |
| F-18 Departure (1,000 ft) | 108 | | |
| F-18 Arrival (1,000 ft) | 104 | | |
| Ambulance Siren (100 ft) | 100 | | Very Loud |
| F-14 Departure (1,000 ft) | 97 | Printing Press Plant | |
| Newspaper Press (5 ft) | | | 8 Times as Loud |
| Power Lawn Mower (3 ft) | 96 | | |
| Motorcycle (25 ft) | 90 | Boiler Room | 4 Times as Loud |
| Prop. Plane Flyover (1,000 ft) | 88 | | |
| Diesel Truck, 40 mph (50 ft) | 84 | | |
| F-14 Arrival (1,000 ft) | 83 | | |
| Garbage Disposal (3 ft) | 80 | High Urban Ambient Sound | 2 Times as Loud |
| Passenger Car, 65 mph (25 ft) | 77 | | |
| Living Room Stereo (15 ft) | 76 | | Moderately Loud |
| Vacuum Cleaner (3 ft) | 70 | | |
| Electronic Typewriter (10 ft) | | | |
| Normal Conversation (5 ft) | 60 | Data Processing Center | 1/2 as Loud |
| Air Conditioning Unit (100 ft) | | | |
| | | Department Store | |
| Light Traffic (100 ft) | 50 | Private Business Office | 1/4 as Loud |
| Bird Calls (Distant) | 44 | | |
| | 40 | Lower Limit of Urban Ambient Sound | Quiet<br>1/8 as Loud |
| Soft Whisper (5 ft) | 30 | Quiet Bedroom<br>Recording Studio | |
| | 20 | | |
| | 10 | | Just Audible |
| | 0 | | Threshold of Hearing |

NOTE: (1) Relative to a reference loudness of 70 dBA

SOURCE: Ogden 1992; Wyle Labs 1997.

**Figure 3.1-21 SOUND LEVELS OF TYPICAL NOISE SOURCES AND NOISE ENVIRONMENTS**

**Table 5.2-16**

**OFF-STATION AREA AND ESTIMATED POPULATION WITHIN 1978 AICUZ, EXISTING 1997, AND PROJECTED 1999 NOISE ZONES NAS OCEANA/NALF FENTRESS - ARS 2**

| | 1978 AICUZ Noise Zones | | 1997 Noise Zones | | 1999 Noise Zones | | | Increase in Area/Population Exposed Relative to 1978 AICUZ | |
|---|---|---|---|---|---|---|---|---|---|
| Ldn | Area in Acres (Hectares) | Estimated Population | Area in Acres (Hectares) | Estimated Population | Area in Acres (Hectares) | Estimated Population | Change in Ldn | Area in Acres (Hectares) | Estimated Population |
| 65 to 75 dB | 30,425 (12,313) | 64,465 | 13,645 (5,522) | 27,660 | 32,142 (13,008) | 73,512 | From less than 65 dB to between 65 and 75 dB | 11,537 (4,669) | 18,486 |
| 75 dB or greater | 20,298 (8,215) | 42,378 | 653 (264) | 370 | 228 (10,614) | 47,151 | From between 65 and 75 dB to greater than 75 dB | 7,620 (3,084) | 14,668 |
| Total | 50,723 (20,528) | 106,843 | 14,298 (5,786) | 28,030 | 58,370 (23,622) | 120,663 | Total | 19,157 (7,753) | 33,154 |

Key:

AICUZ = Air Installations Compatible Use Zones.
dB = Decibel.
Ldn = Day-night average sound level.

Source: Wyle Labs 1997.

3810-FF

DEPARTMENT OF DEFENSE

Department of the Navy

Record of Decision and General Conformity Determination for Realignment of F/A-18 Aircraft and Operational Functions from Naval Air Station (NAS) Cecil Field, Florida, to other East Coast Installations

AGENCY: Department of the Navy, DoD

ACTION: Notice of Record of Decision

SUMMARY: The Department of the Navy, after carefully weighing the operational, environmental, and cost implications of relocating F/A-18 aircraft from NAS Cecil Field to other Naval and Marine Corps installations, announces its decision to realign two F/A-18 fleet squadrons to Marine Corps Air Station (MCAS) Beaufort, South Carolina, and nine F/A-18 fleet squadrons and the Fleet Replacement Squadron (FRS) to Naval Air Station (NAS) Oceana, Virginia.

FOR FURTHER INFORMATION CONTACT: Mr. J. Daniel Cecchini, Atlantic Division Naval Facilities Engineering Command (Code 2032DC), 1510 Gilbert Street, Norfolk, VA 23511-2699, telephone (757) 322-4891.

RECEIVED
MAY 29 1998

SUPPLEMENTARY INFORMATION: The text of the entire Record of Decision (ROD) is provided as follows:

The Department of the Navy (DON), pursuant to the Defense Base Closure and Realignment Act of 1990 (10 USC 2687), Section 102(2)(c) of the National Environmental Policy Act (NEPA) of 1969 (42 USC 4331 et seq.), and the regulations of the Council on Environmental Quality that implement NEPA procedures (40 CFR Parts 1500-1508), hereby announces its decision to realign two F/A-18 fleet squadrons (24 aircraft and 500 military personnel) to Marine Corps Air Station (MCAS) Beaufort, South Carolina, and nine F/A-18 fleet squadrons and the Fleet Replacement Squadron (FRS) (156 aircraft and 3,700 military and civilian personnel) to Naval Air Station (NAS) Oceana, Virginia. The realignment will be accomplished as set out in Alternative Realignment Scenario (ARS) 2, which is described in the Final Environmental Impact Statement (FEIS).

To support the additional personnel and operation and maintenance of the aircraft, four construction projects are required at MCAS Beaufort; 14 construction projects, primarily consisting of additions to existing facilities, are required at NAS Oceana.

The realignment of the fleet squadrons to MCAS Beaufort will increase aircraft operations at MCAS Beaufort, associated military training areas along the coast of South Carolina and Georgia, and the Townsend Bombing Range in Georgia. The

realignment of the fleet squadrons and FRS to NAS Oceana will increase aircraft operations at NAS Oceana, Naval Auxiliary Landing Field (NALF) Fentress, Virginia, and associated military training areas and target ranges located primarily in eastern North Carolina. This includes the Brant Island Shoal (BT-9), Piney Island (BT-11), and Dare County target ranges. Pursuant to Section 176(c) of the Clean Air Act (CAA) (42 U.S.C. 7476(c)), the DON has determined that the realignment of F/A-18 aircraft to NAS Oceana under ARS 2 conforms to Virginia's State Implementation Plan. The entire State of South Carolina is classified as attainment for all criteria pollutants. Therefore, the air quality effects of ARS 2 at MCAS Beaufort are exempt from the General Conformity Rule.

Realignment of the F/A-18 aircraft and operational functions from NAS Cecil Field will begin in 1998 and is expected to be completed in 1999.

BACKGROUND: The 1993 Defense Base Closure and Realignment Commission (BRAC) recommended closure of NAS Cecil Field and realignment of all of its aircraft and associated personnel to MCAS Cherry Point, North Carolina; MCAS Beaufort, South Carolina; and NAS Oceana, Virginia.

In 1995, the BRAC Commission revised its recommendations regarding realignment of NAS Cecil Field assets by redirecting all aircraft and associated personnel to "...other naval air stations, primarily [NAS] Oceana; [MCAS] Beaufort; [NAS]

Jacksonville, Florida; [NAS] Atlanta, Georgia; or other Navy or Marine Corps air stations with necessary capacity and support infrastructure." In separate actions, some of the NAS Cecil Field assets have been relocated to NAS Jacksonville (six S-3 ASW squadrons) and NAS Atlanta (two reserve F/A-18 squadrons). This ROD selects a receiving site for the NAS Cecil Field active duty F/A-18 aircraft.

As the 1995 BRAC Commission did not recommend realignment to a specific base, the DON conducted a multi-stage screening process to identify reasonable and feasible alternatives for realignment of NAS Cecil Field F/A-18 active duty aircraft to east/gulf coast Navy or Marine Corps air station(s) with necessary capacity and support infrastructure.

PROCESS: A Notice of Intent (NOI) to prepare an EIS for the transfer of up to ten squadrons of F/A-18 aircraft from NAS Cecil Field to NAS Oceana was published in the *Federal Register* on November 16, 1995. This notice also indicated that separate NEPA documentation would be prepared for the transfer of two operational (active duty) F/A-18 squadrons from NAS Cecil Field to MCAS Beaufort. On August 23, 1996, in recognition of the non-specific language contained in the 1995 BRAC Commission mandates, the DON published an amended NOI in the *Federal Register* indicating its intent to expand its alternatives analysis and to prepare a single comprehensive document for realignment of all operational Atlantic Fleet F/A-18 fleet aircraft and the FRS from

NAS Cecil Field. The DON reopened its scoping process and held two additional scoping meetings.

A Notice of Availability (NOA) of the Draft EIS (DEIS) and a Draft CAA Conformity Determination were published in the *Federal Register* on September 19, 1997, and in local newspapers the following week. Seven public hearings were held on the DEIS - one in South Carolina, four in North Carolina, and two in Virginia - between October 20 and November 17, 1997. Approximately 275 individuals, agencies, and organizations submitted comments. All verbal and written comments were addressed in Appendix I of the FEIS.

An NOA of the FEIS and the Final CAA Conformity Determination were published in the *Federal Register* on March 20, 1998, and announced in local newspapers the preceding week. Approximately 440 letters were received on the FEIS during the 30-day public review period; substantive comments are addressed later in this ROD.

ALTERNATIVES CONSIDERED: The DON screened 20 Navy and Marine Corps air installations located along the Atlantic Coast and the Gulf of Mexico using capacity, support infrastructure, and operational criteria. Only three installations met these criteria - NAS Oceana, MCAS Beaufort, and MCAS Cherry Point.

Because none of the three installations would be able to accommodate all F/A-18 fleet and FRS aircraft without some expansion of existing facilities or new construction, the DON

developed alternative realignment scenarios (ARSs) designed to make the best use of excess capacity at each installation.

ARS 1 proposed realigning all 11 F/A-18 fleet squadrons and the FRS at NAS Oceana. This was identified in the FEIS as an operationally preferred alternative because single-siting the Atlantic Fleet F/A-18 Strike/Fighter Wing would provide the same configuration that currently exists at NAS Cecil field. This alternative expands capacity at NAS Oceana and requires 14 construction projects.

ARS 2 proposed realigning two F/A-18 fleet squadrons to MCAS Beaufort and nine F/A-18 fleet squadrons and the FRS to NAS Oceana. This was identified in the FEIS as an operationally acceptable alternative because it would: result in the least degradation of single-site benefits; fully utilize excess capacity at both NAS Oceana and MCAS Beaufort; take advantage of the F/A-18 training facilities that currently exist at MCAS Beaufort; and result in only slightly higher construction and life-cycle costs than ARS 1. It requires some construction at NAS Oceana, but is the lowest cost dual-site alternative.

ARS 3 proposed realigning three F/A-18 fleet squadrons to MCAS Cherry Point and eight F/A-18 fleet squadrons and the FRS to NAS Oceana. This alternative maximizes the use of existing hangar and apron capacity at MCAS Cherry Point and sends the remaining assets to NAS Oceana. This alternative requires some construction at NAS Oceana.

ARS 4 proposed realigning five F/A-18 fleet squadrons to MCAS Beaufort and six F/A-18 fleet squadrons and the FRS to NAS Oceana. This alternative expands capacity at MCAS Beaufort and requires some construction at NAS Oceana. It utilizes all available capacity at NAS Oceana and reduces noise and air quality impacts at NAS Oceana and NALF Fentress.

ARS 5 proposed realigning five F/A-18 fleet squadrons to MCAS Cherry Point and six F/A-18 fleet squadrons and the FRS to NAS Oceana. This alternative expands capacity at MCAS Cherry Point and requires some construction at NAS Oceana. It utilizes all available capacity at NAS Oceana and reduces noise and air quality impacts at NAS Oceana and NALF Fentress. ARS 5 is the environmentally preferred alternative.

ENVIRONMENTAL IMPACTS: The DON analyzed the potential impacts of all ARSs on: airfield operations; military training areas; target ranges; land use; socioeconomics and community services; infrastructure and utilities; transportation; noise; air quality; topography, geology and soils; water resources; vegetation and wildlife; wetlands; cultural resources; hazardous materials and waste management; and installation restoration programs. The DON also considered the potential cumulative impacts of the project and whether the proposed action would be consistent with federal policies addressing environmental justice.

Since the DON has decided to implement ARS 2, this ROD focuses on the major impacts of ARS 2 at MCAS Beaufort and NAS

Oceana. ARS 2 creates significant land use and noise impacts at MCAS Beaufort and NAS Oceana. Impacts on all other resources or functions analyzed in the FEIS were less than significant.

Land Use - Increases in airfield operations at MCAS Beaufort and NAS Oceana will result in the expansion of aircraft noise zones and the expansion and reconfiguration of accident potential zones (APZs). The expansion of APZs and noise zones has the potential to adversely affect use of land underlying the APZs and noise zones. Certain land uses, such as residential development, are considered incompatible with noise zone III where the day-night average noise level (Ldn) is greater than 75dB(A). High-density residential and commercial development is also considered incompatible land use in APZs.

Impacts to future private development actions may occur as a result of implementing ARS 2 because additional area may be subject to development restrictions in local airfield encroachment zones. The City of Beaufort has in place an ordinance that requires disclosure when selling property within the Beaufort noise zones. The City of Virginia Beach's airfield noise attenuation and safety ordinance places additional requirements (i.e., noise attenuation) on private development in high aircraft noise areas within the 1978 Air Installations Compatible Use Zones (AICUZ) noise zones. Although the ARS 2 footprint is larger than the 1978 AICUZ footprint at NAS Oceana,

landowners would be able to continue development based on existing property zoning and applicable sound attenuation requirements.

In addition, the U.S. Department of Housing and Urban Development (HUD), the Federal Housing Administration (FHA), and the U.S. Department of Veterans Affairs (VA) restrict the availability of mortgage loans for existing and new homes in noise zones II (i.e. 65-75 dB(A) Ldn) and III (i.e. greater than 75 dB(A) Ldn) and the APZs nearest the runways (i.e. the clear zones).

APZs will expand by 1,894 acres around MCAS Beaufort compared to the 1994 AICUZ. Thirteen percent of this area is residential. APZ expansion at MCAS Beaufort is driven by an increase in the number and type of operations flown by Navy F/A-18 aircraft.

Changes in APZs around NAS Oceana are a result of two different factors. Changes between 1978 APZs and 1997 APZs at NAS Oceana are due in large part to a change in the criteria used by the DON to develop APZs. The result of this change is that APZs will expand by 2,759 and 3,473 acres around NAS Oceana and NALF Fentress, respectively, compared to the 1978 AICUZ. Changes in APZs from 1997 to 1999 reflect the addition of Navy F/A-18 operations as a result of this ROD causing a 1,751 acre APZ increase around NAS Oceana. There would be no change in the size of the APZ around NALF Fentress from addition of the F/A-18

aircraft. Forty-one percent of the total projected NAS Oceana APZ area and five percent of the total projected NALF Fentress APZ areas are residential.

Individuals living or working within an APZ are slightly more at risk from an aircraft accident, in the unlikely event that one occurs, than others living or working near NAS Oceana, NALF Fentress, or MCAS Beaufort outside designated APZs.

Noise - Expansion of noise zones under ARS 2 also has the potential to adversely affect public health and safety. Compared to the 1997 MCAS Beaufort AICUZ, this action will expose 1,659 new people to the 65 to 75 dB(A) Ldn noise zone and 644 new people to the 75+ dB(A) Ldn noise zone.

Compared to the 1978 NAS Oceana and NALF Fentress AICUZ, this action will expose 18,486 new people to the 65 to 75 dB(A) Ldn noise zone and 14,668 new people to the 75+ dB(A) Ldn noise zone. Compared to the 1997 noise contours and APZs prepared as part of the EIS process, this action will expose 45,852 new people to the 65 to 75 dB(A) Ldn noise zone and 46,781 new people to the 75+ dB(A) Ldn noise zone.

Individuals living in 65+ dB(A) noise zones may be annoyed and experience interference with daily activities such as sleep, conversation, television viewing, and outdoor recreation. Homeowners may incur costs to ensure that sufficient sound attenuation exists within their dwellings to achieve the Environmental Protection Agency (EPA) desired interior noise

level goal of 45 dB(A) Ldn. There is very little probability that long term physical affects, such as hearing loss, will result from exposure to the projected noise levels. A recent study suggests, however, some individuals, particularly children, may temporarily experience stress or elevated blood pressure.

The EIS used public schools as representative sensitive noise receptors to predict impacts. While the discussion of impacts in the FEIS focused on public schools, the impacts discussed in the FEIS could be experienced at private schools and other sensitive receptors as well.

No public schools are located within the 65 dB(A) Ldn or greater noise zone around MCAS Beaufort. Twenty-one public schools in the vicinity of NAS Oceana and NALF Fentress will be within the 65 dB(A) Ldn or greater noise zone with the implementation of ARS 2. Six of these schools are in the 75 dB(A) Ldn or greater noise contour. The projected increases in noise at these schools vary, ranging from an 8 to 20 dB(A) Ldn increase over existing (1997) conditions.

Studies conducted by Cornell University researchers have shown that learning ability and comprehension may be impaired in children exposed to high noise levels. Local school authorities may incur costs to ensure that sufficient sound attenuation exists within the schools to achieve the EPA desired interior noise level goal of 45 dB(A) Ldn. Exposure to high levels of

noise while outdoors in schoolyards cannot be mitigated through sound attenuation.

<u>Schools and Housing</u> - Realignment of two squadrons to MCAS Beaufort involves the transfer of 500 military personnel and 600 dependents to the area. Realignment of nine squadrons and the FRS to NAS Oceana involves the transfer of 3,700 military and civilian personnel and 4,600 dependents to the Hampton Roads area. Most of the relocating families will live off-base due to the lack of on-base housing. Sufficient housing vacancies and school capacity exists in the local community to accommodate this influx of personnel. Therefore, local community services and infrastructure are not expected to be significantly impacted at either MCAS Beaufort or NAS Oceana.

<u>Traffic</u> - Traffic will increase in the vicinity of MCAS Beaufort by 1999 due to the proposed realignment and regional growth exclusive of the realignment. Two roadways in the vicinity of MCAS Beaufort are projected to operate at Level of Service (LOS) F in 1999. However, the projected LOS is attributed to regional growth exclusive of the realignment and the island geography of the region. Traffic volume associated with the realignment is less than 2% of the projected 1999 traffic volume for local roadways.

Regional roadways in the vicinity of NAS Oceana will experience an increase in daily traffic as a result of the personnel increase under ARS 2. In most cases, projected LOS on

these roadways will be C or better upon completion of roadway improvements already planned by local governments independent of this action. Some roadway segments along First Colonial Road and Virginia Beach Boulevard will continue to operate at LOS D, E, or F, with or without the realignment. The delay in traffic flow associated with LOS D, E, and F is a result of projected regional growth, not traffic increases associated with ARS 2.

Air Quality - Air emissions at NAS Oceana and NALF Fentress will have a net emission increase of approximately 2 tons per year of volatile organic compounds (VOCs), 349 tons per year of nitrogen oxides ($NO_x$), 298 tons per year of carbon monoxide (CO), 9 tons per year of sulfur dioxide ($SO_2$) and 195 tons per year of particulate matter ($PM_{10}$). The DON completed a conformity determination under Section 176(c) of the CAA and EPA's implementing regulations demonstrating that the projected increases in emissions of ozone precursors (VOC and $NO_x$) conform to the allowable emissions in the recently revised Commonwealth of Virginia's State Implementation Plan (SIP).

In revising its SIP, Virginia expressly included emission levels associated with the realignment of F/A-18 aircraft from NAS Cecil Field. As part of this realignment decision, I approve the Final CAA Conformity Determination included as Appendix E in the FEIS.

MITIGATION:

<u>Noise</u> - In response to public comment the DON will request congressional authorization to increase the priority of funding to accelerate the construction schedule of an already planned $12 million aircraft acoustical enclosure ("hush house") at NAS Oceana to reduce noise emissions associated with the high-power, in-aircraft engine maintenance tests.

<u>Land Use</u> - In response to public comment, the DON will also move some local flight pattern operations from runway 5R to runway 5L at NAS Oceana. This mitigation measure will remove the City of Virginia Beach's Brookwood and Plaza Elementary Schools from APZ-2, and decrease the number of people living in the 75 dB Ldn and greater noise zone by 322 individuals.

RESPONSE TO COMMENTS RECEIVED REGARDING THE FINAL ENVIRONMENTAL IMPACT STATEMENT: The DON received comments on the FEIS from 1 federal agency, 10 members of Congress and elected state officials, 10 state agencies, 2 local governments, and numerous citizen groups and private individuals. Many of the comments received simply stated support for or opposition to the proposed realignment.

Several commentors suggested that a supplemental EIS was necessary to address additional alternatives. The comments received on the FEIS did not present new or additional information that substantially affected the analysis of environmental impacts in the FEIS. The range of alternatives analyzed in the EIS is based upon the BRAC-directed realignment,

provides a logical basis for analysis of environmental impacts and, permits a reasoned choice by the decision-maker. I have reviewed the comments and the range of alternatives and have determined that a supplemental EIS is not warranted.

Other substantive comments received are addressed below by subject matter.

Noise

Sound Attenuation - Many commentors, including EPA, were critical of the lack of discussion of the cost of sound attenuation as mitigation for noise impacts. As indicated in the FEIS, the DON does not have legal authority to expend federal funds on improvements to state, local, or private property. Specific Congressional authorization and appropriation would be required to obtain funds for this purpose. The DON does not intend to request such authority.

In addition, the decision to implement sound attenuation for buildings and homes surrounding the airfields is an individual choice made by local governments, school boards, and individual homeowners. Therefore, any attempt to determine these costs would be speculative in nature.

The FEIS discusses potential sound attenuation such as air conditioning and insulation, and, as requested, the DON will work with local officials to help them conduct detailed engineering evaluations at those schools of particular concern. Upon request, the DON will also provide technical information on sound

mitigation to any affected entity in the MCAS Beaufort or NAS Oceana/NALF Fentress regions.

Noise Impacts on Children - Citizens Concerned About Jet Noise noted that the FEIS discussion of impacts on children did not include reference to a study entitled *Noise: A Hazard for the Fetus and Newborn (RE9728)*. In response to that comment, the DON reviewed the study and found it to be not relevant to discussion of noise impacts related to aircraft overflight. The study focused on the type of continuous noise found in the workplace and used a very narrow range of subjects (i.e. those in neonatal intensive care units). The constant workplace noise the study focused on does not correlate to intermittent aircraft noise or the discrete noise events generally associated with an airfield environment. A Cornell University study, *Chronic Noise Exposure and Reading Deficits: The Mediating Effects of Language Acquisition* (Evans 1997), which specifically addressed health effects from aircraft noise on children, was used in analyzing impacts associated with aircraft noise in the FEIS.

Property Values - Several commentors criticized the FEIS for not addressing changes in property values due to noise impacts. As discussed in the FEIS, property values are dynamic, vary over time and reflect factors including neighborhood characteristics and individual housing characteristics. Any discussion of changes in property value would, therefore, be too speculative for inclusion in the EIS.

Aircraft Maintenance - Commentors from the State of North Carolina suggested that life cycle costs for facilities at MCAS Cherry Point in ARS 3 and ARS 5 were overstated because they included construction of facilities for, and outfitting of, an F/A-18 Aircraft Intermediate Maintenance Department (AIMD). These commentors suggested that intermediate maintenance work at MCAS Cherry Point in ARS 3 and ARS 5 could be accomplished for a substantially lower cost by using Naval Aviation Depot (NADEP) Cherry Point. In light of these comments, the DON, examined using the NADEP in lieu of a stand-alone AIMD. My evaluation of this issue included a thorough review of Navy AIMD requirements and procedures, a point-by-point analysis of the assertions made regarding NADEP capabilities, and a visit to the NADEP on May 11, 1998. This evaluation confirmed the conclusion that it would be necessary to establish an AIMD at MCAS Cherry Point. The NADEP does not have the excess capacity needed to take on the intermediate maintenance requirement, does not have the capabilities needed to perform AIMD functions, and the additional workload could not be assigned without significant expansion of the facilities, equipment, and workforce at the NADEP. Additionally, the intermediate maintenance workload in support of tactical aircraft needs to be performed by military personnel to ensure maintenance proficiency while deployed and to support sea/shore rotation, technical advancement, and career progression. I also noted that intermediate maintenance on

Marine Corps aircraft assigned to Cherry Point is performed by Marine Aircraft Logistical Squadron (MALS), not the NADEP.

<u>Transportation</u> - EPA commented that a peak hour LOS analysis needed to be completed for the roadways around NAS Oceana. NAS Oceana gate count traffic data indicate peak LOS times do not correlate with regional peak traffic flow. Therefore, a peak analysis would not have contributed to the analysis of impacts of the proposed action.

<u>Carbon Monoxide (CO) Hot Spot Analysis</u> - Another commentor suggested that a CO hot spot analysis should have been conducted at heavily used intersections. As discussed in the FEIS, degradation in the LOS would occur on only one on-base roadway segment. No off-base roadway segments would experience degradation of LOS on a long-term basis as a result of the proposed action. Therefore, there is no need to conduct a CO hot spot analysis since the Hampton Roads Planning District Commission traffic study indicated that LOS would not deteriorate due to the planned roadway improvements on roadways that surround the base.

<u>Fuel Handling</u> - EPA asked for more information about potential fuel spills. NAS Oceana has been pro-active in improving its fuel spill prevention, control, and countermeasures in the past few years. Spill response procedures have been and continue to be adequate to handle any spill encountered or expected.

Fuel Dumping - EPA commented on emergency fuel dumping. As noted on pages 4.3-8 and B-1-18 in the FEIS, emergency fuel dumping is extremely rare. DON policy directs that it not occur below 6,000 feet above ground level unless necessary to save the pilot and/or aircraft. In the event of an engine failure on a dual engine fighter, like the F/A-18, the pilot should be able to operate with the remaining engine or climb above 6,000 feet before dumping fuel, thus minimizing the impacts associated with the release of the fuel. (Above 6,000, the fuel has enough time to completely vaporize and dissipate before reaching the ground, and thus has a negligible effect at ground level.) Therefore, any impact from fuel dumping would not be significant.

Sediment and Water Quality Sampling at BT-9/11 - EPA recommended gathering more information about sediment quality in target locations. The 1991 Sirrene Study test results for BT-9 which analyzed sediments impacted by approximately 40 years of military bombing activities showed no significant differences in water and sediment quality between the range areas and non-range areas. As a direct result of this study, as indicated in their letter of May 28, 1992, to the Marine Corps, the State of North Carolina determined that continuous monitoring was not required, and future, narrowly focused sampling would only be required as a result of changes in ordnance volume or type, or some indication of significant water or sediment quality degradation.

U.S. Fish and Wildlife Service (USFWS) Red Wolf Re-introduction Program - EPA expressed concern about potential impacts to the Red Wolf. USFWS's only concern has been their continued access to the range to monitor Red Wolf populations. In our response to USFWS comments, set out in Appendix I of the FEIS, the DON agreed to continue to make the range accessible to the USFWS consistent with DON operational use of the range.

Water Supply Issue - One commentor asked for clarification on the water supply sources available to NAS Oceana. In the event of a regional drought, the Navy would rely on an existing Norfolk/Suffolk well pumping contract to assure water for our bases.

Family Housing Costs - The State of North Carolina questioned the family housing costs under ARS 5. Subsequently, the DON conducted a detailed review of all housing costs and other expense items and has identified the following necessary revisions:

1. In ARS 5, the DON inadvertently used the Variable Housing Allowance (VHA) rate for Beaufort, South Carolina, instead of Havelock, North Carolina, to determine family housing costs for five squadrons at MCAS Cherry Point. The change is shown as item 1 in the table below.

2. In all five ARSs, an incorrect number of enlisted bachelor loading was used. The change is shown as item 2 in the table below.

3. In ARS 2, the NAS Oceana off-base bachelor officers housing component was inadvertently omitted. The change is shown as item 3 in the table below.

4. In all five ARSs, Basic Allowance for Quarters (BAQ) was not included since it remains fixed across varying economies. However, since the mix of housing in each ARS varies between on-base and off-base, adding BAQ to the life-cycle cost analysis would improve the accuracy of our analysis. The resulting increase in ARS 1 was established as the baseline for which adjustments to ARSs 2-5 were made. The change is shown as item 4 on the table below:

| | ARS 1 ($M) | ARS 2 ($M) | ARS 3 ($M) | ARS 4 ($M) | ARS 5 ($M) |
|---|---|---|---|---|---|
| FEIS | 285.3 | 307.1 | 465.3 | 686.4 | 535.6 |
| Item 1 | - | - | - | - | -8.2 |
| Item 2 | -33.7 | -33.3 | -33.7 | -33.7 | -33.3 |
| Item 3 | - | 5.1 | - | - | - |
| Item 4 | - | -12.9 | -7.8 | -75.6 | -13.1 |
| REVISED | 251.6 | 266.0 | 423.8 | 577.1 | 481.0 |

The overall effect of these changes is not significant. (Note: Two commentors suggested that the DON use a shorter life-cycle cost analysis than the 30-year analysis performed in the EIS. In response, the DON conducted a 25 year life-cycle analysis for each alternative. The change was not significant.)

Outlying Fields - One commentor suggested that further consideration should be given to the use of outlying fields in addition to or in lieu of NALF Fentress. There are no other outlying airfields within 50 miles of NAS Oceana that could accommodate F/A-18 operations. Chapter 2 of the FEIS discusses the operational and fiscal reasons for establishing a 50-mile limitation.

Seatack Elementary School - One commentor asked for clarification of the location of Seatack Elementary School relative to the new APZs. Under ARS 2, APZ-1 bisects Seatack Elementary school.

Chesapeake Bay Water Quality - EPA expressed concern about potential impacts to the Chesapeake Bay water quality from $NO_x$ emissions. As indicated in the FEIS, the $NO_x$ emissions from the proposed action conform to Virginia's State Implementation Plan. Calculations indicate the net increase in $NO_x$ emissions over the Chesapeake Bay watershed from implementing ARS 2 will be approximately 1 ton per day to the regional airshed. This amount is minor compared to the overall input to the bay from all existing terrestrial and atmospheric sources. Therefore, the affect of the projected increase in air traffic and the associated air emissions over the Chesapeake Bay will be minimal.

State Historic Preservation Determination - Under Section 106 of the National Historic Preservation Act, the Virginia State Historic Preservation Office and the South Carolina Department of

Archives and History concurred with the DON's determination that implementation of ARS 2 would have "no effect" on historic properties.

CONCLUSIONS: In deciding where to realign F/A-18 fleet and FRS aircraft from NAS Cecil Field, I considered the following: 1995 BRAC Commission recommendations concerning capacity and infrastructure; F/A-18 operational requirements; costs associated with construction of facilities, operation and maintenance of aircraft, and training of personnel; environmental impacts; and comments received during the DEIS and FEIS public review periods.

I have analyzed and carefully weighed all of these factors and have decided, on behalf of the DON, to direct realignment of two F/A-18 fleet squadrons (24 aircraft) to MCAS Beaufort, South Carolina, and nine F/A-18 fleet squadrons and the FRS (for a total of 156 aircraft) to NAS Oceana, Virginia. ARS 2, which stations most of the squadrons at NAS Oceana and collocates two Navy squadrons with their Marine Corps counterparts at MCAS Beaufort, offers operational benefits that are not realized under the other alternatives: it establishes air wing integrity at MCAS Beaufort for the joint Navy-Marine Corps squadrons that deploy together, while retaining air wing integrity for the squadrons located at NAS Oceana. It also reduces usage of the North Carolina training ranges, and environmental impacts are slightly less than in ARS 1. While costs are slightly greater than in ARS 1, ARS 2 is the least expensive dual-siting

alternative, it fully uses excess capacity at MCAS Beaufort, and it takes full advantage of existing Marine Corps training and maintenance facilities.

Implementation of ARS 2 will result in significant land use and noise impacts on the local communities around MCAS Beaufort, NAS Oceana, and NALF Fentress. In addition to the specific mitigation measures identified in this Record of Decision, the DON will continue to review its operational procedures at NAS Oceana, NALF Fentress, and MCAS Beaufort to determine if any additional mitigation is feasible and practicable.

18 May 98
Date

Duncan Holaday
Deputy Assistant Secretary
of the Navy
(Installations and Facilities)

# Airfield and Airspace Operational Study for the 1995 BRAC Realignment of Navy F/A-18 Aircraft

February 18, 1998

Submitted under contract
N68925-93-D-A093

**Naval Facilities Engineering Command**
Department of the Navy
Alexandria, Virginia

ATAC
**ATAC Corporation**
Sunnyvale, California

# PREFACE

The Airfield and Airspace Study for the 1995 BRAC Realignment of Navy F/A-18 Aircraft was conducted by ATAC Corporation under Work Order Number 13 of Contract Number N68925–93–D–A093. The Naval Aviation Simulation Model, NASMOD, the primary tool used to produce this study, was developed by ATAC for the Naval Facilities Engineering Command (NAVFAC).

The ATAC analysts for this study, and the authors of this report, are Derek Huber, Eric Boyajian, and Joe Martin. Michael Abkin is overall project manager. The authors acknowledge the indispensable contributions throughout this study of other members of ATAC's NASMOD team and of our Navy, Marine Corps, and Air Force points of contact.

**Update Note:**

This final report is an update to the final report originally issued August 22, 1997. Several tables and figures have been modified, including Tables 2-4, 2-5, and 2-7 and Figure 4-4, to reflect current information and to correct reported data. Also, descriptions of the Manteo/Dare County Regional Airport runways have been updated (see Section 4).

Subsequent to publication of the August 1997 Final Report, the Navy reduced the number of F-14 aircraft in fleet squadrons and in the F-14 fleet replacement squadron (FRS). The reduction was a function of the age of some F-14 aircraft. As a result, the eleven F-14 fleet squadrons at NAS Oceana will be reduced from 150 to 114 F-14 aircraft, and the FRS will be reduced from 48 to 33 aircraft. The total F-14 aircraft at NAS Oceana is now 147. The maximum number of pilots per squadron will also be reduced from 18 to 15. There will be no reduction in the number of pilots in the FRS.

As a result of these reductions in aircraft and pilots, the number of sorties projected by F-14 fleet squadrons is estimated to decrease by 17 percent from those identified in the August report. In calculating this percent reduction, the reduction in pilots per squadron was assumed to affect the frequency of all flight types equally. Although the number of FRS aircraft is reduced from 48 to 33, the number of pilots in the FRS and the FRS pilot training requirements will remain unchanged. The projected sorties for the FRS will be identical to those identified in the August report.

# EXECUTIVE SUMMARY

This study examines the capability of NAS Oceana and MCAS Cherry Point, including NALF Fentress, MCALF Bogue, and the local airspace and ranges, to accommodate the prospective levels of operations resulting from the implementation of BRAC 95-related decisions. This analysis is accomplished through the use of a fast-time computer simulation model, NASMOD.

Five alternative relocation scenarios (ARS) were identified by the Navy for analysis. Each scenario represents an alternative base-loading squadron mix in a future year (i.e., FY99) following the relocation and realignment of the modeled squadrons. A baseline scenario was analyzed with which to compare the alternatives.

The tenant mix for the Baseline Scenario is as follows:

| NAS Oceana | MCAS Cherry Point |
|---|---|
| 7 F-14 Atlantic fleet squadrons<br>4 F-14 Pacific fleet squadrons<br>1 F-14 FRS<br>1 F/A-18 adversary squadron | 3 AV-8 fleet squadrons<br>1 AV-8 FRS<br>4 EA-6B squadrons<br>1 KC-130 fleet squadron<br>1 KC-130 FRS |

The alternative scenarios specify the location of the Atlantic F/A-18 squadrons as follows:

| | ARS-1 | ARS-2 | ARS-3 | ARS-4 | ARS-5 |
|---|---|---|---|---|---|
| NAS Oceana | 11 + FRS | 9 + FRS | 8 + FRS | 6 + FRS | 6 + FRS |
| MCAS Cherry Point | | | 3 | | 5 |
| MCAS Beaufort | | 2 | | 5 | |

The impacts of Navy squadron realignment alternatives on MCAS Beaufort and that air station's surrounding training areas is not examined in the study.

On an annual basis, the increase in flight operations from the realignment of the Navy F/A-18 squadrons does not affect the ability of the squadrons to complete their overall flight requirements. Although increases for most aircraft groups in adjusted and postponed flights do occur in the alternative scenarios, no significant postponements in flight scheduling are experienced. Some adjustments are made to alternative or less-preferred training areas for most squadrons. Also, shifting of flight launch times due to adjusted training area selections affect squadron aircraft allocation and overall scheduling efficiency.

The impacts to airfield operations at NAS Oceana by a comparison between the Baseline Scenario and ARS-1 are as follows:

- Operations increase by about 120 percent.
- NALF Fentress experiences an increase of 51 percent in operations.
- Taxi delay rises from an average of 1.0 minute to 1.9 minutes per sortie.

# 1 INTRODUCTION

This study examines the capability of Naval Air Station (NAS) Oceana and Marine Corps Air Station (MCAS) Cherry Point, including Naval Auxiliary Landing Field (NALF) Fentress and Marine Corps Auxiliary Landing Field (MCALF) Bogue Field, and the related ranges, military operations areas (MOAs), warning areas, and restricted areas, to accommodate prospective levels of operations resulting from 1995 Base Realignment and Closure (BRAC 95)-related decisions. Figure 1-1 depicts the general study region. This section describes the issues and objectives of the study, the methodology followed, data sources, and the contents of this report.

## 1.1 Issues and Study Objectives

The Navy has identified several issues associated with the BRAC 95-related decisions to single site the F-14 squadrons at NAS Oceana and to relocate NAS Cecil Field-based F/A-18 squadrons. These issues include:

- The sufficiency of airfield, airspace, and range capacity to accommodate the projected activity in the NAS Oceana and MCAS Cherry Point region;
- The ability of squadrons to meet their training requirements; and
- The environmental impacts on the military facilities, training areas, routes, and ranges, as well as the communities surrounding them.

Fiscal Year 1999 (FY99) is the simulation period; the proposed relocations of the F-14 fleet squadrons from NAS Miramar and the F/A-18 fleet squadrons and F/A-18 fleet replacement squadron (FRS) from NAS Cecil Field are assumed to be completed by this year.

The principal study objective is to provide the Navy with an analysis of operations within the study region under alternative base loading conditions that address these issues. The results presented are inputs to noise and environmental impact studies.

## 1.2 Study Methodology

The study methodology employs a general simulation model for naval aviation operations, the Naval Aviation Simulation Model (NASMOD). Using data and information supplied by the Navy, Marine Corps, and Air Force, ATAC configured NASMOD to represent the aviation activities at NAS Oceana and MCAS Cherry Point with the existing and proposed tenants. These simulation inputs reflect the anticipated operations at the modeled airfields and airspace including several associated bombing ranges, MOAs, and warning and restricted areas.




*Figure 1-1: Airspace Study Region*

## 1.3 NASMOD Background

The development of NASMOD was motivated by a need within the Navy for a technically credible tool to objectively and efficiently analyze options in a number of critical naval aviation decision areas. For example:

- Base closings and realignments. Is there sufficient airfield and airspace capacity at selected sites to accommodate the training requirements of both existing and realigned military users? What operational alternatives are there that could potentially mitigate capacity constraints? What are the potential impacts on civilian traffic in the area?
- Changes in special use airspace. What operational efficiencies are attainable from proposed modifications to MOAs, warning areas, and other military special use airspace areas (SUAs); or from proposed changes in operating schedules and configurations of such areas? What would be the training and cost impacts to the military of restrictions on the availability or use of such areas? What impacts might there be on civilian traffic?
- Interactions between civilian and military air traffic. What are the cost and operational impacts on military and civilian users of shared airspace due to: projected growth in levels of activity, changes in instrument flight rule (IFR) routes and/or air traffic control (ATC) procedures, or changes in the operational requirements of the users?
- New aircraft types. What are the airfield and airspace impacts associated with the introduction of a new aircraft type and its affiliated training requirements? What procedural or operational changes in airfield and airspace management, schedules, and configurations are feasible to mitigate identified constraints?
- Changes in training and resource requirements. What airfield and airspace modifications may be required due to changes in mission (e.g., the addition of night bombing to the F-14 mission), pilot training requirements (e.g., increased flight hours in the Training and Readiness Matrix for certain training events), or training resource requirements (e.g., instructors, adversary aircraft, target facilities)? What operational changes in airfield and airspace management, schedules, and configurations are feasible?
- Environmental assessments and environmental impact statements. What are the potential impacts on airfield operations and utilization of ranges and SUAs, which in turn have noise and other environmental impacts, due to changes in operations?

NASMOD is derived directly from two other general simulation models: the Navy Air Training System Model (NATS) and the Airfield and Airspace Capacity Model (SIMMOD). NATS was developed in the mid-1980s for analysis of special use airspace and other resource impacts on basic flight training at NAS Whiting Field, Florida. The design of the model was specialized for that particular application. SIMMOD, conversely, is the official simulation model of the Federal Aviation

Administration (FAA) and is used in terminal and en route airspace environments for analysis of airfield and airspace capacity issues. It has been validated and used in numerous studies for the analysis of airport layouts, runway and taxiway procedures, sectorization plans, air traffic control procedures, traffic management strategies, and traffic routing. NASMOD incorporates the functionality of NATS, the simulation and analytical capabilities of SIMMOD, and also includes advanced database and analytical capabilities necessary to model complex tactical military training operations.

NASMOD is a fast-time computer simulation model composed of:

- A graphical user interface (GUI) for data entry, including database table editing and graphical tools for building airfields, routes, and mission profiles; simulation control; and results analysis, including a database querying tool;
- A traffic animator, which replays a simulated day of air traffic and training operations as an animated, graphical approximation of the events simulated by the NASMOD mathematical model;
- Relational databases of input and output data, wherein the input data control the model assumptions and parameters, and the output data contain the results for the simulation period;
- Simulation modules that model squadron mission scheduling, central scheduling of airspace areas, and the evolution of military missions and their interactions with other modeled traffic; and
- A performance calculator that computes selected measures of performance for squadrons and their training activities, airfield operations, and airspace and range area scheduling and utilization.

Appendix D provides an overview of the NASMOD simulation model components.

## 1.4 Study Process

A NASMOD study consists of four basic phases: study design, data collection, model development, and scenario simulation and analysis. Each study is a highly iterative and interactive process requiring extensive coordination between the analysts and the data sources during all phases. Often, information learned and insights gained during a later phase of the study necessitate revisiting earlier phases before proceeding. Occasionally, assumptions are adjusted, data collection is revised, or the scenario design is modified.

### 1.4.1 Study Design

During the design phase of a study, analysts and military personnel meet and determine the baseline and operating alternatives, including the assumptions

governing each. Occasionally, modifications or updates are required to reflect results of the analysis in progress, particularly when the need for a more detailed analysis is recognized or an area of interest changes due to a dynamic decision.

### 1.4.2 Data Collection Requirements and Sources

During the data collection phase of the study, analysts collect the large volume of data required for model construction and analysis. These data describe current and proposed operations. For this study, there are three general categories of data sources: publications; personal interviews and observations of operations; and records of actual airfield and airspace operations. The References section lists all of the documents, publications, and other direct and indirect sources used. Examples of the published information include: letters of agreement, maps and charts of airspace structures and airfield facilities, approach plates, computer-aided design (CAD) and other engineering drawings, the air operations manual, and range regulations. Examples of information gathered through interviews and direct observations include: ATC procedures, flight profiles, flight scheduling requirements, and squadron deployment specifications. Actual operations records include: ATC facility logs, traffic analyzer data, and squadron flight schedules.

### 1.4.3 Model Development

Preparation of the NASMOD input database involves analyzing the collected data and extracting and assembling the essential information. Analysts convert this information into the format required by the model, enter the data, and then test various parameters for accuracy.

### 1.4.4 Simulation and Analysis of Alternative Scenarios

Each alternative scenario requires a separate database with parameters set to reflect the appropriate assumptions. The model simulates the air traffic and training operations associated with those assumptions. For this study, ATAC uses a one-year simulation period. Results from the one-year period account for the seasonal variation in operations and the impact of unit deployment schedules. Simulation results are used in the analysis to identify, quantify, and compare the differences between the baseline and operating alternatives.

## 1.5 Report Contents

This report documents the process, assumptions, results and analyses of the Airfield and Airspace Operational Study for the 1995 BRAC Realignment of Navy F/A-18 Aircraft (hereinafter refered to as the Navy F/A-18 Realignment Study). The report contains four additional sections. These sections describe the model building process with a description of the alternative scenarios and their associated

assumptions, the comparative analysis among the alternatives based on simulation results, and the summary and conclusions. The appendices contain a description of the model and selected detailed results. A glossary of terms and lists of references and acronyms are also provided.

# 2 SCENARIO SPECIFICATION AND MODEL DEVELOPMENT

This section describes the model development process and provides detailed information about the baseline and five alternative base-loading scenarios studied. It provides an overview of the key logical and data assumptions that comprise the Navy F/A-18 Realignment Study, including airfield and airspace data, training area descriptions, and user operations characteristics.

## 2.1 Scenario Specifications

The five alternative scenarios for this study are unique base-loading possibilities involving Navy F/A-18 squadrons from NAS Cecil Field. All assumptions governing the baseline scenario also apply to each alternative scenario unless specifically stated otherwise in the following discussions. Table 2-1 summarizes the Navy F/A-18 squadron base loading for each alternative scenario. Note that, although two scenarios assume F/A-18 assets are relocated to MCAS Beaufort, analysis of the impacts on the MCAS Beaufort area of this relocation is outside the scope of this study.

The alternative realignment scenario (ARS) designation reflects the numbering of the scenarios in the environmental impact statement (EIS) for which this study is a data source.

***Table 2-1: Alternative Relocation Scenarios of the Navy F/A-18 Squadrons***

| | ARS-1 | ARS-2 | ARS-3 | ARS-4 | ARS-5 |
|---|---|---|---|---|---|
| **NAS Oceana** | 11 + FRS | 9 + FRS | 8 + FRS | 6 + FRS | 6 + FRS |
| **MCAS Cherry Point** | | | 3 | | 5 |
| **MCAS Beaufort** | | 2 | | 5 | |

The Baseline Scenario against which the above alternatives are compared assumes that four Pacific Fleet F-14 squadrons are based at NAS Oceana along with seven Atlantic Fleet F-14 squadrons, one F-14 fleet replacement squadron (FRS), and one Navy F/A-18 adversary squadron. Based at MCAS Cherry Point are three AV-8 fleet squadrons, one AV-8 FRS, four EA-6B squadrons, one KC-130 fleet squadron, and one KC-130 FRS. In the Baseline Scenario, all Navy A-6 squadrons at NAS Oceana are decommissioned, and the base loading at MCAS Cherry Point reflects current conditions.

The EIS specification of ARS-5 includes the addition of a new runway parallel to Runway 23R at MCAS Cherry Point. This study does not address the quantitative impacts of the parallel runway. However, descriptions of the location and specifications of the parallel runway (that are currently known) and changes that will be made to the air station's patterns and operations are provided in Section 2.3.4.1. A qualitative assessment of the impacts of the parallel runway is presented in Section 3.

## 2.2 Airfield Operations

NAS Oceana and MCAS Cherry Point are master Navy and Marine Corps air stations in Virginia and North Carolina, respectively. Other Navy/Marine Corps airfields in the region include NAS Patuxent River, NAS Norfolk, and MCAS New River; these three air stations are not under consideration as sites for basing Navy F/A-18 squadrons.

### 2.2.1 NAS Oceana Operations

The NAS Oceana airfield is located approximately 3½ miles west of the Atlantic coast in Virginia Beach, Virginia, as shown in Figure 2-1. NALF Fentress, an outlying airfield used primarily for field carrier landing practice (FCLP) operations, is located about 8½ miles southwest of NAS Oceana. This region has experienced substantial commercial and residential growth in recent years with significant development occurring just outside the confines of the air station.




*Figure 2-1: Vicinity of NAS Oceana*

NAS Oceana has two sets of dual runways for arrival and departure traffic. Runways 5L/R (left/right) and 23L/R are the "calm wind" runways. These runways are preferred at times when wind is not a constraining factor (typically less than 3 knots) due to their length, orientation with respect to arrival and

departure routings, and proximity to desired ground features such as high speed exits and fuel pits. Figure 2-2 depicts the proposed NAS Oceana airfield layout after the proposed realignment of the F-14 and F/A-18 squadrons.




***Figure 2-2: NAS Oceana Airfield Layout***

In general, airfield operations for all scenarios modeled in NASMOD are in accordance with published ATC procedures and consistent with the current NAS Oceana Air Operations Manual. However, to facilitate timely development of the NAS Oceana airfield model, all the airfield operations are "mapped" to one duty runway plan (Runways 5R and 5L). This greatly reduces the modeling effort while

achieving the desired results with no significant loss of accuracy. NAVFAC and NAS Oceana base operations representatives concurred with this approach. Therefore, results related to specific runways are not addressed in this study; however, such statistics can be derived by distributing the total operations among the runways based on their historical proportion of total usage.

This approach is supported by several NAS Oceana airfield characteristics, including:

1. The airfield consists of two pairs of dual runways (5/23 and 14/32) aligned about 90 degrees from each other. Historically, total airfield operations have been distributed by runway pair as follows:

| Runway Pair | Operations Distribution |
|---|---|
| 5 | 50% |
| 14 | 2% |
| 23 | 34% |
| 32 | 14% |

2. There is no significant difference between the duty runways in the total time required by aircraft to taxi for takeoff and return to the ramp after landing. There is somewhat less room for aircraft holding for departures on Runway 32.
3. Overhead break approaches and precision approach landing system (PALS) approaches are available to all four runway pairs. Standard departures can be made from all the runways. Instrument carrier landing system (ICLS) services are available on Runway 5R.
4. Each of the runway pairs has a visual pattern and a GCA box pattern. The capacities of the patterns are the same for each runway pair.
5. Field carrier landing practice (FCLP) can be performed on each of the four runway pairs.

The airfield facilities and ground activities (i.e., aircraft parking areas, refueling pits, and taxiways) are modeled according to the current airfield layout and operating procedures. A node/link network in NASMOD represents the runway/taxiway/parking area. Airfield nodes are placed at physical positions where aircraft interact or where significant events (in terms of aircraft movements) occur, including the ends of runways, runway exits, runway/taxiway crossing points, taxiway/taxiway crossing points, refueling pits, and parking areas. A link is the travel path between two nodes. Figure 2-3 depicts the node/link network constructed for NAS Oceana.

The direction in which links can be traversed and the type of operation that can use a link (that is, arrivals only, departures only, or both arrivals and departures) are inputs to the model. In traveling between two ground nodes (e.g., fuel pit and hangar), the taxipath to be used by an individual aircraft can be either pre-specified in the NASMOD input or determined by the model logic to achieve the minimum-time routing. The minimum-time routing logic is implemented as much as possible

except in cases where specific directionality is required, such as when aircraft pass through the fuel pits.




***Figure 2-3: NAS Oceana NASMOD Airfield Network for the Runway 5 Plan***

Operations at the aircraft parking areas are not modeled in detail. Squadron parking areas, in which a specific squadron or squadrons park, are defined instead of parking spaces for individual aircraft. The capacity of a squadron parking area is defined as the total number of individual aircraft capable of being parked there. The squadron parking area allocation is based primarily on the actual squadron

The frequently used, published routes are:

APOLLO Departure: This standard departure follows the 175° NTU (NAS Oceana) Tactical Air Navigation (TACAN) radial. Aircraft departing the field climb to 1000 feet (altitudes in MSL) and maintain until clear of the VFR pattern. Aircraft then execute a right turn from Runways 5 and 14 and a left turn from Runways 23 and 32 to intercept the radial within four nautical miles (NM) of the TACAN. The left turn from Runway 32 should be made within two NM. Aircraft should climb above 11,000 feet within 38 miles along the radial. There are a number of transitions along this route for entry into W-72, the W-72 Tactical Aircrew Combat Training System (TACTS) range, R-5314 and the Navy Dare County Bombing Range, R-5313, Stumpy Point MOA, Pamlico MOA, and W-122.

SOUCEK Departure: Aircraft on this standard departure climb straight from Runway 5 or execute left turns above 3500 feet from Runways 14, 23, and 32 to intercept the 95° radial of the Norfolk International Airport Very High Frequency Omnidirectional Range Tactical Air Navigation (VORTAC) transmitter. Transitions take aircraft into W-386 and W-72.

NORFOLK Departure: Aircraft on this standard departure climb to 1500 feet while maintaining their runway heading. They are then given radar vectors to their appropriate transition or fix. A flight track to the SCHOL fix has been modeled for missions using the military training routes (MTRs) to the west.

SANDERS Approach: Aircraft on this standard approach intercept the 193° NTU TACAN radial within 29 NM at altitudes between 4500 feet and 6500 feet. When three NM from the airfield, they turn to fly the three-NM arc until they intercept the duty runway extended center-line, at which point they turn to enter the break or land.

LIGHTSHIP Approach: This standard approach is available only to runways 23 and 32. Aircraft on this approach intercept the 83° NTU TACAN radial within 16 NM at altitudes between 4500 feet and 6500 feet. When three NM from the airfield, they turn to fly the three-NM-radius arc until they intercept the duty runway extended center-line, at which point they turn to enter the break or land.

Two patterns are used at the NAS Oceana airfield for visual and instrument approach training. The visual pattern, also called the tower pattern, is a left-hand pattern in which aircraft conduct touch-and-go operations to Runway 5L. FCLP operations also use this pattern. Aircraft operate at 1000 feet AGL (above ground level) on the downwind leg of this pattern. ATC limits five aircraft to the tower pattern. Aircraft enter the visual pattern from the overhead break approach (most common), a straight-in visual approach, a transition from an instrument approach to Runway 5R, or directly after take-off. The instrument pattern, or GCA box pattern, is a right-hand pattern to Runway 5R. Instrument approaches involve shallower approach angles, hence a larger distance from an initial point to the

runway, than visual approaches. For modeling purposes, ATC personnel stated that a reasonable maximum number of aircraft in the GCA pattern at one time is eight aircraft.

The NALF Fentress pattern is designated as the airspace below 1000 feet and within 1¾ nautical miles from the center of the airfield. This auxiliary field is used only under VFR or Special VFR (SVFR) conditions. Interfacility departures from NAS Oceana to NALF Fentress use the following procedures:

> NALF Fentress duty runway is 5: NAS Oceana Runway 5 and 14 departures execute right turns within 3 nautical miles to intercept the 201° (VFR) or 213° (SVFR) NTU TACAN radial. They follow the radial at or below 1500 feet (VFR) or as assigned (SVFR) to 11 nautical miles from the TACAN at which they execute a right hand turn and enter NALF Fentress pattern via the break at 1000 feet. NAS Oceana Runway 32 departures execute left turns within 3 nautical miles to intercept the 233° (VFR) or 213° (SVFR) NTU TACAN radial. They follow the radial at or below 1500 feet (VFR) or as assigned (SVFR) to 11 nautical miles from the TACAN at which they execute a left (VFR) or right (SVFR) hand turn and enter NALF Fentress pattern via the break at 1000 feet.
>
> NALF Fentress duty runway is 23: All NAS Oceana departures execute turns within 3 nautical miles to intercept the 223° NTU TACAN radial. They follow the radial at or below 1500 feet (VFR) or as assigned (SVFR) and directly enter NALF Fentress pattern via the break at 1000 feet.

Interfacility departures from NALF Fentress to NAS Oceana use the following procedures:

> NAS Oceana duty runway is 5: NALF Fentress departures proceed directly to NAS Oceana for a straight-in approach.
>
> NAS Oceana duty runway is 14: NALF Fentress Runway 5 departures proceed directly to NAS Oceana and enter the downwind leg of the tower pattern. NALF Fentress Runway 23 departures turn left and proceed to NAS Oceana via the STUMPY LAKE fix and enter the base leg of the tower pattern.
>
> NAS Oceana duty runway is 23: NALF Fentress departures turn right and proceed to NAS Oceana via the PUNGO fix and enter the downwind leg of the tower pattern.
>
> NAS Oceana duty runway is 32: NALF Fentress Runway 5 departures turn right and proceed to NAS Oceana via the PUNGO fix and enter the base leg of the tower pattern. NALF Fentress Runway 23 departures turn left and proceed to NAS Oceana via the PUNGO fix and enter the downwind leg of the tower pattern.

The upwind leg of NALF Fentress visual or FCLP pattern is a maximum of 1.5 miles for Runway 5 and a minimum of 1.7 miles for Runway 23. The pattern

altitude is 800 feet. Coordination by a landing signal officer (LSO) is required when more than one aircraft is in the pattern.

### 2.3.3 MCAS Cherry Point Airspace Description

The MCAS Cherry Point RATCF provides radar air traffic control services for airports and air traffic operations within Alert Area 530 (A-530), the Restricted Area 5306 complex (R-5306A, C, D, and E), and portions of Warning Area 122 (W-122) at-or-below 17,000 feet, and in other areas where altitudes and airspace structures are specified by letters of agreement. Figure 2-9 depicts the modeled approach control airspace boundaries and stratification. Air traffic control responsibilities for R-5313 and R-5314 are delegated by Washington ARTCC to FACSFAC VACAPES when these areas are in use by military units.




***Figure 2-9: MCAS Cherry Point Approach Control Airspace***

Since the commissioning of this study, a proposal has been made to modify the boundaries of the MCAS Cherry Point Approach Control Airspace by increasing the volume of airspace under the MCAS Cherry Point RATCF's control by approximately 300 percent, with lateral boundaries stretching to R-5314. Personnel at MCAS Cherry Point RATCF stated that the change will increase the quality of services (e.g., improved radar and radio coverage for several airports, improved traffic flow efficiency due to new airspace sectorization) provided to aircraft operating in the new airspace but will not have significant impacts on military and civilian traffic routings.

#### 2.5.1.4 F-14 Fleet Squadrons

There are eleven F-14 fleet squadrons based at NAS Oceana in the baseline scenario. These are composed of seven Atlantic fleet and four Pacific fleet squadrons. Squadron compositions are shown in Table 2-6. Many squadrons begin their workup with fewer than their full complement of aircrews and aircraft; however, as their deployment date gets closer, the squadrons are usually brought up to full strength. Typically, only ten aircraft per squadron are mission capable on a given day.

***Table 2-6: F-14 Fleet Squadron Compositions***

| Squadron Type | Number of Squadrons | Aircraft per Squadron | Aircrew per Squadron |
|---|---|---|---|
| F-14 Fleet (Atlantic) | 3 | 14 | 18 |
| F-14 Fleet (Atlantic) | 4 | 13 | 17 |
| F-14 Fleet (Pacific) | 4 | 14 | 18 |

The squadrons typically work Monday through Friday; however, weekends are utilized to catch up on incomplete training due to unforeseen events, such as bad weather and equipment failures. Cross-country flights and detachment transits are often (or primarily) flown during the weekend. The F-14 fleet squadrons occupy Hangars 500, 404, and 200 in the western-facing ramp area at NAS Oceana.

#### 2.5.1.5 F/A-18 Fleet

All F/A-18 squadrons are assumed to be similar in composition and workup schedule. Each squadron is assumed to have 17 aircrews and 12 aircraft; however, on average only nine aircraft are mission capable on a given day.

Like the F-14 squadrons, the F/A-18 squadrons typically work Monday through Friday with "catch-up" training, cross-country flights, and detachment transits flown primarily on weekends. The F/A-18 fleet squadrons occupy Hangars 111 and 122 in the eastern-facing ramp area at NAS Oceana. At MCAS Cherry Point, they occupy Hangars 1665W, 131S, and 1700E as well as additional ramp space adjacent to Hangar 130 for ARS-5.

#### 2.5.1.6 Navy Squadron Airwing Assignments

An important component of a squadron's impact over the course of a year on its home air station and the local training areas is its airwing assignment. After proposed carrier deployment cycles were determined by AIRLANT personnel and ATAC analysts, the composition of each airwing for each scenario was carefully selected in order to have an *average* impact over the year on NAS Oceana, MCAS Cherry Point, and the local training areas. Table 2-7 presents the Atlantic Fleet airwings' composition of Navy F-14 and F/A-18 squadrons for the alternative

### 3.2.1 NAS Oceana Operations

All of the alternative scenarios involve the relocation of F/A-18 squadrons to NAS Oceana, resulting in a significantly greater number of annual operations than are observed for the Baseline Scenario. Figure 3-2 illustrates the proportion of day (defined as 0700–2200) versus night (2200–0700) operations. The percentage of




*Figure 3-2: NAS Oceana Annual Airfield Operations*

night operations for the alternative scenarios ranges from 8.1 percent (ARS-3 ) to 8.5 percent (ARS-1) of total operations while it is 6.5 percent for the Baseline Scenario. This reflects the heavier emphasis on nighttime operations by the F/A-18 squadrons.

With the greatest number of squadrons based at NAS Oceana (25 squadrons) of the analyzed scenarios, ARS-1 generates the greatest increase in annual operations over the Baseline Scenario, as shown in Table 3-3. The F/A-18 FRS generates 47 percent (over 60,000) of the additional operations in ARS-1; if only the FRS

*Table 3-3: Percentage Increase in Annual NAS Oceana Operations over the Baseline*

| | |
|---|---|
| ARS-1 | 118.1% |
| ARS-2 | 108.6% |
| ARS-3 | 100.6% |
| ARS-4 | 92.6% |
| ARS-5 | 92.9% |

is realigned to NAS Oceana, airfield operations would increase by 56 percent over the Baseline Scenario. The increase over the baseline is significantly less for ARS-4 and ARS-5 which have six (vice 11) F/A-18 Fleet squadrons based at NAS Oceana.

Pattern operations at NAS Oceana significantly increase with the realignment of the F/A-18 squadrons in each of the alternative scenarios. Table 3-4 shows the number of annual operations conducted in the VFR pattern, the FCLP pattern, and the instrument pattern for each scenario. Table 3-5 presents the percentage increase over the Baseline Scenario in each pattern type at NAS Oceana for the alternative realignment scenarios. The VFR touch-and-go operations are more than doubled in all scenarios, with the F/A-18 FRS alone contributing over 38,000 operations. NAS Oceana-based squadrons prefer to conduct FCLP operations at NALF Fentress and utilize NAS Oceana only when NALF Fentress is unavailable. In the Baseline Scenario, squadrons are able to complete their FCLP training without utilizing NAS Oceana; however, in each of the alternative scenarios, NAS Oceana is utilized for FCLP training. This "off-load" of operations represents about three percent of the total FCLP operations conducted by NAS Oceana-based squadrons in ARS-1. Note that the amount of exclusive-use pattern time utilized at NAS Oceana (on Runway 5L) in ARS-1 is approximately 25 hours for the year.

***Table 3-4: Annual Pattern Operations at NAS Oceana***

| | Baseline | ARS-1 | ARS-2 | ARS-3 | ARS-4 | ARS-5 |
|---|---|---|---|---|---|---|
| VFR Touch-and-Go Operations | 52,300 | 117,800 | 114,200 | 110,800 | 106,700 | 106,500 |
| NAS Oceana FCLP Operations | 0 | 3,500 | 2,900 | 1,400 | 2,300 | 1,800 |
| Instrument Touch-and-Go Operations | 9,400 | 17,300 | 17,000 | 16,600 | 16,100 | 16,200 |
| Note: Operations rounded to the nearest 100. | | | | | | |

***Table 3-5: Percentage Increase in Annual Pattern Operations at NAS Oceana over the Baseline***

| | ARS-1 | ARS-2 | ARS-3 | ARS-4 | ARS-5 |
|---|---|---|---|---|---|
| VFR Touch-and-Go Operations | 125% | 119% | 112% | 104% | 104% |
| Instrument Touch-and-Go Operations | 84% | 80% | 77% | 71% | 72% |

One measure of potential airfield congestion is the average amount of taxi time required per sortie. For this calculation, taxi time is considered to be the time an aircraft spends moving from one point to another on the airfield before and after a flight. Time spent arming, de-arming, pit refueling, or waiting for an available fuel pit, while modeled, is not included in the taxi time delay analysis since not all sorties perform these activities. Consequently, the only taxi times considered are the time spent in motion and the delays imposed by pilot and controller action,

*Table 3-6: Average "Per Sortie" Taxi Times (in minutes) for NAS Oceana*

| Per Sortie (sum of pre-takeoff and post-landing) | | |
|---|---|---|
| | Taxi Duration | Taxi Delay |
| Baseline | 15.1 | 1.0 |
| ARS-1 | 17.3 | 1.9 |
| ARS-2 | 17.1 | 1.8 |
| ARS-3 | 17.0 | 1.7 |
| ARS-4 | 16.8 | 1.6 |
| ARS-5 | 16.8 | 1.6 |

such as holding short for takeoff and waiting to cross active runways or busy taxiways. All sorties are subject to these types of delays, regardless of their mission. As can be seen from Table 3-6, the average taxi delay for ARS-1 is almost double that for the Baseline Scenario, generating about a 15 percent increase in the total average sortie taxi time.

The amount of delay a sortie experiences while refueling in the pits is another indicator of airfield congestion. Section 2.2.1 notes that the fuel pits are modeled to accommodate the simultaneous refueling of up to four aircraft on the western-facing ramp and four aircraft on the eastern-facing ramp, with queues of up to six aircraft allowed for each ramp area. The six-aircraft-per-queue limit is the threshold used by the model to determine the point at which additional aircraft taxi directly to their line without waiting to refuel at the pits.

Table 3-7 lists some noteworthy fuel pit statistics for selected scenarios. The **Total Aircraft Requesting Pit Refueling** is a count of all the annual sorties that will use the fuel pits if they can. The **Aircraft that Must Wait** is the number of aircraft that want to use the fuel pits but find them all occupied upon arrival. Note that this value is 141 percent higher for ARS-1 than it is for the baseline while the number of aircraft requesting pit refueling is only 112 percent higher. This difference in the relative comparisons of the two statistics indicates that the fuel pit capacity adversely affects the level of operations for ARS-1. This condition is not the case for ARS-3. The **Aircraft that Must Wait** statistic is given as a proportion of **Total Aircraft Requesting Pit Refueling** in the row labeled **Percentage of Total Aircraft that Must Wait**. This percentage can also be interpreted as the probability that the desired fuel pit is occupied when an aircraft wishes to enter. The **Percentage of Aircraft that Cannot Enter Queue** is a subset of the **Percentage of Total Aircraft that Must Wait**. This is the proportion or probability that not only are the four fuel pit slots in a given ramp area full, but there are already six aircraft waiting when another aircraft arrives. The queues for the western-ramp and eastern-ramp fuel pits are assumed to be independent; however, these statistics aggregate the fuel pits of both ramps. The **Average Wait Prior to Refueling** is virtually the same in all scenarios. This is the amount of time that an aircraft, once it has entered the queue, will actually spend waiting for a fuel pit slot.

*Table 3-8: Annual Pattern Event Completions at NAS Oceana*

| Aircraft Group | Desired Pattern Events* not Performed | | | | | |
|---|---|---|---|---|---|---|
| | Baseline | ARS-1 | ARS-2 | ARS-3 | ARS-4 | ARS-5 |
| F/A-18 Fleet | — | 1,386 | 1,249 | 931 | 770 | 741 |
| F/A-18 FRS | — | 1,576 | 1,753 | 1,607 | 1,341 | 1,432 |
| F-14 Fleet | 308 | 1,368 | 1,269 | 1,256 | 1,226 | 1,115 |
| F-14 FRS | 269 | 937 | 857 | 767 | 805 | 846 |
| Adversary/Transient | 99 | 251 | 187 | 226 | 196 | 200 |
| ***Total Events*** | 676 | 5,518 | 5,315 | 4,787 | 4,338 | 4,334 |
| **Aircraft Group** | **Percent of Desired Pattern Events* Performed** | | | | | |
| | Baseline | ARS-1 | ARS-2 | ARS-3 | ARS-4 | ARS-5 |
| F/A-18 Fleet | — | 91.8% | 91.5% | 92.4% | 92.2% | 92.3% |
| F/A-18 FRS | — | 93.5% | 92.8% | 93.4% | 94.5% | 94.1% |
| F-14 Fleet | 97.2% | 89.3% | 89.9% | 90.0% | 89.9% | 90.8% |
| F-14 FRS | 98.4% | 94.6% | 95.0% | 95.6% | 95.3% | 95.1% |
| Adversary/Transient | 97.9% | 95.4% | 96.6% | 95.8% | 96.4% | 96.3% |
| ***Total Percentage*** | 98.0% | 92.8% | 92.9% | 93.3% | 93.7% | 93.7% |

*One Event = Two Operations; excludes FCLP operations

### 3.2.2 NALF Fentress Operations

Figure 3-3 provides the number of annual operations at NALF Fentress for each of the scenarios, and Table 3-9 presents a comparison of the percentage increase of NALF Fentress operations from the Baseline Scenario. The impacts of the F/A-18 squadrons' realignment is significant: a 51 percent increase in operations (about 53,500 operations) in ARS-1 over the baseline and a 40 percent increase in ARS-4 and -5.

*Table 3-9: Scenario Comparisons of NALF Fentress Operations*

| | Percent Greater than Baseline | Daytime Operations | Nighttime Operations |
|---|---|---|---|
| Baseline | — | 38,056 | 66,612 |
| ARS-1 | 51.1% | 59,602 | 98,592 |
| ARS-2 | 43.3% | 56,008 | 94,032 |
| ARS-3 | 42.1% | 55,164 | 93,592 |
| ARS-4 | 39.2% | 53,408 | 92,252 |
| ARS-5 | 39.6% | 54,008 | 92,132 |

FCLP training is grouped into daytime and nighttime periods, with the first nighttime period occurring no earlier than thirty minutes after sunset. Table 3-9

provides a comparison of the daytime and nighttime (based on sunrise and sunset times) operations for NALF Fentress. For all the scenarios, about 63 percent of the FCLPs are conducted under nighttime conditions. However, only about 38 percent (33 percent for Baseline) are conducted after 2200. Of course, during the summer months, a greater number of FCLPs are flown after 2200 than during the winter months, simply due to the shifts in the sunset time.




***Figure 3-3: NALF Fentress Annual Airfield Operations***

Constraints on simulated daytime and nighttime FCLP scheduling at NALF Fentress exist due to airfield closure periods, the shifting of sunrise and sunset times during the year, and rigid block scheduling of Fentress time in NASMOD. The operating hours of NALF Fentress for a normal week are illustrated in Figure 3-4. The shaded regions denote the times that NALF Fentress is closed. Notice that the number of daytime and nighttime hours is dependent on the sunrise and sunset times. As modeled, NALF Fentress is scheduled in 45-minute time blocks; however, some of the open time periods, such as 1230–1630, do not divide evenly into 45-minute blocks and, consequently, fifteen minutes will be unused. During certain periods of the year, up to thirty minutes of nighttime hours are technically "unschedulable" each night. This limitation may not be entirely realistic since squadrons can slide the times at which they arrive at NALF Fentress, can mix with sister squadrons, or can simply use a time block less than 45 minutes. While the

# 5 SUMMARY AND CONCLUSIONS

This study examines the capability of NAS Oceana and MCAS Cherry Point, including NALF Fentress, MCALF Bogue, and the local airspace and ranges, to accommodate the prospective levels of operations resulting from the implementation of BRAC 95-related decisions. This analysis is accomplished through the use of a fast-time computer simulation model, NASMOD, by modeling the proposed tenant squadrons and other airspace and range users with their training requirements over a simulated year. This study also examines the issues related to the proximity of the Manteo/Dare County Regional Airport to R-5314.

The NASMOD model of NAS Oceana and MCAS Cherry Point was developed with extensive coordination between the analysts and military personnel and encompasses all the relevant airfield, airspace, and squadron attributes required to characterize the elements under the scope of this study.

Five alternative relocation scenarios (ARS) were identified by the Navy for analysis. Each scenario represents an alternative base-loading squadron mix in a future year (i.e., FY99) following the relocation and realignment of the modeled squadrons. A baseline scenario was analyzed with which to compare the alternatives.

The tenant mix for the Baseline Scenario is as follows:

| NAS Oceana | MCAS Cherry Point |
|---|---|
| 7 F-14 Atlantic fleet squadrons<br>4 F-14 Pacific fleet squadrons<br>1 F-14 FRS<br>1 F/A-18 adversary squadron | 3 AV-8 fleet squadrons<br>1 AV-8 FRS<br>4 EA-6B squadrons<br>1 KC-130 fleet squadron<br>1 KC-130 FRS |

The alternative scenarios specify the location of the Atlantic F/A-18 squadrons as follows:

| | ARS-1 | ARS-2 | ARS-3 | ARS-4 | ARS-5 |
|---|---|---|---|---|---|
| **NAS Oceana** | 11 + FRS | 9 + FRS | 8 + FRS | 6 + FRS | 6 + FRS |
| **MCAS Cherry Point** | | | 3 | | 5 |
| **MCAS Beaufort** | | 2 | | 5 | |

The impacts of Navy squadron realignment alternatives on MCAS Beaufort and that air station's surrounding training areas is not examined in the study.

In the Baseline Scenario, each modeled squadron and unit is able to complete its training with very little difficulty. Delays, scheduling adjustments and postponements, and incomplete airfield operations are minimal. The training areas, although significantly utilized, are able to accommodate users' demand adequately; however, some missions occasionally "flex" to alternate training areas due to scheduling conflicts.

With the realignment of the Navy F/A-18 squadrons from NAS Cecil Field to NAS Oceana and MCAS Cherry Point (ARS-3 and -5), operation levels at airfield and

local training areas increase significantly. With the increases in operations comes a cost to existing tenant squadrons (as well as the realigned squadrons) in terms of "lost" airfield operations (i.e., desired return-to-base pattern operations not performed due to full patterns, weather, or FCLP periods underway), more frequent usage of secondary and alternate training areas, an increase in adjusted and postponed missions, and flight launch times more frequently "pushed" later in the day or later in the evening. With more users in the region and more demand placed on limited training area resources, the scheduling of flight operations becomes more complex. These impacts of the increase in operations are costs to the users, air traffic control, and range schedulers in the area.

On an annual basis, the increase in flight operations from the realignment of the Navy F/A-18 squadrons does not affect the ability of the squadrons to complete their overall flight requirements. Although increases for most aircraft groups in adjusted and postponed flights do occur in the alternative scenarios, no significant postponements in flight scheduling are experienced. Some adjustments are made to alternative or less-preferred training areas for most squadrons. Also, shifting of flight launch times due to adjusted training area selections affect squadron aircraft allocation and overall scheduling efficiency.

Significant increases of airfield operations at NAS Oceana occur with the realignment of the F/A-18 squadrons. In ARS-1, airfield operations increase by about 120 percent (about 128,600 operations) above baseline levels. The F/A-18 FRS contributes 47 percent of the increase. NALF Fentress experiences an increase of 51 percent in airfield operations. As a result of increased operations, taxi delay, a component of the mission delay, increases by 90 percent, rising from 1.0 minute in the Baseline to 1.9 minutes per sortie on average for ARS-1. Due to increased interactions and pattern congestion, completion of desired return-to-base pattern operations drops from 98.0 percent (average over all aircraft groups) in the Baseline Scenario to 92.8 percent in ARS-1. The F-14 fleet squadrons experience the largest decrease, from 97.2 percent in the Baseline Scenario to 89.3 percent in ARS-1.

Airfield operations at MCAS Cherry Point increase moderately in ARS-3 and -5 (18 percent and 26 percent, respectively) as a result of relocation of Navy F/A-18 fleet squadrons. Night (2200 to 0700) operations increase sharply — by 85 percent in ARS-3 and 113 percent in ARS-5. The F/A-18 fleet squadrons conduct about 10,700 FCLP operations annually in ARS-3 at MCAS Cherry Point. Note that MCALF Bogue Field operations, which total about 17, 300 annually, are not affected by Navy F/A-18 squadron operations.

Interactions increase only slightly from baseline levels with the F/A-18 squadrons at MCAS Cherry Point. The average taxi delay increases from the Baseline Scenario by about six seconds per sorties in ARS-3 and eight seconds in ARS-5. Taxi delay at MCAS Cherry Point is much lower on average (0.14 minutes in the Baseline) than at NAS Oceana (60 seconds). The pattern event completion rate drops from 96.8 percent to 94.2 percent and 94.4 percent in ARS-3 and ARS-5, respectively. Compared to the number of "lost" operations at NAS Oceana, the

operations "lost" at MCAS Cherry Point are much lower (about 70 percent lower for ARS-3).

Navy F/A-18 squadrons have a significant impact on local training area operations, especially in W-72, the W-72 TACTS range, Navy Dare County Range, and BT-11. The F/A-18 squadrons utilize almost all of the local areas currently used by the aircraft communities at NAS Oceana and MCAS Cherry Point. In W-72, annual sorties double after the realignment of F/A-18s to NAS Oceana, increasing from about 11,400 in the Baseline Scenario to 22,800 in ARS-1. Even in ARS-4 (the scenario with the fewest Navy F/A-18 squadrons in the region), W-72 sorties increase by 44 percent to 20,200 for the simulated year.

The W-72 TACTS range and Navy Dare County Range approach capacity limits with the realignment of F/A-18 squadrons. The TACTS range in ARS-1 is utilized 83 percent (of its published available hours), with over 8000 sorties using the area annually. In the Baseline Scenario, the TACTS range experiences 4000 annual sorties and has a utilization rate of 78 percent. The number of sorties utilizing the TACTS range increases by 67 percent in ARS-1 (the greatest increase from the baseline of any alternative scenario) to 46 percent in ARS-4 (the smallest increase).

Note that the utilization percentages for the alternative scenarios are about the same as for the Baseline although the number of sorties is substantially higher. This implies that, as more Navy squadrons are based in the region, the average number of aircraft participating in each TACTS range event will increase. Also, scheduling inefficiencies and demand peaking from among the squadrons preclude the possibility of scheduling 100 percent of the available hours, and utilization rates of 80 percent to 85 percent may be a practical upper limit given the current scheduling procedures and requirements.

Navy Dare County Range also experiences high levels of utilization after the realignment. The annual sorties at Navy Dare increase by 37 percent in ARS-1, 33 percent in ARS-2, -3, and -5, and 25 percent in ARS-4. The variation of Navy Dare's utilization rate in the alternative scenarios is very small: 67 percent in ARS-1 and 64 percent in ARS-4. As demand for the area is reduced (e.g., ARS-1 to ARS-4 or ARS-5), the utilization rate does not decrease by a proportional amount. This observation, coupled with the fact that the training area selection "flexing" from Navy Dare increases in the alternative scenarios, suggests that as Navy Dare's utilization rate approaches 70 percent, the range approaches "capacity," or saturation.

The increases in annual sortie rates at BT-9 and BT-11 are on the same order in all scenarios as those experienced at Navy Dare range. BT-11 sorties increase by 34 percent in ARS-1 and only 19 percent in ARS-4 from baseline levels. Similarly, BT-9 annual sorties increase by 41 percent in ARS-1 and 16 percent in ARS-4 from the Baseline Scenario. From a schedule capacity point-of-view, BT-11 has the ability to accommodate increased operations after the realignment of the Navy F/A-18 squadrons (in any scenario). BT-11's utilization rate is approximately 50

Case 1:01-cv-00201-VJW Document 173-52 Filed 05/26/2006 Page 27 of 29

percent for all scenarios (42 percent in the Baseline Scenario). On average, BT-9 is only utilized about 20 percent of its available hours.

W-122 is significantly affected only in ARS-3 and -5, in which F/A-18 fleet squadrons are based at MCAS Cherry Point. Annual sorties increase by 13 percent and 21 percent in ARS-3 and ARS-5, respectively. Air Force jets (primarily F-15E aircraft from Seymour Johnson AFB) and Marine Corps squadrons from MCAS Cherry Point dominate the usage of W-122, annually generating about 5430 sorties and 5800 sorties, respectively. These two user groups represent about 79 percent of the annual sorties in the Baseline Scenario and 65 percent in ARS-5.

The local MTRs are modeled with MCAS Cherry Point and NAS Oceana squadrons' demand only. These routes are scheduled only to avoid multiple flights from beginning a route at the same time. Capacity of the local route system is not a constraint on squadron operations. The local MTRs experience about 3530 sorties annual in the Baseline Scenario. In ARS-1, about 5060 aircraft — an increase of 43 percent — perform operations on the MTRs, and in ARS-4, about 4680 sorties conduct flights on MTRs, representing a 32 percent increase in operations. The most utilized MTR in the area in ARS-1 experiences 5 to 6 sorties per day on average.

Monthly and hourly operation flows are examined at MCAS Cherry Point (ARS-5), NAS Oceana (ARS-1), and at five training areas (ARS-1 and ARS-5). The busiest month at NAS Oceana is April with about 22,200 operations. At NALF Fentress, the peak month is June with about 20,000 operations performed; during the least busy month at Fentress, about 6000 operations are conducted. The variation in monthly operations is extreme compared to the monthly operations at NAS Oceana, which reflects the FCLP schedule.

At MCAS Cherry Point, airfield operations in ARS-5 vary from a low of 9800 in January to a peak of over 17,100 operations June. With the realignment of F/A-18 fleet squadrons, the month-to-month variations in ARS-5 are much greater than in the Baseline Scenario.

Annual hourly airfield operations between 0800 to 1900, representing the average day's "surge" period, average 33 operations per hour at NAS Oceana in the Baseline Scenario and 68 operations per hour in ARS-1. Similarly, operations during this same period at MCAS Cherry Point average 34 operations per hour in the Baseline Scenario and 41 operations per hour in ARS-5.

An analysis of military and civilian traffic in the Dare County region of the potential impacts due to the increase in operations from the realignment of the Navy F/A-18 squadrons on the civilian traffic in the area was performed. Although the number of sorties to and from R-5314 increases by 37 percent in ARS-1 and 25 percent in ARS-4 over the baseline levels, the amount of hours that the range is utilized increases by at most 10 percent in any of the alternative scenarios. In ARS-1, the introduction of 11 F/A-18 fleet squadrons and one F/A-18 FRS to NAS Oceana results in a seven-sortie-per-day *net* increase (37 percent) to an

average rate of 26 sorties per day at the Navy Dare County Range. Furthermore, the amount of time that the range is "open" per day will only slightly increase in order to accommodate special operations. No significant impact on civilian traffic is caused by the additional R-5314 operations resulting from the realignment of Navy F/A-18 squadrons to the region.

The Navy is in the process of determining a site for an air surveillance radar system in northeastern North Carolina. Radar coverage in this area will offer significant benefits to all civilian and military users. The implementation of a new radar site will provide all airspace users with better service and a safer flying environment while enhancing military training. The primary benefits to the flying community will include: increased flight safety, enhanced services to civil airfields, and improved traffic flow and services to Dare County/Manteo Airport.

## A.2 Flight Track Airfield Operations

Flight track airfield operations are those commonly used to assess the frequency by which specific flight tracks are used and are provided to support noise assessment efforts. For NAS Oceana and NALF Fentress, they are defined as follows:

**NAS Oceana**

| | |
|---|---|
| Southeasterly Departure | One aircraft leaving the airfield traffic pattern to the southeast (e.g., APOLLO Departure). *One operation.* |
| Northeasterly Departure | One aircraft leaving the airfield traffic pattern to the northeast (e.g., SOUCEK/NORFOLK Departure). *One operation.* |
| Interfacility Departure to Fentress | One aircraft leaving the NAS Oceana airfield and arriving at NALF Fentress. *One operation.* |
| Straight-In/Full Stop Arrival | One aircraft approaching the NAS Oceana directly to a runway (including instrument and visual straight-in approaches) to either a full-stop landing, touch-and-go, or low approach (excluding arrivals from NALF Fentress). *One operation.* |
| Overhead Arrival at Oceana | One aircraft arriving at the airfield through the overhead approach (excluding arrivals from NALF Fentress). *One operation.* |
| Visual Touch-and-Go | One full circuit of the visual (tower) pattern. *Two operations.* |
| GCA Pattern | One full circuit of the GCA box pattern. *Two operations.* |
| Depart and Reenter to Overhead | One aircraft conducting an overhead approach immediately after leaving the airfield traffic pattern. *One operation.* |
| FCLP Pattern | One full circuit of the FCLP pattern at NAS Oceana. *Two operations.* |
| Interfacility Arrival from Fentress (w/ overhead approach) | One aircraft leaving NALF Fentress and arriving at NAS Oceana via the overhead approach. *One operation.* |
| Interfacility Arrival from Fentress (w/ straight-in approach) | One aircraft leaving NALF Fentress and conducting a straight-in approach at NAS Oceana. *One operation.* |

wyle laboratories

REPORT

# WYLE RESEARCH REPORT
# WR 97-10

# AIRCRAFT NOISE STUDY FOR THE 1995 BRAC REALIGNMENT OF NAVY F/A-18 AIRCRAFT

Prepared For:

Commander
NAVAL FACILITIES ENGINEERING COMMAND
200 Stovall Street
Alexandria, Virginia 22332

Contract No. N68925-96-D-A538

Prepared By:

Joseph J. Czech
Gary M. Sypek
Christine C. France
WYLE RESEARCH
Wyle Laboratories
2001 Jefferson Davis Highway
Arlington, Virginia 22202

(J/N 59050-01 & 59119-01)

February 1998

## EXECUTIVE SUMMARY

Pursuant to the ongoing Naval Facilities Engineering Command (NAVFAC-ENGCOM) support and development of environmental documentation for Naval and Marine Corps Air Stations and associated facilities throughout the United States and overseas, this report presents the results of the noise analyses for:

- Naval Air Station (NAS) Oceana, Virginia;
- Naval Auxiliary Landing Field (NALF) Fentress, Virginia;
- Marine Corps Air Station (MCAS) Beaufort, South Carolina;
- MCAS Cherry Point, North Carolina;
- Marine Corps Auxiliary Landing Field (MCALF) Bogue, North Carolina; and
- Related airspace including 12 Military Training Routes and 3 Restricted Areas/Ranges in the Mid-Atlantic States region.

The above-mentioned facilities are the subject of a Draft Environmental Impact Statement (DEIS) involving the 1995 Base Realignment and Closure Commission's recommendation for the closure of NAS Cecil Field, Florida, and the realignment of 180 Navy F/A-18 Hornet aircraft. In addition to the existing (Baseline) environment whose timeframe is calendar year 1997 (CY97), the DEIS and this report examine the aircraft noise and safety impacts of five Alternative Realignment Scenarios (ARS). Any ARS is proposed to be fully implemented prior to CY99.

Table E-1 summarizes the results for the airfield noise analyses. For these analyses, Baseline and proposed annual flight operations were either directly or indirectly provided by the Naval Aviation Simulation Model (NASMOD). From Table E-1, the total airfield operations can be derived by adding the Proposed Navy F/A-18 Annual Flight Operations to the Annual Flight Operations by Other Aircraft. Aircraft noise exposure of flight and run-up operations, in terms of contours of Day-Night Average Sound Level (DNL), was computed with the NOISEMAP computer program. Aircraft noise impacts, in terms of acreage and population within bands of DNL contours, were estimated with a Geographic Information System and the US Census 1990 database.

The DNL values for selected school locations in the vicinity of NAS Oceana and MCAS Cherry Point were also computed. The Equivalent Sound Level for a 9-hour period corresponding to the typical school hours of 7 a.m. to 4 p.m. was also

Table E-1

Summary of Noise Exposure From Airfield Operations

| Airfield | Data Item | | Baseline | Alternative Realignment Scenario (ARS) 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|---|---|---|
| NAS Oceana | Proposed Navy F/A-18 | Base Loading[1] | n/a | 11+ FRS | 9 + FRS | 8 + FRS | 6 + FRS | 6 + FRS |
| | | Annual Flight Operations[2] | --- | 123,238 | 113,177 | 105,052 | 97,290 | 96,556 |
| | Annual Flight Operations[2] by Other Aircraft | | 108,897 | 105,779 | 105,454 | 105,070 | 104,191 | 105,215 |
| | Estimated Population[3] Within 65 dB DNL[4] | | 28,030 | 125,563 | 120,668 | 118,146 | 113,135 | 114,063 |
| | Number of Selected Schools | Between 65 dB and 75 dB $L_{eq9}$ (inclusive) | 7 | 16 | 16 | 16 | 16 | 16 |
| | | Greater than 75 dB $L_{eq9}$ | 0 | 6 | 6 | 6 | 6 | 6 |
| NALF Fentress | Proposed Navy F/A-18 | Base Loading | see NAS Oceana | | | | | |
| | | Annual Flight Operations[2] | --- | 53,826 | 46,412 | 43,528 | 41,552 | 41,752 |
| | Annual Flight Operations[2] by Other Aircraft | | 104,668 | 97,881 | 97,235 | 98,685 | 97,635 | 97,930 |
| | Estimated Population[3] Within 65 dB DNL | | see NAS Oceana | | | | | |
| MCAS Beaufort | Proposed Navy F/A-18 | Base Loading[1] | n/a | | 2 | | 5 | |
| | | Annual Flight Operations[2] | --- | | 15,198 | | 32,812 | |
| | Annual Flight Operations[2] by Other Aircraft | | 37,987 | | 37,987 | | 37,987 | |
| | Estimated Population[3] Within 65 dB DNL | | 3,802 | | 4,675 | | 5,237 | |
| MCAS Cherry Point | Proposed Navy F/A-18 | Base Loading[1] | n/a | | | 3 | | 5 |
| | | Annual Flight Operations[2] | --- | | | 23,064 | | 32,688 |
| | Annual Flight Operations[2] by Other Aircraft | | 116,254 | | | 114,175 | | 114,256 |
| | Estimated Population[3] Within 65 dB DNL | | 2,119 | | | 3,281 | | 4,425 |
| | Number of Selected Schools | Between 65 dB and 75 dB $L_{eq9}$ (inclusive) | 1 | | | 1 | | 1 |
| | | Greater than 75 dB $L_{eq9}$ | 3 | | | 3 | | 3 |
| MCALF Bogue[5] | Proposed Navy F/A-18 | Base Loading[1] | see MCAS Cherry Point | | | | | |
| | | Annual Flight Operations[2] | --- | | | 0 | | 0 |
| | Annual Flight Operations[2] by Other Aircraft | | 17,337 | | | 17,719 | | 17,503 |
| | Estimated Population[3,5] Within 65 dB DNL | | 1,447 | | | 1,447 | | 1,447 |

[1] Expressed as number of Fleet squadrons plus ('+') the FRS, if applicable.

[2] Pattern work counted as two operations each.

[3] Excludes on-Station population; Computed using 1990 Census population densities within block-groups.

[4] Includes exposure in the vicinity of NALF Fentress.

[5] ARS-3 and ARS-5 not modeled; Noise exposure estimated to be the same as Baseline since changes in operations are insignificant.

estimated for each of the schools. As indicated by the shaded areas of Table E-1, MCASs Beaufort and Cherry Point and MCALF Bogue were analyzed (in terms of overall noise exposure) for only their applicable scenarios. The analyses of locations in the vicinity of MCAS Beaufort and MCALF Bogue were not within the scope of this effort.

Table E-1 reveals that implementation of either ARS-1 or 2 (9 to 11 Fleet squadrons plus the FRS) would more than double the total Baseline annual flight operations at NAS Oceana. ARS-3, 4, and 5 would nearly double total Baseline annual flight operations at NAS Oceana. Annual flight operations at NALF Fentress would increase by 45 to 33 percent for ARSs 1 through 5, respectively, with operations by aircraft other than the proposed F/A-18 remaining in a narrow range of 97,000 to 98,000. ARS-1 for NAS Oceana/NALF Fentress would have the highest number of people within the 65 dB DNL contour (about 126,000); ARS-4 would have the least number of people within the 65 dB DNL contour (about 113,000). Although not shown in Table E-1, the number of people within the 75 dB DNL contour would increase from about 370 for Baseline to 43,000 to 50,000, depending on the ARS.

The number of school locations within the 65–75 dB $L_{eq9}$ noise contour (inclusive) would increase from 7 for Baseline to 16 for any ARS; the number of school locations exposed to $L_{eq9}$ greater than 75 dB would increase from 0 for Baseline to 6 for any ARS.

As shown in Table E-1, total flight operations at MCAS Beaufort would increase by about 50 percent due to the basing of two F/A-18 fleet squadrons (ARS-2) and would increase by about 86 percent if five F/A-18 fleet squadrons are realigned to the MCAS (ARS-5), relative to Baseline conditions. ARS-4, with a noise exposure of about 5,200 people within the 65 dB DNL, would be the highest of exposures for ARS-2 or ARS-4 and would constitute an increase of 38 percent relative to Baseline exposure.

The introduction of three or five fleet squadrons at MCAS Cherry Point (ARS-3 or 5) would increase total flight operations by about 18 or 26 percent relative to Baseline conditions and would cause about a 55 or 109 percent increase in population within the 65 dB DNL contour, respectively. The Baseline, ARS-3, and ARS-5 noise exposure at MCALF Bogue is estimated to be about 1,447 people within the

65 dB DNL contour as total flight operations are projected to remain nearly the same as Baseline. The number of school locations within bands of 65–75 dB $L_{eq9}$ and greater than 75 dB $L_{eq9}$ is 1 and 3, respectively, for Baseline and would remain the same for any ARS.

Table E-2 summarizes the results of the airspace noise analyses. For the five Restricted Area/Range airspaces, Baseline and proposed annual sorties were derived from the NASMOD, along with input from various Department of Defense user organizations. Baseline sortie levels for the 12 modeled Military Training Routes (MTRs) were based on annual sortie levels as presented in previous noise studies. The predicted sortie levels for all MTRs included in the five scenarios were adjusted based on levels obtained from NASMOD. Aircraft noise exposure in terms of the Onset-Rate Adjusted Day-Night Average Sound Level ($L_{dnmr}$) were predicted using the MR_NMAP computer program.

Table E-2 reveals that proposed Navy F/A-18 aircraft would contribute 58 to 110 annual sorties for ARS-1 through 5 on Military Training Routes (MTRs) VR-85, VR-1040, VR-1752, VR-1754, VR-1758, and VR-1759. These additional sorties would represent an average proportion of 17 percent of the Baseline sorties on the above-mentioned MTRs. Navy F/A-18 aircraft would contribute 114 to 700 annual sorties for ARS-1 through 5 on MTRs VR-1046, VR-1753, and IR-714. These additional annual sorties would represent 42 percent to 67 percent of the Baseline sorties on each of these three routes. Navy F/A-18 aircraft are not proposed to use VR-73, VR-1043, and VR-1074 in any ARS. Cumulatively, the average percentage difference in total annual sorties (for each MTR) among all MTRs for ARS-1 through 5 are +13 percent, +12 percent, +7 percent, +11 percent, and +14 percent, respectively, relative to Baseline.

All MTR maximum $L_{dnmr}$, for existing or proposed operations, are below a level of 58 dB. Of those MTRs whose maximum $L_{dnmr}$ is above 50 for Baseline and ARS-1 through 5, the minimum and maximum changes in $L_{dnmr}$ among all MTRs for ARS-1 through 5 are -8 and +1 dB, respectively. The introduction or addition of Navy F/A-18 sorties do not significantly contribute to the noise environment primarily because the F/A-18 typically flies the MTRs at higher altitudes than other aircraft. The complete retirement of A-6 Intruder aircraft proposed for all ARS is the

Table E-2

Summary of Noise Exposure From Airspace Operations

| Airspace | | Baseline | | | ARS-1 | | | ARS-2 | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Annual Sorties | | $L_{dnmr}$ (dB)[1] | Annual Sorties | | $L_{dnmr}$ (dB)[1] | Annual Sorties | | $L_{dnmr}$ (dB)[1] |
| Type | Name | Proposed Navy F/A-18 | Other Aircraft | | Proposed Navy F/A-18 | Other Aircraft | | Proposed Navy F/A-18 | Other Aircraft | |
| Military Training Route | VR-73 | --- | 987 | 54 | --- | 1,248 | 54 | --- | 1,250 | 54 |
| | VR-85 | --- | 544 | <50 | 58 | 735 | <50 | 58 | 740 | <50 |
| | VR-1040 | --- | 754 | 53 | 58 | 781 | 53 | 58 | 786 | 53 |
| | VR-1043 | --- | 755 | 57 | --- | 321 | <50 | --- | 310 | <50 |
| | VR-1046 | --- | 642 | 58 | 366 | 390 | 51 | 328 | 353 | 51 |
| | VR-1074 | --- | 686 | 53 | --- | 782 | 53 | --- | 805 | 53 |
| | VR-1752 | --- | 612 | 52 | 58 | 460 | <50 | 58 | 465 | <50 |
| | VR-1753 | --- | 1,094 | 52 | 700 | 1,107 | 53 | 643 | 1,091 | 52 |
| | VR-1754 | --- | 450 | 50 | 58 | 343 | <50 | 58 | 348 | <50 |
| | VR-1758 | --- | 962 | 58 | 58 | 466 | 54 | 58 | 471 | 54 |
| | VR-1759 | --- | 181 | <50 | 58 | 261 | <50 | 58 | 266 | <50 |
| | IR-714 | --- | 173 | <50 | 115 | 99 | <50 | 120 | 99 | <50 |
| Range | R-5306A[2] | --- | 9,925 | <50 | 1,806 | 10,432 | <50 | 1,490 | 10,400 | <50 |
| | R-5306A / BT-9 | --- | 1,741 | 60 | 340 | 2,062 | 62 | 228 | 1,986 | 61 |
| | R-5306A / BT-11 | --- | 4,646 | 68 | 1,466 | 4,628 | 68 | 1,262 | 4,680 | 68 |
| | R-5306D | --- | 6,124 | 55 | --- | 6,145 | 55 | --- | 6,134 | 55 |
| | R-5314 / Air Force | --- | 2,009 | 60/74* | --- | 2,002 | 60/74* | --- | 2,002 | 60/74* |
| | R-5314 / Navy | --- | 5,288 | 52/64* | 2,316 | 4,440 | 53/62 | 2,169 | 4,388 | 53/64* |

| Airspace | | ARS-3 | | | ARS-4 | | | ARS-5 | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Annual Sorties | | $L_{dnmr}$ (dB)[1] | Annual Sorties | | $L_{dnmr}$ (dB)[1] | Annual Sorties | | $L_{dnmr}$ (dB)[1] |
| Type | Name | Proposed Navy F/A-18 | Other Aircraft | | Proposed Navy F/A-18 | Other Aircraft | | Proposed Navy F/A-18 | Other Aircraft | |
| Military Training Route | VR-73 | --- | 1,263 | 54 | --- | 1,275 | 54 | --- | 1,227 | 54 |
| | VR-85 | 81 | 732 | <50 | 58 | 735 | <50 | 110 | 734 | <50 |
| | VR-1040 | 81 | 778 | 53 | 58 | 781 | 53 | 110 | 780 | 53 |
| | VR-1043 | --- | 309 | <50 | --- | 307 | <50 | --- | 309 | <50 |
| | VR-1046 | 280 | 380 | 50 | 186 | 380 | <50 | 192 | 356 | <50 |
| | VR-1074 | --- | 790 | 53 | --- | 790 | 53 | --- | 848 | 53 |
| | VR-1752 | 81 | 457 | <50 | 58 | 460 | 50 | 110 | 459 | 50 |
| | VR-1753 | 557 | 1,105 | 52 | 484 | 1,400 | 51 | 475 | 1,107 | 52 |
| | VR-1754 | 81 | 340 | <50 | 58 | 343 | <50 | 110 | 342 | <50 |
| | VR-1758 | 81 | 463 | 54 | 58 | 466 | 54 | 110 | 465 | 54 |
| | VR-1759 | 81 | 258 | <50 | 58 | 261 | <50 | 110 | 260 | <50 |
| | IR-714 | 114 | 99 | <50 | 119 | 99 | <50 | 114 | 99 | <50 |
| Range | R-5306A | 1,710 | 10,313 | <50 | 952 | 10,176 | <50 | 1,855 | 10,256 | <50 |
| | R-5306A / BT-9 | 286 | 1,994 | 63 | 142 | 1,846 | 63 | 276 | 2,076 | 62 |
| | R-5306A / BT-11 | 1,424 | 4,567 | 68 | 810 | 4,591 | 68 | 1,579 | 4,443 | 68 |
| | R-5306D | --- | 6,143 | 55 | --- | 6,139 | 55 | --- | 6,151 | 56 |
| | R-5314 / Air Force | --- | 2,002 | 60/74* | --- | 2,002 | 60/74* | --- | 2,002 | 60/74* |
| | R-5314 / Navy | 2,053 | 4,511 | 53/63* | 1,616 | 4,524 | 53/64* | 1,944 | 4,585 | 53/64* |

[1] Maximum for MTRs; Average for Ranges.
[2] Includes BT-9 and BT-11 transit sorties.
* Values for run-in/target areas.

cause of the *decrease* in $L_{dnmr}$ for many of the MTRs relative to Baseline conditions. The A-6's altitude distribution and the relative noisiness of these aircraft serve to make the A-6 the dominant aircraft on some routes for Baseline.

Table E-2 also presents annual sorties for proposed Navy F/A-18 aircraft and other aircraft and average $L_{dnmr}$ for each modeled Range. For ARS-1 through 5, proposed Navy F/A-18 aircraft would contribute about 140 to 340 additional annual sorties in BT-9, approximately 800 to 1,600 additional annual sorties in BT-11, about 1,600 to 2,300 additional annual sorties in R-5314 Navy Dare, and approximately 1,500 to 1,850 additional annual sorties in R-5306A. These additional sorties would represent an average proportion of 24 percent of the Baseline sorties in the above-mentioned Ranges. Navy F/A-18 Range sorties vary for each ARS as the number of aircraft based at NAS Oceana, MCAS Beaufort, and MCAS Cherry Point vary with ARS. Navy F/A-18 aircraft are not proposed to use R-5306D for any ARS and very small changes in (cumulative) operations are proposed for these two airspaces. Cumulatively, the average percentage difference in total annual sorties, relative to Baseline, are +13 percent, +12 percent, +7 percent, +11 percent, and +14 percent, for ARS-1 through 5, respectively.

The average $L_{dnmr}$ for existing operations on R-5306A (exclusive of BT-9 and BT-11) is less than 50 dB. It remains less than 50 dB for any of the ARSs. The average $L_{dnmr}$ for existing operations on BT-9 is 60 dB and increases up to 63 dB for the ARSs. The average $L_{dnmr}$ for existing operations on BT-11 is 68 dB and remains at that level for any of the ARSs. The average $L_{dnmr}$ for existing operations on R-5306D is 55 dB and remains as such for ARS-1 through 4. For ARS-5, the average $L_{dnmr}$ would be 56 dB due to two factors: (1) slightly higher sorties than any other ARS, and (2) rounding of estimated levels up to the nearest dB. Note that no Navy F/A-18 sorties are proposed for R-5306D for any ARS. The average $L_{dnmr}$ for existing operations on R-5314/Air Force Dare is 60 dB and 74 dB for run-in and target areas, respectively. Similar to R-5306D, no Navy F/A-18 sorties are proposed for Air Force Dare, and its proposed utilization by other aircraft would affect no change to the levels (to the nearest dB) of any ARS. The average $L_{dnmr}$ for existing operations on R-5314/Navy Dare is 52 dB and 64 dB for run-in and target areas, respectively. The $L_{dnmr}$ in the Navy Dare run-in area would increase to 53 dB for any ARS, while they would <u>decrease</u> by 1 to 2 dB or remain constant in the target area for the ARSs. These atypical trends are explained in Section 4.

The introduction or addition of Navy F/A-18 sorties do not significantly contribute to the Restricted Area noise environments primarily because the F/A-18 typically flies the Ranges (including BT-9 and BT-11) at higher altitudes than other aircraft. Changes in $L_{dnmr}$, unlike those reported for the MTRs, would not occur for the Ranges because the A-6 does not typically utilize the Ranges, thus none were modeled. EA-6B aircraft, whose noise output is similar to the A-6, were modeled on the Ranges, but they usually utilize the Ranges at higher altitudes than other aircraft.

The noise exposure for individual portions of some of the airspaces sum to form the overall noise exposure underneath the point of intersection or area of overlap. Total $L_{dnmr}$ values were computed for 42 of these intersections/overlaps for Baeline and all ARSs, and the details of the results are contained in Section 4.0.




## Scale

0 7500 15000
Feet

MN 10.2°W N

## Legend

- Military Property
- Water
- City/Town
- Navigational Aid
- Runway
- Run-Up Location
- Representative Location

## Figure 2-1

NAS Oceana
and NALF Fentress
Vicinity Map

Source: NAS Oceana, TIGER\Line 1990

Table 3-1

Annual Flight Operations at NAS Oceana for Baseline

| Operation Type | F-14 Fleet | | | F-14 FRS | | | Adversary | | | Transient Jet | | | Transient Propeller[1] | | | All Aircraft | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Day | Night | Total | Day | Night | Total | Day | Night | Total | Day | Night | Total | Day | Night | Total | Day | Night | Total |
| Southeasterly Departures | 5,879 | 111 | 5,990 | 1,661 | | 1,661 | 673 | 13 | 686 | 46 | 2 | 48 | 174 | 3 | 177 | 8,433 | 129 | 8,562 |
| Northeasterly Departures | 4,729 | 91 | 4,820 | 3,976 | | 3,976 | 153 | | 153 | 901 | 18 | 919 | 1,437 | 28 | 1,465 | 11,196 | 137 | 11,333 |
| Interfacility Departures to Fentress | 1,750 | 665 | 2,415 | 965 | 320 | 1,285 | | | | | | | | | | 2,715 | 985 | 3,700 |
| Interfacility Arrival from Fentress With an Overhead Approach | 1,365 | 900 | 2,265 | 520 | 160 | 680 | | | | | | | | | | 1,885 | 1,060 | 2,945 |
| Interfacility Arrival from Fentress With a Straight-In Approach | 60 | 90 | 150 | 295 | 310 | 605 | | | | | | | | | | 355 | 400 | 755 |
| Visual Straight-In/Full-Stop Arrivals (Sanders) | | | | 613 | | 613 | | | | 283[3] | 6[3] | 289[3] | 665[3] | 11[3] | 676[3] | 1,561 | 17 | 1,578 |
| Visual Straight-In/Full-Stop Arrivals (Lightship) | | | | 283 | | 283 | | | | | | | | | | 283 | | 283 |
| Instrument Arrivals | 450 | 25 | 475 | 793 | 86 | 879 | 89 | | 89 | | | | | | | 1,332 | 111 | 1,443 |
| Overhead Arrivals at Oceana (Sanders, non-interfacility) | 8,712 | 326 | 9,038 | 2,873 | 83 | 2,956 | 685 | 2 | 687 | 670[4] | 8[4] | 678[4] | 956[4] | 10[4] | 966[4] | 13,896 | 429 | 14,325 |
| Overhead Arrivals at Oceana (Lightship, non-interfacility) | 1,226 | 60 | 1,286 | 891 | 15 | 906 | 57 | | 57 | | | | | | | 2,174 | 75 | 2,249 |
| Depart and Reenter to Overhead | 111 | | 111 | 689 | | 689 | | | | | | | | | | 800 | | 800 |
| Touch & Go[2] | 19,377 | 1,130 | 20,507 | 27,390 | 1,117 | 28,507 | 604 | | 604 | 1,132 | 38 | 1,170 | 3,239 | 61 | 3,300 | 51,742 | 2,346 | 54,088 |
| GCA Box[2] | 304 | 44 | 348 | 2,216 | 1,328 | 3,544 | | | | 722 | 22 | 744 | 2,164 | 36 | 2,200 | 5,406 | 1,430 | 6,836 |
| FCLP[2] | | | | | | | | | | | | | | | | | | |
| **GRAND TOTAL** | 43,963 | 3,442 | 47,405 | 43,165 | 3,419 | 46,584 | 2,261 | 15 | 2,276 | 3,754 | 94 | 3,848 | 8,635 | 149 | 8,784 | 101,778 | 7,119 | 108,897 |

Source: ATAC, 1998.

[1] Not Modeled.

[2] Counted as two operations.

[3] Includes Visual Straight-in/Full Stop (Lightship) and Instrument Arrivals.

[4] Includes Overhead Arrivals at Oceana (Lightship).

## 4.2 ARS-2

ARS-2 is defined as the realignment of nine F/A-18 Fleet squadrons and an F/A-18 FRS from NAS Cecil Field to NAS Oceana and the realignment of two F/A-18 Fleet squadrons from NAS Cecil Field to MCAS Beaufort. MCAS Cherry Point or MCALF Bogue are not involved. Calendar year 1999 is the time-frame for the ARS-2 condition. Section 4.2.1 involves NAS Oceana and NALF Fentress. Section 4.2.2 describes the results for MCAS Beaufort, and Section 4.2.3 presents the noise exposure for the affected airspace.

### 4.2.1 NAS Oceana and NALF Fentress

Section 4.2.1.1 discusses reported and modeled average busy-day flight operations by aircraft type. Section 4.2.1.2 discusses runway and flight track utilization for all operations by aircraft type. Sections 4.2.1.3 and 4.2.1.4 describe aircraft flight profile and noise data, and run-up operations, respectively. Section 4.2.1.5 discusses the resulting aircraft noise exposure.

#### 4.2.1.1 *Flight Operations*

The Naval Aviation Simulation Model (NASMOD)[9] provided a basis for the annual number of flight operations by aircraft type and operation type by temporal period for ARS-2. As mentioned in Reference 9, the only change required of the NASMOD data was that F-14 Fleet operations were reduced by 17 percent. These operations are contained in Tables 4-16 and 4-17 for NAS Oceana and NALF Fentress, respectively. The temporal periods of day(time) and night(time) are as defined in Section 2.

NAS Oceana would have about 219,000 annual flight operations and NALF Fentress would have about 144,000 annual flight operations for ARS-2. Overall, this would represent a 101 percent increase in operations at NAS Oceana and a 37 percent increase at NALF Fentress. Most of the operations at NAS Oceana (~113,000 annually) would be generated by the proposed F/A-18 Fleet and FRS aircraft. F-14 Tomcat Fleet and FRS aircraft would generate about 7 percent less operations than in the Baseline condition (~87,000 annually versus ~94,000 for Baseline). The Adversary operations in Table 4-16 are due to the one based Adversary squadron. Approximately 13,000 annual operations of transient aircraft (Transient Jet and Propeller categories) are also represented in Table 4-16. Overall nighttime utilization would be about 8 percent.


wyle laboratories

0571

Table 4-16

Annual Flight Operations at NAS Oceana for Scenario 2

| Operation Type | F-14 Fleet | | | F-14 FRS | | | F/A-18 Fleet | | | F/A-18 FRS | | | Adversary | | | Transient Jet | | | Transient Propeller[1] | | | All Aircraft | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Day | Night | Total | Day | Night | Total | Day | Night | Total | Day | Night | Total | Day | Night | Total | Day | Night | Total | Day | Night | Total | Day | Night | Total |
| Southeasterly Departures | 4,077 | 56 | 4,133 | 1,623 | | 1,623 | 5,427 | 212 | 5,639 | 406 | | 406 | 1,433 | 55 | 1,488 | 46 | 2 | 48 | 174 | 3 | 177 | 13,186 | 328 | 13,514 |
| Northeasterly Departures | 4,763 | 85 | 4,848 | 4,012 | | 4,012 | 5,616 | 80 | 5,696 | 6,522 | 101 | 6,623 | 529 | | 529 | 900 | 19 | 919 | 1,464 | 28 | 1,492 | 23,806 | 313 | 24,119 |
| Interfacility Departures to Fentress | 1,141 | 809 | 1,950 | 830 | 455 | 1,285 | 995 | 655 | 1,650 | 1,189 | 310 | 1,499 | | | | | | | | | | 4,155 | 2,229 | 6,384 |
| Interfacility Arrival from Fentress With an Overhead Approach | 946 | 851 | 1,797 | 450 | 220 | 670 | 830 | 641 | 1,471 | 664 | 190 | 854 | | | | | | | | | | 2,890 | 1,902 | 4,792 |
| Interfacility Arrival from Fentress With a Straight-In Approach | 37 | 116 | 153 | 280 | 335 | 615 | 55 | 124 | 179 | 365 | 280 | 645 | | | | | | | | | | 737 | 855 | 1,592 |
| Visual Straight-In/Full-Stop Arrivals (Sanders) | 37 | 9 | 46 | 619 | | 619 | 34 | 15 | 49 | 122 | 36 | 158 | | | | 285[3] | 8[3] | 293[3] | 669[3] | 12[3] | 681[3] | 1,766 | 80 | 1,846 |
| Visual Straight-In/Full-Stop Arrivals (Lightship) | 8 | 2 | 10 | 296 | | 296 | 10 | 3 | 13 | 4 | | 4 | | | | | | | | | | 318 | 5 | 323 |
| Instrument Arrivals | 346 | 31 | 377 | 787 | 93 | 880 | 1,409 | 507 | 1,916 | 1,801 | 233 | 2,034 | 94 | 1 | 95 | | | | | | | 4,437 | 865 | 5,302 |
| Overhead Arrivals at Oceana (Sanders, non-interfacility) | 6,877 | 241 | 7,118 | 2,859 | 72 | 2,931 | 7,466 | 303 | 7,769 | 3,211 | 175 | 3,386 | 1,693 | | 1,693 | 668[4] | 6[4] | 674[4] | 979[4] | 9[4] | 988[4] | 23,753 | 806 | 24,559 |
| Overhead Arrivals at Oceana (Lightship, non-interfacility) | 1,375 | 45 | 1,420 | 893 | 16 | 909 | 1,524 | 77 | 1,601 | 1,444 | 3 | 1,447 | 229 | | 229 | | | | | | | 5,465 | 141 | 5,606 |
| Depart and Reenter to Overhead | 87 | | 87 | 690 | | 690 | 275 | | 275 | 1,179 | 165 | 1,344 | | | | | | | | | | 2,231 | 165 | 2,396 |
| Touch & Go[2] | 17,221 | 852 | 18,073 | 26,363 | 1,063 | 27,426 | 22,223 | 2,592 | 24,815 | 37,685 | 2,483 | 40,168 | 1,698 | | 1,698 | 1,102 | 32 | 1,134 | 3,281 | 61 | 3,342 | 109,573 | 7,083 | 116,656 |
| GCA Box[2] | 219 | 53 | 272 | 2,122 | 1,412 | 3,534 | 326 | 26 | 352 | 1,560 | 160 | 1,720 | | | | 720 | 22 | 742 | 2,166 | 36 | 2,202 | 7,113 | 1,709 | 8,822 |
| FCLP[2] | 810 | 266 | 1,076 | 50 | 130 | 180 | 140 | 924 | 1,064 | 320 | 80 | 400 | | | | | | | | | | 1,320 | 1,400 | 2,720 |
| **GRAND TOTAL** | 37,944 | 3,416 | 41,360 | 41,874 | 3,796 | 45,670 | 46,330 | 6,159 | 52,489 | 56,472 | 4,216 | 60,688 | 5,676 | 56 | 5,732 | 3,721 | 89 | 3,810 | 8,733 | 149 | 8,882 | 200,750 | 17,881 | 218,631 |

Source: ATAC, 1998

[1] Not Modeled.

[2] Counted as two operations.

[3] Includes Visual Straight-In/Full Stop (Lightship) and Instrument Arrivals.

[4] Includes Overhead Arrivals at Oceana (Lightship).

DEPARTMENT OF THE NAVY
OFFICE OF THE CHIEF OF NAVAL OPERATIONS
2000 NAVY PENTAGON
WASHINGTON, DC 20350-2000

And
**HEADQUARTERS**
**UNITED STATES MARINE CORPS**
**WASHINGTON, D.C. 20830-1776**

IN REPLY REFER TO:
OPNAVINST 11010.36B
N46
CMC (LFL)
19 DEC 2002

OPNAV INSTRUCTION 11010.36B

From: Chief of Naval Operations
Commandant of the Marine Corps

Subj: AIR INSTALLATIONS COMPATIBLE USE ZONES (AICUZ) PROGRAM

Ref: (a) DODINST 4165.57 of 8 Nov 77, Air Installations Compatible Use Zones
(b) SECNAVINST 11010.11 of 22 May 78, Air Installations Compatible Use Zones
(c) Noise Control Act of 1972, 42 U.S.C. 4901 {et Seq.}

Encl: (1) AICUZ Program Procedures and Guidelines

1. Purpose. To revise Department of the Navy policy, procedures and guidelines for implementation of references (a) and (b), and to establish centers of excellence on the east and west coasts of the United States. This instruction provides guidance from the Chief of Naval Operations, Commandant of the Marine Corps, and Naval Facilities Engineering Command (NAVFACENGCOM), responsible for management of the AICUZ Program.

2. Cancellation. OPNAVINST 11010.36A.

3. Background. Reference (c) requires Federal agencies and State and local governments to develop measures to control the harmful effects of noise on people. The Department of Defense initiated the Air Installations Compatible Use Zones (AICUZ) program to protect the public's health, safety, and welfare and to prevent encroachment from degrading the operational capability of military air installations in meeting national security. The AICUZ program recommends land uses that will be compatible with noise levels, accident potential and obstruction clearance criteria associated with military airfield operations. Program implementation procedures for the Navy and Marine Corps are contained in enclosure (1).

4. Discussion. The foundation of the AICUZ program is an active local command effort to work with local, State, regional, other Federal agencies, and community leaders to encourage compatible development of land adjacent to military airfields. The Department of the Navy is particularly susceptible to such encroachment with many of its installations located in high growth urban areas. The AICUZ process

involves four basic steps:

a. Develop, and periodically update, a study for each air installation to quantify aircraft noise zones and identify accident potential zones; develop a noise reduction strategy for impacted lands, both on and off the installation; prepare a compatible land use plan for the installation and surrounding areas; and develop a strategy to promote compatible development on land within these areas.

b. Develop a prospective long-term (5 to 10 years) AICUZ analysis to illustrate impact on known future missions and how it will be implemented by the AICUZ program.

c. Implement the AICUZ plan for the installation including coordination with federal, state and local officials to maintain public awareness of AICUZ.

d. Identify and program property rights acquisition and sound suppression projects when appropriate in critical areas, where action to achieve compatibility within AICUZ program guidelines through local land use controls is either impossible or has been attempted and proven unsuccessful.

5. Applicability. These procedures apply to all Navy and Marine Corps airfields within the confines of the United States, its territories, trusts and possessions. AICUZ studies, or portions thereof, may be developed for U.S. activities in foreign countries if such action supports host nation policy for protecting the operational capabilities of those activities, and for on-base facility planning goals.

6. Action. Addressees shall comply with the procedures outlined herein.

*Signed*

Deputy Chief of Naval Operations
(Fleet Readiness and Logistics)

*Signed*

Deputy Commandant
Installations and Logistics
Headquarters, United States
Marine Corps

Distribution:
See Page 3



OCE212843

Distribution:

| | | |
|---|---|---|
| SNDL | A2A | (Department of the Navy Staff Offices) |
| | A6 | (CMC) |
| | 20A | (Fleet Forces Command) |
| | 21A1 | (FLTCINC LANT) |
| | 21A2 | (FLTCINC PAC) |
| | 21A3 | (FLTCINC EUR) |
| | 21A4 | (COMUSNAVSO) |
| | 23C | (COMNAVRESFOR) |
| | 23A2 | (COMNAVFORJAPAN, only) |
| | 24J | (Marine Corps Force Commands) |
| | FA6 | (Air Station, LANT) |
| | FA24 | (Base, LANT) |
| | FB6 | (Air Facility, PAC) |
| | FB7 | (Air Station, PAC) |
| | FB15 | (Base, PAC) |
| | FB28 | (Navy Regions, PAC) |
| | FB44 | (Missile Range Facility) |
| | FC4 | (Air Facility, EUR) |
| | FC14 | (Air Station, EUR) |
| | FF1 | (NAVDIST WASHINGTON DC) |
| | FF5 | (Safety Center) |
| | FKA1A | (NAVAIRSYSCOM) |
| | FKA1C | (NAVFACENGCOM) |
| | FKN1 | (NAVFACENGCOMDIV) |
| | FKN13 | (NAVFACENGCOMEFA) |
| | FKR1A | (Air Station, NAVAIRSYSCOM) |
| | FKR6A | (NAVAIRWARCEN TRASYSDIV) |
| | FKR6B | (NAVAIRWARCENWPNDIV) |
| | FKR3C | (NAVAIRTESTCEN) |
| | FKR6C | (Air Weapons Station) |
| | FR3 | (Air Station, NAVRESFOR) |
| | FR5 | (Air Reserve) |
| | FR9 | (NAVRESREDCOMREG) |
| | FT2 | (Air Training) |
| | FT6 | (Air Station, CNET) |
| | V3 | (Air Bases, Marine Corps) |
| | V4 | (Air Facility, Marine Corps) |
| | V5 | (Air Station, Marine Corps) |

OPNAV (N4, N45, N46, N463, N78, N79, N091)

(Page intentionally left blank)

# AICUZ
# PROGRAM PROCEDURES
# AND
# GUIDELINES
# FOR
# DEPARTMENT OF THE NAVY
# AIR INSTALLATIONS

Enclosure (1)

TABLE OF CONTENTS


| SECTION | TITLE | PAGE |
|---|---|---|
| I | THE PROCESS | 3 |
| II | CHANGES FROM PREVIOUS CNO/CMC GUIDANCE | 5 |
| III | NOISE EXPOSURE CONTOURS AND ACCIDENT POTENTIAL ZONE DEVELOPMENT | 6 |
| IV | AICUZ STUDY CONTENTS | 28 |
| V | AICUZ STUDY UPDATES | 30 |
| VI | AICUZ IMPLEMENTATION | 32 |
| VII | REAL PROPERTY GUIDANCE | 34 |
| VIII | RESPONSIBILITIES | 38 |
| APPENDIX A | NAVAL AVIATION INSTALLATIONS WITH AICUZ STUDIES BY COMMAND | A-1 |

TABLES

| | | |
|---|---|---|
| TABLE 1 | RUNWAY CLASSIFICATION BY AIRCRAFT TYPE | 14 |
| TABLE 2 | SUGGESTED LAND USE COMPATIBILITY IN NOISE ZONES | 16 |
| TABLE 3 | SUGGESTED LAND USE COMPATIBILITY IN ACCIDENT POTENTIAL ZONES | 22 |

FIGURES

| | | |
|---|---|---|
| FIGURE 1 | FIXED WING ACCIDENT POTENTIAL ZONES | 15 |

SECTION I

THE PROCESS

A. THE AICUZ PROGRAM OBJECTIVES

The purpose of the AICUZ program is to achieve compatibility between air installations and neighboring communities by:

1. Protecting the health, safety, and welfare of civilians and military personnel by encouraging land use which is compatible with aircraft operations;

2. Protecting Navy and Marine Corps installation investment by safeguarding the installation's operational capabilities;

3. Reducing noise impacts caused by aircraft operations while meeting operational, training, and flight safety requirements, both on and in the vicinity of air installations; and

4. Informing the public about the AICUZ program and seeking cooperative efforts to minimize noise and aircraft accident potential impact by promoting compatible development in the vicinity of military air installations.

B. THE AICUZ STUDY

Each Navy and Marine Corps air installation designated by the Chief of Naval Operations (CNO) or the Commandant of the Marine Corps (CMC) has an AICUZ study which includes a detailed analysis of aircraft noise, accident potential, land use compatibility, operational alternatives, and recommended strategies to address existing and potential incompatible development in the vicinity of the air installation. All initial AICUZ studies have been completed and approved and are now updated when circumstances require such action. AICUZ areas depicted in these studies shall not be modified without CNO or CMC approval.

C. OPERATIONAL ALTERNATIVES

Each AICUZ study should normally include an evaluation of operational alternatives to reduce noise and accident potential zone impacts, e.g., flight track modifications, altering hours of operation, construction of acoustical enclosures, changes in pattern altitudes, etc. Evaluation of an operational alternative must balance noise and accident potential zone changes with impacts on flight safety, operational capability, and cost. The decision to accept or reject a new alternative must be clearly presented. Proposed changes to already approved operational procedures will require documentation by the local command as to the reasons for the change along with notification and approval by the installation's chain of command. Environmental documentation in compliance with the

National Environmental Policy Act (NEPA) may also be required.

D. IMPLEMENTATION

Each installation's AICUZ program implementation must be a continuous effort. Local command representatives should continually work toward achieving compatibility between the air installation and its neighboring communities, primarily through local land use controls. Land use controls outside the air installation, which are critical to limiting the number of people exposed to excessive noise and the potential for accidents, are under the exclusive control of State and local governments, and local commands should act only in an informational role. Land acquisition may be considered only in critical situations where State and local governments are unwilling or unable to enact land use controls to achieve land use compatibility within the AICUZ. Land acquisition, for which Congressional authorization is normally required, will usually involve undeveloped land. The air installation should initially ensure chain of command support from the appropriate CNO or CMC resource sponsor, and then submit a land acquisition request via its chain of command for inclusion on the MILCON Integrated Priorities List (IPL).

## SECTION II

## CHANGES FROM PREVIOUS CNO/CMC GUIDANCE

Of particular note are the following changes from the policy issued by earlier CNO/CMC guidance on the AICUZ program.

A. A new Rotorcraft Noise Model (RNM) is included for use in modeling rotary wing aircraft (helicopter and tilt-rotor). The use of single-event noise analysis to augment Day Night Average Sound Level/Community Noise Equivalent Level noise exposure contours is incorporated, as is the use of Average Annual Day (AAD) for noise contours. Floor Area Ratio (FAR) density considerations to augment land use compatibility guidelines are provided for use in Accident Potential Zones (APZ).

B. Long-range strategies related to present and future land use in the vicinity of the air installation are emphasized. Since application of local land use control strategies often do not lend themselves to frequent zoning changes or frequent changes in land use recommendations themselves, it is recognized that continual updates to AICUZ studies can be counterproductive to the goal of community support for the AICUZ Program.

C. Additional guidance is provided as to the modification of APZ, and in the development of prospective noise contours and the selection of the "AICUZ Footprint."

D. Table 1, Runway Classification by Aircraft Type, has been updated to reflect current and projected aircraft types for ease of future reference.

E. Two centers of excellence to coordinate AICUZ issues with activities within their overall area of responsibility have been established. The center of excellence (COE) for the eastern and southern United States, the Atlantic area and Europe is located at the Atlantic Division, Naval Facilities Engineering Command in Norfolk, VA. The center of excellence for the western United States and the Pacific area is located at the Southwest Division, Naval Facilities Engineering Command in San Diego, CA. The primary purpose of the COE is to provide technical assistance to air installations as required. Each COE reports to the NAVFACENGCOM AICUZ Program Office.

## SECTION III

## NOISE EXPOSURE CONTOURS AND ACCIDENT POTENTIAL ZONE DEVELOPMENT

### A. GENERAL

The core of an AICUZ program is a compatible land use plan developed for the air installation. The plan includes height and obstruction criteria for flight safety, as well as recommended land uses for areas exposed to different levels of noise and accident potential. These recommendations indicate the highest and best use of land (both on and off base), which are exposed to high levels of noise and/or aircraft accident potential.

### B. DEVELOPMENT OF NOISE EXPOSURE CONTOURS

The initial step in the AICUZ process is preparation of a noise study to define noise exposure contours and compare them to prior noise contours published in the last approved AICUZ document. The noise contours are developed by a computerized simulation of aircraft activity at the installation and reflect site-specific operational data; e.g., flight tracks, type and mix of aircraft, aircraft profiles (airspeed, altitude, power settings), and frequency and times of operations. AICUZ program experience indicates that future year planning is necessary to consider the effects of expected changes in mission, aircraft, operational levels, etc. Therefore, in addition to the current year analysis, AICUZ updates will include an analysis of projected operations. The resultant noise contours will be referred to as the "prospective" noise contours. Projections of aircraft and aircraft operations will be based upon currently available unclassified estimates of future mission requirements. Where such estimates are not available, or where little or no change is expected in the next 5 to 10 years, the current year noise contours may also be used as the prospective noise contours. Noise impacts from aircraft operations will be graphically portrayed, and operational alternatives that could reduce noise impact on the installation and on the nearby community should be evaluated when practicable from the perspectives of aircraft safety and ability to maintain operational and training requirements. The activity shall recommend the most appropriate AICUZ footprint for approval by CNO/CMC.

1. General. The Day-Night Average Sound Level (DNL) noise descriptor will be used to describe the noise environment around airfields, except in the State of California where the Community Noise Equivalent Level (CNEL) descriptor will be used to describe the noise environment. If State or local laws require some other noise descriptor, it may be used in addition to DNL/CNEL. In addition, single event noise analysis can be used to augment the DNL/CNEL analysis, if appropriate as noted by the Federal Interagency Committee on Aircraft Noise (FICAN).

Since land use compatibility guidelines are based on yearly average noise levels, noise contours should be developed based on Average Annual Day (AAD) operations. However, where the documented nature of AAD air operations at a specific installation does not adequately represent the noise impacts at that installation, the Average Busy Day (ABD) can be used with supporting rationale.

The operations level on an AAD is calculated by dividing the total annual airfield operations by 365 days. An ABD occurs when the airfield operations levels on a day are at least 50 percent of the Average Annual Day operations level. The ABD is calculated by determining the number of operations on busy days and dividing the total number of operations on those busy days by the number of busy days.

2. Noise Zones

(a) At a minimum, contours for DNL 65, 70, 75, and 80 shall be plotted on maps for Navy and Marine Corps air installations as part of AICUZ studies. Contours below 65 DNL are not required but may be provided if local conditions warrant discussion of lower noise levels or where significant noise complaints have been received in areas outside DNL 65.

(b) The NOISEMAP program will be used for developing noise contours for fixed-wing aircraft and the Rotorcraft-Noise Model (RNM) program will be used for developing noise contours for rotary-wing and tilt-rotor aircraft operations.

3. Maintaining Operational Data

Each air installation is responsible for maintaining the operational data required to develop noise exposure contours. This data shall include aircraft operations at the airfield by aircraft type, runway utilization, and operation (approach, departure, ground control approach (GCA), touch-and-go (T&G), field carrier landing practice (FCLP), etc.). If specific questions arise, standardized data packages and guidance for data acquisition and data maintenance at the local activity can be provided by CNO N46.

4. Aircraft Noise Data

CNO N46 is responsible for providing aircraft noise technical and policy guidance within the Department of Navy in the area of aircraft noise. Policy recommendations will be coordinated with HQMC (LFL) and major claimants prior to implementation. Acoustic data for Department of Defense aircraft for both flyover and ground runups are available through the DOD NOISEFILE database maintained at the Air Force's Wright-Patterson Research Laboratory at Wright-Patterson Air Force Base. Noise measurements for new aircraft and aircraft/engine upgrades will be acquired during the acquisition process. The Naval Air Systems Command (NAVAIRSYSCOM) is responsible for programming

acoustic data acquisition for new weapons systems.

The AICUZ Program Office at Naval Facilities Engineering Command (NAVFACENGCOM) will coordinate with NAVAIRSYSCOM as appropriate to schedule and develop the noise measurement program as required. Programming for acoustic data for existing legacy aircraft is the responsibility of the Chief of Naval Operations (N46) through the AICUZ Program Office. Headquarters, Marine Corps is responsible for programming acoustic data collection for Marine Corps existing legacy aircraft after consultation with the AICUZ Program Office at NAVFACENGCOM.

5. Selection of Final Noise Contours to be used in the AICUZ Study

The selection criteria and rationale for the noise contours used must be documented in the request for approval of the AICUZ study. Selection of the recommended AICUZ footprint for approval; (i.e., current year or prospective), shall be made by the activity, concurred with by the chain of command, and approved by CNO or CMC.

C. NOISE COMPATIBLE LAND USE GUIDELINES

For land use planning purposes, the noise exposure area is divided into three noise zones. Noise Zone 1 (DNL/CNEL 64 and below) is essentially an area of low or no impact. Noise Zone 2 (DNL/CNEL 65-74) is an area of moderate impact where some land use controls are needed. Noise Zone 3 (DNL/CNEL 75 and above) is the most severely impacted area and requires the greatest degree of compatible use controls. In addition to the noise zones, areas of concern may be defined where noise levels are not normally considered to be objectionable (less than DNL/CNEL 65), but land use controls are recommended in that particular area.

Land use compatibility information and general guidance, by land use category, is presented in Table 2. Further amplification is available from three sources: (1) "Standard Land Use Coding Manual" U. S. Department of Transportation, Federal Highway Administration, March 1977; (2) "Guidelines for Considering Noise in Land Use Planning and Control," Federal Interagency Committee on Urban Noise, June 1980; and (3) Federal Interagency Committee on Noise (FICON) "Federal Agency Review of Selected Noise Issues", August 1992. Where specific local land uses are not adequately described in the standard guidance documents, refinement and interpretation of the basic data is encouraged, within the constraints of accepted land use planning practice and with the approval of CNO. Recommended acceptable land use for AICUZ noise zones shall also consider sound attenuation

measures imposed by zoning, building code requirements, or restrictive use easements. Where local authorities have adopted specific land use recommendations that are different than the criteria herein provided, the AICUZ study may incorporate and support the specific local

criteria. However, land use planning recommendations proposed for publication in AICUZ documents that vary from Table 2 require CNO/CMC approval prior to public dissemination.

D. DEVELOPMENT OF FIXED WING AIRCRAFT ACCIDENT POTENTIAL ZONES (APZ)

1. General. The accident potential concept describes the probable impact area if an accident were to occur, which is to be distinguished from the probability of an accident occurring. Probable impact area information is based upon historical accident data. This data is used to determine: (1) the size of the Clear Zone and Accident Potential Zones I and II, and (2) suggested land use guidelines for each zone. Application of this concept includes not only statistical but operational considerations as well.

(a) Clear Zones, areas immediately beyond the ends of runways and along primary flight paths, have the greatest potential for occurrence of aircraft accidents and should remain undeveloped. See Figure 1.

(b) The accident potential zones illustrated in Figure 1 are provided for general guidance to protect the public from aircraft accident impact. Strict application will increase the safety of the general public but cannot provide complete protection from aircraft accidents. Local situations may differ significantly from these guidelines and may require individual study. Additionally, there may be cases where the number of flight operations per flight tracks does not meet the threshold criteria to designate accident potential zones and additional analysis may be warranted. Where local authorities desire to implement different criteria than those herein included, to reflect specific local conditions, the AICUZ study may incorporate and support those criteria with approval of the CNO/CMC, as appropriate.

(c) DOD fixed-wing runways are separated into two classes for the purpose of defining accident potential areas. Class A runways are used primarily by light aircraft (see Table 2) and do not have the potential for intensive use by heavy or high performance aircraft. Typically, these runways have less than 10 percent of their operations involving heavier aircraft and are usually less than 8,000 feet long.

Class B runways are all other fixed-wing runways. Naval Air System Command and Naval Facilities Engineering Command concurrence and CNO/CMC approval is required prior to classifying or reclassifying any runway. Figure 1 illustrates the geometry of the Clear Zone and Accident Potential Zones I and II for both Class A and B runways.

2. Clear Zones and Accident Potential Zones (See Figure 1)

(a) Clear Zones. The area immediately beyond the usual runway threshold is designated the "Clear Zone." It is the area with the greatest potential for occurrence of aircraft accidents. Clear Zones should remain undeveloped. Traditionally, the Clear Zone has

been acquired by the Government in fee, or by restrictive use easements, to keep it clear of obstructions to flight. Due to the characteristics of flight operations at Navy and Marine Corps installations, the trapezoidal or "fan shaped" Clear Zone shall be used. The Clear Zone is required for all active runway ends.

(b) Accident Potential Zone I (APZ-I) APZ-I is the area beyond the clear zone which still possesses a measurable potential for accidents relative to the clear zone. APZ-I is provided under flight tracks which experience 5,000 or more annual fixed wing operations (departures or approaches, but not both combined). Figure 1 illustrates the normal dimensions for APZ-1 which may be modified in accordance with paragraph D.3.

(c) Accident Potential Zone II (APZ-II) APZ-II is an area beyond APZ-I (or clear zone if APZ-I is not used) which has a measurable potential for aircraft accidents relative to APZ-I or the clear zone. APZ-II is used whenever APZ-I is required. If APZ-I is not warranted, APZ-II may still be used if an analysis indicates a need for it. In this case, rationale shall be provided for use of APZ-II and it shall be configured as shown on Figure 1, next to the clear zone. APZ-II may also be modified per paragraph D.3.

3. Modification of APZ

Modification of APZ-I and APZ-II for a particular flight path may be considered in the following situations:

(a) Fixed-wing aircraft do not operate on the extended runway centerline during normal flight operations. Modifications shall be made to align the zones to follow the projections of the aircraft flight track on the ground. The width of the curved APZ remains 3,000 feet.

(1) Where the flight track departs the runway centerline prior to crossing the Clear Zone, APZ-I will be 5,000 feet in length and APZ-II will be 10,000 feet in length, measured from the point the flight path leaves the runway centerline.

(2) Where the flight track passes through the side of the clear zone, APZ-I will be 5,000 feet in length and the length of APZ-II will be the difference between the total length of the clear zone and APZ-I and II (15,000 feet) less APZ-I and the distance the flight track traverses the Clear Zone. The distances are measured beginning at the point the flight path leaves the runway centerline.

(b) Field Carrier Landing Practice (FCLP) is typically an intense aircraft evolution and is viewed by the Department of the Navy as an unusual operating condition as noted in reference (a). FCLP operations are usually conducted at night with several aircraft in the pattern at low altitude. At Air Stations, Outlying Landing Fields (OLF) and Auxiliary Landing Fields (ALF) where the operational

criteria for application of APZ-I is satisfied due to FCLP operations, APZ-II should be applied to the entire FCLP track beyond APZ-I resulting in a closed loop for the entire pattern.

(c) Specific conditions may also point toward modification of the standard APZ geometry or application. In these situations, supporting rationale shall be coordinated with the AICUZ Program Office in advance and documented in the AICUZ study/update. Situations in which APZ modifications could be considered include, but are not limited to, the following:

(1) Where multiple flight tracks exist for a specific operation (e.g. arrival, departure, Field Carrier Landing Practice (FCLP), Ground Controlled Approach (GCA), etc.) which intersect the runway centerline and 5,000 operations exist by combining numbers on similar mode flight tracks. APZ should be centered on the dominant flight tracks(s) with the most operations.

(2) Where other unusual conditions exist and can be documented.

(d) CNO/CMC coordination and approval is required prior to any modification of an installation's APZ.

E. DEVELOPMENT OF ROTARY WING AIRCRAFT APZ

1. Basis for Clear Zone and APZ Application. The clear zone for rotary wing aircraft will be provided for all VFR landing pads/runways. The use of APZ-I will be provided for VFR landing pads/runways located at air installations that support daily training and operational missions. Normally, helipads provided to support administrative functions and hospitals, which generate a low volume of helicopter operations, will not require APZ-I or APZ-II. Since extensive land use controls apply to IFR primary surface areas; additional clear zones and APZ are normally not required for IFR helicopter facilities due to extensive IFR primary surface area.

2. Clear Zone and Accident Potential Zones

(a) Clear Zone. The takeoff safety zone for VFR rotary-wing facilities shall be used as the clear zone. The takeoff safety zone is that area under the VFR approach/departure surface until that surface is 50 feet above the established landing area elevation.

(b) Accident Potential Zone I (APZ-I). An area beyond the clear zone for the remainder of the approach/departure zone, which is defined as the area under the VFR approach/departure surface until that surface is 150 feet above the established landing area elevation.

(c) Accident Potential Zone II (APZ-II). Normally not applied to helicopter flight paths unless the local accident history indicates the need for additional protection.

F. ACCIDENT POTENTIAL ZONES COMPATIBLE LAND USE GUIDELINES

Recommended land use compatibility guidelines for clear zones and APZ are shown in Table 3. Local planning & zoning authorities may desire to implement different criteria than those included herein, to reflect specific local conditions. CNO/CMC approval is required prior to an Installation's public support of any criteria other than that contained in this instruction.

Floor area ratio (FAR) is the ratio between square feet of floor area and square feet of site area. It is commonly used to identify population density or intensity for non-residential structures or land uses. The FAR recommendations in Table 3 are provided as an aid to local officials and installation personnel considering restrictions on the density/intensity of non-residential development in APZ. However, it is not realistic to state that one numerical density is safe while another is not. The objective is to maximize the degree of safety that can reasonably be attained within local land use considerations.

G. OBSTRUCTION AND SAFETY CLEARANCES

This instruction addresses compatible land use with respect to aircraft noise and accident potential. Land uses in the vicinity of air installations are also subject to aircraft safety clearances and height restrictions. These restrictions are included by reference in this Instruction based upon criteria published in NAVFAC P-80.3.

H. AICUZ COMPATIBLE LAND USE IMPLEMENTATION

1. General

(a) DOD policy is to work toward promoting compatible land use development in the vicinity of air installations, and to encourage local governments to incorporate the AICUZ study recommendations into local land use planning and control process. This process includes, but is not limited to, zoning and subdivision ordinances and building codes. Land use planning must address long-range strategies involving present and future land use and development. Application of land use control strategies often does not result in immediate changes in land use development in the areas subject to the specific requirements or restrictions. Additionally, since land use planning is a long-range process, communities cannot be expected to continually change their comprehensive plans to reflect frequent changes in Navy/Marine Corps noise contours and APZ. Frequent changes can also undermine support for the program. Hence, it is imperative that AICUZ Studies consider not only current but also realistic 5-to 10-year projections of airfield operations when making land use planning recommendations.

(b) The AICUZ study or update shall include recommended land uses based on recognized guidelines and sound planning principles. The AICUZ boundary is generally defined as that area contained within the

Accident Potential and Noise Zones. The development of the final boundary of the AICUZ shall also take into account natural and manmade features that can impact land use development underlying the imaginary surfaces of the airfield. The study recommendations shall be based on current operations levels and the best available (5-to 10-year) projection of operations that best support long-range planning controls to protect the health, safety and welfare of the community and the future operational integrity of the air installation. This may not be simply a snapshot reflection of current operational levels. This information will be provided to local government agencies with the recommendation that it be incorporated into the local planning and regulatory process. Land use compatibility guidelines in aircraft noise zones are shown in Table (2), and land use compatibility guidelines within Clear Zones and APZ are outlined in Table (3).

(c) The recommendations regarding compatible land use within each zone may vary according to local conditions. The primary objectives will be to identify areas within the AICUZ that can be affected by air operations; to share information with local government agencies that regulate land use, and to recommend restrictions on incompatible development. Local governments may choose to provide for additional land use controls outside the AICUZ boundary based on local economic and social concerns with the intent of providing long-term encroachment protection. Such actions by local governments should be encouraged since they can have the effect of implementing long-term land use development and smart growth initiatives.

**TABLE 1**

**AIRCRAFT TYPES BY RUNWAY CLASSIFICATION[(1)]**

**Class A Runway**

| | |
|---|---|
| C-1 | OV-1 |
| C-2 | OV-10 |
| C-12 | T-3 |
| C-20 | T-6 |
| C-21 | T-28 |
| C-22 | T-34 |
| C-26 | T-41 |
| C-32 | T-43 |
| C-37 | UV-18 |
| C-38 | V-22 |
| E-1 | DASH-7 |
| E-2 | DASH-8 |

**Class B Runway**

| | | |
|---|---|---|
| A-4 | C-135 | P-3 |
| EA-6 | C-137 | RQ-1 |
| A-10 | C-141 | S-3 |
| AV-8 | E-3 | T-1 |
| B-1 | E-4 | T-37 |
| B-2 | E-8 | T-38 |
| B-52 | F-14 | T-39 |
| C-5 | F-15 | T-45 |
| C-9 | F-16 | TR-1 |
| KC-10 | F/A-18 | U-2 |
| C-17 | F-22[(2)] | VC-25A |
| C-40 | F-117 | JSF[(2)] |
| C-130 | | |

(1) Aircraft types with multiple configurations (e.g., C-130E; C-130H; AC-130; LC-130; EC-130; MC-130, etc.) are all included for these purposes under the basic C-130 entry.

(2) Aircraft planned to be added to inventory.

**FIGURE 1 - FIXED WING ACCIDENT POTENTIAL ZONES**




CLASS A RUNWAY

**Notes;**

(1) APZ I and II may be altered to conform to flight shadow.

(2) The 2284' dimension is based on criteria of using a 7°-58'-11" flare angle for the approach departure surface where the outer width of that surface was established at 15,500'. This dimension would be 2312' where the outer width of the surface was established at 16,000'.

(See NAVFAC P-80.3)




CLASS B RUNWAY

[See NAVFAC P-80.3, for additional details. Flare starts at 200' from end of runways and the 3000' Clear Zone length starts at runway end]

**TABLE 2 - AIR INSTALLATIONS COMPATIBLE USE ZONES**
**SUGGESTED LAND USE COMPATIBILITY IN NOISE ZONES**

| Land Use | | Suggested Land Use Compatibility | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Noise Zone 1 ( DNL or CNEL) | | Noise Zone 2 ( DNL or CNEL) | | Noise Zone 3 ( DNL or CNEL) | | |
| **SLUCM NO** | **LAND USE NAME** | < 55 | 55- 64 | 65 - 69 | 70 -74 | 75- 79 | 80 -84 | 85+ |
| | ***Residential*** | | | | | | | |
| 11 | Household Units | Y | Y[1] | N[1] | N[1] | N | N | N |
| 11.11 | Single units: detached | Y | Y[1] | N[1] | N[1] | N | N | N |
| 11.12 | Single units: semidetached | Y | Y[1] | N[1] | N[1] | N | N | N |
| 11.13 | Single units: attached row | Y | Y[1] | N[1] | N[1] | N | N | N |
| 11.21 | Two units: side-by-side | Y | Y[1] | N[1] | N[1] | N | N | N |
| 11.22 | Two units: one above the other | Y | Y[1] | N[1] | N[1] | N | N | N |
| 11.31 | Apartments: walk-up | Y | Y[1] | N[1] | N[1] | N | N | N |
| 11.32 | Apartment: elevator | Y | Y[1] | N[1] | N[1] | N | N | N |
| 12 | Group quarters | Y | Y[1] | N[1] | N[1] | N | N | N |
| 13 | Residential Hotels | Y | Y[1] | N[1] | N[1] | N | N | N |
| 14 | Mobile home parks or courts | Y | Y[1] | N | N | N | N | N |
| 15 | Transient lodgings | Y | Y[1] | N[1] | N[1] | N[1] | N | N |
| 16 | Other residential | Y | Y[1] | N[1] | N[1] | N | N | N |
| | | | | | | | | |
| ***20*** | ***Manufacturing*** | | | | | | | |
| 21 | Food & kindred products; manufacturing | Y | Y | Y | Y[2] | Y[3] | Y[4] | N |
| 22 | Textile mill products; manufacturing | Y | Y | Y | Y[2] | Y[3] | Y[4] | N |
| 23 | Apparel and other finished products; products made from fabrics, leather and similar materials; manufacturing | Y | Y | Y | Y[2] | Y[3] | Y[4] | N |
| 24 | Lumber and wood products (except furniture); manufacturing | Y | Y | Y | Y[2] | Y[3] | Y[4] | N |
| 25 | Furniture and fixtures; manufacturing | Y | Y | Y | Y[2] | Y[3] | Y[4] | N |
| 26 | Paper and allied products; manufacturing | Y | Y | Y | Y[2] | Y[3] | Y[4] | N |
| 27 | Printing, publishing, and allied industries | Y | Y | Y | Y[2] | Y[3] | Y[4] | N |
| 28 | Chemicals and allied products; manufacturing | Y | Y | Y | Y[2] | Y[3] | Y[4] | N |
| 29 | Petroleum refining and related industries | Y | Y | Y | Y[2] | Y[3] | Y[4] | N |

**TABLE 2 - AIR INSTALLATIONS COMPATIBLE USE ZONES
SUGGESTED LAND USE COMPATIBILITY IN NOISE ZONES (Continued)**

| Land Use | | Suggested Land Use Compatibility | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Noise Zone 1 ( *DNL or CNEL*) | | Noise Zone 2 ( *DNL or CNEL*) | | Noise Zone 3 ( *DNL or CNEL*) | | |
| **SLUCM NO.** | **LAND USE NAME** | < 55 | 55- 64 | 65 - 69 | 70 -74 | 75- 79 | 80 -84 | 85+ |
| *30* | ***Manufacturing (continued)*** | | | | | | | |
| 31 | Rubber and misc. plastic products; manufacturing | Y | Y | Y | Y [2] | Y [3] | Y [4] | N |
| 32 | Stone, clay and glass products; manufacturing | Y | Y | Y | Y [2] | Y [3] | Y [4] | N |
| 33 | Primary metal products; manufacturing | Y | Y | Y | Y [2] | Y [3] | Y [4] | N |
| 34 | Fabricated metal products; manufacturing | Y | Y | Y | Y [2] | Y [3] | Y [4] | N |
| 35 | Professional scientific, and controlling instruments; photographic and optical goods; watches and clocks | Y | Y | Y | 25 | 30 | N | N |
| 39 | Miscellaneous manufacturing | Y | Y | Y | Y [2] | Y [3] | Y [4] | N |
| *40* | ***Transportation, communication and utilities.*** | | | | | | | |
| 41 | Railroad, rapid rail transit, and street railway transportation | Y | Y | Y | Y [2] | Y [3] | Y [4] | N |
| 42 | Motor vehicle transportation | Y | Y | Y | Y [2] | Y [3] | Y [4] | N |
| 43 | Aircraft transportation | Y | Y | Y | Y [2] | Y [3] | Y [4] | N |
| 44 | Marine craft transportation | Y | Y | Y | Y [2] | Y [3] | Y [4] | N |
| 45 | Highway and street right-of-way | Y | Y | Y | Y [2] | Y [3] | Y [4] | N |
| 46 | Automobile parking | Y | Y | Y | Y [2] | Y [3] | Y [4] | N |
| 47 | Communication | Y | Y | Y | 25 [5] | 30 [5] | N | N |
| 48 | Utilities | Y | Y | Y | Y [2] | Y [3] | Y [4] | N |
| 49 | Other transportation, communication and utilities | Y | Y | Y | 25 [5] | 30 [5] | N | N |
| *50* | ***Trade*** | | | | | | | |
| 51 | Wholesale trade | Y | Y | Y | Y [2] | Y [3] | Y [4] | N |
| 52 | Retail trade - building materials, hardware and farm equipment | Y | Y | Y | Y [2] | Y [3] | Y [4] | N |
| 53 | Retail trade - shopping centers | Y | Y | Y | 25 | 30 | N | N |
| 54 | Retail trade - food | Y | Y | Y | 25 | 30 | N | N |

**TABLE 2 - AIR INSTALLATIONS COMPATIBLE USE ZONES**
**SUGGESTED LAND USE COMPATIBILITY IN NOISE ZONES (Continued)**

| Land Use | | Suggested Land Use Compatibility | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Noise Zone 1 ( *DNL or CNEL*) | | Noise Zone 2 ( *DNL or CNEL*) | | Noise Zone 3 ( *DNL or CNEL*) | | |
| **SLUCM NO** | **LAND USE NAME** | < 55 | 55- 64 | 65 -69 | 70 -74 | 75-79 | 80 -84 | 85+ |
| ***50*** | ***Trade (Continued)*** | | | | | | | |
| 55 | Retail trade - automotive, marine craft, aircraft and accessories | Y | Y | Y | 25 | 30 | N | N |
| 56 | Retail trade - apparel and accessories | Y | Y | Y | 25 | 30 | N | N |
| 57 | Retail trade - furniture, home, furnishings and equipment | Y | Y | Y | 25 | 30 | N | N |
| 58 | Retail trade - eating and drinking establishments | Y | Y | Y | 25 | 30 | N | N |
| 59 | Other retail trade | Y | Y | Y | 25 | 30 | N | N |
| ***60*** | ***Services*** | | | | | | | |
| 61 | Finance, insurance and real estate services | Y | Y | Y | 25 | 30 | N | N |
| 62 | Personal services | Y | Y | Y | 25 | 30 | N | N |
| 62.4 | Cemeteries | Y | Y | Y | Y [2] | Y [3] | Y [4,11] | Y [6,11] |
| 63 | Business services | Y | Y | Y | 25 | 30 | N | N |
| 63.7 | Warehousing and storage | Y | Y | Y | Y [2] | Y [3] | Y [4] | N |
| 64 | Repair Services | Y | Y | Y | Y [2] | Y [3] | Y [4] | N |
| 65 | Professional services | Y | Y | Y | 25 | 30 | N | N |
| 65.1 | Hospitals, other medical fac. | Y | Y [1] | 25 | 30 | N | N | N |
| 65.16 | Nursing Homes | Y | Y | N [1] | N [1] | N | N | N |
| 66 | Contract construction services | Y | Y | Y | 25 | 30 | N | N |
| 67 | Government Services | Y | Y [1] | Y [1] | 25 | 30 | N | N |
| 68 | Educational services | Y | Y [1] | 25 | 30 | N | N | N |
| 69 | Miscellaneous | Y | Y | Y | 25 | 30 | N | N |
| ***70*** | ***Cultural, entertainment and recreational*** | | | | | | | |
| 71 | Cultural activities (& churches) | Y | Y[1] | 25 | 30 | N | N | N |
| 71.2 | Nature exhibits | Y | Y[1] | Y[1] | N | N | N | N |
| 72 | Public assembly | Y | Y[1] | Y | N | N | N | N |
| 72.1 | Auditoriums, concert halls | Y | Y | 25 | 30 | N | N | N |
| 72.11 | Outdoor music shells, amphitheaters | Y | Y [1] | N | N | N | N | N |
| 72.2 | Outdoor sports arenas, spectator sports | Y | Y | Y [7] | Y [7] | N | N | N |
| 73 | Amusements | Y | Y | Y | Y | N | N | N |
| 74 | Recreational activities (include golf courses, riding stables, water rec.) | Y | Y[1] | Y[1] | 25 | 30 | N | N |
| 75 | Resorts and group camps | Y | Y [1] | Y [1] | Y [1] | N | N | N |
| 76 | Parks | Y | Y [1] | Y [1] | Y [1] | N | N | N |
| 79 | Other cultural, entertainment and recreation | Y | Y [1] | Y [1] | Y [1] | N | N | N |

**TABLE 2 - AIR INSTALLATIONS COMPATIBLE USE ZONES
SUGGESTED LAND USE COMPATIBILITY IN NOISE ZONES (Continued)**

| Land Use | | Suggested Land Use Compatibility | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Noise Zone 1 ( *DNL or CNEL*) | | Noise Zone 2 ( *DNL or CNEL*) | | Noise Zone 3 ( *DNL or CNEL*) | | |
| SLUCM NO. | LAND USE NAME | < 55 | 55- 64 | 65 -69 | 70 -74 | 75-79 | 80 -84 | 85+ |
| ***80*** | ***Resource Production and Extraction*** | | | | | | | |
| 81 | Agriculture (except live stock) | Y | Y | Y 8 | Y 9 | Y 10 | Y 10,11 | Y 10,11 |
| 81.5, | Livestock farming | Y | Y | Y 8 | Y 9 | N | N | N |
| 81.7 | Animal breeding | Y | Y | Y 8 | Y 9 | N | N | N |
| 82 | Agriculture related activities | Y | Y | Y 8 | Y 9 | Y 10 | Y 10,11 | Y 10,11 |
| 83 | Forestry Activities | Y | Y | Y 8 | Y 9 | Y 10 | Y 10,11 | Y 10,11 |
| 84 | Fishing Activities | Y | Y | Y | Y | Y | Y | Y |
| 85 | Mining Activities | Y | Y | Y | Y | Y | Y | Y |
| 89 | Other resource production or extraction | Y | Y | Y | Y | Y | Y | Y |

**KEY TO TABLE 2 - SUGGESTED LAND USE COMPATIBILITY IN NOISE ZONES**

| | |
|---|---|
| SLUCM | Standard Land Use Coding Manual, U.S. Department of Transportation |
| Y (Yes) | Land Use and related structures compatible without restrictions. |
| N (No) | Land Use and related structures are not compatible and should be prohibited. |
| $Y^x$ (Yes with Restrictions) | The land use and related structures are generally compatible. However, see note(s) indicated by the superscript. |
| $N^x$ (No with exceptions) | The land use and related structures are generally incompatible. However, see notes indicated by the superscript. |

| | |
|---|---|
| NLR (Noise Level Reduction) | Noise Level Reduction (outdoor to indoor) to be achieved through incorporation of noise attenuation into the design and construction of the structure. |
| 25, 30, or 35 | The numbers refer to Noise Level Reduction levels. Land Use and related structures generally compatible however, measures to achieve NLR of 25, 30 or 35 must be incorporated into design and construction of structures. However, measures to achieve an overall noise reduction do not necessarily solve noise difficulties outside the structure and additional evaluation is warranted. Also, see notes indicated by superscripts where they appear with one of these numbers. |

| | |
|---|---|
| DNL | Day-Night Average Sound Level. |
| CNEL | Community Noise Equivalent Level (Normally within a very small decibel difference of DNL) |
| Ldn | Mathematical symbol for DNL. |

**NOTES FOR TABLE 2 - SUGGESTED LAND USE COMPATIBILITY IN NOISE ZONES**

1.

a) Although local conditions regarding the need for housing may require residential use in these Zones, residential use is discouraged in DNL 65-69 and strongly discouraged in DNL 70-74. The absence of viable alternative development options should be determined and an evaluation should be conducted locally prior to local approvals indicating that a demonstrated community need for the residential use would not be met if development were prohibited in these Zones.

b) Where the community determines that these uses must be allowed, measures to achieve and outdoor to indoor Noise Level Reduction (NLR) of at least 25 dB in DNL 65-69 and NLR of 30 dB in DNL 70-74 should be incorporated into building codes and be in individual approvals; for transient housing a NLR of at least 35 dB should be incorporated in DNL 75-79.

c) Normal permanent construction can be expected to provide a NLR of 20 dB, thus the reduction requirements are often stated as 5, 10 or 15 dB over standard construction and normally assume mechanical ventilation, upgraded Sound Transmission Class (STC) ratings in windows and doors and closed windows year round. Additional

consideration should be given to modifying NLR levels based on peak noise levels or vibrations.

d) NLR criteria will not eliminate outdoor noise problems. However, building location and site planning, design and use of berms and barriers can help mitigate outdoor noise exposure NLR particularly from ground level sources. Measures that reduce noise at a site should be used wherever practical in preference to measures that only protect interior spaces.

2. Measures to achieve NLR of 25 must be incorporated into the design and construction of portions of these buildings where the public is received, office areas, noise sensitive areas or where the normal noise level is low.

3. Measures to achieve NLR of 30 must be incorporated into the design and construction of portions of these buildings where the public is received, office areas, noise sensitive areas or where the normal noise level is low.

4. Measures to achieve NLR of 35 must be incorporated into the design and construction of portions of these buildings where the public is received, office areas, noise sensitive areas or where the normal noise level is low.

5. If project or proposed development is noise sensitive, use indicated NLR; if not, land use is compatible without NLR.

6. No buildings.

7. Land use compatible provided special sound reinforcement systems are installed.

8. Residential buildings require a NLR of 25

9. Residential buildings require a NLR of 30.

10. Residential buildings not permitted.

11. Land use not recommended, but if community decides use is necessary, hearing protection devices should be worn.

**TABLE 3 - AIR INSTALLATIONS COMPATIBLE USE ZONES**
**SUGGESTED LAND USE COMPATIBILITY IN ACCIDENT POTENTIAL ZONES [1]**

| SLUCM NO. | LAND USE NAME | CLEAR ZONE Recommendation | APZ-I Recommendation | APZ-II Recommendation | Density Recommendation |
|---|---|---|---|---|---|
| *10* | *Residential* | | | | |
| 11 | Household Units | | | | |
| 11.11 | Single units: detached | N | N | Y[2] | Maximum density of 1-2 Du/Ac |
| 11.12 | Single units: semidetached | N | N | N | |
| 11.13 | Single units: attached row | N | N | N | |
| 11.21 | Two units: side-by-side | N | N | N | |
| 11.22 | Two units: one above the other | N | N | N | |
| 11.31 | Apartments: walk-up | N | N | N | |
| 11.32 | Apartment: elevator | N | N | N | |
| 12 | Group quarters | N | N | N | |
| 13 | Residential Hotels | N | N | N | |
| 14 | Mobile home parks or courts | N | N | N | |
| 15 | Transient lodgings | N | N | N | |
| 16 | Other residential | N | N | N | |
| | | | | | |
| *20* | *Manufacturing* [3] | | | | |
| 21 | Food & kindred products; manufacturing | N | N | Y | Maximum FAR 0.56 |
| 22 | Textile mill products; manufacturing | N | N | Y | Same as above |
| 23 | Apparel and other finished products; products made from fabrics, leather and similar materials; manufacturing | N | N | N | |
| 24 | Lumber and wood products (except furniture); manufacturing | N | Y | Y | Maximum FAR of 0.28 in APZ I & 0.56 in APZ II |
| 25 | Furniture and fixtures; manufacturing | N | Y | Y | Same as above |
| 26 | Paper and allied products; manufacturing | N | Y | Y | Same as above |
| 27 | Printing, publishing, and allied industries | N | Y | Y | Same as above |
| 28 | Chemicals and allied products; manufacturing | N | N | N | |
| 29 | Petroleum refining and related industries | N | N | N | |



OCE212867

TABLE 3 - AIR INSTALLATIONS COMPATIBLE USE ZONES
SUGGESTED LAND USE COMPATIBILITY IN ACCIDENT POTENTIAL ZONES [1]
(Continued)

| SLUCM NO. | LAND USE NAME | CLEAR ZONE Recommendation | APZ-I Recommendation | APZ II Recommendation | Density Recommendation |
|---|---|---|---|---|---|
| | | | | | |
| *30* | *Manufacturing* [3] *(continued)* | | | | |
| 31 | Rubber and misc. plastic products; manufacturing | N | N | N | |
| 32 | Stone, clay and glass products; manufacturing | N | N | Y | Maximum FAR 0.56 |
| 33 | Primary metal products; manufacturing | N | N | Y | Same as above |
| 34 | Fabricated metal products; manufacturing | N | N | Y | Same as above |
| 35 | Professional scientific, & controlling instrument; photographic and optical goods; watches & clocks | N | N | N | |
| 39 | Miscellaneous manufacturing | N | Y | Y | Maximum FAR of 0.28 in APZ I & 0.56 in APZ II |
| | | | | | |
| *40* | *Transportation, communication and utilities* [4]. | | | | See Note 3 below. |
| 41 | Railroad, rapid rail transit, and street railway transportation | N | Y[5] | Y | Same as above. |
| 42 | Motor vehicle transportation | N | Y[5] | Y | Same as above |
| 43 | Aircraft transportation | N | Y[5] | Y | Same as above |
| 44 | Marine craft transportation | N | Y[5] | Y | Same as above |
| 45 | Highway and street right-of-way | N | Y[5] | Y | Same as above |
| 46 | Auto parking | N | Y[5] | Y | Same as above |
| 47 | Communication | N | Y[5] | Y | Same as above |
| 48 | Utilities | N | Y[5] | Y | Same as above |
| 485 | Solid waste disposal (Landfills, incineration, etc.) | N | N | N | |
| 49 | Other transport, comm. and utilities | N | Y[5] | Y | See Note 3 below |
| | | | | | |
| *50* | *Trade* | | | | |
| 51 | Wholesale trade | N | Y | Y | Maximum FAR of 0.28 in APZ I. & .56 in APZ II. |
| 52 | Retail trade - building materials, hardware and farm equipment | N | Y | Y | Maximum FAR of 0.14 in APZ I & 0.28 in APZ II |

**TABLE 3 - AIR INSTALLATIONS COMPATIBLE USE ZONES**
**SUGGESTED LAND USE COMPATIBILITY IN ACCIDENT POTENTIAL ZONES [1]**
**(Continued)**

| SLUCM NO. | LAND USE NAME | CLEAR ZONE Recommendation | APZ-I Recommendation | APZ-II Recommendation | Density Recommendation |
|---|---|---|---|---|---|
| *50* | ***Trade (Continued)*** | | | | |
| 53 | Retail trade - shopping centers | N | N | Y | Maximum FAR of 0.22. |
| 54 | Retail trade - food | N | N | Y | Maximum FAR of 0.24 |
| 55 | Retail trade - automotive, marine craft, aircraft and accessories | N | Y | Y | Maximum FAR of 0.14 in APZ I & 0.28 in APZ II |
| 56 | Retail trade - apparel and accessories | N | N | Y | Maximum FAR 0.28 |
| 57 | Retail trade - furniture, home, furnishings and equipment | N | N | Y | Same as above |
| 58 | Retail trade - eating and drinking establishments | N | N | N | |
| 59 | Other retail trade | N | N | Y | Maximum FAR of 0.22 |
| | | | | | |
| *60* | ***Services*** [6] | | | | |
| 61 | Finance, insurance and real estate services | N | N | Y | Maximum FAR of 0.22 for "General Office/Office park" |
| 62 | Personal services | N | N | Y | Office uses only. Maximum FAR of 0.22. |
| 62.4 | Cemeteries | N | Y[7] | Y[7] | |
| 63 | Business services (credit reporting; mail, stenographic, reproduction; advertising) | N | N | Y | Max. FAR of 0.22 in APZ II |
| 63.7 | Warehousing and storage services | N | Y | Y | Max. FAR 1.0 APZ I; 2.0 in APZ II |
| 64 | Repair Services | N | Y | Y | Max. FAR of 0.11 APZ I; 0.22 in APZ II |
| 65 | Professional services | N | N | Y | Max. FAR of 0.22 |
| 65.1 | Hospitals, nursing, homes | N | N | N | |
| 65.1 | Other medical facilities | N | N | N | |
| 66 | Contract construction services | N | Y | Y | Max. FAR of 0.11 APZ I; 0.22 in APZ II |
| 67 | Government Services | N | N | Y | Max FAR of 0.24 |
| 68 | Educational services | N | N | N | |
| 69 | Miscellaneous | N | N | Y | Max. FAR of 0.22 |

TABLE 3 - AIR INSTALLATIONS COMPATIBLE USE ZONES
SUGGESTED LAND USE COMPATIBILITY IN ACCIDENT POTENTIAL ZONES [1]
(Continued)

| SLUCM NO. | LAND USE NAME | CLEAR ZONE Recommendation | APZ-I Recommendation | APZ-II Recommendation | Density Recommendation |
|---|---|---|---|---|---|
| *70* | *Cultural, entertainment and recreational* | | | | |
| 71 | Cultural activities | N | N | N | |
| 71.2 | Nature exhibits | N | Y[8] | Y[8] | |
| 72 | Public assembly | N | N | N | |
| 72.1 | Auditoriums, concert halls | N | N | N | |
| 72.11 | Outdoor music shells, amphitheaters | N | N | N | |
| 72.2 | Outdoor sports arenas, spectator sports | N | N | N | |
| 73 | Amusements - fairgrounds, miniature golf, driving ranges; amusement parks, etc | N | N | Y | |
| 74 | Recreational activities (including golf courses, riding stables, water recreation) | N | Y[8] | Y[8] | Max. FAR of 0.11 APZ I; 0.22 in APZ II |
| 75 | Resorts and group camps | N | N | N | |
| 76 | Parks | N | Y[8] | Y[8] | Same as 74 |
| 79 | Other cultural, entertainment and recreation | N | Y[8] | Y[8] | Same as 74 |
| *80* | ***Resource production and extraction*** | | | | |
| 81 | Agriculture (except live stock) | Y[4] | Y[9] | Y[9] | |
| 81.5, 81.7 | Livestock farming and breeding | N | Y[9,10] | Y[9,10] | |
| 82 | Agriculture related activities | N | Y[9] | Y[9] | Max FAR of 0.28 APZ I; 0.56 APZ II no activity which produces smoke, glare, or involves explosives |
| 83 | Forestry Activities [11] | N | Y | Y | Same as Above |
| 84 | Fishing Activities [12] | N[12] | Y | Y | Same as Above |
| 85 | Mining Activities | N | Y | Y | Same as Above |
| 89 | Other resource production or extraction | N | Y | Y | Same as Above |
| *90* | *Other* | | | | |
| 91 | Undeveloped Land | Y | Y | Y | |
| 93 | Water Areas | N[13] | N[13] | N[13] | |



OCE212870

**KEY TO TABLE 3 - SUGGESTED LAND USE COMPATIBILITY IN ACCIDENT POTENTIAL ZONES**

| | |
|---|---|
| SLUCM - | Standard Land Use Coding Manual, U.S. Department of Transportation |
| Y (Yes) - | Land use and related structures are normally compatible without restriction. |
| N (No) - | Land use and related structures are not normally compatible and should be prohibited. |
| $Y^x$ - (Yes with restrictions) | The land use and related structures are generally compatible. However, see notes indicated by the superscript. |
| $N^x$ - (No with exceptions) | The land use and related structures are generally incompatible. However, see notes indicated by the superscript. |
| FAR - Floor Area Ratio | A floor area ratio is the ratio between the square feet of floor area of the building and the site area. It is customarily used to measure non-residential intensities. |
| Du/Ac - Dwelling Units per Acre | This metric is customarily used to measure residential densities. |

**NOTES FOR TABLE 3 - SUGGESTED LAND USE COMPATIBILITY IN ACCIDENT POTENTIAL ZONES**

The following notes refer to Table 3.

1. A "Yes" or a "No" designation for compatible land use is to be used only for general comparison. Within each, uses exist where further evaluation may be needed in each category as to whether it is clearly compatible, normally compatible, or not compatible due to the variation of densities of people and structures. In order to assist installations and local governments, general suggestions as to floor/area ratios are provided as a guide to density in some categories. In general, land use restrictions which limit commercial, services, or industrial buildings or structure occupants to 25 per acre in APZ I, and 50 per acre in APZ II are the range of occupancy levels considered to be low density. Outside events should normally be limited to assemblies of not more that 25 people per acre in APZ I, and maximum assemblies of 50 people per acre in APZ II.

2. The suggested maximum density for detached single-family housing is one to two Du/Ac. In a Planned Unit Development (PUD) of single family detached units where clustered housing development results in



OCE212871

large open areas, this density could possibly be increased provided the amount of surface area covered by structures does not exceed 20 percent of the PUD total area. PUD encourages clustered development that leaves large open areas.

3. Other factors to be considered: Labor intensity, structural coverage, explosive characteristics, air-pollution, electronic interference with aircraft, height of structures, and potential glare to pilots.

4. No structures (except airfield lighting), buildings or aboveground utility/ communications lines should normally be located in Clear Zone areas on or off the installation. The Clear Zone is subject to severe restrictions. See NAVFAC P-80.3 or Tri-Service Manual AFM 32-1123(I); TM 5-803-7, NAVFAC P-971 "Airfield and Heliport Planning & Design" dated 1 May 99 for specific design details.

5. No passenger terminals and no major above ground transmission lines in APZ I.

6. Low intensity office uses only. Accessory uses such as meeting places, auditoriums, etc. are not recommended.

7. No Chapels are allowed within APZ I or APZ II.

8. Facilities must be low intensity, and provide no tot lots, etc. Facilities such as clubhouses, meeting places, auditoriums, large classes, etc. are not recommended.

9. Includes livestock grazing, but excludes feedlots and intensive animal husbandry. Activities that attract concentrations of birds creating a hazard to aircraft operations should be excluded.

10. Includes feedlots and intensive animal husbandry.

11. Lumber and timber products removed due to establishment, expansion, or maintenance of Clear Zones will be disposed of in accordance with appropriate DOD Natural Resources Instructions.

12. Controlled hunting and fishing may be permitted for the purpose of wildlife management.

13. Naturally occurring water features (e.g., rivers, lakes, streams, wetlands) are compatible.

## SECTION IV

## AICUZ STUDY CONTENTS

A. GENERAL

AICUZ studies have been developed and approved for each Navy and Marine Corps air installation. Where a new installation is established, or where major missions change to an existing installation is proposed, NEPA documentation is required (See OPNAVINST 5090.1B). Subsequent to the completion of the Final NEPA documentation, an AICUZ Study should be prepared. The AICUZ study and AICUZ study updates generally should include the following:

1. Existing Conditions

A description and graphic depiction of the flight operations, noise contours and accident potential zones, land use compatibility, and supporting data which describe aircraft types, operations, flight tracks, and a history of aircraft operations since the previous AICUZ Study. Locations of previous aircraft accidents should be shown, also noise complaint numbers and locations should be provided. A description of land use controls currently in effect in the area surrounding the installation should also be included.

2. Future-Year Forecast and Prospective AICUZ

Based on the currently available unclassified information, each installation will develop a forecast of air operations activity levels (normally for a time frame 5 to 10 years forward). Forecasts may be based upon historical trends or projected aircraft base loading and should address expected mission changes. The AICUZ update will include footprints and supporting discussions reflecting the operational forecasts. These footprints will provide the necessary guidance as to what actions must be taken to assure future mission integrity at the air installation. Further, future year footprints will provide local governments with the information to plan for changes in air installation activity levels and/or operational procedures.

3. AICUZ Recommendations

An AICUZ map depicting the area of critical concern, a land use compatibility matrix for the installation, and recommended safety clearances/ height restrictions to protect safety of flight shall be included.

4. Alternatives and Changes from Prior AICUZ Study

An analysis of alternatives that could mitigate noise and/or accident potential impact normally is included. Examples of alternatives include community implementation strategies, sound-attenuated facility construction, acquisition of land or interests

therein, or practicable potential operational changes. Noise and accident potential zone changes should be described and illustrated since these changes may influence the decision to implement land use control changes. Documentation should include discussion of which factors contributed to the change (aircraft, tempo of operation, operational procedures, etc.).

5. Impact Analysis

An analysis and graphic depiction of existing and potential land use incompatibilities and their impact on station development and operation shall be included. The AICUZ update shall also discuss strategies to address future development of the impacted areas.

6. On-Station Implementation Plan

On-station development described in regional plans (Navy)/ master-plans (Marine Corps) shall be consistent with the AICUZ Study. The base development strategies and capital improvement projects (MCON; MCNR; NAF; etc. and public private partnership ventures (PPV) shall reflect that consistency. However, where consistency is not possible, documentation should be submitted by the installation, via the chain of command and appropriate Naval Facilities Engineering Command Engineering Field Division (EFD) to the CNO or CMC for consideration of a waiver.

7. Off-Station Implementation

Recommendations for off-station implementation proposals shall also be included.

B. APPROVALS

Public distribution of revised or updated AICUZ information requires CNO/CMC approval.

## SECTION V

## AICUZ STUDY UPDATES

### A. GENERAL

Operational and training requirements, aircraft mix, tempo of aviation activity, maintenance procedures, and community development seldom remain static. The primary purpose of an AICUZ Study is to support long-term compatible land use in the vicinity of air installations. Frequent AICUZ updates and changes in land use recommendations can undermine the neighboring community's confidence and willingness to incorporate recommendations into local comprehensive plans or to enact various land use controls. AICUZ reviews should be conducted when new requirements are anticipated at an installation such as basing of a new type of aircraft, significant increases in operational levels, or significant increases in nighttime (2200 to 0700 hours) flying activities. Since major changes in operations, which have a significant impact on the environment, require environmental documentation in accordance with the NEPA, an AICUZ update subsequent to completion of the NEPA documentation is normally sufficient.

### B. INTERIM NOISE STUDIES

Noise studies can be conducted on an interim basis for a variety of purposes. These studies can provide useful information that does not always result in the need to update the AICUZ Study. Requests for interim noise studies should be forwarded to the Navy Regional Commander or CMC (LFL) documenting the need for the study. CNO/CMC will provide technical guidance as required.

### C. ENVIRONMENTAL IMPACT OF OPERATIONAL CHANGES

Several parameters must be periodically monitored locally to insure that the AICUZ Study continues to reflect the best information available on noise and accident potential; e.g., the type and mix of aircraft operated or maintained, flight tracks, tempo and timing of night operations, and operational alternatives implemented.

When significant operational changes are proposed, an evaluation by the air installation is required, to determine whether documentation in compliance with the NEPA is required. If questions arise as to the need for specific documentation in this area, the air installation should consult with their chain of command and the appropriate Naval Facilities Engineering Command Engineering Field Division. Recommendations or questions in this area can be forwarded to the major claimant for guidance if appropriate. Marine Corps air installations shall submit their recommendation concerning such documentation to CMC (LFL) for review. The CNO/CMC will advise the air installation as to the need for NEPA documentation in accordance with OPNAVINST 5090.1B or MCO P5090.2 (NOTAL). If such documentation is required it shall be prepared prior to the implementation of any proposed operational change.



OCE212875

## SECTION VI

## AICUZ IMPLEMENTATION

A. GENERAL

Each Navy and Marine Corps air installation listed in Appendix 1 shall actively pursue implementation of its AICUZ Program. Program implementation may include elements such as soliciting the cooperation of local governments, operational modifications, complaint response programs for residents of surrounding communities, and the acquisition of land or interests therein to protect operational capability. Early recognition of the problem will provide increased opportunity to solve it and can reduce future implementation requirements.

B. COMMUNITY IMPLEMENTATION

DOD AICUZ policy is predicated on promoting harmony between air installations and neighboring communities through a compatible land use planning and control process conducted by the responsible local authorities. This policy recognizes the local government's responsibility under its police power to protect the public health, safety and welfare. By enacting compatible land use controls, local government protects its citizens from high noise levels of noise or accident potential. When applicable, an installation's AICUZ policy needs to address the uniqueness of federally recognized tribes.

Through controls like zoning ordinances, building codes, subdivision regulations, permitting authority, disclosure statements and public acquisition, surrounding areas can be allowed to develop to the highest and best compatible use. Successful implementation of such a program depends on a close working relationship between installation and community leaders. Acquisition should not be discussed as an encroachment solution unless and until all community-oriented strategies prove unsuccessful or inappropriate. The activity should continually inform local governments, citizen groups, and the general public on: (a) the requirements of military aviation; (b) air installation operations; (c) the efforts underway and planned to reduce noise and ensure compatible development, and (d) the local command's position on specific land use issues. Air installation representatives, primarily commanding officers and their Community Planning Liaison Officers (CPLO), must take every opportunity to meet with and make presentations to local governments, particularly the planning and zoning agencies.

Although the emphasis of the AICUZ implementation effort must be on areas within the AICUZ footprint, the air installation can comment on land use issues outside of the footprint that might impact on it, e.g. large-scale developments bordering the AICUZ area, or transportation system developments that could make the AICUZ area more desirable for development. The air installation must be considered as a major land use in the local community. Development that occurs up to the AICUZ area of critical concern boundary could prevent mission changes or

mission expansion in the future. Therefore, commanding officers and their staffs are encouraged to monitor proposed development beyond the AICUZ boundary, and, if needed, to present those concerns in appropriate local forums. The CNO/CMC will provide assistance as needed.

C. DOCUMENTATION OF LOCAL EFFORTS

Records of important discussions, negotiations, testimony, etc., with and before local officials, boards, etc., must be maintained by the local command. Such records shall be available for inclusion in military construction project submissions if required by CNO/CMC. This will ensure that documentation is available to indicate all reasonable and prudent efforts were made to preclude incompatible land use through cooperation with local government officials and that all recourse to such actions has been exhausted.

D. COMMUNITY PLANNING LIAISON OFFICER (CPLO)

Air installations need an interface with community leaders and citizens. The commanding officer should be at the forefront of this effort. A CPLO may be designated as either a full-time or collateral duty to be the central information point and to relieve the commanding officer of some of the day-to-day burden of responding to community complaints or inquiries and administering the installation's noise abatement program.

Some activities have recognized the need for a primary duty CPLO to respond to complaints and inquiries about noise and to work to counteract incompatible development. Naval aviators often fill these positions since they are able to describe problems unique to Navy and Marine Corps aviation. CNO/CMC realize that not every air installation can justify and support a full-time CPLO. However, each air installation must be responsive to its own encroachment situation when designating its CPLO. To ensure proper continuity, a community planning liaison team including a civilian planner is encouraged.

SECTION VII

REAL PROPERTY GUIDANCE

A. ACQUISITION POLICY

When threats to operational integrity from incompatible development (encroachment) are noted, and when local communities are unwilling or unable to take the initiative in combating the threat via their own authority, consideration can be given to land acquisition. Documentation of community unwillingness or inability will be required to support acquisition projects. Where the mission of the air installation is imminently threatened, acquisition of fee title or restrictive easements over the impacted lands in any noise or accident potential zone may be appropriate to maintain operational integrity.

Reference (b) states that the first priority for acquisition in fee or restrictive easements is the clear zone. The second priority is other accident potential zones. Noise areas may be considered for acquisition when all avenues of achieving compatible use zoning, or similar protection, have been explored and the operational integrity of the air installation is manifestly threatened. Unless unusual situations exist which would warrant the expense and disruption of "trying to turn back the clock" in developed areas, the primary focus of these acquisition efforts is on undeveloped land.

B. ENCROACHMENT INDICATORS

The importance of the air installation having sensitivity to long-range encroachment indicators cannot be overemphasized. Local community capital improvement plans and long range land use plans, commonly referred to as "Comprehensive Plans," provide clues far in advance of actual encroachment actions. These plans generally address land areas far greater than the AICUZ and must be evaluated to determine their influence on the AICUZ area either directly or indirectly.

C. REAL PROPERTY UTILIZATION SURVEY INTERFACE

Executive Order 12512 calls for continual review of Federal real property holdings and the conduct of surveys in order to determine the level of their utilization. Properties found to be excess to the requirements of the holding agency are reported for disposal. In the past, the AICUZ area has provided protection to air installations, but increased pressure to excess property can dilute that protection. To avoid the forced disposal of lands required for the protection of the installation from encroachment, air installations will ensure that required lands or easements are fully justified. Where disposal is directed, those rights and interests required for the protection of the future operational integrity of the installation through restrictions to ensure compatible land use will be retained.

Particular attention must be paid to property located outside of the AICUZ area, which if excessed, would attract uses that would induce incompatible developments within the AICUZ area; e.g., water, sewer, or highway development adjoining the AICUZ makes the AICUZ area more desirable for development. Additionally, the prior history of AICUZ areas and potential growth should be fully considered. Once property rights are relinquished, they are not easily, if ever, regained. The dynamic nature of Navy and Marine Corps operational needs must be evaluated in encroachment protection decisions.

D. GUIDELINES FOR ACQUISITION/RETENTION OF REAL ESTATE INTERESTS WITHIN AN AICUZ

This instruction shall not be used as sole justification for either the acquisition or the retention of owned interests beyond that required to protect the Government. Detailed procedural requirements related to the Navy's real estate program are set forth in NAVFAC P-73 (Real Estate Procedural Manual) (NOTAL), or as implemented within the Marine Corps by MCO P11000.14 (NOTAL).

E. REAL ESTATE INTERESTS TO BE CONSIDERED FOR CLEAR ZONES, ACCIDENT POTENTIAL ZONES AND NOISE ZONES

When it is necessary for the Navy to acquire interests in land, a careful assessment must be made of the type of interest to be acquired. The following list of possible interests that should be considered, either in the form of a perpetual restrictive use easement containing the rights or a basis for fee acquisition of the property, is offered for guidance.

1. The right to make low and frequent flights over said land and to generate noises associated with:

(a) Aircraft in flight, whether or not while directly over said land;

(b) Aircraft and aircraft engines operating on the ground at said installation, and;

(c) Aircraft engine test/stand/cell operations at said installation.

2. The right to regulate or prohibit the release into the air of any substance, which would impair the visibility or otherwise interfere with the operations of aircraft, such as, but not limited to, steam, dust and smoke.

3. The right to regulate or prohibit light emissions, either direct or indirect (reflective), which might interfere with pilot vision.

4. The right to prohibit electromagnetic and radio frequency emissions that would interfere with aircraft, aircraft communications

systems, or aircraft navigational equipment.

5. The right to prohibit any use of the land which would unnecessarily attract birds or waterfowl, such as, but not limited to, operation of sanitary landfills, water impoundment areas, maintenance of feeding stations or the growing of certain types of vegetation or activities attractive to flocks of birds or waterfowl.

6. The right to prohibit and remove any buildings or other non-frangible structures that do not comply with the AICUZ plan.

7. The right to top, cut to ground level, and to remove trees, shrubs, brush or other forms of obstruction which the installation commander determines might interfere with the operation of aircraft, including emergency landings.

8. The right of ingress and egress upon, over and across said land for the purpose of exercising the rights set forth herein.

9. The right to post signs on said land indicating the nature and extent of the Government's control over said land.

10. The right to allow only specific land uses.

11. The right to prohibit entry of persons onto the land except in connection with authorized activities.

12. The right to disapprove and/or prohibit land uses not in accordance with the established land use restrictions.

13. The right to control the height of structures to ensure that they do not become a hazard to flight.

14. The right to install airfield lighting and navigational aids.

15. The right to require sound attenuation in new construction or modifications to buildings in conformance with the AICUZ recommendations.

F. <u>REAL PROPERTY MANAGEMENT</u>

Regional commanders/area coordinators and commanding officers of Marine Corps and stand-alone Navy activities shall be responsible for the administration, use, and management of real property assets as related to the readiness and effectiveness of Department of the Navy air installations. This responsibility is particularly relevant to documentation, oversight, and enforcement of Navy and Marine Corps interests in land outside the installation boundary as encroachment protection, whether that land is acquired in fee, easement, or through local zoning actions.

SECTION VIII

RESPONSIBILITIES

A. The Deputy Chief of Naval Operations (Fleet Readiness and Logistics) (N4) shall:

1. Exercise program manager responsibility for the Navy AICUZ program through CNO (N46) and supported by NAVFACENGCOM and the AICUZ Program Office;

2. Monitor and coordinate application of the policies and principles of the AICUZ program;

3. Emphasize the importance of energetic implementation of the AICUZ recommendations to all major claimants;

4. Pursue an education program for installation, chain of command and other cognizant DOD and non-DOD individuals regarding the policies, purposes and strategies of the AICUZ program;

5. Coordinate with the Deputy Chief of Naval Operations (Resources, Requirements and Assessments) (N8) on AICUZ aspects when approving installation facilities planning proposals, and

6. Exercise approval authority over AICUZ documents and AICUZ footprint changes.

B. For airfields under Navy mission and resource sponsorship, the Deputy Chief of Naval Operations (Warfare Requirements and Programs) (N7) shall:

1. Provide future year forecast information for prospective AICUZ planning.

C. The Commander, Naval Facilities Engineering Command, as directed by CNO (N4) and HQMC (IL), shall provide oversight for the AICUZ program and:

1. Integrate the AICUZ planning process into Regional Shore Infrastructure Program (RSIP) Overview plans for Navy complexes or activities and activity master plans for the Marine Corps recognizing on and off-station impacts and utilizing detailed guidance and criteria in the areas of land use compatibility with respect to both noise and accident potential exposure.

2. Provide technical direction and planning support for the reduction of noise emanating from aircraft flight, maintenance and test operations.

3. Establish an east coast and a west coast center of excellence to coordinate AICUZ issues with activities within their area of responsibility.

D. The Chief of Naval Education and Training shall provide support for education programs tasked to the Deputy Chief of Naval Operations (Fleet Readiness and Logistics).

E. Installation Major Claimant shall:

1. Provide command direction, priorities and recommendations on AICUZ plans submitted by air installation commanders under their cognizance;

2. Review and approve proposed operational changes to insure mission requirements;

3. Emphasize to installation commanders the importance of continual review of operational procedures to identify operational changes to reduce noise within the constraints of safety, mission effectiveness and economy;

4. Ensure that AICUZ-related environmental documentation requirements are met. Specifically, such actions as the introduction of new aircraft types or changes in flight corridors which may change the AICUZ footprint should be assessed as to their potential impact and a determination made as to the appropriate level of environmental documentation; and

5. Monitor AICUZ implementation program of subordinate commands.

F. The Commandant of the Marine Corps (Code LFL) shall exercise approval authority and responsibility for the AICUZ program within the Marine Corps as follows:

1. Exercise management responsibility for the Marine Corps AICUZ program in conjunction with the AICUZ Program Office (N463E) at NAVFACENGCOM.

2. Provide technical assistance and guidance to Marine Corps air installations regarding AICUZ policy decisions and implementation.

3. Promote an AICUZ education program in cooperation with CNO (N4).

G. Air installation commanders shall:

1. Familiarize themselves with the AICUZ program.

2. Implement an AICUZ program for the air installation following the concepts set forth herein.

3. Actively work with State and local planning officials to implement its objectives.

4. Notify the chain of command and the CNO N463 or CMC (LFL) whenever local conditions merit update or review of the AICUZ Plan.

5. Promote attendance at CNO-sponsored AICUZ Seminars by commanding officers, executive officers, air operations and air traffic control facility officers and other aviation-related staff personnel to increase awareness of current trends and techniques for AICUZ Program development and implementation.

6. If appropriate, designate a community planning liaison officer to assist in the execution of the AICUZ plan by the installation and act as spokesman for the command in AICUZ matters.

7. Maintain a documentary file on the implementation of the AICUZ plan at the air installation. Such a file should contain, among other things, a chronological narrative of important events, newspaper articles, data and referenced aerial and ground photographs, and pertinent correspondence.

8. Provide assistance in developing AICUZ information, including operational data needed to update the AICUZ plan.

9. Justify the retention of land or interests in land required for mission performance.

# APPENDIX A
## NAVAL AVIATION INSTALLATIONS WITH AICUZ STUDIES BY COMMAND

NAVY:

CINCLANTFLT

COMNAVREG MID-LANT
- NAS OCEANA DET NORFOLK, VIRGINIA
- NAS OCEANA, VIRGINIA
  - NALF FENTRESS

COMNAVREG NORTHEAST
- NAS BRUNSWICK, MAINE

COMNAVREG SOUTHEAST
- NAS JACKSONVILLE, FLORIDA
- OLF WHITEHOUSE
- NS MAYPORT, FLORIDA
- NAF KEY WEST, FLORIDA
- NAS GUANTANAMO BAY, CUBA*
- NS ROOSEVELT ROADS, PUERTO RICO

CINCUSNAVEUR

COMNAVREG EUROPE
- NAS SIGONELLA, SICILY**
- NSA NAPLES, ITALY**
- NSA SOUDA BAY, GREECE**
- NS ROTA, SPAIN**
- NAS KEFLAVIK, ICELAND** (Note: transferred from CLF in FY03)

CINCPACFLT

COMNAVREG HAWAII
- PMRF BARKING SANDS, HAWAII

COMNAVREG SOUTHWEST
- NAS NORTH ISLAND, CALIFORNIA
  - OLF IMPERIAL BEACH
  - ALF SAN CLEMENTE ISLAND
- NB VENTURA COUNTY, CALIFORNIA
- NAS LEMOORE, CALIFORNIA
- NAS FALLON, NEVADA
- NAF EL CENTRO, CALIFORNIA

COMNAVREG NORTHWEST
- NAS WHIDBEY ISLAND, WASHINGTON
  - OLF COUPEVILLE

COMNAVREG JAPAN
NAF ATSUGI, HONSHU, JAPAN**
NAF MISAWA, HONSHU, JAPAN**
NAF KADENA, OKINAWA, JAPAN**
NSF DIEGO GARCIA **

COMNAVAIRSYSCOM

NAEC LAKEHURST, NEW JERSEY
NAWC (AD) PATUXENT RIVER, MARYLAND
NAWC (WD) CHINA LAKE, CALIFORNIA
OLF SAN NICOLAS ISLAND

CNET

CNATRA

COMTRAWING ONE
NAS MERIDIAN, MISSISSIPPI
OLF JOE WILLIAMS

COMTRAWING TWO
NAS KINGSVILLE, TEXAS
ALF ORANGE GROVE

COMTRAWING FOUR
NAS CORPUS CHRISTI, TEXAS
ALF WALDRON
ALF CABANISS

COMTRAWING FIVE
NAS WHITING FIELD, FLORIDA
NOLF BREWTON
NOLF HOLLEY
NOLF EVERGREEN
NOLF SANTA ROSA
NOLF SPENCER
NOLF CHOCTAW
NOLF SAUFLEY
NOLF WOLF
NOLF SITE 8
NOLF BARIN
NOLF PACE
NOLF HAROLD
NOLF SILVERHILL
NOLF SUMMERDALE

COMTRAWING SIX
NAS PENSACOLA

COMNAVRESFOR

NASJRB ATLANTA, GA*
NASJRB FORT WORTH, TX
NAF WASHINGTON, DC*
NASJRB NEW ORLEANS, LA
NASJRB WILLOW GROVE, PA

MARINE CORPS:

COMCABEAST

MCAS NEW RIVER, JACKSONVILLE, NORTH CAROLINA
MCOLF OAK GROVE
MCOLF CAMP DAVIS
MCAS BEAUFORT, SOUTH CAROLINA
MCAS CHERRY POINT, NORTH CAROLINA
MCALF BOGUE FIELD
MCOLF ATLANTIC
MCAF QUANTICO, VIRGINIA

COMCABWEST

MCAS MIRAMAR, CALIFORNIA
MCAS CAMP PENDLETON, CALIFORNIA
MCAS YUMA, ARIZONA

MARFORPAC

MCAS FUTENMA, OKINAWA, JAPAN**
MCAS IWAKUNI, HONSHU, JAPAN**
MCBH KANEOHE, HAWAII

MAGTFTC

MCAGCC TWENTYNINE PALMS, CALIFORNIA

*NAVY AICUZ STUDY NOT REQUIRED
**NOISE STUDY ONLY

DEPARTMENT OF THE NAVY
OFFICE OF THE CHIEF OF NAVAL OPERATIONS
2000 NAVY PENTAGON
WASHINGTON, DC 20350-2000

And
**HEADQUARTERS**
**UNITED STATES MARINE CORPS**
**WASHINGTON, D.C. 20830-1776**

IN REPLY REFER TO:
OPNAVINST 11010.36B
N46
CMC (LFL)
19 DEC 2002

OPNAV INSTRUCTION 11010.36B

From: Chief of Naval Operations
Commandant of the Marine Corps

Subj: AIR INSTALLATIONS COMPATIBLE USE ZONES (AICUZ) PROGRAM

Ref: (a) DODINST 4165.57 of 8 Nov 77, Air Installations Compatible Use Zones
(b) SECNAVINST 11010.11 of 22 May 78, Air Installations Compatible Use Zones
(c) Noise Control Act of 1972, 42 U.S.C. 4901 {et Seq.}

Encl: (1) AICUZ Program Procedures and Guidelines

1. Purpose. To revise Department of the Navy policy, procedures and guidelines for implementation of references (a) and (b), and to establish centers of excellence on the east and west coasts of the United States. This instruction provides guidance from the Chief of Naval Operations, Commandant of the Marine Corps, and Naval Facilities Engineering Command (NAVFACENGCOM), responsible for management of the AICUZ Program.

2. Cancellation. OPNAVINST 11010.36A.

3. Background. Reference (c) requires Federal agencies and State and local governments to develop measures to control the harmful effects of noise on people. The Department of Defense initiated the Air Installations Compatible Use Zones (AICUZ) program to protect the public's health, safety, and welfare and to prevent encroachment from degrading the operational capability of military air installations in meeting national security. The AICUZ program recommends land uses that will be compatible with noise levels, accident potential and obstruction clearance criteria associated with military airfield operations. Program implementation procedures for the Navy and Marine Corps are contained in enclosure (1).

4. Discussion. The foundation of the AICUZ program is an active local command effort to work with local, State, regional, other Federal agencies, and community leaders to encourage compatible development of land adjacent to military airfields. The Department of the Navy is particularly susceptible to such encroachment with many of its installations located in high growth urban areas. The AICUZ process

**TABLE 2 - AIR INSTALLATIONS COMPATIBLE USE ZONES
SUGGESTED LAND USE COMPATIBILITY IN NOISE ZONES**

| Land Use | | Suggested Land Use Compatibility | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Noise Zone 1 ( *DNL or CNEL)* | | Noise Zone 2 ( *DNL or CNEL)* | | Noise Zone 3 ( *DNL or CNEL)* | | |
| **SLUCM NO** | **LAND USE NAME** | < 55 | 55- 64 | 65 - 69 | 70 -74 | 75- 79 | 80 -84 | 85+ |
| | ***Residential*** | | | | | | | |
| 11 | Household Units | Y | Y [1] | N [1] | N [1] | N | N | N |
| 11.11 | Single units: detached | Y | Y [1] | N [1] | N [1] | N | N | N |
| 11.12 | Single units: semidetached | Y | Y [1] | N [1] | N [1] | N | N | N |
| 11.13 | Single units: attached row | Y | Y [1] | N [1] | N [1] | N | N | N |
| 11.21 | Two units: side-by-side | Y | Y [1] | N [1] | N [1] | N | N | N |
| 11.22 | Two units: one above the other | Y | Y [1] | N [1] | N [1] | N | N | N |
| 11.31 | Apartments: walk-up | Y | Y [1] | N [1] | N [1] | N | N | N |
| 11.32 | Apartment: elevator | Y | Y [1] | N [1] | N [1] | N | N | N |
| 12 | Group quarters | Y | Y [1] | N [1] | N [1] | N | N | N |
| 13 | Residential Hotels | Y | Y [1] | N [1] | N [1] | N | N | N |
| 14 | Mobile home parks or courts | Y | Y [1] | N | N | N | N | N |
| 15 | Transient lodgings | Y | Y [1] | N [1] | N [1] | N [1] | N | N |
| 16 | Other residential | Y | Y [1] | N [1] | N [1] | N | N | N |
| | | | | | | | | |
| ***20*** | ***Manufacturing*** | | | | | | | |
| 21 | Food & kindred products; manufacturing | Y | Y | Y | Y [2] | Y [3] | Y [4] | N |
| 22 | Textile mill products; manufacturing | Y | Y | Y | Y [2] | Y [3] | Y [4] | N |
| 23 | Apparel and other finished products; products made from fabrics, leather and similar materials; manufacturing | Y | Y | Y | Y [2] | Y [3] | Y [4] | N |
| 24 | Lumber and wood products (except furniture); manufacturing | Y | Y | Y | Y [2] | Y [3] | Y [4] | N |
| 25 | Furniture and fixtures; manufacturing | Y | Y | Y | Y [2] | Y [3] | Y [4] | N |
| 26 | Paper and allied products; manufacturing | Y | Y | Y | Y [2] | Y [3] | Y [4] | N |
| 27 | Printing, publishing, and allied industries | Y | Y | Y | Y [2] | Y [3] | Y [4] | N |
| 28 | Chemicals and allied products; manufacturing | Y | Y | Y | Y [2] | Y [3] | Y [4] | N |
| 29 | Petroleum refining and related industries | Y | Y | Y | Y [2] | Y [3] | Y [4] | N |

**TABLE 2 - AIR INSTALLATIONS COMPATIBLE USE ZONES
SUGGESTED LAND USE COMPATIBILITY IN NOISE ZONES (Continued)**

| Land Use | | Suggested Land Use Compatibility | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Noise Zone 1 ( *DNL or CNEL*) | | Noise Zone 2 ( *DNL or CNEL*) | | Noise Zone 3 ( *DNL or CNEL*) | | |
| **SLUCM NO.** | **LAND USE NAME** | **< 55** | **55- 64** | **65 - 69** | **70 -74** | **75- 79** | **80 -84** | **85+** |
| ***30*** | ***Manufacturing (continued)*** | | | | | | | |
| 31 | Rubber and misc. plastic products; manufacturing | Y | Y | Y | Y [2] | Y [3] | Y [4] | N |
| 32 | Stone, clay and glass products; manufacturing | Y | Y | Y | Y [2] | Y [3] | Y [4] | N |
| 33 | Primary metal products; manufacturing | Y | Y | Y | Y [2] | Y [3] | Y [4] | N |
| 34 | Fabricated metal products; manufacturing | Y | Y | Y | Y [2] | Y [3] | Y [4] | N |
| 35 | Professional scientific, and controlling instruments; photographic and optical goods; watches and clocks | Y | Y | Y | 25 | 30 | N | N |
| 39 | Miscellaneous manufacturing | Y | Y | Y | Y [2] | Y [3] | Y [4] | N |
| ***40*** | ***Transportation, communication and utilities.*** | | | | | | | |
| 41 | Railroad, rapid rail transit, and street railway transportation | Y | Y | Y | Y [2] | Y [3] | Y [4] | N |
| 42 | Motor vehicle transportation | Y | Y | Y | Y [2] | Y [3] | Y [4] | N |
| 43 | Aircraft transportation | Y | Y | Y | Y [2] | Y [3] | Y [4] | N |
| 44 | Marine craft transportation | Y | Y | Y | Y [2] | Y [3] | Y [4] | N |
| 45 | Highway and street right-of-way | Y | Y | Y | Y [2] | Y [3] | Y [4] | N |
| 46 | Automobile parking | Y | Y | Y | Y [2] | Y [3] | Y [4] | N |
| 47 | Communication | Y | Y | Y | 25 [5] | 30 [5] | N | N |
| 48 | Utilities | Y | Y | Y | Y [2] | Y [3] | Y [4] | N |
| 49 | Other transportation, communication and utilities | Y | Y | Y | 25 [5] | 30 [5] | N | N |
| ***50*** | ***Trade*** | | | | | | | |
| 51 | Wholesale trade | Y | Y | Y | Y [2] | Y [3] | Y [4] | N |
| 52 | Retail trade - building materials, hardware and farm equipment | Y | Y | Y | Y [2] | Y [3] | Y [4] | N |
| 53 | Retail trade - shopping centers | Y | Y | Y | 25 | 30 | N | N |
| 54 | Retail trade - food | Y | Y | Y | 25 | 30 | N | N |

**TABLE 2 - AIR INSTALLATIONS COMPATIBLE USE ZONES**
**SUGGESTED LAND USE COMPATIBILITY IN NOISE ZONES (Continued)**

| **Land Use** | | **Suggested Land Use Compatibility** | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | **Noise Zone 1** *( DNL or CNEL)* | | **Noise Zone 2** *( DNL or CNEL)* | | **Noise Zone 3** *( DNL or CNEL)* | | |
| **SLUCM NO** | **LAND USE NAME** | < 55 | 55- 64 | 65 -69 | 70 -74 | 75-79 | 80 -84 | 85+ |
| ***50*** | ***Trade (Continued)*** | | | | | | | |
| 55 | Retail trade - automotive, marine craft, aircraft and accessories | Y | Y | Y | 25 | 30 | N | N |
| 56 | Retail trade - apparel and accessories | Y | Y | Y | 25 | 30 | N | N |
| 57 | Retail trade - furniture, home, furnishings and equipment | Y | Y | Y | 25 | 30 | N | N |
| 58 | Retail trade - eating and drinking establishments | Y | Y | Y | 25 | 30 | N | N |
| 59 | Other retail trade | Y | Y | Y | 25 | 30 | N | N |
| | | | | | | | | |
| ***60*** | ***Services*** | | | | | | | |
| 61 | Finance, insurance and real estate services | Y | Y | Y | 25 | 30 | N | N |
| 62 | Personal services | Y | Y | Y | 25 | 30 | N | N |
| 62.4 | Cemeteries | Y | Y | Y | Y [2] | Y [3] | Y [4,11] | Y [6,11] |
| 63 | Business services | Y | Y | Y | 25 | 30 | N | N |
| 63.7 | Warehousing and storage | Y | Y | Y | Y [2] | Y [3] | Y [4] | N |
| 64 | Repair Services | Y | Y | Y | Y [2] | Y [3] | Y [4] | N |
| 65 | Professional services | Y | Y | Y | 25 | 30 | N | N |
| 65.1 | Hospitals, other medical fac. | Y | Y [1] | 25 | 30 | N | N | N |
| 65.16 | Nursing Homes | Y | Y | N [1] | N [1] | N | N | N |
| 66 | Contract construction services | Y | Y | Y | 25 | 30 | N | N |
| 67 | Government Services | Y | Y [1] | Y [1] | 25 | 30 | N | N |
| 68 | Educational services | Y | Y [1] | 25 | 30 | N | N | N |
| 69 | Miscellaneous | Y | Y | Y | 25 | 30 | N | N |
| | | | | | | | | |
| ***70*** | ***Cultural, entertainment and recreational*** | | | | | | | |
| 71 | Cultural activities (& churches) | Y | Y[1] | 25 | 30 | N | N | N |
| 71.2 | Nature exhibits | Y | Y[1] | Y[1] | N | N | N | N |
| 72 | Public assembly | Y | Y[1] | Y | N | N | N | N |
| 72.1 | Auditoriums, concert halls | Y | Y | 25 | 30 | N | N | N |
| 72.11 | Outdoor music shells, amphitheaters | Y | Y [1] | N | N | N | N | N |
| 72.2 | Outdoor sports arenas, spectator sports | Y | Y | Y [7] | Y [7] | N | N | N |
| 73 | Amusements | Y | Y | Y | Y | N | N | N |
| 74 | Recreational activities (include golf courses, riding stables, water rec.) | Y | Y[1] | Y[1] | 25 | 30 | N | N |
| 75 | Resorts and group camps | Y | Y [1] | Y [1] | Y [1] | N | N | N |
| 76 | Parks | Y | Y [1] | Y [1] | Y [1] | N | N | N |
| 79 | Other cultural, entertainment and recreation | Y | Y [1] | Y [1] | Y [1] | N | N | N |

**TABLE 2 - AIR INSTALLATIONS COMPATIBLE USE ZONES**
**SUGGESTED LAND USE COMPATIBILITY IN NOISE ZONES (Continued)**

| Land Use | | Suggested Land Use Compatibility | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Noise Zone 1 ( DNL or CNEL) | | Noise Zone 2 ( DNL or CNEL) | | Noise Zone 3 ( DNL or CNEL) | | |
| SLUCM NO. | LAND USE NAME | < 55 | 55- 64 | 65 -69 | 70 -74 | 75-79 | 80 -84 | 85+ |
| ***80*** | ***Resource Production and Extraction*** | | | | | | | |
| 81 | Agriculture (except live stock) | Y | Y | Y [8] | Y [9] | Y [10] | Y [10,11] | Y [10,11] |
| 81.5, | Livestock farming | Y | Y | Y [8] | Y [9] | N | N | N |
| 81.7 | Animal breeding | Y | Y | Y [8] | Y [9] | N | N | N |
| 82 | Agriculture related activities | Y | Y | Y [8] | Y [9] | Y [10] | Y [10,11] | Y [10,11] |
| 83 | Forestry Activities | Y | Y | Y [8] | Y [9] | Y [10] | Y [10,11] | Y [10,11] |
| 84 | Fishing Activities | Y | Y | Y | Y | Y | Y | Y |
| 85 | Mining Activities | Y | Y | Y | Y | Y | Y | Y |
| 89 | Other resource production or extraction | Y | Y | Y | Y | Y | Y | Y |

**<u>KEY TO TABLE 2 - SUGGESTED LAND USE COMPATIBILITY IN NOISE ZONES</u>**

| | |
|---|---|
| SLUCM | Standard Land Use Coding Manual, U.S. Department of Transportation |
| Y (Yes) | Land Use and related structures compatible without restrictions. |
| N (No) | Land Use and related structures are not compatible and should be prohibited. |
| $Y^x$ (Yes with Restrictions) | The land use and related structures are generally compatible. However, see note(s) indicated by the superscript. |
| $N^x$ (No with exceptions) | The land use and related structures are generally incompatible. However, see notes indicated by the superscript. |

| | |
|---|---|
| NLR (Noise Level Reduction) | Noise Level Reduction (outdoor to indoor) to be achieved through incorporation of noise attenuation into the design and construction of the structure. |
| 25, 30, or 35 | The numbers refer to Noise Level Reduction levels. Land Use and related structures generally compatible however, measures to achieve NLR of 25, 30 or 35 must be incorporated into design and construction of structures. However, measures to achieve an overall noise reduction do not necessarily solve noise difficulties outside the structure and additional evaluation is warranted. Also, see notes indicated by superscripts where they appear with one of these numbers. |

| | |
|---|---|
| DNL | Day-Night Average Sound Level. |
| CNEL | Community Noise Equivalent Level (Normally within a very small decibel difference of DNL) |
| Ldn | Mathematical symbol for DNL. |

**NOTES FOR TABLE 2 - SUGGESTED LAND USE COMPATIBILITY IN NOISE ZONES**

1.

a) Although local conditions regarding the need for housing may require residential use in these Zones, residential use is discouraged in DNL 65-69 and strongly discouraged in DNL 70-74. The absence of viable alternative development options should be determined and an evaluation should be conducted locally prior to local approvals indicating that a demonstrated community need for the residential use would not be met if development were prohibited in these Zones.

b) Where the community determines that these uses must be allowed, measures to achieve and outdoor to indoor Noise Level Reduction (NLR) of at least 25 dB in DNL 65-69 and NLR of 30 dB in DNL 70-74 should be incorporated into building codes and be in individual approvals; for transient housing a NLR of at least 35 dB should be incorporated in DNL 75-79.

c) Normal permanent construction can be expected to provide a NLR of 20 dB, thus the reduction requirements are often stated as 5, 10 or 15 dB over standard construction and normally assume mechanical ventilation, upgraded Sound Transmission Class (STC) ratings in windows and doors and closed windows year round. Additional

ADA-154319

**NTIS**
Information is our business.

# AVIATION NOISE EFFECTS

FEDERAL AVIATION ADMINISTRATION
WASHINGTON, DC

MAR 85

U.S. DEPARTMENT OF COMMERCE
National Technical Information Service

1

---

## TABLE OF CONTENTS


| | | | PAGE |
|---|---|---|---|
| Table of Contents | | | i |
| List of Figures | | | vi |
| List of Tables | | | viii |
| List of Terms | | | ix |
| **Section** | 1.0 | General Introduction | 1 |
| **Section** | 2.0 | Noise Metrics | 7 |
| | 2.1 | Introduction | 9 |
| | 2.2 | Single Event Maximum Sound Level Metrics | 9 |
| | 2.2.1 | A-Weighted Sound Level | 9 |
| | 2.2.2 | D-Weighted Sound Level | 11 |
| | 2.2.3 | Perceived Noise level (PNL) | 11 |
| | 2.2.4 | Tone Corrected Perceived Noise Level (PNLT) | 12 |
| | 2.3 | Single Event Energy Dose Metrics | 12 |
| | 2.3.1 | Effective Perceived Noise Level (EPNL) | 12 |
| | 2.3.2 | Sound Exposure Level (SEL) | 12 |
| | 2.4 | Cumulative Energy Average Metrics | 12 |
| | 2.4.1 | Equivalent Sound Level (Leq) | 13 |
| | 2.4.2 | Yearly Average Day-Night Sound Level (DNL | 13 |
| | 2.4.3 | Community Noise Equivalent level (CNEL) | 13 |
| | 2.4.4 | Noise Exposure Forecast (NEF) | 13 |

3. Federal interagency Committee on Urban Noise. *Guidelines for Considering Noise in Land Use Planning and Control*. June 1980.

4. U.S. Air Force. Manual 19-10. *Planning in the Noise Environment*. Chapter 4.

Page 98

Top
Return to NPC Library
Return to NPC Home Page

---

Section 15.0 **EFFECT OF AIRCRAFT NOISE ON REAL ESTATE VALUES**

SUMMARY

**INTRODUCTION**

This section reviews research conducted to assess the effect of aircraft noise on real estate values. While an effect is observed it is considered an influence which is often offset by the advantages associated with ready access to the airport and employment opportunities.

**AVIATION APPLICATION/ISSUES**

The effect of aircraft noise on real estate values is a topic often associated with environmental assessments.

**GUIDIANCE/POLICY/EXPERIENCE**

Studies indicate that a one decibel change in cumulative airport noise exposure (in DNL) usually results in a 0.5 to 2% decrease in real estate values.

Page 99

Top
Return to NPC Library
Return to NPC Home Page

---

15.1 **INTRODUCTION**

Studies have shown that aircraft noise does decrease the value of residential property located around airports. Although there are many socio-economical factors which must be considered because they may negatively affect property values themselves, all research conducted in this area found negative effects from aviation noise, with effects ranging from a 0.6 to 2.3 percent decrease in property value per decibel increase of cumulative noise exposure. This section reports on those studies.

15.2 **RESEARCH CONSIDERATIONS**

A number of socio-economic factors besides aircraft noise can negatively affect real estate values. Such factors include:

--the size of the houses
--number of rooms per house
--the repair of the houses
--number of homes that are air-conditioned
--distance from business district
--percent of the housing that is minority
--number of lakes, parks or other amenities in the surrounding area

The absence of aircraft noise, then, is just one of many considerations the consumer must evaluate in buying or selling a residence. Researchers have been careful to consider these other effects and to normalize their influences in research studies. Yet even with other factors considered, increased aircraft noise does appear to lower property values.

## 15.3 REVIEW OF RESEARCH

To date, studies have been conducted analyzing nine airports in the U.S. and Canada comparing property values and noise exposure levels. These studies, which assess data gathered between 1960 and 1970, all employed the NEF, a noise measurement that has been superseded by the DNL as the FAA's accepted unit of cumulative noise measurement (see glossary and Section 2 for description of NEF and DNL). These studies are summarized by Jon Nelson in **Economic Analysis of Transportation Noise Abatement**; his summary is reproduced, with conversions to DNL, in Table 15.1 and discussed below (Ref. 1).

Page 100

Top
Return to NPC Library
Return to NPC Home Page

TABLE 15.1

Summary of Empirical Damage Estimate for Aircraft Noise and Property Values in Nine Urban Areas

| Study Area (Year, mean property value) | Range of Noise Levels (DNL) | Best NDI-NEF Estimate* (Percent) |
|---|---|---|
| New York (1960, $16,656) | 55 - 75 | 1.9% |
| Los Angeles (1960, $19,772) | 55 - 75 | 1.8 |
| Dallas (1960, $18,011) | 55 - 75 | 2.3 |
| All Areas (1960, $18,074) | 55 - 75 | 2.0 |
| Minneapolis (1967, $19,683) | 55 - 85 | 0.6 |
| San Francisco (1970, $27,600) | 60 - 80 | 1.5 |
| San Jose (1970, $21,000) | 60 - 80 | 0.7 |
| Boston (1970, $13,000) | 60 - 80 | 0.6 |
| Toronto (1969-1973, $30,000-35,000) | 55 - 70 | 0.9 |
| Dallas (1970, $22,000) | 55 - 90 | 0.6 |
| Washington, D.C. (1970, $32,724) | 55 - 70 | 1.0 |

*The NDI-NEF is the percentage decrease in a given property value per unit increase in the DNL

Nelson found that the studies can be divided into two groups and some conclusions drawn. The first group of estimates in the table was based on 1960 data (and included New York, Los Angeles and Dallas) and suggests a range of 1.8 to 2.3 percent decrease in value per decibel (DNL). The second group of estimates, covering the period from1967 to 1970, suggests a mean of 0.8 percent devaluation per decibel change in DNL. Nelson then excludes the San Francisco data (which was influenced by unique climatic and political differences) and finds a mean of 0.7 percent devaluation per decibel change in DNL.

Nelson also notes that there seems to be a decline in the noise depreciation index over time, from 1960-1970. This could be due either to noise sensitive people being replaced by those less bothered by noise, or to the enhanced commercial value of land near airports. Evidence exists to support either of these hypotheses (Ref. 2).

## 15.4 CONCLUSION

The bottom line is that noise has been shown to decrease the value of property by only a small amount -- approximately 1% decrease per decibel (DNL). At a minimum, the depreciation of a home due to aircraft noise is equal to the cost of moving to a new residence. Because there are many other factors that affect the price and desirability of a residence, the annoyance of aircraft noise remains just one of the considerations that affect the market value of a home.

**From:** "Steven.Bryant@usdoj.gov" <Steven.Bryant@usdoj.gov>
**To:** "kfquinn@quinnlaw.com" <kfquinn@quinnlaw.com> (Receipt Notification Requested) (IPM Return Requested)
**Cc:** "Kelle.Acock@usdoj.gov" <Kelle.Acock@usdoj.gov> (Receipt Notification Requested) (IPM Return Requested), "mwolf@quinnlaw.com" <mwolf@quinnlaw.com> (Receipt Notification Requested) (IPM Return Requested), "mquinn@quinnlaw.com" <mquinn@quinnlaw.com> (Receipt Notification Requested) (IPM Return Requested), "tferrebee@hoflaw.com" <tferrebee@hoflaw.com> (Receipt Notification Requested) (IPM Return Requested), "jferrebee@hoflaw.com" <jferrebee@hoflaw.com> (Receipt Notification Requested) (IPM Return Requested), "clustig@srgslaw.com" <clustig@srgslaw.com> (Receipt Notification Requested) (IPM Return Requested), "mary.raivel@navy.mil" <mary.raivel@navy.mil> (Receipt Notification Requested) (IPM Return Requested), "dominick.yacono@navy.mil" <dominick.yacono@navy.mil> (Receipt Notification Requested) (IPM Return Requested), "robert.j.smith2@navy.mil" <robert.j.smith2@navy.mil> (Receipt Notification Requested) (IPM Return Requested)
**Sent:** 5/22/2006 7:59PM
**Subject:** RE: Oceana Operations in 1999 (FOLLOW UP)

Kieron,

We have not identified any documents that reflect the actual number of FCLPs or T&Gs at NASO for 1999.

Regards,

Steve

-----Original Message-----
From: kfquinn@quinnlaw.com [mailto:kfquinn@quinnlaw.com]
Sent: Monday, May 22, 2006 9:54 AM
To: Bryant, Steven (ENRD)
Cc: Acock, Kelle (ENRD); jferrebee@hoflaw.com; tferrebee@hoflaw.com; clustig@srgslaw.com; mquinn@quinnlaw.com; mwolf@quinnlaw.com
Subject: Fwd: Oceana Operations in 1999 (FOLLOW UP)
Importance: High

STEVE

I HAVE HAD NO RESPONSE TO THIS EMAIL. PLEASE TODAY GIVE ME THIS INFORMATION OR TELL ME THAT THE NAVY WILL NOT PROVIDE THIS INFORMATION.

KIERON

==============================================================
>Date: Wed, 17 May 2006 16:29:44 -0400
>To: SteveBryant
>From: Kieron Quinn <kfquinn@quinnlaw.com>
>Subject: Oceana Operations in 1999
>Cc: KelleAcock, JackFerrebee, TomFerrebee, CharlesLustig, Oceana
>NAS::MargaretQuinn, Oceana NAS::MartyWolf
>Bcc: kfquinn@quinnlaw.com
>

>Steve
>
>Please tell me the number of (1) FCLP and (2) Touch & Go operations
>at Oceana in 1999.
>
>Thanks
>
>Kieron
>
>Kieron
>Quinn Tel. 410 825
2300
>Quinn, Gordon & Wolf Chtd. Fax. 410 825
0066
>102 West Pennsylvania
>Ave. Em kfquinn@quinnlaw.com
>Suite 402 www.quinnlaw.com
>Baltimore, MD 21204

**Watson, Sue R. (EFDLANT)**

3671

**From:** Eric Boyajian [EricBoyajian@atac.com]
**Sent:** Thursday, December 07, 2000 12 23 PM
**To:** 'Firenze, Ray'
**Cc:** Jason Kim (E-mail); Phil Welliver (E-mail); Cecchini, J. Dan (EFDLANT)
**Subject:** RE: OP COUNT AT NTU/NFE

Ray,

Table 5.2.1 presents the model results for the "ARS-2" scenario of the F/A-18 C/D EIS. The inputs for this scenario where prepared in 1995 based on what the squadrons thought they were going to be doing in 1999.

When we visited Oceana in June 2000, we revisited the different communities (F-14, F/A-18, E-2/C-2) to find out what they are doing now. Based on what they told us, we implemented new inputs to create the "Baseline" scenario for the F/A-18 E/F EIS. The "Baseline" does not reflect introduction of the F/A-18 E/F aircraft, which will be the subject of one of our future scenarios.

The problem with respect to FCLPs seems to be this:

F/A-18 C/D EIS ARS-2: 152,980 (98.1% at NFE)

F/A-18 E/F EIS Baseline: ~170,000

Reported NFE operations
for 2000: ~100,000

Is there a way to know how many FCLPs were conducted at NTU in 2000? Our simulation sends the FCLPs to NFE unless there is a severe scheduling crunch, in which case NTU is used as an "overflow" FCLP site.

Eric

-----Original Message-----
From: Firenze, Ray [mailto:FirenzeR@nasoceana.navy.mil]
Sent: Thursday, December 07, 2000 7:18 AM
To: 'Eric Boyajian'
Subject: RE: OP COUNT AT NTU/NFE

Eric, The numbers that I use to compare real from estimates come from the Final EIS for the Realignmentt of the F/A-18 C/D, Table 5.2.1. They obviously differ form the spread sheet. Does the spread sheet reflect estimates for the F/A-18 E/F? Ray

-----Original Message-----
From: Eric Boyajian [mailto:EricBoyajian@atac.com]
Sent: Tuesday, December 05, 2000 2:55 PM
To: 'Firenze, Ray'; Dan Cecchini (E-mail); Fred Pierson (E-mail)
Cc: Jason Kim (E-mail); Phil Welliver (E-mail)
Subject: RE: OP COUNT AT NTU/NFE

Ray,

Attached is a spreadsheet that indicates the number of FCLP passes performed by each of the squadrons in our simulation. This spreadsheet shows the hypothetical timeline of deployments and at-sea exercises so illustrate why specific squadrons perform FCLPs during specific months. The FRS squadrons

tend to spread their FCLP training throughout the year. Please, review the spreadsheet to see if something does not look right based on your experiences.

The various communities were fairly specific about how many passes they need to complete, and so forth. It's quite possible (probable?) that our squadron contacts estimated high.

Eric Boyajian
ATAC Corporation

-----Original Message-----
From: Firenze, Ray [mailto:FirenzeR@nasoceana.navy.mil]
Sent: Tuesday, December 05, 2000 7:28 AM
To: 'CecchiniJD@efdlant.navfac.navy.mil'; 'EricBoyajian@atac.com'
Subject: OP COUNT AT NTU/NFE

Fred asked that I try to help sort the traffic count matter out. As of Dec.1, the number of FCLP's are as follows: Fentress - 95,974, Oceana - 20,940 for a total of 116,914 with the month of December left. Historically, December flight ops are generally light so it's safe to say that we'll be under the projected total FCLP of 140,000. I think that the E-2/C-2 input of 34,000 passes is a bit high and needs to be addressed. Total flight operations at NAS Oceana as of Dec 1 are 222,990. This number includes the 20,940 FCLP count above so again it's safe to say that the projections for Oceana were accurate. For my own education, can you please tell me who provides the input for the yearly projected numbers? If I can be of any further assistance please call me.
Respectfully,

Ray Firenze
Assistant Community Planning Liaison Officer
Naval Air Station Oceana
(757) 433-3158 FAX (757) 433-2380
firenzer@nasoceana.navy.mil

t D
ntal
tion

DEPARTMENT OF THE NAVY
NAVAL AIR STATION OCEANA
1750 TOMCAT BOULEVARD
VIRGINIA BEACH VIRGINIA 23460-2168

IN REPLY REFER TO
5726
Ser 32/0396
October 7, 2003

Ms. Barbara Duke
Planning Department
City of Virginia Beach
Building 2, Room 100
2405 Courthouse Drive
Virginia Beach, VA 23456

Dear Ms. Duke:

Item 5 on the Planning Commission Agenda for October 8, 2003, is a rezoning request and proposed residential development by VA-CAR Development, L.L.C. The site is located approximately five miles southwest of Naval Air Station (NAS) Oceana and three miles north of Naval Auxiliary Landing Field (NALF) Fentress in the 70-75 decibel (dB) day-night average (Ldn) noise zone. The Navy's Air Installations Compatible Use Zones Program states that residential land use is not compatible in this zone. I urge you to deny their request.

This site is directly aligned to NAS Oceana's runway 5, one of our busiest runways. There are several key flight tracks to and from NAS Oceana and NALF Fentress that concern us. In 2002 runway 5 accounted for 44 percent of 218,000 annual flight operations. Aircraft on approach to NAS Oceana conducting straight-in instrument procedures will fly directly over this property, as will overhead arrivals to NAS Oceana and inter-facility arrivals and departures between NAS Oceana NALF Fentress. NAS Oceana and NALF Fentress operate 24 hours a day, 7 days a week.

Quality of life in the VA-CAR Development subdivision will be impacted by flight operations while being subject to high single event noise levels. An F/A-18 Hornet in landing configuration at 1000 feet produces sound exposure level of 109 decibels and an F/A-18 Super Hornet is expected to produce 114 decibels. These are the levels that will be typical for aircraft on late night straight in arrivals from NALF Fentress. At an altitude of 1500 feet on an instrument approach the Hornet has a sound exposure level of 106 decibels and the Super Hornet is 110 decibels. The sound exposure level represents both the intensity of sound and its duration. So, for an aircraft flyover it includes both the maximum and lower decibel levels and is representative of the entire event. In comparison, the noise environment of a rock music concert is approximately 110 decibels.

**Exhibit D**
**Supplemental Information**

5726
Ser 32/0396
October 7, 2003

The Navy acknowledges the landowners' desire to develop their property, but as already stated, I urge you to deny their request. We would view residential development at this site as encroachment upon operations at NAS Oceana. If you have any questions, please contact my Community Planning Liaison Officer, Mr. Ray Firenze at (757) 433-3158.

Sincerely and very respectfully,

T. KEELEY
Captain, U.S. Navy
Commanding Officer

Copy to:
COMNAVREG MIDLANT (00/N02)
LANTDIV
Regional Engineer
Mayor Meyera Oberndorf
Virginia Beach City Council
Virginia Beach Planning Commission

HOFHEIMER/FERREBEE, P.C.
ATTORNEYS AND COUNSELORS AT LAW
1060 LASKIN ROAD, SUITE 12B
SANDPIPER KEY
VIRGINIA BEACH, VIRGINIA 23451-6365

MARY ELIZABETH DAVIS
JACK E. FERREBEE
SHEERA R. HERRELL
CHARLES R. HOFHEIMER
KRISTEN D. HOFHEIMER
JEFFREY D. TARKINGTON

TELEPHONE (757) 425-5200
FACSIMILE (757) 425-6100
*E-mail: jferrebee@hoflaw.com*
Our File No. 034233

May 12, 2006

VIA EMAIL ONLY

Steven D. Bryant, Esquire
Department of Justice
Environmental & Natural Resources Division
P.O. Box 663
Washington, DC 20044-0663

RE: Testwuide v. US

Dear Steve:

I am writing to follow up with you on Plaintiffs' Request for Production Number 32, propounded during the Class Certification phase of the pending litigation.

Plaintiffs requested "all documents that identify number and type of aircraft stationed at Oceana since 1975."

The only response to this request was provided on November 11, 2001 in which the Navy responded with the following:

> Defendant objects on the grounds that this Request is overly broad, unduly burdensome and not reasonably related to the issue of class certification. Without waiving this objection, the following responsive documents are attached: 228, 229, 235, 419, 420, 422, 424, 425, 1516, 1518, 1520, 1530, 1542, 1544, 1546, 1547, 1549, 1627, 1636, 1642, 1644, 1645, 1648, 1649, 1661, 1662, 1663, 1664, 1669, 1671, 1673, 1675, 1676, 1677, 1679. Discovery is ongoing, defendant will supplement this response as necessary.

In reviewing the documents identified in this response, I have not found any of the base loading statistics for Oceana during the 1970s and 1980s, with the exception of 1989. Will you kindly produce the base loading statistics for Oceana for the periods 1978 – 1988. If you are unable to produce these documents by Tuesday, May 16th, I may ask

you to agree to an enlargement of time to file our response to your motion for summary judgment, while our motion to compel is pending. As you know, we had no idea which year you were going to select for your statute of limitations argument until you filed your motion.

It was not until May 5, 2006 that you responded to our multiple discovery requests regarding the statute of limitations. Even now, your response appears somewhat vague. It is improbable that the government knew anything about the date of the statute of limitations date in May 2006 that it did not know in 2001 or at least upon the naming of the test case plaintiffs.

Given what has every appearance of a deliberate withholding of a required discovery response for over five years, I also would like to have the documents showing the counts for each type of operation at Oceana in 1981.

Thank you in advance for your cooperation.

Sincerely yours,

Jack E. Ferrebee

cc: Counsel

of those of the Association as they go a long ways if you fit it into the plan.

Stephen White: Absolutely.

Ronald Ripley: If you all would do that we would appreciate it.

Stephen White: We'll be glad to.

Mike Nuckols: The biggest problem with the Laskin Road project is waiting on it, because there is no real time frame as I understand it. That's where the Association is coming from. They really do like the project, but this intersection is trouble now, and it is only going to get worse.

Ronald Ripley: Your comments will bring focus to it I'm sure.

Mike Nuckols: Thank you.

Ronald Ripley: Thank you very much. We have Ray Firenze from Oceana.

Ray Firenze: Good afternoon. My name is Ray Firenze. I'm representing the Navy at Oceana, and I'm here today in opposition to the proposed. Before I start I'd like to tell you, Mr. Nutter, I've met with him and his staff, his architect and all the concerns that I'm going to lay out for you here I shared with him a week ago. This project is two and half miles northeast of Oceana in a 70-75 decibel day/night average noise zone. It's in accident potential zone number two It's directly aligned to our runway two three, which accounted for 47 percent of 218,000 annual flight operations in 2002. That is about 102,000 operations. What you see there is one straight line coming off the ocean, but that actually represents five different flight tracks. For example, there are two flight tracks that I analyze, two radar type approaches between September 2002 and August 2003. We over flew that area 4,891 times, and that's just two of the tracks. So what does that mean? It's two and half miles, at about five miles at 1500 feet the airplane starts final descent into the runway At 300 feet a mile the rate of descent we're going to be over the top of that complex at 800 feet. So what does mean? It means that were going to over fly that place quite frankly and at night, no doubt. Using metric caught sound exposure level and what the sound exposure level does is it measures the impact of the noise duration, the maximum and minimal db levels, so what they can expect is an F-18 right now, Hornet, at a 1,000 feet is 109 decibels and a Super Hornet, which we are getting. Now the last time I was up here that decision hadn't been made. It's going to be 114 decibels, but if you want to compare some decibel levels, normal conversation is 60 db and a rock concert is a 110 db. So you will have 100,000 rock concerts flying over year. It's not only about jet noise. It's also a safety issue about putting this complex in an accident potential zone. Oceana and Fentress are 24-hour facilities. We ask that you consider our concerns on your way to a final decision and like our letter stated from Capt. Keeley, that we view further development in this area as incompatible and an encroachment upon operations at Oceana. That's it. Thank you

Ronald Ripley: Are there questions of Ray?

Ray Firenze: Thank you.

Ronald Ripley: Yes, Mr. Nutter, please.

R.J. Nutter: Thank you. I want to thank Ray and the gentleman that he brought with him and I keep forgetting his name. Forgive me.

Ray Firenze: Bobby Roundtree.

R.J. Nutter: Bobby Roundtree. Thank you very much. We appreciate the opportunity to meet with them We shared with them quite a bit of information about this project and now just what we showed you but a lot of the construction details. I shared a little bit of that with you. This is not a normal stick and brick construction. When you go to six stories in height and five stories in height these buildings are all constructed out of concrete and steel. They have the heaviest of installation and windows So from the sound effect, they are built to standards that, quite frankly that most residential buildings in this area don't meet at all, well in excessive. Secondly, we've tried to point out and I think and they don't deny. This is a little different then other applications that have taken a more public stand on where the zoning is not in place and where you have a situation where the existing zoning allows a degree of intense development far and excess of what's being proposed. In fact, this is definitely a reduction in the number of people living, working, and being in and around that same exact area with this application. That's the one point that I think I can almost leave with you, because there is no other way to reduce the potential impact on what can be built on that property other than a rezoning application and otherwise you can go 267 units plus B-1 and B-2 properties in additional to that, unconditional. As you may know H-1 district does not have height limit. We have a height here in this case of 85 feet at the highest point. If there were no zoning there, I would have a difficult time making this presentation But the fact is that we're reducing what's there and that's an improvement in terms of what the potential problems are here. Secondly, we're building this to standards that far exceed residential normal standard. Third, let me tell you that the normal buyer and what we're finding is that the buyers for these properties are interested in the properties as staying there for only months a year. Most of these are second homes for them. This is what we shared with the other condominium owners at Cove Point as well. The other is, quite frankly is that many of them live right in and around this area today and at Cove Point, we've talked with them and we've talked with and we've met in their room, which is just right across the street. They know it very well and several of them expressed some interest in it. I just want to tell you that people, who live, work and play in this area no this issue. They like the Navy they think they are an asset. They use the ability to live on that property as an asset. This is the only thing that I can tell you that we'll actually reduce the concerns that the Navy might have by reducing the densities or by right can be built on the property. That is how we tried to address their concerns. That is why we think this distinguishes us from other cases that they have taken a public position on. Mr. Ripley,

Publication: The Virginian-Pilot;Date: Nov 26, 2003;Section: Hampton Roads;Page: 19

# Beach council approves condominium project

BY JON W. GLASS
THE VIRGINIAN-PILOT

VIRGINIA BEACH — A majority of the City Council signaled its willingness Tuesday to override the Navy's tough new stance against housing developments around Oceana Naval Air Station.

In the city's first major test of the Navy policy, the council voted 7-2 to approve a 90-unit luxury condominium project off Laskin Road that the Navy opposed because residents would be exposed to loud jet noise and the potential for jet crashes.

Council members who supported the project called it a quality redevelopment of a blighted property, including the old Seashire Inn hotel, which they said generated about 100 police complaints during the past year.

Council opponents, including Mayor Meyera E. Oberndorf, worried about interfering with the Navy's mission at Oceana and feared that approving such development could put the base at risk of future closure.

Tuesday's vote laid bare a dilemma that city leaders will continue to confront as the Beach pushes to redevelop

*Please see* **Vote,** *Page* **B3**




## WHAT'S AHEAD

Many potenti
development
such as the L
Road proposa
high-noise or
potential zon
Oceana Nava
Station. Next
the Virginia B
Council is sch
vote on at lea
other housing
the Navy opp
lie in areas wl
roar of Navy j
expose reside
average day-
noise levels o
decibels and

Publication: The Virginian-Pilot; Date: Nov 26, 2003; Section: Hampton Roads; Page: 21
ActivePaper™

# Vote: Some did not want to interfere with Navy

*Continued from Page B1*

older sections of the city and the availability of developable land grows more scarce.

Many other potential development sites lie in high-noise or accident-potential zones around Oceana. Next month, the council is scheduled to vote on at least three housing projects the Navy opposes.

"I think we're starting to walk down a very, very precarious path," Oberndorf said.

Other council members, however, said the city's relationship with the Navy should not be based on one project.

"Tonight's vote is not a referendum on the Navy; it's a vote on a single planning item," said Councilman Richard Maddox, who voted for the condo project.

The Navy used to view housing developments in noise zones with day-night noise averages of 65 to 75 decibels as "conditionally compatible" – if equipped with noise-muffling features.

But since May, acting under a Department of Defense directive that affects military air bases worldwide, the Navy has begun opposing them. Pentagon officials say urban growth is encroaching on the military's ability to train.

After Tuesday's vote, both city and Navy officials said they plan to move ahead with a regional land-use study to identify development that would fit in with Oceana, the Navy's largest master jet base.

"It establishes what is compatible and what is not in a group forum," Rear Adm. Stephen A. Turcotte, the commanding officer of the Navy's Mid-Atlantic Command, said Tuesday. "That's the beauty of it."

R.J. Nutter II, a Beach lawyer representing the condo project, said the developer, after discussions with Navy officials, has agreed to go beyond the city's current real-estate disclosure requirements and alert buyers that the condos would be subject to low-flying Navy jets.

The property is being developed by Near Post LLC, whose managing member is John C. White, a developer and owner of a Beach travel agency.

The site is located next to the Cavalier Golf Course at Laskin and Oriole Drive and would be developed with 10 condo buildings, with units priced at $400,000 to $800,000, Nutter said. Buyers already have reserved 23 units, he said.

Council proponents lauded the redevelopment, saying it meshes with the city's plans to enhance an Oceanfront gateway to 31st Street. They also noted that under the site's existing zoning, the owner could build a 256-room hotel or a mix of hotel and residential units without the council's approval.

"This is an attractive plan," said Councilman James Wood. "It ties into the Laskin gateway, and it reduces density."

But Navy Capt. Tom Keeley, Oceana's commanding officer, said the site lies under the flight path of one of the base's busiest runways. Last year, jets flew over the site 102,000 times, roaring at up to 114 decibels – roughly equivalent to a rock concert.

"Essentially, that's 100,000 rock concerts approaching over this property a year," Keeley said. The Navy would consider development of the site with office or retail as compatible, but not houses or hotels, he said.

Hal Levenson, spokesman for Citizens Concerned About Jet Noise, said the council was "stiffing the Navy" and was "about to become the real threat" to Oceana's future.

■ *Reach Jon W. Glass at 222-5119 or* **jon.glass@pilotonline.com**

# NAS Oceana

## CAPT Tom Keeley, USN
### Commanding Officer

## Virginia Beach AICUZ Task Force
### March 16, 2004

PL-INV000067

Chambers Field Willow Grove
Fentress – Dam Neck Annex

# Single Event Noise

| NOISE SOURCE (at a given distance) | A-WEIGHTED SOUND LEVEL SCALE (dBA) | NOISE ENVIRONMENT |
|---|---|---|
| Civil Defense Siren (100 ft) | 130 | Carrier Flight Deck |
| | 120 | |
| Pile Driver (50 ft) | 110 | Rock Music Concert |
| F-18 Departure (1,000 ft) | 108 | |
| F-18 Arrival (1,000 ft) | 104 | |
| Ambulance Siren (100 ft) | 100 | |
| F-14 Departure (1,000 ft) | 97 | Printing Press Plant |
| Newspaper Press (5 ft) | | |
| Power Lawn Mower (3 ft) | 96 | |
| Motorcycle (25 ft) | 90 | Boiler Room |
| Prop. Plane Flyover (1,000 ft) | 88 | |
| Diesel Truck, 40 mph (50 ft) | 84 | |
| F-14 Arrival (1,000 ft) | 83 | |
| Garbage Disposal (3 ft) | 80 | High Urban Ambient Sound |
| Passenger Car, 65 mph (25 ft) | 77 | |
| Living Room Stereo (15 ft) | 76 | |
| Vacuum Cleaner (3 ft) | 70 | |
| Electronic Typewriter (10 ft) | | |
| Normal Conversation (5 ft) | 60 | Data Processing Center |
| Air Conditioning Unit (100 ft) | | |
| | | Department Store |
| Light Traffic (100 ft) | 50 | Private Business Office |
| Bird Calls (Distant) | 44 | |
| | 40 | Lower Limit of Urban Ambient Sound |
| Soft Whisper (5 ft) | 30 | Quiet Bedroom Recording Studio |
| | 20 | |

## SEL dB Levels

| Alt 1000’ | App | Dep |
|---|---|---|
| F-14A | 93 | 110 |
| F-14B/D | 87 | 108 |
| F/A-18C/D | 109 | 117 |
| F/A-18E/F | 114 | 117 |

| FCLP | NTU@1000’ | NFE @800’ |
|---|---|---|
| F-14A | 93 | 96 |
| F-14B/D | 95 | 97 |
| F/A-18C/D | 108 | 109 |
| F/A-18E/F | 113 | 115 |

PL-INV000078

## Test Plaintiffs - Coordinates

Data Source: Virginia Beach Tax Parcels
Created by: Lisa Matthies, Ecology and Environment, Inc
March 31, 2005

DNL Source: Wyle Laboratories, Inc.
Created by: Micah Downing
September 22, 2005

| | | | | | | | | Specific Point DNL Values | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Name | Parcel Street Number | Parcel Street Name | Parcel Street Type | Zip Code | Latitude | Longitude | Wyle ID | Base 1997 | Original ARS2 | Base 2000 |
| Carroll Lindsay | 2709 | EAST KINGS | RD | 23452 | 36.84507 | -76.06555 | AAAA | 58.5 | 75.3 | 68.5 |
| Eddie and Elizabeth Waterman | 2244 | WINDY PINES | BND | 23456 | 36.77202 | -76.02892 | AAAB | 59.6 | 72.8 | 66.3 |
| Hal and Elaine Levenson | 2004 | BRICKELL | CT | 23454 | 36.85768 | -76.04147 | AAAC | 62.3 | 76.4 | 70.3 |
| Herbert and Betty Van Nostrand | 305 | CORVETTE | LN | 23452 | 36.82957 | -76.08200 | AAAD | 56.1 | 71.3 | 67.1 |
| James and Virginia Riddick | 1805 | LOGANBERRY | CT | 23453 | 36.77408 | -76.07253 | AAAE | 58.1 | 71 | 67.3 |
| Kenneth and Tammy Hill | 925 | LAMPLIGHT | LN | 23452 | 36.80739 | -76.08023 | AAAF | 68.3 | 78.1 | 76.3 |
| Michael and Diane Leary | 3209 | CHICORY | CT | 23453 | 36.77180 | -76.07962 | AAAG | 59.4 | 73.3 | 70.6 |
| Sara Hoag | 1301 | BRANT | RD | 23451 | 36.83420 | -75.99225 | AAAH | 66.6 | 79.2 | 78.5 |
| Sean and Graciela Ryan | 1856 | PATHFINDER | DR | 23454 | 36.77680 | -75.99621 | AAAI | 56.2 | 72.1 | 63.9 |
| Theodore Dingle | 912 | CAROLINA | AVE | 23451 | 36.83279 | -75.98458 | AAAJ | 61.6 | 75.2 | 72.1 |
| William and Betty Capps | 409 | PALLETS | RD | 23454 | 36.84608 | -76.04327 | AAAK | 71.3 | 89.7 | 78.3 |

**AdditionalTest Plaintiff - Coordinates**

Data Source: email from J. Guerin 12/20/05 DNL Source: Wyle Laboratories, Inc.

Created by: Created by: Micah Downing

January 30, 2006

| | | | | | | | | Specific Point DNL Values | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Name | Parcel Street Number | Parcel Street Name | Parcel Street Type | Zip Code | Latitude | Longitude | Wyle ID | Base 1997 | Original ARS2 | Base 2000 |
| Eileen May | 620 | Little Neck | Road | | 36.85368 | -76.09098 | AAAA | 45.7 | 60.43 | 56.8 |

00001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL and ROBERT TESTWUIDE, *
et al., *
Plaintiffs, *
*
vs. * NO.: 01-201 L
*
THE UNITED STATES OF AMERICA, *
Defendant. *

* * * * * * * * * * * * * * * * * * * * * * * * * * *

The deposition of SANFORD FIDELL was taken on Friday, December 16, 2005, commencing at 9:40 a.m., at the offices of UNITED STATES DEPARTMENT OF JUSTICE, ENVIRONMENT & NATURAL RESOURCES DIVISION, 601 D Street, N.W., Washington, D.C., 20004, before Cheryl A. Lord, Notary Public.

* * * * * * * * * * * * * * * * * * * * * * * * * * *

Reported by:
Cheryl A. Lord, RPR, CRR

00010

different acousticians at different levels of expertise?

In other words, can you be a board-certified acoustician under the Acoustical Society of America?

A. Not to my knowledge.

There are different grades of membership from student and associate through full member through a fellow of the society.

Q. Okay. And is there a parallel between your Ph.D. in experimental psychology and your field as an acoustician?

A. The intersection of acoustics and experimental psychology is often referred to as psychoacoustics. I suppose you could consider me a psychoacoustician.

Q. A psychoacoustician, is that exactly what you've described to me that you do in performing control studies and the like?

Is that what we're talking about?

A. Yeah.

A psychoacoustician is someone who is involved with the effects of sound on individuals or communities, groups of people.

Q. Do you have any specialized training beyond your Ph.D.?

A. Well, of an academic nature or of any nature?

Q. Of an academic nature.

A. No, not of an academic nature.

Q. And in the area of acoustics or noise-related subjects, do you have any specialized training beyond your Ph.D.?

A. Well, many years' worth of experience with the tools of the trade.

Q. Now, after your -- let me start with your undergraduate work.

While you were doing your college studies, did you work in the field of acoustics at all?

A. No.

Q. When did you first begin your field of

conversation with Wyle Labs?
A. I think it was to verify my understanding of the noise modeling that Wyle had conducted.
Q. Do you remember for what period of time?
A. No, I don't.
Q. It could have been specifically noise modeling with respect to Vivian's Island?
A. Yes.
Q. And not noise modeling generally?
A. No, with respect to assumptions about numbers of aircraft, types of operations, and so forth.
Q. Did you receive anything from Wyle Labs at that time by way of email or in writing with respect to noise modeling at Vivian's Island?
A. I don't think so.
Q. Now, in preparation for your 2002 report, the one we're talking about in the class certification phase, did you make any visits to Oceana Naval Air Station?
A. No, I did not.

00033

values in the peninsula area.
Q. You've done one for Langley Air Force Base, Hampton, Virginia, related to property valuation, am I correct?
A. That's correct.
Q. Is that the one you were talking about, the time when you might have been in Virginia Beach at the time you were doing that study?
A. Yes.
Q. So other than the time -- well, the time you went to Virginia Beach and you saw some houses there, you didn't do any site noise studies or field studies of noise in the area of Oceana, did you?
A. No.
Q. Have you ever personally undertaken to do any field studies of noise in the area around Oceana?
A. No.
Q. When was it you were contacted and by whom to be an expert in this case, in the Testwuide

00035

correct?

A. Not a specific economic analysis in this matter.

Q. If it's not specific, are you generally contracted with the government in this case to provide economic testimony of any kind?

A. Only tangentially with respect to the primary work that I've done on noise modeling.

Q. And what tangential economic commentary would you provide in this case, tangential to your field as a psychoacoustician?

A. Well, I don't know that it would actually be in the form of testimony, but I have had conversations about the general effects of aircraft noise on property values.

Q. And you've done at least one study in that area that involved Langley Air Force Base in Tucson.

Am I correct?

A. That's correct, Davis Monthan Air Force Base.

compatibility in terms of decibel values.

Q. Okay. Well, since in your opinion noise exposure as expressed in DNL is not a unique predictor of the impact on lands, would you disagree with the Navy's approach to its AICUZ program?

MR. BRYANT: Objection.

BY MR. JACK FERREBEE:

Q. You're okay to answer the question. He just interposed an objection.

Go ahead.

A. There is no perfect predictor of -- no perfect acoustic predictor of the effects of noise on people, because the effects of noise on people are not uniquely determined by any acoustic measure, and DNL is among those that have been studied more carefully than other measures and is highly correlated with other reasonable metrics.

However, it is not a perfect predictor of noise impacts. If there were a clearly superior metric, then I suppose I would prefer that be used

00050

rather than DNL, but since there isn't a clearly superior metric to DNL, I don't know that I formally disagree with its use as a less than perfect measure of noise impact.

Q. So to summarize, for the present time as we sit here today, this is as good as the government can do -- or as well as the government can do.

I'm sorry.

MR. BRYANT: Objection.

This is a 1979 document, number 1, and objection to the characterization, for this witness to opine.

A. Would you restate the question, please?

BY MR. JACK FERREBEE:

Q. If there were something else the government could do in the development of its AICUZ program as we sit here, other than convert DNL into noise impacts, what would that be?

MR. BRYANT: Objection, personal knowledge of everything the government has done in

novelty of exposure and came up with letter ratings, A, B, C, D, so forth, that sought to characterize the overt behavioral consequences such as complaints and litigation arising from noise exposure at military installations.

It was better than the prior state of the art, which was effectively nonexistent, but rapidly -- "rapidly" is a relatively term -- within 10 or 15 years was supplanted by the noise exposure forecast predictor.

Noise exposure forecast was very similar to DNL, except that the frequency weighting scheme was based on perceived noise level rather than on the A weighting, and the arithmetic with which it was calculated led to numerically smaller values than DNL values for the same exposure conditions.

The day-night average sound level did not gain currency as a universal summary of noise exposure due to aircraft and other sources until its adoption by the Environmental Protection Agency in 1974, and it shortly thereafter swept the field

00148

A. I think they were referred to -- they were long ago, not current.

Q. Okay. Have you seen any documents that graph out for you the number of noise complaints at NAS Oceana from 1972 through the year 2000?

A. No, I haven't.

Q. Did you ask to see documents like that?

A. No, I didn't.

Q. Would those documents be in any way helpful to you in doing the kind of analysis you did here?

A. Well, for purposes of reconstructing noise exposure, they would be of very little use. The point of this work was simply to document that the issues at -- of the current litigation are not novel and they've been around for decades. That's the only statement, the import of this.

Q. Do you understand from the way noise modeling works with NOISEMAP and the flight tracks as they are laid out over land in the AICUZ noise contour, that those flight tracks that you see on

# FEDERAL AGENCY REVIEW OF SELECTED AIRPORT NOISE ANALYSIS ISSUES

## FEDERAL INTERAGENCY COMMITTEE ON NOISE




AUGUST 1992

# FEDERAL INTERAGENCY COMMITTEE ON NOISE

The Federal Interagency Committee on Noise has completed its study and is pleased to submit this report, with recommendations, for consideration by member agencies.

The Committee, composed of representatives of the Departments of Transportation (Office of the Secretary and the Federal Aviation Administration), Defense, Justice, Veterans Affairs, Housing and Urban Development; the Environmental Protection Agency; and the Council on Environmental Quality, was chartered to review specific elements of federal agency procedures for the assessment of airport noise impacts and to make appropriate recommendations.

The Committee formed three subgroups: Technical, Policy and Legal. The initial work was performed by the Technical Subgroup, and its study provided the basis for the Policy and Legal Subgroups' findings, conclusions and recommendations. The Legal Subgroup provided an overall legal review of the policy recommendations. The Committee's Report reflects the efforts of all three subgroups. To maximize its utility, the report is formatted with an Executive Summary, a Policy Section which contains the recommendations, and a Technical Section to provide detailed background and support for the recommendations.

Pursuant to agreement by the Legal Subcommittee, this transmittal constitutes the final action of the Federal Interagency Committee on Noise and terminates the Committee.

James Hegland
(Lt. Col. U.S. Air Force)
Chairman, Technical Subgroup

William Dickerson
(Environmental Protection Agency)
Chairman, Policy Subgroup

Richard Danforth
(Federal Aviation Administration)
Chairman, Legal Subgroup

August 21, 1992
(Date)

# EXECUTIVE SUMMARY

## INTRODUCTION

The 1990 Federal Interagency Committee on Noise (FICON) was formed to review Federal policies that govern the assessment of airport noise impacts. The FICON review focused primarily on:

- The manner in which noise impacts are determined, including whether aircraft noise impacts are fundamentally different from other transportation noise impacts;
- The manner in which noise impacts are described;
- The extent of impacts outside of Day-Night Average A-Weighted Sound Level (DNL) 65 decibels (dB) that should be reviewed in a National Environmental Policy Act (NEPA) document;
- The range of Federal Aviation Administration (FAA)-controlled mitigation options (noise abatement and flight track procedures) analyzed; and,
- The relationship of the FAA Federal Aviation Regulation (FAR) Part 150 process to the NEPA process; including ramifications to the NEPA process if they are separate, and exploration of the means by which the two processes can be handled to maximize benefits.

The FICON was organized into three subgroups to appropriately focus on the technical, legal and policy issues associated with the assessment of airport noise impacts. The Technical Subgroup #1 was tasked to review the body of science associated with methodologies and metrics for assessing airport noise impacts which have evolved since the 1980 meetings of the Federal Interagency Committee on Urban Noise (FICUN). The Policy Subgroup #2 was tasked to review Federal policies that govern the assessment of airport noise impacts. The Legal Subgroup #3 reviewed the legal aspects of current and proposed Federal policies for assessing airport noise impacts. The Subgroup #1 Technical report was used as a basis for the policy report development.

The results of the work of the Policy and Technical Subgroups are contained herein as Volume I: Policy Review and Volume II: Technical Report. Key conclusions from the Technical Report and the overall FICON recommendations are summarized below.

## TECHNICAL CONCLUSIONS

### General

- There are no new descriptors or metrics of sufficient scientific standing to substitute for the present DNL cumulative noise exposure metric.
- The methodology employing DNL as the noise exposure metric and appropriate dose-response relationships (primarily the Schultz curve for Percent Highly Annoyed) to determine noise impacts on populations is considered the proper one for civil and military aviation scenarios in the general vicinity of airports.
- Federal agencies generally conduct noise assessments at DNL levels of ≥ 65 dB. For a variety of reasons, noise predictions and interpretations are frequently less reliable

below DNL 65 dB. DNL prediction models tend to degrade in accuracy at large distances from the airport. Therefore, predictions of noise exposure and impact below DNL 65 dB should take the possibility of such inaccuracy into account.

- DNL is sometimes supplemented by other metrics, on a case-by-case basis.
- Noise analyses should address impacts in the following areas: (1) health and welfare, (2) environmental degradation/impact and (3) land use planning.
- Complaints are an inadequate indicator of the full extent of noise effects on a population.

**Health and Welfare:**

- The dose-effect relationship, as represented by DNL and "Percent Highly Annoyed" (%HA), remains the best available approach for analyzing overall health and welfare impacts for the vast majority of transportation noise analysis situations.
- The 10 dB nighttime penalty levied against noise during the 10 PM to 7 AM period is specifically designed to account for the intrusiveness of noise during this period, and its potential impact on sleep. There are no new hard data which would justify a change in this penalty.
- If supplemental analysis for sleep disturbance is desired, use may be made of an interim dose-response model developed by the AF Armstrong Laboratories (AL) (see Volume II, Section 3.2.2.3). Although this relationship is described in terms of Sound Exposure Level (SEL), single event metrics are of limited use in predicting and interpreting cumulative noise exposure impacts
- Annoyance is a summary measure of the general adverse reaction of people to living in noisy environments that causes speech interference, sleep disturbance, desire for a tranquil environment; and the inability to use the telephone, radio or television satisfactorily.
- No definitive evidence of nonauditory health effects from aircraft noise exists, particularly below DNL 70 dB.
- For supplemental analysis Long-Term Equivalent Sound Level [Leq(x)] (where X represents the time period of concern) or Time Above (TA) may be used for analysis of school and communications requirements indoors during specific hours.
- Public health and welfare effects below DNL 60 dB have not been established, but are assumed to decrease according to the decrease in percent of people highly annoyed.

**Environmental Degradation/Impact**

- Under NEPA, environmental degradation might have to be assessed around airports even if there is no clear effect on public health and welfare. Other criteria might be appropriate.
- A 3 dB increase in the DNL environment represents a doubling of sound energy, and clearly is an indicator of the need for further analysis, although smaller increases may indicate similar need. In other words, the impact of a given incremental amount of change in noise levels depends, in part, upon the existing level of the noise environment.
- Recent technology and software advances in geographic information systems (GIS),

noise methodology and census data present an enhanced potential for detailed analysis of sound impacts on population and noise-sensitive areas. These technologies should be considered for use to determine noise impacts of present and proposed actions.

**Land Use Planning**

- DNL represents the accepted noise metric for input to compatible land use planning.
- For cumulative speech interference, Table 3-2 "Effects of Noise on People" contained in FICON Volume II: Technical Report, provides a rough approximation of both outdoor and indoor predicted speech interference parameters for various levels of noise exposure as measured in DNL for residential land use only.
- There is a need for selective updating [including Standard Land Use Coding Manual (SLUCM) updating] and enhanced public understanding of the land-use compatibility guidelines, its application and interpretation through incentives and other programs.

**Education of the Public**

Education of the public should concentrate on the following frequently misunderstood issues:

- Environmental noise exposure is measured and described most generally by DayNight Average A-Weighted Sound Level (DNL). DNL should be defined clearly and its significance and use explained clearly.
- Relation of DNL to Percent Highly Annoyed describes long-term community response to the overall sound environment (indices of health and welfare effects).
- Although the A-Weighed Maximum Sound Level ($L_{max}$) for a single flyover is easily understood, it is useful only for analyzing short-term responses.
- Every change in the noise environment does not necessarily impact public health and welfare.
- Aircraft noise predictions below DNL 65 dB can be less accurate and should be interpreted with caution.

## POLICY RECOMMENDATIONS

- Continue use of the DNL metric as the principal means for describing long-term noise exposure of civil and military aircraft operations. **[Section 3.1, Volume 1]**
- Continue agency discretion in the use of supplemental noise analysis.**[Section 3.2, Volume 1]**
- Improve public understanding of the DNL, supplemental methodologies and aircraft noise impacts. **[Section 3.3, Volume 1]**
- If screening analysis shows that noise-sensitive areas will be at or above DNL 65 dB and will have an increase of DNL 1.5 dB or more, further analysis should be conducted of noise-sensitive areas between DNL 60-65 dB having an increase of DNL 3 dB or more due to the proposed airport noise exposure. **[Section 3.4, Volume I]**
- If the DNL 65 dB screening test calls for further analysis between DNL 60-65 dB, agency mitigation options will include noise sensitive areas between 60-65 dB that are

projected to have an increase of 3 dB or more as a result of the proposed airport noise exposure. **[Section 3.5, Volume 1]**

- If a FAA FAR Part 150 program is included by the FAA as a NEPA mitigation measure, the FAA and the airport operator are responsible for ensuring that the commitment is carried out and the Part 150 study scope conforms to the NEPA scope of analysis. **[Section 3.6, Volume I]**
- Increase research (R&D) on methodology development and on the impact of aircraft noise. To foster this, a standing Federal interagency committee should be established to assist agencies in providing adequate forums for discussion of public and private sector proposals identifying needed research and in encouraging R&D in these areas. The following initial R&D issues are recommended:
- Evaluate potential modifications to the 1980 FICUN land use compatibility table to improve its usefulness for both routine land use planning and planning for noise-sensitive land uses.
- Continue research into community reaction to aircraft noise, including sleep disturbance, speech interference, and non-auditory health effects of noise.
- Investigate differences in perceptions of aircraft noise, ground transportation noise (highways and railroads), and general background noise.
- Continue and expand research on the airport noise impacts of rotary-wing operations. **[Section 3.7, Volume 1]**

It is the FICON's belief that these recommendations will provide both immediate and longterm improvements in airport noise analysis. Federal interagency encouragement of a continuing review of airport noise analysis will provide for future incorporation of improved airport noise analysis techniques and provide a forum to address related public concerns.

While the FICON is seeking to achieve improved uniformity among Federal agencies in airport noise impact analysis, it must also be recognized that agencies have differing legislative mandates and operating environments. These recommendations should be viewed as general guidance. Each Federal agency must determine how it can best use this guidance, supplementing it as appropriate to meet agency needs, within the framework of the NEPA requirements.

The FICON Report itself neither addresses the adequacy of compliance with NEPA to-date by the participating agencies, attempts to redefine thresholds of significance of impacts under NEPA, nor modifies the NEPA regulations or procedures of the agencies.

# 3.4 Land Use Compatibility

## 3.4.1 General

In most cases, land use compatibility recommendations regarding noise are in the form of guidelines provided by Federal agencies to State and local communities. The FICUN Guidelines (1980) provided a summary table of Land Use Applications and Compatibilities for this purpose. In general, land use compatibility guidelines tend to be expressed in terms of DNL and include (1) identification of compatible and incompatible land uses on the basis of DNL in 5 dB increments beginning at or below 65 dB, and (2) recommendations for building design and construction methods necessary to achieve specified levels of noise attenuation (reduction) based on the outdoor DNL. Airfield environs, which are the focus of this report, affect only certain categories of these guidelines.

For local agency decisions, these guidelines do not constitute thresholds of impact, because local agencies determine the application of the guidelines taking into consideration economic, technical and political ramifications specific to the communities involved. In general, these guidelines have been broadly accepted. However, there is also general recognition of the need for selective updating to include new types of land use (e.g. biotechnology laboratories) and the need for improved public understanding of the guidelines, their applications and interpretations.

The DoD, DOE, HUD and DOT are currently working together to update the Standard Land Use Coding Manual (SLUCM) land use categories used in land use compatibility guidelines. When SLUCM updating is completed, the FICON will need to establish new land use compatibility guidelines for each DNL range for any new land use codes.

The Secretary of Defense Office of Economic Adjustment has established a program to provide incentives to local governments to study, approve and implement land use plans and controls to protect installations from encroachment.

The standards established by HUD for future land use planning in noise environments are exceptions to the general federal practice of simply providing recommended noise guidelines to local communities.

## 3.4.2 Agency Regulatory Guidelines

### 3.4.2.1 HUD and VA

Agencies like HUD have developed regulations related to the overall community noise level, but these affect only their own programs and are not binding on local communities. The Department of Veteran Affairs (VA) program also considers aircraft noise and its findings affect only its own program. The mandate for HUD's involvement with noise is the Housing Act of 1949 (Public Law 81-171). This law sets a national goal of a decent home and suitable living environment for every American family. The Department was also tasked by the Housing and Urban Development Act of 1965 (Public Law 80-117) "to determine feasible methods of reducing the economic

loss and hardships suffered by homeowners as a result of the depreciation in the value of their properties following the construction of airports in the vicinity of their homes." Finally, HUD is tasked by Federal Management Circular 75-2, Compatible Land Uses at Federal Airfields, to promote compatible land uses around Federal airfields (HUD 1985).

**Regulatory Guidance (Standards**

HUD Regulations are based on the DNL metric, and set forth the following exterior noise standards for new construction assisted or supported by the Department. They provide planning guidance only for existing conditions:

- DNL 65 dB or less - Acceptable;
- DNL 65 dB to DNL 75 dB - Normally Unacceptable - appropriate sound attenuation measures must be provided: 5 dB above the attenuation provided by the standard construction required in DNL 65 dB to 70 dB zone; 10 dB additional attenuation in DNL 70 dB to 75 dB zone;
- Exceeding DNL 75 dB - Unacceptable.

HUD's Regulations do not contain standards for interior noise levels. Rather, a level of DNL 45 dB is set forth as a goal for interior noise levels and the regulations specify noise reduction (attenuation) requirements which are directed towards achieving that goal. It is assumed that with standard construction materials and methods, any residential structure will provide sufficient attenuation (i.e., a 20 dB reduction in exterior noise levels) so that if the exterior level is DNL 65 dB, the interior level will be DNL 45 dB or less (Department of Housing and Urban Development 1985).

The HUD impact determination process is clearly spelled out in their Noise Assessment Guidelines, and is fairly simple. The noise level from each source affecting the proposed site is calculated and then combined to derive the overall exposure. The overall noise level is then compared to HUD's standards and the appropriate action, as specified in the regulations, is taken (Department of Housing and Urban Development 1985). HUD's recommended "ideal" solution to a potential problem is to reduce the noise being produced by the source. However, usually the best available solution is to make sure that noise-sensitive uses are located where they will not be exposed to high noise levels.

### 3.4.2.2 FAA

Part 150 of the Federal Aviation Regulations (FAR Part 150) establishes the recommended procedures, standards and methodology governing the development of airport noise exposure maps and airport noise compatibility planning programs. It is consistent with the EPA "Levels Document" that prescribes a single system for: (1) measuring noise at airports and surrounding areas that generally provides a highly reliable relationship between projected noise exposure and surveyed reaction of people to noise; and (2) determining exposure of individuals to noise that results from the operations of an airport. This Part 150 Regulation also parallels the HUD regulatory guidance in that it identifies those land uses which are normally compatible with various levels of DNL exposure.

FAR Part 150 includes a table titled "Land Use Compatibility with Yearly Day-Night Average Sound Levels." This table identifies various land use recommendations that are compatible or incompatible with yearly DNL levels above 65 dB in 5 dB increments. Levels below DNL 65 dB are considered compatible for all indicated land uses and related structures without restrictions. Levels between DNL 65 and 75 dB are considered incompatible with residential or school land uses unless measures are taken to achieve additional Noise Level Reductions (NLRs). Above DNL 75 dB, residential land uses are considered unacceptable, even with incorporation of noise attenuation measures. However, a variety of non-residential, open space, commercial and manufacturing land uses are identified as compatible in areas with DNL > 75 dB.

### 3.4.2.3 DoD

The DoD program for land use compatibility around airports is referred to as the Air Installation Compatible Use Zone (AICUZ) program. This program uses land use tables similar to the one in FAR Part 150 for noise levels of DNL 65 dB and above. While screening criteria vary somewhat from Service to Service, new environmental noise analysis is usually conducted when there is any significant change in airfield operations, types of aircraft, or aircraft flight tracks. Additionally, the program provides for periodic updates. When the noise assessments are completed for the airfield, each service provides land use recommendations to the local communities for consideration and potential incorporation into the community land use ordinances. Through the Base Comprehensive Planning process, on-base facility siting also incorporates noise as a planning factor.

The DoD Joint Services Manual, Planning in the Noise Environment (1978) provides military installation planners with a procedural tool to aid in the creation of acceptable noise environments. The acceptable outdoor noise environments for major military and civil uses are described. Planning levels are in terms of DNL values; however, $L_{eq}$ is used for detailed design when occupancy or usage does not extend over 24-hour periods. The land use compatibility tables are consistent with those discussed for the FAA FAR Part 150 and the DoD AICUZ programs.

### 3.4.2.4 Federal Interagency Committee on Urban Noise (FICUN) Guidelines

The purpose of the 1980 FICUN was to put the various Federal agency policy and guidance packages on environmental noise into perspective. The result was the publication of Guidelines for Considering Noise in Land Use Planning and Control (1980). The "Guidelines" do not replace the individual Federal agency guidelines. They serve as a point-of-departure for dealing with each agency's programs, and facilitate the consideration of noise in all land use planning and interagency/intergovernmental processes. The FICUN established DNL as the descriptor to be used for all noise sources. The $L_{eq}$ descriptor is included because some highway noise is best characterized in terms of an equivalent sound level for the highway "design hour." Table 2 of these "Guidelines" contains suggested land use compatibility guidelines. This table was previously discussed in Section 3.2.2.3 and is reproduced herein as Table 3.2. In addition, the FICUN "Guidelines" provide a reference for describing the effects of noise on people in terms of annoyance, speech, and hearing loss.

3668

**Watson, Sue R. (EFDLANT)**

**From:** Cecchini, J. Dan (EFDLANT)
**Sent:** Monday, November 27, 2000 1:24 PM
**To:** 'Smith, Shawn M CAPT (CNAL N80E-F)'; 'Logan, Phillip CDR (CLF N4683)'
**Cc:** Cecchini, J. Dan (EFDLANT); Seyler, Jim A. (EFDLANT)
**Subject:** RE: Op count at NTU

The C/D EIS, with Oceana CO approval, stated that most FCLPs would be conducted at Fentress. We did not say that we would never do them at Oceana. In fact, we only suggest that most FCLPs would be conducted at Fentress. The NASMOD reflected this in the C/D EIS. However, we also state that approx 120,000 Touch and Go ops would be conducted at Oceana between the F-14 and F/A-18 community (along with approx 3,000 FCLP ops). The public has no idea what the difference is between the two. Therefore, according to the C/D EIS, they should expect to see aircraft in the pattern at 1,000 ft. AGL at Oceana on a frequent basis (avg. of 300-400/day). I think we are OK here. The issue was CAPT Zobel stating that we were going to move 1/3 of FCLPs to Oceana - this appears to be OBE now. The CO does have flexibility to run his airfield as he sees fit. Lets not put too much on "breaking the old EIS" We heard the same thing in Dallas about Lemoore and it is a misue of terms.

Dan

-----Original Message-----
**From:** Smith, Shawn M CAPT (CNAL N80E-F) [mailto:smithsm@cnal.navy.mil]
**Sent:** Monday, November 27, 2000 11:13 AM
**To:** Logan, Phillip CDR (CLF N4683)
**Cc:** 'cecchinijd@efdlant navfac.navy.mil'
**Subject:** RE. Op count at NTU

Phil ----
Watch your step here - Oceana is not restricted from FCLPs at Oceana - there is a percentage - but the CO needs to have the operational flex to do what needs to be done to meet operational requirements - deployments.

I do not think Capt Zobel can be "locked" from any aspect of doing his job at Oceana
Let's not lose sight of the requiremetns to meet deployments The EIS taking is not to "restrict" the base CO
The other issue is the "baseline" we need is what they are doing NOW - and maybe that is what ou mean by "lock in" - there can not be any significant changes to procedures - they have bounced at Oceana - and have since stopped - but the procedure to use Oceana for this task is established - we need the flight paths and procedures for the operations - no changes can be made there - but this base line is not to restrict the CO from running his base.

Maybe I am not on target here - but do not want the Adm to get the wrong idea of what the base line is - and the issue with Fred and Zussman on operations at Oceana with regard to base line

-----Original Message-----
From: Logan, Phillip CDR (CLF N4683)
Sent: Monday, November 27, 2000 10:10 AM
To: Nowakowski, Michael RDML (CLF N46); Crabtree, Thomas SES (CLF N46A); Ungvarsky, William CAPT (CLF N468)
Cc. Lang, James CDR (CLF N02LE), Klena, Jude LCDR (CLF N33B4); Maguire, Chuck GM-13 (CLF N4654); Zusman, Alan F (NAVFACWNY); Dan Cecchini (E-mail); Smith, Shawn M CAPT (CNAL N80E-F)
Subject. RE: Op count at NTU

Yes Sir, if we believe the numbers they are now telling us are the "correct"

numbers - that's why I asked Fred Pierson to get base ops to re-calculate their numbers - they smelled fishy If we can get CAPT Zobel locked into not bouncing at Oceana then I think we've got smooth sailing. V/R Phil

CDR P. E. Logan, CLF N4683
(757) 836-3674, DSN 836-3674
loganpe@clf.navy.mil

-----Original Message-----
From: Nowakowski, Michael RDML (CLF N46)
Sent: Monday, November 27, 2000 9:21 AM
To: Logan, Phillip CDR (CLF N4683); Crabtree, Thomas SES (CLF N46A); Ungvarsky, William CAPT (CLF N468)
Cc: Lang, James CDR (CLF N02LE), Klena, Jude LCDR (CLF N02LE3)
Subject RE: Op count at NTU

Phil,

So you're telling me that we went a whole year worrying that we grossly surpassed the C/D ops estimates at Fentress and Oceana. With this glitch in the way we were counting the traffic count fixed is the C/D baseline still good to use for the EIS?
R, N

-----Original Message-----
From: Logan, Phillip CDR (CLF N4683)
Sent: Monday, November 27, 2000 8:07 AM
To: Nowakowski, Michael RDML (CLF N46); Crabtree, Thomas SES (CLF N46A); Ungvarsky, William CAPT (CLF N468)
Cc: Lang, James CDR (CLF N02LE); Klena, Jude LCDR (CLF N02LE3)
Subject. FW: Op count at NTU

Sirs, the most technologically advanced nation in the world and still we have difficulty counting. We all seem to have southern Florida disease. The EIS totals were 220,000 for Oceana and 140,000 for Fentress - appears they may squeak under at Oceana. V/R Phil

CDR P. E. Logan, CLF N4683
(757) 836-3674, DSN 836-3674
loganpe@clf.navy.mil

-----Original Message-----
From: Pierson, Fred [mailto Mraicuz@nasoceana navy mil]
Sent. Saturday, November 25, 2000 12 53 PM
To: Dan Cecchini (E-mail); Alan Zusman (E-mail), Chuck Maguire (E-mail); CDR Phil Logan (E-mail)
Subject. FW: Op count at NTU

Looks like we will be below totals projected in the F/A-18 C/D EIS

R/Fred

> -----Original Message-----
> From: Hebert, CDR Dirk
> Sent: Tuesday, November 14, 2000 2:26 PM
> To. Zobel, CAPT William
> Cc: Pierson, Fred; Firenze, Ray
> Subject Op count at NTU
>
> Skipper,
>
> Based on your query, Ray and Chief Banks just recalculated our traffic
> count for the year and our reported-to-date count has been off. The
> computer algorithm (formula) was double counting touch and gos (including
> FCLPs) based on each touch and go equaling both a takeoff and a landing.
> Unfortunately our crews were already counting each touch and go twice,
> hence a double count. Chief Banks fortunately keeps all the paper logs
> and was able to correct the count within the computer tabulation The new
> totals are promising because they are right on track (or even below) the
> EIS projections and no longer point an accusing finger at FCLPs at Oceana
> as the obvious culprit for the increase. Here are the corrected numbers.
>
> as of Nov 1 NTU: 199,764 NFE 83,734
>
> If the above sounds like Air Ops double speak, I ask only that you follow
> the recounting of ballots in Florida for the appropriate precedence :-)
> v/r gumbo

**Zobel, William C CAPT (NAS Oceana)**

**From:** Hebert, CDR D.
**Sent:** Monday, March 13, 2000 2:36 PM
**To:** Zusmanaf@navfac.navy.mil
**Cc:** Zobel, CAPT William; Pierson, Fred
**Subject:** Noise Mitigation/Abatement procedures at NAS Oceana

364

Alan, here's a narrative cut on what we discussed on Saturday. We have been doing these things to some degree since late last summer. As our operators have gotten more comfortable with the nuances of the new procedures we have increased their activity. The percentages listed with each new procedure represents the current average (and the one we expect to reflect the future norm), but they are approximations.

- GCA box pattern raised from 1500 feet MSL to 2500 feet MSL. After completing a touch and go landing, aircraft are now instructed to climb to 2500 feet to prepare for their next pass. For Runway 5 operations this means aircraft will turn right into an oval pattern with 10-12 mile legs. Instead of aircraft holding at 1500 feet until intercepting the normal glide slope at 6 miles on runway course, pilots fly the pattern at 2500 feet until making a crosswind turn to final at approx 10-12 miles before descending to 1500 feet; i.e. the entire downind portion is flown at a higher altitude. This is now occurring approx 90% of the time for Rwy 5 operations. Elevating the box for Rwy 23 ops has had minimal impact since aircraft are still in the climb crossing the beach.

- Holding VFR traffic inbound for the break at 2500 until reaching 5 miles approaching the airport. Prior to this being implemented, aircraft were cleared to 1500 feet MSL once handed off to Tower with the field in sight. This usually occurred at around 10 miles. Now aircraft are not descended to 1500 feet until the have reached 5 miles. We are doing this on all runways about 75% of the time.

- Southbound departures held down at 4000 feet MSL and 250 Knots until reaching 7 miles outbound. The majority of the aircraft launching from Oceana (80-90%) are heading to one of the operating areas to the east and south. The 175 degree radial is the departure corridor designed to accomodate this flow of traffic into the various areas. Instead of allowing aircraft departing the airfield to climb immediately on course to their final assigned altitude, ATC is now issuing instructions to fly the published route but to delay climbing out of 4000 feet until reaching 7 miles. This is now occurring approx 90% of the time for Rwy 14 and 23 departures, but only 45-50% of the time for Rwy 32 and 5 departures. The remainder of the departures (approx 45-50%) on Rwy 32 and 5 are now being vectored over the water directly then allowed to climb on course. At least 10% of traffic on all runways is still allowed to climbout normally as before; this is due to weather, traffic deconfliction and transients. Power settings while flying level at 4000 feet until 7 miles are as follows: F-14 - 87%, F/A-18 - 83% (This can vary with different aircraft loading).

- Helo departures moved south to fly over Camp Pendleton (military) vice Rudee Inlet. All local flights and most transient operations now use this departure, accounting for approx 80% of all helo ops. During severe IFR weather conditions and pop-up transient operations Rudee Inlet remains the reporting point because of its qualities as a natural geographic reference.

- Move some FCLP periods to Oceana. Whenever operational surge periods dictate Fentress use past 1:00 AM (7-10 days / month) FCLP periods are available at Oceana, but not after 11:00 PM. This allows operations to shut down at both airfields prior to midnight on most nights. During peak periods (again 7-10 days / month), 1/3 of all FCLP's are done at Oceana.

Let me know if there's anthing else you need. Fred, Ray and I are looking at the EIS graphic depictions to try and quantify this in art form - a picture's worth a 1000 words! very respectfully, gumbo

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| CAROL AND ROBERT TESTWUIDE, et al.,<br>Plaintiffs,<br>v.<br>THE UNITED STATES OF AMERICA,<br>Defendant. | No.: 01-201L<br><br>DECLARATION OF<br>DIRK P. HEBERT<br>Commander, U.S. Navy |

STATE OF VIRGINIA )

CITY OF VIRGINIA BEACH )

I, Dirk P. Hebert, state that:

*INTRODUCTION AND BACKGROUND*

1. I am a Commander in the United States Navy, presently serving as the Air Operations Officer of Naval Air Station (NAS) Oceana and have served in that capacity since July 1999. I am a qualified Naval Flight Officer and have logged in excess of 3500 hours in F-14 strike fighter aircraft. Over the course of my career, I have served six tours of duty at NAS Oceana, beginning in 1979, including five operational flying tours from 1979 through 1997 where I personally participated in flight operations at NAS Oceana on a day-to-day basis.

2. As the Air Operations Officer at NAS Oceana, I am responsible for daily airspace management and air traffic control within the airport traffic area of NAS Oceana, which encompasses airspace within five miles of the airport, and all air traffic transiting to and from the air station to the various training areas throughout the region.

3. NAS Oceana has four intersecting runways, arrayed as two sets of parallels. The primary runways are 5/23, intersected at a 90 degree angle by runways 32/14. Runways are chosen for daily use based on the relative winds. Wind direction is the only factor in determining which runway will be used for normal operations. Because of prevailing wind patterns in the Tidewater area, historically Runway 5 has been the most used runway.

DEFENDANT'S EXHIBIT J

EXHIBIT H-2 7-18-02 cc



EXHIBIT PX015

*OPERATIONS IN GENERAL*

4. Attached is a breakdown of the number of total operations flown at both NAS Oceana and Naval Auxiliary Landing Field (NALF) Fentress since 1979. These numbers are maintained by the Air Installations Compatibility Use Zones office at NAS Oceana. For this discussion the term "operation" generally refers to anytime an aircraft crosses the runway threshold, whether to touchdown or takeoff. For example, a single touch and go or Field Carrier Landing Practice (FCLP) evolution would count as two operations; one for the approach and touch down, another for taking off again. Since 1979 the number of operations at NALF Fentress has ranged from about 80,000 to 120,000, with a low of 65,000 in 1998 to a high of 150,000 in 1990. These fluctuations are primarily the result of the number of aircraft assigned to NAS Oceana, although events such as the Gulf War in 1990 create surge requirements that can increase the number of operations.

5. As both an aviator whose land-based flying has been predominately from NAS Oceana, and the Air Operations Officer in charge of safely conducting flight operations from this airport, I have observed that course rules, flight tracks and flight patterns have remained essentially the same at NAS Oceana and NALF Fentress since at least 1979. Although there have been many changes to Air Traffic Control procedures in those 23 years, and in the type of aircraft that have been stationed onboard, very little has affected how aircraft operate within the NAS Oceana airport traffic area.

6. During landing operations at NAS Oceana and NALF Fentress, only those areas within the Accident Potential Zones (APZs) are typically subjected to overflights by aircraft. This is true for both touch and go and FCLP landings. Areas outside of the APZs, including most of those inside the 75dB line are not subjected to normal and repeated overflights during FCLP and touch and go landings.

7. Basic landing patterns, including FCLPs and touch and go's, and instrument approaches to the airport have remained constant in their flight path geometry. Put another way, the ground track of an aircraft flying out of or returning to NAS Oceana has not changed over time. As much as possible, Navy pilots practice the same procedures and flight paths they will fly when operating on an aircraft carrier. Furthermore, carrier procedures have not changed in my 25 years of experience.

*FIELD CARRIER LANDING PRACTICE AND TOUCH AND GO'S*

8. For Navy pilots, the flight characteristics (power settings, aircraft configuration) and geometric parameters

(flight track over the ground) of touch and go landings and FCLP landings are identical. In both types of landings, the aircraft is configured the same, flies the same profile over the ground, flies the same glide slope to touch down, and uses the same power settings. The only difference between the two is that during FCLP landings an observer is present near the touch down point in order to "grade" the landing.

9. Procedures describing the proper geometry for safe execution of a normal landing as it applies to carrier operations can be found in NAVAIR Instruction 00-80T-105 CV NATOPS generally, and specifically in the NATOPS manual defining operations for each aircraft type.

10. While land-based, Navy pilots conduct touch and go landings on a routine basis following most missions they fly. Touch and go landings are not normally scheduled events, but are commonly conducted when sufficient fuel is available after a tactical mission is completed. FCLP landings are touch and go landings under the supervision of a qualified pilot known as a Landing Signals Officer (LSO), who as noted earlier "grades" the performance of the pilot. When compared to touch and go's, FCLPs are specifically scheduled, dedicated mission events. Both touch and go's and FCLPs, however, are designed to prepare Navy pilots for future shipboard operations and allow for aircrews to increase proficiency prior to at-sea periods.

11. FCLP landings are normally conducted at NALF Fentress, which is available for scheduling 24 hours a day, 7 days a week. NALF Fentress is a landing strip located 12 miles southwest of NAS Oceana in Chesapeake, Virginia. It has an 8000 foot runway that is 150 feet wide with lighting details and markings depicting an aircraft carrier's landing area at both ends of the runway. NALF Fentress' dedicated mission is supporting FCLP requirements for fleet aviators from NAS Oceana and Chambers Field (NAS Norfolk). However, weather conditions and saturation of operations during certain peak periods of the year require that some FCLP operations be shifted to NAS Oceana. While this is done on a case-by-case basis, FCLP operations are not normally scheduled at NAS Oceana. Most touch and go's, by contrast, are conducted at NAS Oceana, because they are performed at the end of a mission, and NAS Oceana is the typical terminus for missions flown by aircraft based there. Touch and go landings are not permitted at NAS Oceana between the hours of 11:00 PM and 7:00 AM.

12. As previously stated, the flight patterns aircraft fly during FCLP and touch and go landings have not changed in any significant way or in location since at least 1979. At NAS Oceana, aircraft are directed to climb to a pattern altitude of 1000 feet, and fly an elliptical pattern around the field to

achieve the proper geometry for safe execution of a normal landing. Again, a normal landing is usually one that most closely resembles carrier-landing procedures. At NALF Fentress airfield, aircraft are authorized to climb to a pattern altitude of 800 feet and fly a similar elliptical pattern around the field to achieve the proper geometry for safe execution of a normal landing. The altitudes assigned for these patterns have not changed since at least 1979. As a point of reference, pattern altitude for carrier operations at sea is 600 feet. Once pattern altitude is achieved in any of the above situations, an aircraft will remain at that altitude until "abeam" the touchdown point, when the aircraft will begin descending and turn until properly aligned to runway heading and the touchdown point. The "abeam" position is located 1.5 miles from the touchdown point with aircraft heading in the exact opposite direction from runway heading. This is also commonly called the "180" position because an aircraft is flying a heading 180 degrees different than runway aligned heading.

*THE EFFECT OF FLIGHT OPERATIONS ON PLAINTIFF'S PROPERTY*

13. The Testwuide property is located 2.5 miles from the approach end of NAS Oceana's Runway 23 and ½ mile north of the extended centerline (approach corridor) of Runway 23R. Because of its location, this property is not subjected to overflights during FCLP and touch and go landings. Furthermore it is not normally overflown by other air traffic arriving to land from the north east. Because of its location ½ mile north of Runway 23 extended centerline, this property is outside of the standard approach corridor.

14. Both the Bunn and Green properties are located within 1.0 mile of either the departure end or approach end of a runway at NAS Oceana (Runway 23 approach-Bunn; Runway 32 departure-Green), and are subjected to different departure and approach patterns, timing and frequency from the two runways. Both properties experience FCLPs and "touch and go" operations that are flown at 1000 feet, but are located at different points along the elliptical pattern. The Lyles property is located 1.5 miles from the approach end of Runway 23 and lies outside of the normal FCLP and touch and go landing patterns at Oceana.

15. The Locasto property is located 1.75 miles from the approach end of the runway at NALF Fentress. FCLP operations at NALF Fentress are flown at a pattern altitude of 800 feet.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 6, 2002 at NAS Oceana, Virginia Beach, Virginia.

DIRK P. HEBERT

SUMMARY OF FLIGHT OPERATIONS 1979-2001

| | | | | |
|---|---|---|---|---|
| 1979 | Oceana: | 198,255 | Fentress: | 90,819 |
| 1980 | Oceana: | 160,800 | Fentress: | 103,711 |
| 1981 | Oceana: | 204,404 | Fentress: | 96,486 |
| 1982 | Oceana: | 198,824 | Fentress: | 83,828 |
| 1983 | Oceana: | 204,492 | Fentress: | 90,206 |
| 1984 | Oceana: | 220,574 | Fentress: | 106,802 |
| 1985 | Oceana: | 160,169 | Fentress: | 96,520 |
| 1986 | Oceana: | 132,401 | Fentress: | 100,499 |
| 1987 | Oceana: | 149,140 | Fentress: | 77,209 |
| 1988 | Oceana: | 165,064 | Fentress: | 129,764 |
| 1989 | Oceana: | 185,014 | Fentress: | 117,958 |
| 1990 | Oceana: | 200,677 | Fentress: | 152,497 |
| 1991 | Oceana: | 203,044 | Fentress: | 115,258 |
| 1992 | Oceana: | 240,039 | Fentress: | 84,656 |
| 1993 | Oceana: | 206,608 | Fentress: | 93,546 |
| 1994 | Oceana: | 181,742 | Fentress: | 76,252 |
| 1995 | Oceana: | 174,997 | Fentress: | 85,914 |
| 1996 | Oceana: | 154,532 | Fentress: | 86,692 |
| 1997 | Oceana: | 114,100 | Fentress: | 84,115 |
| 1998 | Oceana: | 124,461 | Fentress: | 65,159 |
| 1999 | Oceana: | 186,423 | Fentress: | 81,320 |
| 2000 | Oceana: | 237,263 | Fentress: | 99,152 |
| 2001 | Oceana: | 219,535 | Fentress: | 96,096 |



EXHIBIT PX015

00001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, et al., :
Plaintiffs, :
vs. : NO.: 01 201L
THE UNITED STATES OF AMERICA, :
Defendant. :

DEPOSITION UPON ORAL EXAMINATION OF
DIRK P. HEBERT
July 18, 2002 - 9 a.m.
Virginia Beach, Virginia

APPEARANCES: QUINN, GORDON & WOLF
By: MARTIN E. WOLF, Esquire
KIERON F. QUINN, Esquire
Counsel for the Plaintiffs
JACK E. FERREBEE, Esquire
Counsel for the Plaintiffs

SENIOR COUNSEL, U.S. DEPARTMENT OF JUSTICE
ENVIRONMENTAL & NATURAL RESOURCE DIVISION
By: DAVID SHUEY, Esquire
Counsel for the USA
NAVY LITIGATION OFFICE
By: ROBERT J. SMITH, Esquire
ROBERT C. MANLEY, Esquire
Counsel for the USA

JUDE KLENA, CDR, JAGC, USNR
Assistant Fleet Environmental Counsel
REBEKAH TURNER
Acting Command Judge Advocate, NAS Oceana

REPORTED BY: Cathy D. Aiello, RPR

A. Not the logs. I've reviewed some of the complaints.

Q. Okay. Do you know if complaints are made by properties that are not under the blue areas on Exhibit 22 that aircraft are flying over?

A. You know, I rarely, when I review complaints, look at the actual location.

Q. Okay. Paragraph 8, For Navy pilots, the flight characteristics (power settings, aircraft configuration) and geometric parameters of touch and go landings and FCLP landings are identical.

A. Right.

Q. For the same type of aircraft, right?

A. Right, yes.

Q. Okay.

A. Yes.

Q. Now, you say in paragraph 8 that the only difference between a touch and go and a FCLP is that an FCLP is graded?

A. That's right.

Q. That's by the line signal officer?

A. Landing signal officer, LSO.

Q. Now, we talked a few minutes ago about more than one aircraft in the pattern. Are there multiple aircraft in the pattern on a touch and go as

well as the FCLP?

A. There can be. FCLPs are scheduled events. Normally a squadron likes to get its full complement of airplanes into a pattern. Touch and go's are not -- often, single airplanes return to Oceana for touch and go's. It can join another airplane that's already there for touch and go's. I couldn't tell you how often that occurs, but it's not uncommon to have more than one airplane and it's also not uncommon to have a single airplane in a pattern.

Q. Would you say it's more common than not that FCLPs will be multiple aircraft?

A. I can't state that with any certainty. I have witnessed personally a number of FCLP operations with a single aircraft, so. I couldn't give you the distinction whether it's more common or less common. It's one or two or three. That's what I mean by that. You're asking is there a majority of the time, right, when there's more than one airplane. I can't -- since I don't record that data, I couldn't tell you.

Q. Right. Well, FCLPs are scheduled?

A. Right.

Q. Would you expect that it's more than one plane most of the time?

A. I would expect that a squadron will

schedule more than one airplane at a time, but I'll leave it at that.

Q. In this section, which you have a subtitle called Field Carrier Landing Practice and Touch and Go's, it's paragraphs 8 through 12.

A. Okay.

Q. You talk -- in general, in each of the paragraphs, you talk about the consistency of the FCLP and touch and go geometry over a long period of time --

A. Right.

Q. -- being the same, hasn't changed. I just want to make sure that I'm clear.

A. Okay.

Q. That's specifically referring to flight tracks, not to things like power settings and configuration of the aircraft?

A. As my -- well, let me read this real quick. Is there one paragraph you're in particular looking at?

Q. I thought there was, but looking through the paragraphs, in a number of places, it seems to be -- like in paragraph 9, for instance, it says proper geometry.

A. Yes, that is referring specifically to those because power settings -- that's a hard target

00077

there. Yes, that was referring to the actual tracks across the ground.

Q. Okay. And, you know, like in 12 you say the flight patterns. Again, I'm assuming you're talking again about the tracks, what you called the geometry?

A. Right.

Q. Okay. Paragraph 13, you talk about the Testwuide's property in relation to the runways at Oceana.

A. Right.

Q. And you say, "Because of its location, this property is not subjected to overflights during FCLP and touch and go landings."

How did you determine that?

A. I tracked -- I took a copy of their address, applied it to this chart - and I have actually brought a copy of that with me - and looked as it applies to our standard flight tracks and its location.

Q. So if I understand you, you put the address on this map, and if it wasn't in blue, they weren't subject to overflights?

A. That's essentially true. I actually measured the distances for our corridors as well again to make sure that -- because, again, this is just a reference, and the blues to me tell me that that's where

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CAROL AND ROBERT TESTWUIDE, et al., | ) | No. 01-201L |
| Plaintiffs, | ) | |
| v. | ) | Honorable Victor J. Wolski |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**DEFENDANT UNITED STATES' SUPPLEMENTAL RESPONSE TO PLAINTIFFS' INTERROGATORIES TO DEFENDANT, INTERROGATORY NO. 3**

Defendant, the United States of America, by and through its undersigned counsel, hereby supplements its response to Plaintiffs' Interrogatory No. 3. Defendant incorporates by reference its preliminary statement and objections to instructions, as well as the objections to each Interrogatory, as set forth in its previous responses.

**Supplemental Response to Interrogatory Number 3**

**Interrogatory Number 3** State the date on which you allege that a six year statute of limitations began to run as asserted in Paragraph 2 of your Affirmative Defenses.

**Supplemental Response to Interrogatory Number 3**

For the reasons described in detail in Defendant's Motion to Dismiss or, Alternatively, for Summary Judgment and Memorandum in Support Thereof and supporting materials filed on April 28, 2006, the United States asserts that, if any taking occurred with respect to the test

plaintiffs' properties, it occurred at least as early as 1981, which is when the Statute of Limitations began to run.

Respectfully submitted,

CDR Dominick Yacono, JAGC, USN

STEVEN D. BRYANT
KELLE S. ACOCK
United States Department of Justice
Environment and Natural Resources Div.
Natural Resources Section
P.O. Box 663
Washington, D.C. 20044-0663
(202) 305-0424

Of Counsel:

Robert J. Smith
Mary S. Raivel
Navy Litigation Office
720 Kennon Street SE, Bldg. 36
Washington, D.C. 20374

CDR Dominick Yacono, JAGC, USN
Commander Navy region, Mid-Atlantic, Code (00LE)
1510 Gilbert Street
Norfolk, VA 23511-2737

CERTIFICATE OF SERVICE

The undersigned certifies that on this 5th day of May 2006 a true and correct copy of the foregoing **DEFENDANT UNITED STATES' SUPPLEMENTAL RESPONSE TO PLAINTIFFS' INTERROGATORIES TO DEFENDANT, INTERROGATORY NO. 3** was served electronically and via Federal Express to the following counsel of record:

Jack Ferrebee
1060 Laskin Road
Sandpiper Key
Suite 12-B
Virginia Beach, VA 23451

Felicia Lesesne
Felicia Lesesne
Legal Support Assistant

00001

IN THE:

UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, *
et al., *
Plaintiffs, *
*
vs. * No. 01-201L
*
THE UNITED STATES OF AMERICA, *
Defendant. *

* * * * * * * * * * * * * * * * *

The deposition of STEPHEN RILEY was taken on Tuesday, February 14, 2006, commencing at 1:15 p.m., at U. S. Department of Justice, Environment & Natural Resources Division, 601 D Street, N.W., PO Box 663, Washington, D.C. 20044, before Alfred A. Betz, Court Reporter and Notary Public.

* * * * * * * * * * * * * * * * *

Reported by:
Alfred A. Betz, Certified LiveNote Reporter

00010

facilities. So I was one of the guys that stayed back so all their jobs came down to me.

Q. I do remember that. I'm old enough to remember the air traffic controller crisis. Now, during that time at Oceana can you give me in a general description of how the number of aircraft operations were counted at Oceana?

A. There are various ways to count operations. Do you want the specific method we used or -- not we at Oceana. The specific Navy method. There is a standard method for counting air traffic operations.

Q. Let's start there.

A. Okay. In the control tower the control tower counts everything that occurs, every airplane, they count it all. Operations are broken down into various phases. A takeoff is one operation, takeoff of flight a 2, it gets a 2 count. Although it is only one operation, the count of the airplanes is what's critical for the control tower. They count everything that occurs.

If an airplane comes in and does a touch and go, you get a 2 count. Although it is one airplane, it is a 2 count because the airplane comes in, he crosses the threshold and then he takes off again. So he's actually doing two evolutions or operations, if that's what you will. An airplane passing through the control tower's area of responsibility is counted as a one count. He just passes through. He doesn't make an approach to the airport. He doesn't do anything like that. A landing is counted as one. A landing, a flight of two airplanes would come in and land separately is a two count. Two distinct evolutions.

Q. And who makes the count, physically makes the count?

A. The person that actually makes the count is the local controller in the tower. The local controller has, during the initial period of time has what we call blood cell counters or -- it's a clicker, a little hand-held clicker and they would click the evolutions.

That's all.

A. I'm trying to be as truthful as I can but it's going back. From Chase Field, Texas I was stationed at FAA headquarters for three years. I was in a reimbursable slot at FAA headquarters here in D.C. From FAA headquarters I went down to Pax River, Maryland, another major approach control. Pax River back up to FAA headquarters as the Navy liaison officer. From there down to AIRLANT Force Air Traffic Control at AIRLANT. From AIRLANT up here to N785 up at the Pentagon.

Q. And how long have you been up here?

A. Three years. It will be three years the 8th of June.

Q. Okay. When were you notified that you would, that you would potentially be a witness in this case? Roughly.

A. A couple of inquiries were made to my office about, you know, gathering the data and so forth. And in the course of those telephone conversations individuals making the call -- I

don't remember names.
MR. BRYANT: Be careful about saying the contents of the communications. You can talk to about who you talked to if you need to but be careful -- if you talked to a lawyer in any of those conversations please don't disclose the content of those conversations.
A. I did but I didn't, at the time I didn't consider it anything out of the ordinary because I was constantly being asked for information. Okay. I value what you just said. Actually told that I may be a witness in this? I, Steve Riley?
Q. Yes.
A. Thursday.
Q. Are you familiar with this particular case and the allegations of the Complaint? When I say "this particular case" the case we're here for this deposition on.
A. I don't know how to answer that question.
Q. Okay. Let me ask it this way. What do you know about the case you've been asked to


Complaints by Calendar Year
1800
1600
1400
1200
1000
800
600
400
200
0
85 86 87 88 89 90 91 92 93 94 95 96 97 98 99
Year

OCE005638

| Year | Complaints | Operations Oceana | Operations Fentress | Operations Total |
|---|---|---|---|---|
| 1973 | 218 | | | |
| 1974 | 364 | | | |
| 1975 | 258 | 124,303 | 50,264 | 174,567 |
| 1976 | 140 | 131,616 | 46,109 | 177,725 |
| 1977 | 194 | 168,296 | 70,748 | 239,044 |
| 1978 | 263 | 187,491 | 82,109 | 269,600 |
| 1979 | | 198,255 | 90,819 | 289,074 |
| 1980 | | 160,800 | 103,711 | 264,511 |
| 1981 | 303 | 204,404 | 96,486 | 300,890 |
| 1982 | 415 | 198,824 | 83,828 | 282,652 |
| 1983 | 327 | 204,492 | 90,206 | 294,698 |
| 1984 | 460 | 220,574 | 106,802 | 327,376 |
| 1985 | 538 | 160,169 | 96,520 | 256,689 |
| 1986 | 424 | 132,401 | 100,499 | 232,900 |
| 1987 | 730 | 149,140 | 77,209 | 226,349 |
| 1988 | 440 | 165,064 | 129,764 | 294,828 |
| 1989 | 664 | 185,014 | 117,958 | 302,972 |
| 1990 | 421 | 200,677 | 152,497 | 353,174 |
| 1991 | 434 | 203,044 | 115,258 | 318,302 |
| 1992 | 485 | 240,039 | 84,656 | 324,695 |
| 1993 | 418 | 206,608 | 93,546 | 300,154 |
| 1994 | 403 | 181,742 | 76,252 | 257,994 |
| 1995 | 236 | 174,997 | 85,914 | 260,911 |
| 1996 | 316 | 154,532 | 86,692 | 241,224 |
| 1997 | 621 | 114,100 | 84,115 | 198,215 |
| 1998 | 572 | 124,461 | 65,159 | 190,620 |
| 1999 | 1789 | 186,423 | 79,642 | 266,065 |
| 2000 | 2326 | 237,263 | 99,152 | 336,415 |

AICUZ SHARED OPS. DOC

**U.S. Department of Justice**

Environment and Natural Resources Division

SDB
90-1-23-10297

*Natural Resources Section*
*P.O. Box 663*
*Washington, DC 20044-0663*

*Telephone (202) 305-0424*
*Facsimile (202) 305-0267*

May 16, 2006

**Via E-mail and Federal Express**

Jack E. Ferrebee, Esquire
Hofheimer/Ferrebee, P.C.
1060 Laskin Road
Suite 12B
Sandpiper Key
Virginia Beach, Virginia 23451-6365

Re: **Testwuide v. United States, 01-201**

Dear Jack:

This responds to your May 12, 2006 letter regarding plaintiffs' Request for Production ("RFP") No. 32 from the class certification phase of the litigation and requesting additional information regarding 1981 operations.

First, contrary to the assertion in your letter, defendant has not intentionally withheld its response to Interrogatory No. 2 from the class certification stage. Second, I am perplexed at the implication in your letter that we had an obligation to provide you a supplemental response to RFP 32. In neither Kieron Quinn's June 7, 2004 letter nor Marty Wolf's June 21, 2004 e-mail, discussing renewal of discovery from the class certification phase of the litigation, did plaintiffs renew RFP 32. Nor have you mentioned RFP 32 at all in the more than two years since then. We therefore view your request to resurrect RFP 32 as untimely. Nevertheless, as a courtesy to you, we are providing responsive documents.

The enclosed CD contains responsive documents from the period you requested, 1978 to 1988 (OCE239467-616). Additionally, the 1978 AESO noise study (OCE 039712, Doc. ID No. 2227) provides base loading information, albeit for 1977.

Concerning your request for "the counts for each type of operation at [NAS] Oceana in 1981", we have not been able to identify any responsive documents.

The enclosed CD also contains supplemental responsive documents to RFP 29 (OCE239617-655) and RFP 33 (OCE239656-694).

Sincerely,

s// Steven D. Bryant
Steven D. Bryant

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| CAROL AND ROBERT TESTWUIDE, et al.,<br>Plaintiffs,<br>v.<br>THE UNITED STATES OF AMERICA,<br>Defendant. | No.: 01-201L<br>(Honorable Victor J. Wolski) |

DECLARATION OF DR. NORAL D. STEWART

1. My name is Noral D. Stewart. I received a Bachelor's of Science Degree in Mechanical Engineering from North Carolina State University in 1969. I received my Master's Degree in Mechanical Engineering in 1974 and my PhD in 1981 in the Department of Mechanical & Aerospace Engineering at North Carolina State University. My graduate specialty was in acoustics and noise control. I was the President of the National Council of Acoustical Consultants from 2000-2002.

2. I have been retained by the Plaintiffs in this case to review and comment upon the reports of Dr. Sanford Fidell. I have reviewed Dr. Fidell's Declaration dated February 22, 2002; his report dated September 30, 2005; his first revised report dated February 15, 2006; and his second revised report dated March 29, 2006.

3. Until the publication of his second revised report, Dr. Fidell's reports in this case focused upon the government and industry accepted method of noise exposure and impact analysis using the Day-Night Sound Level (DNL) based on the A-weighted sound level of events. In his February 22, 2002 Declaration in this case, Dr. Fidell

acknowledged that "...DNL as a single, general measure of cumulative noise exposure has at least been preferable to reliance on a potpourri of inconsistent measures of environmental noise, ranging from maximum noise levels alone to counts of numbers of noise events and arbitrary combinations of such descriptors." (Fidell Declaration, p. 12). In his initial report, dated September 30, 2005, Dr. Fidell based his analysis of the test case plaintiffs' properties on a study using NOISEMAP software that reported the noise exposure by using DNL metrics. In so doing, Dr. Fidell undertook to convert modeling exercises made between 1972 and 1978 into DNL metrics. Noise modeling from 1978 to the present, for military airfield studies, is expressed in DNL metrics.

4. Table 1 of Dr. Fidell's September 30, 2005 report purports to state each of the test case plaintiffs' properties noise exposure using the DNL metric exclusively for the years 1972, 1975, 1978, 1982, 1988, 1993, 1997 and 2000. No analysis is reported for the year 1981.

5. My initial review of Dr. Fidell's report noted that he failed to account for the 1985 report of Harris, Miller, Miller and Hansen (HMMH), the Navy's noise study contractor in the 1980's, that determined that the 1978 noise contours for NAS Oceana were based upon a 6-10 dB overstatement of the noise of the A-6 aircraft. Although Dr. Fidell acknowledged in a footnote in his report that HMMH's report differed with NOISEMAP, he failed to state the difference nor did he undertake to determine the accuracy of the 1978 NOISEMAP database. Dr. Fidell apparently did not make any modifications to the NOISEMAP database to reflect the lower A-6 noise emissions found by HMMH.

6. In Dr. Fidell's report of September 30, 2005 and both revisions, he acknowledged that the "measure of greatest concern for evaluating aircraft noise impacts ('"Day-Night Average Sound Level"'…) is by definition a 24-hour measure…." (Page 3). Later, in the same report, he noted that …"the state of the art of aircraft exposure modeling has advanced over the last three decades." (Page 4).

7. Following the passage of the Noise Control Act of 1972, the Environmental Protection Agency developed and adopted DNL as the standard method for environmental noise measurement in Federal projects and introduced it widely in its publication, Information on Levels of Environmental Noise Requisite to Protect Public Health and Welfare with an Adequate Margin of Safety (1974). DNL is based on A-weighted sound levels. A-weighted sound levels are used as the basis for all evaluation of environmental noise by Federal agencies. Except for the Federal Highway Administration, all Federal agencies including the DOD and FAA use the DNL to characterize long term noise exposure

8. In his second revised report, dated March 29, 2006, Dr. Fidell inexplicably reverted to "Tone Corrected Perceived Noise Level" (PNLT) and "Tone Corrected Sound Exposure Level" methods of measurement for individual events, method not previously used in any of his earlier reports in this case. PNL was first developed in the 1950's by K.D. Kryter as a scale of perceived "noisiness." Later, Kryter modified the methodology to include discrete frequency components or tones. The latter was known as PNLT.

9. PNLT never achieved any use other than for aircraft noise. It has not been used extensively since the adoption of the DNL by Federal agencies. The A-weighted DNL for long-term exposure and A-weighted sound exposure level for event have been

accepted and supported by Federal agencies as the most appropriate methods for measuring aircraft noise exposure in communities. A PNL measurement involves subjective evaluations of "noisiness."

10. Dr. Fidell's introduction of the PNLT metrics for the first time is an apparent effort to show a different relationship in the sound level of individual events among various aircraft including the A-6, F-4, F-14, and F/A-18 C/D aircraft, inconsistent with the A-weighted sound levels that were the basis for the 1998 Final Environmental Impact Statement published in support of the deployment of the F/A-18 C/D aircraft to NAS Oceana from Cecil Field, Florida. Given the belated change in methodology, particularly a methodology that has not been used for AICUZ noise contours of military airfields in over 25 years, the basis for an eleventh hour change in methodology, and the meaningfulness of the purported tone-corrected comparisons among the various aircraft, is questionable.

11. The data for the "Pattern" operation of the F-4C is taken from a different source than the other data which may be inconsistent. It is not clear whether the data for the A6-A used by Dr. Fidel is the same data that HMMH found to be higher than actual observations in their report of 1982 noise exposure.

12. Irrespective of the ultimate conclusion regarding the noise levels of these military aircraft, the gross number of operations each year is an insufficient basis upon which to compare the impact of aircraft noise on the test case plaintiffs' homes. In order to conclude that the adverse noise impact on the test case plaintiffs' homes in 1981 was comparable to or greater than in 1999, one must know the type and number of aircraft operating over and in proximity to the test case plaintiffs' homes, the frequency of each

type of operation, such as field carrier landing practice (FCLP), touch and go, and similar intensive operations, and the air-to-ground noise level of each aircraft in each type of operation. Without knowing the number of times an F-4 or A-6 aircraft passed over or in proximity to a test case plaintiffs' home in 1981, and the number of those flights which were of a particularly intensive nature, it is impossible to draw any conclusions about the exposure or impact in 1981.

I HEREBY DECLARE, UNDER PENALTY OF PERJURY, PURSUANT TO 28 U.S.C. 1746 THAT THE FOREGOING DECLARATION IS TRUE TO THE BEST OF MY KNOWLEDGE AND BELIEF.

Date: May 23, 2006

Dr. Noral D. Stewart

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| VIVIAN'S ISLAND *et al.* , | ) |
| | ) |
| | ) |
| Plaintiffs, | ) Civil No. 02-756L |
| | ) |
| v. | ) |
| | ) DECLARATION OF |
| THE UNITED STATES OF AMERICA, | ) SANFORD FIDELL |
| | ) |
| Defendant | ) |
| | ) |
| | ) |

I, Sanford Fidell, state:

1. I have been engaged by the U.S. Department of Justice to provide consultation and, if required, expert witness testimony in the above captioned case, Vivian's Island et al. v. United States. I have prepared an Expert Report based upon my review and analysis of various documents related to this litigation. This Declaration summarizes several issues related to the history and nature of military aircraft noise exposure on Vivian's Island, including

   - the stability of flight patterns in the vicinity of Vivian's Island;
   - annual numbers of aircraft operations on these patterns; and
   - the relative noisiness of F-4 and F/A-18 aircraft that have operated at MCAS Beaufort at various times during the last three decades.

Additional detail concerning these and related matters may be found in my Expert Report prepared for the present litigation.

2. I have conducted research on the effects of environmental noise on individuals and communities since the 1960s. This research has included both laboratory and field studies of the effects of noise on people, such as speech interference, sleep disturbance, annoyance, complaints, hearing damage, and extra-auditory physiological *sequelae*, as well as effects of aircraft noise exposure on property values. I have also consulted on matters of environmental noise measurement and noise impact prediction for local and federal government agencies, airport proprietors, trade associations, citizens' groups, environmental protection organizations, and other parties concerned with evaluating community noise impacts. I have provided expert witness testimony in a number of federal proceedings, including Branning v. United States, 654 F.2d 88 (Ct. Cl. 1981). My professional experience is summarized in my résumé, contained in Exhibit A.



PENGAD-Bayonne, N.J.
DEFENDANT'S EXHIBIT 3

## 3. VARIATION IN ANNUAL AIRCRAFT OPERATIONS AT MCAS BEAUFORT

Table 1 shows gross numbers of aircraft operations at MCAS Beaufort by year between 1985 and 2002. Total operations at the airfield have varied by a factor of about 2:1 during this time period, waxing and waning from more than 100,000 per year in the 1980s, to as few as 44,528 in 1999. This pattern of variability in annual operational levels is commonplace at military airfields; has been characteristic of MCAS Beaufort since its initial establishment in 1943; and is unlikely to change in years to come.

**Table 1** Annual gross numbers of aircraft operations at MCAS Beaufort.

| YEAR | TOTAL OPERATIONS AT MCAS BEAUFORT |
|---|---|
| 1985 | 98,315 |
| 1986 | 104,404* |
| 1987 | 47,301 |
| 1988 | 79,535 |
| 1989 | 69,029 |
| 1990 | (no information) |
| 1991 | 47,405 |
| 1992 | 51,004 |
| 1993 | 53,504 |
| 1994 | 72,128 |
| 1995 | 62,971 |
| 1996 | 69,775 |
| 1997 | 61,278 |
| 1998 | 53,778 |
| 1999 | 44,528 |
| 2000 | 51,492 |
| 2001 | 45,237 |
| 2002 | 48,654 |

* Estimated by doubling six-month count

## 4. STABILITY OF FLIGHT PATTERNS WHICH DOMINATE THE NOISE EXPOSURE OF VIVIAN'S ISLAND

Aircraft noise exposure on Vivian's Island is controlled by actual numbers and times of day of a small subset of all flight operations at MCAS Beaufort: specifically, those occurring on FCLP[1] flight tracks from Runway 23. The island's noise exposure is not closely related to gross annual numbers of operations at the airfield, nor to numbers of fighter squadrons, nor to total numbers of aircraft assigned to MCAS Beaufort. Operations on other flight tracks, and by aircraft types other than those that fly on tracks that do not pass near Vivian's Island, contribute little additional noise to the island's exposure.

Aircraft on FCLP, touch and go, and overhead break flight tracks overfly Vivian's Island at altitudes as low as 600 to 1,000 feet above ground level. These pattern altitudes have remained constant since at least 1976.[2] Touch and go and overhead break operations are conducted on a daily basis. FCLP operations, the primary determinant of aircraft noise exposure on Vivian's Island, occur only episodically, and are concentrated over the course of the year into a few periods of two to three weeks.

## 5. FIGHTER AIRCRAFT ACTIVITY AT MCAS BEAUFORT, 1993-2003

The 115th, 122nd, 224th, 251st, 312th, 332nd, and 533rd Marine Corps F/A-18 squadrons have been continuously assigned to MCAS Beaufort during the period from 1993 to the present. Another squadron (the 451st,first assigned to MCAS Beaufort in 1963), was deactivated in 1997. Yet another squadron, the 333rd, first assigned to MCAS Beaufort in 1958, was deactivated in 1992, prior to the initial purchase of Vivian's Island by one of the Plaintiffs. The Navy's 82nd and 86th squadrons have been assigned to MCAS Beaufort from April of 2000 to the present.

The nominal "assignment" of a squadron to MCAS Beaufort in a given year does not imply that all twelve of its aircraft regularly fly from the airfield. Not all aircraft of each squadron fly during each month of the year, and one or more squadrons are typically deployed elsewhere for periods of months at a time. Furthermore, the number of squadrons and types of fighter aircraft flown from MCAS Beaufort vary over time.

On or about the time of one Plaintiff's 1993 purchase of land on Vivian's Island, eight squadrons of F/A-18 fighters (a total of 96 aircraft in the Marine Corps 115th, 122nd, 224th, 251st, 312th, 332nd, 451st, and 533rd squadrons) were assigned to MCAS Beaufort. These squadron assignments continued for six more years (with the exception of the 451st, which was deactivated in 1997), until two more squadrons of F/A-18s (the Navy's 82nd and 86th squadrons), for a total of 108 fighter aircraft, were assigned to MCAS Beaufort in 2000, following the closure of Cecil Field.

Table 2 summarizes quarterly numbers of F/A-18 aircraft: those that actually fly the touch-and-go, overhead break, and FCLP flight tracks from Runway 23 that dominate the noise exposure of Vivian's Island. Column 3 of Table 2 shows the number of such aircraft actually operating at MCAS Beaufort during each

---

[1] FCLP is an abbreviation for Field Carrier Landing Practice (formerly known as Field Mirror Landing Practice), a form of precision touch-and-go exercise in which pilots practice the procedures necessary to land on an aircraft carrier at sea.

[2] *cf.* page C-22 of the AICUZ Study prepared by Burns & McDonnell for the Southern Division of the Naval Facilities Engineering Command in 1976.

**Table 2** Quarterly numbers of F/A-18 aircraft-months per quarter and FCLP operations on Runway 23 at MCAS Beaufort

| YEAR | QUARTER | F/A-18 AIRCRAFT-MONTHS PER QUARTER | NUMBER OF FCLP OPERATIONS PER QUARTER |
|---|---|---|---|
| 1996 | 1 | 168 | 1593 |
| | 2 | 234 | 958 |
| | 3 | 201 | 1454 |
| | 4 | 200 | 1440 |
| 1997 | 1 | 152 | 586 |
| | 2 | 134 | 424 |
| | 3 | 224 | 622 |
| | 4 | 202 | 0 |
| 1998 | 1 | 167 | 1000 |
| | 2 | 203 | 1340 |
| | 3 | 158 | 96 |
| | 4 | 124 | 982 |
| 1999 | 1 | 105 | 728 |
| | 2 | 165 | 1428 |
| | 3 | 194 | 348 |
| | 4 | 172 | 12 |
| 2000 | 1 | 133 | 744 |
| | 2 | 275 | 664 |
| | 3 | 248 | 1318 |
| | 4 | 228 | 1268 |
| 2001 | 1 | 154 | 1837 |
| | 2 | 191 | 2370 |
| | 3 | 216 | 802 |
| | 4 | 180 | 50 |
| 2002 | 1 | 143 | 615 |
| | 2 | 252 | 397 |
| | 3 | 212 | 558 |
| | 4 | 267 | 1117 |

calendar quarter, in units of aircraft-months per quarter.[3] Column 4 of Table 2 shows the number of FCLPs flown during each quarter by all of the F/A-18 aircraft operating from the air station.

Note that both the the numbers of F/A-18 operating at MCAS Beaufort per quarter and the numbers of FCLP operations flown per quarter fluctuate widely from one calendar quarter to the next: from as few as 105 F/A-18 months per quarter in the first quarter of 1999, to as many as 275 F/A-18 months per quarter in the second quarter of 2000; and from no FCLPs whatsoever in the fourth quarter of 1997, to 2370 in the second quarter of the 2001. The peaks in numbers of F/A-18 aircraft months per quarter and in numbers of FCLPs do not line up with one another, however. For example, there were fewer F/A-18 aircraft-months at MCAS Beaufort in the quarter with the greatest number of FCLPs than in the quarter with no FCLPs at all.

In fact, the statistical correlation between numbers of aircraft months per quarter and numbers of FCLPs conducted within calendar quarters is very nearly zero ($r = 0.07$). This means that the number of F/A-18s operating at MCA Beaufort in any given calendar quarter has no statistically significant association with numbers of FCLP operations. In other words, no historically meaningful relationship exists between numbers of F/A-18 aircraft that have been assigned to MCAS Beaufort and numbers of FCLP operations flown in airspace near Vivian's Island. Since FCLP operations are the primary determinant of aircraft noise exposure on Vivian's Island, the record simply does not support allegations of sustained, substantial increases in noise levels of flights directly over the property of the Plaintiff following the nominal assignment of the Navy's 82nd and 86th F/A-18 squadrons to MCAS Beaufort.

## 6. NOISEMAP-BASED ESTIMATES OF MILITARY AIRCRAFT NOISE ON VIVIAN'S ISLAND

### a. ESTIMATION OF PAST AIRCRAFT NOISE EXPOSURE LEVELS

NOISEMAP is the computer program on which the Department of Defense relies to estimate the geographic distribution of aircraft noise exposure levels in the vicinity of military airfields. The program operates on input files that specify numbers, types of aircraft; types of operations, times of day of operation, flight paths, and other factors that affect cumulative noise exposure levels under annual average busy day conditions[4]. Originally developed in the early 1970s, this software may be used not only to produce noise exposure contours, but also to estimate noise levels at particular locations.

Several sets of environmental disclosure documents created since the mid-1970s contain maps and drawings that superimpose aircraft noise exposure contours produced by NOISEMAP in 5 dB intervals over base maps of areas near MCAS Beaufort. Although approximate noise exposure levels on Vivian's Island may be inferred from these maps, independent estimates were made to develop more precise point estimates of DNL values at the centroid of Vivian's Island during specific years on the basis of information contained in the public record. These are shown in Table 3.

---

[3] Each F/A-18 actually flying at MCAS Beaufort generates three aircraft-months per quarter.

[4] AICUZ studies calculate noise exposure for "average busy day" conditions, which omit consideration of weekend and holiday periods, when military flight operations rarely occur. This is done to avoid misinforming the public about characteristic noise levels during operational periods.

**Table 3** Estimates of DNL values at centroid of Vivian's Island due to operations of dominant aircraft operating on flight tracks overlying the island.

| YEAR | FIGHTER AIRCRAFT ASSIGNED TO MCAS BEAUFORT | TOTAL ANNUAL OPERATIONS (ALL AIRCRAFT) AT MCAS BEAUFORT | BASIS OF ESTIMATE | ESTIMATED DNL AT CENTROID OF VIVIAN'S ISLAND (dB) |
|---|---|---|---|---|
| 1976 | 60 (5 F-4 squadrons) | 138,420 | Inference from CNR value | 80 |
| 1986 | 72 (6 F-18 squadrons) | 52,202 | NOISEMAP 6.5 calculation | 69.4 |
| 1989 | 72 (6 F-18 squadrons) | 69,029 | NOISEMAP 6.5 calculation | 66.8 |
| 1994 | 96 (8 F-18 squadrons) | 72,128 | NOISEMAP 6.5 calculation | 78.4 |
| 2000 | 108 (9 F-18 squadrons) | 51,492 | NOISEMAP 7.0 calculation | 77.9 |

Input files used by the Marine Corps in preparing environmental disclosure documentation using earlier versions of NOISEMAP were located and edited to run in the current release of NOISEMAP (Version 6.5). The software was used to estimate DNL values at the centroid of Vivian's Island for several of the cases noted in Table 3. Version 7.0 of NOISEMAP was used to estimate a DNL value on Vivian's Island for the most recent (calendar year 2000) case. It is noteworthy that the military aircraft noise exposure of Vivian's Island in calendar year 2000, during which nine squadrons of F/A-18 aircraft were assigned to MCAS Beaufort, remained somewhat lower than it had been in 1976, when only five squadrons of F-4s were assigned to the facility.

## b. COMPARISON OF F-4 AND F/A-18 AIRCRAFT SIZE AND NOISE EMISSIONS

### i. COMPARISON OF AIRCRAFT SIZE SPECIFICATIONS

According to Jane's "All the World's Aircraft", the F-4 Phantom aircraft was designed as a large, multi-role, two-seat fighter aircraft, powered by two General Electric J-79 jet engines that were developed in the mid-1950s. The F-4 was first flown in May of 1958. By the time that production ended in 1981, more than 5,000 F-4s had been delivered to U.S. and other armed forces. F-4 squadrons operated at MCAS Beaufort as late as the early 1980s.

The F/A-18 aircraft, first flown in November of 1978 (two decades after the development of the F-4), was designed as a low cost, lightweight replacement for the F-4. The aircraft is powered by more modern GE-404 turbofan engines. The F/A-18 went into service with the U.S. armed forces in 1982, replacing all of the F-4 aircraft in squadrons assigned to MCAS Beaufort by 1986.

Table 4, comparing general dimensions and weights of the two aircraft, indicates that the F-4, an aircraft 20 years older than the F/A-18, is a considerably larger and heavier aircraft. Since engine power in fighter aircraft scales directly with size and weight, and engine noise scales directly with power, it is hardly surprising that the larger and heavier fighter aircraft produced more noise than the smaller and lighter one.

### ii. COMPARISON OF AIRCRAFT NOISE EMISSIONS

The Omega 6 database of aircraft noise measurements referenced in Version 6.5 of the Department of Defense's NOISEMAP software contains empirical measurements of F-4 and F/A-18 aircraft noise emissions. Noise emissions of all aircraft depend on flight regime, aircraft configuration, weight, and power setting. For example, all aircraft produce more noise on takeoff than on landing. Meaningful comparisons of the noise emissions of different aircraft can therefore be made only under comparable flight conditions. Table 5 summarizes the noise levels on Vivian's Island that the NOISEMAP software predicts for F-4 and F/A-18 aircraft under flight conditions characteristic of operations in the FCLP pattern from Runway 23.

**Table 4** **Comparison of F-4 and F/A-18 aircraft size specifications**

| SPECIFICATION | F-4 | F/A-18 |
|---|---|---|
| Empty weight | 29,500 lbs | 23,782 |
| Maximum takeoff weight | 58,000 lbs | 36,632 lbs (fighter mission); 51,790 lbs (attack mission) |
| Overall length | 63 ft | 56 ft |
| Height | 16 ft | 15.3 ft |
| Wing Area | 530 ft² | 400 ft² (F/A-18 C/D) |

Table 5 shows that flight operations by the older, noisier and heavier F-4 aircraft formerly assigned to MCAS Beaufort produced levels on Vivian's Island that exceeded those currently produced by F/A-18 aircraft by more than an order of magnitude.

**Table 5** **Comparison of F-4 and F/A-18 nose emissions**

| NOISE METRIC | F-4 | F/A-18 | DIFFERENCE (F-4 - F/A-18) |
|---|---|---|---|
| Perceived Noise Level | 112.2 dB | 101.2 dB | 11 dB |
| Maximum A-Level | 101.3 dB | 89.6 dB | 11.7 dB |
| Sound Exposure Level | 106.7 dB | 93.3 dB | 13.4 dB |
| Tone Correction | 2.3 dB | 1.0 dB | 1.3 dB |

To a first approximation, the loudness of a sound doubles when its level increases by 10 dB. Since a factor of ten (10 dB) difference in sound level is equivalent to a factor of two in loudness, the noise produced on Vivian's Island by a single F/A-18 in the FCLP pattern above Vivian's Island today would be perceived as less than **half** as loud as that formerly produced by a single F-4 aircraft in the same flight pattern. A difference of a factor of two in the loudness of two successive aircraft overflights would be readily noticeable to even a casual observer on Vivian's Island.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 12, 2004 in Los Angeles, California

Sanford Fidell

# REPORT OF SANFORD FIDELL

## IN VIVIAN'S ISLAND *et al.* *v.* THE UNITED STATES OF AMERICA
## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
## CIVIL COMPLAINT 02-756L

25 November 2003

Prepared for:

**U.S. DEPARTMENT OF JUSTICE**
Environment and Natural Resources Division
601 D Street, NW
Washington, D.C. 20004

Prepared by:

Sanford Fidell
**FIDELL ASSOCIATES, INC.**
23139 Erwin Street
Woodland Hills, California 91367

# 1 INTRODUCTION AND SUMMARY

## 1.1 PURPOSE OF THIS REPORT

This report presents technical opinions developed following review of materials pertinent to Civil Complaint 02-756L in the United States Court of Federal Claims (Vivian's Island, Inc. *et al. v.* the United States of America, filed July 1, 2002), and from reconstruction of historical aircraft noise exposure levels on Vivian's Island. To clarify the bases for these technical opinion, the report also includes an Appendix that discusses the measurement of aircraft noise, the effects of environmental noise exposure on people, and the general effects of aircraft noise on property values.

## 1.2 SUMMARY OF OPINIONS

In my opinion, the purpose for which Plaintiffs acquired property on Vivian's Island, South Carolina — "developing lots for single family residences"[1] — has long been incompatible with military aircraft noise exposure produced by flight operations at the Marine Corps Air Station (MCAS) Beaufort. More specifically,

- Even though the number of squadrons of fighter aircraft stationed at MCAS Beaufort, the number of annual operations conducted by these aircraft, and the resulting levels of military aircraft noise exposure have fluctuated over the years, Vivian's Island has been consistently exposed to Day-Night Average Sound Levels (DNL) in excess of 65 dB for decades. Touch and go, overhead break, and Field Carrier Landing Practice (FCLP) operations at MCAS Beaufort have been conducted on the same flight tracks and at the same altitudes in airspace overlying Vivian's Island since at least 1980.

- Federal policy has considered DNL values of noise exposure in excess of 65 dB to be incompatible with single family residential land uses for more than twenty years. At no time in the last quarter century has annual military aircraft noise exposure on Vivian's Island been compatible with low density residential land uses.

- Both the total numbers of aircraft operations at MCAS Beaufort and the actual military aircraft noise exposure on Vivian's Island have declined from the time that Plaintiffs acquired property on Vivian's Island to recent years: from 72,128 total operations and a DNL of 78.4 dB in 1994 (the first full year following the initial purchase of Vivian's Island property by one Plaintiff), to 51,492 total operations and a DNL of 77.9 dB in 2000 (the year of the alleged taking).

[1] See paragraph 8 of Plaintiff's Complaint


Test Plaintiffs and Non-Plaintiff Witnesses
Virginia Beach, Virginia
Goodwin
Shick
Levenson
McCreary
Youngberg
Stokely
Askins
May
Lindsay
Nash
Capps
Helvie
Lynch (Hoag)
Dingle
Darling
Van Nostrand
Figari
Hill
Johnson (Blasdell)
Ryan
Riddick
Leary
Waterman
Legend
Plaintiffs
Witnesses
Oceana NAS
Roads
0
0.5
1
1.5
2
Miles

00001

OCEANA - CITY COUNCIL

TAPE 1

(Pages: 1-67)

Transcribed by:

Alfred A. Betz, Notary Public, RPR

CAPTAIN THOMAS KEELEY: Good evening, Madam Mayor, City Council members. My name is Tom Keeley and on behalf of Rear Admiral Turcotte, Commander Navy region Mid-Atlantic, I'm here to present you a brief on some issues that the Mayor invited us here to talk about concerning naval aviation and urban growth here throughout the region, not only here in Virginia Beach.

Can I ask that you please hold your questions until the end of the brief. I'll pass out a flier and booklet to go over some more information. I'll gladly go back to any slide and discuss it if you wish but I'd just like to begin.

The issue at hand here is the urbanization and the strategic viability of Naval Air Station Oceana to carry out its assigned mission, whatever that mission may be. We also have to consider if we curtail essential training, we're not able to meet our mission requirements and if we have future mission changes.

I think you're all aware what the Navy is

Last year we had over 200,000 operations at Oceana. Over 100,000 operations came down this track to land at runway 23. Aircraft on an instrument approach will come overhead this development. If it's a Hornet the db level will be 108 db. Now, remember that's 60 is normal speech, 110 is a concert. Day and night that could occur.

So we recommend that this type of development not be built there due to the density and due to the health, safety and welfare issue of anybody that would be there.

Right now because of the ordinances that the city has adopted the developer could put a hotel there. They could build a hotel. Looking at AICUZ again we go back to the density issue. Hotels do not have permanent residents. Since they would be transient that would keep down the number of people. And that's how we apply that criteria when we look to the program. So that's the issue on a redevelopment aspect.

On a development aspect from the city's

```
ERROR: undefined
OFFENDING COMMAND: get

STACK:

/quit
-dictionary-
-mark-
```

9 February 1995

To "Anderson,Pamela P", "Reuther,John M", "Stephenson,Kent D"
Cc "Shepherd,David S", "Walker,Charles W"
From Cecchini, J Daniel
Subject. EIS Issues
Date 1/9/96 Time 10 36AM

In addition to discussing the alternatives write-up for the EIS this morning at 1030 in Dave's office, other issues need to be discussed/resolved (based on a conference call with E&E yesterday)

1 One of the bigger themes brought up in the scoping meetings in NC was the impact the jets would have on water quality/fisheries/wildlife within the bombing ranges Tom Tosta (Local fisherman) indicated that (1) small plastic parachutes used by the military get caught in his nets and that turtles and other marine life ingest the parachutes and die, (2) water quality around the ranges is poor due to bombing and resultant burning, (3) waterfowl are adversely affected by bombing operations, (4) destruction of wetlands as a result of bombing

NO Data

only gave validity in L

I will get a copy of water quality report from Dave Cotnoir and will ensure that we do not have to do any additional testing Also, Bill Rogers at Cherry Point has assured my that waterfowl study starts four years ago will be finished by 31 January 96 As for other issues associated with the ranges, my feeling is that if we can get numbers to show that the projected use of BT-9/11, Dare for 1998 is similar to use in 1990, and that we are introducing no new types of aircraft, etc , then there is no "change" in use of the ranges per say The reality of the situation is that most issues associated with the ranges are on-going issues that have been and will continue to be issues with the locals in eastern NC.

2 Consultant needs background information on Dare County (terrestrial descriptions, etc ) . Geomarine

I will obtain this information from ~~Brian Hoessster~~ and give to E&E.

3 Consultant is worried about wetland impacts to ditches behind simulator building and over by the proposed hush house (even though hush house is currently not included in the EIS as a project)

John Evans from the COE came out to look at ditches last week and said they do not qualify as "Waters of the US" and that filling/moving would not require a permit.

16 Jan at best in week ?

4 Are noise contours going to be received by ~~12~~ Janauary? Even if received by 12 January, consultant will need an additional week to get draft DEIS out to us (this will push devivery date back to 2 February which in turn gives the Navy only two weeks to get comments back to E&E). If noise contours are delayed (which may happen because of snow storm), draft DEIS will probably be delayed as well. Also, Wyle conducted noise monitoring for F-14s and F/A-18s for their studyn (I believe to calibrate their model). If so, E&E needs to include a discussion of this in the EIS Bottom line. E&E would like to have a little more than contours on 12 January.

*what is absolute minimum time needed to incorp. data

I don't think anyone is in D C to check on status of noise contours. I have no problem giving E&E another week We will just have to make sure we contact all DEIS reviewers and let them know that they will have one week to read/comment on DEIS and the following week we will need to have a tiger team meeting at Oceana to go over all comments When we actually talk to someone in DC (Jim Nordberg/Alan/Wyle), we can check to see if they can provide us some lingo on their assumptions, background, and the testing that they did this time.

5. According to analysis by E&E, without BEQ, NAS Oceana will have a 650 bed shortfall. Where is Oceana planning to put these people? → Potentially get BEQ in 99 milcon, RJ briefing Shore Board.
* Short term - on the house E1-E4s Move from Norfolk to Oceana.
Need to get with Ed Miller to find out.

6 Air Quality It appears that we should be under the de minimus threshold for VOCs, however, we may ~~have a~~ problem with NOx. We will be receiving draft conformity review on 19 January

Dist. when received

I will get copy of review to Steve Martin and Igrid Ward (Oceana) for them to review and scrub We may have to play with some of our assumptions to make things come under the de minimus threshold (and I don't know if it is possible) Bottom line, this is something we have to watch

7 E&E would like an update on any corrective measures that were taken at Oceana to handle flying on incorrect flight tracks, receiving complaints, etc. They would like to include this in DEIS. Also, as a side note, the guy out by Fentress called me and left a message on my voice mail only you could barely hear him for the aircraft buzzing his house (according to him at Chimney top level) Obviously, corrective measures (if even implemented) may not be working As of 16 Jan - have a portable TACAN installed at Fentress- testing

We need to get in tough with Ed Miller to discuss #7

over

8 E&E is concerned about issue raised about conflicts with Dare County Airport How do they handle

My feeling is that Larry Pickett is the person they need to be talking to According to him, there are no conflicts at Dare Airport and that air travel is safe in the area Any ideas??

9 E&E needs any updated site plans for projects at Oceana Do we have any 35% designs?? They are going to have to go with original "site plans" is they do not receive anything else They need these soon

Larry Pickett / VACAPES

1990 #s

Check with 201 on this.

10. Scoping raised the issue of the Upper Wolfsnare house adjacent to Oceana Is this on the National Register? If so, we may need to initiate consultation with SHPO.

I will check with Bruce on this issue

Summary. I have to get some answers to E&E ASAP I have a follow-up call with them tommorrow at 1300
Dan

01 Oct 2004

United States Naval Air Station Oceana
Virginia Beach, Virginia
Air Traffic Control Facility

Subj: AIR TRAFFIC CONTROL FACILITY MANUAL

Ref: (a) NAVAIR 00-80T-114

1. Purpose. To promulgate subject manual as set forth under the provisions of reference (a).

2. Cancellation. NAS Oceana Facility Manual dated 10 April 2003.

3. Scope. This manual addresses Air Traffic Control matters at Naval Air Station Oceana, Virginia. It is applicable to all personnel assigned to the Air Traffic Control Facility. No attempt has been made to consolidate all required information into this text; therefore, controllers shall be tested on and make maximum use of all other source material referenced in this manual.

B. A. POLK

DISTRIBUTION:

CNO (N785F)
COMNAVAIRLANT (2)(N37)
CO NAS OCEANA
NASO AIR OPERATIONS (2)
NAVREP EAST
NAVREP SOUTH
NATTC PENSACOLA
SPAWARSYSCEN CHARLESTON (31M)

# TABLE OF CONTENTS


| CHAPTER NUMBER | | PAGE # |
|---|---|---|
| **Chapter 1** | General. | 1-1 |
| | Section 1. General Information | 1-1 |
| | Section 2. General Safety | 1-3 |
| **Chapter 2** | Facility Administration. | 2-1 |
| **Chapter 3** | Training | 3-1 |
| **Chapter 4** | Air Traffic Control Facility Equipment. | 4-1 |
| **Chapter 5** | Control Tower. | 5-1 |
| | Section 1. General Information | 5-1 |
| | Section 2. Flight Data | 5-10 |
| | Section 3. Ground Control | 5-13 |
| | Section 4. Local Control | 5-17 |
| | Section 5. Tower Supervisor | 5-26 |
| **Chapter 6** | Radar | 6-1 |
| | Section 1. General Information | 6-1 |
| | Section 2. Radar Final Control | 6-10 |
| | Section 3. Approach/Arrival Control | 6-20 |
| | Section 4. Radar Supervisor | 6-24 |
| **Chapter 7** | Flight Planning | 7-1 |
| **Chapter 8** | Facility Watch Supervisor | 8-1 |

Appendix A1, A2 . . . . . . . . . . . . . . . . . . Airfield diagram
Appendix B1- B7 . . . . . . . . . . . . . . . . . . Strip marking
Appendix C . . . . . . . . . . . . . . . . . . . . Location ID's
Appendix D . . . . . . . . . . . . . . . . . . . . 60NM Map
Appendix E1-E2. . . . . . . . . . . . . . . . . . . MVA Map
Appendix F1-F2. . . . . . . . . . . . . . . . . . . Approach Airspace
Appendix G . . . . . . . . . . . . . . . . . . . . Arrival Airspace
Appendix H . . . . . . . . FDIO Abbreviated and Tactical Callsigns
Appendix I . . . . . . . . . .(Initial) Mentor Counseling Record
Appendix J . . . . . . . . . .(Quarterly) Mentor Counseling Record
Appendix K . . . . . . . . . . . . . . . Local Frequency Button Plan

of the runway.

| | |
|---|---|
| F14/FA18/EA6 | 3000 |
| Any type following AV8 | 6000 |
| S3/E2/C2/T34/C12 following USN/USMC tactical jet | 3000 |

All others according to FAAH 7110.65 Same Runway Separation.

NOTE: Reduced runway separation may be applied to a touch-and-go following a full-stop using the criteria above.

2. IMC (less than 1000/3) The following criteria may be applied during IFR conditions greater than the highest published circling minimums for the aircraft involved provided the runway is dry and the local controller can maintain visual reference to the entire runway.

| | |
|---|---|
| F14/FA18/EA6 | 6000 |
| S3/E2/C2/C12/T34 following USN/USMC tactical jet | 6000 |
| Any type following AV8 | 6000 |

All others according to FAAH 7110.65 Same Runway Separation.

**5406. MAXIMUM CROSSWIND COMPONENT.**

A. F-14 20 knots at 90 degrees

B. F/A-18 20 knots at 90 degrees

C. C-2 21 knots at 90 degrees (waiverable by the pilot)

D. E-2 22 knots at 90 degrees

**5407. FIELD CARRIER LANDING PRACTICE.**

A. FCLP conducted at NTU shall be in compliance with NASOCEANAINST 3710.1.

B. Squadron LSO shall be briefed by the Tower Supervisor or FWS.

C. Once airborne and sequenced, aircraft shall contact "Paddles" on 363.1 or other frequency as assigned.

**Note:** During FCLP'S on runway 5 aircraft should avoid extending the pattern upwind beyond Oceana Blvd. Occasional extensions to facilitate separation or sequencing will be at the discretion of the local controller or LSO. If traffic saturation requires aircraft to extend excessively beyond Oceana Blvd, it is the prerogative of the Tower Supervisor to limit the number of aircraft in the pattern accordingly. If FCLP aircraft extend beyond Oceana Blvd with 3 or less in the pattern, the LSO shall instruct FCLP aircraft to "tighten the pattern". When 4 or more aircraft are in the pattern and extensions are unavoidable, The Tower Supervisor may make a courtesy advisory to the LSO "If able, make downwind turns prior to Oceana Blvd for noise abatement considerations".

**5407.1. NFE FCLP.**

DEPARTMENT OF THE NAVY
NAVAL AIR STATION OCEANA (23460-5120)
FIGHTER WING, U.S. ATLANTIC FLEET (23460-5200)
VIRGINIA BEACH, VIRGINIA

NAS Oceana
3124
Ser 00/2281
5 Dec 97

From: Commanding Officer, Naval Air Station Oceana
Commander, Fighter Wing, U.S. Atlantic Fleet
To: Office of the Assistant Secretary (Installation and Environment)

Draft was never sent

Subj: ENVIRONMENTAL IMPACT STATEMENT

1. The Field Carrier Landing Practice (FCLP) flight tracks presented in the Draft Environmental Impact Statement (DEIS) for the relocation of F/A-18 aircraft from Cecil Field, Florida to other East Coast installations are representative of the actual patterns flown at Naval Air Station (NAS) Oceana and other Naval air installations. The NAS Oceana patterns are virtually unchanged in over 20 years and have adequately accommodated less agile aircraft such as the A-6 Intruder and F-4 Phantom II.

2. Aircraft do not fly a fine line in the sky but fly within a corridor. Flight tracks define an average path of aircraft operations and are used in the formation of Accident Potential Zones (APZs). All flight tracks within 15,000 feet of the end of the runway (or flight tracks representing FCLP operations) and with over 5,000 annual operations rate an APZ. The proposed APZs in the DEIS accurately project the flight corridors at NAS Oceana and Naval Auxiliary Landing Field (NALF) Fentress.

3. The DEIS reflects the fact that we train the way we fly at sea. FCLP is flown 1.2 to 1.5 miles abeam of the runway - the same as actual patterns flown for carrier landings. As such, F-14 and F/A-18 pilots are trained to fly these patterns and their performance is no different than that of the fleet squadron pilots. All runways at NAS Oceana and runway 05 at NALF Fentress utilize the same pattern geometry. Only runway 23 at NALF Fentress is flown with a wider pattern which was established to accommodate residential development near the airfield. Because of the negative impact this pattern has on training, FCLP is performed on runway 05 whenever possible.

4. We are confident that the flight tracks shown in the DEIS accurately represent actual flying conditions at NAS Oceana and NALF Fentress.

T. F. ENRIGHT

S. E. BENSON

OPTIONAL FORM 99 (7-90)

**FAX TRANSMITTAL** # of pages ▶ 1

| To CAPT HOPPOCK | From FRED PIERSON |
|---|---|
| Dept./Agency | Phone # 433-3158 |
| Fax # 445-9514 | Fax # 433-2007 |

NSN 7540-01-317-7368 5099-101 GENERAL SERVICES ADMINISTRATION

OCE063233

AirOps

121

**DEPARTMENT OF THE NAVY**
NAVAL AIR STATION OCEANA
VIRGINIA BEACH, VIRGINIA 23460-5120

IN REPLY REFER TO
5726
Ser 00G/0765
April 30, 1998

The Honorable John Warner
United States Senate
4900 World Trade Center
Norfolk, VA 23510-1624

Dear Senator Warner,

This is in response to your recent letter on behalf of your constituent, Mr. Harold Lehman, regarding aircraft operations at Naval Auxiliary Landing Field (NALF) Fentress in Chesapeake, Virginia and at Naval Air Station (NAS) Oceana in Virginia Beach, Virginia. Mr. Lehman expressed concern over aircraft not adhering to the flight patterns, the Navy failing to respond to a letter and giving out misinformation, and aircraft failing to adhere to FAA altitude minimums. I recently called Mr. Lehman to discuss his concerns and we had a very cordial conversation.

Mr. Lehman lives less than 1,500 feet from the runway at NALF Fentress and adjacent to the approach corridor into NAS Oceana, in Noise Zone 3. Noise Zone 3 is the most intensive noise zone with a day-night average noise level (DNL) of 75 decibels or greater.

The operations impacting Mr. Lehman stem from normal airfield operations to the Ground Controlled Approach (GCA) pattern used to practice radar controlled approaches to NAS Oceana. Because of his homes close proximity to NALF Fentress, Mr. Lehman's house is frequently overflown. As you are aware, patterns are not fine lines in the sky and may vary due to aircraft type, configuration, pilot technique, controller workload and wind speed as well as the need to separate aircraft for flight safety. Obviously, Mr. Lehman will be impacted by any operation at Fentress and often from Oceana.

Mr. Lehman mentioned that his pastor (Mr. Harold Bergey) had sent a letter to the Commanding Officer at NAS Oceana two and one-half years ago. While we were unable to find the letter in our records, Mr. Bergey is in frequent contact with Chief Warrant Officer Doug Cheney, the Officer in Charge at NALF Fentress, and we are aware of his concerns, many we have addressed to his satisfaction. Mr. Lehman also felt the Navy may have mistakenly given the pastor an incorrect telephone number at the Chesapeake public hearing for the Final Environmental Impact Statement (FEIS) for the Relocation of F/A-18 Aircraft from NAS Cecil Field to other East Coast bases. The meeting transcript and the Navy's response to the pastor's comments in the FEIS show that Mr. Bergey was provided with the number for my Community Planning Liaison Officer, Mr. Fred Pierson, who serves as a liaison on noise and land use issues between the community and NAS Oceana.

In response to another concern voiced by Mr. Lehman, the following is provided. Federal Aviation Regulations require aircraft to maintain at least 1,000 feet altitude in congested areas and 500 feet altitude in rural areas (such as near NALF Fentress) except on takeoff and landing. The Navy, at a minimum, adheres to these altitudes and aircrews are acutely aware of the impact of noise on residents in the areas around Fentress. Additionally, the Navy has raised the minimum pattern altitude at NALF Fentress to 800 feet above mean sea level (MSL), but it is an active and extensively utilized facility and will continue as such.

NAS Oceana has an ongoing program to brief aircrews on noise abatement, ensuring that they are sensitive to our neighbors' concerns. The Navy strives to be a good neighbor and continues to work closely with the City of Virginia Beach and Chesapeake, as well as surrounding communities. While flight operations are essential to our mission, we will do all we can to mitigate impact of our operations on the community. Recently, we installed a TACAN - a navigation aid - at NALF Fentress to assist aircraft in maintaining a proper pattern during Field Carrier Landing Practice (FCLP). This new TACAN has resulted in a decrease in noise complaints from Chesapeake.

My Community Planning Liaison Officer, Mr. Fred Pierson, is available if you or Mr. Lehman have any further questions. He may be reached at 433-3158.

Thank you sir for your interest in this and all matters at Oceana. Yours is a widespread and most respected reputation at our nations largest air station.

Sincerely,

S. E. BENSON
Captain, U.S. Navy
Commanding Officer

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

Citizens Concerned About Jet Noise, Inc.,

Plaintiff,

v. Civil Action No. 2:98cv800

John Dalton, et al.,

Defendants.

**AFFIDAVIT**

I, John C. Shick, depose and say that:
[full name]

1. I am an adult resident of Virginia Beach, Virginia.
[City and State]

2. I have resided at 912 Duke of Suffolk Drive for a period of 31.
[street address] [number of years]

3. See attached sheet.

[Here, state your personal knowledge. Example: "Jet aircraft from Oceana fly at low levels directly over my home."]

[Continue the affidavit with the details of your knowledge, including, for example, the frequency of the noise, its intensity, and in what ways it disturbs your normal activities.]

[If your affidavit is addressed to statements made to you or in your presence by Navy officials, state the name, rank, and position of the official; the date and place the statement was made to you or in your presence; and the content of the statement.]

Under penalty of perjury as provided by federal law, I swear and affirm that the foregoing statements made by me are true and correct to the best of my knowledge.

Date: 11/24/98 John C. Shick
[Signature]

This document may be handwritten, but care must be taken to assure that it is fully legible.
Please mail your completed affidavit to CCAJN, 2004 Brickell Ct., Va. Beach, VA 23454

# AFFIDAVIT OF JOHN C. SHICK

The following issues are of concern to me regarding the decision to realign 156 additional F/A-18 C/D aircraft from NAS Cecil Field, FL. to NAS Oceana, VA.

1. My home is currently located in the middle of noise zone 2 (65-75 dB Ldn). As a consequence of the realignment my home will be on the border of noise zone 3 (75 dB Ldn and above). When weather and wind conditions require aircraft to use the north/south bearing runways, my home lies beneath a flight path commonly used. According to the AICUZ (Air Installation Compatible Use Zone) for NAS Oceana, however, my home is outside published flight paths. Thus, it is apparent that aircraft routinely fly outside published flight paths. In addition, these overflights are frequently below the minimum established 500 feet. I estimate that on numerous occasions they are as low as 250-300 feet. Further, according to the Draft Environmental Impact Statement, aircraft flight speeds during these training evolutions (touch and go and Field Carrier Landing Practice operations) are modeled to be conducted at air speeds between 150 and 250 kts. Again, as an estimate, I believe that they routinely exceed 300-350 kts, with many exceeding 400 kts. In a meeting held with Citizens Concerned About Jet Noise (CCAJN), Capt Eric Benson, Commanding Officer, NAS Oceana and his Community Planning Liaison Officer, Mr. Fred Pierson acknowledged that aircraft, on occasion, flew outside published flight profile parameters (i.e. at higher air speeds, lower altitudes, and off prescribed flight paths). The reason given was differences in experience and skill levels of the pilots and that for safety reasons they could not be flown differently, particularly with reference to flight speeds and flight paths.

2. As a consequence of these overflights, A-weighted decibel readings taken with a Sound Level Meter exceeded, on occasion, 107 dB outside my home and 85 dB inside. These overflights and the noise they generate disturb not only human occupants, but cause my dog and other pets to behave frantically.

3. During the meeting cited above, and at another meeting between CCAJN and NAS Oceana officials, as well as at the public hearing at the Virginia Beach Pavilion, Capt. Benson and Mr. Pierson, and hearing officials, in responding to a question as to why planes couldn't be moved from MCAS Beaufort to MCAS Cherry Point (or from MCAS Cherry Point to MCAS Beaufort) to create additional excess capacity for more F/A-18s at the losing activity, advised that BRAC 95 law prohibited such a move as part of the realignment and National Environmental Policy Act environmental impact statement development process.

4. Capt Benson and Mr. Pierson also advised that flight procedures effecting the local community could not be reviewed in advance of the final decision since any changes made to reduce the existing impact on these communities might unfairly influence that decision. Such a review, however is not mentioned in the FEIS.

John C. Shick

SENT BY:Xerox Telecopier 7020 ;12- 5-97 ; 13:20 ; 8044455959→ 757 322 6161;# 2
DEC-04-97 THU 01:34 PM CINCLANT N48 FAX NO. 7573226622 P. 01
DEC-04-97 09:38 FROM:ASN(I&E) (IF/EN) ID:7036962574 PAGE 1/1

DEPARTMENT OF THE NAVY
OFFICE OF THE ASSISTANT SECRETARY
(INSTALLATIONS AND ENVIRONMENT)
1000 NAVY PENTAGON
WASHINGTON, D.C. 20350-1000

12/4/97
Copy to: 44
44A
442
461

3 DEC 1997

MEMORANDUM FOR DEPUTY CHIEF OF NAVAL OPERATIONS (LOGISTICS)

SUBJECT: Cecil Field Environmental Impact Statement

Recently, the CINCLANTFLT Deputy Director, Shore Resources, raised a serious issue regarding the flight paths used in the Cecil Field Draft Environmental Impact Statement. In brief, the concern (as I understand it) is that the flight paths reflect flight patterns with turns significantly tighter than are actually being flown today and that are well beyond the capabilities of the students in the F-14 and F-18 Fleet Replacement Squadrons.

These flight paths form the basis for the DEIS noise and safety analyses; noise levels are the most significant environmental impact associated with the proposed action (especially at NAS Oceana, but also at MCAS Cherry Point and MCAS Beaufort). Expanded flight paths would probably expose more people to high noise levels and might also expand the accident potential zones.

This issue must be resolved before we can release the Final Environmental Impact Statement and it is in all of our interests to resolve it quickly. I would appreciate receiving a briefing covering your analysis of the issue, and your plan for resolving it, as soon as possible.

Duncan Holaday
Deputy Assistant Secretary
(Installations and Facilities)

Copy to:
AGC (I&E)
DASN(E&S)
N88
DCS/AVN
CNAL
CINCLANTFLT(N46)

Post-it™ brand fax transmittal memo 7671 | # of pages ▸ 1
To CDR Laubsiere | From Capt Rivera
Co. | Co. N462
Dept. | Phone #
Fax # 322-5957 | Fax #

FAX TRANSMITTAL | # of pages 1
To RADM Johnson | From Duncan Holaday
Dept./Agency | Phone #
Fax # 757-322-6897 | Fax #

12-12-97 ; 13:21 ;

223

OPTIONAL FORM 99 (7-90)

**FAX TRANSMITTAL** # of pages ► 4

| | |
|---|---|
| To CAPT RICCIO | From A. ZUSMAN |
| Dept./Agency N46 | Phone # |
| Fax # 757-322-5522 | Fax # |

NSN 7540-01-317-7368 5099-101 GENERAL SERVICES ADMINISTRATION

Post-it® brand fax transmittal memo 7671 # of pages ►

| | |
|---|---|
| To CAPT HOPPICK | From CAPT RICCIO |
| Co. AIRLANT | Co. CLF |
| Dept. | Phone # 322-7751 |
| Fax # 445-9514 | Fax # |

57200

Joe —

1. Here is our response to NAS Oceana ltr of 10 Dec 97 concerning changes to flight tracks. Bottom line — small changes and not significant

2. Note, NAS Oceana/Fleet/Wing previously signed off on modulated tracks as late as July 96.

3. Question RADM Smith wants answered is where are the planes flying. E.g. Figure 3-10 of Wyle Noise Report identifies T&Gs. We know that when the pattern is saturated, ATC usually extends downwind leg of the pattern. Need to have ATC look at track SLT1, for example, and say that when the pattern is saturated the downwind leg is extended X ft from that shown. Same kind of question applies to all tracks. In other words, what variability is there in the tracks?

[signature]

00001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - -

CAROLE and ROBERT TESTWUIDE, et )
al., )
Plaintiffs, )
) Case No. 01-201-l
vs. ) JUDGE WOLSKI
)
THE UNITED STATES OF AMERICA, )
Defendant. )

- - - - - - - - - - - - - - - - -

Thursday, April 7, 2005
9:00 a.m.

Videotaped deposition of JOSEPH J. CZECH, held at the law offices of Wyle Laboratories, Crystal Plaza I, 2001 Jefferson Davis Highway, Suite 701, Arlington, Virginia 22202, before Jonathan Wonnell, a Registered Professional Court Reporter and Notary Public of the Commonwealth of Virginia.

00058

Q. Okay. And the handwritten note, again -- I'll come back to Exhibit 5 separately. The handwritten note says note, "NAS Oceana, fleet" -- does that say "fleet," the next one?
A. "Fleet/wing."
Q. "Previously signed off on modeled tracks as late as July '96."
A. Yes.
Q. Do you know what that's referring to?
A. That was probably referring to the 96-3 report or the data package related thereto.
Q. Right. And they were the tracks you used as the baseline for 97-10?
A. (Nods head).
Q. Okay. And then the third one --
A. That's what we initially started with, yes.
Q. Right. And I understood there were some modifications that were sent over time?
A. Right. Correct.
Q. And then the third paragraph in the handwritten note, it talks about a question that an

admiral, a Rear Admiral Smith, has. Have you read that?

A. I'm reading it now. (Reading) Okay.

Q. Do you recall any questions about the accuracy of the flight tracks as to the actual flights that were being conducted at Oceana during this time period?

A. Was I aware of the accuracy?

Q. Or a question about the accuracy of the flight tracks.

A. Other than what -- these memos, no.

Q. In that paragraph 3, there's this -- Mr. Zusman I assume is writing that air traffic control extends downwind leg and that they would have to look, for example, at this flight track and tell you when it's extended and by how many feet and so forth. Do you recall that ever being done?

A. No. I don't believe it was.

Q. Do you recall any changes to the flight tracks to extend them for any reason because of saturation in the pattern?

A. May I look at this?

Q. Oh, sure. You can look at anything you'd like.

A. (Reading) Okay. I'm sorry. What was the question again?

Q. The question is do you recall whether there was any investigation into the accuracy of the flight tracks for, you know, variances, for instance, when the pattern is saturated?

A. I don't think there were.

Q. Okay. The last sentence Mr. Zusman writes "In other words, what variability is there in the tracks?" Do you recall making any investigation with air traffic control, for instance, whether the tracks were different than what was shown in the report?

A. Well, nothing more than them saying they represent nominal or average flight tracks. There is going to be some variability and they don't fly as lines in the sky but that basically the tracks shown are mean, you know, means of where they fly.

Q. After around this time in December 1997 do you recall making any further inquiries of air

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| CAROLE and ROBERT TESTWUIDE, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No.: 01-201L<br>(Honorable Victor J. Wolski) |

**PLAINTIFFS' PROPOSED FINDINGS OF UNCONTROVERTED FACTS IN OPPOSITION <u>TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>**

1. Oceana Naval Air Station is located in the densely populated community of Virginia Beach, Virginia. Oceana, at approximately 5,400 acres, is the Navy's smallest Master jet base. The next smallest, Miramar, is over 20,000 acres. Oceana's main facility consists of two paired 12,000 foot and two paired 8,000 foot runways. (Ex. 27, Excerpts from Wyle Laboratories, Aircraft Noise Study, February 1998, Report 97-10, Figure 2-1, February 1998, ("Wyle Report")). Fentress is located in the adjoining community of Chesapeake, Virginia. The combined population of these communities was approximately 545,045 in 1990 and 625,570 in 2000, according to census data. (Ex. 24, Excerpts pertaining to NAS Oceana and NALF Fentress from the Final Environmental Impact Statement for Realignment of F/A-18 C/D Aircraft ("EIS") at Table 3.1-22 at 3.1-99-100).

2. Air operations at Oceana are very different from civilian air operations. Navy pilots train for aircraft carrier operations at low altitudes and high speeds. Even within the military universe, Navy aircraft have their own unique operations that produce unique noise characteristics. Naval Aviation is by definition based in large part on aircraft carriers, not land-based airfields. Consequently Naval aircraft focus a significant amount of attention and resources

on the unique skill of landing on aircraft carriers. This training regimen is known as Field Carrier Landing Practice ("FCLP").

3. FCLP operations have been accurately described, using slightly different nomenclature, in *Branning v United States,* 228 Ct. Cl. 240, 244, 654 F.2d 88, 91 (1981) as follows:

> One type of training conducted on and around the station consists of practice landings and takeoffs designed to simulate aircraft carrier takeoffs and landings. One type of operation is referred to as "field mirror landing practice" (FMLP). In the course of such operation, the prescribed flight pattern requires the trainees to take off from the runway on the station and then fly defendant's aircraft directly over plaintiffs property in a "racetrack pattern" at an altitude of 600 feet above ground level (AGL) and return to the runway. The pattern is repeated by each aircraft several times, the training exercise being conducted squadron-by-squadron (and virtually nose-to-tail at 25 to 30 second intervals) over a period of several days during each month in which training is conducted.

4. The FCLP flight pattern at Oceana is supposed to be flown at a maximum altitude of 1,000 feet at a distance of 1.5 to 1.75 miles from the center of the airfield (Ex. 26, Excerpts from ATAC Corp. Airfield and Airspace Operational Study, February 18, 1998 ("ATAC Report"), at C-46, 47).

5. It is also necessary for naval aviators to be able to land on an aircraft carrier at night. Consequently, FCLPs are conducted at night as well as in the daytime. (Ex. 27, Wyle Report, Table 3-1 at 3-2; Table 3-2 at 3-3). Most late night FCLP operations are conducted at Fentress; Oceana generally operates only until 11:00 p.m.

6. FCLPs also expand the concept of accident potential zones ("APZ"). In 1952, the "Doolittle Report" recommended that an area surrounding military airfields should be set aside as a buffer for aircraft accidents. The first APZ guidelines were issued in 1972 as part of an investigation into aircraft accidents. (Ex. 24, EIS at 3.1-79). The APZ studies established a pattern of accident locations on or near the runways at military airfields. Between the early 1970s

when APZs were first identified, and the issuance of the EIS, there were 632 aircraft accidents at Navy and Marine Corps airfields. A 13-year study by the Navy reports that 80% of serious accidents (defined as $1 million in damage or death) occurred in the APZs. (*id.* at 3.1-79; 80).

There are three identified APZs:

1. The Clear Zone, from the end of the runway extending 3,000 feet;
2. APZ 1, from the end of the clear zone extending 5,000 feet;
3. APZ 2, from the end of APZ 1 extending 7,000 feet.

The shape of the APZs for any given airfield is influenced by specific conditions, including local accident history and the type of operations. The APZs at Oceana are elliptical and mimic the FCLP flight patterns for that airfield. (Ex. 27, Wyle Report, Figure 4.403).

7. In the late 1990s, in accordance with § 102(2)(c) of the National Environmental Policy Act of 1969 ("NEPA") (42 U.S.C. §§ 4331 et seq.), Chief of Naval Operations Instruction 11010.36A ("OPNAVINST") and the Defense Base Closure and Realignment Act of 1990 (10 U.S.C § 2687), the Navy prepared the EIS in connection with the requirement to move the Atlantic Fleet F/A-18s from Cecil Field in Florida which was slated for closing under BRAC. The F/A-18 is the Navy's most powerful carrier based strike-fighter. In that EIS, five alternative realignment scenarios ("ARS"), involving three air installations: (1) NAS Oceana, (2) MCAS Beaufort, South Carolina, and (3) MCAS Cherry Point, North Carolina, were evaluated. The Atlantic Fleet had 180 F/A-18 Hornets, consisting of 11 squadrons of 12 F/A-18s each (132 aircraft) and a Fleet Replacement Squadron ("FRS") of 48 F/A-18s. The FRS is the training squadron where brand new pilots are introduced to the plane they are assigned to fly or where pilots who are experienced in other aircraft are trained to fly the F/A-18. The five realignment scenarios were:

**<u>ARS 1</u>**- Relocate all 11 F/A-18 squadrons and the FRS to NAS Oceana, a total of 180 aircraft.

**<u>ARS 2</u>- Relocate 2 F/A-18 squadrons to MCAS Beaufort (24 aircraft) and 9 F/A-18 squadrons and the FRS to NAS Oceana (156 aircraft).**

**<u>ARS 3</u>**- Relocate 3 F/A-18 squadrons to MCAS Cherry Point and 8 F/A-18 squadrons and the FRS to NAS Oceana.

**<u>ARS 4</u>**- Relocate 5 F/A-18 squadrons to MCAS Beaufort and 6 F/A-18 squadrons and the FRS to NAS Oceana.

**<u>ARS 5</u>**- Relocate 5 F/A-18 squadrons to MCAS Cherry Point and 6 F/A-18 squadrons and the FRS to NAS Oceana.

8. The EIS documented and evaluated each scenario. Ultimately, the Navy selected ARS 2 for implementation. (Ex. 25, Record of Decision of May 18, 1998).

9. The EIS documented and projected the level of operations at Oceana based on the ATAC Report which used a computer simulation model, NASMOD. (Ex. 26, ATAC Report).

10. NASMOD was developed to analyze options in a number of naval aviation operations. NASMOD is derived from: (1) Navy air training system model (NATS), and (2) SIMMOD the official simulation model, which the Federal Aviation Administration uses to make analogous studies of civilian airports. NASMOD includes database and analytical capabilities necessary to model military training operations.

11. The data used by ATAC is compiled from (1) records of actual air field and air space operations, including air traffic control facility logs, traffic analyzer data and squadron flight schedules, (2) publications, and (3) personal interviews of pilots, and (4) observations of operations. ATAC then established the baseline operations at Oceana prior to the arrival of the F/A-18s (the year 1997 was chosen) and NASMOD established projected levels of use for the

anticipated first full year following the realignment, 1999 (*id.* at C-29). As it turned out, all the F/A-18's were not on site at Oceana until mid-1999.

12. Based on the operations levels reported by ATAC, noise exposure levels and projections for the EIS were studied by another Navy contractor, Wyle Laboratories, Inc. Wyle develops aircraft noise exposure studies at various Navy installations. Those noise studies are used to develop Environmental Impact Statements and also to establish the Navy's Air Installations Compatible Use Zone program for various airfields. AICUZ requirements are set out in OPNAVINST 11010.36B (Ex. 28) which identifies both accident and noise impacts from Navy and Marine Corps air stations. These are similar to those required of civilian aircraft and airports by the Noise Control Act of 1972 (Ex. 24, EIS, at 3.1-78).

13. The Wyle Report sets out the contrast between noise exposure during the baseline year of 1997 and that projected during 1999. In assessing the noise, Wyle used the universally accepted standard for aircraft noise exposure in communities around airfields and airports, the day-night average sound level (DNL) expressed in decibels (dB) (Ex. 27, Wyle Report, at 1-2). DNL is the average sound level generated by all aviation related operations during an average 24-hour period.

14. In calculating the noise, Wyle Labs used a suite of computer modeling programs, NOISEMAP, which predicts and then compares before and after noise effects from proposed operational changes. (*id.* at 1-4).

15. Noise is one of the most prominent and intrusive environmental impacts associated with aircraft operations. Even with other sources of noise in today's environment, aircraft noise is readily identifiable as intrusive. This is particularly true of military aviation, which uses powerful and unmuffled jet engines. Navy jet operations have particularly intrusive characteristics because they are tailored to the need to land on an aircraft carrier.

16. Human sensation of sound involves two characteristics, frequency and intensity. Frequency is the number of times per second the air vibrates. For example, low frequency sounds may be described as a rumble, where a high frequency sound may be described as a screech. (*id.* at A-1).

17. Sound intensity is measured in a logarithmic unit known as a decibel ("db"). The threshold of pain is 120 dB. (*id.* at A-2). Because decibels are logarithmic and not linear, comparing sound levels is not a matter of simple addition or subtraction. If a sound's intensity is doubled, the increase is 3 dB. In other words, doubling of 60 dB DNL is 63 dB DNL, not 120 dB DNL.

18. An important factor when measuring average sounds over a period of time is the time-average sound level, which is dominated by the louder sound levels during the averaging period. For example, a 100 dB sound for 30 seconds followed by a 50 dB sound for another 30 seconds produces a time-average sound of 97 dB for the 60-second period. This becomes important to explain Day-Night Average Sound Levels (*id.*). The DNL takes into consideration both the maximum sound level and the sound exposure level over an entire 24-hour period. (*id.* at A-9).

19. In measuring sounds for environmental impact, the Department of Defense, the FAA and the EPA have specified that the universally recognized DNL metric should be used. Maximum sound level measures the highest sound level during a sound event, such as an aircraft overflight. Sound exposure level ("SEL") measures both the sound level and duration of a single sound event normalized at one second. (*id.* at A-4).

20. Noise affects people and the environment in a number of ways. A number of health effects are associated with environmental noise. The best defined of the health effects is noise-induced hearing loss. Based on scientific research and Federal workplace guidelines, a day-

night average of 75 dB DNL is the threshold at which hearing loss could occur from aircraft noise. (*id.* at A-10). This is consistent with findings of both the EPA (which suggests using 70 dB DNL) and the National Academy of Sciences Committee on Hearing, Bioacoustics and Biomechanics (75 dB DNL) (Ex.24, EIS, at 3.1-134). Long-term noise exposure has also been associated with non-auditory health effects, such as cardiovascular problems, low birth weight and mortality rates. (*id.*, EIS, at 3.1-134, 136). Those effects manifest themselves at the same noise levels as hearing loss (75 dB DNL). (Ex. 27, Wyle Report, at A-10, 11). There is a growing body of evidence that chronic exposure to aircraft noise can also result in learning deficits among school children. Several studies have documented reading deficits, impaired cognitive abilities and impaired speech perception among children living in close proximity to airports (Ex. 24, EIS, at 3.1-138).

21. Another prominent effect of aircraft noise is community annoyance. Repeated studies have shown a high correlation between noise exposure and annoyance of groups of people. (Ex. 27, Wyle Report, at A-7). While noise levels of 55 – 60 dB DNL have been proposed (and could be used) as the threshold of community annoyance, average noise level of 65 dB DNL has been more generally used. (*id.* at A-12). This level is also (1) the level at which aircraft noise normally dominates other ambient noise sources, (2) the threshold for grant-in-aid funding of airport noise mitigation projects, (3) the ceiling level established by both HUD and the Veterans Administration for federally guaranteed home loans and (4) the level chosen as incompatible with residential use by the Navy's AICUZ program (Ex. 29, OPNAVINST 11010.36B, 2002 Table).

22. Other common effects of noise-induced community annoyance are speech interference, sleep interference and vibration of structures and objects. (Ex. 27, Wyle Report, at A-12 through 20). Of these, speech interference from aircraft noise is the primary cause of annoyance. Aircraft noise disrupts routine daily activities such as conversation, television or radio, reading, work and telephone use. It disrupts more formal speech settings such as in the

classroom or office. This often leads to fatigue and vocal strain for those who must speak above the aircraft noise. Indoor noise levels in excess of 60 dB interferes with speech communication. (*id*. at A-12).

23. Aircraft noise is particularly disruptive to sleep. Sleep interference manifests itself in awakening, sometime referred to as "arousal", and in changes in "sleep stage" in which the subject shifts from one stage of sleep to another. The EPA has identified a sound level of 45 dB DNL and below as necessary to protect against sleep interference. (*id.* at A-14). Quality sleep is a requisite to good health (Ex. 24, EIS, at 3.1-137).

24. Vibration of structures and objects is also a source of annoyance. While high noise levels lasting for more than one second are likely to damage structures, secondary vibration of objects in a house can occur at much lower noise levels. Vibration of pictures, dishes and other objects contribute to annoyance and fear of breakage. (Ex. 27, Wyle Report, at A-20).

25. Using the generally accepted scientific understanding of environmental noise and its measurement, the Navy in the EIS then evaluated the noise impact to the properties around Oceana.

26. As part of AICUZ (Air Installation Compatible Use Zones), the Navy developed a table of compatible land uses at various levels of noise exposure. Noise levels of 65 dB DNL and above are deemed to be incompatible with residential use. (Exs. 28 and 29, AICUZ Program; OPNAVINST 11010.36B, 2002 Table, p.20-24). The AICUZ in effect in 1998 (from a regulation issued in 1988) discouraged residential use in zones of 75 dB DNL and above.

27. One of the most immediate and significant effects that aircraft noise has on surrounding property is a reduction in market value. The Federal Aviation Administration recognizes that a wealth of economic studies lead to the conclusion that increased aircraft noise lowers property values. (Ex. 30, *Aviation Noise Effects*, Federal Aviation Administration, March,

1985, at 99-101). Indeed, Congress has long-recognized that proximity to an airport, with the attendant noise and other intrusions, depreciates the value of surrounding property. (Ex. 40, *Federal Agency Review of Selected Airport Noise Analysis Issues*, Federal Interagency Committee on Noise, August, 1992, at pp. 3-18; 19), ("FICON"). There, FICON reports that the Housing and Urban Development Act of 1965 charged HUD with the task "to determine feasible methods of reducing the economic loss and hardships suffered by homeowners as a result of the depreciation in the value of their properties following the construction of airports in the vicinity of their homes." (*id.* at pp. 3-18; 19).

28. One squadron of F/A-18s was already stationed at Oceana prior to the closure of Cecil Field. In 1998 the first of the 156 F/A-18 squadrons began to arrive at NAS Oceana from Cecil Field. The transfer was complete by July, 1999.

29. The total operations at Oceana increased from the 1997 baseline of 108,897 to the 1999 projection of 218,631, an increase of 101%. In 1997 Oceana conducted 54,088 touch-and-go operations and no FCLPs. In 1999, Oceana was projected to conduct 116,656 touch-and-go operations, an increase of 115%, and 2,720 FCLP.[1] (Ex. 27, Wyle Report, at 3-2; Table 3-1; p. 4-26, 27; Table 4-16).

1 This projection, as bad as it is, severely understates the real noise impact since Oceana actually conducted Approximately 20,000 FCLP during this year.

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **CAROLE AND ROBERT TESTWUIDE, et. al.,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **No. 01-201 L** |
| | ) | **Honorable Victor J. Wolski** |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT IN SUPPORT OF ITS MOTION TO DISMISS OR, ALTERNATIVELY, FOR SUMMARY JUDGMENT**

**Plaintiffs submit the following response to the Defendant's Proposed Findings of Uncontroverted Fact in support of Defendant's Motion to Dismiss or, Alternatively for Summary Judgment. Plaintiffs will respond to each of the Defendant's proposed findings in order.**

1. Naval Air Station ("NAS") Oceana is located in Virginia's southeastern coastal region within the City of Virginia Beach, Virginia. Declaration of Captain Thomas F. Keeley ("Keeley Decl."), Exhibit A, ¶ 6. Virginia Beach is part of the Hampton Roads region, which includes six counties and seven cities in addition to Virginia Beach, Chesapeake, and Norfolk. Keeley Decl., ¶ 6. Located south of the Chesapeake Bay and west of the Atlantic Ocean, NAS Oceana is approximately 100 miles southeast of Richmond, Virginia, and 200 miles northeast of Raleigh, North Carolina. Keeley Decl., ¶ 6. For over sixty-five years, NAS Oceana has been vital to U.S. Naval aviation and of strategic importance to national defense. Keeley Decl., ¶ 6.

**Response No. 1.**

**Plaintiffs agree with the first three sentences of Paragraph 1 because they are facts of common geographic knowledge, of which this Court could take judicial notice. The cited source, Captain Thomas Keeley, has no personal knowledge that would support these facts and his declaration can be accorded no weight. RCFC Rule 56 (e). Plaintiffs also incorporate the discussion in their Memorandum opposing summary judgment setting out the law regarding affidavits made without personal knowledge and the section discussing Cdr. Erie's affidavit. In response to the fourth sentence, Plaintiffs reiterate their objection to Captain Keeley's affidavit and further state that all Naval Air Stations are of strategic importance to national defense. Plaintiffs further point out that the most recent (2005) Base Realignment and Closing Commission recommended that the Navy consider moving the F/A-18s from Oceana because of the density of population over which its planes operate, the safety considerations in connection with those operations, and the noise in connection with those operations.**

2. NAS Oceana was commissioned on August 17, 1943, and designated a Master Jet Base in 1957. Keeley Decl., ¶ 7. A Master Jet Base is a location with permanent basing of carrier air groups, including in some cases the provision of auxiliary landing fields to conduct Field Carrier Landing Practice ("FCLP") exercises. Keeley Decl., ¶¶ 7, 9.

**Response No. 2**

**Plaintiffs object to the first sentence and reiterate their objection to the declaration of Captain Keeley set out in Response No. 1. Plaintiffs do not object to**

**the second sentence of paragraph 2.**

3. The United States Navy's ("Navy") finest tactical jet aircraft have been flown by squadrons assigned to NAS Oceana, including the A-4 Skyhawk, the F-4 Phantom, the A-6 Intruder, the F-14 Tomcat, and the F/A-18 Hornet. Keeley Decl., ¶ 7. The facility currently serves as home base for 16 F/A-18 squadrons, including 10 squadrons of F/A-18 C/D Hornet aircraft that were realigned to NAS Oceana from NAS Cecil Field in Florida as a result of the Navy's implementation of the 1995 round of base closures that were conducted pursuant to the Defense Base Closure and Realignment Act of 1990, as amended (10 U.S.C. § 2687 note) ("BRAC Law"). Keeley Decl., ¶ 8. The mission of all NAS Oceana squadrons is to be prepared to conduct timely, sustained combat operations from the sea, in support of our Nation's interests, whenever called upon to do so. Keeley Decl., ¶ 8.

**Response No. 3**

**Plaintiffs have no objection to the second sentence of paragraph 3. Plaintiffs object to the remainder of paragraph 3 for the reasons set out in Response No. 1 as to personal knowledge. In addition, the last sentence is merely argumentative.**

4. NAS Oceana is located on nearly 5,400 acres and employs over 12,000 Navy employees. Keeley Decl., ¶ 10. The base spends approximately $400 to $500 million per year in goods and services and has a gross annual payroll of over $773 million, with a total economic impact on the Hampton Roads region exceeding $1 billion annually. Keeley Decl., ¶ 10. NAS Oceana is the largest employer in Virginia Beach. Keeley Decl., ¶ 10.

**Response No. 4**

**Plaintiffs object to paragraph 4 for the reasons set out in Response No. 1 as to personal knowledge. Plaintiffs object to Defendant making assertions of fact through Captain Keeley, an ex-commanding officer of Oceana, who lacks qualifications to state the economic impact on the region and the relative place of Oceana in the hierarchy of area. Plaintiffs agree that Oceana covers about 5,400 acres.**

5. To train for operating from an aircraft carrier at sea, squadrons stationed at NAS Oceana typically use nearby Naval Auxiliary Landing Field ("NALF") Fentress for Field Carrier Landing Practice ("FCLP") operations. Keeley Decl., ¶ 9. FCLPS are touch-and-go operations performed on a runway designed to simulate landing on an aircraft carrier. Keeley Decl., ¶ 9. NALF Fentress was established in 1940 and is located approximately seven miles southwest of NAS Oceana in Chesapeake, Virginia. NALF Fentress is under the command of NAS Oceana. Keeley Decl., ¶ 9.

**Response No. 5**

**Plaintiffs object to the statement that the planes at Oceana typically use Fentress for field carrier landing operations because it suggests that those operations are unique to Fentress. Contrary to that suggestion, an increasing number of FCLPs are conducted at Oceana, far above the number predicted in either of the Environmental Impact Statements recently published by the Navy. In addition, an enormous number of touch and go operations are conducted at Oceana. Touch and go's are identical to field carrier landing practices in terms of the speed of the aircraft, its altitude, throttle settings and configuration, as well as the pattern**

**it flies. The only difference is that in a touch and go there is not an officer on the ground grading the pilot as that operation is conducted. Plaintiffs also object to Captain Keeley's assertion of historical fact for periods of time prior to his command at Oceana for the reasons stated in Response No. 1.**

6. Flight operations at NAS Oceana, as with any naval air station, are reported annually in the air station's Air Traffic Activity Reports ("ATARs"). Declaration of Commander Stephen G. Riley III ("Riley Decl."), Exhibit B, ¶¶ 6, 7. Until 1996, NAS Oceana ATARs were single-page forms that reflected the number of aircraft operations that occurred at the NAS Oceana airfield on an annual basis. Riley Decl., ¶¶ 7, 15. Operations at NALF Fentress were documented in the "Remarks" section of ATARs prepared before 1996. See also Riley Decl., Footnote 2 (some earlier ATARs cover periods of less than one year, in which case one must add the data from the two or more ATARs that, together, cover that year).

**Response No. 6**

**Plaintiffs object to paragraph 6. Flight operations at NAS Oceana and Fentress are reported in a variety of ways by a variety of sub-commands on the air station. It is common for the number and type of operations reported in one official document to differ markedly from another official document concerning the same period of time. Moreover, using the ATARs as the basis for reporting operations on an annual basis invokes a substantial amount of subjectivity (Cdr. Stephen Riley depo., Ex. 46, p. 10-12). Moreover, Cdr. Riley had never even heard of this case until three days before his deposition and had no knowledge of any subject on which he might be asked to testify (*id.* p. 35-36). This tactic effectively hamstrung**

**Plaintiffs in taking and using his deposition in the way that the rules intend.**

7. Beginning in 1996, ATARs, including those for NAS Oceana, were separated into two forms. Riley Decl., ¶ 20. One ATAR form, "Control Tower Operations," reported the number of aircraft operations in the air space controlled by NAS Oceana's air traffic control tower. Riley Decl., ¶ 20.

**Response No. 7**

**Plaintiffs object to paragraph 7 and reiterate Plaintiffs' comments to paragraphs 1 and 6.**

8. The second ATAR form, "Approach Control Operations," recorded the number of aircraft operations counted by radar room personnel. Riley Decl., ¶ 21. The NAS Oceana air traffic control tower air space includes a limited geographic area surrounding the air station. Riley Decl., ¶ 9. It extends to distances of 4.3 to 5 nautical miles away from the air station, depending upon direction, and up to an altitude of 2,500 feet. Riley Decl., ¶ 9. Conversely, the air space controlled by radar is far greater, extending in some cases many miles, and up to an altitude of 23,000 feet, but does not include the control tower's air space. Riley Decl., ¶ 10.

**Response No. 8**

**Plaintiffs object to paragraph 8 and reiterate Plaintiffs' comments to paragraphs 1 and 6.**

9. Compared to many prior years, however, 1999 was a year of relatively light flight activity − less than 133,000 operations as indicated by the 1999 ATAR forms. Riley Decl., ¶ 22, Table 1. By comparison, in 1981 the reported number of operations was 231,753. Riley Decl., Table 1. As CDR Stephen Riley indicates in his declaration,

the older ATARs are not precisely an "apples-to-apples" comparison with the newer (1996 and thereafter) ATARs in terms of the number of operations that occurred in the control tower's airspace. Riley Decl., ¶¶ 15-22. Nevertheless, the bottom line number on the older forms is a "reasonably close approximation" of the operations in the control tower's airspace that year. Riley Decl., ¶ 18.

**Response No. 9**

**Plaintiffs object to paragraph 9 and reiterate Plaintiffs' comments to paragraphs 1 and 6. Cdr. Riley is incompetent under RCFC Rule 56 (e) to testify on historic operations and to offer opinions such as "relatively light" and "close approximation". Notwithstanding that, Cdr. Dirk P. Hebert, Air Operations Officer at NAS Oceana, swore under oath to the operations counts for the same years as Cdr. Riley. The Government submitted that affidavit in connection with class certification. No years match. (Hebert Decl. March 6, 2002, Ex. 43). Many years are markedly different. For example, Cdr. Hebert reports more than 186,000 operations for 1999 and only 204,000 in 1981. The uniform testimony of the people who live around the airfield, including the Plaintiffs and many others, is that 1999 was a year of horrendous increase in the jet noise which they were subject to. That fact is hammered home by the tremendous increase in the number of citizen complaints about jet noise as exemplified by Ex. 47. (Complaint graphs for years 1973 through 2000). Ex. 47 also depicts the number of complaints by residents around the airfield in 1981. That number was trivial compared to the number of complaints made in 1999 and 2000. Plaintiffs therefore disagree that the comparison on the pre and post 1996 ATARs is apples to apples and disagree that**

**the older forms are a "reasonably close approximation" of the operations at Oceana. In order to know what impact the operations at Oceana had upon the surrounding population in a given year one would have to know, at a minimum, (1) the exact type of aircraft that made up the operations; (2) the precise type of operation flown by each of those aircraft and what time of day it was flown; and (3) the number of each such operation. Notwithstanding Defendant's May, 2006 decision to choose 1981 as the year of a prior "taking", a specific request to the Government for the operations at Oceana for that year elicited the response that Defendant has no documents that report those facts. (Letter from Steve Bryant to Jack Ferrebee, dated May 16, 2006, Ex. 48).**

10. And in 1982, there were close to 178,000 operations. See Riley Decl., Table 1. The high operations continued between 1989 and 1995 as well with annual operations consistently approaching or exceeding 200,000 operations, including a high of over 229,000 operations in 1992. See Riley Decl., Table 1.

**Response No. 10**

**Plaintiffs object to paragraph 10 and reiterate Plaintiffs' comments to paragraphs 1, 6 and 9.**

11. NAS Oceana has four runways that operate in both directions. Declaration of Commander Richard S. Erie ("Erie Decl."), Exhibit D, ¶ 6. The dual intersecting runways are designated Runways 5/23 Left and Right and Runways 14/32 Left and Right as follows[1]:

[1] See Erie Decl., ¶ 8.




**Response No. 11**

**Plaintiffs agree that NAS Oceana has four intersecting runways with the designations stated.**

12. The designation of the runway depends on which way the runway is to be approached. The primary factor dictating runway use is wind direction. Erie Decl., ¶ 9. As reflected in studies at NAS Oceana, the relative frequency of the use of each runway has remained generally the same, consistent with the following approximate percentages[2]:

Runway 5L/R – 50%
Runway 23L/R – 34%
Runway 32L/R – 14%
Runway 14L/R – 2%

[2] See Erie Decl., ¶ 25.

**Response No. 12**

**Plaintiffs object to Cdr. Erie's competence to offer admissible evidence of facts that pertain to a period prior to his service at Oceana. *See* Plaintiffs' objection to paragraph 1. Over time, the percentage use of the runways has changed every time it is reported, but Plaintiffs concede that Runway 5 L/R is the most frequently used and that Runway 14 L/R is the least frequently used.**

13. NAS Oceana provides for the safe operation of its aircraft with "course rules" that provide guidance for the basic departure, arrival and landing procedures pilots follow. Erie Decl., ¶ 10. The course rules incorporate guidance on altitude and flight tracks to provide sufficient separation of aircraft out of and back into the air station. Erie Decl., ¶¶ 11, 12.

**Response No. 13**

**Plaintiffs agree that the Navy gives its pilots guidance on what courses to fly and what procedures to follow on take-off and landing.**

14. As is the case with any Navy or Marine Corps air station to which carrier-based aircraft are assigned, the shore-based landing procedures and patterns at NAS Oceana are designed to mirror the procedures and pattern used when landing on an aircraft carrier at sea. Erie Decl., ¶ 13.

**Response No. 14**

**Plaintiffs object to paragraph 14 because Cdr. Erie , under RCFC 56 (e), lacks competence to make such sweeping generalities.**

15. Landing an aircraft on a moving (sometimes pitching and rolling) ship in daylight hours is an extremely difficult endeavor; at night it becomes arguably the most challenging maneuver in aviation. Erie Decl., ¶ 14. The patterns flown day and night around the aircraft carrier are designed to maneuver each aircraft into a position behind the ship where the pilot can land the aircraft through use of the Fresnel Lens Optical Landing System ("FLOLS"). Erie Decl., ¶ 14. The FLOLS is a series of lights that allow the pilot to observe his position so that he may make the appropriate adjustments to land safely. Erie Decl., ¶ 14.

**Response No. 15**

**Plaintiffs do not object to paragraph 15, but state that the first sentence is argumentative.**

16. While the basic "stick and rudder" skills required are acquired early in a flying career, the fine motor skills to do it safely and successfully every time are perishable, necessitating continuous refresher training. Erie Decl., ¶ 14. Consequently, every runway in use at a Navy field has a FLOLS at the approach end so that pilots may always practice "flying the ball," and pilots practice shipboard landing every time they land an aircraft. Erie Decl., ¶ 14.

**Response No. 16**

**Plaintiffs incorporate their objection to paragraph 15.**

17. The VFR ("Visual Flight Rules") landing pattern is a left-hand racetrack or oval pattern oriented along a runway heading with one end of that oval being a descent to landing. Erie Decl., ¶ 15. When landing at sea, the altitude of the landing pattern is 600 feet. Erie Decl., ¶ 15.

**Response No. 17**

**Plaintiffs agree that the VFR landing pattern is <u>one</u> among a number of patterns associated with Oceana's runways and further agree that the landing pattern altitude at sea is 600 feet.**

18. As a noise mitigation measure, the pattern at NAS Oceana was elevated to 1,000 feet many years ago. Erie Decl., ¶ 15.

**Response No. 18**

**Plaintiffs agree that the touch and go and FCLP patterns at Oceana provide for an altitude of 1,000 feet. Plaintiffs object to Cdr. Erie's testimony as to what happened "many years ago" for the reasons set out in Plaintiffs' response to paragraph 1 under RCFC Rule 56 (e). Plaintiffs also object to Cdr. Erie's declaration because his assertions are made on a "might have" or "would have" basis. See Plaintiffs' response to paragraph 1.**

19. In general, pilots strive to recreate the "approach turn" to landing in the same manner every time, from a location 1.1 to 1.5 nautical miles abeam (directly to the side) of the intended point of landing, at 1,000 feet above ground. Erie Decl., ¶ 15. Each position along the racetrack pattern has specific aircraft parameters that the pilot is looking to maintain. Erie Decl., ¶ 15. The diagram below is illustrative of the VFR landing pattern[3]:

[3] See Erie Decl., ¶ 16.




**Response No. 19**

**Plaintiffs object to paragraph 19 for the reasons stated in response to paragraph 1. Cdr. Erie cannot competently testify as to what all pilots "strive to" do. RCFC Rule 56 (e). Plaintiffs agree that the "approach turn" and the descent from the approach turn to the airfield are a part of the racetrack landing pattern and that most pilots pay attention to the theoretical track during that portion of the evolution. Plaintiffs disagree that for the remainder of the evolution, such as the crosswind turn, the downwind leg and "the 180" positioning, pilots pay particular**

**attention. A given pattern for a particular operation at an airfield is a line drawn on a map which has associated with it certain defined but theoretical altitudes, speeds, throttle settings, etc. Depending upon the type of aircraft, configuration of the plane (wheels up or wheels down), the experience of the pilot, the mood of the pilot, the wind direction and velocity, the weight of any armament and the amount of fuel remaining, the pilot in a given evolution may be close, or not very close at all, to the components of the theoretical line on the map. The testimony is replete with witnesses whose properties are distant from the theoretical racetrack oval but who regularly are subjected to direct and low overflights from Navy aircraft in the pattern. Perhaps the most common reason for planes flying wide is the number of planes flying in the pattern. As three or six aircraft go around for FCLPs or touch and goes, and then around again and then around again, they fly wide.**

20. Aircraft enter the pattern by performing "the break," which means they fly upwind in the direction of the runway heading and then execute the "crosswind turn" to head downwind. Erie Decl., ¶ 17. The location of the "crosswind turn" will vary depending, in part, upon the number of aircraft in the pattern. Erie Decl., ¶ 18. In general, the more aircraft in the pattern, the more the oval will extend. Erie Decl., ¶ 18.

**Response No. 20**

**Plaintiffs do not object to paragraph 20 except that Plaintiffs object to Cdr. Erie testifying for all pilots as set out in Plaintiffs' response to paragraph 19 and for any period of time prior to his service as operations officer, as stated in Plaintiffs' response to paragraph 1.**

21. At NAS Oceana, "the break" is performed at an altitude of 1,500 feet.

Erie Decl., ¶ 17. Once on the downwind heading, aircraft descend to a pattern altitude of 1,000 feet and decelerate as they move towards "the 180" (the point at which the aircraft begins its turn to land). Erie Decl., ¶ 17. "The 90" is the point halfway through the approach turn. Erie Decl., ¶ 17.

**Response No. 21**

**Plaintiffs object to paragraph 21 for the reasons stated in Plaintiffs' objections to 19.**

22. Because of the requirement for continuous training in carrier landing, "touch-and-go" operations are performed regularly at NAS Oceana. Keeley Decl., ¶ 15. As the name implies, a touch-and-go involves a practice takeoff and landing. Keeley Decl., ¶ 15. Aircraft will typically perform one to three touch-and-go operations upon arrival at the station. Keely Decl., ¶¶ 16, 19.

**Response No. 22**

**Plaintiffs object to paragraph 22 for reasons set out in response to paragraphs 1 and 19. Plaintiffs agree that a very large number of touch and go operations are performed at Oceana. Plaintiffs, however, state that the aircraft often perform more than three touch and go operations and often are engaged with as many as 3-5 other aircraft in that operation. Plaintiffs also state that the Navy performs thousands more FCLPs at Oceana than the Navy projected and told to the public.**

23. FCLPs do, however, share some similarities with touch-and-go operations. Keeley Decl., ¶ 18. The basic geometry of the touch-and-go and FCLP patterns is the same. Keeley Decl., ¶ 17. At NAS Oceana the pattern altitude for both touch-and-gos

and FCLPs is 1,000 feet. Keeley Decl., ¶ 18. However, there is a critical difference between touch-and-gos and FCLPs, namely the intensity and duration of FCLP's versus touch-and-go landings. Keeley Decl., ¶ 18.

**Response No. 23**

**Plaintiffs object to paragraph 23. FCLPs and touch and gos are more than similar; they are identical except FCLPs are graded by an observer near the touch down point. (Hebert Decl. March 6, 2002, Ex. 43, ¶ 8). The intensity and duration of FCLPs versus touch and go's is purely theoretical and not of any significance in this case given the number of FCLPs and touch and gos performed at NAS Oceana (Email from Dan Cecchini to Shawn Smith and Phillip Logan regarding "Re: Op count at NTU," dated November 27, 2000, Ex. 41).**

24. The "approach turn" will also vary, but to a lesser degree than the "crosswind turn." Erie Decl., ¶ 19. For example, the position of "the 180" will vary based on winds in the upwind direction. Erie Decl., ¶¶ 19-20. When winds in the upwind direction are light, the aircraft will have to fly a longer downwind leg before it begins its approach turn, to allow enough room for the aircraft to still have the required 15-18 seconds for the final approach heading. Erie Decl., ¶ 19. When this occurs the "approach turn" end of the oval will lengthen. Erie Decl., ¶ 19. Conversely, with higher winds in the upwind direction, the "approach turn" will occur closer to the ideal abeam position, because when the plane turns to head upwind it will require less space in which to line up for final approach. Erie Decl., ¶ 19.

**Response No. 24**

**Plaintiffs agree that the wind direction and speed will alter the flight pattern**

**in a variety of ways and disagree that that variety is encompassed in the statements in paragraph 24, all of which are incompetent under RCFC Rule 56 (e). Plaintiffs also object to Cdr. Erie's testimony for all pilots as set out in Plaintiffs' objection to paragraphs 1 and 19.**

25. An FCLP pattern can have as many as five aircraft in it at one time. FCLPs are prescheduled, graded training periods, that normally last approximately 45 minutes, during which each aircraft will conduct from seven to ten touch-and-gos. Keeley Decl., ¶ 19. In contrast, an individual aircraft would typically perform approximately one to three touch-and-gos, and, while it is not uncommon to have more than one aircraft in the pattern performing touch-and-gos at the same time, it is generally one to three aircraft. Keeley Decl., ¶ 19.

**Response No. 25**

**Plaintiffs object to paragraph 25 and incorporate their response to paragraphs 1 and 19. There is no "typical" number of aircraft in either an FCLP or touch and go pattern. (Ex. 44, Hebert Depo.)**

26. FCLP operations are primarily conducted at Naval Auxiliary Landing Field ("NALF") Fentress rather than NAS Oceana. Keeley Decl., ¶ 9.

**Response No. 26**

**Plaintiffs agree that NALF Fentress is supposed to and does conduct more FCLPs than Oceana; but Plaintiffs also state that Oceana is nevertheless conducting a great many FCLPs because of the desire to give the people who live around Fentress some sleep at night and because Fentress and Oceana combined are overburdened. (Hebert Email dated March 13, 2000, Ex. 42). Plaintiffs also**

**incorporate their response to paragraph 1.**

27. The departure, arrival, and landing patterns at NAS Oceana have remained generally the same over the years. Keeley Decl., ¶ 12. The altitudes at which these patterns were flown in the last three decades have changed somewhat, in that some pattern elevations have been raised, but these changes only served to reduce noise impacts on the ground and did not affect the nominal flight tracks or altitude that the aircraft flew when in the landing patterns. Keeley Decl., ¶ 13.

**Response No. 27**

**Plaintiffs agree that the altitude of the oval patterns at Oceana has been raised in the past. Plaintiffs object on the grounds of RCFC Rule 56 (e) to Captain Keeley's testimony on events that took place prior to his command and to his attempt to give expert opinion on acoustics and Plaintiffs incorporate their objections to paragraph 1.**

28. Notwithstanding the relative consistency of the predominant flight tracks, no two flights, even of the same aircraft flown by the same pilot, are identical; nor does each flight proceed at precisely the same altitude throughout the flight or cover precisely the same track over the ground. Keeley Decl., ¶ 20. None of the changes in flight operations since at least 1979 would have affected any of the flight operations with respect to the test plaintiffs' properties. Keeley Decl., ¶ 13.

**Response No. 28**

**Plaintiffs do not object to the first sentence of paragraph 28. Plaintiffs object to the remainder of the paragraph and incorporate their response to paragraph 1.**

29. The predominant aircraft that have operated at NAS Oceana have included

the F-4 Phantom, the A-6 Intruder, the F-14 Tomcat, and the F/A-18 Hornet. Keeley Decl., ¶ 7. The F-4 Phantom operated in the 1960s, 1970s, and early 1980s. Keeley Decl., ¶ 7. The A-6 Intruder operated from the 1970s through the mid-1990s. Keeley Decl., ¶ 7. The F-14 Tomcat has operated at NAS Oceana from the mid-1970s until the present. Keeley Decl., ¶ 7. Although one squadron of F/A-18 A aircraft was present at NAS Oceana since the mid-1990's, the first F/A-18 C/D Hornet squadrons arrived at NAS Oceana in December, 1998. Keeley Decl., ¶ 7.

**Response No. 29**

**Plaintiffs object to all but the last sentence of paragraph 28 pursuant to RCFC Rule 56 (e) and incorporate their objection to paragraph 1.**

30. These various fighter jets produce different noise levels for a variety of reasons, such as size, weight, design, and engine type. Revised Report of Sanford Fidell, 29 March 2006, ("Fidell Report"), Exhibit E, p. 15. A relative comparison of the perceived single event noise level produced by these aircraft can be found in NOISEMAP, the computer program relied upon by the Department of Defense to estimate noise exposure surrounding military air stations. Fidell Report, p. 3.

**Response No. 30**

**Plaintiffs object to paragraph 30. Plaintiffs do not disagree that various fighter jets produce different noise levels for a variety of reasons; but Plaintiffs state that the authority proposed for this allegation, Sanford Fidell, is an incompetent witness on the subject pursuant to RCFC 56 (e) and the rules governing expert testimony. Plaintiffs also incorporate their objection to Sanford Fidell articulated in the section of their memorandum addressing Fidell. Plaintiffs assert that the**

**NOISEMAP software can produce graphic depictions of Single Event ("SEL") Levels and DNL levels but state that those estimates of noise on the ground are based on the software's assumption that all of the flights projected for a specific type of operation (such as FCLP) at a given airport are flown by an expert pilot flying the pattern precisely as set out on a given map, at precisely the altitudes supposed to be flown, at the precise speed called for, by the operation, and using the specific throttle setting called for. A difference in any of the variables set out above will result in a different noise level being projected on the ground. The software itself also extrapolates the noise of a given aircraft in a given operation from only one or two known measurements of noise. In addition to human variables, the noise will differ depending on the elevation or airfield, the temperature, humidity and wind.**

31. The most widely accepted frequency-weighting procedure for annoyance comparisons is the Perceived Noise Level ("PNL"), which accords more weight to the more annoying high frequency sound bands. Fidell Report, p. 14.

**Response No. 31**

**Plaintiffs object to paragraph 31 for the same reasons as stated in response to paragraph 30. Under the Noise Control Act of 1972, the Environmental Protection Agency was charged by Congress with adopting a standard for the evaluation of environmental noise. In 1974 the EPA adopted and directed that the day-night average sound level ("DNL") be used. Every study of any military installation provided by Defendant to the Plaintiffs has used DNL as the basis for decision making. The Perceived Noise Level ("PNL") is a 1950s vintage noise metric that is**

**particularly difficult to measure and contains a large element of subjectivity (Stewart Decl., Ex. 49). PNL or PTNL never emerged in this case until Dr. Fidell's fourth report, served on Plaintiffs one month before Defendant filed its Motion for Summary Judgment and long after depositions and expert discovery was closed. Fidell is a psychologist and "psycho-acoustician" who gives testimony in this, and other cases, far outside his actual expertise. His opinion in this case should be given no weight at all. Plaintiffs rely upon the section of their Memorandum opposing summary judgment which discusses Dr. Fidell's opinions.**

32. NOISEMAP contains the most consistent and comprehensive database of field measurements of noise produced by military aircraft in various modes, including departure, approach, and pattern operations. Fidell Report, p. 15. The database does not have measurements for all the variant aircraft in all operations. Fidell Report, p. 15. It is common to substitute one aircraft's noise measurements for another, particularly when the aircraft share the same engines and are similar in weight. Fidell Report, p. 15.

**Response No. 32**

**Plaintiffs object to paragraph 32 on the grounds stated in response to paragraphs 30 and 31. The most consistent and useful evidence of the noise produced by particular Navy aircraft is that measured by various Navy commands of actual aircraft. Plaintiffs rely upon the section of their memorandum opposing summary judgment which discusses Dr. Fidell's opinions.**

33. The following table provides the maximum tone-corrected PNLs for the various aircraft, which reflects the greatest single value measured in decibels ("dB") at

any instant during a flyover[4]:

| AIRCRAFT | DEPARTURE | APPROACH | PATTERN |
|---|---|---|---|
| A6-A | 120.7 | 116.1 | No data |
| F-4C | 123.2 | 112.6 | 114.5 |
| F-14A | 118.2 | 102.4 | 103.2 |
| F-14B | 120.9 | 99.2 | 101.9 |
| F/A-18 C/D | 121.9 | 116.5 | 102.2 |

**Response No. 33**

**Plaintiffs object to paragraph 33. For the reasons stated in Plaintiffs' objections to paragraphs 30 and 31, Dr. Fidell's reports deserve to be given no weight. Plaintiffs rely upon the section of their Memorandum opposing summary judgment which discusses Dr. Fidell's opinions. Moreover, the concept of PNL has substantial subjectivity. In this case, it is the subjectivity of a professional expert witness which is depicted in the chart following paragraph 33. PNL has seldom been used for any purpose since 1974 when the EPA, under the direction of Congress, decided that DNL should be the preferred metric for time-weighted noise assessment.**

34. Aircraft single event noise levels are also measured in terms of the sound exposure level (SEL), which reflects the total energy produced in a single flyover, normalized to a hypothetical one-second duration. Fidell Report, p. 14, 23.

**Response No. 34**

**Plaintiffs have no objection to paragraph 34 except the objection to Dr. Fidell as set out in Plaintiffs' objection to paragraphs 30-33.**

35. The sound pressure level at the measurement point on the ground initially rises to a maximum as an aircraft approaches, then declines as the airplane flies away.

[4] This table was extracted from the Fidell Report, p. 15.

Fidell Report, p. 23. Since the sound pressure levels vary throughout the overflight, and since the durations of different overflights also vary, no single number can usefully characterize the moment-to-moment changes in sound levels. Fidell Report, p. 23. The usual method for representing the sound energy produced during the entire overflight is therefore to "normalize" the measurement to a standard time period (one second). Fidell Report, p. 23.

**Response No. 35.**

**Plaintiffs object to paragraph 35 for the reasons stated in Plaintiffs' objections to paragraphs 30-34. Plaintiffs rely upon the section of their Memorandum opposing summary judgment which discusses Dr. Fidell's opinions.**

36. Tone-corrections further assist in accounting for the contribution of prominent tones to the annoyance of aircraft noise. Fidell Report, p. 14. The following table lists the tone-corrected, A-weighted SELs for the predominant aircraft at NAS Oceana from the 1970s to 2000[5]:

| AIRCRAFT | DEPARTURE | APPROACH | PATTERN |
|---|---|---|---|
| A-6A | 113.7 | 110.7 | No data |
| F-4C | 116.7 | 106.8 | 108.5 |
| F-14A | 107.9 | 96.2 | 90.6 |
| F-14B | 109.8 | 94.5 | 89.7 |
| F/A-18 C/D | 118.2 | 110.9 | 94.5 |

**Response No. 36**

**Plaintiffs object to paragraph 36 for the reasons stated in response to**

[5] This table was extracted from the Fidell Report, p. 16.

**paragraphs 30 - 34. Plaintiffs rely upon the section of their memorandum opposing summary judgment which discusses Dr. Fidell's opinions.**

37. When the VFR pattern was flown from Runway 5L/R, the Capps and Hill properties experienced frequent overflights. Erie Decl., ¶¶ 29, 57. On the downwind leg, aircraft in this pattern would have regularly flown over or within approximately one-half mile of the Capps property at an altitude of approximately 1,000 feet. Erie Decl., ¶ 29. The Hill property is located on the approach turn for Runway 5L/R. Erie Decl., ¶¶ 56, 57; see also Exhibit F. It is just past the "180 position" and therefore would have been routinely overflown by aircraft in the landing pattern. Erie Decl., ¶¶ 56, 57. These aircraft would have passed directly over or within approximately one-half mile of this property at an altitude of approximately 700-800 feet as they descended into the "approach turn." Erie Decl., ¶ 57; see generally Declaration of Commander Dirk Hebert ("Hebert Decl."), Exhibit G.

**Response No. 37**

**Plaintiffs object to paragraph 37 for the reasons stated in Plaintiffs' response to Paragraph 1. The Declaration of Cdr. Erie consists of inadmissible conclusions by an incompetent witness under RCFC Rule 56 (e). *See* also Plaintiffs' objection to paragraph 30 setting out the completely theoretical nature of the patterns drawn on a map. The unsupported theory that Plaintiffs are, are not, are often, or are not often, subjected to overflights or substantial noise is completely refuted by the sworn testimony of those Plaintiffs and by a number of other witnesses, and by the admissions of the Navy in documents and testimony. In addition, *see* the sworn**

**testimony of Betty Capps, Ex. 1B and Kenneth Hill, Ex. 8B. Plaintiffs also rely upon the section of their memorandum which discusses the incompetence of Cdr. Erie under Rule 56 (e). The same analysis applies to Cdr. Hebert.**

38. In addition to overflights in the downwind pattern from Runway 5L/R, the Capps property is also underneath the VFR landing pattern for Runway 14L/R. Erie Decl., ¶ 31; see also Exhibit F. It is near "the 90" (halfway through the approach turn), so during the roughly two percent of the time when Runway 14L/R was in use aircraft would have flown over or within approximately one-half mile of the Capps property at an altitude of approximately 450-500 feet. Erie Decl., ¶ 31; see generally Hebert Decl.

**Response No. 38**

**Plaintiffs object to paragraph 38 for the reasons stated in response to paragraph 37.**

39. When Runway 23L/R was in use, approximately 34 percent of the time, aircraft would have routinely flown over or nearly over the Hoag and Dingle properties during the approach to landing. Erie Decl., ¶¶ 25, 34, 37-38; see also Exhibit F. The aircraft would have been at an altitude of approximately 500-800 feet. Erie Decl., ¶¶ 34, 38; see generally Hebert Decl.

**Response No. 39**

**Plaintiffs object to paragraph 39 for the reasons stated in their response to paragraphs 30 and 37, and because of the sworn testimony of Sara Hoag (Lynch), Ex. 13B, and Theodore Dingle, Ex. 22B.**

40. The Leary and Riddick properties are both south of Runway 5L/R and would regularly have experienced noise from aircraft landing on that runway either in the

visual landing pattern or on straight in approaches; however, it would have been unusual for these properties to be overflown when a visual landing pattern was being used. Erie Decl., ¶61; see also Exhibit F. Aircraft in the visual landing pattern for Runway 5L/R would have been no closer than one-half mile of these properties at an altitude of 400 to 800 feet. Erie Decl., ¶61. Aircraft on a straight in approach to Runway 5L/R would have flown within approximately one-half to one mile of these properties, at an altitude of approximately 500 to 1,000 feet, but would not normally have directly overflown the properties. Erie Decl., ¶61.

**Response No. 40**

**Plaintiffs object to paragraph 40 for the reasons stated in paragraphs 30 and 37 and in the sworn testimony of Plaintiffs Leary, Ex. 12B, and James Riddick, Ex. 7B.**

41. When Runway 23L/R was in use the Leary and Riddick properties would have routinely been overflown on departures, but at an altitude of approximately 1,500 to 2,000 feet. Erie Decl., ¶62. Also, aircraft departing from Runway 23L/R on their way to NALF Fentress to conduct FCLPs would have flown within approximately one-half mile of these properties at an altitude of approximately 1,000 feet. Erie Decl., ¶62; see generally Hebert Decl.

**Response No. 41**

**Plaintiffs object to paragraph 41 for the reasons stated in their objections to paragraphs 30, 37 and 40.**

42. When Runway 5L/R was in use, aircraft in the downwind leg would routinely have flown within approximately one-half to one mile of the Levenson property

at an altitude of approximately 1,000 feet. Erie Decl., ¶ 42; see also Exhibit F. Only if aircraft were extremely wide abeam, however, would they have directly overflown the Levenson property, which would have been unusual. Erie Decl., ¶ 42.

**Response No. 42**

**Plaintiffs object to paragraph 42 for the reasons stated in response to paragraph 37. According to the sworn testimony of Mr. Levenson, the planes regularly fly directly over his house. (Ex. 11B). Because Mr. Levenson is on the Board of Citizens Concerned Against Jet Noise ("CCAJN"), the members of the Board often meet at his house and as a result they are familiar with the noise at the Levenson property. The fact that the planes fly overhead and are extremely loud is supported by the testimony of Kim Johnson (Ex. 23B) and of Herk Stokely (Ex. 2B).**

43. The Levenson property would also have experienced noise from aircraft in "the break" for Runway 5L/R, but at an altitude of approximately 1,500 feet. Erie Decl., ¶ 42. During the roughly two percent of the time that Runway 14L/R was being used, aircraft flying the VFR landing pattern would fly over or within one-half mile of the Levenson property during the approach turn at an altitude of approximately 450 to 550 feet. Erie Decl., ¶ 43.

**Response No. 43**

**Plaintiffs object to the statements in paragraph 43 for the reasons stated in paragraphs 37, 40 and 42.**

44. The Levenson property would also have experienced noise from aircraft departing on Runway 32L/R, which was in use roughly 14% of the time. Erie Decl., ¶¶

25, 44. These aircraft would climb from 1,000 to 4,000 feet and their ground track would vary greatly, so it is possible that the Levenson property may have been overflown during these operations on occasion by aircraft turning right after departure, but this would not have been a regular event. Erie Decl., ¶ 44.

**Response No. 44**

**Plaintiffs object to paragraph 44 for the reasons stated in their objections to paragraphs 37 and 40.**

45. When Runway 5L/R was in use, aircraft in the downwind leg would routinely have flown within approximately three-quarters to one mile of the Lindsay property at an altitude of approximately 1,000 feet. Erie Decl., ¶ 46; see also Exhibit F. Only if aircraft were extremely wide abeam (even wider abeam than in the case of the Levenson property) would they have directly overflown the Lindsay property, and it would have been even more unusual for an aircraft to be this wide abeam than it would have been with the Levenson property. Erie Decl., ¶ 46. Additionally, aircraft entering the pattern via the break maneuver would fly a similar ground track as above, but at 1,500 feet and at a significantly lower power setting. Erie Decl., ¶ 46.

**Response No. 45**

**Plaintiffs object to paragraph 45 for the reasons stated in paragraphs 37, 40 and 44. The Lindsay property is regularly overflown causing substantial noise impact on their property. (Sworn testimony of Carroll Lindsay, Ex. 10B).**

46. The Lindsay property would also have experienced noise from aircraft departing from Runway 32L/R, as the aircraft climbed from 1,000 feet to 4,000 feet. Erie Decl., ¶ 47. The ground track of these aircraft would have varied, so it is possible that on

occasion the Lindsay property may have been overflown during these operations (in the case of the Lindsay property by aircraft turning left after departure), but, based on the location of the property, any direct overflights would have been rare. Erie Decl., ¶ 47.

**Response No. 46**

**Plaintiffs object to paragraph 46 for the reasons stated in objection to paragraphs 37, 40 and 45.**

47. During those very infrequent occasions when Runway 14L/R was in use and the airfield was also in Instrument Flight Rules ("IFR") conditions, the Lindsay property would have experienced noise from aircraft on straight-in IFR radar-controlled approaches to Runway 14L/R as they passed by at an altitude of approximately 1,000 feet, but the property would not typically have been overflown during those operations. Erie Decl., ¶ 48.

**Response No. 47**

**Plaintiffs object to paragraph 47 for the reasons stated in opposition to paragraphs 37, 40 and 45.**

48. The Lindsay property would have also experienced noise from aircraft entering the visual landing pattern for Runway 14L/R via "the break" on an infrequent basis. Erie Decl., ¶ 48. The aircraft conducting this maneuver would fly over or nearly over (within one-half to one mile) the Lindsay property at an altitude of 1,500 feet. Erie Decl., ¶ 48; <u>see generally</u> Hebert Decl.

**Response No. 48**

**Plaintiffs object to paragraph 48 for the reasons stated in paragraph 37, 40**

**and 45.**

49. When Runway 5 L/R was in use, aircraft in the downwind leg would routinely have flown within approximately three-quarters to one mile of the Van Nostrand property at an altitude of approximately 1,000 feet. Erie Decl., ¶ 50; see also Exhibit F. Only if aircraft significantly deviated from the VFR pattern would they have overflown this property. Erie Decl., ¶ 50.

**Response No. 49**

**Plaintiffs object to paragraph 49 for the reasons stated in objection to paragraph 37, 40 and 45. The Van Nostrand property is regularly directly overflown by aircraft causing substantial noise impact on their property. (Sworn testimony of Herbert Van Nostrand (Ex. 3C).**

50. The Van Nostrand property would also have experienced noise from aircraft in "the break" for Runway 5L/R at an altitude of approximately 1,500 feet, but would have been directly overflown only if the aircraft was extremely wide abeam, which would have been unusual. Erie Decl., ¶ 50. The Van Nostrand property would also have experienced noise from aircraft departing NAS Oceana on Runway 32 L/R that turned left (toward the south) and were flying at approximately 2,000 feet while climbing to assigned altitude, but this property would not have been routinely overflown during these departures. Erie Decl., ¶ 51.

**Response No. 50**

**Plaintiffs object to paragraph 50 for the reasons stated in objection to paragraphs 37, 40 and 49.**

51. The Van Nostrand property would also have experienced noise from

aircraft entering the visual landing pattern for Runway 14L/R via "the break" on a very infrequent basis. Erie Decl., ¶ 52. Aircraft in this pattern may very infrequently overfly the Van Nostrand property at approximately 1,500 feet. Erie Decl., ¶ 52.

**Response No. 51**

**Plaintiffs object to paragraph 51 for the reasons stated in opposition to paragraphs 37, 40 and 49.**

52. Aircraft may have flown over or within a mile of the Waterman property when using the IFR/radar training pattern for Runways 5L/R and 23L/R, but would have done so at an altitude of 2,000 feet. Erie Decl., ¶ 64; see also Exhibit F. Aircraft departing Runway 5L/R on the way to NALF Fentress would have flown over or within one to two miles of the Waterman property at an altitude of approximately 1,500 feet. Erie Decl., ¶ 65. Aircraft departing Runway 23L/R for areas to the east may have overflown directly over or within one to two miles of this property at an altitude of approximately 1,500 to 2,000 feet as they climbed to 4,000 feet. Erie Decl., ¶ 65.

**Response No. 52**

**Plaintiffs object to paragraph 52 for the reasons stated in opposition to paragraphs 37 and 40. The Waterman property is directly and often overflown with substantial impact of noise on the ground. (Depo. of Eddie Waterman, Ex. 6B).**

53. The May property is located approximately four miles away from the NAS Oceana runways, barely inside the NAS Oceana tower-controlled airspace. Erie Decl., ¶ 53; see also Exhibit F. The May property may have experienced minimal aircraft noise when Runway 14L/R was in use, roughly two percent of the time, but these aircraft

would usually have passed well south of the property on the way to the airfield. Erie Decl., ¶¶ 25, 54.

**Response No. 53**

**Plaintiffs object to paragraph 53 for the reasons stated in opposition to paragraphs 37 and 40. Mrs. May's property is an excellent example of how the theoretical flight patterns and theoretical operations that form the basis of Defendant's case have little relationship to the real world. Ms. May's property, which is the most distant of the Test Case properties from the airfield, is regularly overflown and Ms. May has been bombarded by substantial jet noise since the arrival of the F/A-18s (Depo. of Eileen May, Ex. 9B).**

54. On the very infrequent occasions when Runway 14L/R was in use and NAS Oceana was in IFR conditions, aircraft on IFR/Radar approaches to NAS Oceana would have flown within three-quarters to one mile of the May property, but not over it, at an altitude of approximately 1,500 to 2,000 feet. Erie Decl., ¶ 55. It is also possible that aircraft flying between NAS Norfolk and NAS Oceana would have flown within one to two miles of the May property at approximately 2,000 feet, but this would have been extremely infrequent, perhaps once per month. Erie Decl., ¶ 55; see generally Hebert Decl.

**Response No. 54**

**Plaintiffs object to paragraph 54 for the reasons stated in objection to paragraphs 37, 40 and 53.**

55. Aircraft may have flown directly over or within a mile of the Ryan

property when the IFR/radar training pattern for Runways 5L/R and 23L/R, but at an altitude of 2,000 feet. Erie Decl., ¶ 68; see also Exhibit F. This property would also have experienced noise from aircraft on their way to NALF Fentress to conduct FCLPs after departing NAS Oceana Runway 5L/R and turning right toward the ocean; however, the aircraft would have been at an altitude of 1,500 feet and would not have routinely overflown the Ryan property. Erie Decl., ¶ 69; but see Hebert Decl., ¶ 2.

**Response No. 55**

**Plaintiffs object to paragraph 55 for the reasons stated in Plaintiffs' opposition to paragraphs 37, 40 and 53. The Ryan's property has been regularly directly overflown by the F/A-18s since their arrival causing substantial noise impact to the property and to Mr. Ryan's family. (Depo. of Sean Ryan, Ex. 5B).**