00001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, )
et al., )
)
Plaintiffs, )
)
v. ) NO. 01-201L
) Judge Victor J. Wolski
THE UNITED STATES OF AMERICA, )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION
OF CARROLL LINDSAY
TAKEN ON BEHALF OF THE DEFENDANT

Virginia Beach, Virginia
June 9, 2005

Appearances:

HOFHEIMER / FERREBEE, P.C.
By: KRISTEN HOFHEIMER, ESQUIRE
Counsel for the Plaintiffs

00011

Q. And why did you sell your home on Royal Palm?

A. It was a divorce situation, and the ex-wife forced the issue.

Q. So when you moved into the rental home on Mornay Drive, were you the only one living in that house?

A. I had a girlfriend.

Q. And then you went from the rental home and you bought the current home that you have now?

A. Correct.

Q. When did you buy the house?

A. In 1994.

Q. Okay.

A. July. June or July.

Q. Okay. Mr. Lindsay, I'm showing you, this is marked Defendant's Exhibit 10. And what I'd like you to do, if you can -- sorry. Is that -- there you go. If you could show me on the map where you have lived in Virginia Beach in terms of the first home that you lived at on Independence Boulevard, or in that area. And if you could just show me?

A. My eyes, nor my neck is going to reach that far.

Q. No. That's fine.

A. Laskin Road. North Great Neck. It's not on the map. Independence Boulevard is further west towards Norfolk.

Q. Okay. What about your home, the first home that

June of 1998 was when the first cancer was detected, diagnosed, whatever.

Q. And so after June '98 you were here in Virginia Beach during the week?

A. Correct. With an occasional trip up to Cincinnati, the home office, because theoretically I was still on the payroll.

Q. Okay.

A. Not theoretically. I was on the payroll.

Q. You mentioned earlier that when you first moved into the home, you didn't think the jet noise was insignificant. When do you think --

A. I'm sorry. When I first moved into the home, I thought the jet noise --

Q. Was not significant?

A. Correct.

Q. Do you remember when you noticed the jet noise becoming more significant?

A. Well, with the coming of the F-18s, without doubt, without any question, reservation, whatsoever, without doubt, that was when that first occurred. And it was in the time frame of when I was I'll call it recuperating or recovering from the first cancer operation that I had, and the subsequent radiation treatment that I had, which went over a period of three or four months, which

00021

would have been the fall of 1998.
Q. The fall of '98?
A. Correct. The surgery was in June, July of 1998.
Q. And that coincides with increased jet noise that you experienced in your home?
A. I was home. Yes.
Q. When you first came to Virginia Beach in 1979, did you know the Naval Air Station Oceana was here?
A. Yes.
Q. Did you know that they flew jets in and out of the base?
A. Oh, of course.
Q. Did you ever experience jet noise at any of the other homes that you lived at in Virginia Beach?
A. I'm sure I did. But was it anything significant? No.
Q. What do you mean by significant?
A. Significant means to the point where it was bothersome.
Q. What is bothersome?
A. Bothersome in that context to me would mean something that would interrupt my daily routine, my life, or something of that nature.
Q. Okay. Can you give me an example?
A. An example of something that would interfere with

my life?
Q. Yes.
A. I'm standing out in my yard talking to my wife and suddenly we can't hear each other. We just have to stop because you can't hear.
Q. Has that happened to you in your current home?
A. Most definitely.
Q. Do you remember the first time that happened?
A. I couldn't tell you exactly. It was sometime in the 1998 time frame.
Q. What about when you are inside your home? Can you hear jets?
A. It's muffled somewhat. But when you are watching a TV program and you have got the volume so loud that it's -- I'm going to say almost vibrating the floor, the volume is so loud, and you still can't hear the TV, that's bothersome to me.
Q. You mean the TV volume vibrates the floor?
A. Yes.
Q. Or the jet --
A. Well, the jet noise too. Windows have shaken in my house. And I don't think that was because of the volume of the TV.
Q. Okay. You mentioned that you and your wife would be having a conversation outside. Does she live with you

now?

A. Yes. She is my wife now. When I referred to girlfriend earlier, it's my wife now.

Q. Have you seen jets fly over your property?

A. Numerous times.

Q. Can you describe that for me?

A. Oh, I mean I don't know exactly how to describe it. Jets -- I mean I'm not trying to give you a smart answer. Here's a plane. I'm standing outside. I hear the noise, a tremendous noise coming, and I look up and there's a jet plane. I recognize a jet plane. Sometimes they are very low.

