00001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, )
et al., )
Plaintiffs, )
)
v. ) No. 01-201L
)Judge Victor J. Wolski
THE UNITED STATES OF AMERICA, )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION OF

CARL HELVIE

TAKEN ON BEHALF OF THE DEFENDANT

VIRGINIA BEACH, VIRGINIA

JANUARY 12, 2006

Appearances:

HOFHEIMER/FERREBEE, PC
By: JACK E. FERREBEE, ESQUIRE
Counsel for Plaintiffs

U.S. DEPARTMENT OF JUSTICE
By: STEVEN D. BRYANT, ESQUIRE
Counsel for Defendant

00003

Deposition upon oral examination of CARL HELVIE, taken on behalf of the Defendant, before Kerry E. Zahn, Registered Merit Reporter, Certified Realtime Reporter, a Notary Public for the Commonwealth of Virginia at large, taken pursuant to notice, commencing at 2:30 p.m. on January 12, 2006, at the offices of Hofheimer/Ferrebee, PC, 1060 Laskin Road, Virginia Beach, Virginia.

CARL HELVIE was sworn and deposed on behalf of the Defendant as follows:

EXAMINATION

BY MR. BRYANT:

Q. Good afternoon, Mr. Helvie. My name is Steve Bryant with the Department of Justice. I'm going to be asking some questions today. If, first, you'll state your name, address, and occupation.

A. Carl Helvie. 9 Riley's Way, Hampton, Virginia 23664, Professor Emeritus - Old Dominion University.

Q. Have you ever been deposed before, Mr. Helvie?

A. No.

Q. Sort of the ground rules of it is we

00005

Q. Is it north?

A. Hampton. Well, I live north of Hampton. I live on a little island called Grand View, but it's a Hampton address and it would be -- it's toward Richmond from here, but it's just on the other side of the water.

Q. And what body of water is that?

A. What body of water --

Q. If you don't know --

A. I don't know.

Q. That's fine.

Why did you move to that house?

A. Because of the jet noise.

Q. That's the reason you moved; any other reason?

A. Definitely not. I loved my house.

Q. All right. Let's talk about your previous residence.

A. Okay.

Q. What was that address?

A. That was 421 Lake Drive.

Q. Okay.

A. Virginia Beach 23451.

Q. And how long did you live there?

A. Twenty -- I believe it was 26 or 28

00006

years.

Q. A long time.

A. Right.

Q. Do you recall approximately the year that you moved in? Was it about -- was it about '72 or something?

A. It was, yes, right.

Q. I'm going to ask you -- I have a map here, it's DX 10, and I'm going to ask you to point out for me -- here's a pen -- where 421 Lake Drive is. If you could hold it down so I could see.

A. Let's see. Let's see. I lived right here.

Q. If you could do me a favor and next to that write the letter B and the number 1. B1.

A. (Complying)

Q. Okay. Thank you.

What I'm going to do is write on the bottom of this, and I should have been doing it the whole time, but I'm going to write your name, Helvie, and then B1, and Lake Drive for that address.

So you lived in that location for approximately 28 years or so?

A. Right. Yes.

Q. Did you live anywhere else in Virginia

00013

with jet noise in your house or being outside of your house --

A. No.

Q. -- when you rented that property for a year?

A. No.

Q. When you bought the property at Lake Drive, which was several blocks south of there, you moved in there in 19 --

A. '7 --

Q. -- '72?

A. Right.

Q. And did you experience any flight operations/jet noise when you moved into that house?

A. Occasionally, for the first -- well, the last two years is when it got very, very bad, but before that it was just occasionally. Not very often.

Q. Okay. So the Lake Drive home, when you say you would experience flight operations occasionally, up until --

A. Up until the last couple of years, right.

Q. For that fairly long period of time, 26 years or so?

A. (Nodding)

Q. That 26-year period again before the last two, did you hear flight operations while you were inside your house ever?

A. I don't remember that either.

Q. You don't remember ever being on the phone and having to stop a conversation because of flights?

A. The only thing I remember is that, you know, when I discussed with my neighbors, they always said that we were not in the flight path then. And, so, I didn't have the loud, loud noise right over my house.

Q. Well, when you say you discussed it with your neighbors, I'm inferring that that was in the last two-year period when things changed; is that correct? Or would you have had that conversation that you're now --

A. I think we had a conversation, you know, with neighbors on either side of me before, because the noise was in the distance and they had said we weren't in the flight path.

