

# FINAL ENVIRONMENTAL IMPACT STATEMENT

## Realignment of F/A-18 Aircraft and Operational Functions from Naval Air Station (NAS) Cecil Field, Florida, to Other East Coast Installations

DEPARTMENT OF THE NAVY
UNITED STATES OF AMERICA

# Executive Summary

## Name of Action

The action evaluated in this environmental impact statement (EIS) is the realignment of Atlantic Fleet F/A-18 fleet and FRS aircraft (i.e., F/A-18 fleet squadrons and the F/A-18 Fleet Replacement Squadron [FRS]) and operational functions from Naval Air Station (NAS) Cecil Field to other Navy and Marine Corps air stations on the east coast of the United States.

The action is an administrative action, undertaken by the U.S. Department of the Navy (DoN, which includes the Navy and Marine Corps) to accommodate the realignment mandated by the U.S. Department of Defense's (DoD's) base closure and realignment process.

This EIS was prepared in accordance with the National Environmental Policy Act (NEPA) of 1969, the Council on Environmental Quality (CEQ) regulations implementing NEPA (40 Code of Federal Regulations [CFR] 1500-1508), Chief of Naval Operations Instruction (OPNAVINST) 5090.1B - Chapter 2, and the Defense Base Closure and Realignment Act (DBCRA) of 1990 (P.L. 101-510, Title XXIX).

## Description of the Proposed Action

Based on the DoD's assessment of its military force structure, NAS Cecil Field is to be closed and its critical functions and assets transferred to other installations with excess capacity and support infrastructure. The F/A-18 fleet squadrons and FRS from NAS Cecil Field total 180 aircraft (11 squadrons of 12 aircraft each [132 total aircraft] and an FRS of 48 aircraft), and are supported by 4,200 military and civilian personnel. Installations that are being considered in five separate alternative realignment scenarios (ARSs) are: NAS Oceana, Virginia; Marine Corps Air Station (MCAS) Beaufort, South Carolina; and MCAS Cherry Point, North Carolina.

The proposed action for each ARS includes an operational scenario to accommodate F/A-18 squadrons in existing regional airspace structures, construction of new facilities, and

renovation of existing facilities in order to accommodate the Atlantic Fleet F/A-18 squadrons and support personnel.

### Alternatives

The 1993 Defense Closure and Realignment (BRAC) Commission directed the closure of NAS Cecil Field, Florida, and realigned its aircraft and personnel to MCAS Cherry Point, North Carolina, and MCAS Beaufort, South Carolina, and NAS Oceana, Virginia. The 1995 BRAC Commission redirected the realignment of NAS Cecil Field aircraft to "*...other naval air stations, primarily [NAS] Oceana; [MCAS] Beaufort, South Carolina; [NAS] Jacksonville, Florida; [NAS] Atlanta, Georgia; or other Navy and Marine Corps Air Stations with the necessary capacity and support infrastructure.*" This change was based on the Commission's intent to retain only that infrastructure necessary to support the Department of Defense's (DoD's) Force Structure Plan without impeding operational flexibility for deployment of that force. The overall goal was to optimize use of existing infrastructure, thereby reducing additional investment and ensuring that taxpayer dollars are spent in the most efficient way possible. The 1995 BRAC findings specifically stated that the Commission's intention was to avoid the substantial construction at MCAS Cherry Point required to support relocating F/A-18 aircraft under the 1993 BRAC mandates.

The DoN conducted a multi-stage screening process to identify reasonable and feasible alternatives that would complete the realignment in a manner consistent with the 1995 BRAC Commission recommendations, which have the force and effect of law. Installations were screened for necessary capacity and support infrastructure as well as the installation's ability to meet operations criteria. Specifically, this screening process consisted of a capacity analysis, an infrastructure analysis, and an operational readiness analysis. One-time costs and life-cycle costs necessary to implement the relocation of F/A-18 fleet and FRS aircraft were also considered. Numerous alternative basing options were examined; however, only five were determined to be reasonable and feasible alternatives. These five reasonable and feasible alternatives were given a full comparative analysis, and economic, environmental, and social concerns were evaluated.

