3810-FF

DEPARTMENT OF DEFENSE

Department of the Navy

Record of Decision and General Conformity Determination for Realignment of F/A-18 Aircraft and Operational Functions from Naval Air Station (NAS) Cecil Field, Florida, to other East Coast Installations

AGENCY: Department of the Navy, DoD

ACTION: Notice of Record of Decision

SUMMARY: The Department of the Navy, after carefully weighing the operational, environmental, and cost implications of relocating F/A-18 aircraft from NAS Cecil Field to other Naval and Marine Corps installations, announces its decision to realign two F/A-18 fleet squadrons to Marine Corps Air Station (MCAS) Beaufort, South Carolina, and nine F/A-18 fleet squadrons and the Fleet Replacement Squadron (FRS) to Naval Air Station (NAS) Oceana, Virginia.

FOR FURTHER INFORMATION CONTACT: Mr. J. Daniel Cecchini, Atlantic Division Naval Facilities Engineering Command (Code 2032DC), 1510 Gilbert Street, Norfolk, VA 23511-2699, telephone (757) 322-4891.

RECEIVED
MAY 29 1998

SUPPLEMENTARY INFORMATION: The text of the entire Record of Decision (ROD) is provided as follows:

The Department of the Navy (DON), pursuant to the Defense Base Closure and Realignment Act of 1990 (10 USC 2687), Section 102(2)(c) of the National Environmental Policy Act (NEPA) of 1969 (42 USC 4331 et seq.), and the regulations of the Council on Environmental Quality that implement NEPA procedures (40 CFR Parts 1500-1508), hereby announces its decision to realign two F/A-18 fleet squadrons (24 aircraft and 500 military personnel) to Marine Corps Air Station (MCAS) Beaufort, South Carolina, and nine F/A-18 fleet squadrons and the Fleet Replacement Squadron (FRS) (156 aircraft and 3,700 military and civilian personnel) to Naval Air Station (NAS) Oceana, Virginia. The realignment will be accomplished as set out in Alternative Realignment Scenario (ARS) 2, which is described in the Final Environmental Impact Statement (FEIS).

To support the additional personnel and operation and maintenance of the aircraft, four construction projects are required at MCAS Beaufort; 14 construction projects, primarily consisting of additions to existing facilities, are required at NAS Oceana.

The realignment of the fleet squadrons to MCAS Beaufort will increase aircraft operations at MCAS Beaufort, associated military training areas along the coast of South Carolina and Georgia, and the Townsend Bombing Range in Georgia. The

realignment of the fleet squadrons and FRS to NAS Oceana will increase aircraft operations at NAS Oceana, Naval Auxiliary Landing Field (NALF) Fentress, Virginia, and associated military training areas and target ranges located primarily in eastern North Carolina. This includes the Brant Island Shoal (BT-9), Piney Island (BT-11), and Dare County target ranges. Pursuant to Section 176(c) of the Clean Air Act (CAA) (42 U.S.C. 7476(c)), the DON has determined that the realignment of F/A-18 aircraft to NAS Oceana under ARS 2 conforms to Virginia's State Implementation Plan. The entire State of South Carolina is classified as attainment for all criteria pollutants. Therefore, the air quality effects of ARS 2 at MCAS Beaufort are exempt from the General Conformity Rule.

Realignment of the F/A-18 aircraft and operational functions from NAS Cecil Field will begin in 1998 and is expected to be completed in 1999.

BACKGROUND: The 1993 Defense Base Closure and Realignment Commission (BRAC) recommended closure of NAS Cecil Field and realignment of all of its aircraft and associated personnel to MCAS Cherry Point, North Carolina; MCAS Beaufort, South Carolina; and NAS Oceana, Virginia.

In 1995, the BRAC Commission revised its recommendations regarding realignment of NAS Cecil Field assets by redirecting all aircraft and associated personnel to "...other naval air stations, primarily [NAS] Oceana; [MCAS] Beaufort; [NAS]

Jacksonville, Florida; [NAS] Atlanta, Georgia; or other Navy or Marine Corps air stations with necessary capacity and support infrastructure." In separate actions, some of the NAS Cecil Field assets have been relocated to NAS Jacksonville (six S-3 ASW squadrons) and NAS Atlanta (two reserve F/A-18 squadrons). This ROD selects a receiving site for the NAS Cecil Field active duty F/A-18 aircraft.

