# FEDERAL AGENCY REVIEW OF SELECTED AIRPORT NOISE ANALYSIS ISSUES

## FEDERAL INTERAGENCY COMMITTEE ON NOISE




AUGUST 1992

FEDERAL
INTERAGENCY COMMITTEE
ON NOISE

The Federal Interagency Committee on Noise has completed its study and is pleased to submit this report, with recommendations, for consideration by member agencies.

The Committee, composed of representatives of the Departments of Transportation (Office of the Secretary and the Federal Aviation Administration), Defense, Justice, Veterans Affairs, Housing and Urban Development; the Environmental Protection Agency; and the Council on Environmental Quality, was chartered to review specific elements of federal agency procedures for the assessment of airport noise impacts and to make appropriate recommendations.

The Committee formed three subgroups: Technical, Policy and Legal. The initial work was performed by the Technical Subgroup, and its study provided the basis for the Policy and Legal Subgroups' findings, conclusions and recommendations. The Legal Subgroup provided an overall legal review of the policy recommendations. The Committee's Report reflects the efforts of all three subgroups. To maximize its utility, the report is formatted with an Executive Summary, a Policy Section which contains the recommendations, and a Technical Section to provide detailed background and support for the recommendations.

Pursuant to agreement by the Legal Subcommittee, this transmittal constitutes the final action of the Federal Interagency Committee on Noise and terminates the Committee.

James Hegland
(Lt. Col. U.S. Air Force)
Chairman, Technical Subgroup

William Dickerson
(Environmental Protection Agency)
Chairman, Policy Subgroup

Richard Danforth
(Federal Aviation Administration)
Chairman, Legal Subgroup

August 21, 1992
(Date)

# EXECUTIVE SUMMARY

## INTRODUCTION

The 1990 Federal Interagency Committee on Noise (FICON) was formed to review Federal policies that govern the assessment of airport noise impacts. The FICON review focused primarily on:

- The manner in which noise impacts are determined, including whether aircraft noise impacts are fundamentally different from other transportation noise impacts;
- The manner in which noise impacts are described;
- The extent of impacts outside of Day-Night Average A-Weighted Sound Level (DNL) 65 decibels (dB) that should be reviewed in a National Environmental Policy Act (NEPA) document;
- The range of Federal Aviation Administration (FAA)-controlled mitigation options (noise abatement and flight track procedures) analyzed; and,
- The relationship of the FAA Federal Aviation Regulation (FAR) Part 150 process to the NEPA process; including ramifications to the NEPA process if they are separate, and exploration of the means by which the two processes can be handled to maximize benefits.

The FICON was organized into three subgroups to appropriately focus on the technical, legal and policy issues associated with the assessment of airport noise impacts. The Technical Subgroup #1 was tasked to review the body of science associated with methodologies and metrics for assessing airport noise impacts which have evolved since the 1980 meetings of the Federal Interagency Committee on Urban Noise (FICUN). The Policy Subgroup #2 was tasked to review Federal policies that govern the assessment of airport noise impacts. The Legal Subgroup #3 reviewed the legal aspects of current and proposed Federal policies for assessing airport noise impacts. The Subgroup #1 Technical report was used as a basis for the policy report development.

The results of the work of the Policy and Technical Subgroups are contained herein as Volume 1: Policy Review and Volume II: Technical Report. Key conclusions from the Technical Report and the overall FICON recommendations are summarized below.

## TECHNICAL CONCLUSIONS

### <u>General</u>

- There are no new descriptors or metrics of sufficient scientific standing to substitute for the present DNL cumulative noise exposure metric.
- The methodology employing DNL as the noise exposure metric and appropriate dose-response relationships (primarily the Schultz curve for Percent Highly Annoyed) to determine noise impacts on populations is considered the proper one for civil and military aviation scenarios in the general vicinity of airports.
- Federal agencies generally conduct noise assessments at DNL levels of ≥ 65 dB. For a variety of reasons, noise predictions and interpretations are frequently less reliable

below DNL 65 dB. DNL prediction models tend to degrade in accuracy at large distances from the airport. Therefore, predictions of noise exposure and impact below DNL 65 dB should take the possibility of such inaccuracy into account.

- DNL is sometimes supplemented by other metrics, on a case-by-case basis.
- Noise analyses should address impacts in the following areas: (1) health and welfare, (2) environmental degradation/impact and (3) land use planning.
- Complaints are an inadequate indicator of the full extent of noise effects on a population.

