**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| CAROL AND ROBERT TESTWUIDE, et al., Plaintiffs, v. THE UNITED STATES OF AMERICA, Defendant. | No.: 01-201L (Honorable Victor J. Wolski) |

DECLARATION OF DR. NORAL D. STEWART

1. My name is Noral D. Stewart. I received a Bachelor's of Science Degree in Mechanical Engineering from North Carolina State University in 1969. I received my Master's Degree in Mechanical Engineering in 1974 and my PhD in 1981 in the Department of Mechanical & Aerospace Engineering at North Carolina State University. My graduate specialty was in acoustics and noise control. I was the President of the National Council of Acoustical Consultants from 2000-2002.

2. I have been retained by the Plaintiffs in this case to review and comment upon the reports of Dr. Sanford Fidell. I have reviewed Dr. Fidell's Declaration dated February 22, 2002; his report dated September 30, 2005; his first revised report dated February 15, 2006; and his second revised report dated March 29, 2006.

3. Until the publication of his second revised report, Dr. Fidell's reports in this case focused upon the government and industry accepted method of noise exposure and impact analysis using the Day-Night Sound Level (DNL) based on the A-weighted sound level of events. In his February 22, 2002 Declaration in this case, Dr. Fidell

acknowledged that "...DNL as a single, general measure of cumulative noise exposure has at least been preferable to reliance on a potpourri of inconsistent measures of environmental noise, ranging from maximum noise levels alone to counts of numbers of noise events and arbitrary combinations of such descriptors." (Fidell Declaration, p. 12). In his initial report, dated September 30, 2005, Dr. Fidell based his analysis of the test case plaintiffs' properties on a study using NOISEMAP software that reported the noise exposure by using DNL metrics. In so doing, Dr. Fidell undertook to convert modeling exercises made between 1972 and 1978 into DNL metrics. Noise modeling from 1978 to the present, for military airfield studies, is expressed in DNL metrics.

4. Table 1 of Dr. Fidell's September 30, 2005 report purports to state each of the test case plaintiffs' properties noise exposure using the DNL metric exclusively for the years 1972, 1975, 1978, 1982, 1988, 1993, 1997 and 2000. No analysis is reported for the year 1981.

5. My initial review of Dr. Fidell's report noted that he failed to account for the 1985 report of Harris, Miller, Miller and Hansen (HMMH), the Navy's noise study contractor in the 1980's, that determined that the 1978 noise contours for NAS Oceana were based upon a 6-10 dB overstatement of the noise of the A-6 aircraft. Although Dr. Fidell acknowledged in a footnote in his report that HMMH's report differed with NOISEMAP, he failed to state the difference nor did he undertake to determine the accuracy of the 1978 NOISEMAP database. Dr. Fidell apparently did not make any modifications to the NOISEMAP database to reflect the lower A-6 noise emissions found by HMMH.

6. In Dr. Fidell's report of September 30, 2005 and both revisions, he acknowledged that the "measure of greatest concern for evaluating aircraft noise impacts (""Day-Night Average Sound Level"'...) is by definition a 24-hour measure...." (Page 3). Later, in the same report, he noted that ..."the state of the art of aircraft exposure modeling has advanced over the last three decades." (Page 4).

7. Following the passage of the Noise Control Act of 1972, the Environmental Protection Agency developed and adopted DNL as the standard method for environmental noise measurement in Federal projects and introduced it widely in its publication, Information on Levels of Environmental Noise Requisite to Protect Public Health and Welfare with an Adequate Margin of Safety (1974). DNL is based on A-weighted sound levels. A-weighted sound levels are used as the basis for all evaluation of environmental noise by Federal agencies. Except for the Federal Highway Administration, all Federal agencies including the DOD and FAA use the DNL to characterize long term noise exposure

8. In his second revised report, dated March 29, 2006, Dr. Fidell inexplicably reverted to "Tone Corrected Perceived Noise Level" (PNLT) and "Tone Corrected Sound Exposure Level" methods of measurement for individual events, method not previously used in any of his earlier reports in this case. PNL was first developed in the 1950's by K.D. Kryter as a scale of perceived "noisiness." Later, Kryter modified the methodology to include discrete frequency components or tones. The latter was known as PNLT.

9. PNLT never achieved any use other than for aircraft noise. It has not been used extensively since the adoption of the DNL by Federal agencies. The A-weighted DNL for long-term exposure and A-weighted sound exposure level for event have been

accepted and supported by Federal agencies as the most appropriate methods for measuring aircraft noise exposure in communities. A PNL measurement involves subjective evaluations of "noisiness."

10. Dr. Fidell's introduction of the PNLT metrics for the first time is an apparent effort to show a different relationship in the sound level of individual events among various aircraft including the A-6, F-4, F-14, and F/A-18 C/D aircraft, inconsistent with the A-weighted sound levels that were the basis for the 1998 Final Environmental Impact Statement published in support of the deployment of the F/A-18 C/D aircraft to NAS Oceana from Cecil Field, Florida. Given the belated change in methodology, particularly a methodology that has not been used for AICUZ noise contours of military airfields in over 25 years, the basis for an eleventh hour change in methodology, and the meaningfulness of the purported tone-corrected comparisons among the various aircraft, is questionable.

11. The data for the "Pattern" operation of the F-4C is taken from a different source than the other data which may be inconsistent. It is not clear whether the data for the A6-A used by Dr. Fidel is the same data that HMMH found to be higher than actual observations in their report of 1982 noise exposure.

12. Irrespective of the ultimate conclusion regarding the noise levels of these military aircraft, the gross number of operations each year is an insufficient basis upon which to compare the impact of aircraft noise on the test case plaintiffs' homes. In order to conclude that the adverse noise impact on the test case plaintiffs' homes in 1981 was comparable to or greater than in 1999, one must know the type and number of aircraft operating over and in proximity to the test case plaintiffs' homes, the frequency of each

type of operation, such as field carrier landing practice (FCLP), touch and go, and similar intensive operations, and the air-to-ground noise level of each aircraft in each type of operation. Without knowing the number of times an F-4 or A-6 aircraft passed over or in proximity to a test case plaintiffs' home in 1981, and the number of those flights which were of a particularly intensive nature, it is impossible to draw any conclusions about the exposure or impact in 1981.

I HEREBY DECLARE, UNDER PENALTY OF PERJURY, PURSUANT TO 28 U.S.C. 1746 THAT THE FOREGOING DECLARATION IS TRUE TO THE BEST OF MY KNOWLEDGE AND BELIEF.

Date: May 23, 2006

Dr. Noral D. Stewart