**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| CAROLE and ROBERT TESTWUIDE, et al.,<br>Plaintiffs,<br>v.<br>THE UNITED STATES OF AMERICA,<br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No.: 01-201L<br>(Honorable Victor J. Wolski) |

**PLAINTIFFS' PROPOSED FINDINGS OF UNCONTROVERTED FACTS IN OPPOSITION <u>TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>**

1. Oceana Naval Air Station is located in the densely populated community of Virginia Beach, Virginia. Oceana, at approximately 5,400 acres, is the Navy's smallest Master jet base. The next smallest, Miramar, is over 20,000 acres. Oceana's main facility consists of two paired 12,000 foot and two paired 8,000 foot runways. (Ex. 27, Excerpts from Wyle Laboratories, Aircraft Noise Study, February 1998, Report 97-10, Figure 2-1, February 1998, ("Wyle Report")). Fentress is located in the adjoining community of Chesapeake, Virginia. The combined population of these communities was approximately 545,045 in 1990 and 625,570 in 2000, according to census data. (Ex. 24, Excerpts pertaining to NAS Oceana and NALF Fentress from the Final Environmental Impact Statement for Realignment of F/A-18 C/D Aircraft ("EIS") at Table 3.1-22 at 3.1-99-100).

2. Air operations at Oceana are very different from civilian air operations. Navy pilots train for aircraft carrier operations at low altitudes and high speeds. Even within the military universe, Navy aircraft have their own unique operations that produce unique noise characteristics. Naval Aviation is by definition based in large part on aircraft carriers, not land-based airfields. Consequently Naval aircraft focus a significant amount of attention and resources

on the unique skill of landing on aircraft carriers. This training regimen is known as Field Carrier Landing Practice ("FCLP").

3. FCLP operations have been accurately described, using slightly different nomenclature, in *Branning v United States,* 228 Ct. Cl. 240, 244, 654 F.2d 88, 91 (1981) as follows:

> One type of training conducted on and around the station consists of practice landings and takeoffs designed to simulate aircraft carrier takeoffs and landings. One type of operation is referred to as "field mirror landing practice" (FMLP). In the course of such operation, the prescribed flight pattern requires the trainees to take off from the runway on the station and then fly defendant's aircraft directly over plaintiffs property in a "racetrack pattern" at an altitude of 600 feet above ground level (AGL) and return to the runway. The pattern is repeated by each aircraft several times, the training exercise being conducted squadron-by-squadron (and virtually nose-to-tail at 25 to 30 second intervals) over a period of several days during each month in which training is conducted.

4. The FCLP flight pattern at Oceana is supposed to be flown at a maximum altitude of 1,000 feet at a distance of 1.5 to 1.75 miles from the center of the airfield (Ex. 26, Excerpts from ATAC Corp. Airfield and Airspace Operational Study, February 18, 1998 ("ATAC Report"), at C-46, 47).

5. It is also necessary for naval aviators to be able to land on an aircraft carrier at night. Consequently, FCLPs are conducted at night as well as in the daytime. (Ex. 27, Wyle Report, Table 3-1 at 3-2; Table 3-2 at 3-3). Most late night FCLP operations are conducted at Fentress; Oceana generally operates only until 11:00 p.m.

6. FCLPs also expand the concept of accident potential zones ("APZ"). In 1952, the "Doolittle Report" recommended that an area surrounding military airfields should be set aside as a buffer for aircraft accidents. The first APZ guidelines were issued in 1972 as part of an investigation into aircraft accidents. (Ex. 24, EIS at 3.1-79). The APZ studies established a pattern of accident locations on or near the runways at military airfields. Between the early 1970s

when APZs were first identified, and the issuance of the EIS, there were 632 aircraft accidents at Navy and Marine Corps airfields. A 13-year study by the Navy reports that 80% of serious accidents (defined as $1 million in damage or death) occurred in the APZs. (*id.* at 3.1-79; 80).

