**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **CAROLE AND ROBERT TESTWUIDE, et. al.,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **No. 01-201 L** |
| | ) | **Honorable Victor J. Wolski** |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT IN SUPPORT OF ITS MOTION TO DISMISS OR, ALTERNATIVELY, FOR SUMMARY JUDGMENT**

**Plaintiffs submit the following response to the Defendant's Proposed Findings of Uncontroverted Fact in support of Defendant's Motion to Dismiss or, Alternatively for Summary Judgment. Plaintiffs will respond to each of the Defendant's proposed findings in order.**

1. Naval Air Station ("NAS") Oceana is located in Virginia's southeastern coastal region within the City of Virginia Beach, Virginia. Declaration of Captain Thomas F. Keeley ("Keeley Decl."), Exhibit A, ¶ 6. Virginia Beach is part of the Hampton Roads region, which includes six counties and seven cities in addition to Virginia Beach, Chesapeake, and Norfolk. Keeley Decl., ¶ 6. Located south of the Chesapeake Bay and west of the Atlantic Ocean, NAS Oceana is approximately 100 miles southeast of Richmond, Virginia, and 200 miles northeast of Raleigh, North Carolina. Keeley Decl., ¶ 6. For over sixty-five years, NAS Oceana has been vital to U.S. Naval aviation and of strategic importance to national defense. Keeley Decl., ¶ 6.

**Response No. 1.**

**Plaintiffs agree with the first three sentences of Paragraph 1 because they are facts of common geographic knowledge, of which this Court could take judicial notice. The cited source, Captain Thomas Keeley, has no personal knowledge that would support these facts and his declaration can be accorded no weight. RCFC Rule 56 (e). Plaintiffs also incorporate the discussion in their Memorandum opposing summary judgment setting out the law regarding affidavits made without personal knowledge and the section discussing Cdr. Erie's affidavit. In response to the fourth sentence, Plaintiffs reiterate their objection to Captain Keeley's affidavit and further state that all Naval Air Stations are of strategic importance to national defense. Plaintiffs further point out that the most recent (2005) Base Realignment and Closing Commission recommended that the Navy consider moving the F/A-18s from Oceana because of the density of population over which its planes operate, the safety considerations in connection with those operations, and the noise in connection with those operations.**

2. NAS Oceana was commissioned on August 17, 1943, and designated a Master Jet Base in 1957. Keeley Decl., ¶ 7. A Master Jet Base is a location with permanent basing of carrier air groups, including in some cases the provision of auxiliary landing fields to conduct Field Carrier Landing Practice ("FCLP") exercises. Keeley Decl., ¶¶ 7, 9.

**Response No. 2**

**Plaintiffs object to the first sentence and reiterate their objection to the declaration of Captain Keeley set out in Response No. 1. Plaintiffs do not object to**

**the second sentence of paragraph 2.**

3. The United States Navy's ("Navy") finest tactical jet aircraft have been flown by squadrons assigned to NAS Oceana, including the A-4 Skyhawk, the F-4 Phantom, the A-6 Intruder, the F-14 Tomcat, and the F/A-18 Hornet. Keeley Decl., ¶ 7. The facility currently serves as home base for 16 F/A-18 squadrons, including 10 squadrons of F/A-18 C/D Hornet aircraft that were realigned to NAS Oceana from NAS Cecil Field in Florida as a result of the Navy's implementation of the 1995 round of base closures that were conducted pursuant to the Defense Base Closure and Realignment Act of 1990, as amended (10 U.S.C. § 2687 note) ("BRAC Law"). Keeley Decl., ¶ 8. The mission of all NAS Oceana squadrons is to be prepared to conduct timely, sustained combat operations from the sea, in support of our Nation's interests, whenever called upon to do so. Keeley Decl., ¶ 8.

**Response No. 3**

**Plaintiffs have no objection to the second sentence of paragraph 3. Plaintiffs object to the remainder of paragraph 3 for the reasons set out in Response No. 1 as to personal knowledge. In addition, the last sentence is merely argumentative.**

4. NAS Oceana is located on nearly 5,400 acres and employs over 12,000 Navy employees. Keeley Decl., ¶ 10. The base spends approximately $400 to $500 million per year in goods and services and has a gross annual payroll of over $773 million, with a total economic impact on the Hampton Roads region exceeding $1 billion annually. Keeley Decl., ¶ 10. NAS Oceana is the largest employer in Virginia Beach. Keeley Decl., ¶ 10.

**Response No. 4**

**Plaintiffs object to paragraph 4 for the reasons set out in Response No. 1 as to personal knowledge. Plaintiffs object to Defendant making assertions of fact through Captain Keeley, an ex-commanding officer of Oceana, who lacks qualifications to state the economic impact on the region and the relative place of Oceana in the hierarchy of area. Plaintiffs agree that Oceana covers about 5,400 acres.**

5. To train for operating from an aircraft carrier at sea, squadrons stationed at NAS Oceana typically use nearby Naval Auxiliary Landing Field ("NALF") Fentress for Field Carrier Landing Practice ("FCLP") operations. Keeley Decl., ¶ 9. FCLPS are touch-and-go operations performed on a runway designed to simulate landing on an aircraft carrier. Keeley Decl., ¶ 9. NALF Fentress was established in 1940 and is located approximately seven miles southwest of NAS Oceana in Chesapeake, Virginia. NALF Fentress is under the command of NAS Oceana. Keeley Decl., ¶ 9.

