**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

(E-filed: June 9, 2006)

| | | |
|---|---|---|
| CAROL AND ROBERT TESTWUIDE, et. al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 01-201L |
| v. | ) | |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | Judge Victor J. Wolski |
| Defendant. | ) | |

**DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS OR, ALTERNATIVELY, FOR SUMMARY JUDGMENT**

Dated: June 9, 2006

Respectfully submitted,

Steven D. Bryant
Kelle S. Acock
Environmental & Natural Resources Division
United States Department of Justice
601 D Street, NW, Rm. 3205
Washington, D.C. 20004
Counsel for Defendants
202-305-0424

Of Counsel:

Robert J. Smith
Mary Raivel
Navy Litigation Office
Washington Navy Yard, D.C. 20374

CDR Dominick Yacono
JAGC, USN
Commander Navy region
Norfolk, VA 23511-2737

## TABLE OF CONTENTS

Introduction . . . . . 1

I. Standards For Summary Judgment . . . . . 3

II. Test Plaintiffs Fail to State An Overflight Taking Claim In July 1999 . . . . . 5

A. *Causby* Provides The Elements For Proving An Overflight Taking . . . . . 5

B. The Flight Activity At The Group 2 and 3 Test Plaintiff Properties Does Not Establish An Overflight Taking Under *Causby* . . . . . 6

C. The Unique Circumstances In Branning and Argent Are Not Present at NAS Oceana . . . . . 12

III. Test Plaintiffs Claims Are Barred By The Statute of Limitations . . . . . 15

A. Legal Standard For The Statute of Limitations In An Overflight Takings Case Where There Is Prior Overflight Interference . . . . . 15

B. The Statute of Limitations Began To Run In 1981When Aircraft Operations Far Exceeded Those In 1999 . . . . . 15

C. Plaintiffs Cannot Prove A Second Taking In 1999 . . . . . 20

1. Noise Level of NAS Oceana Aircraft . . . . . 21

2. No Evidence That May Property Has Experienced A Significant Diminution In Value . . . . . 24

Conclusion . . . . . 25

## TABLE OF AUTHORITIES

### CASES

A.J. Hodges Industries, Inc. v. United States,
355 F.2d 592 (Ct. Cl. 1966) . . . . . 14

Aaron v. United States,
340 F.2d 655 (Ct. Cl. 1964) . . . . . 5, 24

Alder Terrace, Inc. v. United States,
161 F.3d 1372 (1998) . . . . . 15

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) . . . . . 4

Argent v. United States,
124 F.3d 1277 (Fed. Cir. 1997) . . . . . 2, 11, 12

Avery v. United States,
330 F.2d 640 (Ct. Cl. 1964) . . . . . 20

Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.,
731 F.2d 831 (Fed. Cir. 1984) . . . . . 5

Boardman v. United States,
180 Ct. Cl. 264 (1967) . . . . . 20

Branning v. United States,
228 Ct. Cl. 240, 654 F.2d 88 (1981) . . . . . 2, 11

Bromley Contracting Co. v. United States,
15 Cl. Ct. 100 (1988) . . . . . 4

Campbell v. United States,
2 Cl. Ct. 247 (1983) . . . . . 4

Carrier Corp. v. United States,
6 Cl. Ct. 169 (1984) . . . . . 4

Celotex Corp. v. Catrett,
477 U.S. 317 (1986) . . . . . 5

Davis v. United States,
155 Ct. Cl. 418 (1961) . . . . . 5, 23

Hero Lands Co. v. United States,
1 Cl. Ct. 102 (1983) . . . . . . . . . . 23

Lacey v. United States,
219 Ct. Cl. 551 (1979) . . . . . . . . . . 14, 19

Persyn v. United States,
34 Fed. Cl. 187 (1995) . . . . . . . . . . 5, 9, 14, 20

Powell v. United States,
1 Cl. Ct. 669 (1983) . . . . . . . . . . 14, 19, 23

Robertson v. United States,
173 Ct. Cl. 621 (1965) . . . . . . . . . . 19

Speir v. United States,
485 F.2d 643 (1973) . . . . . . . . . . 19

Stephens v. United States,
11 Cl. Ct. 352 (1986) . . . . . . . . . . 5, 8

Sweats Fashions, Inc. v. Pannill Knitting Co. Inc.,
833 F.2d 1560 (Fed. Cir. 1987) . . . . . . . . . . 4

Testwuide v. United States,
56 Fed.Cl. 755 (Fed.Cl. 2003) . . . . . . . . . . 13

Town & Country Motor Hotel v. United States,
180 Ct. Cl. 563 (1967) . . . . . . . . . . 19

United States v. Causby,
328 U.S. 256 (1946) . . . . . . . . . . 2, 5

**STATUTES**

28 U.S.C. § 2501 . . . . . . . . . . 3, 15, 24
28 U.S.C. § 1491 . . . . . . . . . . 24

**RULES**

RCFC 12(b)(1), . . . . . . . . . . 24

RCFC 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

**REGULATIONS**

14 CFR Part 36 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23-25

## LIST OF EXHIBITS

| Exhibit No. | Exhibit Description |
| --- | --- |
| Exhibit A | Deposition Testimony of Eddie Waterman |
| Exhibit B | Deposition Testimony of Michael J. Leary |
| Exhibit C | Deposition Testimony of Carroll Lindsay |
| Exhibit D | Deposition Testimony of Charles K. Nash |
| Exhibit E | Deposition Testimony of Hebert Van Nostrand |
| Exhibit F | Deposition Testimony of James E. Riddick |
| Exhibit G | Deposition Testimony of John C. Shick |
| Exhibit H | Deposition Testimony of Jeffrey McCreary |
| Exhibit I | Deposition Testimony of Harold Levenson |
| Exhibit J | Deposition Testimony of Sean M. Ryan |
| Exhibit K | Deposition Testimony of Eileen May |
| Exhibit L | Excerpt from Harris, Miller, Miller, & Hanson (HMMH) 1982 noise study |
| Exhibit M | Declaration of Curtis A. Utz |
| Exhibit N | Excerpt from Expert Report of Sanford Fidell |
| Exhibit O | Deposition Testimony of Dr. Noral Stewart |
| Exhibit P | Declaration of Dr. Sandford Fidell |
| Exhibit Q | Declaration of Fred Pierson |

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

(E-filed: June 9, 2006)

| | | |
|---|---|---|
| CAROL AND ROBERT TESTWUIDE, et. al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 01-201L |
| v. | ) | |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | Judge Victor J. Wolski |
| Defendant. | ) | |

**DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS OR, ALTERNATIVELY, FOR SUMMARY JUDGMENT**

Dated: June 9, 2006

Respectfully submitted,

SUE ELLEN WOOLDRIDGE
Assistant Attorney General
Environmental & Natural Resources Division

Steven D. Bryant
Kelle S. Acock
Environmental & Natural Resources Division
United States Department of Justice
601 D Street, NW, Rm. 3205
Washington, D.C. 20004
Counsel for Defendants
202-305-0424

Of Counsel:

Robert J. Smith
Mary Raivel
Navy Litigation Office
Washington Navy Yard, D.C. 20374

CDR Dominick Yacono
JAGC, USN
Commander Navy region
Norfolk, VA 23511-2737

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| CAROL AND ROBERT TESTWUIDE, et. al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 01-201L |
| v. | ) | |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | Judge Victor J. Wolski |
| Defendant. | ) | |

**DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS OR, ALTERNATIVELY, FOR SUMMARY JUDGMENT**

The United States hereby replies to plaintiffs' opposition to defendant's motion to dismiss and motion for summary judgment. Plaintiffs have failed to sustain their burden in responding to a motion for summary judgment. Plaintiffs failed to present any factual evidence or legal support regarding the material issues for which they ultimately bear the burden of proof. Defendant has shown in its motion to dismiss and motion for summary judgment that no material facts are in dispute and that defendant is entitled to judgment as a matter of law. Nothing presented in plaintiffs' pleadings alters that that conclusion.[1]

**Introduction**

As more fully discussed in defendant's opening brief, the test plaintiff properties are geographically dispersed around Naval Air Station (NAS) Oceana, a master jet base that has been in operation for over four decades. Defendant presented a thorough analysis of flight paths, runway use, and aircraft operations at NAS Oceana, identified the flight operations at the test plaintiff properties at the time of the alleged taking in July 1999, and defendant established

[1] Defendant also moved to dismiss the claims of those plaintiffs who lack standing because they did not own their property at the time of the alleged taking. Plaintiffs fail to address this issue in their opposition.

that none of these operations had changed with respect to the test plaintiffs since as far back as 1979.

This analysis demonstrates that the test plaintiff properties can be divided into three groups based on the level of flight activity to which they historically have been exposed. The Group 1 test plaintiff properties (Capps, Hill, Hoag, and Dingle) have long been exposed to low and frequent aircraft operations. The Group 2 test plaintiff properties (Leary, Riddick, Levenson, Lindsay, Van Nostrand, and Waterman) have historically been exposed to flight activity, but not at the low altitude and regularity of Group 1. Finally, the Group 3 properties (May and Ryan) have been exposed to the least flight activity of the test plaintiffs with no history of routine overflights at low altitudes.

As defendant demonstrated in its opening brief, through the declarations of Commanders Erie and Hebert and other evidence, the Group 2 and Group 3 properties have not experienced overflights with the frequency and low altitude required in United States v. Causby, 328 U.S. 256 (1946). see Def.'s Mot. Exhibits D, G. Plaintiffs present no evidence to the contrary in their response. Instead, plaintiffs attempt to rely on the limited exception to Causby discussed in Branning v. United States, 228 Ct. Cl. 240, 654 F.2d 88 (1981), and Argent v. United States, 124 F.3d 1277, 1278 (Fed. Cir. 1997) for "peculiarly burdensome" flight activity.[2] However, the intense field carrier landing practice ("FCLP") training regime in those cases was not present at NAS Oceana. In support of their claim of a permanent taking under this exception, plaintiffs inexplicably rely on an irrelevant temporary increase in FCLPs,

[2] Although Branning and Argent involved peculiarly burdensome aircraft activity, the decisions are nevertheless erroneous attempts at expansion of overflight takings law in that they countenance a finding of an overflight taking in situations where the clear elements of liability set forth in Causby are not present. Defendant notes its disagreement with the decisions in Argent and Branning, for the purpose of preserving the possibility of arguing to the court of appeals that the reasoning in those cases was in error.

and their conclusory allegation that a 30-year aviator and former commanding officer of NAS Oceana has misstated the difference between touch-and-go operations and FCLPs.

As further explained in defendant's opening brief through the declaration of Commander Riley, the number of NAS Oceana flight operations throughout the 1980s and early 1990s exceeded or were comparable to the 133,000 operations in 1999. see Def.'s Mot. Exhibit B. This evidence is also uncontroverted. Consequently, if a taking of an avigation easement occurred at some of the test plaintiff properties, it occurred at least as early as 1981 when there were 232,000 aircraft operations. In 1981, the flight paths, runway use, and aircraft operations in relation to the test plaintiff properties were generally the same as in 1999. Given the significantly higher number of operations in 1981 than 1999, the test plaintiffs' claims are barred by the mandatory six-year statute of limitations, 28 U.S.C. § 2501.

Plaintiffs further fail to present evidence of a second incremental overflight taking in July 1999. Plaintiffs do not present evidence, nor can they, that the altitude of flights was reduced or that the number of operations significantly increased compared with 1981. Moreover, plaintiffs fail to present evidence that the F/A-18 C/D was substantially louder than all of the predominant aircraft in 1981, the F-4, A-6, and F-14. Plaintiffs indeed ignore the F-4 and A-6. For the reasons below and in defendant's opening brief, defendant's motion should be granted.

## I. Standards For Summary Judgment

Defendant filed its motion to dismiss and motion for summary judgment, supported by declarations, an expert report, and other documents, all of which show that no genuine issues of material fact exist and that defendant is entitled to judgment as a matter of law. See RCFC

56(b). The Rules of this Court set forth the obligations of plaintiffs in the face of defendant's presentation. Rule 56(e), provides in part:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Once the moving party has met its burden, the non-movant "must proffer countering evidence sufficient to create a genuine factual dispute." Sweats Fashions, Inc. v. Pannill Knitting Co. Inc., 833 F.2d 1560, 1562 (Fed. Cir. 1987). The non-movant must, therefore, present sufficient evidence of the existence of a dispute as to a material fact such that the trier of fact could reasonably find in favor of the non-movant. As was stated in Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986):

> [T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.
>
> ***
>
> The inquiry performed is the threshold inquiry of determining whether there is the need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

Id. (citations omitted); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Persyn v. United States, 34 Fed. Cl. 187 (1995).

Here, plaintiffs have failed to set forth specific facts that would generate an issue for trial. Plaintiffs' burden "is not met by reliance on its pleadings alone, or by conclusory allegations and generalities." Bromley Contracting Co. v. United States, 15 Cl. Ct. 100, 105 (1988); see Campbell v. United States, 2 Cl. Ct. 247, 249 (1983). Plaintiffs' response "must set forth facts showing that there is a genuine issue for trial." Carrier Corp. v. United States, 6

Cl. Ct. 169, 175 (1984); see also Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd., 731 F.2d 831, 836 (Fed. Cir. 1984).

As discussed below and in defendant's opening brief, summary judgment must be entered in favor of the United States because plaintiffs have failed to establish the existence of essential elements of their overflight taking case and that their claims are not barred by the statute of limitations.

## II. Test Plaintiffs Fail To State An Overflight Takings Claim In July 1999

### A. *Causby* Provides The Elements For Proving An Overflight Taking

As discussed at length in our opening brief (pp 22-24) the Supreme Court has held that the following four elements must be proven in order to establish an overflight taking:

(1) the aircraft flights must "directly" invade the airspace over the property;
(2) the flights must be "low";
(3) the flights must be "frequent"; and
(4) the flights meeting the above criteria must substantially destroy the use and enjoyment of the property.

United States v. Causby, 328 U.S. 256 (1946). Essentially, the first element requires flights directly over the property. Regarding the second element, flights at an altitude below 1,000 feet are considered "low" for a congested residential area such as Virginia Beach. Stephens v. United States, 11 Cl. Ct. 352, 359 (1986). Although "frequent" has not specifically been defined, the case law indicates that annual overflights must be in the thousands – and more likely tens of thousands – to establish the third element of an overflight taking. The fourth element requires a showing by the plaintiffs of a very significant burden on the property, such as rendering a home uninhabitable by preventing the occupants from sleeping, or flights that cause buildings to shake, interfere with radio and television operation, and negate the ability to

use the telephone or conduct conversations. Aaron v. United States, 340 F.2d 655, 659 (Ct. Cl. 1964). See Davis v. United States, 155 Ct. Cl. 418, 420 (1961).

**B. The Flight Activity At The Group 2 and Group 3 Test Plaintiff Properties Does Not Establish An Overflight Taking Under *Causby***

In our opening brief defendant thoroughly detailed NAS Oceana aircraft operations in relation to the Group 2 and Group 3 properties. This analysis is predicated in large part on the declaration of Commander Richard Erie, NAS Oceana's Air Operations Officer, who analyzed flight paths, runway use, and aircraft operations at NAS Oceana to identify the impact of operations at the test plaintiffs' properties at the time of the alleged taking in July 1999. see Def.'s Mot. pp. 5-8, 12-17. This analysis demonstrated that the Group 2 and Group 3 properties have not been exposed to low and frequent overflights and therefore cannot prove an overflight taking under Causby.

Notably, plaintiffs make vague arguments, but do not attack the accuracy of Commander Erie's analysis with respect to impacts at the test plaintiff properties in their brief. Instead, plaintiffs seek to exclude his declaration on the grounds that he has no personal knowledge of the facts in July 1999 because he did not become the Air Operations Officer until 2003. This is thoroughly unconvincing. First, Commander Erie was assigned to NAS Oceana previously, from 1996 to 1998, as an Instructor Pilot in NAS Oceana's F-14 training squadron, and during that time he "flew extensively from and around NAS Oceana." see Erie Declaration ¶¶ 4-5, 13 (Def.'s Mot. Exhibit D). Second, the plaintiffs completely ignore the declaration of Commander Dirk Hebert, the Air Operations Officer in July 1999. In his declaration, Commander Hebert stated that he had reviewed Commander Erie's declaration and that, with one minor exception related to the Ryan property, "[Commander] Erie's description of the effects of flight operations on the properties of the 12 test plaintiffs accurately describes

those effects as of July 1999 and thereafter…." see Hebert Declaration ¶¶ 1-3 (Def.'s Mot. Exhibit G).

Plaintiffs also claim that some of the language Commander Erie used to describe the impacts of flight operations at the test plaintiffs properties was "vague" and "speculative", in particular, his use of the terms "would have" or "may have." This is equally unpersuasive. The phrase "would have" describes past (i.e., July 1999) events rather than current events. "May have," simply acknowledges that, given the inherent variation that occurs in flights,[3] it is not always possible to state with certainty whether a particular property was directly overflown.

Plaintiffs have produced no documentary evidence that disputes the underlying flight data or Commander Erie's analysis. Indeed, plaintiffs' allegations of an overflight taking are devoid of any evidence reporting the number and altitude of any flights over the test plaintiff properties in July 1999.

Plaintiffs invite the Court's attention to the test plaintiffs' deposition testimony (Plts.' Response p 12); however, a review of their testimony demonstrates that they cannot satisfy the requisite four Causby elements.[4] Group 2 test plaintiffs Waterman, Leary, and Lindsay testified that they could not estimate the altitude of the flights near their properties, but recognized that the altitude and path of the flights before and after the arrival of the F/A-18

---

[3] These variations are addressed by both Commander Erie and Captain Thomas Keeley in their declarations. Erie Decl. ¶ 20 (Def.'s Mot. Exhibit D), Keeley Decl. ¶ 20 (Def.'s Mot. Exhibit A).

[4] Plaintiffs have also cited testimony of several non-test plaintiff witnesses. Only three of these witnesses are even potentially relevant regarding overflight activity. John Schick and Jeffrey McCreary appear to live within a few blocks of Group 2 test plaintiff Levenson, and Charles Nash lives within a few blocks of Group 2 test plaintiff Lindsay. The remaining witnesses, however, live nearly a mile or more from any of the Group 2 or Group 3 test plaintiffs and therefore their testimony cannot be relevant regarding flight activity at the Group 2 or Group 3 properties.

C/Ds were generally the same in relation to their properties.[5] Exhibit A, pp. 41-42; Exhibit B, pp. 43-44; Exhibit C, pp. 23, 36-37, 69.

Group 2 test plaintiff Van Nostrand testified that over the approximately four decades he has lived in his home jets in the vicinity of his property have generally flown the same flight paths at the same altitude, which he roughly estimated at 1,000 to 1,400 feet. Exhibit E, pp. 15, 72-73.[6] Flights above 1,000 feet would not meet the definition of "low" in the context of an overflight taking. Stephens v. United States, 11 Cl. Ct. at 359. Regarding frequency of flight operations, Mr. Van Nostrand estimated that approximately 180 flights per month fly in the vicinity of his property, some directly over, others not. Exhibit E, pp. 13-15. Mr. Van Nostrand further acknowledged that the frequency of operations (like the pattern) was the same from 1967 through the present. Exhibit E, p. 15. Assuming Mr. Van Nostrand's estimate of the operations near his property were correct (putting aside the fact that only an unspecified portion of the flights were directly over the property), it still would not satisfy Causby's third element – frequent operations.

Group 2 test plaintiff Riddick testified that he could not estimate the altitude of the aircraft, nor did he quantify the number of overflights. Exhibit F, pp. 49-50. Group 2 test plaintiff Levenson likewise did not indicate the number of flight operations directly over his

---

[5] Mr. Nash did not keep a log of the frequency of the operations, but estimated that ten percent or less of landings directly fly over his property (near test plaintiff Lindsay) when Runway 14 (the least used runway) is in use. Exhibit D, pp. 23. Mr. Nash noted that he felt "very fortunate" that Runway 14 was not used "very often." Exhibit D, pp. 12. Mr. Nash testified that he was not sure of the altitude of flights in the vicinity of his home, but estimated that they were "Anywhere from 500 to 1,000 feet, probably." Exhibit D, pp. 19.

[6] The Van Nostrands and Capps are the only test plaintiffs who lived on their property in 1981 and would have any personal knowledge of aircraft operations at that time.

property,[7] although he did estimate the altitude at 400 to 500 feet based on a conversation with officials from NAS Oceana. Exhibit I, p. 34.

During his deposition testimony, Group 3 test plaintiff Ryan speculated that the flights after the arrival of the F/A-18 C/D squadrons may have been at an altitude from 400 to 500 feet, but went on to acknowledge that he really was unsure: "I don't know how high they are. No I don't … I'm not sure on the heights. I really don't know." Exhibit J, pp. 79-81. This Court has recognized the inherent difficulty and unreliability of a layman's estimate of aircraft altitude. Persyn v. United States, 34 Fed. Cl. 187, 198 (1995) ("A court should not accept the uncorroborated testimony of a plaintiff … because of the difficulties in determining the altitude of a plane from the ground."). Mr. Ryan further acknowledged that jets before and after the arrival of the F/A-18 C/D flew at roughly the same altitude and proximity to his home. Exhibit J, p. 80.

Additionally, Mr. Ryan did not testify to the number of overflights at the time of the alleged taking. Plaintiffs cite an excerpt of Mr. Ryan's deposition testimony that seems to suggest that he kept a record of overflights in July 1999. Mr. Ryan claimed that "46-48%" of flights "near his property" in the summer of 1999 directly flew over his house. Plts.' Response p 13. Mr. Ryan, however, did not testify as to the total number of operations that were near his property in July 1999; therefore, Mr. Ryan's speculative percentage of an unknown total does not address the frequency of the overflights.

Group 3 test plaintiff Eileen May presented no evidence of the frequency or altitude of overflights. Additionally, Ms. May's deposition testimony would not support the plaintiffs' contention that the F/A-18 C/D aircraft is the cause of interference with the use and enjoyment

[7] Mr. Schick and Mr. McCreary, who live near test plaintiff Levenson, also acknowledged in their depositions that they did not maintain logs of operations. Exhibit G, p. 47; Exhibit H, p. 67.

of her property. Ms. May testified that the adverse impacts she has experienced from jets, which are bothersome while she is outside, began before the arrival of the F/A-18 C/D in the 1997 to 1998 timeframe. Exhibit K, pp. 24-27.

Concerning the fourth element of an overflight taking, certain of the test plaintiffs' deposition testimonies indicate that the use and enjoyment of their property was not materially altered after the arrival of the F/A-18 C/D aircraft. As a preliminary matter, it is noteworthy that from 1996 to 1998, the three-year period preceding the arrival of the F/A-18 C/D, flight activity in NAS Oceana tower-controlled air space was at its lowest point since at least 1980. As reflected in the annual ATARs, there were approximately 46,000, 53,000, and 77,000 operations in tower controlled airspace for 1996, 1997, and 1998, respectively. These reported totals are significantly lower than all other years for which we have ATARs. Annual operations in tower-controlled airspace from 1980 to 1995 almost invariably approached or exceeded 200,000 as reported in the ATARs. In 1999, the year the F/A-18 C/D completed its transfer to NAS Oceana, following several years of relatively light flight activity, operations began to increase. The 1999 ATAR reports approximately 133,000 operations in tower-controlled airspace. This increase in flight activity from the unusually quiet preceding three years would be expected to exacerbate the perception of adverse impacts of the F/A-18 C/D operations. Nevertheless, the level of flight activity in 1999 was light in historic terms, and the interference with the use and enjoyment of two of the Group 2 and Group 3 test plaintiffs was essentially unchanged.

Group 2 test plaintiff Leary testified that F/A-18 C/D operations in 1999 prevented him from talking on the phone outside of his house, required him to increase the volume of his television, and to plug his ears while he was outside, until the aircraft passed. Exhibit B, pp.

49-51. Mr. Leary testified that there were no other inconveniences caused by the F/A-18 C/D overflights. Exhibit B, pp. 51. Although Mr. Leary indicated that the F/A-18 C/D was louder than the F-14, he generally experienced the same inconveniences with overflights before 1999. He could not talk on the phone outside; he had to turn up the volume of his television; and he plugged his ears during overflights in the same manner he did with F/A-18 C-D overflights. Exhibit B, pp. 52-53.

Group 3 test plaintiff Ryan testified that he experienced inconveniences similar to those experienced by Mr. Leary both before and after the arrival of the F/A-18 C/D:

> Q. Before '99, when you were outside having a party, or barbecue, or whatever else, and the planes flew over, could you talk and hear each other?
> A. No
> Q. Did you have to turn up the TV?
> A. Certainly. Yes.
> Q. And I'm talking about before '99. That's what I'm talking about now, not after?
> A. Yes.
> Q. And phone conversations, the same sorts of problems?
> A. Yes.
> Q. So you had the same sorts of problems before and after '99?
> A. Right.
> Q. In terms of the enjoyment of the house?
> A. Right.

Exhibit J, pp. 84-85.

This testimony demonstrates that, while test plaintiffs Leary and Ryan purport to experience impact from overflight activity, they do not complain of impacts substantially different than they experienced before the arrival of the F/A-18 C/D. Indeed, the impacts before and after the arrival the F/A-18 are essentially identical for these test plaintiffs. Although other test plaintiffs have alleged that the impacts were worse after the arrival of the F/A-18 C/D, such generalized and undocumented anecdotal testimony cannot be considered credible or persuasive in contrast to Commander Erie's detailed analysis, particularly when the

flight activity for the three years preceding the arrival of the F/A-18 C/D was at a historically low level.

Thus, plaintiffs have utterly failed to challenge Commander Erie's analysis or to present credible evidence that could state an overflight taking under Causby in July 1999 as to the Group 2 and Group 3 properties.

### C. The Unique Circumstances In Branning and Argent Are Not Present at NAS Oceana

Implicitly conceding that they cannot prove the Causby elements, the test plaintiffs seek refuge in the narrow exception articulated in Branning v. United States, 228 Ct. Cl. 240, 654 F.2d 88 (1981), and Argent v. United States, 124 F.3d 1277, 1278 (Fed. Cir. 1997). As discussed in defendant's opening brief, the "peculiarly burdensome" exception created in those cases was the result of the court recognizing that the United States consciously selected a particular group to bear the brunt of intense FCLP training exercises around "bounce fields."[8] Those circumstances are not present at NAS Oceana.

As a preliminary matter, plaintiffs wholly misstate the holding in Argent. Plaintiffs claim that Argent does not require "direct overflight[s]" over a property, i.e., that jet noise alone can establish a taking. Plts.' Response p 7. The plaintiffs in Argent alleged a peculiarly burdensome pattern of flight activity that combined intrusive flights (i.e., direct overflights) and nonintrusive flights, and the collective impact of the direct overflights plus other flights significantly impaired the use and enjoyment of their land. Id. at 1284. The court specifically acknowledged that there were flights directly over the Argents' property, stating that the United States could not succeed on summary judgment "merely by pointing out that most of [the] flights do not pass over the Argents' land." Id. (emphasis added). The court recognized,

[8] A "bounce field" is a landing field where FCLPs are conducted on a regular basis. Keeley Decl. ¶ 9.

however, that aircraft noise alone could not support a takings claim: "where a plaintiff complains only of noise resulting from normal aircraft operations, not passing directly overhead, this court follows the general rules springing from Causby to deny recovery." 124 F.3d at 1284.

In addition to misstating the law, plaintiffs rely on a variety of mischaracterizations and irrelevant facts for their erroneous suggestion that the "peculiarly burdensome" pattern of activity found in Argent and Branning was present at NAS Oceana at the time of the alleged taking. Plaintiffs first argue, based on a single e-mail, that one-third of the FCLPs "for the entire Oceana community" were performed at NAS Oceana 7-10 days a month beginning in "at least late the summer of 1999.[9] Plts.' Response p. 9; Plts.' Response Exhibit 42. Plaintiffs fail to explain, however, that this FCLP shift was a temporary mitigation measure that was terminated by the end of 2000.[10] This temporary increase in FCLPs at NAS Oceana has no relevance to an alleged permanent overflight taking in July 1999 and should be completely disregarded.

Plaintiffs also argue that there were more than 20,000 FCLPs at NAS Oceana in the year 2000, but fail to explain why this is relevant to an alleged taking in July 1999 or why this temporary shift in FCLP activity is relevant to an allegation of a permanent taking. Most

[9] Plaintiffs also mischaracterize the substance of this e-mail. This e-mail does not support an argument that a shift of FCLPs began in July 1999 (as opposed to "late . . . summer"); it does not support the argument that implementation of this shift was immediate in July 1999 (as opposed to "to some degree"); and it does not support the argument that the shift was fully implemented in July 1999 (the e-mail specifically notes that, "[a]s our operators have gotten more comfortable with the nuances of the new procedures we have increased their activity. The percentages listed with each new procedure represents the current [i.e., March 13, 2000] average . . ."

[10] As reflected in an e-mail exchange between Captain Shawn Smith (former NAS Oceana Executive Officer, then working at Commander, Naval Air Forces, U.S. Atlantic Fleet) and Daniel Cecchini, the one-third FCLP shift was terminated sometime before November 27, 2000. See Plts.' Response Exhibit 41. Mr. Cecchini states: "[the] 1/3 of FCLPs to Oceana ... appears to be OBE now." "OBE" is common military parlance for "overtaken by events" and is synonymous with "termination." Captain Smith also noted in his e-mail, "they have bounced [referring to the temporary FCLP shift] at Oceana – and have since stopped..." Id.

importantly, simply referring to the total number of FCLPs at NAS Oceana in a given year, without more, is meaningless in terms of evaluating flight impacts on the test plaintiff properties. Determining whether there is a peculiarly burdensome pattern of activity at a particular test plaintiff property is predicated on the number of FCLPs from the runway(s) with an FCLP flight path in proximity to a specific property[11] Plaintiffs present no evidence whatsoever to address these points.

Plaintiffs also make the unsupported claim that there is no difference between "touch-and-go" operations and FCLP training periods, mischaracterizing Commander Hebert's declaration in the process. In the class certification phase of this case, Commander Hebert prepared a declaration that, inter alia, explained the mechanics of an FCLP landing and a touch-and-go landing. Plts.' Resp. Exhibit 43 ¶ 8. CDR Hebert described the operations as identical in terms of how the aircraft are flown, when talking about a single aircraft flying one touch-and-go or one FCLP. Id.; see also Keeley Decl. ¶¶ 17-18, (Def.'s Mot. Exhibit A). However, as explained in Captain Keeley's declaration, FCLP training periods are more intense and last longer than touch-and-go landings. Keeley Decl., ¶¶ 18-19, (Def.'s Mot. Exhibit A). As many as five aircraft participate in an FCLP training period, and they typically last for 45 minutes. In contrast, touch-and-gos generally involve fewer aircraft in the pattern and for a shorter period of time. Keeley Decl., ¶ 19, (Def.'s Mot. Exhibit A). Additionally, the pattern altitude, whether touch-and-go or FCLP, at NAS Oceana is 1,000 feet, significantly higher than the 600 feet in Branning. See Keeley Decl., ¶ 18, (Def.'s Mot. Exhibit A).

---

[11] Plaintiffs' failure to quantify the overflights at each of the test plaintiff properties demonstrates that they view this as a "one size fits all" analysis. To the contrary, the uniqueness of overflight impacts on different properties is precisely the reason why class certification was rejected. Testwuide v. United States, 56 Fed.Cl. 755, 762 (Fed.Cl. 2003).

For the foregoing reasons, plaintiffs failed to present any credible evidence to refute the conclusion that the limited exception in Branning and Argent does not apply.

## III. Test Plaintiffs Claims Are Barred By The Statute of Limitations

### A. Legal Standard For The Statute Of Limitations In An Overflight Takings Case Where There Is Prior Overflight Interference

An overflight taking occurs when the United States begins to operate its aircraft regularly and frequently over the plaintiffs' property with the intention of continuing such flights indefinitely. Persyn v. United States, 34 Fed. Cl. 187, 197 (1995); Powell v. United States, 1 Cl. Ct. 669, 672 (1983); Lacey v. United States, 219 Ct. Cl. 551, 559 (1979); A.J. Hodges Industries, Inc. v. United States, 355 F.2d 592, 594 (Ct. Cl. 1966). (emphasis added). As defendant made clear in its opening brief, the Group 1 test plaintiff properties have long been exposed to low and frequent aircraft operations. If a taking of an avigation easement occurred, it occurred at these properties at least as early as 1981 when aircraft operations far exceeded the operations in July 1999, plaintiffs' alleged date of taking; therefore, the Group 1 test plaintiffs' claims are barred by the mandatory six-year statute of limitations, 28 U.S.C. § 2501.[12]

As discussed above, the flight activity to which the Group 2 and Group 3 properties were exposed would not establish an overflight taking. Nevertheless, even assuming, arguendo, that this flight activity would suffice for an avigation easement, then as with the Group 1 properties, it would have been acquired at least as early as 1981, and their claims would be also be time-barred.

### B. The Statute Of Limitations Began To Run In 1981 When Aircraft Operations Far Exceeded Those In 1999

[12] Once the statute of limitations defense is raised, plaintiffs bear the burden of proof to establish that their action is not barred. Alder Terrace, Inc. v. United States, 161 F.3d 1372, 1377 (1998).

Plaintiffs present two superficial arguments in response to defendant's factual evidence and analysis that demonstrates that any avigation easement at the test plaintiff properties would have been acquired, if at all, at least as early as 1981. First, plaintiffs argue that 1981 operations should not be considered:

> Defendant has offered nothing more than gross numbers of operations from 1981. There is no evidence of the numbers of FCLPs, touch-and-gos, or any other burdensome flight pattern. There is no evidence of the mix of aircraft at NAS Oceana, the duration of the 1981 flight activity, the patterns flown by each aircraft type, the effect on the property owners in 1981, or any other information necessary to prove either that a taking of an easement occurred or the scope of the easement.

Plts.' Response pp 11-12 (footnote added). This assertion is incredibly misleading in parts and flat wrong in others. Plaintiffs attach significance where none exists to the fact that the precise number of flight operations in the various patterns (e.g. FCLPs, touch-and-gos, departures, arrivals) is unknown for 1981. It is curious that plaintiffs on the one hand suggest that the Court disregard the 232,000 recorded flight operations in 1981 for purposes of the statute of limitations because the specific distribution of the operations in the various patterns is unknown for that year,[13] and then on the other hand argue that the Court should rely on a total number of FCLPs in 2000[14] to establish a taking in July 1999 without presenting any evidence to specify how those FCLPs were distributed among the four runways at NAS Oceana, and more importantly the precise number that flew over the twelve test plaintiff properties.

To analyze the effect of operations on the test plaintiff properties requires reasonable inferences based on an analysis of the flight paths from the four runways in relation to the test plaintiff properties, evidence of whether those flight paths have changed with respect to

[13] While the "specific" distribution is unknown, it is undisputed that defendant's analysis has resulted in reasonable distributions of operations for 1981 and subsequent years.

[14] 2000 is one year after the alleged date of taking, and the number of FCLPs that year were artificial increased based on a temporary shift FCLPs from NALF Fentress; therefore, it is not relevant to plaintiffs claim of a taking in July 1999.

impacts on the test plaintiffs' properties, and the historic usage of each NAS Oceana runway, , which defendant has done in exhaustive detail in its opening brief. Commander Erie provided an extensive analysis of the manner in which aircraft operations impact the test plaintiffs' properties in July 1999 given the NAS Oceana flight paths, the manner in which the aircraft are flown, and the location of the test plaintiff properties. Captain Keeley, NAS Oceana's commander, reviewed Commander Erie's analysis and agreed that it accurately represents the manner in which aircraft operated at NAS Oceana in relation to the test plaintiff properties for the many years he regularly flew at the air station between 1979 and 1997. Keeley Decl. ¶ 13, (Def.'s Mot. Exhibit A). Therefore, the analysis applies to 1981, just as it does to 1999, as well as the intervening years.[15]

In addition to Captain Keeley recognizing that Commander Erie's analysis applies to the operations in 1981, a Harris, Miller, Miller, & Hanson (HMMH) noise study of 1982 operations at NAS Oceana underscores the point that runway use in the early 1980s and the percentage of each type of operation is generally consistent with the runway use and types of operations flown at NAS Oceana after the arrival of the F/A-18 C/D. The HMMH study (Exhibit L, p. OCE090241, Table 3) identified the runway use in 1982 as follows: Runway 5L/R – 44%, Runway 23L/R – 30%, Runway 32L/R – 23%, and Runway 14L/R – 3%, which largely parallels the runway use after the arrival of the F/A-18 C/D as reflected in Wyle Report 0-08.[16] Similarly, the percentage of types of operations in 1982 is similar with the modeled

---

[15] It is important to note that 1981 was not an unusual spike that exceeded the operations in 1999. The ATARs from 11 of the 14 years for which records exist show jet operations that were comparable or exceeded, in some cases by a wide margin, the 133,000 operations in 1999. Riley Decl., Table 1, (Def.'s Mot. Exhibit B).

