# EXHIBIT A

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, )
et al., )
 )
Plaintiffs, )
 )
v. ) NO. 01-201L
 ) Judge Victor J. Wolski
THE UNITED STATES OF AMERICA, )
 )
Defendant. )

DEPOSITION UPON ORAL EXAMINATION
OF EDDIE WATERMAN
TAKEN ON BEHALF OF THE DEFENDANT

Virginia Beach, Virginia

June 9, 2005

Appearances:

HOFHEIMER / FERREBEE, P.C.
By: KRISTEN HOFHEIMER, ESQUIRE
Counsel for the Plaintiffs



Appearances (Cont'd.)

U. S. DEPARTMENT OF JUSTICE
By: STEVEN D. BRYANT, ESQUIRE
KELLE S. ACOCK, ESQUIRE
And
DEPARTMENT OF THE NAVY
COMMANDER NAVY REGION ATLANTIC
By: DOMINICK G. YACONO, ESQUIRE
And
DEPARTMENT OF THE NAVY
NAVY LITIGATION OFFICE
By: J. PAGE TURNEY, ESQUIRE
Counsel for the Defendant



I N D E X


| DEPONENT | | PAGE |
|---|---|---|
| EDDIE WATERMAN | By Mr. Bryant | 4 |


EXHIBITS


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 51 | Purchase agreement dated 24 May 1993 to Eddie J. and Elizabeth L. Waterman | 27 |
| 52 | Tax assessment July 1, 2005 through June 30, 2006 for 2244 Windy Pines Bend | 52 |
| 53 | Plaintiff's Answers to Interrogatories, Eddie and Elizabeth Waterman | 56 |
| 54 | Receipt from Lowe's | 58 |
| 55 | The Home Depot Special Services Customer Invoice | 61 |




Deposition upon oral examination of EDDIE WATERMAN, taken on behalf of the Defendant, before Frances P. Zahn, RPR-RMR, a Notary Public for the Commonwealth of Virginia at large, taken pursuant to notice, commencing at 12:10 p.m. on June 9, 2005, at the offices of Shuttleworth, Ruloff, Giordano & Swain, South Boulevard, Virginia Beach, Virginia; and this in accordance with the Federal Rules of Civil Procedure.

EDDIE WATERMAN was sworn and deposed on behalf of the Defendant, as follows:

EXAMINATION

BY MR. BRYANT:

Q. Mr. Waterman, good afternoon. My name is Steve Bryant from the Department of Justice. How are you?
A. Fine, thank you, sir.
Q. Have you ever been deposed before?
A. No.
Q. We'll go over the ground rules quickly so you will know. I'm asking you questions, you're going to answer those, and Mrs. Zahn is taking down everything we say so it's very important that you articulate your answers. Say yes or no and don't nod your head or say uh huh or anything of that nature because it won't be clear for the record. It's also important that we don't talk over one another, so

you had flights directly over your house, could you still hear the television?
A. At what point in time?
Q. This is before '98. '92 to '98?
A. I don't recall any problems speaking on the phone or watching TV inside the house.
Q. Okay. Can you estimate the altitude of the flights back in that time frame?
A. No. I don't know how to do that.
Q. Can you estimate the altitude that you are currently experiencing?
A. No.
Q. Is it roughly the same altitude?
A. I would say yes. Same altitude.
Q. It's been roughly consistent?
A. Right.
Q. Before April Fools Day, did you have roughly the same distribution of the overflights being lateral to your house versus those that were directly over? Was that roughly consistent from --
A. Yes.
Q. The only difference being then the noise generated by the aircraft starting in December of '98?
A. I don't understand the question.
Q. Well, you said, you know, there was that



demarcation of when the -- when December, when you were having that -- around December when you were having the camp out with your grandson, suddenly it was louder?
A. Yes.
Q. What I'm focusing on now is the flight distribution from over your house versus lateral to your house was still the same until April 2000?
A. That's correct.
Q. The only difference between the pre December '98 and post December '98 up until April Fools Day was that the aircraft was a louder aircraft, you were experiencing more noise. Is that right?
A. Yes.
Q. Okay. And in that time frame, what would happen with the conversation outside in the yard if they were flying laterally to the house?
MS. HOFHEIMER: Can you tell me what time frame?
MR. BRYANT: December '98 until --
MS. HOFHEIMER: April '05.
A. Flying laterally over the house, we certainly had to raise our voices, and speak much louder.
BY MR. BRYANT:
Q. Okay. But you could still communicate with one another --
A. Yes.



