# EXHIBIT D

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, )
et al., )
)
Plaintiffs, )
)
v. ) NO. 01-201L
) Judge Victor J. Wolski
THE UNITED STATES OF AMERICA, )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION
OF CHARLES K. NASH
TAKEN ON BEHALF OF THE DEFENDANT

Virginia Beach, Virginia

January 13, 2006

Appearances:

SHUTTLEWORTH, RULOFF GIORDANO & SWAIN, P.C.
By: CHARLES LUSTIG, ESQUIRE
Counsel for the Plaintiffs

U. S. DEPARTMENT OF JUSTICE
By: KELLE S. ACOCK, ESQUIRE
And
DEPARTMENT OF THE NAVY
COMMANDER NAVY REGION ATLANTIC
By: DOMINICK G. YACONO, ESQUIRE
Counsel for the Defendant



INDEX


| DEPONENT | | PAGE |
|---|---|---|
| CHARLES K. NASH | By Ms. Acock | 3 |


EXHIBITS


| NO. DESCRIPTION | PAGE |
|---|---|
| (NONE) | |




Deposition upon oral examination of CHARLES K. NASH, taken on behalf of the Defendant, before Frances P. Zahn, RPR-RMR, a Notary Public for the Commonwealth of Virginia at large, taken pursuant to notice, commencing at 8:30 a.m. on January 13, 2006, at the offices of Shuttleworth, Ruloff, Giordano & Swain, 4525 South Boulevard, Virginia Beach, Virginia; and this in accordance with the Federal Rules of Civil Procedure.

CHARLES K. NASH was sworn and deposed on behalf of the Defendant, as follows:

EXAMINATION

BY MS. ACOCK:

Q. Good morning, Mr. Nash. My name is Kelly Acock from the Department of Justice. I represent the United States in Testwuide versus United States along with Steven Bryant who is not here with us today.

The rules of the road here are Mrs. Zahn is going to be recording everything that we say, so it's important that we articulate -- I articulate my questions and you articulate your responses. For example, she will not be able to record nods of the head, like nods yes and nods no. Also it's helpful for her if we avoid talking over one another. If we avoid talking at the same time, so that way she is able to clearly record what you and I are saying.



If you need a break at any time please feel free to let me know and we'll take a break.

Can you state your name and address for the record?

A. Charles K. Nash, 2617 Boush Quarter, B-o-u-s-h, in Virginia Beach, Virginia 23452.

Q. And have you ever been involved in a lawsuit or litigation before?

A. No.

Q. Have you ever testified under oath before?

A. Yes.

Q. And when was that?

A. Oh, goodness. Early 1988.

Q. And what was that in relation to?

A. At a service station robbery. I was a witness.

Q. Was that here in Virginia Beach?

A. Yes.

Q. And were you a witness for the prosecution or the defense?

A. The prosecution

Q. Do you remember the outcome of that?

A. The party was guilty.

Q. And did you bring anything with you today?

A. Like?

Q. Documents.

A. From what I understand it had been on the market for over a year.
Q Okay. Was that typical in '93 that houses would stay on the market for about a year?
A. I don't have any idea.
Q Since you and your wife own the home, have there been any legal actions associated with the property?
A. Not against us.
Q And has the home been appraised since you purchased it?
A. Yes.
Q If you could, just tell me the years that it's been appraised and the value?
A. I wish I had my wife here for that one. She keeps track of those sort of things. The latest one was during the last refinance. I believe that was -- I believe appraised it at 480. And that was about two years ago.
Q In '03 or '04?
A. Yes. About that.
Q Any other appraisals?
A. I think we did it once before and I can't remember when. It was in between.
Q In between the purchase and the --
A. Right. Whenever the interest rate was favorable.
Q Was there an appraisal associated with your purchase of the property?
A. Yes. I believe there was.
Q Do you remember the appraised value?
A. I think it appraised at the 260.
Q 260. Have you made any improvements to the home or the property?
A. Yes.
Q Could you walk me through those, please?
A. I don't know whether -- well, we've added a bathroom upstairs, remodeled all the bathrooms downstairs, carpet and tile. I guess the major one was ripping all the windows out and putting new ones in back in '99.
Q What prompted you to put new windows in?
A. The arrival of the F-18s.
Q What about the arrival of the F/A-18s made you want to put new windows in your home?
A. Well, we had the old single pane windows with storms over the top of them and in reading I found out that you could cut the noise down by putting in these double pane gas filled windows, and so forth, and so that's what we did.
Q When you refer to your by reading, what did you read that suggested that?
A. Anything I could find on the internet and so forth about noise reduction.
Q And did the windows in your opinion help to



