# EXHIBIT G

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, )
et al., )
)
Plaintiffs, )
)
v. ) NO. 01-201L
) Judge Victor J. Wolski
THE UNITED STATES OF AMERICA, )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION
OF JOHN C. SHICK
TAKEN ON BEHALF OF THE DEFENDANT

Virginia Beach, Virginia

July 25, 2005

Appearances:

HOFHEIMER/FERREBEE, P.C.
By: KRISTEN D. HOFHEIMER, ESQUIRE
And
QUINN, GORDON & WOLF
By: KIERON QUINN, ESQUIRE
Counsel for the Plaintiffs



Appearances (Cont'd.)

U. S. DEPARTMENT OF JUSTICE
By: STEVEN D. BRYANT, ESQUIRE
KELLE S. ACOCK, ESQUIRE
And
DEPARTMENT OF THE NAVY
COMMANDER NAVY REGION ATLANTIC
By: DOMINICK G. YACONO, ESQUIRE
Counsel for the Defendant



INDEX


| DEPONENT | | PAGE |
|---|---|---|
| JOHN C. SHICK | By Mr. Bryant | 4 |


EXHIBITS


| NO. DESCRIPTION | PAGE |
|---|---|
| (NONE) | |




Deposition upon oral examination of JOHN C. SHICK, taken on behalf of the Defendant, before Frances P. Zahn, RPR-RMR, a Notary Public for the Commonwealth of Virginia at large, taken pursuant to notice, commencing at 1:15 p.m. on July 25, at the offices of Hofheimer/Ferrebee, P.C., 1060 Laskin Road, Virginia Beach, Virginia; and this in accordance with the Federal Rules of Civil Procedure.

JOHN C. SHICK was sworn and deposed on behalf of the Defendant, as follows:

EXAMINATION

BY MR. BRYANT:

Q. Good afternoon, Mr. Schick. My name is Steve Bryant. Thanks for coming here today.

First, before we get started, Mrs. Zahn is taking down everything that you and I say so it's important that you wait until I finish my questions to respond to them and I wait until you finish answering before I ask more questions. And also please don't nod your head because she can't take those down. Everything has to be verbalized in terms of answers. And if you at some point are describing something with your hands, whatever, we need to describe that for the record as well. Everything has to be transcribed so it's reflected on the record.

Also, at any time during this if you need a break

was a distinct increase in noise and annoyance.
Q. What about the sort of number of operations that you experienced at your house. You obviously had some overflights directly over your house, you said, and then some, a couple hundred yards on each side. Is that a fair description?
A. Yes. I mean it could go miles. It could go a long way either side.
Q. Has that been roughly the same since you have been there, since '97? I mean, irrespective of the type of aircraft, has the level of operations been the same roughly?
A. I can only speculate. I don't know.
Q. But there at no point did you sit down and say, oh, my gosh, the operations over my house have doubled or tripled, or whatever, have increased significantly? You have never sort of had that kind of thought?
A. I have never made that particular analysis. What analysis I do is I go back to the Navy's information. We stuck very closely to Navy information in anything we did. If the Navy says they were doing 320,000 overflights in this community, I believe that Navy figure. If that was bigger than -- if that figure was bigger than it was prior, then I would have to say there were more overflights.
Q. And why would you believe what the Navy would put out in terms of the numbers and say, 300,000, whatever the



operations were, why would you accept those?
A. Why would I not? I guess, the question is, it was -- it was more reasonable to take an official study and try to make our case that we needed a reasonable solution than to generate our own numbers and say, I want you to believe us. Let's believe the Navy.
Q. Well, did your 30 years of experience in the Navy contribute to your conclusion that, hey, the Navy is putting out what it believes the correct operational numbers? Or would that --
A. I would have no reason -- in my career I had no reason to believe that the Navy was fudging figures for the public.
Q. Aside from Navy documents saying how many operations we had this year or that year, whatever, did you experience anything that was different in terms of level of operations, not the actual noise of an F-18 versus an F-14, at your house?
A. Repeat. I'm sorry. I started thinking on something else, and I lost my train of thought.
Q. Putting aside for a second the -- you said the F-14 you measured with the high 90s, versus the F-18 C/D I think you said was 117, or thereabouts. I may be getting that wrong.
A. F-18, because I really couldn't -- as I told you,



I couldn't tell the distinction between an A and B and C and D.
Q. Well, putting that difference aside in terms of one being louder than the other, and putting aside the documents that you reviewed that the Navy generated in terms of we have 100,000 operations, or however many operations in a given year time frame, was there anything that you personally experienced in living in the house that it changed suddenly. It was suddenly much higher than it was, more touch and gos, more FCLPs, anything of that nature?
A. As far as frequency -- you're talking frequency?
Q. Yes.
A. Or you're talking consequences?
Q. I'm talking -- let's talk frequency right now.
A. Okay. In frequency, as I said, I never made -- I never looked at the frequency. They were -- I shouldn't say I never looked at it, but I never made a study of it. I never recorded any data to support there are more. The overflights, as you probably are already aware, are sporadic. You can go a couple of days without having any, and you can go several days and it just seems to be constant.
Those days of constant overflights I suspect were consistent with the number of aircraft that were here, the number of aircraft that were being prepared for a



deployment. If they have -- if the -- consistent with the flights of the FRS, how many student flights they have to have in a particular cycle, that they were consistent. As for my experience with it, I was just noting that they were flying over. They were in trail or, you know, one after the other, and that sometimes it would go on for several hours with repeating. Whether -- I can't give you a distinctive answer on whether three years ago they were longer than they are today, because I have never made that assessment.
Q. I mean based on all that, you have never at any time said, wow!, there's a lot more flights going on now than there were. I mean a personal feeling of that and living in your house, than there were when you first got back here in '97?
A. I can make this as a definite. There are a lot more overflights over my house that are annoying. Okay? There are a lot more that annoy me now than there were in the past. Whether that means there are a lot more flights at this time than there were in the past, I don't know.
Q. And you attribute the higher noise and annoyance to the higher noise level of the F-18. Is that correct?
A. Yes.
Q. So again, like the preface to the question, trying to put that aside, there is nothing about the number of flights, though -- aside from the F-18 being louder,

