# EXHIBIT N

# REVISED REPORT OF SANFORD FIDELL

## IN TESTWUIDE *et al.* *v.* THE UNITED STATES OF AMERICA IN THE UNITED STATES COURT OF FEDERAL CLAIMS

29 March 2006

Prepared for:

**U.S. DEPARTMENT OF JUSTICE**
Environment and Natural Resources Division
601 D Street, NW
Washington, D.C. 20004

Prepared by:

Sanford Fidell
**FIDELL ASSOCIATES, INC.**
23139 Erwin Street
Woodland Hills, California 91367

# 1 INTRODUCTION AND SUMMARY

## 1.1 PURPOSE OF REVISED REPORT

This report is a further revision of a technical report originally dated 30 September 2005. The purpose of this further revision is to respond to certain matters raised by Dr. Noral Stewart in his report of 22 February 2006 by providing additional information about historical fluctuations in the aircraft noise environment at NAS Oceana, including a new section containing information about single event noise levels produced by aircraft that have operated at NAS Oceana. I also made minor wording changes (as in Section 2.2.4) to more accurately reflect sources of operational information for the various noise modeling exercises.

As part of this revision, I added 1.6 dB to the 1997 and 2000 calculated DNL values at plaintiffs' homes described in Section 2.2, to approximate average busy day modeling assumptions. For the sake of conservatism in estimation, I did not similarly adjust DNL calculations for any of the 1970s-era studies, even though it is uncertain whether all of them were based on consistent average busy day assumptions.[1/] Had I made such adjustments, they would have slightly *increased* estimated DNL values at plaintiffs' homes during the 1970s. The effect of such increases would have been to further strengthen my opinion that noise exposure levels at plaintiffs' homes had been greater in the past than in some subsequent years.

## 1.2 SUMMARY OF OPINIONS

Cumulative noise exposure levels produced by military aircraft operations at the test plaintiffs' homes in recent years are neither novel nor unusually high from an historical perspective. Likewise, adverse reaction in nearby residential areas to noise from aircraft operations at NAS Oceana and NALF Fentress is hardly novel. Although operational levels and aircraft noise exposure at the homes of the Plaintiffs have varied at NAS Oceana over the years, the levels of noise exposure at most of the test plaintiffs' homes have been incompatible with residential land uses for the better part of the last three decades.[2/]

Further, the aircraft noise exposure at all but four of the test plaintiffs' homes had been greater at various times throughout these decades than in 2000. At three of the four homes with greater noise exposure in 2000 than in prior years, noise exposure had previously been incompatible with residential land uses. At the fourth of these homes, aircraft noise exposure had been compatible with residential land uses for the entire time period examined in my report.

The local press has amply documented controversies about aircraft noise on residents of neighborhoods near NAS Oceana and NALF Fentress, as well as the adverse effects of the noise on residents over four decades. If history is any guide, future aircraft noise exposure levels at the test plaintiffs' homes

---

[1/] For example, minutes of a December 1978 AICUZ meeting suggest that the Paulhus (1972) study had adopted average annual day assumptions, and that the 1978 study had assumed 275 rather than 250 days of operation. Due to the logarithmic nature of decibel notation, differences between 250 and 275 day modeling assumptions are of minor practical significance, since they lead to adjustments on the order of ± 0.1 dB.

[2/] As discussed in Section A.2.2, federal policy for the last quarter-century has treated noise exposure at levels in excess of $L_{dn}$ = 65 dB as incompatible with single family residential land use.

will continue to fluctuate with the numbers and types of training missions and aircraft types based at NAS Oceana. A future federal Base Realignment and Closure Committee could even recommend closure of the facility, effectively ending aircraft noise in the vicinity of NAS Oceana.

## 1.3 PERSONAL BACKGROUND

I have conducted research on the effects of environmental noise on individuals and communities since the 1960s. This research has included both laboratory and field studies of the effects of noise on people, such as speech interference, sleep disturbance, annoyance, complaints, hearing damage, and extra-auditory physiological *sequelae*, as well as effects of aircraft noise exposure on property values. I have also consulted on matters of environmental noise measurement and noise impact prediction for local and federal government agencies, airport proprietors, trade associations, citizens' groups, environmental protection organizations, and other parties concerned with evaluating community noise impacts.

My professional experience is summarized in my résumé, contained in Appendix C. My hourly labor rate is $225.00.

