IN THE UNITED STATES COURT OF FEDERAL CLAIMS

(E-filed: June 9, 2006)

CAROLE AND ROBERT TESTWUIDE, Et. Al.,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

No. 01-201 L
Honorable Victor J. Wolski

**DEFENDANT'S RESPONSE TO PLAINTIFFS' PROPOSED FINDINGS OF UNCONTROVERTED FACTS IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS, OR ALTERNATIVELY, FOR SUMMARY JUDGMENT**

1. Oceana Naval Air Station is located in the densely populated community of Virginia Beach, Virginia. Oceana, at approximately 5,400 acres, is the Navy's smallest Master jet base. The next smallest, Miramar, is over 20,000 acres. Oceana's main facility consists of two paired 12,000 foot and two paired 8,000 foot runways. (Ex. 27, Excerpts from Wyle Laboratories, Aircraft Noise Study, February 1998, Report 97-10, Figure 2-1, February 1998, ("Wyle Report")). Fentress is located in the adjoining community of Chesapeake, Virginia. The combined population of these communities was approximately 545,045 in 1990 and 625,570 in 2000, according to census data. (Ex. 24, Excerpts pertaining to NAS Oceana and NALF Fentress from the Final Environmental Impact Statement for Realignment of F/A-18 C/D Aircraft ("EIS") at Table 3.1-22 at 3.1-99-100).

**Response No. 1**

Defendant agrees with the first sentence of paragraph 1 with the exception that the term "densely populated" is too vague for Defendant to agree or disagree with, therefore Defendant objects to this portion of the first sentence. With respect to the second sentence, Defendant agrees

that Naval Air Station (NAS) Oceana covers about 5,400 acres, and further agrees that the acreage contained within the fenceline of NAS Oceana is smaller than the acreage contained within the fenceline of the other master jet bases, but objects to this comparison because it is not relevant or pertinent to the jurisdictional issue presented to the Court in defendant's motion, nor is it relevant to stating a claim for an overflight taking. Defendant agrees that Marine Corps Air Station, Miramar has over 20,000 acres within its fenceline, but objects to the third sentence on grounds of relevance.. Defendant disagrees that NAS Oceana has two paired 12,000 foot runways and two paired 8,000 foot runways, and further notes that the page cited to support the plaintiffs' proposed finding is not included in Exhibit 27. In fact, as set forth in Commander Erie's declaration, NAS Oceana has one 12,000 foot runway (designated 5R/23L) and three 8,000 foot runways. Defendant agrees with the fourth sentence and notes that the complete designation of the installation in question is Naval Auxiliary Landing Field Fentress. With respect to the fifth sentence, Defendant agrees that the combined population of Virginia Beach and Chesapeake in 1990 according to census data as reflected by the table in the document the plaintiffs cite was approximately 545,045 (151,976 in Chesapake and 393,069 in Virginia Beach). Defendant disagrees that the combined population of these two communities in 2000 according to census data as reflected by the table in the document the plaintiffs cite in 2000 was 625,570, and note that the document the plaintiffs cite was published in 1998. According to Table 3-15 in the EIS for East Coast Basing of the F/A-18 E/F aircraft, the combined population of Virginia Beach and Chesapeake in the year 2000 was 624,441. In any event, Defendant objects to the fifth sentence because it is not relevant or pertinent to the jurisdictional issue presented to the Court in defendant's motion, nor is it relevant to stating a claim for an overflight taking.

2. Air operations at Oceana are very different from civilian air operations. Navy pilots train for aircraft carrier operations at low altitudes and high speeds. Even within the

military universe, Navy aircraft have their own unique operations that produce unique noise characteristics. Naval Aviation is by definition based in large part on aircraft carriers, not land-based airfields. Consequently Naval aircraft focus a significant amount of attention and resources on the unique skill of landing on aircraft carriers. This training regimen is known as Field Carrier Landing Practice ("FCLP").

