**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| CAROL AND ROBERT TESTWUIDE, et. al., | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 01-201L |
| THE UNITED STATES OF AMERICA, | ) | Judge Victor J. Wolski |
| Defendant. | ) | |

**DEFENDANT UNITED STATES' RESPONSE TO PLAINTIFFS' MOTION TO STRIKE DECLARATION AND EXHIBITS OF CURTIS A. UTZ**

Defendant United States of America, by and through the undersigned counsel, hereby files this Response in opposition to Plaintiffs' Motion to Strike Declaration and Exhibits of Mr. Curtis A. Utz ("Plts.' Mot. to Strike"). Mr. Utz's declaration and the accompanying exhibits were appended to the United States' Reply Memorandum in Support of its Motion to Dismiss, or alternatively for Summary Judgment ("Reply"). These documents address the type of aircraft operating at Naval Air Station Oceana ("NAS Oceana") in 1981, the year the statute of limitations began to run, assuming there was a taking, as defendant has explained in its briefing.

Plaintiffs make two arguments in their motion: 1) that defendant is relying exclusively on the total number of flight operations in 1981 as the basis for its statute of limitations defense and should have identified 1981 earlier; and 2) that defendant did not produce the exhibits attached to Mr. Utz's declaration in response to plaintiffs' discovery request. Neither assertion has any merit.

**Factual Background**

Captain Thomas Keeley's declaration was attached to Defendant's Motion to Dismiss, or alternatively for Summary Judgment ("Def.'s Motion") and identified the various predominant aircraft that have been assigned to NAS Oceana through 1999, including the A-4 Skyhawk (1957-1994), the F-4 Phantom (1960s-1983), the A-6 Intruder (1963-1997), the F-14 Tomcat (1974-2006), and the F/A-18 C-D Hornet (December 1998-present). Def.'s Motion, p. 2; Keeley Decl., ¶ 7 (Def.'s Motion, Exhibit A). Thus, defendant's opening brief already revealed that the aircraft assigned to NAS Oceana in 1981 included the A-4, F-4, A-6, and F-14. In their opposition to defendant's opening brief, plaintiffs ignored the information Captain Keeley provided and asserted that "Defendant has offered … no evidence of the mix of aircraft at NAS Oceana [in 1981]." Plt.s' Response, p. 11.[1]

In response to plaintiffs' assertion, defendant provided supplemental information in its Reply – through Mr. Utz's declaration – to specify the number and type of the various aircraft permanently assigned to NAS Oceana in 1981, as reported in *Naval Aeronautical Organization* ("NAO") reports. Utz Decl. ¶ 7-8 (Reply Exhibit M). However, as Mr. Utz explained in his declaration, because aircraft permanently assigned to an air station may be deployed away from the air station or undergoing maintenance at a particular time, the number of permanently assigned aircraft does not reveal how many aircraft were in an operating status at the air station at a particular time (i.e. in a "flyable" status). Utz Decl. ¶ 12 (Reply Exhibit M). Instead, this information was recorded in the *Allowances and Location of Naval Aircraft* reports, which for 1981 were published in March and September. Utz Decl. ¶s 11-12 (Reply Exhibit M). Mr. Utz specifically

[1] Plaintiffs reiterated this erroneous assertion later in their Response. Plts.' Response p. 26 (n 6).

identified the number of the various types of aircraft permanently assigned to NAS Oceana that were in a flyable status in March and September 1981. Utz Decl. ¶ 12 (Reply Exhibit M).

Plaintiffs misquote a May 23, 2006 letter from defendant's counsel, and incorrectly suggest that NAO reports reflect the number of aircraft operating at NAS Oceana at a particular time. Plts.' Mot. to Strike, p. 3. Defendant's counsel's quote in its original context explains that the *Allowances and Location of Naval Aircraft* report, not the NAO report, documents the number of aircraft in a flyable status at an air station:

> For clarification, the documents I provided you last week are not simply base loading "projections." Rather, the excerpted documents bates-stamped OCE239467-616 also reflect the number and types of aircraft located and operating as part of NAS Oceana-based squadrons from 1978 to 1988, the specific years you requested in your May 12, 2006 letter. Under the "Inventory" section of the "Inventory and Operating Allowances" tables, please see the "Operating Status" column for the number and type of each type of aircraft in each of the relevant squadrons at NAS Oceana at the time of the report. This table includes the physical location of the aircraft if it was part of an Oceana-based squadron but was, at the time of the report, deployed elsewhere.

