# In the United States Court of Federal Claims

NOT FOR PUBLICATION
No. 01-201L
(Filed August 7, 2006)

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**CAROL & ROBERT TESTWUIDE, et al.,**

Plaintiffs,

v.

**THE UNITED STATES,**

Defendant.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**MEMORANDUM OPINION AND ORDER**

The Court has received and reviewed plaintiffs' Motion to Compel Production of Discovery ("Motion to Compel"), defendant's Motion for a Protective Order Regarding a Subpoena Issued to Wyle Laboratories ("Motion for Protective Order"), and plaintiffs' Motion to Compel Defendant to Produce Additional Documents in Camera ("Motion to Compel Additional Documents"). For the reasons stated below, plaintiffs' Motion to Compel is **GRANTED-IN-PART** and **DENIED-IN-PART**; Defendant's Motion for Protective Order is **GRANTED**; and plaintiffs' Motion to Compel Additional Documents is **GRANTED-IN-PART** and **DENIED-IN-PART**.

## I. BACKGROUND[1]

In 1995, base closures forced the Navy to relocate twelve squadrons of F/A-18 C/D Hornet aircraft. The Navy considered three possible sites for the move, including Naval Air Station Oceana in Virginia Beach. The National Environmental Policy Act, 42 U.S.C. § 4331, *et seq.* (NEPA), required the Navy to produce an Environmental Impact Study (EIS) to assess the environmental effects of such a possible move. Among the effects the Navy studied was the impact of jet noise on the area surrounding the air station. To prepare the EIS, Navy contracted with Ecology and Environment, Inc. ("E & E"), which subcontracted with Wyle to perform the noise contour analyses showing the projected changes in noise levels that would occur following the move. Wyle had prior experience in performing noise studies of both military and civilian

[1] The facts contained in this section are provided for the purpose of context, and should not be taken as findings of fact by the Court for any purposes.

airfields, and has been under contract with the Navy since the early 1990's as the Navy's primary contractor for analyses of aircraft noise. When performing the noise analysis for the 1998 Report, Wyle studied both a baseline year prior to the prospective move (1997), and an affected year following the move (1999), and developed noise contours for both years. Wyle issued its report on the C/D basing decision in February 1998 (1998 Report). In March 1998, the Navy issued the final EIS, which recommended moving ten of the twelve C/D squadrons to NAS Oceana. The Navy adopted this decision in its Record of Decision, and ten squadrons of C/Ds ultimately relocated to NAS Oceana between November 1998, and July 1999.

A lawsuit was filed in the district court in July, 1998 challenging the relocation of these aircraft. In response to this and in anticipation of other litigation, Wyle was engaged to provide technical analyses "[a]s a part of the overall evaluation of litigative risk and to assist Navy and Department of Justice counsel in providing advice to senior management regarding that risk." Borro Decl. ¶ 5. These analyses were performed by Mr. Joseph Czech. An employee of the Navy, Mr. Alan Zusman, served as defendant's liaison with Wyle and was allegedly "operating under the direction of Navy counsel." *Id.* This work was performed between February, 1999, and February, 2000. *Id.*

At some point, the Navy began working to produce another EIS to comply with NEPA, this time studying the impact of relocating eleven squadrons of F/A-18 E/F aircraft to several possible airfields, including NAS Oceana.[2] The Navy once again contracted with Wyle, through E & E, to study the effects of the proposed move. It appears that in the course of developing the noise projection for the E/F EIS, Wyle re-examined the noise projection it developed in conjunction with the C/D relocation, might have discovered mistakes in that noise projection, and sought "to understand[] to what extent use of any inaccurate information had affected the projections of noise contained in the EIS for the realignment of the F/A-18 C/D aircraft . . . to NAS Oceana." Borro Decl. ¶ 7. Wyle issued this second report in April, 2003 (2003 Report).

