# EXHIBIT A

# EFFECTS OF AIRCRAFT NOISE ON RESIDENTIAL PROPERTY VALUES:

## NAVAL AIR STATION (NAS) OCEANA and

## NAVAL AUXILIARY LANDING FIELD (NALF) FENTRESS

---

**EXPERT REPORT OF**
**JON P. NELSON, Ph.D.**

**September 26, 2005**

---

EXHIBIT

300 times by other researchers in economics, transportation, and real estate. Two of my articles have been reprinted in collected volumes, which is another mark of their importance. The 1979 article was reprinted in *The Environment and Transport* (Hayashi et al. 1999) and the 1980 article was reprinted in *Classics in Transport Analysis: Air Transport* (Forsyth et al. 2002). In January 2004, I published a peer-reviewed meta-analysis of airport noise and property values, which was the lead article in the *Journal of Transport Economics and Policy* (Nelson 2004; attachment 2).

5. During 1976-77, I was a member of the Committee on Appraisal of Societal Consequences of Transportation Noise Abatement, National Academy of Sciences, and I contributed to two chapters in the Committee's final report (DeVany et al. 1977a, 1977b). I received three research grants from the U.S. Department of Transportation to investigate the effects of mobile-source pollution on residential property values, including aircraft noise (1972-73, 1974-75, and 1977-78). I have published several other articles that examine adverse effects of pollution on residential property values, including peer-reviewed articles appearing in the *Southern Economic Journal* (1977); *Journal of Urban Economics* (1978); and *Land Economics* (1981). I have acted as a technical consultant to several organizations concerned with noise and other pollutants, including the Pennsylvania Low-Emissions Vehicle Commission (1993).

6. I have experience with the collection of data on residential property values and the measurement of aircraft noise levels for economic studies; I have performed several econometric analyses of the empirical relationship between aircraft noise and residential property values; I have examined the costs and benefits of aircraft noise abatement policies; and I have extensively reviewed the academic literatures in economics and real estate that deal with the effects of noise on residential property values in the United States, Canada, and other countries (Nelson 1978, 1980, 1982, 2004).

7. This report contains my evaluation of the effects on residential property values resulting from aircraft noise exposure, including the impact of the realignment of F/A-18 C/D fleet squadrons and fleet replacement squadrons (FRS) to Naval Air Station (NAS) Oceana, Virginia, and Naval Auxiliary Landing Field (NALF) Fentress, Virginia. This decision was effective during 1998-1999. The Navy's realignment decision was followed by the publication of additional environmental policies, including a revised AICUZ map for Oceana and Fentress (1999); a draft EIS for the basing of F/A-18 E/F (Super Hornet) aircraft at these fields (July 2002); revised land use compatibility guidelines for Navy installations (December 2002); and a *Joint Land Use Study* for the Hampton Roads area (Hampton Roads PDC, April 2005). In September 2003, the Navy announced its intentions to homebase eight F-18 E/F fleet squadrons (96 aircraft) and the FRS (24 aircraft) at NAS Oceana.

8. My rate of compensation as an expert is $200 per hour, and my compensation is not dependent on my method of evaluation or the conclusions researched from my evaluation. My opinions

the NDI results in the FAA's (1985) report on *Aviation Noise Effects*. Second, I will summarize my recent meta-analysis (Nelson 2004), which updates and extends my earlier reviews for U.S. and Canadian airports. All of the empirical studies cover noise from civilian aircraft and the residential environment at civilian airports. All of the studies apply the hedonic model. The next section of this report, **Section V**, discusses special features of military aircraft operations and the residential living environment of Virginia Beach and Chesapeake, Virginia. In **Section V**, I also summarize the results from two survey studies of the effects of aircraft noise on residential property values, which are especially important for noise exposure levels of 80 dB and above. The monetary damages developed below isolate the effect of aircraft noise on property values, holding constant other influences such as accessibility and general growth of nominal housing values. Where the passage of time is important, researchers have included variables to account for general changes in housing market demand and supply and other macro-economic conditions.

