# EXHIBIT D

**IN THE:**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**CAROL AND ROBERT TESTWUIDE,** *
**et al.,** *
**Plaintiffs,** *
*
**vs.** * **No. 01-201L**
*
**THE UNITED STATES OF AMERICA,** *
**Defendant.** *

* * * * * * * * * * * * * * * * *

The deposition of **JON P. NELSON** was taken on Wednesday, December 21, 2005, commencing at 9:30 a.m., at Quinn Gordon & Wolf, 102 West Pennsylvania Avenue, Suite 402, Towson, Maryland, before Alfred A. Betz, Court Reporter and Notary Public.

* * * * * * * * * * * * * * * * *

Reported by:

Alfred A. Betz, Certified LiveNote Reporter

ORIGINAL

**APPEARANCES:**

On behalf of Plaintiffs:

**KIERON QUINN, Esquire**

Quinn, Gordon & Wolf

40 W. Chesapeake Avenue

Suite 408

Towson, Maryland 21204

(410) 825-2300 (Voice)

On behalf of Defendant:

**ROBERT J. SMITH, Esquire**

**STEVEN D. BRYANT, Esquire**

**KELLE S. ACOCK, Esquire, Esquire**

U. S. Department of Justice

Environment & Natural Resources Division

601 D Street, N.W.,

PO Box 663

Washington, D.C. 20044

(202) 305-0424 (Voice)

examining people's annoyance due to noise. I think that kind of background knowledge is necessary for many economic studies. In examining the steel industry I had to read a lot of literature, a lot of engineering literature on the steel industry. I had to have access to a book called *The Making, Shaping and Treating of Steel.* And so when I do an economic study I do not confine myself solely to the economics literature.

Q. So would you consider yourself an expert in the effect of noise on people?

A. No. I'm not an expert in that. What I've stated is that I have to have background knowledge of the literature in that area. I certainly do not do original studies of that issue.

Q. Now I'd like to turn to some experience you've had in litigation. You have been involved with Mr. Quinn in another case; is that right?

A. That's correct.

Q. How many cases have you been contracted by this law office?

testified in court?

A. I've testified twice in court.

Q. So those were the two times?

A. That's correct.

Q. Have you ever been offered as an expert in whatever the subject and been found to not be qualified as an expert to testify?

A. No.

Q. Do you have any consulting experience outside of this case involving the effect of aircraft noise on properties around military air stations?

A. No.

Q. Have you published any research examining aircraft noise on residential property values around a military base or air station?

A. No.

Q. Do any of the studies that you cite in your report examine the relationship between aircraft noise and residential property values around military bases?

A. No. As I indicated, in my meta analysis they are all concerned with major civilian airports.

Q. Are you aware of any published or unpublished studies examining the relationship of aircraft noise and residential property values around a military base?

A. I am aware of one study, not a hedonic study, by, if I'm pronouncing the names right, Sanford Fidel.

Q. Okay. Was that study also associated with Bolt, BBN, Bolt Barrick and I don't know the last name?

A. Newman, I believe.

Q. Is that the study you're referring to?

A. I believe so.

Q. We might come back to that. Well, actually, did you draw any conclusions based on what was found in that study?

A. I did not think the study was very well done. I thought it was not using what I would

not asked to do an original study of the issue. Rather, I was asked to give my professional judgment as to, based on analysis, as to what would be the impact on property values from this realignment. I did not do an original study in my first report in 2001. I relied on my earlier survey of the literature. And also examined, as one should, what were the special features that might distinguish Oceana and Virginia Beach from the set of studies that I looked at at that time.

In my second report of September 2005 I then added the additional information from my meta analysis which had been contained in my rebuttal back in 2002 and used that as the basis for my evaluation.

Q. You said you didn't do an original study. I take that to mean that you didn't do a hedonic study of the community surrounding the naval air stations Oceana and Chesapeake; is that what you're saying?

A. That's correct.

could obtain that would you recommend conducting a hedonic study of Virginia Beach as opposed to relying on your estimated NDI for a meta analysis?

MR. QUINN: Same objection.

A. By recommendation, I'm going to assume that you mean that this is a requirement of this case and I don't think it's a requirement of this case.

MR. QUINN: Excuse me, don't interrupt him, please.

A. Because all the previous studies have obtained a negative result. My understanding is that the way this case is now going forward is that my expertise will establish a negative impact and other analyses of these properties will determine the exact damages. So at this juncture, with hindsight as perfect, at this juncture my expertise is to determine the negative effect of aircraft noise. I believe I have done that to my satisfaction. And other testimony will establish the exact magnitude of the impact.

data.

Q. And as you said you haven't investigated Virginia Beach so no one there has refused any data that you would need to conduct this study.

A. I have not done that personally. I would go through Mr. Quinn if I were to pursue that issue.

Q. Have you, do you know a Mr. Dennis Gruel and Mr. Salzburg?

A. I do not know them, no.

Q. So you've never talked to either one of them?

A. I have not talked to them.

Q. Have you reviewed their expert report in this case?

A. No, I have not.

Q. Have you reviewed the data that they obtained in this case?

A. No, I have not.

Q. You have reviewed the data that Dr. Dale-Johnson relied on in his expert opinion, the

impact, a negative impact between, and there's increase in noise and property values and someone else would do the other piece of the damages, if you want to describe them that way. What was your understanding of what would be done in that piece?

A. My understanding of where the case is now is that the class action part has been dropped and that my role as a consultant is to establish the negative effect of the aircraft noise on property values and that there would be a professional appraiser in the Virginia Beach area, I believe, who would be establishing the damage to each of the 14 properties that are being contested. Beyond that, I know nothing else about the role of that person or persons or what they're doing or what particular method or methodology they're using.

Q. Okay. Have you had any communications of any kind, e-mail, correspondence, whatever else you can come up with between you and Mr. Gruel or Mr. Salzburg?

A. I've never met them, I've never talked

pure passage of time.

Q. That's exactly right. They're not dealing with a situation where the airport is expanding or more airplanes are coming in or louder airplanes are flying, are they?

A. No. And I don't see that it's necessary to do that.

Q. You don't see that. But it hasn't been studied, has it?

A. Yes, it has.

Q. When has it been studied?

A. There are two studies that I cite in a footnote in my rebuttal. One is looking at the expansion of the Winston-Salem Greensboro Airport and the other one is looking at the closure of the airport in Austin, Texas. Both of those studies are examining the kinds of changes that I believe you have in mind.

Q. Okay. This Winston-Salem study you're talking about you cited it in where?

A. It's in a footnote in my rebuttal report