**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

CAROLE and ROBERT TESTWUIDE, *et al*.,

*Plaintiffs*,

v.

THE UNITED STATES OF AMERICA,

*Defendant*.

No.: 01-201L
(Honorable Victor J. Wolski)

**PLAINTIFFS' PROPOSED**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Plaintiffs hereby propose the following findings of fact and conclusions of law at the close of trial in this case.

**Findings of Fact**

1. Oceana Naval Air Station is located in the densely populated community of Virginia Beach, Virginia. Oceana, at approximately 5,400 acres, is the Navy's smallest Master jet base. The next smallest, Miramar, is over 20,000 acres. Oceana's main facility consists of two paired 12,000 foot and two paired 8,000 foot runways. Naval Auxiliary Landing Field (NALF) Fentress is located in the adjoining community of Chesapeake, Virginia. The combined population of these communities was approximately 545,045 in 1990 and 625,570 in 2000, according to census data.

2. Air operations at Oceana are very different from civilian air operations. Navy pilots train for aircraft carrier operations at low altitudes and high speeds. Even within the military universe, Navy aircraft have their own unique operations that produce unique noise characteristics. Naval Aviation is by definition based in large part on aircraft carriers, not land-based airfields. Consequently Naval aircraft focus a significant amount of attention and

resources on the unique skill of landing on aircraft carriers. This training regimen is known as Field Carrier Landing Practice ("FCLP").

3. FCLP operations have been accurately described, using slightly different nomenclature, in *Branning v United States,* 228 Ct. Cl. 240, 244, 654 F.2d 88, 91 (1981) as follows:

> One type of training conducted on and around the station consists of practice landings and takeoffs designed to simulate aircraft carrier takeoffs and landings. One type of operation is referred to as "field mirror landing practice" (FMLP). In the course of such operation, the prescribed flight pattern requires the trainees to take off from the runway on the station and then fly defendant's aircraft directly over plaintiffs property in a "racetrack pattern" at an altitude of 600 feet above ground level (AGL) and return to the runway. The pattern is repeated by each aircraft several times, the training exercise being conducted squadron-by-squadron (and virtually nose-to-tail at 25 to 30 second intervals) over a period of several days during each month in which training is conducted.

4. The FCLP flight pattern at Oceana is supposed to be flown at a maximum altitude of 1,000 feet at a distance of 1.5 to 1.75 miles from the center of the airfield.

5. It is also necessary for naval aviators to be able to land on an aircraft carrier at night. Consequently, FCLPs are conducted at night as well as in the daytime.

6. FCLPs also expand the concept of accident potential zones ("APZ"). In 1952, the "Doolittle Report" recommended that an area surrounding military airfields should be set aside as a buffer for aircraft accidents. The first APZ guidelines were issued in 1972 as part of an investigation into aircraft accidents. The APZ studies established a pattern of accident locations on or near the runways at military airfields. Between the early 1970s when APZs were first identified, and the issuance of the EIS, there were 632 aircraft accidents at Navy and Marine Corps airfields. A 13-year study by the Navy reports that 80% of serious accidents (defined as $1 million in damage or death) occurred in the APZs.

There are three identified APZs:

1. The Clear Zone, from the end of the runway extending 3,000 feet;
2. APZ 1, from the end of the clear zone extending 5,000 feet;
3. APZ 2, from the end of APZ 1 extending 7,000 feet.

The shape of the APZs for any given airfield is influenced by specific conditions, including local accident history and the type of operations. The APZs at Oceana are elliptical and mimic the FCLP flight patterns for that airfield.

7. The Base Realignment and Closure Commission of 1995 ("BRAC") ordered the closing of NAS Cecil Field in Jacksonville, Florida, requiring reassignment of 11 squadrons plus the Fleet Replacement Squadron ("FRS") of F/A-18 strike fighter jets. The F/A-18 is the Navy's most powerful carrier based strike-fighter.

8. In the late 1990s, in accordance with § 102(2)(c) of the National Environmental Policy Act of 1969 ("NEPA") (42 U.S.C. §§ 4331 et seq.), Chief of Naval Operations Instruction 11010.36A ("OPNAVINST") and the Defense Base Closure and Realignment Act of 1990 (10 U.S.C § 2687), the Navy prepared an Environmental Impact Statement ("EIS") in connection with the requirement to move the Atlantic Fleet F/A-18s from Cecil Field in Florida. In that EIS, five alternative realignment scenarios ("ARS"), involving three air installations: (1) NAS Oceana, (2) MCAS Beaufort, South Carolina, and (3) MCAS Cherry Point, North Carolina, were evaluated. The Atlantic Fleet had 180 F/A-18 Hornets, consisting of 11 squadrons of 12 F/A-18s each (132 aircraft) and a Fleet Replacement Squadron ("FRS") of 48 F/A-18s. The FRS is the training squadron where brand new pilots are introduced to the plane they are assigned to fly or where pilots who are experienced in other aircraft are trained to fly the F/A-18. The five realignment scenarios were:

> **ARS 1**- Relocate all 11 F/A-18 squadrons and the FRS to NAS Oceana, a total of 180 aircraft.

**<u>ARS 2</u>- Relocate 2 F/A-18 squadrons to MCAS Beaufort (24 aircraft) and 9 F/A-18 squadrons and the FRS to NAS Oceana (156 aircraft).**

**<u>ARS 3</u>**- Relocate 3 F/A-18 squadrons to MCAS Cherry Point and 8 F/A-18 squadrons and the FRS to NAS Oceana.

**<u>ARS 4</u>**- Relocate 5 F/A-18 squadrons to MCAS Beaufort and 6 F/A-18 squadrons and the FRS to NAS Oceana.

**<u>ARS 5</u>**- Relocate 5 F/A-18 squadrons to MCAS Cherry Point and 6 F/A-18 squadrons and the FRS to NAS Oceana.

9. The EIS documented and evaluated each scenario. The EIS documented and projected the level of operations at Oceana based on the ATAC Report which used a computer simulation model, NASMOD. Ultimately, the Navy selected ARS 2 for implementation.

