**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| CAROL AND ROBERT TESTWUIDE, et. al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 01-201L |
| v. | ) | |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | Judge Victor J. Wolski |
| Defendant. | ) | |

**DEFENDANT'S PRETRIAL**
**MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

Dated: September 28, 2006

Respectfully Submitted,

STEVEN D. BRYANT
KELLE S. ACOCK
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington, DC 20044-0663
Email: steven.bryant@usdoj.gov
Voice: (202) 305-0424
Fax: (202) 305-0267

Of Counsel:

Robert J. Smith
Mary Raivel
Navy Litigation Office
Washington Navy Yard, D.C. 20374

CDR Dominick Yacono
JAGC, USN
Commander Navy region
Mid-Atlantic, Code (00LE)
Norfolk, VA 23511-2737

## TABLE OF CONTENTS


Table of Authorities . . . . . . . . . . iii-iv

LIST OF EXHIBITS . . . . . . . . . . vi-vii

INTRODUCTION . . . . . . . . . . 1

SUMMARY OF ARGUMENT . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . 4

I. Naval Air Station Oceana . . . . . . . . . . 4

II. NAS OCEANA Aircraft Operations . . . . . . . . . . 5

A. Annual Operations . . . . . . . . . . 5

B. NAS Oceana Runaways . . . . . . . . . . 6

C. Flight Procedures . . . . . . . . . . 7

D. Aircraft Operations at Test Plaintiff Properties . . . . . . . . . . 10

1. Group 1 (Capps, Hill, Hoag, and Dingle Properties) . . . . . . . . . . 11

a. Capps/Hill Properties . . . . . . . . . . 11

b. Hoag/Dingle Properties . . . . . . . . . . 11

2. Group 2 (Leary, Riddick, Levenson, Lindsay, Van Nostrand, and Waterman Properties) . . . . . . . . . . 12

a. Leary/Riddick Properties . . . . . . . . . . 12

b. Levenson Property . . . . . . . . . . 13

c. Lindsay Property . . . . . . . . . . 13

d. Van Nostrand Property . . . . . . . . . . 14

e. Waterman Property . . . . . . . . . . 15

3. Group 3 (May and Ryan Properties) . . . . . . . . . . . . . . . . . . . . . 15

a. May Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

b. Ryan Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

E. Aircraft Flown at NAS Oceana . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

F. Analysis of Historic Noise Studies at the Test Plaintiff Properties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

III. Test Plaintiffs Fail To State An Overflight Takings Claim In July 1999 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

A. *Causby* Provides The Elements For Proving An Overflight Taking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

B. The Flight Activity At The Group 2 and Group 3 Test Plaintiff Properties Does Not Establish An Overflight Taking Under Causby . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

C. Substantial Interference with Use and Enjoyment . . . . . . . . . . . . . . . . . 24

D. The Unique Circumstances In Branning and Argent Are Not Present at NAS Oceana . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

IV. Test Plaintiffs Claims Are Barred By The Statute of Limitations . . . . . . . . . . . 28

A. Legal Standard For The Statute of Limitations In An Overflight Takings Case Where There Is Prior Overflight Interference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

B. The Statute of Limitations Began To Run In 1981 When Aircraft Operations Far Exceeds Those in 1999 . . . . . . . . . . . . . . . . . . . 29

C. Plaintiffs Cannot Prove A Second Taking In 1999 . . . . . . . . . . . . . . . . . 31

1. Same Flight Path And Same Elevation . . . . . . . . . . . . . . . . . . . . 32

2. Same or Greater Number of Flights . . . . . . . . . . . . . . . . . . . . . . 32

3. Noise Level of NAS Oceana Aircraft . . . . . . . . . . . . . . . . . . . . . 34

4. Permanent Intent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

5. The Test Plaintiff Properties Have Not Depreciated . . . . . . . . . 36

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

# TABLE OF AUTHORITIES

## CASES

A.J. Hodges Industries, Inc. v. United States,
355 F.2d 592 (Ct. Cl. 1966) . . . . . . . . . . 28

Aaron v. United States,
340 F.2d 655 (Ct. Cl. 1964) . . . . . . . . . . 22, 36

Alder Terrace, Inc. v. United States,
161 F.3d 1372 (Fed. Cir. 1998) . . . . . . . . . . 29

Argent v. United States,
124 F.3d 1277(Fed. Cir. 1997) . . . . . . . . . . 27

Avery v. United States,
330 F.2d 640 (Ct. Cl. 1964) . . . . . . . . . . 31, 32

Bacon v. United States,
295 F.2d 936 (Ct. Cl. 1961) . . . . . . . . . . 32

Boardman v. United States,
180 Ct. Cl. 264 (1967) . . . . . . . . . . 31

Branning v. United States,
228 Ct. Cl. 240, 654 F.2d 88 (1981) . . . . . . . . . . 2, 16, 26

Davis v. United States,
No. 02-746, 2006 U.S. Claims LEXIS 277 at 31 (September 15, 2006) . . . . . . . . . . 21

Davis v. United States,
155 Ct. Cl. 418 (1961) . . . . . . . . . . 22

Klein v. United States,
152 Ct. Cl. 221 (1961) . . . . . . . . . . 32

Lacey v. United States,
219 Ct. Cl. 551 (1979) . . . . . . . . . . 28, 31

Persyn v. United States,
34 Fed. Cl. 187 (1995) . . . . . . . . . . 31, 33

Powell v. United States,
1 Ct. Cl. 669 (1983) . . . . . . . . . . 28, 31

Robertson v. United States,
173 Ct. Cl. 621 (1965) . . . . . . . . . . 31

Speir v. United States,
485 F.2d 643 (Ct. Cl. 1973) . . . . . . . . . . 31

Stephens v. United States,
11 Cl. Ct. 352 (1986) . . . . . . . . . . 21, 22

Testwuide v. United States,
56 Fed.Cl. 755 (Fed.Cl. 2003) . . . . . . . . . . 28

Town & Country Motor Hotel v. United States,
180 Ct. Cl. 563 (1967) . . . . . . . . . . 31

United States v. Causby,
328 U.S. 256 (1946) . . . . . . . . . . 1, 22

**STATUTES**

28 U.S.C. § 2501 . . . . . . . . . . 3, 29
28 U.S.C. §1491 . . . . . . . . . . 40

**REGULATIONS**

14 CFR Part 36 . . . . . . . . . . 35

# LIST OF EXHIBITS

| EXHIBIT NO. | EXHIBIT DESCRIPTION |
|---|---|
| Exhibit A | Plaintiffs' Answers to Interrogatory No. 2 |
| Exhibit B | DX 691 - "Table 1" attached to Capt. Riley's declaration as an FRE 1006 summary of the ATARs |
| Exhibit C | DX 444 - Excerpt from Wyle Report 02-08, Table 3.1.1-1. Annual Basic Operations at NAS Oceana for Baseline and Table 3.1.3-1 Modeled Runway and Flight Track Percentages at NAS Oceana and NALF Fentress |
| Exhibit D | DX430 - Revised Report of Dr. Sanford Fidell, 29 March 2006 and Table 1, Summary of estimated aircraft noise exposure (DNL), in dB) at test plaintiffs' homes; Table 2, Identification and geographic coordinates of Plaintiffs' homes; Historical Newspaper and other Accounts of Adverse Community Reaction to Aircraft Noise at NAS Oceana |
| Exhibit E | DX 197 - Excerpts from 1975 AICUZ Plan, NAS Oceana |
| Exhibit F | Deposition Testimony of Harold Levenson |
| Exhibit G | Deposition Testimony of Carroll Lindsay |
| Exhibit H | Deposition Testimony of Herbert Van Nostrand |
| Exhibit I | Deposition Testimony of Michael J. Leary |
| Exhibit J | Deposition Testimony of James E. Riddick |
| Exhibit K | Deposition Testimony of Eddie Waterman |
| Exhibit L | Deposition Testimony of Sean M. Ryan |
| Exhibit M | JX093 - Various e-mails in 2000, regarding termination of FCLP shift from Fentress to NASO. |
| Exhibit N | DX142.1 - Excerpts from HMMH |
| Exhibit O | DX434 - Allowances and Location of Navy Aircraft |

| | |
|---|---|
| Exhibit P | DX584 - Excerpts from Expert Report of David Dale-Johnson, Ph.D., including Pages 1, 3, 4, 5 and Pages 13 through 18 (paragraphs 26-41) and Exhibits 2, 4 and 8 |
| Exhibit Q | DX173 - Excerpts from Rebuttal Report of David Dale-Johnson, Ph.D. |
| Exhibit R | DX585 - Excerpts from Expert Report of Henry J. Wise |
| Exhibit S | PX300 - Excerpts from Expert Supplemental Report of Henry J. Wise |

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| CAROL AND ROBERT TESTWUIDE, et. al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 01-201L |
| v. | ) | |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | Judge Victor J. Wolski |
| Defendant. | ) | |

## DEFENDANT'S PRETRIAL MEMORANDUM OF CONTENTIONS OF FACT AND LAW

## INTRODUCTION

Plaintiffs' takings claim stems from the reassignment of nine Navy F/A-18 C/D (Hornet) squadrons and the Fleet Replacement Squadron, a total of 156 jets, from Cecil Field, Florida to Naval Air Station ("NAS") Oceana in Virginia Beach, Virginia. Plaintiffs allege that the noise produced by the Hornets has substantially interfered with the use and enjoyment of their properties, and has resulted in an overflight taking in July 1999. Eight related complaints[1] were consolidated and are proceeding with test cases. The first test case includes 12 residential properties surrounding NAS Oceana.

