# EXHIBIT G

Case 1:01-cv-00201-VJW Document 180 Filed 09/28/2006 Page 10 of 11



1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, )
et al., )
)
Plaintiffs, )
)
v. ) NO. 01-201L
) Judge Victor J. Wolski
THE UNITED STATES OF AMERICA, )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION
OF CARROLL LINDSAY
TAKEN ON BEHALF OF THE DEFENDANT

Virginia Beach, Virginia

June 9, 2005

[Ap]pearances:

HOFHEIMER / FERREBEE, P.C.
By: KRISTEN HOFHEIMER, ESQUIRE
Counsel for the Plaintiffs

2

Appearances (Cont'd.)

U. S. DEPARTMENT OF JUSTICE
By: STEVEN D. BRYANT, ESQUIRE
KELLE S. ACOCK, ESQUIRE
And
DEPARTMENT OF THE NAVY
NAVY LITIGATION OFFICE
By: J. PAGE TURNEY, ESQUIRE
Counsel for the Defendant

3

INDEX


| [DE]PONENT | | PAGE |
|---|---|---|
| [CA]RROLL LINDSAY | By Ms. Acock | 4 |
| | By Ms. Hofheimer | 76 |
| | By Ms. Acock | 77 |
| | By Mr. Bryant | 102 |


EXHIBITS


| DESCRIPTION | PAGE |
|---|---|
| Purchase agreement dated 24 May 1993 to [E]ddie J. And Elizabeth L. Waterman | 28 |
| Tax assessment July 1, 2005 through June 30, [2]006 for 2244 Windy Pines Bend | 41 |
| [U]niform Residential Appraisal Report | 46 |
| [C]ustom Electric invoice | 48 |
| [P]ermit to Build | 49 |
| [P]hysical survey of Lot 237, Chesopeian Colony | 51 |
| [D]eed or Bargain and Sale | 54 |
| [D]eed of Trust | 55 |
| [S]ettlement Statement | 56 |
| [U]niform Residential Appraisal Report [..]09 East Kings Road | 57 |
| [B]uyers' Possession Agreement for Residential [Pro]perty | 61 |
| [Sk]etch/Area Table Addendum | 62 |


4

EXHIBITS (CONT'D.)


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 68 | Real Estate Tax Assessment July 1, 2004 through June 30, 2005 | 66 |
| 69 | Subpoena and Notice of Taking Deposition - Duces Tecum | 92 |

Case 1:01-cv-00201-VJW Document 180 Filed 06/09/2006 Page 11 of 14





would have been the fall of 1998.
Q. The fall of '98?
A. Correct. The surgery was in June, July of 1998.
Q. And that coincides with increased jet noise that you experienced in your home?
A. I was home. Yes.
Q. When you first came to Virginia Beach in 1979, did you know the Naval Air Station Oceana was here?
A. Yes.
Q. Did you know that they flew jets in and out of the base?
A. Oh, of course.
Q. Did you ever experience jet noise at any of the other homes that you lived at in Virginia Beach?
A. I'm sure I did. But was it anything significant? No.
Q. What do you mean by significant?
A. Significant means to the point where it was bothersome.
Q. What is bothersome?
A. Bothersome in that context to me would mean something that would interrupt my daily routine, my life, or something of that nature.
Q. Okay. Can you give me an example?
A. An example of something that would interfere with



my life?
Q. Yes.
A. I'm standing out in my yard talking to n and suddenly we can't hear each other. We just because you can't hear.
Q. Has that happened to you in your curre
A. Most definitely.
Q. Do you remember the first time that hap
A. I couldn't tell you exactly. It was somet the 1998 time frame.
Q. What about when you are inside your h you hear jets?
A. It's muffled somewhat. But when you a a TV program and you have got the volume so loud that it's -- I'm going to say almost vibrating the floor, the volume is so loud, and you still can't hear the TV, that's bothersome to me.
Q. You mean the TV volume vibrates the floor?
A. Yes.
Q. Or the jet --
A. Well, the jet noise too. Windows have shaken in my house. And I don't think that was because of the volume of the TV.
Q. Okay. You mentioned that you and your wife would be having a conversation outside. Does she live with you



