# EXHIBIT I

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, )
et al., )
)
Plaintiffs, )
)
v. ) NO. 01-201L
) Judge Victor J. Wolski
THE UNITED STATES OF AMERICA, )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION
OF MICHAEL J. LEARY,
TAKEN ON BEHALF OF THE DEFENDANT

Virginia Beach, Virginia

April 28, 2005

Appearances:

SHUTTLEWORTH, RULOFF GIORDANO & SWAIN, P.C.
By: STEPHEN C. SWAIN, ESQUIRE
Counsel for the Plaintiffs

U. S. DEPARTMENT OF JUSTICE
By: STEVEN D. BRYANT, ESQUIRE
DOMINICK G. YACONO, ESQUIRE
Counsel for the Defendant



INDEX


| DEPONENT | | PAGE |
|---|---|---|
| MICHAEL J. LEARY | By Mr. Bryant | 3 |


EXHIBITS


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 11 | Plaintiffs' Answers to Interrogatories, Michael and Diane Leary | 17 |
| 12 | Deed of Bargain and Sale, Thomas J. Moody and Janet M. Moody to Michael J. Leary and Diane M. Leary | 75 |
| 13 | Deed of Trust | 76 |
| 14 | Settlement Statement, HUD D-1 | 77 |
| 15 | Physical Survey, Lot 46, Landstown Meadows | 78 |
| 16 | Certificate of Reasonable Value | 78 |
| 17 | Proposal from Nature's Edge dated 4/24/02 | 90 |
| 18 | Invoice from Bradford-Cameron to Ms. Diane Leary | 90 |




Deposition upon oral examination of MICHAEL J. LEARY, taken on behalf of the Defendant, before Frances P. Zahn, RPR-RMR, a Notary Public for the Commonwealth of Virginia at large, taken pursuant to notice, commencing at 8:10 a.m. on April 28, 2005, at the offices of Shuttleworth, Ruloff, Giordano & Swain, Virginia Beach, Virginia; and this in accordance with the Federal Rules of Civil Procedure.

MICHAEL J. LEARY was sworn and deposed on behalf of the Defendant, as follows:

EXAMINATION

BY MR. BRYANT:

Q. Good morning, Mr. Leary. My name is Steve Bryant from the Department of Justice. How are you?
A. Fine.
Q. Have you ever been deposed before?
A. No.
Q. Let me sort of go over the ground rules of how this takes place. I'll ask questions and you'll answer them. Mrs. Zahn is going to be taking down everything we say verbatim so we can't talk over each other, and if you would, please enunciate your response and say yes or no rather than nodding your head or uh huh, that kind of thing can be confusing, to keep the record clear.
Also, if at any time you want to take a break,



just say the word and we will go off the record and you can do so.
And if you don't understand the question that I ask, please let me know and I'll be happy to rephrase it.
A. Okay.
Q. Any questions about any of that?
A. No, sir.
Q. Okay. Let's first start, if you could tell me what your occupation is?
A. I am a defense contractor.
Q. Okay. With whom and what do you do?
A. Serco. I do some work for the Naval Supply Systems Command.
Q. Let's go back to Serco. I assume it's an acronym, or is it?
A. It's Serco. They recently acquired a company I used to work for, Resource Consultants.
Q. And what do you do for them? What is your position?
A. I do a lot of logistics work for the Naval ships.
Q. What is the title of your position?
A. Lead logistics analyst.
Q. And go into some detail, if you would, about what you do as a lead logistics analyst?
A. The afloat supply applications, I work with

A. If I -- from my memory, it stayed pretty consistent.
Q. Pretty consistent. Okay.
For how many years did it stay consistent?
A. Until today.
Q. Until -- when you say today, you mean right now? Do you mean a year ago, or what do you mean?
A. I would say until, yes, right now.
Q. Until right now.
And tell me about the operations right now, how they are different?
A. They are just louder.
Q. Well, I'm talking more at the moment about, referring to the level of operations in terms of -- you said back in '95 and consistently thereafter until about today, four to five days a week, when they are operating, that would be for a couple of weeks, maybe down for a couple of weeks, and then the 70 to 30 percent proportion that you mentioned, when did that change? Or how did that change, if it did?
A. I haven't really noticed any change.
Q. Okay. So in terms of the level of operations, it's been even the same from when you moved in until now? Not the noise impacts; the level of operations.
A. I would say it's maybe slightly increased since



'95. I mean they have just always flown a lot. I just never really kept track.
Q. And you said that they are louder. I think you said today they are louder. When did they become louder? The jets?
A. Exactly -- '99, but exactly when I don't know.
Q. And how is it louder? How is it different?
A. It's hard to explain but the noise from the jets is significantly louder than it used to be with the F-14s that they used to fly.
Q. And was it a -- I mean was it sort of a night and day thing? Was it a dramatic difference that you noticed?
A. Yes.
Q. So when did you notice a dramatic difference? What happened? Was anything going on?
A. No.
Q. That stands out?
A. I knew that they were -- they had to bring up these planes from Cecil Field, I believe it was in Florida. You know, you hear on the news, you know, they were different type plane, louder. And they sure were.
Q. So you heard on the news that a louder aircraft was coming? Is that what you said?
A. Yes.
Q. And when did you hear that on the news?



