# EXHIBIT L

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, )
et al., )
Plaintiffs, )
v. ) NO. 01-201L
) Judge Victor J. Wolski
THE UNITED STATES OF AMERICA, )
Defendant. )

DEPOSITION UPON ORAL EXAMINATION
OF SEAN M. RYAN
TAKEN ON BEHALF OF THE DEFENDANT

Virginia Beach, Virginia

April 27, 2005

Appearances:

SHUTTLEWORTH, RULOFF GIORDANO & SWAIN, P.C.
By: STEPHEN C. SWAIN, ESQUIRE
Counsel for the Plaintiffs

U. S. DEPARTMENT OF JUSTICE
By: STEVEN D. BRYANT, ESQUIRE
DOMINICK G. YACONO, ESQUIRE
Counsel for the Defendant





INDEX

DEPONENT PAGE
SEAN M. RYAN By Mr. Bryant

EXHIBITS

NO. DESCRIPTION PAGE
3 Signed page of real estate contract, Bates OCE223263 ........ 44
4 Appraisal of 1856 Pathfinder Drive ........ 67
5 Partial complaint ........ 77
6 Plaintiffs' Answers to Interrogatories, Plaintiffs Sean and Graciela Ryan ........ 86
7 Invoice from Home Front Contracting, Inc. to Mr. & Mrs. Sean Ryan ........ 93
8 Deed of Bargain and Sale, from Richard M. Kemp to Sean M. Ryan and Graciela F. Ryan ........ 94
9 Deed of Trust ........ 95
10 AICUZ map (retained by Mr. Bryant) ........ 111





Deposition upon oral examination of SEAN M. RYAN, taken on behalf of the Defendant, before Frances P. Zahn, RPR-RMR, a Notary Public for the Commonwealth of Virginia at large, taken pursuant to notice, commencing at 12:25 p.m. on April 27, 2005, at the offices of Shuttleworth, Ruloff, Giordano & Swain, P.C., Virginia Beach, Virginia; and this in accordance with the Federal Rules of Civil Procedure.

SEAN M. RYAN was sworn and deposed on behalf of the Defendant, as follows:

EXAMINATION

BY MR. BRYANT:
Q. How are you, Mr. Ryan?
A. Good.
Q. I'm Stephen Bryant from the Department of Justice, along with Commander Yacono on behalf of the Navy. We're here on behalf of the United States. First I'd like to know if you have ever been deposed before so I'll go over the ground rules. Have you ever been in a deposition?
A. No.
Q. It's a question and answer sort of thing, and I'll ask questions throughout. You need to answer them. She's going to be taking everything down verbatim so we can't talk over one another, and please verbalize your answers. Don't nod or say uh huh because that can get





mistranslated.
A. Yes.
Q. Thank you. And if you need a break at any point during this, just feel free to say so at any time and we'll stop. For a bathroom break, whatever you need, that's fine.
And if you don't understand the question I ask, please let me know and I'll rephrase it.
A. Fine.
Q. First, I'd like to ask, have you ever been a plaintiff or a defendant in another case before?
A. Yes, I have.
Q. Okay. Can you tell me about that. How many times, first?
A. Just once.
Q. Just one case?
A. It was an accident that occurred to me on board ship.
Q. And when was that?
A. This was back in -- I'm not really sure about the date, but it was like '90 -- early '90s.
Q. And you say it was on a ship. What happened?
A. A line was hooked around a fairlead and the horn of the fairlead parted and the line hit me and I got hurt.
Q. I don't know what any of that -- what a fairlead is?

A. It was.
Q. Okay. And when did it become unsuitable?
A. Well, it started to get bad, real bad, you know, when the Hornets were coming, and they -- they, you know, when they started getting more and more jets at the base, there were more jets, more flyovers. And that's what made it getting bad.
Q. Okay.
A. It steadily got louder and louder.
MR. BRYANT: I'd like to mark this partial complaint as DX 5, I guess is the next number?
(Partial complaint was marked Defendant's Exhibit No. DX005.)
(Discussion off the record)
BY MR. BRYANT:
Q. I think I may have shown you this before, Mr. Ryan. OCE222981 through OCE223005. It's Plaintiffs' Answers to Interrogatories from the Plaintiffs Sean and Graciela Ryan.
I hand this back to you.
MR. BRYANT: I think we have another copy if you'd like to see it, Mr. Swain.
BY MR. BRYANT:
Q. If you could go to page 24 of that document, please. It has your name and your wife's name but no





