# EXHIBIT P

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| CAROL AND ROBERT TESTWUIDE, et. al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No.: 01-201L |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | Judge Victor J. Wolski |
| Defendant. | ) | |

**EXPERT REPORT OF DAVID DALE-JOHNSON, Ph.D.**

PENGAD-Bayonne, N. J.
DEFENDANT'S EXHIBIT
DX 584

OCE262051

## TABLE OF CONTENTS

Page

**I. Introduction ..... 1**

A. Qualifications ..... 1
B. Scope of Assignment ..... 2
C. Documents Considered ..... 2
D. Summary of Conclusions ..... 3

**II. Case Background ..... 5**

**III. Response to Nelson Report ..... 9**

**IV. Analyses of the Impact of the Realignment on House Values ..... 11**

A. Analysis of Changes in Noise Levels and House Values ..... 12
1. Methodology ..... 12
2. Data ..... 13
3. Results ..... 16

B. Analysis of House Values Inside and Outside Noise Contours ..... 17
1. Methodology ..... 17
2. Results ..... 18

C. Analysis for the Range of Noise Levels for the Test Plaintiffs ..... 19
D. Analyses for the Alternative Scenarios ..... 20

**V. Conclusions ..... 21**

# I. Introduction

## A. Qualifications

1. I am currently the Chief Investment Officer for Fog Cutter Capital Group Inc., a company whose activities include investments, both direct and indirect, in residential and commercial real estate equity and debt, as well as investments in operating companies, among them a restaurant company of which I am a director. Prior to assuming my current position at Fog Cutter, I was an Associate Professor of Finance and Business Economics at the University of Southern California Marshall School of Business, where I taught courses in microeconomics, macroeconomics, real estate finance and investments, and real estate development. While at the Marshall School I also served as the Director of The Program in Real Estate. I also am a Director at LECG, LLC, a firm that provides consulting services to government agencies, regulatory bodies and companies on economic and other issues.

2. I have a Ph.D. in Applied Economics from the University of California, Berkeley (1980), where my dissertation was "Hedonic Prices, Hedonic Price Indexes, and Housing Markets." I have a M.Sc. (1975) and a B.A. (1969) from the University of British Columbia. I joined the faculty of the Marshall School of Business at the University of Southern California in September 1979. In 1999, I received a joint appointment at the School of Policy Planning and Development at the University of Southern California. In 1990, I spent one year as a visiting Associate Professor at the Faculty of Commerce and Business Administration at the University of British Columbia in Vancouver, Canada.

3. I have written extensively on the subject of real estate valuation, including the subjects of hedonic pricing, housing valuation, and residential property values. My research has been published in books and peer-reviewed publications. I am a member of the Board of Editors of the *Journal of Real Estate Research.* I have served on the Board of Editors of *Real Estate Economics* and the *Journal of Real Estate Finance and Economics* and continue to be an ad hoc reviewer for those journals and other real estate research-oriented journals.

of Raymond B. Palmquist. I, or others working under my direction, also have reviewed various academic articles, government reports and studies and newspaper articles. I have used data produced by the City of Virginia Beach Department of Communications and Information Technology, Wyle Laboratories, Inc., Ecology and Environment, Inc., and TeleAtlas North America, Inc. A full list of documents considered can be found in Appendix B.

**D. Summary of Conclusions**

7. I conclude that Dr. Nelson fails to show that the realignment of aircraft and personnel to NAS Oceana in 1998/99 had a negative impact on house values for the area surrounding NAS Oceana. First, although Dr. Nelson purports to evaluate the impact of the realignment on house values, he never analyzes actual house value data for the area to determine if house values were in fact negatively impacted by the realignment. As a consequence, Dr. Nelson does not provide any evidence that house values were actually negatively impacted as a result of the realignment. Rather, Dr. Nelson relies on findings from selected studies that have examined the relationship between noise and house values around commercial airports, assumes that results found for noise level and house values in his selected studies would hold for the area around NAS Oceana, and assumes that a *change* in noise level for a given house would cause a *change* in the value of that house by an amount suggested by studies cited by Dr. Nelson, even though those studies do not examine the effects of noise level *changes* but rather how different houses with different noise levels are valued. There are many reasons why these assumptions may not be realistic, so it is puzzling to me that Dr. Nelson would conclude that the realignment had a negative impact on house values without ever looking at actual house value data for the area around NAS Oceana. Without looking at actual data, Dr. Nelson has only assumed that there was a negative impact on house values due to the realignment without determining if there was an actual measurable impact.