Q. Can you tell me, or can you describe how low?

A. I don't know. I can't judge distances looking up in the air. I don't know. Low. To me, very low.

Q. You mentioned you have trees on your property?

A. Yes.

Q. Do they fly close to the trees?

A. Yes.

Q. To the tops of the trees?

A. Yes.

Q. Do you know about how far?

A. I can't give you a number of feet. I don't know.

Q. They seem to be close?

A. They seem pretty darned close to me, yes. Using

about the jet noise?
A. I don't know that it will.
Q. What would eliminate your concerns?
A. To eliminate the jet noise, or to make the jet noise I'll call it tolerable.
Q. You described the noise a few minutes ago as intolerable?
A. Yes.
Q. What would be your opinion of what is tolerable?
A. I'm sorry.
Q. Well, what is the difference between what is intolerable and what is tolerable?
A. The difference between tolerable and intolerable, as it relates to jet noise, is the difference between, as an example, something that disrupts my life-style as opposed to something that does not disrupt my life-style. Something that interferes with my conversation with my wife or my neighbor or someone that is visiting, and prohibits that conversation from taking place, as opposed to the opposite of that. To me, that's what I mean by tolerable or intolerable. Or not tolerable.
Q. Do you think the noise was tolerable before the fall of '98?
A. I do not recall the disruption and the noise level being to anywhere near the extent prior to the arrival

00072

of the F/A-18s. Or putting it a different way: The activity with the F/A -- with the F-14s as an example, the Tomcats, there was noise levels there, but that I did not necessarily put in the intolerable category.

Q. Why is that?

A. For the reasons that I have already stated. It was -- the noise level is -- it's certainly there with the F-14s. But it is not intolerable to the extent that it disrupts my life-style, to the extent that it keeps -- prohibits me from carrying on a conversation when they are flying.

Q. When the F-14s are flying, how do you know F-14s were flying before the F-18s?

A. Well, generally speaking, I can tell the difference between -- visually, between an F-14 and an F-18.

Q. So did you see F-14s flying near your property before you saw F-18s flying?

A. Yes.

Q. When did you see F-14s flying?

A. I don't recall. I mean I couldn't tell you a date. I don't know. I can't remember.

Q. Would it be before the fall of '98?

A. Yes.

Q. And when you saw those F-14s flying, could you have a conversation outdoors then?

00074

less frequently?
A. The noise level was not as high. The noise level was not as high. I don't know how else to answer that question. It was not as disruptive.
Q. Did you have conversations outside your house when the F-14s were flying?
A. I don't remember.
Q. Do you know if you were ever watching TV when the F-14s were flying over?
A. I couldn't answer that definitively, one way or the other. I don't have a schedule of when F-14s fly. That in relation to when I watch TV. My life is not structured that way.
Q. You mentioned earlier that you are married. What is your wife's name?
A. Brenda.
Q. Is she a plaintiff in this lawsuit?
A. No.
Q. Have you ever taken any video recordings, tape-recordings, or photographs of the jets?
A. No. Sorry. No.
Q. Going back to the F-14s for just a moment.
A. Okay.
Q. Would you agree that most of the time while those planes were flying prior to the fall of '98 that you were

00080

conference room. Can you just describe the window that you pointed to behind you?

A. That window is approximately four feet in height. I would say my windows are three feet maybe. Three feet in height.

Q. And what about the width?

A. It varies. I assume the windows -- the width of the windows are -- that window is approximately, in terms of the glass, is approximately 18 inches. The windows in my house are approximately 18 inches wide as well. But again they vary because of different size windows depending on the amount of opening. And there are certain windows -- I'll call them windows, glass, that do not open or close at all. They are just pieces of solid glass that's inserted in a hole in the wall.

Q. If you wanted to replace your windows in your home, do you think you could afford to do that?

A. Absolutely not.

Q. Why not?

A. I can't afford it. We're talking about -- maybe I shouldn't anticipate your question. But we're talking about thousands of dollars. I had quotes. I don't recall the amount of money right now, but we're talking about approximately $10,000.

Q. When did you have the quotes?

A. I don't remember. Two years ago. Three years ago. Maybe five years ago. I don't remember.

Q. Do you remember who did the quotes?

A. I don't remember the name of the company.

Q. Why did you have the quotes done?

A. Two reasons. Number one, possibly to eliminate some noise. Number two, there is some -- obviously some degradation in the windows, in the casings around the windows, being that they are 30 years old or so. So age, and better insulation from the elements outside. Not just noise, but the elements outside to give better insulation.

Q. What other elements outside?

A. The cold, the heat, to better insulate your home.

Q. So if you replace the windows with windows that you would like, what percentage of the noise from the jets do you think would be eliminated?

A. It's some positive number. I wouldn't venture to guess.

Q. Five percent, ten percent?

MS. HOFHEIMER: Objection. Calls for speculation.

A. Yes.

MS. HOFHEIMER: He can't answer if he doesn't know.

A. You can guess whatever number you want to use. I