Q. I see. Okay.

A. I think. But it could have been after, but I think we had had that conversation before.

Q. Do you know what neighbor that would

that 26-year period; is that correct?
A. I don't remember ever seeing them; no.
Q. Okay. Let's now turn to the last two years you were in the house, and you said you -- I believe you sold that house in -- or you moved into the other house in December of 2000?
A. I believe that was when I moved, right.
Q. And did you move directly from the Lake Drive house to the Hampton Roads (sic) home?
A. Yes.
Q. So when you say the last two years, you would be talking December 1998 through December 2000?
A. I'm not definite on the time, you know, but it -- it was a year or two years. It was that last period when I lived in the house, and I -- I said, I've got to get away from this, I can't take it anymore.
Q. Okay. And in that period of time, when did you first notice a change, what event, what happened where you -- how did you first notice it, that something was different?
A. Well, I think maybe the first time I noticed it was when someone flew over and I thought they were going to hit the tree in my front yard

because they were just above the tree when they went over. And you could, you know, see the people in the planes flying over, they were so low and so loud.

Q. And do you remember what time of year this was?

A. No.

Q. And you say there was -- there was a tree in your yard?

A. Two big oak trees in my front yard.

Q. Oak trees.

And did the aircraft graze the top of the trees or just over?

A. They were just over the top of the trees.

Q. And when you say "just over," are we talking a few feet, a hundred feet?

A. Oh, a few feet.

Q. Oh, just over?

A. Right.

Q. Okay. Did the -- did the trees sway and bend as a result of the jets flying over?

A. I don't remember that. I don't remember whether they did or not.

Q. But you remember specifically the aircraft flying --

A. Right.
Q. -- just a few feet over the trees?
A. Right. Right.
Q. But you don't recall what else happened in terms of --
A. No.
Q. -- did any tree limbs fall out of the tree or anything of that nature?
A. Tree limbs fell, but I don't know if they were related to that or if they just fell because it was a very, very old tree.
Q. Well, I mean in terms of at the time that that aircraft was flying --
A. Oh, you mean when it was flying?
Q. Yes.
A. I went in the house, so I don't know.
Q. You didn't observe any tree branches fall or anything of that nature?
A. You mean when the plane was going over? No. Because once I saw the plane right up on top, I went in the house.
Q. Okay. And what did you do next when you went in the house?
A. Held my ears.
Q. Okay.

00025

that had come.

Q. Okay.

A. But it also was obvious that the flight pattern had also changed.

Q. Because these flights were now over your house?

A. Right.

Q. And they weren't before?

A. No.

Q. So if it became a common occurrence for the flights -- for the jets to fly over and sort of graze over the top of that oak -- those two oak trees, I think you said?

A. Right.

Q. -- about how often did you see that happen?

A. I don't know how often they were over the trees, but I know that it was a daily occurrence, the noise, daily and nightly, because there were nights when there was no way to get rid of the noise. And then I would go to school the next day and try to teach, and I was tired.

Q. But sort of going back to the -- so there were other operations that weren't that low --

A. Right.

00026

Q. -- where the trees --
What would be -- in relation to that level, the other operations that you had experienced daily and nightly, what altitude would those flights be?
A. A lot of times I was inside my house, so I didn't go out to see how high they were. I only knew that they were very loud and that the noise was -- you couldn't carry on a conversation. I couldn't talk on the phone. I couldn't catch television. I mean, I couldn't concentrate on developing my classes, or research papers, or anything else. It was just too noisy.
Q. And did you ever -- were you ever outside and observing flights coming over your house?
A. Sometimes very low, right, and sometimes a little bit higher. And there were a couple times when it looked like fire was coming out of the planes and I was afraid it was going to set the ground on fire or catch the house on fire. I don't know what that was.
Q. Okay.
A. And, also, I noticed that my roof got very in dark color, and I don't know if that was from

Q. Okay.
A. The house I sold.
Q. Okay.
A. So there was still value in the house.
Q. Okay. So, then, what do you mean by the loss of the house? What exactly do you mean by that?
A. By the loss of the house, I mean that I was forced out of my house because of jet noise, a house that I had that was paid for, that was secure primarily from hurricanes. I never had a problem with hurricanes. A house that I didn't have house payments because, as I say, it was paid for, I was very comfortable in. I was comfortable in my neighborhood. I knew everyone there. I was President of the civic league. I was very happy in my neighborhood. But I was forced out of the house because of the jet noise. I could not stand the jet noise anymore.
Q. Okay. And in terms of the compensation you're seeking, what would happen if there is to be recovery in this case would be any diminution in value, property value, of the house.
A. What do you mean? I don't know what "diminution" means.
Q. A reduction --