The capacity analysis paralleled that of the BRAC process by using available hangar capacity, measured in "hangar modules", as the primary indicator of whether existing capacity was present at a particular installation. Again parallel to the BRAC process, necessary support infrastructure at each installation was examined and issues such as runway capacity, maintenance and training infrastructure, and other support facilities were considered. Finally,

the operational analysis examined issues such as access to training ranges, airspace availability, Field Carrier Landing Practice (FCLP) requirements, safety, effects on combat readiness, and implementation life-cycle costs.

The DoN used Naval Facilities Engineering Command (NAVFAC) P-80 guidelines (P-80), the common standard for construction at Navy and Marine Corps air stations, to evaluate capacity and infrastructure. This publication provides planning guidance for determining the requirements for shore-based facilities needed to support Navy and Marine Corps operations. In addition, these guidelines are used to evaluate the adequacy of existing facilities, identify facility deficiencies or excesses, and validate construction project submittals. Thus, P-80 is the planning guidance that sets general standards for construction of Navy and Marine Corps facility infrastructure. Identification and application of these guidelines enabled the DoN to identify potential receiving installations and determine those ARSs considered reasonable for further comparison.

All ARSs had to be operationally and functionally acceptable. Additionally, all ARSs had to be consistent with the BRAC recommendation to utilize excess capacity and infrastructure at potential receiving installations. The following basic considerations, in addition to those discussed in Section 2.1, were used to develop the ARSs:

- At least one ARS had to consider siting all F/A-18 fleet and FRS aircraft at one installation to replace to the greatest extent practicable the operational and logistical characteristics currently experienced with all Atlantic Fleet F/A-18 fleet and FRS aircraft stationed at NAS Cecil Field. From operations, logistics support, and life-cycle cost perspectives, single-siting all F/A-18 aircraft is preferred to siting aircraft in multiple locations. Multiple locations complicate required logistics and degrades synergism (i.e., interrelationships between various functions associated with training, deployment, and maintenance of Navy F/A-18 fleet and FRS squadrons).

- An ARS consisting of splitting Atlantic Fleet F/A-18 fleet and FRS assets among more than two locations was considered unacceptable because of operational constraints and high support costs associated with maintaining and operating Navy F/A-18 assets in multiple locations. Further, it would sacrifice the readiness levels and effectiveness of training for Navy F/A-18 pilots and support personnel. The Navy's current authorized personnel levels, and the funding ceilings for such levels, as well as the Navy's inventory of F/A-18 parts and equipment, would not be able to fully support such a separation. The technical, logistical, and economic problems resulting from the dispersal of F/A-18 aircraft to multiple receiving sites were considered so undesirable that they precluded relocation of the Atlantic Fleet Navy F/A-18 assets to more than two locations.

- Consideration had to be given to the implications of "carrier air wing" configurations, which are subsets of the overall Atlantic Fleet strike/fighter wing consisting of groupings of aircraft squadrons to facilitate deployment with aircraft carriers. A normal carrier air wing includes two or three Navy F/A-18 squadrons, depending on the availability of other fighter/attack aircraft (e.g., Navy F-14s, Marine Corps F/A-18s). Therefore, ARSs could not include the relocation of only one F/A-18 fleet squadron to a particular location.

- An ARS consisting of splitting the F/A-18 FRS from the majority of Navy fleet squadrons was considered unacceptable because of specific training, logistical, and maintenance interrelationships between the FRS and fleet squadrons. Within the past 30 years, the FRS has never been separated from Navy operational squadrons of the same type/model/series aircraft, except for short-term training detachments. Separating the FRS from the majority of the Navy fleet squadrons would detract significantly from the ability of the FRS and fleet squadrons to support each other, which has proven to be of great value. For example, the practice of loaning aircraft or parts to provide the needed capability for deploying squadrons would be rendered very costly and difficult. Maintenance parts, equipment, and personnel do not currently exist in the Navy's inventory to fully support such a separation. Squadron training requires use of the two-seat version of the F/A-18 aircraft assigned to the FRS, and necessary training on night vision equipment would likewise be significantly impacted. Finally, the Navy would incur significant cost increases and management difficulties associated with the assignment of personnel. The degraded capabilities resulting from separating the FRS from the majority of the fleet aircraft are thus considered unacceptable.