As the 1995 BRAC Commission did not recommend realignment to a specific base, the DON conducted a multi-stage screening process to identify reasonable and feasible alternatives for realignment of NAS Cecil Field F/A-18 active duty aircraft to east/gulf coast Navy or Marine Corps air station(s) with necessary capacity and support infrastructure.

PROCESS: A Notice of Intent (NOI) to prepare an EIS for the transfer of up to ten squadrons of F/A-18 aircraft from NAS Cecil Field to NAS Oceana was published in the *Federal Register* on November 16, 1995. This notice also indicated that separate NEPA documentation would be prepared for the transfer of two operational (active duty) F/A-18 squadrons from NAS Cecil Field to MCAS Beaufort. On August 23, 1996, in recognition of the non-specific language contained in the 1995 BRAC Commission mandates, the DON published an amended NOI in the *Federal Register* indicating its intent to expand its alternatives analysis and to prepare a single comprehensive document for realignment of all operational Atlantic Fleet F/A-18 fleet aircraft and the FRS from

NAS Cecil Field. The DON reopened its scoping process and held two additional scoping meetings.

A Notice of Availability (NOA) of the Draft EIS (DEIS) and a Draft CAA Conformity Determination were published in the *Federal Register* on September 19, 1997, and in local newspapers the following week. Seven public hearings were held on the DEIS - one in South Carolina, four in North Carolina, and two in Virginia - between October 20 and November 17, 1997. Approximately 275 individuals, agencies, and organizations submitted comments. All verbal and written comments were addressed in Appendix I of the FEIS.

An NOA of the FEIS and the Final CAA Conformity Determination were published in the *Federal Register* on March 20, 1998, and announced in local newspapers the preceding week. Approximately 440 letters were received on the FEIS during the 30-day public review period; substantive comments are addressed later in this ROD.

ALTERNATIVES CONSIDERED: The DON screened 20 Navy and Marine Corps air installations located along the Atlantic Coast and the Gulf of Mexico using capacity, support infrastructure, and operational criteria. Only three installations met these criteria - NAS Oceana, MCAS Beaufort, and MCAS Cherry Point.

Because none of the three installations would be able to accommodate all F/A-18 fleet and FRS aircraft without some expansion of existing facilities or new construction, the DON

developed alternative realignment scenarios (ARSs) designed to make the best use of excess capacity at each installation.

ARS 1 proposed realigning all 11 F/A-18 fleet squadrons and the FRS at NAS Oceana. This was identified in the FEIS as an operationally preferred alternative because single-siting the Atlantic Fleet F/A-18 Strike/Fighter Wing would provide the same configuration that currently exists at NAS Cecil field. This alternative expands capacity at NAS Oceana and requires 14 construction projects.

ARS 2 proposed realigning two F/A-18 fleet squadrons to MCAS Beaufort and nine F/A-18 fleet squadrons and the FRS to NAS Oceana. This was identified in the FEIS as an operationally acceptable alternative because it would: result in the least degradation of single-site benefits; fully utilize excess capacity at both NAS Oceana and MCAS Beaufort; take advantage of the F/A-18 training facilities that currently exist at MCAS Beaufort; and result in only slightly higher construction and life-cycle costs than ARS 1. It requires some construction at NAS Oceana, but is the lowest cost dual-site alternative.

ARS 3 proposed realigning three F/A-18 fleet squadrons to MCAS Cherry Point and eight F/A-18 fleet squadrons and the FRS to NAS Oceana. This alternative maximizes the use of existing hangar and apron capacity at MCAS Cherry Point and sends the remaining assets to NAS Oceana. This alternative requires some construction at NAS Oceana.

ARS 4 proposed realigning five F/A-18 fleet squadrons to MCAS Beaufort and six F/A-18 fleet squadrons and the FRS to NAS Oceana. This alternative expands capacity at MCAS Beaufort and requires some construction at NAS Oceana. It utilizes all available capacity at NAS Oceana and reduces noise and air quality impacts at NAS Oceana and NALF Fentress.

ARS 5 proposed realigning five F/A-18 fleet squadrons to MCAS Cherry Point and six F/A-18 fleet squadrons and the FRS to NAS Oceana. This alternative expands capacity at MCAS Cherry Point and requires some construction at NAS Oceana. It utilizes all available capacity at NAS Oceana and reduces noise and air quality impacts at NAS Oceana and NALF Fentress. ARS 5 is the environmentally preferred alternative.