**Health and Welfare:**

- The dose-effect relationship, as represented by DNL and "Percent Highly Annoyed" (%HA), remains the best available approach for analyzing overall health and welfare impacts for the vast majority of transportation noise analysis situations.
- The 10 dB nighttime penalty levied against noise during the 10 PM to 7 AM period is specifically designed to account for the intrusiveness of noise during this period, and its potential impact on sleep. There are no new hard data which would justify a change in this penalty.
- If supplemental analysis for sleep disturbance is desired, use may be made of an interim dose-response model developed by the AF Armstrong Laboratories (AL) (see Volume II, Section 3.2.2.3). Although this relationship is described in terms of Sound Exposure Level (SEL), single event metrics are of limited use in predicting and interpreting cumulative noise exposure impacts
- Annoyance is a summary measure of the general adverse reaction of people to living in noisy environments that causes speech interference, sleep disturbance, desire for a tranquil environment; and the inability to use the telephone, radio or television satisfactorily.
- No definitive evidence of nonauditory health effects from aircraft noise exists, particularly below DNL 70 dB.
- For supplemental analysis Long-Term Equivalent Sound Level [Leq(x)] (where X represents the time period of concern) or Time Above (TA) may be used for analysis of school and communications requirements indoors during specific hours.
- Public health and welfare effects below DNL 60 dB have not been established, but are assumed to decrease according to the decrease in percent of people highly annoyed.

**Environmental Degradation/Impact**

- Under NEPA, environmental degradation might have to be assessed around airports even if there is no clear effect on public health and welfare. Other criteria might be appropriate.
- A 3 dB increase in the DNL environment represents a doubling of sound energy, and clearly is an indicator of the need for further analysis, although smaller increases may indicate similar need. In other words, the impact of a given incremental amount of change in noise levels depends, in part, upon the existing level of the noise environment.
- Recent technology and software advances in geographic information systems (GIS),

noise methodology and census data present an enhanced potential for detailed analysis of sound impacts on population and noise-sensitive areas. These technologies should be considered for use to determine noise impacts of present and proposed actions.

### Land Use Planning

- DNL represents the accepted noise metric for input to compatible land use planning.
- For cumulative speech interference, Table 3-2 "Effects of Noise on People" contained in FICON Volume II: Technical Report, provides a rough approximation of both outdoor and indoor predicted speech interference parameters for various levels of noise exposure as measured in DNL for residential land use only.
- There is a need for selective updating [including Standard Land Use Coding Manual (SLUCM) updating] and enhanced public understanding of the land-use compatibility guidelines, its application and interpretation through incentives and other programs.

### Education of the Public

Education of the public should concentrate on the following frequently misunderstood issues:

- Environmental noise exposure is measured and described most generally by DayNight Average A-Weighted Sound Level (DNL). DNL should be defined clearly and its significance and use explained clearly.
- Relation of DNL to Percent Highly Annoyed describes long-term community response to the overall sound environment (indices of health and welfare effects).
- Although the A-Weighed Maximum Sound Level ($L_{max}$) for a single flyover is easily understood, it is useful only for analyzing short-term responses.
- Every change in the noise environment does not necessarily impact public health and welfare.
- Aircraft noise predictions below DNL 65 dB can be less accurate and should be interpreted with caution.

## POLICY RECOMMENDATIONS

- Continue use of the DNL metric as the principal means for describing long-term noise exposure of civil and military aircraft operations. **[Section 3.1, Volume 1]**
- Continue agency discretion in the use of supplemental noise analysis.**[Section 3.2, Volume 1]**
- Improve public understanding of the DNL, supplemental methodologies and aircraft noise impacts. **[Section 3.3, Volume 1]**
- If screening analysis shows that noise-sensitive areas will be at or above DNL 65 dB and will have an increase of DNL 1.5 dB or more, further analysis should be conducted of noise-sensitive areas between DNL 60-65 dB having an increase of DNL 3 dB or more due to the proposed airport noise exposure. **[Section 3.4, Volume I]**
- If the DNL 65 dB screening test calls for further analysis between DNL 60-65 dB, agency mitigation options will include noise sensitive areas between 60-65 dB that are

projected to have an increase of 3 dB or more as a result of the proposed airport noise exposure. **[Section 3.5, Volume 1]**