There are three identified APZs:

1. The Clear Zone, from the end of the runway extending 3,000 feet;
2. APZ 1, from the end of the clear zone extending 5,000 feet;
3. APZ 2, from the end of APZ 1 extending 7,000 feet.

The shape of the APZs for any given airfield is influenced by specific conditions, including local accident history and the type of operations. The APZs at Oceana are elliptical and mimic the FCLP flight patterns for that airfield. (Ex. 27, Wyle Report, Figure 4.403).

7. In the late 1990s, in accordance with § 102(2)(c) of the National Environmental Policy Act of 1969 ("NEPA") (42 U.S.C. §§ 4331 et seq.), Chief of Naval Operations Instruction 11010.36A ("OPNAVINST") and the Defense Base Closure and Realignment Act of 1990 (10 U.S.C § 2687), the Navy prepared the EIS in connection with the requirement to move the Atlantic Fleet F/A-18s from Cecil Field in Florida which was slated for closing under BRAC. The F/A-18 is the Navy's most powerful carrier based strike-fighter. In that EIS, five alternative realignment scenarios ("ARS"), involving three air installations: (1) NAS Oceana, (2) MCAS Beaufort, South Carolina, and (3) MCAS Cherry Point, North Carolina, were evaluated. The Atlantic Fleet had 180 F/A-18 Hornets, consisting of 11 squadrons of 12 F/A-18s each (132 aircraft) and a Fleet Replacement Squadron ("FRS") of 48 F/A-18s. The FRS is the training squadron where brand new pilots are introduced to the plane they are assigned to fly or where pilots who are experienced in other aircraft are trained to fly the F/A-18. The five realignment scenarios were:

**ARS 1**- Relocate all 11 F/A-18 squadrons and the FRS to NAS Oceana, a total of 180 aircraft.

**ARS 2**- **Relocate 2 F/A-18 squadrons to MCAS Beaufort (24 aircraft) and 9 F/A-18 squadrons and the FRS to NAS Oceana (156 aircraft).**

**ARS 3**- Relocate 3 F/A-18 squadrons to MCAS Cherry Point and 8 F/A-18 squadrons and the FRS to NAS Oceana.

**ARS 4**- Relocate 5 F/A-18 squadrons to MCAS Beaufort and 6 F/A-18 squadrons and the FRS to NAS Oceana.

**ARS 5**- Relocate 5 F/A-18 squadrons to MCAS Cherry Point and 6 F/A-18 squadrons and the FRS to NAS Oceana.

8. The EIS documented and evaluated each scenario. Ultimately, the Navy selected ARS 2 for implementation. (Ex. 25, Record of Decision of May 18, 1998).

9. The EIS documented and projected the level of operations at Oceana based on the ATAC Report which used a computer simulation model, NASMOD. (Ex. 26, ATAC Report).

10. NASMOD was developed to analyze options in a number of naval aviation operations. NASMOD is derived from: (1) Navy air training system model (NATS), and (2) SIMMOD the official simulation model, which the Federal Aviation Administration uses to make analogous studies of civilian airports. NASMOD includes database and analytical capabilities necessary to model military training operations.

11. The data used by ATAC is compiled from (1) records of actual air field and air space operations, including air traffic control facility logs, traffic analyzer data and squadron flight schedules, (2) publications, and (3) personal interviews of pilots, and (4) observations of operations. ATAC then established the baseline operations at Oceana prior to the arrival of the F/A-18s (the year 1997 was chosen) and NASMOD established projected levels of use for the

anticipated first full year following the realignment, 1999 (*id.* at C-29). As it turned out, all the F/A-18's were not on site at Oceana until mid-1999.

12. Based on the operations levels reported by ATAC, noise exposure levels and projections for the EIS were studied by another Navy contractor, Wyle Laboratories, Inc. Wyle develops aircraft noise exposure studies at various Navy installations. Those noise studies are used to develop Environmental Impact Statements and also to establish the Navy's Air Installations Compatible Use Zone program for various airfields. AICUZ requirements are set out in OPNAVINST 11010.36B (Ex. 28) which identifies both accident and noise impacts from Navy and Marine Corps air stations. These are similar to those required of civilian aircraft and airports by the Noise Control Act of 1972 (Ex. 24, EIS, at 3.1-78).