**Response No. 5**

**Plaintiffs object to the statement that the planes at Oceana typically use Fentress for field carrier landing operations because it suggests that those operations are unique to Fentress. Contrary to that suggestion, an increasing number of FCLPs are conducted at Oceana, far above the number predicted in either of the Environmental Impact Statements recently published by the Navy. In addition, an enormous number of touch and go operations are conducted at Oceana. Touch and go's are identical to field carrier landing practices in terms of the speed of the aircraft, its altitude, throttle settings and configuration, as well as the pattern**

**it flies. The only difference is that in a touch and go there is not an officer on the ground grading the pilot as that operation is conducted. Plaintiffs also object to Captain Keeley's assertion of historical fact for periods of time prior to his command at Oceana for the reasons stated in Response No. 1.**

6. Flight operations at NAS Oceana, as with any naval air station, are reported annually in the air station's Air Traffic Activity Reports ("ATARs"). Declaration of Commander Stephen G. Riley III ("Riley Decl."), Exhibit B, ¶¶ 6, 7. Until 1996, NAS Oceana ATARs were single-page forms that reflected the number of aircraft operations that occurred at the NAS Oceana airfield on an annual basis. Riley Decl., ¶¶ 7, 15. Operations at NALF Fentress were documented in the "Remarks" section of ATARs prepared before 1996. See also Riley Decl., Footnote 2 (some earlier ATARs cover periods of less than one year, in which case one must add the data from the two or more ATARs that, together, cover that year).

**Response No. 6**

**Plaintiffs object to paragraph 6. Flight operations at NAS Oceana and Fentress are reported in a variety of ways by a variety of sub-commands on the air station. It is common for the number and type of operations reported in one official document to differ markedly from another official document concerning the same period of time. Moreover, using the ATARs as the basis for reporting operations on an annual basis invokes a substantial amount of subjectivity (Cdr. Stephen Riley depo., Ex. 46, p. 10-12). Moreover, Cdr. Riley had never even heard of this case until three days before his deposition and had no knowledge of any subject on which he might be asked to testify (*id.* p. 35-36). This tactic effectively hamstrung**

**Plaintiffs in taking and using his deposition in the way that the rules intend.**

7. Beginning in 1996, ATARs, including those for NAS Oceana, were separated into two forms. Riley Decl., ¶ 20. One ATAR form, "Control Tower Operations," reported the number of aircraft operations in the air space controlled by NAS Oceana's air traffic control tower. Riley Decl., ¶ 20.

**Response No. 7**

**Plaintiffs object to paragraph 7 and reiterate Plaintiffs' comments to paragraphs 1 and 6.**

8. The second ATAR form, "Approach Control Operations," recorded the number of aircraft operations counted by radar room personnel. Riley Decl., ¶ 21. The NAS Oceana air traffic control tower air space includes a limited geographic area surrounding the air station. Riley Decl., ¶ 9. It extends to distances of 4.3 to 5 nautical miles away from the air station, depending upon direction, and up to an altitude of 2,500 feet. Riley Decl., ¶ 9. Conversely, the air space controlled by radar is far greater, extending in some cases many miles, and up to an altitude of 23,000 feet, but does not include the control tower's air space. Riley Decl., ¶ 10.

**Response No. 8**

**Plaintiffs object to paragraph 8 and reiterate Plaintiffs' comments to paragraphs 1 and 6.**

9. Compared to many prior years, however, 1999 was a year of relatively light flight activity − less than 133,000 operations as indicated by the 1999 ATAR forms. Riley Decl., ¶ 22, Table 1. By comparison, in 1981 the reported number of operations was 231,753. Riley Decl., Table 1. As CDR Stephen Riley indicates in his declaration,

the older ATARs are not precisely an "apples-to-apples" comparison with the newer (1996 and thereafter) ATARs in terms of the number of operations that occurred in the control tower's airspace. Riley Decl., ¶¶ 15-22. Nevertheless, the bottom line number on the older forms is a "reasonably close approximation" of the operations in the control tower's airspace that year. Riley Decl., ¶ 18.

**Response No. 9**

**Plaintiffs object to paragraph 9 and reiterate Plaintiffs' comments to paragraphs 1 and 6. Cdr. Riley is incompetent under RCFC Rule 56 (e) to testify on historic operations and to offer opinions such as "relatively light" and "close approximation". Notwithstanding that, Cdr. Dirk P. Hebert, Air Operations Officer at NAS Oceana, swore under oath to the operations counts for the same years as Cdr. Riley. The Government submitted that affidavit in connection with class certification. No years match. (Hebert Decl. March 6, 2002, Ex. 43). Many years are markedly different. For example, Cdr. Hebert reports more than 186,000 operations for 1999 and only 204,000 in 1981. The uniform testimony of the people who live around the airfield, including the Plaintiffs and many others, is that 1999 was a year of horrendous increase in the jet noise which they were subject to. That fact is hammered home by the tremendous increase in the number of citizen complaints about jet noise as exemplified by Ex. 47. (Complaint graphs for years 1973 through 2000). Ex. 47 also depicts the number of complaints by residents around the airfield in 1981. That number was trivial compared to the number of complaints made in 1999 and 2000. Plaintiffs therefore disagree that the comparison on the pre and post 1996 ATARs is apples to apples and disagree that**

**the older forms are a "reasonably close approximation" of the operations at Oceana. In order to know what impact the operations at Oceana had upon the surrounding population in a given year one would have to know, at a minimum, (1) the exact type of aircraft that made up the operations; (2) the precise type of operation flown by each of those aircraft and what time of day it was flown; and (3) the number of each such operation. Notwithstanding Defendant's May, 2006 decision to choose 1981 as the year of a prior "taking", a specific request to the Government for the operations at Oceana for that year elicited the response that Defendant has no documents that report those facts. (Letter from Steve Bryant to Jack Ferrebee, dated May 16, 2006, Ex. 48).**

10. And in 1982, there were close to 178,000 operations. See Riley Decl., Table 1. The high operations continued between 1989 and 1995 as well with annual operations consistently approaching or exceeding 200,000 operations, including a high of over 229,000 operations in 1992. See Riley Decl., Table 1.