[16] This noise study supported the Final Environmental Impact Statement for the Introduction of the F/A-18 E/F aircraft to NAS Oceana, and identified runway use as follows: Runway 5L/R – 50%, Runway 23L/R – 34%, Runway 32L/R – 14%, and Runway 14L/R – 2%. Erie Decl. ¶ 25, (Def.'s Mot. Exhibit D); Plts.' Resp. Exhibit 26 p. C-36.

operations in the Wyle study. The HMMH study reflected that approximately 42 percent of operations were arrivals or departures and 58 percent were pattern operations (i.e. FCLPs, touch-and-gos, GCA Box, and ACLS).[17] Similarly, the Wyle study reflects that after the arrival of the F/A-18 C/D, approximately 59 percent of operations were pattern operations (i.e. touch-and-gos, FCLPs, and GCA Box) and the remaining 41 percent were arrivals and departures.[18] Distributing the 232,000 operations from 1981 among the four runways and by the type of operation (i.e. pattern or arrivals and departures) clearly reveals that if any avigation easement were acquired at the test plaintiff properties, it was acquired in 1981.

Plaintiffs' remaining assertions are equally misleading. In contrast to plaintiffs' claim regarding the mix of aircraft, Captain Keeley identified the various predominant aircraft operating in 1981, including the A-6 Intruder, F-4 Phantom, and the F-14 Tomcat. For further specificity, the *Allowances and Location of Naval Aircraft* report dated March 31, 1981 indicates that 199 aircraft were in "operating status" (flyable) at NAS Oceana at the time of the report, including twenty-two F-4, forty-seven A-6, ninety-nine F-14, eighteen A-4, four F-5, three TC-4, three T-2 aircraft, and three H-46 helicopters. See generally Exhibit M, Declaration of Curtis A. Utz ¶ 12. The September 30, 1981 report indicates that 229 aircraft, including thirty-six F-4, sixty-six A-6, ninety-two F-14, twenty-one A-4, three F-5, two TC-4, three T-38, three T-2 aircraft, and three SH-3 helicopters were in operating status at NAS Oceana at the time of that report. Id.

---

[17] Table 5 from the HMMH study details the various types of operations on an average busy day. Exhibit L, p. OCE090242. In 1982, there were a total of approximately 555 operations on an average busy day at NAS Oceana, including approximately 321 pattern operations and 234 arrivals and departures, which equates to approximately 58 percent pattern operations and 42 percent arrivals and departures. Id.

[18] As reflected in Wyle Report 02-08, the noise study supporting the Final Environmental Impact Statement for the Introduction of the F/A-18 E/F aircraft, the total number of modeled touch-and-gos, GCA Box operations, and FCLPs for the baseline year 2000 equals 122,732 (101,276 + 8,184 + 13,272). Dividing this number by the total number of modeled operations at NAS Oceana for that year – 207,722 – equals 59%. See Exhibit M.

Plaintiffs' suggestion that evidence needs to be presented regarding the effect on the property owners in 1981 is specious. The focus of a statue of limitations argument in the context of military overflight takings is on the number of recorded operations; flight paths including the altitude; aircraft type; and the permanency of the flight activity. Plaintiffs have not, and cannot, cite a single case that requires anecdotal testimony from property owners two decades removed from an alleged date of taking, especially in the face of such compelling documentation by the Navy.

Plaintiffs' only other argument concerning 1981 aircraft operations is a regurgitation of their baseless motion for sanctions. Pls.' Response pp 25-26. Plaintiffs assert that defendant "clearly acted in bad faith in refusing to answer the statute of limitations interrogatories." Pls.' Response p 26. Defendant has repeatedly informed plaintiffs that once this legal question is investigated and analyzed through discovery defendant would supplement its response. See Def.'s Response to Plts.' Mot. for Sanctions. Defendant did just that.[19]

Moreover, plaintiffs erroneously claim that defendant's statute of limitations defense is based solely on total aircraft operations in 1981 and 1999, and that it acted in bad faith by not identifying 1981 earlier. This is plainly untrue. Defendant's statute of limitations defense is based, in part, on the 1981 operations as reported in the ATAR. It is also based on Commander Erie's analysis (endorsed by Captain Keeley and Commander Hebert) of flight operations in relation to the test plaintiff properties, which was not completed until shortly before defendant filed its dispositive motion.

---

[19] Additionally, contrary to plaintiffs' assertions (Pls.' Response pp 25- 26), defendant has never stated that it needed to conduct a historical noise analysis in order to determine when the statute of limitations began to run. Apparently, plaintiffs are confusing Interrogatory No. 3 from the class certification phase of the litigation with Interrogatory No. 1 from the test case phase of the litigation.

For the foregoing reasons, plaintiffs have failed to present credible evidence that refutes the fact that, if defendant acquired an avigation easement over those properties that have experienced sufficient flight activity, it was acquired in1981, when the statute of limitations began to run for those properties.

## C. Plaintiffs Cannot Prove A Second Taking In 1999

To avoid the statute of limitations jurisdictional bar, plaintiffs bear the burden of establishing that a second taking occurred in 1999 over and above any existing 1981 easement. As discussed in defendant's opening brief, the following factors should be considered: (1) whether the flight path has remained the same in terms of elevation and location, Robertson v. United States, 173 Ct. Cl. 621 (1965); (2) whether the numbers of flights over the pertinent properties have increased since the earlier taking, Lacey v. United States, 595 F.2d at 560, Town & Country Motor Hotel v. United States, 180 Ct. Cl. 563, 569 (1967); (3) whether the type of aircraft have remained the same, or whether the prior aircraft were as loud or louder than the aircraft flying at the time of the earlier taking, Powell v. United States, 1 Ct. Cl. 669, 674 (1983); Avery v. United States, 330 F.2d 640, 643 (Ct. Cl. 1964); Lacey v. United States, 595 F.2d at 560; and (4) whether the earlier operations indicated a permanent intent to use the affected airspace and such use has not been abandoned, Speir v. United States, 485 F.2d 643, 648 (1973). In order to establish a second, incremental taking plaintiffs must prove either (1), (2), or (3) above, and (4) that there was no abandonment of the prior avigation easement. Plaintiffs must also prove a significant depreciation in the market value of the property resulting from the recent additional overflights in order to establish a second, incremental taking. Persyn v. United States, 34 Fed. Cl. at 207; Boardman v. United States, 180 Ct. Cl. 264, 271 (1967); Avery v. United States, 330 F.2d at 643.

1. **Noise Level Of NAS Oceana Aircraft**

In the instant case, plaintiffs only address the third factor – the loudness of the F/A-18 C/D – and once again resort to baseless allegations of bad faith rather than substantive evidence. They ignore the other two factors: (1) whether the flight path has changed and (2) whether the number of operations has materially increased. Additionally, plaintiffs have not alleged that the Navy abandoned any existing avigation easement. Test plaintiff May has also completely ignored the additional requirement to put forth evidence of a significant depreciation in market value in order to establish a second taking. Unlike plaintiffs, defendant's motion presented evidence as to each element of an overflight taking in 1981, and since that evidence is uncontroverted, defendant's motion should be granted.

Defendant's acoustical expert, Dr. Sanford Fidell, addressed the loudness of the F/A-18 C/D in relation to the F-4 flown at Oceana during the 1960s through the early 1980s, the A-6 flown at Oceana during the 1970s through mid 1990s, and the F-14 from the mid 1970s to the present. Plaintiffs contend the proffered testimony and expert report of Dr. Fidell should be rejected by the Court because, "[t]he tactics under which those opinions came to be filed . . . justify denying Defendant's Motion for Summary Judgment." Opp. at p. 37. Specifically, plaintiffs complain that, on March 29, 2006, Dr. Fidell supplemented his expert report to provide information regarding an additional method of single event noise analysis referred to as perceived noise levels ("PNL") and tone-corrected perceived noise levels ("PNLT"). Opp. at 36; see Exhibit N. Plaintiffs' argument is without merit.

Plaintiffs fail to acknowledge that the additional information Dr. Fidell provided on March 29, 2006, was in response to a report from plaintiffs' expert, Dr. Noral Stewart, which the government did not receive until February 22, 2006, months after the deadline for

submission of expert reports, and months after the submission of Dr. Fidell's report, to which Dr. Stewart's report responds. see Exhibit N ¶ 1.1. Additionally, in his March 10, 2006 deposition, Dr. Stewart contended that a noise analysis relying solely on the DNL metric is flawed because it does not contain information regarding single event noise levels. Exhibit O, pp. 35-37. Dr. Stewart further stated that, while he believed the DNL noise metric should be considered in an airfield noise analysis, he did not believe the DNL metric was an adequate descriptor of noise because DNL represented an average that provided "little information in actuality." Exhibit O, p. 35. Dr. Stewart added that, ". . . you can't try to use one number and say that one number tells the whole story. You have to look at metrics of individual events and numbers of those events. . . ." Exhibit O, p. 36. Dr. Fidell's supplemental report addresses Dr. Stewart's concern about single event noise levels.

Plaintiffs cannot have it both ways. Plaintiffs cannot criticize Dr. Fidell's use of DNL as a failure to analyze single event noise levels, accuse Dr. Fidell of bad faith when he provides additional information addressing their criticism, and then praise the use of DNL and refer to Dr. Fidell's supplemental analysis as "an eleventh hour change in methodology." Pla. Exhibit 49, p. 4, para. 10.

Dr. Fidell's supplemental analysis incorporated PNL and PNLT values, which are aircraft noise measurements that have been incorporated into the Department of Defense ("DOD") NOISEMAP software for decades and are the product of an objective mathematical process still used today by the Federal Aviation Administration "to regulate the noisiness of aircraft offered for sale in the United States." Exhibit P, Declaration of Dr. Sandford Fidell ("Fidell Decl."), ¶¶ 5, 7, citing; 14 CFR Part 36. The mathematical process involves converting 50 Hz through 10kHz one-third octave bands into instantaneous perceived noise

levels and then correcting for the presence of tones and overflight duration to arrive at the effective (that is, tone- and duration-corrected) perceived noise level. Exhibit P, ¶ 7. The result is more accurate than DNL for predicting the annoyance of aircraft noise because the process more accurately predicts subjective judgments of noise, and therefore is relevant and useful information on the specific issue of the relative noisiness of various aircraft. Fidell Exhibit P, p. 3. Ironically, Dr. Stewart recognizes that PNLT is a relevant metric for analyzing aircraft noise: Plts.' Exhibit 49, p. 4, para. ("never achieved any use other than for aircraft noise").

Instead of refuting Dr. Fidell's analysis, plaintiffs cite information not relevant to the statute of limitations argument, such as subjective, unreliable, and biased data regarding the number of noise complaints received by NAS Oceana. Opp. at 30. Fred Pierson, a former NAS Oceana Community Planning Officer stated that there was little confidence in the accuracy of historical noise complaint statistics before his arrival at NAS Oceana. Exhibit Q, pp 69-70, 72. Moreover, there was a dramatic increase in the Virginia Beach population between the 1980s and 1999, which alone could account for an increase in complaints.

For these reasons, plaintiffs fail to refute the fact that the F/A 18 C/D is not substantially louder than all of the various aircraft that have historically operated at NAS Oceana. See Def.'s Mot. pp. 9-10.

In Powell v. United States, 1 Cl. Ct. 669 (1983) Senior Judge White granted the United States' motion for summary judgment because plaintiffs' claim of a second taking was barred by the statute of limitations. "It is well established by the cases, for example, that although the Government, at an earlier time, has taken an avigation easement in the airspace above a tract of land, a 'second taking' may occur if the Government later begins to overfly the land with

noisier aircraft or at lower altitudes." Id. at 673. (citations omitted). In Powell, the court granted defendant's motion for summary judgment because the aircraft at issue, the F-15, did not create more noise than the other major aircraft operating at Robins Air Force Base since 1960. Id at 674. The same reasoning applies here.

In Hero Lands Co. v. United States, the court dismissed plaintiffs' complaint because the evidence established that Field Carrier Landing Practice ("FCLP") operations at Naval Air Station, New Orleans, began before the six-year period immediately preceding plaintiffs' complaint. Hero Lands Co. v. United States, 1 Cl. Ct. 102, 106-107 (1983). Although the United States had introduced newer aircraft, the A-7 and A-37, during the six-year statute of limitations period, the evidence did not establish that the A-7 and A-37 were noisier than the previous aircraft, the A-4 and F-8. Id. Likewise, there was no evidence that the A-7 and A-37 flew at substantially lower altitudes than the A-4 and F-8. Id. Cf. Davis v. United States, 155 Ct. Cl. 418, 420-22 (1961).

Accordingly, plaintiffs have failed to address this required element and cannot establish a second taking has occurred. Therefore, defendant's motion should be granted, and plaintiffs' claims should be dismissed.

### 2. No Evidence That May Property Has Experienced A Significant Diminution In Value

Additionally, plaintiffs have completely failed to address the fact that test plaintiff May has not presented evidence that her property value has diminished as a result of the alleged taking. See Def.'s Mot. pp 33-36. To establish a second, incremental taking plaintiffs must prove that there was a significant diminution in property value. This factor is measured as the difference between the fair market property value before the taking and after the taking. Aaron v. United States, 340 F.2d 655, 659-60 (Ct. Cl. 1964). As discussed in defendant's brief, test

plaintiff May has presented no evidence of a diminution in property value. At best, she alleges damages that sound in tort, which are not within this Court's jurisdiction. See 28 U.S.C. §1491 (1988). On this basis alone, summary judgment must be granted against test plaintiff May.

## CONCLUSION

The test plaintiffs fail to state an overflight takings claim, and the test plaintiffs' claims are time-barred under the mandatory six-year statute of limitations of 28 U.S.C. §2501 and therefore should be dismissed pursuant to RCFC 12(b)(1), or alternatively, summary judgment should be granted in favor of the United States pursuant to RCFC 56. Moreover, under RCFC 12(b)(6) those plaintiffs who did not own their property at the time of the alleged taking should be dismissed because they lack standing.

Dated: June 9, 2006

Respectfully submitted,

/s/ Steven D. Bryant
Steven D. Bryant
Kelle S. Acock
Environmental & Natural Resources Division
United States Department of Justice
601 D Street, NW, Rm. 3205
Washington, D.C. 20004
Counsel for Defendants
202-305-0424

Of Counsel:
Robert J. Smith
Mary Raivel
Navy Litigation Office
720 Kennon Street
Washington Navy Yard, D.C. 20374

CDR Dominick Yacono
JAGC, USN
Commander Navy region
Mid-Atlantic, Code (00LE)
1510 Gilbert Street
Norfolk, VA 23511-2737

# EXHIBIT A

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, )
et al., )
)
Plaintiffs, )
)
v. ) NO. 01-201L
) Judge Victor J. Wolski
THE UNITED STATES OF AMERICA, )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION
OF EDDIE WATERMAN
TAKEN ON BEHALF OF THE DEFENDANT

Virginia Beach, Virginia

June 9, 2005

Appearances:

HOFHEIMER / FERREBEE, P.C.
By: KRISTEN HOFHEIMER, ESQUIRE
Counsel for the Plaintiffs



Appearances (Cont'd.)

U. S. DEPARTMENT OF JUSTICE
By: STEVEN D. BRYANT, ESQUIRE
KELLE S. ACOCK, ESQUIRE
And
DEPARTMENT OF THE NAVY
COMMANDER NAVY REGION ATLANTIC
By: DOMINICK G. YACONO, ESQUIRE
And
DEPARTMENT OF THE NAVY
NAVY LITIGATION OFFICE
By: J. PAGE TURNEY, ESQUIRE
Counsel for the Defendant



INDEX


| DEPONENT | | PAGE |
|---|---|---|
| EDDIE WATERMAN | By Mr. Bryant | 4 |


EXHIBITS


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 51 | Purchase agreement dated 24 May 1993 to Eddie J. and Elizabeth L. Waterman | 27 |
| 52 | Tax assessment July 1, 2005 through June 30, 2006 for 2244 Windy Pines Bend | 52 |
| 53 | Plaintiff's Answers to Interrogatories, Eddie and Elizabeth Waterman | 56 |
| 54 | Receipt from Lowe's | 58 |
| 55 | The Home Depot Special Services Customer Invoice | 61 |




Deposition upon oral examination of EDDIE WATERMAN, taken on behalf of the Defendant, before Frances P. Zahn, RPR-RMR, a Notary Public for the Commonwealth of Virginia at large, taken pursuant to notice, commencing at 12:10 p.m. on June 9, 2005, at the offices of Shuttleworth, Ruloff, Giordano & Swain, South Boulevard, Virginia Beach, Virginia; and this in accordance with the Federal Rules of Civil Procedure.

EDDIE WATERMAN was sworn and deposed on behalf of the Defendant, as follows:

EXAMINATION

BY MR. BRYANT:

Q. Mr. Waterman, good afternoon. My name is Steve Bryant from the Department of Justice. How are you?
A. Fine, thank you, sir.
Q. Have you ever been deposed before?
A. No.
Q. We'll go over the ground rules quickly so you will know. I'm asking you questions, you're going to answer those, and Mrs. Zahn is taking down everything we say so it's very important that you articulate your answers. Say yes or no and don't nod your head or say uh huh or anything of that nature because it won't be clear for the record. It's also important that we don't talk over one another, so

you had flights directly over your house, could you still hear the television?
A. At what point in time?
Q. This is before '98. '92 to '98?
A. I don't recall any problems speaking on the phone or watching TV inside the house.
Q. Okay. Can you estimate the altitude of the flights back in that time frame?
A. No. I don't know how to do that.
Q. Can you estimate the altitude that you are currently experiencing?
A. No.
Q. Is it roughly the same altitude?
A. I would say yes. Same altitude.
Q. It's been roughly consistent?
A. Right.
Q. Before April Fools Day, did you have roughly the same distribution of the overflights being lateral to your house versus those that were directly over? Was that roughly consistent from --
A. Yes.
Q. The only difference being then the noise generated by the aircraft starting in December of '98?
A. I don't understand the question.
Q. Well, you said, you know, there was that



demarcation of when the -- when December, when you were having that -- around December when you were having the camp out with your grandson, suddenly it was louder?
A. Yes.
Q. What I'm focusing on now is the flight distribution from over your house versus lateral to your house was still the same until April 2000?
A. That's correct.
Q. The only difference between the pre December '98 and post December '98 up until April Fools Day was that the aircraft was a louder aircraft, you were experiencing more noise. Is that right?
A. Yes.
Q. Okay. And in that time frame, what would happen with the conversation outside in the yard if they were flying laterally to the house?
MS. HOFHEIMER: Can you tell me what time frame?
MR. BRYANT: December '98 until --
MS. HOFHEIMER: April '05.
A. Flying laterally over the house, we certainly had to raise our voices, and speak much louder.
BY MR. BRYANT:
Q. Okay. But you could still communicate with one another --
A. Yes.



Q. -- outside.
Now, what about when the December of '98 to April Fools Day 2005, when the flights were directly over your house, how would that impact conversations outside?
A. We had to stop talking until they flew away.
Q. Let's go inside the house now. When you had the lateral flights starting December of '98, could you still listen to the television, talk on the phone, that kind of thing.
A. Yes. But we had to speak louder that I recall, then we had to either cut the TV up louder or -- you're talking about lateral flights, right?
Q. Yes, I am.
A. It was certainly bearable, but it was uncomfortable unless we talked -- spoke louder, or cut the TV up louder.
Q. What about, when you had direct overflights at that time, December '98 to April 1st of this year, directly over your house? How would that impact the TV, phone conversations?
A. We just -- we stopped talking on the phone until they passed over and in terms of the TV, listened to the radio, we just didn't hear it.
Q. No matter how high you turned it up?
A. Well, we didn't turn it all the way up as far as



it could go.
Q. How would you -- I think you said bearable is the word you used. How would you describe the jet noise when you first moved into the house?
A. It was definitely bearable. It was uncomfortable at times outside. It really didn't affect us inside the house. It didn't adversely. Just strictly outside.
Q. And how would you describe it since, from the 1st of December of '98 through April 1, 2005? If -- you know, I should have clarified that too.
Has it been, the noise impacts, consistent from April 1st -- sorry, December 1, 1998 to April 1, 2005?
A. Has the noise been consistent?
Q. Consistent from that time period?
A. Yes.
Q. It has. So with that said, how would you describe the noise impacts and living there in that house in that time period?
A. I would say it was at times extremely uncomfortable. Particularly when the aircraft flew right directly over the house.
More so outside than inside.
Q. And how would you describe it from April 1st, 2005, until today?
A. I don't get to sleep late any more, and as a

# EXHIBIT B

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, )
et al., )
)
Plaintiffs, )
)
v. ) NO. 01-201L
) Judge Victor J. Wolski
THE UNITED STATES OF AMERICA, )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION
OF MICHAEL J. LEARY,
TAKEN ON BEHALF OF THE DEFENDANT

Virginia Beach, Virginia

April 28, 2005

Appearances:

SHUTTLEWORTH, RULOFF GIORDANO & SWAIN, P.C.
By: STEPHEN C. SWAIN, ESQUIRE
Counsel for the Plaintiffs

U. S. DEPARTMENT OF JUSTICE
By: STEVEN D. BRYANT, ESQUIRE
DOMINICK G. YACONO, ESQUIRE
Counsel for the Defendant



INDEX


| DEPONENT | | PAGE |
|---|---|---|
| MICHAEL J. LEARY | By Mr. Bryant | 3 |


EXHIBITS


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 11 | Plaintiffs' Answers to Interrogatories, Michael and Diane Leary | 17 |
| 12 | Deed of Bargain and Sale, Thomas J. Moody and Janet M. Moody to Michael J. Leary and Diane M. Leary | 75 |
| 13 | Deed of Trust | 76 |
| 14 | Settlement Statement, HUD D-1 | 77 |
| 15 | Physical Survey, Lot 46, Landstown Meadows | 78 |
| 16 | Certificate of Reasonable Value | 78 |
| 17 | Proposal from Nature's Edge dated 4/24/02 | 90 |
| 18 | Invoice from Bradford-Cameron to Ms. Diane Leary | 90 |




Deposition upon oral examination of MICHAEL J. LEARY, taken on behalf of the Defendant, before Frances P. Zahn, RPR-RMR, a Notary Public for the Commonwealth of Virginia at large, taken pursuant to notice, commencing at 8:10 a.m. on April 28, 2005, at the offices of Shuttleworth, Ruloff, Giordano & Swain, Virginia Beach, Virginia; and this in accordance with the Federal Rules of Civil Procedure.

MICHAEL J. LEARY was sworn and deposed on behalf of the Defendant, as follows:

EXAMINATION

BY MR. BRYANT:
Q. Good morning, Mr. Leary. My name is Steve Bryant from the Department of Justice. How are you?
A. Fine.
Q. Have you ever been deposed before?
A. No.
Q. Let me sort of go over the ground rules of how this takes place. I'll ask questions and you'll answer them. Mrs. Zahn is going to be taking down everything we say verbatim so we can't talk over each other, and if you would, please enunciate your response and say yes or no rather than nodding your head or uh huh, that kind of thing can be confusing, to keep the record clear.
Also, if at any time you want to take a break,



just say the word and we will go off the record and you can do so.
And if you don't understand the question that I ask, please let me know and I'll be happy to rephrase it.
A. Okay.
Q. Any questions about any of that?
A. No, sir.
Q. Okay. Let's first start, if you could tell me what your occupation is?
A. I am a defense contractor.
Q. Okay. With whom and what do you do?
A. Serco. I do some work for the Naval Supply Systems Command.
Q. Let's go back to Serco. I assume it's an acronym, or is it?
A. It's Serco. They recently acquired a company I used to work for, Resource Consultants.
Q. And what do you do for them? What is your position?
A. I do a lot of logistics work for the Naval ships.
Q. What is the title of your position?
A. Lead logistics analyst.
Q. And go into some detail, if you would, about what you do as a lead logistics analyst?
A. The afloat supply applications, I work with

A. If I -- from my memory, it stayed pretty consistent.
Q. Pretty consistent. Okay.
For how many years did it stay consistent?
A. Until today.
Q. Until -- when you say today, you mean right now? Do you mean a year ago, or what do you mean?
A. I would say until, yes, right now.
Q. Until right now.
And tell me about the operations right now, how they are different?
A. They are just louder.
Q. Well, I'm talking more at the moment about, referring to the level of operations in terms of -- you said back in '95 and consistently thereafter until about today, four to five days a week, when they are operating, that would be for a couple of weeks, maybe down for a couple of weeks, and then the 70 to 30 percent proportion that you mentioned, when did that change? Or how did that change, if it did?
A. I haven't really noticed any change.
Q. Okay. So in terms of the level of operations, it's been even the same from when you moved in until now? Not the noise impacts; the level of operations.
A. I would say it's maybe slightly increased since



'95. I mean they have just always flown a lot. I just never really kept track.
Q. And you said that they are louder. I think you said today they are louder. When did they become louder? The jets?
A. Exactly -- '99, but exactly when I don't know.
Q. And how is it louder? How is it different?
A. It's hard to explain but the noise from the jets is significantly louder than it used to be with the F-14s that they used to fly.
Q. And was it a -- I mean was it sort of a night and day thing? Was it a dramatic difference that you noticed?
A. Yes.
Q. So when did you notice a dramatic difference? What happened? Was anything going on?
A. No.
Q. That stands out?
A. I knew that they were -- they had to bring up these planes from Cecil Field, I believe it was in Florida. You know, you hear on the news, you know, they were different type plane, louder. And they sure were.
Q. So you heard on the news that a louder aircraft was coming? Is that what you said?
A. Yes.
Q. And when did you hear that on the news?



A. I can't remember exactly. It was, you know, '98, '99, somewhere in that area.
Q. Okay. And how soon after you'd see a news broadcast -- saw a news broadcast of that, with that information, did you experience a change?
A. As soon as the F-18s started flying. You know, what that date was, I couldn't tell you. But you knew there was a difference.
Q. Okay. Did you -- could you look in the air and tell the difference between an F-18 versus another aircraft by looking at it when it's flying above your house or near your house?
A. Well, they are going so fast, but, yes, I could point out the difference.
Q. You could tell the difference? When do you remember seeing F-18s above your neighborhood, if you -- we'll go back to that.
When do you remember starting to see F-18s when -- near your residence?
A. Sometime in '99.
Q. Was it in the winter of '99, or spring, summer?
A. I'm sorry. I can't really pinpoint it.
Q. Was there any change in -- between the Tomcat that preceded the F-18 -- was there any change in terms of the altitude and where they were flying in relation to your



house from the Tomcat to the Hornet? Was there any change?
A. No. They appeared to be flying similar flight paths.
Q. And can you estimate now the altitude of the jets that are flying in relation to your house?
A. No. I'd hate to -- they are low. That's all -- that's the best estimation I can give you.
Q. Let's say if you had to put it in football fields, for example. How many football fields? Stack them up.
A. I'd hate to say. I really can't judge distance that way. But they are close.
Q. Can you read the lettering on the jets?
A. At times, yes, sir.
Q. At times. Explain how at times -- how there's a difference between the certain times you can read the lettering and other times you can't?
A. Well, the closeness. If they are going over like my next door neighbor's house, sure, I can pick it out. But if they are just flying somewhere else over my subdivision, my eyesight can't.
Q. And so you just said that at times the planes are flying over your neighbor's -- your immediate neighbor's house?
A. Or my house.

A. Yes.
Q. And I say ex. You are retired. You are still part of --
A. In the subdivision I'm sure there's plenty, but in my cul-de-sac there's no retired Navy.
Q. How do you know that there is such a high percentage of active duty and ex-Navy in your neighborhood? How do you know that?
A. On the base decals on their vehicles. And sometimes I see them in uniforms in their yards.
Q. When -- before the F-18s were transferred here from Cecil Field, you said you were aware then. Did you attend any public meetings discussing that?
A. No, sir.
Q. Okay. Have you ever attended any public meetings discussing jet noise or any other related --
A. No, sir.
Q. -- Naval Air Station Oceana issues?
A. No, sir.
Q. Have you attended any public meetings related to anything since you have been in this area in Virginia Beach?
A. No, sir.
Q. Now I'd like to explore the difference that happened when the F-18s arrived in terms of the noise impacts that you felt. Describe what effect it has? Or



what effect it did have in 1999 when they started flying?
A. No effect other than that they are just significantly louder than what I remember.
Q. Has it -- did it change anything about the way you lived in your house, the increased noise, being significantly louder?
A. Other than, you know, having to raise the volume on the TV, at different times, you know. You know, you'd have to take all your phone calls inside. You know, you obviously couldn't talk outside.
Q. Can you have conversations -- well, I guess you're indicating that you could have a phone call inside the house when the planes are going over and hear the other person?
A. Yes, sir.
Q. So you can obviously have this type of conversation with somebody in your house when the planes are going over and hear each other?
A. You might have to take a brief pause, especially if it's going fairly close to your house.
Q. What about when you're outside in the 1999 time frame and -- well, we're talking about the 1999 time frame. What about outside? How would it affect you when you're outside?
A. If you saw it coming, you would, you know, brace



for it. You would put your fingers in your ears, that type of thing.
Q. Okay. So a conversation you were having would cease until it passed over?
A. Oh, absolutely.
Q. Anything else besides raising the volume on the TV, phone calls inside the house, any other -- and then, as you said, putting your fingers in your ears while you are outside. Any other sort of effects that the noise would have?
A. Not that I can think of.
Q. Would you describe that sort of an impact as making your house unsuitable for living, residential living?
A. Let's just say it's less enjoyable.
Q. So if it's less enjoyable, then you still enjoy your house but just not to the same level you would enjoy it without the noise?
A. Well, it's, you know, it may be unsuitable. I mean, it's just, you know, unfortunately something that I have had to live with.
Q. Well, you said it may be unsuitable. I'm going to explore this in terms of --
A. That's just a broad definition.
Q. I mean is your house with the noise with the F-18s flying over it, which is, it's in the flight path, or



below the flight path, so that is something you are going to experience. Recognizing that, is your house unsuitable for residential living?
A. I believe where someone could get that interpretation.
Q. Well, I'm asking you. What's your view of it? Not someone else.
A. If I had to go one way or the other, I would say unsuitable.
Q. Why do you say it's unsuitable for residential living?
A. Well, it's -- you can't enjoy your yard. Invariably -- and I guess it's probably because of safety reasons, they fly on nice days when, you know, you want to be outside in your yard; and it makes it rather unpleasant to deal with the constant bombardment of the jet noise.
Q. Now, when you say constant, you mean when they are flying? There's times when they are flying a couple of weeks, and they won't fly for a couple of weeks. That still holds true, right?
A. Pretty much, yes.
Q. And that was also true in 1999?
A. Right.
Q. Let's go back to when you moved in in '95 and up until '99. And there was obviously jet noise as you

discussed earlier then. Could you talk on the phone outside back then?
A. No.
Q. So you had to go inside to talk on the phone back then?
A. Yes.
Q. Did you have to turn up the volume of your television when the jets were flying over?
A. At times, yes, sir.
Q. Did they fly on nice days back then in terms of --
A. Don't get me wrong. They don't always fly on nice days. There's overcast days and rainy days I'm sure they are flying. It just seems like the majority of the time they are nice days that they fly. But, yes, it's similar.
Q. To what it was back then?
A. (Deponent nodded head.)
Q. And back then when you were outside, did you have to put your fingers in your ears when the jets flew over, the Tomcats?
A. If they were -- yes. Especially if they were very close, yes, sir.
Q. Was your house unsuitable for residential living before '99? In light of the fact that you had to plug your



ears when you were outside and that you had to take phone calls inside the house, turn up the volume of the television, and those kind of things? Was it unsuitable then?
A. I don't believe so.
Q. You don't believe so.
But starting in 1999, you believe it's insuitable?
A. Somewhere in that proximity.
Q. Somewhere in that proximity. What do you mean?
A. Sometime in 1999.
Q. Okay. Yes. Whenever the F-18s, you started xperiencing F-18s that were flying over the house?
A. Yes, sir.
Q. Well, why do you view it, the difference that it s suitable back then and it's unsuitable now? Because it unds like you had roughly the same sorts of onveniencies from the noise in terms of plugging your rs when you were outside, taking phone calls indoors, ning up the volume of the television, and those kind of ngs. Why the difference?
A. Just the extent of the volume. It's, you know, ere something might have been a nuisance in the past, it's wn right bothersome now. I mean it's -- you know, certain el of music in your car, you know, at one time if they



cranked it up, it might become unbearable.
Q. And you just said unbearable. Do you view living in your house as unbearable because of the F-18 noise?
A. No.
Q. So it's not unbearable?
A. I wouldn't go the that extreme, no.
Q. But you -- so you view, say on a continuum of living conditions, I guess you're saying unbearable is at the far end, and no jet noise at all would be at the other end?
A. Uh huh.
Q. Is unsuitable somewhere to the left of unbearable? Somewhere towards the less of a nuisance as you said?
A. Yes.
Q. On the spectrum.
And when I say unsuitable for residential living, just so we're clear about what that means, I'm defining it in the context of they are just not compatible. You can't live -- living in that type of an environment is just -- you can't live with that kind of noise. You can't -- I guess I'm defining it as being unbearable. You're saying it's a lesser -- you're viewing it as a lesser degree. Unbearable by your definition would mean we have to move out of the house. Is that accurate?



A. I don't know what would eventually make me move out of the house; but, yes, it's -- just not being able to enjoy what other people take for granted. You know, living in their yards.
Q. But that recognizes that even before the F-18s got there, you still had to plug your ears and those other things we talked about, going inside for phone calls and that kind of thing. So when you say other people take that for granted, other people who are not subject to any jet noise don't have to do those things either, correct?
A. Yes.
Q. Plaintiffs' Answers to Interrogatories.
I'm showing you again DX 11. On page 14, also known as --
Before I do that, actually I'd like just, for the record, to clarify that DX 11 is OCE222906 through OCE222931.
Turning to page 14, also OCE222919, if you could look at -- one moment. Subparagraph A?
A. Okay.
Q. And just read the first two sentences to yourself.
Do you agree with that?
First, let me know when you are finished.
A. Yes.

# EXHIBIT C

Case 1:01-cv-00201-VJW Document 180-2 Filed 06/09/2006 Page 10 of 14





IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, )
et al., )
)
Plaintiffs, )
)
v. ) NO. 01-201L
) Judge Victor J. Wolski
THE UNITED STATES OF AMERICA, )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION
OF CARROLL LINDSAY
TAKEN ON BEHALF OF THE DEFENDANT

Virginia Beach, Virginia

June 9, 2005

ppearances:

HOFHEIMER / FERREBEE, P.C.
By: KRISTEN HOFHEIMER, ESQUIRE
Counsel for the Plaintiffs



Appearances (Cont'd.)

U. S. DEPARTMENT OF JUSTICE
By: STEVEN D. BRYANT, ESQUIRE
KELLE S. ACOCK, ESQUIRE
And
DEPARTMENT OF THE NAVY
NAVY LITIGATION OFFICE
By: J. PAGE TURNEY, ESQUIRE
Counsel for the Defendant



I N D E X


PONENT — PAGE

RROLL LINDSAY By Ms. Acock 4
By Ms. Hofheimer 76
By Ms. Acock 77
By Mr. Bryant 102


EXHIBITS


DESCRIPTION — PAGE

Purchase agreement dated 24 May 1993 to ddie J. And Elizabeth L. Waterman ............... 28

Tax assessment July 1, 2005 through June 30, 006 for 2244 Windy Pines Bend .................. 41

Uniform Residential Appraisal Report ............. 46

Custom Electric invoice .......................... 48

ermit to Build .................................. 49

hysical survey of Lot 237, Chesopeian Colony .... 51

eed or Bargain and Sale ......................... 54

eed of Trust .................................... 55

ettlement Statement ............................. 56

niform Residential Appraisal Report 09 East Kings Road ............................. 57

uyers' Possession Agreement for Residential perty ....................................... 61

etch/Area Table Addendum ........................ 62




EXHIBITS (CONT'D.)