Q. -- outside.
Now, what about when the December of '98 to April Fools Day 2005, when the flights were directly over your house, how would that impact conversations outside?
A. We had to stop talking until they flew away.
Q. Let's go inside the house now. When you had the lateral flights starting December of '98, could you still listen to the television, talk on the phone, that kind of thing.
A. Yes. But we had to speak louder that I recall, then we had to either cut the TV up louder or -- you're talking about lateral flights, right?
Q. Yes, I am.
A. It was certainly bearable, but it was uncomfortable unless we talked -- spoke louder, or cut the TV up louder.
Q. What about, when you had direct overflights at that time, December '98 to April 1st of this year, directly over your house? How would that impact the TV, phone conversations?
A. We just -- we stopped talking on the phone until they passed over and in terms of the TV, listened to the radio, we just didn't hear it.
Q. No matter how high you turned it up?
A. Well, we didn't turn it all the way up as far as



it could go.
Q. How would you -- I think you said bearable is the word you used. How would you describe the jet noise when you first moved into the house?
A. It was definitely bearable. It was uncomfortable at times outside. It really didn't affect us inside the house. It didn't adversely. Just strictly outside.
Q. And how would you describe it since, from the 1st of December of '98 through April 1, 2005? If -- you know, I should have clarified that too.
Has it been, the noise impacts, consistent from April 1st -- sorry, December 1, 1998 to April 1, 2005?
A. Has the noise been consistent?
Q. Consistent from that time period?
A. Yes.
Q. It has. So with that said, how would you describe the noise impacts and living there in that house in that time period?
A. I would say it was at times extremely uncomfortable. Particularly when the aircraft flew right directly over the house.
More so outside than inside.
Q. And how would you describe it from April 1st, 2005, until today?
A. I don't get to sleep late any more, and as a

# EXHIBIT B

1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, )
et al., )
) 
Plaintiffs, )
)
v. ) NO. 01-201L
) Judge Victor J. Wolski
THE UNITED STATES OF AMERICA, )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION
OF MICHAEL J. LEARY,
TAKEN ON BEHALF OF THE DEFENDANT

Virginia Beach, Virginia

April 28, 2005

Appearances:

SHUTTLEWORTH, RULOFF GIORDANO & SWAIN, P.C.
By: STEPHEN C. SWAIN, ESQUIRE
Counsel for the Plaintiffs

U. S. DEPARTMENT OF JUSTICE
By: STEVEN D. BRYANT, ESQUIRE
DOMINICK G. YACONO, ESQUIRE
Counsel for the Defendant

2

INDEX


| DEPONENT | | PAGE |
|---|---|---|
| MICHAEL J. LEARY | By Mr. Bryant | 3 |


EXHIBITS


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 11 | Plaintiffs' Answers to Interrogatories, Michael and Diane Leary | 17 |
| 12 | Deed of Bargain and Sale, Thomas J. Moody and Janet M. Moody to Michael J. Leary and Diane M. Leary | 75 |
| 13 | Deed of Trust | 76 |
| 14 | Settlement Statement, HUD D-1 | 77 |
| 15 | Physical Survey, Lot 46, Landstown Meadows | 78 |
| 16 | Certificate of Reasonable Value | 78 |
| 17 | Proposal from Nature's Edge dated 4/24/02 | 90 |
| 18 | Invoice from Bradford-Cameron to Ms. Diane Leary | 90 |


3

Deposition upon oral examination of MICHAEL J. LEARY, taken on behalf of the Defendant, before Frances P. Zahn, RPR-RMR, a Notary Public for the Commonwealth of Virginia at large, taken pursuant to notice, commencing at 8:10 a.m. on April 28, 2005, at the offices of Shuttleworth, Ruloff, Giordano & Swain, Virginia Beach, Virginia; and this in accordance with the Federal Rules of Civil Procedure.

MICHAEL J. LEARY was sworn and deposed on behalf of the Defendant, as follows:

EXAMINATION

BY MR. BRYANT:

Q. Good morning, Mr. Leary. My name is Steve Bryant from the Department of Justice. How are you?
A. Fine.
Q. Have you ever been deposed before?
A. No.
Q. Let me sort of go over the ground rules of how this takes place. I'll ask questions and you'll answer them. Mrs. Zahn is going to be taking down everything we say verbatim so we can't talk over each other, and if you would, please enunciate your response and say yes or no rather than nodding your head or uh huh, that kind of thing can be confusing, to keep the record clear.
Also, if at any time you want to take a break,