decrease the noise?
A. Dramatically. Plus we added insulation in the attic wherever we could.
Q Can you describe what you would perceive the noise to be like before the new windows and the insulation and what you experienced after? You mentioned it dramatically changed.
A. Well, before you couldn't talk on the telephone if they were flying overhead, and now you can still carry on a conversation there. That's the biggest thing.
Q Are you able to watch television and hear the television?
A. For the most part, yes. Every now and then somebody takes the roof off.
Q Not literally?
A. No. Well, every now and then we get an overflight that is more than normal. If you look at the pattern and where we're located, we don't normally, because they use this runway most of the time.
Q And which, just for the record and Mrs. Zahn, you are pointing at Defendant's Exhibit 122?
A. Yes. I'm trying to think what runway that is. They are normally using 5 right or left. And it's not, you know, until they start using 14 left and right. When they use 14 left and right, that's when it gets really obnoxious.



Q And how do you know which runway the jets are using?
A. Well, when they come in to go to runway 5, they will be cycling around over towards Lynnhaven Mall off to the east of us and when they come in to use runway 14 they come directly overhead.
Q Directly over your home?
A. At very low altitude.
Q How often would you say -- you could use percentages of 100 percent -- would you say that the flights are directly over your home as compared to when they were using runway 5?
A. I couldn't tell you, but I'm sure that Oceana could. I mean they can tell you how many times a year they use that runway. I think we are probably in the 10 -- about 10 percent. Maybe less.
Q 10 percent of?
A. Of their landings when they use that runway. They don't use that very often.
Q I'm sorry. Which runway are you talking about?
A. The 14. That's very fortunate for us.
Q What is your current occupation?
A. I'm a combat systems engineer.
Q I'm sorry. I didn't quite hear you. Combat?
A. No. Combat systems engineer.

entail?

A. To the exchange and places like that.

Q. Is your home near the air station?

A. It's fairly close.

Q. So your house is fairly convenient to the exchange?

A. My wife uses the gym on a daily basis during the week.

Q. Was that a selling point or a positive attribute of the property when you purchased it?

A. No, not really.

Q. Have you ever been involved in the real estate business?

A. No.

Q. Has your wife?

A. No.

Q. Any family members involved in real estate?

A. My daughter used to be in Florida a long time ago.

Q. You mentioned earlier that the real estate agent Zenglioski --

A. Yes.

Q. -- assisted you in purchasing the property. Was that a man or a woman?

A. It was a husband and wife team. Angie and John.



Q. Did they tell you anything about Oceana before you purchased the property?

A. They showed me a map very similar to this one, and we looked at it and noticed that, if I'm not mistaken, this map is more recent than the one that used to be out there.

Q. This is an AICUZ map, Defendant's exhibit 122 is an AICUZ map, and I believe it's dated 2005.

A. Right. And if I'm not mistaken, the one that used to be out there did not have these outer bands, these last two. The only thing it showed was that we were on the fringe of the only -- you know, there was like a pink area that showed some jet noise and so forth. And we were on the outer side of the thing. There was nothing indicating any of these bands out here as far as I knew.

Q. When you are referring to these bands, the one that is labeled 65 and 70 on Defendant's Exhibit 122?

A. I do not believe those were shown on the map that they showed us. Because they did point out, because you know we were concerned about the noise and the impacts and so forth. But we were outside of it. And --

Q. What were your concerns about the noise when you purchased the property?

A. Well, we had only looked at it a couple of times and if you visit a thing on Sunday, when the Navy is not



flying, it's hard to tell how much jet noise there is.

Q. Did you visit the property on a weekend?

A. Yes. We visited it many times after that. Back in those days, it wasn't -- you know there were F-14s around and A-6s, and it wasn't that bad.