# EXHIBIT H

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, )
et al., )
Plaintiffs, )
)
v. ) No. 01-201L
) Judge Victor J. Wolski
THE UNITED STATES OF AMERICA, )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION OF
JEFFREY McCREARY
TAKEN ON BEHALF OF THE DEFENDANT
VIRGINIA BEACH, VIRGINIA
JANUARY 13, 2006

Appearances:

HOFHEIMER/FERREBEE, PC
By: JACK E. FERREBEE, ESQUIRE
Counsel for Plaintiffs

U.S. DEPARTMENT OF JUSTICE
By: STEVEN D. BRYANT, ESQUIRE
Counsel for Defendant



I N D E X


| DEPONENT | PAGE |
|---|---|
| JEFFREY McCREARY | |
| Examination by Mr. Bryant | 3 |


E X H I B I T S


| NO. DESCRIPTION | PAGE |
|---|---|
| (None) | |




Deposition upon oral examination of JEFFREY McCREARY, taken on behalf of the Defendant, before Kerry E. Zahn, Registered Merit Reporter, Certified Realtime Reporter, a Notary Public for the Commonwealth of Virginia at large, taken pursuant to notice, commencing at 11:30 a.m. on January 13, 2006, at the offices of Hofheimer/Ferrebee, PC, 1060 Laskin Road, Virginia Beach, Virginia.

JEFFREY McCREARY was sworn and deposed on behalf of the Defendant as follows:

EXAMINATION

BY MR. BRYANT:

Q. Good morning, Mr. McCreary. My name is Steve Bryant from the Department of Justice, and I'm representing the Navy in this litigation.
My first question is, have you ever been deposed before?
A. No. This will be my first time.
Q. Just for some ground rules, I will be asking you questions and you'll answer. Ms. Zahn is going to take down everything we're saying, as she is right now. So please wait until I finish my question before responding, and I'll do my best to wait until



you're done responding before I ask another question.
Please also articulate your answers because nods of the head are not going to be reflected when she's typing.
Also, if you need a break at any time, please let me know. And if you don't understand a question that I ask, please ask me to rephrase it and I'll be happy to do so. Okay?
A. Okay.
Q. All right. Please first state your name, address, and occupation.
A. My name is Jeffrey Earl McCreary. I reside at 804 Lord Leighton Court in Virginia Beach, and I'm an information specialist of the public library system at the oceanfront branch.
Q. Okay. And how long have you lived at Lord Leighton Court?
A. Since November of '96.
Q. And where did you live before that?
A. In Cardinal Estates, 2901 Finch Avenue. I moved there in August of 1976.
Q. Okay. How long have you lived in Virginia Beach, since '76?
A. October/November '76.
Q. What is the address that you lived in in

Go ahead. You can answer it again.

·Y MR. BRYANT:

Q. What I'm finding difficult to understand .s if you've experienced it for the last six and a ıalf years, how did you not expect it to be for -- for jet noise to be in the vicinity of your home tomorrow ɔr the day after that or the day after that?

A. Technology should be progressive. Used to be at Cardinal Estates the noise of the test engines were a real bother. For hours on ends they would run these engines. You couldn't hear yourself. They built a hush house. So it became less of problem. Technology fixed that problem.

Q. When did they build the hush house?

A. I couldn't say exactly when, but at ardinal Estates you no longer hear the sounds of hose engines being tested for seemingly hours on end. o that's technology progressing.

I would expect technology to progress to n extent that they are not going to get louder.

Q. So then you expect for this technology, his sound attenuation technology, to take place vernight --

A. No.

Q. -- and muffle the sound?



A. No. I have only been here since '76 and here have been great advances. But when they keep lying farther and farther away from what had been a erceived landing pattern, what had not been a problem n the neighborhood before, is now a continual problem n the neighborhood, should we accept it? No.

Q. I'm not asking you to accept it. You aid now it's a continual problem. Do you expect that roblem to continue through next month?

MR. FERREBEE: Again, I'm going to bject. We're on the eighth time you asked him if he xpects it; he answered he did not expect it. I don't now what you're going to get out of him. We can be ere for the next six weeks and you'll get the same nswer.

Go ahead.

A. If they move-if they have moved all the ets to Fentress, I would not expect them to move them o Fentress; so if they did move them to Fentress, I ould not expect to hear jet noise next week.

Q. Okay.

A. If the noises did come back, it's a jet, e live where we do; do I expect it? No, I don't xpect it.

Q. Okay. So you describe what you're



experiencing as a continual problem; is that correct?

A. Yes.

Q. Okay. Do you expect that that problem, that continual problem, is not going to be a problem tomorrow?

A. Sometime in the future, I hope something is done about it. But I don't know who, I don't know how, and I don't know when.

Q. Okay. Exactly.

So at some indeterminate time in the future you expect it to no longer be a problem; is that right.

A. If something is done about it.

Q. Okay.

A. Or I die.

Q. So if nothing is done about it, then you would expect --

A. To be a continual irritation.

Q. -- for the irritation to continue?

A. Yes.

Q. Okay. Have you kept a log of these flights at all?

A. No, I didn't.

Q. Any sort of records at all?



A. No.

Q. Your wife, has she done that?

A. No.

Q. Have you taken any photos or videotapes or anything?

A. No.

Q. Have you filed any noise complaints with the air station?

A. No.

Q. Have you discussed jet noise with any -- any personnel from the Navy?

A. No.

Q. Have you communicated your irritation with the jet noise to any public officials?

A. No.

Q. Are you a member of the group CCAJN?

A. I get their newsletter. I've never attended any of their meetings.

Q. Okay. Have you ever attended any public meetings or hearings related to jet noise?

A. No.

Q. Have you considered selling your house because of the jet noise?

A. No.

Q. Is the reason for that because you

# EXHIBIT I

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, )
et al., )
)
Plaintiffs, )
)
v. ) NO. 01-201L
) Judge Victor J. Wolski
THE UNITED STATES OF AMERICA, )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION
OF HAROLD LEVENSON
TAKEN ON BEHALF OF THE DEFENDANT

Virginia Beach, Virginia

June 8, 2005

Appearances:

SHUTTLEWORTH, RULOFF GIORDANO & SWAIN, P.C.
By: STEPHEN C. SWAIN, ESQUIRE
Counsel for the Plaintiffs



Appearances (Cont'd.)