# EXHIBIT O

ORIGINAL



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, )
et al., )
Plaintiffs, )
)
v. ) No. 01-201L
) Judge Victor J. Wolski
THE UNITED STATES OF AMERICA, )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION OF
DR. NORAL STEWART
TAKEN ON BEHALF OF THE DEFENDANT
VIRGINIA BEACH, VIRGINIA
MARCH 10, 2006

that as a portion of your description of the noise around an airfield. It's -- I don't feel it's a totally adequate descriptor, but it is certainly one that you have to use and have to consider.

Q. You mentioned it's not totally adequate; what do you mean by that?

A. Well, it's an average and you can achieve an average a number of different ways. As Mr. Odom said in one of the trials in Charlotte I can be standing here with one hand in a bucket of ice water and one hand in a bucket of boiling water; on average, I'm comfortable. So anytime you're dealing with an average you have lost a lot of information. You don't know whether the sound was steady at that level for 24 hours or slightly under it so it would average out, the Day Night Level, you're adding a nighttime penalty, or whether it was one extremely loud event and quiet for the rest of the 24 hours or whether it was ten loud events or a hundred less loud events. You don't know. If all you have is that one number, you have very little information in actuality.

Q. Despite those shortcomings, is DNL still the best metric and the most widely accepted to use?

A. If you are limited to only one number, it is the most widely accepted and a number that needs

to be used. But it has its shortcomings.

Q. Are there other metrics that could be used that you feel are superior to DNL?

A. There are a number of metrics that you should always look at when you are looking at noise like this. And there's not other one number metrics. In other words, you can't try to use one number and say that one number tells the whole story. You have to look at metrics of individual events and numbers of those events. Look at the -- a better description of what really caused you to get to that one number in order to better understand the situation.

Q. So are there other metrics that you believe are superior to DNL?

A. When you say superior, I'm not sure what you mean. Are you asking is there another metric that will give me a one number result that is superior to Day Night Level? No. Not -- one's not been developed that I know of.

Q. Aside from the one number result, is there another superior method or a superior metric to use other than DNL?

A. The superior method is to use a number of metrics, to look at various measures that tell a more complete story. There is no one number that you

can use that tells you the whole story.

Q. In your previous cases you mentioned that DNL provide -- you relied on that for a portion --

A. Certainly.

Q. -- of your testimony and opinion. What else did you rely on?

A. As I said, we would monitor and record individual events, how many times per day did we have events that go over, say, 65 dB. That was a common trigger level. And what were the levels of those events. How many of them. We could tabulate the number of events per day, how many of them were, say, reached a maximum level in the range of 90 to 95. How many were in a range of 85 to 90. How many were in a range of 80 to '85. We could tabulate things like that. Look at those distributions, look at how they occurred in time, how many of them were during the night, how many during the day, were they randomly distributed or were there periods of heavy activity followed by periods of light activity. What was the real picture. What is going on here, as opposed to just some single number that just really tells you an average, that doesn't tell you anything else, and you have no idea how that average was arrived at.

# EXHIBIT P

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| CAROL AND ROBERT TESTWUIDE, et al., Plaintiffs | |
| v. | No.: 01-201L (Honorable Victor J. Wolski) |
| THE UNITED STATES OF AMERICA, Defendant | |

DECLARATION OF DR. SANFORD FIDELL

1. My name is Sanford Fidell. I received a Doctorate in Experimental Psychology from the University of Michigan in 1969. I have conducted original research, consulted, written handbook chapters, participated in international standards activities, and published extensively in peer-reviewed professional journals on the effects of transportation noise on individuals and communities for more than 35 years.

2. I have been retained by the Defendant in this case to reconstruct aircraft noise exposure at the homes of Plaintiffs living in the vicinity of NAS Oceana, and to form technical opinions about changes in their aircraft noise exposure over the last several decades. I have prepared and revised an Expert Report in this matter to provide the Court with consistent estimates of aircraft noise exposure at the homes of test plaintiffs over the years in terms of typical long term (24-hour) cumulative units. The latest revision of this report also contains supplementary information about noise levels produced by individual overflights of specific aircraft types that have operated at NAS Oceana.