**Response No. 2**

Defendant agrees with the first sentence to the extent that operations of aircraft stationed at NAS Oceana differ in certain respects from operations of civilian aircraft at civilian airports, but the term "very different" is vague, ambiguous and argumentative and Defendant objects to this characterization on those bases. The second sentence is too vague and ambiguous for Defendant to agree or disagree, in that it is not clear which training is being described, what the term "low altitude" means in the context of the sentence, nor what the term "high speed" means in the context of the sentence, therefore Defendant objects to the second sentence. The third sentence is too vague and ambiguous with respect to the terms "military universe," "unique operations" and "unique noise characteristics" for Defendant to agree or disagree, therefore Defendant objects to the third sentence. The fourth sentence is too vague and ambiguous for Defendant to agree or disagree, therefore Defendant objects to the fourth sentence, although Defendant does agree that carrier-based operations are a fundamental part of naval aviation. The fifth sentence is too vague and ambiguous for Defendant to agree or disagree, therefore Defendant objects to this sentence, but Defendant does agree that naval aviators who fly carrier-based aircraft devote significant time to practicing the perishable skills necessary for the extremely difficult tasks necessary to operate from aircraft carriers. The sixth sentence is too vague and ambiguous for Defendants to agree or disagree, therefore Defendant objects to the sixth sentence, although Defendant agrees that Field

Carrier Landing Practice ("FCLP") training is a fundamental part of training for aviators who fly in aircraft that operate on aircraft carriers.

3. FCLP operations have been accurately described, using slightly different nomenclature, in *Branning v United States,* 228 Ct. Cl. 240, 244, 654 F.2d 88, 91 (1981) as follows:

> One type of training conducted on and around the station consists of practice landings and takeoffs designed to simulate aircraft carrier takeoffs and landings. One type of operation is referred to as "field mirror landing practice" (FMLP). In the course of such operation, the prescribed flight pattern requires the trainees to take off from the runway on the station and then fly defendant's aircraft directly over plaintiffs property in a "racetrack pattern" at an altitude of 600 feet above ground level (AGL) and return to the runway. The pattern is repeated by each aircraft several times, the training exercise being conducted squadron-by-squadron (and virtually nose-to-tail at 25 to 30 second intervals) over a period of several days during each month in which training is conducted.

**Response No. 3**

Defendant agrees that this language in certain respects describes a typical FCLP operation, but disagrees that in all respects it accurately describes FCLP operations at NAS Oceana, and therefore objects, and notes that at NAS Oceana the FCLP pattern altitude is 1,000 feet, not 600 feet.

4. The FCLP flight pattern at Oceana is supposed to be flown at a maximum altitude of 1,000 feet at a distance of 1.5 to 1.75 miles from the center of the airfield (Ex. 26, Excerpts from ATAC Corp. Airfield and Airspace Operational Study, February 18, 1998 ("ATAC Report"), at C-46, 47).

**Response No. 4**

Defendant disagrees with this proposed finding on the grounds that it is inaccurate with respect to FCLP operations at NAS Oceana. Defendant notes that the pages of the document

plaintiffs cited appears to relate to FCLP operations at NALF Fentress, not NAS Oceana, and therefore, plaintiffs misstated the content of those pages with respect to FCLP operations at NALF Fentress.

5. It is also necessary for naval aviators to be able to land on an aircraft carrier at night. Consequently, FCLPs are conducted at night as well as in the daytime. (Ex. 27, Wyle Report, Table 3-1 at 3-2; Table 3-2 at 3-3). Most late night FCLP operations are conducted at Fentress; Oceana generally operates only until 11:00 p.m.

**Response No. 5**

Defendant agrees with paragraph 5 with the clarification that it is necessary for naval aviators who fly carrier-based aircraft to be able to land on an aircraft carrier at night, but Defendant notes that the pages the plaintiffs cite to support this paragraph are not in Exhibit 27.

6. FCLPs also expand the concept of accident potential zones ("APZ"). In 1952, the "Doolittle Report" recommended that an area surrounding military airfields should be set aside as a buffer for aircraft accidents. The first APZ guidelines were issued in 1972 as part of an investigation into aircraft accidents. (Ex. 24, EIS at 3.1-79). The APZ studies established a pattern of accident locations on or near the runways at military airfields. Between the early 1970s when APZs were first identified, and the issuance of the EIS, there were 632 aircraft accidents at Navy and Marine Corps airfields. A 13-year study by the Navy reports that 80% of serious accidents (defined as $1 million in damage or death) occurred in the APZs. (*id.* at 3.1-79; 80).

There are three identified APZs:

1. The Clear Zone, from the end of the runway extending 3,000 feet;
2. APZ 1, from the end of the clear zone extending 5,000 feet;
3. APZ 2, from the end of APZ 1 extending 7,000 feet.

The shape of the APZs for any given airfield is influenced by specific conditions, including local accident history and the type of operations. The APZs at Oceana are elliptical and mimic the FCLP flight patterns for that airfield. (Ex. 27, Wyle Report, Figure 4.403).