Plts.' Mot. to Strike, Exhibit 5.

**Argument**

Plaintiffs first contend that defendant is solely relying on the total number of flight operations in 1981 for its statute of limitations defense. Plts.' Mot. to Strike, p. 1. Plaintiffs' contention is without merit. Although the number of flight operations in 1981 is a factor in the statute of limitations analysis, these numbers by no means are the only evidence supporting defendant's statute of limitations defense. In addition to the number of 1981 flight operations, defendant is relying on, inter alia, Commander Richard Erie's

analysis[2] of flight operations in relation to the test plaintiff properties, the relative historic use of NAS Oceana's four runways, the relative frequency of the types of flight operations (e.g. pattern operations such as touch-and-gos in contrast to arrivals and departures) as reflected in noise studies, the type of aircraft, as well as the number of flight operations recorded in the remaining Air Traffic Activity Reports ("ATAR") from 1980 to 1999. All of these considerations are relevant to evaluating test plaintiffs' claims of an overflight taking in July 1999 and whether such claims are time-barred as a result of the longstanding flight activity at NAS Oceana, particularly in 1981.

For background, ATARs are the Navy's official record for reporting aircraft operations in tower-controlled air space.[3] Every aircraft departure or landing is (and has always been) counted as a single aircraft operation. For example, a touch-and-go is counted as two operations, because it includes one departure and one landing. Annual ATARs report the total number of operations in a given year. The NAS Oceana ATARs that still exist from 14 of the years between 1980 and 1998 demonstrate that flight activity was comparable to or far exceeded the approximately 133,000 operations in 1999 – the year of the alleged taking – roughly 79% of the time. Riley Decl., Table 1 (Def.'s Motion, Exhibit B). The 1981 ATAR reflected approximately 232,000 operations in tower-controlled airspace. Riley Decl., Table 1 (Def.'s Motion, Exhibit B).

---

[2] Captain Thomas Keeley confirmed that none of the changes made to the altitude and direction of some patterns since 1979 would have affected any of the flight operations Commander Erie described in with respect to the 12 test plaintiffs' properties.. Keeley Decl. ¶ 13 (Def.s' Motion Exhibit A). With one minor exception, Commander Dirk Hebert likewise agreed that Commander Erie's description of the effects of flight operations on the test plaintiffs' properties accurately described those effects as of July 1999, the alleged date of taking. Hebert Decl. ¶ 3 (Def.s' Motion Exhibit G).

[3] At NAS Oceana, this air space extends approximately 4.3 to 5.0 nautical miles from the runways up to an altitude of 2500 feet, and includes all of the test plaintiff properties. Riley Decl., ¶ 9 (Def.'s Reply Exhibit B).

Plaintiffs' motion also implies, without any supporting evidence, that defendant wrongfully and in bad faith withheld identifying 1981 as the reference point for the statute of limitations until after discovery closed. Plts.' Mot. to Strike, p.1. This allegation, as with the other allegations of bad faith the plaintiffs have raised in other pleadings, is completely without foundation. In regard to the number of flight operations in 1981, defendant produced the 1981 ATARs very soon after locating them. Moreover, as discussed above, determining the date the statute of limitations began to run is only based in part on the number of operations in a given year. The declarations of Commander Erie and Captain Keeley also are important in determining that the statute of limitations began to run at least by 1981, Commander Erie's because it analyzed what the impacts from flight operations were with respect to the test plaintiffs in July 1999, and Captain Keeley's because he stated none of the changes to flight operations since 1979 would have affected any of these flight operations with respect to the test plaintiffs. These declarations were not completed until shortly before defendant's motion was filed on April 28, 2006.