On October 24, 2005, plaintiffs filed a Motion to Compel Discovery, requesting an order compelling defendant to produce unredacted versions of documents responsive to discovery requests, and compelling witnesses Czech and Zusman to resume their depositions to answer questions previously propounded by plaintiffs regarding the 1999 work performed by Czech. The documents requested by plaintiffs are email communications that occurred between October and December, 2001, during the preparation of the EIS related to the proposed E/F relocation. Defendant has asserted both attorney-client and work product privileges. The government asserts that these documents "reflect communications between Navy personnel, its contractor [Wyle], and Navy attorneys for the purpose of seeking, giving or receiving legal advice and also constitute attorney work product." Def's Resp. at 8. "The issue that is at the heart of the communications . . . was relevant both to establishing the baseline noise environment used in the F/A-18 E/F East Coast basing EIS and to understanding to what extent use of any inaccurate information had affected the projections of noise contained in the EIS for the realignment of the

[2] The E/Fs are larger and noisier than the C/Ds, which were the subject of the 1998 EIS.

F/A-18 C/D aircraft from NAS Cecil Field to NAS Oceana. This noise projection is a centerpiece of the plaintiffs' complaint." Borro Decl. ¶ 7. According to defendant's privilege log, some of the communications include requests for legal advice and/or opinions from Navy attorneys and responses thereto. Def's Resp. at 8. Others involve communications from attorneys directly to Wyle, or to Wyle through Zusman. Def's Resp. at 8.

According to plaintiffs, defendant should have to produce the documents because these were prepared as part of the NEPA process for the E/F basing decision. In addition, plaintiffs argue that any existing privilege as to several of the documents has been waived because the documents were disclosed to third parties or Navy and Wyle personnel who had no reason to see the documents and had no authority to speak for the Navy on the topic of the communications.

The Court initially found that defendant's privilege log and the declaration of Mr. Ronald J. Borro,[3] submitted as exhibits to defendant's Response to Plaintiffs' Motion to Compel, were insufficient for determining whether the communications were intended to be confidential, or whether any privileges protecting them were waived by disclosure of the communications to third parties. The deficiencies were due to certain presumptions that may have been valid with respect to the plaintiffs, but not the Court. As defendant explained in its response to plaintiffs' motion to compel, "[t]he descriptions [in the privilege log] of Navy employees identify their official positions, *except in certain instances where plaintiffs have deposed an individual and therefore know the person's official position*." Def's Resp. at 9 (emphasis added). The Court not being privy to this information, and the documents being relatively few in number, defendant was accordingly ordered to submit the documents to Chambers, along with a supplemental privilege log, for *in camera* review. *See* Order dated April 20, 2006.

The Court also, of course, hoped that such review would assist it to determine whether the communications were intended to be confidential, or whether they were disclosed in such a way as to waive any privilege that would otherwise attach. For example, several of the documents were disclosed to Geral Long and Micah Downing, employees at Wyle Labs. Def's Resp. at 9-10. Defendant argues that communications with Wyle personnel should be treated as "communications with independent consultants . . . subject to the attorney-client privilege when the consultants are meaningfully associated with the client." Def's Resp. at 10 (citing *In re Bieter*, 16 F.3d 929, 936-40 (8th Cir. 1994)). Without a more detailed description of the various participants in the email communications and the purpose for which the communications were disclosed to them, it would have been difficult to determine whether any particular participant was "meaningfully associated with" the Navy, or whether the communications with them were for the purpose of obtaining or providing legal advice. *See Pacific Gas & Elec. Co. v. United States*, 69 Fed. Cl. 784, 813 (Fed.Cl. 2006).

---

[3] Mister Borro is Senior Counsel within the office of the Assistant General Counsel (Installations and Environment), Department of the Navy, and was involved in advising the Navy concerning the realignment of both the F/A-18 C/D aircraft and the F/A-18 E/F aircraft. Borro Decl. ¶¶ 1-3.