**The FAA found that aircraft noise decreases the value of residential property by approximately -1% per dB. This estimate is based on results from seven hedonic studies that use data for civilian aircraft and airports.**

40. The FAA's (1985 at 100) report on *Aviation Noise Effects* includes a discussion of the effects of aircraft noise on the value of residential property located around civilian airports. The FAA selected 10 best estimates of the NDI from the range of available values, including three estimates for 1960 and seven estimates for 1967-70. The three NDI values for 1960 are about -2% per dB, which reflects adjustments in housing markets due to early growth of commercial jet aircraft as a mode of transport. The values for 1967-70 include estimates of -1.5% for San Francisco and -1.0% for Washington, D.C., which may reflect climate and other lifestyle considerations in these areas. After omitting the three estimates from the 1960s, the FAA's range of estimates is -0.6% to -1.5% per dB (FAA, 1985 at 101). The FAA (1985 at 101) concluded that noise decreases the value of property by approximately -1% per decibel. As shown below, the FAA's estimate of the NDI is well within the range of values found by more recent empirical studies of the aircraft noise-property value relationship.[6]

**Empirical studies produce a range of estimates for the NDI from -0.3% to -1.5% per dB. The simple mean NDI is -0.75% per dB, which is close to the FAA's estimate. This estimate is based on information from 23 U.S. and Canadian airports and 33 estimates of the NDI.**

---

[6] The FAA notes that "... all research conducted in this area found negative effects from aviation noise ... researchers have been careful to consider [other factors] and to normalize their influences in research studies" (FAA, 1985 at 100).

41. Since the publication of my survey article (Nelson 1980), there have been additional studies of the empirical relationship between aircraft noise and property values. In Nelson (2004), I updated and extended my earlier survey using the technique of meta-analysis. Table 3 displays the results from 20 hedonic studies that cover 23 different civilian airports in the U.S. and Canada, and includes studies using sample data from 1967 to 1995. A total of 33 best estimates of the NDI is presented. Two independent estimates are available for Atlanta, Dallas, Reno, San Francisco, St. Louis, and Washington, D.C. A variety of data are employed, including data for census tracts, census blocks, disaggregated census blocks, and individual housing sales (e.g., Multiple Listing Service data). The NDI estimates also reflect a variety of model specifications and variables, which capture sample differences in housing and neighborhood characteristics, employment accessibility, airport accessibility, governmental services, and other economic and environmental features. As previously mentioned, it is not expected that the NDI will have a singular value, and the range of NDI values is -0.28 to -1.49%. The simple mean NDI in Table 3 is -0.75% per dB (Nelson, 2004 at 14). This average implies that each dB increase in noise exposure will reduce property values by -0.75%, holding constant other housing and land characteristics. This value is in substantial agreement with the FAA's estimate of -1.0% per dB.

42. The hedonic estimates in Table 3 uniformly indicate that aircraft noise is negatively capitalized into residential property values. Twenty-seven of 31 estimates are statistically significant at the 95% level or better (estimates for JFK and La Guardia Airports are missing standard errors). This is a far greater number of significant negative estimates than could possibly be attributed to chance. The coefficient standard errors and other statistical measures (e.g., R-square) are found in my attached article.

**The technique of meta-analysis can be used to synthesize the set of NDI estimates contained in Table 3. A meta-regression analysis produces a best estimate for the mean NDI of -0.7% per dB. This value is not affected by moderating and mediating variables such as sample size, sample year, mean property value, or airport accessibility.**

43. Meta-analysis is a statistical procedure for integrating and synthesizing the quantitative results contained in a set of studies of a given empirical relationship or outcome. That is, meta-analysis is "an analysis of the results of statistical analyses" (Hedges and Olkin, 1985 at 13). According to Hedges and Olkin (1985 at 1), "replication of experimental results has long been a central feature of scientific inquiry, and it raises questions concerning how [best] to combine the results obtained." Meta-analysis was developed in the early 1980s and applied originally in psychology and education (Cook et al. 1992; Cooper and Hedges 1994). It is now widely applied in the physical sciences and other areas of the social sciences. In economics, meta-analysis has been applied to environmental issues (Smith and Huang 1995; van den Bergh 1997), recreation demand (Rosenberger and Loomis 2000), gasoline demand