10. NASMOD was developed to analyze options in a number of naval aviation operations. NASMOD is derived from: (1) Navy air training system model (NATS), and (2) SIMMOD the official simulation model, which the Federal Aviation Administration uses to make analogous studies of civilian airports. NASMOD includes database and analytical capabilities necessary to model military training operations.

11. The data used by ATAC is compiled from (1) records of actual air field and air space operations, including air traffic control facility logs, traffic analyzer data and squadron flight schedules, (2) publications, and (3) personal interviews of pilots, and (4) observations of operations. ATAC then established the baseline operations at Oceana prior to the arrival of the F/A-18s (the year 1997 was chosen) and NASMOD established projected levels of use for the anticipated first full year following the realignment, 1999.

12. Based on the operations levels reported by ATAC, noise patterns around Oceana were studied by another Navy contractor, Wyle Laboratories, Inc. Wyle develops aircraft noise

exposure studies at various Navy installations. Those noise studies are used, *inter alia*, to establish the Navy's Air Installations Compatible Use Zone program for various airfields. AICUZ requirements are set out in OPNAVINST 11010.36B (Ex. 28) which identifies both accident and noise impacts from Navy and Marine Corps air stations. These are similar to those required of civilian aircraft and airports by the Noise Control Act of 1972.

13. The Wyle Report sets out the contrast between noise exposure during the baseline year of 1997 and that projected during 1999. In assessing the noise, Wyle used the now-universally accepted standard for aircraft noise exposure in communities around airfields and airports, the day-night average sound level (DNL) expressed in decibels (dB). DNL is the average sound level generated by all aviation related operations during an average 24-hour period.

14. Noise is one of the most prominent and intrusive environmental impacts associated with aircraft operations. Even with other sources of noise in today's environment, aircraft noise is readily identifiable as intrusive. This is particularly true of military aviation, which uses powerful and unmuffled jet engines. Navy jet operations have particularly intrusive characteristics because they are tailored to the need to land on an aircraft carrier.

15. Human sensation of sound involves two characteristics, frequency and intensity. Frequency is the number of times per second the air vibrates. For example, low frequency sounds may be described as a rumble, where a high frequency sound may be described as a screech.

16. Sound intensity is measured in a logarithmic unit known as a decibel ("db"). The threshold of pain is 120 dB. Because decibels are logarithmic and not linear, comparing sound

levels is not a matter of simple addition or subtraction. If a sound's intensity is doubled, the increase is 3 dB. In other words, doubling of 60 dB DNL is 63 dB DNL, not 120 dB DNL.

17. An important factor when measuring average sounds over a period of time is the time-average sound level, which is dominated by the louder sound levels during the averaging period. For example, a 100 dB sound for 30 seconds followed by a 50 dB sound for another 30 seconds produces a time-average sound of 97 dB for the 60-second period. This becomes important to explain Day-Night Average Sound Levels. The DNL takes into consideration both the maximum sound level and the sound exposure level over an entire 24-hour period.

18. In measuring sounds for environmental impact, the Department of Defense, the FAA and the EPA have specified that the universally recognized DNL metric should be used. Maximum sound level measures the highest sound level during a sound event, such as an aircraft overflight. Sound exposure level ("SEL") measures both the sound level and duration of a <u>single</u> sound event normalized at one second. Lmax is a measure of the peak sound of a single noise event.

19. Noise affects people and the environment in a number of ways. A number of health effects are associated with environmental noise. The best defined of the health effects is noise-induced hearing loss. Based on scientific research and Federal workplace guidelines, a day-night average of 75 dB DNL is the threshold at which hearing loss could occur from aircraft noise. This is consistent with findings of both the EPA (which suggests using 70 dB DNL) and the National Academy of Sciences Committee on Hearing, Bioacoustics and Biomechanics (75 dB DNL). Long-term noise exposure has also been associated with non-auditory health effects, such as cardiovascular problems, low birth weight and mortality rates. Those effects manifest themselves at the same noise levels as hearing loss (75 dB DNL). There is a growing body of

evidence that chronic exposure to aircraft noise can also result in learning deficits among school children. Several studies have documented reading deficits, impaired cognitive abilities and impaired speech perception among children living in close proximity to airports.

20. Another prominent effect of aircraft noise is community annoyance. Repeated studies have shown a high correlation between noise exposure and annoyance of groups of people. While noise levels of 55 – 60 dB DNL have been proposed (and could be used) as the threshold of community annoyance, average noise level of 65 dB DNL has been more generally used. This level is also (1) the level at which aircraft noise normally dominates other ambient noise sources, (2) the threshold for grant-in-aid funding of airport noise mitigation projects, (3) the ceiling level established by both HUD and the Veterans Administration for federally guaranteed home loans and (4) the level chosen as incompatible with residential use by the Navy's AICUZ program. The Federal Interagency Committee on Noise (FICON) reported that an increase of 1.5 db in noise merits detailed environmental review when the DNL is between 60 and 65. A DNL noise level between 60 and 65 is incompatible with residences that are poorly insulated against sound or those that are designed for extensive outdoor activities.

21. Other common effects of noise-induced community annoyance are speech interference, sleep interference and vibration of structures and objects. Of these, speech interference from aircraft noise is the primary cause of annoyance. Aircraft noise disrupts routine daily activities such as conversation, television or radio, reading, work and telephone use. It disrupts more formal speech settings such as in the classroom or office. This often leads to fatigue and vocal strain for those who must speak above the aircraft noise. Indoor noise levels in excess of 60 dB interferes with speech communication.