## SUMMARY OF ARGUMENT

To prevail, the test plaintiffs must establish all of the elements of an overflight taking as stated in United States v. Causby, 328 U.S. 256 (1946) – low and frequent direct overflights that substantially interfere with the use and enjoyment of the property. To determine if there have been the requisite low and frequent overflights to support a taking at a test plaintiff property, one must analyze flight paths, runway use, and the

[1] There are approximately 3400 plaintiffs who own nearly 2100 primarily residential properties in Virginia Beach and Chesapeake, Virginia in the related cases. The original Testwuide v. United States complaint was filed on April 5, 2001.

number of aircraft operations at NAS Oceana. Plaintiffs have failed to conduct such an analysis themselves, and cannot satisfy the Causby test by relying on the data provided by the United States, and therefore cannot meet their burden of proving an overflight taking.[2]

Instead, plaintiffs attempt to rely on the limited exception to Causby created by the Court of Claims and the Federal Circuit in Branning v. United States, 228 Ct. Cl. 240, 654 F.2d 88 (1981), and Argent v. United States, 124 F.3d 1277, 1278 (Fed. Cir. 1997), respectively, for "peculiarly burdensome" flight activity.[3] However, that limited exception does not apply to this case because the United States Navy ("Navy") did not selectively burden the test plaintiff properties with the intense field carrier landing practice ("FCLP") training regime found in those cases.

Even assuming any of the test plaintiffs could establish an overflight taking, those claims are time-barred. Navy jets have flown at NAS Oceana for many decades, and the flight paths in relation to the test plaintiff properties have remained essentially unchanged since at least 1979. Moreover, the number of flights in the 1980s and early 1990s has been comparable to or exceeded the number of operations in 1999 as reflected in Air Traffic Activity Reports ("ATARs"). Thus, to the extent that any of the test plaintiff properties has ever been exposed to overflights sufficiently low and frequent to support

[2] As discussed, *infra*, defendant will demonstrate at trial that the test plaintiff properties can be divided into three groups based on an analysis of NAS Oceana's historic flight paths, runway use, and aircraft operations. The Group 1 (Capps, Hill, Hoag, and Dingle) properties have been exposed to the most flight activity. The Group 2 (Leary, Riddick, Levenson, Lindsay, Van Nostrand, and Waterman) and Group 3 (May and Ryan) properties have not been exposed to low and frequent operations and therefore cannot establish an overflight taking.

[3] Although Branning and Argent involved peculiarly burdensome aircraft activity, the decisions are nevertheless erroneous attempts at expansion of overflight takings law in that they countenance a finding of an overflight taking in situations where the clear elements of liability set forth in Causby are not present. Defendant notes its disagreement with the decisions in Argent and Branning, for the purpose of preserving the possibility of arguing to the court of appeals that the reasoning in those cases was in error.

an overflight taking, the avigation easement would have been acquired at least as early as 1981 when there were approximately 232,000 operations in contrast to the 133,000 operations in 1999. Consequently, the mandatory six-year statute of limitations, 28 U.S.C. § 2501, bars test plaintiffs' claims.

To overcome the statute of limitations, plaintiffs must establish a second, incremental overflight taking in July 1999. To do so, plaintiffs would have to show that the F/A-18 C/D is substantially louder than all of the predominant aircraft in 1981, and that the number of overflights in 1999 were at least comparable to the number of overflights in 1981. However, even assuming the Hornet is substantially louder than all of the other predominant aircraft in 1981, which defendant does not concede, a second, incremental taking could not have occurred because there were approximately 100,000 more operations in 1981 as compared to 1999.[4] Thus, plaintiffs will be unable to prove a second, incremental taking.

Finally, a property's value must be diminished to prove a second, incremental taking. The F/A-18 C/Ds' arrival has not adversely impacted the test plaintiffs' property values. Both statistical analyses of Virginia Beach sales and an individual appraisal analysis demonstrate that the test plaintiff property values were not negatively impacted by the NAS Oceana F/A-18 C/Ds. Therefore, following trial, judgment should be entered in favor of the United States.

---

[4] A second incremental taking also can occur if the number of operations remained comparable, but the altitude of flights was significantly reduced. Alternatively, a substantial increase in operations can result in a second incremental taking. None of these factors are present when comparing 1981 and 1999 flight operations.

## STATEMENT OF FACTS

### I. Naval Air Station Oceana

Captain (retired) Thomas Keeley, a former NAS Oceana commanding officer and Naval Flight Officer with over 3,000 hours of flight time who was assigned to NAS Oceana at various times from 1979 to 2005, will testify, inter alia, regarding the base's history, the types of aircraft at NAS Oceana, and historical flight operations in relation to the test plaintiff properties.[5] As Captain Keeley will explain, NAS Oceana was commissioned on August 17, 1943, and designated a Master Jet Base in 1957. Since then NAS Oceana has served as the home of the Navy's tactical jet aircraft. The mission of all NAS Oceana squadrons is to be prepared for sustained combat operations from the sea, in support of our Nation's interests. Captain Keeley will discuss the FCLP training at nearby Naval Auxiliary Landing Field ("NALF") Fentress that is necessary to prepare for operating from an aircraft carrier at sea. FCLPS are touch-and-go operations performed on a runway designed to simulate landing on an aircraft carrier. NALF Fentress was established in 1940 and is located southwest of NAS Oceana in Chesapeake, Virginia.

Captain Keeley will discuss the economic impact of NAS Oceana. The base is the largest employer in Virginia Beach with over 12,000 employees, a gross annual payroll of over $773 million. The base purchases approximately $400 to $500 million per year in goods and services, with a total economic impact on the Hampton Roads region exceeding $1 billion annually.

---

[5] Captain Keeley's declaration attached as Exhibit A to defendant's Motion to Dismiss and for Summary Judgment provides a brief synopsis of some of the topics he is expected to testify about at trial.

## II. NAS OCEANA Aircraft Operations

### A. Annual Operations

Captain Stephen G. Riley, III, the senior Navy Air Traffic Controller with 35 years of experience, will testify regarding how NAS Oceana counts and records flight operations.[6] Like all other naval air stations flight operations are recorded in ATARs. A flight operation is counted every time a jet touches down or departs from a runway. A single touch and go, therefore, is counted as two operations. Therefore, a single jet that conducts five touch-and-gos will be recorded as ten operations on an ATAR.

As Captain Riley will explain, until 1996, NAS Oceana ATARs were single-page forms that reflected the number of annual aircraft operations at the base.[7] Beginning in 1996, ATARs were separated into two forms. One ATAR form, "Control Tower Operations," reported the number of aircraft operations in the air space controlled by NAS Oceana's air traffic control tower. The second ATAR form, "Approach Control Operations," recorded the number of aircraft operations counted by radar room personnel. The NAS Oceana air traffic control tower air space includes a limited geographic area surrounding the air station. It extends to distances of 4.3 to 5 nautical miles away from the air station, depending upon direction, and an altitude of up to 2,500 feet. In contrast, the air space controlled by radar is far greater, extending in some cases many miles, and up to an altitude of 23,000 feet, but does not include the control tower's air space.

Plaintiffs allege a July 1999 date of taking, asserting that a dramatic increase in overflight activity – as compared to historic overflight activity – occurred at that time.

---

[6] Captain Riley's declaration attached as Exhibit B to defendant's Motion to Dismiss and for Summary Judgment provides a brief synopsis of these topics.

[7] Operations at NALF Fentress were documented in the "Remarks" section of ATARs prepared before 1996.

Testwuide Compl. ¶¶ 14-15, 17-20; Plaintiffs' Answers to Interrogatory No. 2, Exhibit A. However, as Captain Riley will testify and as reflected in his summary of the various ATARs since 1980 attached to his declaration, 1999 was a year of relatively light flight activity in the tower-controlled airspace – less than 133,000 operations – as reflected in the 1999 ATAR. Exhibit B, DX691. By comparison, in 1981 the reported number of operations was 231,753. DX691.[8] In 1982, there were close to 178,000 operations. DX691. The high operations continued between 1989 and 1995 as well, consistently approaching or exceeding 200,000 operations, including a high of over 229,000 in 1992. DX691.

From 1996 to 1998 the flight activity in the tower-controlled airspace dropped considerably. The ATARs show there were approximately 46,000, 53,000, and 77,000 operations in tower controlled airspace for 1996, 1997, and 1998, respectively.

**B. NAS Oceana Runways**

Commaner Richard S. Erie, the NAS Oceana Assistant Air Operations Officer and former flight instructor with over 2,200 hours of flight time, will describe, inter alia, the flight patterns, how aircraft fly, and their impact on the test plaintiff properties.[9] The four intersecting NAS Oceana runways are designated as Runways 5/23 Left and Right and Runways 14/32 Left and Right:

[8] As CDR Stephen Riley indicates in his declaration and will testify, the older ATARs are not precisely an "apples-to-apples" comparison with the newer (1996 and thereafter) ATARs in terms of the number of operations that occurred in the control tower's airspace. Nevertheless, the bottom line number on the older forms is a "reasonably close approximation" of the operations in the control tower's airspace that year.

[9] Commader Erie's declaration attached as Exhibit D to defendant's Motion to Dismiss and for Summary Judgment provides a brief synopsis of these topics.




As Commander Erie will explain, the runway designation depends on which direction the runway is approached, and wind direction is the primary consideration for runway use. The relative frequency of the use of each runway has remained generally the same, consistent with the following approximate percentages:[10]

Runway 5L/R – 50%
Runway 23L/R – 34%
Runway 32L/R – 14%
Runway 14L/R – 2%

C. **Flight Procedures**

As naval aviators will explain, landing an aircraft on a moving (pitching and rolling) ship is extremely difficult; at night it becomes arguably the most challenging maneuver in aviation. The fine motor skills necessary to land on an aircraft carrier safely and successfully every time requires continuous training. The landing procedures and

[10] This particular breakdown of the runway percentage use can be found in Wyle Report 02-08, the noise study supporting the Final EIS for the Introduction of the F/A-18 E/F aircraft to the East Coast of the United States. Exhibit C. DX444.

patterns are designed to mirror those used when landing on an aircraft carrier at sea, and pilots practice shipboard landing every time they land an aircraft.