now?
A. Yes. She is my wife now. When I referred to girlfriend earlier, it's my wife now.
Q. Have you seen jets fly over your property?
A. Numerous times.
Q. Can you describe that for me?
A. Oh, I mean I don't know exactly how to describe it. Jets -- I mean I'm not trying to give you a smart answer. Here's a plane. I'm standing outside. I hear the noise, a tremendous noise coming, and I look up and there's a jet plane. I recognize a jet plane. Sometimes they are very low.
Q. Can you tell me, or can you describe how low?
A. I don't know. I can't judge distances looking up in the air. I don't know. Low. To me, very low.
Q. You mentioned you have trees on your property?
A. Yes.
Q. Do they fly close to the trees?
A. Yes.
Q. To the tops of the trees?
A. Yes.
Q. Do you know about how far?
A. I can't give you a number of feet. I don't know.
Q. They seem to be close?
A. They seem pretty darned close to me, yes. Using



simple adjectives and adverbs, very close.
Q. You mentioned that you knew the Naval Air Station was here when you moved here in 1979?
A. Correct.
Q. And that they flew jets in and out of the base?
A. Yes.
Q. When you bought the property on East Kings Road, did you contact the base about the planes and the jets flying over?
A. No.
Q. Why did you not contact them?
A. I didn't see any reason to do that. I didn't think it would be necessary.
Q. Have you complained to the base before about jets flying over your home?
A. There is a -- I don't know what they call it, a hotline or something to that effect. There is a complaint line. I have attempted to call that on several occasions, and I could get nothing but put me on hold, or no one would ever answer the phone. So the answer is yes, I attempted to call to complain but I never was successful in making contact.
Q. About how many times have you attempted to call to the hotline?
A. Five, approximately.

Q. And so that's the primary reason?
A. That is the primary reason, yes.
Q. Where would you like to move to? Or have you thought about that?
A. I thought about it, thought about it, and thought about it. I really don't know. My wife is originally from Louisiana, and most of her -- all of her people still live in western Louisiana, or eastern Texas, in the Houston area. And she's lobbying awfully hard for that.
Q. I can understand.
A. But my favorite expression right now is only the Lord knows and he's not telling.
Sorry.
Q. I'm going back to the dates that you traveled for work, Monday through Fridays. You mentioned that it started in, sometime in 1995?
A. Right.
Q. Or maybe '96. And went through June?
A. As I think about it more, I'm pretty sure it was '95.
Q. And that went through June of '98?
A. Right.
Q. And you were gone Mondays through Fridays, and you were here in Virginia Beach on the weekends?
A. Yes.



Q. Is that your year round schedule?
A. Yes.
Q. That's the consistent schedule?
A. Well, that was the goal. As my boss would say, you're not making me any money sitting at home, or you're not making me money sitting here in Cincinnati. You make me money by going to the client's site and teaching them how to use computer hardware and computer software. Primarily software. So that was the goal was for me to be gone Monday through Friday.
Q. So if you had a vacation would you come back to Virginia Beach for vacation, or would you go somewhere else for vacation?
A. We would normally go someplace else.
Q. So for those years you were primarily here only on the weekends?
A. Correct. Primarily, yes.
Q. Did you bring the folder of documents with you today?
A. I brought a folder that I have some information in relative to the subject matter, yes.
Q. Can I take a look at those?
MS. HOFHEIMER: Let me -- I haven't seen it yet, so let me take a look and see what it is.
MR. BRYANT: When you're done looking at that,



you can hand it to me, assuming we can look at it.
MS. HOFHEIMER: It's got correspondence from us in it so I'm taking that out.
MR. BRYANT: Of course.
MS. ACOCK: But is it okay? Do you mind if I ask questions.
MS. HOFHEIMER: Yes. You can go on.
BY MS. ACOCK:
Q. I'm going to go ahead and keep asking you questions while she looks at those papers in your folder.
A. Okay.
Q. You mentioned earlier that you had seen jets fly over your home?
A. Yes.
Q. Can you be a little bit more specific about what you see. Can you see anything on the jet, like a mark or any kind of identification? Can you describe what you see?
A. The planes were flying very low.
Q. Okay.
A. If I had to sit here and tell you that I remember a particular plane flying over on such and such a date, or any date, for that matter, and I saw a certain marking, or I saw a certain number, or I saw the pilots in the cockpit, no. I couldn't tell you that. I mean, I wasn't thinking of that. I'd be calling a number, get his license plate and