A. I can't remember exactly. It was, you know, '98, '99, somewhere in that area.
Q. Okay. And how soon after you'd see a news broadcast -- saw a news broadcast of that, with that information, did you experience a change?
A. As soon as the F-18s started flying. You know, what that date was, I couldn't tell you. But you knew there was a difference.
Q. Okay. Did you -- could you look in the air and tell the difference between an F-18 versus another aircraft by looking at it when it's flying above your house or near your house?
A. Well, they are going so fast, but, yes, I could point out the difference.
Q. You could tell the difference? When do you remember seeing F-18s above your neighborhood, if you -- we'll go back to that.
When do you remember starting to see F-18s when -- near your residence?
A. Sometime in '99.
Q. Was it in the winter of '99, or spring, summer?
A. I'm sorry. I can't really pinpoint it.
Q. Was there any change in -- between the Tomcat that preceded the F-18 -- was there any change in terms of the altitude and where they were flying in relation to your



house from the Tomcat to the Hornet? Was there any change?
A. No. They appeared to be flying similar flight paths.
Q. And can you estimate now the altitude of the jets that are flying in relation to your house?
A. No. I'd hate to -- they are low. That's all -- that's the best estimation I can give you.
Q. Let's say if you had to put it in football fields, for example. How many football fields? Stack them up.
A. I'd hate to say. I really can't judge distance that way. But they are close.
Q. Can you read the lettering on the jets?
A. At times, yes, sir.
Q. At times. Explain how at times -- how there's a difference between the certain times you can read the lettering and other times you can't?
A. Well, the closeness. If they are going over like my next door neighbor's house, sure, I can pick it out. But if they are just flying somewhere else over my subdivision, my eyesight can't.
Q. And so you just said that at times the planes are flying over your neighbor's -- your immediate neighbor's house?
A. Or my house.

49

A. Yes.
Q. And I say ex. You are retired. You are still part of --
A. In the subdivision I'm sure there's plenty, but in my cul-de-sac there's no retired Navy.
Q. How do you know that there is such a high percentage of active duty and ex-Navy in your neighborhood? How do you know that?
A. On the base decals on their vehicles. And sometimes I see them in uniforms in their yards.
Q. When -- before the F-18s were transferred here from Cecil Field, you said you were aware then. Did you attend any public meetings discussing that?
A. No, sir.
Q. Okay. Have you ever attended any public meetings discussing jet noise or any other related --
A. No, sir.
Q. -- Naval Air Station Oceana issues?
A. No, sir.
Q. Have you attended any public meetings related to anything since you have been in this area in Virginia Beach?
A. No, sir.
Q. Now I'd like to explore the difference that happened when the F-18s arrived in terms of the noise impacts that you felt. Describe what effect it has? Or

50

what effect it did have in 1999 when they started flying?
A. No effect other than that they are just significantly louder than what I remember.
Q. Has it -- did it change anything about the way you lived in your house, the increased noise, being significantly louder?
A. Other than, you know, having to raise the volume on the TV, at different times, you know. You know, you'd have to take all your phone calls inside. You know, you obviously couldn't talk outside.
Q. Can you have conversations -- well, I guess you're indicating that you could have a phone call inside the house when the planes are going over and hear the other person?
A. Yes, sir.
Q. So you can obviously have this type of conversation with somebody in your house when the planes are going over and hear each other?
A. You might have to take a brief pause, especially if it's going fairly close to your house.
Q. What about when you're outside in the 1999 time frame and -- well, we're talking about the 1999 time frame. What about outside? How would it affect you when you're outside?
A. If you saw it coming, you would, you know, brace

51

for it. You would put your fingers in your ears, that type of thing.
Q. Okay. So a conversation you were having would cease until it passed over?
A. Oh, absolutely.
Q. Anything else besides raising the volume on the TV, phone calls inside the house, any other -- and then, as you said, putting your fingers in your ears while you are outside. Any other sort of effects that the noise would have?
A. Not that I can think of.
Q. Would you describe that sort of an impact as making your house unsuitable for living, residential living?
A. Let's just say it's less enjoyable.
Q. So if it's less enjoyable, then you still enjoy your house but just not to the same level you would enjoy it without the noise?
A. Well, it's, you know, it may be unsuitable. I mean, it's just, you know, unfortunately something that I have had to live with.
Q. Well, you said it may be unsuitable. I'm going to explore this in terms of --
A. That's just a broad definition.
Q. I mean is your house with the noise with the F-18s flying over it, which is, it's in the flight path, or