signature.
A. No. I guess we forgot that one.
Q. Well, what I'm trying to get at is, I'd like you, with that said, I'd like you to review the document and see if you have ever seen it and if you agree to the answers that are in there on your behalf.
MR. SWAIN: Would, after you finish the question about the interrogatories, be a good time to take a break?
MR. BRYANT: Absolutely.
BY MR. BRYANT:
Q. Take your time reviewing that. Don't let me rush it.
A. Well, I remember talking to Jack about this. I don't know why I didn't sign it.
Q. Did you see this document?
A. I do believe so.
Q. All right. I'd like you to turn -- once you are done -- let me know when you are done reviewing it.
A. Okay. I have seen it before.
Q. And you agree with the contents?
A. Yes.
Q. Okay. On page 6, if you would go to -- it discusses in the middle of subparagraph C in the response about aircraft operating in a pattern with several aircraft circling every few minutes, do you experience that at your





house in Upton Estates?
A. One flyover every couple of minutes.
Q. Several aircraft circling every few minutes directly over and around the plaintiffs' home. I'm trying to figure out if this part of the answer applies to your house or not. That's what I'm trying to get at.
A. Yes. They fly over.
Q. When you say they fly over, let's start with that. Directly over your house?
A. Sometimes. I'm not going to say all the time.
Q. And when you say, literally looking up it's directly over your house?
A. Yes.
Q. How high in the air, altitude?
A. I don't know. You can see them pretty close. I don't know.
Q. Can you see the pilots' faces?
A. I'm looking underneath it. I can't see the pilot.
Q. Are we talking 100 feet, 1,000 feet, 2,000 feet? What are we -- you've been around airplanes for a long time.
A. I guess -- I don't know. Four, 500 feet I guess.
Q. 500 feet above your house?
A. Yes. I guess. Maybe more. Maybe less. I don't know. To look up there and, you know, to tell you the truth





I really don't know how big those planes are. But -- yes. They are -- you can see them fairly, real clear.
Q. Okay.
A. I don't know how high they are. No, I don't.
Q. And were the aircraft, the jets, when they flew over, when you moved in in '96 and '97 and '98, were they also flying in that same pattern above your house?
A. Yes. We were having flyovers. But I don't know if it's the same -- maybe close to it. But I don't know if it was the same, you know, path.
Q. Well, was it --
A. They were the same proximity, yes.
Q. Some were over your house?
A. Yes.
Q. And some weren't?
A. Yes.
Q. Were they the same altitude, roughly?
A. Yes. But sometimes they are higher and sometimes they are lower. You know, they are not all exactly --
Q. Sure.
A. -- at the same height.
Q. So what would you estimate the range of altitudes. You said sometimes 500, maybe 1,000. What did you say?
A. Something like that. I'm not sure on the

heights. I really don't know.
Q. Okay. What percentage of the flights are directly over your house? Starting in 1999 when you said it became unbearable.
A. I would say like about 46, 48 percent. Not all of them. And not quite half of them.
Q. So just under half -- just under 50 percent of the flights were directly over your house?
A. Right. The small half.
Q. I understand. Just under. So the remaining 60 whatever percentage?
A. They were --
Q. Or 55, whatever?
A. They were not -- they were like over a little bit.
Q. And when you say over a little bit, blocks?
A. Sir, I don't know. Maybe a block over.
Q. Within a couple of blocks?
A. Yes, sir. Street, you know.
Q. So, in other words, all the flights that you experienced are either directly over your house or within a couple of blocks of your house?
A. From my house being the center. Okay? You probably could go five blocks each way. Okay?
Q. And that includes all the flights that you are





being exposed to?
A. Well, the low ones. The lower ones are in that area. The higher ones are maybe a little off from that.
Q. And when you say a little off from that, what do you mean?
A. Add a couple more blocks to each side.
Q. So within maybe even a five block radius, that's all the flights in terms of noise that you are experiencing?
A. Yes. My house being the center.
Q. And so are half on one side of your house and the other half on the other side?
A. I don't know the percentage.
Q. All right. And it was roughly the same sort of five block radius when you moved in in '96?
A. I would say, yes.
Q. Yes. So when you were doing that search for -- you were looking for a house, how many houses did you say you looked at in the neighborhood?
A. A few. I don't know the exact number. Maybe 15.
Q. Yes. I think you said 10 to 15. Did you consider picking another one of the houses that might not have been directly under the center of that flight path that you were observing?
A. Well, no. That didn't come into play, to tell you the truth, no. We were looking for the criteria of the





house and not the flight path of the jets.
Q. And aircraft noise was not a concern?
A. Not at the time.
Q. We'll take that break in just a minute. I'm almost finished with this.
Now going back to my original question, you said earlier in an August 1999 party you had, you had basically -- correct me if I am wrong -- four individual flyovers.
A. I would say four, yes.
Q. Three to four, whatever it was?
A. Right.
Q. What I'm trying to figure out is --
A. But I said that there were three to four jets that weren't clustered that would go over at a time, one right after the other.
Q. Three to four jets roughly together but not right next to each other?
A. No. One behind the other.
Q. So in sort of a pattern kind of thing?
A. Right.
Q. And that happened in '99?
A. The party in '99.
Q. And it happened -- did it happen before in '96 through '98?
A. It might have done that.