8. Second, even if Dr. Nelson examined actual data for the area around NAS Oceana and found evidence of a negative relationship between noise level and house value (*i.e.*, that houses with higher levels of noise exposure were worth less than houses

with lower levels of noise exposure, all else equal) and found evidence that *changes* in noise levels were associated with *changes* in house values in the same way, this still would not be sufficient to conclude that the realignment caused a decrease in house values. This is because Dr. Nelson makes the fatal error of assuming that the only effect of the realignment on house values was that the realignment increased noise levels. He completely ignores other effects of the realignment that would be expected to have a positive impact on house values for the area around NAS Oceana. For example, the realignment resulted in the movement of an estimated 8,300 people from Florida to the Virginia Beach area, including approximately 3,700 military and civilian personnel.[3] In addition, the realignment was expected to add roughly $308 million annually to the regional economy and increase taxes by $7.8 million annually.[4] Such increases in population and spending would be expected to result in an increase in the demand for housing which in turn would be expected to cause house values to increase -- an increase as a result of the realignment. Thus, even if Dr. Nelson accurately measured the effect of the increase in noise due to the realignment on house values, he would not be measuring the entire impact of the realignment on house values because his methodology ignores the positive impact the realignment may have had on house values as a result of an increased demand for housing.

9. I have conducted two analyses that are better suited than the approach proposed by Dr. Nelson to examine the impact of the realignment on house values. The first analysis uses a widely accepted methodology – a repeat sales model – to examine the impact on house values from a change in an environmental factor, such as noise. This methodology is well-suited to study whether the change in noise due to the realignment had a negative impact on house values. The second analysis uses an event study methodology to examine whether values for houses that should be most adversely affected by additional noise resulting from the realignment (*i.e.*, houses with a post-

[3] United States, Office of the Federal Register, "Record of Decision and General Conformity Determination for Realignment of F/A–18 Aircraft and Operational Functions From Naval Air Station (NAS) Cecil Field, Florida, to Other East Coast Installations," *Federal Register*, Washington, D.C.: GPO, May 21, 1998, 27925-27930.

[4] Jack Dorsey, Dale Eisman, Louis Hansen, and Dave Mayfield, "Oceana Gets 156 More Jets; Beaufort, SC Wins Two Squadrons," *The Virginian-Pilot*, May 19, 1998, A1.

realignment noise level greater than 65 dB) behaved differently than values for houses that should be least adversely affected by the additional noise due to the realignment (*i.e.*, houses with a post-realignment noise level less than 45 dB) around the time of the realignment. Since the positive impact of the realignment on house values (through increased housing demand) would likely accrue to both houses affected by and houses unaffected by the noise component on the realignment, if no impact is found for the noise component, then one can conclude the realignment did not negatively impact house values.

10. I find no relationship between the changes in noise that occurred as a result of the realignment and changes in house values before and after the realignment. In other words, there is no evidence that houses that experienced greater increases in noise due to the realignment appreciated at a different rate than houses that experienced little or no increase in noise. I also find that values for houses that would have been most affected by the noise component of the realignment did not behave any differently than values for houses that would have been least affected by the noise component of the realignment. Specifically, I find that values for houses with a post-realignment noise level of greater than 65 dB did not appreciate at a different rate than values for houses with a post-realignment noise level of less than 45 dB. These results provide strong statistical evidence that the realignment did not negatively impact house values for the area surrounding NAS Oceana and, in fact, may have increased house values through the increased housing demand that resulted from the realignment.

11. As discovery in this matter is on-going, I may modify my conclusions if new information becomes available to me.

## II. Case Background

12. In mid-September 1997 the U.S. Department of Navy published a Notice of Availability of a Draft Environmental Impact Study listing five possible scenarios for the realignment of 12 squadrons of F/A-18 C/D Hornets, which at the time were stationed

the alleged date of taking and the noise level after the alleged date of taking for property *i*. For the data period spanning the first quarter of 1995 to the fourth quarter of 2003, $Time\ dummy_{t,i}$ is a set of dummy variables for each property *i* that takes on the value of -1 for the quarter of the first transaction date, which is the transaction date before the alleged date of taking, and +1 for the quarter of the second transaction date, which is the transaction date after the alleged date of taking, and takes on the value of zero for all other time periods. If the change in noise had an adverse effect on property values, then the estimated coefficient on the *Change in noise* variable, $\beta$, should be negative. If, on the other hand, there is no relationship between the changes in noise levels for houses around NAS Oceana due to the realignment and the changes in values for those houses from before to after the alleged date of taking, then the estimated coefficient $\beta$ should not be statistically different than zero. Standard statistical tests can be used to determine which hypothesis—an adverse effect or no effect—is supported by the data.