The DoN conducted an initial screening analysis on 20 Navy and Marine Corps air installations located along the Atlantic coast and the Gulf of Mexico. Many of the installations identified as potential receiving sites failed to meet more than one of the screening criteria. The installations were evaluated on capacity; infrastructure, including airfield criteria, training, maintenance, and ancillary facility infrastructure; and operational readiness factors such as proximity to ranges, FCLP requirements, and compatibility of F/A-18 operations with other airfield operations. Section 2.2 summarizes the screening process, and discusses installations that did not meet specific criteria.

Three installations met all required criteria and were identified as reasonable candidate installations for receiving F/A-18 fleet and FRS aircraft: NAS Oceana, MCAS Beaufort, and MCAS Cherry Point. Of the three candidate installations identified in Section 2.2, NAS Oceana has the greatest amount of excess hangar capacity (8 modules), followed by MCAS Cherry Point (3 modules), and MCAS Beaufort (2 modules). From an operational

perspective, the best configuration of the Atlantic Fleet F/A-18 strike/fighter wing would result from relocating all the F/A-18 fleet squadrons and the FRS to a single installation as they are currently based together at NAS Cecil Field. Reasons for this include:

- Training efficiencies are maximized through direct interaction among all F/A-18 fleet squadrons and the FRS, and avoidance of either the cost of transporting trainees to a remote training location or constructing flight simulator facilities at multiple locations.

- Maintenance efficiencies are maximized through single siting all maintenance facilities and related support organizations such as Naval Air Maintenance Training Group Detachment (NAMTRAGRUDET). Additionally, the need for multiple spare parts/equipment stocks is eliminated and all fleet squadrons have access to the FRS in the event there is an immediate need for replacement aircraft to meet operational commitments.

- Personnel efficiencies are maximized through the ability to move personnel directly from the FRS to fleet squadrons without moving families and household goods. Additionally the duplication of personnel to provide maintenance, ground support and flight control functions is eliminated.

The three candidate receiving installations were examined to determine if all F/A-18 aircraft could be relocated within the parameters of the 1995 BRAC mandate. In doing so, adjustments were made to projected needs based on typical deployment schedules. As discussed above, hangar space occupied by deployed squadrons would be used by squadrons remaining at the installation (typically referred to as "hot racking"). Such hangar module utilization practices are normal at most Naval and Marine Corps air stations.

Even with adjustments for deployments, none of the three installations would be able to house all F/A-18 fleet and FRS aircraft to P-80 guidelines. Given the need for 11 available hangar modules in place at any one time and the operational preference for a single site, NAS Oceana is the only reasonable single-site location due to its available capacity and the relative costs involved. With the creation of an additional 3-module hangar and aircraft parking apron, NAS Oceana could house all the F/A-18 aircraft to P-80 guidelines.

Single-siting would not be possible at either MCAS Beaufort or MCAS Cherry Point, even with an additional 3-module hangar. MCAS Beaufort would still be deficient by six modules; MCAS Cherry Point would still be deficient by five modules; and NAS Oceana's capacity would remain completely underutilized.

Taking into account these factors, the following three ARSs were developed:

- **ARS 1:** Relocating all 11 F/A-18 fleet squadrons and the FRS to NAS Oceana.
- **ARS 2:** Relocating two F/A-18 fleet squadrons to MCAS Beaufort and nine fleet squadrons and the FRS to NAS Oceana.
- **ARS 3:** Relocating three fleet squadrons to MCAS Cherry Point and eight fleet squadrons and the FRS to NAS Oceana.

During the development of these ARSs, it became apparent that relocating the F/A-18 aircraft to NAS Oceana would result in significant aircraft noise impacts associated with the large increase in airfield operations. Therefore, the Navy decided to consider other operationally feasible scenarios that could potentially reduce noise impacts.