ENVIRONMENTAL IMPACTS: The DON analyzed the potential impacts of all ARSs on: airfield operations; military training areas; target ranges; land use; socioeconomics and community services; infrastructure and utilities; transportation; noise; air quality; topography, geology and soils; water resources; vegetation and wildlife; wetlands; cultural resources; hazardous materials and waste management; and installation restoration programs. The DON also considered the potential cumulative impacts of the project and whether the proposed action would be consistent with federal policies addressing environmental justice.

Since the DON has decided to implement ARS 2, this ROD focuses on the major impacts of ARS 2 at MCAS Beaufort and NAS

Oceana. ARS 2 creates significant land use and noise impacts at MCAS Beaufort and NAS Oceana. Impacts on all other resources or functions analyzed in the FEIS were less than significant.

Land Use - Increases in airfield operations at MCAS Beaufort and NAS Oceana will result in the expansion of aircraft noise zones and the expansion and reconfiguration of accident potential zones (APZs). The expansion of APZs and noise zones has the potential to adversely affect use of land underlying the APZs and noise zones. Certain land uses, such as residential development, are considered incompatible with noise zone III where the day-night average noise level (Ldn) is greater than 75dB(A). High-density residential and commercial development is also considered incompatible land use in APZs.

Impacts to future private development actions may occur as a result of implementing ARS 2 because additional area may be subject to development restrictions in local airfield encroachment zones. The City of Beaufort has in place an ordinance that requires disclosure when selling property within the Beaufort noise zones. The City of Virginia Beach's airfield noise attenuation and safety ordinance places additional requirements (i.e., noise attenuation) on private development in high aircraft noise areas within the 1978 Air Installations Compatible Use Zones (AICUZ) noise zones. Although the ARS 2 footprint is larger than the 1978 AICUZ footprint at NAS Oceana,

landowners would be able to continue development based on existing property zoning and applicable sound attenuation requirements.

In addition, the U.S. Department of Housing and Urban Development (HUD), the Federal Housing Administration (FHA), and the U.S. Department of Veterans Affairs (VA) restrict the availability of mortgage loans for existing and new homes in noise zones II (i.e. 65-75 dB(A) Ldn) and III (i.e. greater than 75 dB(A) Ldn) and the APZs nearest the runways (i.e. the clear zones).

APZs will expand by 1,894 acres around MCAS Beaufort compared to the 1994 AICUZ. Thirteen percent of this area is residential. APZ expansion at MCAS Beaufort is driven by an increase in the number and type of operations flown by Navy F/A-18 aircraft.

Changes in APZs around NAS Oceana are a result of two different factors. Changes between 1978 APZs and 1997 APZs at NAS Oceana are due in large part to a change in the criteria used by the DON to develop APZs. The result of this change is that APZs will expand by 2,759 and 3,473 acres around NAS Oceana and NALF Fentress, respectively, compared to the 1978 AICUZ. Changes in APZs from 1997 to 1999 reflect the addition of Navy F/A-18 operations as a result of this ROD causing a 1,751 acre APZ increase around NAS Oceana. There would be no change in the size of the APZ around NALF Fentress from addition of the F/A-18

aircraft. Forty-one percent of the total projected NAS Oceana APZ area and five percent of the total projected NALF Fentress APZ areas are residential.

Individuals living or working within an APZ are slightly more at risk from an aircraft accident, in the unlikely event that one occurs, than others living or working near NAS Oceana, NALF Fentress, or MCAS Beaufort outside designated APZs.

Noise - Expansion of noise zones under ARS 2 also has the potential to adversely affect public health and safety. Compared to the 1997 MCAS Beaufort AICUZ, this action will expose 1,659 new people to the 65 to 75 dB(A) Ldn noise zone and 644 new people to the 75+ dB(A) Ldn noise zone.

Compared to the 1978 NAS Oceana and NALF Fentress AICUZ, this action will expose 18,486 new people to the 65 to 75 dB(A) Ldn noise zone and 14,668 new people to the 75+ dB(A) Ldn noise zone. Compared to the 1997 noise contours and APZs prepared as part of the EIS process, this action will expose 45,852 new people to the 65 to 75 dB(A) Ldn noise zone and 46,781 new people to the 75+ dB(A) Ldn noise zone.