- If a FAA FAR Part 150 program is included by the FAA as a NEPA mitigation measure, the FAA and the airport operator are responsible for ensuring that the commitment is carried out and the Part 150 study scope conforms to the NEPA scope of analysis. **[Section 3.6, Volume I]**
- Increase research (R&D) on methodology development and on the impact of aircraft noise. To foster this, a standing Federal interagency committee should be established to assist agencies in providing adequate forums for discussion of public and private sector proposals identifying needed research and in encouraging R&D in these areas. The following initial R&D issues are recommended:
- Evaluate potential modifications to the 1980 FICUN land use compatibility table to improve its usefulness for both routine land use planning and planning for noise-sensitive land uses.
- Continue research into community reaction to aircraft noise, including sleep disturbance, speech interference, and non-auditory health effects of noise.
- Investigate differences in perceptions of aircraft noise, ground transportation noise (highways and railroads), and general background noise.
- Continue and expand research on the airport noise impacts of rotary-wing operations. **[Section 3.7, Volume 1]**

It is the FICON's belief that these recommendations will provide both immediate and longterm improvements in airport noise analysis. Federal interagency encouragement of a continuing review of airport noise analysis will provide for future incorporation of improved airport noise analysis techniques and provide a forum to address related public concerns.

While the FICON is seeking to achieve improved uniformity among Federal agencies in airport noise impact analysis, it must also be recognized that agencies have differing legislative mandates and operating environments. These recommendations should be viewed as general guidance. Each Federal agency must determine how it can best use this guidance, supplementing it as appropriate to meet agency needs, within the framework of the NEPA requirements.

The FICON Report itself neither addresses the adequacy of compliance with NEPA to-date by the participating agencies, attempts to redefine thresholds of significance of impacts under NEPA, nor modifies the NEPA regulations or procedures of the agencies.

# 3.4 Land Use Compatibility

## 3.4.1 General

In most cases, land use compatibility recommendations regarding noise are in the form of guidelines provided by Federal agencies to State and local communities. The FICUN Guidelines (1980) provided a summary table of Land Use Applications and Compatibilities for this purpose. In general, land use compatibility guidelines tend to be expressed in terms of DNL and include (1) identification of compatible and incompatible land uses on the basis of DNL in 5 dB increments beginning at or below 65 dB, and (2) recommendations for building design and construction methods necessary to achieve specified levels of noise attenuation (reduction) based on the outdoor DNL. Airfield environs, which are the focus of this report, affect only certain categories of these guidelines.

For local agency decisions, these guidelines do not constitute thresholds of impact, because local agencies determine the application of the guidelines taking into consideration economic, technical and political ramifications specific to the communities involved. In general, these guidelines have been broadly accepted. However, there is also general recognition of the need for selective updating to include new types of land use (e.g. biotechnology laboratories) and the need for improved public understanding of the guidelines, their applications and interpretations.

The DoD, DOE, HUD and DOT are currently working together to update the Standard Land Use Coding Manual (SLUCM) land use categories used in land use compatibility guidelines. When SLUCM updating is completed, the FICON will need to establish new land use compatibility guidelines for each DNL range for any new land use codes.

The Secretary of Defense Office of Economic Adjustment has established a program to provide incentives to local governments to study, approve and implement land use plans and controls to protect installations from encroachment.

The standards established by HUD for future land use planning in noise environments are exceptions to the general federal practice of simply providing recommended noise guidelines to local communities.

## 3.4.2 Agency Regulatory Guidelines

### 3.4.2.1 HUD and VA

Agencies like HUD have developed regulations related to the overall community noise level, but these affect only their own programs and are not binding on local communities. The Department of Veteran Affairs (VA) program also considers aircraft noise and its findings affect only its own program. The mandate for HUD's involvement with noise is the Housing Act of 1949 (Public Law 81-171). This law sets a national goal of a decent home and suitable living environment for every American family. The Department was also tasked by the Housing and Urban Development Act of 1965 (Public Law 80-117) "to determine feasible methods of reducing the economic

loss and hardships suffered by homeowners as a result of the depreciation in the value of their properties following the construction of airports in the vicinity of their homes." Finally, HUD is tasked by Federal Management Circular 75-2, Compatible Land Uses at Federal Airfields, to promote compatible land uses around Federal airfields (HUD 1985).

**Regulatory Guidance (Standards**

HUD Regulations are based on the DNL metric, and set forth the following exterior noise standards for new construction assisted or supported by the Department. They provide planning guidance only for existing conditions:

- DNL 65 dB or less - Acceptable;
- DNL 65 dB to DNL 75 dB - Normally Unacceptable - appropriate sound attenuation measures must be provided: 5 dB above the attenuation provided by the standard construction required in DNL 65 dB to 70 dB zone; 10 dB additional attenuation in DNL 70 dB to 75 dB zone;
- Exceeding DNL 75 dB - Unacceptable.