13. The Wyle Report sets out the contrast between noise exposure during the baseline year of 1997 and that projected during 1999. In assessing the noise, Wyle used the universally accepted standard for aircraft noise exposure in communities around airfields and airports, the day-night average sound level (DNL) expressed in decibels (dB) (Ex. 27, Wyle Report, at 1-2). DNL is the average sound level generated by all aviation related operations during an average 24-hour period.

14. In calculating the noise, Wyle Labs used a suite of computer modeling programs, NOISEMAP, which predicts and then compares before and after noise effects from proposed operational changes. (*id.* at 1-4).

15. Noise is one of the most prominent and intrusive environmental impacts associated with aircraft operations. Even with other sources of noise in today's environment, aircraft noise is readily identifiable as intrusive. This is particularly true of military aviation, which uses powerful and unmuffled jet engines. Navy jet operations have particularly intrusive characteristics because they are tailored to the need to land on an aircraft carrier.

16. Human sensation of sound involves two characteristics, frequency and intensity. Frequency is the number of times per second the air vibrates. For example, low frequency sounds may be described as a rumble, where a high frequency sound may be described as a screech. (*id.* at A-1).

17. Sound intensity is measured in a logarithmic unit known as a decibel ("db"). The threshold of pain is 120 dB. (*id.* at A-2). Because decibels are logarithmic and not linear, comparing sound levels is not a matter of simple addition or subtraction. If a sound's intensity is doubled, the increase is 3 dB. In other words, doubling of 60 dB DNL is 63 dB DNL, not 120 dB DNL.

18. An important factor when measuring average sounds over a period of time is the time-average sound level, which is dominated by the louder sound levels during the averaging period. For example, a 100 dB sound for 30 seconds followed by a 50 dB sound for another 30 seconds produces a time-average sound of 97 dB for the 60-second period. This becomes important to explain Day-Night Average Sound Levels (*id.*). The DNL takes into consideration both the maximum sound level and the sound exposure level over an entire 24-hour period. (*id.* at A-9).

19. In measuring sounds for environmental impact, the Department of Defense, the FAA and the EPA have specified that the universally recognized DNL metric should be used. Maximum sound level measures the highest sound level during a sound event, such as an aircraft overflight. Sound exposure level ("SEL") measures both the sound level and duration of a single sound event normalized at one second. (*id.* at A-4).

20. Noise affects people and the environment in a number of ways. A number of health effects are associated with environmental noise. The best defined of the health effects is noise-induced hearing loss. Based on scientific research and Federal workplace guidelines, a day-

night average of 75 dB DNL is the threshold at which hearing loss could occur from aircraft noise. (*id.* at A-10). This is consistent with findings of both the EPA (which suggests using 70 dB DNL) and the National Academy of Sciences Committee on Hearing, Bioacoustics and Biomechanics (75 dB DNL) (Ex.24, EIS, at 3.1-134). Long-term noise exposure has also been associated with non-auditory health effects, such as cardiovascular problems, low birth weight and mortality rates. (*id.*, EIS, at 3.1-134, 136). Those effects manifest themselves at the same noise levels as hearing loss (75 dB DNL). (Ex. 27, Wyle Report, at A-10, 11). There is a growing body of evidence that chronic exposure to aircraft noise can also result in learning deficits among school children. Several studies have documented reading deficits, impaired cognitive abilities and impaired speech perception among children living in close proximity to airports (Ex. 24, EIS, at 3.1-138).