**Response No. 10**

**Plaintiffs object to paragraph 10 and reiterate Plaintiffs' comments to paragraphs 1, 6 and 9.**

11. NAS Oceana has four runways that operate in both directions. Declaration of Commander Richard S. Erie ("Erie Decl."), Exhibit D, ¶ 6. The dual intersecting runways are designated Runways 5/23 Left and Right and Runways 14/32 Left and Right as follows[1]:

[1] See Erie Decl., ¶ 8.




**Response No. 11**

**Plaintiffs agree that NAS Oceana has four intersecting runways with the designations stated.**

12. The designation of the runway depends on which way the runway is to be approached. The primary factor dictating runway use is wind direction. Erie Decl., ¶ 9. As reflected in studies at NAS Oceana, the relative frequency of the use of each runway has remained generally the same, consistent with the following approximate percentages[2]:

Runway 5L/R – 50%
Runway 23L/R – 34%
Runway 32L/R – 14%
Runway 14L/R – 2%

---

[2] See Erie Decl., ¶ 25.

**Response No. 12**

**Plaintiffs object to Cdr. Erie's competence to offer admissible evidence of facts that pertain to a period prior to his service at Oceana. *See* Plaintiffs' objection to paragraph 1. Over time, the percentage use of the runways has changed every time it is reported, but Plaintiffs concede that Runway 5 L/R is the most frequently used and that Runway 14 L/R is the least frequently used.**

13. NAS Oceana provides for the safe operation of its aircraft with "course rules" that provide guidance for the basic departure, arrival and landing procedures pilots follow. Erie Decl., ¶ 10. The course rules incorporate guidance on altitude and flight tracks to provide sufficient separation of aircraft out of and back into the air station. Erie Decl., ¶¶ 11, 12.

**Response No. 13**

**Plaintiffs agree that the Navy gives its pilots guidance on what courses to fly and what procedures to follow on take-off and landing.**

14. As is the case with any Navy or Marine Corps air station to which carrier-based aircraft are assigned, the shore-based landing procedures and patterns at NAS Oceana are designed to mirror the procedures and pattern used when landing on an aircraft carrier at sea. Erie Decl., ¶ 13.

**Response No. 14**

**Plaintiffs object to paragraph 14 because Cdr. Erie , under RCFC 56 (e), lacks competence to make such sweeping generalities.**

15. Landing an aircraft on a moving (sometimes pitching and rolling) ship in daylight hours is an extremely difficult endeavor; at night it becomes arguably the most challenging maneuver in aviation. Erie Decl., ¶ 14. The patterns flown day and night around the aircraft carrier are designed to maneuver each aircraft into a position behind the ship where the pilot can land the aircraft through use of the Fresnel Lens Optical Landing System ("FLOLS"). Erie Decl., ¶ 14. The FLOLS is a series of lights that allow the pilot to observe his position so that he may make the appropriate adjustments to land safely. Erie Decl., ¶ 14.

**Response No. 15**

**Plaintiffs do not object to paragraph 15, but state that the first sentence is argumentative.**

16. While the basic "stick and rudder" skills required are acquired early in a flying career, the fine motor skills to do it safely and successfully every time are perishable, necessitating continuous refresher training. Erie Decl., ¶ 14. Consequently, every runway in use at a Navy field has a FLOLS at the approach end so that pilots may always practice "flying the ball," and pilots practice shipboard landing every time they land an aircraft. Erie Decl., ¶ 14.

**Response No. 16**

**Plaintiffs incorporate their objection to paragraph 15.**

17. The VFR ("Visual Flight Rules") landing pattern is a left-hand racetrack or oval pattern oriented along a runway heading with one end of that oval being a descent to landing. Erie Decl., ¶ 15. When landing at sea, the altitude of the landing pattern is 600 feet. Erie Decl., ¶ 15.

**Response No. 17**

**Plaintiffs agree that the VFR landing pattern is one among a number of patterns associated with Oceana's runways and further agree that the landing pattern altitude at sea is 600 feet.**

18. As a noise mitigation measure, the pattern at NAS Oceana was elevated to 1,000 feet many years ago. Erie Decl., ¶ 15.

**Response No. 18**

**Plaintiffs agree that the touch and go and FCLP patterns at Oceana provide for an altitude of 1,000 feet. Plaintiffs object to Cdr. Erie's testimony as to what happened "many years ago" for the reasons set out in Plaintiffs' response to paragraph 1 under RCFC Rule 56 (e). Plaintiffs also object to Cdr. Erie's declaration because his assertions are made on a "might have" or "would have" basis. See Plaintiffs' response to paragraph 1.**

19. In general, pilots strive to recreate the "approach turn" to landing in the same manner every time, from a location 1.1 to 1.5 nautical miles abeam (directly to the side) of the intended point of landing, at 1,000 feet above ground. Erie Decl., ¶ 15. Each position along the racetrack pattern has specific aircraft parameters that the pilot is looking to maintain. Erie Decl., ¶ 15. The diagram below is illustrative of the VFR landing pattern[3]:

[3] See Erie Decl., ¶ 16.




**Response No. 19**

**Plaintiffs object to paragraph 19 for the reasons stated in response to paragraph 1. Cdr. Erie cannot competently testify as to what all pilots "strive to" do. RCFC Rule 56 (e). Plaintiffs agree that the "approach turn" and the descent from the approach turn to the airfield are a part of the racetrack landing pattern and that most pilots pay attention to the theoretical track during that portion of the evolution. Plaintiffs disagree that for the remainder of the evolution, such as the crosswind turn, the downwind leg and "the 180" positioning, pilots pay particular**

**attention. A given pattern for a particular operation at an airfield is a line drawn on a map which has associated with it certain defined but theoretical altitudes, speeds, throttle settings, etc. Depending upon the type of aircraft, configuration of the plane (wheels up or wheels down), the experience of the pilot, the mood of the pilot, the wind direction and velocity, the weight of any armament and the amount of fuel remaining, the pilot in a given evolution may be close, or not very close at all, to the components of the theoretical line on the map. The testimony is replete with witnesses whose properties are distant from the theoretical racetrack oval but who regularly are subjected to direct and low overflights from Navy aircraft in the pattern. Perhaps the most common reason for planes flying wide is the number of planes flying in the pattern. As three or six aircraft go around for FCLPs or touch and goes, and then around again and then around again, they fly wide.**

20. Aircraft enter the pattern by performing "the break," which means they fly upwind in the direction of the runway heading and then execute the "crosswind turn" to head downwind. Erie Decl., ¶ 17. The location of the "crosswind turn" will vary depending, in part, upon the number of aircraft in the pattern. Erie Decl., ¶ 18. In general, the more aircraft in the pattern, the more the oval will extend. Erie Decl., ¶ 18.