NO. DESCRIPTION PAGE

68 Real Estate Tax Assessment July 1, 2004 through June 30, 2005 ............................ 66

69 Subpoena and Notice of Taking Deposition - Duces Tecum ...................................... 92

would have been the fall of 1998.
Q. The fall of '98?
A. Correct. The surgery was in June, July of 1998.
Q. And that coincides with increased jet noise that you experienced in your home?
A. I was home. Yes.
Q. When you first came to Virginia Beach in 1979, did you know the Naval Air Station Oceana was here?
A. Yes.
Q. Did you know that they flew jets in and out of the base?
A. Oh, of course.
Q. Did you ever experience jet noise at any of the other homes that you lived at in Virginia Beach?
A. I'm sure I did. But was it anything significant? No.
Q. What do you mean by significant?
A. Significant means to the point where it was bothersome.
Q. What is bothersome?
A. Bothersome in that context to me would mean something that would interrupt my daily routine, my life, or something of that nature.
Q. Okay. Can you give me an example?
A. An example of something that would interfere with



my life?
Q. Yes.
A. I'm standing out in my yard talking to n and suddenly we can't hear each other. We just because you can't hear.
Q. Has that happened to you in your curre
A. Most definitely.
Q. Do you remember the first time that hap
A. I couldn't tell you exactly. It was somet the 1998 time frame.
Q. What about when you are inside your h you hear jets?
A. It's muffled somewhat. But when you a a TV program and you have got the volume so loud that it's -- I'm going to say almost vibrating the floor, the volume is so loud, and you still can't hear the TV, that's bothersome to me.
Q. You mean the TV volume vibrates the floor?
A. Yes.
Q. Or the jet --
A. Well, the jet noise too. Windows have shaken in my house. And I don't think that was because of the volume of the TV.
Q. Okay. You mentioned that you and your wife would be having a conversation outside. Does she live with you



now?
A. Yes. She is my wife now. When I referred to girlfriend earlier, it's my wife now.
Q. Have you seen jets fly over your property?
A. Numerous times.
Q. Can you describe that for me?
A. Oh, I mean I don't know exactly how to describe it. Jets -- I mean I'm not trying to give you a smart answer. Here's a plane. I'm standing outside. I hear the noise, a tremendous noise coming, and I look up and there's a jet plane. I recognize a jet plane. Sometimes they are very low.
Q. Can you tell me, or can you describe how low?
A. I don't know. I can't judge distances looking up in the air. I don't know. Low. To me, very low.
Q. You mentioned you have trees on your property?
A. Yes.
Q. Do they fly close to the trees?
A. Yes.
Q. To the tops of the trees?
A. Yes.
Q. Do you know about how far?
A. I can't give you a number of feet. I don't know.
Q. They seem to be close?
A. They seem pretty darned close to me, yes. Using



simple adjectives and adverbs, very close.
Q. You mentioned that you knew the Naval Air Station was here when you moved here in 1979?
A. Correct.
Q. And that they flew jets in and out of the base?
A. Yes.
Q. When you bought the property on East Kings Road, did you contact the base about the planes and the jets flying over?
A. No.
Q. Why did you not contact them?
A. I didn't see any reason to do that. I didn't think it would be necessary.
Q. Have you complained to the base before about jets flying over your home?
A. There is a -- I don't know what they call it, a hotline or something to that effect. There is a complaint line. I have attempted to call that on several occasions, and I could get nothing but put me on hold, or no one would ever answer the phone. So the answer is yes, I attempted to call to complain but I never was successful in making contact.
Q. About how many times have you attempted to call to the hotline?
A. Five, approximately.

Q. And so that's the primary reason?
A. That is the primary reason, yes.
Q. Where would you like to move to? Or have you thought about that?
A. I thought about it, thought about it, and thought about it. I really don't know. My wife is originally from Louisiana, and most of her -- all of her people still live in western Louisiana, or eastern Texas, in the Houston area. And she's lobbying awfully hard for that.
Q. I can understand.
A. But my favorite expression right now is only the Lord knows and he's not telling.
Sorry.
Q. I'm going back to the dates that you traveled for work, Monday through Fridays. You mentioned that it started in, sometime in 1995?
A. Right.
Q. Or maybe '96. And went through June?
A. As I think about it more, I'm pretty sure it was '95.
Q. And that went through June of '98?
A. Right.
Q. And you were gone Mondays through Fridays, and you were here in Virginia Beach on the weekends?
A. Yes.



Q. Is that your year round schedule?
A. Yes.
Q. That's the consistent schedule?
A. Well, that was the goal. As my boss would say, you're not making me any money sitting at home, or you're not making me money sitting here in Cincinnati. You make me money by going to the client's site and teaching them how to use computer hardware and computer software. Primarily software. So that was the goal was for me to be gone Monday through Friday.
Q. So if you had a vacation would you come back to Virginia Beach for vacation, or would you go somewhere else for vacation?
A. We would normally go someplace else.
Q. So for those years you were primarily here only on the weekends?
A. Correct. Primarily, yes.
Q. Did you bring the folder of documents with you today?
A. I brought a folder that I have some information in relative to the subject matter, yes.
Q. Can I take a look at those?
MS. HOFHEIMER: Let me -- I haven't seen it yet, so let me take a look and see what it is.
MR. BRYANT: When you're done looking at that,



you can hand it to me, assuming we can look at it.
MS. HOFHEIMER: It's got correspondence from us in it so I'm taking that out.
MR. BRYANT: Of course.
MS. ACOCK: But is it okay? Do you mind if I ask questions.
MS. HOFHEIMER: Yes. You can go on.
BY MS. ACOCK:
Q. I'm going to go ahead and keep asking you questions while she looks at those papers in your folder.
A. Okay.
Q. You mentioned earlier that you had seen jets fly over your home?
A. Yes.
Q. Can you be a little bit more specific about what you see. Can you see anything on the jet, like a mark or any kind of identification? Can you describe what you see?
A. The planes were flying very low.
Q. Okay.
A. If I had to sit here and tell you that I remember a particular plane flying over on such and such a date, or any date, for that matter, and I saw a certain marking, or I saw a certain number, or I saw the pilots in the cockpit, no. I couldn't tell you that. I mean, I wasn't thinking of that. I'd be calling a number, get his license plate and



call him for being a bad boy, for hot-dogging.
Q. So can you -- so are you saying that you can see those kind of details?
A. No. I cannot. Or I cannot or did not. And when I say did not, I wasn't looking for those kind of things.
Q. Do the -- did the jets when you described them flying over your property, do they fly about the same way every time they come over your property, or do they come from the same direction? Can you explain that?
A. They don't always come from the same direction, but predominantly they come -- let me get my bearings. If I'm sitting in front of my house, that's north. They come from the northeast, come from the northeast, and they are flying more towards the southwest. They are in a pattern like that most of the time. And that's either in a pattern that they are coming to make -- well, I'm not going to say what they are doing. I'm not really sure what they are doing.
Q. Is that the same way you observed them flying in 1998?
A. In 1998?
Q. Yes.
A. As compared to today?
Q. As compared to today.
A. For the most part, yes.

Q. So you're saying that the planes basically fly the same way today as they did in 1998?
A. To the best of my knowledge, yes. I don't recall anything being significantly different.
Q. Okay. Aside from those times that you were traveling for work between 1995 and '98, in June of '98, have you always resided in your home from the time of purchase -- are there any other times when you were not in your home?
A. Let me make sure I understand. First of all the time frame that you are talking about is --
Q. The house you currently live in?
A. Right.
Q. We talked about you going out of town for work?
A. Okay.
Q. Is that the only time period that you were gone for travel, or have there been other times where you left your home for travel?
A. I mean I have traveled, you know, on rare occasions. But on a vacation or something, I haven't really worked since I'm going to say June of 1998. So when I say worked, I haven't done a thing that's income producing. So I haven't done any traveling other than taking a vacation, or something like that. Or making a trip down to see my wife's parents down in Texas or Louisiana, or something like



that.
Q. And in going back to the jets flying around your house, when do they fly?
A. There is no specific time. I -- they -- during the day, also at night, there is no set pattern that I have been able to observe.
Q. When they fly at night, do you hear them when you are inside your home watching TV?
A. Yes. Yes. I mean the situation in terms of the effects and the disruption of my life, during the day the same disruption is -- the disruption is the same at night, because they are flying and doing basically the same thing.
Q. Can you sleep through the night?
A. I have been awakened on occasion by jet noise, but, you know, honestly, it's rare for me to be awakened by jet aircraft. It has happened on more than one occasion.
Q. Have you noticed if any of the homes around here have been sold recently?
A. Yes. Not -- I'll just say yes. Yes.
Q. Do you know, has that been recent, in the last month, two months, six months?
A. Well, when -- your question was has any homes sold around me recently. And the answer is yes. The house directly across the street from me sold about a year ago, two years ago, because I think I mentioned earlier that the



gentleman who lived there passed away, died, so his ex-wife, who was -- she inherited the house and she sold it.
The house on the other side, they had been there longer than we. The house directly across the street, she's lived there forever. There's been a couple of houses further down Kings Road that have been for sale and sold. There has been other houses in the neighborhood that have been for sale and sold. Recently, I would say the primary reason for that is taking advantage of the housing bubble that we're in right now.
Q. What do you mean by housing bubble?
A. Well, I'm -- I don't know what I mean. All I mean is basically quoting what they are saying in the newspaper, and what Alan Greenspan says. So that's second hand.
Q. What are they saying?
A. Well what basically they are saying is we're in a housing bubble, and what that means to me is that housing values have, in certain areas of the country have increased perhaps exponentially, so --
Q. Do you think the value of the homes in your neighborhood have increased exponentially?
A. No.
Q. No?
A. No.



Q. Why not?
A. I don't know. I wish I did.
Q. The house across the street that you mentioned, the first house you mentioned that sold, do you know how long it stayed on the market?
A. No. It wasn't days. It wasn't weeks. It was maybe a month.
Q. Okay.
A. Or two. I'm really not sure. It was -- it didn't sell like that.
Q. Do you know how much it sold for?
A. How do I answer that? I know what someone third-hand told me, but I don't really want to quote that figure, because I really don't know. I don't know on a factual basis.
Q. Well, what did they tell you?
A. Oh, 300 -- well, now I have forgotten. I think 300,000.
Q. Do you know how many bedrooms and bathrooms that house had?
A. No. I was only in it once or twice, and I really don't remember.
Q. Do you know anything about the house or the property?
A. I can tell you it's on East Kings Road. What can

socialize in any way.
Q. Can you describe for me when you first moved into the house and when you first started seeing jets fly around your house -- do they fly in your opinion directly over your house or a few blocks over, or can you give me a range of where they fly?
A. Both. They -- sometimes they fly directly over my house. Sometimes they are off to the left of that. And sometimes they are off to the right of that.
Q. So by directly over your house you mean like over the roof top?
A. Yes.
Q. And did they fly that way when you first moved into the house?
A. Yes.
Q. And so that -- and that was in 1994. Do you think they fly the same way now?
A. To the best of my knowledge, yes.
Q. And what do you expect to get out of this lawsuit?
A. I would like to say some relief from the intolerable noise situation.
Q. What do you mean by intolerable?
A. Intolerable to me is as the word suggests, intolerable. What's another synonym for intolerable? It's



very difficult to deal with something that interrupts your life, interrupts your conversation, interrupts your way of life.
Q. You mentioned relief from that. What do you mean by relief?
A. Well, the noise, jet noise is the cause of the -- is what I'm seeking relief of, something that would eliminate that noise. And over my house, near my house.
Q. So it sounds like what you're saying is you'd like the jets to go away?
A. The noise to go away.
Q. Like the noise to go away. Do you realize that in this lawsuit you are suing for money and for compensation?
A. Yes.
Q. So is that -- what do you expect?
A. I learned a long time ago once you make certain expectations, or you have certain expectations in your mind they don't materialize, you are disappointed, or whatever. So I don't know.
Q. Okay. How is money going to alleviate the concerns you have about jet noise?
A. How is money going to alleviate? I'm sorry. Repeat.
Q. How is money going to alleviate your concerns



about the jet noise?
A. I don't know that it will.
Q. What would eliminate your concerns?
A. To eliminate the jet noise, or to make the jet noise I'll call it tolerable.
Q. You described the noise a few minutes ago as intolerable?
A. Yes.
Q. What would be your opinion of what is tolerable?
A. I'm sorry.
Q. Well, what is the difference between what is intolerable and what is tolerable?
A. The difference between tolerable and intolerable, as it relates to jet noise, is the difference between, as an example, something that disrupts my life-style as opposed to something that does not disrupt my life-style.
Something that interferes with my conversation with my wife or my neighbor or someone that is visiting, and prohibits that conversation from taking place, as opposed to the opposite of that. To me, that's what I mean by tolerable or intolerable. Or not tolerable.
Q. Do you think the noise was tolerable before the fall of '98?
A. I do not recall the disruption and the noise level being to anywhere near the extent prior to the arrival



of the F/A-18s. Or putting it a different way: The activity with the F/A -- with the F-14s as an example, the Tomcats, there was noise levels there, but that I did not necessarily put in the intolerable category.
Q. Why is that?
A. For the reasons that I have already stated. It was -- the noise level is -- it's certainly there with the F-14s. But it is not intolerable to the extent that it disrupts my life-style, to the extent that it keeps -- prohibits me from carrying on a conversation when they are flying.
Q. When the F-14s are flying, how do you know F-14s were flying before the F-18s?
A. Well, generally speaking, I can tell the difference between -- visually, between an F-14 and an F-18.
Q. So did you see F-14s flying near your property before you saw F-18s flying?
A. Yes.
Q. When did you see F-14s flying?
A. I don't recall. I mean I couldn't tell you a date. I don't know. I can't remember.
Q. Would it be before the fall of '98?
A. Yes.
Q. And when you saw those F-14s flying, could you have a conversation outdoors then?

# EXHIBIT D

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, )
et al., )
)
Plaintiffs, )
)
v. ) NO. 01-201L
) Judge Victor J. Wolski
THE UNITED STATES OF AMERICA, )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION
OF CHARLES K. NASH
TAKEN ON BEHALF OF THE DEFENDANT

Virginia Beach, Virginia

January 13, 2006

Appearances:

SHUTTLEWORTH, RULOFF GIORDANO & SWAIN, P.C.
By: CHARLES LUSTIG, ESQUIRE
Counsel for the Plaintiffs

U. S. DEPARTMENT OF JUSTICE
By: KELLE S. ACOCK, ESQUIRE
And
DEPARTMENT OF THE NAVY
COMMANDER NAVY REGION ATLANTIC
By: DOMINICK G. YACONO, ESQUIRE
Counsel for the Defendant



INDEX


| DEPONENT | | PAGE |
|---|---|---|
| CHARLES K. NASH | By Ms. Acock | 3 |


EXHIBITS


| NO. DESCRIPTION | PAGE |
|---|---|
| (NONE) | |




Deposition upon oral examination of CHARLES K. NASH, taken on behalf of the Defendant, before Frances P. Zahn, RPR-RMR, a Notary Public for the Commonwealth of Virginia at large, taken pursuant to notice, commencing at 8:30 a.m. on January 13, 2006, at the offices of Shuttleworth, Ruloff, Giordano & Swain, 4525 South Boulevard, Virginia Beach, Virginia; and this in accordance with the Federal Rules of Civil Procedure.

CHARLES K. NASH was sworn and deposed on behalf of the Defendant, as follows:

EXAMINATION

BY MS. ACOCK:

Q. Good morning, Mr. Nash. My name is Kelly Acock from the Department of Justice. I represent the United States in Testwuide versus United States along with Steven Bryant who is not here with us today.
The rules of the road here are Mrs. Zahn is going to be recording everything that we say, so it's important that we articulate -- I articulate my questions and you articulate your responses. For example, she will not be able to record nods of the head, like nods yes and nods no. Also it's helpful for her if we avoid talking over one another. If we avoid talking at the same time, so that way she is able to clearly record what you and I are saying.



If you need a break at any time please feel free to let me know and we'll take a break.
Can you state your name and address for the record?
A. Charles K. Nash, 2617 Boush Quarter, B-o-u-s-h, in Virginia Beach, Virginia 23452.
Q. And have you ever been involved in a lawsuit or litigation before?
A. No.
Q. Have you ever testified under oath before?
A. Yes.
Q. And when was that?
A. Oh, goodness. Early 1988.
Q. And what was that in relation to?
A. At a service station robbery. I was a witness.
Q. Was that here in Virginia Beach?
A. Yes.
Q. And were you a witness for the prosecution or the defense?
A. The prosecution
Q. Do you remember the outcome of that?
A. The party was guilty.
Q. And did you bring anything with you today?
A. Like?
Q. Documents.

A. From what I understand it had been on the market for over a year.
Q Okay. Was that typical in '93 that houses would stay on the market for about a year?
A. I don't have any idea.
Q Since you and your wife own the home, have there been any legal actions associated with the property?
A. Not against us.
Q And has the home been appraised since you purchased it?
A. Yes.
Q If you could, just tell me the years that it's been appraised and the value?
A. I wish I had my wife here for that one. She keeps track of those sort of things. The latest one was during the last refinance. I believe that was -- I believe appraised it at 480. And that was about two years ago.
Q In '03 or '04?
A. Yes. About that.
Q Any other appraisals?
A. I think we did it once before and I can't remember when. It was in between.
Q In between the purchase and the --
A. Right. Whenever the interest rate was favorable.
Q Was there an appraisal associated with your purchase of the property?
A. Yes. I believe there was.
Q Do you remember the appraised value?
A. I think it appraised at the 260.
Q 260. Have you made any improvements to the home or the property?
A. Yes.
Q Could you walk me through those, please?
A. I don't know whether -- well, we've added a bathroom upstairs, remodeled all the bathrooms downstairs, carpet and tile. I guess the major one was ripping all the windows out and putting new ones in back in '99.
Q What prompted you to put new windows in?
A. The arrival of the F-18s.
Q What about the arrival of the F/A-18s made you want to put new windows in your home?
A. Well, we had the old single pane windows with storms over the top of them and in reading I found out that you could cut the noise down by putting in these double pane gas filled windows, and so forth, and so that's what we did.
Q When you refer to your by reading, what did you read that suggested that?
A. Anything I could find on the internet and so forth about noise reduction.
Q And did the windows in your opinion help to decrease the noise?



A. Dramatically. Plus we added insulation in the attic wherever we could.
Q Can you describe what you would perceive the noise to be like before the new windows and the insulation and what you experienced after? You mentioned it dramatically changed.
A. Well, before you couldn't talk on the telephone if they were flying overhead, and now you can still carry on a conversation there. That's the biggest thing.
Q Are you able to watch television and hear the television?
A. For the most part, yes. Every now and then somebody takes the roof off.
Q Not literally?
A. No. Well, every now and then we get an overflight that is more than normal. If you look at the pattern and where we're located, we don't normally, because they use this runway most of the time.
Q And which, just for the record and Mrs. Zahn, you are pointing at Defendant's Exhibit 122?
A. Yes. I'm trying to think what runway that is. They are normally using 5 right or left. And it's not, you know, until they start using 14 left and right. When they use 14 left and right, that's when it gets really obnoxious.



Q And how do you know which runway the jets are using?
A. Well, when they come in to go to runway 5, they will be cycling around over towards Lynnhaven Mall off to the east of us and when they come in to use runway 14 they come directly overhead.
Q Directly over your home?
A. At very low altitude.
Q How often would you say -- you could use percentages of 100 percent -- would you say that the flights are directly over your home as compared to when they were using runway 5?
A. I couldn't tell you, but I'm sure that Oceana could. I mean they can tell you how many times a year they use that runway. I think we are probably in the 10 -- about 10 percent. Maybe less.
Q 10 percent of?
A. Of their landings when they use that runway. They don't use that very often.
Q I'm sorry. Which runway are you talking about?
A. The 14. That's very fortunate for us.
Q What is your current occupation?
A. I'm a combat systems engineer.
Q I'm sorry. I didn't quite hear you. Combat?
A. No. Combat systems engineer.

entail?
A. To the exchange and places like that.
Q. Is your home near the air station?
A. It's fairly close.
Q. So your house is fairly convenient to the exchange?
A. My wife uses the gym on a daily basis during the week.
Q. Was that a selling point or a positive attribute of the property when you purchased it?
A. No, not really.
Q. Have you ever been involved in the real estate business?
A. No.
Q. Has your wife?
A. No.
Q. Any family members involved in real estate?
A. My daughter used to be in Florida a long time ago.
Q. You mentioned earlier that the real estate agent Zenglioski --
A. Yes.
Q. -- assisted you in purchasing the property. Was that a man or a woman?
A. It was a husband and wife team. Angie and John.



Q. Did they tell you anything about Oceana before you purchased the property?
A. They showed me a map very similar to this one, and we looked at it and noticed that, if I'm not mistaken, this map is more recent than the one that used to be out there.
Q. This is an AICUZ map, Defendant's exhibit 122 is an AICUZ map, and I believe it's dated 2005.
A. Right. And if I'm not mistaken, the one that used to be out there did not have these outer bands, these last two. The only thing it showed was that we were on the fringe of the only -- you know, there was like a pink area that showed some jet noise and so forth. And we were on the outer side of the thing. There was nothing indicating any of these bands out here as far as I knew.
Q. When you are referring to these bands, the one that is labeled 65 and 70 on Defendant's Exhibit 122?
A. I do not believe those were shown on the map that they showed us. Because they did point out, because you know we were concerned about the noise and the impacts and so forth. But we were outside of it. And --
Q. What were your concerns about the noise when you purchased the property?
A. Well, we had only looked at it a couple of times and if you visit a thing on Sunday, when the Navy is not



flying, it's hard to tell how much jet noise there is.
Q. Did you visit the property on a weekend?
A. Yes. We visited it many times after that. Back in those days, it wasn't -- you know there were F-14s around and A-6s, and it wasn't that bad.
Q. When you were viewing the property on some of the times you visited it before you purchased it, did you witness the jets flying?
A. Yes.
Q. Can you describe what you saw?
A. Most of it -- most of the time we saw the jets flying, they were circling around to the east, coming in over, basically Lynnhaven Parkway and the Great Neck Road area down in here. It would be coming around to the east from where we were, so --
Q. And what altitude or what height would you estimate they were flying at?
A. I don't know. Anywhere from 500 to 1,000 feet, probably.
Q. And would you say that the altitude of the flights you are experiencing now at your home, that they fly about the same altitude or height?
A. Most of the time.
Q. Most of the time. More than 50 percent of the time?



A. Yes. Yes. There is only the occasional flight that is really, really low.
Q. Can you describe those occasional flights that are low. What -- in terms of how low they fly and the noise you experience?
A. A few hundred -- maybe a few hundred feet. I -- the ones where I have called in on have been very low and kind of scary. When you can see the guys in the cockpits, that's too low.
Q. Can I make out -- you mentioned seeing the pilot. Or the guys in the cockpit. Can you make out any other markings on the jet?
A. You can almost read the stencils on the side, yes. The Navy has gone to a different paint scheme these days so you can't see it as much as you used to be able to.
Q. Are you able to see landing gear?
A. If it's down, yes.
Q. I think you mentioned a couple of hundred feet on the occasional lower flight. How are you able to make that measurement?
A. Just experience of watching airplanes buzzing around an aircraft carrier? Which is an observation level that they let us go out and watch the airplanes take off and land on the aircraft carriers.
Q. And how often would you do that when you were on

the carrier?
A. Every chance you get.
Q. You mentioned earlier that when you installed the windows and the insulation, that after the -- after the new windows and insulation, that you were able to have the conversation for the most part inside your home. Before that time, can you tell me what -- between '93 and I believe you said in '99 when the windows were installed, what noise did you experience at your home? In terms of being able to have a conversation. Could you watch the television?
A. Between '93 and I guess the fall of '98, it wasn't too bad. You'd get an occasional loud A-6 coming over that would interrupt a phone call or television or something, but between '93 and the fall of '98 it wasn't too bad. It was when the F-18s came that the noise level got to the point where you would have to say, wait a minute, there's an airplane going over. That's when we decided to put the windows in. It was -- I guess it really was the spring of '99 that we first decided we had to do something about it, because that's at the end of winter. We open the windows to get some fresh air in at night or something like that. And if they are flying, we close the windows up again, turn the air conditioning back on because we couldn't stand the noise.
Q. How long would you say it was when you noticed



the increase in noise and the F-18s. I was trying to -- how many months would you say that you experienced the F-18s before you changed the windows and the insulation?
A. Probably six to eight months later. Took a while to get a contractor lined up.
Q. So about late '98, early '99?
A. It was -- let me say, it was probably April of '99 that we decided to do something about it. And it was probably July or August before we finally got a contractor around to do something.
Q. And when were you aware that the F/A-18s arrived?
A. I'm trying to think. There was an air show, must have been that fall. Do you remember when the Neptune Festival was? September, isn't it?
MR. LUSTIG: I believe it's in the fall.
A. Yes. Of '98, and they had a big kick off thing at Oceana for it and we were invited to come out.
BY MS. ACOCK:
Q. Take a look at the planes?
A. Well, my wife was the principal of a school.
Q. Which school?
A. At that time, Great Neck Middle. She's retired now.
Q. Do you remember the contractor that came in to do the windows?



A. Tignor, T-i-g-n-o-r, Construction.
Q. Is that a local company?
A. Yes.
Q. Do they also do the insulation?
A. They hired someone to come out and pump it in. I don't know who.
Q. A subcontractor?
A. Yes.
Q. How much did that cost to replace the windows and add the insulation?
A. I think the windows were $8,400 and the insulation was about 1,500.
Q. Roughly $10,000?
A. Roughly.
Q. Do you or your wife keep a log of when the jets fly over, around your home?
A. No.
Q. What about taking photographs or videotape?
A. No.
Q. I believe you mentioned earlier that for the occasional lower flights that you have called the hotline before?
A. I have called the hotline on those, yes.
Q. And just to clarify, that's the noise hotline for Oceana?



A. Right.
Q. How many times have you called the hot line?
A. Oh, probably three or four. I'm not sure if I got through on all of those.
Q. Were you able to get through on some of those?
A. Yes.
Q. And what happens when you are able to get through on some of them?
A. They take a report and don't respond.
Q. What do you mean by don't respond? You don't receive any other correspondence from them?
A. No feedback, no -- nothing.
Q. Do you remember the first time you called the hotline, when that was?
A. No.
Q. Do you remember the most recent time you called?
A. No. I have pretty much given up on it.
Q. The phone calls to the hotline, would those have occurred in the '98-'99 time frame before the insulation?
A. Yes. Well, not all of them, but --
Q. So you called the hotline after the windows and insulation?
A. Yes.
Q. Has your wife called the hotline?
A. No.

# EXHIBIT E

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, et al.,

Plaintiffs,

v.

THE UNITED STATES OF AMERICA,

Defendant.

NO. 01-201L
Judge Victor J. Wolski

ORIGINAL

DEPOSITION UPON ORAL EXAMINATION
OF HERBERT VAN NOSTRAND
TAKEN ON BEHALF OF THE DEFENDANT

Virginia Beach, Virginia

April 27, 2005

Appearances:

SHUTTLEWORTH, RULOFF, GIORDANO & SWAIN, P.C.
By: STEPHEN C. SWAIN, ESQUIRE
Counsel for the Plaintiffs

U. S. DEPARTMENT OF JUSTICE
By: STEVEN D. BRYANT, ESQUIRE
DOMINICK G. YACONO, ESQUIRE
Counsel for the Defendant

Q. How far is the mall from your house approximately?
A. About three miles, two and a half, three miles.
Q. Okay.
Did the jets -- did the jets ever at that time frame fly directly over your house?
A. They have, yes, at one time or another.
Q. Now going back to the 1967 time frame when you first moved into the house, were they flying over your house then?
A. You know, I -- you know, I'd have to say yes because there's jets flying, you know. And I would have to say yes.
Q. All right. About how often did the jets fly over, directly over your house in that time frame of 1967 through the '70s, that time frame?
A. Well, that's another question. You know, just -- I just hear air pattern, I guess you call it.
Q. But when you were sitting on your porch back when you first moved in your house, back in that time frame on occasion --
A. Yes.
Q. -- it would fly over your house?
A. Yes.
Q. Okay. What I'm trying to find out is about how

often did that happen where it would be right above your house? When I say above, it could be how high?

A. Quite often. Quite often.

Q. Quite often back then?

A. Yes.

Q. When you say quite often do you mean -- how many times a month, approximately?

A. Oh, lord! 180.

Q. Oh, so very often then. Quite often?

A. Yes. Yes.

Q. So on a regular basis?

A. Yes.

Q. It was flying directly over your house?

A. At times directly over.

Q. Okay.

A. I mean when you say directly over, I'm talking right straight up.

Q. That's what I'm talking too, so we're having a mind meld here, so that's good. We're talking about the same thing.

You said about 180 in terms of flights a month. When you said 180, do you mean 180 directly above you or 180, a certain number above you and a certain number above the Lynnhaven Mall area?

A. Exactly. A certain amount over, you know they --

and then like right now you see them coming in the afternoons, you know, their pattern, you know. And then some are very often, you know, a little farther than I'd say -- I don't know what he's doing, but he's just --

Q. Well, right now I'm not talking about right now.

A. Then I guess they were. I would say then they would do the same thing, more or less.

Q. Okay. Well, then, speaking of that, have the flights, your experience with the jets flying in and around your house, has it been roughly the same in terms of number of operations and proximity to your home over these many years?

MR. SWAIN: What do you mean by proximity to his home?

MR. BRYANT: I mean, he said some flights back in 1967 were directly above his house. Some were over the Lynnhaven Mall area. Lynnhaven Mall, of course, didn't exist back then, but in that area. What I'm trying to find out, has it been roughly consistent where the planes have flown in relation to your home from back in 1967 through the '70s, '80s, until now? Has it changed?

A. If I had to say same, yes, sir.

MR. SWAIN: Now, no guessing. No guessing. Just tell what you know.

A. I'd say it's about the same pattern.

Q. It also says that -- well, actually, but you do agree that the -- I'll return this actually. I'm not going to make it an exhibit.

Do you agree that there has been sort of a market appreciation in this area, in Virginia Beach?

A. Yes.

Q. You do. And what is your understanding of how long that's been going on?

A. As far as I know of?

Q. Yes.

A. I don't know. I'd say because -- I talked to you more about houses here than I have talked to anybody else.

Q. All right. Fair enough.

A. I mean I really don't.

Q. I'm going to mark --

MR. SWAIN: Let me get a copy of that. Make a copy.

MR. BRYANT: Sure.

MR. SWAIN: You want to do it at the break?

MR. BRYANT: That's fine. We'll do it at the break.

Just give me a moment here.

BY MR. BRYANT:

Q. Another question I have for you is going back to overflights in terms of the altitudes of the overflights.

How high above you are they? Do you have -- can you estimate about how high the planes are currently right now above your house?

A. If I had to guess --

Q. Yes?

A. -- I'm going to say from 1,000 to 1,400 feet.

Q. Okay. Has that altitude been about the same the entire time you have lived in the house?

A. Pretty close. Pretty close.

Q. Okay. Could you -- you said 1,000 to 1,400 feet?

A. I'm guessing.

Q. I understand.

Can you compare that to something like a certain number of homes stacked on top of one another? Is there something you could compare it to to give --

A. No.

Q. You are just going -- okay. Fair enough.

Can you see the pilots from your front porch? Can you see them in there?

A. You know they are in the airplane.

Q. Oh, I know they are in there.

A. I mean, you know, yes, you see the figure of a person there, you know, and all, yes.

Q. Can you see their helmet that they are wearing?

A. Not with my eyes like that, but you know.

# EXHIBIT F

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, et al.,
Plaintiffs,
v.
THE UNITED STATES OF AMERICA,
Defendant.

NO. 01-201L
Judge Victor J. Wolski

DEPOSITION UPON ORAL EXAMINATION
OF JAMES E. RIDDICK
TAKEN ON BEHALF OF THE DEFENDANT

Virginia Beach, Virginia

June 10, 2005

Appearances:

SHUTTLEWORTH, RULOFF GIORDANO & SWAIN, P.C.
By: STEPHEN C. SWAIN, ESQUIRE
Counsel for the Plaintiffs



Appearances (Cont'd.)

U. S. DEPARTMENT OF JUSTICE
By: STEVEN D. BRYANT, ESQUIRE
KELLE S. ACOCK, ESQUIRE
And
DEPARTMENT OF THE NAVY
COMMANDER NAVY REGION ATLANTIC
By: DOMINICK G. YACONO, ESQUIRE
And
DEPARTMENT OF THE NAVY
NAVY LITIGATION OFFICE
By: J. PAGE TURNEY, ESQUIRE
Counsel for the Defendant



I N D E X


| DEPONENT | | PAGE |
| --- | --- | --- |
| JAMES E. RIDDICK | By Ms. Acock | 4 |


EXHIBITS


| NO. | DESCRIPTION | PAGE |
| --- | --- | --- |
| 70 | Real Estate Purchase Contract, James E. And Virgie L. Riddick | 10 |
| 71 | 21st Century Remodeling, Inc. written agreement, dated 26 October 2001 | 19 |
| 72 | Appraisal with comparable photos | 21 |
| 73 | Subpoena and Notice of Taking Deposition - Duces Tecum | 22 |
| 74 | Appraisal of Real Property | 25 |
| 75 | Plaintiffs' Answers to Interrogatories James and Virgie Riddick | 41 |




Deposition upon oral examination of JAMES E. RIDDICK, taken on behalf of the Defendant, before Frances P. Zahn, RPR-RMR, a Notary Public for the Commonwealth of Virginia at large, taken pursuant to notice, commencing at 8:45 a.m. on June 10, 2005, at the offices of Shuttleworth, Ruloff, Giordano & Swain, South Boulevard, Virginia Beach, Virginia; and this in accordance with the Federal Rules of Civil Procedure.

JAMES E. RIDDICK was sworn and deposed on behalf of the Defendant, as follows:

EXAMINATION

BY MS. ACOCK:

Q. Hi, Mr. Riddick. I'm Kelle Acock, and I'm going to ask you some questions today, and we'll need you to verbally say the answers. Ms. Zahn is going to be typing what we say and so nodding your head yes, shaking it no, uh huh, uh uh, she won't be able to transcribe that.

A. Right.

Q. So we just need you to go ahead and verbalize your answers. And if at any time you need a break, if you want to get some water, or if you just need to take a moment, just let us know and we'll be happy to stop and let you take a break.

A. All right.

Q. Did it seem like it just happens overnight, so to speak, or was it something that you really noticed at one particular time?
A. You know the reason I really notice one particular time is, say, when the house shook, you know, it gets your attention. If you are in the house, the thing vibrates and you hear this jet noise going by and all of a sudden the house shakes and it gets your attention. I would say that is in late '99, 2002, though. Somewhere along in there.
Q. When you mentioned in '92 when you first bought the home that the jets would fly, did your house shake then?
A. No. I don't ever remember shaking then like that.
Q. When you describe the planes flying directly over your home, do you know about how high they are flying, or what the altitude is?
A. I don't know.
Q. Do you have really tall trees in your front?
A. No. No.
Q. If you -- if they are not directly over your home and they are flying you said to the right or to the left, do you know how high they may be flying then?
A. No. I couldn't tell.
Q. Do they seem to be higher than when you think



they are flying directly over?
A. It's hard to say because sometimes some of them are lower than the others, and it's hard to say, you know, which is higher and if they are coming directly over the house whether they are higher than when they go to the side. It's hard to say.
Q. Do you think the height that you talked about as they fly now, do you think that is about the same as they flew in 1992?
A. I really don't know. I really don't know. I can't say. I'm not sure.
Q. In terms of the height again, did you ever notice a change between '92 until the present in terms of the height that they fly?
MS. HOFHEIMER: Objection. Asked and answered.
A. I really couldn't tell. I really can't tell if they was flying higher or lower.
BY MS. ACOCK:
Q. So it seems to be the same?
A. Pretty much. Pretty much.
Q. Do you know whether when your house was first built if there was any sound attentuations in the home when it was built?
A. What do you mean by sound attentuation?
Q. Anything in the construction of the home that



would mitigate noise?
A. Not that I know. I don't know.
Q. Have you done anything to your home that would mitigate noise?
A. Well, no. I had new windows put in.
Q. Why did you have new windows put in?
A. Well, you know, first of all, I did it for the comfort. And they said the windows would keep out some of the noise also. And it would keep the heat in. It would keep the heat from coming in and make your house warmer in the wintertime.
Q. So that's what you mean by comfort?
A. Right. They said it would make it a little bit more comfortable. You won't be as cold, you won't be as hot, and it eliminates a little bit of the noise.
Q. And that, the windows, that is part of the remodeling?
A. No. This was just done -- the windows were just done like a couple of months ago.
Q. Okay. This is June, so March or April?
A. April, somewhere along in there.
Q. And who installed the windows?
A. Window World? I believe it was Window World.
Q. Do you remember how much it cost?
A. About $4,000.



Q. You talked about the windows being for comfort. Can you describe them, single pane, double pane?
A. Double pane.
Q. Are there any -- are they like specialized, customized windows or just new windows?
A. Well, I guess -- he came in and measured everything, so I guess they are customized for the house because he had to come in and measure every window individually.
Q. But the main reason you bought them was not for the noise?
A. Well, not the main reason but that was part of the reason because they said it eliminates a little bit of the noise, so that was included. But I basically wanted it to keep the heat inside in the wintertime and the heat outside in the summertime and eliminate what noise I could.
Q. Besides the windows, have you done anything else to your home to make the noise less or to mitigate the noise?
A. Nothing else that I can remember to eliminate the noise. I don't know what else I could do to eliminate noise.
Q. Do you remember the mortgage company when you purchased the home, what mortgage company had the mortgage?
A. You know, I'm not sure. For some reason I want

# EXHIBIT G

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, )
et al., )
)
Plaintiffs, )
)
v. ) NO. 01-201L
) Judge Victor J. Wolski
THE UNITED STATES OF AMERICA, )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION
OF JOHN C. SHICK
TAKEN ON BEHALF OF THE DEFENDANT

Virginia Beach, Virginia

July 25, 2005

Appearances:

HOFHEIMER/FERREBEE, P.C.
By: KRISTEN D. HOFHEIMER, ESQUIRE
And
QUINN, GORDON & WOLF
By: KIERON QUINN, ESQUIRE
Counsel for the Plaintiffs



Appearances (Cont'd.)