4

just say the word and we will go off the record and you can do so.
And if you don't understand the question that I ask, please let me know and I'll be happy to rephrase it.
A. Okay.
Q. Any questions about any of that?
A. No, sir.
Q. Okay. Let's first start, if you could tell me what your occupation is?
A. I am a defense contractor.
Q. Okay. With whom and what do you do?
A. Serco. I do some work for the Naval Supply Systems Command.
Q. Let's go back to Serco. I assume it's an acronym, or is it?
A. It's Serco. They recently acquired a company I used to work for, Resource Consultants.
Q. And what do you do for them? What is your position?
A. I do a lot of logistics work for the Naval ships.
Q. What is the title of your position?
A. Lead logistics analyst.
Q. And go into some detail, if you would, about what you do as a lead logistics analyst?
A. The afloat supply applications, I work with

41

A. If I -- from my memory, it stayed pretty consistent.
Q. Pretty consistent. Okay.
For how many years did it stay consistent?
A. Until today.
Q. Until -- when you say today, you mean right now? Do you mean a year ago, or what do you mean?
A. I would say until, yes, right now.
Q. Until right now.
And tell me about the operations right now, how they are different?
A. They are just louder.
Q. Well, I'm talking more at the moment about, referring to the level of operations in terms of -- you said back in '95 and consistently thereafter until about today, four to five days a week, when they are operating, that would be for a couple of weeks, maybe down for a couple of weeks, and then the 70 to 30 percent proportion that you mentioned, when did that change? Or how did that change, if it did?
A. I haven't really noticed any change.
Q. Okay. So in terms of the level of operations, it's been even the same from when you moved in until now? Not the noise impacts; the level of operations.
A. I would say it's maybe slightly increased since

42

'95. I mean they have just always flown a lot. I just never really kept track.
Q. And you said that they are louder. I think you said today they are louder. When did they become louder? The jets?
A. Exactly -- '99, but exactly when I don't know.
Q. And how is it louder? How is it different?
A. It's hard to explain but the noise from the jets is significantly louder than it used to be with the F-14s that they used to fly.
Q. And was it a -- I mean was it sort of a night and day thing? Was it a dramatic difference that you noticed?
A. Yes.
Q. So when did you notice a dramatic difference? What happened? Was anything going on?
A. No.
Q. That stands out?
A. I knew that they were -- they had to bring up these planes from Cecil Field, I believe it was in Florida. You know, you hear on the news, you know, they were different type plane, louder. And they sure were.
Q. So you heard on the news that a louder aircraft was coming? Is that what you said?
A. Yes.
Q. And when did you hear that on the news?

43

A. I can't remember exactly. It was, you know, '98, '99, somewhere in that area.
Q. Okay. And how soon after you'd see a news broadcast -- saw a news broadcast of that, with that information, did you experience a change?
A. As soon as the F-18s started flying. You know, what that date was, I couldn't tell you. But you knew there was a difference.
Q. Okay. Did you -- could you look in the air and tell the difference between an F-18 versus another aircraft by looking at it when it's flying above your house or near your house?
A. Well, they are going so fast, but, yes, I could point out the difference.
Q. You could tell the difference? When do you remember seeing F-18s above your neighborhood, if you -- we'll go back to that.
When do you remember starting to see F-18s when -- near your residence?
A. Sometime in '99.
Q. Was it in the winter of '99, or spring, summer?
A. I'm sorry. I can't really pinpoint it.
Q. Was there any change in -- between the Tomcat that preceded the F-18 -- was there any change in terms of the altitude and where they were flying in relation to your

44

house from the Tomcat to the Hornet? Was there any change?
A. No. They appeared to be flying similar flight paths.
Q. And can you estimate now the altitude of the jets that are flying in relation to your house?
A. No. I'd hate to -- they are low. That's all -- that's the best estimation I can give you.
Q. Let's say if you had to put it in football fields, for example. How many football fields? Stack them up.
A. I'd hate to say. I really can't judge distance that way. But they are close.
Q. Can you read the lettering on the jets?
A. At times, yes, sir.
Q. At times. Explain how at times -- how there's a difference between the certain times you can read the lettering and other times you can't?
A. Well, the closeness. If they are going over like my next door neighbor's house, sure, I can pick it out. But if they are just flying somewhere else over my subdivision, my eyesight can't.
Q. And so you just said that at times the planes are flying over your neighbor's -- your immediate neighbor's house?
A. Or my house.