Q. When you were viewing the property on some of the times you visited it before you purchased it, did you witness the jets flying?

A. Yes.

Q. Can you describe what you saw?

A. Most of it -- most of the time we saw the jets flying, they were circling around to the east, coming in over, basically Lynnhaven Parkway and the Great Neck Road area down in here. It would be coming around to the east from where we were, so --

Q. And what altitude or what height would you estimate they were flying at?

A. I don't know. Anywhere from 500 to 1,000 feet, probably.

Q. And would you say that the altitude of the flights you are experiencing now at your home, that they fly about the same altitude or height?

A. Most of the time.

Q. Most of the time. More than 50 percent of the time?



A. Yes. Yes. There is only the occasional flight that is really, really low.

Q. Can you describe those occasional flights that are low. What -- in terms of how low they fly and the noise you experience?

A. A few hundred -- maybe a few hundred feet. I -- the ones where I have called in on have been very low and kind of scary. When you can see the guys in the cockpits, that's too low.

Q. Can I make out -- you mentioned seeing the pilot. Or the guys in the cockpit. Can you make out any other markings on the jet?

A. You can almost read the stencils on the side, yes. The Navy has gone to a different paint scheme these days so you can't see it as much as you used to be able to.

Q. Are you able to see landing gear?

A. If it's down, yes.

Q. I think you mentioned a couple of hundred feet on the occasional lower flight. How are you able to make that measurement?

A. Just experience of watching airplanes buzzing around an aircraft carrier? Which is an observation level that they let us go out and watch the airplanes take off and land on the aircraft carriers.

Q. And how often would you do that when you were on

the carrier?

A. Every chance you get.

Q. You mentioned earlier that when you installed the windows and the insulation, that after the -- after the new windows and insulation, that you were able to have the conversation for the most part inside your home. Before that time, can you tell me what -- between '93 and I believe you said in '99 when the windows were installed, what noise did you experience at your home? In terms of being able to have a conversation. Could you watch the television?

A. Between '93 and I guess the fall of '98, it wasn't too bad. You'd get an occasional loud A-6 coming over that would interrupt a phone call or television or something, but between '93 and the fall of '98 it wasn't too bad. It was when the F-18s came that the noise level got to the point where you would have to say, wait a minute, there's an airplane going over. That's when we decided to put the windows in. It was -- I guess it really was the spring of '99 that we first decided we had to do something about it, because that's at the end of winter. We open the windows to get some fresh air in at night or something like that. And if they are flying, we close the windows up again, turn the air conditioning back on because we couldn't stand the noise.

Q. How long would you say it was when you noticed the increase in noise and the F-18s. I was trying to -- how many months would you say that you experienced the F-18s before you changed the windows and the insulation?



A. Probably six to eight months later. Took a while to get a contractor lined up.

Q. So about late '98, early '99?

A. It was -- let me say, it was probably April of '99 that we decided to do something about it. And it was probably July or August before we finally got a contractor around to do something.

Q. And when were you aware that the F/A-18s arrived?

A. I'm trying to think. There was an air show, must have been that fall. Do you remember when the Neptune Festival was? September, isn't it?

MR. LUSTIG: I believe it's in the fall.

A. Yes. Of '98, and they had a big kick off thing at Oceana for it and we were invited to come out.

BY MS. ACOCK:

Q. Take a look at the planes?

A. Well, my wife was the principal of a school.

Q. Which school?

A. At that time, Great Neck Middle. She's retired now.

Q. Do you remember the contractor that came in to do the windows?



A. Tignor, T-i-g-n-o-r, Construction.

Q. Is that a local company?

A. Yes.

Q. Do they also do the insulation?

A. They hired someone to come out and pump it in. I don't know who.

Q. A subcontractor?

A. Yes.

Q. How much did that cost to replace the windows and add the insulation?

A. I think the windows were $8,400 and the insulation was about 1,500.

Q. Roughly $10,000?

A. Roughly.

Q. Do you or your wife keep a log of when the jets fly over, around your home?

A. No.

Q. What about taking photographs or videotape?

A. No.

Q. I believe you mentioned earlier that for the occasional lower flights that you have called the hotline before?

A. I have called the hotline on those, yes.

Q. And just to clarify, that's the noise hotline for Oceana?



A. Right.

Q. How many times have you called the hot line?

A. Oh, probably three or four. I'm not sure if I got through on all of those.

Q. Were you able to get through on some of those?

A. Yes.

Q. And what happens when you are able to get through on some of them?

A. They take a report and don't respond.

Q. What do you mean by don't respond? You don't receive any other correspondence from them?

A. No feedback, no -- nothing.

Q. Do you remember the first time you called the hotline, when that was?

A. No.

Q. Do you remember the most recent time you called?

A. No. I have pretty much given up on it.

Q. The phone calls to the hotline, would those have occurred in the '98-'99 time frame before the insulation?

A. Yes. Well, not all of them, but --

Q. So you called the hotline after the windows and insulation?

A. Yes.

Q. Has your wife called the hotline?

A. No.

# EXHIBIT E

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, et al., )
Plaintiffs, )
v. ) NO. 01-201L
) Judge Victor J. Wolski
THE UNITED STATES OF AMERICA, )
Defendant. )

ORIGINAL

DEPOSITION UPON ORAL EXAMINATION
OF HERBERT VAN NOSTRAND
TAKEN ON BEHALF OF THE DEFENDANT

Virginia Beach, Virginia

April 27, 2005

Appearances:

SHUTTLEWORTH, RULOFF, GIORDANO & SWAIN, P.C.
By: STEPHEN C. SWAIN, ESQUIRE
Counsel for the Plaintiffs

U. S. DEPARTMENT OF JUSTICE
By: STEVEN D. BRYANT, ESQUIRE
DOMINICK G. YACONO, ESQUIRE
Counsel for the Defendant

Q. How far is the mall from your house approximately?

A. About three miles, two and a half, three miles.

Q. Okay.

Did the jets -- did the jets ever at that time frame fly directly over your house?

A. They have, yes, at one time or another.

Q. Now going back to the 1967 time frame when you first moved into the house, were they flying over your house then?

A. You know, I -- you know, I'd have to say yes because there's jets flying, you know. And I would have to say yes.

Q. All right. About how often did the jets fly over, directly over your house in that time frame of 1967 through the '70s, that time frame?

A. Well, that's another question. You know, just -- I just hear air pattern, I guess you call it.

Q. But when you were sitting on your porch back when you first moved in your house, back in that time frame on occasion --

A. Yes.

Q. -- it would fly over your house?

A. Yes.

Q. Okay. What I'm trying to find out is about how

often did that happen where it would be right above your house? When I say above, it could be how high?

A. Quite often. Quite often.

Q. Quite often back then?

A. Yes.

Q. When you say quite often do you mean -- how many times a month, approximately?

A. Oh, lord! 180.

Q. Oh, so very often then. Quite often?

A. Yes. Yes.

Q. So on a regular basis?

A. Yes.

Q. It was flying directly over your house?

A. At times directly over.

Q. Okay.

A. I mean when you say directly over, I'm talking right straight up.

Q. That's what I'm talking too, so we're having a mind meld here, so that's good. We're talking about the same thing.

You said about 180 in terms of flights a month. When you said 180, do you mean 180 directly above you or 180, a certain number above you and a certain number above the Lynnhaven Mall area?

A. Exactly. A certain amount over, you know they --

and then like right now you see them coming in the afternoons, you know, their pattern, you know. And then some are very often, you know, a little farther than I'd say -- I don't know what he's doing, but he's just --

Q. Well, right now I'm not talking about right now.

A. Then I guess they were. I would say then they would do the same thing, more or less.

Q. Okay. Well, then, speaking of that, have the flights, your experience with the jets flying in and around your house, has it been roughly the same in terms of number of operations and proximity to your home over these many years?

MR. SWAIN: What do you mean by proximity to his home?

MR. BRYANT: I mean, he said some flights back in 1967 were directly above his house. Some were over the Lynnhaven Mall area. Lynnhaven Mall, of course, didn't exist back then, but in that area. What I'm trying to find out, has it been roughly consistent where the planes have flown in relation to your home from back in 1967 through the '70s, '80s, until now? Has it changed?