U. S. DEPARTMENT OF JUSTICE
By: STEVEN D. BRYANT, ESQUIRE
KELLE S. ACOCK, ESQUIRE
And
DEPARTMENT OF THE NAVY
COMMANDER NAVY REGION ATLANTIC
By: DOMINICK G. YACONO, ESQUIRE
And
DEPARTMENT OF THE NAVY
NAVY LITIGATION OFFICE
By: J. PAGE TURNEY, ESQUIRE
Counsel for the Defendant



I N D E X


| DEPONENT | | PAGE |
|---|---|---|
| Harold Levenson | By Mr. Bryant | 4 |


EXHIBITS


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 32 | Subpoena and Notice of Taking Deposition - Duces Tecum | 14 |
| 33 | Tax assessment for 2004 Brickell Court | 55 |
| 34 | Plaintiffs' Answers to Interrogatories Harold and Elaine Levenson | 78 |
| 35 | Deed dated July 25, 2003 | 82 |
| 36 | Deed dated 7 August 1986 | 83 |
| 37 | Settlement statement datedd April 17, 1987 | 84 |
| 38 | Deed of Trust dated April 17, 1987 | 85 |




Deposition upon oral examination of HAROLD LEVENSON, taken on behalf of the Defendant, before Frances P. Zahn, RPR-RMR, a Notary Public for the Commonwealth of Virginia at large, taken pursuant to notice, commencing at 9:10 a.m. on June 8, 2005, at the offices of Shuttleworth, Ruloff, Giordano & Swain, 4525 South Boulevard, Virginia Beach, Virginia; and this in accordance with the Federal Rules of Civil Procedure.

HAROLD LEVENSON was sworn and deposed on behalf of the Defendant, as follows:

EXAMINATION

BY MR. BRYANT:

Q. Mr. Levenson, my name is Steve Bryant from the Department of Justice. How are you today?

A. Fine. I'm listening to you.

Q. What we're going to have is a deposition which I will ask you questions and you will answer them. Mrs. Zahn is taking down everything we're saying, so please allow me to finish my questions before responding so we're not talking over one another.

MR. SWAIN: Each time he's asking you a question, wait until he completes that question in its entirety, and then give him a response.

THE DEPONENT: Okay.

consistent as the Navy would like them to be. And that's the reason they are training. I mean that's the reason that Oceana operates, because the pilots are learning how to make an ideal or perfect landing on a carrier, and if they were able to do that every single time out of the box then they would land in the same flight trajectory. But they -- of course, wind conditions occur and there's individual differences between pilots and that kind of thing, yes.
Q. But when talking about that, sometimes it's to the left, sometimes it's to the right?
A. Yes.
Q. The distance changes somewhat?
A. Yes.
Q. Is it roughly the same on this side as the same on that side? Is it about -- you are like right on the flight path, in the middle?
A. I had the occasion -- I've been waiting for the moment to tell you this story. I had the occasion to have a telephone conversation with Ray Furenzi and Bobby Rountree. You know who they are?
Q. Yes, I do.
A. This conversation must have taken place two years ago, maybe. Ray was in his office. Bobby was in Ray's office. He put me on a speakerphone. We had about a 45, 60 minute conversation. The reason for the conversation was



that I was wanting to get Ray to have a pilot -- Bobby is a retired pilot working in a civilian capacity with Ray -- explain to me why when the overflights occur sometimes the noise is much louder than at other times. Why there was the variation of noise levels as the planes were flying over my house. So we had this conversation. Very pleasant conversation. Rountree is a fine guy. And Ray is a fine guy too.
And Rountree looked at his maps in Ray's office, and we agreed that the overflights were going to be at about 400 to 500 feet over my house. Okay? And that if the pilots were flying the perfect trajectory to land on the short runway that they would come approximately over my house. And that was part of the conversation for 45 or 60 minutes. So that is how I know without having to measure in some other way that the altitude, when the planes are landing on a short runway over my house, is about 4 to 500 feet. Because I take Bobby Rountree's word for it.
Q. And in terms of -- not just the altitude that you mentioned, the location in relation to your house?
A. Yes.
Q. In terms of --
A. Yes. I know what you're asking. What is the percentage of the time they fly directly over my house as opposed to the percentage when they fly 50 feet, or 100



feet, or 150 feet. Is that what you want to know?
Q. Yes.
A. To be honest with you I really wouldn't want to guess. I mean have I kept statistics? No. Do I have a clear recollection? You know, have I modeled in my head, you know, what the percentages are of that? No. All I can tell you is a certain amount of time, a goodly amount of the time they fly directly over my house.
And that shouldn't be a surprise to anybody, because, as I am sure you know by now, the purpose of the training at Oceana is to get the pilots to make a perfect landing on a carrier. If they make a perfect landing they would -- it doesn't happen this way, but they would fly in a certain trajectory, and that trajectory, as I have experienced it myself, and as the gist of the discussion was that day with Rountree and Ray -- Ray was just listening; Rountree was doing most of the talking -- comes over my house, yes.
Q. Now going back to before you bought the house?
A. Yes.
Q. You mentioned that you were aware of NAS Oceana?
A. I was aware only in my capacity as the news director of WAVY that periodically in our newscast there were stories about NAS Oceana. That's all I knew.
Q. And did you know where the location of Naval Air