3. I have reviewed comments on my revised report of 29 March 2006 made by Dr. Noral Stewart in his Declaration of 23 May, 2006, as well as portions of Dr. Stewart's Deposition of 10

March 2006, and the arguments made by Plaintiffs in Section VII ("PROFFERED TESTIMONY OF SANFORD FIDELL", pp. 32 *et seq.*) of Plaintiffs' Opposition to Defendant's Motion to Dismiss.

4. The supplementary single event aircraft noise levels that I cite in my Revised Report of 29 March 2006 are objective measurements that have been incorporated for decades in the databases of standard aircraft noise modeling software. Dr. Stewart's Declaration of 23 May 2006 does not challenge the accuracy of the supplementary information that I provide in my revised report of 29 March 2006 about single event aircraft noise levels, nor does Dr. Stewart claim that the supplementary information contradicts any conclusions that I had reached on the basis of my earlier analyses of cumulative noise exposure levels at Plaintiffs' homes.

5. Tone Corrected Perceived Noise Level ("PNLT") values contained in the databases of DOD's NOISEMAP noise modeling software are the product of an objective mathematical transformation of field measurements of aircraft noise levels made in one-third octave bands. (Aircraft noise levels are customarily measured in frequency bands a third of an octave wide, so that, for example, the noise emitted by an aircraft within the octave from 500 Hz to 1000 Hz can be represented as the sum of the noise in three adjacent frequency bands.)

6. It is not correct to imply that transforming measurements of one-third octave band sound levels into perceived noise level units is more subjective than transforming the same sound levels into A-weighted units. Both transformations involve the application of tabled adjustments to underlying one-third octave band measurements. In the case of A-weighted measurements, these adjustments are derived from the judgments of test subjects made as early as the 1920s about the loudness of a variety of synthetic sounds, such as pure tones and bands of Gaussian noise. In the case of PNLT values, the adjustments are based on judgments made by test subjects in the 1950s and 1960s about the annoyance of aircraft overflights and other sounds. In both cases, the noise metrics are necessarily derived from subjective judgment data.

7. The U.S. Federal Aviation Administration (FAA) relies on PNLT measurements to regulate the noisiness of aircraft offered for sale in the United States in 14 CFR Part 36 (the Federal

Aviation Regulations). Appendix B ("Aircraft Noise Evaluation") of Part 36 of the Federal Aviation Regulations explains how acoustic measurements made in the 50 Hz through 10 kHz one-third octave bands are converted into instantaneous perceived noise levels, then corrected for the presence of tones and for overflight duration to calculate "effective" (that is, tone- and duration-corrected) perceived noise levels. The resulting perceived noise levels are more accurate for purposes of predicting the annoyance of noise produced during individual aircraft overflights than A-weighted values.

8. Addition of supplementary single event noise level information to my revised report of 29 March 2006 changes no conclusions that I had previously reached about cumulative aircraft noise exposure at the homes of test plaintiffs in the last decades.

I HEREBY DECLARE, UNDER PENALTY OF PERJURY, PURSUANT TO 28 U.S.C. 1746 THAT THE FOREGOING DECLARATION IS TRUE TO THE BEST OF MY KNOWLEDGE AND BELIEF.

Sanford Fidell

Date: June 9, 2006.

Sanford Fidell

# EXHIBIT Q

3:11 p.m.

MS. HOFHEIMER: I've concluded my questioning.

EXAMINATION

BY MR. BRYANT:

Q Steve Bryant on behalf of the United States. Mr. Pierson, you testified earlier about -- not testified -- about noise complaints and documenting them and going back in time even to 1970 or whenever it was, what is your confidence level in the accuracy of the documentation of noise complaints before you arrived at Oceana?

A Noise complaints are very subjective and it's my confidence would be low that they're -- they're accurate.

Q And I meant in terms of the document -- documenting the number of complaints?

MR. SHUTTLEWORTH: I'm sorry, did you say competence?

MR. BRYANT: Confidence in the accuracy of logging the complaints.

MR. SHUTTLEWORTH: Okay.

MR. BRYANT: Yes, confidence.

THE WITNESS: I don't know what criteria they used to define noise complaints.

MR. BRYANT: And --

THE WITNESS: I do not know if we used the same criteria all the way through.

BY MR. BRYANT:

Q And based on that what is your confidence on their accuracy?

A It would be -- it would be low. We only use noise complaint totals in-house to give us a feeling for how things were going on with the community.

Q And do you know what the procedures were for documenting noise complaints before you arrived?