**Response No. 6**

The first sentence of paragraph 6 is too vague and ambiguous for Defendant to agree or disagree, therefore Defendant objects to the first sentence. Defendant agrees with the second sentence. The third sentence inaccurately states the content of the page of the document the plaintiffs cite, therefore Defendant objects to the third sentence, and further notes that the pages the plaintiffs cite are not included in Exhibit 27. The fourth sentence is too vague and ambiguous for Defendant to agree or disagree, in that it is not clear what "APZ studies" the plaintiffs are referring to, therefore Defendant objects to the fourth sentence. Defendant agrees that the fifth sentence accurately states the content of the page cited. Defendant disagrees with the fifth sentence on the ground that it misstates the document cited, and Defendant therefore objects. With respect to the sixth sentence and the three numbered items below it, Defendant agrees that there are three defined APZ zones as stated, with the clarification that APZ 1 extends 5,000 feet from the end of the clear zone, and that APZ 2 extends 7,000 feet from the end of APZ 1. Defendant agrees with the seventh sentence. Defendant disagrees with the eighth sentence, and therefore objects to the eighth sentence, but Defendant does agree that the APZs at NAS Oceana follow the landing patterns as well as the arrival and departure tracks.

7. In the late 1990s, in accordance with § 102(2)(c) of the National Environmental Policy Act of 1969 ("NEPA") (42 U.S.C. §§ 4331 et seq.), Chief of Naval Operations Instruction 11010.36A ("OPNAVINST") and the Defense Base Closure and Realignment Act of 1990 (10 U.S.C § 2687), the Navy prepared the EIS in connection with the requirement to move the Atlantic Fleet F/A-18s from Cecil Field in Florida which was slated for closing under BRAC. The F/A-18 is the Navy's most powerful carrier based strike-fighter. In that EIS, five alternative realignment scenarios ("ARS"), involving three air installations: (1) NAS Oceana, (2) MCAS Beaufort, South Carolina, and (3) MCAS Cherry Point, North Carolina, were evaluated. The

Atlantic Fleet had 180 F/A-18 Hornets, consisting of 11 squadrons of 12 F/A-18s each (132 aircraft) and a Fleet Replacement Squadron ("FRS") of 48 F/A-18s. The FRS is the training squadron where brand new pilots are introduced to the plane they are assigned to fly or where pilots who are experienced in other aircraft are trained to fly the F/A-18. The five realignment scenarios were:

**ARS 1**- Relocate all 11 F/A-18 squadrons and the FRS to NAS Oceana, a total of 180 aircraft.

**ARS 2**- **Relocate 2 F/A-18 squadrons to MCAS Beaufort (24 aircraft) and 9 F/A-18 squadrons and the FRS to NAS Oceana (156 aircraft).**

**ARS 3**- Relocate 3 F/A-18 squadrons to MCAS Cherry Point and 8 F/A-18 squadrons and the FRS to NAS Oceana.

**ARS 4**- Relocate 5 F/A-18 squadrons to MCAS Beaufort and 6 F/A-18 squadrons and the FRS to NAS Oceana.

**ARS 5**- Relocate 5 F/A-18 squadrons to MCAS Cherry Point and 6 F/A-18 squadrons and the FRS to NAS Oceana.

**Response No. 7**

Defendant agrees with the first sentence with the clarifications that the EIS was published in February, 1998 and that the Chief of Naval Operations Instruction the EIS was prepared in accordance with was 5090.1B, not 11010.36A, although the latter instruction is discussed in the EIS and is a reference document for the EIS, and that the aircraft being relocated was the F/A-18 C/D. The second sentence is too vague and ambiguous with respect to which version of the F/A-18 is being addressed and what the term "most powerful" means for Defendant to agree or disagree, therefore Defendant objects. Defendant agrees with the third and fourth sentences with the clarification that the version of the F/A-18 being relocated was the F/A-18 C/D. Defendant agrees

with the fifth sentence with the clarification that the Fleet Replacement Squadron also provides refresher training for experienced pilots being re-assigned to fleet squadrons from non-flying assignments. Defendant agrees with the sixth sentence.

8. The EIS documented and evaluated each scenario. Ultimately, the Navy selected ARS 2 for implementation. (Ex. 25, Record of Decision of May 18, 1998).

**Response No. 8**

The first sentence is too vague and ambiguous with respect to the term "documented" for Defendant to agree or disagree, therefore Defendant objects, although Defendant agrees that the EIS evaluated each of the Alternative Realignment Scenarios. Defendant agrees with the second sentence.