Plaintiffs also direct the Court's attention to the wrong year in their discussion of the number of F-4s stationed at NAS Oceana. Plaintiffs reference a June 1982 and a November 1982 NAO report. Plts.' Mot. to Strike p. 3. First, as discussed above, NAO reports identify the aircraft permanently assigned to NAS Oceana, not the number in a flyable status at a given time. Second, 1981 is the relevant year for evaluating the statute of limitations, not 1982. Plaintiffs apparently then attempt to discredit the 1982 NAO reports by referring to a 1984 Harris Miller Miller & Hanson (HMMH) noise study documenting flight operations in 1982. Plts.' Mot. to Strike pp. 3-4. Relying on the

HMMH study, plaintiffs erroneously allege that "there was not a single F-4 Phantom operation at N.A.S. Oceana." Plts.' Response p. 3. However, Table 5 in the HMMH study that plaintiffs rely on simply identifies an "average busy day" for 1982 flight operations at NAS Oceana. Exhibit A p. OCE090242. The squadrons that provided information regarding NAS Oceana 1982 operations were not F-4 squadrons. Exhibit A p. OCE090238. Additionally, the F-4 was in the process of being retired and completely stopped operating at NAS Oceana in 1983, the year the data for the 1984 report was collected; therefore, it is not at all surprising that there were no F-4s reflected in the "average busy day" table. By no means, however, does the table demonstrate that there were no F-4 operations in 1982, much less 1981.

Plaintiffs next assert that Mr. Utz's declaration and the attached exhibits should be stricken because defendant did not produce this information in response to plaintiffs' discovery requests. The exhibits attached to Mr. Utz's declaration identify the aircraft in 1981 permanently assigned to NAS Oceana (NAO reports), and the number of assigned aircraft in a "flyable" status (*Allowances and Location of Naval Aircraft* reports). Plaintiffs list four discovery requests in their Motion to Strike, but only one of them is relevant. Plaintiffs' Request No. 32, seeks "All documents that identify the number and type of aircraft stationed at Oceana at 1975." Plts.' Mot. to Strike, p. 2. This request was propounded in the class certification phase of the litigation, and defendant produced a number of documents in response to Request No. 32 on November 11, 2001. Plts.' Mot. to Strike, Exhibit 2. On February 7, 2002, Judge Bush issued an order terminating discovery. After the Federal Circuit Court of Appeals rejected the petition to appeal the denial of class certification and the case was reassigned to this Court to proceed with

individual plaintiffs, discovery resumed on May 26, 2004. Plaintiffs revived some of the discovery requests from the class certification phase, but not Request No. 32. Indeed, the parties' Joint Status Report on June 21, 2004 explicitly recognized that Request No. 32 from the class certification phase was no longer pending:

> The only currently pending discovery requests are those that were the subject of plaintiffs' previous motions to compel. All other previous discovery requests were satisfied or have been withdrawn. Plaintiffs further modified their discovery requests in [a June 2, 2004] telephonic meet and confer session by withdrawing some of their requests for documents and interrogatories and modifying others.

Exhibit B ¶ 2.a. In a June 7, 2004 letter, plaintiffs documented the specific class certification production requests that were renewed, and Request No. 32 was not one of them. Exhibit C. Moreover, Plaintiffs never mentioned Request No. 32 in the nearly two years since plaintiffs renewed the other discovery requests from the class certification in 2004. Since these documents were not the subject of a pending discovery request, it necessarily follows that Defendant did not wrongfully withhold them from production.

On May 12, 2006, well after discovery concluded, plaintiffs requested NAS Oceana aircraft baseloading documents from 1978 to 1988, and indicated that if the documents were not produced by the following Tuesday, May 16th, they might file a motion to compel production of these documents and might ask for an enlargement of time to file their response to defendant's motion for summary judgment/motion to dismiss until this motion to compel was ruled on by the Court. Plts.' Mot. to Strike, Exhibit 2. Defendant objected that the request was not the subject of a pending discovery request but on May 16, 2006 (consistent with the plaintiffs' self-imposed deadline) provided the kind of documents the plaintiffs had requested anyway as a courtesy and by overnight delivery. Plts.' Mot. to Strike, Exhibit 3. On May 19, 2006, plaintiffs

expanded their untimely request for baseloading documents from 1975 to the present. Defendant renewed its objection, but again provided substantial additional documents as a courtesy by overnight delivery. Plts.' Mot. to Strike, Exhibit 5.

In short, the documents the plaintiffs were complaining about were not the subject of a pending discovery request, but defendant provided substantial documents anyway. Thus, plaintiffs' assertion that defendant withheld the documents is completely without merit.