Plaintiffs also seek through their Motion to Compel to resume the depositions of Czech and Zusman, to ask questions regarding the deponents' work on the noise analyses that Wyle apparently performed between February 1999 and February 2000. Defendant alleges the consulting work "was performed at the direction of Navy counsel in anticipation of litigation and for the purpose of providing information to Navy and Department of Justice counsel that would assist them in providing advice regarding such potential litigation." Def's Resp. at 4. Defendant also asserts that the "work is not related to the effort that is the subject of the October-December 2001 documents" which plaintiffs were also seeking. Def's Resp. at 4.

On February 7, 2006, plaintiffs served a subpoena *duces tecum* on Wyle Labs, requesting internal documents and communications regarding the differences between the projected 1999 noise contours in the 1997 Noise Study, and the projected 2000 noise contours in the subsequent study submitted in March, 2002 to the Court in this case, as Revised Exhibits 49 and 49A.

Finally, on June 6, 2006, plaintiffs filed the Motion to Compel Additional Documents. In that Motion, plaintiffs requested production for *in camera* review of documents identified in defendant's November 10, 2005 privilege log as the "Technical Analyses" performed by Joseph Czech in June and August, 1999.[4] *See* Ex. 2 to Mot. to Compel Add. Docs. Plaintiffs argue that the documents were included within the subjects of their October 24, 2005 Motion to Compel, and should therefore be produced in response to the Court's Order of April 20, 2006. Defendant responds that the technical analyses, created in 1999 and discussed in paragraphs four through six of Ronald J. Borro's November 10, 2005 declaration, were part of the Navy's overall litigative risk analysis, and not within the ambit of plaintiffs' Motion to Compel -- which concerned documents created in 2001. Plaintiffs, on the other hand, argue that the Court's April 20, 2006 Order had the effect of compelling production *in camera* of all privileged documents that were responsive to RFP 29, and that documents appearing in privilege logs produced in March, April, May and June of this year should also have been submitted for Court review. Defendant responds that the Court's order only dealt with those documents explicitly referred to by plaintiffs' Motion to Compel, and identified in Exhibit 1 to that motion.

## II. DISCUSSION

### A. Attorney-Client Privilege

"The attorney-client privilege protects the confidentiality of communications between attorney and client made for the purpose of obtaining legal advice." *Genentech, Inc. v. United States Intern. Trade Comm'n*, 122 F.3d 1409, 1415 (Fed. Cir. 1997). The party asserting the privilege bears the burden of establishing: (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar

---

[4] Although only three entries, dated June 14, 1999, August 13, 1999, and August 17, 1999, are listed on this log, defendant explains that these actually refer to *four* documents. Def.'s Resp. to Mot. to Compel Add. Docs. at 4 n.3.

of a court, or his subordinate and (b) in connection with the communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client. *See Energy Capital Corp. v. United States*, 45 Fed. Cl. 481, 484-85 (2000).

Documents do not become privileged simply by being routed through an attorney or his representative. The burden is on the proponent of the privilege to prove the elements of the privilege. This may be done by providing a privilege log describing the documents at issue, the purpose (or purposes) for their creation, and the recipients who viewed the documents. Document descriptions in a privilege log must contain more than boilerplate assertions that the documents in question contain attorney-client communications. When a party invokes the attorney-client privilege by providing a privilege log, "the description of each document and its contents must be sufficiently detailed to allow the court to determine whether the elements of attorney-client privilege . . . have been established. Failing this, the documents must be produced." *Smithkline Beecham Corp. v. Apotex Corp.*, 2005 U.S. Dist. LEXIS 37837, at *28-29 (E.D. Pa. December 30, 2005). As is provided in RCFC 26(b)(5):

> When a party withholds information . . . by claiming that it is privileged . . . the party shall make the claim expressly and shall *describe the nature of the documents*, communications, or things not produced or disclosed *in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection*.

RCFC 26(b)(5) (emphasis added).