**Table 3. Summary of Noise Depreciation Indexes (NDI) for 23 Airports**

| Hedonic Study – Airport | DNL | Sample Size (N) and Data (Year) | NDI |
|---|---|---|---|
| BAH-FAA (1994 at 18) – Baltimore | 60 & 70 dB | N = 30; individual houses (1990) | -1.07 |
| BAH-FAA (1994) – Los Angeles | 60 & 70 dB | N = 24; individual houses (1991) | -1.26 |
| BAH-FAA (1994) – NYC JFK | 60 & 70 dB | N = 30; individual houses (1993); no std. error | -1.20 |
| BAH-FAA (1994) – NYC La Guardia | 60 & 70 dB | N = 30; individual houses (1993); no std. error | -0.67 |
| Blaylock (1977 at 84) – Dallas | 55-90 dB | N = 4264; disaggregated census blocks (1970) | -0.99* |
| DeVany (1976 at 213) – Dallas | 55-85 dB | N = 1270; census blocks (1970) | -0.80* |
| Dygert (1973) – San Francisco | 60-80 dB | N = 128; census tracts (1970) | -0.50* |
| Dygert (1973 at 113) – San Jose | 60-80 dB | N = 198; census tracts (1970) | -0.70* |
| Emerson (1972) – Minneapolis | 60-80 dB | N = 222; individual houses (1967) | -0.58* |
| Espey & Lopez (2000) – Reno | 60-75 dB | N = 1596; individual houses (1991-95) | -0.28 |
| Fromme (1978) – Washington, DC | 55-70 dB | N = 28; census tracts (1970) | -1.49* |
| Levesque (1994 at 207) – Winnipeg | 75+ dB | N = 1635; individual houses (1985-86) | -1.30* |
| Mark (1980 at 112) – St. Louis | 70 & 80 dB | N = 6553; individual houses (1969-70) | -0.56* |
| Maser et al. (1977) – Rochester urban<br>Rochester suburban | 65+ dB<br>65+ dB | N = 398; individual houses (1971)<br>N = 990; individual houses (1971) | -0.86*<br>-0.68* |
| McMillian (1980) – Edmonton | 55-70 dB | N = 352; individual houses (1976) | -0.51* |
| Mieszkowski et al. (1978) – Toronto<br>Toronto (Etobicoke) | 55-70 dB<br>55-70 dB | N = 509; individual houses (1969-73)<br>N = 611; individual houses (1969-73) | -0.87*<br>-0.95* |
| Myles (1997 at 21) – Reno | 55-75 dB | N = 4332; individual houses (1991) | -0.37* |
| Nelson (1978) – Washington, DC | 55-70 dB | N = 52; census tracts (1970) | -1.06 |
| Nelson (1979, 1980) – Buffalo | 60-80 dB | N = 126; census blocks (1970) | -0.52* |
| Nelson (1979, 1980) – Cleveland | 60-80 dB | N = 185; census blocks (1970) | -0.29* |
| Nelson (1979, 1980) – New Orleans | 60-80 dB | N = 143; census blocks (1970) | -0.40* |
| Nelson (1979, 1980) – St. Louis | 60-80 dB | N = 113; census blocks (1970) | -0.51* |
| Nelson (1979, 1980) – San Diego | 60-80 dB | N = 125; census blocks (1970) | -0.74* |
| Nelson (1979, 1980) – San Francisco | 60-80 dB | N = 153; census blocks (1970) | -0.58* |
| Nelson (1979, 1980, 1981) – six airports | 60-80 dB | N = 845; census blocks (1970) | -0.55* |
| O'Byrne et al. (1985) – Atlanta (houses)<br>Atlanta (census blocks) | 65-80 dB<br>60-80 dB | N = 96; individual houses (1979-80)<br>N = 248; census blocks (1970) | -0.67*<br>-0.64* |
| Price (1974) – Boston | 60-80 dB | N = 270; apt. rentals by census tracts (1970) | -0.81* |
| Tarassof (1993 at 83) – Montreal | 55-70 dB | N = 427; individual houses (1989-90) | -0.65* |
| Uyeno et al. (1993 )–Vancouver (houses)<br>Vancouver (condos) | 60-75 dB<br>60-75 dB | N = 645; individual houses (1987-88)<br>N = 907; individual condos (1987-88) | -0.65*<br>-0.90* |

*Notes:* Derived from Nelson (2004 at 12), attached. Asterisks indicate statistically significant at the 95% level.

**Combing the results in Table 4 and the FAA's (1985) estimate, the best NDI estimates are -0.7% to -1.0% per dB. These values measure the diminution in property values due to a one dB increase in noise exposure (DNL) above the background noise level (50-60 dB), and should be applied to noise exposure for residential properties located in the 65-79 dB zone.**

48. In Table 3, the background noise level in most studies is about 60 dB. The maximum noise level in most studies is 80 dB. The change in noise exposure due to **ARS-2** was about 8 to 20 dB (Wyle, 1998 at 4-37). Using these values and the NDI estimate of -0.70% per dB, a 5 dB change in noise due to **ARS-2** reduces a given property value by -3.5% (= -0.70% × 5); a 10 dB change in exposure reduces a given property value by -7%; and a 15 dB change in exposure reduces a given property value by -10.5%. At the FAA's (1985) higher value of -1.0% per dB, the diminution estimates are -5%, -10%, and -15%, respectively.