22. Aircraft noise is particularly disruptive to sleep. Sleep interference manifests itself in awakening, sometime referred to as "arousal", and in changes in "sleep stage" in which the subject shifts from one stage of sleep to another. The EPA has identified a sound level of 45 dB DNL and below as necessary to protect against sleep interference. Quality sleep is a requisite to good health.

23. Vibration of structures and objects is also a source of annoyance. While high noise levels lasting for more than one second are likely to damage structures, secondary vibration of objects in a house can occur at much lower noise levels. Vibration of pictures, dishes and other objects contribute to annoyance and fear of breakage.

24. Using the generally accepted scientific understanding of environmental noise and its measurement, the Navy in the EIS then evaluated the noise impact to the properties around Oceana.

25. As part of AICUZ (Air Installation Compatible Use Zones), the Navy developed a table of compatible land uses at various levels of noise exposure. Noise levels of 65 dB DNL and above are deemed to be incompatible with residential use. The AICUZ in effect in 1998 (from a regulation issued in 1988) discouraged residential use in zones of 75 dB DNL and above.

26. One of the most immediate and significant effects that aircraft noise has on surrounding property is a reduction in market value. The Federal Aviation Administration recognizes that a wealth of economic studies lead to the conclusion that increased aircraft noise lowers property values. Indeed, Congress has long-recognized that proximity to an airport, with the attendant noise and other intrusions, depreciates the value of surrounding property. There, the Federal Interagency Committee on Noise ("FICON") reports that the Housing and Urban Development Act of 1965 charged HUD with the task "to determine feasible methods of

reducing the economic loss and hardships suffered by homeowners as a result of the depreciation in the value of their properties following the construction of airports in the vicinity of their homes."

27. On May 18, 1998, the Department of the Navy selected ARS-2 and decided to transfer 9 squadrons of F/A-18s (model C/D), plus the Fleet Replacement Squadron, from Cecil Field to NAS Oceana, a total of 156 F/A-18s.

28. One squadron of F/A-18s was already stationed at Oceana prior to the closure of Cecil Field. In late 1998 the first of the 156 additional F/A-18 flights began to arrive at NAS Oceana from Cecil Field. The transfer was complete by July, 1999.

29. The total operations at Oceana increased from the 1997 baseline of 108,897 to the 1999 projection of 218,631, an increase of 101%. In 1997 Oceana conducted 54,088 touch-and-go operations and no FCLPs. In 1999, Oceana was projected to conduct 116,656 touch-and-go operations, an increase of 115%, and 2,720 FCLP.

30. The F/A-18 is the loudest aircraft to have flown at NAS Oceana. Measured in decibels, the single event noise exposure (SEL) for the F/A-18 is significantly louder than the F-14, the other principal aircraft flying at NAS Oceana at the time of the transfer.

| **Aircraft** | **FCLP @ 1,000 ft.** | **Approach** | **Departure** |
|---|---|---|---|
| F-14 B/D | 95 dB | 87 dB | 108 dB |
| F/A-18 C/D | 108 dB | 109 dB | 117 dB |

(SJ Ex.37).

31. Subsequent to the arrival of the 156 F/A-18 C/Ds, the Navy transferred the louder Super Hornet F/A-18 E/Fs to NAS Oceana to replace the F-14s as they are retired from service.

These aircraft began arriving at NAS Oceana in Fall 2004 and have continued to arrive. Using the same measures, the F/A-18 E/F generates the following noise:

| **Aircraft** | **FCLP @ 1,000 ft.** | **Approach** | **Departure** |
|---|---|---|---|
| F/A-18 E/F | 113 dB | 114 dB | 117 dB |

As a result, the noise exposure to the homeowners surrounding Oceana has only grown worse.

32. The increased operations from these very loud aircraft caused significant impact on the people and the properties surrounding NAS Oceana. The number of citizen complaints to the AICUZ office at NAS Oceana, which had remained relatively steady for more than twenty years at an average of 402 complaints per year, spiked to all time highs of 1,789 in 1999, and 2,326 in the year 2000.

33. The increased operations specifically had a significant impact on the subject properties and the lives of the 12 property owners, as is evident from their testimony.

34. <u>409 Pallets Road</u> - Betty Capps and her husband lived in Virginia Beach from 1981 through 2005. Mrs. Capps never had any difficulty or indeed paid any attention to the jet noise at her home until after the F/A-18s arrived in 1999. She estimates that of the jets that fly in the general direction of her house, approximately 40% pass directly over her house now. Since the F/A-18s arrived, she cannot conduct phone conversations or hear the television. She also wore earplugs when outside until a doctor told her to stop wearing them because they irritated her ears to the point of bleeding. Vibration has also been a serious problem. Mr. and Mrs. Capps moved to Chesapeake, Virginia in 2005, solely because of the intolerable jet noise.

35. <u>1301 Brant Road</u> - Sara Hoag resumed her maiden name of Lynch in August 2003. Ms. Lynch moved into her present home in 1990. Since the arrival of the F/A-18s the jets fly directly over her home “very frequently” both during the day and the evening. If the jets are

flying she cannot keep her windows open, cannot hear the television and cannot enjoy her yard or anything outdoors. She is also subject to a great deal of vibration. Ms. Hoag is blind. She cannot listen to her CDs or her books on tape when the jets are flying, despite the fact that she wears headphones when listening to books on tape.