Commander Erie will describe the VFR ("Visual Flight Rules") landing pattern, which is a left-hand racetrack or oval pattern oriented along a runway heading with one end of that oval being a descent to landing. At sea the landing pattern altitude is 600 feet. As a noise mitigation measure, the pattern at NAS Oceana was elevated to 1,000 feet many years ago. In general, pilots strive to recreate the "approach turn" to landing in the same manner every time, from a location 1.1 to 1.5 nautical miles abeam (directly to the side) of the intended point of landing, at 1,000 feet above ground. This is an illustration of the VFR landing pattern:



Aircraft enter the pattern by performing "the break," which means they fly upwind in the direction of the runway heading and then execute the "crosswind turn" to head downwind.[11] At NAS Oceana, "the break" is performed at an altitude of 1,500 feet. Once heading downwind, aircraft descend to a pattern altitude of 1,000 feet and decelerate as they move towards "the 180" (the point at which the aircraft begins its turn to land). "The 90" is the point halfway through the approach turn.[12]

As Captain Keeley will explain, touch-and-gos are regularly conducted because of the need for continuous training in carrier landing. As the name implies, a touch-and-go involves a practice takeoff and landing. Aircraft typically perform one to three touch-and-gos upon arrival at the station.

As noted, supra, FCLPs typically are performed at NALF Fentress, not NAS Oceana. Captain Keeley will describe the similarities between FCLPs and touch-and-gos. The geometry of the touch-and-go and FCLP patterns is the same. At NAS Oceana the pattern altitude for both touch-and-gos and FCLPs is 1,000 feet. However, as Captain Keeley will describe, there is a critical difference between touch-and-gos and FCLPs, namely the intensity and duration of FCLP's versus touch-and-go landings. An FCLP pattern can have as many as five aircraft at one time. FCLPs are prescheduled, graded training periods, that normally last approximately 45 minutes, during which each aircraft will conduct from seven to ten touch-and-gos. In contrast, an individual aircraft would

---

[11] As Commander Erie will explain, the location of the "crosswind turn" will vary depending, in part, upon the number of aircraft in the pattern, and in general, the more aircraft, the more the oval will extend.

[12] The "approach turn" will also vary, but to a lesser degree than the "crosswind turn." For example, the position of "the 180" will vary based on winds in the upwind direction. When winds in the upwind direction are light, the aircraft will have to fly a longer downwind leg before it begins its approach turn, to allow enough room for the aircraft to still have the required 15-18 seconds for the final approach heading. When this occurs the "approach turn" end of the oval will lengthen. Conversely, with higher winds in the upwind direction, the "approach turn" will occur closer to the ideal abeam position, because when the plane turns to head upwind it will require less space in which to line up for final approach.

typically perform approximately one to three touch-and-gos, and, while it is not uncommon to have more than one aircraft in the pattern performing touch-and-gos at the same time, it is generally one to three aircraft.

As noted above, Captain Keeley began flying at NAS Oceana in 1979, and he will explain that the landing pattern procedures have remained generally the same over the years. Certain flight path altitudes have been raised in the last three decades, but these changes reduced noise impacts on the ground and did not affect the nominal flight tracks or altitude that the aircraft flew when in the landing patterns. As Captain Keeley will testify, none of the changes in flight operations since at least 1979 would have affected any of the flight operations with respect to the test plaintiff properties. Moreover, notwithstanding the relative consistency of the predominant flight tracks, no two flights, even of the same aircraft flown by the same pilot, are identical; nor does each flight proceed at precisely the same altitude throughout the flight or cover precisely the same track over the ground.

**D. Aircraft Operations at Test Plaintiff Properties**

Commander Erie will describe the flight operations in relation to the test plaintiff properties based on his detailed review of NAS Oceana flight paths described below. The properties can be grouped in descending order from those that experience the most frequent and lowest altitude flight activity (Group 1) to those exposed to the least flight activity (Group 3). The Air Operations Officer at the time of the alleged taking, Commander Dirk Hebert, will confirm that Commander Erie's analysis accurately describes the flight activity in relation to the test plaintiff properties in July 1999, with

one minor exception related to the Ryan property.[13] Finally, as discussed above, Captain Keeley will testify that the flight activity in relation to the test plaintiff properties has remained essentially unchanged while he flew at NAS Oceana, as far back as 1979.

**1. Group 1 (Capps, Hill, Hoag, and Dingle Properties)**

Group 1 properties have historically experienced low and frequent overflights.

**a. Capps/Hill Properties**

When the VFR pattern was flown from Runway 5L/R, the Capps and Hill properties experienced frequent overflights. On the downwind leg, aircraft in this pattern would have regularly flown over or within approximately one-half mile of the Capps property at an altitude of approximately 1,000 feet. The Hill property is located on the approach turn for Runway 5L/R. It is just past the "180 position" and would have been routinely overflown by aircraft in the landing pattern. These aircraft would have passed directly over or within approximately one-half mile of this property at an altitude of approximately 700-800 feet as they descended into the "approach turn." In addition to overflights in the downwind pattern from Runway 5L/R, the Capps property is also underneath the VFR landing pattern for Runway 14L/R. It is near "the 90" (halfway through the approach turn), so during the roughly two percent of the time when Runway 14L/R was in use aircraft would have flown over or within approximately one-half mile of the Capps property at an altitude of approximately 450-500 feet.

**b. Hoag/Dingle Properties**

The Hoag and Dingle properties have also been exposed to low and frequent aircraft operations, though to a somewhat lesser degree than the Capps and Hill

[13] Commader Hebert's declaration attached as Exhibit F to defendant's Motion to Dismiss and for Summary Judgment addresses this.

properties. When Runway 23L/R was in use, approximately 34 percent of the time, aircraft would have routinely flown over or nearly over the Hoag and Dingle properties during the approach to landing. The aircraft would have been at an altitude of approximately 500-800 feet.

**2. Group 2 (Leary, Riddick, Levenson, Lindsay, Van Nostrand, and Waterman Properties)**

Group 2 properties have historically been exposed to flight activity, but not at both the low altitude and regularity of Group 1.

**a. Leary/Riddick Properties**

The Leary and Riddick properties are both south of Runway 5L/R and would regularly have experienced noise from aircraft landing on that runway either in the visual landing pattern or on straight in approaches; however, it would have been unusual for these properties to be overflown when a visual landing pattern was being used. Aircraft in the visual landing pattern for Runway 5L/R would have been no closer than one-half mile of these properties at an altitude of 400 to 800 feet. Aircraft on a straight in approach to Runway 5L/R would have flown within approximately one-half to one mile of these properties, at an altitude of approximately 500 to 1,000 feet, but would not normally have directly overflown the properties. When Runway 23L/R was in use both properties would have routinely been overflown on departures, but at an altitude of approximately 1,500 to 2,000 feet. Aircraft departing from Runway 23L/R to conduct FCLPs at NALF Fentress would have flown within approximately one-half mile of these properties at an altitude of approximately 1,000 feet.

b. **Levenson Property**

When Runway 5L/R was in use, aircraft in the downwind leg would routinely have flown within approximately one-half to one mile of the Levenson property at an altitude of approximately 1,000 feet. Only if aircraft were extremely wide abeam, however, would they have directly overflown the Levenson property, which would have been unusual. The Levenson property would also have experienced noise from aircraft in "the break" for Runway 5L/R, but at an altitude of approximately 1,500 feet. During the roughly two percent of the time that Runway 14L/R was being used, aircraft flying the VFR landing pattern would fly over or within one-half mile of the Levenson property during the approach turn at an altitude of approximately 450 to 550 feet. This property would also have experienced noise from aircraft departing on Runway 32L/R, which was in use roughly 14% of the time. These aircraft would climb from 1,000 to 4,000 feet and their ground track would vary greatly, so it is possible that this property may have occasionally been overflown during these operations by aircraft turning right after departure, but this would not have been a regular event.

c. **Lindsay Property**

When Runway 5L/R was in use, aircraft in the downwind leg would routinely have flown within approximately three-quarters to one mile of the Lindsay property at an altitude of approximately 1,000 feet. Only if aircraft were extremely wide abeam (even wider abeam than in the case of the Levenson property) would they have directly overflown the Lindsay property, and it would have been even more unusual for an aircraft to be this wide abeam than it would have been with the Levenson property. Additionally, aircraft entering the pattern via the break maneuver would fly a similar

ground track as above, but at 1,500 feet and at a significantly lower power setting. This property would also have experienced noise from aircraft departing from Runway 32L/R, as the aircraft climbed from 1,000 feet to 4,000 feet. The ground track of these aircraft would have varied, so it is possible that on occasion the Lindsay property may have been overflown during these operations (in the case of the Lindsay property by aircraft turning left after departure), but, based on the location of the property, any direct overflights would have been rare. During those very infrequent occasions when Runway 14L/R was in use and the airfield was also in Instrument Flight Rules ("IFR") conditions, the Lindsay property would have experienced noise from aircraft on straight-in IFR radar-controlled approaches to Runway 14L/R as they passed by at an altitude of approximately 1,000 feet, but the property would not typically have been overflown during those operations. The Lindsay property would have also experienced noise from aircraft entering the visual landing pattern for Runway 14L/R via "the break" on an infrequent basis. The aircraft conducting this maneuver would fly over or nearly over (within one-half to one mile) the Lindsay property at an altitude of 1,500 feet.