call him for being a bad boy, for hot-dogging.
Q. So can you -- so are you saying that you can see those kind of details?
A. No. I cannot. Or I cannot or did not. And when I say did not, I wasn't looking for those kind of things.
Q. Do the -- did the jets when you described them flying over your property, do they fly about the same way every time they come over your property, or do they come from the same direction? Can you explain that?
A. They don't always come from the same direction, but predominantly they come -- let me get my bearings. If I'm sitting in front of my house, that's north. They come from the northeast, come from the northeast, and they are flying more towards the southwest. They are in a pattern like that most of the time. And that's either in a pattern that they are coming to make -- well, I'm not going to say what they are doing. I'm not really sure what they are doing.
Q. Is that the same way you observed them flying in 1998?
A. In 1998?
Q. Yes.
A. As compared to today?
Q. As compared to today.
A. For the most part, yes.

Q. So you're saying that the planes basically fly the same way today as they did in 1998?
A. To the best of my knowledge, yes. I don't recall anything being significantly different.
Q. Okay. Aside from those times that you were traveling for work between 1995 and '98, in June of '98, have you always resided in your home from the time of purchase -- are there any other times when you were not in your home?
A. Let me make sure I understand. First of all the time frame that you are talking about is --
Q. The house you currently live in?
A. Right.
Q. We talked about you going out of town for work?
A. Okay.
Q. Is that the only time period that you were gone for travel, or have there been other times where you left your home for travel?
A. I mean I have traveled, you know, on rare occasions. But on a vacation or something, I haven't really worked since I'm going to say June of 1998. So when I say worked, I haven't done a thing that's income producing. So I haven't done any traveling other than taking a vacation, or something like that. Or making a trip down to see my wife's parents down in Texas or Louisiana, or something like



that.
Q. And in going back to the jets flying around your house, when do they fly?
A. There is no specific time. I -- they -- during the day, also at night, there is no set pattern that I have been able to observe.
Q. When they fly at night, do you hear them when you are inside your home watching TV?
A. Yes. Yes. I mean the situation in terms of the effects and the disruption of my life, during the day the same disruption is -- the disruption is the same at night, because they are flying and doing basically the same thing.
Q. Can you sleep through the night?
A. I have been awakened on occasion by jet noise, but, you know, honestly, it's rare for me to be awakened by jet aircraft. It has happened on more than one occasion.
Q. Have you noticed if any of the homes around here have been sold recently?
A. Yes. Not -- I'll just say yes. Yes.
Q. Do you know, has that been recent, in the last month, two months, six months?
A. Well, when -- your question was has any homes sold around me recently. And the answer is yes. The house directly across the street from me sold about a year ago, two years ago, because I think I mentioned earlier that the



gentleman who lived there passed away, died, so his ex-wife, who was -- she inherited the house and she sold it.
The house on the other side, they had been there longer than we. The house directly across the street, she's lived there forever. There's been a couple of houses further down Kings Road that have been for sale and sold. There has been other houses in the neighborhood that have been for sale and sold. Recently, I would say the primary reason for that is taking advantage of the housing bubble that we're in right now.
Q. What do you mean by housing bubble?
A. Well, I'm -- I don't know what I mean. All I mean is basically quoting what they are saying in the newspaper, and what Alan Greenspan says. So that's second hand.
Q. What are they saying?
A. Well what basically they are saying is we're in a housing bubble, and what that means to me is that housing values have, in certain areas of the country have increased perhaps exponentially, so --
Q. Do you think the value of the homes in your neighborhood have increased exponentially?
A. No.
Q. No?
A. No.