52

below the flight path, so that is something you are going to experience. Recognizing that, is your house unsuitable for residential living?
A. I believe where someone could get that interpretation.
Q. Well, I'm asking you. What's your view of it? Not someone else.
A. If I had to go one way or the other, I would say unsuitable.
Q. Why do you say it's unsuitable for residential living?
A. Well, it's -- you can't enjoy your yard. Invariably -- and I guess it's probably because of safety reasons, they fly on nice days when, you know, you want to be outside in your yard; and it makes it rather unpleasant to deal with the constant bombardment of the jet noise.
Q. Now, when you say constant, you mean when they are flying? There's times when they are flying a couple of weeks, and they won't fly for a couple of weeks. That still holds true, right?
A. Pretty much, yes.
Q. And that was also true in 1999?
A. Right.
Q. Let's go back to when you moved in in '95 and up until '99. And there was obviously jet noise as you

discussed earlier then. Could you talk on the phone outside back then?
A. No.
Q. So you had to go inside to talk on the phone back then?
A. Yes.
Q. Did you have to turn up the volume of your television when the jets were flying over?
A. At times, yes, sir.
Q. Did they fly on nice days back then in terms of --
A. Don't get me wrong. They don't always fly on nice days. There's overcast days and rainy days I'm sure they are flying. It just seems like the majority of the time they are nice days that they fly. But, yes, it's similar.
Q. To what it was back then?
A. (Deponent nodded head.)
Q. And back then when you were outside, did you have to put your fingers in your ears when the jets flew over, the Tomcats?
A. If they were -- yes. Especially if they were very close, yes, sir.
Q. Was your house unsuitable for residential living before '99? In light of the fact that you had to plug your



ears when you were outside and that you had to take phone calls inside the house, turn up the volume of the television, and those kind of things? Was it unsuitable then?
A. I don't believe so.
Q. You don't believe so.
But starting in 1999, you believe it's unsuitable?
A. Somewhere in that proximity.
Q. Somewhere in that proximity. What do you mean?
A. Sometime in 1999.
Q. Okay. Yes. Whenever the F-18s, you started experiencing F-18s that were flying over the house?
A. Yes, sir.
Q. Well, why do you view it, the difference that it was suitable back then and it's unsuitable now? Because it sounds like you had roughly the same sorts of inconveniencies from the noise in terms of plugging your ears when you were outside, taking phone calls indoors, turning up the volume of the television, and those kind of things. Why the difference?
A. Just the extent of the volume. It's, you know, where something might have been a nuisance in the past, it's down right bothersome now. I mean it's -- you know, certain level of music in your car, you know, at one time if they



cranked it up, it might become unbearable.
Q. And you just said unbearable. Do you view living in your house as unbearable because of the F-18 noise?
A. No.
Q. So it's not unbearable?
A. I wouldn't go the that extreme, no.
Q. But you -- so you view, say on a continuum of living conditions, I guess you're saying unbearable is at the far end, and no jet noise at all would be at the other end?
A. Uh huh.
Q. Is unsuitable somewhere to the left of unbearable? Somewhere towards the less of a nuisance as you said?
A. Yes.
Q. On the spectrum.
And when I say unsuitable for residential living, just so we're clear about what that means, I'm defining it in the context of they are just not compatible. You can't live -- living in that type of an environment is just -- you can't live with that kind of noise. You can't -- I guess I'm defining it as being unbearable. You're saying it's a lesser -- you're viewing it as a lesser degree. Unbearable by your definition would mean we have to move out of the house. Is that accurate?



A. I don't know what would eventually make me move out of the house; but, yes, it's -- just not being able to enjoy what other people take for granted. You know, living in their yards.
Q. But that recognizes that even before the F-18s got there, you still had to plug your ears and those other things we talked about, going inside for phone calls and that kind of thing. So when you say other people take that for granted, other people who are not subject to any jet noise don't have to do those things either, correct?
A. Yes.
Q. Plaintiffs' Answers to Interrogatories.
I'm showing you again DX 11. On page 14, also known as --
Before I do that, actually I'd like just, for the record, to clarify that DX 11 is OCE222906 through OCE222931.
Turning to page 14, also OCE222919, if you could look at -- one moment. Subparagraph A?
A. Okay.
Q. And just read the first two sentences to yourself.
Do you agree with that?
First, let me know when you are finished.
A. Yes.