Q. Did it happen when you were looking at the houses?
A. They were -- I remember that there were some jets that flew over, yes. I don't remember what flight path they were in, or whatever.
Q. I'm saying were there groupings? That's what I'm getting at. Did you have three at a time, that kind of thing? Were they still spread out a little bit?
A. I think they were spread out. They weren't wing to wing.
Q. I mean one behind the other. That's what I'm talking about?
A. Well, sure. Yes.
Q. So you had that in '96, and even before you bought the house?
A. Right.
Q. Before '99, when you were outside having a party, or barbecue, or whatever else, and the planes flew over, could you talk and hear each other?
A. No.
Q. Did you have to turn up the TV?
A. Certainly. Yes.
Q. And I'm talking about before '99. That's what I'm talking about now, not after?
A. Yes.

Q. And phone conversations, the same sorts of problems?
A. Yes.
Q. So you had the same sorts of problems before and after '99?
A. Right.
Q. In terms of the enjoyment of the house?
A. Right.
Q. All right. Let's mark this exhibit as DX006, please. I'm sorry. The Plaintiffs' Answers to Interrogatories, Plaintiffs Sean and Graciela Ryan.
(Plaintiffs' Answers to Interrogatories, Sean and Graciela Ryan, was marked Defendant's Exhibit No. DX 006.)
MR. BRYANT: We can take a break now.
(Recess)
BY MR. BRYANT:
Q. I want to turn back to -- what is your current occupation?
A. Merchant mariner.
Q. And is it ABS?
A. No. I sail boatswain now.
Q. Say that again. I'm sorry?
A. I sail boatswain.
Q. Can you -- what do you do in that position?





A. I supervise the maintenance of the ship.
Q. And where does that take place?
A. Well, different places all over the world, whatever ship I'm going on.
Q. So you deploy with the ships?
A. I work for a union and the shipping companies have ships. Right now, I'm employed by Maersk Line Limited.
Q. Can you -- sort of explain this to me because I don't really understand it. In terms of supervising the maintenance of the ships?
A. Right.
Q. How and when do you do that? Is it nine to five?
A. Eight to five. I'm usually a day worker. I'm not a watch-stander. And when guys come out for overtime, I tell them what needs to be done to the ship, and they do it. Chipping and painting.
Q. And does this occur in Virginia Beach, or does it occur elsewhere in the world?
A. Elsewhere in the world.
Q. What types of locations?
A. Well, May 9 I'm flying to Dubai to catch a ship.
Q. How often are you away from this area?
A. I usually work four and four.
Q. Four months here, four months away?
A. All right. But that's not every time. This time





it's going to be eight and five. Eight here, five at work. Or four.
Q. And when you are here, if it's four and four, the four months that you are here, what are you doing during that time period?
A. Messing around my house.
Q. So you have --
A. I have a barn.
Q. If we can go sort of over time, in 1999 do you recall, were you working in the same position in 1999? When did you start with this?
A. Yes. I was sailing boatswain in '99. I think I started sailing boatswain sometime around '99.
Q. What were you doing just before that?
A. I was an AB.
Q. AB. Okay. And were you deployed as an AB also?
A. Yes.
Q. I said deployed in the colloquial sense. And that's with the same company?
A. No. Different companies.
Q. I'm getting them mixed up now. I'm sorry.
When you were an AB, what was the time period you were an AB?
A. From -- I guess I started sailing AB in '88.
Q. Through?





A. I guess '99. Something like that.
Q. Okay.
A. I'd have to check my records. I don't know.
Q. And with that position, how often were you away from this area?
A. Four months.
Q. The same four and four kind of thing?
A. Well, no, I worked. Usually, I was what they call tramping. I was worked for anyone. I didn't have a permanent job. So I would work four months, and probably stay home six.
Q. And then sometime in '99, do you recall what month you became a maintenance supervisor?
A. I don't know. I'd have to check my records.
Q. And when you first joined this company, this is a unionized thing?
A. It's for a union, yes.
Q. What was your first assignment?
A. With the union?
Q. Yes. With this new position that you took in '99?
A. What was my -- where did we go?
Q. Yes. I'm trying to figure out what your first --
A. Oh, we carried tractors to the Ukraine.
Q. To Ukraine?