### 2. Data

26. The housing transaction data for this report were obtained from the City of Virginia Beach Department of Communications and Information Technology for the years 1995 to 2003. Its records provide detailed information on housing transactions and characteristics of those housing units by year from 1995 to 2003. The housing information for properties is stored in three different databases. I combined the three databases into one database using the property identification number for each property.

27. I have used the single-family housing units[33] that have a non-missing building class. Among the single-family housing units, I included properties that have valid information for living area, the year that the housing was built, and the number of bedrooms, bathrooms, and fireplaces.

28. Any property that had any indication of improvement [34] between the two transactions was excluded. If there was any change in the records of improvements

[33] The properties were also filtered by Class Codes in Land Use data: 100-113, 200-202, 207-210, 501-502 601-602.

[34] In the fields titled "Imprvmnt01" through "Imprvmnt12".

between the two transactions, I considered it as an indication of improvement. More specifically, if a property had two items of improvements when the "before" transaction was made and it had an additional improvement (e.g., the addition of a new garage), when the "after" transaction was made, it was interpreted as a significant improvement between the two periods and thus excluded.

29. I also excluded non-arms-length transactions. If a transaction was made between parties with the same last names, or if a party involved in the transaction was a bank or other financial institution, it was considered as a non-arms-length transaction. Any transaction involving selling of partial interest in a property, transfer of property through wills or gifts, sales made under conditions of foreclosure, or other such special circumstances were also excluded. Exhibit 1 provides information on the various filters I used and the number of properties excluded for each filter.

30. As part of the sample selection process, I chose transactions that occurred as close as possible to the alleged date of taking, both before and after the date. Exhibit 2 reports the distribution of repeat sales of Virginia Beach County housing units. Rows represent the year of "before" sales and columns represent the year of "after" sales. For example, there are 1,091 housing units that were traded in 1995, which is in the "before" period. These 1,091 units were traded within the range of 105 to 260 units during the "after" period of August 1999 to 2003. The other rows show the distribution of sold units over the years.

31. I used two sources to add location information for each housing unit incorporated in my analysis. I primarily used the latitude and longitude information provided by Ecology and Environment, Inc., which was created from tax parcel information provided by the Virginia Beach City GIS department. For those housing units not included in the Ecology and Environment, Inc. data, I used latitude and

longitude information provided by TeleAtlas which is based on property mailing addresses as opposed to tax parcel information.[35]

32. Wyle Laboratories, Inc. added DNL information to each property. There are three different sound levels: BASE 1997 DNL is the DNL for the period before the realignment, ARS2 is the projected DNL based on the alternative realignment scenario 2, and BASE 2000 DNL, which I understand to be the most accurate reflection of the noise environment after the realignment.

33. Exhibit 3 reports the composition of repeat sales data by ranges of the BASE 2000 DNL. The exhibit shows that the sample is distributed over a wide range of decibels using BASE 2000 DNL.

34. Exhibit 4 reports more descriptive statistics of housing units for the repeat sales data. The first panel reports the mean, median, maximum, and minimum values of the percent change in housing price. The first column, for example, shows the descriptive statistics for all the housing units in Virginia Beach that were incorporated in my analysis. From before to after the alleged date of taking, the mean percent change in price is 24.3 percent. The second through fifth columns report the descriptive statistics for subsets of the housing units, ordered by noise level. The mean percent change in price varies from 23.4 percent to 24.8 percent for the different subsets of housing units. The second panel reports percent changes in price on an annualized basis since the figures in the first panel occur over varying periods for the different housing units. The third panel provides information about the time period between the first and second transactions. The fourth panel reports the descriptive statistics for the change in noise level. The mean noise level change from before to after the alleged date of taking ranges from 6.7 dB to 9.9 dB for the different subsets of housing units.

[35] I understand that Ecology and Environment does not provide latitude and longitude data for multi-family housing units such as condominiums and townhouses. Data for these types of housing was obtained from TeleAtlas.