- **ARS 4:** Relocating five F/A-18 fleet squadrons to MCAS Beaufort and six fleet squadrons and the FRS to NAS Oceana.
- **ARS 5:** Relocating five F/A-18 fleet squadrons to MCAS Cherry Point and six fleet squadrons and the FRS to NAS Oceana.

As has been noted, no ARS would meet P-80 guidelines without some additional construction. While the 1995 BRAC mandates are intended to maximize use of existing resources and minimize creation of new facilities, the most efficient use of existing resources would still necessitate some additional construction regardless of where the F/A-18 aircraft are relocated. It should be noted that by adding alternatives that place five F/A-18 fleet squadrons at MCAS Beaufort or MCAS Cherry Point, the capacity of NAS Oceana, defined by P-80 as eight hangar modules, would be fully utilized by the remaining six fleet squadrons and the FRS. MCAS Beaufort and MCAS Cherry Point each possess some available unused hangar capacity and are otherwise acceptable as receiving sites. Additional construction at either of these sites would allow capacity at NAS Oceana to be fully utilized, would use existing capacity at one of the two Marine Corps air stations, and would result in the most noise mitigation possible, consistent with operational requirements. Therefore, additional hangar module construction at MCAS Beaufort or MCAS Cherry Point is considered reasonable in the context of providing an alternative that mitigates noise impacts at NAS Oceana.

Conversely, major expansion at an installation not already having some existing capacity or requiring acquisition of real estate and construction of additional infrastructure would be unreasonable as long as other installations exist that could provide the infrastructure without degrading operational requirements.

The five ARSs are described in the following paragraphs.

### ARS 1: Transfer of 11 F/A-18 Fleet Squadrons (132 Aircraft) and F/A-18 FRS (48 Aircraft) to NAS Oceana, Virginia

This alternative would maximize the use of existing hangar and apron capacity at NAS Oceana. Eight hangar modules of existing excess capacity would be utilized.

Historic operations at NAS Oceana indicate that 11 squadrons could be accommodated, although at somewhat less than P-80 guidelines, even without construction of additional hangars and aircraft parking. To meet P-80 criteria, a 3-module hangar would be required. Other construction projects would be needed to support operation and maintenance of F/A-18 aircraft and training of F/A-18 personnel. These projects are primarily reuse/renovation of existing facilities or building additions.

From an operational perspective, ARS 1 provides the best configuration of the Atlantic Fleet F/A-18 strike/fighter wing, since all F/A-18 fleet squadrons and the FRS are located at a single installation (COMNAVAIRLANT 1997). All training, maintenance, and personnel efficiencies discussed in Section 2.3 are realized in ARS 1.

Implementation of ARS 1 would require 14 construction projects, primarily consisting of reuse/renovation of existing facilities and/or additions to existing facilities. These would consist of the following:

- Minor parking apron alterations, including installation of steel plates along the flight line to protect the pavement and 400-hertz (Hz) converters to provide additional power for parked aircraft;
- Two-story addition to Building 140 for an F/A-18 flight simulator facility;
- One-story addition and interior modifications to Building 140 for a Naval Maintenance Training Group Detachment (NAMTRAGRUDET) training facility;
- Three additions to Building 137 for a Strike Fighter Weapons School facility and parking lot;
- A series of small additions and freestanding construction projects to support F/A-18 maintenance facilities, and two parking lots;

- Construction of a new hangar facility for corrosion control and aircraft painting;
- Installation of vaults in Buildings 111 and 122 for classified document storage;
- Renovations to Building 122, including installation of interior walls and utilities to the hangar;
- A new 230-unit bachelor enlisted quarters (BEQ), a new 55-unit BEQ, and parking lot;
- Renovation of Building 1100 for jet engine testing;
- A new one-story aircraft acoustical enclosure to test high-powered in-aircraft engine run-ups;
- Construction of a new three-module aircraft hangar; and
- Expansion of the aircraft parking apron to provide additional space for F/A-18 aircraft.