Individuals living in 65+ dB(A) noise zones may be annoyed and experience interference with daily activities such as sleep, conversation, television viewing, and outdoor recreation. Homeowners may incur costs to ensure that sufficient sound attenuation exists within their dwellings to achieve the Environmental Protection Agency (EPA) desired interior noise

level goal of 45 dB(A) Ldn. There is very little probability that long term physical affects, such as hearing loss, will result from exposure to the projected noise levels. A recent study suggests, however, some individuals, particularly children, may temporarily experience stress or elevated blood pressure.

The EIS used public schools as representative sensitive noise receptors to predict impacts. While the discussion of impacts in the FEIS focused on public schools, the impacts discussed in the FEIS could be experienced at private schools and other sensitive receptors as well.

No public schools are located within the 65 dB(A) Ldn or greater noise zone around MCAS Beaufort. Twenty-one public schools in the vicinity of NAS Oceana and NALF Fentress will be within the 65 dB(A) Ldn or greater noise zone with the implementation of ARS 2. Six of these schools are in the 75 dB(A) Ldn or greater noise contour. The projected increases in noise at these schools vary, ranging from an 8 to 20 dB(A) Ldn increase over existing (1997) conditions.

Studies conducted by Cornell University researchers have shown that learning ability and comprehension may be impaired in children exposed to high noise levels. Local school authorities may incur costs to ensure that sufficient sound attenuation exists within the schools to achieve the EPA desired interior noise level goal of 45 dB(A) Ldn. Exposure to high levels of

noise while outdoors in schoolyards cannot be mitigated through sound attenuation.

Schools and Housing - Realignment of two squadrons to MCAS Beaufort involves the transfer of 500 military personnel and 600 dependents to the area. Realignment of nine squadrons and the FRS to NAS Oceana involves the transfer of 3,700 military and civilian personnel and 4,600 dependents to the Hampton Roads area. Most of the relocating families will live off-base due to the lack of on-base housing. Sufficient housing vacancies and school capacity exists in the local community to accommodate this influx of personnel. Therefore, local community services and infrastructure are not expected to be significantly impacted at either MCAS Beaufort or NAS Oceana.

Traffic - Traffic will increase in the vicinity of MCAS Beaufort by 1999 due to the proposed realignment and regional growth exclusive of the realignment. Two roadways in the vicinity of MCAS Beaufort are projected to operate at Level of Service (LOS) F in 1999. However, the projected LOS is attributed to regional growth exclusive of the realignment and the island geography of the region. Traffic volume associated with the realignment is less than 2% of the projected 1999 traffic volume for local roadways.

Regional roadways in the vicinity of NAS Oceana will experience an increase in daily traffic as a result of the personnel increase under ARS 2. In most cases, projected LOS on

these roadways will be C or better upon completion of roadway improvements already planned by local governments independent of this action. Some roadway segments along First Colonial Road and Virginia Beach Boulevard will continue to operate at LOS D, E, or F, with or without the realignment. The delay in traffic flow associated with LOS D, E, and F is a result of projected regional growth, not traffic increases associated with ARS 2.

Air Quality - Air emissions at NAS Oceana and NALF Fentress will have a net emission increase of approximately 2 tons per year of volatile organic compounds (VOCs), 349 tons per year of nitrogen oxides ($NO_x$), 298 tons per year of carbon monoxide (CO), 9 tons per year of sulfur dioxide ($SO_2$) and 195 tons per year of particulate matter ($PM_{10}$). The DON completed a conformity determination under Section 176(c) of the CAA and EPA's implementing regulations demonstrating that the projected increases in emissions of ozone precursors (VOC and $NO_x$) conform to the allowable emissions in the recently revised Commonwealth of Virginia's State Implementation Plan (SIP).

In revising its SIP, Virginia expressly included emission levels associated with the realignment of F/A-18 aircraft from NAS Cecil Field. As part of this realignment decision, I approve the Final CAA Conformity Determination included as Appendix E in the FEIS.

MITIGATION:

<u>Noise</u> - In response to public comment the DON will request congressional authorization to increase the priority of funding to accelerate the construction schedule of an already planned $12 million aircraft acoustical enclosure ("hush house") at NAS Oceana to reduce noise emissions associated with the high-power, in-aircraft engine maintenance tests.