HUD's Regulations do not contain standards for interior noise levels. Rather, a level of DNL 45 dB is set forth as a goal for interior noise levels and the regulations specify noise reduction (attenuation) requirements which are directed towards achieving that goal. It is assumed that with standard construction materials and methods, any residential structure will provide sufficient attenuation (i.e., a 20 dB reduction in exterior noise levels) so that if the exterior level is DNL 65 dB, the interior level will be DNL 45 dB or less (Department of Housing and Urban Development 1985).

The HUD impact determination process is clearly spelled out in their Noise Assessment Guidelines, and is fairly simple. The noise level from each source affecting the proposed site is calculated and then combined to derive the overall exposure. The overall noise level is then compared to HUD's standards and the appropriate action, as specified in the regulations, is taken (Department of Housing and Urban Development 1985). HUD's recommended "ideal" solution to a potential problem is to reduce the noise being produced by the source. However, usually the best available solution is to make sure that noise-sensitive uses are located where they will not be exposed to high noise levels.

### 3.4.2.2 FAA

Part 150 of the Federal Aviation Regulations (FAR Part 150) establishes the recommended procedures, standards and methodology governing the development of airport noise exposure maps and airport noise compatibility planning programs. It is consistent with the EPA "Levels Document" that prescribes a single system for: (1) measuring noise at airports and surrounding areas that generally provides a highly reliable relationship between projected noise exposure and surveyed reaction of people to noise; and (2) determining exposure of individuals to noise that results from the operations of an airport. This Part 150 Regulation also parallels the HUD regulatory guidance in that it identifies those land uses which are normally compatible with various levels of DNL exposure.

FAR Part 150 includes a table titled "Land Use Compatibility with Yearly Day-Night Average Sound Levels." This table identifies various land use recommendations that are compatible or incompatible with yearly DNL levels above 65 dB in 5 dB increments. Levels below DNL 65 dB are considered compatible for all indicated land uses and related structures without restrictions. Levels between DNL 65 and 75 dB are considered incompatible with residential or school land uses unless measures are taken to achieve additional Noise Level Reductions (NLRs). Above DNL 75 dB, residential land uses are considered unacceptable, even with incorporation of noise attenuation measures. However, a variety of non-residential, open space, commercial and manufacturing land uses are identified as compatible in areas with DNL > 75 dB.

### 3.4.2.3 DoD

The DoD program for land use compatibility around airports is referred to as the Air Installation Compatible Use Zone (AICUZ) program. This program uses land use tables similar to the one in FAR Part 150 for noise levels of DNL 65 dB and above. While screening criteria vary somewhat from Service to Service, new environmental noise analysis is usually conducted when there is any significant change in airfield operations, types of aircraft, or aircraft flight tracks. Additionally, the program provides for periodic updates. When the noise assessments are completed for the airfield, each service provides land use recommendations to the local communities for consideration and potential incorporation into the community land use ordinances. Through the Base Comprehensive Planning process, on-base facility siting also incorporates noise as a planning factor.

The DoD Joint Services Manual, Planning in the Noise Environment (1978) provides military installation planners with a procedural tool to aid in the creation of acceptable noise environments. The acceptable outdoor noise environments for major military and civil uses are described. Planning levels are in terms of DNL values; however, $L_{eq}$ is used for detailed design when occupancy or usage does not extend over 24-hour periods. The land use compatibility tables are consistent with those discussed for the FAA FAR Part 150 and the DoD AICUZ programs.

### 3.4.2.4 Federal Interagency Committee on Urban Noise (FICUN) Guidelines

The purpose of the 1980 FICUN was to put the various Federal agency policy and guidance packages on environmental noise into perspective. The result was the publication of Guidelines for Considering Noise in Land Use Planning and Control (1980). The "Guidelines" do not replace the individual Federal agency guidelines. They serve as a point-of-departure for dealing with each agency's programs, and facilitate the consideration of noise in all land use planning and interagency/intergovernmental processes. The FICUN established DNL as the descriptor to be used for all noise sources. The $L_{eq}$ descriptor is included because some highway noise is best characterized in terms of an equivalent sound level for the highway "design hour." Table 2 of these "Guidelines" contains suggested land use compatibility guidelines. This table was previously discussed in Section 3.2.2.3 and is reproduced herein as Table 3.2. In addition, the FICUN "Guidelines" provide a reference for describing the effects of noise on people in terms of annoyance, speech, and hearing loss.