21. Another prominent effect of aircraft noise is community annoyance. Repeated studies have shown a high correlation between noise exposure and annoyance of groups of people. (Ex. 27, Wyle Report, at A-7). While noise levels of 55 – 60 dB DNL have been proposed (and could be used) as the threshold of community annoyance, average noise level of 65 dB DNL has been more generally used. (*id.* at A-12). This level is also (1) the level at which aircraft noise normally dominates other ambient noise sources, (2) the threshold for grant-in-aid funding of airport noise mitigation projects, (3) the ceiling level established by both HUD and the Veterans Administration for federally guaranteed home loans and (4) the level chosen as incompatible with residential use by the Navy's AICUZ program (Ex. 29, OPNAVINST 11010.36B, 2002 Table).

22. Other common effects of noise-induced community annoyance are speech interference, sleep interference and vibration of structures and objects. (Ex. 27, Wyle Report, at A-12 through 20). Of these, speech interference from aircraft noise is the primary cause of annoyance. Aircraft noise disrupts routine daily activities such as conversation, television or radio, reading, work and telephone use. It disrupts more formal speech settings such as in the

classroom or office. This often leads to fatigue and vocal strain for those who must speak above the aircraft noise. Indoor noise levels in excess of 60 dB interferes with speech communication. (*id*. at A-12).

23. Aircraft noise is particularly disruptive to sleep. Sleep interference manifests itself in awakening, sometime referred to as "arousal", and in changes in "sleep stage" in which the subject shifts from one stage of sleep to another. The EPA has identified a sound level of 45 dB DNL and below as necessary to protect against sleep interference. (*id.* at A-14). Quality sleep is a requisite to good health (Ex. 24, EIS, at 3.1-137).

24. Vibration of structures and objects is also a source of annoyance. While high noise levels lasting for more than one second are likely to damage structures, secondary vibration of objects in a house can occur at much lower noise levels. Vibration of pictures, dishes and other objects contribute to annoyance and fear of breakage. (Ex. 27, Wyle Report, at A-20).

25. Using the generally accepted scientific understanding of environmental noise and its measurement, the Navy in the EIS then evaluated the noise impact to the properties around Oceana.

26. As part of AICUZ (Air Installation Compatible Use Zones), the Navy developed a table of compatible land uses at various levels of noise exposure. Noise levels of 65 dB DNL and above are deemed to be incompatible with residential use. (Exs. 28 and 29, AICUZ Program; OPNAVINST 11010.36B, 2002 Table, p.20-24). The AICUZ in effect in 1998 (from a regulation issued in 1988) discouraged residential use in zones of 75 dB DNL and above.

27. One of the most immediate and significant effects that aircraft noise has on surrounding property is a reduction in market value. The Federal Aviation Administration recognizes that a wealth of economic studies lead to the conclusion that increased aircraft noise lowers property values. (Ex. 30, *Aviation Noise Effects*, Federal Aviation Administration, March,

1985, at 99-101). Indeed, Congress has long-recognized that proximity to an airport, with the attendant noise and other intrusions, depreciates the value of surrounding property. (Ex. 40, *Federal Agency Review of Selected Airport Noise Analysis Issues*, Federal Interagency Committee on Noise, August, 1992, at pp. 3-18; 19), ("FICON"). There, FICON reports that the Housing and Urban Development Act of 1965 charged HUD with the task "to determine feasible methods of reducing the economic loss and hardships suffered by homeowners as a result of the depreciation in the value of their properties following the construction of airports in the vicinity of their homes." (*id.* at pp. 3-18; 19).

28. One squadron of F/A-18s was already stationed at Oceana prior to the closure of Cecil Field. In 1998 the first of the 156 F/A-18 squadrons began to arrive at NAS Oceana from Cecil Field. The transfer was complete by July, 1999.

29. The total operations at Oceana increased from the 1997 baseline of 108,897 to the 1999 projection of 218,631, an increase of 101%. In 1997 Oceana conducted 54,088 touch-and-go operations and no FCLPs. In 1999, Oceana was projected to conduct 116,656 touch-and-go operations, an increase of 115%, and 2,720 FCLP.[1] (Ex. 27, Wyle Report, at 3-2; Table 3-1; p. 4-26, 27; Table 4-16).

[1] This projection, as bad as it is, severely understates the real noise impact since Oceana actually conducted Approximately 20,000 FCLP during this year.