**Response No. 20**

**Plaintiffs do not object to paragraph 20 except that Plaintiffs object to Cdr. Erie testifying for all pilots as set out in Plaintiffs' response to paragraph 19 and for any period of time prior to his service as operations officer, as stated in Plaintiffs' response to paragraph 1.**

21. At NAS Oceana, "the break" is performed at an altitude of 1,500 feet.

Erie Decl., ¶ 17. Once on the downwind heading, aircraft descend to a pattern altitude of 1,000 feet and decelerate as they move towards "the 180" (the point at which the aircraft begins its turn to land). Erie Decl., ¶ 17. "The 90" is the point halfway through the approach turn. Erie Decl., ¶ 17.

**Response No. 21**

**Plaintiffs object to paragraph 21 for the reasons stated in Plaintiffs' objections to 19.**

22. Because of the requirement for continuous training in carrier landing, "touch-and-go" operations are performed regularly at NAS Oceana. Keeley Decl., ¶ 15. As the name implies, a touch-and-go involves a practice takeoff and landing. Keeley Decl., ¶ 15. Aircraft will typically perform one to three touch-and-go operations upon arrival at the station. Keely Decl., ¶¶ 16, 19.

**Response No. 22**

**Plaintiffs object to paragraph 22 for reasons set out in response to paragraphs 1 and 19. Plaintiffs agree that a very large number of touch and go operations are performed at Oceana. Plaintiffs, however, state that the aircraft often perform more than three touch and go operations and often are engaged with as many as 3-5 other aircraft in that operation. Plaintiffs also state that the Navy performs thousands more FCLPs at Oceana than the Navy projected and told to the public.**

23. FCLPs do, however, share some similarities with touch-and-go operations. Keeley Decl., ¶ 18. The basic geometry of the touch-and-go and FCLP patterns is the same. Keeley Decl., ¶ 17. At NAS Oceana the pattern altitude for both touch-and-gos

and FCLPs is 1,000 feet. Keeley Decl., ¶ 18. However, there is a critical difference between touch-and-gos and FCLPs, namely the intensity and duration of FCLP's versus touch-and-go landings. Keeley Decl., ¶ 18.

**Response No. 23**

**Plaintiffs object to paragraph 23. FCLPs and touch and gos are more than similar; they are identical except FCLPs are graded by an observer near the touch down point. (Hebert Decl. March 6, 2002, Ex. 43, ¶ 8). The intensity and duration of FCLPs versus touch and go's is purely theoretical and not of any significance in this case given the number of FCLPs and touch and gos performed at NAS Oceana (Email from Dan Cecchini to Shawn Smith and Phillip Logan regarding "Re: Op count at NTU," dated November 27, 2000, Ex. 41).**

24. The "approach turn" will also vary, but to a lesser degree than the "crosswind turn." Erie Decl., ¶ 19. For example, the position of "the 180" will vary based on winds in the upwind direction. Erie Decl., ¶¶ 19-20. When winds in the upwind direction are light, the aircraft will have to fly a longer downwind leg before it begins its approach turn, to allow enough room for the aircraft to still have the required 15-18 seconds for the final approach heading. Erie Decl., ¶ 19. When this occurs the "approach turn" end of the oval will lengthen. Erie Decl., ¶ 19. Conversely, with higher winds in the upwind direction, the "approach turn" will occur closer to the ideal abeam position, because when the plane turns to head upwind it will require less space in which to line up for final approach. Erie Decl., ¶ 19.

**Response No. 24**

**Plaintiffs agree that the wind direction and speed will alter the flight pattern**

**in a variety of ways and disagree that that variety is encompassed in the statements in paragraph 24, all of which are incompetent under RCFC Rule 56 (e). Plaintiffs also object to Cdr. Erie's testimony for all pilots as set out in Plaintiffs' objection to paragraphs 1 and 19.**

25. An FCLP pattern can have as many as five aircraft in it at one time. FCLPs are prescheduled, graded training periods, that normally last approximately 45 minutes, during which each aircraft will conduct from seven to ten touch-and-gos. Keeley Decl., ¶ 19. In contrast, an individual aircraft would typically perform approximately one to three touch-and-gos, and, while it is not uncommon to have more than one aircraft in the pattern performing touch-and-gos at the same time, it is generally one to three aircraft. Keeley Decl., ¶ 19.

**Response No. 25**

**Plaintiffs object to paragraph 25 and incorporate their response to paragraphs 1 and 19. There is no "typical" number of aircraft in either an FCLP or touch and go pattern. (Ex. 44, Hebert Depo.)**

26. FCLP operations are primarily conducted at Naval Auxiliary Landing Field ("NALF") Fentress rather than NAS Oceana. Keeley Decl., ¶ 9.