U. S. DEPARTMENT OF JUSTICE
By: STEVEN D. BRYANT, ESQUIRE
KELLE S. ACOCK, ESQUIRE
And
DEPARTMENT OF THE NAVY
COMMANDER NAVY REGION ATLANTIC
By: DOMINICK G. YACONO, ESQUIRE
Counsel for the Defendant



I N D E X


| DEPONENT | | PAGE |
|---|---|---|
| JOHN C. SHICK | By Mr. Bryant | 4 |


EXHIBITS


| NO. DESCRIPTION | PAGE |
|---|---|
| (NONE) | |




Deposition upon oral examination of JOHN C. SHICK, taken on behalf of the Defendant, before Frances P. Zahn, RPR-RMR, a Notary Public for the Commonwealth of Virginia at large, taken pursuant to notice, commencing at 1:15 p.m. on July 25, at the offices of Hofheimer/Ferrebee, P.C., 1060 Laskin Road, Virginia Beach, Virginia; and this in accordance with the Federal Rules of Civil Procedure.

JOHN C. SHICK was sworn and deposed on behalf of the Defendant, as follows:

EXAMINATION

BY MR. BRYANT:

Q. Good afternoon, Mr. Schick. My name is Steve Bryant. Thanks for coming here today.

First, before we get started, Mrs. Zahn is taking down everything that you and I say so it's important that you wait until I finish my questions to respond to them and I wait until you finish answering before I ask more questions. And also please don't nod your head because she can't take those down. Everything has to be verbalized in terms of answers. And if you at some point are describing something with your hands, whatever, we need to describe that for the record as well. Everything has to be transcribed so it's reflected on the record.

Also, at any time during this if you need a break

was a distinct increase in noise and annoyance.
Q. What about the sort of number of operations that you experienced at your house. You obviously had some overflights directly over your house, you said, and then some, a couple hundred yards on each side. Is that a fair description?
A. Yes. I mean it could go miles. It could go a long way either side.
Q. Has that been roughly the same since you have been there, since '97? I mean, irrespective of the type of aircraft, has the level of operations been the same roughly?
A. I can only speculate. I don't know.
Q. But there at no point did you sit down and say, oh, my gosh, the operations over my house have doubled or tripled, or whatever, have increased significantly? You have never sort of had that kind of thought?
A. I have never made that particular analysis. What analysis I do is I go back to the Navy's information. We stuck very closely to Navy information in anything we did. If the Navy says they were doing 320,000 overflights in this community, I believe that Navy figure. If that was bigger than -- if that figure was bigger than it was prior, then I would have to say there were more overflights.
Q. And why would you believe what the Navy would put out in terms of the numbers and say, 300,000, whatever the



operations were, why would you accept those?
A. Why would I not? I guess, the question is, it was -- it was more reasonable to take an official study and try to make our case that we needed a reasonable solution than to generate our own numbers and say, I want you to believe us. Let's believe the Navy.
Q. Well, did your 30 years of experience in the Navy contribute to your conclusion that, hey, the Navy is putting out what it believes the correct operational numbers? Or would that --
A. I would have no reason -- in my career I had no reason to believe that the Navy was fudging figures for the public.
Q. Aside from Navy documents saying how many operations we had this year or that year, whatever, did you experience anything that was different in terms of level of operations, not the actual noise of an F-18 versus an F-14, at your house?
A. Repeat. I'm sorry. I started thinking on something else, and I lost my train of thought.
Q. Putting aside for a second the -- you said the F-14 you measured with the high 90s, versus the F-18 C/D I think you said was 117, or thereabouts. I may be getting that wrong.
A. F-18, because I really couldn't -- as I told you,



I couldn't tell the distinction between an A and B and C and D.
Q. Well, putting that difference aside in terms of one being louder than the other, and putting aside the documents that you reviewed that the Navy generated in terms of we have 100,000 operations, or however many operations in a given year time frame, was there anything that you personally experienced in living in the house that it changed suddenly. It was suddenly much higher than it was, more touch and gos, more FCLPs, anything of that nature?
A. As far as frequency -- you're talking frequency?
Q. Yes.
A. Or you're talking consequences?
Q. I'm talking -- let's talk frequency right now.
A. Okay. In frequency, as I said, I never made -- I never looked at the frequency. They were -- I shouldn't say I never looked at it, but I never made a study of it. I never recorded any data to support there are more. The overflights, as you probably are already aware, are sporadic. You can go a couple of days without having any, and you can go several days and it just seems to be constant.
Those days of constant overflights I suspect were consistent with the number of aircraft that were here, the number of aircraft that were being prepared for a



deployment. If they have -- if the -- consistent with the flights of the FRS, how many student flights they have to have in a particular cycle, that they were consistent. As for my experience with it, I was just noting that they were flying over. They were in trail or, you know, one after the other, and that sometimes it would go on for several hours with repeating. Whether -- I can't give you a distinctive answer on whether three years ago they were longer than they are today, because I have never made that assessment.
Q. I mean based on all that, you have never at any time said, wow!, there's a lot more flights going on now than there were. I mean a personal feeling of that and living in your house, than there were when you first got back here in '97?
A. I can make this as a definite. There are a lot more overflights over my house that are annoying. Okay? There are a lot more that annoy me now than there were in the past. Whether that means there are a lot more flights at this time than there were in the past, I don't know.
Q. And you attribute the higher noise and annoyance to the higher noise level of the F-18. Is that correct?
A. Yes.
Q. So again, like the preface to the question, trying to put that aside, there is nothing about the number of flights, though -- aside from the F-18 being louder,

# EXHIBIT H

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, )
et al., )
Plaintiffs, )
)
v. ) No. 01-201L
) Judge Victor J. Wolski
THE UNITED STATES OF AMERICA, )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION OF
JEFFREY McCREARY
TAKEN ON BEHALF OF THE DEFENDANT
VIRGINIA BEACH, VIRGINIA
JANUARY 13, 2006

Appearances:

HOFHEIMER/FERREBEE, PC
By: JACK E. FERREBEE, ESQUIRE
Counsel for Plaintiffs

U.S. DEPARTMENT OF JUSTICE
By: STEVEN D. BRYANT, ESQUIRE
Counsel for Defendant



I N D E X


DEPONENT PAGE

JEFFREY McCREARY

Examination by Mr. Bryant 3


E X H I B I T S


NO. DESCRIPTION PAGE

(None)




Deposition upon oral examination of JEFFREY McCREARY, taken on behalf of the Defendant, before Kerry E. Zahn, Registered Merit Reporter, Certified Realtime Reporter, a Notary Public for the Commonwealth of Virginia at large, taken pursuant to notice, commencing at 11:30 a.m. on January 13, 2006, at the offices of Hofheimer/Ferrebee, PC, 1060 Laskin Road, Virginia Beach, Virginia.

JEFFREY McCREARY was sworn and deposed on behalf of the Defendant as follows:

EXAMINATION

BY MR. BRYANT:

Q. Good morning, Mr. McCreary. My name is Steve Bryant from the Department of Justice, and I'm representing the Navy in this litigation.

My first question is, have you ever been deposed before?

A. No. This will be my first time.

Q. Just for some ground rules, I will be asking you questions and you'll answer. Ms. Zahn is going to take down everything we're saying, as she is right now. So please wait until I finish my question before responding, and I'll do my best to wait until



you're done responding before I ask another question.

Please also articulate your answers because nods of the head are not going to be reflected when she's typing.

Also, if you need a break at any time, please let me know. And if you don't understand a question that I ask, please ask me to rephrase it and I'll be happy to do so. Okay?

A. Okay.

Q. All right. Please first state your name, address, and occupation.

A. My name is Jeffrey Earl McCreary. I reside at 804 Lord Leighton Court in Virginia Beach, and I'm an information specialist of the public library system at the oceanfront branch.

Q. Okay. And how long have you lived at Lord Leighton Court?

A. Since November of '96.

Q. And where did you live before that?

A. In Cardinal Estates, 2901 Finch Avenue. I moved there in August of 1976.

Q. Okay. How long have you lived in Virginia Beach, since '76?

A. October/November '76.

Q. What is the address that you lived in in

Go ahead. You can answer it again.
·Y MR. BRYANT:
Q. What I'm finding difficult to understand .s if you've experienced it for the last six and a ıalf years, how did you not expect it to be for -- for jet noise to be in the vicinity of your home tomorrow or the day after that or the day after that?
A. Technology should be progressive. Used to be at Cardinal Estates the noise of the test engines were a real bother. For hours on ends they would run these engines. You couldn't hear yourself. They built a hush house. So it became less of problem. Technology fixed that problem.
Q. When did they build the hush house?
A. I couldn't say exactly when, but at ardinal Estates you no longer hear the sounds of those engines being tested for seemingly hours on end. o that's technology progressing.
I would expect technology to progress to n extent that they are not going to get louder.
Q. So then you expect for this technology, his sound attenuation technology, to take place vernight --
A. No.
Q. -- and muffle the sound?



A. No. I have only been here since '76 and here have been great advances. But when they keep lying farther and farther away from what had been a erceived landing pattern, what had not been a problem n the neighborhood before, is now a continual problem n the neighborhood, should we accept it? No.
Q. I'm not asking you to accept it. You aid now it's a continual problem. Do you expect that roblem to continue through next month?
MR. FERREBEE: Again, I'm going to bject. We're on the eighth time you asked him if he xpects it; he answered he did not expect it. I don't now what you're going to get out of him. We can be ere for the next six weeks and you'll get the same nswer.
Go ahead.
A. If they move-if they have moved all the ets to Fentress, I would not expect them to move them o Fentress; so if they did move them to Fentress, I ould not expect to hear jet noise next week.
Q. Okay.
A. If the noises did come back, it's a jet, e live where we do; do I expect it? No, I don't xpect it.
Q. Okay. So you describe what you're



experiencing as a continual problem; is that correct?
A. Yes.
Q. Okay. Do you expect that that problem, that continual problem, is not going to be a problem tomorrow?
A. Sometime in the future, I hope something is done about it. But I don't know who, I don't know how, and I don't know when.
Q. Okay. Exactly.
So at some indeterminate time in the future you expect it to no longer be a problem; is that right.
A. If something is done about it.
Q. Okay.
A. Or I die.
Q. So if nothing is done about it, then you would expect --
A. To be a continual irritation.
Q. -- for the irritation to continue?
A. Yes.
Q. Okay. Have you kept a log of these flights at all?
A. No, I didn't.
Q. Any sort of records at all?



A. No.
Q. Your wife, has she done that?
A. No.
Q. Have you taken any photos or videotapes or anything?
A. No.
Q. Have you filed any noise complaints with the air station?
A. No.
Q. Have you discussed jet noise with any -- any personnel from the Navy?
A. No.
Q. Have you communicated your irritation with the jet noise to any public officials?
A. No.
Q. Are you a member of the group CCAJN?
A. I get their newsletter. I've never attended any of their meetings.
Q. Okay. Have you ever attended any public meetings or hearings related to jet noise?
A. No.
Q. Have you considered selling your house because of the jet noise?
A. No.
Q. Is the reason for that because you

# EXHIBIT I

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, )
et al., )
)
Plaintiffs, )
)
v. ) NO. 01-201L
) Judge Victor J. Wolski
THE UNITED STATES OF AMERICA, )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION
OF HAROLD LEVENSON
TAKEN ON BEHALF OF THE DEFENDANT

Virginia Beach, Virginia

June 8, 2005

Appearances:

SHUTTLEWORTH, RULOFF GIORDANO & SWAIN, P.C.
By: STEPHEN C. SWAIN, ESQUIRE
Counsel for the Plaintiffs



Appearances (Cont'd.)

U. S. DEPARTMENT OF JUSTICE
By: STEVEN D. BRYANT, ESQUIRE
KELLE S. ACOCK, ESQUIRE
And
DEPARTMENT OF THE NAVY
COMMANDER NAVY REGION ATLANTIC
By: DOMINICK G. YACONO, ESQUIRE
And
DEPARTMENT OF THE NAVY
NAVY LITIGATION OFFICE
By: J. PAGE TURNEY, ESQUIRE
Counsel for the Defendant



INDEX


| DEPONENT | | PAGE |
|---|---|---|
| Harold Levenson | By Mr. Bryant | 4 |


EXHIBITS


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 32 | Subpoena and Notice of Taking Deposition - Duces Tecum | 14 |
| 33 | Tax assessment for 2004 Brickell Court | 55 |
| 34 | Plaintiffs' Answers to Interrogatories Harold and Elaine Levenson | 78 |
| 35 | Deed dated July 25, 2003 | 82 |
| 36 | Deed dated 7 August 1986 | 83 |
| 37 | Settlement statement datedd April 17, 1987 | 84 |
| 38 | Deed of Trust dated April 17, 1987 | 85 |




Deposition upon oral examination of HAROLD LEVENSON, taken on behalf of the Defendant, before Frances P. Zahn, RPR-RMR, a Notary Public for the Commonwealth of Virginia at large, taken pursuant to notice, commencing at 9:10 a.m. on June 8, 2005, at the offices of Shuttleworth, Ruloff, Giordano & Swain, 4525 South Boulevard, Virginia Beach, Virginia; and this in accordance with the Federal Rules of Civil Procedure.

HAROLD LEVENSON was sworn and deposed on behalf of the Defendant, as follows:

EXAMINATION

BY MR. BRYANT:

Q. Mr. Levenson, my name is Steve Bryant from the Department of Justice. How are you today?

A. Fine. I'm listening to you.

Q. What we're going to have is a deposition which I will ask you questions and you will answer them. Mrs. Zahn is taking down everything we're saying, so please allow me to finish my questions before responding so we're not talking over one another.

MR. SWAIN: Each time he's asking you a question, wait until he completes that question in its entirety, and then give him a response.

THE DEPONENT: Okay.

consistent as the Navy would like them to be. And that's the reason they are training. I mean that's the reason that Oceana operates, because the pilots are learning how to make an ideal or perfect landing on a carrier, and if they were able to do that every single time out of the box then they would land in the same flight trajectory. But they -- of course, wind conditions occur and there's individual differences between pilots and that kind of thing, yes.
Q. But when talking about that, sometimes it's to the left, sometimes it's to the right?
A. Yes.
Q. The distance changes somewhat?
A. Yes.
Q. Is it roughly the same on this side as the same on that side? Is it about -- you are like right on the flight path, in the middle?
A. I had the occasion -- I've been waiting for the moment to tell you this story. I had the occasion to have a telephone conversation with Ray Furenzi and Bobby Rountree. You know who they are?
Q. Yes, I do.
A. This conversation must have taken place two years ago, maybe. Ray was in his office. Bobby was in Ray's office. He put me on a speakerphone. We had about a 45, 60 minute conversation. The reason for the conversation was



that I was wanting to get Ray to have a pilot -- Bobby is a retired pilot working in a civilian capacity with Ray -- explain to me why when the overflights occur sometimes the noise is much louder than at other times. Why there was the variation of noise levels as the planes were flying over my house. So we had this conversation. Very pleasant conversation. Rountree is a fine guy. And Ray is a fine guy too.
And Rountree looked at his maps in Ray's office, and we agreed that the overflights were going to be at about 400 to 500 feet over my house. Okay? And that if the pilots were flying the perfect trajectory to land on the short runway that they would come approximately over my house. And that was part of the conversation for 45 or 60 minutes. So that is how I know without having to measure in some other way that the altitude, when the planes are landing on a short runway over my house, is about 4 to 500 feet. Because I take Bobby Rountree's word for it.
Q. And in terms of -- not just the altitude that you mentioned, the location in relation to your house?
A. Yes.
Q. In terms of --
A. Yes. I know what you're asking. What is the percentage of the time they fly directly over my house as opposed to the percentage when they fly 50 feet, or 100



feet, or 150 feet. Is that what you want to know?
Q. Yes.
A. To be honest with you I really wouldn't want to guess. I mean have I kept statistics? No. Do I have a clear recollection? You know, have I modeled in my head, you know, what the percentages are of that? No. All I can tell you is a certain amount of time, a goodly amount of the time they fly directly over my house.
And that shouldn't be a surprise to anybody, because, as I am sure you know by now, the purpose of the training at Oceana is to get the pilots to make a perfect landing on a carrier. If they make a perfect landing they would -- it doesn't happen this way, but they would fly in a certain trajectory, and that trajectory, as I have experienced it myself, and as the gist of the discussion was that day with Rountree and Ray -- Ray was just listening; Rountree was doing most of the talking -- comes over my house, yes.
Q. Now going back to before you bought the house?
A. Yes.
Q. You mentioned that you were aware of NAS Oceana?
A. I was aware only in my capacity as the news director of WAVY that periodically in our newscast there were stories about NAS Oceana. That's all I knew.
Q. And did you know where the location of Naval Air

Station Oceana was?
A. Only very vaguely. I knew it was somewhere in Virginia Beach, somewhere near the house. That's all I knew.
Q. And --
A. I now know where it is.
Q. I figured as much. But before you moved in, you did know it was near the house?
A. No. No. I don't really think I did. I knew that the sellers of the house were a Navy officer. I knew that, I had started working at WAVY, and I knew we did stories from time to time about Oceana. I knew that Oceana was somewhere in Virginia Beach. Somewhere. But I mean on the days when we looked at the house, were there any overflights at the house when we looked at it? Absolutely none. No.
Q. Did you inquire with -- well, the naval officer you bought the house from --
A. Yes.
Q. -- was he an aviator?
A. I don't think so, but I'm not sure. Did he tell me about overflights of the house? Absolutely not.
Q. Did you ask him about that at all?
A. No. Not that I recall, no.
Q. Did you inquire at the air station about

# EXHIBIT J

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, )
et al., )
)
Plaintiffs, )
)
v. ) NO. 01-201L
) Judge Victor J. Wolski
THE UNITED STATES OF AMERICA, )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION
OF SEAN M. RYAN
TAKEN ON BEHALF OF THE DEFENDANT

Virginia Beach, Virginia

April 27, 2005

Appearances:

SHUTTLEWORTH, RULOFF GIORDANO & SWAIN, P.C.
By: STEPHEN C. SWAIN, ESQUIRE
Counsel for the Plaintiffs

U. S. DEPARTMENT OF JUSTICE
By: STEVEN D. BRYANT, ESQUIRE
DOMINICK G. YACONO, ESQUIRE
Counsel for the Defendant





INDEX

DEPONENT PAGE

SEAN M. RYAN By Mr. Bryant

EXHIBITS

NO. DESCRIPTION PAGE

3 Signed page of real estate contract, Bates OCE223263 .................................. 44

4 Appraisal of 1856 Pathfinder Drive .............. 67

5 Partial complaint ................................ 77

6 Plaintiffs' Answers to Interrogatories, Plaintiffs Sean and Graciela Ryan ................ 86

7 Invoice from Home Front Contracting, Inc. to Mr. & Mrs. Sean Ryan ......................... 93

8 Deed of Bargain and Sale, from Richard M. Kemp to Sean M. Ryan and Graciela F. Ryan ........... 94

9 Deed of Trust ..................................... 95

10 AICUZ map (retained by Mr. Bryant) .............. 111





Deposition upon oral examination of SEAN M. RYAN, taken on behalf of the Defendant, before Frances P. Zahn, RPR-RMR, a Notary Public for the Commonwealth of Virginia at large, taken pursuant to notice, commencing at 12:25 p.m. on April 27, 2005, at the offices of Shuttleworth, Ruloff, Giordano & Swain, P.C., Virginia Beach, Virginia; and this in accordance with the Federal Rules of Civil Procedure.

SEAN M. RYAN was sworn and deposed on behalf of the Defendant, as follows:

EXAMINATION

BY MR. BRYANT:
Q. How are you, Mr. Ryan?
A. Good.
Q. I'm Stephen Bryant from the Department of Justice, along with Commander Yacono on behalf of the Navy. We're here on behalf of the United States. First I'd like to know if you have ever been deposed before so I'll go over the ground rules. Have you ever been in a deposition?
A. No.
Q. It's a question and answer sort of thing, and I'll ask questions throughout. You need to answer them. She's going to be taking everything down verbatim so we can't talk over one another, and please verbalize your answers. Don't nod or say uh huh because that can get





mistranslated.
A. Yes.
Q. Thank you. And if you need a break at any point during this, just feel free to say so at any time and we'll stop. For a bathroom break, whatever you need, that's fine.
And if you don't understand the question I ask, please let me know and I'll rephrase it.
A. Fine.
Q. First, I'd like to ask, have you ever been a plaintiff or a defendant in another case before?
A. Yes, I have.
Q. Okay. Can you tell me about that. How many times, first?
A. Just once.
Q. Just one case?
A. It was an accident that occurred to me on board ship.
Q. And when was that?
A. This was back in -- I'm not really sure about the date, but it was like '90 -- early '90s.
Q. And you say it was on a ship. What happened?
A. A line was hooked around a fairlead and the horn of the fairlead parted and the line hit me and I got hurt.
Q. I don't know what any of that -- what a fairlead is?

A. It was.
Q. Okay. And when did it become unsuitable?
A. Well, it started to get bad, real bad, you know, when the Hornets were coming, and they -- they, you know, when they started getting more and more jets at the base, there were more jets, more flyovers. And that's what made it getting bad.
Q. Okay.
A. It steadily got louder and louder.
MR. BRYANT: I'd like to mark this partial complaint as DX 5, I guess is the next number?
(Partial complaint was marked Defendant's Exhibit No. DX005.)
(Discussion off the record)
BY MR. BRYANT:
Q. I think I may have shown you this before, Mr. Ryan. OCE222981 through OCE223005. It's Plaintiffs' Answers to Interrogatories from the Plaintiffs Sean and Graciela Ryan.
I hand this back to you.
MR. BRYANT: I think we have another copy if you'd like to see it, Mr. Swain.
BY MR. BRYANT:
Q. If you could go to page 24 of that document, please. It has your name and your wife's name but no





signature.
A. No. I guess we forgot that one.
Q. Well, what I'm trying to get at is, I'd like you, with that said, I'd like you to review the document and see if you have ever seen it and if you agree to the answers that are in there on your behalf.
MR. SWAIN: Would, after you finish the question about the interrogatories, be a good time to take a break?
MR. BRYANT: Absolutely.
BY MR. BRYANT:
Q. Take your time reviewing that. Don't let me rush it.
A. Well, I remember talking to Jack about this. I don't know why I didn't sign it.
Q. Did you see this document?
A. I do believe so.
Q. All right. I'd like you to turn -- once you are done -- let me know when you are done reviewing it.
A. Okay. I have seen it before.
Q. And you agree with the contents?
A. Yes.
Q. Okay. On page 6, if you would go to -- it discusses in the middle of subparagraph C in the response about aircraft operating in a pattern with several aircraft circling every few minutes, do you experience that at your





house in Upton Estates?
A. One flyover every couple of minutes.
Q. Several aircraft circling every few minutes directly over and around the plaintiffs' home. I'm trying to figure out if this part of the answer applies to your house or not. That's what I'm trying to get at.
A. Yes. They fly over.
Q. When you say they fly over, let's start with that. Directly over your house?
A. Sometimes. I'm not going to say all the time.
Q. And when you say, literally looking up it's directly over your house?
A. Yes.
Q. How high in the air, altitude?
A. I don't know. You can see them pretty close. I don't know.
Q. Can you see the pilots' faces?
A. I'm looking underneath it. I can't see the pilot.
Q. Are we talking 100 feet, 1,000 feet, 2,000 feet? What are we -- you've been around airplanes for a long time.
A. I guess -- I don't know. Four, 500 feet I guess.
Q. 500 feet above your house?
A. Yes. I guess. Maybe more. Maybe less. I don't know. To look up there and, you know, to tell you the truth





I really don't know how big those planes are. But -- yes. They are -- you can see them fairly, real clear.
Q. Okay.
A. I don't know how high they are. No, I don't.
Q. And were the aircraft, the jets, when they flew over, when you moved in in '96 and '97 and '98, were they also flying in that same pattern above your house?
A. Yes. We were having flyovers. But I don't know if it's the same -- maybe close to it. But I don't know if it was the same, you know, path.
Q. Well, was it --
A. They were the same proximity, yes.
Q. Some were over your house?
A. Yes.
Q. And some weren't?
A. Yes.
Q. Were they the same altitude, roughly?
A. Yes. But sometimes they are higher and sometimes they are lower. You know, they are not all exactly --
Q. Sure.
A. -- at the same height.
Q. So what would you estimate the range of altitudes. You said sometimes 500, maybe 1,000. What did you say?
A. Something like that. I'm not sure on the

heights. I really don't know.
Q. Okay. What percentage of the flights are directly over your house? Starting in 1999 when you said it became unbearable.
A. I would say like about 46, 48 percent. Not all of them. And not quite half of them.
Q. So just under half -- just under 50 percent of the flights were directly over your house?
A. Right. The small half.
Q. I understand. Just under. So the remaining 60 whatever percentage?
A. They were --
Q. Or 55, whatever?
A. They were not -- they were like over a little bit.
Q. And when you say over a little bit, blocks?
A. Sir, I don't know. Maybe a block over.
Q. Within a couple of blocks?
A. Yes, sir. Street, you know.
Q. So, in other words, all the flights that you experienced are either directly over your house or within a couple of blocks of your house?
A. From my house being the center. Okay? You probably could go five blocks each way. Okay?
Q. And that includes all the flights that you are





being exposed to?
A. Well, the low ones. The lower ones are in that area. The higher ones are maybe a little off from that.
Q. And when you say a little off from that, what do you mean?
A. Add a couple more blocks to each side.
Q. So within maybe even a five block radius, that's all the flights in terms of noise that you are experiencing?
A. Yes. My house being the center.
Q. And so are half on one side of your house and the other half on the other side?
A. I don't know the percentage.
Q. All right. And it was roughly the same sort of five block radius when you moved in in '96?
A. I would say, yes.
Q. Yes. So when you were doing that search for -- you were looking for a house, how many houses did you say you looked at in the neighborhood?
A. A few. I don't know the exact number. Maybe 15.
Q. Yes. I think you said 10 to 15. Did you consider picking another one of the houses that might not have been directly under the center of that flight path that you were observing?
A. Well, no. That didn't come into play, to tell you the truth, no. We were looking for the criteria of the





house and not the flight path of the jets.
Q. And aircraft noise was not a concern?
A. Not at the time.
Q. We'll take that break in just a minute. I'm almost finished with this.
Now going back to my original question, you said earlier in an August 1999 party you had, you had basically -- correct me if I am wrong -- four individual flyovers.
A. I would say four, yes.
Q. Three to four, whatever it was?
A. Right.
Q. What I'm trying to figure out is --
A. But I said that there were three to four jets that weren't clustered that would go over at a time, one right after the other.
Q. Three to four jets roughly together but not right next to each other?
A. No. One behind the other.
Q. So in sort of a pattern kind of thing?
A. Right.
Q. And that happened in '99?
A. The party in '99.
Q. And it happened -- did it happen before in '96 through '98?
A. It might have done that.





Q. Did it happen when you were looking at the houses?
A. They were -- I remember that there were some jets that flew over, yes. I don't remember what flight path they were in, or whatever.
Q. I'm saying were there groupings? That's what I'm getting at. Did you have three at a time, that kind of thing? Were they still spread out a little bit?
A. I think they were spread out. They weren't wing to wing.
Q. I mean one behind the other. That's what I'm talking about?
A. Well, sure. Yes.
Q. So you had that in '96, and even before you bought the house?
A. Right.
Q. Before '99, when you were outside having a party, or barbecue, or whatever else, and the planes flew over, could you talk and hear each other?
A. No.
Q. Did you have to turn up the TV?
A. Certainly. Yes.
Q. And I'm talking about before '99. That's what I'm talking about now, not after?
A. Yes.

Q. And phone conversations, the same sorts of problems?
A. Yes.
Q. So you had the same sorts of problems before and after '99?
A. Right.
Q. In terms of the enjoyment of the house?
A. Right.
Q. All right. Let's mark this exhibit as DX006, please. I'm sorry. The Plaintiffs' Answers to Interrogatories, Plaintiffs Sean and Graciela Ryan.
(Plaintiffs' Answers to Interrogatories, Sean and Graciela Ryan, was marked Defendant's Exhibit No. DX 006.)
MR. BRYANT: We can take a break now.
(Recess)
BY MR. BRYANT:
Q. I want to turn back to -- what is your current occupation?
A. Merchant mariner.
Q. And is it ABS?
A. No. I sail boatswain now.
Q. Say that again. I'm sorry?
A. I sail boatswain.
Q. Can you -- what do you do in that position?





A. I supervise the maintenance of the ship.
Q. And where does that take place?
A. Well, different places all over the world, whatever ship I'm going on.
Q. So you deploy with the ships?
A. I work for a union and the shipping companies have ships. Right now, I'm employed by Maersk Line Limited.
Q. Can you -- sort of explain this to me because I don't really understand it. In terms of supervising the maintenance of the ships?
A. Right.
Q. How and when do you do that? Is it nine to five?
A. Eight to five. I'm usually a day worker. I'm not a watch-stander. And when guys come out for overtime, I tell them what needs to be done to the ship, and they do it. Chipping and painting.
Q. And does this occur in Virginia Beach, or does it occur elsewhere in the world?
A. Elsewhere in the world.
Q. What types of locations?
A. Well, May 9 I'm flying to Dubai to catch a ship.
Q. How often are you away from this area?
A. I usually work four and four.
Q. Four months here, four months away?
A. All right. But that's not every time. This time





it's going to be eight and five. Eight here, five at work. Or four.
Q. And when you are here, if it's four and four, the four months that you are here, what are you doing during that time period?
A. Messing around my house.
Q. So you have --
A. I have a barn.
Q. If we can go sort of over time, in 1999 do you recall, were you working in the same position in 1999? When did you start with this?
A. Yes. I was sailing boatswain in '99. I think I started sailing boatswain sometime around '99.
Q. What were you doing just before that?
A. I was an AB.
Q. AB. Okay. And were you deployed as an AB also?
A. Yes.
Q. I said deployed in the colloquial sense. And that's with the same company?
A. No. Different companies.
Q. I'm getting them mixed up now. I'm sorry.
When you were an AB, what was the time period you were an AB?
A. From -- I guess I started sailing AB in '88.
Q. Through?





A. I guess '99. Something like that.
Q. Okay.
A. I'd have to check my records. I don't know.
Q. And with that position, how often were you away from this area?
A. Four months.
Q. The same four and four kind of thing?
A. Well, no, I worked. Usually, I was what they call tramping. I was worked for anyone. I didn't have a permanent job. So I would work four months, and probably stay home six.
Q. And then sometime in '99, do you recall what month you became a maintenance supervisor?
A. I don't know. I'd have to check my records.
Q. And when you first joined this company, this is a unionized thing?
A. It's for a union, yes.
Q. What was your first assignment?
A. With the union?
Q. Yes. With this new position that you took in '99?
A. What was my -- where did we go?
Q. Yes. I'm trying to figure out what your first --
A. Oh, we carried tractors to the Ukraine.
Q. To Ukraine?

# EXHIBIT K

1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, )
et al., )
Plaintiffs, )
)
v. ) No. 01-201L
) Judge Victor J. Wolski
THE UNITED STATES OF AMERICA, )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION OF
EILEEN MAY
TAKEN ON BEHALF OF THE DEFENDANT
VIRGINIA BEACH, VIRGINIA
MARCH 9, 2006

2

Appearances:

HOFHEIMER/FERREBEE, PC
By: JACK E. FERREBEE, ESQUIRE
Counsel for Plaintiffs

U.S. DEPARTMENT OF JUSTICE
By: KELLE S. ACOCK, ESQUIRE
and
DEPARTMENT OF THE NAVY
COMMANDER NAVY REGION ATLANTIC
By: DOMINICK G. YACONO, ESQUIRE
and
DEPARTMENT OF THE NAVY
NAVY LITIGATION OFFICE
By: MARY RAIVEL, ESQUIRE
Counsel for Defendant

3

I N D E X


| DEPONENT | PAGE |
|---|---|
| EILEEN MAY | |
| Examination by Mr. Yacono | 4 |


E X H I B I T S


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 147 | Notice of Appraisal | 32 |
| 148 | March 2005 Appraisal | 46 |


4

Deposition upon oral examination of EILEEN MAY, taken on behalf of the Defendant, before Kerry E. Zahn, Registered Merit Reporter, Certified Realtime Reporter, a Notary Public for the Commonwealth of Virginia at large, taken pursuant to notice, commencing at 1:10 pm on March 9, 2006, at the offices of Hofheimer/Ferrebee, PC, 1060 Laskin Road, Virginia Beach, Virginia.

EILEEN MAY was sworn and deposed on behalf of the Defendant as follows:

EXAMINATION

BY COMMANDER YACONO:

Q. Good afternoon, Ms. May.

A. Good afternoon.

Q. I'm Commander Dominick Yacono. I am the Regional Environmental Counsel at the -- for Commander Navy Region Mid Atlantic in Norfolk Virginia, and this is Miss Kelle Acock from the U.S. Department of Justice in Washington D.C.

A. Okay.

Q. I'm going to be asking you a series of questions today. If you don't understand a question that I ask you, please don't hesitate to ask me to

Q. Could you see the jets?
A. I don't recall.
Q. Okay. While you are living at the residence on Bedford Lane, did you have -- did you ever file a noise complaint with the folks at Oceana?
A. No.
Q. You mentioned you lived at that residence on Bedford Lane for nine years. Why did you move from that residence?
A. My husband passed away in the house. Well, not in the house, but almost in the house. When he died -- and I wanted to buy the house. I had wanted to buy the house. We had wanted to buy the house. The landlord kept promising maybe one day he would sell it. His wife didn't want to move back here.
So when my husband died, it was very sudden, and there was a house down the road that we had been looking at, and I just went ahead with that and purchased that house.
Q. And that's the house you're currently living at, 620 Little Neck Road?
A. Yes. That's correct.
Q. I just want to make sure. When you



moved out -- your motivation for moving out of Bedford Lane was the passing away of your husband, or was it for other reasons?
A. Well, actually, it was pretty much the passing away of my husband. I didn't want to be there anymore for that reason. I was uncomfortable there.
Q. Okay.
A. That's --
Q. With regard to the -- your current residence at 620 Little Neck Road, how long of a house-hunting were you doing when you found that residence?
A. Three, four months.
Q. Were you using a realtor --
A. Yes.
Q. -- or were you on your -- do you recall what realtor you were using?
A. She's actually a friend of mine. I don't know who she was with at the time. Her name is Janice Meyers Hollowell.
Q. Can you spell the last name for the court reporter?
A. Which? Oh. Janice Meyers, M-E-Y-E-R-S, and H-O-L-L-O-W-E-L-L.
Q. Do you remember what firm she was



associated with at that time?
A. I think she was ReMax, but I couldn't swear to it.
Q. Okay. With the residence at 620 Little Neck Road, did you find it or did your friend the realtor find it for you?
A. Well, we lived very close to that house, so -- it was for sale. My husband and I looked at it. At -- the funny thing was, it would go on the market, then come off the market. And we assumed it was sold. It would come on the market and go off the market. So we didn't know what was going on with the house.
To make a long story short, he passed away, and I wanted to move, and the house was on the market.
Q. Okay.
A. So we -- I looked at it, and I tried to keep my children in the same school district. They had enough to deal with with their dad dying. So that was very -- in the same everything.
Q. So for that 620 Little Neck Road, the school districts were exactly the same?
A. Except for elementary would have been Kingston, but they were already through there. They were into junior high and high school at that point.



Q. And this is 1993?
A. -- three. He died November 12, 1993.
Q. So in terms of your house-hunting, you pretty -- you limited yourself to this Kingston area?
A. Yes, I sure did.
Q. Before you decided to purchase the home on 620 Little Neck Road, did you notice military jets flying around that home or hear the noise at that home before you purchased the home?
A. No.
Q. Okay. When you moved into the residence at 620 Little Neck Road, how soon after you moved in did you hear military jet noise?
A. I lived there for a while before I really noticed jet noise.
Q. When was -- just estimate what year you think you first heard jet noise.
A. It was years. It was a couple years. Probably in 1997/'98.
Q. Okay. Why does '97/'98 stand out to you? Do you recall anything specific?
A. I put a pool in, inground pool in my yard. I remember for years nothing bothered me. I'm just guessing a couple years. It didn't bother me. I

ould be on the phone, in my deck, on the pool, loating, no problem. Then it just seemed to get ouder.

Q. This is pretty much you noticed it rimarily from your experience while being outdoors at he pool?

A. Well, that's the worst. You can't even tay there when they are going overhead when you're in he pool, or especially if you're on the phone you ave to -- I have a terrible habit of taking my phone o the pool and laying on my chair talking.

Q. Okay.

A. Portable phone.

Q. Okay.

A. Or cell phone.

Q. But this was '97/'98?

A. Something like that.

Q. Okay. After that you mentioned -- obviously you mentioned it while outdoors; what about on the indoors? Same thing in terms of radio and television in terms --

A. Yes, turn that up. But I don't watch a lot of television, so, I mean, especially during the day, which is -- I seem to recall them mostly being day or late in the afternoon, like dinnertime area,



around there, and my TV is not usually on during the day.

Q. What about phone conversations?

A. Phone conversations, yes.

Q. Did you ever have to pause?

A. Pause, stop, or call back, yes.

Q. Okay. Now, from what you just described to me, from '97/'98 -- '97/'98 to the present day, has anything changed in terms of frequency or periodicity in terms of military jet noise?

A. I haven't noticed it as much lately, just in the last -- but I don't know. I'm in the house more, so I don't know. I mean, my pool is closed.