A. Yes.
Q. And I say ex. You are retired. You are still part of --
A. In the subdivision I'm sure there's plenty, but in my cul-de-sac there's no retired Navy.
Q. How do you know that there is such a high percentage of active duty and ex-Navy in your neighborhood? How do you know that?
A. On the base decals on their vehicles. And sometimes I see them in uniforms in their yards.
Q. When -- before the F-18s were transferred here from Cecil Field, you said you were aware then. Did you attend any public meetings discussing that?
A. No, sir.
Q. Okay. Have you ever attended any public meetings discussing jet noise or any other related --
A. No, sir.
Q. -- Naval Air Station Oceana issues?
A. No, sir.
Q. Have you attended any public meetings related to anything since you have been in this area in Virginia Beach?
A. No, sir.
Q. Now I'd like to explore the difference that happened when the F-18s arrived in terms of the noise impacts that you felt. Describe what effect it has? Or



what effect it did have in 1999 when they started flying?
A. No effect other than that they are just significantly louder than what I remember.
Q. Has it -- did it change anything about the way you lived in your house, the increased noise, being significantly louder?
A. Other than, you know, having to raise the volume on the TV, at different times, you know. You know, you'd have to take all your phone calls inside. You know, you obviously couldn't talk outside.
Q. Can you have conversations -- well, I guess you're indicating that you could have a phone call inside the house when the planes are going over and hear the other person?
A. Yes, sir.
Q. So you can obviously have this type of conversation with somebody in your house when the planes are going over and hear each other?
A. You might have to take a brief pause, especially if it's going fairly close to your house.
Q. What about when you're outside in the 1999 time frame and -- well, we're talking about the 1999 time frame. What about outside? How would it affect you when you're outside?
A. If you saw it coming, you would, you know, brace



for it. You would put your fingers in your ears, that type of thing.
Q. Okay. So a conversation you were having would cease until it passed over?
A. Oh, absolutely.
Q. Anything else besides raising the volume on the TV, phone calls inside the house, any other -- and then, as you said, putting your fingers in your ears while you are outside. Any other sort of effects that the noise would have?
A. Not that I can think of.
Q. Would you describe that sort of an impact as making your house unsuitable for living, residential living?
A. Let's just say it's less enjoyable.
Q. So if it's less enjoyable, then you still enjoy your house but just not to the same level you would enjoy it without the noise?
A. Well, it's, you know, it may be unsuitable. I mean, it's just, you know, unfortunately something that I have had to live with.
Q. Well, you said it may be unsuitable. I'm going to explore this in terms of --
A. That's just a broad definition.
Q. I mean is your house with the noise with the F-18s flying over it, which is, it's in the flight path, or



below the flight path, so that is something you are going to experience. Recognizing that, is your house unsuitable for residential living?
A. I believe where someone could get that interpretation.
Q. Well, I'm asking you. What's your view of it? Not someone else.
A. If I had to go one way or the other, I would say unsuitable.
Q. Why do you say it's unsuitable for residential living?
A. Well, it's -- you can't enjoy your yard. Invariably -- and I guess it's probably because of safety reasons, they fly on nice days when, you know, you want to be outside in your yard; and it makes it rather unpleasant to deal with the constant bombardment of the jet noise.
Q. Now, when you say constant, you mean when they are flying? There's times when they are flying a couple of weeks, and they won't fly for a couple of weeks. That still holds true, right?
A. Pretty much, yes.
Q. And that was also true in 1999?
A. Right.
Q. Let's go back to when you moved in in '95 and up until '99. And there was obviously jet noise as you

53

discussed earlier then. Could you talk on the phone outside back then?
A. No.
Q. So you had to go inside to talk on the phone back then?
A. Yes.
Q. Did you have to turn up the volume of your television when the jets were flying over?
A. At times, yes, sir.
Q. Did they fly on nice days back then in terms of --
A. Don't get me wrong. They don't always fly on nice days. There's overcast days and rainy days I'm sure they are flying. It just seems like the majority of the time they are nice days that they fly. But, yes, it's similar.
Q. To what it was back then?
A. (Deponent nodded head.)
Q. And back then when you were outside, did you have to put your fingers in your ears when the jets flew over, the Tomcats?
A. If they were -- yes. Especially if they were very close, yes, sir.
Q. Was your house unsuitable for residential living before '99? In light of the fact that you had to plug your

54

ears when you were outside and that you had to take phone calls inside the house, turn up the volume of the television, and those kind of things? Was it unsuitable then?
A. I don't believe so.
Q. You don't believe so.
But starting in 1999, you believe it's unsuitable?
A. Somewhere in that proximity.
Q. Somewhere in that proximity. What do you mean?
A. Sometime in 1999.
Q. Okay. Yes. Whenever the F-18s, you started xperiencing F-18s that were flying over the house?
A. Yes, sir.
Q. Well, why do you view it, the difference that it as suitable back then and it's unsuitable now? Because it unds like you had roughly the same sorts of conveniencies from the noise in terms of plugging your rs when you were outside, taking phone calls indoors, ning up the volume of the television, and those kind of ngs. Why the difference?
A. Just the extent of the volume. It's, you know, ere something might have been a nuisance in the past, it's n right bothersome now. I mean it's -- you know, certain el of music in your car, you know, at one time if they