A. If I had to say same, yes, sir.

MR. SWAIN: Now, no guessing. No guessing. Just tell what you know.

A. I'd say it's about the same pattern.

Q. It also says that -- well, actually, but you do agree that the -- I'll return this actually. I'm not going to make it an exhibit.

Do you agree that there has been sort of a market appreciation in this area, in Virginia Beach?

A. Yes.

Q. You do. And what is your understanding of how long that's been going on?

A. As far as I know of?

Q. Yes.

A. I don't know. I'd say because -- I talked to you more about houses here than I have talked to anybody else.

Q. All right. Fair enough.

A. I mean I really don't.

Q. I'm going to mark --

MR. SWAIN: Let me get a copy of that. Make a copy.

MR. BRYANT: Sure.

MR. SWAIN: You want to do it at the break?

MR. BRYANT: That's fine. We'll do it at the break.

Just give me a moment here.

BY MR. BRYANT:

Q. Another question I have for you is going back to overflights in terms of the altitudes of the overflights.

How high above you are they? Do you have -- can you estimate about how high the planes are currently right now above your house?

A. If I had to guess --

Q. Yes?

A. -- I'm going to say from 1,000 to 1,400 feet.

Q. Okay. Has that altitude been about the same the entire time you have lived in the house?

A. Pretty close. Pretty close.

Q. Okay. Could you -- you said 1,000 to 1,400 feet?

A. I'm guessing.

Q. I understand.

Can you compare that to something like a certain number of homes stacked on top of one another? Is there something you could compare it to to give --

A. No.

Q. You are just going -- okay. Fair enough.

Can you see the pilots from your front porch? Can you see them in there?

A. You know they are in the airplane.

Q. Oh, I know they are in there.

A. I mean, you know, yes, you see the figure of a person there, you know, and all, yes.

Q. Can you see their helmet that they are wearing?

A. Not with my eyes like that, but you know.

# EXHIBIT F

1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, )
et al., )
)
Plaintiffs, )
)
v. ) NO. 01-201L
) Judge Victor J. Wolski
THE UNITED STATES OF AMERICA, )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION
OF JAMES E. RIDDICK
TAKEN ON BEHALF OF THE DEFENDANT

Virginia Beach, Virginia

June 10, 2005

Appearances:

SHUTTLEWORTH, RULOFF GIORDANO & SWAIN, P.C.
By: STEPHEN C. SWAIN, ESQUIRE
Counsel for the Plaintiffs

2

Appearances (Cont'd.)

U. S. DEPARTMENT OF JUSTICE
By: STEVEN D. BRYANT, ESQUIRE
KELLE S. ACOCK, ESQUIRE
And
DEPARTMENT OF THE NAVY
COMMANDER NAVY REGION ATLANTIC
By: DOMINICK G. YACONO, ESQUIRE
And
DEPARTMENT OF THE NAVY
NAVY LITIGATION OFFICE
By: J. PAGE TURNEY, ESQUIRE
Counsel for the Defendant

3

I N D E X


| DEPONENT | | PAGE |
|---|---|---|
| JAMES E. RIDDICK | By Ms. Acock | 4 |


EXHIBITS


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 70 | Real Estate Purchase Contract, James E. And Virgie L. Riddick | 10 |
| 71 | 21st Century Remodeling, Inc. written agreement, dated 26 October 2001 | 19 |
| 72 | Appraisal with comparable photos | 21 |
| 73 | Subpoena and Notice of Taking Deposition - Duces Tecum | 22 |
| 74 | Appraisal of Real Property | 25 |
| 75 | Plaintiffs' Answers to Interrogatories James and Virgie Riddick | 41 |


4

Deposition upon oral examination of JAMES E. RIDDICK, taken on behalf of the Defendant, before Frances P. Zahn, RPR-RMR, a Notary Public for the Commonwealth of Virginia at large, taken pursuant to notice, commencing at 8:45 a.m. on June 10, 2005, at the offices of Shuttleworth, Ruloff, Giordano & Swain, South Boulevard, Virginia Beach, Virginia; and this in accordance with the Federal Rules of Civil Procedure.