Station Oceana was?
A. Only very vaguely. I knew it was somewhere in Virginia Beach, somewhere near the house. That's all I knew.
Q. And --
A. I now know where it is.
Q. I figured as much. But before you moved in, you did know it was near the house?
A. No. No. I don't really think I did. I knew that the sellers of the house were a Navy officer. I knew that, I had started working at WAVY, and I knew we did stories from time to time about Oceana. I knew that Oceana was somewhere in Virginia Beach. Somewhere. But I mean on the days when we looked at the house, were there any overflights at the house when we looked at it? Absolutely none. No.
Q. Did you inquire with -- well, the naval officer you bought the house from --
A. Yes.
Q. -- was he an aviator?
A. I don't think so, but I'm not sure. Did he tell me about overflights of the house? Absolutely not.
Q. Did you ask him about that at all?
A. No. Not that I recall, no.
Q. Did you inquire at the air station about

# EXHIBIT J

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, )
et al., )
)
Plaintiffs, )
)
v. ) NO. 01-201L
) Judge Victor J. Wolski
THE UNITED STATES OF AMERICA, )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION
OF SEAN M. RYAN
TAKEN ON BEHALF OF THE DEFENDANT

Virginia Beach, Virginia

April 27, 2005

Appearances:

SHUTTLEWORTH, RULOFF GIORDANO & SWAIN, P.C.
By: STEPHEN C. SWAIN, ESQUIRE
Counsel for the Plaintiffs

U. S. DEPARTMENT OF JUSTICE
By: STEVEN D. BRYANT, ESQUIRE
DOMINICK G. YACONO, ESQUIRE
Counsel for the Defendant





INDEX

DEPONENT PAGE

SEAN M. RYAN By Mr. Bryant

EXHIBITS

NO. DESCRIPTION PAGE

3 Signed page of real estate contract, Bates OCE223263 .................................. 44

4 Appraisal of 1856 Pathfinder Drive .............. 67

5 Partial complaint ................................ 77

6 Plaintiffs' Answers to Interrogatories, Plaintiffs Sean and Graciela Ryan ................ 86

7 Invoice from Home Front Contracting, Inc. to Mr. & Mrs. Sean Ryan ......................... 93

8 Deed of Bargain and Sale, from Richard M. Kemp to Sean M. Ryan and Graciela F. Ryan ............ 94

9 Deed of Trust ..................................... 95

10 AICUZ map (retained by Mr. Bryant) .............. 111





Deposition upon oral examination of SEAN M. RYAN, taken on behalf of the Defendant, before Frances P. Zahn, RPR-RMR, a Notary Public for the Commonwealth of Virginia at large, taken pursuant to notice, commencing at 12:25 p.m. on April 27, 2005, at the offices of Shuttleworth, Ruloff, Giordano & Swain, P.C., Virginia Beach, Virginia; and this in accordance with the Federal Rules of Civil Procedure.

SEAN M. RYAN was sworn and deposed on behalf of the Defendant, as follows:

EXAMINATION

BY MR. BRYANT:

Q. How are you, Mr. Ryan?

A. Good.

Q. I'm Stephen Bryant from the Department of Justice, along with Commander Yacono on behalf of the Navy. We're here on behalf of the United States. First I'd like to know if you have ever been deposed before so I'll go over the ground rules. Have you ever been in a deposition?

A. No.

Q. It's a question and answer sort of thing, and I'll ask questions throughout. You need to answer them. She's going to be taking everything down verbatim so we can't talk over one another, and please verbalize your answers. Don't nod or say uh huh because that can get





mistranslated.

A. Yes.

Q. Thank you. And if you need a break at any point during this, just feel free to say so at any time and we'll stop. For a bathroom break, whatever you need, that's fine.

And if you don't understand the question I ask, please let me know and I'll rephrase it.

A. Fine.

Q. First, I'd like to ask, have you ever been a plaintiff or a defendant in another case before?

A. Yes, I have.

Q. Okay. Can you tell me about that. How many times, first?

A. Just once.

Q. Just one case?

A. It was an accident that occurred to me on board ship.

Q. And when was that?

A. This was back in -- I'm not really sure about the date, but it was like '90 -- early '90s.

Q. And you say it was on a ship. What happened?

A. A line was hooked around a fairlead and the horn of the fairlead parted and the line hit me and I got hurt.

Q. I don't know what any of that -- what a fairlead is?

A. It was.
Q. Okay. And when did it become unsuitable?
A. Well, it started to get bad, real bad, you know, when the Hornets were coming, and they -- they, you know, when they started getting more and more jets at the base, there were more jets, more flyovers. And that's what made it getting bad.
Q. Okay.
A. It steadily got louder and louder.
MR. BRYANT: I'd like to mark this partial complaint as DX 5, I guess is the next number?
(Partial complaint was marked Defendant's Exhibit No. DX005.)
(Discussion off the record)
BY MR. BRYANT:
Q. I think I may have shown you this before, Mr. Ryan. OCE222981 through OCE223005. It's Plaintiffs' Answers to Interrogatories from the Plaintiffs Sean and Graciela Ryan.
I hand this back to you.
MR. BRYANT: I think we have another copy if you'd like to see it, Mr. Swain.
BY MR. BRYANT:
Q. If you could go to page 24 of that document, please. It has your name and your wife's name but no





signature.
A. No. I guess we forgot that one.
Q. Well, what I'm trying to get at is, I'd like you, with that said, I'd like you to review the document and see if you have ever seen it and if you agree to the answers that are in there on your behalf.
MR. SWAIN: Would, after you finish the question about the interrogatories, be a good time to take a break?
MR. BRYANT: Absolutely.
BY MR. BRYANT:
Q. Take your time reviewing that. Don't let me rush it.
A. Well, I remember talking to Jack about this. I don't know why I didn't sign it.
Q. Did you see this document?
A. I do believe so.
Q. All right. I'd like you to turn -- once you are done -- let me know when you are done reviewing it.
A. Okay. I have seen it before.
Q. And you agree with the contents?
A. Yes.
Q. Okay. On page 6, if you would go to -- it discusses in the middle of subparagraph C in the response about aircraft operating in a pattern with several aircraft circling every few minutes, do you experience that at your





house in Upton Estates?
A. One flyover every couple of minutes.
Q. Several aircraft circling every few minutes directly over and around the plaintiffs' home. I'm trying to figure out if this part of the answer applies to your house or not. That's what I'm trying to get at.
A. Yes. They fly over.
Q. When you say they fly over, let's start with that. Directly over your house?
A. Sometimes. I'm not going to say all the time.
Q. And when you say, literally looking up it's directly over your house?
A. Yes.
Q. How high in the air, altitude?
A. I don't know. You can see them pretty close. I don't know.
Q. Can you see the pilots' faces?
A. I'm looking underneath it. I can't see the pilot.
Q. Are we talking 100 feet, 1,000 feet, 2,000 feet? What are we -- you've been around airplanes for a long time.
A. I guess -- I don't know. Four, 500 feet I guess.
Q. 500 feet above your house?
A. Yes. I guess. Maybe more. Maybe less. I don't know. To look up there and, you know, to tell you the truth