A No, I don't.

Q Turning now to, um, the JLUS. I think earlier -- earlier you, um, mentioned that you had no involvement in the JLUS, what -- what did you mean by that? If -- if I'm wrong in saying that, please correct me.

A The -- the JLUS is a document put -- put out by the Office of Economic Adjustment, Department of Defense, working with the communities. In -- in this case, they're examining Navy bases here in the Hampton Roads area. The -- the team put together has Navy

representatives on it. I am not one of them.

Q Okay.

A I'm aware of the studies going on, and I have -- I have reviewed the study. But I am not involved in anything policywise that's going on.

Q Has your expertise been consulted in regard to the JLUS from anybody within the Navy?

A Yes, it has.

MR. BRYANT: No further questions.

MS. HOFHEIMER: I've got a follow-up question.

EXAMINATION

BY MS. HOFHEIMER:

Q Um, you said that you -- you remarked as to your confidency -- confidence in the accuracy of logging noise complaints, they were logged by the number when they came on -- over the phone; is that correct?

A You -- you mean when I was there?

Q Before you were there.

A I don't know. I -- if somebody called ten times in an hour, did they log it in as ten noise complaints, I don't know.

Q Okay. But those -- those records are in

your file?

A No. The totals were in -- in the files. Because we didn't have confidence in them, we never put the document out to the public as -- as this is noise complaints trends over the years. We looked at it in-house because it was the only reference we had.

Q And -- and those were records that were just -- that were kept in the ordinary course of business and kept in files in your office?

A Yes.

Q And they remained in your office when you got there?

A Yes.

Q And you did use those statistics in the compilation that I showed you earlier?

A The main purpose we used the noise complaints for was to get an idea of trends. We would see that the complaints would up in the spring when people started opening their windows and they dropped down again towards summer as people started putting on air conditioning and they might go up again in the fall.

We would find cycles like that and it gave us a chance to see if anything unusual was occurring that we needed to investigate.

7

(Off the record.)

BY MS. HOFHEIMER:

Q All right. And my question to you, um, when we ran out of tape was, um, that those numbers that were in your file when you came to Oceana, were numbers that you used in preparing a compilation that was, um, in -- in an exhibit that I showed you earlier?

A Yes.

Q Okay. And, um, did you discuss your confidence in, um, in the accuracy of those records with Mr. Bryant or Mr. Smith when we -- when you were -- took a break out there?

A No.

MS. HOFHEIMER: Okay. No -- no further questions.

THE VIDEOGRAPHER: We're off record at 3:18 p.m.

MR. BRYANT: I'm not done yet.

EXAMINATION

BY MR. BRYANT:

Q Um, you mentioned the ordinary course of business for documenting the noise complaints --

A Yes.

Q -- in response to Ms. Hofheimer's question? Do you know what the ordinary course of business was for logging complaints before you arrived at Naval Air Station Oceana?

A No, I don't.

MR. BRYANT: No further questions.

MS. HOFHEIMER: I have one. Um, at least one.

EXAMINATION

BY MS. HOFHEIMER:

Q Was there a published AICUZ manual such as the one, um, that I showed you, um, in my examination of you that gave a protocol for taking noise complaints prior to your coming to Oceana?

A The AICUZ report I believe was from 1978, the previous study that we'd done, it was '76 to '78, it was in that time frame, and that was the only published AICUZ that we have had for Oceana.

Q And was there a noise protocol in that AICUZ?

A I don't recall.

Q Okay. So the numbers before could have

been lower than the ones -- um, the numbers from prior to your being at Ocean, those numbers could have been lower than the ones that are reflected in the number of noise complaints?

A I'm sure it could have gone in either direction. I have -- I have nothing to judge it on.

Q Okay. You just -- you relied on them because they were in your files and you didn't have any reason not to rely on them?

A We -- we knew that there were concerns how the totals are added up, what's considered as a noise complaint, but for internal use to try and show trends over time, it was -- it was the only source we had available.

Q So they were good enough?

A They were not good enough that I would go ahead and call it anything other than a wild guess.

Q And yet, you published them?

A No, we did not.

Q You published a compilation of them?

A No, we did not.

MR. BRYANT: Objection, asked and answered.

MS. HOFHEIMER: Okay. Nothing further.

MR. BRYANT: You're going to have an opportunity to review the transcript --