9. The EIS documented and projected the level of operations at Oceana based on the ATAC Report which used a computer simulation model, NASMOD. (Ex. 26, ATAC Report).

**Response No. 9**

Paragraph 9 is too vague and ambiguous for Defendant to agree or disagree, therefore Defendant objects.

10. NASMOD was developed to analyze options in a number of naval aviation operations. NASMOD is derived from: (1) Navy air training system model (NATS), and (2) SIMMOD the official simulation model, which the Federal Aviation Administration uses to make analogous studies of civilian airports. NASMOD includes database and analytical capabilities necessary to model military training operations.

**Response No. 10**

The first sentence of paragraph 10 is too vague and ambiguous for Defendant to agree or disagree, therefore Defendant objects. The second sentence of paragraph 10 is too vague and

ambiguous with respect to the term "to make analogous studies of civilian airports" for Defendant for Defendant to agree or disagree, therefore Defendant objects. Defendant agrees with the third sentence of paragraph 10.

11. The data used by ATAC is compiled from (1) records of actual air field and air space operations, including air traffic control facility logs, traffic analyzer data and squadron flight schedules, (2) publications, and (3) personal interviews of pilots, and (4) observations of operations. ATAC then established the baseline operations at Oceana prior to the arrival of the F/A-18s (the year 1997 was chosen) and NASMOD established projected levels of use for the anticipated first full year following the realignment, 1999 (*id.* at C-29). As it turned out, all the F/A-18's were not on site at Oceana until mid-1999.

**Response No. 11**

Defendant agrees with the first sentence of paragraph 11. Defendant agrees with the second sentence with the clarifications that the baseline prepared by ATAC is a modeled baseline for a typical year given baseline conditions, not an attempt to describe what actually occurred during the baseline year, that the version of the F/A-18 being relocated was the F/A-18 C/D, and that the year for which the projections were done in the ATAC study was Fiscal Year 1999. Defendant agrees with the third sentence of paragraph 11 with the clarifications that the version of the F/A-18 being relocated was the F/A-18 C/D and that the aircraft from squadrons VFA-15 and VFA-87 arrived at NAS Oceana in September 1999 after returning from lengthy deployment on the USS Theodore Roosevelt (CVN-71).

12. Based on the operations levels reported by ATAC, noise exposure levels and projections for the EIS were studied by another Navy contractor, Wyle Laboratories, Inc. Wyle develops aircraft noise exposure studies at various Navy installations. Those noise studies are used to develop Environmental Impact Statements and also to establish the Navy's Air

Installations Compatible Use Zone program for various airfields. AICUZ requirements are set out in OPNAVINST 11010.36B (Ex. 28) which identifies both accident and noise impacts from Navy and Marine Corps air stations. These are similar to those required of civilian aircraft and airports by the Noise Control Act of 1972 (Ex. 24, EIS, at 3.1-78).

**Response No. 12**

Defendant agrees with the first three sentences. Defendant agrees with the fourth sentence with the clarifications that the Instruction cited, OPNAVINST 11010.36B, was not the instruction in effect at the time of the alleged taking in July 1999, and that the Instruction does not "identify accident and noise impacts from Navy and Marine Corps air stations," but rather provides guidance on how aircraft noise and accident potential are addressed in the context of land use planning recommendations. With regard to the last sentence, Defendant disgrees that the AICUZ program as implemented by the relevant OPNAVINST is "similar to" implementation of the Noise Control Act, and therefore objects to this characterization, but Defendant does agree that the AICUZ program as implemented by the relevant OPNAVINST is in the spirit of the Noise Control Act.

13. The Wyle Report sets out the contrast between noise exposure during the baseline year of 1997 and that projected during 1999. In assessing the noise, Wyle used the universally accepted standard for aircraft noise exposure in communities around airfields and airports, the day-night average sound level (DNL) expressed in decibels (dB) (Ex. 27, Wyle Report, at 1-2). DNL is the average sound level generated by all aviation related operations during an average 24-hour period.

**Response No. 13**

With respect to the first sentence, Defendant agrees that the Wyle Report addresses noise at NAS Oceana for the baseline year of 1997 and projected noise for implementation of

Alternative Realignment Scenario 2 for 1999. Defendant objects to the remaining language in the sentence because it is argumentative. With respect to the second sentence, Defendant agrees that the DNL metric is the standard metric used by many governmental agencies for assessing aircraft noise, although in appropriate circumstances the DNL metric is augmented by use of additional noise metrics. With respect to the third sentence of paragraph 13, Defendant agrees with the clarification that DNL is the average of all noise events (DNL can be used for noise events other than aircraft noise) over a 24-hour period, with a 10-decibel penalty for noise events that take place between 10 p.m. and 7 a.m.