In any event, plaintiffs have failed to demonstrate any specific prejudice based on when they received the documents, even assuming that the government had an obligation – which it did not – to produce them in discovery. Although the plaintiffs now complain that defendant provided these documents "just seven days before Plaintiffs' memorandum . . . was due," they do not mention the fact that defendant provided the materials when the plaintiffs asked for them, and that, at no point after receiving the documents did the plaintiffs seek an extension of time to review these documents or to determine how to make use of them. Indeed, despite their ostensibly urgent need for the documents prior to filing their opposition, they do not even mention the documents or any information in them in their opposition.

In addition to the plaintiffs' substantive arguments lacking merit, the remedy the plaintiffs seek is unjustified as well as inconsistent with the case law they cite. Plaintiffs cite only three cases in their motion, all of which endorse allowing a nonmoving party to file a surreply if new matters are raised in a reply brief in support of a dispositive motion, yet the plaintiffs seek a completely different, more draconian remedy, <u>i.e.</u>, striking Mr. Utz's declaration, rather than seeking an opportunity to reply to it. Defendant disagrees

that Mr. Utz's declaration addresses a new matter. As noted above, Captain Keeley addressed the type of aircraft that operated at NAS Oceana in 1981 in his declaration, which was attached to defendant's motion. Mr. Utz's declaration simply provides further specificity on this issue in response to plaintiffs' assertion in their Response that defendant did not address the mix of aircraft in 1981. See Allen v. United States, 229 Ct. Cl. 515, 517-18 (1981) (motion to strike affidavits submitted with a reply brief denied because affidavits "merely buttressed" defendant's motion for summary judgment and there was no prejudice because plaintiff responded to the affidavits in his motion to strike). Nevertheless, as counsel for Defendant stated during argument, Defendant would not object to plaintiffs filing a surreply limited exclusively to Mr. Utz's declaration.

## CONCLUSION

For the foregoing reasons, defendant respectfully requests this Court deny plaintiffs' Motion to Strike.

Dated: July 5, 2006

Respectfully submitted,

/s/ Steven D. Bryant
Steven D. Bryant
Kelle S. Acock
Environmental & Natural Resources Division
United States Department of Justice
601 D Street, NW, Rm. 3205
Washington, D.C. 20004
Counsel for Defendants
202-305-0424

Of Counsel:
Robert J. Smith
Mary Raivel
Navy Litigation Office
720 Kennon Street
Washington Navy Yard, D.C. 20374

CDR Dominick Yacono

JAGC, USN
Commander Navy region
Mid-Atlantic, Code (00LE)
1510 Gilbert Street
Norfolk, VA 23511-2737

# AIRCRAFT NOISE SURVEY

# NAVAL AIR STATION

# OCEANA

# VIRGINIA BEACH, VIRGINIA

and

# AUXILIARY LANDING FIELD

# FENTRESS

# CHESAPEAKE, VIRGINIA

November, 1984

HMMH Report No. 230104

Prepared Under Contract No. N00025-82-C-0002

Submitted to:

Commander Naval Facilities Engineering Command
200 Stovall Street
Alexandria, Virginia 22332

Prepared by:

Harris Miller Miller & Hanson Inc.
429 Marrett Road
Lexington, Massachusetts 02173

EXHIBIT
A

## INTRODUCTION

The Naval Facilities Engineering Command (NAVFACENGCOM) contracted with Harris Miller Miller & Hanson Inc. (HMMH) to prepare an Aircraft Noise Survey at Naval Air Station Oceana, Virginia Beach, Virginia, and Auxiliary Landing Field Fentress, Chesapeake, Virginia. The survey included field collection of operational data, field monitoring of aircraft noise during two weeks of June 1983, and development of noise exposure contours for current (1982) operations. Operations data were collected through completion of a series of tables and figures distributed to the squadrons. These completed forms and figures are bound as a reference appendix volume to this report. Additional field measurements of aircraft noise were obtained during October 1984.

This report presents the results of the survey. Section II describes the air station and its operation; Section III describes the survey noise metric used as well as the computer programs used to develop noise contours. Section IV presents the updated noise contour for NAS Oceana and ALF Fentress, compares the noise levels from the updated contour with the field-measured levels, and also compares the updated contour with the most recent previous contour.