Inquiry into the subject matter of attorney-client communications does not implicate the attorney-client privilege because it does not seek confidential information. The attorney-client privilege protects the substance of privileged communications, not their subject matter. *See Colton v. United States*, 306 F.2d 633, 636-37 (2d Cir. 1962), *cert. denied*, 371 U.S. 951 (1963). In the case of a communication that the privilege otherwise protects, the privilege may be waived if the communication is disclosed to a third party. "The attorney-client privilege evaporates upon any voluntary disclosure of confidential information to a third party." *First Heights Bank v. Untied States*, 46 Fed. Cl. 312, 316 (2000).

The privilege extends to communications between corporate employees and corporate counsel, *see Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981), and, like any other organization, a government agency can be a client. *See Coastal States Gas Corp. v. Dept. of Energy*, 617 F.2d 854, 863 (D.C. Cir. 1980); *see also Deuterium Corp. v. United States*, 19 Cl. Ct. 697, 700 (1990). Attorney-client privilege is construed narrowly to achieve its purpose, "to encourage full and frank communication between attorneys and their clients." *Swidler & Berlin v. United States*, 524 U.S. 399, 403 (1998) (internal quotes omitted). "Where the client is an

organization, the privilege extends [only] to those communications between attorneys and all agents or employees of the organization *who are authorized to act or speak for the organization in relation to the subject matter* of the communication." *Mead Data Cent., Inc. v. United States Dept. of Air Force*, 566 F.2d 242, 253 n.24 (D.C. Cir. 1977) (emphasis added; citations omitted); *see also Coastal States Gas Corp*., 617 F.2d at 862.

The principle identified in *Upjohn* does not limit the privilege to communications from employees to counsel. In some cases, the privilege may also extend to independent consultants who are "in all relevant respects the functional equivalent of" the organization's employees." *In re Bieter*, 16 F.3d 929, 938 (8th Cir. 1994).

**B. Work Product Rule**

"The attorney work product privilege attaches to documents prepared in anticipation of litigation or for trial by a party or his representative." *United States v. Gulf Oil Corp.*, 760 F.2d 292, 296 (Temp. Emer. Ct. App. 1985). The work product rule is set out in Rule 26(b)(3) of the Rules of the Court of Federal Claims (RCFC), which provides in part:

> Subject to the provisions of subdivision (b)(4), a party may obtain discovery of *documents and tangible things* otherwise discoverable under subdivision (b)(1) of this rule and *prepared in anticipation of litigation* or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

RCFC 26(b)(3) (emphasis added).

The rule protects documents and other tangible things, prepared in anticipation of litigation, by a party or that party's representative (including an attorney or agent). If compelling testimony "would require disclosure of communications protected by the work product doctrine," then the work product doctrine would act to shield the testimony as well. *See In re Cendant Corp. Securities Litig.*, 343 F.3d 658, 667 (3d Cir. 2003). The rule exists to prevent one party from free-riding on the legal work of another party's counsel, and it is narrowly construed to achieve this purpose. *See Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947); *Energy Capital Corp. v. United States*, 45 Fed. Cl. 481, 484 (2000).

The threshold determination in applying the work product rule is whether the "documents and tangible things" sought to be produced were "prepared in anticipation of litigation." RCFC 26(b)(3); *see also Energy Capital Corp. v. United States*, 45 Fed. Cl. 481, 485 (2000). In assessing whether the work product privilege should protect a document from disclosure, courts ask whether the document "would have been created in essentially similar form irrespective of the litigation." *United States v. Adlman*, 134 F.3d 1194, 1202 (2d Cir. 1998); *see also In re Grand Jury Subpoena*, 357 F.3d 900, 908 (7th Cir. 2003). If the answer is yes, then preventing disclosure of the document would not serve the purposes behind the privilege. This is of particular relevance to the dispute at hand, for documents that are required to be prepared to comply with the law may not be protected under the work product doctrine, even when they were also created "because of" litigation. *See Pacific Gas & Elec. Co. v. United States*, 69 Fed. Cl. 784, 792 (2006); *see also In re Raytheon Secs. Litig.*, 218 F.R.D. 354, 359 (D. Mass. 2003); *compare In re Grand Jury Subpoena*, 357 F.3d 900 (9th Cir.) (citing 8 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE 2d § 2024 (West 2006)) ("Under the Wright and Miller 'because of' standard, a document created in part because of the prospect of litigation but also due to business reasons would be protected by the work product doctrine.").