49. In order to illustrate the general calculation of monetary damages using the mean NDI, information was obtained on the assessed value of an average residential property in Virginia Beach. According to the Office of Real Estate Assessor, all residences (non-apartment units) had an average assessed value of $129,800 in January 2000 (City of Virginia Beach, 2000 at 6), compared to $125,290 in January 1999. The average assessed value for July 1, 1999 was about $127,545. Hence, based on an average assessed value of $128,000, the diminution in value due to **ARS-2** is $4,480 to $6,400 for a 5 dB change; $8,960 to $12,800 for a 10 dB change in exposure; and $13,440 to $19,200 for a 15 dB change. As discussed below, it is an important policy question whether or not properties exposed to 75+ dB can continue to be used for residential purposes. In the next section, I show that the adverse effect of **ARS-2** will be at the upper limit of these estimates, or -1% per dB change in exposure. I also demonstrate that the NDI is larger for residential properties exposed to 80 dB or more.

50. Average assessed residential property values in Virginia Beach rose by 3.60% between January 1999 and January 2000. Average assessed values rose to $158,400 in 2003 (FY 2004). Compared to 2000, this is a compound growth rate of 6.9% per annum. The rate of increase from 2003 to 2004 was 11.7%. The rate of increase from 2004 to 2005 was 22.3%. In the past two years, property values rose rapidly in Virginia Beach (City of Virginia Beach, 2005 at 7). However, this factor only affects the general level of nominal values, and does not change the supply and demand for housing in noisy areas. The correct economic issue is the difference in housing values at different noise exposure levels. Suppose that due to **ARS-2** a residential property valued at $100,000 in 1998 was reduced in value by 20% or $20,000. Growth of property values over time means that this property might have a value at $133,500 in 2005. A similar $100,000 house in a quiet area would be worth about $167,000. While both nominal values increased by 67%, the difference in relative values is 20% in 1999 and 2005.

## V. SPECIAL EFFECTS OF MILITARY AIRCRAFT NOISE

**The special effects of military aircraft noise that exceeds 75 dB are not fully captured by the NDI values of -0.7% and -1.0% per dB change in noise exposure.**

51. Only three of the hedonic studies in Table 3 include noise exposures in excess of 80 dB, and even the populations exposed to 75-80 dB are limited in most studies. Hence, most of the studies in Table 3 fail to consider severe noise exposure of 80 dB and above. For example, O'Byrne et al. (1985) examine the effects of aircraft noise in the vicinity of Atlanta's Hartsfield International Airport. For 1970 census blocks, only 12% of the observations are in the 75-80 dB zone, and for 1979-80 individual house sales, only 7% of the observations are in the 75-80 dB zone. As shown in Table 1, ARS-2 subjected 23,000 people to 80+ dB. In this section, I examine evidence indicating that property value losses due to miliary aircraft noise will be seriously understated if the special effects of severe noise exposure are not considered. For this purpose, I review the evidence on: (1) survey studies that show that housing markets near airports are segmented by noise exposure in excess of 75 dB; (2) the adverse effects of severe noise levels on human health and welfare; (3) the unique features of Navy aircraft operations; and (4) the residential living environment and lifestyle of Virginia Beach and Chesapeake, Virginia.

52. The discussion that follows is based on the assumption that the land areas exposed to 80+ dB will continue to be used for some residential purposes. It is not clear that this should be the case. Four U.S. federal agencies – EPA, HUD, FAA, and the Department of the Navy – have established explicit guidelines for noise exposure of 75+ dB, which indicate that such levels of exposure are incompatible with residential land use. For example, in its *National Strategy for Noise Control*, one of EPA's specific national goals was expressed at follows:

> Reduce environmental noise exposure of the population to a DNL value of no more than 75 dB immediately, using all available tools, except in those isolated cases where this would impose hardship. This will essentially eliminate risk of hearing loss due to environmental noise, and reduce the extreme annoyance and activity interference for the population most severely affected (EPA, 1977a at 14).