36. 1856 Pathfinder Drive - Mr. and Mrs. Ryan have lived at their house since 1996. Before they bought that home they went into the neighborhood 10-15 times and never noticed any objectionable noise. Prior to their present home, they lived on 23rd Street and experienced overflights from both F-14s and A-6s. Starting in the summer of 1999, the noise at their home became "unbearable ." They cannot talk on the phone or hear the TV and the noise wakes them up at night. Starting in the summer of 1999, the Ryans estimate that of the flights that fly near their neighborhood 46-48% fly directly over their house.

37. 305 Corvette Lane - Mr. and Mrs. Van Nostrand have lived in their present house since 1967, almost forty years. Mrs. Van Nostrand testified that prior to the arrival of the F/A-18s they were comfortable with the location of Oceana and with whatever small amount of jet noise they were subject to. The noise became a major problem in 1999 when the F/A-18s arrived. In the summer of 1999, the noise got really bad. Telephone conversations would have to stop and television could not be heard.

38. 925 Lamplight Lane - Kenneth Hill retired from active duty in the Navy and is a civilian employee at the Norfolk Naval Shipyard. The Hills have lived in their home since 1992. They have always heard jets from Oceana but overflights are now an even more regular occurrence. Mr. Hill describes the sound of the F/A-18s as a "thunder ." Since the arrival of the F/A-18s no volume control on his television can turn it up loud enough to be heard, and when he

is in his yard he has to put his fingers in his ears because it actually is painful. His house has also been subject to a good deal of vibration.

39. 2004 Brickell Court - Mr. Levenson is retired. The Levenson's bought their home in 1986. Since 1986 they have been aware of jet noise from Oceana, and the planes have flown near their house when the wind was blowing from a particular direction. Until the arrival of the F/A-18s the jet noise was not "interrupting" or "interfering ." Today the pilots fly directly over their house or sometimes 100-400 feet on either side. When the F/A-18s are flying near his property it is difficult to have a conversation or to talk on the telephone or to hear the television. In fact, he uses headsets so that he can watch TV or listen to the radio. Mr. Levenson is also a founding member of CCAJN and believes that the F/A-18s have suppressed the natural increase in the value of his property.

40. 2244 Windy Pines Bend- Mr. and Mrs. Waterman moved into their present home in 1993. Mr. Waterman is retired. Prior to the arrival of the F/A-18s the noise from Oceana was bearable and "not bad ." Today the aircraft often pass both close by their house and directly over their home. The percent of such flights directly overhead has increased. Since the arrival of the F/A-18s they cannot conduct a conversation in their yard and cannot continue a conversation on the phone inside their house or hear the radio or television. In addition their home has been subject to vibration.

41. 1505 Loganberry Court - Mr. and Mrs. Riddick built their home in 1992. They were not bothered by any jet noise until 1999. At that time Mr. Riddick was outside with his grandson and a plane flew directly overhead. The child was scared by the loudness and they had to go inside the house. Since 1999 their whole house shakes at times, they cannot hear the television and they have to stop talking on the telephone. The number of planes that fly directly

over their house has increased since the arrival of the F/A-18s. Mr. Riddick has also replaced all the windows in his home, in part, to attempt to mitigate the noise.

42. 912 Carolina Avenue - Theodore Dingle and his ex-wife purchased their home in Virginia Beach in 1983. Mr. Dingle joined the Navy in 1974 and often was away from home on active duty. During the 1990s, after he separated from his wife, the house at 912 Carolina Avenue was often rented, including for the period when the F/A-18s arrived. He states that the noise since the F/A-18s arrived is "extremely noticeable" compared to the early 1990s. He describes the "intensity" of the noise level as "vastly increased" from prior to the time that the F/A-18s arrived.

43. 620 Little Neck Road - Eileen May is a widow who has lived in her present home since 1996. She was not bothered by the jet noise at all until the F/A-18s arrived. The jets now fly directly over her house as well as in front and in back of her house. The noise prevents her from enjoying her pool, gardening or doing anything outside. When the jets are flying she has to come inside her house because it's "ear piercing and it's just annoying."

44. 2709 East Kings Road - Carroll Lindsay and his wife Brenda have lived in Virginia Beach since 1994. Mr. Lindsay testified that the noise became "intolerable" after the arrival of the F/A-18s in the fall of 1998. He cannot even hear his wife when he is trying to talk to her in their yard. The jets fly low over his house, close to the top of the trees, sometimes directly over and sometimes to the left or right of the house. Mr. Lindsay has sought, but has been unable to afford, mitigation measures to his house for the noise.

45. 3209 Chicory Court - Michael Leary is retired after 20 years active duty in the Navy. Prior to the arrival of the F/A-18s, the Learys and their children had no difficulty with the jet noise, but beginning in 1999 the noise became louder. It was a "dramatic difference ." The

planes often fly directly over their house or immediately adjacent to it. He describes the effect of the planes when they are operating as "constant bombardment." His home has also been subject to a vibration problem since the F/A-18s arrived.

46. The testimony of other witnesses who live near the subject properties corroborates the Plaintiffs' testimony.

47. Thomas Askins - Thomas Askins has lived at 879 Winwood Drive in Virginia Beach since 1976. He lives near the homes of Plaintiffs Capps and Levenson. He retired as an airline pilot from Trans World Airlines after 32 years and prior to that time he was a pilot in the United States Navy. Both from his service in the Navy and from his living near Oceana for 30 years, he is familiar with the planes that have flown from Oceana including the A-6, the F-4, the F-14 and F/A-18. Starting in 1999 the noise became very loud and "and I mean it's so loud that you just can't function." In his opinion the A-6 and the F-4 were louder than the F-14 but the loudest plane of all is the F/A-18. "I don't know of any airplane that is that loud. Maybe the Concorde." Mr. Askins is not a plaintiff in this case but is a member of CCAJN.