**d. Van Nostrand Property**

When Runway 5 L/R was in use, aircraft in the downwind leg would routinely have flown within approximately three-quarters to one mile of the Van Nostrand property at an altitude of approximately 1,000 feet. Only if aircraft significantly deviated from the VFR pattern would they have overflown this property. This property would also have experienced noise from aircraft in "the break" for Runway 5L/R at an altitude of approximately 1,500 feet, but would have been directly overflown only if the aircraft was extremely wide abeam, which would have been unusual. The Van Nostrand property

would also have experienced noise from aircraft departing NAS Oceana on Runway 32 L/R that turned left (toward the south) and were flying at approximately 2,000 feet while climbing to assigned altitude, but this property would not have been routinely overflown during these departures. This property would also have experienced noise from aircraft entering the visual landing pattern for Runway 14L/R via "the break" on a very infrequent basis. Aircraft in this pattern may very infrequently overfly the Van Nostrand property at approximately 1,500 feet.

**e. Waterman Property**

Aircraft may have flown over or within a mile of the Waterman property when using the IFR/radar training pattern for Runways 5L/R and 23L/R, but would have done so at an altitude of 2,000 feet. Aircraft departing Runway 5L/R on the way to NALF Fentress would have flown over or within one to two miles of the Waterman property at an altitude of approximately 1,500 feet. Aircraft departing Runway 23L/R for areas to the east may have overflown directly over or within one to two miles of this property at an altitude of approximately 1,500 to 2,000 feet as they climbed to 4,000 feet.

**3. Group 3 (May and Ryan Properties)**

Group 3 properties have been exposed to the least flight activity of the test plaintiffs with no history of routine overflights at low altitudes.

**a. May Property**

The May property is located approximately four miles away from the NAS Oceana runways, barely inside the NAS Oceana tower-controlled airspace. The May property may have experienced minimal aircraft noise when Runway 14L/R was in use, roughly two percent of the time, but these aircraft would usually have passed well south

of the property on the way to the airfield. On the very infrequent occasions when Runway 14L/R was in use and NAS Oceana was in IFR conditions, aircraft on IFR/Radar approaches to NAS Oceana would have flown within three-quarters to one mile of the property, but not over it, at an altitude of approximately 1,500 to 2,000 feet. It is also possible that aircraft flying between NAS Norfolk and NAS Oceana would have flown within one to two miles of the May property at approximately 2,000 feet, but this would have been extremely infrequent, perhaps once per month.

**b. Ryan Property**

Aircraft may have flown directly over or within a mile of the Ryan property when the IFR/radar training pattern for Runways 5L/R and 23L/R was in use, but at an altitude of 2,000 feet. This property would also have experienced noise from aircraft flying to to NALF Fentress for FCLPs after departing NAS Oceana Runway 5L/R and turning right toward the ocean; however, the aircraft would have been at an altitude of 1,500 feet and would not have routinely overflown this property.

**E. Aircraft Flown at NAS Oceana**

Captain Keeley will identify the predominant aircraft at NAS Oceana over the years. The F-4 Phantom flew from the 1960s to the early 1980s. The A-6 Intruder flew in the 1970s through the mid-1990s. The F-14 Tomcat has operated at NAS Oceana from the mid-1970s until it was retired this year, and the first F/A-18 C/D Hornet squadrons arrived at NAS Oceana in December, 1998.

Defendant's acoustical expert, Dr. Sanford Fidell, will describe the noise levels these various fighter jets produce. Dr. Fidell is a member of the Acoustical Society of America and has previously testified in Branning v. United States, as well as other cases

involving aircraft noise. Dr. Fidell has published numerous articles regarding the effects of noise on people and has directed theoretical and field research in the areas of psychoacoustics and environmental acoustics. As Dr. Fidell will explain, jets produce different noise levels for a variety of reasons, such as size, weight, design, and engine type. Exhibit D, Revised Report of Sanford Fidell, 29 March 2006, DX430, p. OCE261840. A relative comparison of the perceived[14] single event noise level produced by these aircraft can be found in NOISEMAP, the computer program relied upon by the Department of Defense to estimate noise exposure surrounding military air stations. DX430, p. OCE261828. NOISEMAP contains the most consistent and comprehensive database of field measurements of noise produced by military aircraft in various modes, including departure, approach, and pattern operations.[15] DX430, p. OCE261840. The following table provides the maximum tone-corrected PNLs for the various aircraft, which reflects the greatest single value measured in decibels ("dB") at any instant during a flyover:[16]

| AIRCRAFT | DEPARTURE | APPROACH | PATTERN |
|---|---|---|---|
| A6-A | 120.7 | 116.1 | No data |
| F-4C | 123.2 | 112.6 | 114.5 |
| F-14A | 118.2 | 102.4 | 103.2 |
| F-14B | 120.9 | 99.2 | 101.9 |
| F/A-18 C/D | 121.9 | 116.5 | 102.2 |

Aircraft single event noise levels are also measured in terms of the sound exposure level (SEL), which reflects the total energy produced in a single flyover,

[14] The most widely accepted frequency-weighting procedure for annoyance comparisons is the Perceived Noise Level ("PNL"), which accords more weight to the more annoying high frequency sound bands. DX430, p. OCE261839.

[15] The database does not have measurements for all the variant aircraft in all operations. DX430, p. OCE261840. It is common to substitute one aircraft's noise measurements for another, particularly when the aircraft share the same engines and are similar in weight. DX430, p. OCE261840.

[16] This table was extracted from the DX430, p. OCE261840.

normalized to a hypothetical one-second duration.[17] DX430, pp. OCE261839, 261848. The following table lists the tone-corrected,[18] A-weighted SELs for the predominant aircraft at NAS Oceana from the 1970s to 2000:[19]

| AIRCRAFT | DEPARTURE | APPROACH | PATTERN |
|---|---|---|---|
| A-6A | 113.7 | 110.7 | No data |
| F-4C | 116.7 | 106.8 | 108.5 |
| F-14A | 107.9 | 96.2 | 90.6 |
| F-14B | 109.8 | 94.5 | 89.7 |
| F/A-18 C/D | 118.2 | 110.9 | 94.5 |

### F. Analysis of Historic Noise Studies at the Test Plaintiff Properties

As Dr. Fidell will describe, jet noise in the community surrounding NAS Oceana is not a recent development. For the past four decades, the local press has documented the adverse reaction of members of residential communities surrounding NAS Oceana to jet operations. DX430, Appendix B, p. OCE261858-886. The air station began efforts to reduce noise impacts on the community in 1966. Exhibit E, DX197, OCE065670. As a result of NAS Oceana's efforts to evaluate jet noise impact on the surrounding community, several aircraft noise studies have been conducted since the 1970s. The studies depicted noise impacts through computer modeled noise exposure contours, which are based on operational data such as flight paths, aircraft types, frequency of operations, individual aircraft noise levels, and the time of day flights occur.

[17] The sound pressure level at the measurement point on the ground initially rises to a maximum as an aircraft approaches, then declines as the airplane flies away. DX430, p. OCE261848. Since the sound pressure levels vary throughout the overflight, and since the durations of different overflights also vary, no single number can usefully characterize the moment-to-moment changes in sound levels. DX430, p. OCE261848. The usual method for representing the sound energy produced during the entire overflight is therefore to "normalize" the measurement to a standard time period (one second). DX430, p. OCE261848.

[18] Tone-corrections further assist in accounting for the contribution of prominent tones to the annoyance of aircraft noise. DX430, p. OCE261839.

[19] This table was extracted from DX430, p. OCE261841.

Dr. Fidell generated a consistent set of historical noise exposure estimates for the test plaintiff properties by re-running noise modeling exercises previously conducted at NAS Oceana.[20] The electronic data from the NAS Oceana noise study from 1978 no longer exist; therefore, when possible the noise exposure on the test plaintiff properties from these studies was estimated based on the graphical depictions of the noise contours as reflected in the reports.[21] The noise exposure contours generated in the 1980s and continuing to 2000 were modeled using various iterations of NOISEMAP. The original data from these noise modeling exercises were re-run using NOISEMAP 6.5, the U.S. Air Force's current version of noise contour modeling software.

As Dr. Fidell will explain, the estimated noise exposure is expressed in the Day-Night Average Sound Level ("DNL" or "Ldn") metric.[22] The DNL metric represents the sound energy averaged over a 24-hour period weighted with a 10 dB penalty for nighttime operations between 10:00 PM and 7:00 AM. Following the Environmental Protection Agency's ("EPA") publication of "Levels of Noise Exposure Requisite to Protect Public Health and Welfare with an Adequate Margin of Safety" in 1974, DNL became the predominant metric for evaluating jet noise impacts.[23]

From the 1970s through 2000 there have been eight noise studies that modeled then-existing (or previous) jet noise impacts. The "2000 OCSBLRD", more commonly

---

[20] Certain NAS Oceana noise studies contain projected future noise contours, including the noise contour known as ARS2 (alternative realignment scenario 2) from the F/A-18 C/D relocation Environmental Impact Study, which the plaintiffs rely on in an attempt to prove their case. These contours are based on anticipated or proposed changes in aircraft type or operations, in contrast to studies that evaluated then-existing or previous operations. Those studies that projected future impacts were not relevant in a comparison of noise levels modeled for existing conditions and therefore were excluded from the analysis.

[21] The NAS Oceana noise contours from the 1970s were generated by hand or developed with the use of mainframe computers.

[22] The contours in the 1972 and 1975 noise studies were converted into the DNL metric to provide a consistent set of measurements for comparison.