Q. Why not?
A. I don't know. I wish I did.
Q. The house across the street that you mentioned, the first house you mentioned that sold, do you know how long it stayed on the market?
A. No. It wasn't days. It wasn't weeks. It was maybe a month.
Q. Okay.
A. Or two. I'm really not sure. It was -- it didn't sell like that.
Q. Do you know how much it sold for?
A. How do I answer that? I know what someone third-hand told me, but I don't really want to quote that figure, because I really don't know. I don't know on a factual basis.
Q. Well, what did they tell you?
A. Oh, 300 -- well, now I have forgotten. I think 300,000.
Q. Do you know how many bedrooms and bathrooms that house had?
A. No. I was only in it once or twice, and I really don't remember.
Q. Do you know anything about the house or the property?
A. I can tell you it's on East Kings Road. What can

69

socialize in any way.
Q. Can you describe for me when you first moved into the house and when you first started seeing jets fly around your house -- do they fly in your opinion directly over your house or a few blocks over, or can you give me a range of where they fly?
A. Both. They -- sometimes they fly directly over my house. Sometimes they are off to the left of that. And sometimes they are off to the right of that.
Q. So by directly over your house you mean like over the roof top?
A. Yes.
Q. And did they fly that way when you first moved into the house?
A. Yes.
Q. And so that -- and that was in 1994. Do you think they fly the same way now?
A. To the best of my knowledge, yes.
Q. And what do you expect to get out of this lawsuit?
A. I would like to say some relief from the intolerable noise situation.
Q. What do you mean by intolerable?
A. Intolerable to me is as the word suggests, intolerable. What's another synonym for intolerable? It's

70

very difficult to deal with something that interrupts your life, interrupts your conversation, interrupts your way of life.
Q. You mentioned relief from that. What do you mean by relief?
A. Well, the noise, jet noise is the cause of the -- is what I'm seeking relief of, something that would eliminate that noise. And over my house, near my house.
Q. So it sounds like what you're saying is you'd like the jets to go away?
A. The noise to go away.
Q. Like the noise to go away. Do you realize that in this lawsuit you are suing for money and for compensation?
A. Yes.
Q. So is that -- what do you expect?
A. I learned a long time ago once you make certain expectations, or you have certain expectations in your mind they don't materialize, you are disappointed, or whatever. So I don't know.
Q. Okay. How is money going to alleviate the concerns you have about jet noise?
A. How is money going to alleviate? I'm sorry. Repeat.
Q. How is money going to alleviate your concerns

71

about the jet noise?
A. I don't know that it will.
Q. What would eliminate your concerns?
A. To eliminate the jet noise, or to make the jet noise I'll call it tolerable.
Q. You described the noise a few minutes ago as intolerable?
A. Yes.
Q. What would be your opinion of what is tolerable?
A. I'm sorry.
Q. Well, what is the difference between what is intolerable and what is tolerable?
A. The difference between tolerable and intolerable, as it relates to jet noise, is the difference between, as an example, something that disrupts my life-style as opposed to something that does not disrupt my life-style.
Something that interferes with my conversation with my wife or my neighbor or someone that is visiting, and prohibits that conversation from taking place, as opposed to the opposite of that. To me, that's what I mean by tolerable or intolerable. Or not tolerable.
Q. Do you think the noise was tolerable before the fall of '98?
A. I do not recall the disruption and the noise level being to anywhere near the extent prior to the arrival

72

of the F/A-18s. Or putting it a different way: The activity with the F/A -- with the F-14s as an example, the Tomcats, there was noise levels there, but that I did not necessarily put in the intolerable category.
Q. Why is that?
A. For the reasons that I have already stated. It was -- the noise level is -- it's certainly there with the F-14s. But it is not intolerable to the extent that it disrupts my life-style, to the extent that it keeps -- prohibits me from carrying on a conversation when they are flying.
Q. When the F-14s are flying, how do you know F-14s were flying before the F-18s?
A. Well, generally speaking, I can tell the difference between -- visually, between an F-14 and an F-18.
Q. So did you see F-14s flying near your property before you saw F-18s flying?
A. Yes.
Q. When did you see F-14s flying?
A. I don't recall. I mean I couldn't tell you a date. I don't know. I can't remember.
Q. Would it be before the fall of '98?
A. Yes.
Q. And when you saw those F-14s flying, could you have a conversation outdoors then?