### 3. Results

35. Exhibit 5 reports the regression results of change in logarithm of price for all housing units on quarterly time dummies and change in noise from a generalized least squares regression, following Palmquist (1982).[36] The model omits the second quarter of 1999 to measure the relative size of the change of housing values each quarter. Thus, the coefficient for each quarter time dummy represents the change in price level relative to the second quarter of 1999. Of most interest is the estimated coefficient on the change in noise variable. The estimated coefficient has a positive sign, which is counter to what is expected if noise were adversely affecting the change in property values. However, the noise coefficient is quite small and is not statistically different from zero. Therefore, the statistical model demonstrates that there is no statistically significant relationship between the changes in noise for houses due to the realignment and changes in property values from before to after the realignment. In fact, the sign of the noise variable is positive, which is counter to the plaintiffs' hypothesis. The model demonstrates that houses that experienced large increases in noise due to the realignment did not appreciate at a different rate than houses that experienced slight increases in noise.[37]

36. I also conducted the analysis for the subsets of housing units by noise level. That is, I tested whether there is evidence of a relationship between change in noise level and change in house value for the subset of houses with a BASE 2000 DNL less than 45 dB, the subset of houses with a BASE 2000 DNL greater than 65 dB, and the subset of houses with a BASE 2000 DNL greater than 75 dB. The results, reported in Exhibit 6, are the same for each subset – there is no evidence of a relationship between change in noise level and change in house value from before to after the realignment and hence no evidence that the increased noise levels that resulted from the realignment had a negative impact on house values.[38]

---

[36] The t-statistics from the generalized least squares estimates correct heteroskedasticity in the residuals.
[37] As sensitivity analyses reported in Appendix C5a-b, I examined the same models for shorter sample periods. The results are not qualitatively different for both of the periods 1996 to 2002 and 1997 to 2001.
[38] As sensitivity analyses reported in Appendix C6a-b, I examined the same models for shorter sample periods. The results are not qualitatively different for both of the periods 1996 to 2002 and 1997 to 2001.

**B. Analysis of House Values Inside and Outside Noise Contours**

**1. Methodology**

37. Another approach that can be used to examine whether the realignment had a negative impact on house values for the homes around NAS Oceana uses event study methodology. By identifying a subset of houses that should be houses most likely to be adversely affected by the realignment (i.e., houses that would have been impacted by the change in noise component of the realignment) and a subset of houses that should not be adversely affected by the realignment and comparing price indexes for the two subsets around the "event" of the realignment, one can test whether the realignment had a negative impact on house values.

38. To conduct the event study, I used the same samples identified in the repeat sales model above. In particular, I used the subset of properties with a BASE 2000 DNL less than 45 dB as the sample of houses that should not be adversely affected by the change in noise component of the realignment. I chose 45 dB as a cut-off based on the report "Information on Levels of Environmental Noise Requisite To Protect Public Health and Welfare with an Adequate Margin of Safety" prepared by the U.S. Environmental Protection Agency Office of Noise Abatement and Control. The report indicates that a noise level less than 45 dB is within normal indoor activity interference and annoyance levels. Thus, any increase in aircraft noise due to the realignment is not likely to be noticed at houses that have a BASE 2000 DNL less than 45 dB. I use the subsets of houses with BASE 2000 DNL greater than 65 dB and greater than 75 dB as samples of houses that should be the most adversely affected by the noise component of the realignment. If no statistically significant change in the relative house values of the less than 45 dB sample on the one hand and the greater than 65 dB sample or greater than 75 dB sample on the other hand is found, then this would indicate that the realignment did not have a negative impact on house values.

39. To evaluate the relative house values for the different samples, I used the repeat sales model to create price indexes for each sample. I did this following Palmquist (1980). I then calculated the ratio of the price indexes (e.g., greater than 65 dB versus

less than 45 dB) and regressed the ratios on a time dummy variable that equals 0 for each quarter prior to the alleged date of taking and 1 for each quarter after the alleged date of taking. The estimated coefficient on the time dummy variable can be used to test whether the relative prices changed from before to after the alleged date of taking. If the noise level after the alleged date of taking is affecting house values in the high noise areas to a greater extent than the low noise (control) areas, then we expect the sign of the dummy variable coefficient to be negative and statistically significant.

### 2. Results

40. Exhibit 7 reports the results of the repeat sales model regressions used to create the price index for each of the three samples of houses. The first column shows the result of repeat sales regression for houses with a BASE 2000 DNL of less than 45 dB.[39] The coefficients for quarter dummies represent the price level change relative to the second quarter 1999.[40] Note there is no independent variable for the change in noise due to the realignment so that the estimated coefficients for each time dummy variable include the effect of the noise on property values, if any. The second and third columns report regression results for the samples of houses with BASE 2000 DNL greater than 65 dB and greater than 75 dB, respectively.