The one-time cost associated with ARS 1 would be approximately $99 million. The net present value of 30-year life-cycle costs of implementing ARS 1 would be approximately $285 million in 1998 dollars.

### ARS 2: Transfer of Two F/A-18 Fleet Squadrons (24 Aircraft) to MCAS Beaufort, South Carolina, and Transfer of Nine F/A-18 Fleet Squadrons (108 Aircraft) and the F/A-18 FRS (48 Aircraft) to NAS Oceana, Virginia

This alternative would maximize the use of existing hangar and apron capacity at MCAS Beaufort and sends the remaining F/A-18 assets, including the FRS, to NAS Oceana. It would have the added advantage of collocating the Navy and Marine Corps F/A-18 squadrons, which comprise one carrier airwing, at MCAS Beaufort. Although there is excess capacity using P-80 guidelines for two fleet squadrons at MCAS Beaufort, it would be necessary to accept slight deviations from P-80 guidelines to accommodate aircraft on the station's parking apron. However, overall airfield efficiency would be maintained.

This scenario would also maximize the use of existing excess hangar and apron capacity at NAS Oceana. However, construction of a three module hangar would still be required at NAS Oceana for periods when the MCAS Beaufort carrier air wing would be deployed (i.e., approximately 20% of deployment schedules). Ten hangar modules of existing excess capacity (eight modules at NAS Oceana and two modules at MCAS Beaufort) would be utilized.

Two fleet squadrons can be absorbed at MCAS Beaufort without any significant aircraft maintenance facility (i.e., AIMD) expansions, because there are available Marine Corps mobile AIMD facilities that can support the two additional squadrons. Because of maintenance requirements, relocating more than two F/A-18 fleet squadrons at MCAS Beaufort would require the construction of an AIMD and new hangar modules (COMNAVAIRLANT 1996a).

From an operational perspective, several of the benefits in a single site alternative are realized in ARS 2 due to the joint basing of Navy F/A-18 aircraft with existing Marine Corps F/A-18 aircraft at MCAS Beaufort. Benefits include: (1) training efficiency through the use of the existing flight simulator facility at MCAS Beaufort; (2) maintenance efficiency through utilization of existing MCAS Beaufort F/A-18 maintenance assets, thereby eliminating the need for multiple spare part/equipment stocks or turnaround times necessary to get parts to and from a single repair site; and (3) personnel efficiency by eliminating the duplication in personnel inherent to siting aircraft at locations without existing F/A-18s.

The following projects would be necessary at MCAS Beaufort to implement ARS 2:

- Parking apron alterations, including installation of steel plates along the flight line to protect the pavement, 400-Hz converters to provide additional power for parked aircraft, and construction of a 390,000-square-foot Mobile Facilities (MF) Pad;

- Construction of a crew, equipment, and administrative building adjacent to the MF Pad; and

- Hangar renovations to Building 729.

Under ARS 2, the large majority of F/A-18 assets would still be transferred to NAS Oceana. Therefore, it would still be the logical location of the majority of F/A-18 maintenance, training, and personnel support facilities. The transfer of 24 aircraft to MCAS Beaufort would not proportionately reduce the size or number of facilities that would be required to conduct these activities. Therefore, with the exception of a reduction in the size of one BEQ, projects at NAS Oceana under ARS 2 would be the same as ARS 1.

The one-time cost associated with ARS 2 would be approximately $95 million for NAS Oceana and $12 million for MCAS Beaufort for a total of $107 million. The net present value of the 30-year life-cycle costs of implementing ARS 2 would be approximately $307 million in 1998 dollars.

**ARS 3: Transfer of Three F/A-18 Fleet Squadrons (36 Aircraft) to MCAS Cherry Point, North Carolina, and Transfer of Eight F/A-18 Fleet Squadrons (96 Aircraft) and the F/A-18 FRS (48 Aircraft) to NAS Oceana, Virginia**

This alternative would maximize the use of excess hangar and apron capacity at MCAS Cherry Point by sending one three-squadron carrier airwing to MCAS Cherry Point and the remaining F/A-18 assets, including the FRS, to NAS Oceana. As with ARS 2, accommodating three squadrons at MCAS Cherry Point would require deviations from P-80 guidelines with regard to parking apron requirements; however, these deviations would not significantly affect airfield efficiency.