<u>Land Use</u> - In response to public comment, the DON will also move some local flight pattern operations from runway 5R to runway 5L at NAS Oceana. This mitigation measure will remove the City of Virginia Beach's Brookwood and Plaza Elementary Schools from APZ-2, and decrease the number of people living in the 75 dB Ldn and greater noise zone by 322 individuals.

RESPONSE TO COMMENTS RECEIVED REGARDING THE FINAL ENVIRONMENTAL IMPACT STATEMENT: The DON received comments on the FEIS from 1 federal agency, 10 members of Congress and elected state officials, 10 state agencies, 2 local governments, and numerous citizen groups and private individuals. Many of the comments received simply stated support for or opposition to the proposed realignment.

Several commentors suggested that a supplemental EIS was necessary to address additional alternatives. The comments received on the FEIS did not present new or additional information that substantially affected the analysis of environmental impacts in the FEIS. The range of alternatives analyzed in the EIS is based upon the BRAC-directed realignment,

provides a logical basis for analysis of environmental impacts and, permits a reasoned choice by the decision-maker. I have reviewed the comments and the range of alternatives and have determined that a supplemental EIS is not warranted.

Other substantive comments received are addressed below by subject matter.

Noise

Sound Attenuation - Many commentors, including EPA, were critical of the lack of discussion of the cost of sound attenuation as mitigation for noise impacts. As indicated in the FEIS, the DON does not have legal authority to expend federal funds on improvements to state, local, or private property. Specific Congressional authorization and appropriation would be required to obtain funds for this purpose. The DON does not intend to request such authority.

In addition, the decision to implement sound attenuation for buildings and homes surrounding the airfields is an individual choice made by local governments, school boards, and individual homeowners. Therefore, any attempt to determine these costs would be speculative in nature.

The FEIS discusses potential sound attenuation such as air conditioning and insulation, and, as requested, the DON will work with local officials to help them conduct detailed engineering evaluations at those schools of particular concern. Upon request, the DON will also provide technical information on sound

mitigation to any affected entity in the MCAS Beaufort or NAS Oceana/NALF Fentress regions.

Noise Impacts on Children - Citizens Concerned About Jet Noise noted that the FEIS discussion of impacts on children did not include reference to a study entitled *Noise: A Hazard for the Fetus and Newborn (RE9728)*. In response to that comment, the DON reviewed the study and found it to be not relevant to discussion of noise impacts related to aircraft overflight. The study focused on the type of continuous noise found in the workplace and used a very narrow range of subjects (i.e. those in neonatal intensive care units). The constant workplace noise the study focused on does not correlate to intermittent aircraft noise or the discrete noise events generally associated with an airfield environment. A Cornell University study, *Chronic Noise Exposure and Reading Deficits: The Mediating Effects of Language Acquisition* (Evans 1997), which specifically addressed health effects from aircraft noise on children, was used in analyzing impacts associated with aircraft noise in the FEIS.

Property Values - Several commentors criticized the FEIS for not addressing changes in property values due to noise impacts. As discussed in the FEIS, property values are dynamic, vary over time and reflect factors including neighborhood characteristics and individual housing characteristics. Any discussion of changes in property value would, therefore, be too speculative for inclusion in the EIS.

<u>Aircraft Maintenance</u> - Commentors from the State of North Carolina suggested that life cycle costs for facilities at MCAS Cherry Point in ARS 3 and ARS 5 were overstated because they included construction of facilities for, and outfitting of, an F/A-18 Aircraft Intermediate Maintenance Department (AIMD). These commentors suggested that intermediate maintenance work at MCAS Cherry Point in ARS 3 and ARS 5 could be accomplished for a substantially lower cost by using Naval Aviation Depot (NADEP) Cherry Point. In light of these comments, the DON, examined using the NADEP in lieu of a stand-alone AIMD. My evaluation of this issue included a thorough review of Navy AIMD requirements and procedures, a point-by-point analysis of the assertions made regarding NADEP capabilities, and a visit to the NADEP on May 11, 1998. This evaluation confirmed the conclusion that it would be necessary to establish an AIMD at MCAS Cherry Point. The NADEP does not have the excess capacity needed to take on the intermediate maintenance requirement, does not have the capabilities needed to perform AIMD functions, and the additional workload could not be assigned without significant expansion of the facilities, equipment, and workforce at the NADEP. Additionally, the intermediate maintenance workload in support of tactical aircraft needs to be performed by military personnel to ensure maintenance proficiency while deployed and to support sea/shore rotation, technical advancement, and career progression. I also noted that intermediate maintenance on

Marine Corps aircraft assigned to Cherry Point is performed by Marine Aircraft Logistical Squadron (MALS), not the NADEP.