**Response No. 26**

**Plaintiffs agree that NALF Fentress is supposed to and does conduct more FCLPs than Oceana; but Plaintiffs also state that Oceana is nevertheless conducting a great many FCLPs because of the desire to give the people who live around Fentress some sleep at night and because Fentress and Oceana combined are overburdened. (Hebert Email dated March 13, 2000, Ex. 42). Plaintiffs also**

**incorporate their response to paragraph 1.**

27. The departure, arrival, and landing patterns at NAS Oceana have remained generally the same over the years. Keeley Decl., ¶ 12. The altitudes at which these patterns were flown in the last three decades have changed somewhat, in that some pattern elevations have been raised, but these changes only served to reduce noise impacts on the ground and did not affect the nominal flight tracks or altitude that the aircraft flew when in the landing patterns. Keeley Decl., ¶ 13.

**Response No. 27**

**Plaintiffs agree that the altitude of the oval patterns at Oceana has been raised in the past. Plaintiffs object on the grounds of RCFC Rule 56 (e) to Captain Keeley's testimony on events that took place prior to his command and to his attempt to give expert opinion on acoustics and Plaintiffs incorporate their objections to paragraph 1.**

28. Notwithstanding the relative consistency of the predominant flight tracks, no two flights, even of the same aircraft flown by the same pilot, are identical; nor does each flight proceed at precisely the same altitude throughout the flight or cover precisely the same track over the ground. Keeley Decl., ¶ 20. None of the changes in flight operations since at least 1979 would have affected any of the flight operations with respect to the test plaintiffs' properties. Keeley Decl., ¶ 13.

**Response No. 28**

**Plaintiffs do not object to the first sentence of paragraph 28. Plaintiffs object to the remainder of the paragraph and incorporate their response to paragraph 1.**

29. The predominant aircraft that have operated at NAS Oceana have included

the F-4 Phantom, the A-6 Intruder, the F-14 Tomcat, and the F/A-18 Hornet. Keeley Decl., ¶ 7. The F-4 Phantom operated in the 1960s, 1970s, and early 1980s. Keeley Decl., ¶ 7. The A-6 Intruder operated from the 1970s through the mid-1990s. Keeley Decl., ¶ 7. The F-14 Tomcat has operated at NAS Oceana from the mid-1970s until the present. Keeley Decl., ¶ 7. Although one squadron of F/A-18 A aircraft was present at NAS Oceana since the mid-1990's, the first F/A-18 C/D Hornet squadrons arrived at NAS Oceana in December, 1998. Keeley Decl., ¶ 7.

**Response No. 29**

**Plaintiffs object to all but the last sentence of paragraph 28 pursuant to RCFC Rule 56 (e) and incorporate their objection to paragraph 1.**

30. These various fighter jets produce different noise levels for a variety of reasons, such as size, weight, design, and engine type. Revised Report of Sanford Fidell, 29 March 2006, ("Fidell Report"), Exhibit E, p. 15. A relative comparison of the perceived single event noise level produced by these aircraft can be found in NOISEMAP, the computer program relied upon by the Department of Defense to estimate noise exposure surrounding military air stations. Fidell Report, p. 3.

**Response No. 30**

**Plaintiffs object to paragraph 30. Plaintiffs do not disagree that various fighter jets produce different noise levels for a variety of reasons; but Plaintiffs state that the authority proposed for this allegation, Sanford Fidell, is an incompetent witness on the subject pursuant to RCFC 56 (e) and the rules governing expert testimony. Plaintiffs also incorporate their objection to Sanford Fidell articulated in the section of their memorandum addressing Fidell. Plaintiffs assert that the**

**NOISEMAP software can produce graphic depictions of Single Event ("SEL") Levels and DNL levels but state that those estimates of noise on the ground are based on the software's assumption that all of the flights projected for a specific type of operation (such as FCLP) at a given airport are flown by an expert pilot flying the pattern precisely as set out on a given map, at precisely the altitudes supposed to be flown, at the precise speed called for, by the operation, and using the specific throttle setting called for. A difference in any of the variables set out above will result in a different noise level being projected on the ground. The software itself also extrapolates the noise of a given aircraft in a given operation from only one or two known measurements of noise. In addition to human variables, the noise will differ depending on the elevation or airfield, the temperature, humidity and wind.**

31. The most widely accepted frequency-weighting procedure for annoyance comparisons is the Perceived Noise Level ("PNL"), which accords more weight to the more annoying high frequency sound bands. Fidell Report, p. 14.

**Response No. 31**

**Plaintiffs object to paragraph 31 for the same reasons as stated in response to paragraph 30. Under the Noise Control Act of 1972, the Environmental Protection Agency was charged by Congress with adopting a standard for the evaluation of environmental noise. In 1974 the EPA adopted and directed that the day-night average sound level ("DNL") be used. Every study of any military installation provided by Defendant to the Plaintiffs has used DNL as the basis for decision making. The Perceived Noise Level ("PNL") is a 1950s vintage noise metric that is**

**particularly difficult to measure and contains a large element of subjectivity (Stewart Decl., Ex. 49). PNL or PTNL never emerged in this case until Dr. Fidell's fourth report, served on Plaintiffs one month before Defendant filed its Motion for Summary Judgment and long after depositions and expert discovery was closed. Fidell is a psychologist and "psycho-acoustician" who gives testimony in this, and other cases, far outside his actual expertise. His opinion in this case should be given no weight at all. Plaintiffs rely upon the section of their Memorandum opposing summary judgment which discusses Dr. Fidell's opinions.**

32. NOISEMAP contains the most consistent and comprehensive database of field measurements of noise produced by military aircraft in various modes, including departure, approach, and pattern operations. Fidell Report, p. 15. The database does not have measurements for all the variant aircraft in all operations. Fidell Report, p. 15. It is common to substitute one aircraft's noise measurements for another, particularly when the aircraft share the same engines and are similar in weight. Fidell Report, p. 15.