Q. When you're outdoors at your current residence, can you see the military jets flying in and out?

A. Not necessarily the jets, but I can see the trails, whatever they call them, white smoke that looks like line -- my mother used to -- yes, sir.

Q. You can see the trails?

A. Yes. Currently. I have seen -- I have looked up and seen, you know.

Q. That's what I'm asking. From '97 --

A. Oh.



Q. -- when you moved into your home in '94, 620 Little Neck Road --

A. Yes.

Q. -- when did you first observe, when you actually physically sighted a military jet?

A. You want the year?

Q. Just the year.

A. Well, I would have to say 1997 if I had to pin a year down then.

Q. So from '94 to '97 --

A. No.

Q. -- you didn't see a military jet?

A. No.

Q. Did you hear them at least during that time?

A. As I said, I remember them becoming a very big nuisance roughly three to four years after I moved in, but not at the beginning.

Q. Okay. Now, from -- in '97/'98 when you said you were able to see -- at least you were able to see a military jet, could you estimate at what altitude the jet was at?

A. Well, you saw how I did on that map. I'm not real good -- I mean, I couldn't see anybody in the plane or anything like that. I could just see



like the gray, the metal.

Q. Okay. Could you see any markings on the plane, numbers, letters?

A. Not that I recall, no.

Q. Okay. And from '97/'98 to the present day, has that changed? Can you see any markings on the jets?

A. No.

Q. Okay. Can you see the pilot?

A. No.

Q. Okay. From the time you moved into your current residence up to the present day, have you ever filed a noise complaint with any of the folks at the Naval Air Station Oceana?

A. I never filed a complaint that I can recall. I went on a website and filled out stuff, but I don't know if that was actually -- it might have been a complaint.

Q. All right.

A. That's how I got involved in this. I don't know if it was a complaint, per se.

Q. Okay.

A. See, well, I didn't know you could, being a military town. I thought that was part of day-to-day life, just dealt with it. I'm not too big

# EXHIBIT L

4836

# HARRIS, MILLER, MILLER & HANSEN, INC - NOV 1984; PREPARED UNDER CONTRACT # N00025-82-C-0002, AICUZ OFFICE, NAS OCEANA

C 1. Annual Operations and Average Day

Noise Contours are normally based on "average busy day" operations; this is the number of operations that occurs during a 24-hour period when the station is in full operation. The tower maintains daily and annual summaries of these operations. An examination of tower counts indicates that at NAS Oceana the busiest months are March and August. The average weekday operational level during those months is approximately 125 percent of the annual average day. (The annual average day is annual operations divided by 365 days). Therefore the noise contours are based on 125 percent of the annual average daily operations. Table 2 gives the total annual operations for 1980 through 1982.

C 2. Operations by Aircraft Type

To compute the number of daily operations flown by each aircraft type, each squadron provided for its aircraft estimates of annual numbers of departures, arrivals and patterns flown. These numbers were added for all aircraft types, then used to determine percent of total operations by each type. The grand total of the operations data provided by the squadrons was approximately five percent higher than the total from Air Traffic Control (ATC) counts. To be consistent with the ATC counts, we adjusted the squadron totals downward proportionately. We then developed operations numbers for an average busy day. The resulting numbers of operations are given in Table 3.

Use of individual flight tracks by aircraft type is determined by combining runway utilizations provided by the Tower, and shown in Table 4, with flight track utilization provided by the squadrons. These percentages are multiplied by the numbers of operations of Table 3.

Table 4 gives the flight track labelling conventions followed to distinguish the various types of flight tracks. Table 5 is a summary of operations by aircraft type and by type of activity. Tables 6 and 7 list the numbers of operations by runway, flight track and type of activity for Oceana and Fentress, respectively. Figures 3 through 6 depict the corresponding flight tracks.

Two notes concerning these operations are necessary. First, as indicated in Table 5, operations of certain aircraft are omitted since they contribute so little to total noise contours and thus would add only to the complexity of the noise computation process, not to its accuracy. The F-5E, T-2C and TC-4C were omitted at NAS Oceana and the E-2 and C-1 were omitted at ALF Fentress. Second, general aviation activity is also omitted because it would have no noticeable effect on contours.

TABLE 2

NAS OCEANA AND ALF FENTRESS

ANNUAL OPERATIONS

| YEAR | NAS OCEANA ANNUAL OPERATIONS | ALF FENTRESS ANNUAL OPERATIONS |
|---|---|---|
| 1982 | | |
| TOTAL ANNUAL OPS | 177486 | NA |
| LESS ENROUTE OPS | -15977 | NA |
| TOTAL STATION OPS | 161509 | 96062 |
| 1981 TOTAL ANNUAL OPS | 231753 | 90928 |
| 1980 JAN - OCT ONLY | 120816 | 74006 |

*Source: Air Traffic Activity Report
Note: Patterns are counted as two (2) operations

TABLE 3

NAS OCEANA AND ALF FENTRESS

RUNWAY UTILIZATIONS

NAS OCEANA

| RUNWAY | UTILIZATION(%) |
|---|---|
| 05 | 44 |
| 14 | 3 |
| 23 | 30 |
| 32 | 23 |

ALF FENTRESS

| RUNWAY | UTILIZATION(%) |
|---|---|
| 05 | 60 |
| 23 | 40 |

TABLE 4

NAS OCEANA AND ALF FENTRESS

FLIGHT TRACK DESCRIPTIONS

| Flight Track Suffix | Flight Track Description |
|---|---|
| A | Departures |
| B | Interfacility Departures |
| D | Patterns |
| E | Straight-In Arrivals |
| G | Overhead Arrivals |

TABLE 5

NAS OCEANA AND ALF FENTRESS

1982 AVERAGE BUSY DAY OPERATIONS

NAS OCEANA

| AIRCRAFT TYPE | ARRIVALS DAY | ARRIVALS NIGHT | DEPARTURES DAY | DEPARTURES NIGHT | TOUCH AND GO DAY | TOUCH AND GO NIGHT | PATTERNS FCLP DAY | PATTERNS FCLP NIGHT | PATTERNS GCA DAY | PATTERNS GCA NIGHT | PATTERNS ACLS DAY | PATTERNS ACLS NIGHT | TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A-6 | 7.31 | 2.98 | 8.55 | 1.74 | 33.97 | 11.90 | 6.32 | 9.79 | 2.60 | 2.85 | 0.25 | 0.12 | 84.3[illegible] |
| A-4 | 14.50 | 0.87 | 14.88 | 0.50 | 5.21 | 0.66 | 0.00 | 0.00 | 2.85 | 0.04 | 1.12 | 0.12 | 40.75 |
| F-14 | 63.60 | 17.11 | 64.34 | 16.36 | 101.29 | 19.34 | 4.96 | 4.96 | 71.65 | 23.80 | 3.84 | 7.07 | 398.33 |
| F-5E | 6.45 | 0.12 | 6.57 | 0.01 | 3.60 | 0.04 | 0.00 | 0.00 | 0.00 | 0.09 | 0.62 | 0.00 | 17.6[illegible] |
| T-2C | 2.60 | 0.12 | 2.60 | 0.12 | 0.99 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.25 | 0.00 | 6.[illegible] |
| TC-4C | 1.49 | 0.04 | 1.39 | 0.04 | 0.37 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.0[illegible] | 0.00 | 3.1[illegible] |
| TOTALS | 95.95 | 21.24 | 98.83 | 18.77 | 145.43 | 31.94 | 11.28 | 18.75 | 77.11 | [illegible] | 6.98 | 7.31 | 554.98 |

ALF FENTRESS

| AIRCRAFT TYPE | ARRIVALS DAY | ARRIVALS NIGHT | DEPARTURES DAY | DEPARTURES NIGHT | TOUCH AND GO DAY | TOUCH AND GO NIGHT | PATTERNS FCLP DAY | PATTERNS FCLP NIGHT | PATTERNS GCA DAY | PATTERNS GCA NIGHT | PATTERNS ACLS DAY | PATTERNS ACLS NIGHT | TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A-6 | 1.30 | 1.30 | 1.30 | 1.30 | 0.00 | 0.00 | 27.26 | 27.25 | 0.00 | 0.00 | 0.00 | 0.00 | 57.92 |
| F-14 | 5.20 | 5.20 | 5.20 | 5.20 | 0.00 | 0.00 | 108.30 | 108.30 | 0.00 | 0.00 | 0.00 | 0.00 | 237.40 |
| E-2 | 1.80 | 1.80 | 1.80 | 1.80 | 0.00 | 0.00 | 39.59 | 39.59 | 0.00 | 0.00 | 0.00 | 0.00 | 86.38 |
| C-1 | 1.00 | 0.00 | 1.00 | 0.00 | 0.00 | 0.00 | 18.75 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 16.75 |
| TOTALS | 9.30 | 8.30 | 9.30 | 8.30 | 0.00 | 0.00 | 189.90 | 175.15 | 0.00 | 0.00 | 0.00 | 0.00 | 400.25 |

NOTE: (1) Each pattern is counted as 2 operations.

(2) F-5E, T-2C and TC-4C aircraft operations at NAS Oceana and F-2 and C-1 operations at ALF Fentress were not modelled since they do not contribute significantly to the noise exposure.

# EXHIBIT M

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **CAROLE AND ROBERT TESTWUIDE, et. al.,** **Plaintiffs,** **v.** **THE UNITED STATES,** **Defendant.** | **No. 01-201 L** **Honorable Victor J. Wolski** |

**DECLARATION OF CURTIS A. UTZ, NAVAL HISTORICAL CENTER**

I, Curtis A. Utz, Naval Historical Center, state as follows:

**INTRODUCTION AND QUALIFICATIONS**

1. My name is Curtis A. Utz. I am a historian with the Naval Historical Center (NHC) and have been the Head, Naval Aviation History Branch, Naval Warfare Division, NHC since December 2003. Previously I was a historian with the Contemporary History Branch, NHC, from August 1992 to September 1994. I was a historian with the Defense Intelligence Agency from September 1994 to November 2003.

2. I graduated from the University of Maryland, College Park in 1984 with a Bachelor of Arts Degree in History. I graduated from University of Maryland, College Park in 1989 with a Master of Arts in History; my area of specialization was 20th Century U.S. Naval and Military History and my thesis was entitled "Carrier Aviation Policy and Procurement in the U.S. Navy 1936-1940."

3. I have extensive experience as a reference historian and as a writing historian. A reference historian's primary mission is to provide answers to various requests for information based on the materials held in the collections of the institution for which the

historian works. The secondary role is to write reference publications (dictionaries, chronologies, etc.) that provide basic informational material in hardcopy or electronic formats. These publications are also based largely on the materials held in the collections of the institution for which the historian works. A writing historian researches and writes historical works, both narrative and interpretive studies, based on a wide variety of published sources, libraries and archival collections. I have published two monographs: *Cordon of Steel: The U.S. Navy in the Cuban Missile Crisis* (NHC 1993) and *Assault from the Sea: The Amphibious Landing at Inchon* (NHC 1994) and several articles. I also have extensive experience as an instructor and lecturer on historical topics, including the following: instructor of Modern Military History 1815 to the Present at the University of Maryland, College Park, (Spring semester 2006); lecturer on U.S. Naval Aviation for the U.S. Air Force Chief of Staff's Intern Program (Winter 2006)("interns" are Air Force officers); as well as numerous lectures on various topics for the Defense Intelligence Agency's Joint Military Intelligence Training Center and the Joint Military Intelligence College (1995-2003).

4. I currently direct the Naval Aviation History Branch, which performs reference work, publishes, and maintains an archive of Navy aviation records and related materials. The Naval Aviation History Branch answered over 4,000 reference requests during calendar years 2004 and 2005 and I have personally prepared numerous responses to a variety of customers including senior naval commands, Congress, and the Department of Veterans Affairs. I have assisted numerous visitors, researchers and scholars in using the materials held in our archive.

5. Because of my responsibilities as the Head of the Naval Aviation History Branch, I am familiar with and knowledgeable about the publications *Naval Aeronautical Organization* and *Allowances and Location of Naval Aircraft*, which I discuss below. These publications are among the holdings in the collection of the Naval Aviation History Branch

***Naval Aeronautical Organization***

6. The *Naval Aeronautical Organization* (NAO) was first published in 1923 by the Navy Bureau of Aeronautics to provide a basic description of the planned organization of Naval Aviation forces for the next fiscal year. The NAO was published annually until World War II, when publication became monthly. During the late 1940s and most of the 1950s, the publication schedule varied (monthly or semiannually). By July 1959 the NAO had become Chief of Operations Notice 05400 (OPNAVNOTE 05400) and was published semiannually to provide "a detailed presentation of the various naval aviation programs" as of 1 July and 1 January each year, and to be the "primary source of current base loading planning information."[1] The publication schedule changed again in 1977 when the data provided was as of 1 October and 1 April each year. The NAO provided "statistical information concerning the Naval Aeronautical Organization (NAO)." It was "primarily concerned with the current base loading of the aeronautical shore activities of the naval establishment."[2] Publication became annual in

[1] *Naval Aeronautical Organization*, OPNAVNOTE P05400 OP-501 Ser 01209P50 31 July 1959. "Purpose" cover letter (attachment 1 to my declaration).
[2] *Naval Aeronautical Organization*, OPNAVNOTE C5400, Ser 511/C233012 27 May 1977, "Purpose," page i (attachment 2 to my declaration). (The first zero in "05400" was dropped from the OPNAVNOTE in July 1970. The presence of the "C"-as in OPNAVNOTE C5400-indicates that the document was classified at the CONFIDENTIAL level when published. All documents cited in this declaration have been declassified.

1986, documenting the same data as of 1 October each year. Publication ceased after the 2001 edition.

7. The NAO provided a listing of each of the organizations and units that had their permanent duty station at each naval aviation base. For each unit, the listing included the number and type of aircraft and personnel assigned to that unit as of the date specified in the NAO. Therefore, one can determine from any NAO report the total number of aircraft assigned to the units whose permanent duty station was NAS Oceana (as of the date of the particular NAO report).

8. For example, the NAO of 1 April 1981, pages 30-32 (attachment 3 to my declaration), shows that Naval Air Station (NAS) Oceana, Virginia Beach, Virginia had 297 aircraft assigned to deployable fleet, reserve, and training units which had their permanent duty station at NAS Oceana as well as station aircraft (a small number of aircraft, usually helicopters, assigned to an NAS for search and rescue and local transportation missions). The 297 aircraft are based on the 81 aircraft assigned to Permanent Units[3] (pages 30-31) in column 2 (Aircraft On Board); the 202 aircraft assigned to Deployable (fleet) Units (page 32) in column 2 (Aircraft On Board); and the 14 aircraft assigned to Air Reserve Units (page 32) in column 2 (On Board Aircraft). These 297 aircraft comprised the following: 53 F-4 aircraft, 99 A-6 aircraft, 107 F-14 aircraft, 21 A-4 aircraft, 4 F-5 aircraft, 3 TC-4 aircraft, 3 T-38 aircraft, 3 T-2 aircraft and 4 H-46 helicopters. The NAO of 1 October 1981, pages 30- 32 (attachment 4 to my declaration) shows that NAS Oceana had 300 aircraft assigned, based on the 85 aircraft assigned to Permanent Units, the 201 aircraft assigned to Deployable (fleet) Units, and the 14 aircraft assigned to Air Reserve Units. These 300 aircraft comprised the

[3] Permanent Units includes both the training squadrons and the station aircraft.

following: 35 F-4 aircraft, 101 A-6 aircraft, 127 F-14 aircraft, 21 A-4 aircraft, 4 F-5 aircraft, 3 TC-4 aircraft, 6 T-2 aircraft and 3 SH-3 helicopters.

***Allowances and Location of Naval Aircraft***

9. While the NAO provided the number and type of aircraft assigned to each unit whose permanent duty station was NAS Oceana, the detailed accounting of the allowances and location of aircraft--whether deployed, in storage or in rework--is listed in a different publication, OPNAVNOTE 3110 *Allowances and Location of Naval Aircraft*.

10. *Allowances and Location of Navy Aircraft* was first published in August 1951 as OPNAVNOTE 03110. One purpose of this document was to indicate a unit's allowance of aircraft (that is, the maximum authorized aircraft strength of a unit) and the actual inventory of operating aircraft (that is, aircraft that were able to fly at the time the data for the report were gathered, as opposed to aircraft undergoing extensive maintenance, or aircraft assigned to a squadron but not on board, such as aircraft in transit from the manufacturer) with the squadron. The document also provided the location of each of the units and each of its aircraft as of the reporting date.

11. *Allowances and Location of Navy Aircraft* was published monthly from August 1951 though March 1971, then quarterly from June 1971 Dec 1976, then semiannually from March 1977 until publication ended with the March 1988 edition. [4]

12. We can determine from the *Allowances and Location of Naval Aircraft* of 31 March 1981 that 199 aircraft were in "operating"(flyable) status at NAS Oceana at that time. The 199 aircraft are derived from data for the deployable fleet squadrons assigned

[4] The title of the report changed from *Allowances and Location of Navy Aircraft* to *Allowances and Location of Naval Aircraft* in March 1969.

to NAS Oceana; the training squadrons at NAS Oceana; reserve squadrons; squadrons located at, but not assigned to, NAS Oceana; as well as the few aircraft assigned to NAS Oceana as "station aircraft" in Table 6 and Table 8.[5] These 199 aircraft were comprised of the following: 22 F-4 aircraft, 47 A-6 aircraft, 99 F-14 aircraft, 18 A-4 aircraft, 4 F-5 aircraft, 3 TC-4 aircraft, 3 T-2 aircraft and 3 H-46 helicopters. In both Table 6 and Table 8 (relevant portions of which are attachments 5 and 6, respectively, to my declaration), the first column ("Unit Name") lists the squadrons (such as "VF 11"), the seventh column ("Aircraft Location") lists the actual physical location of the aircraft assigned to the squadron (such as "Oceana"), and the eighth column ("Operating Status") lists the number of aircraft that are actually operating (flyable) at the Aircraft Location. To determine the total number of aircraft in an operating status at NAS Oceana at the time of the report, one would add the total number of aircraft for each unit located at Oceana and in an operating status. For example, starting at the beginning of Table 6, one would start with VF 11, which had 10 aircraft at Oceana in an operating status, and to that add 12 aircraft for VF 14 at Oceana in an operating status, plus 5 aircraft for VF 31 at Oceana in an operating status, and so on. Similarly, in Table 8, the first column lists the reserve squadron located at NAS Oceana ("VC-12"), the seventh column shows the actual physical location of the aircraft assigned to that squadron, and the eighth column shows the number of aircraft that are actually in an operating status. Adding the numbers in Tables 6 and 8 for all of the units that had aircraft in an operating status at NAS Oceana at the time the data were gathered for the report yields 199 aircraft. A similar calculation based on data in the 30 September 1981 *Allowances and Location of Naval Aircraft*

[5] *Allowances and Location of Naval Aircraft OPNAV NOTICE C311031* March 1981. Ser 508/C407068 2 July 1981, pages 37, 40, 45, 48 and 67.

report (attachments 7 and 8 to my declaration) yields 229 aircraft. These 229 aircraft comprised the following: 36 F-4 aircraft, 66 A-6 aircraft, 92 F-14 aircraft, 21 A-4 aircraft, 3 F-5 aircraft, 2 TC-4 aircraft, 3 T-38 aircraft, 3 T-2 aircraft and 3 SH-3 helicopters.

13. The total number of aircraft reported for NAS Oceana in the *Allowances and Location of Naval Aircraft* for a given period is usually going to be smaller than the total number reported for NAS Oceana in the NAO for the same period because the *Allowances and Location of Naval Aircraft* reports only aircraft physically present at NAS Oceana as of the reporting date and in an operating status, whereas the NAO reports all aircraft permanently assigned to NAS Oceana, whether or not they are physically present (including being deployed aboard an aircraft carrier) or in an operating status. As examples, please see 31 March 1981 *Allowances and Location of Naval Aircraft*, page 37, Table 6 (see attachment 5) for VF-33 and VF-102, both deployed aboard *Independence*. In comparison, the NAO for 1 April 1981 page 32 (see attachment 3) shows VF-32 and VF-102 assigned to NAS Oceana with a total of 18 aircraft.

I hereby swear under penalty of perjury pursuant to 28 U.S.C. 1746 that the foregoing information is true and accurate to the best of my knowledge and belief.

Curtis A. Utz

9 June 2006

Date

DEPARTMENT OF THE NAVY
OFFICE OF THE CHIEF OF NAVAL OPERATIONS
WASHINGTON 25, D. C.

OPNAV P05400
OP-501
Ser 01209P50
31 July 1959

DECLASSIFIED

[redacted]

OPNAV NOTICE P05400

From: Chief of Naval Operations
To: Distribution List

Subj: Naval Aeronautical Organization for Fiscal Year 1960; promulgation of (U)

Ref: (a) OPNAV INST 5451.53A of 15 May 1959

Encl: (1) Naval Aeronautical Organization FY 1960

1. Purpose. The Naval Aeronautical Organization (NAO) contains a detailed presentation of the various naval aviation programs appearing in the Basic Naval Establishment Plan (BNEP). The aviation bases section has been expanded to include aircraft and personnel allowances for each station and the activities to be supported thereon. The NAO will be published semi-annually and will be the primary source of current base loading planning information.

2. Cancellation of Previous Publication. OPNAV NOTICE 05400 serial 01227P50 of 8 October 1958 is cancelled by this Notice and will be destroyed by burning. No report of destruction is necessary.

3. Corrections. Addressees are requested to notify the Chief of Naval Operations (Op-501) of any errors or omissions. It is further requested that on 1 December 1959 the commanding officer of each station review the base loading section and forward to this office any recommended changes.

4. Classification and Downgrading. The security classification of this publication and all previous editions thereof is automatically downgraded from Confidential to Unclassified five (5) years from the date of issue on the letter of promulgation. This action is in accordance with section 3, chapter 4 of OPNAV Instruction 5510.1B. Upon downgrading, this publication will be marked "FOR OFFICIAL USE ONLY."

5. Cancellation. This Notice will be cancelled upon receipt of the next issue of the Naval Aeronautical Organization.

F. MASSEY
By direction

DECLASSIFIED

[redacted]

~~CONFIDENTIAL~~
DECLASSIFIED

DEPARTMENT OF THE NAVY
OFFICE OF THE CHIEF OF NAVAL OPERATIONS
WASHINGTON, DC 20350

Canc frp: Dec 77
OPNAVNOTE C5400
Ser 511/C233012
27 May 1977

DECLASSIFIED

~~CONFIDENTIAL~~ - Unclassified upon removal of enclosure (2)

OPNAV NOTICE C5400

From: Chief of Naval Operations

Subj: Naval Aeronautical Organization for April 1977; promulgation of (U)

Ref: (a) OPNAVINST 5510.144A

Encl: (1) Station listing format requirements
(2) Naval Aeronautical Organization

1. Purpose. The purpose of this publication is to provide statistical information concerning the Naval Aeronautical Organization (NAO). It is primarily concerned with the current base loading of the aeronautical shore activities of the naval establishment. The NAO is published semi-annually and contains information corrected to 1 April and 1 October of each year.

2. Cancellation. OPNAVNOTICE C5400 Ser 511/C721039 of 19 August 1976 is cancelled by this notice and will be destroyed by burning. No report of destruction is necessary.

3. Corrections. Addressees responsible for the information in various sections of this publication are requested to notify the Chief of Naval Operations (Op-511) of any errors or omissions. In particular, commanding officers of each station are requested to review the command and support relationships and base loading figures pertaining to the station. A revised edition of that portion, reflecting the 1 October 1977 situation, should be forwarded to the Chief of Naval Operations by 1 September 1977, in accordance with enclosure (1).

4. Classification. Users of this publication should refer to reference (a), to ascertain the proper classification of extracted information.

5. Report. Report Symbol OPNAV 5400-3 is assigned to this report.

6. Cancellation. This notice will be cancelled upon receipt of the next edition of the Naval Aeronautical Organization.

J. L. Akagi
J. L. AKAGI
By direction

~~CONFIDENTIAL~~



DECLASSIFIED

~~CONFIDENTIAL~~

DECLASSIFIED

[redacted] OPNAV [redacted]

# NAVAL AERONAUTICAL ORGANIZATION



## OPNAV NOTICE C5400

## 1 APRIL 1981

**DEPARTMENT OF THE NAVY**
**OFFICE OF THE CHIEF OF NAVAL OPERATIONS**

CLASSIFIED BY OPNAVINST C5513.2A
DECLASSIFY ON 1 APRIL 1984

~~CONFIDENTIAL~~

CONFIDENTIAL

ATLANTIC CONTINENTAL FLEET SUPPORT STATIONS

OCEANA, VIRGINIA BEACH, VIRGINIA (Continued)

Furnishing Limited Support To: (Continued)

Fleet Logistics Support Squadron 56, Norfolk, VA
Fleet Logistics Support Squadron 58, Jacksonville, FL
Fleet Composite Squadron 6 (VC-6) Det Dam Neck, Virginia Beach, VA
Carrier Airborne Early Warning Squadron 120 (VAW-120), Norfolk, VA
Carrier Airborne Early Warning Squadron 121 (VAW-121), Norfolk, VA
Carrier Airborne Early Warning Squadron 122 (VAW-122), Norfolk, VA
Carrier Airborne Early Warning Squadron 123 (VAW-123), Norfolk, VA
Carrier Airborne Early Warning Squadron 124 (VAW-124), Norfolk, VA
Carrier Airborne Early Warning Squadron 125 (VAW-125), Norfolk, VA
Carrier Airborne Early Warning Squadron 126 (VAW-126), Norfolk, VA
Atlantic Division, Naval Facilities Engineering Command, Norfolk, Virginia
U. S. Army, Fort Story, Virginia Beach, VA
20th NORAD/CONAD Region, Fort Lee AFS, Petersburg, Virginia
Langley Air Force Base, Virginia
District of Columbia, ANG, Andrews AFB, Washington, DC
Armed Forces Staff College, VA
Virginia National Guard, Richmond, VA
Kentucky Air National Guard
West Virginia Air National Guard
Seymour Johnson Air Force Base, North Carolina
U. S. Coast Guard Air Station, Elizabeth City, North Carolina
Aviation Supply Office, Philadelphia, PA
Naval Air Logistics Control Office, Alameda, CA
Naval Aviation Logistics Center, Patuxent River, MD
Naval Air Test Center, Patuxent River, MD
Naval Weapons Support Center, Crane, IN
Naval Public Works Center, Norfolk, VA
Naval Air Reserve Unit, Norfolk, VA
Pacific Missile Test Center, Point Mugu, CA
Marine Corps Air Station, Cherry Point, North Carolina
Marine Corps Air Station (Helicopter), New River, Jacksonville, North Carolina
Marine Wing Headquarters Squadron 2, MCAS, Cherry Point, North Carolina
Marine Corps Air Base East, Cherry Point, NC

| Activities and Units Supported | Aircraft On Board | Officer On Board Aviation | Officer On Board Other | Enlisted On Board | Administrative Superior |
|---|---|---|---|---|---|
| **Permanent Naval Units (Non-Reserve)** | | | | | |
| NAS | 4 HH46A | 14 | 39 | 603 | COMTACWINGSLANT |
| A/C OP DET | -- | -- | -- | 293 | CO NAS OCEANA |
| Base Consolidated Telecommunications | | -- | -- | 24 | CO NAS OCEANA |
| ALF Fentress | -- | -- | (1) | 30 | CO NAS OCEANA |
| Dare County/Palmetto Point Target Complex | -- | -- | -- | -- | CO NAS OCEANA |
| COMTACWINGSLANT | -- | 9 | 1 | 12 | COMNAVAIRLANT |
| COMFITWING ONE | -- | 15 | 4 | 21 | COMTACWINGSLANT |
| VF-43 | 4 F5E, 3 T38, 3 A4E, 2 A4F, 2 TA4J | 21 | 5 | 186 | COMFITWING ONE |
| VF-101 | 28 F14, 3 T2C | 54 | 6 | 371 | COMFITWING ONE |
| Students | -- | 81 | -- | 186 | -- |
| VF-171 | 14 F4J | 24 | 12 | 270 | COMFITWING ONE |
| Students | -- | 42 | -- | 179 | -- |
| COMMATWING ONE | -- | 12 | 4 | 20 | COMTACWINGSLANT |
| VA-42 | 1 KA6D, 3 TC4C, 14 A6E | 53 | 13 | 329 | COMMATWING ONE |
| Students | -- | 37 | -- | 182 | -- |

CONFIDENTIAL

DECLASSIFIED
CONFIDENTIAL

ATLANTIC CONTINENTAL FLEET SUPPORT STATIONS

OCEANA, VIRGINIA BEACH, VIRGINIA (Continued)

| Activities and Units Supported | Aircraft On Board | Officer On Board Aviation/Other | | Enlisted On Board | Administrative Superior |
|---|---|---|---|---|---|
| **Permanent Naval Units (Non-Reserve) (Continued)** | | | | | |
| Branch Legal Services Office, Oceana | -- | -- | 4 | 3 | OIC NAVLEGSVCOFF, Norfolk, VA |
| FASOTRAGRULANT DET | -- | 3 | 3 | 179 | FASOTRAGRULANT |
| NAVOCEANCOMDET OCEANA | -- | -- | 1 | 17 | NAVOCEANCOMFAC JAX |
| NAESU REP | -- | 1 | -- | 2 | NAESU Phila., PA |
| NAMTRADET | -- | 1 | 1 | 202 | CO NAMTRAGRU MFS |
| ROICC | -- | -- | 3 | -- | LANTDIVNAVFACENG-COM |
| Naval Investigative Resident Agent | -- | -- | -- | -- | NISRA Little Creek |
| Branch Commissary Store | -- | -- | 1 | 17 | OIC COMSYSTOREG, Norfolk |
| Navy Exchange NAS Oceana | -- | -- | 1 | -- | CO NAS Oceana |
| NAVREGMEDCEN Branch Disp. | -- | 1 | 16 | 90 | NRMC Portsmouth VA |
| NAVREGDENCEN Oceana Branch | -- | -- | 11 | 17 | NRDC Norfolk, VA |
| FACSFAC VACAPES | -- | 2 | 9 | 98 | COMTACWINGSLANT |
| CB Unit 415 | -- | -- | 1 | 25 | CO NAS Oceana |
| Tangier Island Target Facility | -- | -- | -- | -- | CO NAS Oceana |
| East Coast Tactical Aircrew Training System | -- | -- | -- | -- | FMSAEG, Corona, CA |
| FLTAVCOMLANT Det Oceana | -- | -- | 1 | 38 | FLTAVCOMLANT NORVA |
| PERSUPPACT Det Oceana | -- | -- | 2 | 62 | PERSUPPACT NORVA |
| **Permanent Non-Naval Units (Non-Reserve)** | | | | | |
| 20th Air Defense Squadron USAF Det Alpha | -- | -- | 1 | 31 | 20th NORAD Region Fort Lee, VA |
| FAA Rep | -- | -- | -- | -- | -- |
| American Red Cross | -- | -- | -- | -- | -- |
| First and Merchants Bank | -- | -- | -- | -- | -- |
| Federal Credit Union | -- | -- | -- | -- | -- |
| Navy Relief Society | -- | -- | -- | -- | -- |
| Western Union | -- | -- | -- | -- | -- |
| U. S. Post Office | -- | -- | -- | -- | -- |
| NAS Nursery | -- | -- | -- | -- | -- |
| Navy Wives Club of America #143 | | -- | -- | -- | -- |
| Officer and Enlisted Wives Club | | -- | -- | -- | -- |
| Boy Scouts of America (Troop 414) | | -- | -- | -- | -- |
| Princess Anne Bowmen's Club | -- | -- | -- | -- | -- |
| Golden Eagles Motorcycle Club | | -- | -- | -- | -- |
| Thrift Shop | -- | -- | -- | -- | -- |
| Virginia Beach Little League | -- | -- | -- | -- | -- |
| Embry-Riddle Aeronautical University | -- | -- | -- | -- | -- |
| **Permanent Unit Totals:** | | | | | |
| Total Military: | 81 | 370 | 139 | 3,487 | |

| | USDH | NFUSC | CONTR | FND | NFFNC | FNI |
|---|---|---|---|---|---|---|
| Total Civilian: | 758 | 605 | 471 | -- | -- | -- |

CONFIDENTIAL
DECLASSIFIED

DECLASSIFIED

CONFIDENTIAL

ATLANTIC CONTINENTAL FLEET SUPPORT STATIONS

OCEANA, VIRGINIA BEACH, VIRGINIA (Continued)

| Activities and Units Supported | Aircraft On Board | Officer On Board Aviation | Officer On Board Other | Enlisted On Board | Administrative Superior |
|---|---|---|---|---|---|
| Deployable Units (Non-Reserve) | | | | | |
| CVW-1 | -- | 6 | 2 | 8 | CO USS J. F. KENNEDY |
| VF-14 | 12 F14 | 29 | 4 | 225 | CVW-1 |
| VF-32 | 12 F14 | 28 | 6 | 242 | CVW-1 |
| VA-34 | 10 A6E, 4 KA6D | 33 | 4 | 278 | CVW-1 |
| CVW-17 | -- | 4 | 6 | 9 | CO USS FORRESTAL |
| VF-11 | 7 F14 | 31 | 7 | 242 | CVW-17 |
| VF-74 | 12 F4J | 27 | 4 | 234 | CVW-17 |
| VA-85 | 10 A6E, 4 KA6D | 31 | 6 | 286 | CVW-17 |
| CVW-7 | -- | 4 | 5 | 9 | USS EISENHOWER |
| VF-102 | 9 F4J | 27 | 3 | 230 | CVW-7 |
| VF-33 | 9 F4J | 25 | 3 | 243 | CVW-7 |
| VA-65 | 10 A6E, 4 KA6D | 35 | 8 | 291 | CVW-7 |
| CVW-8 | -- | 4 | 5 | 9 | CO USS NIMITZ |
| VF-41 | 14 F14 | 27 | 6 | 228 | CVW-8 |
| VF-84 | 14 F14 | 26 | 4 | 247 | CVW-8 |
| VA-35 | 10 A6E, 4 KA6D | 33 | 8 | 282 | CVW-8 |
| CVW-6 | -- | 4 | 5 | 9 | USS INDEPENDENCE |
| VF-143 | 10 F14 | 25 | 6 | 243 | CVW-6 |
| VF-142 | 9 F14 | 32 | 5 | 225 | CVW-6 |
| VA-176 | 9 A6E, 5 KA6D | 30 | 7 | 293 | CVW-6 |
| VF-31 | 1 F14 | 21 | 2 | 232 | CVW-3 |
| VA-75 | 10 A6E, 4 KA6D | 33 | 8 | 289 | CVW-3 |
| VF-103 | 9 F4J | 24 | 4 | 224 | CVW-3 |
| Deployable Unit Totals: | 202 | 539 | 118 | 4,578 | |

Deployed Units Supported (Non-Reserve)

Commercial Air Carriers: DC-8, B707, B727, B747, CONVAIR 990, DC-9, DC-10

Reserve Forces/Training Units

| Units Supported | On Board Aircraft | On Board Officer Aviation AcDu | On Board Officer Aviation SelRes | On Board Officer Other AcDu | On Board Officer Other SelRes | On Board Enlisted AcDu | On Board Enlisted SelRes |
|---|---|---|---|---|---|---|---|
| VC-12 | 14 TA4J | 8 | 13 | 1 | 11 | 69 | 71 |
| Air Reserve Totals: | 14 | 8 | 13 | 1 | 11 | 69 | 71 |

| | Aircraft | Personnel Officer | Personnel Enlisted | Personnel (RON) Officer | Personnel (RON) Enlisted |
|---|---|---|---|---|---|
| Average Daily Transients: | 11 | 27 | 7 | 10 | 5 |

REMARKS: (1) Data Services support provided to all tenant activities.