55

cranked it up, it might become unbearable.
Q. And you just said unbearable. Do you view living in your house as unbearable because of the F-18 noise?
A. No.
Q. So it's not unbearable?
A. I wouldn't go the that extreme, no.
Q. But you -- so you view, say on a continuum of living conditions, I guess you're saying unbearable is at the far end, and no jet noise at all would be at the other end?
A. Uh huh.
Q. Is unsuitable somewhere to the left of unbearable? Somewhere towards the less of a nuisance as you said?
A. Yes.
Q. On the spectrum.
And when I say unsuitable for residential living, just so we're clear about what that means, I'm defining it in the context of they are just not compatible. You can't live -- living in that type of an environment is just -- you can't live with that kind of noise. You can't -- I guess I'm defining it as being unbearable. You're saying it's a lesser -- you're viewing it as a lesser degree. Unbearable by your definition would mean we have to move out of the house. Is that accurate?

56

A. I don't know what would eventually make me move out of the house; but, yes, it's -- just not being able to enjoy what other people take for granted. You know, living in their yards.
Q. But that recognizes that even before the F-18s got there, you still had to plug your ears and those other things we talked about, going inside for phone calls and that kind of thing. So when you say other people take that for granted, other people who are not subject to any jet noise don't have to do those things either, correct?
A. Yes.
Q. Plaintiffs' Answers to Interrogatories.
I'm showing you again DX 11. On page 14, also known as --
Before I do that, actually I'd like just, for the record, to clarify that DX 11 is OCE222906 through OCE222931.
Turning to page 14, also OCE222919, if you could look at -- one moment. Subparagraph A?
A. Okay.
Q. And just read the first two sentences to yourself.
Do you agree with that?
First, let me know when you are finished.
A. Yes.

# EXHIBIT C

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, )
et al., )
) 
Plaintiffs, )
)
v. ) NO. 01-201L
) Judge Victor J. Wolski
THE UNITED STATES OF AMERICA, )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION
OF CARROLL LINDSAY
TAKEN ON BEHALF OF THE DEFENDANT

Virginia Beach, Virginia

June 9, 2005

ppearances:

HOFHEIMER / FERREBEE, P.C.
By: KRISTEN HOFHEIMER, ESQUIRE
Counsel for the Plaintiffs



Appearances (Cont'd.)

U. S. DEPARTMENT OF JUSTICE
By: STEVEN D. BRYANT, ESQUIRE
KELLE S. ACOCK, ESQUIRE
And
DEPARTMENT OF THE NAVY
NAVY LITIGATION OFFICE
By: J. PAGE TURNEY, ESQUIRE
Counsel for the Defendant



I N D E X


| PONENT | | PAGE |
|---|---|---|
| RROLL LINDSAY | By Ms. Acock | 4 |
| | By Ms. Hofheimer | 76 |
| | By Ms. Acock | 77 |
| | By Mr. Bryant | 102 |


EXHIBITS


DESCRIPTION PAGE

Purchase agreement dated 24 May 1993 to ddie J. And Elizabeth L. Waterman .............. 28

Tax assessment July 1, 2005 through June 30, 006 for 2244 Windy Pines Bend .................. 41

Uniform Residential Appraisal Report ............. 46

Custom Electric invoice .......................... 48

ermit to Build .................................. 49

hysical survey of Lot 237, Chesopeian Colony .... 51

eed or Bargain and Sale ......................... 54

eed of Trust .................................... 55

ettlement Statement ............................. 56

niform Residential Appraisal Report 09 East Kings Road ............................ 57

uyers' Possession Agreement for Residential operty ........................................ 61

etch/Area Table Addendum ....................... 62




EXHIBITS (CONT'D.)