JAMES E. RIDDICK was sworn and deposed on behalf of the Defendant, as follows:

EXAMINATION

BY MS. ACOCK:

Q. Hi, Mr. Riddick. I'm Kelle Acock, and I'm going to ask you some questions today, and we'll need you to verbally say the answers. Ms. Zahn is going to be typing what we say and so nodding your head yes, shaking it no, uh huh, uh uh, she won't be able to transcribe that.

A. Right.

Q. So we just need you to go ahead and verbalize your answers. And if at any time you need a break, if you want to get some water, or if you just need to take a moment, just let us know and we'll be happy to stop and let you take a break.

A. All right.

Q. Did it seem like it just happens overnight, so to speak, or was it something that you really noticed at one particular time?
A. You know the reason I really notice one particular time is, say, when the house shook, you know, it gets your attention. If you are in the house, the thing vibrates and you hear this jet noise going by and all of a sudden the house shakes and it gets your attention. I would say that is in late '99, 2002, though. Somewhere along in there.
Q. When you mentioned in '92 when you first bought the home that the jets would fly, did your house shake then?
A. No. I don't ever remember shaking then like that.
Q. When you describe the planes flying directly over your home, do you know about how high they are flying, or what the altitude is?
A. I don't know.
Q. Do you have really tall trees in your front?
A. No. No.
Q. If you -- if they are not directly over your home and they are flying you said to the right or to the left, do you know how high they may be flying then?
A. No. I couldn't tell.
Q. Do they seem to be higher than when you think



they are flying directly over?
A. It's hard to say because sometimes some of them are lower than the others, and it's hard to say, you know, which is higher and if they are coming directly over the house whether they are higher than when they go to the side. It's hard to say.
Q. Do you think the height that you talked about as they fly now, do you think that is about the same as they flew in 1992?
A. I really don't know. I really don't know. I can't say. I'm not sure.
Q. In terms of the height again, did you ever notice a change between '92 until the present in terms of the height that they fly?
MS. HOFHEIMER: Objection. Asked and answered.
A. I really couldn't tell. I really can't tell if they was flying higher or lower.
BY MS. ACOCK:
Q. So it seems to be the same?
A. Pretty much. Pretty much.
Q. Do you know whether when your house was first built if there was any sound attentuations in the home when it was built?
A. What do you mean by sound attentuation?
Q. Anything in the construction of the home that



would mitigate noise?
A. Not that I know. I don't know.
Q. Have you done anything to your home that would mitigate noise?
A. Well, no. I had new windows put in.
Q. Why did you have new windows put in?
A. Well, you know, first of all, I did it for the comfort. And they said the windows would keep out some of the noise also. And it would keep the heat in. It would keep the heat from coming in and make your house warmer in the wintertime.
Q. So that's what you mean by comfort?
A. Right. They said it would make it a little bit more comfortable. You won't be as cold, you won't be as hot, and it eliminates a little bit of the noise.
Q. And that, the windows, that is part of the remodeling?
A. No. This was just done -- the windows were just done like a couple of months ago.
Q. Okay. This is June, so March or April?
A. April, somewhere along in there.
Q. And who installed the windows?
A. Window World? I believe it was Window World.
Q. Do you remember how much it cost?
A. About $4,000.



Q. You talked about the windows being for comfort. Can you describe them, single pane, double pane?
A. Double pane.
Q. Are there any -- are they like specialized, customized windows or just new windows?
A. Well, I guess -- he came in and measured everything, so I guess they are customized for the house because he had to come in and measure every window individually.
Q. But the main reason you bought them was not for the noise?
A. Well, not the main reason but that was part of the reason because they said it eliminates a little bit of the noise, so that was included. But I basically wanted it to keep the heat inside in the wintertime and the heat outside in the summertime and eliminate what noise I could.
Q. Besides the windows, have you done anything else to your home to make the noise less or to mitigate the noise?
A. Nothing else that I can remember to eliminate the noise. I don't know what else I could do to eliminate noise.
Q. Do you remember the mortgage company when you purchased the home, what mortgage company had the mortgage?
A. You know, I'm not sure. For some reason I want