I really don't know how big those planes are. But -- yes. They are -- you can see them fairly, real clear.
Q. Okay.
A. I don't know how high they are. No, I don't.
Q. And were the aircraft, the jets, when they flew over, when you moved in in '96 and '97 and '98, were they also flying in that same pattern above your house?
A. Yes. We were having flyovers. But I don't know if it's the same -- maybe close to it. But I don't know if it was the same, you know, path.
Q. Well, was it --
A. They were the same proximity, yes.
Q. Some were over your house?
A. Yes.
Q. And some weren't?
A. Yes.
Q. Were they the same altitude, roughly?
A. Yes. But sometimes they are higher and sometimes they are lower. You know, they are not all exactly --
Q. Sure.
A. -- at the same height.
Q. So what would you estimate the range of altitudes. You said sometimes 500, maybe 1,000. What did you say?
A. Something like that. I'm not sure on the

heights. I really don't know.
Q. Okay. What percentage of the flights are directly over your house? Starting in 1999 when you said it became unbearable.
A. I would say like about 46, 48 percent. Not all of them. And not quite half of them.
Q. So just under half -- just under 50 percent of the flights were directly over your house?
A. Right. The small half.
Q. I understand. Just under. So the remaining 60 whatever percentage?
A. They were --
Q. Or 55, whatever?
A. They were not -- they were like over a little bit.
Q. And when you say over a little bit, blocks?
A. Sir, I don't know. Maybe a block over.
Q. Within a couple of blocks?
A. Yes, sir. Street, you know.
Q. So, in other words, all the flights that you experienced are either directly over your house or within a couple of blocks of your house?
A. From my house being the center. Okay? You probably could go five blocks each way. Okay?
Q. And that includes all the flights that you are





being exposed to?
A. Well, the low ones. The lower ones are in that area. The higher ones are maybe a little off from that.
Q. And when you say a little off from that, what do you mean?
A. Add a couple more blocks to each side.
Q. So within maybe even a five block radius, that's all the flights in terms of noise that you are experiencing?
A. Yes. My house being the center.
Q. And so are half on one side of your house and the other half on the other side?
A. I don't know the percentage.
Q. All right. And it was roughly the same sort of five block radius when you moved in in '96?
A. I would say, yes.
Q. Yes. So when you were doing that search for -- you were looking for a house, how many houses did you say you looked at in the neighborhood?
A. A few. I don't know the exact number. Maybe 15.
Q. Yes. I think you said 10 to 15. Did you consider picking another one of the houses that might not have been directly under the center of that flight path that you were observing?
A. Well, no. That didn't come into play, to tell you the truth, no. We were looking for the criteria of the





house and not the flight path of the jets.
Q. And aircraft noise was not a concern?
A. Not at the time.
Q. We'll take that break in just a minute. I'm almost finished with this.
Now going back to my original question, you said earlier in an August 1999 party you had, you had basically -- correct me if I am wrong -- four individual flyovers.
A. I would say four, yes.
Q. Three to four, whatever it was?
A. Right.
Q. What I'm trying to figure out is --
A. But I said that there were three to four jets that weren't clustered that would go over at a time, one right after the other.
Q. Three to four jets roughly together but not right next to each other?
A. No. One behind the other.
Q. So in sort of a pattern kind of thing?
A. Right.
Q. And that happened in '99?
A. The party in '99.
Q. And it happened -- did it happen before in '96 through '98?
A. It might have done that.





Q. Did it happen when you were looking at the houses?
A. They were -- I remember that there were some jets that flew over, yes. I don't remember what flight path they were in, or whatever.
Q. I'm saying were there groupings? That's what I'm getting at. Did you have three at a time, that kind of thing? Were they still spread out a little bit?
A. I think they were spread out. They weren't wing to wing.
Q. I mean one behind the other. That's what I'm talking about?
A. Well, sure. Yes.
Q. So you had that in '96, and even before you bought the house?
A. Right.
Q. Before '99, when you were outside having a party, or barbecue, or whatever else, and the planes flew over, could you talk and hear each other?
A. No.
Q. Did you have to turn up the TV?
A. Certainly. Yes.
Q. And I'm talking about before '99. That's what I'm talking about now, not after?
A. Yes.

Q. And phone conversations, the same sorts of problems?
A. Yes.
Q. So you had the same sorts of problems before and after '99?
A. Right.
Q. In terms of the enjoyment of the house?
A. Right.
Q. All right. Let's mark this exhibit as DX006, please. I'm sorry. The Plaintiffs' Answers to Interrogatories, Plaintiffs Sean and Graciela Ryan.
(Plaintiffs' Answers to Interrogatories, Sean and Graciela Ryan, was marked Defendant's Exhibit No. DX 006.)
MR. BRYANT: We can take a break now.
(Recess)
BY MR. BRYANT:
Q. I want to turn back to -- what is your current occupation?
A. Merchant mariner.
Q. And is it ABS?
A. No. I sail boatswain now.
Q. Say that again. I'm sorry?
A. I sail boatswain.
Q. Can you -- what do you do in that position?