14. In calculating the noise, Wyle Labs used a suite of computer modeling programs, NOISEMAP, which predicts and then compares before and after noise effects from proposed operational changes. (*id.* at 1-4).

**Response to No. 14**

Defendant agrees that the NOISEMAP program can be used to calculate different datasets, and that the results of these different computer runs can be compared to permit, among other things, before and after noise effects from proposed operational changes.

15. Noise is one of the most prominent and intrusive environmental impacts associated with aircraft operations. Even with other sources of noise in today's environment, aircraft noise is readily identifiable as intrusive. This is particularly true of military aviation, which uses powerful and unmuffled jet engines. Navy jet operations have particularly intrusive characteristics because they are tailored to the need to land on an aircraft carrier.

**Response to No. 15**

Defendant objects to plaintiffs' proposed finding of fact No. 15 because it contains no citations to any documentary evidence. Notwithstanding this objection, Defendant responds as follows. With respect to the first and second sentences, Defendant agrees that noise can be an

significant environmental impact from aircraft operations, but beyond this these two sentences are argumentative and Defendant therefore objects. Defendant objects to the third sentence because it is too vague and ambiguous for Defendant to agree or disagree, particularly the phrase "powerful and unmuffled." The last sentence is too vague and ambiguous for Defendant to agree or disagree, therefore Defendant objects.

16. Human sensation of sound involves two characteristics, frequency and intensity. Frequency is the number of times per second the air vibrates. For example, low frequency sounds may be described as a rumble, where a high frequency sound may be described as a screech. (*id.* at A-1).

**Response to No. 16**

Defendant agrees with plaintiffs' proposed finding of fact number 16 with the clarification that the information contained in the proposed finding describes human "perception" of sound, not human sensation of sound. Wyle Report 97-10, Appendix A, p. A-1. Defendant believes plaintiffs intended to cite Appendix A to Wyle Report 97-10, but this Appendix was not included as part of Exhibit 27. Defendant agrees with the second and third sentences of this proposed finding of fact.

17. Sound intensity is measured in a logarithmic unit known as a decibel ("db"). The threshold of pain is 120 dB. (*id.* at A-2). Because decibels are logarithmic and not linear, comparing sound levels is not a matter of simple addition or subtraction. If a sound's intensity is doubled, the increase is 3 dB. In other words, doubling of 60 dB DNL is 63 dB DNL, not 120 dB DNL.

**Response to No. 17**

Defendant agrees sound intensity is measured in a logarithmic unit known as a decibel ("db"). Defendant objects to the remainder of this proposed finding as it mischaracterizes

information contained in Appendix A of the Wyle Report. Regarding the second sentence, Appendix A states sound levels at 120dB "begin to be felt inside the human ear as discomfort and eventually pain at still higher levels." Wyle Report 97-10, Appendix A, p. A-2. Defendant agrees with the third and fourth sentences. Regarding the last sentence of this proposed finding, Appendix A indicates that doubling sound intensity results in a 3dB increase, not an increase of 3dB DNL. Wyle Report 97-10, Appendix A, p. A-2.

18. An important factor when measuring average sounds over a period of time is the time-average sound level, which is dominated by the louder sound levels during the averaging period. For example, a 100 dB sound for 30 seconds followed by a 50 dB sound for another 30 seconds produces a time-average sound of 97 dB for the 60-second period. This becomes important to explain Day-Night Average Sound Levels (*id.*). The DNL takes into consideration both the maximum sound level and the sound exposure level over an entire 24-hour period. (*id.* at A-9).

**Response to No. 18**

Defendant agrees with the first two sentences of this proposed finding. The third sentence is argumentative, and too vague and ambiguous for Defendant to agree or disagree, therefore Defendant objects. Defendant agrees with the fourth sentence.

19. In measuring sounds for environmental impact, the Department of Defense, the FAA and the EPA have specified that the universally recognized DNL metric should be used. Maximum sound level measures the highest sound level during a sound event, such as an aircraft overflight. Sound exposure level ("SEL") measures both the sound level and duration of a single sound event normalized at one second. (*id.* at A-4).