TABLE 1

NAS OCEANA

SQUADRONS THAT PROVIDED
OPERATIONS INFORMATION

| Squadron | Aircraft Type |
|---|---|
| VA-42 | A-6 **, TC-4 |
| VAW-120 | E-2 |
| VAW-124 | E-2* |
| VRC-40 | C-1A |
| VC-12 | A-4 |
| VF-43 | A-4 |
| VF-101 | F-14 *** |

* One of five E-2 fleet squadrons.
** There are also three A-6 fleet squadrons at a time.
*** One of eight F-14 squadrons at a time.

TABLE 5

NAS OCEANA AND ALF FENTRESS

1982 AVERAGE BUSY DAY OPERATIONS

NAS OCEANA

| AIRCRAFT TYPE | ARRIVALS | | DEPARTURES | | TOUCH AND GO | | FCLP | | PATTERNS GCA | | ACLS | | TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | DAY | NIGHT | DAY | NIGHT | DAY | NIGHT | DAY | NIGHT | DAY | NIGHT | DAY | NIGHT | |
| A-6 | 7.31 | 2.98 | 8.55 | 1.74 | 33.97 | 11.90 | 6.32 | 9.79 | 2.60 | 2.95 | 0.29 | 0.12 | 84.[illegible] |
| A-4 | 14.50 | 0.87 | 14.80 | 0.50 | 5.21 | 0.66 | 0.00 | 0.00 | 2.85 | 0.04 | 1.12 | 0.12 | 40.75 |
| F-14 | 63.60 | 17.11 | 64.38 | 16.36 | 101.29 | 19.34 | 4.96 | 4.96 | 71.65 | 23.80 | 3.08 | 7.07 | 398.33 |
| F-5E | 6.45 | 0.12 | 6.57 | 0.01 | 3.60 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.62 | 0.00 | 17.6[illegible] |
| T-2C | 2.60 | 0.12 | 2.60 | 0.12 | 0.99 | 0.00 | 0.09 | 0.00 | 0.00 | 0.00 | 0.27 | 0.00 | [illegible] |
| TC-4C | 1.49 | 0.04 | 1.49 | 0.04 | 0.47 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.0[illegible] | 0.00 | 3.1[illegible] |
| TOTALS | 95.95 | 21.24 | 98.03 | 18.77 | 145.43 | 31.94 | 11.28 | 18.75 | 77.11 | [illegible] | 5.08 | 7.31 | 554.98 |

ALF FENTRESS

| AIRCRAFT TYPE | ARRIVALS | | DEPARTURES | | TOUCH AND GO | | FCLP | | PATTERNS GCA | | ACLS | | TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | DAY | NIGHT | DAY | NIGHT | DAY | NIGHT | DAY | NIGHT | DAY | NIGHT | DAY | NIGHT | |
| A-6 | 1.30 | 1.30 | 1.30 | 1.30 | 0.00 | 0.00 | 27.26 | 27.25 | 0.00 | 0.00 | 0.00 | 0.00 | 57.92 |
| F-14 | 5.20 | 5.20 | 5.20 | 5.20 | 0.00 | 0.00 | 108.30 | 108.30 | 0.00 | 0.00 | 0.50 | 0.00 | 237.40 |
| E-2 | 1.80 | 1.80 | 1.80 | 1.80 | 0.00 | 0.00 | 39.59 | 39.59 | 0.00 | 0.00 | 0.00 | 0.00 | 86.38 |
| C-1 | 1.00 | 0.00 | 1.00 | 0.00 | 0.00 | 0.00 | 14.75 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 16.75 |
| TOTALS | 9.30 | 8.30 | 9.30 | 8.30 | 0.00 | 0.00 | 189.90 | 175.15 | 0.00 | 0.00 | 0.00 | 0.00 | 400.25 |

NOTE: (1) Each pattern is counted as 2 operations.

(2) F-5E, T-2C and TC-4C aircraft operations at NAS Oceana and E-2 and C-1 operations at ALF Fentress were not modelled since they do not contribute significantly to the noise exposure.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FILED
JUN 21 2004
U.S. COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CAROL AND ROBERT TESTWUIDE, et al., Plaintiffs, | ) | |
| v. | ) | No.: 01-201L (Honorable Victor J. Wolski) |
| THE UNITED STATES OF AMERICA, Defendant. | ) | |

**JOINT STATUS REPORT**

Pursuant to this Court's Order on May 26, 2004, the parties, by and through undersigned counsel, respectfully submit this Joint Status Report. This Report does not address all topics set forth in Appendix A of the RCFC, which were addressed in the Joint Preliminary Status Report filed with the Court prior to the Status Conference on May 25, 2004. The Report only addresses those topics discussed by the parties in accordance with the Court's Order of May 26, 2004. For those subjects on which the parties do not agree, the parties submit their separate respective positions.