This exclusion of documents prepared pursuant to some public requirement applies "even if the party is aware that the document may also be useful in the event of litigation." *Pacamor Bearings, Inc. v. Meneba Co., Ltd.*, 918 F. Supp. 491, 513 (D.N.H. 1996); *cf. United States v. El Paso Co.*, 682 F.2d 530, 543 (5th Cir. 1982) (finding work product privilege does not apply where "[t]he primary motivating force behind the tax pool analysis . . . is not to ready [appellant] for litigation over its tax returns . . . [but] to anticipate, for financial reporting purposes, what the impact of litigation might be on the company's tax liability."). In general, therefore, "a document generated in connection with the preparation of an EIS should not be treated as work product," although a close question may be presented in cases where "the preparation of the EIS . . . was inextricably bound up with [the] defense of a seamless web of litigation." *Biddison v. City of Chicago*, 1989 U.S. Dist. LEXIS 3991, *3 (N.D. Ill. 1989).

Finally, the work product doctrine does not protect facts concerning the creation of work product, or facts contained in work product. "Thus, work product does not preclude inquiry into the mere fact of an investigation." *Resolution Trust Corp. v. Dabney*, 73 F.3d 262, 266 (10th Cir. 1995).

With this understanding of the relevant privileges in mind, the Court considers in turn the arguments in plaintiffs' Motion to Compel, defendant's Motion for Protective Order, and plaintiffs' Motion to Compel Additional Documents. With regard to the documents requested by plaintiffs' Motion to Compel, defendant has asserted both the attorney-client privilege and the work product doctrine. Defendant has asserted the same bases for its objections to certain questions propounded by plaintiffs during the depositions of Messrs. Czech and Zusman.

**C. Application to the Plaintiffs' Motion to Compel**

*1. The Disputed Documents and the Attorney-Client Privilege*

At its core, the attorney-client privilege protects *confidential* communications from a client to an attorney, made for the purpose of legal advice. *Sparton Corp. v. United States*, 44 Fed. Cl. 557, 566 (1999). RCFC 26(b)(5) requires the party claiming the privilege to "describe the nature of the documents, communications, or things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection." RCFC 26(b)(5). Defendant has done this in response to the Court's April 20, 2006 order, by providing the Court with a supplemental privilege log identifying each person to whom each document was disclosed, and, with respect to those persons, identifying their official positions, whether they were attorneys, and the purpose for which the documents were disclosed to them. Defendant also produced unredacted copies of the documents for the Court's review *in camera*. After reviewing the documents *in camera*, the Court has concluded that the following documents or portions thereof, identified by Bates numbers, are protected by the attorney-client privilege and need not be produced in unredacted form:

OCE 213574-76
OCE 213585
OCE 213629
OCE 213632 & Coffer Memorandum[5]
OCE 213633-34
OCE 213637
OCE 213644-45
OCE 213663
OCE 213722-24
OCE 213730
OCE 213731

*2. The Disputed Documents and the Work Product Rule*

The second question to consider is whether the work product rule shields any documents from disclosure. The test here is "whether, in light of the nature of the document and the factual situation in the particular case, the document can be fairly said to have been prepared or obtained because of the prospect of litigation." *Senate of Puerto Rico v. U.S. Dept. of Justice*, 823 F.2d 574 (D.C. Cir. 1987). Because some of the documents involved in this dispute were apparently produced both for the purpose of litigation and to comply with NEPA, the Court had to determine whether the documents "would have been created in essentially similar form

---

[5] The privilege log appears to inaccurately describe this document and two others as being attachments to OCE 213648-49. *See* Amended Suppl. Priv. Log (May 3, 2006) at 3-4.

irrespective of the litigation" for "[i]t is well established that work-product privilege does not apply to such documents." *United States v. Adlman*, 134 F.3d 1194, 1202 (2d Cir. 1998). For this reason, a document prepared in connection with an EIS generally is not protected as work product. *See Biddison*, 1989 U.S. Dist. LEXIS 3991 at *3.