53. The FAA's Part 150 guidelines also are explicit about the scope and purpose of limiting residential land use at a DNL of 75 dB or greater at civilian airports. According to the FAA, the purpose of an airport's noise compatibility program will be:

> To develop comprehensive and implementable noise reduction techniques and land use controls which, to the maximum extent feasible, will confine severe aircraft YDNL values of DNL 75 dB or greater to areas included within the airport boundary (14 *Code of Federal Regulations* Part150, January 1, 2000 at 89).

54. The Department of the Navy's AICUZ guidelines also strongly discourage residential use near airfields at DNL 70-75, and recommends that the greatest degree of compatible use controls should be used at DNL of 75 dB and above (DoN, 2002 at 16; DoN, 2003 at 3-38). Hence, the discussion that follows is based on the strong assumption that some of the land areas at 80 dB or greater will continue to be used for residential purposes. This assumption is clearly in violation of policy positions taken by several U.S. federal agencies, including the U.S. Navy.

**Two survey studies of aircraft noise and property values indicate that housing markets are segmented at 75-80 dB and above. At severe noise levels of 80+ dB, the NDI is -0.85% to -1.50% per dB change in exposure.**

55. Frankel (1991) examined the effect of aircraft noise on property values in the vicinity of Chicago's O'Hare Airport. Rather than using the hedonic price method, Frankel surveyed 200 realtors and 70 appraisers from 35 suburban communities surrounding O'Hare Airport. Two of the survey questions addressed the issue of valuation of properties exposed to different levels of aircraft noise. At background noise levels (60-65 dB), 49% of the survey respondents estimated that this noise level would have little or no effect on property values (Frankel, 1991 at 103). However, at severe noise levels (75-80 dB and above), only 2.3% of the respondents thought there would be no effect, and 41% estimated that property values would decline by 25% or more. At severe noise levels, the median reductions for single-family homes were 21.6% for realtors and 16.5% for appraisers. The mean reductions were 16.4% and 12.7%, respectively (Frankel, 1991 at 105). Using the medians and a difference of 15 dB over the background, the NDI for single-family homes at severe noise levels is -1.10% to -1.44% per dB (Frankel, 1991 at 107). Using the means, the NDI is -0.85 to -1.09% per dB for houses located at 75-80 dB and above.

56. Frankel (1991 at 107) compares the survey results with estimates obtained from hedonic price studies. He uses a mean NDI estimate from Nelson (1980), and compares that NDI value and his survey estimates at four different noise levels (62.5, 67.5, 72.5, and 77.5 dB). At the two lower noise levels, the hedonic price estimates and the survey estimates are similar. However, at the two higher noise levels, Frankel (1991 at 107) concludes that the hedonic estimates fall below the survey estimates. Frankel (1991 at 107) offers several possible explanations for this result, including a nonlinear NDI; differences in local residential markets and airport environments; interactions between housing characteristics and aircraft noise; and asymmetric information in housing markets, which limits the efficient operation of the market. Frankel (1991 at 108) concludes that the NDI at noise levels of 80+ dB is about -0.90% per dB. This conclusion is supported by two studies in Table 3 that included more ample information on noise levels above 80 dB. The study by Blaylock (1977) for Dallas obtained an NDI of -0.99% and the study by Levesque (1994) for Winnipeg obtained an NDI of -1.30% per dB.

57. A second survey study was conducted by Feitelson et al. (1996). The authors' survey design was based on 10 noise scenarios and a telephone survey of 426 homeowners and 274 renters in three communities near a major hub airport. This study employed Contingent Valuation (CV) survey methods to analyze two interrelated decisions by homeowners. First, respondents were asked to state their willingness to buy a house at different noise levels. Second, if a respondent was willing to buy a house, they were next asked to state their willingness to pay to avoid different aircraft noise exposures. Renters were asked similar questions about their willingness to rent and the rental premium for quiet. Thus, valuation is modeled as the outcome of a two-stage process: (1) the respondent determines whether he or she is willing to consider buying a residence; and (2) if the answer to this question was affirmative, then the respondent is asked to state their willingness to pay for the residence and its associated level of noise exposure. Hence, survey responses are obtained for the number of individuals who are unwilling to buy noisy properties at any price. If this number is large, the resulting housing market is "thin," or segmented (Feitelson et al., 1996 at 4; Frankel, 1991 at 100).