48. John Shick - John Shick is a retired Captain in the United States Navy whose home in Virginia Beach is not far from Plaintiff Levenson and is about 1.5 – 2 miles from Oceana. He has lived there since the 1980s. In the 1980s his home experienced overflights by both A-6s and some F-14s. He had no complaints about the noise over his house until the arrival of the F/A-18s. He then purchased a noise meter and has measured the sound level of the F/A-18s C/D when they were flying patterns over his house between 108 and 110 dB. He has also made measurements of the Super Hornets (F/A-18 E/F) in the same location and they are above 120 dB. During the period from late 1998 through mid-1999 as the squadrons of F/A-18s were arriving in Oceana the noise became progressively more disturbing and more annoying, and

became an increasing problem “both for the community and noticeably in my home and my neighborhood.” He was a founding member of CCAJN which was organized prior to the issuance of the Cecil Field EIS. Captain Shick is not a plaintiff in this litigation.

49. Herk Stokely - Herk Stokely and his family have lived in their home near Oceana since 1967. Mr. Stokely was a pilot in the Navy in the 1960s and after he left active duty he flew in the Reserves, out of Oceana, mostly in A-4 jets. He has flown all the patterns at Oceana. After active duty he worked as an aeronautical engineer at the Naval Aviation Depot in Norfolk from which he retired. His home is near Plaintiffs Capps and the Levenson. Mr. Stokely is not a plaintiff in this case, but he is a member of CCAJN. The most dramatic noise event that he can recall since 1967, before the arrival of the F/A-18s, was the preparation for the First Gulf War in 1991 which involved constant deployment preparation of A-6 and F-14 aircraft. It was very loud and constant for a relatively short period of time. Mr. Stokely knows that the planes from Oceana fly far outside the patterns because his home is quite distant from the oval FCLP patterns, but planes regularly fly directly over his house and even beyond his house. Despite the fact that the published pattern calls for a maximum altitude of 1,000 feet, he has regularly triangulated the altitude of planes near his home at 600 - 800 feet. Prior to the arrival of the F/A-18s, almost all FCLPs were flown at Fentress. Although the EIS predicted a very small number of FCLPs at Oceana following the move, in fact, there have been substantial and increasing numbers of FCLPs at Oceana. Indeed Mr. Stokely asked the commanding officer of Oceana, Captain Zobel, why this was happening and Captain Zobel advised that there had already been 20,000 FCLPs flown in Oceana for that year. The planes also fly over his house when they perform touch and go operations. Mr. Stokely regularly works in his garden and uses

earmuff type noise suppressors. He has purchased a competent decibel meter and has recorded noise levels as high as 117 dB in his yard.

50. Nancy Darling - Nancy Darling has lived at her home in Virginia Beach since 1993. Her home is not far from Plaintiffs Hoag (Lynch) and Dingle. Ms. Darling is a plaintiff in this case, although not part of this trial. Until the F/A-18s, arrived Ms. Darling had little or no difficulty with aircraft noise. She had no problem with phone conversations or being able to watch television or keep her windows open. Her experience changed "significantly and intolerably" when the F/A-18s were moved from Cecil Field. Since then, she cannot keep her windows open, or have a telephone conversation or conduct business outside her home. She cannot sit outside and read or garden or entertain people on the patio when the planes are flying. Sometimes the planes fly directly over her house and sometimes to one side or the other. She purchased a decibel meter and has recorded 123 dB near her home. She is considering selling her home. The only reason she would do so is the recent jet noise.

51. Louis Figari - Mr. Figari lives with his wife at a home in Virginia Beach they moved into in December 1991. Mr. and Mrs. Figari live not far from Plaintiffs Dingle and Hoag (Lynch). Mr. Figari is a commercial airline pilot with Continental Airlines and when he was in the Navy he flew the F-4 Phantom. After active duty he stayed in the Naval Reserves for 20 years. He built his present home and before he purchased the lot he paid careful attention to the noise from Oceana. The planes flying out of Oceana prior to the arrival of the F/A-18s were the A-6 and the F-14. His home is not supposed to be near a pattern. Prior to the arrival of the F/A-18s, a plane would fly over his house only very occasionally. After the arrival of the F/A-18s, the planes regularly fly directly over his house at a height of 800 – 1,000 feet. Since that time it has affected his ability to listen to radio and television and conduct conversations.

52. Carl Helvie - Carl Helvie is retired Professor Emeritus at Old Dominion University. For 28 years he lived at 421 Lake Drive in Virginia Beach which is not far from Plaintiffs Dingle and Hoag (Lynch). In December 2000 he moved from his home to Hampton, Virginia solely to get away from the jet noise. Prior to the arrival of the F/A-18s, his home was quiet and only occasionally did he hear jets at all. During the period after the arrival of the F/A-18s, overflights of his house became common and very intrusive. He could not carry on a conversation, talk on the phone, watch television or concentrate on his class work or research. Mr. Helvie is a plaintiff in the case.

53. Kimberly Johnson - Kim Johnson lived at 3220 Sugar Creek Drive in Virginia Beach, not far from Plaintiff Kenneth Hill, until 2000. She is a real estate investor and broker and her office was in her home. After the arrival of the F/A-18s she could no longer conduct business because she could no longer talk on the telephone when the planes were flying. Similarly, it was difficult or impossible to do anything outdoors. After the arrival of the F/A-18s, many more planes flew directly over her house. She is also presently chair of CCAJN. The CCAJN board has met on a number of occasions at the Levenson home and she knows from experience that the Levensons suffer loud and frequent noisy overflights.