[23] Under the Noise Control Act of 1972 EPA was required to analyze and develop noise criteria that would protect the public.

referred to as the "BASE00 contours", is the most accurate available depiction of the noise impacts in Virginia Beach after the arrival of the F/A-18 C/D. The BASE00 contours included a detailed analysis of how the F/A-18 C/D and F-14, the two predominant aircraft at the time at NAS Oceana, actually flew at NAS Oceana.[24] Although they are the best available depiction of the jet noise impacts, even the BASE00 contours do not reflect the noise environment in 1999 with precision. Rather, these contours are based on both computer modeled numbers of flights and computer modeled noise reflecting those modeled operations numbers as well as other inputs. Moreover, the computer modeled number of flight operations used in the BASE00 contours reflected a higher number of operations for the year 2000 than occurred that year based on the relevant ATAR.[25] As mentioned above, the 1999 ATAR shows that there were only 133,000 flight operations in 1999 in tower-controlled airspace. The BASE00 contours, however, are modeled based on a total of 207,722 operations. Therefore, when comparing historical noise estimates at the test plaintiff properties, it must be recognized that BASE00, if anything, overestimates the DNL at the test plaintiff properties in July 1999, the alleged date of taking, when compared with what a similar analysis would show using numbers from the ATAR for tower-controlled airspace. The following table reflects the estimated aircraft DNL noise exposure at the test plaintiff properties based on these studies:[26]

---

[24] As part of the F/A-18 C/D Environmental Impact Statement ("EIS"), noise contours were generated based on the Hornets' projected impact. These projected contours are known as the "ARS2 contours." In preparation of the F/A-18 E/F (Super Hornet) EIS, it was discovered that ARS2 contours far overstated the Hornets' noise impacts. Various assumptions about how the Hornets were projected to fly turned out to be inaccurate. These assumptions were corrected in the process of preparing the BASE00 contours.

[25] Unlike ATARs, which are based on numbers of flight operations in a calendar year, the computer-modeled numbers are based on fiscal years.

[26] The 1978 AESO noise study was prepared using 1977 operations. Harris, Miller, Miller, & Hanson ("HMMH") concluded that the 1978 contours were overstated. HMMH, based this determination, in part,

| PLAINTIFF | 1972 | 1975 | 1978 | 1982 OC600 | 1988 OC1 | 1993 WR 94-18 | 1997 WR 97-10 | 2000 OCSBLRD |
|---|---|---|---|---|---|---|---|---|
| P01 | 67.5 | 70.0 | 73.4 | 72.0 | 71.7 | 60.7 | 60.2 | 70.0 |
| P02 | - | - | 73.0 | 69.5 | 70.6 | 62.2 | 61.1 | 68.0 |
| P03 | 62.4 | 65.9 | 67.7 | 68.5 | 68.6 | 64.5 | 63.8 | 72.2 |
| P04 | - | - | 71.5 | 67.4 | 67.7 | 58.8 | 57.9 | 68.6 |
| P05 | - | - | 70.4 | 65.9 | 66.6 | 59.8 | 59.9 | 69.2 |
| P06 | 66.8 | 67.1 | 79.0 | 74.6 | 74.6 | 71.0 | 69.4 | 78.4 |
| P08 | 63.8 | 65.6 | 68.6 | 66.8 | 67.5 | 61.3 | 61.5 | 72.4 |
| P09 | 78.2 | 77.3 | 80.6 | 78.2 | 77.1 | 69.1 | 68.6 | 80.5 |
| P10 | - | - | 65.3 | 65.0 | 65.3 | 57.8 | 58.1 | 65.9 |
| P11 | 74.8 | 70.8 | 78.9 | 70.3 | 70.0 | 64.6 | 65.1 | 74.2 |
| P12 | 80.0 | 80.0 | 78.5 | 76.0 | 76.1 | 73.2 | 74.7 | 79.9 |
| P13 | - | - | 54.0 | 55.9 | 57.3 | 48.1 | 47.5 | 58.4 |

As reflected in the table, all but four of the test plaintiff properties[27] (P03 – Levenson, P08 – Leary, P10 – Ryan, and P13 – May) have been exposed to greater DNL noise levels according to the input computer modeling specifications used in the studies from the 1980s and 1990s (or the noise contour graphics from the 1970s-era studies) than the properties were exposed to according to the BASE00 study. Based on the noise studies, three of these four properties have nevertheless been exposed to high noise levels in the past, including DNL values exceeding 65dB, which is considered incompatible with residential land uses.[28] The fourth property – the May property – has been exposed to noise levels that are compatible with residential land use for each period of time analyzed by the NAS Oceana noise studies.

## III. Test Plaintiffs Fail To State An Overflight Takings Claim In July 1999

### A. *Causby* Provides The Elements For Proving An Overflight Taking

on its conclusion that its field measurements of A-6 noise levels were more accurate than the standard noise measurements found in the NOISEMAP database.

[27] There is no "P07" property because one of the original test plaintiffs dropped out of the test case.

[28] The mere fact that a property is in an AICUZ considered incompatible for residential development does not mean there has been an overflight taking. Stephens v. United States, 11 Cl. Ct. 352, 363 (1986); Davis v. United States, No. 02-746, 2006 U.S. Claims LEXIS 277 at *31 (September 15, 2006)

The Supreme Court has held that the following four elements must be proven in order to establish an overflight taking:

(1) the aircraft flights must "directly" invade the airspace over the property;
(2) the flights must be "low";
(3) the flights must be "frequent"; and
(4) the flights meeting the above criteria must substantially destroy the use and enjoyment of the property.

United States v. Causby, 328 U.S. 256 (1946). Essentially, the first element requires flights directly over the property. Regarding the second element, flights at an altitude below 1,000 feet are considered "low" for a congested residential area such as Virginia Beach. Stephens v. United States, 11 Cl. Ct. 352, 359 (1986). Although "frequent" has not specifically been defined, the case law indicates that annual overflights must be in the thousands – and more likely tens of thousands – to establish the third element of an overflight taking. The fourth element requires a showing of a very significant burden on the property, such as rendering a home uninhabitable by preventing the occupants from sleeping, or flights that cause buildings to shake, interfere with radio and television operation, and negate the ability to use the telephone or conduct conversations. Aaron v. United States, 340 F.2d 655, 659 (Ct. Cl. 1964). See Davis v. United States, 155 Ct. Cl. 418, 420 (1961).

**B. The Flight Activity At The Group 2 and Group 3 Test Plaintiff Properties Does Not Establish An Overflight Taking Under Causby**

The Group 2 and Group 3 properties have not been exposed to low and frequent overflights and therefore cannot prove an overflight taking under Causby. The Group 2 properties have been exposed to varying degrees of overflights. Certain of the Group 2 properties have been directly overflown by "low" flights, but not with sufficient regularity to support an overflight taking. Other Group 2 properties may have been

exposed to frequent overfights, but not at an altitude below 1,000 feet, which likewise would not establish an overflight taking. The Group 3 properties have not been exposed to either low or frequent overflights.

As discussed above, the Levenson property (Group 2) falls under the Runway 14L/R VFR landing pattern. Aircraft flying in this pattern would directly fly over or within one-half mile of the Levenson property at an altitude of approximately 450 to 550 feet. These direct overflights would meet the first and second elements in the Causby analysis. However, they do not occur frequently enough to support a taking.[29] As discussed *supra*, Runway 14 L/R is in use only two percent of the time. Given that there were approximately 133,000 reported operations in NAS Oceana tower-controlled air space in 1999, then roughly 2,660 operations could be attributed to Runway 14L/R. DX691. If approximately 59% of those operations were VFR pattern flights then it can be inferred that there were less than 1600 VFR pattern flights from Runway 14L/R in 1999.[30] That number must be further reduced because touch-and-gos and FCLPs are counted as two operations (departure and landing) by the control tower, leaving approximately 800 VFR flights that passed over or near the Levenson property in 1999. As discussed earlier, overflight takings involve thousands (and more likely tens of thousands) of annual overflights, not hundreds. Two other Group 2 properties, Lindsay[31] and Van Nostrand,[32] also were not overflown with sufficient frequency to establish an

---

[29] Levenson did not record the number of flights directly over his property. Exhibit F, p. 34.

[30] As reflected in Wyle Report 02-08, the noise study supporting the Final EIS for the Introduction of the F/A-18 E/F aircraft, the total number of modeled touch-and-gos, GCA Box operations, and FCLPs for the baseline year 2000 equals 122,732 (101,276 + 8,184 + 13,272). DX444.Dividing this number by the total number of modeled operations at NAS Oceana for that year – 207,722 – equals 59%. DX444.

[31] Lindsay could not estimate the altitude of the flights near his property. Exhibit G, pp. 23, 36-37, 69.

[32] Van Nostrand estimated flights near his property at 1,000 to 1,400 feet. Exhibit H, pp. 15, 72-73.

overflight taking. These properties would have been overflown on the rare occasions that aircraft were far outside the standard abeam distance in the Runway 5L/R VFR pattern.

The Leary/Riddick (Group 2) claims of an overflight taking suffer from a different, but equally fatal deficiency. These properties were directly and frequently overflown, but at altitudes well above the 1,000 feet ceiling necessary to satisfy the second element in the Causby analysis.[33] Specifically, when Runway 23L/R was in use, approximately 34% of the time, these properties would have been overflown routinely on departures, but at an altitude of approximately 1,500 to 2,000 feet.

The final Group 2 property, Waterman,[34] would also have experienced direct overflights, though with lesser frequency than the Leary/Riddick properties. These overflights would not be considered "low" under the Causby analysis because they were at an altitude of approximately 1,500 to 2,000 feet.