41. Exhibit 8 graphs the housing price indices using the results of Exhibit 7. Coefficients for quarters by each regression model were first converted into the price index compared to the base period, which is the second quarter of 1999. This price index is rebased to make the first quarter 1995 equal to 100.0. The graphs show that the values of houses in the less than 45 dB sample appreciated at very similar rates to the rates for houses in the greater than 65 dB sample and the rates for houses in the greater than 75 dB sample throughout the relevant time period.

42. Exhibit 9 graphs the ratios of price indices, comparing the greater than 65 dB sample index with the less than 45 dB sample index and comparing the greater than

[39] Following the theoretical derivation and empirical specification of the model as found in Palmquist (1980), the model does not include an intercept term.
[40] The second quarter of 1999 is used as the base quarter and thus excluded from the model.

# Exhibit 2

## Distribution of Repeat Sales of Virginia Beach Housing Units

| | | Year of Transaction After July 1999 | | | | | |
|---|---|---|---|---|---|---|---|
| | | 1999 | 2000 | 2001 | 2002 | 2003 | Total |
| Year of Transaction Before July 1999 | 1995 | 105 | 238 | 260 | 259 | 229 | 1,091 |
| | 1996 | 136 | 314 | 285 | 320 | 264 | 1,319 |
| | 1997 | 103 | 301 | 283 | 287 | 274 | 1,248 |
| | 1998 | 93 | 275 | 394 | 419 | 370 | 1,551 |
| | 1999 | 23 | 96 | 214 | 254 | 233 | 820 |
| | Total | 460 | 1224 | 1436 | 1539 | 1370 | 6,029 |

Note: Housing is defined as single family residential property.

Source: City of Virginia Beach Department of Communications and Information Technology.

# Exhibit 4

## Descriptive Statistics of Housing Units for Repeat Sales Analysis

| | All Housing Units | Base 2000 DNL<45 | Base 2000 45≤DNL≤65 | Base 2000 DNL>65 | Base 2000 DNL>75 |
|---|---|---|---|---|---|
| Number of Housing Units | 6,029 | 1,685 | 3,128 | 1,216 | 280 |
| **Percent Change in Price** | | | | | |
| Mean | 24.3 | 23.4 | 24.8 | 24.2 | 24.1 |
| Median | 19.6 | 19.3 | 19.6 | 20.1 | 18.7 |
| Maximum | 1187.0 | 195.0 | 1187.0 | 230.0 | 230.0 |
| Minimum | -95.6 | -95.6 | -91.4 | -42.4 | -22.0 |
| **Annualized Percent Change in Price** | | | | | |
| Mean | 6.6 | 5.5 | 7.7 | 5.0 | 6.0 |
| Median | 4.4 | 4.2 | 4.5 | 4.5 | 4.3 |
| Maximum | 3300.3 | 835.1 | 3300.3 | 330.6 | 330.6 |
| Minimum | -58.1 | -58.1 | -48.7 | -33.4 | -16.8 |
| **Time Period Between Transactions (In years)** | | | | | |
| Mean | 4.4 | 4.5 | 4.4 | 4.5 | 4.4 |
| Median | 4.4 | 4.5 | 4.3 | 4.4 | 4.3 |
| Maximum | 8.8 | 8.8 | 8.8 | 8.7 | 8.6 |
| Minimum | 0.1 | 0.2 | 0.1 | 0.3 | 0.3 |
| **Change in Noise** | | | | | |
| Mean | 7.4 | 6.7 | 7.3 | 8.6 | 9.9 |
| Median | 7.8 | 7.0 | 7.6 | 8.9 | 9.7 |
| Maximum | 19.0 | 13.0 | 19.0 | 16.5 | 16.5 |
| Minimum | 0.6 | 1.0 | 1.8 | 0.6 | 3.3 |

Notes: Percent Change in Price is defined as ((Price of transaction after July 1999/Price of transaction before July 1999) - 1)*100.
Change in Noise is defined as Base 2000 DNL less Base 1997 DNL.
Housing is defined as single family residential property.

Sources: City of Virginia Beach Department of Communications and Information Technology, Wyle Laboratories, Inc., Ecology and Environment, Inc., TeleAtlas North America, Inc.

# Exhibit 8

## Virginia Beach Housing Price Indices by Base 2000 Noise Level




Note: Housing is defined as single family residential property.

Source: Exhibit 7.