This scenario would reduce the hangar module deficiency at NAS Oceana compared to ARS 1 or 2. NAS Oceana would be deficient by only two modules for periods when the MCAS Cherry Point fleet squadrons would be deployed (i.e. approximately 20% of deployment schedules). Construction of a two-module hangar would be required at NAS Oceana. Eleven modules of existing excess capacity (eight modules at NAS Oceana and three modules at MCAS Cherry Point) would be utilized.

AIMD activities at MCAS Cherry Point are assigned to Marine Aircraft Logistical Squadron (MALS)-14. Currently, there is no F/A-18 repair capability at MCAS Cherry Point (LANTDIV 1996a). Therefore, a stand-alone F/A-18 AIMD facility would be required to support the realignment of three fleet squadrons of Navy F/A-18 aircraft to this station (COMNAVAIRLANT 1997).

From an operational perspective, the overall cost of transporting trainees to NAS Oceana is lower for MCAS Cherry Point than for MCAS Beaufort. However, very few other training, maintenance, or personnel benefits achieved in a single-site alternative are realized in ARS 3 because there are no existing F/A-18 facilities at MCAS Cherry Point.

The following projects would be necessary at MCAS Cherry Point to implement ARS 3:

- Parking apron alterations, including installation of steel plates along the flight line to protect the pavement, 400-Hz converters to provide additional power for parked aircraft;
- Hangar renovations to Buildings 1665W, 131S, and 1700; and
- The construction of an AIMD facility consisting of specialized shops for F/A-18 aircraft.

Similar to ARS 2, ARS 3 would still involve the majority of F/A-18 assets being transferred to NAS Oceana. With the exception the second BEQ and the smaller parking

### Master Jet Base Master Plan

The station master plan sets forth broad development policies for NAS Oceana to provide planning guidance. The plan encompasses several background studies regarding development constraints, regional development, operational requirements, and capital improvements. The future development plan indicates a general continuation of current functional land use arrangements at the station, with minor extensions into relatively undeveloped areas (LANTDIV 1985).

### AICUZ Program

When Congress enacted the Noise Control Act of 1972, it exempted military aircraft. However, in the spirit of the Act, DoD established the AICUZ program in 1973. By working with local governments, the AICUZ program fosters compatible development around military airfields to protect the health, safety, and welfare of those living in nearby communities while enabling DoD to safely conduct its flight operations. The program defines areas around the station that are exposed to increased levels of aircraft noise and the potential for aircraft accidents. The AICUZ study includes a detailed analysis of aircraft noise, accident potential, land use compatibility, operational procedures, and recommendations for compatible development in the vicinity of the installation.

Aircraft noise impacts are quantified and depicted through noise exposure contours, which are developed by computer modeling of aircraft operations at the installation. These contours reflect installation-specific operation data such as flight tracks, type and mix of aircraft, frequency/times of operations, altitude profiles, and aircraft performance parameters (power and airspeed). Noise exposure contours, measured in day-night average sound level (Ldn), are developed using either annual average day (AAD) or average busy day (ABD) operations where appropriate (see Section 3.1.8). The Ldn noise metric places more weight on measurements for night operations (10:00 p.m. to 7:00 a.m.) because of the higher annoyance associated with night operations when ambient noise levels are low (see Appendix H).

Noise exposure areas are divided into three noise zones. Noise Zone 1 (less than 65 dB Ldn) is essentially an area of minimal noise impact. Noise Zone 2 (65 to 75 dB Ldn) is an area of moderate noise impact. Noise Zone 3 (greater than 75 dB Ldn) is the area most severely impacted by noise (U.S. Navy 1988). When aircraft operations or aircraft type change, a new aircraft noise study is typically performed to accurately assess the potential change in noise exposure.