Transportation - EPA commented that a peak hour LOS analysis needed to be completed for the roadways around NAS Oceana. NAS Oceana gate count traffic data indicate peak LOS times do not correlate with regional peak traffic flow. Therefore, a peak analysis would not have contributed to the analysis of impacts of the proposed action.

Carbon Monoxide (CO) Hot Spot Analysis - Another commentor suggested that a CO hot spot analysis should have been conducted at heavily used intersections. As discussed in the FEIS, degradation in the LOS would occur on only one on-base roadway segment. No off-base roadway segments would experience degradation of LOS on a long-term basis as a result of the proposed action. Therefore, there is no need to conduct a CO hot spot analysis since the Hampton Roads Planning District Commission traffic study indicated that LOS would not deteriorate due to the planned roadway improvements on roadways that surround the base.

Fuel Handling - EPA asked for more information about potential fuel spills. NAS Oceana has been pro-active in improving its fuel spill prevention, control, and countermeasures in the past few years. Spill response procedures have been and continue to be adequate to handle any spill encountered or expected.

Fuel Dumping - EPA commented on emergency fuel dumping. As noted on pages 4.3-8 and B-1-18 in the FEIS, emergency fuel dumping is extremely rare. DON policy directs that it not occur below 6,000 feet above ground level unless necessary to save the pilot and/or aircraft. In the event of an engine failure on a dual engine fighter, like the F/A-18, the pilot should be able to operate with the remaining engine or climb above 6,000 feet before dumping fuel, thus minimizing the impacts associated with the release of the fuel. (Above 6,000, the fuel has enough time to completely vaporize and dissipate before reaching the ground, and thus has a negligible effect at ground level.) Therefore, any impact from fuel dumping would not be significant.

Sediment and Water Quality Sampling at BT-9/11 - EPA recommended gathering more information about sediment quality in target locations. The 1991 Sirrene Study test results for BT-9 which analyzed sediments impacted by approximately 40 years of military bombing activities showed no significant differences in water and sediment quality between the range areas and non-range areas. As a direct result of this study, as indicated in their letter of May 28, 1992, to the Marine Corps, the State of North Carolina determined that continuous monitoring was not required, and future, narrowly focused sampling would only be required as a result of changes in ordnance volume or type, or some indication of significant water or sediment quality degradation.

U.S. Fish and Wildlife Service (USFWS) Red Wolf Re-introduction Program - EPA expressed concern about potential impacts to the Red Wolf. USFWS's only concern has been their continued access to the range to monitor Red Wolf populations. In our response to USFWS comments, set out in Appendix I of the FEIS, the DON agreed to continue to make the range accessible to the USFWS consistent with DON operational use of the range.

Water Supply Issue - One commentor asked for clarification on the water supply sources available to NAS Oceana. In the event of a regional drought, the Navy would rely on an existing Norfolk/Suffolk well pumping contract to assure water for our bases.

Family Housing Costs - The State of North Carolina questioned the family housing costs under ARS 5. Subsequently, the DON conducted a detailed review of all housing costs and other expense items and has identified the following necessary revisions:

1. In ARS 5, the DON inadvertently used the Variable Housing Allowance (VHA) rate for Beaufort, South Carolina, instead of Havelock, North Carolina, to determine family housing costs for five squadrons at MCAS Cherry Point. The change is shown as item 1 in the table below.

2. In all five ARSs, an incorrect number of enlisted bachelor loading was used. The change is shown as item 2 in the table below.

3. In ARS 2, the NAS Oceana off-base bachelor officers housing component was inadvertently omitted. The change is shown as item 3 in the table below.