**Response No. 32**

**Plaintiffs object to paragraph 32 on the grounds stated in response to paragraphs 30 and 31. The most consistent and useful evidence of the noise produced by particular Navy aircraft is that measured by various Navy commands of actual aircraft. Plaintiffs rely upon the section of their memorandum opposing summary judgment which discusses Dr. Fidell's opinions.**

33. The following table provides the maximum tone-corrected PNLs for the various aircraft, which reflects the greatest single value measured in decibels ("dB") at

any instant during a flyover[4]:

| AIRCRAFT | DEPARTURE | APPROACH | PATTERN |
|---|---|---|---|
| A6-A | 120.7 | 116.1 | No data |
| F-4C | 123.2 | 112.6 | 114.5 |
| F-14A | 118.2 | 102.4 | 103.2 |
| F-14B | 120.9 | 99.2 | 101.9 |
| F/A-18 C/D | 121.9 | 116.5 | 102.2 |

**Response No. 33**

**Plaintiffs object to paragraph 33. For the reasons stated in Plaintiffs' objections to paragraphs 30 and 31, Dr. Fidell's reports deserve to be given no weight. Plaintiffs rely upon the section of their Memorandum opposing summary judgment which discusses Dr. Fidell's opinions. Moreover, the concept of PNL has substantial subjectivity. In this case, it is the subjectivity of a professional expert witness which is depicted in the chart following paragraph 33. PNL has seldom been used for any purpose since 1974 when the EPA, under the direction of Congress, decided that DNL should be the preferred metric for time-weighted noise assessment.**

34. Aircraft single event noise levels are also measured in terms of the sound exposure level (SEL), which reflects the total energy produced in a single flyover, normalized to a hypothetical one-second duration. Fidell Report, p. 14, 23.

**Response No. 34**

**Plaintiffs have no objection to paragraph 34 except the objection to Dr. Fidell as set out in Plaintiffs' objection to paragraphs 30-33.**

35. The sound pressure level at the measurement point on the ground initially rises to a maximum as an aircraft approaches, then declines as the airplane flies away.

[4] This table was extracted from the Fidell Report, p. 15.

Fidell Report, p. 23. Since the sound pressure levels vary throughout the overflight, and since the durations of different overflights also vary, no single number can usefully characterize the moment-to-moment changes in sound levels. Fidell Report, p. 23. The usual method for representing the sound energy produced during the entire overflight is therefore to "normalize" the measurement to a standard time period (one second). Fidell Report, p. 23.

**Response No. 35.**

**Plaintiffs object to paragraph 35 for the reasons stated in Plaintiffs' objections to paragraphs 30-34. Plaintiffs rely upon the section of their Memorandum opposing summary judgment which discusses Dr. Fidell's opinions.**

36. Tone-corrections further assist in accounting for the contribution of prominent tones to the annoyance of aircraft noise. Fidell Report, p. 14. The following table lists the tone-corrected, A-weighted SELs for the predominant aircraft at NAS Oceana from the 1970s to 2000[5]:

| AIRCRAFT | DEPARTURE | APPROACH | PATTERN |
|---|---|---|---|
| A-6A | 113.7 | 110.7 | No data |
| F-4C | 116.7 | 106.8 | 108.5 |
| F-14A | 107.9 | 96.2 | 90.6 |
| F-14B | 109.8 | 94.5 | 89.7 |
| F/A-18 C/D | 118.2 | 110.9 | 94.5 |

**Response No. 36**

**Plaintiffs object to paragraph 36 for the reasons stated in response to**

[5] This table was extracted from the Fidell Report, p. 16.

**paragraphs 30 - 34. Plaintiffs rely upon the section of their memorandum opposing summary judgment which discusses Dr. Fidell's opinions.**

37. When the VFR pattern was flown from Runway 5L/R, the Capps and Hill properties experienced frequent overflights. Erie Decl., ¶¶ 29, 57. On the downwind leg, aircraft in this pattern would have regularly flown over or within approximately one-half mile of the Capps property at an altitude of approximately 1,000 feet. Erie Decl., ¶ 29. The Hill property is located on the approach turn for Runway 5L/R. Erie Decl., ¶¶ 56, 57; see also Exhibit F. It is just past the "180 position" and therefore would have been routinely overflown by aircraft in the landing pattern. Erie Decl., ¶¶ 56, 57. These aircraft would have passed directly over or within approximately one-half mile of this property at an altitude of approximately 700-800 feet as they descended into the "approach turn." Erie Decl., ¶ 57; see generally Declaration of Commander Dirk Hebert ("Hebert Decl."), Exhibit G.

**Response No. 37**

**Plaintiffs object to paragraph 37 for the reasons stated in Plaintiffs' response to Paragraph 1. The Declaration of Cdr. Erie consists of inadmissible conclusions by an incompetent witness under RCFC Rule 56 (e). *See* also Plaintiffs' objection to paragraph 30 setting out the completely theoretical nature of the patterns drawn on a map. The unsupported theory that Plaintiffs are, are not, are often, or are not often, subjected to overflights or substantial noise is completely refuted by the sworn testimony of those Plaintiffs and by a number of other witnesses, and by the admissions of the Navy in documents and testimony. In addition, *see* the sworn**

**testimony of Betty Capps, Ex. 1B and Kenneth Hill, Ex. 8B. Plaintiffs also rely upon the section of their memorandum which discusses the incompetence of Cdr. Erie under Rule 56 (e). The same analysis applies to Cdr. Hebert.**

38. In addition to overflights in the downwind pattern from Runway 5L/R, the Capps property is also underneath the VFR landing pattern for Runway 14L/R. Erie Decl., ¶ 31; see also Exhibit F. It is near "the 90" (halfway through the approach turn), so during the roughly two percent of the time when Runway 14L/R was in use aircraft would have flown over or within approximately one-half mile of the Capps property at an altitude of approximately 450-500 feet. Erie Decl., ¶ 31; see generally Hebert Decl.