CONFIDENTIAL

DECLASSIFIED

DECLASSIFIED
~~CONFIDENTIAL~~

# ALLOWANCES AND LOCATION OF NAVAL AIRCRAFT (U)

## OPNAV NOTICE C3110

31 MARCH 1981

TABLE


TOTAL A/C INVENTORY BY MAJOR STATUS CATEGORIES .................... 1
PROGRAM & NON-PROGRAM A/C STATUS DISTRIBUTION .................. 2
PROGRAM OPERATING ALLOWANCES:
ALL COMMANDS .......................................................... 3
ATLANTIC FLEET ........................................................ 3A
PACIFIC FLEET .......................................................... 3B
PROGRAM & NON-PROGRAM A/C BY COMMAND, CLASS & MODEL ... 4
DISTRIBUTION OF NON-PROGRAM A/C BY MODEL ........................... 5
INVENTORY & OPERATING ALLOWANCES:
PROGRAM & NON-PROGRAM A/C - ATLANTIC FLEET ..................... 6
PROGRAM & NON-PROGRAM A/C - PACIFIC FLEET ........................ 7
PROGRAM & NON-PROGRAM A/C - CNAVRES, NATRA,
NASC AIRCRAFT CUSTODIAN, NASC STF, NASC FS .................. 8
DRONE A/C BY STATUS & COMMAND ............................................. 9
A/C ON LOAN TO NAVY ........................................................ 10
LOCATION OF A/C INVENTORY BY ORGANIZATIONAL UNIT ............. 11


THIS ISSUE CONTAINS
ALLOWANCE INFORMATION
PROJECTED FOR END FY 1981

DEPARTMENT OF THE NAVY
OFFICE OF THE CHIEF OF NAVAL OPERATIONS

CLASSIFIED BY OPNAVINST C5513.2A-36
DECLASSIFY ON 31 MARCH 1984

~~CONFIDENTIAL~~
DECLASSIFIED

DECLASSIFIED

[redacted]

# INVENTORY AND OPERATING ALLOWANCES

## PROGRAM AND NON - PROGRAM AIRCRAFT

TABLE 6

31 MARCH 1981

| LANT | ALLOWANCES PROJECTED FOR END FY 1981 | | | INVENTORY | | | NUMBER OF A/C IN UNIT CUSTODY BY STATUS | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| UNIT NAME | SUBCLASS ALLOWED | PRIMARY USE | NUMBER ALLOWED | MODEL ASSIGNED | STATUS CODE | AIRCRAFT LOCATION | OPERATING STATUS | AWAITING OPERATING | PIPELINE | OTHER |
| ATTACK CARRIER AIR SQUADRONS | | | | | | | | | | |
| VF 11 | | | | | | OCEANA | | | | |
| | VFFB | A1 | 12 | | | | | | | |
| | | | | F-14A | A10 | OCEANA | 10 | | | |
| | | | | F-14A | G30 | OCEANA | | | 1 | |
| TOTAL | | | 12 | | | | 10 | | 1 | |
| VF 14 | | | | | | OCEANA | | | | |
| | VFFB | A1 | 12 | | | | | | | |
| | | | | F-14A | A10 | OCEANA | 12 | | | |
| | | | | F-14A | D10 | OCEANA | | | 2 | |
| | | | | F-14A | K1F | OCEANA | | | | 1 |
| | | | | F-14A | K6J | OCEANA | | | | 1 |
| TOTAL | VF 14 | | 12 | | | | 12 | | 2 | 2 |
| VF 31 | | | | | | OCEANA | | | | |
| | VFFB | A1 | 12 | | | | | | | |
| | | | | F-14A | A10 | OCEANA | 5 | | | |
| | | | | F-14A | G40 | OCEANA | | | 1 | |
| TOTAL | VF 31 | | 12 | | | | 5 | | 1 | |
| VF 32 | | | | | | OCEANA | | | | |
| | VFFB | A1 | 12 | | | | | | | |
| | | | | F-14A | A10 | OCEANA | 12 | | | |
| | | | | F-14A | D10 | OCEANA | | | 1 | |
| | | | | F-14A | K1F | OCEANA | | | | 3 |
| TOTAL | VF 32 | | 12 | | | | 12 | | 1 | 3 |
| VF 33 | | | | | | ABD INDEPEN | | | | |
| | VFFB | A1 | 12 | | | | | | | |
| | | | | F-4J | A10 | ABD INDEPEN | 7 | | | |
| | | | | F-4J | G30 | ABD INDEPEN | | | 1 | |
| | | | | F-4J | HCA | ABD INDEPEN | | | 1 | |
| TOTAL | VF 33 | | 12 | | | | 7 | | 2 | |
| VF 41 | | | | | | OCEANA | | | | |
| | VFFB | A1 | 12 | | | | | | | |
| | | | | F-14A | D10 | NORFOLK | | | 1 | |
| | | | | F-14A | G30 | NORFOLK | | | 1 | |
| | | | | F-14A | A10 | OCEANA | 10 | | | |
| | | | | F-14A | D10 | OCEANA | | | 1 | |
| | | | | F-14A | G40 | OCEANA | | | 1 | |
| | | | | F-14A | HCA | OCEANA | | | 1 | |
| | | | | F-14A | K1F | OCEANA | | | | 1 |
| TOTAL | VF 41 | | 12 | | | | 10 | | 5 | 1 |
| VF 74 | | | | | | ABD FORRESTA | | | | |
| | VFFB | A1 | 12 | | | | | | | |
| | | | | F-4J | A10 | ABD FORRESTA | 11 | | | |
| | | | | F-4J | K6J | ABD FORRESTA | | | | 1 |
| TOTAL | VF 74 | | 12 | | | | 11 | | | 1 |
| VF 84 | | | | | | OCEANA | | | | |
| | VFFB | A1 | 12 | | | | | | | |
| | | | | F-14A | K1F | NORFOLK | | | | 2 |
| | | | | F-14A | A10 | OCEANA | 12 | | | |
| | | | | F-14A | D10 | OCEANA | | | 1 | |
| | | | | F-14A | F10 | OCEANA | | | 1 | |
| | | | | F-14A | G60 | OCEANA | | | 1 | |
| TOTAL | VF 84 | | 12 | | | | 12 | | 3 | 2 |
| VF 102 | | | | | | ABD INDEPEN | | | | |
| | VFFB | A1 | 12 | | | | | | | |
| | | | | F-4J | A10 | ABD INDEPEN | 6 | | | |
| | | | | F-4J | BY1 | ABD INDEPEN | | | 1 | |
| | | | | F-4J | HCA | ABD INDEPEN | | | 2 | |
| TOTAL | VF 102 | | 12 | | | | 6 | | 3 | |
| VF 103 | | | | | | OCEANA | | | | |
| | VFFB | A1 | 12 | | | | | | | |
| | | | | F-4J | D20 | CHERRY POINT | | | 1 | |
| | | | | F-4J | A10 | OCEANA | 6 | | | |
| | | | | F-4J | E2A | OCEANA | | | 1 | |
| | | | | F-4J | G30 | OCEANA | | | 1 | |
| TOTAL | VF 103 | | 12 | | | | 6 | | 3 | |
| VF 142 | | | | | | OCEANA | | | | |
| | VFFB | A1 | 12 | | | | | | | |
| | | | | F-14A | K1F | NORFOLK | | | | 3 |
| | | | | F-14A | A10 | OCEANA | 4 | | | |
| | | | | F-14A | D10 | OCEANA | | | 1 | |
| | | | | F-14A | G30 | OCEANA | | | 1 | |
| | | | | F-14A | G40 | OCEANA | | | 1 | |
| | | | | F-14A | I40 | OCEANA | | | 1 | |
| | | | | F-14A | KEF | OCEANA | | | | 1 |
| | | | | F-14A | K1F | OCEANA | | | | 1 |
| | | | | F-14A | K6J | OCEANA | | | | 2 |
| TOTAL | VF 142 | | 12 | | | | 4 | | 4 | 7 |
| VF 143 | | | | | | OCEANA | | | | |
| | VFFB | A1 | 12 | | | | | | | |
| | | | | F-14A | A10 | OCEANA | 13 | | | |
| | | | | F-14A | G40 | OCEANA | | | 1 | |
| | | | | F-14A | K1F | OCEANA | | | | 3 |
| TOTAL | VF 143 | | 12 | | | | 13 | | 1 | 3 |



DECLASSIFIED

[redacted]

DECLASSIFIED

[redacted]

# INVENTORY AND OPERATING ALLOWANCES

## PROGRAM AND NON - PROGRAM AIRCRAFT

TABLE 6

31 MARCH 1981

| LANT | ALLOWANCES PROJECTED FOR END FY 1981 | | | INVENTORY | | | NUMBER OF A/C IN UNIT CUSTODY BY STATUS | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| UNIT NAME | SUBCLASS ALLOWED | PRIMARY USE | NUMBER ALLOWED | MODEL ASSIGNED | STATUS CODE | AIRCRAFT LOCATION | OPERATING STATUS | AWAITING OPERATING | PIPELINE | OTHER |
| VA 12 | | | | | | CECIL FIELD | | | | |
| | VAL | A1 | 12 | | | | | | | |
| | | | | A-7E | A10 | ABD EISENHOW | 1 | | | |
| | | | | A-7E | A10 | CECIL FIELD | 9 | | | |
| | | | | A-7E | G30 | CECIL FIELD | | | 1 | |
| | | | | A-7E | BY1 | JACKSONVILLE | | | 1 | |
| | | | | A-7E | G30 | JACKSONVILLE | | | 1 | |
| TOTAL VA 12 | | | 12 | | | | 10 | | 3 | |
| VA 15 | | | | | | ABD INDEPEN | | | | |
| | VAL | A1 | 12 | | | | | | | |
| | | | | A-7E | A10 | ABD INDEPEN | 7 | | | |
| TOTAL VA 15 | | | 12 | | | | 7 | | | |
| VA 34 | | | | | | OCEANA | | | | |
| | VAM | A1 | 14 | | | | | | | |
| | | | | A-6E | K6J | ABD KENNEDY | | | | 1 |
| | | | | A-6E | A10 | OCEANA | 7 | | | |
| | | | | A-6E | F10 | OCEANA | | | 2 | |
| | | | | *A-6D | A10 | ABD KENNEDY | 2 | | | |
| | | | | *A-6D | A10 | OCEANA | 2 | | | |
| TOTAL VA 34 | | | 14 | | | | 11 | | 2 | 1 |
| VA 35 | | | | | | OCEANA | | | | |
| | VAM | A1 | 14 | | | | | | | |
| | | | | A-6E | A10 | OCEANA | 6 | | | |
| | | | | A-6E | G30 | OCEANA | | | 4 | |
| | | | | *A-6D | A10 | FALLON | 1 | | | |
| | | | | *A-6D | A10 | OCEANA | 1 | | | |
| | | | | *A-6D | D10 | OCEANA | | | 1 | |
| | | | | *A-6D | F10 | OCEANA | | | 1 | |
| | | | | *A-6D | G30 | OCEANA | | | 2 | |
| TOTAL VA 35 | | | 14 | | | | P | | 8 | |
| VA 37 | | | | | | CECIL FIELD | | | | |
| | VAL | A1 | 12 | | | | | | | |
| | | | | A-7E | A10 | CECIL FIELD | 12 | | | |
| | | | | A-7E | G40 | DALLAS | | | 1 | |
| | | | | A-7E | D10 | JACKSONVILLE | | | 2 | |
| TOTAL VA 37 | | | 12 | | | | 12 | | 3 | |
| VA 46 | | | | | | CECIL FIELD | | | | |
| | VAL | A1 | 12 | | | | | | | |
| | | | | A-7E | A10 | ABD KENNEDY | 2 | | | |
| | | | | A-7E | A10 | CECIL FIELD | 10 | | | |
| TOTAL VA 46 | | | 12 | | | | 12 | | | |
| VA 65 | | | | | | OCEANA | | | | |
| | VAM | A1 | 14 | | | | | | | |
| | | | | A-6E | A10 | OCEANA | 10 | | | |
| | | | | *A-6D | D10 | OCEANA | | | 1 | |
| | | | | *A-6D | G30 | OCEANA | | | 2 | |
| TOTAL VA 65 | | | 14 | | | | 10 | | 3 | |
| VA 66 | | | | | | CECIL FIELD | | | | |
| | VAL | A1 | 12 | | | | | | | |
| | | | | A-7E | A10 | ABD EISENHOW | 1 | | | |
| | | | | A-7E | A10 | CECIL FIELD | 9 | | | |
| | | | | A-7E | FC0 | CECIL FIELD | | | 1 | |
| | | | | A-7E | BY1 | JACKSONVILLE | | | 1 | |
| | | | | A-7E | G30 | JACKSONVILLE | | | 1 | |
| | | | | A-7E | H31 | JACKSONVILLE | | | 1 | |
| TOTAL VA 66 | | | 12 | | | | 10 | | 4 | |
| VA 72 | | | | | | CECIL FIELD | | | | |
| | VAL | A1 | 12 | | | | | | | |
| | | | | A-7E | A10 | CECIL FIELD | 12 | | | |
| TOTAL VA 72 | | | 12 | | | | 12 | | | |
| VA 75 | | | | | | OCEANA | | | | |
| | VAM | A1 | 14 | | | | | | | |
| | | | | A-6E | A10 | OCEANA | 9 | | | |
| | | | | A-6E | G30 | OCEANA | | | 1 | |
| | | | | *A-6D | D10 | ALAMEDA | | | 1 | |
| | | | | *A-6D | A10 | OCEANA | 2 | | | |
| | | | | *A-6D | G40 | OCEANA | | | 1 | |
| TOTAL VA 75 | | | 14 | | | | 10 | | 3 | |
| VA 81 | | | | | | ABD FORRESTA | | | | |
| | VAL | A1 | 12 | | | | | | | |
| | | | | A-7E | A10 | ABD FORRESTA | 10 | | | |
| | | | | A-7E | A10 | CECIL FIELD | 1 | | | |
| TOTAL VA 81 | | | 12 | | | | 11 | | | |
| VA 82 | | | | | | CECIL FIELD | | | | |
| | VAL | A1 | 12 | | | | | | | |
| | | | | A-7E | A10 | CECIL FIELD | 11 | | | |
| | | | | A-7E | G30 | CECIL FIELD | | | 1 | |
| | | | | A-7E | G40 | DALLAS | | | 2 | |
| | | | | A-7E | D10 | JACKSONVILLE | | | 1 | |
| TOTAL VA 82 | | | 12 | | | | 11 | | 4 | |
| VA 83 | | | | | | ABD FORRESTA | | | | |
| | VAL | A1 | 12 | | | | | | | |
| | | | | A-7E | A10 | ABD FORRESTA | 11 | | | |
| | | | | A-7E | A10 | CECIL FIELD | 1 | | | |
| TOTAL VA 83 | | | 12 | | | | 12 | | | |

[redacted]

DECLASSIFIED

[redacted]

# INVENTORY AND OPERATING ALLOWANCES

## PROGRAM AND NON - PROGRAM AIRCRAFT

**TABLE 6**

31 MARCH 1981

| LANT | ALLOWANCES PROJECTED FOR END FY 1981 | | | INVENTORY | | | NUMBER OF A/C IN UNIT CUSTODY BY STATUS | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| UNIT NAME | SUBCLASS ALLOWED | PRIMARY USE | NUMBER ALLOWED | MODEL ASSIGNED | STATUS CODE | AIRCRAFT LOCATION | OPERATING STATUS | AWAITING OPERATING | PIPELINE | OTHER |
| VA 85 | | | | | | ABD FORRESTA | | | | |
| | VAM | A1 | 14 | | | | | | | |
| | | | | A-6E | A10 | ABD FORRESTA | 9 | | | |
| | | | | A-6E | G30 | ABD FORRESTA | | | 1 | |
| | | | | A-6E | A10 | OCEANA | 1 | | | |
| | | | | KA-6D | A10 | ABD FORRESTA | 5 | | | |
| | | | | KA-6D | D10 | ABD FORRESTA | | | 1 | |
| TOTAL | VA 85 | | 14 | | | | 15 | | 2 | |
| VA 86 | | | | | | CECIL FIELD | | | | |
| | VAL | A1 | 12 | | | | | | | |
| | | | | A-7E | A10 | ABD NIMITZ | 2 | | | |
| | | | | A-7E | A10 | CECIL FIELD | 9 | | | |
| | | | | A-7E | G40 | DALLAS | | | 1 | |
| | | | | A-7E | G30 | JACKSONVILLE | | | 3 | |
| | | | | A-7E | H31 | JACKSONVILLE | | | 1 | |
| TOTAL | VA 86 | | 12 | | | | 11 | | 5 | |
| VA 87 | | | | | | ABD INDEPEN | | | | |
| | VAL | A1 | 12 | | | | | | | |
| | | | | A-7F | A10 | ABD INDEPEN | 9 | | | |
| | | | | A-7E | I30 | ABD INDEPEN | | | 1 | |
| TOTAL | VA 87 | | 12 | | | | 9 | | 1 | |
| VA 105 | | | | | | CECIL FIELD | | | | |
| | VAL | A1 | 12 | | | | | | | |
| | | | | A-7E | A10 | CECIL FIELD | 10 | | | |
| | | | | A-7E | D10 | CECIL FIELD | | | 1 | |
| | | | | A-7E | KCA | CECIL FIELD | | | | 1 |
| | | | | A-7E | BY1 | DALLAS | | | 1 | |
| | | | | A-7E | G40 | DALLAS | | | 2 | |
| | | | | A-7E | D10 | JACKSONVILLE | | | 2 | |
| TOTAL | VA 105 | | 12 | | | | 10 | | 6 | 1 |
| VA 176 | | | | | | ABD INDEPEN | | | | |
| | VAM | A1 | 14 | | | | | | | |
| | | | | A-6E | A10 | ABD INDEPEN | 7 | | | |
| | | | | A-6E | G30 | ABD INDEPEN | | | 1 | |
| | | | | A-6E | KEA | ABD INDEPEN | | | | 1 |
| | | | | KA-6D | A10 | ABD INDEPEN | 5 | | | |
| TOTAL | VA 176 | | 14 | | | | 12 | | 1 | 1 |
| READINESS ATTACK CARRIER AIR SQUADRONS | | | | | | | | | | |
| VF 101 | | | | | | OCEANA | | | | |
| | VFFB | A1 | 24 | | | | | | | |
| | | | | F-14A | D10 | NORFOLK | | | 3 | |
| | | | | F-14A | K1F | NORFOLK | | | | 2 |
| | | | | F-14A | A10 | OCEANA | 21 | | | |
| | | | | F-14A | G30 | OCEANA | | | 2 | |
| | | | | F-14A | G40 | OCEANA | | | 2 | |
| | | | | F-14A | KEF | OCEANA | | | | 1 |
| | | | | F-14A | K1F | OCEANA | | | | 2 |
| | | | | F-14A | K6G | OCEANA | | | | 1 |
| TOTAL | VF 101 | | 24 | | | | 21 | | 7 | 6 |
| VF 171 | | | | | | OCEANA | | | | |
| | VFFB | A1 | 15 | | | | | | | |
| | | | | F-4J | A10 | OCEANA | 8 | | | |
| | | | | F-4J | G30 | OCEANA | | | 1 | |
| | | | | F-4J | K6G | OCEANA | | | | 1 |
| TOTAL | VF 171 | | 15 | | | | 8 | | 1 | 1 |
| VF 171 DET KEY W | | | | | | KEY WEST | | | | |
| | VFFB | A1 | 10 | | | | | | | |
| | | | | F-4N | D10 | BIRMINGHAM | | | 2 | |
| | | | | F-4N | A10 | KEY WEST | 7 | | | |
| | | | | F-4N | G30 | KEY WEST | | | 1 | |
| | VAL | A1 | 3 | | | | | | | |
| | | | | A-4E | A10 | KEY WEST | 1 | | | |
| | | | | A-4E | D10 | PENSACOLA | | | 2 | |
| | | | | TA-4J | A40 | KEY WEST | 1 | | | |
| | | | | TA-4J | D10 | PENSACOLA | | | 1 | |
| TOTAL | VF 171 DET KEY W | | 13 | | | | 9 | | 6 | |
| VA 42 | | | | | | OCEANA | | | | |
| | VAM | A1 | 17 | | | | | | | |
| | | | | A-6E | A10 | OCEANA | 10 | | | |
| | | | | A-6E | G40 | OCEANA | | | 2 | |
| | | | | A-6E | HCA | OCEANA | | | 2 | |
| | | | | A-6E | I40 | OCEANA | | | 1 | |
| | | | | A-6E | K6G | OCEANA | | | | 2 |
| | | | | KA-6D | D10 | OCEANA | | | 1 | |
| | | | | KA-6D | G40 | OCEANA | | | 1 | |
| | VTSP | A4 | 3 | | | | | | | |
| | | | | TC-4C | A40 | OCEANA | [illegible] | | | |
| TOTAL | VA 42 | | 20 | | | | 13 | | 7 | 2 |



[redacted]

DECLASSIFIED

[redacted]

# INVENTORY AND OPERATING ALLOWANCES

## PROGRAM AND NON - PROGRAM AIRCRAFT

**TABLE 6**

31 MARCH 1981

| LANT | ALLOWANCES PROJECTED FOR END FY 1981 | | | INVENTORY | | | NUMBER OF A/C IN UNIT CUSTODY BY STATUS | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| UNIT NAME | SUBCLASS ALLOWED | PRIMARY USE | NUMBER ALLOWED | MODEL ASSIGNED | STATUS CODE | AIRCRAFT LOCATION | OPERATING STATUS | AWAITING OPERATING | PIPELINE | OTHER |
| VF 43 | | | | | | OCEANA | | | | |
| | VFFB | A1 | 3 | | | | | | | |
| | | | | F-5E | A40 | OCEANA | 4 | | | |
| | VAL | A1 | 4 | | | | | | | |
| | | | | A-4F | A40 | OCEANA | 1 | | | |
| | | | | A-4F | D10 | PENSACOLA | | | 1 | |
| | | | | A-4E | A40 | OCEANA | 2 | | | |
| | | | | A-4E | HCA | OCEANA | | | 1 | |
| | | | | A-4E | D10 | PENSACOLA | | | 1 | |
| | VTAJ | A4 | 5 | | | | | | | |
| | | | | T-39A | A40 | OCEANA | 3 | | | |
| | | | | TA-4J | A40 | OCEANA | 3 | | | |
| | VTBJ | A4 | 3 | | | | | | | |
| | | | | T-2C | A40 | OCEANA | 3 | | | |
| TOTAL VF 43 | | | 15 | | | | 16 | | 3 | |
| VA 45 | | | | | | KEY WEST | | | | |
| | VTAJ | A4 | 14 | | | | | | | |
| | | | | TA-4J | A40 | CECIL FIELD | 1 | | | |
| | | | | TA-4J | A40 | KEY WEST | 9 | | | |
| | | | | TA-4J | RNC | PENSACOLA | | | 1 | |
| | | | | TA-4J | D10 | PENSACOLA | | | 3 | |
| | VTSJ | A4 | 1 | | | | | | | |
| | | | | T-39D | F10 | KEY WEST | | | 1 | |
| | | | | T-39D | G30 | KEY WEST | | | 1 | |
| | | | | T-39D | E11 | PENSACOLA | | | 1 | |
| TOTAL VA 45 | | | 15 | | | | 10 | | 7 | |
| VA 174 | | | | | | CECIL FIELD | | | | |
| | VAL | A1 | 10 | | | | | | | |
| | | | | A-7E | A10 | CECIL FIELD | 19 | | | |
| | | | | A-7E | D10 | CECIL FIELD | | | 1 | |
| | | | | A-7E | KDF | CECIL FIELD | | | | 3 |
| | | | | A-7E | PY1 | DALLAS | | | 1 | |
| | | | | A-7E | G40 | DALLAS | | | 1 | |
| | | | | A-7E | C10 | JACKSONVILLE | | | 1 | |
| | | | | A-7E | D10 | JACKSONVILLE | | | 1 | |
| | | | | A-7E | G30 | JACKSONVILLE | | | 1 | |
| | VTAJ | A4 | 20 | | | | | | | |
| | | | | TA-7C | A30 | CECIL FIELD | 15 | | | |
| | | | | TA-7C | G30 | CECIL FIELD | | | 2 | |
| | | | | TA-7C | KDF | CECIL FIELD | | | | 1 |
| | | | | TA-7C | BSD | JACKSONVILLE | | | 2 | |
| | | | | TA-7C | G30 | JACKSONVILLE | | | 2 | |
| TOTAL VA 174 | | | 30 | | | | 34 | | 12 | 4 |
| CARRIER ANTISUBMARINE SQUADRONS | | | | | | | | | | |
| HS1 DET | | | | | | JACKSONVILLE | | | | |
| | H S | A4 | 4 | | | | | | | |
| TOTAL HS1 DET | | | 4 | | | | | | | |
| HS 1 SEA COMP | | | | | | JACKSONVILLE | | | | |
| | | | | SH-3G | A20 | JACKSONVILLE | 1 | | | |
| | | | | SH-3G | D20 | PENSACOLA | | | 1 | |
| | | | | SH-3G | H31 | PENSACOLA | | | 1 | |
| TOTAL HS 1 SEA COMP | | | | | | | 1 | | 2 | |
| HS 1 SEA DET 1 | | | | | | ABD HORNE | | | | |
| | | | | SH-3G | A20 | ABD HORNE | 1 | | | |
| TOTAL HS 1 SEA DET 1 | | | | | | | 1 | | | |
| HS 1 SEA DET 2 | | | | | | ABD PUGET SO | | | | |
| | | | | SH-3G | A20 | ABD PUGET SO | 1 | | | |
| TOTAL HS 1 SEA DET 3 | | | | | | | 1 | | | |
| HS 3 | | | | | | ABD FORRESTA | | | | |
| | H S | A1 | 6 | | | | | | | |
| | | | | SH-3H | A10 | ABD FORRESTA | 5 | | | |
| TOTAL HS 3 | | | 6 | | | | 5 | | | |
| HS 5 | | | | | | JACKSONVILLE | | | | |
| | H S | A1 | 6 | | | | | | | |
| | | | | SH-3H | A10 | ABD EISENHOW | 1 | | | |
| | | | | SH-3H | A10 | JACKSONVILLE | 5 | | | |
| TOTAL HS 5 | | | 6 | | | | 6 | | | |
| HS 7 | | | | | | JACKSONVILLE | | | | |
| | H S | A1 | 6 | | | | | | | |
| | | | | SH-3H | A10 | JACKSONVILLE | 6 | | | |
| TOTAL HS 7 | | | 6 | | | | 6 | | | |
| HS 9 | | | | | | JACKSONVILLE | | | | |
| | H S | A1 | 6 | | | | | | | |
| | | | | SH-3H | A10 | JACKSONVILLE | 7 | | | |
| | | | | SH-3H | D10 | PENSACOLA | | | 1 | |
| TOTAL HS 9 | | | 6 | | | | 7 | | 1 | |
| HS 11 | | | | | | JACKSONVILLE | | | | |
| | H S | A1 | 6 | | | | | | | |
| | | | | SH-3H | A10 | JACKSONVILLE | 4 | | | |
| | | | | SH-3H | HC1 | NORFOLK | | | 2 | |
| TOTAL HS 11 | | | 6 | | | | 4 | | 2 | |
| HS 15 | | | | | | ABD INDEPEN | | | | |
| | H S | A1 | 6 | | | | | | | |
| | | | | SH-3H | A10 | ABD INDEPEN | 5 | | | |
| | | | | SH-3H | G30 | ABD INDEPEN | | | 1 | |
| TOTAL HS 15 | | | 6 | | | | 5 | | 1 | |
| VS 22 | | | | | | CECIL FIELD | | | | |
| | VS | A1 | 10 | | | | | | | |
| | | | | S-3A | A10 | CECIL FIELD | 10 | | | |
| | | | | S-3A | G40 | CECIL FIELD | | | 2 | |
| TOTAL VS 22 | | | 10 | | | | 10 | | 2 | |

[redacted]



DECLASSIFIED

DECLASSIFIED

[redacted]

# INVENTORY AND OPERATING ALLOWANCES

## PROGRAM AND NON - PROGRAM AIRCRAFT

TABLE 6

31 MARCH 1981

| LANT | ALLOWANCES PROJECTED FOR END FY 1981 | | | INVENTORY | | | NUMBER OF A/C IN UNIT CUSTODY BY STATUS | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| UNIT NAME | SUBCLASS ALLOWED | PRIMARY USE | NUMBER ALLOWED | MODEL ASSIGNED | STATUS CODE | AIRCRAFT LOCATION | OPERATING STATUS | AWAITING OPERATING | PIPELINE | OTHER |
| VR 24 COD MDE | | | | | | NAPLES | | | | |
| | VRC | A2 | 9 | | | | | | | |
| | H H | A2 | 3 | | | | | | | |
| TOTAL VR 24 COD MDE | | | 12 | | | | | | | |
| VRC 40 | | | | | | NORFOLK | | | | |
| | VRC | A2 | 7 | | | | | | | |
| | | | | C-1A | D10 | DOTHAN | | | 1 | |
| | | | | C-1A | A20 | NORFOLK | 10 | | | |
| | VRLJ | AM | 2 | | | | | | | |
| | VRLJ | A2 | 2 | | | | | | | |
| | | | | CT-39E | A20 | NORFOLK | 2 | | | |
| TOTAL VRC 40 | | | 11 | | | | 12 | | 1 | |
| MARINE FIGHTER SQUADRONS | | | | | | | | | | |
| VMFA 115 | | | | | | ABD FORRESTA | | | | |
| | VFFB | A1 | 12 | | | | | | | |
| | | | | F-4J | A10 | ABD FORRESTA | 10 | | | |
| | | | | F-4J | EAA | ABD FORRESTA | | | 1 | |
| | | | | F-4J | G30 | ABD FORRESTA | | | 1 | |
| TOTAL VMFA 115 | | | 12 | | | | 10 | | 2 | |
| VMFA 122 | | | | | | BEAUFORT | | | | |
| | VFFB | A1 | 12 | | | | | | | |
| | | | | F-4S | A10 | BEAUFORT | 9 | | | |
| | | | | F-4S | BY1 | BEAUFORT | | | 1 | |
| | | | | F-4S | G30 | BEAUFORT | | | 1 | |
| TOTAL VMFA 122 | | | 12 | | | | 9 | | 2 | |
| VMFA 251 | | | | | | BEAUFORT | | | | |
| | VFFB | A1 | 12 | | | | | | | |
| | | | | F-4S | A10 | BEAUFORT | 11 | | | |
| | | | | F-4S | G30 | CHERRY POINT | | | 1 | |
| TOTAL VMFA 251 | | | 12 | | | | 11 | | 1 | |
| VMFA 312 | | | | | | IWAKUNI | | | | |
| | VFFB | A1 | 12 | | | | | | | |
| | | | | F-4S | A10 | IWAKUNI | 11 | | | |
| | | | | F-4J | A10 | IWAKUNI | 1 | | | |
| TOTAL VMFA 312 | | | 12 | | | | 12 | | | |
| VMFA 333 | | | | | | IWAKUNI | | | | |
| | VFFB | A1 | 12 | | | | | | | |
| | | | | F-4J | A10 | IWAKUNI | 9 | | | |
| TOTAL VMFA 333 | | | 12 | | | | 9 | | | |
| VMFA 451 | | | | | | OCEANA | | | | |
| | VFFB | A1 | 12 | | | | | | | |
| | | | | F-4J | A10 | OCEANA | 8 | | | |
| | | | | F-4J | G30 | OCEANA | | | 3 | |
| TOTAL VMFA 451 | | | 12 | | | | 8 | | 3 | |
| MARINE ATTACK SQUADRONS | | | | | | | | | | |
| VMA 223 | | | | | | CHERRY POINT | | | | |
| | VAL | A1 | 19 | | | | | | | |
| | | | | A-4M | A10 | CHERRY POINT | 18 | | | |
| | | | | A-4M | B1K | CHERRY POINT | | 1 | | |
| | | | | A-4M | B10 | CHERRY POINT | | 2 | | |
| | | | | A-4M | D10 | PENSACOLA | | | 2 | |
| TOTAL VMA 223 | | | 19 | | | | 18 | 3 | 2 | |
| VMAAW 224 | | | | | | CHERRY POINT | | | | |
| | VAM | A1 | 10 | | | | | | | |
| | | | | A-6E | A10 | CHERRY POINT | 7 | | | |
| | | | | A-6E | GC0 | CHERRY POINT | | | 1 | |
| | | | | A-6E | J10 | CHERRY POINT | | | | 2 |
| | | | | A-6E | KDF | CHERRY POINT | | | | 1 |
| | | | | A-6E | KEA | CHERRY POINT | | | | 1 |
| | | | | A-6E | KFJ | CHERRY POINT | | | | 1 |
| | | | | A-6E | A10 | NORWAY | 1 | | | |
| TOTAL VMAAW 224 | | | 10 | | | | 8 | | 1 | 5 |
| VMAAW 533 | | | | | | CHERRY POINT | | | | |
| | VAM | A1 | 10 | | | | | | | |
| | | | | A-6E | A10 | CHERRY POINT | 10 | | | |
| | | | | A-6E | K1F | CHERRY POINT | | | | 1 |
| | | | | A-6E | D10 | NORFOLK | | | 1 | |
| TOTAL VMAAW 533 | | | 10 | | | | 10 | | 1 | 1 |
| VMA 231 | | | | | | CHERRY POINT | | | | |
| | VAL | A1 | 9 | | | | | | | |
| | | | | AV-8A | A10 | CHERRY POINT | 7 | | | |
| | | | | AV-8A | D10 | CHERRY POINT | | | 2 | |
| | | | | AV-8A | G40 | CHERRY POINT | | | 2 | |
| TOTAL VMA 231 | | | 9 | | | | 7 | | 4 | |
| VMA 231 DET A | | | | | | CHERRY POINT | | | | |
| | VAL | A1 | 6 | | | | | | | |
| TOTAL VMA 231 DET A | | | 6 | | | | | | | |
| VMA 542 | | | | | | CHERRY POINT | | | | |
| | VAL | A1 | 9 | | | | | | | |
| | | | | AV-8A | A10 | CHERRY POINT | 12 | | | |
| | | | | AV-8A | G40 | CHERRY POINT | | | 1 | |
| TOTAL VMA 542 | | | 9 | | | | 12 | | 1 | |



[redacted]

DECLASSIFIED

[redacted]

# INVENTORY AND OPERATING ALLOWANCES

## PROGRAM AND NON - PROGRAM AIRCRAFT

TABLE 6

31 MARCH 1981

| LANT | ALLOWANCES PROJECTED FOR END FY 1981 | | | INVENTORY | | | NUMBER OF A/C IN UNIT CUSTODY BY STATUS | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| UNIT NAME | SUBCLASS ALLOWED | PRIMARY USE | NUMBER ALLOWED | MODEL ASSIGNED | STATUS CODE | AIRCRAFT LOCATION | OPERATING STATUS | AWAITING OPERATING | PIPELINE | OTHER |
| OPERATION TEST AND EVALUATION FORCE | | | | | | | | | | |
| VX 1 | | | | | | PTXNT RIVER | | | | |
| | VS | A7 | 3 | | | | | | | |
| | | | | S-3A | A70 | PTXNT RIVER | 3 | | | |
| | VPL | A7 | 5 | | | | | | | |
| | | | | P-3C | A70 | PTXNT RIVER | 5 | | | |
| | VWH | A7 | 1 | | | | | | | |
| | | | | EP-3A | A70 | PTXNT RIVER | 1 | | | |
| | H S | A7 | 3 | | | | | | | |
| | | | | SH-3H | A70 | PTXNT RIVER | 4 | | | |
| | | | | SH-2F | A70 | PTXNT RIVER | 1 | | | |
| | | | | SH-2F | F10 | PTXNT RIVER | | | 1 | |
| TOTAL VX 1 | | | 12 | | | | 14 | | 1 | |
| FLEET COMPOSITE SQUADRONS | | | | | | | | | | |
| VC 2 | | | | | | OCEANA | | | | |
| | | | | TA-4J | D10 | OCEANA | | | 1 | |
| | | | | TA-4J | D10 | PENSACOLA | | | 2 | |
| TOTAL VC 2 | | | | | | | | | 3 | |
| VC 8 | | | | | | ROOSEVELT RD | | | | |
| | VTAJ | A2 | 4 | | | | | | | |
| | | | | TA-4J | D10 | PENSACOLA | | | 1 | |
| | | | | TA-4J | A40 | ROOSEVELT RD | 4 | | | |
| | H S | A2 | 6 | | | | | | | |
| | | | | SH-3G | D20 | PENSACOLA | | | 2 | |
| | | | | SH-3G | A20 | ROOSEVELT RD | 4 | | | |
| | | | | SH-3G | G30 | ROOSEVELT RD | | | 1 | |
| TOTAL VC 8 | | | 10 | | | | 8 | | 4 | |
| VC 10 | | | | | | GTMO BAY | | | | |
| | VTAJ | A2 | 8 | | | | | | | |
| | | | | TA-4J | A20 | GTMO BAY | 8 | | | |
| TOTAL VC 10 | | | 8 | | | | 8 | | | |
| CV AND CVN CARRIER UTILITY AIRCRAFT | | | | | | | | | | |
| CVN 69 EISENHWR | | | | | | NORFOLK | | | | |
| | VRC | A2 | 1 | | | | | | | |
| | | | | C-1A | A20 | NORFOLK | 1 | | | |
| TOTAL CVN 69 EISENHWR | | | 1 | | | | 1 | | | |
| CV 59 FORRESTAL | | | | | | MAYPORT | | | | |
| | VRC | A2 | 1 | | | | | | | |
| | | | | C-1A | A20 | MAYPORT | 1 | | | |
| TOTAL CV 59 FORRESTAL | | | 1 | | | | 1 | | | |
| CV 60 SARATOGA | | | | | | MAYPORT | | | | |
| | VRC | A2 | 1 | | | | | | | |
| | | | | C-1A | A20 | MAYPORT | 1 | | | |
| TOTAL CV 60 SARATOGA | | | 1 | | | | 1 | | | |
| CV 62 INDEPEND | | | | | | NORFOLK | | | | |
| | VRC | A2 | 1 | | | | | | | |
| TOTAL CV 62 INDEPEND | | | 1 | | | | | | | |
| CV 66 AMERICA | | | | | | NORFOLK | | | | |
| | VRC | A2 | 1 | | | | | | | |
| TOTAL CV 66 AMERICA | | | 1 | | | | | | | |
| CV 67 KENNEDY | | | | | | NORFOLK | | | | |
| | VRC | A2 | 1 | | | | | | | |
| | | | | C-1A | A80 | NORFOLK | 1 | | | |
| TOTAL CV 67 KENNEDY | | | 1 | | | | 1 | | | |
| CVN 68 NIMITZ | | | | | | NORFOLK | | | | |
| | VRC | A2 | 1 | | | | | | | |
| | | | | C-1A | G30 | NORFOLK | | | 1 | |
| TOTAL CVN 68 NIMITZ | | | 1 | | | | | | 1 | |
| STATION ASSIGNED AIRCRAFT | | | | | | | | | | |
| NAS BRUNSWICK | | | | | | BRUNSWICK | | | | |
| | VUS | A8 | 1 | | | | | | | |
| | | | | UC-12B | A80 | BRUNSWICK | 1 | | | |
| | H L | AL | 2 | | | | | | | |
| | | | | UH-1N | AL0 | BRUNSWICK | 2 | | | |
| TOTAL NAS BRUNSWICK | | | 3 | | | | 3 | | | |
| NAS OCEANA | | | | | | OCEANA | | | | |
| | H S | AL | 3 | | | | | | | |
| | | | | HH-46A | AL0 | OCEANA | 3 | | | |
| TOTAL NAS OCEANA | | | 3 | | | | 3 | | | |
| NAS NORFOLK | | | | | | NORFOLK | | | | |
| | | | | C-131F | AM0 | NORFOLK | 2 | | | |
| | VRC | A2 | 1 | | | | | | | |
| | VUS | A8 | 2 | | | | | | | |
| | | | | UC-12B | A80 | NORFOLK | 2 | | | |
| TOTAL NAS NORFOLK | | | 3 | | | | 4 | | | |
| NAS CECIL FIELD | | | | | | CECIL FIELD | | | | |
| | | | | C-1A | A80 | CECIL FIELD | 1 | | | |
| TOTAL NAS CECIL FIELD | | | | | | | 1 | | | |
| NAS JACKSONVILLE | | | | | | JACKSONVILLE | | | | |
| | VUS | A8 | 3 | | | | | | | |
| | | | | UC-12B | A80 | JACKSONVILLE | 2 | | | |
| | H S | AL | 2 | | | | | | | |
| | | | | SH-3D | AL0 | JACKSONVILLE | 3 | | | |
| TOTAL NAS JACKSONVILLE | | | 5 | | | | 5 | | | |