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 68 | Real Estate Tax Assessment July 1, 2004 through June 30, 2005 | 66 |
| 69 | Subpoena and Notice of Taking Deposition - Duces Tecum | 92 |

would have been the fall of 1998.
Q. The fall of '98?
A. Correct. The surgery was in June, July of 1998.
Q. And that coincides with increased jet noise that you experienced in your home?
A. I was home. Yes.
Q. When you first came to Virginia Beach in 1979, did you know the Naval Air Station Oceana was here?
A. Yes.
Q. Did you know that they flew jets in and out of the base?
A. Oh, of course.
Q. Did you ever experience jet noise at any of the other homes that you lived at in Virginia Beach?
A. I'm sure I did. But was it anything significant? No.
Q. What do you mean by significant?
A. Significant means to the point where it was bothersome.
Q. What is bothersome?
A. Bothersome in that context to me would mean something that would interrupt my daily routine, my life, or something of that nature.
Q. Okay. Can you give me an example?
A. An example of something that would interfere with



my life?
Q. Yes.
A. I'm standing out in my yard talking to n and suddenly we can't hear each other. We just because you can't hear.
Q. Has that happened to you in your curre
A. Most definitely.
Q. Do you remember the first time that hap
A. I couldn't tell you exactly. It was somet the 1998 time frame.
Q. What about when you are inside your h you hear jets?
A. It's muffled somewhat. But when you a a TV program and you have got the volume so loud that it's -- I'm going to say almost vibrating the floor, the volume is so loud, and you still can't hear the TV, that's bothersome to me.
Q. You mean the TV volume vibrates the floor?
A. Yes.
Q. Or the jet --
A. Well, the jet noise too. Windows have shaken in my house. And I don't think that was because of the volume of the TV.
Q. Okay. You mentioned that you and your wife would be having a conversation outside. Does she live with you



now?
A. Yes. She is my wife now. When I referred to girlfriend earlier, it's my wife now.
Q. Have you seen jets fly over your property?
A. Numerous times.
Q. Can you describe that for me?
A. Oh, I mean I don't know exactly how to describe it. Jets -- I mean I'm not trying to give you a smart answer. Here's a plane. I'm standing outside. I hear the noise, a tremendous noise coming, and I look up and there's a jet plane. I recognize a jet plane. Sometimes they are very low.
Q. Can you tell me, or can you describe how low?
A. I don't know. I can't judge distances looking up in the air. I don't know. Low. To me, very low.
Q. You mentioned you have trees on your property?
A. Yes.
Q. Do they fly close to the trees?
A. Yes.
Q. To the tops of the trees?
A. Yes.
Q. Do you know about how far?
A. I can't give you a number of feet. I don't know.
Q. They seem to be close?
A. They seem pretty darned close to me, yes. Using



simple adjectives and adverbs, very close.
Q. You mentioned that you knew the Naval Air Station was here when you moved here in 1979?
A. Correct.
Q. And that they flew jets in and out of the base?
A. Yes.
Q. When you bought the property on East Kings Road, did you contact the base about the planes and the jets flying over?
A. No.
Q. Why did you not contact them?
A. I didn't see any reason to do that. I didn't think it would be necessary.
Q. Have you complained to the base before about jets flying over your home?
A. There is a -- I don't know what they call it, a hotline or something to that effect. There is a complaint line. I have attempted to call that on several occasions, and I could get nothing but put me on hold, or no one would ever answer the phone. So the answer is yes, I attempted to call to complain but I never was successful in making contact.
Q. About how many times have you attempted to call to the hotline?
A. Five, approximately.

Q. And so that's the primary reason?
A. That is the primary reason, yes.
Q. Where would you like to move to? Or have you thought about that?
A. I thought about it, thought about it, and thought about it. I really don't know. My wife is originally from Louisiana, and most of her -- all of her people still live in western Louisiana, or eastern Texas, in the Houston area. And she's lobbying awfully hard for that.
Q. I can understand.
A. But my favorite expression right now is only the Lord knows and he's not telling.
Sorry.
Q. I'm going back to the dates that you traveled for work, Monday through Fridays. You mentioned that it started in, sometime in 1995?
A. Right.
Q. Or maybe '96. And went through June?
A. As I think about it more, I'm pretty sure it was '95.
Q. And that went through June of '98?
A. Right.
Q. And you were gone Mondays through Fridays, and you were here in Virginia Beach on the weekends?
A. Yes.