A. I supervise the maintenance of the ship.
Q. And where does that take place?
A. Well, different places all over the world, whatever ship I'm going on.
Q. So you deploy with the ships?
A. I work for a union and the shipping companies have ships. Right now, I'm employed by Maersk Line Limited.
Q. Can you -- sort of explain this to me because I don't really understand it. In terms of supervising the maintenance of the ships?
A. Right.
Q. How and when do you do that? Is it nine to five?
A. Eight to five. I'm usually a day worker. I'm not a watch-stander. And when guys come out for overtime, I tell them what needs to be done to the ship, and they do it. Chipping and painting.
Q. And does this occur in Virginia Beach, or does it occur elsewhere in the world?
A. Elsewhere in the world.
Q. What types of locations?
A. Well, May 9 I'm flying to Dubai to catch a ship.
Q. How often are you away from this area?
A. I usually work four and four.
Q. Four months here, four months away?
A. All right. But that's not every time. This time





it's going to be eight and five. Eight here, five at work. Or four.
Q. And when you are here, if it's four and four, the four months that you are here, what are you doing during that time period?
A. Messing around my house.
Q. So you have --
A. I have a barn.
Q. If we can go sort of over time, in 1999 do you recall, were you working in the same position in 1999? When did you start with this?
A. Yes. I was sailing boatswain in '99. I think I started sailing boatswain sometime around '99.
Q. What were you doing just before that?
A. I was an AB.
Q. AB. Okay. And were you deployed as an AB also?
A. Yes.
Q. I said deployed in the colloquial sense. And that's with the same company?
A. No. Different companies.
Q. I'm getting them mixed up now. I'm sorry.
When you were an AB, what was the time period you were an AB?
A. From -- I guess I started sailing AB in '88.
Q. Through?





A. I guess '99. Something like that.
Q. Okay.
A. I'd have to check my records. I don't know.
Q. And with that position, how often were you away from this area?
A. Four months.
Q. The same four and four kind of thing?
A. Well, no, I worked. Usually, I was what they call tramping. I was worked for anyone. I didn't have a permanent job. So I would work four months, and probably stay home six.
Q. And then sometime in '99, do you recall what month you became a maintenance supervisor?
A. I don't know. I'd have to check my records.
Q. And when you first joined this company, this is a unionized thing?
A. It's for a union, yes.
Q. What was your first assignment?
A. With the union?
Q. Yes. With this new position that you took in '99?
A. What was my -- where did we go?
Q. Yes. I'm trying to figure out what your first --
A. Oh, we carried tractors to the Ukraine.
Q. To Ukraine?

# EXHIBIT K

1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, )
et al., )
Plaintiffs, )
)
v. ) No. 01-201L
) Judge Victor J. Wolski
THE UNITED STATES OF AMERICA, )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION OF
EILEEN MAY
TAKEN ON BEHALF OF THE DEFENDANT
VIRGINIA BEACH, VIRGINIA
MARCH 9, 2006

2

Appearances:

HOFHEIMER/FERREBEE, PC
By: JACK E. FERREBEE, ESQUIRE
Counsel for Plaintiffs

U.S. DEPARTMENT OF JUSTICE
By: KELLE S. ACOCK, ESQUIRE
and
DEPARTMENT OF THE NAVY
COMMANDER NAVY REGION ATLANTIC
By: DOMINICK G. YACONO, ESQUIRE
and
DEPARTMENT OF THE NAVY
NAVY LITIGATION OFFICE
By: MARY RAIVEL, ESQUIRE
Counsel for Defendant

3

I N D E X


| DEPONENT | PAGE |
|---|---|
| EILEEN MAY | |
| Examination by Mr. Yacono | 4 |


E X H I B I T S


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 147 | Notice of Appraisal | 32 |
| 148 | March 2005 Appraisal | 46 |


4

Deposition upon oral examination of EILEEN MAY, taken on behalf of the Defendant, before Kerry E. Zahn, Registered Merit Reporter, Certified Realtime Reporter, a Notary Public for the Commonwealth of Virginia at large, taken pursuant to notice, commencing at 1:10 pm on March 9, 2006, at the offices of Hofheimer/Ferrebee, PC, 1060 Laskin Road, Virginia Beach, Virginia.

EILEEN MAY was sworn and deposed on behalf of the Defendant as follows:

EXAMINATION

BY COMMANDER YACONO:

Q. Good afternoon, Ms. May.

A. Good afternoon.

Q. I'm Commander Dominick Yacono. I am the Regional Environmental Counsel at the -- for Commander Navy Region Mid Atlantic in Norfolk Virginia, and this is Miss Kelle Acock from the U.S. Department of Justice in Washington D.C.

A. Okay.

Q. I'm going to be asking you a series of questions today. If you don't understand a question that I ask you, please don't hesitate to ask me to

Q. Could you see the jets?
A. I don't recall.
Q. Okay. While you are living at the residence on Bedford Lane, did you have -- did you ever file a noise complaint with the folks at Oceana?
A. No.
Q. You mentioned you lived at that residence on Bedford Lane for nine years. Why did you move from that residence?
A. My husband passed away in the house. Well, not in the house, but almost in the house. When he died -- and I wanted to buy the house. I had wanted to buy the house. We had wanted to buy the house. The landlord kept promising maybe one day he would sell it. His wife didn't want to move back here.
So when my husband died, it was very sudden, and there was a house down the road that we had been looking at, and I just went ahead with that and purchased that house.
Q. And that's the house you're currently living at, 620 Little Neck Road?
A. Yes. That's correct.
Q. I just want to make sure. When you



moved out -- your motivation for moving out of Bedford Lane was the passing away of your husband, or was it for other reasons?
A. Well, actually, it was pretty much the passing away of my husband. I didn't want to be there anymore for that reason. I was uncomfortable there.
Q. Okay.
A. That's --
Q. With regard to the -- your current residence at 620 Little Neck Road, how long of a house-hunting were you doing when you found that residence?
A. Three, four months.
Q. Were you using a realtor --
A. Yes.
Q. -- or were you on your -- do you recall what realtor you were using?
A. She's actually a friend of mine. I don't know who she was with at the time. Her name is Janice Meyers Hollowell.
Q. Can you spell the last name for the court reporter?
A. Which? Oh. Janice Meyers, M-E-Y-E-R-S, and H-O-L-L-O-W-E-L-L.
Q. Do you remember what firm she was