**Response to No. 19**

Defendant objects to this proposed finding as it mischaracterizes information contained on pages 4 through 9 in Appendix A of the Wyle Report. Appendix A states that the Department of Defense and the Federal Aviation Administration ("FAA") have agreed on common metrics for environmental impact analyses documents. Wyle Report 97-10, Appendix A, p. A-4. These common metrics include maximum sound level, sound exposure level, DNL, and onset-rate adjusted DNL. Wyle Report 97-10, Appendix A, pp. A-4 through A-9. The report states the maximum A-weighted sound level or maximum sound level is the "highest A-weighted sound level measured during a single event in which the sound level changes value as time goes on (e.g. an aircraft overflight)". Wyle Report 97-10, Appendix A, p. A-4. The report states that Sound Exposure Level ("SEL") is a composite metric which measures the "total acoustic energy transmitted to the listener during the event" and "represents both the intensity of sound and its duration." Wyle Report 97-10, Appendix A, p. A-6. The report states further that "[M]athematically, [SEL] represents the sound level of the constant sound that would, in one second, generate the same acoustic energy as did the actual noise event." Wyle Report 97-10, Appendix A, p. A-6.

20. Noise affects people and the environment in a number of ways. A number of health effects are associated with environmental noise. The best defined of the health effects is noise-induced hearing loss. Based on scientific research and Federal workplace guidelines, a day-night average of 75 dB DNL is the threshold at which hearing loss could occur from aircraft noise. (*id.* at A-10). This is consistent with findings of both the EPA (which suggests using 70 dB DNL) and the National Academy of Sciences Committee on Hearing, Bioacoustics and Biomechanics (75 dB DNL) (Ex.24, EIS, at 3.1-134). Long-term noise exposure has also been associated with non-auditory health effects, such as cardiovascular problems, low birth weight and mortality rates. (*id.*, EIS, at 3.1-134, 136). Those effects manifest themselves at the same noise levels as hearing

loss (75 dB DNL). (Ex. 27, Wyle Report, at A-10, 11). There is a growing body of evidence that chronic exposure to aircraft noise can also result in learning deficits among school children. Several studies have documented reading deficits, impaired cognitive abilities and impaired speech perception among children living in close proximity to airports (Ex. 24, EIS, at 3.1-138).

**Response to No. 20**

Defendant objects to this proposed finding because it is not relevant or pertinent to the jurisdictional issue presented to the Court in defendant's motion, nor is it relevant to stating a claim for an overflight taking. Defendant further objects because plaintiffs fail to identify which test plaintiff, if any, this proposed finding of fact relates.

21. Another prominent effect of aircraft noise is community annoyance. Repeated studies have shown a high correlation between noise exposure and annoyance of groups of people. (Ex. 27, Wyle Report, at A-7). While noise levels of 55 – 60 dB DNL have been proposed (and could be used) as the threshold of community annoyance, average noise level of 65 dB DNL has been more generally used. (*id.* at A-12). This level is also (1) the level at which aircraft noise normally dominates other ambient noise sources, (2) the threshold for grant-in-aid funding of airport noise mitigation projects (3) the ceiling level established by both HUD and the Veterans Administration for federally guaranteed home loans and (4) the level chosen as incompatible with residential use by the Navy's AICUZ program (Ex. 29, OPNAVINST 11010.36B, 2002 Table).

**Response to No. 21**

Defendant objects to this proposed finding as it mischaracterizes information contained in Appendix A of Wyle Report 97-10 and refers to an OPNAV Instruction not in effect in July 1999, plaintiffs' alleged date of taking. As such, this proposed finding is not relevant or pertinent to the jurisdictional issue presented to the Court in defendant's motion, nor is it relevant to stating a claim for an overflight taking. Notwithstanding these objections, Defendant responds as follows.

Defendant agrees with the first sentence with the clarification that the report states the "primary effect" of aircraft noise is annoyance. Wyle Report 97-10, Appendix A, p. A-12. Regarding the second sentence, the report states "correlation coefficients of .85 to .95 are found between the percentages of groups of people highly annoyed and the level of average noise exposure." Wyle Report 97-10, Appendix A, p. A-7. Defendant disagrees that 65 dB DNL is the threshold of community annoyance. With respect to the last sentence, numbered item (1) is vague and ambiguous and therefore Defendant objects; for numbered item (2), Defendant disagrees and therefore objects; with respect to numbered item (3), Defendant disagrees and therefore objects, and with respect to numbered item (4), Defendant agrees that the instruction cited deems residential development incompatible at 65 dB DNL for land use planning purposes.