1. Additional Parties. Pursuant to RCFC 15(a), plaintiffs filed a "Motion for Leave to File amended Complaint" for the purpose of adding additional plaintiffs, the owners of an additional 64 properties. Defendant will file a response opposing the addition of these plaintiffs. The parties agree that it would be inappropriate to further discuss a discovery schedule until the Court rules on plaintiffs' motion for an amended complaint to add additional parties.

EXHIBIT
B

(82)

2. Meet and Confer. The parties held a telephonic meet and confer session on June 2, 2004, at which the following issues were discussed.

a. The only currently pending discovery requests are those that were the subject of plaintiffs' previous motions to compel. All other previous discovery requests were satisfied or have been withdrawn. Plaintiffs further modified their discovery requests in the telephonic meet and confer session by withdrawing some of their requests for documents and interrogatories and modifying others. Plaintiffs further advised that some of the withdrawn requests will be redrafted and resubmitted. Defendant is actively searching for the information and documents to respond to plaintiffs' modified discovery, but still reserves the right to object to those requests and interrogatories that are unduly burdensome, vague or otherwise objectionable. Defendant will respond to the modified requests and interrogatories on or before July 16, 2004. The parties agreed that it would be impossible to formulate a discovery schedule until the Court decides the motion to amend to add plaintiffs described in paragraph 1 above.

b. The parties also discussed the date of the alleged taking and a potential statute of limitations defense. Plaintiffs' counsel indicated that they alleged a July 1998 date of taking as a result of anecdotal evidence that at least some F/A-18 aircraft were transferred to Oceana at that time. Defendant's records indicate that the first F/A-18 aircraft squadrons arrived on or about December 4, 1998; however, defendant will research whether additional aircraft arrived in advance of the squadrons. Defendant is evaluating the statute of limitations as a defense stemming from prior aircraft operations, but will not conclude our determination until the close of discovery.

c. Plaintiffs indicated a willingness to discuss settlement or to enter alternative dispute resolution ("ADR") consistent with the May 2004 Joint Preliminary Status Report in

## PLAINTIFFS' REQUESTS FOR PRODUCTION ADDRESSED UNDER MOTIONS

| Request Number | Action Demanded or Amendment by Plaintiffs |
|---|---|
| 1 | Withdraw - Will redraft and resubmit |
| 2 | Demand ArcView format files be produced up to present time |
| 3 | Demand Production |
| 4 | DemandProduction of Eight listed and all others |
| 5 | Demand Production. Plaintiffs willing to revise beginning date if US Agrees that no prejudice attaches |
| 6 | Withdraw - Will redraft and resubmit |
| 7 | Withdraw - Will redraft and resubmit |
| 8 | Withdraw |
| 9 | Withdraw - Will redraft and resubmit |
| 10 | Withdraw |
| 11 | Withdraw |
| 12 | Withdraw |
| 13 | Withdraw - Will redraft and resubmit |
| 22 | Withdraw - US to advise further |
| 23 | Withdraw - US to advise further |
| 24 | Demand Production |
| 25 | Withdraw - Will redraft and resubmit |
| 26 | Withdraw - Will redraft and resubmit |
| 30 | Demand Production |

PENGAD-Bayonne, N.J. EXHIBIT C

| | |
|---|---|
| 31 | Demand Production |
| 33 | Withdraw - US to advise further |
| 34 | Withdraw - Will redraft and resubmit |
| 35 | Demand production of the text of the avigation easement and the price paid |
| 39 | Demand Production. Modified to state more than 1,000 operations per year or a number to be negotiated |
| 42 | Withdraw |
| 43 | Demand Production |
| 44 | Demand Production. US may provide a list of files or types and Plaintiffs will select a small set for copying |
| 45 | Demand Production. US may provide a list of files or types and Plaintiffs will select a small set for copying |
| 46 | Withdrawn. Production demanded if covered by another Request |
| 47 | Demand Production. US may provide a list of files or types and Plaintiffs will select a small set for copying |
| 48 | Demand Production |
| 51 | Demand Production |