The documents that plaintiffs seek are emails described in defendant's privilege log either as "prepared in conjunction with pending inverse condemnation litigation," or as prepared "in anticipation of potential litigation arising out of F/A-18 E/F East Coast basing NEPA process," or, which is more usual, as both. *See* Ex. D to Def.'s Resp. to Mot. to Compel. The communications concern studies that Wyle Laboratories prepared "in conjunction with then-pending litigation (specifically, *Testwuide*) and in anticipation of potential litigation arising from the . . . NEPA process." Def's Resp. to Mot. to Compel at 8. After reviewing the unredacted documents *in camera*, the Court has determined that the following documents, identified by Bates numbers, or portions thereof, are protected by the attorney work product doctrine, and need not be produced in unredacted form:

OCE 213627-28
OCE 213638-39
OCE 213642-43
OCE 239446

<u>*3. Documents to be Produced*</u>

After reviewing the documents *in camera*, the Court has determined that the following documents, identified by Bates numbers, are not protected by either the attorney-client privilege or the work product doctrine as asserted by defendant, and the court **ORDERS** defendant to **PRODUCE** them in unredacted form:

OCE 213630-31
OCE 213647-49
OCE 213650-56 (except for a portion of OCE 213655; *see* discussion below)
OCE 213659-62
OCE 213716
OCE 213717-20
OCE 213741
undated chart and other Coffer document attached to OCE 213632 (the last two documents listed on the May 2, 2006 Supplemental Privilege Log)

Regarding OCE 213630-31, although this document was assembled at the request of a Navy lawyer, it is of a purely factual nature, concerning an issue that is obviously known to plaintiffs (the revision in the F/A-18 C/D profile data) and revealing no "mental impressions, conclusions, opinions, or legal theories" of defendant's counsel. *See* RCFC 26(b)(3).

The documents stamped OCE 213647-49 consist of an email from a Navy attorney and an attachment of proposed questions and answers regarding the relevant noise contours. Although the email was sent to Navy and Department of Justice lawyers, it was also sent to non-lawyers, including public affairs officers. Most importantly, the documents do not represent a request or provision of legal advice, nor can they be reasonably characterized as prepared in connection with litigation -- to the contrary, the attachment was prepared for public dissemination. Any privilege that might have attached to these documents was waived when the communications were disseminated to Navy Public Affairs officials "because of their expertise in and knowledge of dealing with the media." *See* Def's Supp. Privilege Log at Attachment 1. Public relations advice obtained by defendant's counsel with regard to litigation can be protected work product to the extent that it reveals the defendant's strategy for conducting the litigation itself. However, "the purpose of the [work product] rule is to protect a zone of privacy for strategizing about the conduct of the litigation itself, not for strategizing about the effects of the litigation on the client's customers, the media, or on the public generally." *Calvin Klein Trademark Trust v. Wachner*, 198 F.R.D. 53, 55 (D.C.N.Y. 2000). This communication is not a case where "the [Navy Public Affairs Office] need[ed] to know the attorney's strategy in order to advise as to public relations, and [where] the public relations impact bears, in turn, on the attorney's own strategizing as to whether or not to take a contemplated step in the litigation itself and, if so, in what form." *Id.* Likewise, any attorney-client privilege was waived because Navy Public Affairs "is, at most, simply providing ordinary public relations advice so far as the documents here in question are concerned." *Id.* at 54. This same analysis governs the various emails contained in OCE 213650-56, with the exception that the Robert J. Smith email in the middle of OCE 213655 is protected from disclosure by the attorney-client privilege.