58. Feitelson et al. (1996 at 10) find that a larger number of individuals are unwilling to purchase a home (or rent) at severe noise levels, especially if overflights are involved. Almost half (45.1%) of the survey respondents were unwilling to buy a home that was exposed to severe noise and subject to overflights. For renters, the similar figure was 34.7%. Feitelson et al. (1996 at 11) conclude that the survey responses imply that the housing market near airports is segmented. An increasingly larger number of buyers are unwilling to consider the purchase of a property as the noise level rises, at any discount from the sale price. Comparing background noise exposure to severe noise exposures (15-25 dB difference), Feitelson et al. (1996 at 12) derive an NDI estimate of -2.4% to -4.1% per dB for homeowners and -1.8% to -3.0% per dB for renters. Compared to hedonic price estimates, the higher NDI includes the loss of use value incurred by homeowners who experience a severe noise exposure and who wish to sell their house. Excluding the zero valuation responses, Feitelson et al. (1996 at 11) derive an NDI at severe noise levels of -1.5% to -2.4% per dB for house prices and -0.9% to -1.5% per dB for rentals. These values agree substantially with the estimates obtained by Frankel (1991).

59. Both survey studies yield estimates that exceed the mean NDI of -0.7% per dB derived in Table 4. Combining the results in the two survey studies, a conservative range of estimates for the NDI at 80+ dB is -0.85 to -1.5% per dB. Hence, an average $128,000 residence located at 65 dB in CY99 was diminished in value by $16,320 to $28,800 if the change in noise exposure due to ARS-2 was 15 dB and $21,760 to $38,400 if the change was 20 dB.

**The Environmental Protection Agency found that a DNL of 75 dB and above is associated with potentially severe health and welfare effects. A recent study of noise and school environments found that aircraft noise impaired children's reading comprehension and recognition memory. Because school quality is a factor that determines property values, this finding is potentially important for residents of Virginia Beach and Chesapeake, Virginia, and future property values.**

60. The EPA's (1982a at 52) *Guidelines for Noise Impact Analysis* examines the possible effects of DNL values that exceed 75 dB. EPA (1982a at 56) recommends that if outdoor noise exposure exceeds three hours a day at a DNL of 75 dB or above, it is important to look for potential severe health effects. First, for some people, noise-induced hearing loss begins to occur at 75 dB. The adverse effect of noise on hearing rapidly accelerates as noise exposure increases, and the possibility of hearing loss is an indicator of other adverse health and welfare effects (EPA, 1982a at 55). Second, those persons who are frequently outdoors are at greatest risk, including young children, retired persons living in warm climates, and persons in certain outdoor occupations. The adverse effects on human health and welfare of DNL 75+ can be summarized as follows (EPA, 1982a at C-1):

| Type of Adverse Effect | Magnitude of Effect at 75 dB and Above |
|---|---|
| • Hearing Loss | May begin to occur in sensitive individuals, depending on actual noise levels received at-ear. |
| • Risk of non-auditory health effects | Noise is one of several factors producing stress-related health effects, such as high-blood pressure. |
| • Speech – indoor | Some disturbance of normal conversation. Sentence intelligibility is approximately 98% at 60 dB indoors (2m). |
| • Speech – outdoor | Very significant disturbance of normal voice conversation. Speech intelligibility is zero at 2m at 75 dB outdoors. |
| • High Annoyance | Approximately 37% of the population will be highly annoyed at 75 dB, 53% at 80 dB, and 72% at 85 dB. |
| • Community Reaction | Very severe. Significant complaints and vigorous actions. |
| • Community Attitudes | Noise is likely to be the most important of all adverse aspects of the community environment. |

61. Second, with respect to noise-induced sleep loss, Suter (1991 at 21) states that sleep interference is one of the critical components of community annoyance. Sleep loss can produce short-term adverse effects, such as mood changes and decrements in task performance the next day, with the possibility of more serious effects on health and well-being if sleep loss continues over long periods (Suter, 1991 at 21). Sleep interference will tend to occur at maximum outdoor sound levels of 65 dB or

(9) The July 1999 average assessed residential value in Virginia Beach was about $128,000. This value is used to illustrate the determination of monetary damages. Using the NDI of -1.0% per dB for an average property exposed to 60-64 dB in CY98, the monetary damage will be $6,400 for a 5 dB increase in exposure; $12,800 for a 10 dB increase; and $19,200 for a 15 dB increase due to **ARS-2**.

(10) Damages will be greater for properties exposed to 80+ dB. Using an NDI of -1.5% per dB for an average property exposed to 65-70 dB in CY98, the monetary damage will be $19,200 for a 10 dB increase in exposure; $28,800 for a 15 dB increase; and $38,400 for a 20 dB increase due to **ARS-2**.

I declare and affirm under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

____________________________

Jon P. Nelson, Ph.D.