54. Jeffrey McCreary - Mr. McCreary and his wife have lived at 804 Lord Leighton Court since 1996. That address is near Plaintiffs Capps and Levenson. Prior to 1996 they lived in a mobile home community close to Oceana, where they moved in 1976 when Mr. McCreary was an Aviation Administration Maintenance Technician at Oceana. In 1996 they moved to their present address specifically to get away from the noise and to move to a quiet neighborhood. They researched the neighborhood using maps in the library, talked to people in the neighborhood and rode their bicycles in the area. It was a quiet neighborhood until the

arrival of the F/A-18s. However, planes are now flying directly over and adjacent to their home, which had not happened before, and the effect is extremely disturbing. They have replaced all of the windows in their home and largely given up gardening which both Mr. McCreary and his wife enjoy a great deal.

55. Charles Nash - Charles Nash retired from the Navy after 22 years. He was a crew member on various patrol aircraft. When he and his family moved into their home in 1993, he reviewed an AICUZ map and determined that his home was on the outer fringes of the lowest noise zone. Between 1993 and the arrival of the F/A-18s, the noise didn't bother the Nashes. After the arrival of the F/A-18s the noise became extremely intrusive and they have replaced all of the windows in their house and added insulation to their attic. The F/A-18 is much louder than the F-14 and its noise is "piercing"… "The F/A-18 hurts." The F/A-18 is also a good deal louder than the A-6. Mr. Nash is a plaintiff in the present litigation. He lives near Test Case Plaintiffs Lindsay and Capps.

56. Robert Goodwin - Robert Goodwin spent 20 years on active duty in the Navy and then worked as a civilian with the Navy. He has lived in Virginia Beach for 29 years, near Plaintiff Levenson. The noise from Oceana aircraft became louder and louder over the period of 1998-1999 as the F/A-18 squadrons moved in. He experiences some direct overflights over his home. Between 1999 and 2002, Mr. Goodwin replaced all of the windows in his home. He rates the F/A-18 as the noisiest Naval aircraft.

57. Bonnie Youngberg - Bonnie Youngberg is a psychotherapist in Virginia Beach. From 1997 through 2002, she lived at 913 Earl of Essex Arch, not far from the Capps and the Levensons. After the arrival of the F/A-18s, the noise became so upsetting and intrusive that she sold her house. Planes were flying directly over her home, and so low that she could look

directly up and see the “belly of the plane.” She has also seen the planes fly directly overhead when she has been at Lynnhaven Mall which is even further outside the theoretical flight patterns than Ms. Youngberg’s home.

58. The fair market values of the subject properties were also negatively affected as a result of the operations at NAS Oceana after the arrival of the F/A-18s. Two appraisers testified for the Plaintiffs, Alexander Salzberg and Dennis Gruelle, MAI. Both witnesses are local appraisers in the Virginia Beach community. They appraised the subject properties and analyzed the Virginia Beach market to determine what impact, if any, the effect of increased operations had on the housing market. The Plaintiffs also presented the testimony of Dr. Jon Nelson, Professor of Economics (retired) from The Pennsylvania State University. Dr. Nelson has focused on environmental economics during his career and is the leading economist in the United States on the impact of aircraft noise on housing values.

59. Messrs. Salzberg and Gruelle appraised each of the subject properties as of July 1999, the date the parties selected as the date of taking for the purposes of this litigation. Mr. Salzberg primarily performed these appraisals, although Mr. Gruelle assisted and shares the opinions of value. The appraisals showed the following values:

| **Property** | **Appraisal** |
|---|---|
| 409 Palletts Road | $110,000 |
| 912 Carolina Avenue | $140,000 |
| 925 Lamplight Lane | $ 89,000 |
| 3209 Chicory Court | $112,500 |
| 2004 Brickell Court | $189,000 |
| 2709 East Kings Rd | $200,000 |
| 1301 Brant Road | $141,000 |
| 620 Little Neck Road | $160,000 |
| 1805 Loganberry Ct | $150,000 |
| 1856 Pathfinder Drive | $108,500 |
| 305 Corvette | $ 83,000 |
| 2244 Windy Pines | $135,000 |

60. Mr. Gruelle was primarily responsible for the market analysis, although Mr. Salzberg assisted and shares the impact conclusions reached therein. In the market analysis, Mr. Gruelle made three areas of inquiry to determine the impact on market values: (1) the literature in real estate appraisal publications regarding the impact of aircraft noise on property values, (2) the experience of real estate brokers and developers in Virginia Beach regarding their experiences in the Virginia Beach market, and (3) the sales data for houses sold in 1998 (the year prior to the date of taking) and 2001, a subsequent year. The year 2001 was selected as the after year to allow sufficient time for the market to react, but not too distant in time in order to minimize the effect of other unknown external factors.

61. Messrs. Gruelle and Salzberg compared market data for houses that were exposed to different levels of noise as identified by the various noise exposure contours from the Government's EIS: (1) < 65 dB, (2) 65 dB – 70 dB, (3) 70 dB – 75 dB, and (4) > 75 dB. The houses < 65 dB were considered the "quiet" houses or the control group.

62. Based on their investigation, Messrs. Gruelle and Salzberg opine that the aircraft noise from the 156 F/A-18s has negatively impacted the fair market value of the properties in the Virginia Beach market at the rates depicted in the following matrix:

| | $80,000 - $120,000 | $121,000 - $160,000 | > $160,000 |
|---|---|---|---|
| 65 dB – 70 dB | 5% | 5% | 10% |
| 70 dB – 75 dB | 5% | 5% | 10% |
| > 75 dB | 10% | 10% | 15% |

63. Dr. Nelson reviewed the economic analyses of aircraft noise on property values that have been conducted at various airports over the past 40 years. This review included a meta-

analysis of the findings in those studies, which showed a consistent correlation between noise exposure and reduction in market value. That meta-analysis was published in a peer-reviewed journal, Journal of Transport Economics and Policy in January of 2004. Based on this analysis, Dr. Nelson opines that there is a noise depreciation factor ("NDF") of 1% of the market value per decibel of noise increase from the noise levels before and after the arrival of the F/A-18s for after noise levels < 75dB. For noise levels > 75dB, the NDF is 1.5% per decibel increase.