**C. Substantial Interference with Use and Enjoyment**

Concerning the fourth element of an overflight taking, certain of the test plaintiffs' deposition testimonies indicate that the use and enjoyment of their properties was not materially altered after the arrival of the F/A-18 C/D aircraft. As a preliminary matter, it is noteworthy that from 1996 to 1998, the three-year period preceding the arrival of the F/A-18 C/D, flight activity in NAS Oceana tower-controlled air space was at its lowest point since at least 1980. As mentioned above, the annual ATARs show there were approximately 46,000, 53,000, and 77,000 operations in tower controlled airspace for 1996, 1997, and 1998, respectively. These reported totals are significantly lower than all other years for which we have ATARs. Annual operations in tower-

[33] Leary and Riddick could not estimate the altitude of flights. Exhibit I, pp. 43-44; Exhibit J, pp. 49-50.
[34] Waterman could not estimate the altitude of the flights near his property. Exhibit K, pp. 41-42.

controlled airspace from 1980 to 1995 almost invariably approached or exceeded 200,000 as reported in the ATARs. In 1999, the year the F/A-18 C/D completed its transfer to NAS Oceana, following several years of relatively light flight activity, operations began to increase. The 1999 ATAR reports approximately 133,000 operations in tower-controlled airspace. This increase in flight activity from the unusually quiet preceding three years would be expected to exacerbate the perception of adverse impacts of the F/A-18 C/D operations. This is especially true where, as here, many of the test plaintiffs did not reside on their properties during the prior periods of heavy overflight activity. Nevertheless, the level of flight activity in 1999 was light in historic terms, and the interference with the use and enjoyment of two of the Group 2 and Group 3 test plaintiffs was essentially unchanged as reflected in the testimony of two test plaintiffs.

Mr. Leary testified that F/A-18 C/D operations in 1999 prevented him from talking on the phone outside of his house, required him to increase the volume of his television, and to plug his ears while he was outside, until the aircraft passed. Exhibit I, pp. 49-51. Mr. Leary testified that there were no other inconveniences caused by the F/A-18 C/D overflights. Exhibit I, pp. 51. Although Mr. Leary indicated that the F/A-18 C/D was louder than the F-14, he also testified that he generally experienced the same inconveniences with overflights before 1999. He could not talk on the phone outside; he had to turn up the volume of his television; and he plugged his ears during overflights in the same manner he did with F/A-18 C-D overflights. Exhibit I, pp. 52-53.

Group 3 test plaintiff Ryan testified that he experienced inconveniences similar to those experienced by Mr. Leary both before and after the arrival of the F/A-18 C/D:

> Q. Before '99, when you were outside having a party, or barbecue, or whatever else, and the planes flew over, could you talk and hear each other?

A. No.
Q. Did you have to turn up the TV?
A. Certainly. Yes.
Q. And I'm talking about before '99. That's what I'm talking about now, not after?
A. Yes.
Q. And phone conversations, the same sorts of problems?
A. Yes.
Q. So you had the same sorts of problems before and after '99?
A. Right.
Q. In terms of the enjoyment of the house?
A. Right.

Exhibit L, pp. 84-85.

This testimony demonstrates that, while test plaintiffs Leary and Ryan purport to experience impact from overflight activity, they do not complain of impacts substantially different than they experienced before the arrival of the F/A-18 C/D. Indeed, the impacts before and after the arrival the F/A-18 are essentially identical for these test plaintiffs. Although other test plaintiffs have alleged that the impacts were worse after the arrival of the F/A-18 C/D, such generalized and undocumented anecdotal testimony by itself cannot be considered credible or persuasive, particularly when the flight activity for the three years preceding the arrival of the F/A-18 C/D was at a historically low level and thus the contrast between impacts before and after would, if anything, be expected to be more noticeable, not less.

Thus, the Group 2 and Group 3 test plaintiffs cannot refute Commander Erie's analysis, nor can they prove an overflight taking under Causby in July 1999.

**D. The Unique Circumstances In Branning and Argent Are Not Present at NAS Oceana**

In Branning v. United States, 228 Ct. Cl. 240, 654 F.2d 88, 90 (1981), the court found a taking where military jets conducted FCLPs at 600 feet in a noncongested area

based on the unique facts of that case.[35] The court created a "peculiarly burdensome" exception because of the conscious selection of a particular group to bear the brunt of intense FCLP training exercises at a "bounce field."[36]

Those circumstances are not present at NAS Oceana. Unlike in Branning, the Navy did not select any of the test plaintiffs' properties, as opposed to other properties near NAS Oceana, to be exposed to FCLP overflights. As Commander Erie will explain, the exposure to aircraft flight activity at NAS Oceana is predicated on which runway is in use on a given day (and can change a number of times during a day depending upon wind conditions), and runway selection is a function of wind rather than a conscious decision to expose certain properties to overflights as opposed to others.

Plaintiffs have also inexplicably pointed to a temporary shift of FCLPs from NALF Fentress to NAS Oceana to support their erroneous suggestion that the "peculiarly burdensome" pattern of activity found in Branning was present at NAS Oceana at the time of the alleged taking. This shift of some FCLPs was a temporary mitigation measure that ended by the end of 2000. JX093. This temporary increase in FCLPs at NAS Oceana has no relevance to an alleged permanent overflight taking in July 1999. Additionally, this temporary shift affected thousands of properties similarly as compared to the relatively few "targeted" properties in Branning.

Moreover, simply referring to the total number of FCLPs at NAS Oceana in a given year, without more, is meaningless in terms of evaluating flight impacts on the test

[35] Like Branning, Argent v. United States, 124 F.3d 1277, 1278 (Fed. Cir. 1997), involved FCLP training exercises in a noncongested area. Argent, however, is inapplicable to the merits of plaintiffs' claims at trial, because it simply held that the United States could not succeed on summary judgment in the context of peculiarly burdensome FCLP flight activity "merely by pointing out that most of [the] flights do not pass over the Argents' land." Id. at 1284.
[36] A "bounce field" is a landing field where FCLPs are conducted on a regular basis.

plaintiff properties. Determining whether there is a peculiarly burdensome pattern of activity at a particular test plaintiff property would include determining the number of FCLPs from the runway(s) with an FCLP flight path in proximity to a specific property.[37] Plaintiffs present no evidence whatsoever to address these points.

Plaintiffs also make the unsupported claim that there is no difference between "touch-and-go" operations and FCLP training periods. While it is true that the mechanics of a single aircraft flying one FCLP or one touch-and-go are identical as Captain Keeley will testify, FCLP training periods are more intense and last longer than touch-and-gos. As many as five aircraft participate in an FCLP training period, and they typically last for 45 minutes. In contrast, touch-and-gos generally involve fewer aircraft in the pattern and for a shorter period of time. Additionally, the pattern altitude, whether touch-and-go or FCLP, at NAS Oceana is 1,000 feet, significantly higher than the 600 feet in Branning.

Consequently, the limited exception in Branning and Argent does not apply.

## IV. Test Plaintiffs Claims Are Barred By The Statute of Limitations

### A. Legal Standard For The Statute Of Limitations In An Overflight Takings Case Where There Is Prior Overflight Interference

An overflight taking occurs when the United States begins to operate its aircraft regularly and frequently over the plaintiffs' property with the intention of continuing such flights indefinitely. Persyn v. United States, 34 Fed. Cl. 187, 197 (1995); Powell v. United States, 1 Cl. Ct. 669, 672 (1983); Lacey v. United States, 219 Ct. Cl. 551, 559 (1979); A.J. Hodges Industries, Inc. v. United States, 355 F.2d 592, 594 (Ct. Cl. 1966). The Group 1 test plaintiff properties have long been exposed to low and frequent aircraft

[37] Plaintiffs' failure to quantify the overflights at each of the test plaintiff properties demonstrates that they view this as a "one size fits all" analysis. To the contrary, the uniqueness of overflight impacts on different properties is precisely the reason why class certification was rejected. Testwuide v. United States, 56 Fed.Cl. 755, 762 (Fed.Cl. 2003).

operations. If a taking of an avigation easement occurred, it occurred at these properties at least as early as 1981 when aircraft operations far exceeded the operations in July 1999, plaintiffs' alleged date of taking; therefore, the Group 1 test plaintiffs' claims are barred by the mandatory six-year statute of limitations, 28 U.S.C. § 2501.[38]

As discussed above, the flight activity to which the Group 2 and Group 3 properties were exposed would not establish an overflight taking. Nevertheless, even assuming, *arguendo*, that this flight activity would suffice for an avigation easement, then as with the Group 1 properties, it would have been acquired at least as early as 1981, and their claims would be also be time-barred.

### B. The Statute of Limitations Began To Run In 1981 When Aircraft Operations Far Exceeded Those in 1999

To analyze the effect of operations on the test plaintiff properties requires reasonable inferences based on an analysis of the flight paths from the four runways in relation to the test plaintiff properties, evidence of whether those flight paths have changed with respect to impacts on the test plaintiffs' properties, and the historic usage of each NAS Oceana runway. Commander Erie has extensively analyzed the manner in which aircraft operations impact the test plaintiffs' properties given the NAS Oceana flight paths, the manner in which the aircraft are flown, and the location of the test plaintiff properties. As discussed above, Captain Keeley and Commander Hebert confirm that Commander Erie's analysis accurately represents the manner in which aircraft operated at NAS Oceana in relation to the test plaintiff properties from the late

[38] Once the statute of limitations defense is raised, plaintiffs bear the burden of proof to establish that their action is not barred. Alder Terrace, Inc. v. United States, 161 F.3d 1372, 1377 (Fed. Cir. 1998).