**Table 3.1-21**

**GEOGRAPHICAL DISTRIBUTION OF PERSONS EMPLOYED AT NAS OCEANA**

| Geographical Area | Percentage of Personnel |
|---|---|
| City of Virginia Beach | 74.2 |
| City of Chesapeake | 9.3 |
| City of Norfolk | 5.9 |
| City of Portsmouth | 2.5 |
| City of Suffolk | 0.9 |
| Total in South Hampton Roads | 92.8 |
| All Other Locations | 7.2 |

Source: Countryman 1995.

population by 500 military personnel. As shown in Table 3.1-20, without the proposed action, the station population increased to approximately 8,800 military and civilian personnel by the end of FY 1996, increased to approximately 9,500 personnel by the end of FY 1997 (September 30, 1997), and is projected to decline to 9,000 personnel by the end of FY 1998.

NAS Oceana is located in the City of Virginia Beach in southeastern Virginia. The area immediately surrounding the station is known as south Hampton Roads, which consists of the cities of Chesapeake, Norfolk, Portsmouth, Suffolk, and Virginia Beach. Data from civilian personnel employed at NAS Oceana were used to estimate the geographical distribution of all personnel (military and civilian) employed at NAS Oceana. As shown on Table 3.1-21, the majority of civilian and military personnel stationed at NAS Oceana are assumed to live in south Hampton Roads, with the largest portion of these personnel residing in the City of Virginia Beach (74%), distantly followed by the City of Chesapeake (9%).

According to the U.S. Bureau of the Census, the total 1990 population of the City of Virginia Beach was 393,069 persons, making it the largest city in south Hampton Roads (U.S. Bureau of the Census 1992). The 1993 population in the city was estimated to be 416,200 persons (Hampton Roads Planning District Commission 1995). The 1993 population in Chesapeake was estimated to be 170,400 persons, making it the third largest city in south Hampton Roads, after Virginia Beach and Norfolk (Hampton Roads Planning District Commission 1995).

Virginia Beach, Chesapeake, and south Hampton Roads as a whole experienced rapid growth during the 1980s. From 1980 to 1990, the total population in Virginia Beach increased by nearly 50% over the 1980 population level of 262,199 persons. Chesapeake's total population increased by over 32% from 1980 to 1990, growing from 114,486 to 151,976 total persons. During the same time period, south Hampton Roads expanded approximately 21%, from 795,862 residents in 1980 to 962,322 residents in 1990 (see Table 3.1-22).

The total population of Virginia Beach, Chesapeake, and south Hampton Roads as a whole is projected to continue to grow. By the end of this decade, the total population of Virginia Beach is expected to reach 440,024 residents; by the year 2015, the total population is projected to reach 505,522 persons. The population of the City of Chesapeake is projected to grow to 210,271 by 2000, and 253,535 by 2015. South Hampton Roads as a whole is expected to experience population increases over the next 20 years, with total population projected to reach 1,095,280 residents in the year 2000. By 2015, the total population of the region is expected to climb to 1,239,625 persons (see Table 3.1-23).

**Table 3.1-22**

**TOTAL POPULATION OF THE CITIES LOCATED IN SOUTH HAMPTON ROADS DURING 1980, 1990, AND CURRENT CONDITIONS**

| | Total Population | | | Percent Change 1980 to 1990 |
|---|---|---|---|---|
| | 1980 | 1990 | Current Conditions[a] | |
| City of Chesapeake | 114,486 | 151,976 | 170,400 | 32.7 |
| City of Norfolk | 266,979 | 261,229 | 245,300 | -2.2 |
| City of Portsmouth | 104,577 | 103,907 | 103,600 | -0.6 |
| City of Suffolk | 47,621 | 52,141 | 53,800 | 9.5 |
| City of Virginia Beach | 262,199 | 393,069 | 416,200 | 49.9 |
| South Hampton Roads | 795,862 | 962,322 | 989,300 | 20.9 |

[a]Current population estimated as of 1993.

Source: Hampton Roads Planning District Commission 1995.