4. In all five ARSs, Basic Allowance for Quarters (BAQ) was not included since it remains fixed across varying economies. However, since the mix of housing in each ARS varies between on-base and off-base, adding BAQ to the life-cycle cost analysis would improve the accuracy of our analysis. The resulting increase in ARS 1 was established as the baseline for which adjustments to ARSs 2-5 were made. The change is shown as item 4 on the table below:

| | ARS 1 ($M) | ARS 2 ($M) | ARS 3 ($M) | ARS 4 ($M) | ARS 5 ($M) |
|---|---|---|---|---|---|
| FEIS | 285.3 | 307.1 | 465.3 | 686.4 | 535.6 |
| Item 1 | - | - | - | - | -8.2 |
| Item 2 | -33.7 | -33.3 | -33.7 | -33.7 | -33.3 |
| Item 3 | - | 5.1 | - | - | - |
| Item 4 | - | -12.9 | -7.8 | -75.6 | -13.1 |
| REVISED | 251.6 | 266.0 | 423.8 | 577.1 | 481.0 |

The overall effect of these changes is not significant. (Note: Two commentors suggested that the DON use a shorter life-cycle cost analysis than the 30-year analysis performed in the EIS. In response, the DON conducted a 25 year life-cycle analysis for each alternative. The change was not significant.)

Outlying Fields - One commentor suggested that further consideration should be given to the use of outlying fields in addition to or in lieu of NALF Fentress. There are no other outlying airfields within 50 miles of NAS Oceana that could accommodate F/A-18 operations. Chapter 2 of the FEIS discusses the operational and fiscal reasons for establishing a 50-mile limitation.

Seatack Elementary School - One commentor asked for clarification of the location of Seatack Elementary School relative to the new APZs. Under ARS 2, APZ-1 bisects Seatack Elementary school.

Chesapeake Bay Water Quality - EPA expressed concern about potential impacts to the Chesapeake Bay water quality from $NO_x$ emissions. As indicated in the FEIS, the $NO_x$ emissions from the proposed action conform to Virginia's State Implementation Plan. Calculations indicate the net increase in $NO_x$ emissions over the Chesapeake Bay watershed from implementing ARS 2 will be approximately 1 ton per day to the regional airshed. This amount is minor compared to the overall input to the bay from all existing terrestrial and atmospheric sources. Therefore, the affect of the projected increase in air traffic and the associated air emissions over the Chesapeake Bay will be minimal.

State Historic Preservation Determination - Under Section 106 of the National Historic Preservation Act, the Virginia State Historic Preservation Office and the South Carolina Department of

Archives and History concurred with the DON's determination that implementation of ARS 2 would have "no effect" on historic properties.

CONCLUSIONS: In deciding where to realign F/A-18 fleet and FRS aircraft from NAS Cecil Field, I considered the following: 1995 BRAC Commission recommendations concerning capacity and infrastructure; F/A-18 operational requirements; costs associated with construction of facilities, operation and maintenance of aircraft, and training of personnel; environmental impacts; and comments received during the DEIS and FEIS public review periods.

I have analyzed and carefully weighed all of these factors and have decided, on behalf of the DON, to direct realignment of two F/A-18 fleet squadrons (24 aircraft) to MCAS Beaufort, South Carolina, and nine F/A-18 fleet squadrons and the FRS (for a total of 156 aircraft) to NAS Oceana, Virginia. ARS 2, which stations most of the squadrons at NAS Oceana and collocates two Navy squadrons with their Marine Corps counterparts at MCAS Beaufort, offers operational benefits that are not realized under the other alternatives: it establishes air wing integrity at MCAS Beaufort for the joint Navy-Marine Corps squadrons that deploy together, while retaining air wing integrity for the squadrons located at NAS Oceana. It also reduces usage of the North Carolina training ranges, and environmental impacts are slightly less than in ARS 1. While costs are slightly greater than in ARS 1, ARS 2 is the least expensive dual-siting

alternative, it fully uses excess capacity at MCAS Beaufort, and it takes full advantage of existing Marine Corps training and maintenance facilities.

Implementation of ARS 2 will result in significant land use and noise impacts on the local communities around MCAS Beaufort, NAS Oceana, and NALF Fentress. In addition to the specific mitigation measures identified in this Record of Decision, the DON will continue to review its operational procedures at NAS Oceana, NALF Fentress, and MCAS Beaufort to determine if any additional mitigation is feasible and practicable.

18 May 98
Date

Duncan Holaday
Deputy Assistant Secretary
of the Navy
(Installations and Facilities)