**Response No. 38**

**Plaintiffs object to paragraph 38 for the reasons stated in response to paragraph 37.**

39. When Runway 23L/R was in use, approximately 34 percent of the time, aircraft would have routinely flown over or nearly over the Hoag and Dingle properties during the approach to landing. Erie Decl., ¶¶ 25, 34, 37-38; see also Exhibit F. The aircraft would have been at an altitude of approximately 500-800 feet. Erie Decl., ¶¶ 34, 38; see generally Hebert Decl.

**Response No. 39**

**Plaintiffs object to paragraph 39 for the reasons stated in their response to paragraphs 30 and 37, and because of the sworn testimony of Sara Hoag (Lynch), Ex. 13B, and Theodore Dingle, Ex. 22B.**

40. The Leary and Riddick properties are both south of Runway 5L/R and would regularly have experienced noise from aircraft landing on that runway either in the

visual landing pattern or on straight in approaches; however, it would have been unusual for these properties to be overflown when a visual landing pattern was being used. Erie Decl., ¶61; see also Exhibit F. Aircraft in the visual landing pattern for Runway 5L/R would have been no closer than one-half mile of these properties at an altitude of 400 to 800 feet. Erie Decl., ¶61. Aircraft on a straight in approach to Runway 5L/R would have flown within approximately one-half to one mile of these properties, at an altitude of approximately 500 to 1,000 feet, but would not normally have directly overflown the properties. Erie Decl., ¶61.

**Response No. 40**

**Plaintiffs object to paragraph 40 for the reasons stated in paragraphs 30 and 37 and in the sworn testimony of Plaintiffs Leary, Ex. 12B, and James Riddick, Ex. 7B.**

41. When Runway 23L/R was in use the Leary and Riddick properties would have routinely been overflown on departures, but at an altitude of approximately 1,500 to 2,000 feet. Erie Decl., ¶62. Also, aircraft departing from Runway 23L/R on their way to NALF Fentress to conduct FCLPs would have flown within approximately one-half mile of these properties at an altitude of approximately 1,000 feet. Erie Decl., ¶62; see generally Hebert Decl.

**Response No. 41**

**Plaintiffs object to paragraph 41 for the reasons stated in their objections to paragraphs 30, 37 and 40.**

42. When Runway 5L/R was in use, aircraft in the downwind leg would routinely have flown within approximately one-half to one mile of the Levenson property

at an altitude of approximately 1,000 feet. Erie Decl., ¶ 42; see also Exhibit F. Only if aircraft were extremely wide abeam, however, would they have directly overflown the Levenson property, which would have been unusual. Erie Decl., ¶ 42.

**Response No. 42**

**Plaintiffs object to paragraph 42 for the reasons stated in response to paragraph 37. According to the sworn testimony of Mr. Levenson, the planes regularly fly directly over his house. (Ex. 11B). Because Mr. Levenson is on the Board of Citizens Concerned Against Jet Noise ("CCAJN"), the members of the Board often meet at his house and as a result they are familiar with the noise at the Levenson property. The fact that the planes fly overhead and are extremely loud is supported by the testimony of Kim Johnson (Ex. 23B) and of Herk Stokely (Ex. 2B).**

43. The Levenson property would also have experienced noise from aircraft in "the break" for Runway 5L/R, but at an altitude of approximately 1,500 feet. Erie Decl., ¶ 42. During the roughly two percent of the time that Runway 14L/R was being used, aircraft flying the VFR landing pattern would fly over or within one-half mile of the Levenson property during the approach turn at an altitude of approximately 450 to 550 feet. Erie Decl., ¶ 43.

**Response No. 43**

**Plaintiffs object to the statements in paragraph 43 for the reasons stated in paragraphs 37, 40 and 42.**

44. The Levenson property would also have experienced noise from aircraft departing on Runway 32L/R, which was in use roughly 14% of the time. Erie Decl., ¶¶

25, 44. These aircraft would climb from 1,000 to 4,000 feet and their ground track would vary greatly, so it is possible that the Levenson property may have been overflown during these operations on occasion by aircraft turning right after departure, but this would not have been a regular event. Erie Decl., ¶ 44.

**Response No. 44**

**Plaintiffs object to paragraph 44 for the reasons stated in their objections to paragraphs 37 and 40.**

45. When Runway 5L/R was in use, aircraft in the downwind leg would routinely have flown within approximately three-quarters to one mile of the Lindsay property at an altitude of approximately 1,000 feet. Erie Decl., ¶ 46; see also Exhibit F. Only if aircraft were extremely wide abeam (even wider abeam than in the case of the Levenson property) would they have directly overflown the Lindsay property, and it would have been even more unusual for an aircraft to be this wide abeam than it would have been with the Levenson property. Erie Decl., ¶ 46. Additionally, aircraft entering the pattern via the break maneuver would fly a similar ground track as above, but at 1,500 feet and at a significantly lower power setting. Erie Decl., ¶ 46.

**Response No. 45**

**Plaintiffs object to paragraph 45 for the reasons stated in paragraphs 37, 40 and 44. The Lindsay property is regularly overflown causing substantial noise impact on their property. (Sworn testimony of Carroll Lindsay, Ex. 10B).**

46. The Lindsay property would also have experienced noise from aircraft departing from Runway 32L/R, as the aircraft climbed from 1,000 feet to 4,000 feet. Erie Decl., ¶ 47. The ground track of these aircraft would have varied, so it is possible that on

occasion the Lindsay property may have been overflown during these operations (in the case of the Lindsay property by aircraft turning left after departure), but, based on the location of the property, any direct overflights would have been rare. Erie Decl., ¶ 47.

**Response No. 46**

**Plaintiffs object to paragraph 46 for the reasons stated in objection to paragraphs 37, 40 and 45.**

47. During those very infrequent occasions when Runway 14L/R was in use and the airfield was also in Instrument Flight Rules ("IFR") conditions, the Lindsay property would have experienced noise from aircraft on straight-in IFR radar-controlled approaches to Runway 14L/R as they passed by at an altitude of approximately 1,000 feet, but the property would not typically have been overflown during those operations. Erie Decl., ¶ 48.