[redacted]

DECLASSIFIED

CONFIDENTIAL

OP-05D2

OPNAV

# NAVAL AERONAUTICAL ORGANIZATION

DECLASSIFIED



OPNAV NOTICE C5400

1 OCTOBER 1981

DEPARTMENT OF THE NAVY
OFFICE OF THE CHIEF OF NAVAL OPERATIONS

CLASSIFIED BY OPNAVINST C5513.2A
DECLASSIFY ON 1 OCTOBER 1984

CONFIDENTIAL
DECLASSIFIED

DECLASSIFIED
~~CONFIDENTIAL~~

ATLANTIC CONTINENTAL FLEET SUPPORT STATIONS

OCEANA, VIRGINIA BEACH, VIRGINIA (Continued)

Furnishing Limited Support To: (Continued)

Fleet Logistics Support Squadron 56, Norfolk, VA
Fleet Logistics Support Squadron 58, Jacksonville, FL
Fleet Composite Squadron 6 (VC-6) Det Dam Neck, Virginia Beach, VA
Carrier Airborne Early Warning Squadron 120 (VAW-120), Norfolk, VA
Carrier Airborne Early Warning Squadron 121 (VAW-121), Norfolk, VA
Carrier Airborne Early Warning Squadron 122 (VAW-122), Norfolk, VA
Carrier Airborne Early Warning Squadron 123 (VAW-123), Norfolk, VA
Carrier Airborne Early Warning Squadron 124 (VAW-124), Norfolk, VA
Carrier Airborne Early Warning Squadron 125 (VAW-125), Norfolk, VA
Carrier Airborne Early Warning Squadron 126 (VAW-126), Norfolk, VA
Atlantic Division, Naval Facilities Engineering Command, Norfolk, Virginia
U. S. Army, Fort Story, Virginia Beach, VA
20th NORAD/CONAD Region, Fort Lee AFS, Petersburg, Virginia
Langley Air Force Base, Virginia
District of Columbia, ANG, Andrews AFB, Washington, DC
Armed Forces Staff College, VA
Virginia National Guard, Richmond, VA
Kentucky Air National Guard
West Virginia Air National Guard
Seymour Johnson Air Force Base, North Carolina
U. S. Coast Guard Air Station, Elizabeth City, North Carolina
Aviation Supply Office, Philadelphia, PA
Naval Air Logistics Control Office, Alameda, CA
Naval Aviation Logistics Center, Patuxent River, MD
Naval Air Test Center, Patuxent River, MD
Naval Weapons Support Center, Crane, IN
Naval Public Works Center, Norfolk, VA
Naval Air Reserve Unit, Norfolk, VA
Pacific Missile Test Center, Point Mugu, CA
Marine Corps Air Station, Cherry Point, North Carolina
Marine Corps Air Station (Helicopter), New River, Jacksonville, North Carolina
Marine Wing Headquarters Squadron 2, MCAS, Cherry Point, North Carolina
Marine Corps Air Base East, Cherry Point, NC

| Activities and Units Supported | Aircraft On Board | Officer On Board Aviation | Officer On Board Other | Enlisted On Board | Administrative Superior |
|---|---|---|---|---|---|
| Permanent Naval Units (Non-Reserve) | | | | | |
| NAS | 3 SH3G | 17 | 37 | 623 | COMTACWINGSLANT |
| A/C OP DET | -- | -- | -- | 289 | CO NAS OCEANA |
| Base Consolidated Telecommunications | | -- | -- | 16 | CO NAS OCEANA |
| ALF Fentress | -- | -- | (1) | 35 | CO NAS OCEANA |
| Dare County/Palmetto Point Target Complex | -- | -- | -- | -- | CO NAS OCEANA |
| COMTACWINGSLANT | -- | 7 | 2 | 8 | COMNAVAIRLANT |
| COMFITWING ONE | -- | 19 | 7 | 22 | COMTACWINGSLANT |
| VF-43 | 4 F5E, 3 A4E, 2 TA4J, 2 A4F, 3 T2C | 25 | 4 | 146 | COMFITWING ONE |
| VF-101 | 31 F14, 3 T2C | 39 | 15 | 399 | COMFITWING ONE |
| Students | -- | 113 | -- | 114 | -- |
| VF-171 | 9 F4J, 5 F4S | 22 | 11 | 248 | COMFITWING ONE |
| Students | -- | 40 | -- | 117 | -- |
| COMMATWING ONE | -- | 12 | 4 | 19 | COMTACWINGSLANT |
| VA-42 | 1 KA6D, 3 TC4C, 16 A6E | 51 | 17 | 284 | COMMATWING ONE |
| Students | -- | 41 | -- | 182 | -- |

~~CONFIDENTIAL~~
DECLASSIFIED

DECLASSIFIED
CONFIDENTIAL

ATLANTIC CONTINENTAL FLEET SUPPORT STATIONS

OCEANA, VIRGINIA BEACH, VIRGINIA (Continued)

| Activities and Units Supported | Aircraft On Board | Officer On Board Aviation | Officer On Board Other | Enlisted On Board | Administrative Superior |
|---|---|---|---|---|---|
| **Permanent Naval Units (Non-Reserve) (Continued)** | | | | | |
| Branch Legal Services Office, Oceana | -- | -- | 4 | 3 | OIC NAVLEGSVCOFF, Norfolk, VA |
| FASOTRAGRULANT DET | -- | 3 | 3 | 172 | FASOTRAGRULANT |
| NAVOCEANCOMDET OCEANA | -- | -- | 1 | 19 | NAVOCEANCOMFAC JAX |
| NAESU REP | -- | 1 | -- | 3 | NAESU Phila., PA |
| NAMTRADET | -- | 1 | 1 | 206 | CO NAMTRAGRU MFS |
| ROICC | -- | -- | 3 | -- | LANTDIVNAVFACENG-COM |
| Naval Investigative Resident Agent | -- | -- | -- | -- | NISRA Little Creek |
| Branch Commissary Store | -- | -- | 1 | 22 | OIC COMSYSTOREG, Norfolk |
| Navy Exchange NAS Oceana | -- | -- | 1 | -- | CO NAS Oceana |
| NAVREGMEDCEN Branch Disp. | -- | 1 | 11 | 112 | NRMC Portsmouth VA |
| NAVREGDENCEN Oceana Branch | -- | -- | 11 | 17 | NRDC Norfolk, VA |
| FACSFAC VACAPES | -- | 2 | 6 | 87 | COMTACWINGSLANT |
| CB Unit 415 | -- | -- | 1 | 29 | CO NAS Oceana |
| Tangier Island Target Facility | -- | -- | -- | -- | CO NAS Oceana |
| East Coast Tactical Aircrew Training System | -- | -- | -- | -- | FMSAEG, Corona, CA |
| FLTAVCOMLANT Det Oceana | -- | -- | 1 | 47 | FLTAVCOMLANT NORVA |
| PERSUPPACT Det Oceana | -- | -- | 2 | 74 | PERSUPPACT NORVA |
| **Permanent Non-Naval Units (Non-Reserve)** | | | | | |
| 20th Air Defense Squadron USAF Det Alpha | -- | -- | 1 | 31 | 20th NORAD Region Fort Lee, VA |
| FAA Rep | -- | -- | -- | -- | -- |
| American Red Cross | -- | -- | -- | -- | -- |
| First and Merchants Bank | -- | -- | -- | -- | -- |
| Federal Credit Union | -- | -- | -- | -- | -- |
| Navy Relief Society | -- | -- | -- | -- | -- |
| Western Union | -- | -- | -- | -- | -- |
| U. S. Post Office | -- | -- | -- | -- | -- |
| NAS Nursery | -- | -- | -- | -- | -- |
| Navy Wives Club of America #143 | | -- | -- | -- | -- |
| Officer and Enlisted Wives Club | | -- | -- | -- | -- |
| Boy Scouts of America (Troop 414) | | -- | -- | -- | -- |
| Princess Anne Bowmen's Club | -- | -- | -- | -- | -- |
| Golden Eagles Motorcycle Club | | -- | -- | -- | -- |
| Thrift Shop | -- | -- | -- | -- | -- |
| Virginia Beach Little League | -- | -- | -- | -- | -- |
| Embry-Riddle Aeronautical University | -- | -- | -- | -- | -- |
| **Permanent Unit Totals:** | | | | | |
| Total Military: | 85 | 394 | 144 | 3,324 | |

| | USDH | NFUSC | CONTR | FND | NFFNC | FNI |
|---|---|---|---|---|---|---|
| Total Civilian: | 753 | 565 | 803 | -- | -- | -- |

CONFIDENTIAL
DECLASSIFIED

DECLASSIFIED
CONFIDENTIAL

ATLANTIC CONTINENTAL FLEET SUPPORT STATIONS

OCEANA, VIRGINIA BEACH, VIRGINIA (Continued)

| Activities and Units Supported | Aircraft On Board | Officer On Board Aviation/Other | | Enlisted On Board | Administrative Superior |
|---|---|---|---|---|---|
| Deployable Units (Non-Reserve) | | | | | |
| CVW-6 | -- | 6 | 2 | 8 | USS INDEPENDENCE |
| VF-14 | 12 F14 | 26 | 5 | 221 | CVW-6 |
| VF-32 | 12 F14 | 25 | 9 | 225 | CVW-6 |
| VA-176 | 9 A6E, 5 KA6D | 33 | 4 | 270 | CVW-6 |
| CVW-17 | -- | 4 | 6 | 9 | CO USS FORRESTAL |
| VF-103 | 9 F4S | 24 | 4 | 224 | CVW-17 |
| VF-74 | 12 F4J | 24 | 5 | 221 | CVW-17 |
| VA-85 | 10 A6E, 4 KA6D | 31 | 6 | 264 | CVW-17 |
| CVW-7 | -- | 4 | 5 | 9 | USS EISENHOWER |
| VF-142 | 12 F14 | 25 | 5 | 215 | CVW-7 |
| VF-143 | 12 F14 | 32 | 7 | 242 | CVW-7 |
| VA-65 | 10 A6E, 4 KA6D | 35 | 8 | 267 | CVW-7 |
| CVW-8 | -- | 4 | 5 | 9 | CO USS NIMITZ |
| VF-41 | 12 F14 | 28 | 5 | 241 | CVW-8 |
| VF-84 | 12 F14 | 29 | 4 | 267 | CVW-8 |
| VA-35 | 10 A6E, 4 KA6D | 33 | 8 | 276 | CVW-8 |
| CVW-3 | -- | 4 | 5 | 9 | USS J. F. KENNEDY |
| VF-11 | 12 F14 | 31 | 7 | 261 | CVW-3 |
| VF-31 | 12 F14 | 31 | 7 | 247 | CVW-3 |
| VA-75 | 10 A6E, 4 KA6D | 30 | 7 | 266 | CVW-3 |
| CVW-1 | -- | 6 | 2 | 8 | COMFITWING ONE |
| VF-33 | -- | 20 | 3 | 207 | CVW-1 |
| VA-34 | 10 A6E, 4 KA6D | 33 | 8 | 261 | CVW-1 |
| VF-102 | -- | 21 | 2 | 193 | CVW-1 |
| Deployable Unit Totals: | 201 | 539 | 129 | 4,420 | |

Deployed Units Supported (Non-Reserve)

Commercial Air Carriers: DC-8, B707, B727, B747, CONVAIR 990, DC-9, DC-10

Reserve Forces/Training Units

| Units Supported | On Board Aircraft | On Board Officer Aviation AcDu/SelRes | | On Board Officer Other AcDu/SelRes | | On Board Enlisted AcDu/SelRes | |
|---|---|---|---|---|---|---|---|
| VC-12 | 14 TA4J | 7 | 14 | -- | 11 | 74 | 81 |
| Air Reserve Totals: | 14 | 7 | 14 | -- | 11 | 74 | 81 |

| | Aircraft | Personnel Officer | Personnel Enlisted | Personnel (RON) Officer | Personnel (RON) Enlisted |
|---|---|---|---|---|---|
| Average Daily Transients: | 11 | 27 | 7 | 10 | 5 |

REMARKS: (1) Data Services support provided to all tenant activities.

CONFIDENTIAL
DECLASSIFIED

DECLASSIFIED
[redacted]

# ALLOWANCES AND LOCATION OF NAVAL AIRCRAFT (U)

## OPNAV NOTICE C3110

31 MARCH 1981

TABLE


TOTAL A/C INVENTORY BY MAJOR STATUS CATEGORIES .................... 1
PROGRAM & NON-PROGRAM A/C STATUS DISTRIBUTION .................... 2
PROGRAM OPERATING ALLOWANCES:
ALL COMMANDS .................... 3
ATLANTIC FLEET .................... 3A
PACIFIC FLEET .................... 3B
PROGRAM & NON-PROGRAM A/C BY COMMAND, CLASS & MODEL ... 4
DISTRIBUTION OF NON-PROGRAM A/C BY MODEL .................... 5
INVENTORY & OPERATING ALLOWANCES:
PROGRAM & NON-PROGRAM A/C - ATLANTIC FLEET .................... 6
PROGRAM & NON-PROGRAM A/C - PACIFIC FLEET .................... 7
PROGRAM & NON-PROGRAM A/C - CNAVRES, NATRA, NASC AIRCRAFT CUSTODIAN, NASC STF, NASC FS .................... 8
DRONE A/C BY STATUS & COMMAND .................... 9
A/C ON LOAN TO NAVY .................... 10
LOCATION OF A/C INVENTORY BY ORGANIZATIONAL UNIT .................... 11


THIS ISSUE CONTAINS
ALLOWANCE INFORMATION
PROJECTED FOR END FY 1981

DEPARTMENT OF THE NAVY

OFFICE OF THE CHIEF OF NAVAL OPERATIONS

CLASSIFIED BY OPNAVINST C5513.2A-36
DECLASSIFY ON 31 MARCH 1984

[redacted]
DECLASSIFIED

DECLASSIFIED

# INVENTORY AND OPERATING ALLOWANCES [redacted]

## PROGRAM AND NON - PROGRAM AIRCRAFT

TABLE 8

31 MARCH 1981

| CNAVRES | ALLOWANCES PROJECTED FOR END FY 1981 | | | INVENTORY | | | NUMBER OF A/C IN UNIT CUSTODY BY STATUS | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| UNIT NAME | SUBCLASS ALLOWED | PRIMARY USE | NUMBER ALLOWED | MODEL ASSIGNED | STATUS CODE | AIRCRAFT LOCATION | OPERATING STATUS | AWAITING OPERATING | PIPELINE | OTHER |
| VAW 78 | | | | | | NORFOLK | | | | |
| | VWM | A4 | 4 | | | | | | | |
| | | | | E-2B | A40 | NORFOLK | 3 | | | |
| | | | | E-2B | D10 | NORFOLK | | | 1 | |
| | | | | E-2B | D10 | NORTH ISLAND | | | 1 | |
| TOTAL | VAW 78 | | 4 | | | | 3 | | 2 | |
| VAW 88 | | | | | | MIRAMAR | | | | |
| | VWM | A4 | 4 | | | | | | | |
| | | | | E-2B | A40 | MIRAMAR | 1 | | | |
| | | | | E-2B | D10 | MIRAMAR | | | 1 | |
| | | | | E-2B | E11 | MIRAMAR | | | 1 | |
| | | | | E-2B | D10 | NORTH ISLAND | | | 2 | |
| TOTAL | VAW 88 | | 4 | | | | 1 | | 4 | |
| HC 9 | | | | | | NORTH ISLAND | | | | |
| | H A | A4 | 8 | | | | | | | |
| | | | | HH-3A | A40 | NORTH ISLAND | 7 | | | |
| | | | | HH-3A | D10 | PENSACOLA | | | 1 | |
| TOTAL | HC 9 | | 8 | | | | 7 | | 1 | |
| VAK 208 | | | | | | ALAMEDA | | | | |
| | VAH | A4 | 4 | | | | | | | |
| | | | | KA-3B | A40 | ALAMEDA | 2 | | | |
| | | | | KA-3B | D10 | ALAMEDA | | | 2 | |
| | | | | KA-3B | IC0 | ALAMEDA | | | 1 | |
| TOTAL | VAK 208 | | 4 | | | | 2 | | 3 | |
| VAQ 209 | | | | | | NORFOLK | | | | |
| | VAQM | A4 | 4 | | | | | | | |
| | | | | EA-6A | A40 | NORFOLK | 4 | | | |
| TOTAL | VAQ 209 | | 4 | | | | 4 | | | |
| VAK 308 | | | | | | ALAMEDA | | | | |
| | VAH | A4 | 4 | | | | | | | |
| | | | | KA-3B | A40 | ALAMEDA | 2 | | | |
| | | | | KA-3B | B40 | ALAMEDA | | 1 | | |
| | | | | KA-3B | D10 | ALAMEDA | | | 1 | |
| | | | | KA-3B | G30 | ALAMEDA | | | 1 | |
| TOTAL | VAK 308 | | 4 | | | | 2 | 1 | 2 | |
| VAQ 309 | | | | | | WHIDBEY ISLA | | | | |
| | VAQM | A4 | 4 | | | | | | | |
| | | | | EA-6A | D10 | NORFOLK | | | 1 | |
| | | | | EA-6A | A40 | WHIDBEY ISLA | 4 | | | |
| TOTAL | VAQ 309 | | 4 | | | | 4 | | 1 | |
| VC 12 | | | | | | OCEANA | | | | |
| | VTAJ | A4 | 12 | | | | | | | |
| | | | | TA-4J | A40 | OCEANA | 9 | | | |
| | | | | TA-4J | D10 | OCEANA | | | 2 | |
| | | | | TA-4J | D10 | PENSACOLA | | | 3 | |
| TOTAL | VC 12 | | 12 | | | | 9 | | 5 | |
| VC 13 | | | | | | MIRAMAR | | | | |
| | VTAJ | A4 | 12 | | | | | | | |
| | | | | TA-4J | A40 | MIRAMAR | 10 | | | |
| | | | | TA-4J | B40 | MIRAMAR | | 1 | | |
| | | | | TA-4J | D10 | MIRAMAR | | | 1 | |
| | | | | TA-4J | D10 | PENSACOLA | | | 2 | |
| TOTAL | VC 13 | | 12 | | | | 10 | 1 | 3 | |
| HS 74 | | | | | | SOUTH WEYMOU | | | | |
| | H S | A4 | 8 | | | | | | | |
| | | | | SH-3D | EC1 | PENSACOLA | | | 1 | |
| | | | | SH-3D | E11 | PENSACOLA | | | 1 | |
| | | | | SH-3D | A40 | SOUTH WEYMOU | 7 | | | |
| TOTAL | HS 74 | | 8 | | | | 7 | | 2 | |
| HS 75 | | | | | | LAKEHURST | | | | |
| | H S | A4 | 8 | | | | | | | |
| | | | | SH-3D | A40 | LAKEHURST | 5 | | | |
| | | | | SH-3D | G30 | LAKEHURST | | | 1 | |
| | | | | SH-3D | D10 | PENSACOLA | | | 2 | |
| TOTAL | HS 75 | | 8 | | | | 5 | | 3 | |
| HS 84 | | | | | | NORTH ISLAND | | | | |
| | H S | A4 | 8 | | | | | | | |
| | | | | SH-3D | A40 | NORTH ISLAND | 7 | | | |
| | | | | SH-3D | BY1 | PENSACOLA | | | 1 | |
| TOTAL | HS 84 | | 8 | | | | 7 | | 1 | |
| HS 85 | | | | | | ALAMEDA | | | | |
| | H S | A4 | 8 | | | | | | | |
| | | | | SH-3D | A40 | ALAMEDA | 8 | | | |
| | | | | SH-3D | C10 | ALAMEDA | | | 1 | |
| TOTAL | HS 85 | | 8 | | | | 8 | | 1 | |
| VP 60 | | | | | | GLENVIEW | | | | |
| | VPL | A4 | 9 | | | | | | | |
| | | | | P-3B | A40 | GLENVIEW | 5 | | | |
| | | | | P-3B | D10 | GLENVIEW | | | 2 | |
| | | | | P-3A | A40 | GLENVIEW | 3 | | | |
| TOTAL | VP 60 | | 9 | | | | 8 | | 2 | |



[redacted]

DECLASSIFIED
[redacted]

OP-05D2

# ALLOWANCES AND LOCATION OF NAVAL AIRCRAFT (U)

## OPNAV NOTICE C3110

30 SEPTEMBER 1981

DECLASSIFIED

TABLE


TOTAL A/C INVENTORY BY MAJOR STATUS CATEGORIES .................... 1
PROGRAM & NON-PROGRAM A/C STATUS DISTRIBUTION .................. 2
PROGRAM OPERATING ALLOWANCES:
ALL COMMANDS .................................................................. 3
ATLANTIC FLEET .................................................................. 3A
PACIFIC FLEET .................................................................. 3B
PROGRAM & NON-PROGRAM A/C BY COMMAND, CLASS & MODEL ... 4
DISTRIBUTION OF NON-PROGRAM A/C BY MODEL ........................... 5
INVENTORY & OPERATING ALLOWANCES:
PROGRAM & NON-PROGRAM A/C - ATLANTIC FLEET .................... 6
PROGRAM & NON-PROGRAM A/C - PACIFIC FLEET ...................... 7
PROGRAM & NON-PROGRAM A/C - CNAVRES, NATRA, NASC AIRCRAFT CUSTODIAN, NASC STF, NASC FS .................. 8
DRONE A/C BY STATUS & COMMAND ............................................... 9
A/C ON LOAN TO NAVY ........................................................ 10
LOCATION OF A/C INVENTORY BY ORGANIZATIONAL UNIT ............. 11


THIS ISSUE CONTAINS ALLOWANCE INFORMATION (PROJECTED FOR END FY 1981

DEPARTMENT OF THE NAVY
OFFICE OF THE CHIEF OF NAVAL OPERATIONS

CLASSIFIED BY OPNAVINST C5513.2A-36
DECLASSIFY ON 30 SEPTEMBER 1984

[redacted]
DEC

DECLASSIFIED

[redacted]

# INVENTORY AND OPERATING ALLOWANCES

## PROGRAM AND NON - PROGRAM AIRCRAFT

TABLE 6

30 SEPTEMBER 1981

| LANT | ALLOWANCES | | | INVENTORY | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | PROJECTED FOR END FY 1981 | | | | | | NUMBER OF A/C IN UNIT CUSTODY BY STATUS | | | |
| UNIT NAME | SUBCLASS ALLOWED | PRIMARY USE | NUMBER ALLOWED | MODEL ASSIGNED | STATUS CODE | AIRCRAFT LOCATION | OPERATING STATUS | AWAITING OPERATING | PIPELINE | OTHER |
| ATTACK CAPRIEP AIR SQUADRONS | | | | | | | | | | |
| VF 11 | | | | | | ABD FORRESTA | | | | |
| | VFFB | A1 | 12 | | | | | | | |
| | | | | F-14A | A10 | ABD FORRESTA | 12 | | | |
| TOTAL | | | 12 | | | | 12 | | | |
| VF 14 | | | | | | OCEANA | | | | |
| | VFFB | A1 | 12 | | | | | | | |
| | | | | F-14A | A10 | OCEANA | 10 | | | |
| | | | | F-14A | D1D | OCEANA | | | 1 | |
| | | | | F-14A | G4C | OCEANA | | | 1 | |
| | | | | F-14A | K6J | OCEANA | | | | 1 |
| TOTAL | VF 14 | | 12 | | | | 10 | | 2 | 1 |
| VF 31 | | | | | | OCEANA | | | | |
| | VFFB | A1 | 12 | | | | | | | |
| | | | | F-14A | A10 | OCEANA | 10 | | | |
| | | | | F-14A | G4C | OCEANA | | | 2 | |
| TOTAL | VF 31 | | 12 | | | | 10 | | 2 | |
| VF 32 | | | | | | OCEANA | | | | |
| | VFFB | A1 | 12 | | | | | | | |
| | | | | F-14A | D1C | NORFOLK | | | 2 | |
| | | | | F-14A | A10 | OCEANA | 10 | | | |
| | | | | F-14A | G3D | OCEANA | | | 2 | |
| | | | | F-14A | K1F | OCEANA | | | | 1 |
| TOTAL | VF 32 | | 12 | | | | 10 | | 4 | 1 |
| VF 33 | | | | | | OCEANA | | | | |
| | VFFB | A1 | 12 | | | | | | | |
| | | | | F-4J | A1D | OCEANA | 1 | | | |
| | | | | F-4J | G3D | OCEANA | | | 1 | |
| TOTAL | VF 33 | | 12 | | | | 1 | | 1 | |
| VF 41 | | | | | | OCEANA | | | | |
| | VFFB | A1 | 12 | | | | | | | |
| | | | | F-14A | K1F | NORFOLK | | | | 1 |
| | | | | F-14A | A1D | OCEANA | 12 | | | |
| | | | | F-14A | K1F | OCEANA | | | | 1 |
| TOTAL | VF 41 | | 12 | | | | 12 | | | 2 |
| VF 74 | | | | | | OCEANA | | | | |
| | VFFB | A1 | 12 | | | | | | | |
| | | | | F-4J | A1D | OCEANA | 10 | | | |
| TOTAL | VF 74 | | 12 | | | | 10 | | | |
| VF 84 | | | | | | OCEANA | | | | |
| | VFFB | A1 | 12 | | | | | | | |
| | | | | F-14A | D1C | NORFOLK | | | 1 | |
| | | | | F-14A | A1D | OCEANA | 12 | | | |
| | | | | F-14A | K1F | OCEANA | | | | 3 |
| TOTAL | VF 84 | | 12 | | | | 12 | | 1 | 3 |
| VF 102 | | | | | | OCEANA | | | | |
| | VFFB | A1 | 12 | | | | | | | |
| | | | | F-4J | G3D | CHERRY POINT | | | 1 | |
| | | | | F-4J | G3D | OCEANA | | | 1 | |
| TOTAL | VF 102 | | 12 | | | | | | 2 | |
| VF 103 | | | | | | OCEANA | | | | |
| | VFFB | A1 | 12 | | | | | | | |
| | | | | F-4S | A10 | OCEANA | 10 | | | |
| | | | | F-4J | D1D | CHERRY POINT | | | 1 | |
| | | | | F-4J | A1C | OCEANA | 1 | | | |
| TOTAL | VF 103 | | 12 | | | | 11 | | 1 | |
| VF 142 | | | | | | ABD EISENHOW | | | | |
| | VFFB | A1 | 12 | | | | | | | |
| | | | | F-14A | A1C | ABD EISENHOW | 12 | | | |
| | | | | F-14A | D1D | ABD EISENHOW | | | 3 | |
| | | | | F-14A | K1F | ABD EISENHOW | | | | 3 |
| | | | | F-14A | D1C | NORFOLK | | | 1 | |
| TOTAL | VF 142 | | 12 | | | | 12 | | 4 | 3 |
| VF 143 | | | | | | OCEANA | | | | |
| | VFFB | A1 | 12 | | | | | | | |
| | | | | F-14A | D1D | NORFOLK | | | 1 | |
| | | | | F-14A | K1F | NORFOLK | | | | 1 |
| | | | | F-14A | A1D | OCEANA | 12 | | | |
| | | | | F-14A | D1D | OCEANA | | | 2 | |
| | | | | F-14A | K1F | OCEANA | | | | 2 |
| TOTAL | VF 143 | | 12 | | | | 12 | | 3 | 3 |
| VA 12 | | | | | | ABD EISENHOW | | | | |
| | VAL | A1 | 12 | | | | | | | |
| | | | | A-7E | A1D | ABD EISENHOW | 9 | | | |
| | | | | A-7E | HCA | ABD EISENHOW | | | 1 | |
| | | | | A-7E | PSO | JACKSONVILLE | | | 1 | |
| | | | | A-7F | G3C | JACKSONVILLE | | | 1 | |
| TOTAL | VA 12 | | 12 | | | | 9 | | 3 | |
| VA 15 | | | | | | CECIL FIELD | | | | |
| | VAL | A1 | 12 | | | | | | | |
| | | | | A-7E | A1D | CECIL FIELD | 10 | | | |
| | | | | A-7E | KDF | CECIL FIELD | | | | 1 |
| | | | | A-7F | G3D | JACKSONVILLE | | | 1 | |
| TOTAL | VA 15 | | 12 | | | | 10 | | 1 | 1 |

DECLASSIFIED



[redacted]

DECLASSIFIED

[redacted]

# INVENTORY AND OPERATING ALLOWANCES

## PROGRAM AND NON - PROGRAM AIRCRAFT

TABLE 6

30 SEPTEMBER 1981

| LANT | ALLOWANCES | | | INVENTORY | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | PROJECTED FOR END FY 1981 | | | | | | NUMBER OF A/C IN UNIT CUSTODY BY STATUS | | | |
| UNIT NAME | SUBCLASS ALLOWED | PRIMARY USE | NUMBER ALLOWED | MODEL ASSIGNED | STATUS CODE | AIRCRAFT LOCATION | OPERATING STATUS | AWAITING OPERATING | PIPELINE | OTHER |
| VA 34 | VAM | A1 | 14 | | | OCEANA | | | | |
| | | | | A-6E | D10 | ALAMEDA | | | 2 | |
| | | | | A-6E | D10 | NORFOLK | | | 1 | |
| | | | | A-6E | A10 | OCEANA | 7 | | | |
| | | | | A-6E | G30 | OCEANA | | | 1 | |
| | | | | KA-6D | A10 | OCEANA | 3 | | | |
| TOTAL | VA 34 | | 14 | | | | 10 | | 4 | |
| VA 35 | VAM | A1 | 14 | | | OCEANA | | | | |
| | | | | A-6E | A10 | OCEANA | 10 | | | |
| | | | | KA-6D | D10 | NORFOLK | | | 1 | |
| | | | | KA-6D | A10 | OCEANA | 4 | | | |
| | | | | KA-6D | G30 | OCEANA | | | 1 | |
| TOTAL | VA 35 | | 14 | | | | 14 | | 2 | |
| VA 37 | VAL | A1 | 12 | | | CECIL FIELD | | | | |
| | | | | A-7E | A10 | CECIL FIELD | 12 | | | |
| | | | | A-7E | HCA | CECIL FIELD | | | 1 | |
| TOTAL | VA 37 | | 12 | | | | 12 | | 1 | |
| VA 46 | VAL | A1 | 12 | | | CECIL FIELD | | | | |
| | | | | A-7E | A10 | CECIL FIELD | 6 | | | |
| | | | | A-7E | G30 | CECIL FIELD | | | 1 | |
| | | | | A-7E | G40 | CECIL FIELD | | | 1 | |
| | | | | A-7E | PY1 | JACKSONVILLE | | | 1 | |
| | | | | A-7E | D10 | JACKSONVILLE | | | 5 | |
| TOTAL | VA 46 | | 12 | | | | 6 | | 8 | |
| VA 65 | VAM | A1 | 14 | | | ABD EISENHOW | | | | |
| | | | | A-6E | A10 | ABD EISENHOW | 9 | | | |
| | | | | A-6E | K6G | ABD EISENHOW | | | | 1 |
| | | | | KA-6D | A10 | ABD EISENHOW | 4 | | | |
| | | | | KA-6D | H3A | ABD EISENHOW | | | 1 | |
| TOTAL | VA 65 | | 14 | | | | 13 | | 1 | 1 |
| VA 66 | VAL | A1 | 12 | | | ABD EISENHOW | | | | |
| | | | | A-7E | A10 | ABD EISENHOW | 10 | | | |
| | | | | A-7E | KEA | ABD EISENHOW | | | | 1 |
| | | | | A-7E | G40 | DALLAS | | | 1 | |
| TOTAL | VA 66 | | 12 | | | | 10 | | 1 | 1 |
| VA 72 | VAL | A1 | 12 | | | CECIL FIELD | | | | |
| | | | | A-7E | A10 | CECIL FIELD | 8 | | | |
| | | | | A-7E | G40 | DALLAS | | | 2 | |
| | | | | A-7E | H41 | DALLAS | | | 1 | |
| | | | | A-7E | D10 | JACKSONVILLE | | | 4 | |
| | | | | A-7E | G30 | JACKSONVILLE | | | 1 | |
| TOTAL | VA 72 | | 12 | | | | 8 | | 8 | |
| VA 75 | VAM | A1 | 14 | | | OCEANA | | | | |
| | | | | A-6E | A10 | OCEANA | 10 | | | |
| | | | | A-6E | G40 | OCEANA | | | 1 | |
| | | | | KA-6D | D10 | ALAMEDA | | | 1 | |
| | | | | KA-6D | A10 | OCEANA | 3 | | | |
| | | | | KA-6D | G40 | OCEANA | | | 1 | |
| TOTAL | VA 75 | | 14 | | | | 13 | | 3 | |
| VA 81 | VAL | A1 | 12 | | | CECIL FIELD | | | | |
| | | | | A-7E | A10 | CECIL FIELD | 11 | | | |
| | | | | A-7E | G30 | CECIL FIELD | | | 1 | |
| TOTAL | VA 81 | | 12 | | | | 11 | | 1 | |
| VA 82 | VAL | A1 | 12 | | | ABD NIMITZ | | | | |
| | | | | A-7E | A10 | ABD NIMITZ | 12 | | | |
| | | | | A-7E | KEA | ABD NIMITZ | | | | 1 |
| | | | | A-7E | G40 | DALLAS | | | 1 | |
| TOTAL | VA 82 | | 12 | | | | 12 | | 1 | 1 |
| VA 83 | VAL | A1 | 12 | | | CECIL FIELD | | | | |
| | | | | A-7E | A10 | CECIL FIELD | 11 | | | |
| | | | | A-7E | HCA | CECIL FIELD | | | 1 | |
| TOTAL | VA 83 | | 12 | | | | 11 | | 1 | |
| VA 95 | VAM | A1 | 14 | | | OCEANA | | | | |
| | | | | A-6E | A10 | OCEANA | 6 | | | |
| | | | | A-6E | G30 | OCEANA | | | 2 | |
| | | | | A-6E | K6G | OCEANA | | | | 1 |
| | | | | KA-6D | D10 | ALAMEDA | | | 1 | |
| | | | | KA-6D | A10 | OCEANA | 3 | | | |
| | | | | KA-6D | HC1 | OCEANA | | | 1 | |
| TOTAL | VA 95 | | 14 | | | | 9 | | 4 | 1 |

[redacted]



DECLASSIFIED

DECLASSIFIED

[redacted]