Q. Is that your year round schedule?
A. Yes.
Q. That's the consistent schedule?
A. Well, that was the goal. As my boss would say, you're not making me any money sitting at home, or you're not making me money sitting here in Cincinnati. You make me money by going to the client's site and teaching them how to use computer hardware and computer software. Primarily software. So that was the goal was for me to be gone Monday through Friday.
Q. So if you had a vacation would you come back to Virginia Beach for vacation, or would you go somewhere else for vacation?
A. We would normally go someplace else.
Q. So for those years you were primarily here only on the weekends?
A. Correct. Primarily, yes.
Q. Did you bring the folder of documents with you today?
A. I brought a folder that I have some information in relative to the subject matter, yes.
Q. Can I take a look at those?
MS. HOFHEIMER: Let me -- I haven't seen it yet, so let me take a look and see what it is.
MR. BRYANT: When you're done looking at that,



you can hand it to me, assuming we can look at it.
MS. HOFHEIMER: It's got correspondence from us in it so I'm taking that out.
MR. BRYANT: Of course.
MS. ACOCK: But is it okay? Do you mind if I ask questions.
MS. HOFHEIMER: Yes. You can go on.
BY MS. ACOCK:
Q. I'm going to go ahead and keep asking you questions while she looks at those papers in your folder.
A. Okay.
Q. You mentioned earlier that you had seen jets fly over your home?
A. Yes.
Q. Can you be a little bit more specific about what you see. Can you see anything on the jet, like a mark or any kind of identification? Can you describe what you see?
A. The planes were flying very low.
Q. Okay.
A. If I had to sit here and tell you that I remember a particular plane flying over on such and such a date, or any date, for that matter, and I saw a certain marking, or I saw a certain number, or I saw the pilots in the cockpit, no. I couldn't tell you that. I mean, I wasn't thinking of that. I'd be calling a number, get his license plate and



call him for being a bad boy, for hot-dogging.
Q. So can you -- so are you saying that you can see those kind of details?
A. No. I cannot. Or I cannot or did not. And when I say did not, I wasn't looking for those kind of things.
Q. Do the -- did the jets when you described them flying over your property, do they fly about the same way every time they come over your property, or do they come from the same direction? Can you explain that?
A. They don't always come from the same direction, but predominantly they come -- let me get my bearings. If I'm sitting in front of my house, that's north. They come from the northeast, come from the northeast, and they are flying more towards the southwest. They are in a pattern like that most of the time. And that's either in a pattern that they are coming to make -- well, I'm not going to say what they are doing. I'm not really sure what they are doing.
Q. Is that the same way you observed them flying in 1998?
A. In 1998?
Q. Yes.
A. As compared to today?
Q. As compared to today.
A. For the most part, yes.

Q. So you're saying that the planes basically fly the same way today as they did in 1998?
A. To the best of my knowledge, yes. I don't recall anything being significantly different.
Q. Okay. Aside from those times that you were traveling for work between 1995 and '98, in June of '98, have you always resided in your home from the time of purchase -- are there any other times when you were not in your home?
A. Let me make sure I understand. First of all the time frame that you are talking about is --
Q. The house you currently live in?
A. Right.
Q. We talked about you going out of town for work?
A. Okay.
Q. Is that the only time period that you were gone for travel, or have there been other times where you left your home for travel?
A. I mean I have traveled, you know, on rare occasions. But on a vacation or something, I haven't really worked since I'm going to say June of 1998. So when I say worked, I haven't done a thing that's income producing. So I haven't done any traveling other than taking a vacation, or something like that. Or making a trip down to see my wife's parents down in Texas or Louisiana, or something like



that.
Q. And in going back to the jets flying around your house, when do they fly?
A. There is no specific time. I -- they -- during the day, also at night, there is no set pattern that I have been able to observe.
Q. When they fly at night, do you hear them when you are inside your home watching TV?
A. Yes. Yes. I mean the situation in terms of the effects and the disruption of my life, during the day the same disruption is -- the disruption is the same at night, because they are flying and doing basically the same thing.
Q. Can you sleep through the night?
A. I have been awakened on occasion by jet noise, but, you know, honestly, it's rare for me to be awakened by jet aircraft. It has happened on more than one occasion.
Q. Have you noticed if any of the homes around here have been sold recently?
A. Yes. Not -- I'll just say yes. Yes.
Q. Do you know, has that been recent, in the last month, two months, six months?
A. Well, when -- your question was has any homes sold around me recently. And the answer is yes. The house directly across the street from me sold about a year ago, two years ago, because I think I mentioned earlier that the



gentleman who lived there passed away, died, so his ex-wife, who was -- she inherited the house and she sold it.
The house on the other side, they had been there longer than we. The house directly across the street, she's lived there forever. There's been a couple of houses further down Kings Road that have been for sale and sold. There has been other houses in the neighborhood that have been for sale and sold. Recently, I would say the primary reason for that is taking advantage of the housing bubble that we're in right now.
Q. What do you mean by housing bubble?
A. Well, I'm -- I don't know what I mean. All I mean is basically quoting what they are saying in the newspaper, and what Alan Greenspan says. So that's second hand.
Q. What are they saying?
A. Well what basically they are saying is we're in a housing bubble, and what that means to me is that housing values have, in certain areas of the country have increased perhaps exponentially, so --
Q. Do you think the value of the homes in your neighborhood have increased exponentially?
A. No.
Q. No?
A. No.