associated with at that time?
A. I think she was ReMax, but I couldn't swear to it.
Q. Okay. With the residence at 620 Little Neck Road, did you find it or did your friend the realtor find it for you?
A. Well, we lived very close to that house, so -- it was for sale. My husband and I looked at it. At -- the funny thing was, it would go on the market, then come off the market. And we assumed it was sold. It would come on the market and go off the market. So we didn't know what was going on with the house.
To make a long story short, he passed away, and I wanted to move, and the house was on the market.
Q. Okay.
A. So we -- I looked at it, and I tried to keep my children in the same school district. They had enough to deal with with their dad dying. So that was very -- in the same everything.
Q. So for that 620 Little Neck Road, the school districts were exactly the same?
A. Except for elementary would have been Kingston, but they were already through there. They were into junior high and high school at that point.



Q. And this is 1993?
A. -- three. He died November 12, 1993.
Q. So in terms of your house-hunting, you pretty -- you limited yourself to this Kingston area?
A. Yes, I sure did.
Q. Before you decided to purchase the home on 620 Little Neck Road, did you notice military jets flying around that home or hear the noise at that home before you purchased the home?
A. No.
Q. Okay. When you moved into the residence at 620 Little Neck Road, how soon after you moved in did you hear military jet noise?
A. I lived there for a while before I really noticed jet noise.
Q. When was -- just estimate what year you think you first heard jet noise.
A. It was years. It was a couple years. Probably in 1997/'98.
Q. Okay. Why does '97/'98 stand out to you? Do you recall anything specific?
A. I put a pool in, inground pool in my yard. I remember for years nothing bothered me. I'm just guessing a couple years. It didn't bother me. I

25

ould be on the phone, in my deck, on the pool, loating, no problem. Then it just seemed to get ouder.

Q. This is pretty much you noticed it rimarily from your experience while being outdoors at he pool?

A. Well, that's the worst. You can't even tay there when they are going overhead when you're in he pool, or especially if you're on the phone you ave to -- I have a terrible habit of taking my phone o the pool and laying on my chair talking.

Q. Okay.

A. Portable phone.

Q. Okay.

A. Or cell phone.

Q. But this was '97/'98?

A. Something like that.

Q. Okay. After that you mentioned -- obviously you mentioned it while outdoors; what about on the indoors? Same thing in terms of radio and television in terms --

A. Yes, turn that up. But I don't watch a lot of television, so, I mean, especially during the day, which is -- I seem to recall them mostly being day or late in the afternoon, like dinnertime area,

26

around there, and my TV is not usually on during the day.

Q. What about phone conversations?

A. Phone conversations, yes.

Q. Did you ever have to pause?

A. Pause, stop, or call back, yes.

Q. Okay. Now, from what you just described to me, from '97/'98 -- '97/'98 to the present day, has anything changed in terms of frequency or periodicity in terms of military jet noise?

A. I haven't noticed it as much lately, just in the last -- but I don't know. I'm in the house more, so I don't know. I mean, my pool is closed.

Q. When you're outdoors at your current residence, can you see the military jets flying in and out?

A. Not necessarily the jets, but I can see the trails, whatever they call them, white smoke that looks like line -- my mother used to -- yes, sir.

Q. You can see the trails?

A. Yes. Currently. I have seen -- I have looked up and seen, you know.

Q. That's what I'm asking. From '97 --

A. Oh.

27

Q. -- when you moved into your home in '94, 620 Little Neck Road --

A. Yes.

Q. -- when did you first observe, when you actually physically sighted a military jet?

A. You want the year?

Q. Just the year.

A. Well, I would have to say 1997 if I had to pin a year down then.

Q. So from '94 to '97 --

A. No.

Q. -- you didn't see a military jet?

A. No.

Q. Did you hear them at least during that time?

A. As I said, I remember them becoming a very big nuisance roughly three to four years after I moved in, but not at the beginning.

Q. Okay. Now, from -- in '97/'98 when you said you were able to see -- at least you were able to see a military jet, could you estimate at what altitude the jet was at?

A. Well, you saw how I did on that map. I'm not real good -- I mean, I couldn't see anybody in the plane or anything like that. I could just see

28

like the gray, the metal.

Q. Okay. Could you see any markings on the plane, numbers, letters?

A. Not that I recall, no.

Q. Okay. And from '97/'98 to the present day, has that changed? Can you see any markings on the jets?

A. No.

Q. Okay. Can you see the pilot?

A. No.

Q. Okay. From the time you moved into your current residence up to the present day, have you ever filed a noise complaint with any of the folks at the Naval Air Station Oceana?

A. I never filed a complaint that I can recall. I went on a website and filled out stuff, but I don't know if that was actually -- it might have been a complaint.

Q. All right.

A. That's how I got involved in this. I don't know if it was a complaint, per se.

Q. Okay.

A. See, well, I didn't know you could, being a military town. I thought that was part of day-to-day life, just dealt with it. I'm not too big

# EXHIBIT L

4836

# HARRIS, MILLER, MILLER & HANSEN, INC - NOV 1984; PREPARED UNDER CONTRACT # N00025-82-C-0002, AICUZ OFFICE, NAS OCEANA

## C 1. Annual Operations and Average Day

Noise Contours are normally based on "average busy day" operations; this is the number of operations that occurs during a 24-hour period when the station is in full operation. The tower maintains daily and annual summaries of these operations. An examination of tower counts indicates that at NAS Oceana the busiest months are March and August. The average weekday operational level during those months is approximately 125 percent of the annual average day. (The annual average day is annual operations divided by 365 days). Therefore the noise contours are based on 125 percent of the annual average daily operations. Table 2 gives the total annual operations for 1980 through 1982.

## C 2. Operations by Aircraft Type

To compute the number of daily operations flown by each aircraft type, each squadron provided for its aircraft estimates of annual numbers of departures, arrivals and patterns flown. These numbers were added for all aircraft types, then used to determine percent of total operations by each type. The grand total of the operations data provided by the squadrons was approximately five percent higher than the total from Air Traffic Control (ATC) counts. To be consistent with the ATC counts, we adjusted the squadron totals downward proportionately. We then developed operations numbers for an average busy day. The resulting numbers of operations are given in Table 3.