22. Other common effects of noise-induced community annoyance are speech interference, sleep interference and vibration of structures and objects. (Ex. 27, Wyle Report, at A-12 through 20). Of these, speech interference from aircraft noise is the primary cause of annoyance. Aircraft noise disrupts routine daily activities such as conversation, television or radio, reading, work and telephone use. It disrupts more formal speech settings such as in the classroom or office. This often leads to fatigue and vocal strain for those who must speak above the aircraft noise. Indoor noise levels in excess of 60 dB interferes with speech communication. (*id*. at A-12).

**Response to No. 22**

Defendant objects to this proposed finding of fact because plaintiffs fail to identify which test plaintiff, if any, this proposed finding of fact relates.

23. Aircraft noise is particularly disruptive to sleep. Sleep interference manifests itself in awakening, sometime referred to as "arousal", and in changes in "sleep stage" in which the subject shifts from one stage of sleep to another. The EPA has identified a sound level of 45 dB

DNL and below as necessary to protect against sleep interference. (*id.* at A-14). Quality sleep is a requisite to good health (Ex. 24, EIS, at 3.1-137).

**Response to No. 23**

Defendant objects to this proposed finding of fact because plaintiffs fail to identify which test plaintiff, if any, this proposed finding of fact relates. Defendant further objects to the first sentence of this proposed finding of fact because it mischaracterized information contained on page A-14 of Appendix A of Wyle Report 97-10. The report states "[S]leep disturbance is another source of annoyance associated with aircraft noise." Wyle Report 97-10, Appendix A, p. A-14. Defendant further objects to the third sentence because it mischaracterized information contained on page A-14 of Appendix A of Wyle Report 97-10. The report refers to an indoor sound level of 45 dB to protect against sleep interference. Wyle Report 97-10, Appendix A, p. A-14. The report states further that, "[A]ssuming a conservative structural noise insulation of 20dB for typical dwellings, 45dB corresponds to an outdoor DNL of 65dB as minimizing sleep interference." Wyle Report 97-10, Appendix A, p. A-14. Defendant further objects to the last sentence because it mischaracterized information contained in the document cited, which states that "reasonable" quality sleep is a requisite to good health. (Plaintiffs Ex. 24, EIS, at 3.1-137).

24. Vibration of structures and objects is also a source of annoyance. While high noise levels lasting for more than one second are likely to damage structures, secondary vibration of objects in a house can occur at much lower noise levels. Vibration of pictures, dishes and other objects contribute to annoyance and fear of breakage. (Ex. 27, Wyle Report, at A-20).

**Response to No. 24**

Defendant objects to this proposed finding of fact because plaintiffs fail to identify which test plaintiff, if any, this proposed finding of fact relates. Defendant further objects to the first and

second sentences of this proposed finding of fact because they fail to cite to any documentary evidence, and because they are too vague and ambiguous for Defendant to agree or disagree.

25. Using the generally accepted scientific understanding of environmental noise and its measurement, the Navy in the EIS then evaluated the noise impact to the properties around Oceana.

**Response to No. 25**

Defendant agrees that, in the EIS, the Navy used generally accepted scientific knowledge, including noise metrics, in evaluating the noise impact associated with the various alternative realignment scenarios.

26. As part of AICUZ (Air Installation Compatible Use Zones), the Navy developed a table of compatible land uses at various levels of noise exposure. Noise levels of 65 dB DNL and above are deemed to be incompatible with residential use. (Exs. 28 and 29, AICUZ Program; OPNAVINST 11010.36B, 2002 Table, p.20-24). The AICUZ in effect in 1998 (from a regulation issued in 1988) discouraged residential use in zones of 75 dB DNL and above.

**Response to No. 26**

Defendant agrees with the first sentence of this proposed finding of fact. Defendant objects to the second sentence of because it references a Navy instruction from 2002, which was not in effect at the time of the alleged taking. With regard to the last sentence, Defendant agrees that under the OPNAV Instruction in effect at the time of the alleged taking residential development in areas 75 dB DNL and higher was considered to be incompatible for land use planning purposes.

27. One of the most immediate and significant effects that aircraft noise has on surrounding property is a reduction in market value. The Federal Aviation Administration recognizes that a wealth of economic studies lead to the conclusion that increased aircraft noise

lowers property values. (Ex. 30, *Aviation Noise Effects*, Federal Aviation Administration, March, 1985, at 99-101)**.** Indeed, Congress has long-recognized that proximity to an airport, with the attendant noise and other intrusions, depreciates the value of surrounding property. (Ex. 40, *Federal Agency Review of Selected Airport Noise Analysis Issues*, Federal Interagency Committee on Noise, August, 1992, at pp. 3-18; 19), ("FICON"). There, FICON reports that the Housing and Urban Development Act of 1965 charged HUD with the task "to determine feasible methods of reducing the economic loss and hardships suffered by homeowners as a result of the depreciation in the value of their properties following the construction of airports in the vicinity of their homes." (*id.* at pp. 3-18; 19).