While the Court finds the November 5, 2001 Memorandum attached to OCE 213632 to be protected by the attorney-client privilege, the other two attachments to this email should be produced. These contain information that appears to have been created in connection with the preparation of the E/F EIS, and not for the purpose of litigation. *See Biddison v. City of Chicago*, 1989 U.S. Dist. LEXIS 3991 (N.D. Ill. 1989). Moreover, these attachments contained factual information the substantial equivalent of which would be unduly hard for plaintiffs to obtain by other means. *See* RCFC 26(b)(3).

The Court finds that the other documents "would have been created in essentially similar form irrespective of the litigation," *Adlman*, 134 F.3d at 1202, in preparing the FA-18 E/F EIS. Thus, these are not protectible. *See Biddison*, 1989 U.S. Dist. LEXIS 3991 at *3.

*4. Deposition Testimony*

Defendant concedes that in shutting down plaintiffs' inquiries at the deposition of Mr. Zusman, it prevented discovery of non-privileged information, including information relating to Zusman's work that was not at the direction of counsel. Def.'s Resp. to Mot. to Compel at 2. Defendant is **ORDERED** to make Mr. Zusman available for the resumption of his deposition to testify as to these non-privileged matters, within thirty days of the date of this order.

Defendant continues to assert privilege regarding other aspects of the deposition testimony of Messrs. Czech and Zusman. The disputed testimony concerns consulting work that took place mostly in 1999. Def's Resp. to Mot. to Compel at 4. According to the declaration of Mr. Borro, the privileged topic involved "an analysis of litigative risk, which included technical analyses, [which] was initiated under the direct supervision of Navy counsel." Borro Decl. ¶ 4. Based on the Borro Declaration, executed pursuant to 28 U.S.C. § 1746 under penalty of perjury, the Court must conclude that the work in question is privileged. *See* Borro Decl. ¶¶ 5-6 (describing the work).[6] Although the work itself may not be the subject of discovery, any facts that were gathered by Czech or Zusman should be produced, unless these are embodied in a form that reveals the "mental impressions, conclusions, opinions, or legal theories" of defendant's counsel. *See* RCFC 26(b)(3). Thus, while the actual responses to the inquiries guided or initiated by Navy counsel would be protected as work product, the raw materials assembled for this purpose are not. *See Resolution Trust Corp.*, 73 F.3d at 266.

**D. Defendant's Motion for a Protective Order**

The Court now turns to the defendant's motion for a protective order preventing plaintiffs from obtaining discovery directly from Wyle.[7] In its various filings, defendant takes the position that, for purposes of this litigation, Wyle and the Navy should be considered one and the same. *See*, *e.g.*, Def.'s Resp. to Mot. to Compel at 10 ("For all intents and purposes, Wyle was and is an extension of the Navy for technical analysis concerning jet noise."); Def.'s Mot. for a Prot. Order Re: Wyle at 6 (stating "Wyle Labs is essentially an extension of the Navy for purposes of technical issues related to aircraft noise"). It appears to the Court that, under these circumstances, defendant is correct, and that all of the information in Wyle's possession that bears on the matters involved in this litigation would have been obtained in performance of a consulting contract that made Wyle the functional equivalent of a Navy employee. *See In re Bieter Co.*, 16 F.3d at 937-40. Thus, defendant's Motion for a Protective Order concerning the subpoena to Wyle is **GRANTED**. Defendant may respond on behalf of Wyle, may assert privileges, and need not produce copies of documents already produced.

There is a big *however*, though. Given that defendant has conceded that Wyle was "essentially an extension of the Navy," for every single request for production propounded by the plaintiffs, defendant will review and produce all responsive documents that are in the possession of Wyle, unless privileged. If Wyle and the Navy are one and the same, all discovery served on the government seeking information from the Navy should be treated as if the information was also sought from Wyle. The Court is concerned that, in its motion for a protective order, the

---

[6] The Court must add, however, that defendant's counsel improperly objected during these depositions to questions that merely sought to test the foundation for the privileges asserted. *See* Pls.' Mot. to Compel at 3-8.