64. The before and after noise exposure to the subject properties is as follows (in decibels):

| | **1997** | **1999** | **INCREASE** |
|---|---|---|---|
| Lindsey | 58.5 | 75.3 | +16.7 |
| Waterman | 59.6 | 72.8 | +13.2 |
| Levenson | 62.3 | 76.4 | +14.1 |
| VanNostrand | 56.1 | 71.3 | +15.2 |
| Riddick | 58.1 | 71.0 | +12.9 |
| Hill | 68.3 | 78.1 | + 9.8 |
| Leary | 59.4 | 73.3 | +13.9 |
| Hoag | 66.6 | 79.2 | +12.6 |
| Ryan | 56.2 | 72.1 | +15.9 |
| Dingle | 61.6 | 75.2 | +13.6 |
| Capps | 71.3 | 89.7 | +18.4 |
| May | 45.7 | 60.4 | +14.7 |

65. The amount of just compensation to which the owners of the subject properties would be entitled using the Gruelle/Salzberg analysis, except for the property of Eileen May, is as follows:

| **Property** | **Appraisal** | **Damage %** | **Damages** |
|---|---|---|---|
| 409 Palletts Road | $ 122,000 | 10% | $ 12,200 |
| 912 Carolina Avenue | $ 155,500 | 10% | $ 15,550 |
| 925 Lamplight Lane | $ 99,000 | 10% | $ 9,900 |
| 3209 Chicory Court | $ 118,500 | 5% | $ 5,925 |
| 2004 Brickell Court | $ 199,000 | 15% | $ 29,850 |
| 2709 East Kings Rd | $ 222,000 | 15% | $ 33,300 |
| 1301 Brant Road | $ 156,500 | 10% | $ 15,650 |

| | | | | |
|---|---|---|---|---|
| 1805 Loganberry Ct | $ 158,000 | 5% | $ 7,900 | |
| 1856 Pathfinder Drive | $ 114,000 | 5% | $ 5,700 | |
| 305 Corvette | $ 87,500 | 5% | $ 4,375 | |
| 2244 Windy Pines | $ 142,000 | 5% | $ 7,100 | |
| | | | | $ 147,450 |

The Wyle estimated noise exposure to Eileen May's property, < 65 dB, takes it outside the noise levels which Gruelle/Salzberg opinion. That does not mean that there has been no taking or that the value of the taking is zero. Ms. May convincingly testified that the aircraft often fly over or directly adjacent to her home and that her use and enjoyment of her property has been significantly diminished.

66. The amount of just compensation to which the owners of the subject properties would be entitled using Dr. Nelson's analysis is as follows:

| **Property** | **Appraisal** | **Before dB** | **After dB** | **Change** | **Factor** | **Damages** | |
|---|---|---|---|---|---|---|---|
| 409 Palletts Road | $110,000 | 71.3 | 89.7 | 18.4 | 1.5% | $ 30,360 | |
| 912 Carolina Avenue | $140,000 | 61.6 | 75.2 | 13.6 | 1.5% | $ 28,560 | |
| 925 Lamplight Lane | $ 89,000 | 68.3 | 78.1 | 9.8 | 1.5% | $ 13,083 | |
| 3209 Chicory Court | $112,500 | 59.4 | 73.3 | 13.9 | 1.0% | $ 15,638 | |
| 2004 Brickell Court | $189,000 | 62.3 | 76.4 | 14.1 | 1.5% | $ 39,974 | |
| 2709 East Kings Rd | $200,000 | 58.5 | 75.3 | 16.8 | 1.5% | $ 50,400 | |
| 1301 Brant Road | $141,000 | 66.6 | 79.2 | 12.6 | 1.5% | $ 26,649 | |
| 620 Little Neck Road | $160,000 | 45.7 | 60.4 | 14.7 | 1.0% | $ 23,520 | |
| 1805 Loganberry Ct | $150,000 | 58.1 | 71 | 12.9 | 1.0% | $ 19,350 | |
| 1856 Pathfinder Drive | $108,500 | 56.2 | 72.1 | 15.9 | 1.0% | $ 17,252 | |
| 305 Corvette | $ 83,000 | 56.1 | 71.3 | 15.2 | 1.0% | $ 12,616 | |
| 2244 Windy Pines | $135,000 | 59.6 | 72.8 | 13.2 | 1.0% | $ 17,820 | |
| | | | | | | | $295,221 |

67. The Court finds that both Dr. Nelson's, and Messrs. Gruelle and Salzberg's opinions, are credible. On the contrary, the Government's experts, who have opined that the increase in aircraft noise exposure has had no negative effect on property values, are not credible. The Court finds further that Dr. Nelson, and Messrs. Gruelle and Salzberg have been conservative in their estimates of impact. For example, it would cost approximately $35,000 per

house to mitigate noise under the FAA Part 150 program for civilian airports for thing such as insulated windows and doors, additional wall insulation, etc. These measures estimate the cost of making a home exposed to aircraft noise conform to the standards set by the Navy's AICUZ program. While not technically direct damages, this cost serves as a measure of the economic impact on the subject properties as a result of the F/A-18 aircraft.

68. Accordingly, the Court finds that the value of the taking may in fact be higher than the amounts expressed in the opinions of Dr. Nelson and Messrs. Gruelle and Salzberg.