1970s through 1999. Therefore, the analysis applies to 1981, just as it does to July 1999, the alleged date of taking.[39]

In addition to Captain Keeley agreeing that Commander Erie's analysis applies to the operations in 1981, a Harris, Miller, Miller, & Hanson (HMMH) noise study of 1982 operations at NAS Oceana underscores the point that runway use in the early 1980s and the percentage of each type of operation is generally consistent with the runway use and types of operations flown at NAS Oceana after the arrival of the F/A-18 C/D. PX142.1, pp. OCE090230-264. The HMMH study (p. OCE090241, Table 3) identified the runway use in 1982 as follows: Runway 5L/R – 44%, Runway 23L/R – 30%, Runway 32L/R – 23%, and Runway 14L/R – 3%, which largely parallels the runway use after the arrival of the F/A-18 C/D as reflected in Wyle Report 02-08. See *supra*, n 10; DX444. Further, the percentage of types of operations in 1982 is similar to the modeled operations in the Wyle study. The HMMH study reflected that approximately 42 percent of operations were arrivals or departures and 58 percent were pattern operations (e.g. FCLPs, touch-and-gos, and other pattern flights).[40] Similarly, the Wyle study reflects that after the arrival of the F/A-18 C/D, approximately 59 percent of operations were pattern operations and the remaining 41 percent were arrivals and departures. See *supra*, n 30. Distributing the 232,000 operations from 1981 among the four runways and by the type of operation (i.e. pattern or arrivals and departures) clearly reveals that if any avigation easement was acquired at the test plaintiff properties, it was acquired in 1981.

---

[39] It is important to note that 1981 was not an unusual spike that exceeded the operations in 1999. The ATARs from 11 of the 14 years for which records exist show jet operations that were comparable or exceeded, in some cases by a wide margin, the 133,000 operations in 1999. DX691.

[40] Table 5 from the HMMH study details the various types of operations on an average busy day. PX142.1 p. OCE090242. In 1982, there were a total of approximately 555 operations on an average busy day at NAS Oceana, including approximately 321 pattern operations and 234 arrivals and departures, which equates to approximately 58 percent pattern operations and 42 percent arrivals and departures. Id.

For the foregoing reasons, if defendant acquired an avigation easement over any of the test plaintiff properties, it was acquired in 1981, long before July 1999.

### C. Plaintiffs Cannot Prove A Second Taking In 1999

To avoid the statute of limitations jurisdictional bar, plaintiffs bear the burden of establishing that a second taking occurred in 1999 over and above any existing 1981 easement. The following factors should be considered: (1) whether the flight path has remained the same in terms of elevation and location, Robertson v. United States, 173 Ct. Cl. 621 (1965); (2) whether the numbers of flights over the pertinent properties have increased since the earlier taking. Lacey v. United States, 595 F.2d at 560; Town & Country Motor Hotel v. United States, 180 Ct. Cl. 563, 569 (1967); (3) whether the type of aircraft have remained the same, or whether the prior aircraft were as loud or louder than the aircraft flying at the time of the earlier taking, Powell v. United States, 1 Ct. Cl. 669, 674 (1983); Avery v. United States, 330 F.2d 640, 643 (Ct. Cl. 1964); Lacey v. United States, 595 F.2d at 560; and (4) whether the earlier operations indicated a permanent intent to use the affected airspace and such use has not been abandoned, Speir v. United States, 485 F.2d 643, 648 (Ct. Cl. 1973). In order to establish a second, incremental taking plaintiffs must prove either (1), (2), or (3) above, and (4) that there was no abandonment of the prior avigation easement. Plaintiffs must also prove a significant depreciation in the market value of the property resulting from the recent additional overflights in order to establish a second, incremental taking. Persyn v. United States, 34 Fed. Cl. at 207; Boardman v. United States, 180 Ct. Cl. 264, 271 (1967); Avery v. United States, 330 F.2d at 643.

Thus, the burden of proof for a second, incremental taking requires a

substantial increase in impacts on the property. Changes in flight patterns must materially increase the noise and vibration and the consequent inconvenience, discomforts, and uneasiness suffered by plaintiffs. Klein v. United States, 152 Ct. Cl. 221, 223 (1961). See also Bacon v. United States, 295 F.2d 936, 938 (Ct. Cl. 1961) (while earlier aircraft aggravated plaintiffs property, their property use was not seriously interfered with until operation of the new aircraft, the B-52, which was exceptionally loud and the noisiest of planes to have operated at the base).

**1. Same Flight Path And Same Elevation**

As Captain Keeley will explain, although no two flights are identical, landing pattern procedures have remained generally the same since the late 1970s in terms of the nominal track the aircraft fly over the ground when in the landing patterns.[41] The altitude of certain flight patterns has increased over the years, but these changes would have decreased noise impacts. Moreover, variations in the way in which aircraft have flown the landing pattern have existed since at least the late 1970s. Finally, the relative frequency of runway use, which is a function of wind, has remained generally consistent over the years as Captain Keeley and Commander Erie will explain. Thus, the location of NAS Oceana aircraft in relation to the test plaintiff properties has remained generally consistent for more than two decades before the alleged taking.

**2. Same or Greater Number of Flights**

In order to prove a second incremental taking the test plaintiffs must show a substantial increase in aircraft operations. See Avery v. United States, 330 F.2d at 643;

[41] Group 2 test plaintiffs Waterman, Leary, Lindsay, and Van Nostrand testified that the altitude and path of the flights before and after the arrival of the F/A-18 C/Ds were generally the same in relation to their properties. Exhibit K, pp. 41-42; Exhibit I, pp. 43-44; Exhibit G, pp. 23, 36-37, 69; Exhibit H, pp. 15, 72-73. Group 3 test plaintiff Ryan also acknowledged that flights remained roughly at the same altitude and proximity to his home after the arrival of the F/A-18 C/D. Exhibit L, p. 80.

Persyn v. United States, 34 Fed. Cl. 187, 207 (1995) (the nature and degree of disturbance must substantially worsen to establish second taking). This plaintiffs cannot do. In historic terms, the 1999 operations were very light when compared with the vast majority of prior years for which there are ATARs. DX691.

As discussed above, air traffic control tower air space includes all the test plaintiff properties. DX691. The 1999 ATAR reflects approximately 133,000 operations in control tower air space. DX691. That number of operations provides a reference point for evaluating whether a second, incremental taking has occurred, and must be compared to ATARs from other years at NAS Oceana.

As Captain Riley will explain, NAS Oceana ATARs exist for 14 of the years between 1980 and 1998. DX691. The ATARs from 11 of these years show jet operations that were comparable or exceeded, in some cases by a wide margin, the 133,000 operations in 1999. DX691. Thus, in the years that recorded data are available between 1980 and 1998 operations were comparable to or exceeded 1999 data approximately 79% of the time. Monthly ATARs from January through November 1980 total approximately 131,000 operations reflecting a year of comparable flight activity to that in 1999. DX691. The operational tempo intensified significantly in 1981 when NAS Oceana reached the two and one-half decade high point of nearly 232,000 operations. DX691. In the following year, 1982, there were close to 178,000 operations. DX691. NAS Oceana again experienced a high operational tempo between 1989 and 1995, when annual operations consistently approached or exceed 200,000 operations, including a high of over 229,000 operations in 1992. DX691. The following three years, 1996 to 1998, saw a significant drop off in flight activity, ranging from approximately 46,000 to 77,000

operations. DX691. Operational tempo began to pick up again in 1999 and 2000 with approximately 133,000 and 160,000 operations, respectively, but did not reach the highs recorded in the 1980s and early to mid-1990s. DX691. This data demonstrates that aircraft overflight activity has equaled or exceeded the 1999 flight levels on numerous prior occasions. Thus, the 133,000 operations in NAS Oceana control tower airspace in 1999 do not support a second, incremental taking.

### 3. Noise Level Of NAS Oceana Aircraft

Plaintiffs cannot prove a second, incremental taking based on the noise generated by the F/A-18 C/D, either. It is possible for a second, incremental taking to occur if a substantially louder aircraft replaces a quieter aircraft, assuming the overall noise impact is materially worse. To account for the overall impact, one must consider whether the number of operations has changed. Assuming the number of operations of the (significantly louder) replacement aircraft is comparable to the quieter aircraft, then the likelihood of a second taking is increased because the probable net effect of the noise impacts would be considerably worse. Conversely, if the louder aircraft flies less than the aircraft it replaced then there will not be a second taking if the overall noise impact is not materially different.

In the present case, there cannot be a second, incremental taking based on the relative loudness of the Hornet. Even assuming the Hornet is substantially louder than all of the other predominant aircraft in 1981, which defendant does not concede, a second incremental taking could not have occurred given the approximately 100,000 additional operations in 1981 as compared to 1999.

Additionally, the Hornet, in fact, is not substantially louder than all of the predominant aircraft from 1981. Dr. Fidell has addressed the loudness of the F/A-18 C/D in relation to the F-4 flown at Oceana during the 1960s through 1982, the A-6 flown at Oceana during the 1970s through mid 1990s, and the F-14 from the mid 1970s to the present.[42] Dr. Fidell identified the PNL and PNLT values, which are aircraft noise measurements that have been incorporated into the Department of Defense ("DOD") NOISEMAP software for decades and are the product of an objective mathematical process on which the Federal Aviation Administration relies "to regulate the noisiness of aircraft offered for sale in the United States." 14 CFR Part 36. As Dr. Fidell will explain, these values are particularly useful in evaluating noise annoyance because they reflect effective, perceived noise levels that have been corrected for tones and overflight duration. In other words, these values give more weight to "several of the more annoying high frequency [sound] bands." DX430 p. OCE261839. As shown, *supra*, tthe F/A-18 C/D may be louder in certain patterns of flight, but is plainly not substantially louder than all the other aircraft operating in 1981.