02: OV8903\5321\OV8_3121.CDR

| NOISE SOURCE (at a given distance) | A-WEIGHTED SOUND LEVEL SCALE (dBA) | NOISE ENVIRONMENT | HUMAN JUDGMENT OF NOISE LOUDNESS [(1)] |
|---|---|---|---|
| Civil Defense Siren (100 ft) | 130 | Carrier Flight Deck | |
| | 120 | | Threshold of Pain<br>32 Times as Loud |
| Pile Driver (50 ft) | 110 | Rock Music Concert | 16 Times as Loud |
| F-18 Departure (1,000 ft) | 108 | | |
| F-18 Arrival (1,000 ft) | 104 | | |
| Ambulance Siren (100 ft) | 100 | | Very Loud |
| F-14 Departure (1,000 ft) | 97 | Printing Press Plant | |
| Newspaper Press (5 ft) | | | 8 Times as Loud |
| Power Lawn Mower (3 ft) | 96 | | |
| Motorcycle (25 ft) | 90 | Boiler Room | 4 Times as Loud |
| Prop. Plane Flyover (1,000 ft) | 88 | | |
| Diesel Truck, 40 mph (50 ft) | 84 | | |
| F-14 Arrival (1,000 ft) | 83 | | |
| Garbage Disposal (3 ft) | 80 | High Urban Ambient Sound | 2 Times as Loud |
| Passenger Car, 65 mph (25 ft) | 77 | | |
| Living Room Stereo (15 ft) | 76 | | Moderately Loud |
| Vacuum Cleaner (3 ft) | 70 | | |
| Electronic Typewriter (10 ft) | | | |
| Normal Conversation (5 ft) | 60 | Data Processing Center | 1/2 as Loud |
| Air Conditioning Unit (100 ft) | | | |
| | | Department Store | |
| Light Traffic (100 ft) | 50 | Private Business Office | 1/4 as Loud |
| Bird Calls (Distant) | 44 | | |
| | 40 | Lower Limit of Urban Ambient Sound | Quiet<br>1/8 as Loud |
| Soft Whisper (5 ft) | 30 | Quiet Bedroom<br>Recording Studio | |
| | 20 | | |
| | 10 | | Just Audible |
| | 0 | | Threshold of Hearing |

NOTE: [(1)] Relative to a reference loudness of 70 dBA

SOURCE: Ogden 1992; Wyle Labs 1997.

**Figure 3.1-21 SOUND LEVELS OF TYPICAL NOISE SOURCES AND NOISE ENVIRONMENTS**

**Table 5.2-16**

**OFF-STATION AREA AND ESTIMATED POPULATION WITHIN 1978 AICUZ, EXISTING 1997, AND PROJECTED 1999 NOISE ZONES NAS OCEANA/NALF FENTRESS - ARS 2**

| | 1978 AICUZ Noise Zones | | 1997 Noise Zones | | 1999 Noise Zones | | | Increase in Area/Population Exposed Relative to 1978 AICUZ | |
|---|---|---|---|---|---|---|---|---|---|
| **Ldn** | **Area in Acres (Hectares)** | **Estimated Population** | **Area in Acres (Hectares)** | **Estimated Population** | **Area in Acres (Hectares)** | **Estimated Population** | **Change in Ldn** | **Area in Acres (Hectares)** | **Estimated Population** |
| 65 to 75 dB | 30,425 (12,313) | 64,465 | 13,645 (5,522) | 27,660 | 32,142 (13,008) | 73,512 | From less than 65 dB to between 65 and 75 dB | 11,537 (4,669) | 18,486 |
| 75 dB or greater | 20,298 (8,215) | 42,378 | 653 (264) | 370 | 228 (10,614) | 47,151 | From between 65 and 75 dB to greater than 75 dB | 7,620 (3,084) | 14,668 |
| Total | 50,723 (20,528) | 106,843 | 14,298 (5,786) | 28,030 | 58,370 (23,622) | 120,663 | Total | 19,157 (7,753) | 33,154 |

Key:

AICUZ = Air Installations Compatible Use Zones.
dB = Decibel.
Ldn = Day-night average sound level.

Source: Wyle Labs 1997.