**Response No. 47**

**Plaintiffs object to paragraph 47 for the reasons stated in opposition to paragraphs 37, 40 and 45.**

48. The Lindsay property would have also experienced noise from aircraft entering the visual landing pattern for Runway 14L/R via "the break" on an infrequent basis. Erie Decl., ¶ 48. The aircraft conducting this maneuver would fly over or nearly over (within one-half to one mile) the Lindsay property at an altitude of 1,500 feet. Erie Decl., ¶ 48; see generally Hebert Decl.

**Response No. 48**

**Plaintiffs object to paragraph 48 for the reasons stated in paragraph 37, 40**

**and 45.**

49. When Runway 5 L/R was in use, aircraft in the downwind leg would routinely have flown within approximately three-quarters to one mile of the Van Nostrand property at an altitude of approximately 1,000 feet. Erie Decl., ¶ 50; see also Exhibit F. Only if aircraft significantly deviated from the VFR pattern would they have overflown this property. Erie Decl., ¶ 50.

**Response No. 49**

**Plaintiffs object to paragraph 49 for the reasons stated in objection to paragraph 37, 40 and 45. The Van Nostrand property is regularly directly overflown by aircraft causing substantial noise impact on their property. (Sworn testimony of Herbert Van Nostrand (Ex. 3C).**

50. The Van Nostrand property would also have experienced noise from aircraft in "the break" for Runway 5L/R at an altitude of approximately 1,500 feet, but would have been directly overflown only if the aircraft was extremely wide abeam, which would have been unusual. Erie Decl., ¶ 50. The Van Nostrand property would also have experienced noise from aircraft departing NAS Oceana on Runway 32 L/R that turned left (toward the south) and were flying at approximately 2,000 feet while climbing to assigned altitude, but this property would not have been routinely overflown during these departures. Erie Decl., ¶ 51.

**Response No. 50**

**Plaintiffs object to paragraph 50 for the reasons stated in objection to paragraphs 37, 40 and 49.**

51. The Van Nostrand property would also have experienced noise from

aircraft entering the visual landing pattern for Runway 14L/R via "the break" on a very infrequent basis. Erie Decl., ¶ 52. Aircraft in this pattern may very infrequently overfly the Van Nostrand property at approximately 1,500 feet. Erie Decl., ¶ 52.

**Response No. 51**

**Plaintiffs object to paragraph 51 for the reasons stated in opposition to paragraphs 37, 40 and 49.**

52. Aircraft may have flown over or within a mile of the Waterman property when using the IFR/radar training pattern for Runways 5L/R and 23L/R, but would have done so at an altitude of 2,000 feet. Erie Decl., ¶ 64; see also Exhibit F. Aircraft departing Runway 5L/R on the way to NALF Fentress would have flown over or within one to two miles of the Waterman property at an altitude of approximately 1,500 feet. Erie Decl., ¶ 65. Aircraft departing Runway 23L/R for areas to the east may have overflown directly over or within one to two miles of this property at an altitude of approximately 1,500 to 2,000 feet as they climbed to 4,000 feet. Erie Decl., ¶ 65.

**Response No. 52**

**Plaintiffs object to paragraph 52 for the reasons stated in opposition to paragraphs 37 and 40. The Waterman property is directly and often overflown with substantial impact of noise on the ground. (Depo. of Eddie Waterman, Ex. 6B).**

53. The May property is located approximately four miles away from the NAS Oceana runways, barely inside the NAS Oceana tower-controlled airspace. Erie Decl., ¶ 53; see also Exhibit F. The May property may have experienced minimal aircraft noise when Runway 14L/R was in use, roughly two percent of the time, but these aircraft

would usually have passed well south of the property on the way to the airfield. Erie Decl., ¶¶ 25, 54.

**Response No. 53**

**Plaintiffs object to paragraph 53 for the reasons stated in opposition to paragraphs 37 and 40. Mrs. May's property is an excellent example of how the theoretical flight patterns and theoretical operations that form the basis of Defendant's case have little relationship to the real world. Ms. May's property, which is the most distant of the Test Case properties from the airfield, is regularly overflown and Ms. May has been bombarded by substantial jet noise since the arrival of the F/A-18s (Depo. of Eileen May, Ex. 9B).**

54. On the very infrequent occasions when Runway 14L/R was in use and NAS Oceana was in IFR conditions, aircraft on IFR/Radar approaches to NAS Oceana would have flown within three-quarters to one mile of the May property, but not over it, at an altitude of approximately 1,500 to 2,000 feet. Erie Decl., ¶ 55. It is also possible that aircraft flying between NAS Norfolk and NAS Oceana would have flown within one to two miles of the May property at approximately 2,000 feet, but this would have been extremely infrequent, perhaps once per month. Erie Decl., ¶ 55; see generally Hebert Decl.

**Response No. 54**

**Plaintiffs object to paragraph 54 for the reasons stated in objection to paragraphs 37, 40 and 53.**

55. Aircraft may have flown directly over or within a mile of the Ryan

property when the IFR/radar training pattern for Runways 5L/R and 23L/R, but at an altitude of 2,000 feet. Erie Decl., ¶ 68; see also Exhibit F. This property would also have experienced noise from aircraft on their way to NALF Fentress to conduct FCLPs after departing NAS Oceana Runway 5L/R and turning right toward the ocean; however, the aircraft would have been at an altitude of 1,500 feet and would not have routinely overflown the Ryan property. Erie Decl., ¶ 69; but see Hebert Decl., ¶ 2.

**Response No. 55**

**Plaintiffs object to paragraph 55 for the reasons stated in Plaintiffs' opposition to paragraphs 37, 40 and 53. The Ryan's property has been regularly directly overflown by the F/A-18s since their arrival causing substantial noise impact to the property and to Mr. Ryan's family. (Depo. of Sean Ryan, Ex. 5B).**