# INVENTORY AND OPERATING ALLOWANCES
## PROGRAM AND NON - PROGRAM AIRCRAFT

TABLE 6

30 SEPTEMBER 1981

| LANT | ALLOWANCES PROJECTED FOR END FY 1981 | | | INVENTORY | | | NUMBER OF A/C IN UNIT CUSTODY BY STATUS | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| UNIT NAME | SUBCLASS ALLOWED | PRIMARY USE | NUMBER ALLOWED | MODEL ASSIGNED | STATUS CODE | AIRCRAFT LOCATION | OPERATING STATUS | AWAITING OPERATING | PIPELINE | OTHER |
| VA 86 | | | | | | ABD NIMITZ | | | | |
| | VAL | A1 | 12 | | | | | | | |
| | | | | A-7E | A1C | ABD NIMITZ | 12 | | | |
| | | | | A-7E | HC1 | ABD NIMITZ | | | 2 | |
| TOTAL VA 86 | | | 12 | | | | 12 | | 2 | |
| VA 87 | | | | | | CECIL FIELD | | | | |
| | VAL | A1 | 12 | | | | | | | |
| | | | | A-7E | A1C | CECIL FIELD | 9 | | | |
| | | | | A-7E | G30 | JACKSONVILLE | | | 1 | |
| TOTAL VA 87 | | | 12 | | | | 9 | | 1 | |
| VA 105 | | | | | | CECIL FIELD | | | | |
| | VAL | A1 | 12 | | | | | | | |
| | | | | A-7E | A1C | ABD KENNEDY | 8 | | | |
| | | | | A-7E | G30 | ABD KENNEDY | | | 1 | |
| | | | | A-7E | A1C | CECIL FIELD | 1 | | | |
| | | | | A-7E | H3A | CECIL FIELD | | | 1 | |
| | | | | A-7E | MSD | JACKSONVILLE | | | 1 | |
| | | | | A-7E | G3C | JACKSONVILLE | | | 1 | |
| TOTAL VA 105 | | | 12 | | | | 9 | | 4 | |
| VA 176 | | | | | | OCEANA | | | | |
| | VAM | A1 | 14 | | | | | | | |
| | | | | A-6E | KCF | NORFOLK | | | | 1 |
| | | | | A-6E | A1C | OCEANA | 6 | | | |
| | | | | A-6E | G3C | OCEANA | | | 2 | |
| | | | | KA-6D | D1C | NORFOLK | | | 1 | |
| | | | | KA-6D | A1C | OCEANA | 1 | | | |
| | | | | KA-6D | D1C | OCEANA | | | 1 | |
| | | | | KA-6D | G3C | OCEANA | | | 1 | |
| | | | | KA-6D | G4C | OCEANA | | | 2 | |
| TOTAL VA 176 | | | 14 | | | | 7 | | 7 | 1 |
| READINESS ATTACK CARRIER AIR SQUADRONS | | | | | | | | | | |
| VF 101 | | | | | | OCEANA | | | | |
| | VFFB | A1 | 24 | | | | | | | |
| | | | | F-14A | D1C | NORFOLK | | | 3 | |
| | | | | F-14A | K6J | NORFOLK | | | | 1 |
| | | | | F-14A | A1C | OCEANA | 26 | | | |
| | | | | F-14A | F1C | OCEANA | | | 1 | |
| | | | | F-14A | G4C | OCEANA | | | 1 | |
| | | | | F-14A | KEF | OCEANA | | | | 1 |
| | | | | F-14A | K66 | OCEANA | | | | 1 |
| | | | | F-14A | K6J | OCEANA | | | | 1 |
| TOTAL VF 101 | | | 24 | | | | 26 | | 5 | 4 |
| VF 171 | | | | | | OCEANA | | | | |
| | VFFB | A1 | 15 | | | | | | | |
| | | | | F-4S | A1C | OCEANA | 5 | | | |
| | | | | F-4J | A1C | OCEANA | 9 | | | |
| | | | | F-4J | K56 | OCEANA | | | | 1 |
| TOTAL VF 171 | | | 15 | | | | 14 | | | 1 |
| VF 171 DET KEY W | | | | | | KEY WEST | | | | |
| | VFFB | A1 | 10 | | | | | | | |
| | | | | F-4N | D1C | BIRMINGHAM | | | 3 | |
| | | | | F-4N | G3C | BIRMINGHAM | | | 1 | |
| | | | | F-4N | G30 | CHERRY POINT | | | 1 | |
| | | | | F-4N | A1C | KEY WEST | 5 | | | |
| | VAL | A1 | 3 | | | | | | | |
| | | | | A-4E | A4C | KEY WEST | 2 | | | |
| | | | | A-4F | HCA | KEY WEST | | | 1 | |
| | | | | TA-4J | A4C | KEY WEST | 1 | | | |
| TOTAL VF 171 DET KEY W | | | 13 | | | | 8 | | 6 | |
| VA 42 | | | | | | OCEANA | | | | |
| | VAM | A1 | 17 | | | | | | | |
| | | | | A-6E | C1C | NORFOLK | | | 1 | |
| | | | | A-6E | A1C | OCEANA | 13 | | | |
| | | | | A-6E | D1C | OCEANA | | | 1 | |
| | | | | A-6E | G3C | OCEANA | | | 1 | |
| | | | | A-6E | G4C | OCEANA | | | 1 | |
| | VTSP | A4 | 3 | | | | | | | |
| | | | | TC-4C | D1C | BETHPAGE | | | 1 | |
| | | | | TC-4C | A1C | OCEANA | 1 | | | |
| | | | | TC-4C | A4C | OCEANA | 1 | | | |
| TOTAL VA 42 | | | 20 | | | | 15 | | 5 | |
| VF 43 | | | | | | OCEANA | | | | |
| | VFFB | A1 | 3 | | | | | | | |
| | | | | F-5E | A4C | OCEANA | 3 | | | |
| | | | | F-5F | KFA | OCEANA | | | | 1 |
| | VAL | A1 | 4 | | | | | | | |
| | | | | A-4F | A4C | OCEANA | 2 | | | |
| | | | | A-4F | A4C | OCEANA | 7 | | | |
| | | | | A-4E | KDA | OCEANA | | | | 1 |
| | VTAJ | A4 | 5 | | | | | | | |
| | | | | T-38A | A4C | OCEANA | 1 | | | |
| | | | | TA-4J | A4C | OCEANA | 1 | | | |
| | VTBJ | A4 | 3 | | | | | | | |
| | | | | T-2C | A4C | OCEANA | 1 | | | |
| TOTAL VF 43 | | | 15 | | | | 17 | | | 2 |

DECLASSIFIED



[redacted]

DECLASSIFIED

[redacted]

# INVENTORY AND OPERATING ALLOWANCES

## PROGRAM AND NON - PROGRAM AIRCRAFT

TABLE 6

30 SEPTEMBER 1981

LANT

| UNIT NAME | ALLOWANCES PROJECTED FOR END FY 1981 | | | INVENTORY | | | NUMBER OF A/C IN UNIT CUSTODY BY STATUS | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | SUBCLASS ALLOWED | PRIMARY USE | NUMBER ALLOWED | MODEL ASSIGNED | STATUS CODE | AIRCRAFT LOCATION | OPERATING STATUS | AWAITING OPERATING | PIPELINE | OTHER |
| HMT 204 | | | | | | NEW RIVER | | | | |
| | H H | A4 | 9 | | | | | | | |
| | | | | CH-53D | A20 | NEW RIVER | [illegible] | | | |
| | | | | CH-53D | KEA | NEW RIVER | | | | 1 |
| | H M | A4 | 10 | | | | | | | |
| | | | | CH-46E | A20 | NEW RIVER | 12 | | | |
| TOTAL HMT 204 | | | 19 | | | | 20 | | | 1 |
| OPERATION TEST AND EVALUATION FORCE | | | | | | | | | | |
| VX 1 | | | | | | PTXNT RIVER | | | | |
| | VS | A7 | 3 | | | | | | | |
| | | | | S-3A | BY1 | ALAMEDA | | | 1 | |
| | | | | S-3A | A70 | PTXNT RIVER | 2 | | | |
| | VPL | A7 | 5 | | | | | | | |
| | | | | P-3C | A70 | PTXNT RIVER | 6 | | | |
| | VAH | A7 | 1 | | | | | | | |
| | | | | EP-3A | F10 | PTXNT RIVER | | | 1 | |
| | H S | A7 | 3 | | | | | | | |
| | | | | SH-3H | A70 | PTXNT RIVER | 3 | | | |
| | | | | SH-6CP | A70 | PTXNT RIVER | 1 | | | |
| | | | | SH-2F | A70 | PTXNT RIVER | 2 | | | |
| TOTAL VX 1 | | | 12 | | | | 14 | | 2 | |
| FLEET COMPOSITE SQUADRONS | | | | | | | | | | |
| VC 8 | | | | | | ROOSEVELT RO | | | | |
| | VTAJ | A2 | 4 | | | | | | | |
| | | | | TA-4J | D10 | PENSACOLA | | | 1 | |
| | | | | TA-4J | A4C | ROOSEVELT RO | 5 | | | |
| | H S | A2 | 6 | | | | | | | |
| | | | | SH-3G | BY1 | PENSACOLA | | | 1 | |
| | | | | SH-3G | D10 | PENSACOLA | | | 1 | |
| | | | | SH-3G | A2C | ROOSEVELT RO | 5 | | | |
| TOTAL VC 8 | | | 10 | | | | 10 | | 3 | |
| VC 10 | | | | | | GTMO BAY | | | | |
| | VTAJ | A2 | 8 | | | | | | | |
| | | | | TA-4J | A20 | GTMO BAY | 7 | | | |
| | | | | TA-4J | BY1 | PENSACOLA | | | 1 | |
| TOTAL VC 10 | | | 8 | | | | 7 | | 1 | |
| CV AND CVN CARRIER UTILITY AIRCRAFT | | | | | | | | | | |
| CVN 69 EISENHWR | | | | | | NORFOLK | | | | |
| | VRC | A2 | 1 | | | | | | | |
| | | | | C-1A | A20 | NORFOLK | 1 | | | |
| TOTAL CVN 69 EISENHWR | | | 1 | | | | 1 | | | |
| CV 59 FORRESTAL | | | | | | MAYPORT | | | | |
| | VRC | A2 | 1 | | | | | | | |
| | | | | C-1A | A2C | MAYPORT | 1 | | | |
| TOTAL CV 59 FORRESTAL | | | 1 | | | | 1 | | | |
| CV 60 SARATOGA | | | | | | MAYPORT | | | | |
| | VRC | A2 | 1 | | | | | | | |
| | | | | C-1A | A2C | MAYPORT | 1 | | | |
| TOTAL CV 60 SARATOGA | | | 1 | | | | 1 | | | |
| CV 62 INDEPEND | | | | | | NORFOLK | | | | |
| | VRC | A2 | 1 | | | | | | | |
| | | | | C-1A | A20 | NORFOLK | 1 | | | |
| TOTAL CV 62 INDEPEND | | | 1 | | | | 1 | | | |
| CV 66 AMERICA | | | | | | NORFOLK | | | | |
| | VRC | A2 | 1 | | | | | | | |
| TOTAL CV 66 AMERICA | | | 1 | | | | | | | |
| CV 67 KENNEDY | | | | | | NORFOLK | | | | |
| | VRC | A2 | 1 | | | | | | | |
| | | | | C-1A | A2C | NORFOLK | 1 | | | |
| TOTAL CV 67 KENNEDY | | | 1 | | | | 1 | | | |
| CVN 68 NIMITZ | | | | | | NORFOLK | | | | |
| | VRC | A2 | 1 | | | | | | | |
| | | | | C-1A | A20 | NORFOLK | 1 | | | |
| TOTAL CVN 68 NIMITZ | | | 1 | | | | 1 | | | |
| CVAN 70 | | | | | | NORFOLK | | | | |
| | | | | C-1A | A2C | NORFOLK | 1 | | | |
| TOTAL CVAN 70 | | | | | | | 1 | | | |
| STATION ASSIGNED AIRCRAFT | | | | | | | | | | |
| NAS BRUNSWICK | | | | | | BRUNSWICK | | | | |
| | VUS | A5 | 1 | | | | | | | |
| | | | | UC-12B | A5C | BRUNSWICK | 1 | | | |
| | H L | AL | 2 | | | | | | | |
| | | | | UH-1N | AL0 | BRUNSWICK | 2 | | | |
| TOTAL NAS BRUNSWICK | | | 3 | | | | 3 | | | |
| NAS OCEANA | | | | | | OCEANA | | | | |
| | H S | AL | 3 | | | | | | | |
| | | | | SH-3G | AL0 | OCEANA | 3 | | | |
| TOTAL NAS OCEANA | | | 3 | | | | 3 | | | |
| NAS NORFOLK | | | | | | NORFOLK | | | | |
| | | | | C-131F | AM0 | NORFOLK | 2 | | | |
| | VRC | A2 | 1 | | | | | | | |
| | VUS | A5 | 2 | | | | | | | |
| | | | | UC-12B | A60 | NORFOLK | 2 | | | |
| TOTAL NAS NORFOLK | | | 3 | | | | 4 | | | |
| NAS CECIL FIELD | | | | | | CECIL FIELD | | | | |
| | | | | C-1A | A6C | CECIL FIELD | 1 | | | |
| TOTAL NAS CECIL FIELD | | | | | | | 1 | | | |

[redacted]



DECLASSIFIED

DECLASSIFIED
[redacted]

OP-05D2

# ALLOWANCES AND LOCATION OF NAVAL AIRCRAFT (U)

## OPNAV NOTICE C3110

30 SEPTEMBER 1981

DECLASSIFIED

TABLE


TOTAL A/C INVENTORY BY MAJOR STATUS CATEGORIES .................... 1
PROGRAM & NON-PROGRAM A/C STATUS DISTRIBUTION .................... 2
PROGRAM OPERATING ALLOWANCES:
ALL COMMANDS .................... 3
ATLANTIC FLEET .................... 3A
PACIFIC FLEET .................... 3B
PROGRAM & NON-PROGRAM A/C BY COMMAND, CLASS & MODEL ... 4
DISTRIBUTION OF NON-PROGRAM A/C BY MODEL .................... 5
INVENTORY & OPERATING ALLOWANCES:
PROGRAM & NON-PROGRAM A/C - ATLANTIC FLEET .................... 6
PROGRAM & NON-PROGRAM A/C - PACIFIC FLEET .................... 7
PROGRAM & NON-PROGRAM A/C - CNAVRES, NATRA, NASC AIRCRAFT CUSTODIAN, NASC STF, NASC FS .................... 8
DRONE A/C BY STATUS & COMMAND .................... 9
A/C ON LOAN TO NAVY .................... 10
LOCATION OF A/C INVENTORY BY ORGANIZATIONAL UNIT .................... 11


THIS ISSUE CONTAINS
ALLOWANCE INFORMATION
(PROJECTED FOR END FY 1981

DEPARTMENT OF THE NAVY

OFFICE OF THE CHIEF OF NAVAL OPERATIONS

CLASSIFIED BY OPNAVINST C5513.2A-36
DECLASSIFY ON 30 SEPTEMBER 1984

[redacted]

DECLASSIFIED

[redacted]

# INVENTORY AND OPERATING ALLOWANCES

## PROGRAM AND NON - PROGRAM AIRCRAFT

**TABLE 8**

30 SEPTEMBER 1981

| CNAVRES | ALLOWANCES PROJECTED FOR END FY 1981 | | | INVENTORY | | | NUMBER OF A/C IN UNIT CUSTODY BY STATUS | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| UNIT NAME | SUBCLASS ALLOWED | PRIMARY USE | NUMBER ALLOWED | MODEL ASSIGNED | STATUS CODE | AIRCRAFT LOCATION | OPERATING STATUS | AWAITING OPERATING | PIPELINE | OTHER |
| VAW 88 | | | | | | MIRAMAR | | | | |
| | VAW | A4 | 4 | | | | | | | |
| | | | | E-2B | A4C | MIRAMAR | 3 | | | |
| | | | | E-2B | D1C | NORTH ISLAND | | | 2 | |
| TOTAL | VAW 88 | | 4 | | | | 3 | | 2 | |
| HC 9 | | | | | | NORTH ISLAND | | | | |
| | H A | A4 | 8 | | | | | | | |
| | | | | HH-3A | A4C | NORTH ISLAND | 7 | | | |
| | | | | HH-3A | D2D | NORTH ISLAND | | | 1 | |
| | | | | HH-3A | E21 | NORTH ISLAND | | | 1 | |
| TOTAL | HC 9 | | 8 | | | | 7 | | 2 | |
| VAK 208 | | | | | | ALAMEDA | | | | |
| | VAH | A4 | 4 | | | | | | | |
| | | | | KA-3B | A4D | ALAMEDA | 4 | | | |
| | | | | KA-3B | D1D | ALAMEDA | | | 1 | |
| TOTAL | VAK 208 | | 4 | | | | 4 | | 1 | |
| VAQ 209 | | | | | | NORFOLK | | | | |
| | VAQM | A4 | 4 | | | | | | | |
| | | | | EA-6A | A4D | NORFOLK | 5 | | | |
| TOTAL | VAQ 209 | | 4 | | | | 5 | | | |
| VAK 308 | | | | | | ALAMEDA | | | | |
| | VAH | A4 | 4 | | | | | | | |
| | | | | KA-3B | A1D | ALAMEDA | 2 | | | |
| | | | | KA-3B | A4C | ALAMEDA | 2 | | | |
| | | | | KA-3B | FAA | ALAMEDA | | | 1 | |
| TOTAL | VAK 308 | | 4 | | | | 4 | | 1 | |
| VAQ 309 | | | | | | WHIDBEY ISLA | | | | |
| | VAQM | A4 | 4 | | | | | | | |
| | | | | EA-6A | A4D | WHIDBEY ISLA | 5 | | | |
| TOTAL | VAQ 309 | | 4 | | | | 5 | | | |
| VC 12 | | | | | | OCEANA | | | | |
| | VTAJ | A4 | 12 | | | | | | | |
| | | | | TA-4J | A4D | OCEANA | 13 | | | |
| | | | | TA-4J | D1D | OCEANA | | | 1 | |
| TOTAL | VC 12 | | 12 | | | | 13 | | 1 | |
| VC 13 | | | | | | MIRAMAR | | | | |
| | VTAJ | A4 | 12 | | | | | | | |
| | | | | TA-4J | A4D | MIRAMAR | 12 | | | |
| | | | | TA-4J | HC1 | MIRAMAR | | | 1 | |
| | | | | TA-4J | D1D | PENSACOLA | | | 1 | |
| TOTAL | VC 13 | | 12 | | | | 12 | | 2 | |
| HS 74 | | | | | | SOUTH WEYMOU | | | | |
| | H S | A4 | [illegible] | | | | | | | |
| | | | | SH-3D | A4D | SOUTH WEYMOU | [illegible] | | | |
| | | | | SH-3D | D1D | SOUTH WEYMOU | | | 1 | |
| | | | | SH-3D | G3D | SOUTH WEYMOU | | | 1 | |
| TOTAL | HS 74 | | 8 | | | | 8 | | 2 | |
| HS 75 | | | | | | LAKEHURST | | | | |
| | H S | A4 | 8 | | | | | | | |
| | | | | SH-3D | A4D | LAKEHURST | 7 | | | |
| | | | | SH-3D | D1D | LAKEHURST | | | 1 | |
| TOTAL | HS 75 | | 8 | | | | 7 | | 1 | |
| HS 84 | | | | | | NORTH ISLAND | | | | |
| | H S | A4 | 8 | | | | | | | |
| | | | | SH-3D | A4D | NORTH ISLAND | 7 | | | |
| | | | | SH-3D | F1D | NORTH ISLAND | | | 1 | |
| TOTAL | HS 84 | | 8 | | | | 7 | | 1 | |
| HS 85 | | | | | | ALAMEDA | | | | |
| | H S | A4 | 8 | | | | | | | |
| | | | | SH-3D | A4D | ALAMEDA | 6 | | | |
| | | | | SH-3D | D1D | ALAMEDA | | | 1 | |
| | | | | SH-3D | D1D | PENSACOLA | | | 1 | |
| TOTAL | HS 85 | | 8 | | | | 6 | | 2 | |
| VP 60 | | | | | | GLENVIEW | | | | |
| | VPL | A4 | 9 | | | | | | | |
| | | | | P-3B | A4C | GLENVIEW | 8 | | | |
| | | | | P-3B | D1D | GLENVIEW | | | 1 | |
| TOTAL | VP 60 | | 9 | | | | 8 | | 1 | |
| VP 62 | | | | | | JACKSONVILLE | | | | |
| | VPL | A4 | 9 | | | | | | | |
| | | | | P-3B | A4D | JACKSONVILLE | 9 | | | |
| TOTAL | VP 62 | | 9 | | | | 9 | | | |
| VP 64 | | | | | | WILLOW GROVE | | | | |
| | VPL | A4 | 9 | | | | | | | |
| | | | | P-3A | D1C | LAKE CITY | | | 1 | |
| | | | | P-3A | A4C | WILLOW GROVE | 8 | | | |
| | | | | P-3A | 94D | WILLOW GROVE | | 1 | | |
| TOTAL | VP 64 | | 9 | | | | 8 | 1 | 1 | |

DECLASSIFIED



[redacted]

# EXHIBIT N

# REVISED REPORT OF SANFORD FIDELL

## IN TESTWUIDE *et al.* *v.* THE UNITED STATES OF AMERICA IN THE UNITED STATES COURT OF FEDERAL CLAIMS

29 March 2006

Prepared for:

**U.S. DEPARTMENT OF JUSTICE**
Environment and Natural Resources Division
601 D Street, NW
Washington, D.C. 20004

Prepared by:

Sanford Fidell
**FIDELL ASSOCIATES, INC.**
23139 Erwin Street
Woodland Hills, California 91367

# 1 INTRODUCTION AND SUMMARY

## 1.1 PURPOSE OF REVISED REPORT

This report is a further revision of a technical report originally dated 30 September 2005. The purpose of this further revision is to respond to certain matters raised by Dr. Noral Stewart in his report of 22 February 2006 by providing additional information about historical fluctuations in the aircraft noise environment at NAS Oceana, including a new section containing information about single event noise levels produced by aircraft that have operated at NAS Oceana. I also made minor wording changes (as in Section 2.2.4) to more accurately reflect sources of operational information for the various noise modeling exercises.

As part of this revision, I added 1.6 dB to the 1997 and 2000 calculated DNL values at plaintiffs' homes described in Section 2.2, to approximate average busy day modeling assumptions. For the sake of conservatism in estimation, I did not similarly adjust DNL calculations for any of the 1970s-era studies, even though it is uncertain whether all of them were based on consistent average busy day assumptions.[1/] Had I made such adjustments, they would have slightly *increased* estimated DNL values at plaintiffs' homes during the 1970s. The effect of such increases would have been to further strengthen my opinion that noise exposure levels at plaintiffs' homes had been greater in the past than in some subsequent years.

## 1.2 SUMMARY OF OPINIONS

Cumulative noise exposure levels produced by military aircraft operations at the test plaintiffs' homes in recent years are neither novel nor unusually high from an historical perspective. Likewise, adverse reaction in nearby residential areas to noise from aircraft operations at NAS Oceana and NALF Fentress is hardly novel. Although operational levels and aircraft noise exposure at the homes of the Plaintiffs have varied at NAS Oceana over the years, the levels of noise exposure at most of the test plaintiffs' homes have been incompatible with residential land uses for the better part of the last three decades.[2/]

Further, the aircraft noise exposure at all but four of the test plaintiffs' homes had been greater at various times throughout these decades than in 2000. At three of the four homes with greater noise exposure in 2000 than in prior years, noise exposure had previously been incompatible with residential land uses. At the fourth of these homes, aircraft noise exposure had been compatible with residential land uses for the entire time period examined in my report.

The local press has amply documented controversies about aircraft noise on residents of neighborhoods near NAS Oceana and NALF Fentress, as well as the adverse effects of the noise on residents over four decades. If history is any guide, future aircraft noise exposure levels at the test plaintiffs' homes

---

[1/] For example, minutes of a December 1978 AICUZ meeting suggest that the Paulhus (1972) study had adopted average annual day assumptions, and that the 1978 study had assumed 275 rather than 250 days of operation. Due to the logarithmic nature of decibel notation, differences between 250 and 275 day modeling assumptions are of minor practical significance, since they lead to adjustments on the order of ± 0.1 dB.

[2/] As discussed in Section A.2.2, federal policy for the last quarter-century has treated noise exposure at levels in excess of $L_{dn} = 65$ dB as incompatible with single family residential land use.

will continue to fluctuate with the numbers and types of training missions and aircraft types based at NAS Oceana. A future federal Base Realignment and Closure Committee could even recommend closure of the facility, effectively ending aircraft noise in the vicinity of NAS Oceana.

## 1.3 PERSONAL BACKGROUND

I have conducted research on the effects of environmental noise on individuals and communities since the 1960s. This research has included both laboratory and field studies of the effects of noise on people, such as speech interference, sleep disturbance, annoyance, complaints, hearing damage, and extra-auditory physiological *sequelae*, as well as effects of aircraft noise exposure on property values. I have also consulted on matters of environmental noise measurement and noise impact prediction for local and federal government agencies, airport proprietors, trade associations, citizens' groups, environmental protection organizations, and other parties concerned with evaluating community noise impacts.

My professional experience is summarized in my résumé, contained in Appendix C. My hourly labor rate is $225.00.

# EXHIBIT O

ORIGINAL



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, )
et al., )
Plaintiffs, )
)
v. ) No. 01-201L
) Judge Victor J. Wolski
THE UNITED STATES OF AMERICA, )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION OF
DR. NORAL STEWART
TAKEN ON BEHALF OF THE DEFENDANT
VIRGINIA BEACH, VIRGINIA
MARCH 10, 2006

that as a portion of your description of the noise around an airfield. It's -- I don't feel it's a totally adequate descriptor, but it is certainly one that you have to use and have to consider.

Q. You mentioned it's not totally adequate; what do you mean by that?

A. Well, it's an average and you can achieve an average a number of different ways. As Mr. Odom said in one of the trials in Charlotte I can be standing here with one hand in a bucket of ice water and one hand in a bucket of boiling water; on average, I'm comfortable. So anytime you're dealing with an average you have lost a lot of information. You don't know whether the sound was steady at that level for 24 hours or slightly under it so it would average out, the Day Night Level, you're adding a nighttime penalty, or whether it was one extremely loud event and quiet for the rest of the 24 hours or whether it was ten loud events or a hundred less loud events. You don't know. If all you have is that one number, you have very little information in actuality.

Q. Despite those shortcomings, is DNL still the best metric and the most widely accepted to use?

A. If you are limited to only one number, it is the most widely accepted and a number that needs

to be used. But it has its shortcomings.

Q. Are there other metrics that could be used that you feel are superior to DNL?

A. There are a number of metrics that you should always look at when you are looking at noise like this. And there's not other one number metrics. In other words, you can't try to use one number and say that one number tells the whole story. You have to look at metrics of individual events and numbers of those events. Look at the -- a better description of what really caused you to get to that one number in order to better understand the situation.

Q. So are there other metrics that you believe are superior to DNL?

A. When you say superior, I'm not sure what you mean. Are you asking is there another metric that will give me a one number result that is superior to Day Night Level? No. Not -- one's not been developed that I know of.

Q. Aside from the one number result, is there another superior method or a superior metric to use other than DNL?

A. The superior method is to use a number of metrics, to look at various measures that tell a more complete story. There is no one number that you

can use that tells you the whole story.

Q. In your previous cases you mentioned that DNL provide -- you relied on that for a portion --

A. Certainly.

Q. -- of your testimony and opinion. What else did you rely on?

A. As I said, we would monitor and record individual events, how many times per day did we have events that go over, say, 65 dB. That was a common trigger level. And what were the levels of those events. How many of them. We could tabulate the number of events per day, how many of them were, say, reached a maximum level in the range of 90 to 95. How many were in a range of 85 to 90. How many were in a range of 80 to '85. We could tabulate things like that. Look at those distributions, look at how they occurred in time, how many of them were during the night, how many during the day, were they randomly distributed or were there periods of heavy activity followed by periods of light activity. What was the real picture. What is going on here, as opposed to just some single number that just really tells you an average, that doesn't tell you anything else, and you have no idea how that average was arrived at.

# EXHIBIT P

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| CAROL AND ROBERT TESTWUIDE, et al., Plaintiffs | ) | |
| v. | ) | No.: 01-201L (Honorable Victor J. Wolski) |
| THE UNITED STATES OF AMERICA, Defendant | ) | |

DECLARATION OF DR. SANFORD FIDELL

1. My name is Sanford Fidell. I received a Doctorate in Experimental Psychology from the University of Michigan in 1969. I have conducted original research, consulted, written handbook chapters, participated in international standards activities, and published extensively in peer-reviewed professional journals on the effects of transportation noise on individuals and communities for more than 35 years.

2. I have been retained by the Defendant in this case to reconstruct aircraft noise exposure at the homes of Plaintiffs living in the vicinity of NAS Oceana, and to form technical opinions about changes in their aircraft noise exposure over the last several decades. I have prepared and revised an Expert Report in this matter to provide the Court with consistent estimates of aircraft noise exposure at the homes of test plaintiffs over the years in terms of typical long term (24-hour) cumulative units. The latest revision of this report also contains supplementary information about noise levels produced by individual overflights of specific aircraft types that have operated at NAS Oceana.

3. I have reviewed comments on my revised report of 29 March 2006 made by Dr. Noral Stewart in his Declaration of 23 May, 2006, as well as portions of Dr. Stewart's Deposition of 10

March 2006, and the arguments made by Plaintiffs in Section VII ("PROFFERED TESTIMONY OF SANFORD FIDELL", pp. 32 *et seq*.) of Plaintiffs' Opposition to Defendant's Motion to Dismiss.

4. The supplementary single event aircraft noise levels that I cite in my Revised Report of 29 March 2006 are objective measurements that have been incorporated for decades in the databases of standard aircraft noise modeling software. Dr. Stewart's Declaration of 23 May 2006 does not challenge the accuracy of the supplementary information that I provide in my revised report of 29 March 2006 about single event aircraft noise levels, nor does Dr. Stewart claim that the supplementary information contradicts any conclusions that I had reached on the basis of my earlier analyses of cumulative noise exposure levels at Plaintiffs' homes.

5. Tone Corrected Perceived Noise Level ("PNLT") values contained in the databases of DOD's NOISEMAP noise modeling software are the product of an objective mathematical transformation of field measurements of aircraft noise levels made in one-third octave bands. (Aircraft noise levels are customarily measured in frequency bands a third of an octave wide, so that, for example, the noise emitted by an aircraft within the octave from 500 Hz to 1000 Hz can be represented as the sum of the noise in three adjacent frequency bands.)

6. It is not correct to imply that transforming measurements of one-third octave band sound levels into perceived noise level units is more subjective than transforming the same sound levels into A-weighted units. Both transformations involve the application of tabled adjustments to underlying one-third octave band measurements. In the case of A-weighted measurements, these adjustments are derived from the judgments of test subjects made as early as the 1920s about the loudness of a variety of synthetic sounds, such as pure tones and bands of Gaussian noise. In the case of PNLT values, the adjustments are based on judgments made by test subjects in the 1950s and 1960s about the annoyance of aircraft overflights and other sounds. In both cases, the noise metrics are necessarily derived from subjective judgment data.

7. The U.S. Federal Aviation Administration (FAA) relies on PNLT measurements to regulate the noisiness of aircraft offered for sale in the United States in 14 CFR Part 36 (the Federal

Aviation Regulations). Appendix B ("Aircraft Noise Evaluation") of Part 36 of the Federal Aviation Regulations explains how acoustic measurements made in the 50 Hz through 10 kHz one-third octave bands are converted into instantaneous perceived noise levels, then corrected for the presence of tones and for overflight duration to calculate "effective" (that is, tone- and duration-corrected) perceived noise levels. The resulting perceived noise levels are more accurate for purposes of predicting the annoyance of noise produced during individual aircraft overflights than A-weighted values.

8. Addition of supplementary single event noise level information to my revised report of 29 March 2006 changes no conclusions that I had previously reached about cumulative aircraft noise exposure at the homes of test plaintiffs in the last decades.

I HEREBY DECLARE, UNDER PENALTY OF PERJURY, PURSUANT TO 28 U.S.C. 1746 THAT THE FOREGOING DECLARATION IS TRUE TO THE BEST OF MY KNOWLEDGE AND BELIEF.

Sanford Fidell

Date: June 9, 2006.

Sanford Fidell

# EXHIBIT Q

3:11 p.m.

MS. HOFHEIMER: I've concluded my questioning.

EXAMINATION

BY MR. BRYANT:

Q Steve Bryant on behalf of the United States. Mr. Pierson, you testified earlier about -- not testified -- about noise complaints and documenting them and going back in time even to 1970 or whenever it was, what is your confidence level in the accuracy of the documentation of noise complaints before you arrived at Oceana?

A Noise complaints are very subjective and it's my confidence would be low that they're -- they're accurate.

Q And I meant in terms of the document -- documenting the number of complaints?

MR. SHUTTLEWORTH: I'm sorry, did you say competence?

MR. BRYANT: Confidence in the accuracy of logging the complaints.

MR. SHUTTLEWORTH: Okay.

MR. BRYANT: Yes, confidence.

THE WITNESS: I don't know what criteria they used to define noise complaints.

MR. BRYANT: And --

THE WITNESS: I do not know if we used the same criteria all the way through.

BY MR. BRYANT:

Q And based on that what is your confidence on their accuracy?

A It would be -- it would be low. We only use noise complaint totals in-house to give us a feeling for how things were going on with the community.

Q And do you know what the procedures were for documenting noise complaints before you arrived?

A No, I don't.

Q Turning now to, um, the JLUS. I think earlier -- earlier you, um, mentioned that you had no involvement in the JLUS, what -- what did you mean by that? If -- if I'm wrong in saying that, please correct me.

A The -- the JLUS is a document put -- put out by the Office of Economic Adjustment, Department of Defense, working with the communities. In -- in this case, they're examining Navy bases here in the Hampton Roads area. The -- the team put together has Navy

representatives on it. I am not one of them.

Q Okay.

A I'm aware of the studies going on, and I have -- I have reviewed the study. But I am not involved in anything policywise that's going on.

Q Has your expertise been consulted in regard to the JLUS from anybody within the Navy?

A Yes, it has.

MR. BRYANT: No further questions.

MS. HOFHEIMER: I've got a follow-up question.

EXAMINATION

BY MS. HOFHEIMER:

Q Um, you said that you -- you remarked as to your confidency -- confidence in the accuracy of logging noise complaints, they were logged by the number when they came on -- over the phone; is that correct?

A You -- you mean when I was there?

Q Before you were there.

A I don't know. I -- if somebody called ten times in an hour, did they log it in as ten noise complaints, I don't know.

Q Okay. But those -- those records are in

7

your file?

A No. The totals were in -- in the files. Because we didn't have confidence in them, we never put the document out to the public as -- as this is noise complaints trends over the years. We looked at it in-house because it was the only reference we had.

Q And -- and those were records that were just -- that were kept in the ordinary course of business and kept in files in your office?

A Yes.

Q And they remained in your office when you got there?

A Yes.

Q And you did use those statistics in the compilation that I showed you earlier?

A The main purpose we used the noise complaints for was to get an idea of trends. We would see that the complaints would up in the spring when people started opening their windows and they dropped down again towards summer as people started putting on air conditioning and they might go up again in the fall.

We would find cycles like that and it gave us a chance to see if anything unusual was occurring that we needed to investigate.

(Off the record.)

BY MS. HOFHEIMER:

Q All right. And my question to you, um, when we ran out of tape was, um, that those numbers that were in your file when you came to Oceana, were numbers that you used in preparing a compilation that was, um, in -- in an exhibit that I showed you earlier?

A Yes.

Q Okay. And, um, did you discuss your confidence in, um, in the accuracy of those records with Mr. Bryant or Mr. Smith when we -- when you were -- took a break out there?

A No.

MS. HOFHEIMER: Okay. No -- no further questions.

THE VIDEOGRAPHER: We're off record at 3:18 p.m.

MR. BRYANT: I'm not done yet.

EXAMINATION

BY MR. BRYANT:

Q Um, you mentioned the ordinary course of business for documenting the noise complaints --

A Yes.

Q -- in response to Ms. Hofheimer's question? Do you know what the ordinary course of business was for logging complaints before you arrived at Naval Air Station Oceana?

A No, I don't.

MR. BRYANT: No further questions.

MS. HOFHEIMER: I have one. Um, at least one.

EXAMINATION

BY MS. HOFHEIMER:

Q Was there a published AICUZ manual such as the one, um, that I showed you, um, in my examination of you that gave a protocol for taking noise complaints prior to your coming to Oceana?

A The AICUZ report I believe was from 1978, the previous study that we'd done, it was '76 to '78, it was in that time frame, and that was the only published AICUZ that we have had for Oceana.

Q And was there a noise protocol in that AICUZ?

A I don't recall.

Q Okay. So the numbers before could have

been lower than the ones -- um, the numbers from prior to your being at Ocean, those numbers could have been lower than the ones that are reflected in the number of noise complaints?

A I'm sure it could have gone in either direction. I have -- I have nothing to judge it on.

Q Okay. You just -- you relied on them because they were in your files and you didn't have any reason not to rely on them?

A We -- we knew that there were concerns how the totals are added up, what's considered as a noise complaint, but for internal use to try and show trends over time, it was -- it was the only source we had available.

Q So they were good enough?

A They were not good enough that I would go ahead and call it anything other than a wild guess.

Q And yet, you published them?

A No, we did not.

Q You published a compilation of them?

A No, we did not.

MR. BRYANT: Objection, asked and answered.

MS. HOFHEIMER: Okay. Nothing further.

MR. BRYANT: You're going to have an opportunity to review the transcript --