Q. Why not?
A. I don't know. I wish I did.
Q. The house across the street that you mentioned, the first house you mentioned that sold, do you know how long it stayed on the market?
A. No. It wasn't days. It wasn't weeks. It was maybe a month.
Q. Okay.
A. Or two. I'm really not sure. It was -- it didn't sell like that.
Q. Do you know how much it sold for?
A. How do I answer that? I know what someone third-hand told me, but I don't really want to quote that figure, because I really don't know. I don't know on a factual basis.
Q. Well, what did they tell you?
A. Oh, 300 -- well, now I have forgotten. I think 300,000.
Q. Do you know how many bedrooms and bathrooms that house had?
A. No. I was only in it once or twice, and I really don't remember.
Q. Do you know anything about the house or the property?
A. I can tell you it's on East Kings Road. What can

socialize in any way.
Q. Can you describe for me when you first moved into the house and when you first started seeing jets fly around your house -- do they fly in your opinion directly over your house or a few blocks over, or can you give me a range of where they fly?
A. Both. They -- sometimes they fly directly over my house. Sometimes they are off to the left of that. And sometimes they are off to the right of that.
Q. So by directly over your house you mean like over the roof top?
A. Yes.
Q. And did they fly that way when you first moved into the house?
A. Yes.
Q. And so that -- and that was in 1994. Do you think they fly the same way now?
A. To the best of my knowledge, yes.
Q. And what do you expect to get out of this lawsuit?
A. I would like to say some relief from the intolerable noise situation.
Q. What do you mean by intolerable?
A. Intolerable to me is as the word suggests, intolerable. What's another synonym for intolerable? It's



very difficult to deal with something that interrupts your life, interrupts your conversation, interrupts your way of life.
Q. You mentioned relief from that. What do you mean by relief?
A. Well, the noise, jet noise is the cause of the -- is what I'm seeking relief of, something that would eliminate that noise. And over my house, near my house.
Q. So it sounds like what you're saying is you'd like the jets to go away?
A. The noise to go away.
Q. Like the noise to go away. Do you realize that in this lawsuit you are suing for money and for compensation?
A. Yes.
Q. So is that -- what do you expect?
A. I learned a long time ago once you make certain expectations, or you have certain expectations in your mind they don't materialize, you are disappointed, or whatever. So I don't know.
Q. Okay. How is money going to alleviate the concerns you have about jet noise?
A. How is money going to alleviate? I'm sorry. Repeat.
Q. How is money going to alleviate your concerns



about the jet noise?
A. I don't know that it will.
Q. What would eliminate your concerns?
A. To eliminate the jet noise, or to make the jet noise I'll call it tolerable.
Q. You described the noise a few minutes ago as intolerable?
A. Yes.
Q. What would be your opinion of what is tolerable?
A. I'm sorry.
Q. Well, what is the difference between what is intolerable and what is tolerable?
A. The difference between tolerable and intolerable, as it relates to jet noise, is the difference between, as an example, something that disrupts my life-style as opposed to something that does not disrupt my life-style.
Something that interferes with my conversation with my wife or my neighbor or someone that is visiting, and prohibits that conversation from taking place, as opposed to the opposite of that. To me, that's what I mean by tolerable or intolerable. Or not tolerable.
Q. Do you think the noise was tolerable before the fall of '98?
A. I do not recall the disruption and the noise level being to anywhere near the extent prior to the arrival



of the F/A-18s. Or putting it a different way: The activity with the F/A -- with the F-14s as an example, the Tomcats, there was noise levels there, but that I did not necessarily put in the intolerable category.
Q. Why is that?
A. For the reasons that I have already stated. It was -- the noise level is -- it's certainly there with the F-14s. But it is not intolerable to the extent that it disrupts my life-style, to the extent that it keeps -- prohibits me from carrying on a conversation when they are flying.
Q. When the F-14s are flying, how do you know F-14s were flying before the F-18s?
A. Well, generally speaking, I can tell the difference between -- visually, between an F-14 and an F-18.
Q. So did you see F-14s flying near your property before you saw F-18s flying?
A. Yes.
Q. When did you see F-14s flying?
A. I don't recall. I mean I couldn't tell you a date. I don't know. I can't remember.
Q. Would it be before the fall of '98?
A. Yes.
Q. And when you saw those F-14s flying, could you have a conversation outdoors then?