Use of individual flight tracks by aircraft type is determined by combining runway utilizations provided by the Tower, and shown in Table 4, with flight track utilization provided by the squadrons. These percentages are multiplied by the numbers of operations of Table 3.

Table 4 gives the flight track labelling conventions followed to distinguish the various types of flight tracks. Table 5 is a summary of operations by aircraft type and by type of activity. Tables 6 and 7 list the numbers of operations by runway, flight track and type of activity for Oceana and Fentress, respectively. Figures 3 through 6 depict the corresponding flight tracks.

Two notes concerning these operations are necessary. First, as indicated in Table 5, operations of certain aircraft are omitted since they contribute so little to total noise contours and thus would add only to the complexity of the noise computation process, not to its accuracy. The F-5E, T-2C and TC-4C were omitted at NAS Oceana and the E-2 and C-1 were omitted at ALF Fentress. Second, general aviation activity is also omitted because it would have no noticeable effect on contours.

TABLE 2

NAS OCEANA AND ALF FENTRESS

ANNUAL OPERATIONS

| YEAR | | NAS OCEANA ANNUAL OPERATIONS | ALF FENTRESS ANNUAL OPERATIONS |
|---|---|---|---|
| 1982 | TOTAL ANNUAL OPS | 177486 | NA |
| | LESS ENROUTE OPS | -15977 | NA |
| | TOTAL STATION OPS | 161509 | 96062 |
| 1981 | TOTAL ANNUAL OPS | 231753 | 90928 |
| 1980 | JAN - OCT ONLY | 120816 | 74006 |

*Source: Air Traffic Activity Report
Note: Patterns are counted as two (2) operations

TABLE 3

NAS OCEANA AND ALF FENTRESS

RUNWAY UTILIZATIONS

NAS OCEANA

| RUNWAY | UTILIZATION(%) |
|---|---|
| 05 | 44 |
| 14 | 3 |
| 23 | 30 |
| 32 | 23 |

ALF FENTRESS

| RUNWAY | UTILIZATION(%) |
|---|---|
| 05 | 60 |
| 23 | 40 |

TABLE 4

NAS OCEANA AND ALF FENTRESS

FLIGHT TRACK DESCRIPTIONS

| Flight Track Suffix | Flight Track Description |
|---|---|
| A | Departures |
| B | Interfacility Departures |
| D | Patterns |
| E | Straight-In Arrivals |
| G | Overhead Arrivals |

TABLE 5

NAS OCEANA AND ALF FENTRESS

1982 AVERAGE BUSY DAY OPERATIONS

NAS OCEANA

| AIRCRAFT TYPE | ARRIVALS | | DEPARTURES | | TOUCH AND GO | | PATTERNS FCLP | | PATTERNS GCA | | PATTERNS ACLS | | TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | DAY | NIGHT | DAY | NIGHT | DAY | NIGHT | DAY | NIGHT | DAY | NIGHT | DAY | NIGHT | |
| A-6 | 7.31 | 2.98 | 8.55 | 1.74 | 33.97 | 11.90 | 6.32 | 9.79 | 2.60 | 2.85 | 0.25 | 0.12 | 84.38 |
| A-4 | 14.50 | 0.87 | 14.88 | 0.50 | 5.21 | 0.66 | 0.00 | 0.00 | 2.85 | 0.04 | 1.12 | 0.12 | 40.75 |
| F-14 | 63.60 | 17.11 | 64.34 | 16.36 | 101.29 | 19.34 | 4.96 | 4.96 | 71.65 | 23.80 | 3.84 | 7.07 | 398.33 |
| F-5E | 6.45 | 0.12 | 6.57 | 0.01 | 3.60 | 6.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.62 | 0.00 | 17.61 |
| T-2C | 2.60 | 0.12 | 2.60 | 0.12 | 0.99 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.25 | 0.00 | [illegible] |
| TC-4C | 1.49 | 0.04 | 1.39 | 0.04 | 0.37 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.0 | 0.00 | [illegible] |
| TOTALS | 95.95 | 21.24 | 98.43 | 18.77 | 145.43 | 31.94 | 11.28 | 14.75 | 77.11 | [illegible] | 6.08 | 7.31 | 564.98 |

ALF FENTRESS

| AIRCRAFT TYPE | ARRIVALS | | DEPARTURES | | TOUCH AND GO | | PATTERNS FCLP | | PATTERNS GCA | | PATTERNS ACLS | | TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | DAY | NIGHT | DAY | NIGHT | DAY | NIGHT | DAY | NIGHT | DAY | NIGHT | DAY | NIGHT | |
| A-6 | 1.30 | 1.30 | 1.30 | 1.30 | 0.00 | 0.00 | 27.26 | 27.25 | 0.00 | 0.00 | 0.00 | 0.00 | 57.92 |
| F-14 | 5.20 | 5.20 | 5.20 | 5.20 | 0.00 | 0.00 | 108.30 | 108.30 | 0.00 | 0.00 | 0.00 | 0.00 | 237.40 |
| E-2 | 1.80 | 1.80 | 1.80 | 1.80 | 0.00 | 0.00 | 39.59 | 39.59 | 0.00 | 0.00 | 0.00 | 0.00 | 86.38 |
| C-1 | 1.00 | 0.00 | 1.00 | 0.00 | 0.00 | 0.00 | 14.75 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 16.75 |
| TOTALS | 9.30 | 8.30 | 9.30 | 8.30 | 0.00 | 0.00 | 189.90 | 175.15 | 0.00 | 0.00 | 0.00 | 0.00 | 400.25 |

NOTE: (1) Each pattern is counted as 2 operations.

(2) F-5E, T-2C and TC-4C aircraft operations at NAS Oceana and F-2 and C-1 operations at ALF Fentress were not modelled since they do not contribute significantly to the noise exposure.