**Response to No. 27**

Defendant's objects to plaintiffs proposed finding of fact number 27 because the first sentence does not contain a citation to any documentary evidence, and the entire proposed finding mischaracterizes the information contained in plaintiffs' exhibits 30 and 40. Moreover, Exhibit 30 is not relevant to this case because is was published in 1985, more than eleven years before plaintiffs alleged date of taking, and utilized data gathered from 1960 to 1970, more than two decades before plaintiffs' alleged date of taking. The conclusion of the 1985 study recognizes noise may decrease property values by approximately one percent, but also states that "there are many factors that affect the price and desirability of a residence, the annoyance of aircraft noise remains just one of the considerations that affect the market value of a home." Pla. Ex. 30, p. 102. The third sentence of this proposed finding asserts Congress has long-recognized that proximity to an airport, with the attendant noise and other intrusions, depreciates the value of surrounding property. This assertion does not appear in Exhibit 40, nor does any support regarding Congress's position regarding the relationship between market value of a home and proximity to an airport

appear in Exhibit 40. Defendant agrees Exhibit 40 contains the statement set forth in the last sentence of this proposed finding.

28. One squadron of F/A-18s was already stationed at Oceana prior to the closure of Cecil Field. In 1998 the first of the 156 F/A-18 squadrons began to arrive at NAS Oceana from Cecil Field. The transfer was complete by July, 1999.

**Response to No. 28**

Defendant agrees with this proposed finding of fact with the clarifications that one squadron of F/A-18A aircraft was present at Oceana prior to the arrival of any of the squadrons being relocated to NAS Oceana from NAS Cecil Field, that the F/A-18 squadrons being relocated from NAS Cecil Field were composed of F/A-18 C/D aircraft, that in December 1998 the first of the F/A-18 C/D squadrons to be relocated to NAS Oceana was relocated, and that the aircraft from squadrons VFA-15 and VFA-87 arrived at NAS Oceana in September 1999 after returning from lengthy deployment on the USS Theodore Roosevelt (CVN-71)

29. The total operations at Oceana increased from the 1997 baseline of 108,897 to the 1999 projection of 218,631, an increase of 101%. In 1997 Oceana conducted 54,088 touch-and-go operations and no FCLPs. In 1999, Oceana was projected to conduct 116,656 touch-and-go operations, an increase of 115%, and 2,720 FCLP.[1] (Ex. 27, Wyle Report, at 3-2; Table 3-1; p. 4-26, 27; Table 4-16).

**Response to No. 29**

Defendant objects to plaintiffs' proposed finding of fact number 29 because it mischaracterizes information found in Wyle Report 97-10. The Wyle Report does not provide a total number of actual operations in 1999, but a projection of total operations in 1999 based on modeling. Defendant agrees Table 3-1 of the Wyle Report indicates that 54,088 touch-and-go

operations were performed at NAS Oceana in 1997, but this number too was a modeled number, part of a modeled baseline for a typical year given baseline conditions, and not an attempt to describe what actually occurred during the baseline year. Defendant agrees Table 4-16 of the Wyle Report indicates that 116,656 touch-and-go operations and 2,720 FCLP operations were projected to be performed at NAS Oceana in 1999. Defendant objects to the relevance of this proposed finding as it relies on projected, not actual, numbers of operations. Defendant further objects to the footnote contained in this finding of fact as it is argumentative and cites no documentary evidence to support the statement.

Dated: June 9, 2006

Respectfully submitted,

/s/ Steven D. Bryant
Steven D. Bryant
Kelle S. Acock
Environmental & Natural Resources Division
United States Department of Justice
601 D Street, NW, Rm. 3205
Washington, D.C. 20004
Counsel for Defendants
202-305-0424

Of Counsel:
Robert J. Smith
Mary Raivel
Navy Litigation Office
720 Kennon Street
Washington Navy Yard, D.C. 20374

CDR Dominick Yacono
JAGC, USN
Commander Navy region
Mid-Atlantic, Code (00LE)
1510 Gilbert Street
Norfolk, VA 23511-2737

---

[1] This projection, as bad as it is, severely understates the real noise impact since Oceana actually conducted Approximately 20,000 FCLP during this year.