[7] Defendant's motion for a protective order made in conjunction with its opposition to the initial motion to compel is, of course, **DENIED**.

government has explained that "purely internal Wyle communications" relating to the revision of the 1999 noise contours were already produced in response to Request For Production No. 29, Def.'s Reply at 2, yet it also admitted that additional Wyle documents existed that were not yet produced. Defendant is **ORDERED** to produce to plaintiffs, within thirty days of the date of this order, a copy of all non-privileged documents, not already produced, in the possession of Wyle, that are responsive to plaintiffs' past requests for production made upon the Navy or to plaintiffs' subpoena of Wyle, and a privilege log concerning any documents or portions thereof withheld.

The Court reiterates that any document that was created in the preparation of the FA-18 E/F EIS is not privileged, even if the document could also be related to potential litigation. *See Biddison*, 1989 U.S. Dist. LEXIS 3991 at *3; *cf. Adlman*, 134 F.3d at 1202.

**E. Plaintiffs' Motion to Compel Additional Documents**

Plaintiffs' Motion to Compel Additional Documents requests that defendant produce, *in camera*, documents identified in the defendant's November 10, 2005 privilege log as "technical analyses" prepared by Czech, as well as documents identified in subsequent privilege logs. Defendant counters that these documents were not the subject of either plaintiffs' October 24, 2005 Motion to Compel, or the Court's April 20, 2006 order. The defendant is correct that the second set of documents that plaintiffs want submitted to Chambers does not strictly fall within the letter of the April 20, 2006 order, although they certainly fall within its spirit. Had defendant previously identified these documents in a privilege log, to the extent that plaintiffs disputed the assertion of privilege, they most likely would have been included in the first motion to compel.

In the case of the Czech analyses, plaintiffs did, in fact, request their compelled production in the reply paper supporting the initial motion. *See* Pls.' Reply at 9-10. The technical analyses of Czech are the result of the work performed in 1999 and 2000, which the Court has found protectible under the work product rule. But given the widespread circulation of these documents to "offices and commands [that were] responsible to some degree for land use planning, aircraft operations, aircraft noise compatibility, and the environmental impact analysis" concerning the FA-18 C/D relocation decision, Borro Decl. ¶ 6, the Court has determined that it would be best to have an *in camera* review to verify their status. The Court therefore **ORDERS** defendant to provide the Court with unredacted versions of these documents for *in camera* review, within fourteen days of the date of this order, and to serve and file, also by that date, a revised privilege log identifying all individuals to whom these analyses were provided and explaining the reason why each received the documents. To this extent, plaintiffs' motion is **GRANTED**.

But concerning all other documents relating to this motion, the Court has not seen any of the privilege logs supporting the defendant's assertion of privilege. Courts are not in the habit of routinely viewing all documents, *in camera*, over which a privilege has been asserted, and the April 20, 2006 order should not be viewed as some sort of blank check to that end. Plaintiffs' motion is thus **DENIED** in all other respects.

If plaintiffs wish to file a new motion to compel production of these other documents, laying out the basis on which plaintiffs dispute the defendant's assertion of privilege, they may do so. The Court reiterates that responsive documents which were prepared for the purpose of complying with NEPA are -- like the documents discussed above that are the subject of plaintiffs' initial Motion to Compel -- *not* privileged, and should be produced by defendant. The Court also expects the government to identify the basis for any claimed privilege over these documents, and to identify for the plaintiffs the discovery requests to which they are responsive. Inquiry into the subject matter of attorney-client communications does not implicate the attorney-client privilege because it does not seek confidential information. The attorney-client privilege protects the substance of privileged communications, not their subject matter. *See Colton*, 306 F.2d at 636-37.

## III. CONCLUSION

For the foregoing reasons, plaintiffs' Motion to Compel is **GRANTED-IN-PART** and **DENIED-IN-PART**. Defendant's Motion for a Protective Order is **GRANTED**. Plaintiffs' Motion to Compel Production of Additional Documents is **GRANTED-IN-PART** and **DENIED-IN-PART**.

**IT IS SO ORDERED**.

/s Victor J. Wolski

**VICTOR J. WOLSKI**
Judge