**Conclusions of Law**

69. In *Argent v. United States*, 124 F.3d 1277 (Fed. Cir. 1997), the Court of Appeals for the Federal Circuit established the legal standard for determining the taking of an avigation easement in cases such as the present. The Court adopts the analysis to the findings of fact in this case. In *Argent*, the Federal Circuit stated (124 F.3d at 1282-1286)(emphasis supplied):

> Although federal courts have, by and large, required the facts of a case to match the Causby paradigm before allowing recovery, ***nothing in Causby or the intervening precedent limits a takings claim to only those facts. Indeed, overflight takings disputes defy per se rules or classification***. [citations omitted] Rather, precedent requires, consistent with the purpose of the Takings clause, a remedy for government action that singles out a private landowner to bear a disproportionate burden for a public benefit. [citation omitted] ***Thus, while the facts, reasoning, and rules of Causby have always guided this corner of takings law, they do not imprison it.***
>
> * * *
>
> ***While physical invasion of private property remains an especially notorious category of takings,*** [citation omitted] ***the law is flexible enough to recognize non-invasive Governmental action that nonetheless threatens to destroy the owner's enjoyment of his estate.***
>
> * * *

> ***[W]here, as here, plaintiffs complain of a peculiarly burdensome pattern of activity, including both intrusive and non-intrusive flights, that significantly impairs their use and enjoyment of their land, those plaintiffs may state a cause of action. [citations omitted]*** The Argents are not before this court to complain of individual flights, which may or may not pass over their property. Rather, they complain of the entire course of operation at OLF Coupeville that entails hundreds of flights per week – an allegedly constant source of noise and disruption. ***If true, this activity is a peculiar burden imposed on the Argents and their neighbors by the United States' selection of a remote site for aircraft training operations. [citations omitted]***

70. The Court finds as a matter of law that the entire course of operations at NAS Oceana constitutes a peculiarly burdensome pattern of activity that entails hundreds of flights per week at low altitudes over or near the subject properties. This peculiar burden has been imposed on the Plaintiffs and their neighbors by the Government's selection of NAS Oceana as the place to assign the 156 F/A-18 aircraft.

71. The Court finds further as a matter of law that this pattern of activity significantly impairs the use and enjoyment of the subject properties. As a result, the Court finds that the Government has taken an avigation easement over the subject properties to conduct up to 218,631 operations per year (including no more than 119,376 touch-and go/FCLP operations) of military aircraft that generate noise up to the decibel levels of the F/A-18 C/D, at an altitude of 1,000 feet or higher.

72. The Court finds further as a matter of law that the following individuals owned the respective properties as of July 1999, the date of taking:

| **Property** | **Owner(s)** |
|---|---|
| 409 Palletts Road | Mr. and Mrs. Capps |
| 912 Carolina Avenue | Theodore Dingle |
| 925 Lamplight Lane | Mr. and Mrs. Hill |
| 3209 Chicory Court | Mr. and Mrs. Leary |
| 2004 Brickell Court | Mr. and Mrs. Levenson |

| | |
|---|---|
| 2709 East Kings Rd | Mr. and Mrs. Lindsay |
| 1301 Brant Road | Sara Hoag |
| 1805 Loganberry Ct | Mr. and Mrs. Riddick |
| 1856 Pathfinder Drive | Mr. and Mrs. Ryan |
| 305 Corvette Lane | Mr. and Mrs. Van Nostrand |
| 2244 Windy Pines Bend | Mr. and Mrs. Waterman |
| 620 Little Neck Road | Eileen May |

73. The Court finds further as a matter of law that the following individuals are entitled to just compensation in the respective amounts:

| **Owner(s)** | **Just Compensation** |
|---|---|
| Mr. and Mrs. Capps | ____________________ |
| Theodore Dingle | ____________________ |
| Mr. and Mrs. Hill | ____________________ |
| Mr. and Mrs. Leary | ____________________ |
| Mr. and Mrs. Levenson | ____________________ |
| Mr. and Mrs. Lindsay | ____________________ |
| Sara Hoag | ____________________ |
| Mr. and Mrs. Riddick | ____________________ |
| Mr. and Mrs. Ryan | ____________________ |
| Mr. and Mrs. Van Nostrand | ____________________ |
| Mr. and Mrs. Waterman | ____________________ |
| Eileen May | ____________________ |

Dated: September 26, 2006

Respectfully submitted,

/s/ Jack E. Ferrebee

Jack E. Ferrebee
Hofheimer/Ferrebee, P.C.
1060 Laskin Road, Suite 12-B
Virginia Beach, Virginia 23451
(757) 425-5200
jferrebee@hoflaw.com

Counsel of Record for Plaintiffs

Of Counsel:

Kieron F. Quinn
Martin E. Wolf
Quinn, Gordon & Wolf, Chtd.
102 W. Pennsylvania Avenue
Suite 402
Towson, Maryland 21204
(410) 825-2300
kfquinn@quinnlaw.com
mwolf@quinnlaw.com

Charles R. Hofheimer
Kristen D. Hofheimer
Hofheimer/Ferrebee, P.C.
1060 Laskin Road, Suite 12-B
Virginia Beach, Virginia 23451
(757) 425-5200
chofheimer@hoflaw.com
khofheimer@hoflaw.com

Thomas Shuttleworth
Stephen C. Swain
Lawrence Woodward
Charles B. Lustig
Shuttleworth, Ruloff, Giordano & Swain
4525 South Blvd., Suite 300
Virginia Beach, Virginia 23452
(757) 671-6000
tshuttleworth@srgslaw.com
sswain@srgslaw.com
lwoodward@srgslaw.com
clustig@srgslaw.com