Dr. Fidell's DNL noise exposure estimates at the test plaintiff properties based on past NAS Oceana noise studies is illustrative as well. Eight of the test plaintiff properties have been exposed to greater DNL noise levels according to the data used in the studies from the 1980s and 1990s or the noise contour graphics from the 1970s-era studies. Of the remaining four, three properties previously had been exposed to high noise levels that were incompatible with residential land uses. According to the studies, the fourth

[42] As Curtis Utz, a Navy historian, will explain, the Allowances and Location of Naval Aircraft report indicates that as of March 1981 there were twenty-two F-4, forty-seven A-6, ninety-nine F-14, and eighteen A-4 aircraft in a flyable status at NAS Oceana. DX???, p. OCE???. As of September 1981 there were thirty-six F-4, sixty-six A-6, ninety-two F-14, and twenty-one A-4, aircraft, in a flyable status. DX???, p. OCE???.

property – the May property – has always been exposed to noise levels well below the 65dB DNL, and therefore, has always been compatible with residential land use. Plaintiffs, therefore, cannot prove a second taking based on the Hornet's sound level.

**4. Permanent Intent**

As with any military air station, there have been fluctuations in the number of operations over the years, but the base has operated continuously since it was commissioned in 1943 and became a permanent master jet base in 1957. Plaintiffs do not contend, nor could they, that the Navy abandoned a previous avigation easement.

**5. The Test Plaintiff Properties Have Not Depreciated**

To establish a second, incremental taking plaintiffs must also prove that there was a significant diminution in property value. This factor is measured as the difference between the fair market property value before the taking and after the second, incremental taking. Aaron v. United States, 340 F.2d 655, 659-60 (Ct. Cl. 1964). Because plaintiffs cannot show that F/A-18 C/D overflights diminished the value of their property, they cannot prove a second, incremental taking.

Dr. David Dale-Johnson, defendant's expert in economics, real estate valuation, and statistics analyzed over six thousand arms-length residential real estate sales from Virginia Beach tax records and determined that the increase in jet noise following the arrival of the F/A-18 C/D did not adversely impact property values.[43] Exhibit P, DX584, Expert Report of Dr. David Dale-Johnson, pp. OCE262056-057 ¶¶ 9-10. Dr. Dale-

[43] Dr. Dale-Johnson has a Ph.D. in Applied Economics from the University of California, Berkeley, where his dissertation was "Hedonic Prices, Hedonic Price Indexes, and Housing Markets." He was on the faculty of the Marshall School of Business, as well as School of Policy Planning and Development at the University of Southern California, and has written extensively in peer-reviewed publications and books concerning real estate valuation. He has served or is currently serving on the Board of Editors of the *Journal of Real Estate Research, Real Estate Economics,* and the *Journal of Real Estate Finance and Economics.* Dale-Johnson Report p. 1 ¶¶ 2-3.

Johnson applied a repeat sales methodology analyzing single-family homes that sold between 1995 and June 1999 (before the alleged date of taking), and sold again between August 1999 and 2003 (after the alleged date of taking). DX584, pp. OCE262065-066 ¶¶ 26-30 (see Exhibit 2).

The properties' DNL noise exposure were identified before the date of alleged taking according to Wyle Report 97-10, which depicted the jet noise impacts preceding the arrival of the F/A-18 C/D. As discussed above, the BASE00 noise study is the most accurate available depiction of the noise environment after the arrival of the Hornet and was used to identify the DNL sound level after the alleged date of taking.[44] DX584, p. OCE262067 ¶ 32. There was no statistically significant relationship between the increased BASE00 DNL exposure and changes in property values. Dale-Johnson Report, p OCE262068 ¶¶. 35-36. Increased noise levels following the arrival of the F/A-18 C/D did not have a negative impact on property values. Additionally, the median property appreciation for these properties was virtually indistinguishable, irrespective of the DNL sound level. Properties above 65dB DNL experienced a 20% median appreciation; whereas, the median appreciation for properties less than 65dB DNL was slightly lower at roughly 19 ½ %. DX584 p. OCE262069-070, OCE262077 (Exhibit 4). A graphic

[44] Repeat sales were analyzed in relation to the overstated ARS2 projected noise impacts as well and produced inconsistent results, further demonstrating the unreliability of the noise projections. Exhibit Q, DX173, Rebuttal Report of Dr. David Dale-Johnson. In certain time periods the repeat sales data indicated that the projected jet noise increases impacted appreciation values. In some cases the projected increased noise was associated with higher property value appreciation, and in other instances the projected noise increases indicated lower property value appreciation. DX173, (see Exhibit 21, OCE239745)(bold indicates a statistically significant relationship between projected ARS2 noise increases and sales price changes). As Dr. Dale-Johnson explains, these inconsistent results indicate that the ARS2 contours are unreliable. DX173, pp OCE239737-738. Further, Dr. Dale-Johnson points out that the statistical analyses of the sales based on the ARS2 data fails to account for the positive effects of realignment, such as increased housing demand. Consequently, even if property values in the above 75dB DNL (ARS2) projected contours did not appreciate as fast as properties outside of the ARS2 contours, they still may have appreciated at a faster rate than they would have had the F/A-18 C/Ds never been relocated to NAS Oceana.

depiction of the relative appreciation of properties is attached to Dr. Dale-Johnson's report. DX584, Exhibit 8.

One of defendant's appraisal experts, Henry Wise, also analyzed thousands of arms-length residential property sales data from Virginia Beach, Virginia. Exhibit R, DX585 Expert Report of Henry Wise, p. OCE262150 ¶ 7. Mr. Wise relied on Virginia Beach's Real Estate Information Network ("REIN"), the local multiple listing service realtor data. DX585, p. OCE262150 ¶ 7. Mr. Wise evaluated approximately 3,700 repeat sales and determined that that the increased noise resulting from the Hornet's relocation to Virginia Beach did not adversely impact appreciation in Virginia Beach. Wise Report, p. OCE262150 ¶ 7. A few snapshots of the data, as depicted in Mr. Wise's supplemental report (Exhbit S, PX300), underscore that properties within the DNL noise contours, both BASE00 contours and even the erroneously projected ARS2 contours, show that the average appreciation was comparable for properties inside and outside of the noise contours.[45]

Mr. Wise listed the average annual percentage appreciation based on the repeat sales for properties located within the overstated ARS2 noise contours. PX300, Addendum 2, pp. OCE242051-053. One table lists the average annual appreciation of properties sold in 1996 then re-sold after the date of alleged taking between 1999 and 2005. PX300, p. OCE242051. Another table contains the appreciation of properties sold in 1997 then re-sold between 1999 and 2005. PX300, p. OCE242052. Similarly, a third table shows properties sold in 1998 then re-sold between 1999 and 2005. PX300, p.

---

[45] For convenience Mr. Wise dubbed properties with less than a 65dB DNL (or outside the contours) as "quiet" and those above 65dB DNL (or inside the noise contours) as "noisy." DX585, ¶10 n 6.

OCE242053. Even a cursory review shows that the relative appreciation for properties inside and outside the contours was comparable, if not higher, for the "noisy" houses.

Mr. Wise also identified the average annual percentage appreciation based on the repeat sales for properties located within the BASE00 noise contours. PX300, Addendum 2, pp. OCE242079-081. One table identifies the average annual appreciation of properties sold in 1996 then re-sold after the date of alleged taking between 1999 and 2005. PX300, p. OCE242079. A second table lists the appreciation of properties sold in 1997 then re-sold between 1999 and 2005. PX300, p. OCE242080. Similarly, a third table contains properties sold in 1998 then re-sold between 1999 and 2005. PX300, p. OCE242081. As with the projected ARS2 contours, it is clear that the appreciation inside and outside the BASE00 noise contours was comparable.

Additionally, defendant's appraiser with expertise in the local residential real estate market, Mr. P. Michael Germano, appraised the test plaintiff properties before and after the alleged date of taking. This analysis included a comparison of similar homes outside of the noise contours. The relative appreciation of the test plaintiff properties as compared to the similar homes outside the contours further confirms that relocation of the Hornets has not adversely impacted residential property values in general, and specifically regarding the test plaintiff properties.

Moreover, plaintiffs have failed to address the fact that test plaintiff May has not presented evidence that her property value has diminished as a result of the alleged taking. See Def.'s Mot. pp 33-36. Test plaintiff May has presented no evidence of a diminution in property value. Instead, Ms. May has suggested that she is entitled to $30,000, for speculative construction costs to reduce noise impacts inside a house. Ms.

May is seeking an additional $50,000 for the "loss of use and enjoyment of her property."[46] The costs for sound mitigation measures (e.g., additional insulation, upgraded windows) and compensation for the loss of use and enjoyment of one's property are not available under the Fifth Amendment. At most, plaintiffs present demands for damages that could arguably be sought under a tort theory over which this Court has no jurisdiction. See 28 U.S.C. §1491.

For the foregoing reasons, the test plaintiff properties have not experienced a diminution in value and therefore, plaintiffs cannot establish a second, incremental taking.

---

[46] The remaining eleven test plaintiffs are also improperly seeking $80,000 for sound mitigation and "loss of use and enjoyment" of their properties.

## CONCLUSION

The test plaintiffs fail to state an overflight takings claim, and their claims are time-barred under the mandatory six-year statute of limitations of 28 U.S.C. §2501. Therefore, judgment should be entered in favor of the United States.

Dated: September 28, 2006

Respectfully submitted,

/s/ Steven D. Bryant
Steven D. Bryant
Kelle S. Acock
Environmental & Natural Resources
Division
United States Department of Justice
601 D Street, NW, Rm. 3205
Washington, D.C. 20004
Counsel for Defendants
202-305-0424

Of Counsel:
Robert J. Smith
Mary Raivel
Navy Litigation Office
720 Kennon Street
Washington Navy Yard, D.C. 20374

CDR Dominick Yacono
JAGC, USN
Commander Navy region
Mid-Atlantic, Code (00LE)
1510 Gilbert Street
Norfolk, VA 23511-2737