**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| CAROL AND ROBERT TESTWUIDE, *et al.*, | ) | |
| *Plaintiffs,* | ) | |
| v. | ) | No.: 01-201L<br>(Honorable Victor J. Wolski) |
| THE UNITED STATES OF AMERICA, | ) | |
| *Defendant*. | ) | |

**MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION IN LIMINE TO EXCLUDE REPORTS AND TESTIMONY OF DR. JON P NELSON.**

**INTRODUCTION**

On September 20, 2006, Defendant, United States of America ("Defendant"), filed a Motion in Limine and Memorandum[1] to exclude from the upcoming trial expert reports and testimony by one of Plaintiff's integral expert witnesses, Dr. Jon P. Nelson ("Dr. Nelson"). Defendant claims, without reason, that the Court should grant its motion pursuant to *Daubert v. Merrell Pharm., Inc.,* 509 U.S. 579 (1993), Rule 702 of the Federal Rules of Evidence ("FRE") and related case law. The Court should deny Defendant's Motion because 1) Dr. Nelson, one of the foremost experts in his field, is amply qualified to offer expert opinion on a seminal issue in the case, the deleterious effect of jet noise on residential property values; 2) Dr. Nelson's reports and testimony are well-grounded in factual support and based on reliable principles and methodology; 3) exclusion of the disputed evidence and testimony would contravene the plain language of *Daubert,* FRE 702 and related case law, all of which are designed to promote broad admissibility of scientific and expert testimony which is relevant and helpful to the trier of fact; and 4) the erroneous doubts raised by Defendant

[1]Plaintiffs will refer to this pleading herein as Def. Mem. at ____.

about Dr. Nelson's expertise should be resolved through the crucible of trial, and not by way of exclusion of important, reliable, germane evidence. Accordingly, the Court should deny Defendant's meritless *Daubert* motion.

## I. BACKGROUND

Dr. Nelson has prepared four reports[2], all of which assert that the arrival of the F/A 18 C/D squadrons in Virginia Beach culminating in the alleged date of taking in this case, July 1, 1999, had a measurable, negative effect on the value of Plaintiffs' property. Dr. Nelson's initial expert opinion in the test-case portion of this litigation is dated September 26, 2005. A copy of this report is attached as Exhibit A. Dr. Nelson also prepared and submitted a rebuttal report dated December 12, 2005. A copy of this report is attached as Exhibit B. Dr. Nelson's initial report was based, *inter alia*, on a published, peer-review tested article entitled "Meta Analysis of Airport Noise and Hedonic Property Values." A copy of this article, published in January 2004, is attached as Exhibit C. In his article and initial report, Dr.Nelson conducted a meta-analysis of 20 hedonic[3] studies covering 31 estimates of the Noise Depreciation Index ("NDI[4]") for 23 airports in the United States and Canada. Exh. C at 21. During his deposition, Dr. Nelson explained the virtues of a meta-analysis, or statistical synthesis of all existing literature. Relevant portions of Dr. Nelson's deposition transcript are attached as Exhibit D.

According to his deposition testimony, a meta-analysis provides a "more reliable indication of the central tendency of a set of empirical results." Exh. D at 57. The chief virtue of a meta-

---

[2]The first two reports were submitted as part of the class certification phase of this litigation.

[3]The term "hedonic" in this context, connotes "econometric studies that investigate the determinants of residential property values." Exh. A at 12. In this case, hedonic studies seek to isolate the effect of a controlled for variable, in this case jet noise, on the value of real estate located in noise contours exposed to noise above 65 dB.

[4]Plaintiffs concur in Defendant's definition of NDI as "the percentage depreciation in property value per decibel of increased jet noise as measured by the Day-Night Average Sound Level ("DNL") metric." Def. Mem. at 2 n 2.

analysis is that it is used to measure the systemic effect of jet noise on property values. Dr. Nelson's report indicates that meta-analysis was developed in the early 1980's and is now "widely applied in the physical sciences and other areas of social sciences." Exh. A at 16. In the field of economics, meta-analysis has been applied in numerous published studies. Exh. A at 16, 18. In Dr. Nelson's view, a meta-analysis of hedonic studies by way of a temporal snapshot is a more accurate measurement of the effect of jet noise on residential property values than the methodology employed by Defendant's expert Dr. Dale-Johnson. Dr. Dale-Johnson used a "repeat sales model" which seeks to measure over time the effect of jet noise on residential property values. Exh. B at 16. In Dr. Nelson's view, this methodology is inferior for at least two reasons: 1) it "has not been applied in other studies of aircraft noise and residential property values"; and 2) it is "untested and too speculative to serve as an econometric basis for litigation purposes." Exh. B at 16. Equally important, there are so few studies which employ temporal comparisons because it is much more difficult to control for all factors other than jet noise. Exh. D at 150. Finally, Defendant has provided no evidence that a variation in noise at a given point in time has an impact on property values that is any different than a change in noise over time at the same location.

During the class certification phase of this litigation, Defendant criticized Plaintiffs precisely for failing to offer a systematic analysis of existing hedonic studies. Dr. Nelson's meta-analysis and report were prompted in part to address this critique. Applying this rigorous meta-analysis carefully to the existing studies on the effect of noise on residential property values, Dr. Nelson concluded that the studies yielded a simple mean NDI of .75%. Exh. A at 16. Dr. Nelson, who prepared a similar study in 1980 which reached similar conclusions, will opine at trial that the overwhelming scientific evidence on the subject demonstrates a measurable significant negative NDI for residential properties exposed to jet noise above 65 dB. Exh. A at 17-18. It is also important to note that Dr. Nelson's

analysis revealed that all of the NDI values gleaned from the previous studies except four were within the 95% confidence interval. In light of this, Defendant misses the point when it criticizes Dr. Nelson's finding because "only 9 (NDI's) fall within" the range estimated in his report.

Dr. Nelson's meta-analysis article published in January 2004 restricted itself to an attempt to measure the systematic NDI reduction as reflected in the existing literature. Dr. Nelson's September 26, 2005 report sought to particularize his synthesized conclusions by adding in factors unique to Virginia Beach. Exh. D at 48. Defendant erroneously suggests that Dr. Nelson did this arbitrarily by adjusting his proposed NDI upward based solely on a purportedly antiquated FAA study. [5] Dr. Nelson did rely, in part, on the 1985 FAA study to arrive at his scientific judgment that the negative NDI for Virginia Beach was -1.0% for properties in the 65 to 79 dB noise contours and -1.5% for properties in noise contours above 79 dB. The 1985 FAA study is attached as Exhibit E. The FAA study is significant for several reasons. First, it is a government document which acknowledges that that "studies have shown that aircraft noise does decrease the value of residential property located around airports." Exh. E at 98-99. Equally significant, the FAA study concluded that "all research conducted in this area found negative effects from aviation noise with effects ranging from .6 to 2.3 percent decrease in property value per decibel increase in cumulative noise exposure." *Id.* Finally, the FAA study cited Dr. Nelson's work in this area, underlining his reputation as a leading expert on this subject. *Id.*

Dr. Nelson, however, did not rely exclusively on the 1985 FAA study to arrive at his final NDI calculations. As revealed in Dr. Nelson's deposition, he relied on a scientific method known as a "benefits transfer analysis" which involved his "professional judgment" as to how to adjust the

[5] Defendant provides no reasons why a study published by a fellow governmental agency is unreliable simply because it was published in 1985. Defendant has provided no evidence in its Memorandum, by affidavit or otherwise, to bolster its purely conclusory logic.

NDI to reflect factors specific to Virginia Beach based on his having worked on this issue "on and off since 1972." Exh. D at 48, 201-202. Indeed, in his September 2005 report, Dr. Nelson emphasized that there were several reasons for the upward adjustment of NDI including 1) "Navy aircraft have unique operating and safety features that will exacerbate the effects of noise on the exposed population", Exh. A at 25-26; and 2) Virginia Beach residents may suffer greater negative effects from jet noise because of the warm climate and the increased outdoor living activities associated with being in such a community. *Id.* at 26.

Finally, it is important to note that Dr. Nelson is the leading authority on the effects of jet noise on the value of residential properties.[6] In fact, the expert retained by Defendant to counter the expert opinions prepared by Dr. Nelson, Dr. Dale-Johnson, testified at his deposition that Dr. Nelson "certainly is an expert" evaluator of the impact of noise on property values. A copy of pertinent excerpts of Dr. Dale-Johnson's deposition testimony is attached as Exhibit G. Exh. G at 100-101. At his deposition, Dr. Dale Johnson was asked if he could name "some folks that deserve to be placed in the same category" as Dr. Nelson. Exh. G at 101. His response was "Not offhand, no." Exh. G at 101. In his deposition testimony, Dr. Dale-Johnson also acknowledged that he cited Dr. Nelson's work **five** times in a 2002 study, but omitted any reference to Dr. Nelson in the study he prepared for the Government in the test-case litigation. Exh. G at 101.

In addition to explicit admissions by their own witness and the FAA relative to Dr. Nelson's credentials and the soundness of his methodology, Dr. Nelson's report also spelled out in extensive detail his academic and professional qualifications to render an expert opinion on the effect of jet noise on the value of residential property values. Dr. Nelson was a professor of economics for 35

[6] *See* Declaration of Raymond Palmquist which Plaintiff used in the class-action phase of the litigation. A copy of relevant portions of this declaration is attached as Exhibit F. Dr. Palmquist concluded that Dr. Nelson "has provided a careful report" and that "the quality of the report was to be expected since he has been the leading researcher on

years at Penn State University, has written three books and more than 70 articles, including articles on the effects of jet noise on residential property values, and has had numerous peer-reviewed articles appear in a variety of scholarly journals. Exh. A at 1. Dr. Nelson has written one book and nine articles on "the evaluation of transportation noise and its control" and his work has been cited more than 300 times. Exh. A at 1-2. A list of sources which have cited Dr. Nelson's work on noise abatement is attached as Exhibit H. Yet another governmental study was performed by the Federal Reserve in 2005. It sought to assess the affect of jet noise on properties in the vicinity of the Atlanta airport. A copy of this report is attached as Exhibit I. The Federal Reserve report cited Dr. Nelson's work ten times.

Dr. Nelson has extensive experience analyzing the empirical relationship between aircraft noise and residential property values. *Id.* Finally, Dr. Nelson has "extensively reviewed the academic literatures in economics and real estate that deal with the effects of noise on residential property values" including peer-reviewed studies published in 1978, 1980, 1982 and 2004. *Id.* Thus, Dr. Nelson is eminently well-qualified to offer an opinion on the negative correlation between jet noise and residential property values in the context of the transfer of the F/A 18 C-D squadrons to Virginia Beach from Cecil Field in Florida in 1998-1999 and the proper measure of that negative impact.

## II. ARGUMENT

### A. ADMISSIBILITY OF EXPERT TESTIMONY UNDER FRE 702 AND *DAUBERT.*

FRE 702 provides that "[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert

---

this topic for years." Exh. F at 3.

by knowledge, skill, experience, training or education, may testify thereto ..." According to FRE 702, such testimony is admissible provided that the proponent demonstrates that three tests are met:

> "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles reliably to the facts of the case."

Prior to *Daubert* and adoption of FRE 702, the "dominant standard" for admissibility of scientific evidence at trial was the "general acceptance" test first articulated in *Frye v. United States*, 293 F. 1013, 1014 (D. C. Cir. 1923) *Frye* held that expert scientific evidence was admissible only if "generally accepted" within the relevant scientific community. *See Daubert v. Merrill Dow Pharm.*, 509 U.S. at 585. The Court in *Daubert* ruled that this test was too restrictive and, thus, "superceded by the adoption of the Federal Rules of Evidence." *Id.* at 587. The Court emphasized that the "rigid general acceptance requirement would be at odds with the liberal thrust of the federal rules." *Id.* While there was a need to impose some limitations by requiring relevance and reliability, an expert should be "permitted wide latitude to offer opinions *including those that are not based on first hand knowledge or observation.*" *Id.* at 592 (emphasis added).

The *Daubert* Court set out a non-exhaustive list of factors for trial courts to consider when weighing the admissibility of scientific opinion.[7] Those four factors, all of which have been met in this case, are: 1) testability; 2) peer review and publication; 3) known rate of error; and 4) general acceptance. *Id.* at 593-95. In addition, the Court in *Daubert* underlined that the trial court's focus in weighing admissibility must be "solely on principles and methodology not on the conclusions they generate." *Id.* Finally, because the federal rules presuppose broad admissibility of such testimony,

[7]In *Kumho Tire Co., LTD. v. Carmichael*, 526 U.S. 137, 149 (1999), the Court extended its holding in *Daubert* beyond the realm of purely scientific testimony and held that the gatekeeping function required by FRE 702 applies to "all expert testimony."

the best forum for adjudicating the strengths and weaknesses of a particular expert's testimony is not by way of excluding that evidence pre-trial, but by having the trier of fact weigh the evidence at trial:

> Vigorous cross-examination, presentation of contrary evidence and careful instructions on burden of proof[8] are the traditional and appropriate means of attacking shaky but admissible evidence.

*Id.* at 596.

Thus, Defendant's Memorandum requests the Court to apply an overly cramped interpretation of FRE 702, one that is squarely at odds with the plain language of both *Daubert* and FRE 702. The Advisory Notes to the 2000 amendments to Rule 702 reflect this by concluding that "a review of the case law after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule." This Court and the Federal Circuit have similarly declined to exclude reliable, relevant scientific or expert testimony based on conclusory allegations that the expert's reports or testimony derive from unsound methodology or unsupported facts. In fact, this Court in *G & C Enters v. United States*, 55 Fed. Cl. 424, 428, 429 (2003) declined a *Daubert* challenge to expert testimony purportedly based on unsound facts and methodology. In the case, the Court emphasized that "[t]he *Daubert* requirements are derived primarily from FRE 702" and *Daubert's* "holding that trial courts are gatekeepers in determining the fitness of scientific expert testimony for admissibility at trial." *Id.* This Court noted that the "Federal Circuit recently held that a trial court should not exclude an expert witness' testimony on the basis of facts relied on by the expert witness." *Id.* Instead, the trial court should focus solely on "whether the expert has shown a 'reliable foundation in principles and method' for the sponsored opinion." *Id.*, quoting *Micro Chem., Inc. v. Lextron, Inc.*, 317 F. 3d 1387, 1392 (Fed. Cir. 2003).

[8]Of course, jury instructions on the burden of proof are a moot issue in a bench trial.

In *G & C Enters*, this Court went on to hold that an expert's testimony is not even "precluded because his analysis is based on assumptions that may be contrary to fact." *G & C Enters*, 55 Fed. Cl at 429. Rather, these factors, if proven, "affect the weight the court will accord his testimony at trial." *Id.* In *Micro Chem.*, the Federal Circuit upheld the trial court's denial of a *Daubert* motion to exclude expert testimony. Like Defendant in the instant case, the party challenging admissibility argued that the expert's opinion was not supported factually and was the product of flawed methodology. *Micro Chem.*, 317 F. 3d at 1392-93. The Federal Circuit declined to disturb the trial court's ruling on either grounds. The Court first emphasized that where the "parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony." *Id.* The Court quoted with approval language from the Advisory Committee's notes to the effect that "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." *Id.* The Court found it significant that defendants had "ample opportunity to rebut (the expert's) damages theory during cross-examination" and "presented their competing theory through the testimony of their own witness."[9]

Similarly, this Court rejected a *Daubert* challenge to the admissibility of an economist's expert testimony and underlying reports in *Okerlund v. United States*, 53 Fed. Cl. 341, 346-347 (2002), *aff'd*, 365 F. 3rd 1044 (Fed. Cir. 2004). Once again, the Court emphasized that expert opinion is admissible so long as it is relevant and reliable. *Id.* When assessing an expert's reliability, "the use of data and methodology similar to those used by other experts is suggestive of reliability and relevance." *Id.* Moreover, it is "well-settled" that an expert may offer an opinion "on

---

[9] The Court allowed the fact finder, a jury, to resolve the dispute in competing damages theories. Resolution by the fact finder at trial, as opposed to a blanket pretrial exclusion via a motion *in limine* , is even more apropos in the instant case since it will be a bench trial. Some courts have even held that the gatekeeper function imposed by *Daubert* is "largely irrelevant in the context of a bench trial." *Deal v. Hamilton County Bd. Of Educ.*, 392 F. 3d 840, 851, 852 (6th Cir. 2004)

hypothetical questions" and his testimony "need not be based on personal knowledge." Where experts disagree on valuation, but the "valuation methods have enjoyed a general acceptance within the valuation community, these approaches satisfy the *Daubert* and *Kumho Tire* standard for admissible expert testimony." *Id.*[10]

## II. DR. NELSON'S TESTIMONY AND REPORTS ARE CLEARLY ADMISSIBLE PURSUANT TO *DAUBERT*, RULE 702 AND APPLICABLE PRECEDENTS.

Applying these precedents to Dr. Nelson's reports and expected testimony, it is clear that there is no justification for excluding his testimony and reports pursuant to *Daubert* and FRE 702. Clearly, Dr. Nelson's well-grounded opinions on the negative effects of jet noise on residential real estate "will assist the trier of fact to understand the evidence or determine a fact in issue", namely whether the transfer of the F/A 18 C/D squadrons to Virginia Beach in 1998 and 1999 had a negative impact on the value of Plaintiffs' property. Defendant suggests that Dr. Nelson's testimony is somehow irrelevant because he did not conduct a hedonic study of Virginia Beach and because his analysis rested on no studies relating to military airbases, as opposed to civilian airports. Def. Mem. at 809. However, nothing in Rule 702 requires this degree of specificity of expertise as a precondition for testifying at trial. Dr. Nelson's reports, articles, training and expertise, as well as two separate government published reports which cite Dr. Nelson, and virtually every scientific study conducted in the last 30 years, all establish that there is an indisputable link between certain levels of jet noise and a reduction in property values. Dr. Nelson's opinion, therefore, will be extremely relevant and helpful to the trier of fact. If the Court accepts Defendant's overly circumscribed

[10] Tellingly, in its Memorandum, Defendant has not challenged the methodology of Dr. Nelson's meta-analysis or his use of NDI. Instead, they assert that he relies on "insufficient and irrelevant data", that his methodology was flawed because none of the studies he relied on analyzed data from Virginia Beach, and that no studies analyzed noise from military bases. Def. Mem. at 8-9. Additionally, Defendant claims that Dr. Nelson's reports are "completely devoid of any independent investigation" regarding aircraft noise in Virginia Beach. Here again, Defendant ignores compelling precedent permitting an expert to testify beyond "facts and data perceived by him." *Okerlund v. United States*, 53 Fed. Cl. at 346.

definition of relevance, it would conflict with the holding in *Daubert* that an expert should be "permitted wide latitude to offer opinions including those that are not based on first hand knowledge or observation." *Daubert*, 509 U.S. at 585.[11]

In addition to attacking the relevance of Dr. Nelson's testimony and reports, Defendant argues that his testimony satisfies no part of the three-prong test prescribed by Rule 702. Here again, Defendant is mistaken. Dr. Nelson's testimony and reports fully comply with *Daubert* and FRE 702 for several reasons. First, Dr. Nelson's testimony satisfies all of the factors established by *Daubert* to weigh the admissibility of expert opinion. First, Dr. Nelson's meta-analysis of existing literature on the effects of jet noise on residential property values is fully testable by other economists and social scientists. Second, Dr. Nelson's report is based on the meta-analysis contained in the article published in 2004 which was subject to peer review. Indeed, many of the studies which comprised the meta-analysis were also published and peer reviewed. Third, in his report Dr. Nelson established margins of error and weighted his findings to reflect perceived errors in the underlying studies. Finally, Dr. Nelson's use of meta-analysis is widely accepted in the social sciences in general, and in the field of economics in particular. More important, both the 1985 FAA study and Dr. Dale-Johnson's deposition testimony demonstrate that Dr. Nelson is generally accepted as a leading commentator on the effect of jet noise on residential real estate. Thus, based on the plain language of *Daubert* and Rule 702, Dr. Nelson's opinions are well-grounded in fact, based on reliable methodology and fulfill each of the four factors delineated in *Daubert*. It is apparent that Defendant

[11]Defendant carries this illogic to the point of absurdity when it challenges Dr. Nelson's meta-analysis because none of the underlying studies "examined a possible change, either positive or negative, in the value of property purchased at a discount due to the presence of aircraft noise that subsequently experienced a change in noise." Def. Memo at 8. Defendant's misinterpretation of Rule 702, if accepted, would eviscerate the important role played by expert witnesses in complex cases.

raises no meritorious objections[12] to Dr. Nelson's factual foundations and methodology, but instead objects to the "the conclusions they generate." *Daubert*, 509 U.S. at 594-95. *Daubert* and its progeny proscribe exclusion of an expert's testimony and reports based on disagreements with the expert's conclusions.

Second, the Court should deny Defendant's motion because exclusion under the circumstances of this case would conflict with the interpretation favored by the Federal Rules and case law interpreting *Daubert*. This court in *G & C Enters* held that "a trial court should not exclude an expert witness' testimony on the basis of facts relied on by the expert witness"; nor is expert testimony precluded even if the expert's "analysis is based on assumptions that may be contrary to fact." 55 Fed. Cl. at 428-29. Denial of a *Daubert* motion is mandated, where, as here, the expert has used "data and methodology similar to those used by other experts." *Okerlund*, 53 Fed. Cl at 346-47. Thus, it is immaterial that many of the studies relied on by Dr. Nelson predated this litigation. It could hardly be otherwise. This is buttressed by the fact that the Government made no effort to show that more recent studies have been performed which disprove Dr. Nelson's central thesis that airplane noise above 65 dB has a negative impact on property values.

Finally, applicable case law shows that exclusion of Dr. Nelson's testimony is an inappropriate remedy. *Daubert* made clear that "vigorous cross-examination" and "presentation of contrary evidence" are the traditional and appropriate means of attacking evidence. The Advisory Committee reiterated this point in their notes to the 2000 amendments to Rule 702 when it stated that the trial court's gate keeping function should not supplant the adversarial system. Defendant's Memo is precisely an effort to sidestep the adversarial process which is the best forum for resolving

[12] Defendant seeks to distract the Court's attention by arguing that Dr. Nelson is not an expert on the effects of noise on human health. This is a classic red herring because he Nelson offers no opinions on the relationship between noise and health. Dr. Nelson relies on reputable sources and refers to these to provide context for his findings.

disputes among experts. Similarly, Defendant's motion cannot be squared with the holding in *Micro Chem.*. In that case, the Court held that *Daubert* exclusion was not proper where defendants had "ample opportunity to rebut (the expert's) damages theory during cross-examination" and "presented their competing theory through testimony of their own witness." *Micro Chem.*, 317 F. 3d at 1392-33. By the same token, the Court should decline to exclude Dr. Nelson's testimony because Defendant will have ample opportunity to cross-examine him and present a competing theory of damages. In sum, Defendant's *Daubert* motion to exclude Dr. Nelson's reports and testimony lacks foundation. Dr. Nelson's expected testimony and reports are admissible because 1) they rely on ample, relevant facts; 2) they derive from reliable principles and methods; and 3) they rigorously apply that methodology to the factual underpinnings of Dr. Nelson's opinions.

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request the Court to deny Defendant's Motion in Limine to exclude the testimony and reports of Dr. Nelson.

Dated: October 5, 2006

Respectfully submitted,

/s/ Jack E. Ferrebee

Jack E. Ferrebee
Hofheimer/Ferrebee, P.C.
1060 Laskin Road, Suite 12-B
Virginia Beach, Virginia 23451
(757) 425-5200
jferrebee@hoflaw.com

Counsel of Record for Plaintiffs

Of Counsel:

Kieron F. Quinn
Martin E. Wolf
Quinn, Gordon & Wolf, Chtd.
102 W. Pennsylvania Avenue
Suite 402
Towson, Maryland 21204
(410) 825-2300
kfquinn@quinnlaw.com
mwolf@quinnlaw.com

Charles R. Hofheimer
Kristen D. Hofheimer
Hofheimer/Ferrebee, P.C.
1060 Laskin Road, Suite 12-B
Virginia Beach, Virginia 23451
(757) 425-5200
chofheimer@hoflaw.com
khofheimer@hoflaw.com

Thomas Shuttleworth
Stephen C. Swain
Lawrence Woodward
Charles B. Lustig
Shuttleworth, Ruloff, Swain
Haddad & Morecock
4525 South Blvd., Suite 300
Virginia Beach, Virginia 23452
(757) 671-6000
tshuttleworth@srgslaw.com
sswain@srgslaw.com
lwoodward@srgslaw.com
clustig@srgslaw.com

# EFFECTS OF AIRCRAFT NOISE ON RESIDENTIAL PROPERTY VALUES:

## NAVAL AIR STATION (NAS) OCEANA and

## NAVAL AUXILIARY LANDING FIELD (NALF) FENTRESS

---

**EXPERT REPORT OF**
**JON P. NELSON, Ph.D.**

**September 26, 2005**

---

**I. INTRODUCTION AND QUALIFICATIONS**

1. My name is Jon P. Nelson. I reside at 642 Glenn Road, State College, PA 16803. I was employed by the Pennsylvania State University from August 1969 to June 30, 2004. I was promoted to the academic rank of Professor of Economics in 1978 and retired in June 2004 with the rank of Professor Emeritus of Economics. I am presently engaged in private consulting and economic research. My research expertise is the areas of organization of industry, public policy toward business, economics of regulation, applied microeconomic analysis, and environmental economics. During my academic career, I regularly taught courses on industrial organization, antitrust and regulatory economics, microeconomic theory, and environmental economics. From 1986 to 1993, I was director of graduate studies in my department. My curriculum vita is attached to this report.

2. I received my Ph.D. degree in Economics in 1970 from the University of Wisconsin. My major fields of concentration during graduate study were industrial organization and econometrics. Industrial organization is the sub-field of economics that studies markets and industries, and evaluates the extent to which they are functioning in an economically efficient manner. Economics of regulated industries, which includes air transportation, is one of the topical areas of industrial organization. Econometrics is the sub-field of economics that studies the application of statistical methods to economic data and mathematical models.

3. During the past 35 years, the focus of my research has been industry and market regulation, including environmental regulation and policy. I have written three books and more than 70 articles on these topics, including articles on the effects of aircraft noise on residential property values. My peer-reviewed articles have appeared regularly in scholarly journals such as the *Journal of Econometrics, Review of Economics and Statistics*, *Journal of Law and Economics*, *Journal of Regulation, Journal of Regional Science, Quarterly Review of Economics and Business*, *Southern Economic Journal*, *Empirical Economics*, *Contemporary Economic Policy*, *Applied Economics*, *Antitrust Bulletin*, *Journal of Environment and Development*, and other peer-reviewed journals and collected volumes.

4. My research expertise includes the evaluation of transportation noise and its control. I have published one book and nine articles and chapters on this topic. My book is entitled *Economic Analysis of Transportation Noise Abatement* (Ballinger 1978). My articles and chapters have appeared in *Noise Abatement: Policy Alternatives for Transportation* (National Academy of Sciences 1977); *Journal of Environmental Economics and Management* (1979, 1985); *Journal of Transport Economics and Policy* (1980, 1982, 2004); *Advances in Applied Microeconomics* (JAI Press 1981); *Resource Management and Environmental Planning* (Wiley 1983); and *Interagency Symposium on Research in Transportation Noise Proceedings* (Stanford 1973). As a mark of importance, these writings have been cited more than

300 times by other researchers in economics, transportation, and real estate. Two of my articles have been reprinted in collected volumes, which is another mark of their importance. The 1979 article was reprinted in *The Environment and Transport* (Hayashi et al. 1999) and the 1980 article was reprinted in *Classics in Transport Analysis: Air Transport* (Forsyth et al. 2002). In January 2004, I published a peer-reviewed meta-analysis of airport noise and property values, which was the lead article in the *Journal of Transport Economics and Policy* (Nelson 2004; attachment 2).

5. During 1976-77, I was a member of the Committee on Appraisal of Societal Consequences of Transportation Noise Abatement, National Academy of Sciences, and I contributed to two chapters in the Committee's final report (DeVany et al. 1977a, 1977b). I received three research grants from the U.S. Department of Transportation to investigate the effects of mobile-source pollution on residential property values, including aircraft noise (1972-73, 1974-75, and 1977-78). I have published several other articles that examine adverse effects of pollution on residential property values, including peer-reviewed articles appearing in the *Southern Economic Journal* (1977); *Journal of Urban Economics* (1978); and *Land Economics* (1981). I have acted as a technical consultant to several organizations concerned with noise and other pollutants, including the Pennsylvania Low-Emissions Vehicle Commission (1993).

6. I have experience with the collection of data on residential property values and the measurement of aircraft noise levels for economic studies; I have performed several econometric analyses of the empirical relationship between aircraft noise and residential property values; I have examined the costs and benefits of aircraft noise abatement policies; and I have extensively reviewed the academic literatures in economics and real estate that deal with the effects of noise on residential property values in the United States, Canada, and other countries (Nelson 1978, 1980, 1982, 2004).

7. This report contains my evaluation of the effects on residential property values resulting from aircraft noise exposure, including the impact of the realignment of F/A-18 C/D fleet squadrons and fleet replacement squadrons (FRS) to Naval Air Station (NAS) Oceana, Virginia, and Naval Auxiliary Landing Field (NALF) Fentress, Virginia. This decision was effective during 1998-1999. The Navy's realignment decision was followed by the publication of additional environmental policies, including a revised AICUZ map for Oceana and Fentress (1999); a draft EIS for the basing of F/A-18 E/F (Super Hornet) aircraft at these fields (July 2002); revised land use compatibility guidelines for Navy installations (December 2002); and a *Joint Land Use Study* for the Hampton Roads area (Hampton Roads PDC, April 2005). In September 2003, the Navy announced its intentions to homebase eight F-18 E/F fleet squadrons (96 aircraft) and the FRS (24 aircraft) at NAS Oceana.

8. My rate of compensation as an expert is $200 per hour, and my compensation is not dependent on my method of evaluation or the conclusions researched from my evaluation. My opinions

and conclusions are solely my own. During 1998-2000, I was retained by the plaintiffs in three cases involving restrictions on commercial speech. I have not testified in other cases in the past five years. I have been swore in and accepted as an expert witness by federal and state courts and state regulatory agencies.

9. For this report, I reviewed academic and government studies that analyze aircraft noise control, including many studies of the effects of aircraft noise on residential property values. I also collected basic data on the economies of Virginia Beach and Chesapeake, Virginia. As part of my evaluation, I was provided with copies of (1) Wyle Laboratories, *Aircraft Noise Study for the 1995 BRAC Realignment of Navy F/A-18 Aircraft*, WR 97-10 (September 1997, February 1998); (2) Wyle Laboratories, *Aircraft Noise Study for Naval Air Station Oceana and Auxiliary Landing Field Fentress*, WR 94-18 (July 1994); (3) U.S. Department of the Navy, *Final Environmental Impact Statement: Realignment of F/A-18 Aircraft and Operational Functions from Naval Air Station Cecil Field, Florida, to Other East Coast Installations* (March 1998a); (4) U.S. Department of the Navy, *Record of Decision and General Conformity Determination for Realignment of F/A-18 Aircraft and Operational Functions from Naval Air Station (NAS) Cecil Field, Florida, to other East Coast Installations* (May 18, 1998b); (5) U.S. Department of the Navy, *AICUZ Program Procedures and Guidelines for Department of the Navy Air Installations*, OPNAVINST 11010.36A (April 1988) and OPNAVINST 11010.36B (December 2002); (6) U.S. Department of the Navy, *Final Environmental Impact Statement (FEIS) for the Introduction of F/A-18 E/F (Super Hornet) Aircraft to the East Coast of the United States* (July 2003); and (7) Wyle Laboratories, *Noise Study for the Introduction of F/A-18 E/F to the East Coast*, Vol. 1, WR 02-08 (April 2003). I examined the web site for NAS Oceana, <http://www.nasoceana.navy.mil>, which includes reports on the Air Installations Compatible Use Zones (AICUZ) for NAS Oceana and NALF Fentress. In addition, I visited the web site for the Navy's F/A-18 E/F EIS Project at <http://www.efaircraft.ene.com>. I also obtained the Hampton Roads Planning District Commission, *Hampton Roads Joint Land Use Study* (April 2005) at <http://www.vbgov.com/dept/planning>. This study continues to use the 1999 AICUZ noise map for planning purposes (Hampton PDC, 2005 at 3-5).

## II. NOISE EXPOSURE DUE TO ARS-2

**ARS-2 substantially increased aircraft operations at NAS Oceana and NALF Fentress, including touch-and-go, FCLP, and nighttime operations.**

10. The 1993 and 1995 Defense Base Closure and Realignment Commissions (BRAC) directed the closure of NAS Cecil Field, Florida. During 1998-99, the Department of the Navy (DoN) realigned

its aircraft and personnel to NAS Oceana, Virginia (156 aircraft) and Marine Corps Air Station Beaufort, South Carolina (24 aircraft). This realignment scenario is **ARS-2** among the five alternative scenarios considered for transfer of the F/A-18 aircraft. NAS Oceana is located approximately 12 miles southeast of Norfolk, Virginia, in the City of Virginia Beach. NAS Oceana has two sets of crossing parallel runways – three measuring 8,000 feet in length and one measuring 12,000 feet. NALF Fentress is about 7 miles southwest of NAS Oceana in the City of Chesapeake, Virginia, and is used primary by aircraft based at NAS Oceana for Field Carrier Landing Practice (FCLP) patterns. NALF Fentress has one 8,000 foot runway equipped to simulate an aircraft carrier flight deck (Wyle, 1998 at 2-1). Aircraft operations at NALF Fentress normally occur at a pattern altitude of 800 feet (Hampton Roads PDC, 2005 at 2-8). Some of the analysis treats the two airfields together because NALF Fentress is located close to NAS Oceana, and it is used primarily as a practice field for aircraft based at NAS Oceana (Wyle, 1998 at 3-1). NAS Oceana occupies 5,331 acres of land, which increases to 6,820 acres with the Dam Neck Annex. Obstruction clearances and flight easements add an additional 3,680 acres (DoN, 2003 at 3-16; http://www.globalsecurity.org). NALF Fentress occupies a total of 2,560 acres.

11. Wyle Labs defined the 1997 baseline scenario for the **ARS-2** analysis as a single-siting of eleven Atlantic Fleet F-14 squadrons (150 aircraft), one FRS, and one Navy F/A-18 adversary squadron at NAS Oceana (Wyle, 1998 at 3-1). The aircraft mix for the baseline included 198 aircraft (Wyle, 1998 at 3-4). Baseline and projected annual operations were computed using the Naval Aviation Simulation Model (NASMOD). Calendar year 1997 (CY97) was the time period for the baseline analysis and CY99 was used for the **ARS-2** analysis. However, in the Navy's most recent EIS report (DoN, 2003 at 3-9), the baseline was updated to CY00 in anticipation of the arrival of F/A-18 E/F aircraft. Separate operational data were identified for each airfield in CY97 and CY00. While the projected data in the most recent EIS report are tentative, I have compared the CY00 operational data to the projected CY99 data used in the earlier reports by Wyle. The differences are modest. The Navy claims that noise exposed areas and populations changed as a result of operational changes that occurred after the arrival in 1998-99 of the F/A-18 C/D aircraft (DoN, 2003 at 3-9). However, following the analysis in the Hampton Roads *Joint Land Use Study* (2005), I use the 1999 AICUZ noise zones for areas and populations.

12. Baseline operations in 1997 at NAS Oceana were about 109,000 annual flight operations (Wyle, 1998 at Table 3-1). F-14 fleet and FRS aircraft accounted for 86% of NAS Oceana baseline operations, including 49,000 touch-and-go operations. NALF Fentress had about 105,000 annual flight operations in 1997 (Wyle, 1998 at Table 3-2). F-14 fleet and FRS aircraft accounted for 59% of NALF Fentress operations, including 55,000 FCLP operations. In 1997, about 7% of NAS Oceana operations (7,000) and 33% of NALF Fentress operations (35,000) occurred at night.

13. **ARS-2** substantially increased aircraft operations at NAS Oceana from the CY97 baseline value of 109,000 (Wyle, 1998 at Tables E-1 and 4-16). The total number of operations in CY00 was 207,722, including 25,294 operations (12.2%) during the nighttime hours (DoN, 2003 at 3-4). The realignment of F/A-18 fleet and FRS aircraft accounted for more than 98,000 new operations in CY00, including FCLP and touch-and-go operations. Total nighttime operations at NAS Oceana rose dramatically to 25,000 annually, or about 68 operations per night.

14. **ARS-2** substantially increased aircraft operations at NALF Fentress from the CY97 baseline of 105,000 (Wyle, 1998 at Tables E-1 and 4-17). The total number of operations in CY00 was 135,190, including 54,850 operations (40.6%) at night (DoN, 2003 at 3-4). The realignment of F/A-18 fleet and FRS aircraft accounted for more than 30,000 new operations in CY00, including FCLP and touch-and-go operations. Total nighttime operations at NALF Fentress rose dramatically to 55,000 annually, or more than 150 operations per night.[1]

**The increase in airfield operations from ARS-2 dramatically increased the residential populations exposed to noise levels of 65 dB or greater. More than 23,000 people are exposed to noise levels of 80 dB or more, which is a level of exposure with the potential for serious adverse health and welfare consequences.**

15. Wyle Labs computed baseline and **ARS-2** noise exposures using the NOISEMAP 6.5 computer program (Wyle, 1998 at 4-34). At a minimum, NOISEMAP has the capability to compute noise levels in 5 decibel increments, referred to as “noise zones” or “noise intervals.” The noise metric used for assessing noise exposure in the vicinity of airfields and airports is the Day-Night Average Sound Level (DNL or Ldn), expressed in A-weighted decibels (dB). DNL is an *average* sound level generated by all aircraft and aviation-related operations during an average 24-hour period, with a 10 dB penalty for nighttime noise events.[2] Several other noise metrics are computed that capture special features of

---

[1] A comparison of projected operations for CY99 and updated values for CY00 indicates that the earlier EIS reports (DoN 1998a, b; Wyle 1998) contained a slight overestimate of total operations at Oceana, and an underestimate of nighttime operations. At Oceana, the CY99 estimate was 219,000 operations compared to a CY00 value of 208,000 (Wyle, 1998 at 4-16). CY99 nighttime operations were estimated at 18,000 annually compared to CY00 operations of 25,000. At Fentress, total operations were 144,000 for CY99 and 135,000 for CY00. Due to capacity constraints at Fentress, nighttime operations were 55,000 for both CY99 and CY00.

[2] The DNL is the Equivalent Sound Level (Leq), with a 10 dB penalty for nighttime noise. The Leq is the energy-averaged sound level integrated over a specified time period. Leq provides a single number measure of sound *averaged* over a time period, where “equivalent” means that the acoustical energy of the steady state sound equals the energy associated with an actual varying sound level. DNL was selected by the EPA as the uniform descriptor of cumulative sound energy that best correlates with health and welfare effects of noise, including annoyance, community noise exposure, and land use compatibility (FICON, 1992b at B-16).

military aircraft operations, such as sporadic operations, low altitude flights, high speeds, and the "surprise" effect resulting from high-speed low-altitude operations (Wyle, 1998 at 1-3).

16. Typical background noise levels in urban areas are in the interval 50-60 dB during daytime hours and 40 dB during nighttime (Nelson, 1978 at 22). A 50-60 dB sound corresponds to the noise level from light traffic at 100 feet or an air conditioner at 100 feet. A food blender or garbage disposal at three feet produces a sound level of about 80 dB. Because the ear's pattern of response is more nearly logarithmic in nature, decibels are measured on a logarithmic scale. The psychological perception of loudness roughly doubles with each 10 dB increase (Nelson, 1978 at 16). A 90 dB sound is perceived to be twice as loud as an 80 dB sound, four times louder than a 70 dB sound, and eight times louder than a 60 dB sound. At 1,000 feet, F-14 arrivals or departures produce maximum sounds of 83 and 97 dB, respectively. F-18 arrivals or departures produce maximum sounds of 104 dB and 108 dB, respectively, at 1,000 feet (DoN, 1998a at Figure 3.1-21). Hence, F-18 aircraft are four times as loud as F-14 aircraft on arrival and twice as loud on departure.

17. Human annoyance due to noise is generally taken to be a function of both the overall sound-intensity level and fluctuations in the level produced by significant intrusive sounds (EPA, 1971 at 113; Nelson, 1978 at 18). A 3 dB change in sound level represents a doubling of the sound energy. Changes in DNL greater than 3 dB are regarded as an indicator of the need for further analysis of noise impacts (FICON, 1992b at 3-15; DoN, 2003 at 4-43). At noise levels above 65 dB, changes as small as 1.5 dB may be significant due to the effects on human annoyance (FICON, 1992a at 1-4). **ARS-2** increased the outdoor noise exposure in the vicinity of the two airfields by 8 to 20 dB (Wyle, 1998 at 4-37; DoN, 1998b at 11). Considerable economic evidence exists that demonstrates that this change in exposure produces damages that will be reflected in residential property values.

18. The 1997 baseline noise contours show two distinct regions of noise exposure – one for each airfield (Wyle, 1998 at Figure 3-16). At NAS Oceana, the 65 DNL contour extends about 1.5 miles to the east and west of the NAS boundary at the widest points. At NALF Fentress, the 65 DNL contour extends about 1.5 miles to the west and 3 miles to the east of the NALF boundary at the widest points (Wyle, 1998 at 3-2). Under baseline conditions, 14,300 acres of land are in the DNL 65+ zone. As a consequence of **ARS-2**, the land area enclosed by DNL 65+ increases to more than 58,000 acres (Wyle, 1998 at Table 4-20).

19. There is a dramatic increase in the number of people exposed to unacceptably high levels of aircraft noise in the vicinity of Oceana and Fentress. About 23,000 people are exposed to noise levels of DNL 80 and above (DNL 80+), which is a severe level of noise exposure with the potential for temporary hearing loss and substantial adverse effects on the community environment (FICON, 1992b at 3-8). An

additional 97,000 people are exposed to noise levels in the 65 to 79 dB zone, which is a substantial level of noise that interferes with speech, concentration, learning, sleep, and tranquility. A noise level of 65 dB has been accepted by the Navy and other organizations as the maximum noise level at which interference with residential activities and land use normally occurs (DoN, 2002 at 8).

20. Table 1 shows the effects of **ARS-2** on off-base land areas and populations. Due to **ARS-2**, the population within DNL 65+ rose from 28,000 in 1997 to more than 120,000 people in 1999. Table 1 also shows two separate populations that will be the subject of the property value analysis below. First, the population within the DNL 65-79 zone, which rose from 28,000 people in 1997 to 97,000 people in 1999. Second, the population within the DNL 80+ zone that rose to 23,000 people in 1999, compared to only four people in 1997.

**Table 1. Noise-Exposed Land Acres and Population near NAS Oceana and NALF Fentress under ARS-2**

| Noise Zone (dB) | Baseline Acres (CY97) | ARS-2 Acres (CY99) | Baseline Population (CY97) | ARS-2 Population (CY99) | Pop. Change, 97-99 | Pop. Percent Change |
|---|---|---|---|---|---|---|
| DNL 65-70 | 9,217 | 18,933 | 19,823 | 40,877 | 21,054 | 106.2 |
| DNL 70-75 | 4,428 | 13,209 | 7,837 | 32,635 | 24,798 | 316.4 |
| DNL 75-80 | 618 | 10,817 | 366 | 23,732 | 23,366 | not calc. |
| DNL 80-85 | 35 | 8,901 | 4 | 13,607 | 13,603 | not calc. |
| DNL 85+ | 0 | 6,510 | 0 | 9,812 | 9,812 | not calc. |
| **Totals by Zone:** | | | | | | |
| **Total: DNL 65-79** | 14,263 | 42,959 | 28,026 | 97,244 | 69,218 | 247.0 |
| **Total: DNL 80+** | 35 | 15,411 | 4 | 23,419 | 23,415 | not calc. |
| **Total: DNL 65+** | 14,298 | 58,370 | 28,030 | 120,663 | 92,633 | 330.5 |

*Source*: Wyle (1998 at Table 4-20). Acres are off-station and exclude other military and water areas. Population estimates are based on 1990 Census population densities of about 1.5-2.0 people per acre. The recent EIS report used 2000 Census population densities of about 2.0-2.5 people per acres. Much of the available residential land areas around Oceana are developed, but this is less true at Fentress (Hampton Roads PDC, 2005 at 2-9).

**Land use compatibility guidelines adopted by several federal agencies, including the FAA and Department of the Navy, indicate that noise levels above DNL 75 are clearly unacceptable for residential purposes, and levels of DNL 65-75 are normally unacceptable.**

21. The realignment of aircraft under **ARS-2** substantially increased noise exposure levels in the vicinity of NAS Oceana and NALF Fentress. When noise exposure rises above DNL 65, there is a

noticeable increase in individual annoyance and community complaints.[3] With this in mind, guidelines for compatible residential land use have been established by several federal agencies, including the U.S. Navy (1978, 1988, 2002). The U.S. Department of Housing and Urban Development (HUD) has guidelines for safe noise environments within a building. HUD's "Site Acceptability Standards" show that exterior noise in the 65-75 dB zone is normally unacceptable for guaranteed loans, and 75 dB and higher levels are clearly unacceptable (24 *Code of Federal Regulations*, Part 51, "Environmental Criteria and Standards," at 340). The Federal Aviation Administration (FAA) has regulations that identify land uses that are normally incompatible with various levels of noise exposure. The FAA's "Land Use Compatibility" standard shows that noise levels of 65-75 dB are incompatible with residential land uses (other than mobile homes), unless noise attenuation measures are used (14 *Code of Federal Regulations*, Part 150, "Airport Noise Compatibility Planning," at 87). Above 75 dB, residential land use is considered unacceptable due to interference with normal activities, even with the application of noise mitigation measures (GAO, 2000a at 23). The U.S. Department of Defense (DoD) and U.S. Department of the Navy (DoN) have a long-standing program for land use compatibility around military airfields, labeled the Air Installation Compatible Use Zones (AICUZ) program (DoN 1978, 1988, 2002). The Navy's guidelines indicate that residential housing is "discouraged" at 65-69 dB, "strongly discouraged" at 70-74 dB, and "incompatible" with 75 dB and above (DoN, 2002 at 20 and Table 2).

22. In June 1980, the U.S. Federal Interagency Committee on Urban Noise (FICUN) published the *Guidelines for Considering Noise in Land Use Planning and Control* (FICUN 1980). The FICUN guidelines adopted DNL as the standard noise metric. These guidelines indicate that residential land use is discouraged at DNL 65-69; strongly discouraged at DNL 70-74; and incompatible with DNL 75 and above (FICUN, 1980 at 6). The 1990 U.S. Federal Interagency Committee on Noise (FICON), which included the DoN and FAA, recommended continued use of the DNL metric and the compatibility guidelines. As a consequence, land use compatibility criteria used by the HUD, FAA, DoD, and DoN are similar (FICON, 1992b at 3-21; EPA, 1982b at ii). However, outdoor noise exposure due to lifestyle differences is not directly accounted for by these criteria, which is important for the residential areas that surround the two Naval airfields.

23. An American National Standard for land use compatibility has been established by the S12 (Noise) Accredited Standards Committee of the Acoustical Society of America (ASA), which included

---

[3] The modified "Schultz curve" displays the percent of exposed persons highly annoyed as a function of DNL (Schultz 1978). It is widely recognized that annoyance due to aircraft noise and community reaction can occur at noise levels that are below 65 dB (FICON, 1992b at 3-17; DoN, 2002 at 8). About 6-14% of the population will be highly annoyed by noise levels in the 60-65 dB zone (FICON, 1992b at 3-6). There is evidence that aircraft noise is more annoying than other transportation noises (Finegold et al., 1994 at 27).

the Department of Transportation and Department of the Navy. The 1998 revision of these guidelines is the *Sound Level Descriptors for Determination of Compatible Land Use*, ANSI S12.9-1998/Part 5 (ASA 1998). The guidelines were approved by the American National Standards Institute, Inc. (ANSI). For single-family residential land that involves extensive outdoor use, the Standards Committee recommends that DNL 55-65 is marginally compatible and DNL 65+ is incompatible (ASA, 1998 at 3). As indicated above, **ARS-2** exposes more than 120,000 people to DNL levels of 65 dB and greater, compared to 28,000 people prior to the realignment of F-18 C/D aircraft to NAS Oceana.

24. Table 2 summarizes the federal agency and ASA guidelines. Federal agencies have established a uniform standard for compatibility of noise levels and residential land use. These agencies, including the FAA and U.S. Navy, regard noise exposure in excess of 65 dB as an environment that is normally unsuitable for residential use. Above 75 dB, the environment is clearly unsuitable for residential use. The ANSI standard of the Acoustical Society of America, which incorporates lifestyle factors, uses 65 dB as the upper limit for extensive outdoor residential living. The ASA standard shows the importance of accounting for lifestyle factors as part of the evaluation of the effects of noise exposure, which is critical for the land areas near the two Naval airfields. As shown below, economic studies of the effects of aircraft noise on residential property values demonstrate a negative effect of noise exposure above a background noise level of 55-60 dB.

**Table 2. Residential Land Use: Federal Compatibility Guidelines, Day-Night Sound Level (DNL)**

| **Agency** | **65-70 dB** | **70-75 dB** | **75-80 dB** | **80-85 dB** | **85+ dB** |
|---|---|---|---|---|---|
| **HUD: 24 CFR Part 51** | Normally Unacceptable | | Unacceptable | | |
| **FAA: 14 CFR Part 150** | No (1) | No (1) | No | No | No |
| **DoN: AICUZ** (2) | No (1) | No (1) | No | No | No |
| **FICUN & FICON** | No (1) | No (1) | No | No | No |
| **ASA: Residential, Extensive Outdoor Use Guideline** | Residential Use is Incompatible at 65 dB and above | | | | |

*Notes:* (1) Marginally compatible if indoor noise attenuation is used. "No" means non-compatible or not suitable (DoN, 1978 at 4-25). (2) DoN (2002 at Table 2); Web site for NAS Oceana at http://www.nasoceana.navy.mil. The Navy's revised AICUZ guidelines include a broad provision for protection of public welfare (DoN, 2002 at 13).

25. The guidelines for the Navy's AICUZ program clearly recognize the significance of noise exposures beginning at 65 dB and the critical nature of noise exposures of 75 dB or greater. The revised program guidelines (DoN 2002) include a new requirement for long-term analysis of aircraft operations. The Navy's revised guidelines also emphasize protection of general welfare of the community, which is a broader goal than health and safety considerations:

> The study recommendations shall be based on current operations and the best available (5- to 10-year) projections of operations that best support long-range planning controls to protect the *health, safety and welfare* of the community and the future operational integrity of the air installation (DoN, 2002 at 13; emphasis added).

26. Because noisy environments are undesirable to many individuals, existing single-family and other residences in the vicinity of a noisy airfield will be less valuable; that is, the adverse effects of noise will be (negatively) capitalized into the value of residential properties and registered in market-determined housing prices and rents. This effect can be measured using econometric methods and economic data on residential values at differing noise exposure levels. The measurement of these adverse effects is part of a large empirical literature on pollution and property values. The next section of this report reviews selected aspects of this literature and develops the general model of the effects of aircraft noise on property values. This is followed by a meta-analysis of the empirical evidence on the effects of aircraft noise on property values, which is used to derive monetary measures of the adverse and lasting effects of noise. Meta-analysis is a quantitative technique used to synthesize a comparable set of empirical results. Lastly, I discuss special features of **ARS-2**, including the unique operational features of Navy aircraft and the mild climate that affect residential living and lifestyles in Virginia Beach and Chesapeake, Virginia.

## III. AIRCRAFT NOISE AND PROPERTY VALUES

**Economic studies of residential property values have examined the adverse effects on values of numerous pollutants, including aircraft noise.**

27. Noise is unwanted or unpleasant sound. At 65 dB and above, the most common human effects associated with aircraft noise are annoyance, speech and learning interference, and sleep disturbance. In turn, these effects disrupt normal daily activities, such as conversation, television viewing, school work, productivity, outdoor recreation and living, and family activities. Annoyance is the adverse psychological response to a given noise exposure, including the anxiety or apprehension that the noise may cause (FICON, 1992b at 3-4). At noise levels above 75 dB, the Environmental Protection Agency (EPA, 1982a at 12) cautions that severe health effects may occur for some portion of the population, including temporary hearing loss. Those persons who are frequently outdoors are of greatest concern, including young children, retired people in warm climates, and persons in certain outdoor occupations (EPA, 1982a at 55; Suter, 1991 at 14). **ARS-2** resulted in more than 23,000 people being exposed to severe noise levels of 80+ dB in CY99, compared to only four people in CY97.

28. Economists regard pollution as a negative "external cost" (externality) of production and consumption activities – an uncompensated third-party effect – whereby the polluter causes harm, inconvenience, annoyance, and other damages to the polluted. Aircraft noise is a classic example of an external social cost. Because market prices do not directly reflect these damages, the economic activities in question (e.g., aircraft operations) are subject to "market failure." This term means that the level of the economic activity fails to achieve an efficient allocation of resources as measured by the sum of the transaction surplus in the market *less* the amount of the uncompensated third-party damage costs. In general, market failures are not self-correcting due to costs of transaction and the public-good nature of pollution abatement efforts.

29. "Market failure" therefore reflects the absence of an explicit market for corrective actions that could reduce or avoid third-party damages – the market for tranquility is missing.[4] This means that direct estimation of demand schedules for tranquility (or externality avoidance) is not possible. As a consequence, economists resort to a variety of methods – direct and indirect – to measure the uncompensated costs of externalities. These methods include studies using surveys, political referendums, expenditures on mitigation (e.g., soundproofing), impacts on wages, and effects on residential property values (Freeman 1993; Palmquist 1991). Evaluation of the effects of pollution on property values using regression analysis – the "hedonic property value" method – is discussed in undergraduate and graduate textbooks in environmental economics (Tietenberg, 2000 at 41; Kolstad, 2000 at 313); urban economics (O'Sullivan, 2000 at 368; DiPasquale and Wheaton, 1996 at 189); cost-benefit analysis (Boardman, 1996 at 459; Gramlich, 1990 at 71); and real estate valuation (Chinloy, 1988 at 40; Lusht, 1997 at 139). A recent EPA report, *Guidelines for Preparing Economic Analyses*, also contains a discussion of this method (EPA, 2000 at 77).

30. Consider two residential properties that are identical in all respects, except that the first house is located close to an airfield and the other is not (Nelson 1981). A *but for* analysis establishes that the adverse environment will result in a market value for the first house that is lower than the market value of the second house. This occurs because potential buyers reduce their demand for the first house relative to the second house, reflecting the discounted present value of the costs of future annoyance,

---

[4] Airport noise problems have been dealt with by purchase of residential properties. Under the FAA's Part 150 Noise Compatibility Program, 240 airports received over $2.7 billion in AIP-grants for noise-related projects (GAO, 2000b at 80). Many of these projects are directed at noise levels of 75 dB and above. A GAO study of eight airports in 1989 found that $94 million had been spent in Atlanta on purchase of residential properties; $144 million in Los Angeles; and $100 million in Memphis (GAO 1989). The Seattle-Tacoma Airport spent over $260 million acquiring homes and land and insulating homes (GAO, 1998 at 3). The Navy's AICUZ program also provides for the acquisition of land or restrictive easements (DoN, 2002 at 33; EPA 1977b).

speech and learning interference, sleep disturbance, reductions in the quality of outdoor living, and loss of tranquility. A measure of these noise-induced damages is the difference between the market-determined value of the first house as compared to the second house. The *but for* analysis can be extended to analyze different levels of noise exposure (above background), since it has been established that annoyance and other adverse effects of noise rise predictably with increased exposure levels (EPA 1982a; FAA 1985; FICON 1992a, 1992b). Although there is a missing market for tranquility, there is a complementary market wherein individuals register their willingness to pay to avoid different levels of aircraft noise exposure. Hence, consumers reveal the implicit value that they place on tranquility by the explicit choices that they make in the housing market. The willingness to pay for tranquility is a part of the asset price of the "housing bundle," and econometric techniques (regression analysis) are available that unbundle complex products and thereby reveal the implicit or "hedonic price" for tranquility. A large empirical literature has developed using this method.

31. Using the hedonic price model and regression analysis, economists and real estate researchers have empirically investigated the adverse effects on residential properties of numerous forms of pollution. Several surveys of this large literature are available, including Bartik and Smith (1987) on urban amenities; Boardman et al. (1997) for external costs; Donnelly (1991) and Boyle and Kiel (2001) for environmental disamenities; Farber (1998) for health and amenity risks; Smith and Huang (1993, 1995) for air pollution; Nelson (1978, 1982) for highway noise; and Nelson (1978, 1980, 2004) for airport noise. Follain and Jimenez (1985), Freeman (1993), Palmquist (1991, 2005), and EPA (2000) provide useful surveys of methodological issues. This technique also is widely used in the field of real estate valuation, and articles appear regularly in real estate journals that apply regression analysis to housing values and residential amenities and disamenities. For example, recent articles in *The Appraisal Journal* estimate the value of proximity to water (Benson et al. 2000), adverse effects of a Superfund site (Reichert 1997), and adverse effects of nearby railroad tracks (Simons and El Jaouhari 2004).

32. Econometric studies that investigate the determinants of residential property values are collectively referred to as "hedonic price" or "hedonic property value" studies (EPA, 2000 at 77). It is rare that two residential properties are identical in all respects, except for the pollutant in question. Consequently, in order to isolate a given hedonic price, it is necessary to control statistically for other influences on property values, such as the size of house and lot, quality of construction, design of the house, merits of the neighborhood, quality of local schools, crime rates, governmental services, and so forth. Some of these characteristics will vary little within a given data set, and separate measurement is not required to explain the observed variation in property values. In other cases, the excluded characteristics are uncorrelated ("orthogonal") with the included pollutant, and do not bias the resulting

estimate of the hedonic price for the pollutant in question. Random errors in the measurement of property values are captured in the regression error term, and do not bias the estimates.

33. Given differences in statistical methods, samples, time periods, and urban locations, empirical studies have not produced a singular value for the effects of aircraft noise on property values. Indeed, it would be very surprising if they did because demand-supply conditions for housing markets tend to be local or regional, rather than national. Nevertheless, I show below that there is a broad scientific consensus on the measurable effects of aircraft noise. All *hedonic price studies* have shown that aircraft noise has a negative effect on residential property values, and central tendencies clearly exist for the monetary damages. The technique of meta-analysis can be used to synthesis the damage estimates and increase the reliability of summary measures for a set of comparable estimates.

**Annoyance due to noise exposure can be incorporated in the economic model of housing demand and supply, which underlies hedonic property value studies for aircraft noise.**

34. Each house and lot represents a unique combination of characteristics and attributes, which means that the decision to purchase a given property is complex. However, if the characteristics are provided in various combinations, it is possible to estimate an implicit price function that shows how the values of properties vary *due to* changes (only) in a given characteristic. This is the *but for* relationship. Formally, let V be a sample of observations on housing prices; S is a vector of structural variables (house size, number of bedrooms, lot size, etc.); L is a vector of locational variables; T is a vector of local taxes; G is a vector of local government services; and E is a vector of local neighborhood environmental-quality variables (Nelson, 2004 at 6). The market-determined asset value of the houses in the sample is given by V = V(S, L, T, G, E). The marginal implicit price for each characteristic represents the increase in expenditures required to obtain one more unit of that characteristic, holding constant other variables that affect the value of a house. The method of regression analysis is used to insure the constancy of other influences on property values. Mathematically, the marginal price is the partial derivative of the V relationship with respect to the j-th characteristic, or $\partial V/\partial E_j$. The marginal price function can be linear or non-linear (Nelson, 2004 at 6).

35. Many empirical studies employ a non-linear function for property values. For aircraft noise, the hedonic function can be represented by $V = b_0 Z^{b1} A^{b2} u_1$, where V is the property value; Z is the set of physical and locational characteristics (that is, S, L, T, and G); A is subjective annoyance due to aircraft noise; $u_1$ is a stochastic error term; and $b_0$, $b_1$, and $b_2$ are parameters of the relationship. Subjective annoyance can be approximated by the following semi-logarithmic relationship: $A = c_0 e^{c1(DNL)} u_2$, where DNL is the day-night sound level in decibels; $u_2$ is a stochastic error term; e is the natural log base; and $c_0$

and $c_1$ are parameters of the semi-logarithmic relationship.[5]

36. Taking natural logs, and substituting for ln A, yields the following logarithmic relationship: $\ln V = d_0 + d_1(\ln Z) + d_2\, DNL + u_3$, where $d_2 = b_2c_1$, etc. (Nelson, 2004 at 6). This relationship is estimated using regression techniques. The regression coefficient $d_2 \times 100$ (= $\partial V/\partial DNL \bullet 1/V$) represents the percentage decrease in a given property value resulting from a one dB increase in noise exposure on the DNL scale. For this relationship, the marginal implicit price is given by $\partial V/\partial(DNL) = d_2V$, and the noise-housing price elasticity is $d_2(DNL)$.

**The main findings of aircraft noise studies can be summarized by defining a Noise Depreciation Index (NDI), which shows the percentage depreciation per dB.**

37. The main findings of empirical studies of aircraft noise can be summarized, with some adjustments, by means of a Noise Depreciation Index (NDI), which was originally developed by Walters (1975 at 102). For two properties that differ *but for* their level of noise exposure, the absolute amount of housing depreciation per dB (the unit cost of noise) is given by D = (difference in the total noise discount) ÷ (difference in noise exposure in dB). Dividing D by the price of the given house (or an average house price), the percentage rate of deprecation is given by NDI = (D ÷ property value) × 100 = (difference in total percentage deprecation) ÷ (difference in noise exposure in dB). This is the same result as $d_2 \times 100$ in the logarithmic model of residential property values.

38. Many empirical studies use the logarithmic model, and these studies directly estimate the NDI. The coefficient on DNL multiplied by 100 is the percentage change in a given property value due a one dB change in noise exposure (above background). Depending on the functional form, some studies estimate the marginal implicit price or the noise-housing price elasticity. In these cases, appropriate mathematical relationships are used to recover estimates of the NDI. Some empirical studies use an older noise metric, the Noise Exposure Forecast (NEF). The relationship between DNL and NEF is given by DNL = NEF + 35 dB (EPA, 1982a at B-3). The summaries below reflect this adjustment, and all noise levels are expressed using the DNL noise metric.

## IV. EMPIRICAL STUDIES OF AIRCRAFT NOISE AND PROPERTY VALUES

39. Several summaries of empirical studies of civilian aircraft noise and property values are available, including Nelson (1978, 1980, 2004) and FAA (1985). For this report, I will first summarize

---

[5] This annoyance relationship is not precisely the modified "Schultz curve" (Finegold et al. 1994), which covers all forms of transportation noise. The Schultz curve includes low levels of noise exposure (40-50 dB), which provide the non-linear left-hand tail of the curve. These noise exposure levels are omitted from aircraft noise studies or included in the background level. The semi-log function is due to Bishop (1966).

the NDI results in the FAA's (1985) report on *Aviation Noise Effects*. Second, I will summarize my recent meta-analysis (Nelson 2004), which updates and extends my earlier reviews for U.S. and Canadian airports. All of the empirical studies cover noise from civilian aircraft and the residential environment at civilian airports. All of the studies apply the hedonic model. The next section of this report, **Section V**, discusses special features of military aircraft operations and the residential living environment of Virginia Beach and Chesapeake, Virginia. In **Section V**, I also summarize the results from two survey studies of the effects of aircraft noise on residential property values, which are especially important for noise exposure levels of 80 dB and above. The monetary damages developed below isolate the effect of aircraft noise on property values, holding constant other influences such as accessibility and general growth of nominal housing values. Where the passage of time is important, researchers have included variables to account for general changes in housing market demand and supply and other macro-economic conditions.

**The FAA found that aircraft noise decreases the value of residential property by approximately -1% per dB. This estimate is based on results from seven hedonic studies that use data for civilian aircraft and airports.**

40. The FAA's (1985 at 100) report on *Aviation Noise Effects* includes a discussion of the effects of aircraft noise on the value of residential property located around civilian airports. The FAA selected 10 best estimates of the NDI from the range of available values, including three estimates for 1960 and seven estimates for 1967-70. The three NDI values for 1960 are about -2% per dB, which reflects adjustments in housing markets due to early growth of commercial jet aircraft as a mode of transport. The values for 1967-70 include estimates of -1.5% for San Francisco and -1.0% for Washington, D.C., which may reflect climate and other lifestyle considerations in these areas. After omitting the three estimates from the 1960s, the FAA's range of estimates is -0.6% to -1.5% per dB (FAA, 1985 at 101). The FAA (1985 at 101) concluded that noise decreases the value of property by approximately -1% per decibel. As shown below, the FAA's estimate of the NDI is well within the range of values found by more recent empirical studies of the aircraft noise-property value relationship.[6]

**Empirical studies produce a range of estimates for the NDI from -0.3% to -1.5% per dB. The simple mean NDI is -0.75% per dB, which is close to the FAA's estimate. This estimate is based on information from 23 U.S. and Canadian airports and 33 estimates of the NDI.**

[6] The FAA notes that "... all research conducted in this area found negative effects from aviation noise ... researchers have been careful to consider [other factors] and to normalize their influences in research studies" (FAA, 1985 at 100).

41. Since the publication of my survey article (Nelson 1980), there have been additional studies of the empirical relationship between aircraft noise and property values. In Nelson (2004), I updated and extended my earlier survey using the technique of meta-analysis. Table 3 displays the results from 20 hedonic studies that cover 23 different civilian airports in the U.S. and Canada, and includes studies using sample data from 1967 to 1995. A total of 33 best estimates of the NDI is presented. Two independent estimates are available for Atlanta, Dallas, Reno, San Francisco, St. Louis, and Washington, D.C. A variety of data are employed, including data for census tracts, census blocks, disaggregated census blocks, and individual housing sales (e.g., Multiple Listing Service data). The NDI estimates also reflect a variety of model specifications and variables, which capture sample differences in housing and neighborhood characteristics, employment accessibility, airport accessibility, governmental services, and other economic and environmental features. As previously mentioned, it is not expected that the NDI will have a singular value, and the range of NDI values is -0.28 to -1.49%. The simple mean NDI in Table 3 is -0.75% per dB (Nelson, 2004 at 14). This average implies that each dB increase in noise exposure will reduce property values by -0.75%, holding constant other housing and land characteristics. This value is in substantial agreement with the FAA's estimate of -1.0% per dB.

42. The hedonic estimates in Table 3 uniformly indicate that aircraft noise is negatively capitalized into residential property values. Twenty-seven of 31 estimates are statistically significant at the 95% level or better (estimates for JFK and La Guardia Airports are missing standard errors). This is a far greater number of significant negative estimates than could possibly be attributed to chance. The coefficient standard errors and other statistical measures (e.g., R-square) are found in my attached article.

**The technique of meta-analysis can be used to synthesize the set of NDI estimates contained in Table 3. A meta-regression analysis produces a best estimate for the mean NDI of -0.7% per dB. This value is not affected by moderating and mediating variables such as sample size, sample year, mean property value, or airport accessibility.**

43. Meta-analysis is a statistical procedure for integrating and synthesizing the quantitative results contained in a set of studies of a given empirical relationship or outcome. That is, meta-analysis is "an analysis of the results of statistical analyses" (Hedges and Olkin, 1985 at 13). According to Hedges and Olkin (1985 at 1), "replication of experimental results has long been a central feature of scientific inquiry, and it raises questions concerning how [best] to combine the results obtained." Meta-analysis was developed in the early 1980s and applied originally in psychology and education (Cook et al. 1992; Cooper and Hedges 1994). It is now widely applied in the physical sciences and other areas of the social sciences. In economics, meta-analysis has been applied to environmental issues (Smith and Huang 1995; van den Bergh 1997), recreation demand (Rosenberger and Loomis 2000), gasoline demand

**Table 3. Summary of Noise Depreciation Indexes (NDI) for 23 Airports**

| **Hedonic Study – Airport** | **DNL** | **Sample Size (N) and Data (Year)** | **NDI** |
|---|---|---|---|
| BAH-FAA (1994 at 18) – Baltimore | 60 & 70 dB | N = 30; individual houses (1990) | -1.07 |
| BAH-FAA (1994) – Los Angeles | 60 & 70 dB | N = 24; individual houses (1991) | -1.26 |
| BAH-FAA (1994) – NYC JFK | 60 & 70 dB | N = 30; individual houses (1993); no std. error | -1.20 |
| BAH-FAA (1994) – NYC La Guardia | 60 & 70 dB | N = 30; individual houses (1993); no std. error | -0.67 |
| Blaylock (1977 at 84) – Dallas | 55-90 dB | N = 4264; disaggregated census blocks (1970) | -0.99* |
| DeVany (1976 at 213) – Dallas | 55-85 dB | N = 1270; census blocks (1970) | -0.80* |
| Dygert (1973) – San Francisco | 60-80 dB | N = 128; census tracts (1970) | -0.50* |
| Dygert (1973 at 113) – San Jose | 60-80 dB | N = 198; census tracts (1970) | -0.70* |
| Emerson (1972) – Minneapolis | 60-80 dB | N = 222; individual houses (1967) | -0.58* |
| Espey & Lopez (2000) – Reno | 60-75 dB | N = 1596; individual houses (1991-95) | -0.28 |
| Fromme (1978) – Washington, DC | 55-70 dB | N = 28; census tracts (1970) | -1.49* |
| Levesque (1994 at 207) – Winnipeg | 75+ dB | N = 1635; individual houses (1985-86) | -1.30* |
| Mark (1980 at 112) – St. Louis | 70 & 80 dB | N = 6553; individual houses (1969-70) | -0.56* |
| Maser et al. (1977) – Rochester urban<br>Rochester suburban | 65+ dB<br>65+ dB | N = 398; individual houses (1971)<br>N = 990; individual houses (1971) | -0.86*<br>-0.68* |
| McMillian (1980) – Edmonton | 55-70 dB | N = 352; individual houses (1976) | -0.51* |
| Mieszkowski et al. (1978) – Toronto<br>Toronto (Etobicoke) | 55-70 dB<br>55-70 dB | N = 509; individual houses (1969-73)<br>N = 611; individual houses (1969-73) | -0.87*<br>-0.95* |
| Myles (1997 at 21) – Reno | 55-75 dB | N = 4332; individual houses (1991) | -0.37* |
| Nelson (1978) – Washington, DC | 55-70 dB | N = 52; census tracts (1970) | -1.06 |
| Nelson (1979, 1980) – Buffalo | 60-80 dB | N = 126; census blocks (1970) | -0.52* |
| Nelson (1979, 1980) – Cleveland | 60-80 dB | N = 185; census blocks (1970) | -0.29* |
| Nelson (1979, 1980) – New Orleans | 60-80 dB | N = 143; census blocks (1970) | -0.40* |
| Nelson (1979, 1980) – St. Louis | 60-80 dB | N = 113; census blocks (1970) | -0.51* |
| Nelson (1979, 1980) – San Diego | 60-80 dB | N = 125; census blocks (1970) | -0.74* |
| Nelson (1979, 1980) – San Francisco | 60-80 dB | N = 153; census blocks (1970) | -0.58* |
| Nelson (1979, 1980, 1981) – six airports | 60-80 dB | N = 845; census blocks (1970) | -0.55* |
| O'Byrne et al. (1985) – Atlanta (houses)<br>Atlanta (census blocks) | 65-80 dB<br>60-80 dB | N = 96; individual houses (1979-80)<br>N = 248; census blocks (1970) | -0.67*<br>-0.64* |
| Price (1974) – Boston | 60-80 dB | N = 270; apt. rentals by census tracts (1970) | -0.81* |
| Tarassof (1993 at 83) – Montreal | 55-70 dB | N = 427; individual houses (1989-90) | -0.65* |
| Uyeno et al. (1993 )–Vancouver (houses)<br>Vancouver (condos) | 60-75 dB<br>60-75 dB | N = 645; individual houses (1987-88)<br>N = 907; individual condos (1987-88) | -0.65*<br>-0.90* |

*Notes:* Derived from Nelson (2004 at 12), attached. Asterisks indicate statistically significant at the 95% level.

(Espey 1996, 1998), taxation (Phillips and Goss 1995), and many other empirical areas. Summaries of economic applications of meta-analysis are found in Stanley (2001) and Stanley and Jarrell (1989); see also Finkelstein and Levin (2001).

44. In order to conduct a meta-analysis, several steps are necessary (Hedges and Olkin, 1985 at 9; Cooper and Hedges, 1994 at 9). First, the relevant empirical literature must be identified, including unpublished works and statistically weak results. Second, a common "effect size" must be available or can be constructed from each of the studies. The effect size used here is the noise depreciation index or NDI. Third, from the relevant literature, the investigator must extract and code the indicators and variables that ". . . predict outcomes, potential mediators of effects, and the differences in how outcomes are conceptualized" (Cook and Hedges 1994 at 11). Fourth, statistical techniques are applied to the effect size, which summarizes the set of estimates and explains any systematic differences in effect sizes. Weighting of the effect sizes according to the precision of the estimate is emphasized. Hence, standard errors of the effect sizes are a necessary part of the analysis.

45. My 2004 article includes several levels of analysis. First, I compute simple (unweighted) mean and median NDIs. Second, I compute two weighted means that use as weights the inverse variance of each estimate. Hence, more precise estimates in Table 3 are given greater weight. Both fixed-effects and random-effects means are computed, which allows for different sampling and statistical procedures by empirical investigators. Third, a meta-regression analysis is conducted that seeks to identify systematic differences among the estimates that can be traced to measurable differences in sampling and statistical techniques. In the regression analysis, seven variables were identified that might systematically increase (or decrease) a given NDI estimate relative to the other estimates. These variables are: (1) sample country (USA or Canada); (2) sample time period (before or after 1970); (3) sample size (log of number of observations); (4) data type (census data or individual sales); (5) mean property value (in 2000 US dollars); (6) functional form (logarithmic or linear) and (7) airport accessibility (accounted for in the study or not). The meta-regression analysis reveals that only the sample country and functional form are important statistically (Nelson, 2004 at 19).

46. Table 4 summarizes the results of the meta-analysis. The full set of results is found in the attached copy of my article. The unweighted estimates tend to be somewhat larger (i.e., more negative) than the weighted estimates, reflecting the inclusion of JFK and La Guardia Airports. The fixed-effects and random-effects weighted means are very close in magnitude (-0.58 and -0.59). The meta-regression using the inverse variance weights produces the smallest estimate, -0.51, but this estimate does not employ the optimal set of weights (Saxonhouse 1976). The meta-regression using inverse standard error weights yields a synthetic NDI of -0.67 (std. error = 0.20). The 95% confidence interval associated with

this estimate is -0.67 ± 1.96 (0.20) = -0.28 to -1.06. Among the estimates reported in Table 3, the 95% confidence interval includes all NDI values with the exception of four values (Baltimore, Los Angeles, Washington, D.C., and Winnipeg). The large negative estimates for JFK and La Guardia Airports are not included in the regression analysis due to lack of standard errors.

**Table 4. Summary of the Meta-Analysis of Airport Noise and Property Values**

| Statistical Measure | NDI value (std.dev.) | Comments on Measure |
|---|---|---|
| Simple mean NDI (unwt.) | -0.75 (0.30)* | Ignores precision; includes JFK and La Guardia |
| Median NDI (unwt.) | -0.67 | Ignores precision; includes JFK and La Guardia |
| Fixed-effect mean NDI (weighted) | -0.58 (0.04)* | Uses inverse variance weights; sampling error only |
| Random-effect mean NDI (weighted) | -0.59 (0.04)* | Uses inverse variance weights adjusted for between-study variability of estimates |
| Meta-regression coefficient. (unwt.) | -0.83 (0.31)* | White's correction for heteroskedasticity |
| Meta-regression coefficient (wt.) | -0.51 (0.14)* | Wt. regr. with inverse variance weights |
| Meta-regression coefficient (wt.) | -0.67 (0.20)* | Wt. regr. with optimal inverse standard error weights |

*Source*: Nelson (2004); attached. Asterisks indicate statistically significant at the 95% level.

47. An NDI of -0.67% per dB is consistent with my earlier review of the empirical literature. For example, in Nelson (1980), I found that the simple mean NDI for a sample of twelve airports was -0.62% (Nelson, 1980 at 43). In a pooled statistical analysis for six airports, I reported a mean NDI of -0.55% (Nelson, 1979 at 327). Recent studies for other countries also agree with this result. For example, a recent study for Geneva, Switzerland used geographical information system (GIS) data and found a noise discount of -0.7% per dB (Baranzini and Ramirez 2005). Lastly, studies of airport expansions and closures also have found property value effects from anticipated changes in noise exposure (Jud and Winkler 2005; Konda 2002). While these studies do not estimate an NDI, they do serve to demonstrate that market dynamics do not greatly alter the negative effects. In summary, 27 of 31 estimates of the NDI are negative and statistically significant at the 95% level or better. This is convincing evidence that aircraft noise is negatively capitalized into residential property values. A synthesis of this evidence using meta-analysis yields an NDI of about 0.7% per additional dB (above background noise levels).

**Combing the results in Table 4 and the FAA's (1985) estimate, the best NDI estimates are -0.7% to -1.0% per dB. These values measure the diminution in property values due to a one dB increase in noise exposure (DNL) above the background noise level (50-60 dB), and should be applied to noise exposure for residential properties located in the 65-79 dB zone.**

48. In Table 3, the background noise level in most studies is about 60 dB. The maximum noise level in most studies is 80 dB. The change in noise exposure due to **ARS-2** was about 8 to 20 dB (Wyle, 1998 at 4-37). Using these values and the NDI estimate of -0.70% per dB, a 5 dB change in noise due to **ARS-2** reduces a given property value by -3.5% (= -0.70% × 5); a 10 dB change in exposure reduces a given property value by -7%; and a 15 dB change in exposure reduces a given property value by -10.5%. At the FAA's (1985) higher value of -1.0% per dB, the diminution estimates are -5%, -10%, and -15%, respectively.

49. In order to illustrate the general calculation of monetary damages using the mean NDI, information was obtained on the assessed value of an average residential property in Virginia Beach. According to the Office of Real Estate Assessor, all residences (non-apartment units) had an average assessed value of $129,800 in January 2000 (City of Virginia Beach, 2000 at 6), compared to $125,290 in January 1999. The average assessed value for July 1, 1999 was about $127,545. Hence, based on an average assessed value of $128,000, the diminution in value due to **ARS-2** is $4,480 to $6,400 for a 5 dB change; $8,960 to $12,800 for a 10 dB change in exposure; and $13,440 to $19,200 for a 15 dB change. As discussed below, it is an important policy question whether or not properties exposed to 75+ dB can continue to be used for residential purposes. In the next section, I show that the adverse effect of **ARS-2** will be at the upper limit of these estimates, or -1% per dB change in exposure. I also demonstrate that the NDI is larger for residential properties exposed to 80 dB or more.

50. Average assessed residential property values in Virginia Beach rose by 3.60% between January 1999 and January 2000. Average assessed values rose to $158,400 in 2003 (FY 2004). Compared to 2000, this is a compound growth rate of 6.9% per annum. The rate of increase from 2003 to 2004 was 11.7%. The rate of increase from 2004 to 2005 was 22.3%. In the past two years, property values rose rapidly in Virginia Beach (City of Virginia Beach, 2005 at 7). However, this factor only affects the general level of nominal values, and does not change the supply and demand for housing in noisy areas. The correct economic issue is the difference in housing values at different noise exposure levels. Suppose that due to **ARS-2** a residential property valued at $100,000 in 1998 was reduced in value by 20% or $20,000. Growth of property values over time means that this property might have a value at $133,500 in 2005. A similar $100,000 house in a quiet area would be worth about $167,000. While both nominal values increased by 67%, the difference in relative values is 20% in 1999 and 2005.

## V. SPECIAL EFFECTS OF MILITARY AIRCRAFT NOISE

**The special effects of military aircraft noise that exceeds 75 dB are not fully captured by the NDI values of -0.7% and -1.0% per dB change in noise exposure.**

51. Only three of the hedonic studies in Table 3 include noise exposures in excess of 80 dB, and even the populations exposed to 75-80 dB are limited in most studies. Hence, most of the studies in Table 3 fail to consider severe noise exposure of 80 dB and above. For example, O'Byrne et al. (1985) examine the effects of aircraft noise in the vicinity of Atlanta's Hartsfield International Airport. For 1970 census blocks, only 12% of the observations are in the 75-80 dB zone, and for 1979-80 individual house sales, only 7% of the observations are in the 75-80 dB zone. As shown in Table 1, **ARS-2** subjected 23,000 people to 80+ dB. In this section, I examine evidence indicating that property value losses due to miliary aircraft noise will be seriously understated if the special effects of severe noise exposure are not considered. For this purpose, I review the evidence on: (1) survey studies that show that housing markets near airports are segmented by noise exposure in excess of 75 dB; (2) the adverse effects of severe noise levels on human health and welfare; (3) the unique features of Navy aircraft operations; and (4) the residential living environment and lifestyle of Virginia Beach and Chesapeake, Virginia.

52. The discussion that follows is based on the assumption that the land areas exposed to 80+ dB will continue to be used for some residential purposes. It is not clear that this should be the case. Four U.S. federal agencies – EPA, HUD, FAA, and the Department of the Navy – have established explicit guidelines for noise exposure of 75+ dB, which indicate that such levels of exposure are incompatible with residential land use. For example, in its *National Strategy for Noise Control*, one of EPA's specific national goals was expressed at follows:

> Reduce environmental noise exposure of the population to a DNL value of no more than 75 dB immediately, using all available tools, except in those isolated cases where this would impose hardship. This will essentially eliminate risk of hearing loss due to environmental noise, and reduce the extreme annoyance and activity interference for the population most severely affected (EPA, 1977a at 14).

53. The FAA's Part 150 guidelines also are explicit about the scope and purpose of limiting residential land use at a DNL of 75 dB or greater at civilian airports. According to the FAA, the purpose of an airport's noise compatibility program will be:

> To develop comprehensive and implementable noise reduction techniques and land use controls which, to the maximum extent feasible, will confine severe aircraft YDNL values of DNL 75 dB or greater to areas included within the airport boundary (14 *Code of Federal Regulations* Part150, January 1, 2000 at 89).

54. The Department of the Navy's AICUZ guidelines also strongly discourage residential use near airfields at DNL 70-75, and recommends that the greatest degree of compatible use controls should be used at DNL of 75 dB and above (DoN, 2002 at 16; DoN, 2003 at 3-38). Hence, the discussion that follows is based on the strong assumption that some of the land areas at 80 dB or greater will continue to be used for residential purposes. This assumption is clearly in violation of policy positions taken by several U.S. federal agencies, including the U.S. Navy.

**Two survey studies of aircraft noise and property values indicate that housing markets are segmented at 75-80 dB and above. At severe noise levels of 80+ dB, the NDI is -0.85% to -1.50% per dB change in exposure.**

55. Frankel (1991) examined the effect of aircraft noise on property values in the vicinity of Chicago's O'Hare Airport. Rather than using the hedonic price method, Frankel surveyed 200 realtors and 70 appraisers from 35 suburban communities surrounding O'Hare Airport. Two of the survey questions addressed the issue of valuation of properties exposed to different levels of aircraft noise. At background noise levels (60-65 dB), 49% of the survey respondents estimated that this noise level would have little or no effect on property values (Frankel, 1991 at 103). However, at severe noise levels (75-80 dB and above), only 2.3% of the respondents thought there would be no effect, and 41% estimated that property values would decline by 25% or more. At severe noise levels, the median reductions for single-family homes were 21.6% for realtors and 16.5% for appraisers. The mean reductions were 16.4% and 12.7%, respectively (Frankel, 1991 at 105). Using the medians and a difference of 15 dB over the background, the NDI for single-family homes at severe noise levels is -1.10% to -1.44% per dB (Frankel, 1991 at 107). Using the means, the NDI is -0.85 to -1.09% per dB for houses located at 75-80 dB and above.

56. Frankel (1991 at 107) compares the survey results with estimates obtained from hedonic price studies. He uses a mean NDI estimate from Nelson (1980), and compares that NDI value and his survey estimates at four different noise levels (62.5, 67.5, 72.5, and 77.5 dB). At the two lower noise levels, the hedonic price estimates and the survey estimates are similar. However, at the two higher noise levels, Frankel (1991 at 107) concludes that the hedonic estimates fall below the survey estimates. Frankel (1991 at 107) offers several possible explanations for this result, including a nonlinear NDI; differences in local residential markets and airport environments; interactions between housing characteristics and aircraft noise; and asymmetric information in housing markets, which limits the efficient operation of the market. Frankel (1991 at 108) concludes that the NDI at noise levels of 80+ dB is about -0.90% per dB. This conclusion is supported by two studies in Table 3 that included more ample information on noise levels above 80 dB. The study by Blaylock (1977) for Dallas obtained an NDI of -0.99% and the study by Levesque (1994) for Winnipeg obtained an NDI of -1.30% per dB.

57. A second survey study was conducted by Feitelson et al. (1996). The authors' survey design was based on 10 noise scenarios and a telephone survey of 426 homeowners and 274 renters in three communities near a major hub airport. This study employed Contingent Valuation (CV) survey methods to analyze two interrelated decisions by homeowners. First, respondents were asked to state their willingness to buy a house at different noise levels. Second, if a respondent was willing to buy a house, they were next asked to state their willingness to pay to avoid different aircraft noise exposures. Renters were asked similar questions about their willingness to rent and the rental premium for quiet. Thus, valuation is modeled as the outcome of a two-stage process: (1) the respondent determines whether he or she is willing to consider buying a residence; and (2) if the answer to this question was affirmative, then the respondent is asked to state their willingness to pay for the residence and its associated level of noise exposure. Hence, survey responses are obtained for the number of individuals who are unwilling to buy noisy properties at any price. If this number is large, the resulting housing market is "thin," or segmented (Feitelson et al., 1996 at 4; Frankel, 1991 at 100).

58. Feitelson et al. (1996 at 10) find that a larger number of individuals are unwilling to purchase a home (or rent) at severe noise levels, especially if overflights are involved. Almost half (45.1%) of the survey respondents were unwilling to buy a home that was exposed to severe noise and subject to overflights. For renters, the similar figure was 34.7%. Feitelson et al. (1996 at 11) conclude that the survey responses imply that the housing market near airports is segmented. An increasingly larger number of buyers are unwilling to consider the purchase of a property as the noise level rises, at any discount from the sale price. Comparing background noise exposure to severe noise exposures (15-25 dB difference), Feitelson et al. (1996 at 12) derive an NDI estimate of -2.4% to -4.1% per dB for homeowners and -1.8% to -3.0% per dB for renters. Compared to hedonic price estimates, the higher NDI includes the loss of use value incurred by homeowners who experience a severe noise exposure and who wish to sell their house. Excluding the zero valuation responses, Feitelson et al. (1996 at 11) derive an NDI at severe noise levels of -1.5% to -2.4% per dB for house prices and -0.9% to -1.5% per dB for rentals. These values agree substantially with the estimates obtained by Frankel (1991).

59. Both survey studies yield estimates that exceed the mean NDI of -0.7% per dB derived in Table 4. Combining the results in the two survey studies, a conservative range of estimates for the NDI at 80+ dB is -0.85 to -1.5% per dB. Hence, an average $128,000 residence located at 65 dB in CY99 was diminished in value by $16,320 to $28,800 if the change in noise exposure due to **ARS-2** was 15 dB and $21,760 to $38,400 if the change was 20 dB.

**The Environmental Protection Agency found that a DNL of 75 dB and above is associated with potentially severe health and welfare effects. A recent study of noise and school environments found that aircraft noise impaired children's reading comprehension and recognition memory. Because school quality is a factor that determines property values, this finding is potentially important for residents of Virginia Beach and Chesapeake, Virginia, and future property values.**

60. The EPA's (1982a at 52) *Guidelines for Noise Impact Analysis* examines the possible effects of DNL values that exceed 75 dB. EPA (1982a at 56) recommends that if outdoor noise exposure exceeds three hours a day at a DNL of 75 dB or above, it is important to look for potential severe health effects. First, for some people, noise-induced hearing loss begins to occur at 75 dB. The adverse effect of noise on hearing rapidly accelerates as noise exposure increases, and the possibility of hearing loss is an indicator of other adverse health and welfare effects (EPA, 1982a at 55). Second, those persons who are frequently outdoors are at greatest risk, including young children, retired persons living in warm climates, and persons in certain outdoor occupations. The adverse effects on human health and welfare of DNL 75+ can be summarized as follows (EPA, 1982a at C-1):

| Type of Adverse Effect | Magnitude of Effect at 75 dB and Above |
|---|---|
| ! Hearing Loss | May begin to occur in sensitive individuals, depending on actual noise levels received at-ear. |
| ! Risk of non-auditory health effects | Noise is one of several factors producing stress-related health effects, such as high-blood pressure. |
| ! Speech – indoor | Some disturbance of normal conversation. Sentence intelligibility is approximately 98% at 60 dB indoors (2m). |
| ! Speech – outdoor | Very significant disturbance of normal voice conversation. Speech intelligibility is zero at 2m at 75 dB outdoors. |
| ! High Annoyance | Approximately 37% of the population will be highly annoyed at 75 dB, 53% at 80 dB, and 72% at 85 dB. |
| ! Community Reaction | Very severe. Significant complaints and vigorous actions. |
| ! Community Attitudes | Noise is likely to be the most important of all adverse aspects of the community environment. |

61. Second, with respect to noise-induced sleep loss, Suter (1991 at 21) states that sleep interference is one of the critical components of community annoyance. Sleep loss can produce short-term adverse effects, such as mood changes and decrements in task performance the next day, with the possibility of more serious effects on health and well-being if sleep loss continues over long periods (Suter, 1991 at 21). Sleep interference will tend to occur at maximum outdoor sound levels of 65 dB or

greater. Based on a survey of the sleep disturbance literature, Finegold et al. (1994 at 29) recommend that "flight operations with a large number of nighttime events may require that supplemental information, such as an estimate of sleep disturbance, be included in environmental impact analyses." This information is required in addition to the 10 dB penalty for nighttime noise that is incorporated into outdoor DNL values. These adverse effects will be greater at 80+ dB, which implies a greater effect on residential property values than is reflected in Table 4 or the FAA's (1985) estimate.

62. Third, a number of studies investigate the effects of noise on children's health and welfare. The most recent in this long line of studies examined the adverse effects of aircraft noise on cognitive performance of children (Stansfield et al. 2005). The investigators note that children (ages 9-10) are particularly vulnerable to the effects of noise because noise interferes with learning at a critical developmental stage, and because children have less capacity to anticipate, understand, and cope with stressors. The study found that exposure to chronic aircraft noise impaired reading comprehension and recognition memory. Because school quality is a factor that determines residential property values, this finding is potentially important for the residential areas in the vicinity of the two airfields.

**Navy aircraft have unique operating and safety features that will exacerbate the effects of noise on the exposed population and on residential property values.**

63. Navy aircraft have several unique noise characteristics (Wyle, 1998 at 1-3), which imply that NDI estimates based on civilian aircraft will understate the adverse effects of increased noise exposure on property values. First, single-event noise levels are much greater for F-18 aircraft, which do not have the noise suppression equipment required for civilian jet aircraft. Second, military aircraft are granted a waiver from FAA civilian regulations. These aircraft have combat training requirements that occur over land and water at low altitudes and high speeds. Due to high speeds and low altitudes, military aircraft "seem to come from nowhere with a great noise and just as quickly disappear again" (Wyle, 1998 at 1-3). A "surprise" effect occurs under these conditions, which contributes to annoyance. Third, military aircraft operate in a sporadic fashion in designated low-altitude airspaces and along Military Training Routes (DoN, 1998a at 3.1-8). Fourth, Navy jet aircraft operate in formations that are different from Air Force jet aircraft. For example, Navy aircraft are required to practice landing at full power to simulate aircraft carrier operations (EPA, 1977b at 3-12), which means that FCLP noise levels are close to maximum departure-arrival levels (DoN, 1998a at 4.8-12). Fifth, another unique feature is the frequency of nighttime operations, which in CY00 accounted for about 25,000 operations at NAS Oceana and 55,000 operations at NALF Fentress. FCLP operations are often conducted at night with several aircraft in the pattern at low altitudes (DoN, 1988 at 9). These unique operating characteristics do not imply that

noise exposure is being measured incorrectly for **ARS-2**, since corrections to DNL values are possible for intrusiveness, frequency of operations, and nighttime events. The issue is that these characteristics are unique to Navy aircraft, and are not fully captured by empirical studies of the effects of civilian aircraft noise on residential property values. These characteristics mean that the NDI values derived above are likely to be conservative estimates of the effect of **ARS-2** on property values at both substantial noise levels (65-79 dB) and severe noise levels (80+ dB). Lastly, safety and accident considerations are more important for military aircraft, which means that Accident Potential Zones (APZ) are an important part of land compatibility planning (DoN, 2002 at 9).

**Virginia Beach and Chesapeake, Virginia, are residential living environments that are associated with warmer weather and outdoor living activities. These activities will be seriously or critically affected by the increased noise exposure due to ARS-2.**

64. The noise exposure guidelines established by EPA (1973, 1974, 1977a, 1982a) and other federal agencies are primarily designed to protect the public health with an adequate margin of safety. Primary consideration is given to the effects of noise on hearing, speech communication, sleep loss, mental health, productivity, and related health concerns. The effect of noise on public welfare is a broader concern, which includes effects on activities where people value tranquility or the absence of significant intrusive sounds. For example, EPA (1974 at 28) states that “a quiet environment is necessary in both urban and rural residential areas to prevent activity interference and annoyance, and to permit the hearing mechanism to recuperate if it is exposed to higher levels of noise during other periods of the day.” Because outdoor activities are varied, EPA criteria/levels documents and other annoyance studies (Wyle, 1998 at A-1) do not always identify the types of activities that people find most disturbed by aircraft noise. Some evidence on this point is found in a few social surveys. EPA (1971 at 107) reports the results from a social survey of people living within 12 miles of the major airports in Chicago, Dallas, Denver, and Los Angeles. Given the large survey areas, the percentage of people who rated an activity as extremely disturbed by aircraft noise were as follows: TV/radio reception, 21%; conversation, 15%; telephone use, 14%; *relaxing outside*, 13%; relaxing inside, 11%; sleep, 8%; reading, 6%, and eating, 4%. Another example is found in the HUD (1972) report on aircraft noise impacts, which includes an “activity sensitivity analysis.” Outdoor activities are critically affected by DNL levels of 80 dB and above and seriously affected by DNL levels of 60-79 dB (HUD, 1972 at 62). A “critical impact” means that the activity cannot be performed acceptably, and a “serious impact” means that the activity can be performed only with difficulty. Further, FAA (1985 at 21) states that noise is considered more disturbing in the summer because windows are likely to be open and recreational activities take place outdoors. Finegold et al. (1994 at 27) report that aircraft noise is more annoying than other forms of transportation

noise because aircraft noise virtually surrounds a home, whereas street noise is more directed. This difference tends to be ignored in social surveys, but clearly would be very important for outdoor activities, such as backyard relaxation, play, and family recreation. Hence, there are reasons to find that aircraft noise will interfere substantially with outdoor living, and this effect will increase the diminution of property values resulting from **ARS-2**.

65. The Cities of Virginia Beach and Chesapeake are located in an area with a warmer climate, where outdoor living and outdoor recreation are a significant attraction for many people. The average daily high temperature is 67º in April, 76º in May, 80º in September, and 70º in October. The temperate maritime climate is influenced by the nearby Gulf Stream. Virginia Beach is the one of the fastest growing cities on the East Coast and the largest city in the state of Virginia with nearly 500,000 residents. The median age of the residents in 2000 was 32.7 years. Virginia Beach is a popular destination for tourists, with an estimated 2.5 million annual visitors. Due to the mild climate, the beach season extends from spring through fall, which encourages a long visitor season. Water-based recreation attractions include sailing, power boating, surfing, swimming, fishing, diving, and sightseeing. Virginia Beach has 38 miles of shoreline, 28 miles of public beaches, 79 miles of scenic waterways, 60 miles of biking trails, 11 public golf courses, 18 marinas with public access, and three fishing piers. Virginia Beach also has more than 4000 acres of parklands, including 154 neighborhood parks (DoN, 1998a at 3.1). In October 1999, *Entrepreneur* magazine ranked the Virginia Beach area among the top 10 "Best U.S. Cities for Starting a Business." As a result, many residents are drawn to the area for the mild climate, outdoor-oriented quality of life, and economic opportunities; <http://www.vbgov.com> and <http://en.wikipedia.org/wiki/Virginia_Beach%2C_Virginia>.

66. Chesapeake is one of the fastest growing cities in Virginia, with a 2000 population of 199,000; <http://www.chesapeake.va.us>. The city is less than 20 miles from the Atlantic Ocean and is located on Chesapeake Bay. The population of Chesapeake is relatively young, with a median age of 34.7 years. Chesapeake citizens enjoy access to numerous neighborhood and community parks (DoN, 1998a at 3.1). Chesapeake is a family-oriented city, and it has earned recognition as one of the *50 Fabulous Places to Raise Your Family*. Many family-oriented activities are outdoor activities, including backyard play, family recreation, and weekend relaxation.

67. Although some operating hours are restricted, NAS Oceana and NALF Fentress are 24-hour airfields, operating seven days a week. The quality of some portion of the above recreation activities will be adversely affected by severe noise levels and increased aircraft noise exposure. In addition, other normal outside activities, such as backyard play and weekend relaxation, will be disrupted by increased noise exposure. These adverse welfare effects received no mention in the reports by the FAA (1985) and

Wyle Labs (1994, 1997, 1998, 2003), or in the Navy's Final Environmental Impact Statements (DoN 1998a, 2003) and AICUZ study. Due to the mild climate, young populations, and the family-oriented nature of the two Cities, the low-end NDI values (-0.7% and -0.85% per dB) are likely to understate the effect that military aircraft noise and **ARS-2** will have on residential property values.

68. As a result of the mild climate of Virginia Beach and Chesapeake; the unique operating features of Navy aircraft; the adverse health and welfare effects of severe noise levels of 80 dB and above; and the results of survey studies, the NDI for the 65-79 dB zone is -1.0% per dB change in noise exposure and the NDI for 80 dB and above is -1.5% per dB change in noise exposure. In addition to the FAA (1985) study, these values are based on 20 econometric studies that examine residential property values in the vicinity of 23 different airports in the U.S. and Canada, and two survey studies. Using meta-analysis, the cumulative results in the 20 studies provide convincing evidence that aircraft noise has negative effects on property values. This evidence is not affected by differences across studies due to sampling time period, sample size, data type, mean property value, or airport accessibility. In sum, housing market transactions are efficient processes that reveal the negative values that homeowners place on the disamenities associated with aircraft noise.

## VI. SUMMARY AND CONCLUSIONS

69. Based on my evaluation of the change in operations, change in noise exposure, and potential for adverse effects of military aircraft noise, I conclude the following with regard to the adverse effects of **ARS-2** on residential property values:

(1) Under **ARS-2**, the realignment of 156 F/A-18 Fleet and FRS aircraft to NAS Oceana and NALF Fentress substantially increased aircraft operations at the two airfields. Based on operational data for 1997 and 2000, total air station and airfield operations increased by 91% and 29%, respectively. Nighttime operations at Oceana rose dramatically from 7,000 to 25,000. Nighttime operations at Fentress rose from 35,000 to 55,000, or more than 150 operations per night. Navy F-18 aircraft are more than twice as loud as F-14 aircraft.

(2) The increase in operations dramatically increased the populations exposed to substantial and severe noise levels. The population exposed to 65-79 dB rose from 28,000 people in 1997 to more than 97,000 people in 1999. The population exposed to 80+ dB rose from only four people in 1997 to more than 23,000 people. Depending on location, the change in noise exposure in the vicinity of the two airfields is 8 to 20 dB (Wyle, 1998 at 4-37; DoN, 1998b at 11). A change in noise exposure of more than 1.5 to 3 dB is significant due to the effects on annoyance and community response.

(3) Land use compatibility guidelines adopted by several federal agencies, including the FAA and Department of the Navy, indicate that land areas subjected to noise levels between 65-75 dB are normally incompatible with residential land use, and noise levels above 75 dB are clearly incompatible with residential land use. The 1998 Standard of the Acoustical Society of America, which included

representatives of the Department of the Navy, takes into account lifestyle differences. The American National Standard is that DNL of 65+ is incompatible with residential use where extensive outdoor living takes place (ASA 1998). Recent changes in the Navy's AICUZ guidelines recognize the importance of human welfare in addition to health and safety concerns.

(4) Noise has adverse effects on normal daily living activities. At 65 dB and above, the most common human effects are annoyance, speech and learning interference, and sleep disturbance. These adverse effects disrupt normal daily activities, such as conversation, television viewing, school work, productivity, outdoor living, and family recreation activities. At noise exposure levels above 75 dB, there also are damages from temporary hearing loss and greater effects on outdoor living and human welfare. These adverse effects are greatest for children, retired persons in warm climates, and persons in certain outdoor occupations.

(5) Aircraft noise is a classic example of an external social cost – an uncompensated side-effect of production and consumption activities. Purchase of land or restrictive easements is one solution to this problem, and this solution is illustrated by expenditures made at several civilian airports. Direct estimation of a demand or willingness-to-pay schedule for tranquility is not possible. However, housing markets are complementary to levels of noise exposure. The value of tranquility is part of the market-determined price of housing, and econometric techniques are available to unbundle complex products and thereby reveal the implicit or hedonic price of tranquility. A large empirical literature is available in economics that estimates the implicit price model for housing characteristics, including disamenities.

(6) Empirical estimation techniques incorporate the annoyance due to noise exposure above background levels. The main findings from hedonic property value studies can be expressed in terms of a Noise Depreciation Index (NDI). The NDI captures in a single number the percentage decrease in a given property from a one dB increase in noise exposure, holding constant other determinants of housing values. This is the *but for* relationship. The FAA's (1985) report, *Aviation Noise Effects*, concluded that the NDI is -1.0% per dB increase in noise exposure. Based on a meta-analysis of 33 estimates of the NDI for 23 different airports, the NDI for aircraft noise is about -0.7% per dB. Combining these two estimates, the diminution of residential property values from aircraft noise exposure is -0.7% to -1.0% per dB for properties in the 65-79 dB zone. The higher value of -1.0% per dB is appropriate due to the unique operating features of Navy aircraft and the outdoor quality of life associated with the mild climate and recreation opportunities of Virginia Beach and Chesapeake, Virginia.

(7) Available evidence indicates that the NDI is higher at severe noise levels above 75 dB. Two survey studies show that housing markets are segmented at noise exposures of more than 75 dB. A conservative range of estimates from these two studies is an NDI of -0.85% per dB to -1.5% per dB for residential properties exposed to 80 dB or greater. The higher value of -1.5% per dB is appropriate due to the unique operating features of Navy aircraft and the outdoor quality of life associated with the mild climate and recreation opportunities of Virginia Beach and Chesapeake, Virginia.

(8) The importance of a higher NDI value for 80+ dB is reinforced by the greater adverse health and welfare effects of severe noise levels; the unique operating features of Navy aircraft; and the outdoor lifestyle associated with the mild climate of Virginia Beach and Chesapeake, Virginia. Severe noise exposure has the potential to substantially affect human welfare derived from outdoor recreation, backyard play, and weekend relaxation in the out-of-doors. Some outdoor activities are critically affected and cannot be performed acceptably if aircraft noise levels exceed 80 dB (HUD, 1972 at 62). School performance of young children also can suffer if adequate mitigation efforts are not undertaken.

(9) The July 1999 average assessed residential value in Virginia Beach was about $128,000. This value is used to illustrate the determination of monetary damages. Using the NDI of -1.0% per dB for an average property exposed to 60-64 dB in CY98, the monetary damage will be $6,400 for a 5 dB increase in exposure; $12,800 for a 10 dB increase; and $19,200 for a 15 dB increase due to **ARS-2**.

(10) Damages will be greater for properties exposed to 80+ dB. Using an NDI of -1.5% per dB for an average property exposed to 65-70 dB in CY98, the monetary damage will be $19,200 for a 10 dB increase in exposure; $28,800 for a 15 dB increase; and $38,400 for a 20 dB increase due to **ARS-2**.

I declare and affirm under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

____________________________

Jon P. Nelson, Ph.D.

**REFERENCES**

Acoustical Society of America, *Quantities and Procedures for Description and Measurement of Environmental Sound – Part 5: Sound Level Descriptors for Determination of Compatible Land Use*, ANSI S12.9-1998/Part 5 (New York: ASA, January 1998).

Baranzini, A. and J.V. Ramirez, "Paying for quietness: The impact of noise on Geneva rents," *Urban Studies* **42**, 2005, 633-46.

Bartik, T.J. and V.K. Smith, "Urban amenities and public policy," in E.S. Mills (ed.), *Handbook of Regional and Urban Economics* (Amsterdam: North-Holland, 1987), pp. 1207-54.

Benson, E.D., J.L. Hansen, and A.L. Schwartz, "Water views and residential property values," *Appraisal Journal* **68**, 2000, 260-71.

Bishop, D.E., "Judgements of the relative and absolute acceptability of aircraft noise," *Journal of the Acoustical Society of America* **40**, 1966, 108-22.

Blaylock, J.E., *Airport Noise and Housing Values: An Investigation into the Hedonic Theory of Housing and the Value of Quiet*, Unpublished Ph.D. dissertation, Texas A&M University, 1977.

Boardman, A.E., *Cost-Benefit Analysis* (Upper Saddle River, NJ: Prentice-Hall, 1996).

Boardman, A.E., D.H. Greenberg, A.R. Vining, and D.L. Weimer, "Plug-in shadow price estimates for policy analysis," *Annals of Regional Science* **31**, 1997, 299-324.

Boyle, M.A. and K.A. Kiel, "A Survey of House Price Hedonic Studies of the Impact of Environmental Externalities," *Journal of Real Estate Literature* **9**, 2001, 117-44.

Chinloy, P., *Real Estate: Investment and Financial Strategy* (Boston: Kluwer, 1988).

City of Virginia Beach, Office of Real Estate Assessor, *Annual Report to the Virginia Beach City Council for Fiscal Year 2000 - 2001* (Virginia Beach, VA: February 18, 2000).

City of Virginia Beach, Office of Real Estate Assessor, *Annual Report to the Virginia Beach City Council for Fiscal Year 2005 - 2006* (Virginia Beach, VA: February 17, 2005).

Cook, T.D., et al., *Meta-Analysis for Explanation: A Casebook* (New York: Russell Sage Foundation, 1992).

Cooper, H. and L.V. Hedges, "Research synthesis as a scientific enterprise," in H. Cooper and L.V. Hedges (eds.), *The Handbook of Research Synthesis* (New York: Russell Sage Foundation, 1994).

DeVany, A.S. and J.P. Nelson, "Monetary measures of the benefits of abatement: Property-value analysis," in National Academy of Sciences, *Noise Abatement: Policy Alternatives for Transportation* (Washington, DC: NAS, 1977a), pp. 126-60.

DeVany, A.S., J.P. Nelson, and A.A. Walters, "Cost-benefit analysis: Some illustrations," in National Academy of Sciences, *Noise Abatement: Policy Alternatives for Transportation* (Washington, DC: NAS, 1977b), pp. 183-206.

DiPasquale, D. and W.C. Wheaton, *Urban Economics and Real Estate Markets* (Englewood Cliffs, NJ: Prentice Hall, 1996).

Donnelly, W.A., "A survey in applied environometrics: The hedonic valuing of environmental amenities," *Environment International* **17**, 1991, 547-58.

Espey, M., "Explaining the variation in elasticity estimates of gasoline demand: A meta-analysis," *Energy Journal* **17**, 1996, 49.60.

Espey, M., "Gasoline demand revisited: An international meta-analysis," *Energy Economics* **20**, 1998, 273-95.

Farber, S., "Undesirable facilities and property values: A summary of empirical studies," *Ecological Economics* **24**, 1998, 1-14.

Feitelson, E.I, R.E. Hurd, and R.R. Mudge, "The impact of airport noise on willingness to pay for residences," *Transportation Research-D* **1**, 1996, 1-14.

Finegold, L.S, C.S. Harris, and H.E. von Gierke, "Community annoyance and sleep disturbance: Updated criteria for assessing the impacts of general transportation noise on people," *Noise Control Engineering* **42**, 1994, 25-30.

Finkelstein, M.O. and B. Levin, "Meta-analysis," in *Statistics for Lawyers*, 2nd ed. (New York: Springer, 2001), pp. 249-54.

Follain, J.R. and E. Jimenez, "Estimating the Demand for Housing Characteristics: A Survey and Critique," *Regional Science and Urban Economics* **15**, 1985, 77-107.

Forsyth, P. et al. (eds.), *Classics in Transport Analysis: Air Transport* (New York: Elgar, 2002), pp. 613-28.

Frankel, M., "Aircraft noise and residential property values: Results of a survey study," *Appraisal Journal* **59**, 1991, 96-110.

Freeman, A.M., "Property value models," in *The Measurement of Environmental and Resource Values: Theory and Methods* (Washington, DC: Resources for the Future, 1993), pp. 367-420.

Gramlich, E.M., *A Guide to Benefit-Cost Analysis*, 2nd ed. (Englewood Cliffs, NJ: Prentice Hall, 1990).

Hampton Roads Planning District Commission, *Hampton Roads Joint Land Use Study* (Virginia Beach, VA: Hampton Roads PDC, April 2005).

Hayashi, Y., et al. (eds.), *The Environment and Transport* (New York: Elgar Publishing, 1999), pp. 81-92.

Hedges, L.V. and I. Olkin, *Statistical Methods for Meta-Analysis* (New York: Academic Press, 1985).

Jud, G.D. and D.T. Winkler, "The announcement effect of an airport expansion on housing prices," Unpublished working paper, University of North Carolina, Greensboro, April 2005.

Kolstad, C.D., *Environmental Economics* (New York: Oxford University Press, 2000).

Konda, L.S., "A comparison of methodologies to measure effects of airport siting decisions," Unpublished working paper, University of Texas at Austin, October 2002.

Levesque, T., "Modelling the effects of airport noise on residential housing markets: A case study of Winnipeg International Airport," *Journal of Transport Economics and Policy* 28, 1994, 199-210.

Lusht, K.M., *Real Estate Valuation: Principles and Applications* (Chicago: Irwin, 1997).

National Academy of Sciences, *Noise Abatement: Policy Alternatives for Transportation* (Washington, DC: NAS, 1977).

Nelson, J.P., *Economic Analysis of Transportation Noise Abatement* (Cambridge: MA, Ballinger, 1978).

Nelson, J.P., "Airport noise, location rent, and the market for residential amenities," *Journal of Environmental Economics and Management* **6**, 1979, 320-31.

Nelson, J.P., "Airports and property values: A survey of recent evidence," *Journal of Transport Economics and Policy* **14**, 1980, 37-52.

Nelson, J.P., "Measuring benefits of environmental improvements: Aircraft noise and hedonic prices," in V.K. Smith (ed.), *Advances in Applied Microeconomics* (Greenwich, CN: JAI Press, 1981), pp. 51-75.

Nelson, J.P., "Highway noise and property values: A survey of recent evidence," *Journal of Transport Economics and Policy* **16**, 1982, 117-38.

Nelson, J.P., "Meta-analysis of airport noise and hedonic property values: Problems and prospects," *Journal of Transport Economics and Policy* **38**, 2004, 1-28.

O'Byrne, P.H., J.P. Nelson, and J.J. Seneca, "Housing values, census estimates, disequilibrium and the environmental cost of airport noise: A case study of Atlanta," *Journal of Environmental Economics and Management* **12**, 1985, 169-78.

O'Sullivan, A., *Urban Economics*, 4th ed. (Chicago: Irwin, 2000).

Palmquist, R.B., "Hedonic methods," in J.B. Braden and C.D. Kolstad (eds.), *Measuring the Demand for Environmental Quality* (New York: North-Holland, 1991), pp. 77-120.

Palmquist, R.B., "Property value models," in K.-G. Maler and J. Vincent (eds.), *Handbook of Environmental Economics: Valuing Environmental Changes*, vol. 2 (Amsterdam: North Holland, 2005 forthcoming). Available at <http://www4.ncsu.edu/~palmq/RecentWorkingPapers.htm>.

Phillips, J.M. and E.P. Goss, "The effect of state and local taxes on economic development: A meta-analysis," *Southern Economic Journal* **62**, 1995, 320-33.

Reichert, A.K., "Impact of a toxic waste Superfund site on property values," *Appraisal Journal* **65**, 1997, 381-92.

Rosenberger, R.S. and J.B. Loomis, "Using meta-analysis for benefit transfer: In-sample convergent validity tests of an outdoor recreation database," *Water Resources Research* **36**, 2000, 1097-107.

Saxonhouse, G., "Estimated Parameters as Dependent Variables," *American Economic Review* **66**, 1976, 178-83.

Schultz, T.J., "Synthesis of social surveys on noise annoyance," *Journal of the Acoustical Society of America* **64**, 1978, 377-405.

Simons, R.A. and A. El Jaouhari, "The effect of freight railroad tracks and train activity on residential property values," *Appraisal Journal* **72**, 2004, 223-33.

Smith, V.K. and J-C. Huang, "Hedonic models and air pollution: Twenty-five years and counting," *Environmental and Resource Economics* **3**, 1993, 381-94.

Smith, V.K. and J-C. Huang, "Can markets value air quality? A meta-analysis of hedonic property value models," *Journal of Political Economy* **103**, 1995, 209-27.

Stanley, T.D., "Wheat from chaff: Meta-analysis as quantitative literature review," *Journal of Economic Perspectives* **15**, 2001, 131-50.

Stanley, T.D. and S.B. Jarrell, "Meta-regression analysis: A quantitative method of literature surveys," *Journal of Economic Surveys* **3**, 1989, 161-70.

Stansfield, S.A., et al., "Aircraft and road traffic noise and children's cognition and health: A cross-national study," *The Lancet* **365**, 2005, 1942-49.

Suter, A.H., *Noise and Its Effects* (Washington, DC: Administrative Conference of the United States, November 1991). Available at http://www.nonoise.org/library.

Tietenberg, T., *Environmental and Natural Resource Economics*, 5th ed. (Boston: Addison-Wesley, 2000).

U.S. Department of Housing and Urban Development, *Aircraft Noise Impact-Planning Guidelines for Local Agencies*, PB-213020 (Washington, DC: HUD, November 1972).

U.S. Department of the Navy, *Planning in the Noise Environment*, NAVFAC P-970 (Washington, DC: DoN, June 1978).

U.S. Department of the Navy, *AICUZ Program Procedures and Guidelines for Department of the Navy Air Installations*, OPNAVINST 11010.36A (Washington, DC: DoN, April 1988).

U.S. Department of the Navy, *Final Environmental Impact Statement: Realignment of F/A-18 Aircraft and Operational Functions From Naval Air Station Cecil Field, Florida, to Other East Coast Installations* (Washington, DC: DoN, NFEC, March 1998a).

U.S. Department of the Navy, *Record of Decision and General Conformity Determination for Realignment of F/A-18 Aircraft and Operational Functions from Naval Air Station (NAS) Cecil Field, Florida, to other East Coast Installations* (Norfolk, VA: DoN, NFEC, May 18, 1998b).

U.S. Department of the Navy, *AICUZ Program Procedures and Guidelines for Department of the Navy Air Installations*, OPNAVINST 110010.36B (Washington, DC: DoN, December 2002).

U.S. Department of the Navy, *Final Environmental Impact Statement (FEIS) for the Introduction of F/A-18 E/F (Super Hornet) Aircraft to the East Coast of the United States* (Washington, DC: DoN, July 2003).

U.S. Department of the Navy, "Record of Decision for Introduction of F/A-18 E (Super Hornet) Aircraft to the East Coast of the United States," *Federal Register* 68 (175), September 10, 2003, 53353-359.

U.S. Environmental Protection Agency, *Effects of Noise on People*, NTID300.7 (Washington, DC: EPA, December 1971).

U.S. Environmental Protection Agency, *Public Health and Welfare Criteria for Noise*, EPA 550/9-73-002 (Washington, DC: EPA, July 1973).

U.S. Environmental Protection Agency, *Information on Levels of Environmental Noise Requisite to Protect Public Health and Welfare with an Adequate Margin of Safety*, EPA 550/9-74-004 (Washington, DC: EPA, March 1974).

U.S. Environmental Protection Agency, *Toward a National Strategy for Noise Control* (Washington, DC: EPA, April 1977a).

U.S. Environmental Protection Agency, *Department of Defense: Air Installations Compatible Use Zones (AICUZ) Program*, EPA 550/9-77-353 (Washington, DC: EPA, April 1977b).

U.S. Environmental Protection Agency, *Guidelines for Noise Impact Analysis*, EPA 550/9-82-105 (Washington, DC: EPA, April 1982a).

U.S. Environmental Protection Agency, *Airport Noise – Land-Use Compatibility by the Year 2000*, EPA 550/9-82-344 (Washington, DC: EPA, August 1982b).

U.S. Environmental Protection Agency, *Guidelines for Preparing Economic Analyses*, EPA 240-R-00-003, (Washington, DC: EPA, September 2000).

U.S. Federal Aviation Administration, *Aviation Noise Effects*, ADA-154319 (Washington, DC: FAA, March 1985). Available at http://www.nonoise.org/library.

U.S. Federal Interagency Committee on Noise, *Federal Agency Review of Selected Airport Noise Analysis Issues, Volume I, Policy Report* (Washington, DC: FICON, August 1992a). Available at http://www.fican.org.

U.S. Federal Interagency Committee on Noise, *Federal Agency Review of Selected Airport Noise Analysis Issues, Volume II, Technical Report* (Washington, DC: FICON, August 1992b). Available at http://www.fican.org.

U.S. Federal Interagency Committee on Urban Noise, *Guidelines for Considering Noise in Land Use Planning and Control*, PB81-214124 (Washington, DC: FICUN, June 1980).

U.S. General Accounting Office, *Aircraft Noise: Eight Airports' Efforts to Mitigate Noise*, GAO/RCED-89-189 (Washington, DC: GAO, September 1989).

U.S. General Accounting Office, *Airport Improvement Program: FAA Complying with Requirement for Local Involvement in Noise Mitigation Projects*, GAO/RCED-99-41 (Washington, DC: GAO, December 1998).

U.S. General Accounting Office, *Aviation and the Environment: FAA's Role in Major Airport Noise Programs*, GAO/RCED-00-98 (Washington, DC: GAO, April 2000a).

U.S. General Accounting Office, *Aviation and the Environment: Airport Operations and Future Growth Present Environmental Challenges*, GAO/RCED-00-153 (Washington, DC: GAO, August 2000b).

van den Bergh, J.C.J.M., et al., *Meta-Analysis in Environmental Economics* (Boston: Kluwer, 1997).

Walters, A.A., *Noise and Prices* (London: Oxford University Press, 1975).

Wyle Laboratories, *Aircraft Noise Study for Naval Air Station Oceana and Auxiliary Landing Field Fentress*, WR 94-18 (Arlington, VA: Wyle and NFEC, July 1994).

Wyle Laboratories, *Aircraft Noise Study for the 1995 BRAC Realignment of Navy F/A-18 Aircraft*, WR 97-10 (Arlington, VA: Wyle and NFEC, September 1997 and February 1998).

Wyle Laboratories, *Noise Study for the Introduction of F/A-18E/F to the East Coast*, Vol. 1, WR 02-08 (Arlington, VA: Wyle, April 2003).

Attachment #1

**September 2005**

**VITAE**

**JON P. NELSON**

**TELEPHONE:** voice: 814-237-0157
fax: Call first
e-mail: jpn@psu.edu
web page: http://econ.la.psu.edu/people/biographies/nelson_bio.htm

**MAIL ADDRESS:** 642 Glenn Road
State College, PA 16803

**ALT. ADDRESS:** 608 Kern Bldg.
Department of Economics
Pennsylvania State University
University Park, PA 16802

**ACADEMIC DEGREES:** B.S., Economics - University of Wisconsin, 1964
Ph.D., Economics - University of Wisconsin, 1970

**EMPLOYMENT:** Professor Emeritus of Economics, July 2004 -
Professor, The Pennsylvania State University, 1978-2004
Director of Graduate Studies, Department of Economics, 1986-1993
Research Associate, Institute for Policy Research & Evaluation, 1970-2001
Associate Professor, Pennsylvania State Univ., 1973-1978
Assistant Professor, Pennsylvania State Univ., 1969-1973

**HONORS:** Faculty Marshall, College of the Liberal Arts, Spring 2003
Teaching Award, Department of Economics, Fall 2002
National Institute on Alcohol Abuse Grant Panels, 1989-1991, 1994
National Academy of Sciences Committees, 1976-77, 1979-80
National Science Foundation Panel, 1978
American Iron & Steel Institute Fellowship, 1968-69
Ford Foundation Fellowship, 1967-68

**OTHER EXPERIENCE:** Consultant: PA Office of Attorney General (1985-05), U.S. Department of Labor (1974-76), U.S. Department of Transportation (1973-74), National Science Foundation (1972-83), NIAAA (1989-94), RW Johnson (2003-05), Pitt News (1999); researcher, Wis. Dept. of Resource Dev. (1964-65); teaching assistant, U. Wisconsin (1965-67); and various private consultancies.

**COURSES TAUGHT:** Industrial organization, antitrust & regulation, law & economics, microeconomic theory, environmental economics, economic statistics, policy analysis, honors seminar.

**RESEARCH AREAS:** Applied microeconomics, market structure & conduct, antitrust & regulation, technological change, advertising economics, cost-benefit analysis, environmental economics.

**RESEARCH GRANTS:** NSF (1970-72); U.S. Department of Labor (1974-75); U.S. Department of Transportation (1973, 1974-75, 1977-78); U.S. Bureau of Mines (1975-77); U.S. Public Health Service (1987-88); Pennsylvania LEV Commission (1993); National Institute of Standards and Technology (1996). Author/coauthor of ten final research reports; cum. support: $409,892.

**PSU COMMITTEES:** **Liberal Arts:** Promotion & Tenure (1988-90), Instant Tenure (1993-96), Sabbatical Leaves (1984-86), Research (1982-83, 1985-88), Headship Search (1994-95), Faculty Marshall (2003). **Economics:** Personnel & Tenure (1976-78, 1982-84, 1990-92, 1995-97), Recruiting Committee (1994-95), Academic Programs (1972-74, 1979-81, 1985-93, 2000-02), Policy & Planning (1974-76, 1979-80, 1982-83, 1990-91), Graduate Aid & Admissions (1972-74, 1984-93). **Graduate School:** Fellowships (1989-90), Dept. Review Committees (1974-75), Search Committee (1977-78), Programs & Courses (1992-94), Graduate Council (1992-94).

**PROGRAM APPEARANCES:** Program appearances include AISI Steel Economics Seminar (1973, 1979), Eastern Economic Association (1974, 1977, 1982, 1988, 2000), Econometric Society (1970, 1975, 1984), Industrial Organization Society (1995), Midwest Economic Association (1992), Pennsylvania Economic Association (1974, 1987, 1988, 1994), REMI Users Conference (1993), Southern Economic Association (1978, 1980, 1985, 1996, 2005), Western Economic Association (1974, 1979, 1993, 1997, 2001), National Alcoholic Beverage Control Association (2005), and various other professional meetings.

**EDITORIAL WORK:** **Associate Editor:** Journal of Economic Behavior & Organization, 1996-99. **Frequent referee:** Journal of Environmental Economics & Management, Journal of Economic Behavior & Organization, Journal of Economic Education, Review of Economics & Statistics. **Occasional referee:** Alcohol Research & Health, American Economic Review, American Real Estate & Urban Economics Journal, Applied Economics, B.E. Journals in Economic Analysis & Policy, Business Economics, Cato Journal, Contemporary Economic Policy, Eastern Economic Journal, Economic Inquiry, Engineering Economist, European Journal of Political Economy, Health Economics, Journal of the Air Pollution Control Association, Journal of Economics & Business, Journal of Financial Services Research, Journal of Health Economics, Journal of Human Resources, Journal of Industrial Economics, Journal of Law & Economics, Journal of Policy Analysis & Management, Journal of Real Estate Finance & Economics, Journal of Regulatory Economics, Journal of Transport Economics & Policy, Land Economics, Review of Industrial Organization, Southern Economic Journal. **Manuscript reviewer:** American Enterprise Institute, Harvard University Press, JAI Press, Penn State University Press, Resources for the Future, Transportation Research Board, and various commercial book publishers. **Proposal & report reviewer:** NSF, NIAAA, and RW Johnson Foundation.

**GRADUATE STUDENTS:** Ph.D. dissertations directed [9]; M.A. essays [21]; Undergrad Honors essays [5].

**AFFILIATIONS:** American Economic Association, Industrial Organization Society, Western Economic Assoc.

**TESTIMONY:** Three Mile Island class action hearing (8/81); Pennsylvania Liquor Control Board hearing (7/85); Pennsylvania Low-Emissions Vehicle Commission hearing (8/93); The Pitt News hearing on a newspaper advertising ban (4/99).

**WORKING PAPERS:** "Cigarette Advertising Regulation: A Meta-Analysis" (January 2005).
"Alcohol Advertising in Magazines: Effects of Price & Audience Size" (April 2005).
"How Similar are Youth and Adult Alcohol Behaviors? Panel Evidence" (August 2005).

**PUBLICATIONS:** ***A. INDUSTRIAL ORGANIZATION, ANTITRUST & REGULATION***

**BOOK*:* *Industrial Organization*** (Penn State University, World Campus, 2003), 254pp.

**ARTICLES & CHAPTERS:**

1) "An Interregional Recursive Programs Model of Production, Investment, and Technological Change," **Journal of Regional Science**, April 1971, 33-47.

2) "Regional Concentration in the Steel Industry," **Northeast Regional Science Review**, Spring 1972, 218-225.

3) "An Interregional Recursive Programming Model of the Iron and Steel Industry," in G. Judge & T. Takayama (eds.), **Studies in Economic Planning Over Space and Time** (North-Holland, 1973), pp. 368-393.

4) "A Class of Dynamic Models for Describing and Projecting Industrial Development" (w/ R. Day), **Journal of Econometrics**, June 1973, 155-190. (Reprinted in R. H. Day, *The Divergent Dynamics of Economic Growth*, Cambridge University Press, 2004, pp. 97-114.)

**ARTICLES**: (continued)

5) "Forecasting Aggregate Supply of Coal Miners" (w/ E. Cohn & G. Neumann), **Socio-Economic Planning Sciences**, October 1974, 293-299.

6) "Energy Conservation Policies of the Federal Energy Office" (w/ T. Ferrar), **Science**, February 1975, 644-646.

7) "Forecasting Aggregate Demand for Coal Miners" (w/ E. Cohn & G. Neumann), **Applied Economics**, June 1975, 81-92.

8) "The Demand for Space Heating Energy," **Review of Economics and Statistics**, November 1975, 508-512.

9) "Climate and Energy Demand: Fossil Fuels," in T. A. Ferrar (ed.), **The Urban Costs of Climate Modification** (Wiley, 1976), pp. 123-137.

10) "Behavioral, Suboptimizing Models of Industrial Production, Investment and Technological Change" (w/ R. Day, et al.), in **Modelling Economic Change: The Recursive Programming Approach** (North-Holland, 1978), pp. 55-118.

11) "Tax Policy, Capital Shortages, and Iron and Steel Investment Behavior" (w/ G. Neumann), in **Steel Industry Economics** (University of Washington, 1979), pp. 43-63.

12) "A Comparison of Alternative Econometric Models of Iron and Steel Investment Behavior" (w/ G. Neumann), **Review of Economics and Statistics**, February 1980, 122-127.

13) "Tax Policy and Steel Industry Investment Behavior: An Econometric Analysis" (w/ G. Neumann), **Quarterly Review of Economics and Business**, Autumn 1980, 19-34.

14) "Safety Regulation and Firm Size: Effects of the Coal Mine Health and Safety Act of 1969" (w/ G. Neumann), **Journal of Law and Economics**, October 1982, 183-199. (Summarized in American Enterprise Institute, *Regulation*, 1983, p. 46.)

15) "An Analysis of Ramsey Pricing in Electric Utilities" (w/ M. Roberts & E. Tromp), in M. Crew (ed.), **Regulating Utilities in an Era of Deregulation**, (Macmillan, 1987), pp. 85-109.

16) "Ramsey Numbers and the Role of Competing Interest Groups in Electric Utility Regulation" (w/ M. Roberts), **Quarterly Review of Economics and Business**, 1989, 21-42.

17) "Comparative Antitrust Damages in Bid-Rigging Cases: Some Findings from a Used Vehicle Auction," **Antitrust Bulletin**, Summer 1993, 369-394.

18) "Market Structure and Incomplete Information: Price Formation in a Repeated English Auction," **Journal of Economic Behavior and Organization**, December 1995, 421-437.

19) "Estimating the Spillover Benefits of Industrial Modernization Programs" (w/ I. Feller), in **Manufacturing Modernization: Learning from Evaluation Practices and Results** (Georgia Tech University, 1997), pp. 199-221.

20) "The Microeconomics of Manufacturing Modernization Programs" (w/ I. Feller), **Research Policy**, November 1999, 807-818. http://www.sciencedirect.com/science

21) "Consumer Bankruptcies and Chapter Choice: State Panel Evidence," **Contemporary Economic Policy**, October 1999, 552-564.

22) "Consumer Bankruptcies and the Bankruptcy Reform Act: A Time-Series Intervention Analysis, 1960-1997," **Journal of Financial Services Research**, August 2000, 181-200. http://www.kluweronline.com/issn/0920-8550/current

**ARTICLES**:
(continued)

***B. ENVIRONMENTAL DAMAGES, NOISE ABATEMENT & HOUSING MARKETS***

**BOOK:** ***Economic Analysis of Transportation Noise Abatement*** (Ballinger, 1978), 265pp. (Summarized in FAA, *Aviation Noise Abatement*, March 1985, 99-102.)

**ARTICLES & CHAPTERS**:

23) "The Economic Costs of Airport Noise: Theory and Measurement" (w/ I. Feller), in **Interagency Symposium on University Research in Transportation Noise Proceedings**, Stanford University, March 1973, pp. 727-743.

24) "Accessibility and the Value of Time in Commuting," **Southern Economic Journal**, January 1977, 1321-1329.

25) "Monetary Measures of the Benefits of Abatement: Property-Value Analysis" (w/ A. DeVany), in National Academy of Sciences, **Noise Abatement: Policy Alternatives for Transportation** (NAS, 1977), pp. 126-160.

26) "Cost-Benefit Analysis: Some Illustrations" (w/ A. DeVany & A. Walters), in National Academy of Sciences, **Noise Abatement: Policy Alternatives for Transportation** (NAS, 1977), pp. 160-82 and pp. 183-206.

27) "Residential Choice, Hedonic Prices, and the Demand for Urban Air Quality," **Journal of Urban Economics**, July 1978, 357-369.

28) "Airport Noise, Location Rent, and the Market for Residential Amenities," **Journal of Environmental Economics and Management**, December 1979, 320-331. (Reprinted in *The Environment and Transport*, Y. Hayashi, et al. (eds.), Elgar, 1999, pp. 81-92.)

29) "Airports and Property Values: A Survey of Recent Evidence," **Journal of Transport Economics and Policy**, January 1980, 37-52. (Reprinted in *Classics in Transport Analysis: Air Transport*, P. Forsyth, et al. (eds.), Elgar, 2002, pp. 613-28.)

30) "Measuring Benefits of Environmental Improvements: Aircraft Noise and Hedonic Prices," in V.K. Smith (ed.), **Advances in Applied Microeconomics** (JAI, 1981), pp. 51-75.

31) "Three Mile Island and Residential Property Values: Empirical Analysis and Policy Implications," **Land Economics**, August 1981, 363-372. (Cited in M.O. Finkelstein & B. Levin, *Statistics for Lawyers*, Springer-Verlag, 1st ed., 1990, p397; 2nd ed., 2001, p440.)

32) "Highway Noise and Property Values: A Survey of Recent Evidence," **Journal of Transport Economics and Policy**, May 1982, 117-138.

33) "Monetary Evaluation of Noise Nuisance" in T. O'Riordan & R. Turner (eds.), **Progress in Resource Management and Environmental Planning** (Wiley, 1983), pp. 201-209.

34) "Housing Values, Census Estimates, Disequilibrium and the Environmental Cost of Airport Noise: A Case Study of Atlanta" (w/ P. O'Byrne & J. Seneca), **Journal of Environmental Economics and Management**, June 1985, 169-178.

35) "Economic Development and Air Pollution Abatement: A State-Level Policy Simulation of the 1990 Clean Air Act," **Journal of Environment and Development**, March 1997, 61-84.

36) "Airport Noise, Location Rent, and the Market for Residential Amenities," in **The Environment and Transport**, in Y. Hayashi, (ed.), Elgar, 1999, pp. 81-92 (Reprint).

**ARTICLES**:
(continued)

37) "Western Rangelands Reform: An Analysis of the 1996 Senate Vote on Federal Grazing Fees" (w/ G. Fennemore), **Contemporary Economic Policy**, July 2001, 322-335.
http://cep.oupjournals.org/content/vol19/issue3/index.shtml

38) "Airports and Property Values: A Survey of Recent Evidence," in **Classics in Transport Analysis: Air Transport**, in P. Forsyth, et al. (eds.), Elgar, 2002, pp. 613-28 (Reprint).

39) "Green Voting and Ideology: LCV Scores and Roll-Call Voting in the U.S. Senate, 1988-1998," **Review of Economics and Statistics**, August 2002, 518-529.
http://econpapers.hhs.se/article/tprrestat/

40) "Meta-Analysis of Airport Noise and Hedonic Property Values: Problems and Prospects," **Journal of Transport Economics and Policy**, January 2004, 1-27.

***C. ADVERTISING ECONOMICS & ALCOHOL DEMAND***

**BOOK:** ***Advertising and Differentiated Products: Advances in Applied Microeconomics, Volume 10***, editors M.R. Baye and J.P. Nelson (JAI Press & Elsevier Science, 2001), 295 pp.
http://www.elsevier.com/inca/publications/store/6/2/2/4/0/9

**ARTICLES & CHAPTERS:**

41) "State Monopolies and Alcoholic Beverage Consumption," **Journal of Regulatory Economics**, March 1990, 83-98. (Cited 829 F. Supp 546, *44 Liquormart v. R.I.*, 1993.)

42) "Effect of Regulation on Alcoholic Beverage Consumption," **Alcohol and Drug Abuse Reviews**, Fall 1990, 223-243.

43) "Advertising and U.S. Alcoholic Beverage Consumption: System-Wide Estimates" (w/ J. Moran), **Applied Economics**, December 1995, 1225-1236.

44) "Economic and Demographic Factors in U.S. Alcohol Demand: A Growth-Accounting Analysis," **Empirical Economics**, March 1997, 83-102.

45) "Broadcast Advertising and U.S. Demand for Alcoholic Beverages," **Southern Economic Journal**, April 1999, 774-790.

46) "Hard at Play! The Growth of Recreation in Consumer Budgets, 1959-1998," **Eastern Economic Journal**, Winter 2001, 35-53.

47) "Do Advertising Bans Work? An International Comparison" (w/ D.J. Young), **International Journal of Advertising**, 20(3), 2001, 273-296.

48) "The Long-Run Demand for Alcohol and the Advertising Debate: A Cointegration Analysis" (w/ E. Coulson & J. Moran), in **Advertising and Differentiated Products** (JAI Press & Elsevier Science, 2001), pp. 31-54.

49) "Alcohol Advertising and Advertising Bans: A Survey of Research Methods, Results, and Policy Implications," in **Advertising and Differentiated Products**, (JAI, 2001), pp. 239-95.

50) "Advertising Bans, Monopoly, and Alcohol Demand: State Panel Evidence," **Review of Industrial Organization**, Feb. 2003, 1-25. http://www.kluweronline.com/issn/0889-938X.

51) "Cigarette Demand, Structural Change, and Advertising Bans: International Evidence, 1970-1995," **Contributions to Economic Analysis & Policy**, 2(1), August 2003, 1-27.
http://www.bepress.com/bejeap/contributions/vol2/iss1/art10/

**ARTICLES**:
(continued)

52) "Youth Smoking Prevalence in Developing Countries: Effect of Advertising Bans," **Applied Economics Letters**, 10(13), October 2003, 805-11. http://www.tandf.co.uk/journals/routledge/13504851.htm

53) "Advertising Bans in the United States," in **EH.Net Encyclopedia** (R. Whaples, ed.), May 2004, 29pp. http://www.eh.net/encyclopedia/contents/Nelson.AdBans.php

54) "Beer Advertising and Marketing Update: Structure, Conduct, and Social Costs," **Review of Industrial Organization**, 26(3), May 2005, 269-306. Invited paper. http://www.kluweronline.com/issn/0889-938X/contents

55) "Advertising, Alcohol, and Youth," **Regulation: Cato Review of Business & Government**, 28(2), Summer 2005, 40-47. http://www.cato.org/pubs/regulation/index.html

**D. NOTES, REVIEWS & OTHER ARTICLES**

57) "A Note on the Economics of Metallurgical Coke Production," **Management Science**, December 1971, 237-239.

58) **Economic Aspects of Airport Environments**, Council of Planning Librarians, Chicago, July 1972, 18pp.

59) "Residential and Commercial Demand for Space Heating Energy," in **Proceedings of the Pennsylvania Conference of Economists**, Bloomsburg State College, April 1975, 1-20.

60) "Energy Conservation Policies of the Federal Energy Office: Reply" (w/ T. Ferrar), **Science**, 19 September 1975, 1015.

61) "Econometric Analysis of the Effects of Climate on Energy Demand," in **Economic and Social Measures of Climate Change**, Institute for Defense Analyses, September 1975, Ch. 3.

62) Review of *The Economics of Professional Team Sports* (by H. G. Demmert), **Antitrust Bulletin** ,Winter 1975, 939-942.

63) "Economic Considerations of Highway Noise Impact on Land," in **Final Report of the Highway Noise Research Workshop**, Florida Atlantic University, August 1977, pp. 60-63.

64) "Accessibility and the Value of Time in Commuting: Reply," **Southern Economic Journal**, July 1978, 298-300.

65) Review of *Steel Production: Processes, Products, and Residuals* (by C. S. Russell & W. J. Vaughan), **The Engineering Economist**, Spring 1979, 191-192.

66) "Economic Solutions" in **Final Report on the Evaluation of Current Environmental Research and Establishment of Priorities**, EPA & PSU, October 1979, 57-60.

67) "Estimating Demand Functions for Product Characteristics: Comment," **Journal of Consumer Research**, September 1982, 219-220.

68) Review of *Clean Coal/Dirty Air* (by B. A. Ackerman & W. T. Hassle), **Southern Economic Journal**, October 1982, 587-589.

**NOTES & REVIEWS:** (continued)

69) Review of *Energy, Economics and the Environment* (by H. E. Daly & A. F. Umana), **Natural Resources Journal**, October 1982, 1186-1188.

70) "Comment on 'Can Government Regulate Safety? The Coal Mine Example'" (w/ G. Neumann), **American Political Science Review**, December 1982, 876-878.

71) "Real Income, Grade Inflation, Simultaneity, and Teaching Evaluations" (w/ K. Lynch), **Journal of Economic Education**, Winter 1984, 21-37.

72) Review of *The Diffusion of Mature Technologies* (by G. F. Ray), **Journal of Economic Behavior and Organization**, September 1986, 332-334.

73) **Economic Aspects of Alcohol Consumption and Traffic Fatalities**, Vance Bibliographies, September 1988, 33 pp.

74) "Perspective on Alcohol Advertising: Brand Recall or Market Expansion?" **Dimensions**, Penn State University, Spring 1997, 1-3.

75) Review of *The U.S. Brewing Industry: Data and Economic Analysis* (by V.J. Tremblay and C.H. Tremblay), in **EH. Net Book Reviews,** May 2005, 1-4. http://eh.net/bookreviews/library/0941.shtml

**RESEARCH GRANTS & REPORTS:**

1) National Science Foundation Grant No. ME24-206, February 1970 - February 1971 (Research Associate w/I. Feller, P.I.). *State Organization of Research and Development*. Final Report (February 1971, 254pp.). $15,000.

2) Pennsylvania Science and Engineering Foundation ,Grant No. 105-ME24-208, August 1971- August 1972 (Co-P.I. w/ I. Feller). *Research and Development Activities and Regional Economic Growth*. Final Report (August 1972, 249pp.). $52,239.

3) U.S. Department of Transportation, Grant No. DOT-0S-20196, August 1972 - February 1973. (Co-P.I. w/ I. Feller). *Economic Aspects of Noise Pollution*. Final Report No. DOT-TST-73-3 (April 1973, 159pp.). $29,938.

4) U.S. Department of the Interior Grant, No. GO122097, February 1973 - June 1974. (Research Associate w/E. Cohn, P.I.). *Manpower in the Bituminous Coal Industry*. Final Report (September 1973, 298pp.).

5) U.S. Department of Transportation, Grant No. DOT-OS-40094 (P.I.), April 1974 -April 1975 (P.I.). *The Effects of Mobile-Source Air and Noise Pollution on Residential Property Values.* Final Report No. DOT-TST-75-6. (April 1975, 248pp.). $58,000.

6) U.S. Department of Labor, Contract No. 41-USC-252, September 1974 - April 1975 (Co-P.I. w/ G. Neumann). *Labor Productivity and the Coal Mine Health and Safety Act*. Final Report (April 1975, 67pp.). $12,000.

7) U.S. Department of the Interior, Contract No. J0255006, September 1975 - September 1977 (Co-P.I. w/ G. Neumann). *Capital Requirements in the U.S. Iron and Steel Industry*. Final Report (September 1977, 458pp.). $75,801.

8) U.S. Department of Transportation, Contract No. DOT-OS-7006, August 1977 - August 1978 (P.I.). *Aircraft Noise and the Market for Residential Housing*. Final Report No. DOT/RSPA/DPB-50/78/24. (September 1978, 155pp.). $42,998.

**RESEARCH GRANTS**: (continued)

9) National Institute on Alcohol Abuse and Alcoholism Grant No. 1-R23-AA07099-01, February 1987 - February 1988 (P.I.). *The Effects of Legal Restrictions on Alcohol Consumption*. Final Report (February 1988, 81pp.). $52,016.

10) Pennsylvania Low-Emissions Vehicle Commission , Contract No. PTI-9193, May 1993 - August 1993 (Co-P.I. w/ K. Goulias & T. Litzinger). *Low Emission Vehicle Technical Study*. Final Report (August 1993, 248pp.). $40,000.

11) National Institute of Standards and Technology, Contract No. 50SBNB5C9009, March 1996 - August 1996 (Co-P.I. w/ I. Feller). *Feasibility Study for Estimating the Social Savings from MTC Projects*. Final Report (August 1996, 30pp.). $43,900. Cumulative, $409,892.

**CITATION COUNTS:** My published works have been cited more than 950 times.

**TESTIMONY:** Three Mile Island class action hearing (8/81); Pennsylvania Liquor Control Board hearing (7/85); Pennsylvania Low-Emissions Vehicle Commission hearing (8/93); The Pitt News hearing (4/99).

**CONSULTING & LITIGATION:**

I have experience in three main areas: (1) antitrust damage assessments; (2) environmental damage assessments, including noise; and (3) advertising regulation and the First Amendment, especially as applied to alcohol and tobacco. In most instances, one or more reports were prepared. I was deposed in two cases involving bans of billboard advertising of alcohol (7/98, 5/00), and testified under oath in two other cases (8/81, 4/99). I also testified under oath at two public hearings before state regulatory agencies (7/85, 8/93). My major consultancies (& recent personal contacts) include:

**Advertising Economics & Commercial Speech**

- Pennsylvania Office of Attorney General, Antitrust Section (Harrisburg, PA; James Donahue), price advertising ban by the PA Liquor Control Board, 1985. Testified before LC Board, 7/85.
- Silcox Communications (Washington, DC; Marcia Silcox), various advertising and taxation issues, 1997-2003.
- Deutsch, Levy & Engel (Chicago, IL; Phillip Zisook), billboard ban case, 1998-2000. Deposed, 7/98.
- The Pitt News (Pittsburgh, PA), newspaper advertising ban case, 1999. Testified at hearing, 4/99.
- Greines, Martin, Stein & Richland (Beverly Hills, CA; Rex Heinke), billboard ban case, 1999-2000. Deposed, 5/00.
- King & Spalding / Cadwalader, Wikersham & Taft (NYC, NY; Steven G. Brody), billboard ban case, 2000-2001.
- Shook, Hardy & Bacon (Kansas City; MO; Tina Smith, Gene Peck & Mark Dover), various advertising and regulation issues, 2001-2005.

**Antitrust & Regulatory Economics**

- Pennsylvania Office of Attorney General, Antitrust Section (Harrisburg, PA; James Donahue), merger resale price maintenance & price fixing cases; exclusionary practices, 1983-2005.
- National Association of Attorneys General (Madison, WI; 31 plaintiff states), contact lens price fixing case, 1999.
- Constantine & Partners (New York City, NY), resale price maintenance case, 1997.
- Public Service of New Hampshire (Portsmouth, NH), rate increase filing for Seabrook nuclear power plant, 1987.
- Electric Power Research Institute (Iowa City, IA), restructuring & embedded cost issues, 1999.
- Quinn, Gordon, & Wolf (Towson, MD; Kieron Quinn), auto pricing case, 2004.

**CONSULTING & LITIGATION** (continued)

**Environmental Economics & Property Value Damages**

- Pepper, Hamilton & Sheetz (Philadelphia; Harrisburg, PA), Three Mile Island
- damages, 1981, testified at TMI hearing, 8/81; gasoline pipeline rupture impact, 1983.
- Hodges & Hodges (Atlanta, GA), airport noise impact, 1982.
- Buchanan Ingersol (Pittsburgh, PA), radioactive waste impact, 1983.
- Pennsylvania Low-Emissions Vehicle Commission (Harrisburg, PA), LEV impact analysis for Commonwealth of PA, 1993. Testified at Commission hearing, 8/93.
- Quinn, Gordon, & Wolf (Towson, MD; Kieron Quinn), airport noise impact, 2000-2002, 2005.

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| CAROL AND ROBERT TESTWUIDE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No.: 01-201L |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | Judge Victor J. Wolski |
| Defendant. | ) | |

**PLAINTIFFS' REBUTTAL TO THE EXPERT REPORT**

**OF DR. DAVID DALE-JOHNSON**

(Analyses of the Impact of the Realignment on House Values)

**JON P. NELSON, Ph.D.**

**December 12, 2005**

**TABLE OF CONTENTS**


**Page**

**I. Introduction .................................................................................... 1**

**II. Repeat Sales Methodology ................................................................ 2**

A The Repeat Sales Model ........................................................ 2

B. Aggregation Bias and Sample Selection Bias........................... 4

C. Sampling Methods Used by Dale-Johnson ............................... 5

**III. Noise Measurements and Alternative Repeat Sale Estimates ........... 7**

A. Noise Data Used by Dale-Johnson ........................................... 7

B. Differences Between BASE 2000 DNL and ARS2 DNL ........... 8

C. Repeat Sale Regression Results for ARS2 DNL ....................... 9

**IV. Event Study Method and Results ...................................................... 11**

A. Methodology Used by Dale-Johnson ........................................ 11

B. Additional Regression Results for Price Indices ........................ 13

**V. Effects (if any) of the Realignment on Housing Demand .................... 13**

**VI. Conclusions ........................................................................................ 16**

.

**Tables 1 - 10 ........................................................................................ 17**

**I. Introduction**

1. This document presents my evaluation of the expert report by Dr. David Dale-Johnson on the impact on property values of the realignment of 10 squadrons of F-18 C/D aircraft to NAS Oceana and NALF Fentress (hereafter Dale-Johnson report). Dr. Dale-Johnson presents two complementary analyses of the realignment. First, a "repeat-sales analysis" of a sample of residential properties that were sold before-and-after July of 1999. This analysis uses a "refined" sample of 6029 properties that sold twice during the period 1995-2003, and subsamples of these properties are used as the basis for sensitivity analyses. Second, an "event study analysis" of housing price indices constructed for the 36 quarters during 1995-2003 and various subsamples of this longer time period. Empirical results from a modified repeat sales analysis are used to construct the event study price indices. Hence, the event study results hinge on the validity of the repeat sales model, sample, data, and econometric analysis.

2. Based on these analyses, Dr. Dale-Johnson concludes that the realignment of 156 F-18 aircraft did not have a (net) negative effect on residential property values in the vicinity of NAS Oceana. With respect to the results of the repeat sales analysis he states that:

> The statistical model demonstrates that there is no statistically significant relationship between the changes in noise for houses due to the realignment and changes in property values from before to after the realignment. In fact, the sign of the noise variable is positive, which is counter to the plaintiffs' hypothesis. The model demonstrates that houses that experienced large increases in noise due to the realignment did not appreciate at a different rate than houses that experienced slight increases in noise (Dale-Johnson report, p. 16).

and with respect to the event study analysis he states that:

> The regression results show a positive, not statistically significant coefficient on the event dummy variable. Therefore, this is evidence that the realignment did not have a negative impact on house values around NAS Oceana (Dale-Johnson report, p. 19).

3. These results are contrary to a large body of accumulated evidence on the empirical relationship between aircraft noise exposure in the vicinity of major airports and residential property values. This evidence was summarized in the form of a meta-analysis in my Expert Report of September 2005 (hereafter Nelson report). Thus, in terms of the econometric evidence, Dr. Dale-Johnson's results are clearly an outlier. His explanation for his null findings rests on the possible positive impact on housing demand from the transfer of U.S. Navy personnel to Virginia Beach:

> The realignment resulted in the movement of an estimated 8,300 people from Florida to the Virginia Beach area, including approximately 3,700 military and civilian personnel. In addition, the realignment was expected to add roughly $308 million annually to the regional economy and increase taxes by $7.8 million annually. Such increases in population and spending would be expected to result in an increase in the demand for housing which in turn would be expected to cause house values to increase – an increase as a result of the realignment (Dale-Johnson report, p. 4).

4. In order to evaluate these claims, I will first develop the methodology used to conduct a repeat sales analysis, including an examination of the sampling and measurement procedures used by Dr. Dale-Johnson. The methodology of a repeat sales analysis is subject to a number of well-known problems, all of which are largely ignored in his report. Second, building on my criticisms of his work, I present alternative regression estimates for the repeat sales model that demonstrate that the "Change in Noise" coefficient is negative and statistically significant. Furthermore, these negative effects agree with the noise damage estimates presented in my Expert Report (Nelson report, p. 29). Thus, using the same basic methodology and data available to Dr. Dale-Johnson, I demonstrate that plaintiffs' damage formula is statistically sound and correct. Third, I examine selected aspects of Dr. Dale-Johnson's event study analysis. Fourth, I evaluate his hypothesis for his null findings, i.e., the transfer of U.S. Navy personnel to the Virginia Beach area and the possible effects (if any) of this transfer on housing demand and values.

## II. Repeat Sales Methodology

**The repeat sales model is commonly used to construct real estate price indices. It is subject to several methodological and econometric problems that require caution in its application. Two widely discussed problems are aggregation bias and sample selection bias.**

### A. The Repeat Sales Model

5. As an econometric technique, the repeat sales method was first developed in 1963, and it has been widely used in recent years to develop housing price indices. Consequently, the econometric problems or difficulties associated with this technique are well known. The repeat-sales model as applied to environmental effects or damages was pioneered in 1982 by Dr. Raymond Palmquist.[1] Assume a significant environmental "event" that occurs at a specific date in time and which has different measurable physical effects on residential properties. In the case of NAS Oceana, the transfer of 10 squadrons of F/A-18 aircraft occurred during December 1998 to September 1999, with 2 squadrons arriving in December 1998, 6 squadrons in July 1999, and 2 squadrons in late September 1999. Thus, in Dr. Dale-Johnson's analysis, the "event date" or "base quarter" is the second quarter of 1999 (April-June 1999), which is the quarter just before the increase in noise levels. The physical effects of this event refer to different changes in noise exposure, e.g., +0, 5, 10, or 15 dB changes measured relative to the

---

[1] R.B. Palmquist, "Measuring environmental effects on property values without hedonic regressions," *Journal of Urban Economics*, 11 (1982): 333-47. I am aware of only one other study that uses the **repeat sales method for aircraft noise**; see N.N. Knickerbocker, "Aircraft Noise and Property Values," Unpub. Ph.D. dissertation, University of Maryland, 1991. This study of National Airport finds negative effects that agree generally with other studies for National Airport and other airports, i.e, the noise discount is -1.29% per dB (p. 149).

pre-event exposure level. The important reasons for using a sample of repeat sales of residential properties are: (1) it might eliminate the necessity to collect numerous housing features required for the hedonic price model; (2) it focuses the analysis on the change in environmental quality and damages; and (3) it can be used to construct housing price indices for additional analysis of the event.

6. The repeat sales model is based on the notion that there exists a set of residential properties that were sold before and after the event, and which did not change except for the differences in noise exposure. Consider two residential properties, both of which were sold for $100,000 in 1998 and which sold again in 2000. Assume that neither property underwent any structural, environmental, or neighborhood quality changes during 1998-2000, except that Property A experienced a 10 dB increase in noise exposure in July 1999 and Property B did not. If Property B was sold for $120,000 in 2000, the appreciation was $20,000 or 20%. According to plaintiffs' damage formula, Property A should appreciate less in value. Suppose that Property A sold for $110,000 in 2000 or a 10% appreciation. Hence, the damage due to the increase in noise was $10,000 or -1% per dB change in noise exposure.

7. A more technical description of the repeat sales model helps reveal some of the assumptions that underlie the model and analysis. The starting point is the standard semi-log hedonic price function

$$\ln(P_{it}) = \alpha_t + \beta' Z_i + \gamma N_{it} + \delta A_{it} + u_{it} \qquad (1)$$

where $\ln(P_{it})$ is the log of the sales price of house i at time t; $Z_i$ is a vector of housing characteristics that do not vary with time; $N_{it}$ is the noise exposure level at time t; $A_{it}$ is the age of the house; and $u_{it}$ is the error term (aka the "residual"). The error term captures the effects of omitted variables, measurement errors, and purely random or stochastic aspects of the data. The depreciation rate due to age is given by $\delta$. The noise damage index or hedonic price of noise in percentage terms is given by $\gamma \times 100$. The expected sign of $\gamma$ is negative.

8. For the repeat sales model to be appropriate, there must be a sale of each property before and after the event date. Suppose the earlier sale of the property occurred at time t and the second (or subsequent) sale occurred at time s. The first sale occurs before the event and the second sale occurs after the event. For these houses, the price-relative is given by $(P_{is} / P_{it})$. Using the log transformation, the rate of appreciation function for the repeat sales model is given by

$$\ln P_{is} - \ln P_{it} = \alpha_s - \alpha_t + \beta'(Z_i - Z_i) + \gamma(N_{is} - N_{it}) + \delta(A_{is} - A_{it}) + (u_{is} - u_{it}) \qquad (2)$$

Using an assumption due to Dr. Palmquist, houses are assumed to depreciate geometrically with age. The age variable is eliminated by a uniform adjustment of the price-relative using an independent estimate of the depreciation rate. The values of the constant terms, $\alpha_s$ and $\alpha_t$ , form a house price index. These values are the estimated coefficients for dummy variables indicating the quarter(s) of sale.[2]

**B. Aggregation Bias and Sample Selection Bias**

9. In the standard hedonic model, $\beta$ is a vector of parameters to be estimated. In the repeat sales model, this is not necessary because the Z variables are constant over time. Hence, the repeat sales model requires a sample of properties for which the structural, environmental, and neighborhood features of the houses are unchanged between time t and time s. This condition is referred to as the **constant quality assumption** and violation of this assumption is called **aggregation bias**.

10. While the repeat sales model can eliminate the necessity to collect data on housing characteristics required for the hedonic price model, it does this under stringent conditions. It is clear from equation (2) that the sample of repeat sales must not undergo any changes whatsoever – no housing improvements or disrepair other than the uniform effects of age – except for the change in noise level. There also must be no changes in environmental or neighborhood quality variables that vary across properties in the sample, i.e., any important changes in neighborhood quality must be area-wide changes that affect all properties equally. Further, there must be no change in the underlying mathematical relationship for the hedonic price function, i.e., the $\beta$ parameters must not change over time.

11. The constancy assumption is very difficult to meet in practice, and also leads to features of the repeat sales sample that impose subtle constraints on the data. It is very likely that the sample of repeat sales is not a random draw from all properties or a random draw of those properties that were sold on the market, including properties sold once during a given time period. Hence, past studies using repeat sales have found that properties that sell twice are likely to be different from the rest of the housing stock.[3] This is referred to as **sample selection bias**. In fact, there are two possible selection biases in repeat sale studies. First, the repeat sale sample is not a random draw from the existing stock of properties (i.e., not all properties were sold in the time period). Second, all sales are not repeat sales, and

---

[2] Because the repeat sales model is derived from the hedonic price model, it does not avoid various econometric problems that have been the subject of recent discussion for the latter model, including spatial autocorrelation and spatial autoregression.

[3] Housing is a unique commodity because it trades infrequently. This is in contrast to other commodities, such as stocks and bonds, that might trade each business day. As a result, transactions are sparse relative to the outstanding stock of houses. As a consequence, external information from other markets, such as that from a meta-analysis, are informative about the effects of environmental disruptions, including the realignment at NAS Oceana.

a repeat sale sample is biased toward those properties that were re-sold during a specific time period. Hence, properties that sold more than once may not be representative of all residential properties in the market area. Increasing the length of the sample period might reduce selection bias but this aggravates the problem of heteroskedasticity – the price change variability is greater the longer the period between transactions. Further, increasing the length of the sample period increases the likelihood of aggregation bias due to changes in the underlying hedonic price function or unobserved changes in housing quality.

12. The effects of aggregation bias and sample selection bias have been widely discussed in the real estate literature, including a special issue of the *Journal of Real Estate Finance and Economics* (January 1997). Because Dr. Dale-Johnson was an Editor for this journal and has published several papers in the journal, he was obviously in a good position to take account of the special issue papers. However, these well-recognized econometric problems are not discussed explicitly in his report.

**C. Sampling Methods Used by Dale-Johnson**

13. Repeat-sale aggregation bias results from omission of characteristics that contribute to value (including unobserved characteristics) and parameter instability over time. The effect of this bias on the "Change in Noise" coefficient is difficult to establish without greater knowledge of the omitted characteristics and parameter instability. Only the application of other methodologies or more complete data would resolve this issue. Previous studies of this problem have established that the bias can be substantial for the derived price indices.[4] Hence, there is reason to suppose that the event study conducted by Dr. Dale-Johnson is biased statistically.

14. Dr. Dale-Johnson does attempt to ensure that the houses in his sample have not been "improved" between the time of first sale and the second sale. Specifically, he starts with samples of 154,628 "housing units," 141,642 residential properties, and 70,520 properties that were sold at least once between 1/1/1995 and 12/31/2003 (Dale-Johnson report, Exhibit 1). From the latter sample, he omits 4,533 properties that were missing basic information on the living area and 57,085 properties that sold only once or were non-arms-length sales. This leaves him with a raw sample of repeat-sale properties with a sample size of 8,902 (or about 6.3% of the residential housing stock). This raw sample is further reduced by 2,420 properties with <u>recorded</u> improvements and 453 properties with other non-arms-length sales (sales to relatives, banks, etc.). This leaves a final repeat-sale sample of 6,029 properties. The final sample is only 4.3% of the residential stock and 8.5% of all property sales between

---

[4] See J. Dombrow, et al., "Aggregation bias in repeat-sales indices," *Journal of Real Estate Finance and Economics,* 14 (1997): 75-88; and J.E. Zabel, "Controlling for quality in house price indices," *Journal of Real Estate Finance and Economics,* 19 (1999): 223-41;

1995 and 2003. While this screening procedure is necessary to ensure a sample of constant-quality repeat sales, it produces a non-random or selected sample of the Virginia Beach housing stock and housing sales. Further, the screening procedures do not ensure parameter stability or ensure that neighborhood and environmental features are constant, other than the measured change of noise levels.

15. The effect of sample selection bias has been investigated in a number of repeat sale studies. These studies indicate that repeat-sales data are biased toward older and smaller properties. Furthermore, repeat-sale properties tend to appreciate more than properties that sold only once during a specific time period. This difference has been attributed to unobserved or unrecorded improvements to the repeat sale properties between the dates of sale:

(1) Clapp, Nanda, and Ross (1991) found that houses selling repeatedly were older and smaller ("starter homes") than houses that sold only once during a ten to twenty year period.[5]

(2) Meese and Wallace (1997) found that repeat sale houses were smaller and in worse condition ("fixer-uppers") than the average for single-sale properties.[6]

(3) Goetzmann and Spiegel (1997) found that repeat sale homes in San Francisco tended to be sold more often by higher-income families living in racially-mixed neighborhoods.[7]

(4) Case, Pollakowski, and Wachter (1997) found that repeat sale homes were smaller, but also tended to appreciate at a higher rate.[8] They believe that this is due to property improvements that are not adequately reflected in the available data. Further, homes that have depreciated in value are less likely to be sold. Both conditions lead to sample selection bias.

(5) Gatzlaff and Haurin (1997) found that repeat-sale price indexes tended to be <u>biased upward</u> during periods of economic growth and <u>biased downward</u> during periods of economic weakness.[9] This bias is with respect to never-sold homes or less-frequently sold homes.

---

[5] J.M. Clapp, C. Giaccotto, and D. Tirtirglu, "Housing price indices based on all transactions compared to repeat subsamples," *AREUEA Journal*, 19 (1991): 270-85.

[6] R.A. Meese and N.E. Wallace, "The construction of residential housing price indices: A comparison of repeat-sales, hedonic regression, and hybrid approaches," *Journal of Real Estate Finance and Economics,* 14 (1997): 51-73.

[7] W.N. Goetzmann and M. Spiegel, "A spatial model of housing returns and neighborhood substitutability," *Journal of Real Estate Finance and Economics*, 14 (1997): 11-31.

[8] B. Case, H.O. Pollakowski, and S.M. Wachter, "Frequency of transaction and house price modelling," *Journal of Real Estate Finance and Economics*,14 (1997): 173-87.

[9] D.H. Gatzlaff and D.R. Haurin, "Sample selection bias and repeat-sales index estimates," *Journal of Real Estate Finance and Economics*, 14 (1997): 33-50.

(6) McMillen and Thorsnes (2005) found that the average price of houses in Chicago rose an average of 7.5% per year during 1993-2002, but repeat sale houses increased by 8.5% annually.[10] They attribute this difference to unobserved remodeling and renovation.

16. Summarizing the discussion of the model, a repeat sales study requires a sample of properties that were sold at least twice during a given time period and which, aside from normal "wear-and-tear," have not changed in quality. Any unobserved improvements (or major disrepairs) will bias the results, such as improvements done by the first owner or those that go unrecorded at an assessor's office, such as landscaping. The constant quality assumption also applies to other environmental features of the residential area. For example, if traffic noise or air pollution changed in a non-uniform manner across the study area, this will bias the results. There also must be no non-uniform neighborhood quality changes. For example, if one neighborhood had an increase in crime rates, this also can bias the results. Finally, the hedonic price function must not change over time, so that the underlying marginal prices are constant over time. The screening procedures used by Dr. Dale-Johnson are insufficient to ensure that these conditions are met.

17. Using repeat sales and screening the data to delete "improved" properties results in sample selection bias. A sample selected according to various screening procedures is not equivalent to random sampling and a regression analysis based on a non-random sample does not as a general rule produce a true description of the population regardless of the sample size. Previous studies demonstrate that repeat sale samples are biased toward smaller and older properties, and these properties tend to appreciate more than properties that sold only once during a given time period. Due to these problems, the two regression studies conducted by Dr. Dale-Johnson should not be taken as an accurate description of the impact of the realignment on all residential properties in the vicinity of NAS Oceana.

## III. Noise Measurements and Alternative Repeat Sale Estimates

**The post-realignment noise measurements used by Dr. Dale-Johnson – BASE 2000 DNL levels – have not been universally adopted for analyses of the realignment. Due to errors of measurement, this feature of his study alone could bias his regression results toward a null outcome. Regressions using ARS2 noise exposure data yield significantly negative noise coefficients that agree with my meta-analysis and plaintiffs' damage formula.**

### A. Noise Data Used by Dale-Johnson

18. The repeat sales analysis requires data on sales prices before and after 1999Q2; dates of the

---

[10] D.P. McMillen and P. Thorsnes, "Housing renovations and the quantile repeat sales price index," Unpub. paper, University of Illinois at Chicago, August 2005.

two sales; and location of the property. The location information allows the measurement of noise levels on a before-after basis for each repeat sale property. For the pre-realignment sales (i.e., 1995Q1 to 1999Q2), Dr. Dale-Johnson uses the **BASE 1997 DNL** data produced by Wyle Labs (Dale-Johnson report, p. 15). I also employ these data. For the post-realignment sales (i.e., 1999Q3 to 2003Q4), two noise exposure measurements are available, **ARS2 DNL** or **BASE 2000 DNL**. Dr. Dale-Johnson states that it is his understanding that the BASE 2000 data are "... the most accurate reflection of the noise environment after the realignment" (Dale-Johnson report, p. 15).

19. This statement ignores the fact that several post-realignment studies continue to rely on the ARS2 data for noise exposure levels after July 1999:

(1) As part of the U.S. Navy's AICUZ program, the web-site for NAS Oceana uses ARS2 noise contours for purposes of depicting noise exposure levels after the realignment:
http://www.nasoceana.navy.mil/
http://www.nasoceana.navy.mil/graphics/NOISE%20CONTOURS%20PAGE%201.pdf

(2) The NAS Oceana web-site is linked to a GIS eMapping facility operated by the City of Virginia Beach. This site maps property locations by address (or GPIN) according to ARS2 noise contours and contains links to the ARS2 maps used in the Joint Land Use Study:
http://www.vbgov.com/e-gov/emapping/
http://www.vbgov.com/e-gov/emapping/disclaimer.asp?returnURL=/e-gov/emapping/access/

(3) The *Hampton Roads Joint Land Use Study* (Hampton Roads PDC, April 2005) continued to use the 1999 AICUZ maps, which depict ARS2 noise contours. These maps also are linked to Virginia Beach's GIS eMapping site: http://www.vbgov.com/dept/planning/
http://www.vbgov.com/dept/planning/plans/corridor/0,,16452,00.html

(4) The study of *The Economic Impacts of the NAS Oceana BRAC Decision* (City of Virginia Beach, November 2005) also used the 1999 AICUZ maps and ARS2 noise contours as a baseline: http://www.vbgov.com/dept/brac/
http://www.vbgov.com/dept/brac/vgn_files/economic_impacts_of_BRAC_decision_draft.pdf

**B. Differences Between BASE 2000 DNL and ARS2 DNL**

20. The differences between the ARS2 and BASE 2000 data are substantial, and these differences are not revealed by simple correlations. Define the affected geographic area as DNL 65+ (i.e., DNL equal to or greater than 65 dB using either BASE 2000 or ARS2 data). Using the BASE 2000 and ARS2 data, the distribution of post-realignment noise levels for the repeat sales data are as follows (no. of repeat sales by noise zone for the period 1995-2003):

| **DNL Zone** | **Base 2000** | **ARS2** | **Absolute Difference** |
|---|---|---|---|
| 65-70 dB | 619 | 771 | 152 |
| 70-75 | 321 | 662 | 341 |
| 75-80 | 259 | 353 | 94 |
| 80-85 | 25 | 203 | 178 |
| 85-90 | 6 | 49 | 43 |
| 90-95 | 0 | 12 | 12 |
| **Total Sales (no.)** | 1230 | 2050 | 820 |

The comparisons indicate that Dr. Dale-Johnson's study may have misclassified as many as 820 properties in the DNL > 65 zone. This is 40% of the ARS2 sample size of 2050 sales.

21. Using the BASE 1997 data, the distribution of changes in noise levels for the repeat sales data are as follows (no. of repeat sales by noise change for 1995-2003):

| **Change in DNL** | **Base 2000** | **ARS2** | **Absolute Difference** |
|---|---|---|---|
| 0 - 4.99 dB | 126 | 0 | 126 |
| 5 - 9.99 dB | 701 | 123 | 578 |
| 10 - 14.99 dB | 396 | 1343 | 947 |
| 15 dB + | 7 | 584 | 577 |
| **Total Sales (no.)** | 1230 | 2050 | 2228 |

The comparison suggests that the method used by Dr. Dale-Johnson produces measurement errors in the "Change in Noise" variable (in his data files this is the **DNOISE** variable). It is well known that **errors of measurement** will bias an estimated coefficient toward zero. This is one plausible reason for his null results, which are contrary to results contained in numerous hedonic price studies.

**C. Repeat Sale Regression Results for ARS2 DNL**

22. The continued use of ARS2 data by several agencies, including the U.S. Navy and BRAC, casts doubt on regression results using BASE 2000 data. As a result, plaintiffs' attorneys asked that I examine the repeat sales data using ARS2 noise exposure measurements. Although Dr. Dale-Johnson did employ ARS2 data for some of his sensitivity analysis, he also changed the event date from July 1999 to a modified date of July 1997 to June 1998 (Dale-Johnson report, p. 20, Appendix F and Appendix G). In the analysis that follows, I have defined the event date or "date of taking" as July 1999, which is

consistent with Dale-Johnson's Exhibits and plaintiffs' position. In order to reduce aggregation bias, I focus on two time periods: 1996Q1 to 2002Q4 and 1997Q1 to 2001Q4. Results are reported for ARS2 DNL > 65 and ARS2 DNL > 75. For my regressions, I constructed a new "Change in Noise" variable for each property, **DNOISE2**, which is defined as ARS2 DNL minus BASE 1997 DNL.

**For the properties with DNL > 65, the regression results using ARS2 indicate that the noise discount lies between -0.61% to -1.01% per dB change in noise exposure. These values are consistent with my meta-analysis and plaintiffs' damage formula for properties located in the noise zone 65 < DNL < 80. For properties with DNL > 75, the regression results for ARS2 indicate that the noise discount lies between -0.83% to -1.62% per dB. These values are consistent with my meta-analysis and plaintiffs' damage formula for properties located in the noise zone DNL > 80. These results refute Dr. Dale-Johnson's null findings for the realignment.**

23. Tables 1 - 3 show the results for the sample time period **1996-2002**. The event date is 1999Q2. The "Change in Noise" variable is denoted by **DNOISE2**. For sensitivity analysis, I report regression results for two geographic areas: ARS2 > 65 and BASE 2000 > 65. The sample sizes are 1304 and 760 repeat sales, respectively. The noise discounts in Tables 1 and 2 are -0.61% per dB and -0.65% per dB, respectively. Both regression coefficients are statistically significant at the 95% level or better. Table 3 restricts the noise levels to ARS2 > 75. The sample size is 386 repeat sales. The noise discount is -0.83% per dB. The change in noise has a negative impact on property value appreciation.

24. Tables 4 - 6 show the results for the sample time period **1997-2001**. The event date is 1999Q2. The "Change in Noise" variable is denoted by **DNOISE2**. For sensitivity analysis, I report regression results for two geographic areas: ARS2 > 65 and BASE 2000 > 65. The sample sizes are 607 and 343 repeat sales, respectively. The noise discounts in Tables 4 and 5 are -0.85% per dB and -1.01% per dB, respectively. Table 6 restricts the noise levels to ARS2 > 75. The sample size is 172 repeat sales. The noise discount is -1.62% per dB. The change in noise has a negative impact.

**Expanding the sample to 1995-2003 produces a smaller, but significantly negative coefficient. It may be that either aggregation bias and/or sample selection bias are worsened by the longer time period. Regardless of the time period, the results refute the claim made by Dr. Dale-Johnson that the "Change in Noise" coefficient is insignificant (or positive).**

25. Tables 7 - 9 show the results for the sample time period **1995-2003**. The event date is 1999Q2. The "Change in Noise" variable is denoted by **DNOISE2**. For sensitivity analysis, I report regression results for two geographic areas: ARS2 > 65 and BASE 2000 > 65. The sample sizes are 2049 and 1216 repeat sales, respectively. The noise discounts in Tables 7 and 8 are -0.28% per dB and -0.38% per dB, respectively. Table 9 restricts the noise levels to ARS2 > 75. The sample size is 617 repeat sales. The noise discount is -0.50% per dB. The change in noise has a negative impact.

26. My results refute the findings and conclusions produced by Dr. Dale-Johnson. The ARS2 noise exposure contours have continued to be used by the U.S. Navy, BRAC, and the City of Virginia Beach. Using a "Change in Noise" variable defined as ARS2 DNL minus BASE 1997 DNL, the noise coefficient is negative and statistically significant. For DNL > 65, the damage estimates are in the range from -0.61% per dB to -1.01% per dB. The latter estimate matches the value used in plaintiffs' damage formula (Nelson report, p. 29). For DNL > 75, the damage estimates are in the range from -0.83% per dB to -1.61% per dB. The latter estimate agrees with the value used in plaintiffs' damage formula (Nelson report, p. 29). These results also are consistent with findings in numerous hedonic price studies.

## IV. Event Study Method and Results

### A. Methodology Used by Dale-Johnson

27. In economics/finance/accounting research, an event study is an analysis of whether there was a statistically significant market reaction due to a past occurrence of a given type of event that is hypothesized to affect market values. The event that affects market values usually involves an "announcement" date or window and/or an "event date." The event may involve a legislative act being passed (and its effective date), or a regulatory ruling being announced, or an announcement of other changes that affect future market prices in some way. The basic recipe for an event study is as follows:

(1) Define the event. In this case, it is the realignment of 156 F-18 C/D aircraft to NAS Oceana.

(2) Define the "announcement" and the "event date." In this case, the announcement could occur as early as mid-September 1997, March 20, 1998, May 18, 1998, or July 1999 (Dale-Johnson report, pp. 5-6). The event date is July 1999, i.e., the date of the alleged taking.

(3) Define a sample of sales that are unaffected by the event and hence experience "normal" performance returns. Dale-Johnson chooses to use properties with DNL < 45 as the "control group." However, other characteristics of these properties are unknown. There is no reason to suppose that housing returns for this group were totally unaffected by unobserved positive and negative factors (except for aircraft noise), and which had differential effects on the impact group. This is the **aggregation bias problem**.

(4) Define a sample of sales that are affected by the event and which may experience "abnormal" returns. Dale-Johnson uses properties with DNL > 65, DNL > 75, and the DNL range for eleven complaint properties.

(5) Run regressions that determine the size of the abnormal returns. If necessary, run additional regressions to explain the abnormal returns by property characteristics or time. I have reported additional time-adjusted regressions for the housing price indices, rather than their ratio.

**No other study of aircraft noise and property values has applied the event study methodology used by Dr. Dale-Johnson. A lack of prior studies suggests that his econometric results are premature as a basis for litigation. A regression on the individual indices, rather than their ratio, suggests that there may be unaccounted events occurring in the "control sample" that are not revealed by his event study method.**

28. I am not aware of any other study that has applied the event study method to aircraft noise, at least in the form used by Dr. Dale-Johnson.[11] A lack of prior studies suggests that his results are premature as a basis for litigation. There are two major problems with this methodology as applied to aircraft noise exposure. First, it is unclear how market processes incorporate the new information about noise exposure and reflect it in "constant quality" price indices for Virginia Beach. Dr. Dale-Johnson used a "shift" or event dummy model that changes only the constant term in his regressions.

29. Second, the "control area" sample is subject to all of the criticisms levied against the samples used in repeat sale models. The larger and more diverse the control area sample, the more likely it is that the **constant quality assumption** is violated. The "control sample" is defined as the subset of properties with a BASE 2000 DNL < 45 dB. The sample size is 1,685 repeat sales. He argues that this subset of sales should not be affected adversely by the change in noise exposure (Dale-Johnson report, p. 17). The 45 dB cut-off is based on an EPA report that identifies noise levels less than 45 dB as within the normal <u>indoor</u> activity interference and annoyance levels. However, the BASE 2000 DNL for the "control area" is measured for aircraft noise only, and ignores other sources of noise (traffic, commercial and industrial activity, etc.). While the area in question might be removed from the Naval air bases, the noise levels and changes are measured inaccurately if they ignore other noise sources. This is the **errors in measurement problem**. In general, too little is known about the houses in the "control sample" to justify its use as a basis for normal returns in the Virginia Beach housing market.

30. Dr. Dale-Johnson's Exhibit 8 shows a graph of the housing price indices. This graph shows variation of the individual indices that is largely eliminated when ratios of the indices are constructed (Exhibit 9). However, the sample size is small (36 quarters), so it may be that the time span is simply too short for this type of study or the frequency of the data should be different (e.g., constructing the indices

---

[11] I am aware of two recent studies that incorporate **airport announcement effects** within the hedonic price model. A study by Jud and Winkler examined the announcement of a new Greensboro/Winston Salem Airport-Hub on housing prices near the airport. They found housing prices declined in the post-announcement period by 5.7% to 9.2%; see G.D. Jud and D.T. Winkler, "The announcement effect of an airport expansion on housing prices," Unpub. paper, University of North Carolina at Greensboro, April 2005. A second study by Konda examined the announcement effect from construction of a new airport for Austin, TX on housing prices in the vicinity of the old airport, which is a complex setting with multiple announcements. Using hedonic methods and repeat sales, she found a positive effect of the closing, especially for properties located in the noisier areas (70 dB and above); see L.S. Konda, "A comparison of methodologies to measure the effects of airport siting decisions," Unpub. paper, University of Texas at Austin, October 2002. Neither of these studies uses the method employed by Dale-Johnson.

on a monthly basis would increase the maximum sample size to 108 observations). As a sensitivity exercise, I ran regressions on the individual indices in Exhibit 8, which are contained in a data file labeled "indices_9503.xls." A more complex model is estimated that incorporates a time trend, a shift in the time trend, and the shift of the constant term after 1999Q2.

### B. Additional Regression Results for Price Indices

31. Table 10 shows the results of regressions on the individual indices for DNL < 45, DNL > 65, and DNL > 75. I have controlled for the constant term, the event dummy, general effects of time on housing prices, and an interaction term between time and the event dummy. All of the regressions have low Durbin-Watson statistics indicating serial correlation of the residuals, which were not reported by Dr. Dale-Johnson. The event dummies are significantly negative in all three cases, but there is a lack of an explanation for the negative coefficient for the DNL < 45 index (the "control sample" index). The event dummy coefficients are larger (more negative) for the areas that are impacted by aircraft noise. All of the interaction terms are positive, which is consistent with acceleration of housing prices in Virginia Beach after 1999. The time trends are positive, but the DNL < 45 trend is smaller. This result casts doubt on this sample as a basis for "normal" returns in this market. In general, it is very difficult to discern anything from the event study that either strongly supports or strongly refutes a negative effect of the realignment on property values. As applied by Dr. Dale-Johnson, this econometric method is too untested to serve as a basis for litigation.[12]

## V. Effects (if any) of the Realignment on Housing Demand

**Dr. Dale-Johnson hypothesizes that the realignment had a positive effect on housing demand and values in Virginia Beach resulting from the transfer of 3700 personnel to NAS Oceana. In his opinion, this effect was large enough so that the net effect was a rise in property values, regardless of any adverse effects of increased noise. Using the best data available, I estimate that only 6-8% of yearly housing purchases were likely to be due to realigned personnel. It is not reasonable that this small percent of yearly housing purchases can produce a positive market-wide response in housing values that offsets the demonstrated negative effects of noise. My repeat sales results further refute his hypothesis. Dale-Johnson's hypothesis does not withstand additional scrutiny of the supposed positive impact of the transfer.**

---

[12] Because the price indices represent time-series data, there are statistical issues regarding the stationarity of these indices. Violation of the stationarity condition can result in spurious correlation, such as the supposed relationship between the control area index and the impact area indexes. On non-stationarity as a statistical concern, see F.C.N. Myer, M.K. Chaudhry, and J.R. Webb, "Stationarity and co-integration in systems with three national real estate indices," *Journal of Real Estate Research*, 13 (1997): 369-81.

32. Dr. Dale-Johnson hypothesizes that the realignment had a positive effect on housing demand and values in Virginia Beach. If a negative effect due to increased noise exposure is present in this market, this means that it was totally offset by the positive effect of increased demand for housing due to realignment of 3700 U.S. Navy personnel to the Virginia Beach area. He states that:

> The realignment resulted in the movement of an estimated 8,300 people from Florida to the Virginia Beach area, including approximately 3,700 military and civilian personnel. In addition, the realignment was expected to add roughly $308 million annually to the regional economy and increase taxes by $7.8 million annually. Such increases in population and spending would be expected to result in an increase in the demand for housing which in turn would be expected to cause house values to increase – an increase as a result of the realignment . . . Since the positive impact of the realignment on house values (through increased housing demand) would likely accrue to both houses affected by and houses unaffected by the noise component on the realignment, if no impact is found for the noise component, then one can conclude the realignment did not negatively impact house values (Dale-Johnson report, pp. 4-5; emphasis added).

33. There are at least three economic effects that might follow from the realignment which appear to be incorporated in his statement. First, 3700 personnel were transferred to NAS Oceana and an unknown portion of them will purchase homes in Virginia Beach. This is a large urban area, so the percent of residential properties sold after 1999Q2 that were purchased by the new personnel might in fact be quite small. Second, some portion of the wages paid to the new personnel will "ripple" through the Virginia Beach economy, and might result in additional jobs or increased wages and other earnings for existing residents. An unknown portion of these increased incomes might be spent on new homes in Virginia Beach. Third, the "ripple" or multiplier effect might attract new workers to the Virginia Beach area, and some unknown portion of these new residents might purchase a new home in Virginia Beach. The size of the two indirect effects is a matter of speculation, and Dr. Dale-Johnson's report does not contain information that can be used to accurately pin-down the "ripple" effect on housing demand in Virginia Beach. Further, while $308 million is a large sum of money, total retail sales in 2002 in Virginia Beach were $4.7 billion (*Economic Impacts of the NAS Oceana BRAC Decision*, p. C-12). Hence, $308 million represents only a 6.6% increase in local spending, and some unknown portion of this spending will occur elsewhere in the greater Hampton Roads region.[13]

---

[13] The exact dollar amount injected into the local economy has been variously reported as $280 million (Virginian-Pilot, 10/13/1998; 12/05/1998), $438 million (Virginian-Pilot, 10/03/1999), and $308 million (Virginian-Pilot, 5/19/1998). The $7.8 million of local tax receipts associated with the realignment are irrelevant for housing demand unless all substitution effects are accounted for, i.e., **taxes are a transfer of income**.

34. The only certain impact of the realignment is the transfer of 3700 Navy personnel to NAS Oceana. About 48% of NAS Oceana employees own their own home and 78% of homeowners live in Virginia Beach (Economic Impacts study, p. 28). About 65% of those transferring to NAS Oceana were married (Dale-Johnson report, p. 7). Applying these percentages to the 3700 personnel suggests that somewhere between 1400 and 1900 of the new personnel were most likely to purchase a residential home in Virginia Beach ($1400 = 3700 \times 0.48 \times 0.78$ & $1900 = 3700 \times 0.65 \times 0.78$). However, all of these purchases will not occur in the same year. Absent data on the frequency of purchase, suppose that one-third of the purchases occurred each year during the three-year period 1999Q3 to 2002Q3. This amounts to 467 to 633 housing sales per year.

35. The Virginia Beach housing market is a substantial and active market. According to Dr. Dale-Johnson's Exhibit 1, there were 141,642 residential properties in the City of Virginia Beach and 70,520 of these properties sold at least once during the nine-year period 1995-2003. The Economic Impacts report contains additional information on Virginia Beach housing market activities. The number of **owner-occupied housing units** in 2000 was 101,265 (Economic Impacts report, p. C-26). By 2004, this number had increased to 108,997. During the year 2002, there were real estate closings on 1,567 new homes and 6,905 existing homes (Economic Impacts report, p. C-32). This is 8,472 sales in the year 2002, which is typical of the high turnover in this market (Economic Impacts report, p. 33). Further, the available supply of units modestly exceeded reported demand (i.e., closings) by approximately 930 units during 2001-2004 (Economic Impacts report, p. 33).

36. Dr. Dale-Johnson argues that the realignment of Navy personnel affected sale prices in both noisy areas and quiet areas (Dale-Johnson report, p. 5). In Virginia Beach, there are about 8,000 sales in a typical year or 24,000 closings during the three-year period 1999Q3 to 2002Q3. Suppose that one-third of the realigned personnel purchased a home in each year. Thus, somewhere between 6% and 8% of the sales closed in a given year might be due to realigned personnel ($6\% = 467/8000$ & $8\% = 633/8000$). This estimate is rough and subject to revision if new information becomes available. However, the estimate suggests that home purchases by the realigned personnel were a small proportion of total real estate transactions in any given year in Virginia Beach. It hardly seems reasonable that only 6-8% of the homebuyers can produce the type of offsetting market reaction hypothesized by Dr. Dale-Johnson. My repeat sales results further refute his hypothesis, and indicate that the effect of aircraft noise was negative regardless of the measurable impact of the realignment on housing demand. To the best of my knowledge, no other study has advanced this hypothesis for aircraft noise or produced empirical results that support his hypothesis.

**VI. Conclusions**

37. I have examined the methods and arguments put forward in the expert report by Dr. Dale-Johnson. The sampling methods used in his repeat sales analysis are subject to aggregation bias and sample selection bias. His sample ignores physical, environmental, and neighborhood changes that affect the value of the re-sold houses, except for the change in noise level. The selected sample(s) is not a random sample of the Virginia Beach housing stock, and this raises questions of the transfer of his results to the stock of housing in general. However, the larger problem is his use of the BASE 2000 noise data in lieu of ARS2 data. Some of his results also change the event date so that it is not the same as plaintiffs' date of taking. The ARS2 noise exposure data continue to be used by the U.S. Navy, BRAC, the City of Virginia Beach, and the Hampton Roads Planning District Commission. Replacing the BASE 2000 data with the ARS2 data leads to substantial changes in the results for the repeat sales model, given that the event date is July 1999. In my repeat sale results, the "Change in Noise" coefficients are significantly negative. The magnitudes of these negative coefficients agree with the meta-analysis average values in my Expert Report and with plaintiffs' damage formula (Nelson report, p. 29).

38. The event study methodology used by Dr. Dale-Johnson has not been applied in other studies of aircraft noise and residential property values. This method is untested and too speculative to serve as an econometric basis for litigation purposes. The statistical properties of the "control sample" index suggest that it is not representative of "normal" returns in this market. Finally, Dr. Dale-Johnson hypothesizes that the realignment of 3700 Navy personnel had a comprehensive positive effect on housing demand and values in Virginia Beach. Using available data, I found that only 6-8% of yearly housing purchases were likely to be due to realigned personnel. It is not reasonable that this small percent of yearly housing purchases can produce a positive market-wide response in housing values that offsets the demonstrated negative effects of aircraft noise.

**Table 1 – Regression Results for ARS2 DNL > 65 (1996-2002) – Sample Area is ARS2 > 65**

Dependent Variable: DLPRICE_DEP
Method: Least Squares
**Time Period: 1996-2002**
**Sample: 1 3797 IF ARS2_DNL>65**
Included observations: **1304**
White Heteroskedasticity-Consistent Standard Errors & Covariance

| Variable | Coefficient | Std. Error | t-Statistic | Prob. |
|---|---|---|---|---|
| **DNOISE2** | **-0.006096** | **0.001478** | **-4.124060** | **0** |
| Q961 | -0.090987 | 0.015123 | -6.016416 | 0 |
| Q962 | -0.113063 | 0.013619 | -8.301724 | 0 |
| Q963 | -0.091603 | 0.014790 | -6.193766 | 0 |
| Q964 | -0.082426 | 0.012689 | -6.495853 | 0 |
| Q971 | -0.086475 | 0.018342 | -4.714653 | 0 |
| Q972 | -0.090062 | 0.013335 | -6.753567 | 0 |
| Q973 | -0.057084 | 0.013873 | -4.114684 | 0 |
| Q974 | -0.041225 | 0.014938 | -2.759804 | 0.0059 |
| Q981 | -0.032798 | 0.025942 | -1.264274 | 0.2064 |
| Q982 | -0.032670 | 0.012056 | -2.709907 | 0.0068 |
| Q983 | -0.030748 | 0.013129 | -2.342045 | 0.0193 |
| Q984 | -0.049194 | 0.019193 | -2.563087 | 0.0105 |
| Q991 | -0.007985 | 0.016985 | -0.470104 | 0.6384 |
| Q993 | 0.146769 | 0.030146 | 4.868545 | 0 |
| Q994 | 0.131670 | 0.025661 | 5.131123 | 0 |
| Q001 | 0.145103 | 0.025729 | 5.639746 | 0 |
| Q002 | 0.140143 | 0.024455 | 5.730657 | 0 |
| Q003 | 0.164189 | 0.022925 | 7.161981 | 0 |
| Q004 | 0.167613 | 0.028638 | 5.852873 | 0 |
| Q011 | 0.204044 | 0.029825 | 6.841418 | 0 |
| Q012 | 0.202942 | 0.022082 | 9.190447 | 0 |
| Q013 | 0.212724 | 0.022116 | 9.618756 | 0 |
| Q014 | 0.218876 | 0.022671 | 9.654647 | 0 |
| Q021 | 0.242201 | 0.022510 | 10.75989 | 0 |
| Q022 | 0.286352 | 0.023168 | 12.35959 | 0 |
| Q023 | 0.296163 | 0.027439 | 10.79338 | 0 |
| Q024 | 0.360966 | 0.024464 | 14.75477 | 0 |

| | | | |
|---|---|---|---|
| R-squared | 0.274073 | Mean dependent var | 0.190289 |
| Adjusted R-squared | 0.258712 | S.D. dependent var | 0.138244 |
| S.E. of regression | 0.119026 | Akaike info criterion | -1.39772 |
| Sum squared resid | 18.07724 | Schwarz criterion | -1.28664 |
| Log likelihood | 939.3109 | Durbin-Watson stat | 1.772017 |

**Table 2 – Regression Results for ARS2 DNL > 65 (1996-2002) – Sample Area is Base 2000 > 65**

Dependent Variable: DLPRICE_DEP
Method: Least Squares
**Time Period: 1996-2002**
**Sample: 1 3797 IF BASE_00_DNL>65**
Included observations: **760**
White Heteroskedasticity-Consistent Standard Errors & Covariance

| Variable | Coefficient | Std. Error | t-Statistic | Prob. |
|---|---|---|---|---|
| **DNOISE2** | **-0.006516** | **0.001704** | **-3.824701** | **0.0001** |
| Q961 | -0.093578 | 0.018309 | -5.111107 | 0 |
| Q962 | -0.105878 | 0.017365 | -6.097335 | 0 |
| Q963 | -0.097202 | 0.016138 | -6.023167 | 0 |
| Q964 | -0.080509 | 0.015483 | -5.199954 | 0 |
| Q971 | -0.071451 | 0.021309 | -3.353029 | 0.0008 |
| Q972 | -0.085796 | 0.016436 | -5.220148 | 0 |
| Q973 | -0.054003 | 0.016427 | -3.287529 | 0.0011 |
| Q974 | -0.024955 | 0.022486 | -1.109821 | 0.2674 |
| Q981 | -0.043314 | 0.018970 | -2.283251 | 0.0227 |
| Q982 | -0.022164 | 0.013460 | -1.646672 | 0.1001 |
| Q983 | -0.038493 | 0.017745 | -2.169232 | 0.0304 |
| Q984 | -0.049127 | 0.024826 | -1.978823 | 0.0482 |
| Q991 | -0.001643 | 0.016789 | -0.097887 | 0.922 |
| Q993 | 0.173300 | 0.039529 | 4.384102 | 0 |
| Q994 | 0.117308 | 0.030875 | 3.799482 | 0.0002 |
| Q001 | 0.143916 | 0.035123 | 4.097430 | 0 |
| Q002 | 0.155049 | 0.029971 | 5.173274 | 0 |
| Q003 | 0.173540 | 0.028172 | 6.160086 | 0 |
| Q004 | 0.191188 | 0.031948 | 5.984402 | 0 |
| Q011 | 0.223712 | 0.041911 | 5.337746 | 0 |
| Q012 | 0.195821 | 0.026077 | 7.509203 | 0 |
| Q013 | 0.217673 | 0.027064 | 8.042938 | 0 |
| Q014 | 0.219110 | 0.027907 | 7.851467 | 0 |
| Q021 | 0.238501 | 0.026270 | 9.078739 | 0 |
| Q022 | 0.279107 | 0.025480 | 10.95381 | 0 |
| Q023 | 0.311271 | 0.028424 | 10.95091 | 0 |
| Q024 | 0.357586 | 0.029829 | 11.98772 | 0 |

| | | | |
|---|---|---|---|
| R-squared | 0.297449 | Mean dependent var | 0.188031 |
| Adjusted R-squared | 0.271535 | S.D. dependent var | 0.130049 |
| S.E. of regression | 0.110997 | Akaike info criterion | -1.522479 |
| Sum squared resid | 9.0185 | Schwarz criterion | -1.351778 |
| Log likelihood | 606.5421 | Durbin-Watson stat | 1.761016 |

**Table 3 – Regression Results for ARS2 DNL > 75 (1996-2002) – Sample Area is ARS2 > 75**

Dependent Variable: DLPRICE_DEP
Method: Least Squares
**Time Period: 1996-2002**
**Sample: 1 3797 IF ARS2_DNL>75**
Included observations: **386**
White Heteroskedasticity-Consistent Standard Errors & Covariance

| Variable | Coefficient | Std. Error | t-Statistic | Prob. |
|---|---|---|---|---|
| **DNOISE2** | **-0.008335** | **0.002633** | **-3.165898** | **0.0017** |
| Q961 | -0.100405 | 0.031089 | -3.229637 | 0.0014 |
| Q962 | -0.092789 | 0.025458 | -3.644795 | 0.0003 |
| Q963 | -0.121079 | 0.027715 | -4.368794 | 0 |
| Q964 | -0.078867 | 0.025840 | -3.052082 | 0.0024 |
| Q971 | -0.124163 | 0.044212 | -2.808322 | 0.0053 |
| Q972 | -0.093401 | 0.029707 | -3.144082 | 0.0018 |
| Q973 | -0.066450 | 0.026923 | -2.468166 | 0.014 |
| Q974 | -0.046524 | 0.037426 | -1.243103 | 0.2146 |
| Q981 | -0.046605 | 0.028555 | -1.632113 | 0.1035 |
| Q982 | -0.033148 | 0.021857 | -1.516605 | 0.1302 |
| Q983 | -0.023317 | 0.026212 | -0.889535 | 0.3743 |
| Q984 | -0.067712 | 0.051091 | -1.325328 | 0.1859 |
| Q991 | -0.015348 | 0.024572 | -0.624584 | 0.5326 |
| Q993 | 0.227289 | 0.069323 | 3.278689 | 0.0011 |
| Q994 | 0.092951 | 0.056031 | 1.658929 | 0.098 |
| Q001 | 0.145314 | 0.054043 | 2.688862 | 0.0075 |
| Q002 | 0.163283 | 0.053778 | 3.036257 | 0.0026 |
| Q003 | 0.190175 | 0.045513 | 4.178457 | 0 |
| Q004 | 0.199715 | 0.046520 | 4.293069 | 0 |
| Q011 | 0.275491 | 0.075405 | 3.653510 | 0.0003 |
| Q012 | 0.233133 | 0.044884 | 5.194136 | 0 |
| Q013 | 0.259398 | 0.047748 | 5.432621 | 0 |
| Q014 | 0.232694 | 0.047262 | 4.923448 | 0 |
| Q021 | 0.249950 | 0.044225 | 5.651730 | 0 |
| Q022 | 0.292296 | 0.041528 | 7.038511 | 0 |
| Q023 | 0.313548 | 0.048255 | 6.497673 | 0 |
| Q024 | 0.371499 | 0.043903 | 8.461739 | 0 |

| | | | |
|---|---|---|---|
| R-squared | 0.286966 | Mean dependent var | 0.183318 |
| Adjusted R-squared | 0.23319 | S.D. dependent var | 0.140542 |
| S.E. of regression | 0.12307 | Akaike info criterion | -1.282359 |
| Sum squared resid | 5.422317 | Schwarz criterion | -0.995407 |
| Log likelihood | 275.4953 | Durbin-Watson stat | 1.811981 |

**Table 4 – Regression Results for ARS2 DNL > 65 (1997-2001) – Sample Area is ARS2 > 65**

Dependent Variable: DLPRICE_DEP
Method: Least Squares
**Time Period: 1997-2001**
**Sample: 1 1782 IF ARS2_DNL>65**
Included observations: **607**
White Heteroskedasticity-Consistent Standard Errors & Covariance

| Variable | Coefficient | Std. Error | t-Statistic | Prob. |
|---|---|---|---|---|
| **DNOISE2** | **-0.008473** | **0.002320** | **-3.651553** | **0.0003** |
| Q971 | -0.066276 | 0.021232 | -3.121522 | 0.0019 |
| Q972 | -0.070043 | 0.017830 | -3.928369 | 0.0001 |
| Q973 | -0.038701 | 0.018275 | -2.117738 | 0.0346 |
| Q974 | -0.039817 | 0.017497 | -2.275619 | 0.0232 |
| Q981 | -0.043575 | 0.018857 | -2.310800 | 0.0212 |
| Q982 | -0.001177 | 0.016780 | -0.070132 | 0.9441 |
| Q983 | -0.005185 | 0.017803 | -0.291257 | 0.771 |
| Q984 | -0.039707 | 0.027777 | -1.429491 | 0.1534 |
| Q991 | 0.011094 | 0.024083 | 0.460659 | 0.6452 |
| Q993 | 0.207255 | 0.047342 | 4.377798 | 0 |
| Q994 | 0.178249 | 0.039385 | 4.525837 | 0 |
| Q001 | 0.199151 | 0.035770 | 5.567484 | 0 |
| Q002 | 0.197249 | 0.033571 | 5.875599 | 0 |
| Q003 | 0.222421 | 0.033829 | 6.574839 | 0 |
| Q004 | 0.203317 | 0.041189 | 4.936145 | 0 |
| Q011 | 0.247567 | 0.041399 | 5.980073 | 0 |
| Q012 | 0.253737 | 0.033275 | 7.625393 | 0 |
| Q013 | 0.249557 | 0.032333 | 7.718261 | 0 |
| Q014 | 0.263558 | 0.033001 | 7.986285 | 0 |

| | | | |
|---|---|---|---|
| R-squared | 0.116864 | Mean dependent var | 0.138209 |
| Adjusted R-squared | 0.088278 | S.D. dependent var | 0.11929 |
| S.E. of regression | 0.113903 | Akaike info criterion | -1.47455 |
| Sum squared resid | 7.61567 | Schwarz criterion | -1.32929 |
| Log likelihood | 467.5247 | Durbin-Watson stat | 1.935311 |

**Table 5 – Regression Results for ARS2 DNL > 65 (1997-2001) – Sample Area is Base 2000 > 65**

Dependent Variable: DLPRICE_DEP
Method: Least Squares
**Time Period: 1997-201**
**Sample: 1 1782 IF BASE_00_DNL>65**
Included observations: **343**
White Heteroskedasticity-Consistent Standard Errors & Covariance

| Variable | Coefficient | Std. Error | t-Statistic | Prob. |
|---|---|---|---|---|
| **DNOISE2** | **-0.010067** | **0.002715** | **-3.707677** | **0.0002** |
| Q971 | -0.075553 | 0.022962 | -3.290293 | 0.0011 |
| Q972 | -0.072023 | 0.020423 | -3.526616 | 0.0005 |
| Q973 | -0.051013 | 0.021701 | -2.350716 | 0.0193 |
| Q974 | -0.036862 | 0.022053 | -1.671490 | 0.0956 |
| Q981 | -0.036104 | 0.019232 | -1.877266 | 0.0614 |
| Q982 | 0.002713 | 0.018756 | 0.144635 | 0.8851 |
| Q983 | -0.015513 | 0.021808 | -0.711358 | 0.4774 |
| Q984 | -0.062948 | 0.042523 | -1.480343 | 0.1398 |
| Q991 | 0.013943 | 0.022351 | 0.623848 | 0.5332 |
| Q993 | 0.242847 | 0.064483 | 3.766078 | 0.0002 |
| Q994 | 0.148245 | 0.047011 | 3.153434 | 0.0018 |
| Q001 | 0.197954 | 0.047169 | 4.196731 | 0 |
| Q002 | 0.210639 | 0.043488 | 4.843625 | 0 |
| Q003 | 0.242483 | 0.043212 | 5.611454 | 0 |
| Q004 | 0.229609 | 0.046567 | 4.930729 | 0 |
| Q011 | 0.283966 | 0.058129 | 4.885123 | 0 |
| Q012 | 0.260026 | 0.040696 | 6.389524 | 0 |
| Q013 | 0.264470 | 0.040667 | 6.503239 | 0 |
| Q014 | 0.272842 | 0.041251 | 6.614133 | 0 |

| | | | |
|---|---|---|---|
| R-squared | 0.152665 | Mean dependent var | 0.133921 |
| Adjusted R-squared | 0.102822 | S.D. dependent var | 0.125107 |
| S.E. of regression | 0.118501 | Akaike info criterion | -1.37125 |
| Sum squared resid | 4.535739 | Schwarz criterion | -1.14747 |
| Log likelihood | 255.1689 | Durbin-Watson stat | 1.844767 |

**Table 6 – Regression Results for ARS2 > 75 (1997-2001) – Sample Area is ARS2 > 75**

Dependent Variable: DLPRICE_DEP
Method: Least Squares
**Time Period: 1997-2001**
**Sample: 1 1782 IF ARS2_DNL>75**
Included observations: **172**
White Heteroskedasticity-Consistent Standard Errors & Covariance

| Variable | Coefficient | Std. Error | t-Statistic | Prob. |
|---|---|---|---|---|
| **DNOISE2** | **-0.016160** | **0.004824** | **-3.350115** | **0.001** |
| Q971 | -0.145970 | 0.044871 | -3.253222 | 0.0014 |
| Q972 | -0.081360 | 0.037274 | -2.182825 | 0.0306 |
| Q973 | -0.079550 | 0.036685 | -2.168414 | 0.0317 |
| Q974 | -0.082590 | 0.032935 | -2.507615 | 0.0132 |
| Q981 | -0.078060 | 0.038056 | -2.051195 | 0.042 |
| Q982 | -0.011650 | 0.029883 | -0.389697 | 0.6973 |
| Q983 | -0.014620 | 0.035852 | -0.407697 | 0.6841 |
| Q984 | -0.119030 | 0.105523 | -1.127989 | 0.2611 |
| Q991 | -0.012800 | 0.030537 | -0.418991 | 0.6758 |
| Q993 | 0.335150 | 0.098267 | 3.410612 | 0.0008 |
| Q994 | 0.167491 | 0.080363 | 2.084190 | 0.0388 |
| Q001 | 0.252309 | 0.078366 | 3.219641 | 0.0016 |
| Q002 | 0.254123 | 0.076877 | 3.305565 | 0.0012 |
| Q003 | 0.314832 | 0.076735 | 4.102870 | 0.0001 |
| Q004 | 0.290859 | 0.073203 | 3.973319 | 0.0001 |
| Q011 | 0.386530 | 0.113426 | 3.407773 | 0.0008 |
| Q012 | 0.352513 | 0.073397 | 4.802845 | 0 |
| Q013 | 0.364285 | 0.078642 | 4.632222 | 0 |
| Q014 | 0.361028 | 0.077164 | 4.678714 | 0 |

| | | | |
|---|---|---|---|
| R-squared | 0.244281 | Mean dependent var | 0.130238 |
| Adjusted R-squared | 0.149817 | S.D. dependent var | 0.149792 |
| S.E. of regression | 0.138116 | Akaike info criterion | -1.0125 |
| Sum squared resid | 2.899576 | Schwarz criterion | -0.64651 |
| Log likelihood | 107.0746 | Durbin-Watson stat | 1.987784 |

**Table 7 – Regression Results for ARS2 DNL > 65 (1995-2003) – Sample Area is ARS2 > 65**

Dependent Variable: DLPRICE_DEP
Method: Least Squares
**Time Period: 1995-2003**
**Sample: 1 6029 IF ARS2_DNL>65**
Included observations: **2049**
White Heteroskedasticity-Consistent Standard Errors & Covariance

| Variable | Coefficient | Std. Error | t-Statistic | Prob. |
|---|---|---|---|---|
| **DNOISE2** | **-0.002880** | **0.001231** | **-2.336032** | **0.0196** |
| Q951 | -0.140350 | 0.020076 | -6.990953 | 0 |
| Q952 | -0.124330 | 0.017993 | -6.909651 | 0 |
| Q953 | -0.121920 | 0.012681 | -9.613994 | 0 |
| Q954 | -0.104370 | 0.013020 | -8.015531 | 0 |
| Q961 | -0.087470 | 0.016262 | -5.378839 | 0 |
| Q962 | -0.102030 | 0.013530 | -7.540884 | 0 |
| Q963 | -0.090230 | 0.012664 | -7.125237 | 0 |
| Q964 | -0.087160 | 0.011864 | -7.346693 | 0 |
| Q971 | -0.085370 | 0.016173 | -5.278632 | 0 |
| Q972 | -0.087210 | 0.011904 | -7.326518 | 0 |
| Q973 | -0.062520 | 0.012666 | -4.935967 | 0 |
| Q974 | -0.041100 | 0.013355 | -3.077158 | 0.0021 |
| Q981 | -0.037010 | 0.021850 | -1.693935 | 0.0904 |
| Q982 | -0.037360 | 0.011152 | -3.350348 | 0.0008 |
| Q983 | -0.030890 | 0.011748 | -2.629421 | 0.0086 |
| Q984 | -0.053120 | 0.015907 | -3.339427 | 0.0009 |
| Q991 | -0.015660 | 0.014802 | -1.057802 | 0.2903 |
| Q993 | 0.088942 | 0.025261 | 3.520899 | 0.0004 |
| Q994 | 0.082349 | 0.022333 | 3.687378 | 0.0002 |
| Q001 | 0.094893 | 0.022808 | 4.16043 | 0 |
| Q002 | 0.094650 | 0.021830 | 4.33573 | 0 |
| Q003 | 0.120644 | 0.020337 | 5.932302 | 0 |
| Q004 | 0.122840 | 0.024863 | 4.940597 | 0 |
| Q011 | 0.160448 | 0.025526 | 6.285657 | 0 |
| Q012 | 0.161717 | 0.019759 | 8.18461 | 0 |
| Q013 | 0.167656 | 0.019380 | 8.650991 | 0 |
| Q014 | 0.174099 | 0.019918 | 8.740679 | 0 |
| Q021 | 0.195614 | 0.019733 | 9.912814 | 0 |
| Q022 | 0.236264 | 0.020878 | 11.31651 | 0 |
| Q023 | 0.256543 | 0.023852 | 10.75549 | 0 |
| Q024 | 0.317661 | 0.021347 | 14.88068 | 0 |
| Q031 | 0.353520 | 0.022121 | 15.98091 | 0 |
| Q032 | 0.353835 | 0.022559 | 15.68475 | 0 |
| Q033 | 0.386512 | 0.021874 | 17.67012 | 0 |
| Q034 | 0.428647 | 0.020367 | 21.04602 | 0 |

| | | | |
|---|---|---|---|
| R-squared | 0.471204 | Mean dependent var | 0.24781 |
| Adjusted R-squared | 0.46201 | S.D. dependent var | 0.162669 |
| S.E. of regression | 0.119314 | Akaike info criterion | -1.3967 |
| Sum squared resid | 28.65681 | Schwarz criterion | -1.29787 |
| Log likelihood | 1466.919 | Durbin-Watson stat | 1.668993 |

**Table 8 – Regression Results for ARS2 DNL > 65 (1995-2003) – Sample Area is Base 2000 > 65**

Dependent Variable: DLPRICE_DEP
Method: Least Squares
**Time Period: 1995-2003**
**Sample: 1 6029 IF BASE_00_DNL>65**
Included observations: **1216**
White Heteroskedasticity-Consistent Standard Errors & Covariance

| Variable | Coefficient | Std. Error | t-Statistic | Prob. |
|---|---|---|---|---|
| **DNOISE2** | **-0.003840** | **0.001432** | **-2.679454** | **0.0075** |
| Q951 | -0.129460 | 0.024934 | -5.191874 | 0 |
| Q952 | -0.114750 | 0.016844 | -6.812337 | 0 |
| Q953 | -0.112660 | 0.018344 | -6.141272 | 0 |
| Q954 | -0.109320 | 0.016637 | -6.571192 | 0 |
| Q961 | -0.081170 | 0.019846 | -4.089765 | 0 |
| Q962 | -0.082760 | 0.018042 | -4.58692 | 0 |
| Q963 | -0.095980 | 0.014322 | -6.701591 | 0 |
| Q964 | -0.085660 | 0.015429 | -5.552042 | 0 |
| Q971 | -0.076950 | 0.018618 | -4.133054 | 0 |
| Q972 | -0.083130 | 0.015044 | -5.526046 | 0 |
| Q973 | -0.061800 | 0.015644 | -3.950025 | 0.0001 |
| Q974 | -0.029370 | 0.018788 | -1.563431 | 0.1182 |
| Q981 | -0.048040 | 0.017120 | -2.80618 | 0.0051 |
| Q982 | -0.024320 | 0.013052 | -1.863225 | 0.0627 |
| Q983 | -0.042620 | 0.015890 | -2.682118 | 0.0074 |
| Q984 | -0.058310 | 0.020689 | -2.818491 | 0.0049 |
| Q991 | -0.019550 | 0.016667 | -1.172923 | 0.2411 |
| Q993 | 0.110736 | 0.032470 | 3.410458 | 0.0007 |
| Q994 | 0.076362 | 0.027422 | 2.784738 | 0.0054 |
| Q001 | 0.102597 | 0.030688 | 3.343189 | 0.0009 |
| Q002 | 0.119424 | 0.026806 | 4.455095 | 0 |
| Q003 | 0.132158 | 0.024838 | 5.320723 | 0 |
| Q004 | 0.148788 | 0.027900 | 5.332919 | 0 |
| Q011 | 0.179790 | 0.034482 | 5.214034 | 0 |
| Q012 | 0.167812 | 0.023570 | 7.119667 | 0 |
| Q013 | 0.175775 | 0.023692 | 7.419021 | 0 |
| Q014 | 0.187959 | 0.024940 | 7.536481 | 0 |
| Q021 | 0.197329 | 0.023069 | 8.553816 | 0 |
| Q022 | 0.233077 | 0.023783 | 9.800316 | 0 |
| Q023 | 0.276812 | 0.026148 | 10.58652 | 0 |
| Q024 | 0.316580 | 0.026014 | 12.16982 | 0 |
| Q031 | 0.353998 | 0.026983 | 13.11935 | 0 |
| Q032 | 0.349898 | 0.028246 | 12.38773 | 0 |
| Q033 | 0.371668 | 0.026772 | 13.88279 | 0 |
| Q034 | 0.415883 | 0.023909 | 17.39463 | 0 |

| | | | |
|---|---|---|---|
| R-squared | 0.45556 | Mean dependent var | 0.241215 |
| Adjusted R-squared | 0.439411 | S.D. dependent var | 0.153067 |
| S.E. of regression | 0.114605 | Akaike info criterion | -1.46549 |
| Sum squared resid | 15.49851 | Schwarz criterion | -1.31441 |
| Log likelihood | 927.0183 | Durbin-Watson stat | 1.652004 |

**Table 9 – Regression Results for ARS2 DNL > 75 (1995-2003) – Sample Area is ARS2 > 75**

Dependent Variable: DLPRICE_DEP
Method: Least Squares
**Time Period: 1995-2003**
**Sample: 1 6029 IF ARS2_DNL > 75**
Included observations: **617**
White Heteroskedasticity-Consistent Standard Errors & Covariance

| Variable | Coefficient | Std. Error | t-Statistic | Prob. |
|---|---|---|---|---|
| **DNOISE2** | **-0.005020** | **0.002340** | **-2.143646** | **0.0325** |
| Q951 | -0.165710 | 0.039978 | -4.145049 | 0 |
| Q952 | -0.137000 | 0.027369 | -5.005745 | 0 |
| Q953 | -0.110900 | 0.031835 | -3.483735 | 0.0005 |
| Q954 | -0.138910 | 0.024679 | -5.628463 | 0 |
| Q961 | -0.090720 | 0.035113 | -2.583708 | 0.01 |
| Q962 | -0.073180 | 0.029918 | -2.446142 | 0.0147 |
| Q963 | -0.105130 | 0.025525 | -4.118711 | 0 |
| Q964 | -0.073470 | 0.027276 | -2.693594 | 0.0073 |
| Q971 | -0.125960 | 0.038292 | -3.289553 | 0.0011 |
| Q972 | -0.096040 | 0.027987 | -3.431734 | 0.0006 |
| Q973 | -0.075430 | 0.024449 | -3.085098 | 0.0021 |
| Q974 | -0.051310 | 0.031710 | -1.617979 | 0.1062 |
| Q981 | -0.053450 | 0.027230 | -1.962949 | 0.0501 |
| Q982 | -0.046190 | 0.021556 | -2.142701 | 0.0326 |
| Q983 | -0.043170 | 0.025136 | -1.717486 | 0.0864 |
| Q984 | -0.079180 | 0.038851 | -2.038079 | 0.042 |
| Q991 | -0.032360 | 0.024708 | -1.309819 | 0.1908 |
| Q993 | 0.134142 | 0.058608 | 2.28881 | 0.0224 |
| Q994 | 0.038578 | 0.049616 | 0.77753 | 0.4372 |
| Q001 | 0.095969 | 0.051269 | 1.871851 | 0.0617 |
| Q002 | 0.100908 | 0.051804 | 1.947889 | 0.0519 |
| Q003 | 0.136623 | 0.043482 | 3.142064 | 0.0018 |
| Q004 | 0.141395 | 0.044753 | 3.159489 | 0.0017 |
| Q011 | 0.214956 | 0.062885 | 3.418222 | 0.0007 |
| Q012 | 0.187703 | 0.043423 | 4.322615 | 0 |
| Q013 | 0.194901 | 0.044341 | 4.395504 | 0 |
| Q014 | 0.191435 | 0.045909 | 4.169915 | 0 |
| Q021 | 0.199882 | 0.042789 | 4.671312 | 0 |
| Q022 | 0.236149 | 0.040789 | 5.789585 | 0 |
| Q023 | 0.266191 | 0.044846 | 5.935639 | 0 |
| Q024 | 0.307414 | 0.042722 | 7.195614 | 0 |
| Q031 | 0.363281 | 0.047139 | 7.706644 | 0 |
| Q032 | 0.324495 | 0.049233 | 6.591025 | 0 |
| Q033 | 0.379476 | 0.049554 | 7.657826 | 0 |
| Q034 | 0.432288 | 0.046617 | 9.273193 | 0 |

| | | | |
|---|---|---|---|
| R-squared | 0.426553 | Mean dependent var | 0.233649 |
| Adjusted R-squared | 0.392008 | S.D. dependent var | 0.160923 |
| S.E. of regression | 0.125478 | Akaike info criterion | -1.2568 |
| Sum squared resid | 9.14766 | Schwarz criterion | -0.99862 |
| Log likelihood | 423.7229 | Durbin-Watson stat | 1.726194 |

**Table 10 – Price Index Regression Results (1995-2003)**

| **Variable** | **Price Index DNL < 45** | | **Price Index DNL > 65** | | **Price Index DNL > 75** | |
|---|---|---|---|---|---|---|
| | Coefficient | t-Statistic | Coefficient | t-Statistic | Coefficient | t-Statistic |
| Constant | 98.57246 | 216.0686 | 99.64166 | 286.4442 | 107.0733 | 47.44753 |
| Event dummy | -30.8215 | -3.518133 | -36.4079 | -4.92147 | -33.60113 | -4.02968 |
| Time trend 95-03 | 0.445783 | 9.748073 | 0.698825 | 16.20301 | 0.673736 | 3.317536 |
| Dummy*Time9503 | 1.79322 | 5.297527 | 1.913139 | 6.752749 | 1.900804 | 5.50973 |
| | | | | | | |
| R-squared | 0.962434 | | 0.970664 | | 0.909459 | |
| Adjusted R-squared | 0.958912 | | 0.967914 | | 0.900971 | |
| S.E. of regression | 3.286118 | | 3.222854 | | 6.101946 | |
| Sum squared resid | 345.5544 | | 332.3773 | | 1191.48 | |
| Log likelihood | -91.7912 | | -91.0913 | | -114.0716 | |
| Durbin-Watson stat | 0.684024 | | 0.715311 | | 1.74951 | |

Notes: Standard errors are based on Newey-West HAC covariances, which correct for autocorrelation of unknown form. Sample size is 36 quarterly observations for 1995Q1 to 2003Q4. Dependent variables are the price indices constructed by Dr, Dale-Johnson and shown in his Exhibit 8. These indices use the BASE 2000 noise levels.

Case 1:01-cv-00201-VJW Document 219-4 Filed 10/05/2006 Page 1 of 28
Journal of Transport Economics and Policy, Volume 38, Part 1, January 2004, pp. 1–28

# Meta-Analysis of Airport Noise and Hedonic Property Values

## Problems and Prospects

**Jon P. Nelson**

*Address for correspondence*: Jon P. Nelson, Department of Economics, Pennsylvania State University, University Park, PA 16802 USA.

**Abstract**

Meta-analysis is applied to the negative relationship between airport noise exposure and residential property values. The effect size in the analysis is the percentage depreciation per decibel increase in airport noise, or the noise discount. Twenty hedonic property value studies are analysed, covering 33 estimates of the noise discount for 23 airports in Canada and the United States. About one-third of the estimates have not been previously reported in the literature or were not included in previous meta-analyses. A meta-regression analysis examines the variability in the noise discounts that might be due to country, year, sample size, model specification, mean property value, data aggregation, or accessibility to airport employment and travel opportunities. The analysis indicates that country and model specification have some effect on the measured noise discount, but the other variables have little systematic effect.

*Date of receipt of final manuscript: July 2003*

# 1. Introduction

Aircraft noise continues to be an issue at many airports, especially where capacity expansions are under way or are being considered. In the United States, airport noise exposure has been reduced through operating requirements, quieter aircraft, and by soundproofing or purchase of surrounding residential properties. As a result, the past 25 years have seen a dramatic decline in the number of persons exposed to significant noise levels of 65 decibels (dB) or more.[1] However, from January 2000, the entire US commercial fleet had been converted to Stage 3 aircraft and further mitigation of noise at the source will require investments in improved technologies by airlines. The projected growth of air travel could also slow or reverse the decline in the exposed population, although currently there is considerable uncertainty in these forecasts. According to the Federal Aviation Administration, 75 per cent of large hub airports and 47 per cent of transfer airports have proposed or begun building new runways (FAA, 2002). Because noise is the number one environmental concern at major airports, capacity expansion is often slowed by public concern with noise exposure (GAO, 2000a, 2000b).[2] This concern highlights the importance of valuation of noise effects if expansion decisions are based on economic efficiency criteria and benefit-cost analysis.

Measurement of the economic value of quietness has traditionally focused on the effect of significant noise exposure on residential property values. Using hedonic price analysis, a number of studies have measured this value empirically for airports located in Australia, Canada, Netherlands, United Kingdom, United States, and other countries. First-generation studies for the US employed aggregate census track and block data, while second-generation studies made use of sales data for individual houses. It can be anticipated that the next generation of hedonic studies will use geographical information systems (GIS), which has been

[1]Since 1979, federal agencies have considered a Day-Night Average Sound Level (DNL) of 75 dB or greater as incompatible with all residential use, except transient lodging (FAA, 1985, 2000; FICUN, 1980; FICON, 1992a). Under the Aviation Safety and Noise Abatement Act of 1979, the FAA adopted the DNL metric and 65 dB compatibility standard. Lands exposed to DNL 65–74 dB are regarded as "normally" incompatible with residential use, while lands exposed to a DNL of less than 65 dB are regarded as "normally" compatible with such use. Further, at 65 dB and above, increases in exposure of 1.5 dB or more are regarded as a significant addition of noise, and require an environmental impact statement.

[2]These problems also exist at smaller airports or where airport conversions have been proposed. See, for example, the controversy in Orange County, CA, surrounding the proposed conversion of the El Toro Marine Air Station to an international airport to compete with Los Angeles International Airport (http://www.eltoroairport.org).

applied to noise generated by road traffic (Bateman *et al.*, 2002; Lake *et al.*, 2000). Similarly, contingent valuation methods have been used to analyse airport noise valuation, but at present only one such study exists for Canada or the US (Feitelson *et al.*, 1996; see also Navrud, 2002). In the light of these recent developments, a first objective of this study is to provide a benchmark that can be compared against results from studies using alternative methodologies.

Hedonic price models have been used to estimate the effects of numerous amenities and disamenities on the value of residential housing.[3] These models exploit the differentiation that exists in housing markets in terms of locational attributes or characteristics of a sample of properties. The model is especially useful if the attribute in question is ''localised'' so that only a small fraction of the properties within a metropolitan area is affected or exposed (Palmquist, 1992a). For example, noise from a major highway or an airport affects adjacent and nearby properties, while leaving unaffected the general level of urban values.[4] In this case, the hedonic price of the attribute identifies a marginal benefit or willingness-to-pay schedule that is useful for the evaluation of public policies. Several analytical issues remain regarding: (1) the model specification used to separate the effect of noise from numerous other possible influences on property values; and (2) the transferability of noise abatement benefit estimates across urban markets, regions, or countries. In particular, proximity to an airport also provides access to travel and employment opportunities, and a major airport might be expected to have both positive and negative effects on property values. Ignoring accessibility could result in a downward bias for the effect of noise alone. Further, benefits transfer issues arise with respect to noise abatement projects at specific airports; ''full cost'' estimates for alternative modes of transport (Greene *et al.*, 1997; Levinson *et al.*, 1998; NAS, 2002); and benefit-cost analyses of major public policies (Morrison *et al.*, 1999).

Given a large number of hedonic studies of airport noise, problems of model specification and benefit transfers can be addressed using meta-analysis techniques. This paper presents a meta-analysis of the effect of airport noise on property values in the vicinity of civilian airports in

---

[3]There are a large number of narrative surveys of the hedonic price literature. For surveys of the general model, see Palmquist (1992b) and Sheppard (1999). For recent surveys of externality issues, see Boyle and Kiel (2001), EPA (2000), Freeman (2003), and Palmquist and Smith (2002). Follain and Jimenez (1985) contains a survey of empirical results from two-step estimation of structural demand functions for attributes.

[4]Morrison *et al.* (1999, p.734) examined noise exposure maps for 35 major airports in the US. They concluded that airport noise typically affects less than 2 per cent of the total number of housing units in a metropolitan area.

Canada and the US. Twenty different studies are included in the analysis, providing 33 estimates of the effect of noise. About one-third of the estimates have not been previously reported in the property value literature or included in similar analyses. Average values for the estimates are presented and the variation in the estimates is analysed using "meta-regression" analysis (Stanley, 2001; Stanley and Jarrell, 1989). Because two previous meta-analyses have considered subsets of the available estimates, the paper also comments on the problems that exist in these studies.

The remainder of the paper is divided into four sections. The next section provides a brief background on hedonic price studies of airport noise and discusses several measurement problems that can arise due to model specification, accessibility, and benefits transfer. This is followed by a discussion of meta-analysis of environmental effects and the average values for the sample of twenty studies. A summary of the shortcomings found in two previous meta-analyses of airport noise also is presented. In the third section, a meta-regression analysis is presented, which sorts out the possible sources of variation in the values. The conclusions from the study are found in the fourth section. Two appendices provide references for the empirical studies included in the analysis and those studies excluded and the reasons for the exclusions.

## 2. Airport Noise and Property Values

Noise is unwanted or unpleasant sound. At 65 dB and above, the most common human effects associated with aircraft noise are annoyance, speech and learning interference, and sleep disturbance. In turn, these effects disrupt normal daily activities, such as conversation, television viewing, school work, productivity, outdoor recreation and living, and family activities. Annoyance is the adverse psychological response to a given noise exposure, including the anxiety or apprehension that the noise may cause (FICON, 1992b). At noise levels above 75 dB, the Environmental Protection Agency (EPA, 1982) cautions that more severe health effects may occur for some portion of the population, including temporary hearing loss. Those persons who are frequently outdoors are of greatest concern, including young children, retired people in warm climates, and people in certain outdoor occupations.

### 2.1. Hedonic model and noise annoyance

Consider two residential properties that are identical in all respects, except that one house is located close to or under an aircraft flight path, and the other is not. A "but for analysis" establishes that the adverse environment for the first house will result in a market value that is lower than the market value of the second house. This occurs because potential buyers reduce their demand for the first house relative to the second house, reflecting the discounted present value of the costs of annoyance, loss of tranquillity, and possible health effects. A measure of the noise-induced damages is the difference between the market-determined value of the two houses. The analysis can be extended to analyse different levels of noise exposure because annoyance and other adverse effects of noise rise predictably with increased exposure levels (EPA, 1982; FAA, 1985; FICON, 1992a, 1992b). Hence, while there is a missing market for tranquillity, a complementary market exists wherein individuals register their willingness to pay to avoid different levels of aircraft noise exposure. Consumers thus *reveal* the implicit value that they place on quietness by the explicit choices that they make in the housing market. The willingness to pay for quietness and other amenities are part of the asset price of the "housing bundle", and econometric techniques are available that unbundle complex products and thereby reveal the implicit or hedonic price. As indicated above, a large empirical literature has developed using the hedonic method.

It is rare that two residential properties will be identical in all respects, except for the pollutant in question. Consequently, in order to isolate a given hedonic price, it is necessary to control statistically for other influences on property values, such as the size of house and lot, quality of construction, design of the house, merits of the neighbourhood, quality of local schools, crime rates, governmental services, and so on.[5] Some of these characteristics will vary little within a given data set, and separate measurement is not required to explain the observed variation in property values. In other cases, the excluded characteristics are uncorrelated or orthogonal to noise levels, and exclusion will not bias the resulting

[5]A referee argued that the discount associated with an externality, such as noise, could be affected by general housing market conditions in an urban area, such as the presence of strong demand for housing in a "hot" market. Although the direction of the effect is uncertain, this is a general equilibrium issue for which no published empirical evidence seems to exist for aircraft noise. As such the issue is partly one of aggregation across areas that may not be homogeneous with respect to, say, the general level of housing price appreciation. However, as indicated above, properties that are in close proximity to an airport are generally a small proportion of the total housing market for an urban area. For discussion of aggregation issues associated with hedonic property value models, see Bartik and Smith (1987), Freeman (2003), and Palmquist (1992a, 1992b).

estimate of the hedonic price. Given differences in statistical methods, samples, time periods, and urban locations, empirical studies have not produced a singular value for the effects of airport noise on property values. However, hedonic price studies have shown that airport noise has a negative impact on residential property values, and central tendencies can be determined based on the distribution of estimates. Further, meta-analysis can establish the extent to which the variation is systematic.

Each house and lot represents a unique combination of characteristics and locational attributes, which means that the decision to purchase a given property is complex. However, if the characteristics and attributes are provided in various combinations, it is possible to estimate an implicit price function that shows how these values vary conditionally on the distribution of a given characteristic. Formally, let $V$ be a sample of observations on housing prices; $S$ is a vector of structural variables (house size, number of bedrooms, lot size, and so on); $L$ is a vector of locational variables; $T$ is a vector of local taxes; $G$ is a vector of local government services; and $E$ is a vector of localised environmental-quality attributes. The market-determined asset value of houses in the sample is given by $V = V(S, L, T, G, E)$. The marginal implicit price for each characteristic represents the increase in expenditures required to obtain one more unit of that characteristic, holding constant all other variables. The marginal price is the partial derivative of the $V$ relationship with respect to the $j$-th characteristic, or $\partial V/\partial E_j$. A given marginal price could be a constant, but generally it will be a function of the data.

Many empirical studies employ a non-linear function for property values, either a log–log or a semi-log relationship. The hedonic function for properties in the vicinity of an airport can be represented by $V = b_0 Z^{b1} A^{b2} u_1$, where $V$ is the property value; $Z$ is all other physical and locational characteristics (that is, $S$, $L$, $T$, and $G$); $A$ is annoyance due to aircraft noise; $u_1$ is a stochastic error term; and $b_0$, $b_1$, and $b_2$ are parameters. Annoyance can be approximated by the following semi-logarithmic relationship: $A = c_0 e^{c1(DNL)} u_2$, where $DNL$ is the Day–Night Sound Level in decibels; $u_2$ is a stochastic error term; $e$ is the natural log base; and $c_0$ and $c_1$ are parameters (Nelson, 1980).[6] Taking logs of both relationships, and substituting for ln $A$, yields the following relationship for property values: $\ln V = d_0 + d_1(\ln Z) + d_2 DNL + u_3$, where $d_2 = b_2 c_1$, and so on. The regression coefficient $d_2 \times 100 = (\partial V/\partial DNL \bullet 1/V) \times 100$ represents the

[6] The "Schultz curve" displays the percentage of exposed persons highly annoyed as a function of environmental noise (Finegold *et al.*, 1994). The Schultz curve includes low levels of noise exposure (e.g., 40–50 dB), which is the non-linear left-hand tail of the curve. These noise exposures are typically not due to aircraft noise. The semi-log approximation of the Schultz curve is from Bishop (1966).

percentage decrease in a given property value due to a one dB increase in noise exposure on the *DNL* scale.[7] For the log (or semi-log) function, the marginal implicit price is $P = (\partial V/\partial DNL) = d_2 V$. In other words, the marginal price for noise increases as a function of the property value $V$.

Meta-analysis requires a *common effect size* measure of damages due to airport noise. That is, the outcomes from the set of studies must be expressed in terms of a common metric and its standard error. With some adjustments, the findings of empirical studies of airport noise can be summarised by means of a Noise Depreciation Index (NDI), which is the percentage rate of depreciation per dB (Walters, 1975). For two properties that differ except for their level of noise exposure, the absolute amount of housing depreciation per decibel (the unit cost of noise) is given by $D =$ (difference in the total noise discount) $\div$ (difference in noise exposure in dB). Dividing $D$ by the price of the given house (or an average house price), the percentage rate of depreciation is given by $NDI = (D \div \text{property value}) \times 100 =$ (difference in total percentage depreciation) $\div$ (difference in noise exposure in dB). This is the same result as $d_2 \times 100$ above.

### 2.2. Functional form problems

Many empirical studies use the logarithmic (or semi-log) model outlined above, and these studies directly estimate the NDI. The regression coefficient on DNL multiplied by 100 is the percentage decrease in a property value due to a one dB increase in noise exposure. For example, if the NDI is 1 per cent, a property exposed to 70 dB is worth 10 per cent less than a property exposed to 60 dB, and so on. However, some studies use a linear functional form, where $V = f_0 + f_1 Z + f_2(DNL) + u$. Hence, an estimate of the discount is $NDI = f_2(1/V_M) \times 100$, where $V_M$ is, say, the mean value for the sample. As a result the NDI estimates for studies using a linear form might be systematically different from studies using a log specification. In the meta-analysis a dummy variable is included for those studies that used a linear functional form.

### 2.3. Threshold noise problems

Because the ear's pattern of response is more nearly logarithmic in nature, decibels are measured on a log scale. The perception of noise doubles in

[7]This functional form allows the marginal price to depend on the levels of other characteristics of the property. As pointed out by a referee, there is still a possibility that households might substitute among other activities in the face of increased noise exposure, such as reducing the amount of outdoor activity. Some evidence to the contrary is provided by Hoyt and Rosenthal (1997), who demonstrate that US households appear to sort efficiently based on preferences for locational amenities.

Case 1:01-cv-00201-VJW Document 219-4 Filed 10/05/2006 Page 8 of 2


loudness for every 10 dB increase in sound level. An 80 dB sound is perceived to be twice as loud as a 70 dB sound, four times louder than a 60 dB sound, and eight times louder than a 50 dB sound. However, the absence of aircraft noise is not associated with a zero value of the Day–Night Sound Level. The DNL is the average sound level generated by all major environmental noise sources during a 24-hour period, with a 10 dB penalty for nighttime noise events.[8] Noise levels in the vicinity of airports range from about 65 to 80 dB, and noise contour data are generally available in 5 dB increments for this range. Typical background noise levels in urban areas are about 50–60 dB during daytime hours and 40 dB during nighttime. (A level of 50–60 dB corresponds to the noise from light traffic at 100 feet or an air conditioner at 100 feet.) A few studies incorrectly account for the threshold noise level. In some cases, they simply ignore the background level of urban noise and treat it implicitly as zero, rather than 55 or 60 dB. This is especially true where the sample of property values covers a larger portion of an urban area, which leads to a relatively large sample size. A control variable for sample size is used to correct for this problem in the meta-analysis.

### 2.4. Accessibility specification problems

Major airports are commercial facilities that have the potential to create significant travel and employment opportunities. Employment opportunities exist at the airport site as well as at commercial facilities which develop in the vicinity of a major airport. For individuals who might work at (or near) the airport or who use the airport for travel, the benefits of proximity can be reflected in residential property values. Because it is possible for an airport to have negative and positive effects on property values, the net effect can be negative or positive. The empirical problem is the extent to which a particular empirical study has separated out the effect of noise from the effect of accessibility (if any). Failure to allow for accessibility could lead to a downward bias in the hedonic price of airport noise.

Previous studies have addressed the accessibility problem in a variety of ways. DeVany (1976) was the first to investigate this issue, and he proposed a solution using a dummy variable specification. Nelson (1979) suggested another solution based on the elongated shape of aircraft noise

---

[8] Some empirical studies used an older noise metric, the Noise Exposure Forecast (NEF) in A-weighted decibels. The two metrics are highly correlated. The relationship between DNL and NEF is given by $DNL = NEF + 35$ dB (EPA, 1982). The summaries below reflect this adjustment of noise metrics, and all noise levels are expressed using the DNL metric, regardless of the original metric used in the study.

contours and sampling for limited areas with more or less the same degree of accessibility. Li and Brown (1980) examined the general effects of disamenities and accessibility on property values in the Greater Boston metropolitan area. Several studies of the Manchester Airport (UK) have reached conflicting conclusions about the importance of accessibility and noise. In particular, Tomkins *et al.* (1998) used straight-line distance to the airport as a measure of accessibility. The NDI was 0.78 per cent, but they found that the effect of accessibility was greater for certain properties. Hence, for some properties, the net effect of the Manchester Airport on property values was positive.

The purpose of the present analysis is to *isolate* the effect of noise on property values. Each of the twenty studies was examined for controls on accessibility to the airport. In general, three control methods have been used in past studies. First, many studies exploit the elongated nature of noise contours and select a sample area that holds accessibility constant and allows noise levels to vary importantly. This approach is illustrated by Figure 1, which shows elongated noise contours and circular rings for access to the airport. Note that some properties can have a high degree of proximity, but low or moderate noise levels. As a result, the correlation between noise and accessibility is not necessarily high.[9] Second, some studies use DNL noise contours and straight-line distance to the airport as a measure of accessibility. This solution tends to ignore commercial opportunities that are not located at the airport. Third, dummy variable specifications have been used to isolate the effects of aircraft noise. In the meta-analysis, a dummy variable is included for those studies that entirely ignored the accessibility problem.

### 2.5. Benefit transfer problems

Benefit transfer is the general problem of using damage estimates based on primary data from a specific study (or studies) to estimate the benefits of abatement efforts at another setting or location (Brookshire and Neill, 1992; Desvousges *et al.*, 1998). Benefit transfers assume that the parameter estimate is applicable in both areas, which requires that the parameter is drawn from a common population, or the estimate can be adjusted to be applicable to the transfer area. Because benefit transfers reduce the costs

[9] Several of the excluded studies used only the straight-line distance to the airport as a measure of the noise impact of the airport (see Appendix B). The difficulty with this approach is illustrated by Figure 1, which depicts a low correlation between noise and access. For example, using a sample of 424 individual property sales from DeAraujo (1986), I calculated the correlation between aircraft noise exposure and straight-line distance to the Lambert St. Louis International Airport. The simple correlation between noise and distance was only −0.024.

**Figure 1**
*Airport Noise Contours and Accessibility Rings*




of decision making, the central issue is the acceptable degree of variability for a set of estimates to be a reliable guide for public policy. In this context, using all of the available estimates of noise damages is probably unwarranted and undesirable. Hence, the present study examines: (1) hedonic price studies of airports in Canada and the US; and (2) studies based on data from 1967 and later. These sample restrictions also facilitate the collection of data for the meta-analysis.

## 3. Meta-Analysis of Twenty Studies: Basic Results

Meta-analysis was developed to address the general issue of research synthesis.[10] A meta-analysis combines the findings of studies to assess the

[10]Meta-analysis has seen fairly wide applications in economics, especially for non-market valuation studies in the environmental, natural resource, and transportation areas (Smith and Pattanayak, 2002; van den Bergh *et al.*, 1997). Representative applications include Smith and Huang (1995) on air pollution; Espey *et al.* (1997) and Dalhuisen (2003) on residential water demand; Rosenberger and Loomis (2001) on outdoor recreation; and Waters (1996) on value of time savings. Standard reference for technical aspects of meta-analysis are Hedges and Olkin (1985), Hedges (1992), and Lipsey and Wilson (2001).

magnitude and significance of a measure of effect size. Among the hallmarks of a high quality meta-analysis are *comparability, completeness, and transparency.* A meta-analysis compares studies to identify possible moderators of effect size, such as the sample characteristics, time period, model specification, or location. Meta-analysis also can be used to assess the consistency of research findings by determining the extent to which variation in findings is systematic or due to random factors. However, caution is required regarding the set of estimates that form the basis for the analysis. For example, Johnson and Button (1997) examined a sample of noise damage estimates that included airports in Australia, Canada, UK, and US. They also included studies using data from the early 1960s as well as more recent data sets. Not surprisingly, they concluded that the range of damage estimates is wide. The position in the present study is that a more complete and controlled application of meta-analysis is required before the existing research in this area is cast aside or labelled inadequate for benefit transfers and public policy analysis. Additional comments on previous meta-analyses are presented after the summary of the twenty studies.

### 3.1. Summary of the twenty studies

Table 1 displays information from twenty studies of property values in the vicinity airports in Canada and the US. A number of new studies were uncovered by searches using web-based resources, especially *Dissertation Abstracts* (http://wwwlib.umi.com/dissertations). These studies provide 33 estimates of the NDI for 23 different airports. Except for Reno and Rochester, the airports are major facilities for all regions of each country. Some studies use the same data set or cover different aspects of the same study (for example, the two studies of the Vancouver Airport). In order to avoid problems of statistical dependence, only one estimate is used from these joint cases. Using independent samples, several airports have been studied more than once, including Atlanta, Dallas, Reno, St Louis, San Francisco, and Washington, DC. Table 1 also presents relevant information for each study that is used in the meta-regression analysis. This information is discussed below.

Assume $N$ independent studies, each yielding an estimate, $D_i$, of the noise depreciation index $I_i$, where $i = 1, 2, \ldots, N$. In meta-analysis, this outcome is labelled the "effect size" estimate. A "no structure" model or fixed-effects analysis assumes that $I_1 = I_2 = \ldots = I_N$. That is, each study is estimating an identical, but unknown, true population value of $I$. Following Hedges and Olkin (1985), the asymptotically efficient estimator of $I$ is a weighted-mean of the individual effects $D_i$, with the optimal

Case 1:01-cv-00201-VJW Document 219-4 Filed 10/05/2006 Page 12 of


## Table 1

*Meta-Analysis of Airport Noise and Hedonic Property Values (NDI = % depreciation per decibel)*

| *Study (Publication Date & Page no.)* | *Airport (& Area)* | *Study Period (Smpl Size)* | *Data Type* | *Mean Property Value (2000 US $)* | *NDI %: Abs Value (std err)* | *Dep. Variable (R-sq)* | *Access Adjust?* |
|---|---|---|---|---|---|---|---|
| BAH-FAA (1994, p18) | Baltimore | 1990 (30) | ind. prop. | $123,698 ($170,703) | 1.07 (0.823) | linear (0.91) | Yes (1) |
| BAH-FAA (1994, p22) | Los Angeles | 1991 (24) | ind. prop. | $351,062 ($449,359) | 1.26 (0.788) | linear (0.83) | Yes (1) |
| BAH-FAA (1994, p27) | New York (JFK) | 1993 (30) | ind. prop. | $422,500 ($523,900) | 1.20 (na) | linear (0.77) | Yes (1) |
| BAH-FAA (1994, p27) | New York (La Guardia) | 1993 (30) | ind. prop. | $222,534 ($275,942) | 0.67 (na) | linear (0.57) | Yes (1) |
| Blaylock (1977, p79) | Dallas | 1970 (4,264) | census blocks | $25,000 ($136,250) | 0.99 (0.330)* | linear (0.82) | Yes (2) |
| DeVany (1976, p213); NAS (1977, p139) | Dallas | 1970 (1,270) | census blocks | $22,000 ($119,900) | 0.80 (0.267)* | linear (0.82) | Yes (3) |
| Dygert (1973, p105) | San Francisco (San Mateo) | 1970 (82) | census tracts | $27,600 ($150,420) | 0.50 (0.250)* | log (0.66) | Yes (2) |
| Dygert (1973, p113) | San Jose | 1970 (98) | census tracts | $21,000 ($114,450) | 0.70 (0.422)* | log (0.67) | Yes (2) |
| Emerson (1969, p68; 1972, p271) | Minneapolis | 1967 (222) | ind. prop. | $19,683 ($132,270) | 0.58 (0.366) | log (0.80) | Yes (1) |
| Fromme (1978, p100) | Wash. DC (National) | 1970 (28) | census tracts | $30,068 ($163,871) | 1.49 (0.753)* | log (0.75) | Yes (1) |
| Kaufman (1996, p33); Espey and Lopez (2000) | Reno | 1991–95 (1,596) | ind. prop. | $110,970 ($137,603) | 0.28 (0.183) | log (0.85) | Yes (2) |
| Levesque (1994, p207) | Winnipeg | 1985–86 (1,635) | ind. prop. | $72,316 CN$ ($70,104) | 1.30 (0.342)* | log (0.80) | No |
| Mark (1980, p112) | St. Louis | 1969–70 (6,553) | ind. prop. | $15,015 ($81,832) | 0.56 (0.240)* | log (0.67) | No |

**Table 1** *continued*

| *Study (Publication Date & Page no.)* | *Airport (& Area)* | *Study Period (Smpl Size)* | *Data Type* | *Mean Property Value (2000 US $)* | *NDI %: Abs Value (std err)* | *Dep. Variable (R-sq)* | *Access Adjust?* |
|---|---|---|---|---|---|---|---|
| Maser *et al.* (1977, p130); Quinlan (1970) | Rochester (urban) | 1971 (398) | ind. prop. | $19,100 ($99,893) | 0.86 (0.319)* | linear (0.62) | No |
| Maser *et al.* (1977, p130); Quinlan (1970) | Rochester (suburban) | 1971 (990) | ind. prop. | $21,800 ($114,014) | 0.68 (0.279)* | linear (0.84) | No |
| McMillan *et al.* (1980, p319); McMillan (1979) | Edmonton | 1975–76 (352) | ind. prop. | $51,933 CN$ ($108,730) | 0.51 (0.224)* | log (0.71) | No |
| Mieszkowski and Saper (1978, p430) | Toronto (Mississauga) | 1969–73 (509) | ind. prop. | $31,450 CN$ ($89,982) | 0.87 (0.212)* | log (0.90) | Yes(1) |
| Mieszkowski and Saper (1978, p430) | Toronto (Etobicoke) | 1969–73 (611) | ind. prop. | $37,770 CN$ ($108,063) | 0.95 (0.187)* | log (0.92) | Yes(1) |
| Myles (1997, p21) | Reno | 1991 (4,332) | ind. prop. | $135,000 ($178,200) | 0.37 (0.111)* | log (0.74) | No |
| Nelson (1978, p98) | Wash. DC (National) | 1970 (52) | census tracts | $27,455 ($149,630) | 1.06 (0.714) | log (0.86) | Yes(1) |
| Nelson (1979, p325; 1980, p45) | Buffalo | 1970 (126) | census blocks | $20,656 ($112,575) | 0.52 (0.200)* | log (0.61) | Yes(1) |
| Nelson (1979, p325; 1980, p45) | Cleveland | 1970 (185) | census blocks | $20,898 ($113,894) | 0.29 (0.128)* | log (0.89) | Yes(1) |
| Nelson (1979, p325; 1980, p45) | New Orleans | 1970 (143) | census blocks | $21,975 ($119,763) | 0.40 (0.195)* | log (0.75) | Yes(1) |
| Nelson (1979, p325; 1980, p45) | St. Louis | 1970 (113) | census blocks | $16,411 ($89,440) | 0.51 (0.267)* | log (0.74) | Yes(1) |
| Nelson (1979, p325; 1980, p45) | San Diego | 1970 (125) | census blocks | $32,241 ($175,713) | 0.74 (0.233)* | log (0.76) | Yes(1) |
| Nelson (1979, p325; 1980, p45) | San Francisco | 1970 (153) | census blocks | $29,686 ($161,789) | 0.58 (0.184)* | log (0.71) | Yes(1) |
| Nelson (1979, p327; 1980, p69; 1981) | Six airports | 1970 (845) | census blocks | $23,713 ($129,236) | 0.55 (0.200)* | log (0.84) | Yes (2) |

Case 1:01-cv-00201-VJW Document 219-4 Filed 10/05/2006 Page 14 of


**Table 1** *continued*

| *Study (Publication Date & Page no.)* | *Airport (& Area)* | *Study Period (Smpl Size)* | *Data Type* | *Mean Property Value (2000 US $)* | *NDI %: Abs Value (std err)* | *Dep. Variable (R-sq)* | *Access Adjust?* |
|---|---|---|---|---|---|---|---|
| O'Byrne *et al.* (1985, p175) | Atlanta (blocks) | 1970 (248) | census blocks | $18,964 ($103,354) | 0.64 (0.200)* | log (0.74) | No |
| O'Byrne *et al.* (1985, p173) | Atlanta (houses) | 1979–80 (96) | ind. prop. | $28,889 ($81,178) | 0.67 (0.300)* | log (0.71) | Yes(1) |
| Price (1974, p40 & 59) | Boston (rentals) | 1970 (270) | census tracts | $103 per month (na) | 0.81 (0.238)* | linear (0.50) | No |
| Tarassoff (1993, p83) | Montreal | 1989–90 (427) | ind. prop. | $148,525 CN$ ($118,985) | 0.65 (0.325)* | linear (0.64) | No |
| Uyeno *et al.* (1993, p9); Biggs (1990, p136) | Vancouver (houses) | 1987–88 (645) | ind. prop. | $139,100 CN$ ($124,076) | 0.65 (0.164)* | log (0.64) | Yes (2) |
| Uyeno *et al.* (1993, p11) | Vancouver (condos) | 1987–88 (907) | ind. condos | (na) | 0.90 (0.323)* | log (0.79) | Yes (2) |
| Mean NDI (sd) – unwt. | | | | | 0.75 (0.295)* | | |
| Median NDI – unwt. | | | | | 0.67 | | |
| Wt. mean NDI (sd) | | | | | 0.58 (0.041)* | | |
| *Q* statistic | | | | | 31.868 | | |
| Random effect variance | | | | | 0.0033 | | |
| Random effect mean | | | | | 0.59 (0.043)* | | |

*Notes*: All individual housing values are actual sales or list prices, except for Baltimore where professional appraisal values are used; the census values are based on self-appraisals by owner-occupants. Asterisks indicate that the $t$-statistic $> 2.0$. The mean property values were obtained by inflating by the consumer price index (CPI-U) and, if necessary, converting Canadian dollars to U.S. using the exchange rate in 2000. All other data and information are obtained from the individual studies as listed in the table. See text for explanation of accessibility adjustments and for explanation of the calculation of the means. The critical value for the $Q$ statistic at the 5% confidence level is 19.01.

weights given by the inverse of the variance of each estimate. The fixed-effects model assumes that this variance is due to sampling error only. The inverse variance weight is $w_i = (1/s_i^2)$, where $s_i^2$ is the estimated conditional variance of $D_i$ for any $i$. The weighted-mean and variance are given by

$$D = \sum_{i=1}^{N} w_i D_i / \sum_{i=1}^{N} w_i, \qquad V(D) = 1/\sum_{i=1}^{N} w_i, \tag{1}$$

where $D$ is the cumulative effect size and $V(D)$ is its variance. As indicated, these estimates are obtained without imposing any structure on the data.

In order to test for equivalence of effect sizes among the studies, Hedges and Olkin (1985, p.123) suggest the following homogeneity test statistic:

$$Q = \sum_{i=1}^{N} w_i (D_i - D)^2, \tag{2}$$

which has a chi-square distribution with $N - 1$ degrees of freedom. If $Q$ is large, the null hypothesis is rejected and the fixed-effects model is inappropriate; that is, each study may not be estimating the same population value and a single cumulative estimate is inappropriate. A significant $Q$ indicates that the variance among the effect sizes is greater than expected due to sampling error alone.

If homogeneity of the estimates is rejected, several alternatives to the fixed-effects model can be considered for a given data set. A meta-regression analysis seeks to explain categorical within-study variability, while a "random-effects" analysis incorporates both the within-study variability and sampling variation that may be due to an underlying population of effect sizes, namely, the between-study variability. In a random-effects model, the random component of the effect-size variation is calculated and incorporated into the summary statistics. A brief discussion of these alternative models follows.

In a meta-regression, the studies are grouped together according to one or more differentiating characteristics or predictors (for example, time period, country, linear *vs* log specification, and so on). The true effect size is assumed to a function of the predictors, that is, each estimate $D_i$ is an unbiased estimate of $I_i$. The general form of the meta-regression model is

$$D_i = \beta_0 + \beta_1 X_{i1} + \beta_2 X_{i2} + \cdots + \beta_P X_{iP} + \varepsilon_i, i = 1, \ldots, N, \tag{3}$$

where $(X_{i1}, X_{i2}, \ldots, X_{iP})$ is a vector of predictor variables, which are typically dummies; $(\beta_0, \beta_1, \ldots, \beta_P)$ are unknown parameters; and $\epsilon_i$ is a random error term with zero mean and constant variance. The estimates

se 1:01-cv-00201-VJW Document 219-4 Filed 10/05/2006 Page 16 of


of the parameters are obtained using a weighted least-squares model. Tests or comparisons can be made to determine if the effect sizes are heterogeneous *after* removing the variability associated with the predictor variables. If the effect sizes are homogeneous conditionally on the predictor variables, the regression constant term $\beta_0$ is an estimate of the "true" effect size. The results of a meta-regression analysis are reported in the next section.

A second alternative is a random-effects analysis, which allows for random variation in the true effect size from one study to another. Each estimate $D_i$ is a draw from the same statistical distribution for $I$. The true effect sizes are not assumed to be identical, but rather to be observations of the same statistical distribution. Application of random-effects analysis requires an estimate of the unknown variance due to sampling, and the total variance, $v_i^*$, is the sum of the random or between-studies variance and the within-study variance. The inverse variance weight is given by $w_i^* = (1/v_i^*)$. Hence, random-effects analyses involve greater variance around the average estimate, and weaker results generally. Subjective statements about the results also are weaker, such as "on average, the effect size is $D$," or "in most cases, the effect size is $D$."

Hedges and Olkin (1985) recommend the following method-of-moments estimate of the random-effects variance component:

$$\nu_i = \frac{Q - (N - 1)}{\sum w_i - \left(\sum w_i^2 / \sum w_i\right)}, \tag{4}$$

where $Q$ is the value of the homogeneity test statistic in (2); $N$ is the number of effect size estimates; and $w_i$ is the inverse variance-weight defined above. Previous meta-analyses of airport noise have ignored random-effects models.

The bottom row of Table 1 summarises the results for the fixed-effects and random-effects models. The unweighted mean NDI (standard deviation) is 0.75 (0.295) and the median is 0.67. The fixed-effects weighted-mean NDI is 0.58 (0.041). The $Q$ statistic is 31.868, and the null hypothesis of homogeneity is rejected at the 5 per cent confidence level. The random-effects variance component is only 0.0033, which is added to the variance of each effect size to obtain the total variance. Using this new set of weights, the random-effects weighed mean NDI is 0.59 (0.043). Hence, application of the random-effects model does not alter the summary statistics in a substantial manner. The "no structure" model suggests an NDI of about 0.60 per cent per dB, which is a cumulative sum of 31 estimates in Table 1. The fixed-effect 95 per cent confidence interval is $0.58 \pm 0.080$, which yields a fairly tight range of estimates from 0.50 to

0.64 per cent per dB. Hence, further analysis of the variability in Table 1 requires a meta-regression analysis.

### 3.2. Comparisons with previous meta-analyses

The results in Table 1 can be compared to those reported in three previous studies. Nelson (1980) summarised NDI estimates from thirteen studies covering 18 airports, including Australia (2 estimates), Canada (2), UK (1), and US (13). Only unweighted means were calculated, although pooled results were presented for six US airports. The study concluded that "... the noise discount is commonly 0.5–0.6%, although a higher value may occur in some high-income areas" (Nelson, 1980, p.46). This result compares favourably with the estimates derived in Table 1. However, a second study by Johnson and Button (1997) reached a different conclusion. Their study covered 18 estimates of the NDI for airports located in Australia (1 estimate), Canada (5), UK (3), and US (9). They presented a fixed-effects regression with three predictor variables, but none of the predictors were statistically significant and the observations were not weighted.[11] A random effects analysis was not included. Despite the limited nature of the analysis, the study concluded that "... the results provide little by way of overall explanation for variability in results" (Johnson and Button, 1997, p.228).

A third study provided a more ambitious application of meta-analysis. Schipper *et al.* (1998) examined nineteen studies that provide 30 NDI estimates for airports located in Australia (2 estimates), Canada (5), UK (2) and US (21). Standard errors for the NDI estimates were not reported. The simple mean NDI was 0.83 (0.72), but this result is affected by one very large estimate for London and by several estimates from the time period of the early 1960s. The median NDI was 0.61. The *Q* test rejected homogeneity, but the authors did not report the weighted mean. Weighted least-squares were used to obtain the effect of four predictor variables on the variation of the NDIs, but the constant term is inexplicably negative. The most important predictor variable was the "relative mean sample house price," which is the mean sample house price divided by per capita income. This variable is interpreted as a measure of buying power.

[11]The simple mean NDI in Johnson and Button (1997) is 0.68, but standard errors of the NDIs are not reported. Further, results in several studies are misreported (e.g. Nelson, 1979; Paik, 1972) and other relevant studies are omitted (e.g. Nelson, 1978). In related work, Button and Nijkamp (1997) pooled estimates of the NDI for airport noise with estimates for road traffic noise. They failed to report standard errors for the regression analysis of this sample. The subjective nature of these studies is inconsistent with the objectives of meta-analysis, which stresses comparability, completeness, and transparency.

However, there are two reasons why the variable is misspecified: (1) the value of a house is itself a measure of household permanent income; and (2) the authors fail to explain how they estimate per capita income for studies that use disaggregate data for individual houses. Dividing the mean value of a house by the average level of per capita income in the entire urban area is clearly a misspecification. A predictor variable for log-linear and semi-log functional forms had a significantly negative sign and the year of publication had a significantly positive sign. A dummy variable for studies that use data for 1960 (such as Paik, 1972) was positive and weakly significant. The study concluded that ''... the noise depreciation is larger for locations or samples that have a larger average house price'' (Schipper *et al.*, 1998, p.121). This conclusion must be questioned due to the problems associated with the specification of the relative house price variable and the significantly negative intercept term.

In summary, two previous meta-analyses covered a variety of countries and dates. Neither study considered the effect of accessibility on the estimates of the NDIs. Statistical results are incompletely reported. The present study restricts the sample by country and years to better ensure a homogeneous sample. The remainder of the paper seeks to improve the regression analysis by expanding the sample to include several new studies, and by reconsidering the effects of average house price, accessibility, and other influences on the range of estimates.

## 4. Meta-Regression Analysis

This section presents a fixed-effects regression analysis of the studies in Table 1, which covers 33 NDI estimates for airports in Canada (7 estimates) and the US (26 estimates). All estimates are for the year 1967 and later. About one-third of the NDI estimates have not been previously reported in the literature. Table 1 presents the following information set that is relevant for application of meta-regression analysis:

**Sample Characteristics**

Airport and country (area if applicable)
Sample time period
Sample size
Census data or individual sales
Mean property value (2000 US dollars)

**Econometric Specification and Results**

NDI estimate (absolute value) and standard error (page no. for estimates)
Logarithmic *vs* linear functional form
Coefficient of determination (*R*-square)
Specification for airport accessibility ("no" means explicit adjustment is absent)

Given this information set, a regression analysis was conducted for a sample of 29 to 31 observations. (Two estimates are deleted due to lack of mean property values and two estimates are omitted in some regressions due to lack of standard error estimates.) Results are reported for three different corrections for heteroscedasticity: (1) White's heteroscedastic-consistent standard errors; (2) weighted least-squares using inverse variance weights; and (3) weighted least-squares using inverse standard error weights. The residuals are assessed using the Jacques-Bera statistic for normality. The overall fit of the regression model is assessed by a standard $F$-test, which is equivalent to a partitioning of $Q$ into explained and unexplained portions (Lipsey and Wilson, 2001). I also report two additional diagnostics for the quality of the regressions, which are White's heteroscedasticity test and Ramsey's RESET test for specification error bias.

Table 2 shows the results of six regressions, which illustrate different treatments of heteroscedasticity and model specification. Regressions (1) and (2) do not use weighted least-squares, but standard errors are computed by White's heteroscedastic-consistent estimator. The quality of these two regressions is poor as judged by the high $p$-values for the $F$-test and the low $p$-values for the Jacques-Bera normality test. Only the constant term is significant in regression (1), while the constant and average real property values are significant in regression (2). The two dummy variables for aggregate census data and 1967–1970 data performed poorly in regression (2), and have been omitted from the other regressions.

Regressions (3) and (4) are estimated by weighted least-squares using inverse variance weights. The summary and diagnostic statistics indicate high-quality regressions on all counts. The only qualification is an outlier among the residuals, which is due to the NDI estimate by Fromme (1978) for Washington, DC. Regression (3) has a significant constant of 0.53, and the coefficients for linear models and Canada are both significantly positive. There is some overlap between sample size and the access dummy variable. When the latter variable is dropped from the model, the constant term declines slightly to 0.51 in regression (4). The coefficient magnitudes

se 1:01-cv-00201-VJW Document 219-4 Filed 10/05/2006 Page 20 of


**Table 2**
*Meta-Regression Results for the Noise Depreciation Index (NDI)*

| *Variable* | *(1)* | *(2)* | *(3)* | *(4)* | *(5)* | *(6)* |
|---|---|---|---|---|---|---|
| | 0.8316 | 0.7020 | 0.5332 | 0.5069 | 0.6466 | 0.6651 |
| Constant | (0.3062)* | (0.2969)* | (0.1893)* | (0.1425)* | (0.2254)* | (0.2043)* |
| Mean real property value | 0.0006 | 0.0008 | −0.0001 | −0.0001 | −0.0002 | −0.0002 |
| (×0.001) | (0.0004) | (0.0004)* | (0.0013) | (0.0013) | (0.0012) | (0.0011) |
| Accessibility dummy | −0.0106 | 0.0100 | 0.0196 | | −0.0208 | |
| (no adj = 1) | (0.1207) | (0.1363) | (0.0900) | — | (0.0959) | — |
| Sample size | −0.0504 | −0.0475 | −0.0186 | −0.0140 | −0.0231 | −0.0272 |
| (log) | (0.0469) | (0.0447) | (0.0342) | (0.0261) | (0.0336) | (0.0274) |
| Linear model dummy | 0.1862 | 0.2021 | 0.3320 | 0.3340 | 0.3035 | 0.3004 |
| (linear = 1) | (0.1180) | (0.1175) | (0.1579)* | (0.1544)* | (0.1225)* | (0.1192)* |
| Country dummy | 0.2236 | 0.2708 | 0.3389 | 0.3357 | 0.2797 | 0.2807 |
| (Canada = 1) | (0.1354) | (0.1600) | (0.0834)* | (0.0805)* | (0.0939)* | (0.0919)* |
| Census data dummy | | 0.0502 | | | | |
| (census = 1) | — | (0.1406) | — | — | — | — |
| Year dummy | | 0.0553 | | | | |
| (1967–70 = 1) | — | (0.1653) | — | — | — | — |
| $R$-sq | 0.309 | 0.322 | 0.774 | 0.773 | 0.234 | 0.233 |
| $F$-test ($p$ value) | 0.083 | 0.196 | 0.002 | 0.001 | 0.023 | 0.010 |
| RESET test (p) | 0.322 | 0.470 | 0.129 | 0.202 | 0.088 | 0.062 |
| White test (p) | 0.171 | 0.123 | 0.500 | 0.420 | 0.509 | 0.397 |
| J–B test (p) | 0.041 | 0.042 | 0.141 | 0.146 | 0.530 | 0.502 |
| Weights used | White se | White se | inv. var. | inv. var. | inv. se | inv. se |
| Sample size | 31 | 31 | 29 | 29 | 29 | 29 |
| Mean dep. var. | 0.739 | 0.739 | 0.568 | 0.568 | 0.632 | 0.632 |
| (sd) | (0.303) | (0.303) | (0.370) | (0.370) | (0.223) | (0.223) |

*Notes*: Dependent variable is the absolute value of the noise depreciation index (NDI) from Table 1. Asterisks indicate that the $t$-statistic > 2.0. Sample size = 31 omits two studies without a mean property value estimate and sample size = 29 omits additionally two studies without a standard error estimate. $F$-statistic for the test of joint significance of all regressors; the null hypothesis is jointly insignificant. RESET test for specification error bias; the null hypothesis is no bias. White's test statistic for heteroscedastic residuals; the null hypothesis is no heteroscedasticity. Jacques Bera (J–B) test statistic for normally distributed residuals; the null hypothesis is normality.

for linear models and Canada are not affected. Regressions (5) and (6) show the results using inverse standard error weights. Although a strong case can be made for this weighting scheme (Saxonhouse, 1976), the overall results are somewhat poorer as judged by the $F$-test and RESET test. The constants in regressions (5) and (6) are 0.65 and 0.67, respectively.

The main result in Table 2 is a significant and positive constant term that lies between 0.51 and 0.67. Using regression (4), the 95 per cent

confidence interval for the constant term is 0.28 to 0.79, which includes 22 of the 33 estimates in Table 1. Three of the estimates that lie outside this range are based on a linear functional form, including Los Angeles and New York City, and four of the outliers involve Canadian airports. The NDIs from linear models required an estimate of the effect size based on the mean property value. The NDI estimates for Canada may reflect special or unique features of Canadian real estate markets, climate, or operating conditions (curfews, frequency). The other outliers are two estimates for Washington, DC; one estimate for Rochester; and one estimate for Dallas. Hence, there are the only four estimates for three airports that are not explained by the meta-regression model. Using the constant terms in regressions (4) and (6), the effect of airport noise on US property values is 0.51 and 0.67 per cent per dB, respectively, which compare favourably to the weighted-mean of 0.58 per cent per dB in Table 1.

## 5. Conclusions

The results in the present study are consistent with an earlier contribution by the author (Nelson, 1980), which concluded that the noise discount was about 0.50 to 0.60 per cent per dB. The present study expands the sample of estimates from 18 to 33, including a doubling of the number of estimates for US airports. Although a number of estimates in Table 1 employ data for the 1970s, there does not seem to a measurable effect of time on the NDIs. Hence, a given property located at 55 dB would sell for about 10 to 12 per cent less if it was located at 75 dB, all other things held constant. Stated differently, under these same circumstances, a $200,000 house would sell for $20,000 to $24,000 less, which yields a hedonic price of $1000 to $1200 per dB. The noise discount in Canada appears to be greater, 0.80 to 0.90 per cent per dB, and may reflect differences in legal rules as well as other economic differences.

It remains to be seen whether the results in this paper are robust in the face of other analytical methods, such as GIS studies, contingent valuation methods, and new hedonic studies that consider spatial autocorrelation of housing prices (Salvi, 2003). Further, empirical estimation of structural demand models has not been applied to noise avoidance, although additional progress has been made on the theoretical front (Sheppard, 1999). Lastly, caution should be exercised in applying the estimates in this paper to residential areas near airports that are affected by noise in excess

se 1:01-cv-00201-VJW Document 219-4 Filed 10/05/2006 Page 22 of


of 75 dB. Survey studies by Feitelson *et al.* (1996) and Frankel (1991) suggests that the noise discount per dB could be substantially higher where the level of noise exposure makes land virtually unsuitable for any residential use.

## Appendix A
## Hedonic Studies Included in Table 1

Biggs, A. J. G. (1990): *The Impact of Airport Noise: A Case Study of Vancouver International Airport*, Unpublished M.S. thesis, University of British Columbia.

Booz-Allen and Hamilton, Inc. (1994): *The Effects of Airport Noise on Housing Values: A Summary Report*, PB95–212627, BAH and Federal Aviation Administration, Washington, DC.

Blaylock, J. E. (1977): *Airport Noise and Housing Values: An Investigation into the Hedonic Theory of Housing and the Value of Quiet*, Unpublished Ph.D. dissertation, Texas A&M University.

DeVany, A. S. (1976): "An Economic Model of Airport Noise Pollution in an Urban Environment," in *Theory and Measurement of Economic Externalities,* S.A.Y. Lin, ed., Academic Press: New York, 205–14.

Dygert, P. K. (1973): *Estimation of the Cost of Aircraft Noise to Residential Activities*, Unpublished Ph.D. dissertation, University of Michigan.

Emerson, F. C. (1969): *The Determinates of Residential Value with Special Reference to the Effects of Aircraft Nuisance and Other Environmental Features*, Unpublished Ph.D. dissertation, University of Minnesota.

Emerson, F. C. (1972): "Valuation of Residential Amenities: An Econometric Approach," *Appraisal Journal*, 40, 268–78.

Espey, M. and H. Lopez (2000): "The Impact of Airport Noise and Proximity on Residential Property Values," *Growth and Change*, 31, 408–19.

Fromme, W. R. (1978): *Conceptual Framework for Trade-Off Analysis of Multiple Airport Operations: Case Study of the Metropolitan Washington Airports*, Unpublished Ph.D. dissertation, University of Maryland.

Kaufman, H. F. (1996): *No Plane, Big Gain: Airport Noise and Residential Property Values in the Reno-Sparks Area*, Unpublished M.S. thesis, University of Nevada, Reno.

Levesque, T. J. (1994): "Modelling the Effects of Airport Noise on Residential Housing Markets: A Case Study of Winnipeg International Airport," *Journal of Transport Economics and Policy,* 28, 199–210.

Mark, J. H. (1980): "A Preference Approach to Measuring the Impact of Environmental Externalities," *Land Economics*, 56, 103–16.

Maser, S. M., W. H. Riker, and R. N. Rosett (1977): "The Effects of Zoning and Externalities on the Price of Land: An Empirical Analysis of Monroe County, New York," *Journal of Law and Economics*, 20, 111–32.

McMillan, M. L. (1979): "Estimates of Households' Preferences for Environmental Quality and Other Housing Characteristics from a System of Demand Equations," *Scandinavian Journal of Economics*, 81, 174–87.

McMillan, M. L., *et al.* (1980): "An Extension of the Hedonic Approach for Estimating the Value of Quiet," *Land Economics*, 56, 315–28.

Mieszkowski, P. and A. M. Saper (1978): "An Estimate of the Effects of Airport Noise on Property Values," *Journal of Urban Economics*, 3, 425–40.

Myles, C. L. (1997): *Sound Effects: Measuring the Impact of Aircraft Noise on Residential Property Values Around McCarran International Airport*, Unpublished M.A. thesis, University of Nevada, Las Vegas.

National Academy of Sciences (1977): *Noise Abatement: Policy Alternatives for Transportation*, NAS, Washington, D.C.

Nelson, J. P. (1978): *Economic Analysis of Transportation Noise Abatement*, Ballinger, Cambridge, MA.

Nelson, J. P. (1979): "Airport Noise, Location Rent, and the Market for Residential Amenities," *Journal of Environmental Economics and Management*, 6, 320–31.

Nelson, J. P. (1980): "Airports and Property Values: A Survey of Recent Evidence," *Journal of Transport Economics and Policy*, 14, 37–52.

Nelson, J. P. (1981): "Measuring Benefits of Environmental Improvements: Aircraft Noise and Hedonic Prices," In *Advances in Applied Microeconomics*, V.K. Smith, ed., JAI Press, Greenwich, CN, 51–75.

O'Byrne, P. H., J. P. Nelson, and J. J. Seneca (1985): "Housing Values, Census Estimates, Disequilibrium and the Environmental Cost of Airport Noise: A Case Study of Atlanta," *Journal of Environmental Economics and Management*, 12, 169–78.

Price, I. (1974): *The Social Cost of Airport Noise as Measured by Rental Changes: The Case of Logan Airport*, Unpublished Ph.D. dissertation, Boston University.

Quinlan, D. A. (1970): *Property Devaluation due to Jet Aircraft Densities*, Unpublished M.S. thesis, University of Rochester.

Tarassoff, P. S. (1993): *A Hedonic Model of the Impact of Localized Aircraft Noise on Housing Values*, Unpublished M.S. thesis, McGill University.

Uyeno, D., S. W. Hamilton, and A. J. G. Biggs (1993): "Density of Land Use and the Impact of Airport Noise," *Journal of Transport Economics and Policy*, 27, 3–18.

# Appendix B
# Hedonic Studies Excluded from the Meta-Analysis

Al-Khabbaz, A. A. (1987): *Modeling Aviation Facilities Impact on Residential Property Values*, Unpublished Ph.D. dissertation, University of Arizona. {Only distance measures used to obtain noise impacts.}

Clark, D. E. and W. E. Herrin (2000): "The Impact of Public School Attributes on Home Sale Prices in California," *Growth and Change*, 31, 385–407. {Only distance measures used to obtain noise impacts.}

Cockerill, L. W. (2000): *Airport Proximity and Single-Family Home Price in Southern California: A Hedonic Housing Value Approach*, Unpublished M.A. thesis, California State University, Fullerton. {Only distance measures used to obtain noise impacts.}

Crowley, R. W. (1973): "A Case Study of the Effects of an Airport on Land Values," *Journal of Transport Economics and Policy*, 6, 144–52. {Could not compute an NDI.}

se 1:01-cv-00201-VJW Document 219-4 Filed 10/05/2006 Page 24 of


De Araujo, L. A. (1986): *The Impact of Airport Noise on Residential Values*, Unpublished M.S. thesis, Washington University (St. Louis). {Could not compute an NDI.}

DWG Research Associates (1990): *The Management of Airport Noise*, Transportation Development Center, Montreal. {Could not compute an NDI.}

Knickerbocker, N. N. (1991): *Aircraft Noise and Property Values*, Unpublished Ph.D. dissertation, University of Maryland. {A repeat sales analysis; could not compute an NDI.}

Koda, L. S. (2003): "A Comparison of Methodologies to Measure Effects of Airport Siting Decisions," Unpublished paper, Texas A&M University. {Case study of an airport closure; could not compute an NDI.}

Lane, T. (1998): "The Impact of Airport Operations on Land Values: A Case Study of Seattle Tacoma International Airport," Paper presented at the 32nd Annual Pacific Northwest Regional Economic Conference, Olympia, WA. {Only distance measures used to obtain noise impacts.}

Li, M. M. and H. J. Brown (1980): "Micro-Neighborhood Externalities and Hedonic Housing Prices," *Land Economics*, 56, 125–41. {Noise estimates are apparently due to traffic and general noise.}

McClure, P. T. (1969): *Some Projected Effects of Jet Noise on Residential Property Near Los Angeles International Airport by 1970*, P-4083, RAND Corp., Santa Monica, CA. {Could not compute an NDI.}

McDougall, G. S. (1976): "An Inquiry into the Demand for Aircraft Noise Abatement," *Review of Regional Studies*, 6, 59–69. {Could not compute an NDI.}

Paik, I. K. (1972): *Measurement of Environmental Externality in Particular Reference to Noise*, Unpublished Ph.D. dissertation, Georgetown University. {Uses census data for 1960.}

West, R. J. (1988): "Statistical Inference: An Avigation Easement Analysis," *Real Estate Issues*, 13, 35–39. {Could not compute an NDI.}

# References

Bartik, T. J. and V. K. Smith (1987): "Urban Amenities and Public Policy," In *Handbook of Regional and Urban Economics*, E.S. Mills, ed., Elsevier: Amsterdam, 1207–54.

Bateman, I. J., *et al.* (2002): "Applying Geographical Information Systems (GIS) to Environmental and Resource Economics," *Environmental and Resource Economics*, 22, 219–69.

Bishop, D. E. (1966): "Judgements of the Relative and Absolute Acceptability of Aircraft Noise," *Journal of the Acoustical Society of America*, 40, 108–22.

Boyle, M. A. and K. A. Kiel (2001): "A Survey of House Price Hedonic Studies of the Impact of Environmental Externalities," *Journal of Real Estate Literature,* 9, 117–44.

Brookshire, D. S. and H. R. Neill (1992): "Benefit Transfers: Conceptual and Empirical Issues," *Water Resources Research*, 28, 651–55.

Button, K. and P. Nijkamp (1997): "Environmental Policy Assessment and the Usefulness of Meta-Analysis," *Socio-Economic Planning Sciences*, 31, 231–40.

Dalhuisen, J. M., *et al.* (2003): "Price and Income Elasticities of Residential Water Demand: A Meta-Analysis," *Land Economics*, 79, 292–308.

De Araujo, L. A. (1986): *The Impact of Airport Noise on Residential Values*, Unpublished M.S. thesis, Washington University (St. Louis).

DeVany, A. S. (1976): "An Economic Model of Airport Noise Pollution in an Urban Environment," In *Theory and Measurement of Economic Externalities*, S.A.Y. Lin, ed., Academic Press: New York, 205–14.

Desvousges, W. H., F. R. Johnson, and H. S. Banzhaf (1998): *Environmental Policy Analysis with Limited Information: Principles and Applications of the Transfer Method*, Elgar: Cheltenham, UK.

Espey, M., *et al.* (1997): "Price Elasticity of Residential Demand for Water: A Meta-Analysis," *Water Resources Research*, 33, 1369–74.

Feitelson, E. I, R. E. Hurd, and R. R. Mudge (1996): "The Impact of Airport Noise on Willingness to Pay for Residences," *Transportation Research*, 1D, 1–14.

Finegold, L. S, C. S. Harris, and H. E. von Gierke (1994): "Community Annoyance and Sleep Disturbance: Updated Criteria for Assessing the Impacts of General Transportation Noise on People," *Noise Control Engineering Journal*, 42, 25–30.

Follain, J. R. and E. Jimenez (1985): "Estimating the Demand for Housing Characteristics: A Survey and Critique," *Regional Science and Urban Economics*, 15, 77–107.

Frankel, M. (1991): "Aircraft Noise and Residential Property Values: Results of a Survey Study," *Appraisal Journal*, 59, 96–110.

Freeman, A. M (2003): *The Measurement of Environmental and Resource Values: Theory and Methods*, 2nd ed., Resources for the Future: Washington, D.C.

Fromme, W. R. (1978): *Conceptual Framework for Trade-Off Analysis of Multiple Airport Operations: Case Study of the Metropolitan Washington Airports*, Unpublished Ph.D. dissertation, University of Maryland.

Greene, D. L., D. W. Jones, and M. A. Delucchi (1997): *The Full Costs and Benefits of Transportation*, Springer-Verlag:Berlin.

Hedges, L. V. (1992): "Meta-Analysis," *Journal of Educational Statistics*, 17, 279–96.

Hedges, L. V. and I. Olkin (1985): *Statistical Methods for Meta-Analysis*, Academic Press: New York.

Hoyt, W. H. and S. S. Rosenthal (1997): "Household Location and Tiebout: Do Families Sort According to Preferences for Locational Amenities?" *Journal of Urban Economics*, 42, 159–78.

Johnson, K. and K. Button (1997): "Benefit Transfers: Are They a Satisfactory Input to Benefit Cost Analysis? An Airport Noise Nuisance Study," *Transportation Research*, 2D, 223–31.

Lake, I. R., *et al.* (2000): "Improving Land Compensation Procedures via GIS and Hedonic Pricing," *Environment and Planning*, 18C, 681–96.

Levinson, D. M., *et al.* (1998): "The Social Costs of Intercity Transportation: A Review and Comparison of Air and Highway," *Transport Reviews*, 18, 215–40.

Li, M. M. and H. J. Brown (1980): "Micro-Neighborhood Externalities and Hedonic Housing Prices," *Land Economics*, 56, 125–41.

Lipsey, M. W. and D. B. Wilson (2001): *Practical Meta-Analysis*, Sage: Thousand Oaks, CA.

Morrison, S. A., C. Winston, and T. Watson (1999): "Fundamental Flaws of Social Regulation: The Case of Aircraft Noise," *Journal of Law and Economics*, 42, 723–43.

National Academy of Sciences (2002): *For Greener Skies: Reducing Environmental Impacts of Aviation*, National Academy Press, NAS, Washington, D.C.

Case 1:01-cv-00201-VJW Document 219-4 Filed 10/05/2006 Page 26 of



Navrud, S. (2002): *The State-of-the-Art on Economic Valuation of Noise*, Final Report to the European Commission, Agricultural University of Norway. http://europa.eu.int/comm/environment/noise.

Nelson, J. P. (1978): *Economic Analysis of Transportation Noise Abatement*, Ballinger, Cambridge: MA.

Nelson, J. P. (1979): "Airport Noise, Location Rent, and the Market for Residential Amenities," *Journal of Environmental Economics and Management*, 6, 320–31.

Nelson, J. P. (1980): "Airports and Property Values: A Survey of Recent Evidence," *Journal of Transport Economics and Policy*, 14, 37–52.

Paik, I. K. (1972): *Measurement of Environmental Externality in Particular Reference to Noise*, Unpublished Ph.D. dissertation, Georgetown University.

Palmquist, R. B. (1992a): "Valuing Localized Externalities," *Journal of Urban Economics*, 31, 59–68.

Palmquist, R. B. (1992b): "Hedonic Methods," In *Measuring the Demand for Environmental Improvements*, J. B. Braden and C. D. Kolstad, eds., North-Holland: Amsterdam, 77–120.

Palmquist, R. B. and V. K. Smith (2002): "The Use of Hedonic Property Value Techniques for Policy and Litigation," In *The International Yearbook of Environmental and Resource Economics 2002/2003*, T. Tietenberg and H. Folmer, eds., Elgar: Cheltenham, UK, 115–64.

Rosenberger, G. R. and J. B. Loomis (2001): *Benefit Transfer of Outdoor Recreation Use Values*, U.S. Forest Service, Washington, DC.

Salvi, M. (2003): "Spatial Estimation of the Impact of Airport Noise on Residential Housing Prices," Unpublished paper, Zurich Cantonal Bank, Real Estate Unit, Zurich, SZ.

Saxonhouse, G. (1976): "Estimated Parameters as Dependent Variables," *American Economic Review*, 66, 178–83.

Schipper, Y., P. Nijkamp, and P. Rietveld (1998): "Why Do Aircraft Noise Estimates Differ? A Meta-Analysis," *Journal of Air Transport Management*, 4, 117–24.

Sheppard, S. (1999): "Hedonic Analysis of Housing Markets," In *Handbook of Regional and Urban Economics*, vol. 3, E. S. Mills and P. Cheshire, eds., North-Holland: Amsterdam, 1595–1635.

Smith, V. K. and J.-C. Huang (1995): "Can Markets Value Air Quality? A Meta-Analysis of Hedonic Property Value Models," *Journal of Political Economy*, 103, 209–27.

Smith, V. K. and S. Patanayak (2002): "Is Meta-Analysis a Noah's Ark for Non-Market Valuation?" *Environmental and Resource Economics*, 22, 271–96.

Stanley, T. D. (2001): "Wheat from Chaff: Meta-Analysis as Quantitative Literature Review," *Journal of Economic Perspectives*, 15, 131–50.

Stanley, T. D. and S. B. Jarrell (1989): "Meta-Regression Analysis: A Quantitative Method of Literature Reviews," *Journal of Economic Surveys*, 3, 161–70.

Tomkins, J., *et al.* (1998): "Noise Versus Access: The Impact of an Airport in an Urban Property Market," *Urban Studies*, 35, 243–58.

US Environmental Protection Agency (1982): *Guidelines for Noise Impact Analysis*, EPA 550/9–82–105, EPA, Washington, D.C.

US Environmental Protection Agency (2000): *Guidelines for Preparing Economic Analyses*, EPA 240-R-00–003, EPA, Washington, D.C.

US Federal Aviation Administration (1985): *Aviation Noise Effects,* ADA-154319, FAA, Washington, D.C.

US Federal Aviation Administration (2000): "Aviation Noise Abatement Policy," *Federal Register,* 65, 43802–24.

US Federal Aviation Administration (2002): *FAA Report to Congress: National Plan of Integrated Airport Systems (NPIAS), 2001–2005*, FAA, Washington, D.C.

US Federal Interagency Committee on Noise (1992a): *Federal Agency Review of Selected Airport Noise Analysis Issues, Volume I, Policy Report*, FICON, Washington, D.C.

US Federal Interagency Committee on Noise (1992b): *Federal Agency Review of Selected Airport Noise Analysis Issues, Volume II, Technical Report*, FICON, Washington, D.C.

US Federal Interagency Committee on Urban Noise (1980): *Guidelines for Considering Noise in Land Use Planning and Control*, PB81–214124, FICUN, Washington, D.C.

US General Accounting Office (2000a): *Aviation and the Environment: Airport Operations and Future Growth Present Environmental Challenges*, GAO/RCED-00–153, GAO, Washington, D.C.

US General Accounting Office (2000b): *Aviation and the Environment: Results from a Survey of the Nation's 50 Busiest Commercial Airports*, GAO/RCED-00–222, GAO, Washington, D.C.

van den Bergh, J. C. J. M., *et al.* (1997): *Meta-Analysis in Environmental Economics*, Kluwer, Boston.

Walters, A. A. (1975): *Noise and Prices*, Oxford University Press: London.

Waters, W. G. (1996): "Values of Travel Time Savings in Road Transport Project Evaluation," In *World Transport Research*, Vol. 3, D. Hensher, J. King, and T. Oum, eds., Pergamon: Oxford, 213–23.

00001

IN THE:

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, *
et al., *
Plaintiffs, *
*
vs. * No. 01-201L
*
THE UNITED STATES OF AMERICA, *
Defendant. *
* * * * * * * * * * * * * * * * *

The deposition of JON P. NELSON was taken on Wednesday, December 21, 2005, commencing at 9:30 a.m., at Quinn Gordon & Wolf, 102 West Pennsylvania Avenue, Suite 402, Towson, Maryland, before Alfred A. Betz, Court Reporter and Notary Public.

* * * * * * * * * * * * * * * * *

Reported by:
Alfred A. Betz, Certified LiveNote Reporter

00003

Whereupon --

JON P. NELSON,

a witness, called for examination, having been first duly sworn, was examined and testified as follows:

EXAMINATION BY MR. BRYANT:

Q. Good morning, Dr. Nelson. My name is Steve Bryant from the Department of Justice and I'm representing the defendant in this case. If you could please first state your name and address, full name and address?

A. My name is Jon middle initial P Nelson. First name is spelled J-O-N. I live at 642 Glenn Road, State College, Pennsylvania.

Q. I assume you've been deposed before; is that correct?

A. Yes.

Q. So I don't need to go through the sort of general instructions on depositions and that kind of thing?

A. I leave that up to you.

00004

Q. Okay. I think we're comfortable with it. If at any time you don't understand a question or you need a break or something of that nature just say the word. We can certainly accommodate that. First I'd like to turn to your CV that you submitted with your report on September 26, I believe the date was, of this year. Is that CV updated? Has anything happened since you submitted that with your report?

A. I don't believe so. I may have attended a conference that's not on there but I believe it's up to date.

Q. Okay. And it says here that you're a professor emeritus of economics at Penn State University starting July of '04. What is the status of professor emeritus? What does that mean exactly?

A. That means I'm retired from the university. I retain an academic title. I have access to the campus library, computer, that sort of material.

00005

Q. Okay. And how long were you a professor at Penn State?

A. 35 years. I started in August of 1969.

Q. And if you could just sort of go through what you did there, the positions that you held, the areas that you taught and actually how you -- sort of go through the progress of the positions that you held at Penn State.

A. Well, my initial appointment was at the instructor level. I hadn't completed my dissertation. It took me another six months to do that. So I then attained the rank of assistant professor. I was promoted to associate level in I believe 1975 and full professor in I believe it was 1978. My major teaching duties were in the areas of industrial organization, microeconomic theory, environmental economics. I taught a variety of other courses both at the graduate and undergraduate level. Antitrust economics and regulation, an honors course, a course in policy analysis, various things like that. The major

00006

focus of my research was regulation of business in a variety of contexts, antitrust and regulation, environmental controls, a little bit on taxation. So I would say the general thrust of my work was applied, empirical and focused on regulation of business.

Q. Okay. What is the title Faculty Marshal? What is that?

A. Oh! I was selected by a student who was the top student in the college that year to accompany him at graduation. So he was the top, he was selected as the top student in the college, I was one of his faculty, I was an instructor of his and he picked me to accompany him at graduation.

Q. Was that sort of a personal thing as well as, was there anything sort of associated with -- I mean, is there anything other than as a faculty marshal having to do with dealing with the faculty, or appointing positions or anything of that nature or is it just with him selecting you as an honor to join him at his graduation?

A. It was just that.
Q. Okay.
A. He was a straight A student going on to Harvard Law. He picked me as a result of being in my class.
Q. Okay.
A. I left out that I was also a Director of Graduate Studies in my department so I did that position from 1986 to I believe 1993.
Q. And what does that entail?
A. That means that I do the recruitment of graduate students, I sometimes bring them to campus for interviews, I make appointments for graduate students as teaching assistants. I would be the person who would organize the comprehensive exams and pick faculty to administer the exams. So it would be all the kind of administrative duties that go along with the graduate program. I would have a secretary that I work with and appoint various other committees for things like admissions and honors, awards and so forth.

00008

Q. You mentioned your dissertation. What was your dissertation in?

A. My dissertation? My dissertation was on the steel industry.

Q. And what specifically about the steel industry?

A. I was interested in issues primarily of investment and location and I would say technological change in the industry.

Q. And your undergraduate degree was in economics at the University of Wisconsin?

A. That's correct.

Q. Did you also obtain a masters at any point?

A. Yes. At Wisconsin once you pass comprehensive exams they awarded you a masters degree. So it wasn't anything more than that.

Q. Okay. Turning to your other experience that you have listed on your CV it says Pennsylvania Office of the Attorney General from 1985 to 2005. Are you still serving with them

00009

or --

A. I have been working on a case for them. I haven't heard anything from them about it in the last several months but I have an issue I'm working on for them right now, yes.

Q. Have you worked with them on several cases or just --

A. Yes. They've all been -- well, I shouldn't say all. I guess most of them have been antitrust cases, price fixing cases, merger cases, resale price maintenance case, that kind of case.

Q. What is the current case you're working on?

A. Current case I'm working on concerns the Harrisburg airport. The airport authority wants to condemn some property that's currently being used for a private parking lot so that the airport authority would be the only provider of parking within the immediate vicinity of the airport.

Q. What is your role in that case?

A. Typically they retain me to define the

00010

market area and to determine any damages associated with the action.

Q. Is that a direct condemnation case? Do you know what that means when I say that?

A. I'm not sure I'm using the correct legal language in this case, exactly what the airport authority wants to do in this case.

Q. And your role is evaluating the -- what exactly are you doing in terms of evaluating damages? What do you mean by that?

A. I've proposed to them that we do a survey. Whether or not they'll go through with it depends upon how the airport authority reacts to the Complaint that the Attorney General's Office has filed. But they have had me look at what's the market area, the relevant market for this, for airport parking in Harrisburg. I have proposed that we conduct a survey, the formal title would be a cojoint analysis, C-O-J-O-I-N-T would be the spelling for cojoint, as a way of determining whether, how individuals make their decisions with

00011

regard to their use of parking their airports.

Q. What kind of survey would this be?

A. It would be a survey of individuals who park at various airports -- what I proposed, I don't know if they'll do this, what I proposed is that we would survey individuals parking at several airports in Pennsylvania, since the airport authority in Harrisburg is not likely to allow the Attorney General's Office to do it on their property. So we would interview individuals at several airports who would use either short term or long term parking. The issue at Harrisburg is largely one of long term parking.

Q. So this is an issue of it's currently a private parking lot and the Pennsylvania airport or Harrisburg Airport Authority wants to convert it into a public parking lot for the purposes of owned by the --

A. No. They want to get rid of the parking and have the parking only be their short term and long term parking on airport property.

00012

Q. What do they want to do with that property? Do you know?

A. I don't know.

Q. That case has nothing to do with jet noise or anything of that nature, I assume?

A. No. It has no environmental aspect that I'm aware of currently.

Q. Okay. You did three research grants for the Department of Transportation; is that right?

A. That's correct.

Q. And can you tell me about a quick synopsis of each of those?

A. Okay. Sometime in 1972 a colleague of mine was contacted by a person in the Department of Transportation and we were asked to survey the literature on aircraft noise impacts and to think about the issue of how you would evaluate aircraft noise impacts.

Q. Impacts on residential property values or something in addition to that?

A. As I recall, the focus was by and large

00013

residential property values. And so there wasn't
very much literature at that time. There was a
little bit of literature on an airport in England,
Roskil Commission, I think it was, and the
airports. I don't believe it was called Roskil.
And so we did a report for them, presented it to an
office in DOT, did an oral presentation and
submitted a written report giving our overview and
evaluation of the literature at that point in time.
So this would have been the very early 1970s, '72,
'73, the report was submitted sometime in '73.
Q. And the literature that you reviewed were
those hedonic studies or something else?
A. I didn't look at that report in preparing
for this deposition so I don't recall how many of
them were hedonic studies and how many of them
might have been other kinds of studies. I just
don't recall the exact studies we examined.
Q. But you do recall that some of them were
hedonic studies that you evaluated at the time?
A. Yes. I certainly recall that a study by

example of a question where they would be tied
together and you would have expertise in answering
that question?

MR. QUINN: Objection.

Q. You can answer the question.

A. All right. I could imagine a question
asking about the effects of aircraft noise and so
I've, I have professional expertise in examining
the effects of aircraft noise that would involve
again the use of those measures.

Q. When you say the effects of the noise
what type of effects are you talking about?

A. Property value effects.

Q. Property values. Are you talking about
also effects on humans, sort of sensitivity to
noise and that kind of thing?

A. I have not done original studies in that
area. I have used and have read various literature
on the effects of aircraft noise so that I have to
have some background knowledge of what noise, how
noise is measured, what people in acoustics do in

examining people's annoyance due to noise. I think that kind of background knowledge is necessary for many economic studies. In examining the steel industry I had to read a lot of literature, a lot of engineering literature on the steel industry. I had to have access to a book called The Making, Shaping and Treating of Steel. And so when I do an economic study I do not confine myself solely to the economics literature.

Q. So would you consider yourself an expert in the effect of noise on people?

A. No. I'm not an expert in that. What I've stated is that I have to have background knowledge of the literature in that area. I certainly do not do original studies of that issue.

Q. Now I'd like to turn to some experience you've had in litigation. You have been involved with Mr. Quinn in another case; is that right?

A. That's correct.

Q. How many cases have you been contracted by this law office?

00024

A. Just the one other case.

Q. What was that case about?

A. It was a case involving the pricing and sale of automobiles. New automobiles.

Q. And can you tell me a little more about that?

A. Yes. The auto dealership in question would include on the sales, the window sticker of the automobile would include, I'm going to use the term protection package but I don't recall if that is exactly the title that was used by the dealership, that would lead the individual to believe that this was a part of the invoice, the manufacturer's suggested retail price, the MSRP would lead the individual to believe that this was a part of the MSRP rather than a dealer add-on. And so the case was to bring this issue as a legal matter so that individuals could recover damages for overcharges.

Q. Did you testify at trial in that case?

A. No, I didn't. My work was limited to

00047

report examine the effect of the addition of aircraft and/or military personnel on property values around a military air station?

A. No. All of the studies are concerned with civilian airports.

Q. Civilian airports, as you said. Are you aware of any published or unpublished studies that examine the effect of the addition of aircraft and/or military personnel on property values around a military air station?

A. The only studies I can recall are the ones we've been discussing, Fidel's study of two air bases and the, I again have looked at the web site and may have a paper dealing with the --

Q. El Toro?

A. -- El Toro airport.

Q. Okay. What have you been asked to do in connection with this litigation?

A. I was asked back in 2000 to examine the effects on property values of the realignment of F/A18 C/D aircraft to Oceana and Fentress. I was

00048

not asked to do an original study of the issue. Rather, I was asked to give my professional judgment as to, based on analysis, as to what would be the impact on property values from this realignment. I did not do an original study in my first report in 2001. I relied on my earlier survey of the literature. And also examined, as one should, what were the special features that might distinguish Oceana and Virginia Beach from the set of studies that I looked at at that time.

In my second report of September 2005 I then added the additional information from my meta analysis which had been contained in my rebuttal back in 2002 and used that as the basis for my evaluation.

Q. You said you didn't do an original study. I take that to mean that you didn't do a hedonic study of the community surrounding the naval air stations Oceana and Chesapeake; is that what you're saying?

A. That's correct.

00049

Q. Do you think it is better to have more reliable, I should say, to have studied the empirical data at Virginia Beach as opposed to relying on your meta analysis that's contained in your article and your reports in this case?

MR. QUINN: Objection. Better for what?

Q. I said more reliable for the impact on property values surrounding Oceana.

A. I could see doing a study of Virginia Beach using hedonic methodology that would contain information about what's special or unique in terms of the Virginia Beach environment and Oceana and Fentress as naval air bases. However, in both cases we're talking about residential properties and I have in front of me 20 studies all of which find negative impacts of noise. And so the kind of study I've conducted is sometimes referred to as a benefits transfer.

Housing is somewhat unique in that it's traded infrequently. And so one can use external information to try to evaluate the impacts rather

00050

than relying solely on a study which might contain incomplete information, it might contain information that changes over time as has tended to occur in this case. It might be information which is subject to revision. So I can see that there is value in both kinds of studies, both those that examine the, quote, impact area directly and those that provide information about other areas subject to a similar set of forces.

Q. I'll go back to my question. Which would be more reliable in your opinion, a hedonic study of Virginia Beach to estimate the noise depreciation index as you have done in other locations, or relying on your meta analysis of the various studies that you just mentioned?

MR. QUINN: Objection. Asked and answered.

Q. You can answer the question. Which do you believe is more reliable?

A. Reliable is a broad term. Someone in econometrics might use it differently than you are

perhaps using it. I have already stated that I believe there are flaws in the methodology used by Dr. Fidel and so if it was Dr. Fidel's methodology being applied in, quote, a hedonic study I do not think that would be reliable as compared to the studies that have been done previous on other residential environments. We're again talking about a residential environment and that's the basic impact area. So it would depend upon in part on how that study was conducted.

Q. I'm talking about not a study that would be done by Dr. Fidel or anybody else for that matter. I mean a hedonic study, a hedonic model that you would design yourself which would you view as more reliable, that hedonic study or your meta analysis estimated noise depreciation index? That's the question I'm asking.

A. If I had access to adequate data on both properties and noise I could do a study that I think would follow the same methodology I have laid out in previous papers and would rely more heavily

on that analysis than on a pure meta analysis. The meta analysis, however, is now the way in which the literature has been tending in terms of summarizing information about empirical results and so it's not information which is separate and apart from the hedonic study I might conduct.

Q. So you're saying, then, that you would view a hedonic study that you modeled and performed with data that you could obtain from Virginia Beach to be more reliable the noise depreciation index you would estimate from that study as opposed to your meta analysis; is that correct?

MR. QUINN: Objection. Asked and answered, and that's a mischaracterization of the answer.

Q. Is that correct or no?

A. Well, I would conduct a study using the same methodology that I have carried out. But I'll point out in responding to your question that there's 20 studies on the page in front of me.

Q. You did --

00053

A. All of them --

MR. QUINN: Please don't interrupt.

A. -- showing a negative impact. So I would think that a study done for Virginia Beach would come up with the same basic conclusion. There's a negative effect of noise on residential property values.

Q. Okay. So you think the meta analysis is equally reliable as an actual hedonic study of Virginia Beach itself; is that what you're saying?

A. I don't know the precise meaning of "equal."

Q. If you had to choose between two noise depreciation indexes, one that you obtained estimated from a study of the data from Virginia Beach or the noise depreciation index you would have gathered from your studies in your meta analysis, which would you select?

A. Well, this I believe is a hypothetical question because I don't believe that you're going to provide me with the data to do this study. But

00054
I would use the two sets of information together, one to guide the analysis and the other one to come up with what I believe would be a negative impact for Virginia Beach.
Q. What do you mean "guide the analysis"?
A. That I've said that there are, there is a procedure which I've tried to spell out both in my reports and in my previous publications as to how I would begin examining this issue.
Q. In other words, a methodology of creating that hedonic model for Virginia Beach; is that what you mean?
A. Yes.
Q. So the procedures for identifying such a model would coincide with what you've said in your meta analysis and some of your other hedonic studies. I understand that. But what I'm trying to find an answer to is whether you would, let's assume, for example, that the hedonic study that you produced for Virginia Beach came out with a noise appreciation index of .2 percent per dB as

00055

opposed to your -- is that possible that that could
happen?

A. Yes, it's possible that that could
happen.

Q. Is it possible that it could come back
with a .01 percent noise appreciation index
estimated?

A. It's a hypothetical question so let me
give you a hypothetical answer. It could come back
with a noise depreciation of minus 1 percent at
equally -- equally as well in terms of a
hypothetical.

Q. So my question is if you had a result
that came back with, let's say, the .2 percent NDI
would you rely on that as being the noise
appreciation index for Virginia Beach or your meta
analysis estimate of .7 percent?

A. As a hypothetical, it's a negative number
and it's from a valid hedonic study of Virginia
Beach and so I would rely on that number as a
hypothetical.

Q. I want to step back for -- well, you mentioned various potential problems with the hedonic study that could be conducted at Virginia Beach. Measurement issues, revisions of data, those kinds of things. Is it possible that one or more or all of those types of problems affect every one of the 20 studies that you cite in your meta analysis?

A. Yes. All empirical studies have problems that can be pointed out in terms of the quality of the data, the econometric procedures and other kinds of concerns. When I say something is a problem, however, it doesn't mean that it changes the results in a dramatic way. And so some of the studies that are listed in my report will look at the same airport but with somewhat different data or with different data and with somewhat different procedures and so you can examine the same airport more than once, which has been done. So one of the advantages of doing a meta analysis as a way of summarizing a body of empirical results is that

biases always can go in both directions. You can have a positive bias to a number as well as a negative bias to a number, not as though it pushes the results in only one direction. A value of minus .28 might be biased downward for various reasons. A value of minus 1.49 might be biased upward for various reasons. And so the advantage of the meta analysis is it gives you more reliable indication of the central tendency of a set of empirical results rather than relying on either judgment as to the best number or relying only on one study for the best number.

I'm sorry, I've forgotten your question.

Q. The question was you mentioned the various potential problems with the hedonic study if it were to be done at Virginia Beach. You were asked not to do one but if you were to do one you sort of laid out some problems with a study there. The question was is it possible that one or more or all of the problems you have exist in the studies that you're citing?

00058

A. As a hypothetical, yes, it's possible. Some studies are conducted more adequately than other studies. In doing the meta analysis I tried to take account of some of the problems in some studies.

Q. So is it sort of your opinion that throwing all these in together sort of in the wash together that the problems with each of them will be negated by putting them all, averaging them out; is that what you're saying?

A. Not entirely. One of the things, one of the issues in a hedonic study is what numerical values to include. And so in my meta analysis I tried to evaluate each study individually and I put a lot of weight on what the author said about his or her conclusions. So I try to start with the author's judgment about the quality of different estimates in selecting a value to include in the meta analysis.

The second thing that's done in my meta analysis is that the observations are weighted by

their standard error. And so more precise estimates are given greater weight in the summary measures as compared to less precise measurements. Both of these, especially the second one, are a more formal methodology than what you're suggesting which is that studies are included if they're available without any regard to their strengths or weaknesses as econometric studies.

Q. Is it possible that the variability you're finding in your studies, and I think it is pretty significant, the range is from .28 percent per dB all the way up to 1.49 percent, is it possible that the variability in those noise appreciation index estimates is due to real differences among the market study rather than some kind of bias that you're inferring?

A. Yes. That's possible.

Q. Several of these -- would you like a break?

A. I'm okay for another half hour.

Q. Okay.

the data they employed.

Q. Is there any reason why you didn't cite them in your report that was filed just a couple months ago?

A. Well, they are not in the meta analysis and so I relied on the meta analysis results and the meta analysis is drawn from my published article which has gone through peer review. At the time neither of these articles was published. I didn't know about them when I did the meta analysis. So I didn't then go ahead and mention them in my report. I could mention lots of studies I guess in their report but I relied on the meta analysis results.

Q. Just asking the question, not implying anything.

A. Okay. Sorry.

Q. We talked earlier about whether you recommended that a hedonic model of Virginia Beach be done, hedonic study be performed in this case, that you do it. You indicated that it wasn't

00123

required, that your piece of this part of the litigation is to show noise impact occurs associated with airports. My first question, though, is did you recommend, though, that a hedonic model, hedonic study be done for Virginia Beach?

A. I didn't recommend it. We may have discussed back in 2000 whether or not it would be a requirement that I do such a study, that being that I couldn't do anything without doing such a study and I said I thought I could rely on my published results from 1980 plus additional information on Oceana and Virginia Beach.

Q. Who are those discussions with?

A. Mr. Quinn.

Q. And tell me about those discussions, if you would. What did you, what was said between the two of you?

A. I think he asked me would it be possible to evaluate the impact of noise in lieu of doing a study of the area, of just that area, and I

they look at property values and noise exposure at one point in time or at least for a short duration of time, maybe two years. There's one exception to that which is the Reno airport study or one of the Reno airport studies.

Q. Do you know which one it is, Myles or --

A. It's the other one.

Q. Espey and Lopez. So that's a change.

A. No, they're not looking at changes, they just have, because Reno is a fairly small airport and I suppose a small residential area, they collected property value data over a longer period of time to increase their sample size.

Q. '91 to '95?

A. Yes.

Q. Okay.

A. So the other studies are what is referred to as cross-sectional studies. They more or less pick one point in time and measure the variation and noise across geographic space rather than over time.

Q. And for that study you mentioned --

A. So if I could finish.

Q. I'm sorry.

A. If I could finish my point. The change in noise is still present. It's just a change over geographic space rather than a change over time.

Q. So the Espey and Lopez Reno one where they gathered data from '91 to '95 do you know if that was, if within that '91 to '95 timeframe if there was an expansion of the airport or increase in operations or some sort of increase in the noise exposure on those properties or was it viewed as being roughly the same throughout?

A. I don't recall the exact setting in the Reno airport. There may have been some changes proposed or going on that they were concerned about. But I'd have to look back at the study to see the details.

Q. Did any of the studies you cited in your report and article analyze potential noise impacts based on a prediction of what noise would be in the

00147

future as measured by the DNL metric?

A. None of the studies that are used in my meta analysis, to the best of my recollection, are concerned with that issue. The change or variation in noise again is present is just a variation across geographic space rather than over time or an anticipated impact of one sort or another.

Q. Do all of the studies use a retrospective analysis of what noise as measured by the DNL metric was at some time in the past?

A. Well, there's probably some variation in this. Most studies are trying to match up the noise measurement as close as they can with the rest of the sample data. But they're not -- and I'm certain there's some variation on that. The noise data might be for, I don't know, the year prior to the collection of the data on property values, to cite a hypothetical case. But I would say that most studies the attempt is to match the noise measurement as close as possible to the data on the properties.

Q. Okay. So the airport's there, the houses are there, and based on that noise depreciation index is determined based on which contour you're in and exposure you're experiencing.

A. But let me, if I could correct that, the noise depreciation index applies to a range of noise outcomes, roughly 65 to 79.9 dB. It doesn't depend on which noise contour you're in. It is a value expressed per decibel of noise exposure.

Q. Okay.

A. There's probably some variation that over the studies because people have tried to do things like investigating the effects of accessibility as you're closer or further away from the airport. But the values I have recorded are not tied to a particular noise contour.

Q. And when someone buys a property at whatever one dB increment is within one of those contours they, according to your theory, would be buying it at a discount depending on whether it was 65, 70, or 75 one dB per, I guess one dB increase

00149

from -- what would be the threshold, the beginning of that, where the NDI would begin?

A. Well, I'll stick to 65 because that's the basis for the complaint and I think that the 55 to 60 is background noise levels in most areas. The upper limit that I have applied the values in these tables to, with some modification, would be 79.9 dB if I can use that fineness of measurement. For reasons I tried to indicate in my reports there's just a lack of abundant data on 80 decibels and above.

Q. So someone buys a property in this 70 contour, at 70 we'll say, so that's 5 whatever the NDI is, let's say it's one percent per dB, so they get a 5 percent discount on their house of what it would be outside of the contours or, you know, on the 55 to 60 as you said. None of these studies, is it correct to say none of these studies are measuring okay, then the airport expands over the next year, new airplanes come in and the noise exposure changes, that house that was at 70 is now

00150

75. None of your studies evaluate a previously discounted house and how it changes if there is, if the discount would be increased or anything, they just don't study that, do they?

A. The variation in noise is captured by variation cross-sectionally, that is, over space. So one's attempting to remove the time element. I think there are a lot of advantages to doing that for just the kinds of reasons you're pointing out, that there is a lot more things you'd have to control for if you were to include variation over time as well as variation cross-sectionally. Exactly the sorts of criticisms that I have found are applied to Dr. Dale-Johnson's report using a different procedure.

Q. Isn't change in noise over space as you called it also accompanied by change in neighborhood and other property characteristics while a change in noise over time can be measured in the same neighborhood for houses with the same or similar characteristics?

00201

A. The change over time is limited to I believe Dale-Johnson's study and a dissertation done at the University of Maryland by Nancy Knickerbocker who also did a repeat sales analysis although I believe she also includes some hedonic analysis as well. So I'm only aware of two studies that I can think of that have used a repeat sales analysis and I'm not certain that Knickerbocker's study includes a change in noise level. I believe it does not, which means we're only talking about Dale-Johnson's study as pursuing that methodology.

Q. Shift gears yet again. The meta analysis produced a, or you came up with a .7 percent estimated NDI.

A. Yes.

Q. And you then looked at an FAA study and then increased it to .1 percent. Is that across the board or just for Oceana?

A. That's for Oceana. Once I summarize the existing set of studies, then I'm engaged in what's called a benefits transfer analysis. So I'm

00202

attempting to tailor the value I use as the NDI to any special circumstances associated with the impact airport or in this case to Oceana. And so I discuss in my reports the special features of naval aircraft to the extent that I was aware of them and their operation and the special features of Virginia Beach and Chesapeake that I thought would be important in coming up with a final value.

In this case I am employing professional judgment. I've been working on this issue off and on as we indicated earlier since 1972. I have conducted several studies, several hedonic studies of other airports and so when I say judgment I mean a professional judgment, not a flip of the coin. I wrote out in enough detail I think exactly what was my thinking in going from .7 to .1.

Q. Now --

A. Or excuse me, not from .7 to .1 but from .7 to 1.

Q. I'm with you. That professional judgment that you're relying on does not include any studies

ADA-154319
**NTIS**
Information is our business.

# AVIATION NOISE EFFECTS

FEDERAL AVIATION ADMINISTRATION

WASHINGTON, DC

MAR 85

U.S. DEPARTMENT OF COMMERCE
National Technical Information Service



**TABLE OF CONTENTS**

Page

| | | | |
|---|---|---|---|
| Table of Contents | | | i |
| List of Figures | | | vi |
| List of Tables | | | viii |
| List of Terms | | | ix |
| **Section** | 1.0 | General Introduction | 1 |
| **Section** | 2.0 | Noise Metrics | 7 |
| | 2.1 | Introduction | 9 |
| | 2.2 | Single Event Maximum Sound Level Metrics | 9 |
| | 2.2.1 | A-Weighted Sound Level | 9 |
| | 2.2.2 | D-Weighted Sound Level | 11 |
| | 2.2.3 | Perceived Noise level (PNL) | 11 |
| | 2.2.4 | Tone Corrected Perceived Noise Level (PNLT) | 12 |
| | 2.3 | Single Event Energy Dose Metrics | 12 |
| | 2.3.1 | Effective Perceived Noise Level (EPNL) | 12 |
| | 2.3.2 | Sound Exposure Level (SEL) | 12 |
| | 2.4 | Cumulative Energy Average Metrics | 12 |
| | 2.4.1 | Equivalent Sound Level (Leq) | 13 |
| | 2.4.2 | Yearly Average Day-Night Sound Level (DNL | 13 |

| | | | |
|---|---|---|---|
| | 2.4.3 | Community Noise Equivalent level (CNEL) | 13 |
| | 2.4.4 | Noise Exposure Forecast (NEF) | 13 |
| | 2.5 | Cumulative Time Metrics | 13 |
| | 2.5.1 | 24-Hour Above (TA) | 13 |
| | 2.5.2 | Day, Evening, Night (TA) | 15 |
| | 2.6 | DNL: The Standard Cumulative Average Energy Metric | 15 |
| | 2.7 | Evaluation of the DNL Metric for Heliport/ Helistop Noise Impact Assessment | 15 |
| | 2.8 | Summary of Noise Metric Policy | 17 |
| | 2.9 | Noise Metrics Applications | 17 |
| **Section** | 3.0 | Annoyance and Aircraft Noise | 19 |
| | 3.1 | Introduction | 20 |
| | 3.2 | Perception of Noise | 20 |



| | | **PAGE** |
|---|---|---|
| 3.3 | Variables Affecting Response | 20 |
| 3.3.1 | Emotional Variables | 20 |

| | | | |
|---|---|---|---|
| | 3.3.2 | Physical Variables | 21 |
| | 3.4 | Review of Recent Research | 23 |
| | 3 5 | Conclusion | 26 |
| **Section** | 4.0 | Different Sources/Different Human Response? | 27 |
| | 4.1 | Introduction | 29 |
| | 4.2 | Schultz - Kryter Debate | 29 |
| | 4.3 | Hall's Research and Analysis | 31 |
| | 4.4 | Conclusion | 32 |
| **Section** | 5.0 | Hearing and Hearing Loss | 33 |
| | 5.1 | Introduction | 35 |
| | 5.2 | The Hearing Mechanism | 35 |
| | 5.3 | Auditory Range | 36 |
| | 5.4 | Effects of Noise on Hearing | 36 |
| | 5.4.1 | TTS | 36 |

| | | | |
|---|---|---|---|
| | 5.4.2 | NIPTS | 36 |
| | 5.5 | Damage Risk Criteria | 37 |
| | 5.6 | Review of Studies | 38 |
| | 5.6.1 | Interior Aircraft Noise | 38 |
| | 5.6.2 | Community Hearing Loss | 39 |
| | 5.7 | Current Standards on Hearing Protection | 39 |
| | 5.8 | Protection of Hearing | 41 |
| | 5.9 | Conclusion | 42 |
| **Section** | 6.0 | Speech Interference | 43 |
| | 6.1 | Introduction | 44 |
| | 6.2 | Measures of Speech Intelligibility | 44 |
| | 6.3 | Assessing Speech Intelligibility | 45 |

| | | | PAGE |
|---|---|---|---|
| | 6.4 | Speech Interference on the Ground | 47 |
| | 6.5 | Speech Interference in the Cockpit | 49 |
| **Section** | 7.0 | Sleep Interference | 51 |
| | 7.1 | Introduction | 53 |
| | 7.2 | Sleep Disturbance Response | 53 |
| | 7.3 | Recent Literature Review | 53 |
| | 7.3.1 | Arousal for Sleep | 54 |
| | 7.3.2 | Measuring Sleep Interference | 54 |
| | 7.3.3 | Adaptation and Habituation | 55 |
| | 7.4 | 1977 Literature Review | 55 |
| | 7 5 | Summary | 57 |
| **Section** | 8.0 | Non-Auditory Effects of Noise | 59 |

| | | | |
|---|---|---|---|
| | 8.1 | Introduction | 60 |
| | 8.2 | Interpretation of Rulings | 60 |
| | 8.3 | Review of Studies | 60 |
| | 8.4 | Conclusion | 61 |
| **Section** | 9.0 | Effects of Noise on Wild and Domesticated Animals | 63 |
| | 9.1 | Introduction | 65 |
| | 9.2 | Wildlife | 65 |
| | 9.2.1 | Birds | 65 |
| | 9.2.2 | Fish | 65 |
| | 9.3 | Domesticated (Farm) Animals | 66 |
| | 9.4 | Laboratory Animals | 66 |
| | 9.5 | Conclusion | 67 |
| **Section** | 10.0 | Effects of Strong Low Frequency Acoustical Energy | 69 |

10.1 Introduction 70

10.2 Structural Effects 70



Top
Return to NPC Library
Return to NPC Home Page

Page

10.3 Annoyance with Structural Vibration 70

10.4 Physiological Effects 71

10.5 Criteria for Intense Low Frequency Sound 71

10.5.1 EPA Levels Document 71

10.5.2 International Standards Organization 73

10.6 Sonic Boom 73

10.7 Conclusion 75

**Section** 11.0 Impulsive Noise 77

11.1 Introduction 78

11.2 Review of Studies 78

| | | | |
|---|---|---|---|
| | 11.2.1 | 1977 French Report | 78 |
| | 11.2.2 | 1977 U.S. Army Report | 78 |
| | 11.2.3 | 1978 NASA Report | 78 |
| | 11.2.4 | 1981 United Kingdom Paper | 78 |
| | 11.3 | Conclusion | 79 |
| **Section** | 12.0 | Time of Day Weightings for Aircraft Noise | 81 |
| | 12.1 | Historical Background | 82 |
| | 12.2 | Review of the Choice of DNL | 82 |
| | 12.3 | Study Results | 84 |
| | 12.4 | Conclusion | 85 |
| **Section** | 13.0 | Noise contours | 87 |
| | 13.1 | Introduction | 87 |
| | 13.2 | The Uses and Interpretation of Noise Contours | 89 |
| | 13.3 | Application and Interpretation of Noise Contours | 90 |

| | | | |
|---|---|---|---|
| | 13.3.1 | DNL 65 Contour | 90 |
| | 13.3.2 | DNL 75 Contour | 92 |
| **Section** | 14.0 | Airport Noise Exposure and Land Use Compatibility | 93 |
| | 14.1 | Introduction | 94 |
| | 14.2 | FAA FAR Part 150 Guidelines | 94 |



Top
Return to NPC Library
Return to NPC Home Page

Page

| | | | |
|---|---|---|---|
| | 14.3 | Federal Interagency Criteria | 95 |
| | 14.4 | U.S. Air Force AICUZ Criteria | 95 |
| | 14.5 | HUD and VA Criteria | 97 |
| | 14.6 | Conclusion | 97 |
| **Section** | 15.0 | Effects of Aircraft Noise on Real Estate Values | 99 |

15.1 Introduction 100

15.2 Research Considerations l00

15.3 Review of Research l00

15.4 Conclusion 101

Further Information 103



Top
Return to NPC Library
Return to NPC Home Page

**LIST OF FIGURES**

Page

1.1 Community Response to Aircraft Noise Near Major Airports 3

2.1 Frequency Spectrum 8

2.2 The Metric Family l0

2.3 A and D weighting Curves l0

2.4 Typical TA Data Presentation 14

3.1 Community Response to Aircraft Noise Near Major Airports 22

3.2 Community Response to Aircraft Noise --the Netherlands 22

3.3 Community Response to Aircraft Operations— London Heathrow 24

3.4 Comparison of Individual Annoyance and Community Reaction 25

3.5 Attitudes Toward Aircraft Noise 25

4.1 Summary of Annoyance Data from 11 Surveys 28

4.2 Schultz's Synthesis Curve 28

4.3 Hall's Comparison of Air, Road and Schult Synthesis Curve 30

| | | |
|---|---|---|
| 5.1 | Cross-Section of the Ear | 34 |
| 5.2 | Cross-Section of the Middle Ear | 34 |
| 5.3 | Damage Risk Criteria Curves | 38 |
| 5.4 | Attenuation by Earplugs | 41 |
| 5.5 | Attenuation by Earmuffs Combined with Earplugs | 41 |
| 6.1 | Calculated AI vs. Effective AI | 44 |
| 6.2 | Noise Criteria Curves | 45 |
| 6.3 | Permissible Distance Between a Speaker and Listeners of Voice and Ambient Level | 47 |




Top
Return to NPC Library
Return to NPC Home Page


| | | Page |
|---|---|---|
| 7.1 | Sleep Stages | 52 |

7.2 Sleep Disturbance by Noise 54

7.3 Composite of Laboratory Data for Sleep Interference 56

9.1 Dose Response of 11 Different Animal Species 64

10.1 Human Tolerance of Structural Vibration 72

10.2 Human Tolerance of Vibration Caused by Concorde 72

10.3 N-Wave Signature 73

10.4 Adverse Reactions to Sonic Booms 75

13.1 Typical Noise Contour 88

13.2 Applications of DNL 65 Contour 91

13.3 Applications of DNL 75 Contour 91

## LIST OF TABLES

Page

| | | |
|---|---|---|
| 1.1 | Comparative Noise Levels | 2 |
| 2.1 | Noise Metrics Applications | 16 |
| 5.1 | Permissible Noise Exposures | 40 |
| 5.2 | Limiting Values for Total Daily Noise Exposure | 40 |
| 6.1 | Speech Intelligibility Criteria | 46 |
| 6.2 | Recommended Noise Criteria for Offices and Workspaces | 48 |
| 10.1 | Interim Prediction of Effects of Ground Overpressure | 74 |
| 12.1 | Merits and Deficiencies of DNL | 83 |
| 14.1 | Comparison of ANSI and FAA Land Use Guidelines | 95 |
| 14.2 | FAA Land Use Compatibility Guidelines | 96 |
| 14.3 | U.S. Air Force Land Use Objectives Matrix | 98 |
| 15.1 | Damage Estimates for Property Values | 101 |

[Top](#)
[Return to NPC Library](#)
[Return to NPC Home Page](#)

## LIST OF TERMS

| | |
|---|---|
| AI | Articulation Index |
| AICUZ | Air Installation Compatible Use Zones |
| AIR | Aerospace Information Report |
| ALM | A-Weighted Maximum Sound Level |
| ANSI | American National Standards Institute |
| ARP | Aerospace Recommended Practice |
| CHABA | Committee on Hearing, Bioacoustics and Biomechanics |
| CNEL | Community Noise Equivalent Level |
| CNR | Composite Noise Rating |
| dB | Decibel |

| | |
|---|---|
| DNL | Day-Night Average Noise Level |
| DOT | Department of Transportation |
| DRC | Damage Risk Criteria |
| EPA | Environmental Protection Agency |
| EPNL | Effective Perceived Noise level |
| HUD | Housing and Urban Development |
| Hz | Hertz |
| ICAO | International Civil Aviation 0rganization |
| IEC | International Electrotechnical Commission |
| ISO | International Standards 0rganization |
| Ldn | Day-Night Average Sound Level |
| Leq | Equivalent Sound Level |
| Lx | An Airport Cumulative Metric Derived from dBA |

| | |
|---|---|
| NASA | National Aeronautics and Space Administration |
| NEF | Noise Exposure Forecast |
| NIPTS | Noise Induced Permanent Threshold Shift |
| NNI | Noise and Number Index |
| NREM | Non-Rapid Eye Movement Sleep |
| NTSB | National Transportation Safety Board |
| OSHA | Occupational Safety and Health Administration |
| PNL | Perceived Noise Level |
| PNLT | Tone Corrected Perceived Noise Level |
| PSIL | Preferred Speech Interference Level |
| REM | Rapid Eye Movement Sleep |
| SAE | Society of Automotive Engineers |
| SEL | Sound Exposure Level |
| SIL | Speech Interference Level |
| SST | Super Sonic Transport |
| TA | Time Above (a certain noise level) |
| TTS | Temporary Threshold Shift |

x

Top
Return to NPC Library
Return to NPC Home Page

Section 1.0 General Introduction

Aviation noise significantly affects several million people in the United States. In a great number of instances, aircraft noise simply merges into the urban din, a cacophony of buses, trucks, motorcycles, automobiles and construction noise. However, in locations closer to airports and aircraft flight tracks, aircraft noise becomes more of a concern. The Federal Aviation Administration (FAA) presents this report in an effort to enhance public understanding of the impact of noise on people and to answer many questions that typically arise. Information on aircraft noise indices, human response to noise, and criteria for land use controls is included. Additionally, information on hearing damage is presented, along with occupational health standards for noise exposure.

This document has been developed after reviewing the rather extensive literature in each topical area, including many original research papers, and also by taking advantage of literature searches and reviews carried out under FAA and other Federal funding over the past two decades. Efforts have been made to present the critical findings and conclusions of pertinent research, providing, when possible, a "bottom line" conclusion, criterion, or perspective to the reader concerned with aviation noise.

**How to Read This Document**

1. If you want only a general, non-technical presentation of the fundamental issues and concerns with aircraft noise, read this introduction and the one-page summaries at the beginning of each section.
2. If you are an engineer, planner, social scientist or an individual conducting an environmental impact, assessment, consider reading each section of interest in its entirety.
3. If you wish to do an in-depth study, assessment or analysis, delve into the text and the references listed. For more information, consider contacting the staff of the FAA 0ffice of Environment and Energy, Noise Abatement Division,, in Washington, D.C. 20591.

**What is Sound?**

Sound is a complex vibration transmitted through the air which, upon reaching our ears, may be perceived as beautiful, desirable, or unwanted. It is this unwanted sound which people normally refer to as noise.

Top
Return to NPC Library
Return to NPC Home Page

**TABLE 1.1**

**Comparative Noise Levels**

Typical Decibel (dBA) Values Encountered in Daily Life and Industry*

| | |
|---|---|
| Rustling leaves | 20 dBA |
| Room in a quiet dwelling at midnight | 32 |
| Soft whispers at 5 feet | 34 |
| Men's clothing department of large store | 53 |
| Window air conditioner | 55 |
| Conversational speech | 60 |
| Household department of large store | 62 |
| Busy restaurant | 65 |
| Typing pool (9 typewriters in use) | 65 |
| Vacuum cleaner in private residence (at 10 feet) | 69 |

| | |
|---|---|
| Ringing alarm clock (at 2 feet) | 80 |
| Loudly reproduced orchestral music in large room | 82 |
| Beginning of hearing damage if prolonged exposure over 85 dBA | |
| Printing press plant | 86 |
| Heavy city traffic | 92 |
| Heavy diesel-propelled vehicle (about 25 feet away) | 92 |
| Air grinder | 95 |
| Cut-off saw | 97 |
| Home lawn mower | 98 |
| Turbine condenser | 98 |
| 150 cubic foot air compressor | 100 |
| Banging of steel plate | 104 |
| Air hammer | 107 |
| Jet airliner (500 feet overhead) | 115 |

* When distances are not specified, sound levels are the value at the typical location of the machine operator.



**How Does Sound Get Around?**

Sound moves outward from its point of origin in waves just as ripples move outward from the point at which a pebble enters a pond.
Sound, just as the ripple in the pond, requires a medium in which to travel; this medium is usually air.

**What is a Decibel?**

The decibel (dB) is a shorthand way to express the amplitude of sound (the relative height of those ripples in the pond). Because the "ripples" of sound typically experienced may vary in height from 1 to 100,000 "units", it becomes rather cumbersome to maintain an intuitive feeling for what different values represent. The decibel allows people to understand sound strength using numbers ranging between 20 and 120, a more familiar and manageable set of values. Table 1.1 provides a listing Of some typical sounds and their respective sound levels (expressed in decibels) at given distances.

The decibel also relates well to the way in which people perceive sound. A 10 dB increase in a sound seems twice as loud to the listener, while a 10 dB decrease seems only half as loud. In general, changes in sound level of 3 or 4 dB are barely perceptible.

**What is Frequency or Pitch?**

Some of the ripples in the pond may be very short; these are analogous to high pitched sounds such as the voice of a soprano. Other wavelets might be very broad; these waves are analogous to a bass or baritone voice. Most sounds we hear are composed of a mixture of these different length sound waves, giving complexity, richness and character to our experience of sound.

**What is the Most Important Effect of Aviation Noise?**

Annoyance is the most prevalent effect of aircraft noise. It is important to note that while the overall, or average, community attitude about a noise level is usually what is reported, some individuals will be much more and others much less upset or annoyed with the sound in question. Figure 1.1 shows this typical response pattern. This variation in response is what makes the science of measuring "community response" a rather complicated matter.

**What are Other Principal Effects of Aircraft Noise?**

1. speech interference
2. sleep interference
3. hearing damage risk



Top
Return to NPC Library
Return to NPC Home Page

Ref 1

While hearing damage is not a common result of aircraft noise exposure, speech and sleep interferences are major concerns of neighbors close to airports.

**What are Some Less Frequently Identified Effects of Noise on Humans?**

1. physiological (cardiovascular and circulatory) problems
2. psychological problems (stemming from intense annoyance)
3. social behavioral problems

At the present time there is no conclusive evidence to link these effects with aircraft noise. As discussed in the text, these topical areas are often rife with conflicting research results and are very controversial. The summary of the non-auditory effects section (Section 8.0) provides current guidance for interpreting these reported effects.

**What Other Areas May be Affected by Aircraft Noise?**

1. real estate values
2. land use

3. wildlife
4. farm animals



Top
Return to NPC Library
Return to NPC Home Page

Years of experience in airport planning and development have resulted in guidelines which match uses of land -- like hospitals or concert halls -- with normally compatible noise levels; these guidelines are published in an FAA regulation called Federal Aviation Regulation (FAR) PART 150. Implementation of an FAR150 study will assist airport operators and neighbors in minimizing the extent of non-compatible land uses.

While the reactions of animals to noise have been studied, it is another research area plagued with widely varying results. In all but extreme cases (such as in pristine wilderness or in the case of excessive noise levels) wildlife and domesticated animals rarely display any reactions to aviation noise.

**How Do You Measure Aircraft Noise?**

sound is often measured using a sound level meter with a filter which simulates the human hearing response. This filter and the human ear give greater emphasis to sounds in the speech-important frequency bands and less emphasis to the lower and higher frequencies. This differential response in the human ear may have developed over the course of human evolution as a way to filter the sounds of wind and water which might interfere with survival-related communications such as "Here comes a Tyrannosaurus Rex--run for it!" In any event, this filter is called the A-weighting filter, and the sound measured with this filter is called the A-level (AL).

**Now I Know What AL is, but I Am Confused About "Energy Dose." What Exactly is the Sound Exposure Level (SEL)?**

When our sound level meter is measuring the AL, think of the sound falling on the microphone like rain or snow. The maximum rate of rainfall is the maximum AL. Now consider the sound level meter as a bucket or pail. After the "noise event" has passed (aircraft flyover or truck passby) the rain or snow collected in the bucket (having passed through the microphone) is the noise dose or Sound Exposure Level (SEL). Essentially, loud noise events create a large bucket (dose) of sound energy, while quieter events create smaller buckets.

**Now What Do I Do With "Buckets" of Noise (the Leq and DNL)?**

The buckets are typically collected over a 24-hour time period and are poured into a large container. The total volume collected during the 24-hour time period is averaged to formulate a value called the "Equivalent sound Level", or Leq. When the buckets collected during the nighttime hours are multiplied by 10 (because of greater potential for disturbing people) and then the volume averaged, we formulate a value called the "Average Day Night sound Level" or DNL. The Leq and DNL are values one often encounters in looking at the overall noise exposure from an airport operation.



Top

REFERENCE

1. Richards, E. S, and J. B. Ollerhead. Noise Burden Factor--New Way of Rating Airport Noise. *Sound and Vibration*, V.7, No, 12, December 1973.




Return to NPC Library
Return to NPC Home Page

SUMMARY

**INTRODUCTION**

This section describes the noise metrics utilized in conducting analyses of aircraft noise. While dozens of additional metrics exist, this section focuses on the officially designated family of indices. A working knowledge of these measures is extremely valuable in understanding the remainder of this report.

**AVIATION APPLICATIONS/ISSUES**

1. Correlation between human response and various measures of sound.
2. Selection of the best metrics for specific applications.
3. Selection of weighting factors for sound occurring at various times of day.
4. Selection of metrics which are accurate, relatively easy to measure, compute and understand.

**GUIDANCE/POLICY/EXPERIENCE**

1. The fundamental sound level metric designated as the A-Weighted Sound Level, or AL. This metric has often appeared in the literature as dBA. It is designated for measuring noise at an airport and surrounding areas by Part 150.
2. Single event dose or energy metric designated as the Sound Exposure Level or SEL.
3. Airport yearly average noise exposure measure designated as the Yearly Average Day Night Level or DNL. The DNL has often appeared in the literature as Ldn.. Required by Part 150 to measure the exposure of individuals to noise resulting from the operation of an airport.
4. Effective Perceived Noise Level or EPNL designated as the certification metric for large transport turbojet aircraft and helicopters.
5. Time functions of ALm (such as Time Above, TA and L-Values, L-10) identified as supplementary metrics for use in environmental impact analyses.
6. Octave and one-third octave spectra identified as important in specific applications such as sound proofing and speech interference studies.



Top
Return to NPC Library
Return to NPC Home Page

Top
Return to NPC Library
Return to NPC Home Page

2.1 **INTRODUCTION**

The topic of noise metrics has traditionally involved a rather confusing proliferation of units and indices. In response to the requirements of the Aviation Safety and Noise Abatement Act of 1979 (P.L 96-193), the FAA established a single system of metrics for measuring and evaluating noise for land use planning and environmental impact assessment. The FAA also has another system of metrics which it employs for certification of commercial aircraft. This section describes both systems of metrics. It also identifies other noise metrics frequently and necessarily employed in noise certification and provides detailed analysis of noise effects such as speech interference, hearing impact and sleep disturbance. Sound measures, or more academically, acoustical metrics, all consist of three basic building blocks: 1) sound pressure level, expressed in decibels, 2) frequency or pitch of the sound, and 3) time. The sound pressure levels at various frequencies (points 1 and 2 above), for a given point in time, are usually combined into a frequency spectrum (see Figure 2.1), which is somewhat analogous to the fingerprint of the sound. This spectrum, which varies with time, represents the real starting point for the metric story (see Figure 2.2). From this point of origin, the following classes of metrics have evolved:

(1) Single Event Maximum Sound Levels

(2) Single Event Energy Dose

(3) Cumulative Energy Average Metrics

(4) Cumulative Time Metrics

The paragraphs below describe and differentiate these four generic classes of acoustical metrics. An understanding of these four classes essential for an individual undertaking a comprehensive assessment of noise effects. (For mathematical formulations of each of the noise metrics, the reader is referred to **The Handbook of Noise Ratings** (Ref. 1).

2.2 **SINGLE EVENT MAXIMUM SOUND LEVEL METRICS**

The following noise metrics are generally related, each representing a maximum sound level. The applications of these metrics are diagrammed in Figure 2.2.

2.2.1 **A-Weighted Sound Level: ALm (Historically dBA), Expressed in dB**. The A-weighted Sound Level is the single event maximum sound level metric. A-weighted sound pressure level is sound pressure level which has been filtered or weighted to reduce the influence of the low and high frequency extremes. Because unweighted sound pressure level does not correlate well with human assessment of the loudness of sounds, various weighting networks are added to sound level meters to attenuate low and high frequency noise in accordance with accepted equal loudness contours. One of these weighting networks is designated "A" (shown in Figure 2.3).

Top
Return to NPC Library
Return to NPC Home Page



Top
Return to NPC Library
Return to NPC Home Page

It was originally employed for sounds less than 55 dB in level; now A-level is used for all levels of sound because it has been found to correlate well with people's subjective judgment of the loudness of sounds. Its simplicity and superiority over unweighted SPL in predicting people's responses to noise have contributed to its wide acceptance. The ALM is currently used for noise certification of small propeller-driven aircraft; also, in FAA Advisory Circular 36-3C it is used as the basis for airport access restrictions which discriminate solely on the basis of noise level.

2.2.2 **D-Weighted Sound Level: DLm (Historicall dB(D)), Expressed in dB**. D-weighted sound pressure level or D-level is sound pressure level which has been frequency-filtered to reduce the effect of the low frequency noise and to recognize the annoyance at higher frequencies. D-level is measured in decibels with a standard sound level meter with contains a "D" weighting network with the response curve shown in Figure 2.3. D-level was developed as a simple approximation of perceived noise level (PNL) for use in assess aircraft noise. PNL, addressed in the next paragraph, can be estimated from the D-level by this equation: PNL = dB(D) + 7.

2.2.3 **Perceived Noise Level (PNL), Expressed in dB.** Perceived Noise Level (PNL) is a rating of the noisiness that has been used almost exclusively in aircraft noise assessment. PNL is computed from sound pressure levels measured in octave or one-third octave frequency bands. This rating is most accurate in estimating the perceived noisiness of broadband sounds of similar time duration which do not contain strong discrete frequency components. Currently it is used by the FAA and foreign governmental agencies in the noise certification process for all turbojet -- powered aircraft and large propeller-driven transports. The perceived noise level is expressed in decibels. These units translate the

subjective linearly additive noisiness scale to a logarithmic dB-type scale, where an increase of 10 dB in PNL is equivalent to a doubling of its perceived noisiness.



Top
Return to NPC Library
Return to NPC Home Page

2.2.4 **Tone Corrected Perceived Noise Level (PNLT), PNdB.** Tone Corrected Perceived Noise Level is basically the Perceived Noise Level adjusted to account for the presence of discrete frequency components. PNLT was developed to aid in prediction of perceived noisiness for aircraft flyovers and vehicle noise which contain pure tones, or have pronounced irregularities in their spectrum. The method for calculating PNLT adopted by the FAA involves calculation of the PNL of a sound and the addition of a tone correction based on the tonal frequency and the amount that the tone exceeds the noise in the adjacent one-third octave bands.

2.3 **SINGLE EVENT ENERGY DOSE METRICS**

The following noise metrics are generically related, each representing a noise energy dose. Each metric reflects both the maximum sound level and the duration of the event. As shown in Figure 2.2, these metrics are derived from single event sound level metrics.

2.3.1 **Effective Perceived Noise Level (EPNL), Expressed in dB or EPNdB**. Effective Perceived Noise Level is a single number measure of complex aircraft flyover noise which approximates human annoyance responses. It is derived from PNL and PNLT and includes correction terms for the duration of an aircraft flyover and the presence of audible pure tones or discrete frequencies (such as the whine of a jet aircraft) in the noise signal. The EPNL is used by the FAA as the noise certification metric for large transport and turbojet aircraft and helicopters.

2.3.2 **Sound Exposure Level (SEL), Expressed in dB**. SEL is a measure of the effect of duration and magnitude for a single event measured in A-weighted sound level above a specified threshold which is at least 10 dB below the maximum value. In typical aircraft noise model calculations, SEL is used in computing aircraft accoustical contribution to the Equivalent Sound Level (Leq) and the Day-Night Sound Level (DNL).

2.4 **CUMULATIVE ENERGY AVERAGE METRICS**

The cumulative energy average noise metrics are usually derived from single event energy dose metrics. These metrics can also be computed from continuous noise measurement data. Cumulative metrics correlate well with aggregate community annoyance response. They were not designed as single source measures, so they do not account adequately for tonal components. Nor do they relate accurately to speech interference, sleep disturbance or other phenomena requiring analysis using single event maximum and energy dose sound level data. In practice, these measures are not used in determining source standards or for certification of product noise.

2.4.1 **Equivalent Sound Level (Leq), Expressed in dB.** Equivalent sound level, Leq, is the energy average noise level (usually A-weighted) integrated over some specified time. **Equivalent** signifies that the total



_
Top

acoustical energy associated with the fluctuating sound (during the prescribed time period) is equal to the total acoustical energy associated with a steady sound level of Leq for the same period of time. The purpose of Leq is to provide a single number measure of noise averaged over a specified time period.

2.4.2 **Day-Night Sound Level (DNL), Expressed in dB**. Day-Night Sound Level (DNL) was developed as a single number measure of community noise exposure. It is often referred to as Ldn in the literature. DNL was introduced as a simple method for predicting the effects on a population of the average long term exposure to environmental noise. It is an enhancement of the Equivalent Sound Level (Leq) because a correction for nighttime noise intrusions was added. A 10 dB correction is applied to nighttime (10 p.m. to 7 a.m.) sound levels to account for increased annoyance due to noise during the night hours. DNL uses the same energy equivalent concept as Leq. The specified time integration period is 24 hours. As in the case of Leq, there is no stipulation of a minimum noise sampling threshold. The DNL can be derived directly from the A-weighted sound level or the sound exposure level, as shown in Figure 2.2. For assessing long term noise exposure, the yearly average DNL (DNL y-avg) is the specified metric in the FAA FAR Part 150 noise compatibility planning process. In the remainder of this document, the term DNL will be used (in lieu of DNL y-avg), yearly average being implied.

2.4.3 **Community Noise Equivalent Level (CNEL), in dB**. CNEL, like DNL, incorporates the energy average A-weighted sound level integrated over a 24-hour period Weightings are applied for the noise levels occurring during the evening (7 p.m. - 10 p.m.) and nighttime (10 p.m. - 7 a.m.). CNEL differs from DNL in the addition of the evening weighting step function of 3 dB which is intended to account for activity interference and annoyance during that time period. It was originally used by the state of California, but it is being phased out.

2.4.4 **Noise Exposure Forecast (NEF), in dB**. Noise Exposure Forecast performs the same role as DNL or CNEL but is developed using EPNL as the intermediate single event dose metric. The NEF metric incorporates a weighting factor which effectively imposes a 12.2 dB penalty on sound occurring between 10 p.m. and 7 a.m. This corresponds to a nighttime event multiplier of 16.7. NEF correlates extremely well with DNL and the equivalency DNL = NEF + 35 is often used.

2.5 **CUMULATIVE TIME METRICS**

2.5.1 **24-Hour Time Above (TA), Expressed in Minutes**. The 24-hour TA metric provides the duration in minutes for which aircraft related noise exceeded specified A-weighted sound levels. An example of a TA contour is shown in Figure 2.4. TA is one of the criteria specified in HUD Circular 1390.2 for determining eligibility for HUD construction funding (Ref. 3). TA'S inverse, the L-value (e.g., L 10) is used (along with Leq) as the FHWA criteria for planning and design of Federal-aid highways. Further, TA can be related directly to some "threshold activated" physiological or annoyance effects.

Top
Return to NPC Library
Return to NPC Home Page

2.5.2 **Day, Evening, Night (TA), Expressed in Minutes.** The Day-TA metrics provide the duration in minutes for which aircraft related noise exceeded specified A-weighted sound levels during the period 7:00 a.m. to 7:00 p.m. The Evening TA metrics provide the duration in minutes for which aircraft related noise exceeded A-weighted sound levels during the period from 7:00 p.m. to 10:00 p.m. The Night TA metrics provide the duration in minutes for which aircraft related noise exceeded A-weighted sound levels during the period from 10:00 p.m. to 7:00 a.m.

2.6 **DNL: THE STANDARD CUMULATIVE AVERAGE ENERGY METRIC**

The FAA selected DNL as the cumulative average energy metric to be used in airport noise exposure studies. While a dialogue continues within research circles concerning weighting functions, the DNL has emerged as a sound and workable tool for use in land use planning and in relating aircraft noise to community reaction. The substantiating basis for the DNL can perhaps best be summarized as follows:

1) Pragmatically speaking, it works. Engineers and planners have acquired over 30 years working experience with a nominal 10 dB nighttime weighting function. This experience has been successful, contributing to wise zoning and planning decisions.

2) The nominal 10 dB decrease in ambient noise levels in many residential areas at nighttime provides a sensible basis for the weighting factor.

2.7 **EVALUATION OF THE DNL METRIC FOR HELIPORT/HELISTOP NOISE IMPACT ASSESSMENT**

With the increase in helicopter operations in and around urban areas, the FAA has sought to include helicopters in the environmental planning process. In this context, the question has arisen of whether or not the average cumulative energy metric DNL, which is used in the analysis of noise from conventional aircraft, would also be appropriate for analysis of helicopter noise. Most commercial airports have hundreds of operations a day, while heliports generally handle fewer than thirty. The metric used to analyze helicopter noise would have to be sensitive enough to accurately reflect community response at comparatively low levels of noise exposure (lower cumulative levels because of fewer flights).

In order to investigate whether or not DNL would be appropriate, the FAA supported a field test program to examine subjective response to helicopter operations. The actual study was conducted by NASA Langley Research Center and is summarized below (Ref. 4). In the study, researchers examined the reaction of community residents to low numbers of helicopter noise events. Residents of the selected community were interviewed twenty-three times about their general noise annoyance on particular days. Unknown to them, on those days helicopter flights had been controlled for the test purpose; the number of flights per day varied from 0 to 32. The exposure varied randomly through each of the



Top

Return to NPC Library
Return to NPC Home Page

TABLE 2.1

| METRIC | DESCRIPTION |
|---|---|
| **One-third Octave Sound Pressure Levels** | The one-third octave band sound pressure levels are the starting point for all other metrics; useful in implementation of soundproofing |
| **PNL** | Sound Level from which EPNL was developed |
| **PNLT** | Sound Level from which EPNL was developed |
| **EPNL** | A maximum sound level single event cumulative metric developed from the PNLT and PNL sound level. Used in FAR Part 36, Appendix C Certification, Advisory Circular 36-lB and Advisory Circular 36-2A. |
| **NEF** | An Airport cumulative metric no longer in use in the U.S. but often used in older studies; replaced by DNL (the FAA approved metric) |
| **Alm** | A sound level metric applied as follows:<br>Airport Noise Analysis<br>1050.lC Analysis<br>FAR Part 36 Appendix F Certification<br>Specific eligibility for Soundproofing<br>Implementation of Soundproofing<br>Noise Monitoring Systems<br>FAA Advisory Circular |
| **TA** | An airport cumulative metric derived from dB(A) and applied as follows:<br>Airport Noise Analysis<br>l050.lD Analysis<br>Noise Monitoring Systems |

**Lx** An airport Cumulative metric derived from dB(A) and applied as follows:
Airport Noise Analysis
l050.lD Analysis
Noise Monitoring Systems

**SEL** A maximum sound level, single event cumulative metric derived from dB(A) and applied as follows:
Airport Noise Analysis
Noise Monitoring Systems

**Leq** An airport cumulative metric derived from SEL; no application in aviation

**DNL** An airport cumulative metric derived from SEL with the following applications:
Airport Noise Contours
Airport Noise Analysis
FAR l050.lD Analysis
General Eligibility for Soundproofing
Noise Monitoring Systems

**CNEL** An airport cumulative metric derived from SEL used only by the state of California; CNEL will be phased out in the next few years.



twenty-three (non-consecutive) test days. It was found that the (1) maximum noise level, (2) the number of noise events, and (3) the duration of the events (reflected in cumulative energy noise indices) correlated well with community annoyance response.

The results of this program provided strong evidence that the same analytical tool, the DNL metric, employed at airports with large numbers of operations can be used with confidence in assessing the environmental impact (human response) of comparatively small numbers of helicopter operations.

2.8 **SUMMARY OF NOISE METRIC POLICY**

The FAA noise metric usage policy is presented in Figure 2.2. The figure shows the genealogy of the various types of metrics starting from the one-third octave sound pressure level data. The dBA, PNL and PNLT are identified as pertinent **sound levels**. SEL and EPNL are identified as significant **single event cumulative energy (or dose) metrics** while Leq, DNL, CNEL and NEF are recognized as airport **cumulative exposure metrics** along with TA and Lx. The policy outline reflects the stated position supporting ALm as the single event maximum sound level metric, SEL as the single event dose metric, and DNL as the airport cumulative noise metric. EPNL is retained as a certification noise metric. The SEL, TA and Lx metrics are all descendants of the A-weighted sound level and their use is consistent with stated policy.

2.9 **NOISE METRICS APPLICATIONS**

Each of the noise metrics discussed above has a specific set of applications for which it is most

appropriate, as detailed in Table 2.1.



Top
Return to NPC Library
Return to NPC Home Page

**REFERENCES**

1. Pearson, Karl. **Handbook of Noise Ratings**. Bolt, Beranek and Newman, Inc. NASA CR-2376, April 1974.
2. Hassall, J.R. and K. Zaveri. **Acoustic Noise Measurements**. Bruel & Kjaer, January 1979.
3. Housing and Urban Development Circular 1390.2.
4. Fields, James M. and Clemans A. Powell. Community Survey of Helicopter Noise Annoyance Conducted Under Controlled Noise Exposure Conditions. Unpublished Report, December 1984.

Top
Return to NPC Library
Return to NPC Home Page

**Section 3.0 ANNOYANCE AND AIRCRAFT NOISE**

SUMMARY

**INTRODUCTION**

The typical response of humans to aircraft noise is annoyance. Annoyance response is remarkably complex and, considered on an individual basis, displays wide variability for any given noise level. Fortunately, when one considers average annoyance reactions within a community, one can develop aggregate annoyance response/noise level relationships. This section introduces the reader to the factors which influence individual annoyance response. Also included are examples of research findings which display aggregate community annoyance responses.

**AVIATION APPLICATION/ISSUES**

Annoyance is the number one consequence of excessive aircraft noise. The continued growth of the aviation industry and expansion of airport capacity is in part dependent on how well noise compatibility planning is handled.

**GUIDANCE/POLICY/EXPERIENCE**

It is the charter of the FAA to assure safety and promote civil aviation. Promoting civil aviation means, among other things, addressing the problems of aircraft noise annoyance. The FAA, working with other members of the community, has taken a series of steps designed to bring about greater compatibility between aircraft noise levels and affected individuals. Actions include:

1. Source noise certification regulations
2. FAR Part 150 Airport Noise Exposure / Land Use Compatibility Planning Process
3. Research into the mechanism of annoyance to aircraft noise
4. Advisory publications designed to mitigate aircraft noise impact on noise sensitive areas.

3.1 **INTRODUCTION**
Responses of annoyance are the most common reaction to aircraft noise. This section discusses, first, how people perceive noisiness, and second, some of the emotional and physical variables which may influence an individual's response to a sound. A review of pertinent research concludes this section.

3.2 **PERCEPTION OF NOISE**
How people perceive loudness or noisiness of any given sound depends on several measurable physical characteristics of the sound. These factors are:

A. **Intensity**. In general, a ten decibel increase in intensity may be considered a doubling of the perceived loudness or noisiness of a sound; however, other psychoacoustic evidence suggests that a somewhat greater than IO decibel increase in peak level of airplane flyover noise is required to produce a perceived doubling of loudness.

B. **Frequency Content**. Sounds with concentration of energy between 2,000 Hz and 8,000 Hz are perceived to be more noisy than sounds of equal sound pressure level outside this range.

C. **Changes in Sound Pressure Level.** Sounds that are increasing in level are judged to be somewhat louder than those decreasing in level (consider police and emergency vehicle sirens).

D. **Rate of Increase of Sound Pressure Level**. Impulsive sound (ones reaching a high peak very abruptly, such as pile drivers or jack hammers) are usually perceived to be very noisy.

3.3 **VARIABLES AFFECTING RESPONSE**
Individual human response to noise is subject to considerable natural variability, over the past 35 years, researchers have identified many of the factors which contribute to the variation in human reaction to noise.

3.3.1 **Emotional Variables**. Knowledge of the existence of these individual variables helps to understand why it is not possible to state simply that a given noise level from a given noise source will elicit a particular community reaction or have a certain environmental impact. In order to do that, it would be necessary to know how much each variable contributes to human reaction to noise. Research in psychoacoustics has revealed that an individual's attitudes, beliefs and values may greatly influence the degree to which a person considers a given sound annoying. The aggregate emotional response of an individual to noise has been found to depend on:

A. **Feelings about the Necessity or Preventability of the Noise**. If people feel that their needs and concerns are being ignored, they are more likely to feel hostile towards the noise. This feeling of being

alienated or of being ignored and abused is the root of many human annoyance reactions. If people feel that those creating the noise care about their welfare and are doing what they can to mitigate the noise, they are usually more tolerant of the noise and are willing and able to accommodate higher noise levels.

B. **Judgment of the Importance and Value of the Activity which is Producing the Noise**. If the noise is produced by an activity which people feel is vital, they are not as bothered by it as they would be if the noise-producing activity was considered superfluous.

C. **Activity at the Time an Individual Hears a Noise.** An individual's sleep,, rest and relaxation have been found to be more easily disrupted by noise than his communication and entertainment activities.

D. **Attitudes about Environment**. The existence of undesirable features in a person's residential environment will influence the way in which he reacts to a particular intrusion.

E. **General Sensitivity to Noise**. People vary in their ability to hear sound, their physiological predisposition to noise and their emotional experience of annoyance to a given noise.

F. **Belief about the Effect of Noise on Health**. The extent to which people believe that exposure to aircraft noise will damage their health affects their response to aviation noise.

G. **Feeling of Fear Associated with the Noise**. For instance, the extent to which an individual fears physical harm from the source of the noise will affect his attitude toward the noise.

3.3.2 **Physical Variables**. A number of physical factors have also been identified by researchers as influencing the way in which an individual may react to a noise. These factors include:

A. **Type of Neighborhood.** Instances of annoyance, disturbance and complaint associated with a particular noise exposure will be greatest in rural areas, followed by suburban and urban residential areas, and then commercial and industrial areas in decreasing order. The type of neighborhood may actually be associated with one's expectations regarding noise there. People expect rural neighborhoods to be quieter than cities. Consequently, a given noise exposure may produce greater negative reaction in a rural area.

B. **Time of Day**. A number of studies has suggested that noise intrusions are considered more annoying in the early evening and at night than during the day.

C. **Season**. Noise is considered more disturbing in the summer than in the winter. This is understandable since, during the summer, windows are likely to be open and recreational activities take place out of doors.



Top
Return to NPC Library
Return to NPC Home Page

Ref 1Ref 2

D. **Predictability of the Noise**. Research has revealed that individuals exposed to unpredictable noise have a lower noise tolerance than those exposed to predictable noise.

E. **Control over the Noise Source**. A person who has no control over the noise source will be more annoyed than one who is able to exercise some control.

F. **Length of Time an Individual Is Exposed to a Noise**. There is little evidence supporting the argument that annoyance resulting from noise will decrease with continued exposure; rather, under some circumstances, annoyance may increase the longer one is exposed.

3.4 **REVIEW OF RECENT RESEARCH**

The inherent variability in the way individuals react to noise makes it impossible to predict accurately how any one individual will respond to a given noise. However, when one considers the community as a whole, trends emerge which relate noise to annoyance. In this way it is possible to correlate DNL with community annoyance. This measure will represent the average annoyance response for the community. In any community there will be a given percentage of the population highly annoyed, a given percentage mildly annoyed and others who will not be annoyed at all. The changing percentage of population within a given response category is the best indicator of noise annoyance impact.

Various studies have focused on the relationship between annoyance and noise exposure, one researcher, in analyzing the results of numerous social surveys conducted at major airports in several countries, derived the curves shown in Figure 3.1 relating degree of annoyance and percent of population affected with noise exposure expressed in DNL (Ref. 1). A survey conducted in the Netherlands investigated the relationship between the DNL and the percentage of those questioned who suffered feelings of fear, disruption of conversation, sleep or work activities (Ref. 2). Figure 3.2 reflects these findings.

In 1960 the "Wilson Committee" was appointed by the British Government to investigate the nature, sources and effects of the problem of noise (Ref. 3). The final report, published in 1963, included results of extensive examination of community response to aircraft operations at London Heathrow Airport. Figure 3.3, adapted from that report, shows the relationship between DNL and the percent of the population disturbed in various activities including sleep, relaxation, conversation and television viewing. Disturbance response categories for startle and house vibration are also included.

The EPA publication "Information on Levels of Environmental Noise Requisite to Protect Health and Welfare with an Adequate Margin of Safety" provides a relationship between the percent of population highly annoyed and the Day-Night Sound Level (DNL) (Ref. 4). These data are shown in Figure 3.4, along with the relationship between annoyance, complaints and community reaction.

Ref. 3

24

Top
Return to NPC Library
Return to NPC Home Page

25

Top
Return to NPC Library
Return to NPC Home Page

3.5 **CONCLUSION**

This section has presented a series of relationships useful in interpreting average community response to aircraft noise. These data should provide the reader with the necessary perspective to begin understanding the human reactions to various levels of cumulative noise exposure (DNL).

## REFERENCES

1. Richards, E. J, and J. B. 0llerhead. *Noise Burden Factor - New Way of Rating Airport Noise*. **Sound and Vibration**, V. 7, No, 12, December 1973.
2. Kryter, Karl D. **The Effects of Noise on Man**. New York, Academic Press, 1970.
3. Great Britain Committee on the Problem of Noise. Noise, Final Report. Presented to Parliament by the Lord Minister for Science by Command of Her Majesty. London, H. M. Stationery Office, July 1963.
4. U.S. Environmental Protection Agency, Office of Noise Abatement and Control, Washington, D.C. Information on Levels of Environmental Noise Requisite to Protect Public Health and Welfare with an Adequate Margin of Safety. March 1974.

Top
Return to NPC Library
Return to NPC Home Page

**Section 4.0 DIFFERENT SOURCES/DIFFERENT HUMAN RESPONSE?**

SUMMARY

–

**INTRODUCTION**

This section addresses a fundamental question raised from time to time in connection with aviation noise related law suits, environmental impact assessments, and research studies. It has been suggested that aircraft noise levels should be treated as more annoying to people than the same sound levels generated by other sources. A review of the research shows that very strong positions have been taken both supporting and opposing the theory. The most recent papers appearing in the scientific journals concede that a differential in response may exist but it can not be shown to be statistically significant.

**AVIATION APPLICATIONS/ISSUES**

Should aircraft noise be considered as comparable to noise from other sources in the land use planning and environmental assessment process?

**GUIDANCE/POLICY/EXPERIENCE**

In the general application of noise exposure/land use criteria, aircraft noise should be considered in the same manner as noise from other sources.

Top
Return to NPC Library
Return to NPC Home Page

Ref 1



Top
Return to NPC Library
Return to NPC Home Page

4.1 **INTRODUCTION**

In assessing comparative contributions to the overall annoyance with noise experienced by an individual, the issue of whether or not aircraft noise should be compared with other ambient sources continues to arise. The issue is an important one in terms of establishing acceptable cumulative noise exposure levels for various land use categories. This section reviews current literature on this controversial topic.

4.2 **SCHULTZ - KRYTER DEBATE**

In 1978, Theodore Schultz published an article synthesizing results from many social surveys on noise annoyance. In this article he stated that it is possible to compare aircraft and other transportation noise equally, and to find and use a median annoyance response curve for them (Ref. 1). In order to compare these various results, Schultz developed some theories and formulas with which he determined which parts of each survey would fall into the "highly annoyed" category. He also figured the DNL indices for these surveys and plotted them (see Figure 4.1). Figure 4.2 reproduces Schultz's "synthesis curve", the median of all the noise surveys.

Karl Kryter, responding in 1982 to Schultz's article, proposed a different relationship (Ref. 2).. While Schultz only considered people who were highly annoyed, Kryter stated that all individuals annoyed should be considered in these comparisons. He also developed the DNL values for each study differently, so his values varied significantly from those of Schultz. Kryter also attempted to explain the poor correlation between noise exposure and annoyance in individuals by explaining that, while it is assumed that noise exposure is homogeneous over a given neighborhood, an individual's particular dose of noise may vary quite a bit.

Kryter cited Grandjean (Ref. 3), another researcher who found that aircraft noise is significantly more disturbing than other noise. This Swiss study stated that it took a DNL of 10 to 15 dB higher for road traffic noise to cause equal disturbance as aircraft. Kryter then explained his concept of the "effective exposure" of noise, rather than the exposure that may actually be measured or reported. Kryter

suggests that because aircraft noise falls over a structure, like a house, equally, as opposed to passing through interfering structures as traffic noise would do (as in moving from the front to the back of a house), the "effective noise exposure" would be greater than that of traffic noise. Kryter further submits that, for a house facing the road, residents in the back yard would experience diminished noise from those in the front yard; however, they would all experience equal aircraft noise. Likewise, each room in the house would experience nearly identical exposure to aircraft noise (Kryter evidently only considered single - level homes). Kryter found a front to back of house difference of 17 - 21 dB for road traffic and only 0.3 dB for aircraft noise. Thus, Kryter suggests that aircraft noise must be considered separately from other transportation noise.



Top
Return to NPC Library
Return to NPC Home Page

_ Ref 4



Top
Return to NPC Library
Return to NPC Home Page

Fortunately, other researchers have examined this topic; their views aid in going past the Schultz - Kryter stalemate.

4.3 **HALL'S RESEARCH AND ANALYSIS**

In 1981, Fred Hall reported on data which had been collected around the Toronto International Airport (Ref. 4). For the first time, data had been collected on both aircraft and ground traffic noise using comparable questions and measured in DNL, thus alleviating the need for juggling survey results to fit DNL, as Kryter and Schultz had to do. His conclusion was that there is indeed a difference between community responses to aircraft noise and to road traffic noise when each is measured by DNL. Figure 4.3 relates his findings in relation to Schultz's synthesis curve; Hall notes that the aircraft noise curve falls out of proportion with the others.

For the same noise level, a greater percentage of

people are highly annoyed by aircraft noise. The

> difference in annoyance at the two sources is not
>
> constant but instead increases as Ldn increases. The
>
> difference in annoyance is equivalent to about 8 dB at
>
> Ldn of 55 dB increasing to about 15 dB at Ldn of 65 dB.

Hall puts forth some possible explanations of these variations. For example, the sporadic time pattern of aircraft noise differs from the relatively steady noise of road traffic. Thus, maximum levels for aircraft noise will be higher. Hall suggests that until further work can be done, "Ldn is a reasonable predictor of response to any particular source, but there are differences in response to different sources at the same Ldn value." Hall concluded that the best thing to do, then, would be to use separate functions to estimate community response to different types of noise.

In a later article (published in December 1984), Hall further addressed this complex issue, substantially altering his previous conclusions (Ref. 5). He references about a dozen papers published on this subject over the last five years. Hall suggests that intrinsic differences may exist but can not be substantiated as statistically significant. His summary statements are excerpted below:

> The overwhelming conclusion from the recent literature is that different studies have led to different dose-response functions. This has happened for different sources, for different types of one source, and even for different studies at the same location (e.g., Heathrow). There is some consistency of evidence that the annoyance response function for rail noise is lower than for road or aircraft noise. (Rohrmann reaches the same conclusion in his review of relevant literature.) There is also some indication, but with fewer studies pertaining to it, that the aircraft annoyance function is higher than that for road traffic. However, the evidence is not strong enough to totally reject the hypothesis that all of this is just random variation about the "average" response.



Top
Return to NPC Library
Return to NPC Home Page

Lastly, an "average" dose-response function appears to be useful in two contexts, both defined by limited information. The first is the general situation we are now in, in which it appears that different dose-response functions are warranted, but we cannot specify precisely the conditions calling for each. Although we suspect the variance in results is not simply random, it almost behaves as if it were, in which case the "average" function represents our best current estimate. The second situation will arise in the future, when we may be able to specify clearly the conditions calling for separate dose-response functions. Even then, there will undoubtedly be conditions which we cannot categorize, in which case again the "average" response function would be. the best one to use.

## 4.4 **CONCLUSION**

For matters of policy, there does not exist at this time enough evidence to support the requirement of a differential for comparing aircraft noise with noise from other sources. All transportation and other ambient noise sources therefore can be treated as comparable when considering aviation noise impact.

REFERENCES

1. Schultz, Theodore. Synthesis of Social Surveys on Noise Annoyance. **J. Acoust. Soc. Am**. 64, 1978.
2. Kryter, Karl D. Community Annoyance from Aircraft and Ground Vehicle Noise. **J. Acoust. Soc. Am**. 72 (4), October 1982.
3. Grandjean, P. Graf, A. Lauber, H.P. Meier, and R. Huller. Survey on the Effects of Aircraft Noise in Switzerland. *Inter-Noise 76*, Washington, D.C., April 1976.
4. Hall, Fred L., Susan E. Bernie, Martin Taylor, and John E. Palmer. Direct Comparison of Community Response to Road Traffic Noise and to Aircraft Noise. **J. Acoust, Soc. Am**. 70 (6), December 1981.
5. Hall, Fred L. Community Response to Noise: Is All Noise the Same? **J. Acoust. Soc. Am.** 76 (4), October 1984.



Top
Return to NPC Library
Return to NPC Home Page

## Section 5.0 HEARING and HEARING LOSS

SUMMARY

**INTRODUCTION**

This section describes the human hearing mechanism and the processes of temporary and permanent hearing loss. The results of research are presented and the potential for hearing loss in aviation noise environments evaluated. OSHA hearing protection criteria are also addressed.

**AVIATION APPLICATIONS/ISSUES**

1. Permanent or temporary hearing loss.
a. cockpit crew
b. flight attendants
c. passengers
d. persons in communities exposed to aircraft overflight
2. Temporary hearing loss for the same categories of individuals listed above.

**GUIDANCE/POLICY/EXPERIENCE**

1. FAA-sponsored research results show that permanent hearing loss is not a likelihood for a) cockpit crew, b) flight attendants, c) passengers, d) people exposed to overflights.
2. Temporary hearing loss (up to several hours recovery time) may occur in commercial aviation noise

environments. These temporary sensitivity shifts are not unusual in the industrial setting and do not exceed OSHA criteria.
3. Persons on the ground exposed to aircraft overflights would typically not experience any temporary hearing loss due to the relatively short duration of the noise exposure.
4. A greater degree of temporary and possible permanent hearing loss can result in the case of long exposure times in certain small propeller driven aircraft.



Top
Return to NPC Library
Return to NPC Home Page

Ref 1 _



Top
Return to NPC Library
Return to NPC Home Page

5.1 **INTRODUCTION**

It is well established that continuous exposure to high levels of noise will damage human hearing. This section begins with a description of the hearing mechanism, followed by discussion of the effects of noise on hearing, along with criteria for hearing protection established by the military, the FAA and OSHA. Finally, methods for protection of hearing are discussed.

5.2 **THE HEARING MECHANISM**

The ear is an external sense organ designed to receive and respond to air-borne acoustic vibratory energy. Figure 5.1 provides a schematic cross section showing the outer, middle and inner ears. The external ear, made up of the auricle (the outer portion of the ear) and the ear canal, transmits sounds to the eardrum. The eardrum, which is a very thin membrane that moves very slightly in response to sound pressure levels, separates the ear canal from the middle ear.

The middle ear is an air-filled cavity that lies between the outer and the inner ear (see Figure 5.2). It acts as a mechanical amplifier of the air pressure vibrations from the eardrum and through a series of bones called the ossicles. Air pressure vibrations displace the eardrum, which then displaces the ossicles, a link of three small bones which reach across the middle ear cavity to the delicate, fluid-filled membranes of the inner ear. The ossicles, made up of the malleus, the incus and the stapes, rest against the opening to the inner ear, the oval window; when the ossicles are displaced, the stapes pushes

through the oval window, displacing the fluid in the inner ear.

The middle ear allows pressure variations in air to be transmitted into pressure variations in fluid with very little loss of energy. This is due in part to the relative size difference between the eardrum and the oval window (the eardrum has an area 20 times that of the oval window). Thus, the force exerted on the inner ear fluid by the stapes is about the same as the force exerted on the eardrum by the sound wave in the air, but the resulting pressure is much greater -- as much as a ratio of 22 to 1.

The inner ear contains the final section of the organ of hearing, the cochlea, which rests, coiled like a snail, against the oval window. As the stapes forces the oval window in and out, the fluid of the cochlea is also moved. About thirty thousand hair cells (called cilia) located in the cochlea react to the fluid motions, translating them to nerve impulses (and converting them from mechanical to electrical energy), then transmitting the impulses to the brain for interpretation.

Acoustical energy may also be conducted to the inner ear through vibration of bone. An example is the sound of one's own voice. Bone-conducted vibrations set up similar patterns of vibration of the cochlear partition as does air-conducted sound.



Top
Return to NPC Library
Return to NPC Home Page

5.3 **AUDITORY RANGE**

The ear is capable of hearing a frequency range of about nine octaves and a dynamic range of more than120 dB. The least pressure needed to make a tone audible (the "threshold pressure") depends on the frequency of the tone. The lower frequency limit of hearing is a vague boundary because hearing merges into the sensation of vibration; the upper intensity limit of hearing is sometimes taken as the threshold of discomfort, which is a sound pressure level of about 120 dB (independent of frequency). At 120 dB, there may be a sensation of tickling in the middle ear. However, the threshold of pain appears to be 140 dB, with sound continuing to sound louder, with increasing pressure, until auditory fatigue or acoustical injury is reached.

5.4 **EFFECTS OF NOISE ON HEARING**

The sensitivity of the ear is not constant with frequency. Both the threshold at which a tone can be heard and how loud it sounds may vary considerably as a result of previous exposure to sounds of the same or of different frequencies. Even sounds below 90 - 100 dB may bring about short-term changes in hearing; these changes, however, are simply adjustments of the balance within the ear, much like the process of light or dark adaptation in the eye.

Other sounds may produce longer-lasting changes in the threshold of hearing; the chances of these changes occurring increase with continuing exposure to loud noise. The three principle effects are:

1. temporary reduction in hearing acuity, which is referred to as temporary threshold shift (TTS)
2. permanent hearing loss referred to as a "Noise Induced Permanent Threshold Shift" or NIPTS
3. ringing in the ears, or tinnitus

5.4.1 **TTS**. A temporary threshold shift is a common effect of noise on hearing in noisy industrial and

entertainment situations. When an individual is tested for hearing acuity, an audiometer is used to establish the lowest levels of sound that person can perceive at different frequency bands. After exposure to high noise levels for a short time, or moderate noise levels over a long time, the minimum level that the person can perceive may shift to a higher level. Temporary shifts of 20 to 30 dB are usual in healthy ears in noisy situations with a typical eight-hour exposure. This shift is only temporary, however; a 100% recovery of the pre-noise exposure hearing acuity usually occurs within several hours. TTS is also known as "auditory fatigue."

5.4.2 **NIPTS**. NIPTS, or noise induced permanent threshold shift, is just that -- the minimum level at which a person can perceive sound permanently shifts to a higher level. In layman's terms, a person incurs a permanent hearing loss of some degree. It is hypothesized that years of incurring a daily TTS may eventually lead to an NIPTS of similar magnitude.



Top
Return to NPC Library
Return to NPC Home Page

5.5 **DAMAGE RISK CRITERIA**

In order to determine at what levels and under what conditions an NIPTS may occur, damage risk criteria (DRC), or noise limits which should not be exceeded for specified time periods, were developed. DRC are generally set out in a table or curve such as that shown in Figure 5.3 specifying the allowable relationship between noise level and time of exposure. The guiding hypothesis in most of the criteria is the maintenance of "equal energy" in acoustical dose, which is defined by the level and duration of the noise exposure. In each case, there is a level of risk (of incurring an NIPTS) associated with the specified criteria. It is also worth pointing out that damage risk criteria exist for several different classes of hearing protection: (1) no protection, (2) protected by ear plugs, and (3) protected by ear plugs and headphones. One also encounters damage risk criteria established for specific classes of "unusual" noises, such as impulsive noise (gun shots, punch presses), very loud sounds, and sounds dominated by narrow bands of acoustical energy (tones).

The basic damage risk criteria in use today were set forth by the committee on Hearing Bioacoustics and Biomechanics (CHABA) in 1965, after comparison of studies related to the effects of noise on hearing. The committee concluded that a sound environment would be acceptable if people, after ten years of almost daily exposure to the environment, had permanent hearing loss of no more than 10 dB at 1000 Hz or below, 15 dB at 2000 Hz or 20 dB at 3000 Hz or above (Ref. 2). Thus, 502 of the people would have losses greater than these amounts, and 50% of the people would have less. The development of this criterion was based on three points:

1. Temporary Threshold Shift is a constant measure of the effects of a single day's exposure to noise.
2. All exposures that produce a given $TTS_2$ (TTS measured two minutes after cessation of noise exposure) will be equally hazardous.
3. $TTS_2$ is approximately equal to the noise induced permanent threshold shift (NIPTS) after ten years.

Final limits for both broad-band noise are given as damage risk contours in Figure 5.3. These contours provide the maximum octave or one-third octave band levels for specified daily amounts of time, or conversely, the maximum amount of time an individual may be exposed at a specified sound level. Octave or one-third octave band data may be plotted on this figure to determine which particular one-third octave band controls or limits the noise exposure for a specific environment. Similar damage risk criteria for pure tones show the ear to be slightly more susceptible to damage from pure tones.

5.6 **REVIEW OF STUDIES**

A number of studies have been sponsored by the FAA to determine the effect of aircraft noise on hearing; the studies tend to focus either on



Top
Return to NPC Library
Return to NPC Home Page

the effects of noise on the crew and passengers inside an aircraft or on the effects of noise on individuals regularly exposed to aviation noise, such as people who reside around airports.

5.6.1 **Interior Aircraft Noise**. The FAA, in 1981, sponsored research to investigate the potential impact of interior aircraft noise on the crew and passengers of an aircraft (Ref. 2). The researchers concluded that the damage risk criteria of CHABA, discussed in the above paragraphs, is adequate for evaluation of potential hearing damage in both commercial and business jet-powered aircraft. Interior noise levels in both types of aircraft were tested, and none of the average levels in commercial or business jets exceeded the CHABA recommended levels. The study reports that less than 0.l% of the commercial and less than l% of business jets are expected to exceed damage risk contours. Given these small percentages, the researchers drew the following conclusions:

**For the crew of an aircraft**, long exposures to noise of as many as sixteen hours flight time should not present any problems as long as the average daily exposure is four hours. (Four hours is currently the maximum average daily amount flown in commercial jet aircraft.)



Top
Return to NPC Library
Return to NPC Home Page

**For the passengers of an aircraft**, the report concluded that "A passenger would need to fly at least 400,000 miles per year over 10 years to attain exposures equivalent to the exposure of airline crews." Since the crews are at so little risk themselves, an aircraft passenger is at virtually no risk of hearing damage from interior noise.

5.6.2 **Community Hearing Loss**. There are three studies known to have specifically addressed the question of community hearing loss around airports. The first, a 1972 study funded by FAA, compared the hearing acuity of two groups of residents, one group near Los Angeles International Airport and the second group from a relatively quiet area away from the airport. There was no significant difference in the hearing acuity of the two groups of people, and there was no correlation between hearing acuity and length of residency near the airport (Ref. 3).

The second, 1974 laboratory study conducted near Los Angeles International Airport, exposed two small groups of young men to recorded aircraft flyover noise consisting of forty events per hour, each event with a maximum level of 111 A-weighted decibels, over six hour periods (Ref. 4). The recorded flyovers were repeated every three minutes for one group, and every 90 seconds for the second group.

The measured temporary threshold shifts for these subjects were negligible. Since temporary threshold shift is considered to represent a precursor to permanent hearing loss, the finding of no temporary threshold shift in this study is interpreted to indicate that there is no danger of permanent hearing loss from high levels of aircraft noise.

The third study repeated the above experiment in a Japanese laboratory, with the same conclusions found (Ref. 5).

5.7 **CURRENT STANDARDS ON HEARING PROTECTION**

The Occupational Safety and Health Administration (OSHA), the EPA and the U.S. Air Force have issued various statutes and regulations for hearing protection. In 1971, OSHA issued regulations for the protection of the hearing of industrial workers. (Ref. 7) These standards prescribe permissible noise exposure limits for an eight hour work day, which is a continuous A-weighted sound level (AL) of 90 dB. The OSHA standards also incorporate the time-level tradeoff approach(5 dB increase in level per halving of time) as seen in Table 5.1. A maximum level of 140 dB is also specified for any impact or impulsive noise exposure. The EPA has recommended an average equivalent noise level of 70 A-weighted decibels for continuous 24-hour exposure as the maximum exposure level required to protect hearing with an adequate margin of safety (Ref. 7). The EPA criterion is extremely conservative, however, and is based on the probability of negligible hearing loss (less than five decibels in 100% of the exposed population) at the human ear's most damage-sensitive frequency (4,000 Hz) after a 40-year exposure.

The U.S. Air Force has conducted its own research into this area. Table 5.2 shows 1982 Air Force regulations on noise levels that are acceptable without hearing protection when the noise exposure occurs only once a day, for a given time of exposure (Ref. 8).



Top
Return to NPC Library
Return to NPC Home Page

Ref 8

_ Ref 9

40

5.8 **PROTECTION OF HEARING**

Since work must often be carried out in high noise level environments, much attention has been given to methods of hearing protection. Earplugs, when they are the correct size and are inserted to form a good acoustical seal, provide good attenuation below 500 Hz. They are also comfortable to wear. Figure 5.4 shows the attenuation rate of typical earplugs. Earmuffs, whether liquid or foam filled, provide attenuation as great as that of earplugs, but they are not comfortable to wear for very long. The solution that provides the most protection is a combination of earplugs and earmuffs. Although the total attenuation provided by the two is not as great as the sum of the attenuation provided by the devices individually, Figure 5.5 clearly illustrates that the two working in tandem provide greater attenuation -- and thus protection -- for the listener (Ref. 9).

Ref 9

Page 41

Top
Return to NPC Library
Return to NPC Home Page

5.9 **CONCLUSION**

Research continues in the area of hearing-damage as a result of aircraft noise, but the conclusions from the studies discussed above may be summarized as follows:

1. The flight crew of an aircraft will incur virtually no hearing damage, if the crew follows the proper procedures of wearing earplugs and earmuffs and of regulating flight time.
2. The passengers in an aircraft would have to fly an extraordinary number of miles over a long period of time before they would be in danger of any hearing loss.
3. The people in a community surrounding an airport are in no danger (under normal circumstances) of hearing damage due to aircraft noise.

REFERENCES

1. Michael, P.L., 14.T. Anchor, G.R. Bienvenue et al. *Community Noise Fundamentals: A Training Manual and Study Guide*. Pennsylvania State University College of Education, June 1980.
2. Pearson, Karl S, and John F, l4ilby. "*Possibility of Hearing Loss from Exposure to Interior Aircraft Noise*." Ref. No. FAA-AEE-81-15, November 1981.
3. Parnell, Nagel, & Cohen, "*Evaluation of Hearing Levels of Residents Living Near a Major Airport*," Report FAA-RD-72-72, June 1972.

4. Ward, Cushing & Burns, "*TTS From Neighborhood Aircraft Noise*," **Journal of Acoustical Society of America**, Vol. 60, No. 1, July 1976.
5. Kabuto & Suzuki, "*Temporary Threshold Shift from Transportation Noise*," **Journal of Acoustical Society of America**, Vol. 66, No. 1, July 1979.
6. Occupational Safety and Health Administration, Code of Federal Regulations, Title 29, Chapter 27, Part 1910.
7. U.S. Environmental Protection Agency, "*Information on Levels of Environmental Noise Requisite to Protect Public Health and Welfare with an Adequate Margin of Safety*," EPA 550/9-74-004, March 1974.
8. U.S. Air Force Regulation 161-35, April 1982.
9. U.S. Air Force. Design Note 3F1, January 1974.



Top
Return to NPC Library
Return to NPC Home Page

## Section 6.0 SPEECH INTERFERENCE

SUMMARY

–

**INTRODUCTION**

Speech interference is a principal factor in human annoyance response. It can also be a critical factor in situations requiring a high degree of intelligibility essential to safety. This section contains a summary of research results useful in estimating the degree of speech intelligibility as a function of distance in various ambient noise environments. Criteria are also presented defining levels of intelligibility deemed acceptable (through experience) in various work situations.

**AVIATION APPLICATIONS/ISSUES**

1. Annoyance to aircraft noise
2. Interference with cockpit communication

**GUIDANCE/POLICY/EXPERIENCE**

1. Speech intelligibility is adequately assessed using single event noise measures such as ALm, SIL or PSIL.
2. Activities where speech intelligibility is critical include class room instruction, outdoor concerts and other leisure listening endeavors.
3. Advisory information for speech intelligibility in aircraft cockpit environment has been developed by the FAA.
4. Surveys of annoyance to aircraft noise reflect to a large extent reactions to activity interference very often associated with speech interference.

Top
Return to NPC Library
Return to NPC Home Page

6.1 **INTRODUCTION**

A major annoyance associated with aircraft noise is interference with verbal communication. This section discusses the various measures of speech intelligibility that have been developed, explains how to assess speech intelligibility and outlines the implications of speech interference for individuals on the ground and in the cockpit of an aircraft.

6.2 **MEASURES OF SPEECH INTELLIGIBILITY**

A number of noise metrics have evolved for assessing the influence of noise on speech.

1. **The Preferred Speech Interference Level** (PSIL) is defined as the arithmetic average of the sound pressure levels in the 500 Hz, 1000 Hz and 2000 Hz octave bands.
2. **The Speech Interference Level** (SIL) is defined as the arithmetic average of the sound pressure levels at the 500, 1000, 2000 and 4000 Hz octave bands.
3. **The Articulation Index** (AI) is a value, between zero and 1.0, which describes the masking of speech by background noise; this value is found by evaluating the signal to noise ratio in specific frequency bands. There are different methods specified for different bandwidths, depending on the resolution required. For example, a masking noise with a continuous spectrum can be evaluated with fewer points than a spectrum punctuated by sharp spikes and deep valleys. The AI can be adjusted upward through the use of visual cues. Figure 6.1 reflects the relation between the calculated AI and the effective AI for communications where the listener can see the lips and face of the talker. The AI is the most sophisticated and most accurate technique developed to assess speech



Top
Return to NPC Library
Return to NPC Home Page

intelligibility. To be used accurately, however, it requires an extensive knowledge of both the expected speech levels and of background levels. Other, simpler methods (PSIL, SIL and AL) are somewhat less accurate but are adequate for evaluating continuous spectrum masking sounds like those found in aircraft cockpits.

4. **Noise Criterion Curves** utilize the ambient noise spectrum plotted on a noise criteria curves graph, such as the one shown in Figure 6.2. The plotted spectrum (the circled crosses) in that figure represents

typical ambient noise in an office. The graph shows the Noise Curve (NC) rating of the office to be 38, the highest Noise Curve value attained. A table is then consulted to evaluate the degree of speech intelligibility for that environment (see Table 6.2, discussed below).

5. **A-Weighted Sound Level (AL), defined in Section 2.0**, is found to correlate well with SIL and PSIL formostsounds associated with aviation.

6.3 **ASSESSING SPEECH INTELLIGIBILITY**

There are many ways to assess speech intelligibility using the methods discussed above. Various tables exist throughout speech interference



Ref 2



literature which relate AI levels, SIL and PSIL to levels of speech intelligibility. Table 6.1 is one example of such a table; it relates speech interference levels to levels of effective communication. Figure 6.3 provides the permissible distance between a speaker and listeners for specified voice levels and ambient noise levels, using AL (referred to in the table as dBA).

Another helpful interpretive scheme has been developed by the U.S. Army, which has determined through research and experience the levels of speech or sentence intelligibility appropriate for various workspaces. Table 6.2 depicts the relationship between NC values and speech quality.

6.4 **SPEECH INTERFERENCE ON THE GROUND**

Speech interference associated with aircraft noise is a primary source of annoyance to individuals on the ground. The disruption of leisure activities such as listening to the radio, television, music and conversation gives rise to frustration and irritation. Quality speech communication is obviously also important in the classroom, office and industrial settings. In one 1963 study, sponsored by the British government, researchers found that aircraft noise of 75 dB annoyed the



Top
Return to NPC Library
Return to NPC Home Page

highest percentage of the population when it interfered with the television sound (Ref. 3). Eighty percent of the test population reported being annoyed. Also high on the list of annoyances for the surveyed population was flickering of the television picture and interference with casual conversation by aircraft noise.

## 6.5 SPEECH INTERFERENCE IN THE COCKPIT

The concern of cockpit speech intelligibility has been addressed in recent years because of the potential safety hazard. In 1981 the problem came to the forefront with the crash of a turboprop aircraft near Spokane, Washington. The captain of the craft had complained earlier that "he believed the cockpit noise levels precluded normal speech," and he concluded that "the cockpit noise levels could have interfered with verbal communication" (Ref. 4). The National Transportation Safety Board (NTSB) concluded that during approach and flight operations, the noise in the cockpit prevented effective verbal communication (when headphones were not used). Consequently, the NTSB recommended that the FAA consider publication of advisory information concerning speech intelligibility in aircraft with particularly high cockpit sound levels. The FAA responded to the NTSB'S recommendation for action with an advisory circular which remains in draft form at the present time. Pertinent sections are reproduced below (Ref. 5):

1. Above a cockpit noise level of 88 dB(A), (PSIL = 78) efforts made to aid communications by use of one or more of the methods discussed in the Advisory Circular will significantly improve communication between crew members. (The Circular discussed the use of well-fitted hearing protectors, noise-cancelling microphones, and miniature headsets with circumaural muffs as possible methods of increasing speech intelligibility.)
2. An Articulation Index of 0.3 was defined as equivalent to a PSIL 78 or 88 dB(A).
3. An Articulation Index of 0.3 was, identified as adequate for acceptable communication. When coupled with visual cues, this AI value relates to an intelligibility level of 97% in the known sentence test.

## REFERENCES

1. Peterson, Arnold P.G. **Handbook of Noise Measurement.** GenRad, Inc., 1980.
2. U.S. Air Force. *Design Note 3F1*. January 1974.
3. Great Britain Committee on the Problem of Noise. *Noise, Final Report*. Presented to Parliament by the Lord Minister for Science by Command of Her majesty. London, H. M. Stationery Office, July 1963.
4. Industrial Audiology. *Cockpit Communication Interference*. FAA Order Number DTAFAO1-82-81561; July 1982.
5. FAA Advisory Circular Draft on Cockpit Speech Interference.



Top
Return to NPC Library
Return to NPC Home Page

**Section 7.0 SLEEP INTERFERENCE**

SUMMARY

**INTRODUCTION**

This section describes the sleep process and reviews research relating the percentage of an exposed population experiencing awakening to noise level. Design criteria are also identified for avoiding unacceptable rates of awakening.

**AVIATION APPLICATIONS/ISSUES**

Sleep interference associated with aircraft noise.

**GUIDANCE/POLICY/EXPERIENCE**

Sleep interference is one of the factors contributing to aircraft noise annoyance. Airport nighttime restrictions have been employed to minimize this annoyance. In the case of nighttime operations an exterior maximum sound level (ALm) of 72 dB is identified as an acceptable sleep interference threshold for windows closed condition. This corresponds to an interior ALm of about 55 dB.



Top
Return to NPC Library
Return to NPC Home Page



Top

Return to NPC Library
Return to NPC Home Page

7.1 **INTRODUCTION**

Sleep can be divided into two stages: REM (rapid eye movement) and NREM (non-REM). NREM, the heavier sleep, is further divided into four substages, the fourth of which is the deepest sleep. The two stages (REM and NREM) appear throughout the night in cycles, with REM sleep recurring in all ages at approximately 90 minute intervals. The amount of time spent in stage 4 sleep, however, decreases progressively with age. The elderly also have more occurrences of waking after falling asleep than do younger people. Figure 7.1 is a graph of these cycles (Ref. 1).

Sleep has been identified as having a number of beneficial effects which any sleep interference can inhibit. These include the restorative processes of body organs, the recovery of the brain from "fatigue", the consolidation into memory of information gained during wakefulness, and, in children, the release of growth hormones. Interestingly, sleep deprivation does not appear to affect mental and psychomotor performance adversely. However, it is a generally accepted conclusion that sleep is necessary for a healthy life, so the question of to what extent noise can interfere with an individual's sleep naturally arises.

7.2 **SLEEP DISTURBANCE RESPONSE**

In most sleep research experiments, arousal is said to have occurred when (1) within one minute of a noise stimulus, the subject's EEG pattern changes to one of wakefulness, or (2) the subject gives some sort of motor signal indicating he or she is awake. If the subject's EEG changes within one minute of a noise stimulus but the change is normal for that sleep stage, an 0-reaction (meaning a reaction less than a change of one sleep stage) is said to have taken place. Research has shown that fewer awakening reactions were found in deep sleep than in light sleep, and that REM sleep provided more 0-reactions than NREM sleep. Only relatively high exposure to aircraft noise could cause arousal from substages 3 and 4 of NREM sleep.

Figure 7.2 illustrates the number of awakenings and 0-reactions which take place at different noise levels (Ref. 2). The figure represents a collation of ten publications involving 94 subjects and 742 nights of testing. The relationship illustrated in the figure provides the basis for currently accepted policy that interior noise levels of up to 55 dBA are acceptable.

7.3 **RECENT LITERATURE REVIEW**

In 1983, the FAA requested NASA Langley Research Center to review the literature and "state of the art" in sleep interference research. This study was part of a larger reevaluation of weightings proposed for nighttime noise events. The pertinent findings of this study are outlined below (Ref. 3).



Top
Return to NPC Library
Return to NPC Home Page

Ref 2

7.3.1 **Arousal from Sleep**. The study revealed that, while research has yielded widely varying conclusions as to what the threshold of arousal from sleep is, the level of a noise which can interfere with falling or waking from sleep ranges from 35 to 70 dB. The varied results of researchers arise because several factors affect how easily a person will be awakened from sleep. As mentioned above, a person's age is a prominent factor affecting arousal. Children sleep the heaviest, the elderly the lightest, sleep. Thus, older people have a much lower , arousal threshold than do younger people.
As one might expect, there is also a rise in the threshold of arousal as sleep stages deepen. The average difference in the arousal threshold from being awake to stage 4 NREH sleep is about 17.5 dB. Lastly, because of the cyclical nature of the two sleep stages (REM and NREM), an individual's susceptibility to arousal varies throughout the night. However, in a normal 8-hour sleep night, more time is spent in lighter stages of sleep in the last half than in the first half. This implies that airport use restrictions limiting early morning flight from 3 a.m. to 7 a.m. are particularly important. Although people are also susceptible to arousal at the beginning of a sleep period when they are just trying to fall asleep, in general arousal is more likely during the late hours of sleep.
7.3.2 **Measuring Sleep Interference**. Some studies have shown generally that the single event energy dose of a noise event (EPNL or SEL), and not the maximum level (in PNL or AL) is a better predictor of sleep interference (Refs. 4, 5). These findings have been contradicted in a report by 0hrstrom and Rylander, who assert that peak levels should be used to determine tolerable night levels of noise (Ref. 6). Researchers continue to debate this question.



7.3.3 **Adaptation**. Studies conducted to determine adaptation to the sleep arousal noise threshold over a number of successive nights revealed only slight adaptation. Researchers speculate that perhaps even this small degree of adaptation involved subjects' acclimatization to the laboratory setting and instruments rather than to the noise.
Another researcher found that subjects exposed to noise either 0, 6 or 24 times in one night demonstrated habituation during the night: The subjects showed less arousal response on the nights when 24 stimuli were presented than during 6-stimuli nights (Ref. 7). However, subjects' morning performance was better following a 6-stimuli night than a 24-stimuli night despite increased average arousal. The value of habituation to more frequent sleep disturbances in a given night is thus questionable.
In an interesting but unusual study of infants near Osaka airport (in Japan), it was determined that babies who were born of mothers exposed intense aircraft noise before conception and/or during the first five months of pregnancy had habituated themselves to aircraft noise below approximately 90 dBA, although still reacting to music (the control sound) below that level (Ref. 8). Babies having less or no "exposure" before birth to aircraft noise reacted both to aircraft noise and to music below 90 dBA. While this particular report suggested that the babies habituated during the first five months of prenatal growth to a greater extent than the babies with less or no prenatal exposure to aircraft noise, other researchers consider this conclusion "highly speculative."
It is generally accepted that people adapt psychologically to new environmental noises. This adaptation involves learning how often and when environmental noises are likely to occur, and how to adjust behavior patterns to prevent sleep arousal or other effects of noise. Research suggests that adaptation to noise is a constant. In one study, for example, cessation of aircraft landing operations between 11 PM and 6 AM at Los Angeles International Airport had no appreciable effect on subjects' reports of sleep interference (Ref. 9).
7.4 **1977 LITERATURE REVIEW**
An earlier review of sleep interference was also carried out under FAA support in 1977 as part of a congressional mandate to assess the feasibility of soundproofing schools and hospitals in the vicinity of

airports (Ref. 10). Key observations and conclusions from that study are provided below.
Although the effects of noise on sleep are not completely understood, the noise environment of a hospital area must be considered, because sleep is crucial to patient recovery. A level of 40 dBA is a conservative estimate of the threshold level of noise for sleep disturbance of patients in hospitals and public health facilities. Noise exposure below this level is not expected to interfere with sleep.



Top
Return to NPC Library
Return to NPC Home Page

Ref 10



Top
Return to NPC Library
Return to NPC Home Page

Other studies have also attempted to set noise levels for sleep disturbance and have basically supported this limit. The U.S. EPA set 35 dB as the A-weighted disturbance level for a steady noise; it also concluded that single event maximum levels (ALm) of 40 dB result in a 5% probability of awakening. Figure 7.3 is a composite of laboratory data for sleep interference versus maximum A-weighted noise levels.

The recommended interior noise levels for hospitals and sleeping environments was identified in the 1977 report as being between 34 and 47 dNA. A study conducted in patient rooms of eight hospitals revealed a background noise level ranging from 35 to 60 dBA, and an average 24-hour level of between 40 and 45 dBA. Aircraft noise effects in a hospital depend, of course, on how high the background level is without aircraft noise, and the intensity, duration, and frequency of noise disturbance from aircraft.

7.5 **SUMMARY**

In summary, the following conclusions can be drawn from the research studies reviewed:

1. The threshold level of a noise which will cause arousal from sleep depends on sleep stage and the age of the subject, among other things. Noise levels which can cause sleep disturbance cover a range of 35 to 70

dB (ALm).

2. Little or no physiological adaptation to sleep interference from noise occurs, although adaptation to new sleep environments does occur.
3. Psychological annoyance from the effects of sleep interference from aircraft noise is probably more significant than the direct physiological consequences.
4. The recommended interior noise levels for hospitals is between 34 and 47 dB; for other sleeping environments, the maximum acceptable intrusive level is 55 dB.



Top
Return to NPC Library
Return to NPC Home Page

REFERENCES

1. Kales A, and J. Kales. **Evaluation and Treatment of Insomnia**. New York, Oxford University Press, 1984.
2. Griefahn, Barbara. *Research on Noise-Disturbed Sleep Since 1973*. In Proceedings of the Third International Congress on Noise as a Public Health Problem. ASHA Report No. 10, April 1980.
3. Kryter, Karl. D., *Analysis of Laboratory and Field Data on Awakening from Noise*.
4.Lukas, J., *Measures of Noise Level: Their Relative Accuracy in Predicting Objective and Subjective Responses to Noise During Sleep*. EPA-600/1-7-010, U.S. Environ. Protect., Agency. Feb. 1977.
5. Horonjeff, R., R. Bennett, and S. ________, **Sleep Interference** BBN Rpt. 3710 Dec. 1978, Electric Bower Research Institute, Inc., Palo Alto, CA 94302.
6. 0hrstrom, E., and R. Rylander, *Sleep Disturbance Effects of Traffic Noise - A Laboratory Study on After Effects*, **J. Sound and Vib**. Vol. 84, 1982, pp. 87-103.
7. LeVere, T. G. Morlock and F. Hart, *Waking performance decrements following minimal sleep description: The effects of habituation during sleep*, **Physiological Psychology**, Vol. 3, 1975, pp. 147-174.
8. Ando, Y. and H. Hatton, *Effects of Noise on Sleep of Babies*, **J. Acoust. Soc. Am.** Vol. 62, 1977, pp. 199-204.
9. Reported in Kryter, K. D., *Community Annoyance from Aircraft and Ground Vehicle Noise*, **J. Acoust. Soc. Am**. Vol. 72, 1982, pp. 1222-1242.
10. Wyle Labs, Res. Staff. *Study of Soundproofing Public Buildings Near Airports*. Ref. No. DOT-FAA-AEQ-77-9, April 1977.

[Top](#)
[Return to NPC Library](#)
[Return to NPC Home Page](#)

**Section 8.0 NON-AUDITORY EFFECTS**

SUMMARY

–

INTRODUCTION

This section summarizes a series of contemporary research studies which hypothesize correlation between noise exposure in general (in many cases aircraft noise exposure) and various human physiological or behavioral effects. While some studies show a significant correlation, other studies show none. Although research continues, there does not exist a succession of studies which corroborate the "cause and effect" theory. While the reader should be aware of research in this area, the topics reviewed in this section are considered to be beyond the realm of normally accepted and recognized aircraft noise effects.

**AVIATION APPLICATION/ISSUES**

1. Cardiovascular effects
2. Achievement scores
3. Birth weight
4. Mortality rates
5. Psychiatric admissions

**GUIDANCE/POLICY/EXPERIENCE**

1. As cited above the relationship between these suggested "effects" and aircraft noise has not been repeatedly and consistently demonstrated. On the contrary, many studies directly contradict those which show an effect.

Top
Return to NPC Library
Return to NPC Home Page

8.1 **INTRODUCTION**

Frequently, statements and claims are made that aviation noise damages the health of airport neighbors. The fact that aircraft noise above a certain level annoys those neighbors is generally accepted, but whether or not that noise causes any physical or mental damage is far less established. This section briefly reviews the pertinent reports and journal articles dealing with the non-auditory effects of aviation on people.

8.2 **INTERPRETATION OF RULINGS**

Section 611 of the Federal Aviation Act, as amended, requires the Administrator of the FAA to prescribe and amend standards and regulations "In order to afford present and future relief and protection to the public health and welfare from aircraft noise..." There is no clear definition of "public health and welfare" as used in this mandate. The U.S. EPA has interpreted the phrase as "complete physical, mental and social well-being and not merely the absence of disease and infirmity." (Ref. 1) More often, "public health" is interpreted to cover physical or mental damage to individuals and the public, as, for example, the loss of hearing acuity as a result of exposure to high levels of noise. Correspondingly, "public welfare" is interpreted to cover mental or emotional reaction to noise, often characterized as annoyance or interference with a normal activity (speech, sleep or solitude).

FAA's statutory mandate requires relief and protection from both levels of impact, so that a clear distinction between the two effects is largely academic. In many legal actions, however, a distinction may be sought in order to place more emphasis and importance on "health" impacts than on possibly less permanent "welfare" effects. Indeed, a 1982 decision by the U.S. Court of Appeals held that the effects on people's psychological health and community well-being should be included in an environmental impact statement associated with the proposed restart of Three Mile Island Unit 1 (Ref. 2). A strict interpretation of this decision could add comparable new assessments into many aviation-related actions.

8.3 **REVIEW OF STUDIES**

A brief review was carried out of available scientific journal articles and reports dealing with possible health and welfare effects of airport noise on residents of neighboring communities (Ref. 3). The effects of aircraft noise on the physical, mental and emotional health of airport neighbors (the so-called non-auditory effects) are not nearly so clear as those for hearing loss. Most survey reports on this subject find that there is little reliable evidence on the relationship between noise exposure and mental or physical health. Although there are many studies available attempting to relate these factors -- one study cites 150 references, another 83 -- most do not employ scientifically rigorous methods or provide fully descriptive information on which their validity can be judged. It is interesting to note that a recent EPA-sponsored



Top

survey judged only one study out of 83 to rate higher than "4"on a scale of 0 to 9, in terms of study quality (Ref. 3). Thus, in general, it is difficult to prove -- or- disprove -- any connection between mental or physical health and noise, and more particularly, airport noise.

Three pairs of studies, included in this section, directly contradict each other. One 1979 study apparently found a higher mortality rate for residents near Los Angeles International Airport, compared with a lower noise-exposure area (Ref. 5). A 1980 study used exactly the same data, and found that the mortality rates were nearly identical. The latter analysis appears far more thorough and scientifically valid (Ref. 6).

A 1978 study, which received national press coverage, apparently showed a higher rate of birth defects for residents east of Los Angeles International Airport, compared to the remainder of Los Angeles County (Ref. 7). A 1979 study reported exactly the same type of analysis around Atlanta's Hartsfield International Airport, and found no significant differences in 17 categories of birth defects for residents near the airport and those in quieter locales (Ref. 8). Again, the second study appears far more rigorous and scientifically valid (but it apparently received no press attention at all). A third pair of studies examined mental hospital records in relation to airport residents, and also reached different conclusions (Ref. 9, Ref. 10).

Perhaps the most striking set of studies concerning the effects of airport noise on neighbors was that published in 1977 by Knipschild (Ref. 11 through Ref. 14). These studies examined the incidences of cardiovascular problems, doctor contacts, and drug purchases for areas near Amsterdam's Schiphol Airport, and concluded that "airport noise, as prevalent around many airports, constitutes a very serious threat to public health in all its aspects: affection of well-being, mental disorders, somatic symptoms and diseases (especially cardiovascular diseases)." The EPA-sponsored survey included one of these studies, however, but did not seem to find it convincing. Incidentally, the Knipschild studies have been cited in a recent court case and apparently was considered important in that decision (Ref. 15).

8 4 **SUMMARY**

Although many airport neighbors have claimed a direct health impact from aviation noise, there is little valid scientific basis for such claims.

**REFERENCES**

1. U.S. Environmental Protection Agency, "Information on Levels of Environmental Noise Requisite to Protect Public Health and Welfare with an Adequate Margin of Safety," EPA 550/9-74-004, March 1974.
2. People Against Nuclear Energy v. U.S. Nuclear Regulatory Commission U.S. Court of Appeals for the District of Columbia, May 14, 1982.
3. Wesler, John F. Unpublished Information Paper on the Effects of Noise. Federal Aviation Administration, AEE-120, Washington, D.C., 1981.
4. Thompson, "Epidemiology Feasibility Study: Effects of Noise on the Cardiovascular System," EPA Report 550/9-81-103, September 1981.
5. Meecham & Shaw, "Effects of Jet Noise on Mortality Rates," British Journal of Audiology, Vol. 13, 1979.
6. Frerichs, Beeman & Coulson, "Los Angeles Airport Noise and Mortality - Faulty Analysis and Public Policy," American Journal of Public Health, Vol. 70, No. 4, April 1980.
7. Jones & Tauscher, "Residence Under an Airport Landing Pattern as a Factor in Teratism," Archives of Environmental Health, Vol. 33, 1978.
8. Edmonds, Layde & Erickson, "Airport Noise and Teratogenesis," Archives of Environmental Health, Vol. 34, pp. 243-247, 1979.
9. Meecham & Smith, "Effect of Jet Aircraft Noise on Mental Hospital Admissions," British Journal of Audiology, Vol. ii, pp. 81-85, 1977.
10. Gattoni & Tarnopolsky, "Aircraft Noise and Psychiatric Morbidity," Psychological Medicine, Vol. 3, pp. 516-520, 1973.
11. Knipschild, "V. Medical Effects of Aircraft Noise: Community Cardiovascular Survey," International Archives of 0ccupational and Environmental Health, Vol. 40, 1977.
12. Knipschild, "VI. Medical Effects of Aircraft Noise: General Study," International Archives of 0ccupational and Environmental Health, Vol. 40, 1977.
13. Knipschild, "VII. Medical Effects of Aircraft Noise: Drug Survey," International Archives of Occupational and Environmental Health, Vol. 40, 1977.
14. Knipschild, "VIII. Medical Effects of Aircraft Noise: Review and Literature," International Archives of Occupational and Environmental Health, Vol. 40, 1977.
15. Charles Frances Davison et. al. v. Department of Defense et. al., U.S. District Court for Southern District of Ohio, May 1982.



Top
Return to NPC Library
Return to NPC Home Page

## Section 9.0 EFFECTS OF NOISE ON WILD AND DOMESTICATED ANIMALS

SUMMARY

–

**INTRODUCTION**

This section summarizes research concerning the effects of aviation noise on wild mammals, birds and fish, on farm animals (swine, cattle, poultry and mink), and on a variety of laboratory animals. While a significant amount of research has been conducted on the reactions of animals to noise, it has proven difficult to draw any general conclusions on the subject because there is much variability in response both between and within species. Thus, no clear policies or guidelines have been developed concerning

noise exposure and animals.

**AVIATION APPLICATION/ISSUES**

1. Harm to animals in U.S, wildlife refuges, national parks, and wilderness areas
2. Effects on the productivity of domestic animals

**GUIDANCE/POLICY/EXPERIENCE**

Animals are rarely exposed to high noise levels outside of the laboratory, and most have proven impervious to the aircraft noise they do experience. Nevertheless, a few species have demonstrated little tolerance of aircraft noise and have shown few signs of adapting to it. Since no well-established guidelines concerning noise and animals exist, it is important to remain aware of the issue and alert to the possibility that "off-limits" wildlife areas may be desirable in the future for selected wildlife areas.



Top
Return to NPC Library
Return to NPC Home Page

9.1 **INTRODUCTION**

The effects of aviation noise on animals have been studied rather extensively over the past 20 years, with much of the work being conducted by U.S. Air Force-sponsored researchers. The studies have revealed that the effects are highly species-dependent and that the degree of the effect may vary widely. Responses of animals to aircraft noise vary from almost no reaction to virtually no tolerance of the sound. The question of how adaptable animals are remains largely unanswered. Both wild and domesticated animals have been studied, though more research has centered on domesticated or laboratory animals (such as rats and mice). The research summarized below reflects the extensive variation in the sensitivity and response of animals to noise.

9.2 **WILDLIFE**

It has proven difficult to study the effects of aviation noise on wild animals in their own environment and under natural conditions. Yet, as urban areas of the U.S. continue to grow, protecting natural habitats and their inhabitants thereof becomes a greater concern.

9.2.1 **Birds**. A test employing helicopters and other aircraft was conducted at Arkansas National Wildlife Refuge in Texas (Ref. 1). Eleven different avian species were observed and their reactions gauged on a scale of 1 (no reaction) to 4 (violent reaction, left the area). Figure 9.1 depicts the results of this study. Of the eleven species, five--Canadian and Snow Geese, Sandhill Cranes, Turkey Vultures and Great Egrets--showed no change in response as a function of helicopter noise level, while the other six species appeared to alter their response depending upon the noise intensity. The grebes' response increased only slightly while the response of ring-necked ducks, coots, gadwalls, purple gallinules, and pintail ducks were found to increase more strongly as a function of the helicopter noise level. Canadian and Snow Geese did not tolerate helicopter noise at any level. The authors concluded that because any tendency among the geese to adapt remains to be demonstrated, "off-limits" areas may possibly be necessary for such sensitive species.

9.2.2 **Fish.** Fish have been noted to respond to noise within their environment such as underwater explosions and the sound of fishing vessels; however, aircraft noise is very rarely a part of that environment. Most airborne sound is reflected off the water's surface, with only a small fraction actually penetrating the air-water boundary. The impact of sonic boom on aquatic life has also been evaluated. When a sonic boom sweeps an expanse of water, only the vicinity of the water surface is affected. The ICAO Sonic Boom Committee, after conducting various tests, concluded that typical sonic booms are not likely to harm aquatic life (Refs. 2, 3). Also, the U.S. Department of the Interior, Bureau of Sport Fisheries and Wildlife conducted a study of the effect of sonic boom on fish and fish eggs. Trout and salmon eggs were reared in the normal manner until reaching the most critical stage of development and then were exposed to sonic boom. Mortality rates for the exposed eggs were compared with a control group. No mortality differential was discernible (Ref. 4).



9.3 **DOMESTICATED (FARM) ANIMALS**

A 1963 study found that pigs exposed to recorded jet and propeller aircraft sounds of 120 to 135 dB daily from 6 a.m. to 6 p.m. from weaning time or before, until slaughter at 200 pounds body weight,

showed no differences in feeding or weight gain from pigs unexposed to the sounds (Ref. 5). Another study also reported that dairy cattle showed no differences in milk production when exposed to aircraft noise. The researchers compared milk cow herds located within three miles of a number of air force bases using jet aircraft (13 percent of the herds were within 1 mile of the end of an active runway). Dairy cattle studied in the vicinity of Edwards Air Force Base (California) showed few abnormal behavioral reactions due to sonic booms, though they had been exposed to the booms for several years and so may have become habituated (Ref. 6). Other studies also supported this evidence that cattle are generally not affected by the sonic boom or other aircraft noise.

Poultry have shown no more reaction to aircraft noise than swine or cattle. In a 1958 study, recorded aircraft flyover noise at 80 to 115 dB at 300 to 600 Hz was played daily and every third night from the beginning of the hens brooding until the chicks were 9 weeks old. There resulted no difference in weight gain, feeding efficiency, meat tenderness or yield, or mortality between sound-exposed and non-exposed chicks (Ref. 7). Broad breasted bronze turkeys were exposed to recordings of low flying jet planes at l10 to 135 dB for 4 minutes during the third day of brooding. The turkeys typically ceased brooding but resumed it shortly, with no decrease in egg laying (Ref. 8). A final study showed that chicken eggs exposed to daily sonic booms for 21days during their incubation hatched normally (Ref. 9).

In a 1968 study on mink, one hundred twenty animals were exposed to simulated sonic booms ranging from 2.0 to 0.5 lb per sq ft. The litters of mink exposed to the booms were larger than those of mink not exposed. No racing, squealing or other signs of panic were observed in the animals. Animals that died naturally were examined; no disorders which could be traced to the sonic booms were found (Ref. 10). Female mink showed little or no response to exposure to sonic boom during breeding, birth of kits, or whelping. Again, no signs of panic were observed.

9.4 **LABORATORY ANIMALS**

Mice, rats, monkeys, and rabbits have been examined in numerous studies, the results of which are briefly reviewed here (Ref. 11). The studies generally exposed the test animals to a certain level of noise for a predetermined period of time; response was measured in terms of physiological change. Increases and decreases in body chemicals and in the weights of body organs were typically observed in the tests. Although some of the bodily changes were typical of reactions to stress (and noise is often considered stressful), it was not clear that the changes were significant or dangerous. As with humans, hearing damage occurred when the animals were exposed to high level noise; however, animals are rarely exposed to extreme aircraft noise.



Top
Return to NPC Library
Return to NPC Home Page

9.5 **CONCLUSION**

While instances may arise in which aviation noise does create a concern for those protecting wildlife or involved in animal husbandry, in general, aviation noise has a minimal impact on animals.

**REFERENCES**

1. Edwards, Richard G., Alvin B. Broderson, Roger W. Barbour et al. *Assessment of the Environmental Compatibility of Differing Helicopter Noise Certification Standards*. U.S. Department of Transportation, FAA, June 1979.

2. International Civil Aviation 0rganization, Sonic Boom Committee. Report. . First meeting, Montreal, ICAO Doc. 9011, SBC/1, May 1972.
3. International Civil Aviation 0rganization, Sonic Boom Committee. Report. Second meeting, Montreal, ICAO Doc. 9064, SBC/2, June 1973.
4. U.S. Department of Transportation, FAA. *Concorde Supersonic Transport Aircraft: Final Environmental Impact Statement*. Vol. 1, September 1975.
5. Bond, J. C.F. Winchester, L.E. Campbell, and J.C. Webb. *Effects of Loud Sound on the Physiology and Behavior of Swine.* U.S. Department of Agriculture, Agricultural Research Service Technical Bulletin, No. 1280.
6. Parker, J.B, and N.D. Bayley. *Investigations on Effects of Aircraft Sound on Milk Production of Dairy Cattle, 1957-1958*. U.S. Department of Agriculture, Agricultural Research Service, Animal Husbandry Research Division, 1960.
7. Stadelman, W.J. *The Effects of Sounds of Varying Intensity on Hatchability of Chicken Eggs*. **Poultry Science**, 37, 1958.
8. Jeannoutot, D.W. and J.L. Adams. *Progesterone Versus Treatment by High Intensity Sound as Methods of Controlling Broodiness in Broad Breasted Bronze Turkeys*. **Poultry Science**, 40, 1961.
9. Bell, W.B. *Animal Response to Sonic Boom*. Paper presented at the 80th meeting of the Acoustical Society of America, Houston, November 1970.
10. Travis, H.F., G.V. Richardson, J.R. Menear, and J. Bond. *The Effects of Simulated Sonic Booms on Reproduction and Behavior of Farm-Raised Mink*. ARS 44-200, U.S. Department of Agriculture, Agricultural Research Service, June 1968.



Top
Return to NPC Library
Return to NPC Home Page

## Section 10.0 EFFECTS OF STRONG LOW FREQUENCY ACOUSTICAL ENERGY

SUMMARY

–

**INTRODUCTION**

This section reviews the effects of strong low frequency acoustical energy in creating some of the more unusual (albeit rare) aircraft noise effects. The consideration of low frequency sound in creating vibration (and secondary noise) in structures is discussed. While structural vibration is not a common concern for commercial transport airplanes, there may be some need to exercise caution in helicopter operations in close proximity to buildings. A brief review is also provided addressing human physiological reactions to intense low frequency sound as one might encounter near engine test stands. Criteria are presented for both annoyance to vibration and human physical damage risk for exposure to intense infrasound.

**AVIATION APPLICATIONS/ISSUES**

1. Vibration of wall and windows
2. Radiation of secondary noise
3. Human physiological response to intense low frequency

sound
4. Sonic Booms (illegal in U.S, for civil aircraft operations)

**GUIDANCE/POLICY/EXPERIENCE**

The issue of low frequency energy and its impact on buildings and people was explored in detail in regard to the Concorde SST operations in the U.S. Impacts were found to be negligible. Consequently low frequency effects from civil commercial aircraft remains a minor issue in most environmental impact assessments. There remains the need however to consider carefully possible effects of low frequency energy in the operation of helicopters in close proximity to buildings.

(Preceding page blank)



Top
Return to NPC Library
Return to NPC Home Page

10.1 **INTRODUCTION**

The lower end of the audible acoustical spectrum is approximately 20 Hz. Below this frequency people cannot generally hear sound but can easily sense vibrations in their bodies. Intense sound in this frequency range can also excite resonances in various body cavities causing a feeling of nausea or discomfort. Intense infrasound can also cause walls and floors to vibrate, rattling windows and household items. The effects of this low frequency sound are discussed in this chapter.

10.2 **STRUCTURAL EFFECTS**

Potential damage to building structures from low frequency sound vibration became a topic of concern during the environmental assessment of the supersonic jet transport, the Concorde. Subsequent studies revealed that low frequency vibration from the Concorde causes little to no structural damage. Analyses conducted of five historic sites near the proposed subsonic flight path of the Concorde aircraft revealed breakage probabilities from noise-induced vibration for windows, brick chimneys, a stone bridge, and a plaster ceiling to be less than .001 percent per year (Ref. 1). It was found that exposure to normal weather (such as thunder or wind loads) produces a higher probability of breakage than vibrations from the Concorde.

At Sully Plantation, Virginia, the test location nearest the Concorde flight path and therefore most likely to sustain vibration damage, calculations were based on a sound level of 104 dBA for each overflight, or an effective pressure of .313 psf. Estimates of the probability of breakage of one flight from Concorde overflights are about one in every million years. The Concorde's contribution to the cumulative damage of a house in the neighborhood of Kennedy Airport was found to be insignificant. Everyday vibrations from wind and household activities were greater than those caused by aircraft in the worst conditions around normal airports.

Studies show that the Concorde causes five times the vibration to normal buildings as the older model Boeing 707 (with JT3D engines) (Ref. 2). Considering the higher levels of noise produced by the Concorde in relation to other aircraft, the danger of breakage from noise-induced vibration at all frequencies is therefore slight.

10.3 **ANNOYANCE WITH STRUCTURAL VIBRATION**

It has also been theorized that the vibrations induced in buildings and windows by low frequency sound might increase the annoyance of the occupants to a greater degree than the effects of the vibration on the human body. This annoyance is due to human perception of the vibration of a wall or window and rattle created by household objects when the structure vibrates. Infrasound characterized by long wavelengths is not attenuated by walls, partitions, acoustic absorbers, or the atmosphere to the same degree as audible sound.

U.S. Army researchers conducted a study to measure the role of vibration and rattle in human response to helicopter noise (Ref. 3). Helicopter noise annoyance was judged against annoyance from a control noise by



Top
Return to NPC Library
Return to NPC Home Page

subjects in the living-dining area of a frame farmhouse, in a mobile home, and outdoors. Subjects in the living-dining area of the house were most annoyed by vibration and rattle; results suggest that, when high levels of vibration and rattle are present, a control noise would have to be 20 dB higher than the helicopter noise to produce equivalent annoyance. This offset was 3 to 6 dB outdoors with an average of 4 1/2 dB. Subjects in the mobile home, most likely because of the low frequency resonance created by the helicopter, display a 3 to 14 dB offset with an average of about 8 dB. The researchers concluded that vibration and rattle can significantly increase the annoyance associated with a particular sound level.

Reiher and Meister conducted an investigation of subjective human response to different levels of structural vibration, and used this data to develop the tolerance criteria shown in Figure 10.1 (Ref. 4). Their study revealed that, when compared with these criteria, wall vibration caused by takeoff and approach of the Concorde are imperceptible or barely perceptible, causing no adverse effects on human beings (See Figure 10.2).

10.4 **PHYSIOLOGICAL EFFECTS**

Low frequency sound can be directly absorbed through the surface of the body and can excite sense organs other than the ears. The effect is similar to the effect of mechanical vibration on the body, causing the internal organs to vibrate and disturbing the nervous system, digestion and sight. Most physiological effects of vibration and noise are limited to a narrow frequency range. Very intense low frequency noise (0-20 Hz) can cause a sensation of vibration, disequilibrium, motion sickness, speech disturbance, and blurring of vision, just to name a few. Frequencies from 5-9 Hz have been shown to affect the liver, spleen, and stomach, while somewhat higher frequencies may result in mouth, throat, bladder or rectal pain.

Workers in extremely noisy situations complain of distraction from nausea, disequilibrium, disorientation, headache, lassitude, and blurring of vision. French workers have reported disorders of the circulatory and nervous systems as a result of exposure to infrasound, but the presence of permanent effects on the body has not been verified (Ref. 5). Industrial equipment often produces inaudible vibrations which, after prolonged exposure, cause specific complaints of giddiness, nausea, and anxiety not found after similar exposure to noise in the audible range.

10.5 **CRITERIA FOR INTENSE LOW FREQUENCY SOUND (INAUDIBLE), INFRASOUND**

10.5.1 **EPA Levels Document**. According to the EPA Levels Document extremely high levels of infrasound can cause mild stress reactions and such unusual auditory sensations as pulsating or fluttering

(Ref. 5). The threshold for these symptoms is about 120 dB sound pressure level in the 1-16 Hertz range. The EPA sees no serious health hazard in infrasound intensities where the sound pressure level is below 130 dB. To consider a



Top
Return to NPC Library
Return to NPC Home Page

Ref 4

Ref 4



Top
Return to NPC Library
Return to NPC Home Page

worst case example, the Concorde supersonic transport creates sound pressure levels at low frequencies (below 30 Hz) which are well below EPA sensation and damage risk levels. All other commercial transport levels fall below those of the Concorde, indicating no potential health effects associated with low frequency noise from in-service commercial aircraft.

10.5.2 **International Standards 0rganization (ISO).** Generally, human tolerance of vibration is lowest in the 4-8 Hz frequency range, and this is the basis of limits proposed by the ISO Technical Committee 108 working Group. Human tolerance to vibration also depends on situational factors; for example, the blurring of vision which is merely an annoyance to a train passenger could impair safety and efficiency in the workplace. It is also not known to what extent non-auditory sensations of noise are symptoms of psychological stress.

10.6 **SONIC BOOM**

FAA flight rules require civil aircraft to fly at subsonic speed over U.S. land areas in order to prevent sonic booms from impacting the U.S. environment. For supersonic aircraft approaching or leaving U.S. boundaries, flight rules stipulate that the aircraft be operated in a manner that will not cause direct sonic shock waves to encroach upon the U.S. (Ref. 6).

Sonic booms result when a projectile such as an aircraft exceed the speed of sound. The phenomenon we call a boom is similar in many ways to an explosion, characterized by a rapid increase in pressure above the ambient pressure, followed by a negative pressure excursion. An example of this N-wave signature is shown in Figure 10.3.

Ref 7

A great deal of research was conducted in the1950's and 1960's by the U.S. Air Force and prospective manufacturers of the an American SST. (The U.S. SST program was eventually cancelled). The relationships



Top
Return to NPC Library
Return to NPC Home Page

between sonic boom overpressures and resulting damage and community response are presented in Table 10.1 (Ref. 7). One publication concludes "The human reaction to shock wave noise has been fairly well correlated. It has been concluded that 1.0 pound per square foot (overpressure) will cause no damage to ground structures and no significant public reaction day or night."

Ref 7

One of the most famous studies on the sonic boom was conducted in 1964 over Oklahoma City (Ref. 8). Eight sonic booms a day at a median peak overpressure level of 1.2 psf (57.46 pascals) were experienced by this community over a six-month period. Figure 10.4, below, reveals the percentage of responding residents who reported adverse reactions to the sonic booms. Based on this and many other studies, the U.S. EPA has stated that "the peak overpressure of a sonic boom that occurs during the day should be no more than 35.91 pascals (0.75 psf) if the population is not to be annoyed or the general health and welfare adversely affected " (Ref. 9).
As a matter of interest, a rather unusual phenomenon called secondary sonic booms were observed shortly after the introduction of Concorde service to the U.S. In essence, sonic shock waves from the Concorde were refracting off the discontinuity at the top of the earth's atmosphere and bending back down to the earth, l4hile the level of the overpressures was not high enough to cause any damage, people did take notice. After a study of these "mystery booms" by the FAA / DOT (Ref. 10), the Concorde pilots implemented changes in their operational procedures to minimize the occurrences.



Top
Return to NPC Library
Return to NPC Home Page

Ref 8

10.7 **CONCLUSION**

As discussed in this section, low frequency sound and its effects are relatively minor considerations in assessing aircraft nose impact. The case of helicopter operations in close proximity to buildings, however, remains an area warranting close scrutiny.



Top
Return to NPC Library
Return to NPC Home Page

**REFERENCES**

1. Hershey, Robert L., Russ J. Kevala, and Sharon L. Burns. *Analysis of the Effect of Concorde Aircraft Noise on Historic Structures*. Rep. No. FAA-RD-75-118, July 1975.
2. Wiggins, John H. *The Influence of Concorde Noise on Structural Vibrations*. Rep. No. FAA-75-1241-1, July 1975.
3. Schomer, Paul. *The Role of Vibration and Rattle in Human Response to Helicopter Noise*. Unpublished Report, December 1986.
4. Douglas Aircraft Company, Long Beach CA. *Sonic Boom Modeling Investigation of Topographical and Atmospheric Effects.* Final Report, FAA-NO-70-l0, July 1970.
5. U.S. Environmental Protection Agency, Office of Noise Abatement and Control, Washington D.C. *Information on Levels of Environmental Noise Requisite to Protect Public Health and Welfare with an Adequate Margin of Safety.* March 1976.
6. Code of Federal Regulations, FAR 91.55.
7. Federal Aviation Administration, Office of Planning. *Some Considerations of Sonic Boom*. May 1961.
8. Borsky, P.N. *Community Reactions to Sonic Booms in the Oklahoma City Area*. National Opinion Research Center, AHRL-TR-65-37, 1965.
9. U.S. Environmental Protection Agency. *Information on Levels of Environmental Noise Requisite to Protect Public Health and Welfare with an Adequate Margin of Safety.* 550/9-74-004, March 1976.
10. Rickley, Edward J, and Allan D. Pierce. *Detection and Assessment of Secondary Sonic Boom in New England*. FAA-AEE-80-22, May 1980.

Top
Return to NPC Library
Return to NPC Home Page

**Section 11.0 IMPULSIVE NOISE**

SUMMARY

**INTRODUCTION**

Over the past 10 years, researchers in aviation acoustics have suggested that penalties be assessed (dB increments added) for sounds which possess impulsive characteristics. Helicopter blade slap which accompanies certain modes of flight operation has been the primary subject of this research. This section reviews the research. and, as elsewhere, finds conflicting results. While some researchers find the need for an adjustment others do not. Complex distinctions between detectability and annoyance are key to the debate. In the end, the position adopted by the International Civil Aviation Organization (ICAO) was that no correction is necessary.. Nonetheless, the Helicopter Association International (HAT), and the FAA continue to conduct research to minimize impulsive helicopter noise.

**AVIATION APPLICATION/ISSUES**

The question is raised, in connection with helicopter noise, whether or not an impulsivity correction is necessary to properly assess human reaction.

**GUIDANCE/POLICY/EXPERIENCE**

After years of research, ICAO concluded that an impulsivity adjustment was unnecessary to properly certificate aircraft; this, in effect, implies that human response is adequately assessed without a special impulsivity adjustment to the EPNL metric. Nonetheless efforts continue to reduce impulsive noise which dominates helicopter noise in certain flight regimes.

Top
Return to NPC Library
Return to NPC Home Page

11.1 **INTRODUCTION**

During the past ten years, a great deal of research was devoted to evaluating the need for a correction factor or term to account for possible increased annoyance associated with highly impulsive acoustical noise events. The main focus of this activity has been impulsive helicopter noise which occurs during specific operational flight regimes, primarily high speed level flight and particular descent modes. This impulsive sound is sometimes characterized as slapping or banging. These research concerns were driven by the need to develop an adequate metric for use in a proposed international helicopter noise certification standard.

11.2 **REVIEIW OF STUDIES**

The findings of many studies concluded that the currently used aircraft noise certification metric, EPNL, did an adequate job of quantifying human annoyance response to impulsive helicopter noise events. The studies briefly synopsized below found, for the most part, that no adjustment would be needed to the EPNL metric to account for impulsiveness.

11.2.1 **1977 French Report**. In a 1977 report, French researchers concluded that impulsive noise is up to 6 dB more annoying than non-impulsive noise (Ref. 1). They had carried out an evaluation of impulsive noise using subjects who compared pairs of non-impulsive and impulsive noises. Pulse duration, type, degree, level and repetition frequency were all considered; the degree of impulsivity, or the magnitude of impulsive compared with non-impulsive noise, seemed to have the most influence on the subjects' responses.

11.2.2 **1977 U.S. Army Report**. The U.S. Army Medical Research Laboratory also issued a report in 1977 which addressed the issue of a penalty for impulsive noise (Ref. 2). In their test, subjects listened to a fixed wing aircraft as it passed overhead, then rated each flyover of a rotary-wing aircraft relative to the fixed-wing. Although the Army stated in the conclusion of its report that a 2 dB penalty for helicopters was suggested by their results, they asserted that "no correction for blade slap was found which improves the prediction of annoyance."

11.2.3 **1978 NASA Report**. In 1978 NASA sponsored a field study of helicopter blade slap noise. (Ref. 3). Subjects in this study, located both indoors and out, judged the noisiness of two helicopters and a propeller-driven airplane during controlled flyovers. One helicopter was operated to provide several levels of blade slap (impulsiveness); the other varied little in impulsiveness. Among the results of the study was the finding that, for equal EPNL, the more impulsive helicopter was consistently judged less noisy than the less impulsive helicopter. The report published from this study concluded that no significant improvement in the "noisiness predictive ability of EPNL" was provided by a crest impulsiveness correction.

11.2.4 1981 **United Kingdom Paper**. In December of 1981, researchers of the United Kingdom presented a paper to the ICAO Committee on Aircraft



Top
Return to NPC Library

Noise which supports the conclusions of the U.S. Army and NASA. (Ref. 4). These researchers found that a proposed impulsive correction does not make EPNL a better annoyance predictor; in fact, the opposite seems to hold true.

11.3 **CONCLUSION**

There is no need for a separate impulse correction to existing noise metrics to adequately quantify annoyance with helicopter noise. While efforts to reduce impulsive noise continues, research indicates that more detectable sounds are not necessarily more annoying.

**REFERENCES**

1. Wright, S.E, and A. Damongeot. *Psychoacoustic Studies of Impulsive Noise*. Paper #55, Third European Rotorcraft Powered Lift Aircraft Forum, Aeronautical and Astronautical Association of France, September 1971.
2. Patterson, James, Ben T. Mizo, Paul D. Schemer, Robert T, Camp. *Subjective Ratings of Annoyance Produced by Rotary-Wind Aircraft Noise*. U.S. Army Aeromedical Research Laboratory, Report No. 77-12. May 1977.
3. Powell, Clemans A. *A Subjective Field Study of Helicopter Blade-Slap Noise*. NSA Technical memorandum 78758, July 1978.
4. Loughborough University of Technology. *Studies of Helicopter Noise Perception: Background Information Paper*. ICAD Committee on Aircraft Noise, Working Group B, December 1981.



Top
Return to NPC Library
Return to NPC Home Page

**Section 12.0 TIME OF DAY WEIGHTINGS FOR AIRCRAFT NOISE**

SUMMARY

**INTRODUCTION**

The issue of whether noise occurring at different times of the day should be assigned weighting factors to represent different human sensitivity to noise intrusion has been a subject of much concern and research over the past 35 years. This section briefly reviews the research and practice. The metric selected by the FAA as the standard for use in airport noise impact assessment uses a 10 dB nighttime weighting factor.

**AVIATION APPLICATON/ISSUES**

1. Should aircraft noise occurring in the evening or at nighttime be assigned a weighting penalty to account for increased sensitivity to noise intrusions?
2. If a weighting is appropriate, what is the value of the weighting function?

**GUIDANCE/POLICY/EXPERIENCE**

The FAA has designated the Yearly Average Day Night Sound Level as the metric for assessing airport cumulative noise impact. This metric assigns a 10 dB weighting between the hours of 10 p.m. and 7 a.m.

(Preceding page blank)



Top
Return to NPC Library
Return to NPC Home Page

12.1 **HISTORICAL BACKGROUND**

12.1.1 **CNR**. The question of time-of-day first gained attention around 1951, when the Composite Noise Rating (CNR) scheme was developed. This method attempted to relate the noise and attributes of a community to a method which would estimate community response to aircraft noise. The CNR considered the background, or ambient noise level as well as just aircraft noise at night. The CNR penalized aircraft noise 5 dB just because it occurred at night, and another 5 dB because the background noise decreases about 5 dB at night. This reasoning has remained constant, in part forming an historical basis for the FAA's decision to penalize nighttime noise 10 dB. Later, revisions were made to the CNR, but in each case the 10 dB nighttime penalty was retained.

12.1.2 **NNI**. Another system of measuring noise differences was the British Noise and Number Index (NNI). This index, when reduced to similar terms as the CNR, indicated an 11 dB penalty for nighttime noise, a value comparable to the 10 dB in use.

12.1.3 **NEF**. In 1967, yet another measure was developed -- the Noise Exposure Forecast (NEF).

NEF was the first measure which was derived from the effective perceived noise level (EPNL). The NEF imposed a 12.2 dB adjustment for nighttime noise events. The 12.2 dB adjustment corresponds to a nighttime multiplier of 16.7.

Several other methods of measuring the noise around airports were pursued, but eventually the FAA and much of the community that deals with noise settled on the day/night average sound level (DNL) as the accepted measure. Using this measure, the 10 dB penalty for nighttime noise remains intact.

12.2 **REVIEW OF THE CHOICE OF DNL**

The choice of DNL as the "accepted" time of day metric was extensively examined at a workshop held at NASA Langley Research Center in 1980. (Ref. 1) There was much comment on the validity of DNL. One discussion group pointed out that the 10 dB penalty of the DNL was borrowed from earlier cumulative noise measures which were based on limited data and intuitive judgments. Many current studies suggest that people may actually be more sensitive to noise in the evening rather than late at night, other conference members asked whether the penalty of 10 dB was a valid number clearly related to community response or if it merely indicates that nighttime noise is less desirable than daytime noise.

The merits and deficiencies of the DNL metric were also examined. Table 12.1, relates the outcome of that discussion.



Top
Return to NPC Library
Return to NPC Home Page

Table 12.1

| DNL Merits | DNL Deficiencies |
| --- | --- |

| | |
|---|---|
| Accepted by all levels of government<br>Accepted internationally<br>Used to assess all community noise sources<br>Relates to Leq--generally accepted for hearing loss assessment<br>Allows one to relate exposure to instantaneous rms level and single event level<br>Correlates well with human response<br>Nighttime penalty looks reasonable with regard to range of data<br>Ability to account for more than annoyance puts an adequate weight on other health effects<br>Quantifies dose as a single number | Energy summation method sometimes yields bizarre results with nighttime weighting factor. Lacks uniform confidence in the scientific community<br>Hides some value judgments from the user<br>Ignores time of week and seasonal variations<br>Not known if the 10dB penalty is truly representative of all effects<br>Not known if the time periods of application or the magnitude of the penalty are valid |

Various recommendations were offered by conference participants concerning DNL. The representatives of several governmental agencies spoke in favor of maintaining agreement between Federal agencies as to what metric to use; they also stated a desire to have that metric be one that is applicable to all kinds of noise, (i.e. traffic, background, aircraft) which DNL is. Other recommendations from conference discussion groups and individuals included the following:

1. Researchers were urged to reconsider changing lifestyles and to reflect on whether 10 PM to 7 AM is the most sensitive portion of the day. Evening or transition may be more important.

2. DNL should remain a rough screening device. The DNL penalty, for example, could impact school operations if a large number of operations were shifted to the day. The public is urged to pursue local independent decisions on this matter.

3. several individuals suggested removing the nighttime weighting altogether and displaying day/night and weekend/seasonal information separately, using the Leq metric for the respective time periods.
4. DNL is intended to measure annoyance, not health, effects. However, any new nighttime penalty should perhaps consider sleep disturbance, speech interference and other effects.
The consensus of the conference groups seemed to be that, given its long history, its current wide acceptance and use, and the fact that there has been no strong alternative offered by research to date, DNL should remain the "accepted" measure.

12.3 **STUDY RESULTS**

As was noted by the NASA Langley Workshop discussed above, the nighttime noise penalty was derived intuitively - researchers assumed that nighttime noise is more disturbing to people than daytime noise. While there are a few studies that do support this assumption, many others present conflicting or contradictory views. A recent report sponsored by NASA Langley/FAA summarized conflicting report findings on time of day considerations (Ref. 2).
The many reports on time of day have revealed a number of variables that make it difficult (if not impossible) to make a clear statement about when noise is most annoying. For instance, various studies have found that:

! people report at least one awakening per night regardless of the presence or absence of noise
! actual sleep disturbance and people's report of sleep disturbance is weakly related
! people's reported annoyance/disturbance did not decrease after actual flights were reduced.
! People's age and sex both seem to partially determine how much and how easily a person is awakened at night.

There is also the possibility that people's perception of and annoyance with daytime noise affects their perception of nighttime noise, some researchers feel that there may be more complaints about nighttime noise because people view it as a more valid complaint than something like television disruption; thus, the perspective on time-of-day may be skewed. One study suggested that daytime activities, which usually involve communicating or concentrating tasks, might be more sensitive to interruption than sleep. The report stated that the one point that researchers seem to agree on -- although again, empirical evidence is scant -- is that the most annoying/disturbing times for noise to occur are when a person is trying to go to sleep and when he is preparing to awaken. However, bedtime



Top
Return to NPC Library
Return to NPC Home Page

varies greatly for people; it could be anywhere from 9:30 p.m. to 12:30 a.m. Thus it is hard to designate a specific time that is the most disturbing for aircraft noise to occur. The NASA Langley/FAA report concluded that no solid conclusion could be drawn about the suitability of present time-of-day models.
In addition to social surveys which attempt to determine people's nighttime annoyance with noise, a few studies have been conducted on the ambient noise level and its relationship to aircraft noise. The findings, once again, appear to be contradictory. Some studies (Ref. 3) seem to suggest that with higher background noise, annoyance with aircraft noise will be greater, while others suggest (Ref. 4) that there is little or no correlation between annoyance and ambient noise. Thus, no firm conclusion may be drawn concerning ambient levels and aircraft noise.

12.4 **CONCLUSION**

After fifteen years of use, the DNL has shown itself to be a workable tool for the noise community. Its use as the accepted measure in time of day considerations, with its nighttime penalty of 10 dB between 10 p.m. and 7 p.m., will continue unless future research can suggest a reasonable alternative.

## REFERENCES

1. Workshop Proceedings, NASA Langley Research Center. *Time of Day Corrections to Aircraft Noise Metrics*. Rep. No. FAA-EE-80-3, March 1980.
2. Fields, James M. *Research on the Effect of Noise at Different Times of Day: Models, Methods and Findings.* Unpublished Report, August 1984.
3. Pearson, K. S. *The Effects of Duration and Background Noise level on Perceived Noisiness*. FAA ADS-78, Federal Aviation Administration, April 1966.
4. Taylor S. M., F. L. Hall and S. E. Bernie. ?*Effect of Background Levels on community Responses to Aircraft Noise,* **J. Sound & Vib**, Vol. 71, No. 2, July 22, 1980.



Top
Return to NPC Library
Return to NPC Home Page

## Section 13.0 NOISE CONTOURS

SUMMARY

**INTRODUCTION**

Noise contours or footprints are the accepted technique for displaying airport cumulative noise exposure. Noise contours are also employed in comparing the noise footprints of individual aircraft. Contours can be developed for different noise indices, but airport contours generally express DNL while individual aircraft contours usually portray either SEL, EPNL or ALm.

**AVIATION APPLICATION/ISSUES**

1. Contours are used as the tool to assess land use compatibility.
2. Contours are also used to portray the noise exposure of single operations of various aircraft types.

**GUIDANCE/POLICY/EXPERIENCE**

The noise contour program developed by the FAA and approved for use in FAA funded airport land use compatibility studies is the Integrated Noise Model or INM. This program can also generate single event contours. A new microcomputer-based model which will generate noise contours for helicopters is now under development.

(Precedinq page blank)

Top
Return to NPC Library
Return to NPC Home Page



Top
Return to NPC Library
Return to NPC Home Page

**13.1 INTRODUCTION**

The principal tool for analyzing land use compatibility in the vicinity of airports and heliports is the noise footprint or contour. The noise contour represents a line of equal exposure. Noise exposure is expressed using the yearly average day-night sound level, DNL expressed in decibels.

The noise contours are generated using a computer simulation of the yearly average daily operations. The computer program developed for this purpose by the FAA is known as the Integrated Noise Model, or INM. This program has traditionally run on a mainframe computer, but is now available on at least two microcomputers (IBM XT and AT). In addition to the INM, the FAA is presently involved in developing a microcomputer-based Heliport Noise Model (HNM).

Noise contours are usually presented as overlays on 1" = 2000 feet U.S. Geological Survey quarter

sectional maps. This allows easy identification of land use categories and surface references. Figure 13.1 displays the standard INM test case noise contour.

Information on noise contours is available from the FAA. Reports on the use of FAA-approved noise contour methodology include:

Flythe, M. C., "INM Integrated Noise Model, Version 3 User's Guide," FAA-EE-81-17, October 1982.

Federal Aviation Administration, "INM Integrated Noise Model, Version 3--Installation Instruction," October 1982.

Connor, T. L. and D. N. Fortescue, "Area Equivalent Method on VISICALC@," FAA-EE-84-8, February 1984.

Warren, D. G., "Area Equivalent Method on LOTUS 1-2-3," FAA-EE-81-12, July 1984.

To acquire any of these noise impact models or for any additional information, contact:

FAA office of Environment and Energy
Noise Technology Branch
AEE-120
ATTN: Tom Connor or Donna Warren
800 Independence Avenue
Washington, D.C. 20591

13.2 **THE USES AND INTERPRETATION OF NOISE CONTOURS**

The uses of the noise contour include compatibility planning and parametric studies of airport operations such as:



Top
Return to NPC Library
Return to NPC Home Page

1) variation in aircraft ground tracks
2) departure profiles
3) aircraft mix
4) introduction of new aircraft
5) changes in numbers of operations, and
6) introduction of new runways

13.3 **APPLICATION AND INTERPRETATION OF NOISE CONTOURS**

13.3.1 **DNL 65 Contour**. Noise contours provide the important guidance necessary to make sensible zoning and planning decisions, avoiding incompatible land use in areas of high noise levels. Noise contours, especially at lower levels, can be visualized as somewhat fuzzy bands which become more and more discrete and sharp as the exposure level increases. For example, a DNL 55 contour would be rather fuzzy, while a 75 DNL line would be sharply in focus. In effect, the confidence one has in a noise contour and its interpretation increases as the exposure level increases. It is therefore worthwhile to review the strengths and potential weakness of noise contours in representing noise impact.

The applications of the DNL 65 contour are diagrammed in Figure 13.2 and are outlined below. The cautions previously alluded to are also set out below. It is worth noting that these qualifications simply identify possible misinterpretations and do not detract from the important general planning strengths.

**Applications**

1. Soundproofing may be required to achieve desired sound levels for certain building uses.
2. Conflicts may exist between certain land uses and predicted noise exposure as set out in FAA compatible Land Use Guidelines.
3. General caution is offered to prospective home buyers.

4. Contour provides average net change, but may not be applicable at individual locations.
5. Homes within the contour may not be eligible for HUD mortgage insurance (discretionary).

**Precautions**

1. It is most important to emphasize that the DNL 65 contour does not form a boundary line between acceptable and unacceptable noise exposure.
2. Locations within contours do not necessarily require soundproofing nor are public buildings within contours automatically eligible for soundproofing assistance;



Top
Return to NPC Library
Return to NPC Home Page



Top
Return to NPC Library
Return to NPC Home Page

3. DNL contours or grid analyses do not accurately reflect noise exposure at specific locations. Predicted levels may vary +/- 5 dB around actual measured levels for any given location.
4. Other noise sources in the environment may contribute as much or more than aircraft to the total noise exposure at a specific location.

13.3.2 **DNL 75 Contour**. The DNL 75 contour is often considered the boundary between high (75) and moderate (65 - 75) noise exposure. The following interpretations are appropriate for those areas within DNL 75 contours:

1. Soundproofing is very likely required in many buildings (depending on use).
2. Homes are ineligible for HUD mortgage insurance.
3. Aircraft noise is very likely the dominant environmental noise source.
4. DNL prediction accuracy at specific locations improves to + /- 3 dB.

5. Conflicts very likely exist between predicted DNL values and land uses as set out in FAA Land Use Compatibility Guidelines.

6. Definite caution is offered to prospective home buyers.

Figure 13.3 diagrams these applications of DNL 75 contours. It is recommended that perspective home buyers be firmly advised of the above conditions.



Top
Return to NPC Library
Return to NPC Home Page

Section 14.0

## AIRPORT NOISE EXPOSURE AND LAND USE COMPATIBILITY

SUMMARY

**INTRODUCTION**

This section describes the development of criteria linking cumulative airport noise exposure and compatible land use. Criteria are presented which have been designated for use in FAA funded compatibility studies.

**AVIATION APPLICATION/ISSUES**

1. FAR PART 150, Airport Noise Compatibility Programs
2. Planning guidance for developers and zoning officials.
3. Guidance for the granting of HUD and VA mortgage guarantees.
4. Airport master plans.
5. Environmental Impact Assessments

**GUIDANCE/POLICY/EXPERIENCE**

The FAA has published criteria in FAR PART 150 for use in compatibility studies. Other similar criteria have been published by the Department of Defense, the Federal Interagency Committee on Urban Noise, and the American National Standards Institute (ANSI).

Top
Return to NPC Library
Return to NPC Home Page

14.1 **INTRODUCTION**

Throughout the past 25 years, architects, engineers, planners, and zoning officials have developed and employed a variety of land use noise exposure guidelines. Regardless of the particular set of guidelines selected, there is always a range of noise exposure levels associated with a given land use. The relative position of the compatibility interval is arbitrarily defined, usually within 5 to 10 dB of some absolute level. The non-exact, fuzzy-edged nature of compatibility intervals is important to note in application of land use guidelines. Land use guidelines are a planning tool and as such provide general indications as to whether particular land uses are appropriate for certain measured noise exposure levels. The FAA has elected to use criteria based on

(1) Federal Interagency Committee on Urban Noise: Guidelines for Considering Noise in Land use Planning and Control, and

(2) American National Standard Institute (ANSI) publication, "Sound Level Descriptions for Determination of Compatible Land Use (ANSI S3.23-1980)

for establishing airport noise land use compatibility guidelines (Ref. 1). In making compatibility decisions, noise contours are generally used as guidelines; Section 13.0 discusses applications of DNL contours.

14.2 **FAA FAR PART 150 GUIDELINES**

In FAR Part 150, the FAA has identified land uses which are normally compatible (or noncompatible) with various exposures of individuals to noise (Ref. 1). This was done in compliance with the Aviation Safety and Noise Abatement Act of 1979 and is the criteria for use in preparing Airport Noise Exposure Maps and Airport Noise Compatibility Programs submitted under FAR Part 150. All Federal grants issued after Fiscal Year 1986 for noise compatibility planning or development at airports must be in accordance with FAR Part 150. This table is a refinement of Federal and International noise/land use compatibility criteria and is compatible with criteria used by other Federal agencies. It is the only noise/land use compatibility table in the U.S. Code of Federal Regulations (CFR) (14 Cm 150). The Part 150 Table is also compatible in most essential areas with the table published by the American National Standards Institute (ANSI). Table 14.1 offers sample comparisons of the Part 150 table and the ANSI table.

Table 14.2 reproduces the FAA land use table (Ref. 2). (The categories of this table are detailed further in FAA Advisory Circular 150/5020-1.). In addition to FAA and ANSI guidelines, other land use compatibility tables have also been developed.

Top
Return to NPC Library
Return to NPC Home Page

TABLE 14.1

| Land Use | ANSI Standard | FAA Standard |
|---|---|---|
| Livestock Farming | Compatible to 65 dB<br>Marginally compatible to 75 dB Incompatible above 75 dB | Compatible to 75 dB |
| General Manufacturing | Compatible to 70 dB<br>Marginally to 80 dB<br>Incompatible above 80 dB | Compatible to 85 dB<br>Incompatible above 85 dB |
| Music Shells | Marginally to 65 dB | Compatible to 64 dB |
| Playground, Riding, Golf | Compatible to 60 dB<br>Marginally to 75 dB<br>Incompatible above 75 dB | Compatible to 70 dB<br>Compatible with special details up to 80 dB |

14.3 **FEDERAL INTERAGENCY CRITERIA**

**Guidelines for considering Noise in Land use Planning and Control** was published in June 1980 by the Federal Interagency Committee on Urban Noise. This Committee is comprised of representatives from the Departments of Defense, Transportation and Housing and Urban Development, the Veterans' Administration and the Environmental Protection Agency, the five Federal agencies most involved in noise, land use, or environmental policy. Without overriding any agency's existing policies or regulations, the Guidelines provide a foundation for an integrated Federal system of noise/land use policy. As a consequence, FAA, DOD and HUD policy and regulations relative to airport noise and housing are quite compatible.

The Interagency document also contains a summary of the many techniques that local governments can use to reduce the effect of noise on surrounding land uses. These techniques range from simply increasing public awareness of noise levels, to developing land use codes and zoning policies, to the drastic but effective measure of public purchase of severely exposed land.

14.4 **DEPARTMENT OF DEFENSE AICUZ CRITERIA**

The Department of Defense has also developed a comprehensive program to minimize the harmful effects of aircraft noise (Ref. 4). The Air Installation compatible Use Zones (AICUZ) program requires that all military installations be studied in depth to determine those land areas which should be specially considered in development because they are



Top
Return to NPC Library
Return to NPC Home Page

TABLE 14.2

Land Use Compatibility* With Yearly Day-Night Average Sound Levels

| **Land use** | **Yearly day-night average sound level (Leq) in decibels** | | | | | |
|---|---|---|---|---|---|---|
| | below 65 | 65-70 | 70-75 | 75-80 | 80-85 | 0ver 85 |
| **Residential** | | | | | | |
| Residential, other than mobile homes and transient lodgings | Y | N(1) | N(1) | N | N | N |
| Mobile home parks | Y | N | N | N | N | N |
| Transient lodgings | Y | N(1) | N | N(1) | NN | N |
| **Public Use** | | | | | | |
| Schools | Y | N(1) | N(1) | N | N | N |
| Hospitals and nursing homes | Y | 25 | 30 | N | N | N |

| | | | | | | |
|---|---|---|---|---|---|---|
| Churches, auditoriums, and concert halls | Y | 25 | 30 | N | N | N |
| Governmental services | Y | Y | 25 | 30 | N | N |
| Transportation | Y | Y | Y(2) | Y(3) | Y(4) | Y(4) |
| Parking | Y | Y | Y(2) | Y(3) | Y(4) | N |
| **Commercial Use** | | | | | | |
| Offices, business and professional | Y | Y | 25 | 30 | N | N |
| Wholesale & retail--building materials, hardware & farm equip. | Y | Y | Y(2) | Y(3) | Y(4) | N |
| Retail trade--general | Y | Y | 25 | 30 | N | N |
| Utilities | Y | Y | Y(2) | Y(3) | Y(4) | N |
| Communication | Y | Y | 25 | 30 | N | N |
| **Manufacturing and Production** | | | | | | |
| Manufacturing, general | Y | Y | Y(2) | Y(3) | Y(4) | N |
| Photographic and optical | Y | Y | 25 | 30 | N | N |
| Agriculture (except livestock) and forestry | Y | Y(6) | Y(7) | Y(8) | Y(6) | Y(8) |
| Livestock farming and breeding | Y | Y(6) | Y(7) | N | N | N |
| **Mining and fishing, resource production and extraction** | Y | Y | Y | Y | Y | Y |

| **Recreational** | | | | | | |
|---|---|---|---|---|---|---|
| Outdoor sports and spectator sports | Y | Y(5) | Y(5) | N | N | N |
| Outdoor music shells, amphitheaters | Y | N | N | N | N | N |
| Nature exhibits and zoos | Y | Y | N | N | N | N |
| Amusements, parks, resorts, and camps | Y | Y | Y | N | N | N |
| Golf courses, riding stables and water recreation | Y | Y | 25 | 30 | N | N |

Numbers in parentheses refer to notes.

*The designations contained in this table do not constitute Federal determination that any use of land covered by the program is acceptable or unacceptable under Federal, State or local law. The responsibility for determining the acceptable and permissible land uses and the relationship between specific properties and specific noise contours rests with the local authorities. FAA determinations under Part 150 are not intended to substitute federally determined land uses for those determined to be appropriate by local authorities in response to locally determined needs and values in achieving compatible land uses.

KEY TO TABLE 1
**SLUCM** = Standard Land Use Coding Manual
**Y(Yes)** = Land Use and related structures compatible without restrictions.
**N(No)** = Land Use and related structures are not compatible and should be prohibited.
**NLR** = Noise Level Reduction (outdoor to indoor) to be achieved through incorporation of noise attenuation into the design and construction of the structure.
**25**, **30**, or **35** = Land use and related structures generally compatible; measures to achieve NLR of 25, 30, or 35 dB must be incorporated into design and construction of structures.

NOTES FOR TABLE 1

(1) Where the community determines that residential or school uses must be allowed, measures to achieve outdoor to indoor Noise Level Reduction (NLR) of at least 25 dB and 30 dB should be incorporated into building codes and be considered in individual approvals. Normal residential construction can be expected to provide a NLR of 20 dB, thus, the reduction requirements are often stated as 5, 10, or 15 dB over standard construction and normally assume mechanical ventilation and closed windows year round. However, the use of NLR criteria will not eliminate outdoor noise problems.

(2) Measures to achieve NLR 25 dB must be incorporated into the design and construction of portions of these buildings where the public is received, office areas, noise sensitive areas or where the normal noise level is low.
(3) Measures to achieve NLR of 30 dB must be incorporated into the design and construction of portions of these buildings where the public is received, office areas, noise sensitive areas or where the normal noise level is low.

(4) Measures to achieve NLR of 35 dB must be incorporated into the design and construction of portions of these buildings where the public is received, office areas, noise sensitive areas or where the normal noise level is low.
(5) Land use compatible provided special sound reinforcement systems are installed.
(6) Residential buildings require an NLR of 25.
(7) Residential buildings require an NLR of 30.
(8) Residential buildings not permitted.

affected by aircraft noise (the AICUZ program also considers how susceptible an area is to aircraft accidents in its compatibility decisions). This system is also based on the DNL metric. Three zones are identified in the AICUZ structure:

| Noise Zone | **DNL** | **RESPONSE** |
|---|---|---|
| 3. | Greater Than 75 dBA | Zone of highest intensity; frequency and intensity of noise is such as to be loud and annoying.(Inhabitants may complain repeatedly and even form groups to protest.) |
| 2. | 65-75 dBA | Second most intensive zone; noise is more moderate in character. (Inhabitants may complain vigorously and concerted group action is a possibility.) |
| 1. | Less Than 65 dBA | Lowest noise level zone; the noise may, however, interfere occasionally with certain activities of the residents. |

The AICUZ recommends that land around airports or air installations be developed with consideration to these noise zone guidelines. The AICUZ also offers recommended land uses for each zone -- see Table 14.3 below.

14.5 **HUD AND VA CRITERIA.**

Both the Department of Housing and Urban Development and the Veterans' Administration have issued noise regulations. The purpose of the HUD regulations is to protect individuals from noise in their communities and places of residence. Basically, HUD policy states that HUD assistance is prohibited for projects with "Unacceptable" noise exposures (noise levels above 75 dB (DNL) and is discouraged for projects with "Normally Unacceptable" noise exposures (i.e. a noise level above 65 dB but under 75 dB). These noise levels take into account noise from highways, railroads and aircraft.

The Veterans' Administration has also issued a series of statements of policy regarding noise and land use planning.

14.6 **CONCLUSION**

This section has described numerous sets of land use compatibility guidelines. All of them may prove useful to local governments in their efforts to pursue development that is compatible with various noise levels in their area. For matters involving FAA policy, the guidelines presented in Table 14.2 are the recommended compatibility assessment tool.

Top
Return to NPC Library
Return to NPC Home Page

REFERENCES

1. American National Standard. *Sound Level Description for Determination of Compatible Land Use*. Rep. No. ANSI S3.23-1980, 1980.
2. FAA Code of Federal Regulations, Part 150.
3. Federal interagency Committee on Urban Noise. *Guidelines for Considering Noise in Land Use Planning and Control*. June 1980.
4. U.S. Air Force. Manual 19-10. *Planning in the Noise Environment*. Chapter 4.



Top
Return to NPC Library
Return to NPC Home Page

Section 15.0 **EFFECT OF AIRCRAFT NOISE ON REAL ESTATE VALUES**

SUMMARY

**INTRODUCTION**
This section reviews research conducted to assess the effect of aircraft noise on real estate values. While an effect is observed it is considered an influence which is often offset by the advantages associated with ready access to the airport and employment opportunities.

**AVIATION APPLICATION/ISSUES**
The effect of aircraft noise on real estate values is a topic often associated with environmental assessments.

**GUIDIANCE/POLICY/EXPERIENCE**
Studies indicate that a one decibel change in cumulative airport noise exposure (in DNL) usually results in a 0.5 to 2% decrease in real estate values.

Top
Return to NPC Library
Return to NPC Home Page

15.1 **INTRODUCTION**

Studies have shown that aircraft noise does decrease the value of residential property located around airports. Although there are many socio-economical factors which must be considered because they may negatively affect property values themselves, all research conducted in this area found negative effects from aviation noise, with effects ranging from a 0.6 to 2.3 percent decrease in property value per decibel increase of cumulative noise exposure. This section reports on those studies.

15.2 **RESEARCH CONSIDERATIONS**

A number of socio-economic factors besides aircraft noise can negatively affect real estate values. Such factors include:

--the size of the houses
--number of rooms per house
--the repair of the houses
--number of homes that are air-conditioned
--distance from business district
--percent of the housing that is minority
--number of lakes, parks or other amenities in the
surrounding area

The absence of aircraft noise, then, is just one of many considerations the consumer must evaluate in buying or selling a residence. Researchers have been careful to consider these other effects and to normalize their influences in research studies. Yet even with other factors considered, increased aircraft noise does appear to lower property values.

15.3 **REVIEW OF RESEARCH**

To date, studies have been conducted analyzing nine airports in the U.S. and Canada comparing property values and noise exposure levels. These studies, which assess data gathered between 1960 and 1970, all employed the NEF, a noise measurement that has been superseded by the DNL as the FAA's accepted unit of cumulative noise measurement (see glossary and Section 2 for description of NEF and DNL). These studies are summarized by Jon Nelson in **Economic Analysis of Transportation Noise Abatement**; his summary is reproduced, with conversions to DNL, in Table 15.1 and discussed below (Ref. 1).

Top
Return to NPC Library
Return to NPC Home Page

TABLE 15.1

Summary of Empirical Damage Estimate for Aircraft Noise and Property Values in Nine Urban Areas

| Study Area (Year, mean property value) | Range of Noise Levels (DNL) | Best NDI-NEF Estimate* (Percent) |
|---|---|---|
| New York (1960, $16,656) | 55 - 75 | 1.9% |
| Los Angeles (1960, $19,772) | 55 - 75 | 1.8 |
| Dallas (1960, $18,011) | 55 - 75 | 2.3 |
| All Areas (1960, $18,074) | 55 - 75 | 2.0 |
| Minneapolis (1967, $19,683) | 55 - 85 | 0.6 |
| San Francisco (1970, $27,600) | 60 - 80 | 1.5 |
| San Jose (1970, $21,000) | 60 - 80 | 0.7 |
| Boston (1970, $13,000) | 60 - 80 | 0.6 |
| Toronto (1969-1973, $30,000-35,000) | 55 - 70 | 0.9 |
| Dallas (1970, $22,000) | 55 - 90 | 0.6 |
| Washington, D.C. (1970, $32,724) | 55 - 70 | 1.0 |

*The NDI-NEF is the percentage decrease in a given property value per unit increase in the DNL

Nelson found that the studies can be divided into two groups and some conclusions drawn. The first group of estimates in the table was based on 1960 data (and included New York, Los Angeles and Dallas) and suggests a range of 1.8 to 2.3 percent decrease in value per decibel (DNL). The second group of estimates, covering the period from1967 to 1970, suggests a mean of 0.8 percent devaluation per decibel change in DNL. Nelson then excludes the San Francisco data (which was influenced by unique climatic and political differences) and finds a mean of 0.7 percent devaluation per decibel change in DNL.

Nelson also notes that there seems to be a decline in the noise depreciation index over time, from 1960-1970. This could be due either to noise sensitive people being replaced by those less bothered by noise, or to the enhanced commercial value of land near airports. Evidence exists to support either of these hypotheses (Ref. 2).

## 15.4 **CONCLUSION**

The bottom line is that noise has been shown to decrease the value of property by only a small amount -- approximately 1% decrease per decibel (DNL). At a minimum, the depreciation of a home due to aircraft noise is equal to the cost of moving to a new residence. Because there are many other factors that affect the price and desirability of a residence, the annoyance of aircraft noise remains just one of the considerations that affect the market value of a home.



REFERENCES

1. Nelson, Jon P. **Economic Analysis of Transportation Noise Abatement**. Ballenger Publishing Company: Cambridge, Massachusetts, 1978.
2. Crowley, R. W. *A Case Study of the Effects on an Airport on Land Values*. **Journal of Transport Economics and Policy,** Vol. 7, May, 1978.

**AVIATION NOISE TECHNICAL STANDARDS AND RECOMMENDED PRACTICES**

A vast amount of literature on aviation acoustics has been published by national and international standards organizations. These groups include:

International Electrotechnical Commission
1-3, rue de Varembe
CH-1211 Geneva 20, SWITZERLAND

International 0rganization for Standardization
I, rue de Varembe
Case postale 56
CH-1211 Geneva 20, SWITZERLAND

American National Standards Institute
1430 Broadway
New York, New York 10018

Society of Automotive Engineers
400 Commonwealth Drive
Warrendale, Pennsylvania 15096

The reader interested in more information on particular aviation noise-related topics may find the following reference list helpful.

IEC 225(1966): Octave, half-octave and third-octave band filters intended for the analysis of sounds and vibrations.

IEC 537 (1976): Frequency weighting for the measurement of aircraft noise (D-weighting).

IEC 561 (1976): Electro-acoustical measuring equipment for aircraft noise certification.

IEC 651 (1979): Sound level meters.

IEC 655 (1979): Values for the difference between free-field and pressure sensitivity levels for one-inch standard condenser microphones.

ISO 266-1975: Acoustics--Preferred frequencies for measurements.

ISO 2204-1979: Acoustics--Guide to International Standards on the measurement of airborne acoustical noise and evaluation of its effects on human beings.

ISO 2249-1973: Acoustics: Description and measurement of physical properties of sonic booms.

ISO 3891-1978: Acoustics: Procedure for describing aircraft noise heard on the ground.



ISO 5129-1981: Acoustics: Measurement of noise inside aircraft.

ANSI S1.1-1960 (R1979): American national standard acoustical terminology.

ANSI S1.4-1983: American national standard specification for sound level meters.

ANSI S1.6-1984: American national standard preferred reference quantities for acoustical measurements.

ANSI S1.8-1969 (R1974): American national standard preferred reference quantities for acoustical levels.

ANSI S1.13-1971 (R1979): American national standard methods for the measurement of sound

pressure levels.
ANSI S1.40-1984: American national standard specification for acoustical calibrators.
ANSI S3.5-1969 (R1978): American national standard methods for the calculation of the Articulation Index.
ANSI S3.14-1977: American national standard for rating noise with respect to speech interference.
ANSI S3.19-1974 (R1979): American national standard method for the measurement of real-ear protection of hearing protectors and physical attenuation of earmuffs.
ANSI/ASTM E336-77 (1977): standard test method for measurement of airborne sound insulation in buildings.
ANSI/ASTM E413-73 (1980): standard classification for sound transmission class.
ANSI/SAE ARP1071: Definitions and procedures for computing the effective perceived noise level for flyover aircraft noise.
ASA 22-1980: American national standard sound level descriptors for determination of compatible land use.
ASA 23-1978: American national standard method for the calculation of the absorption of sound by the atmosphere.
SAE AIR-852 (1965): Methods of comparing aircraft takeoff and approach noises.
SAE AIR-902 (1966): Determination of minimum distance from ground to aircraft for acoustic tests.



Top
Return to NPC Library
Return to NPC Home Page

SAE AIR-923 (1966): Method for calculating the attenuation of aircraft ground-to-ground noise propagation during take-off and landing.
SAE AIR-1079 (1972): Aircraft noise research needs.
SAE AIR-1081 (1971): House noise-reduction measurements for use in studies of aircraft flyover noise.
SAE AIR-1115 (1969): Evaluation of headphones for demonstration of aircraft noise.
SAE AIR-1216 (1972): Ground runup and flyover noise levels: comparison.
SAE AIR-1286 (1973): Helicopter and V/STOL aircraft noise measurement problems.
SAE AIR-1407 (1977): Prediction procedure for near-field and far-field propeller noise.
SAE ARP-796 (1965): Measurements of exterior aircraft noise in the field.
SAE ARP-865B. (1983): Definitions and procedures for computing the perceived noise level of aircraft noise.
SAE ARP-866A (1975): Standard values of atmospheric absorption as a function of temperature and humidity.
SAE ARP-1071 (1972): Definitions and procedures for computing the effective perceived nose level for flyover aircraft noise.
SAE ARP-1080 (1969): Frequency weighting network for approximation of perceived noise level for aircraft noise.
SAE ARP-1279 (1972): Standard indoor method of collection and presentation of the turboshaft base, engine noise data for use in helicopter installations.
SAE ARP-1307 (1979): Measurement of exterior noise produced by aircraft auxiliary power units (APUs) and associated equipment during ground operation.
SAE ARP-1323 (1978): Measurements of interior sound pressure levels in cruise type aircraft.

Top
Return to NPC Library
Return to NPC Home Page

# DECLARATION

## Evaluation of the Expert Reports on the Effect of the Realignment of Aircraft to NAS Oceana and NALF Fentress on Surrounding Property Values

Raymond B. Palmquist

The issue being contested in the reports I have been asked to review is quite simple: Does a major increase in aircraft noise have a negative effect on the property values of houses exposed to that noise relative to the property values of houses that are not exposed to noise? The answer to that question seems obvious. Suppose there were two houses that were identical in all respects except that one was subject to extremely high levels of aircraft noise and the other was in an area free of that noise. If the houses were offered for the same price, which would you choose? Obviously, property values are going to be hurt by the noise. Professor Nelson provides evidence on the magnitude of this reduction by looking at previous empirical work.. The experts on the other side suggest the effect may not exist.

## Qualifications

1. My name is Raymond B. Palmquist. I reside at 1613 Westhaven Drive, Raleigh, NC 27607. I have been employed by North Carolina State University from August 1979 to the present. I was promoted to the academic rank of Professor of Economics in 1991. I served as Department Head of the Department of Economics from 1992 to 1997. Prior to coming to North Carolina State University, I was a Research Economist with the Washington State Department of Transportation. My research and teaching expertise is in the fields of environmental economics, urban economics, and applied microeconomics. I received my Ph.D. degree from the University of Washington in 1978. I have been an Associate Editor of the *Journal of Environmental*

*Economics and Management*. I have served as Vice-president of the Association of Environmental and Resource Economics. Attached is my Curriculum Vita.

2. Much of my research has concerned measuring the benefits of environmental improvements and the damages resulting from environmental problems. My publications have appeared in American Economic Review, Review of Economics and Statistics, Journal of Environmental Economics and Management, Land Economics, American Journal of Agricultural Economics, Journal of Urban Economics, Environmental and Resource Economics, and other journals and books. I have had grants from the Environmental Protection Agency, Sea Grant, U.S. Department of Agriculture, U.S. Forest Service, U.S. Department of Housing and Urban Development, U.S. Department of Transportation, and state agencies. I have also served as a consultant to public and private organizations.

3. I have been studying the effects of environmental conditions on property values for over twenty-five years now. My dissertation in graduate school was on the effects of highway accessibility and noise on property values. I conducted a major study on that topic for the Washington Department of Transportation and the Federal Highway Administration. Several of my publications concern noise and property values. I have also conducted hedonic studies on many other environmental problems including air quality. I also have widely-cited publications on real estate price indexes. My survey of hedonic techniques, "Hedonic Methods," in Braden, John B., and Charles D. Kolstad, eds., *Measuring the Demand for Environmental Quality*, North Holland, 1991, 77-120, is widely cited. I was invited to write "Property Value Models," for the prestigious North Holland Handbook series (Karl-Göran Mäler and Jefferey Vincent, eds., *Handbook of Environmental Economics*, Elsevier). I (in collaboration with V. Kerry Smith) have recently completed "The Use of Hedonic Property Value Techniques for Policy and

Litigation," for the *International Yearbook of Environmental and Resource Economics*, edited by Tom Tietenberg and Henk Folmer for Edward Elgar.

4. I have used documents and exhibits submitted in support of Carole and Robert Testwuide, et al. I have used exhibits submitted in support of the Defendant. I have reviewed academic and government studies on aircraft noise. My comments emphasize the reports of Jon Nelson, David Dale-Johnson, and David Gillen. I have not met any of these three individuals. I was retained on March 22, 2002 by Quinn, Gordan and Wolf, LLP.

## Expert Report of Jon P. Nelson

5. Professor Nelson has provided a careful report that applies what is currently known about the effects aircraft noise on surrounding property values. The quality of the report was to be expected since he has been the leading researcher on this topic for many years. His conclusions are based on research that has been done throughout the United States and Canada.

### Transferring Empirical Results

6. The use of empirical results derived in different locations to infer the likely effects in the area under consideration is common in environmental economics. The concept is called Benefits Transfer. There have been numerous evaluations of validity of benefits transfer. It is widely accepted in environmental policy design. However, we should evaluate how reliable one would expect it to be in the current instance.

7. Microeconomics is concerned with how individual consumers and firms make their decisions and how they interact in markets. If an economic study in one location reveals how individuals make decisions, one would be fairly confident that the information could be transferred and applied in other locations. This is because consumers and firms are similar

00001

IN THE:

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, *
et al., *
Plaintiffs, *
*
vs. * No. 01-201L
*
THE UNITED STATES OF AMERICA, *
Defendant. *

* * * * * * * * * * * * * * * * *

The deposition of DAVID DALE-JOHNSON was taken on Friday, December 9, 2005, commencing at 9:00 a.m., at the Department of Justice, Patrick Henry Building, 601 D Street, N.W., Room 2313, Washington, D.C. before Alfred A. Betz, Court Reporter and Notary Public.

* * * * * * * * * * * * * * * * *

Reported by:
Alfred A. Betz, Certified LiveNote Reporter

00099

the end of '99. That's my recollection.

Q. Is that, I mean did you have any better data as to when they arrived or is it just that general statement is what you knew?

A. I'm sure I have more detail but I can't remember the specifics. I mean, the July '99 date was in fact chosen because that's, as I understand it, the event date or the date of impact selected by the plaintiffs.

Q. Would you have selected a different date to study knowing the facts of the case if you just did it as an academic exercise?

A. Well, as I --

MR. BRYANT: Objection. Foundation.

A. As I implied earlier, one might expect to see an impact at the point when people expect the change to occur. So we actually do include in the appendices subsequent analysis where we broaden the event timeframe to begin my recollection is mid '90. To begin in the beginning of '98 and end at the end of July -- beginning of -- I'm sorry. July

00100

'97 through July '98. So we look at alternative
assumptions regarding the event date, if you like.
Q. Would you turn to appendix B. Also if
you would take a look at your 2002 study.
Specifically, it's a list of documents you
utilized. Do you have that?
A. I believe so.
Q. So the 2002 study is exhibit what? You
have to look on the first page.
A. It's exhibit 150.
Q. And your study is 151, right? Your
present study.
A. Yes.
Q. Okay. Now, in your 2002 study you listed
five articles by Dr. Nelson that you utilized in
connection with that study and in your 2005 study
you list no articles by Dr. Nelson. Why is that?
A. Well, the simple answer or the answer to
your question is that the appendix B in appendix E
in exhibit 151 reflects specifically those
publications I reviewed in preparation of this

00101

report. That doesn't mean that there aren't other articles that I have looked at in the past but I didn't specifically review them in preparation for this report.

Q. Isn't Dr. Nelson the leading academic evaluator of the impact of noise on property values?

A. I don't know that he's the leading. He certainly is an expert.

Q. Can you cite for me some folks that deserve to be placed up in that category along with him?

A. Not offhand, no.

Q. You note in paragraph 20 of your report which is on page 10?

A. Which report now?

Q. Your 2005 report, paragraph 20, page 10. Do you have it?

A. Yes.

Q. You note the differences in noise patterns in expectations of future noise levels

between commercial airports and military air bases.
What information do you have on that subject?
A. My own, you know, in preparation for this case, and I can't recollect the specific documents, but I reviewed information on flight patterns that are typical for Oceana. I think having done that it's clear that there is a, you know, a difference in the regularity of flight patterns and the consistency of airport-related noise as a consequence of that.
Q. Let's take an Air Force base and a commercial airport. What would you think is the difference between noise that could be expected in those two environments?
A. Well, airport noise I would think would be more regularly scheduled throughout the day to accommodate the movement of multiple aircraft going to and from that particular airport to other locations throughout the country.
Q. You're referring to the commercial airport?

# CITATIONS TO DR. JON P. NELSON'S WRITINGS ON TRANSPORTATION NOISE

Economic Aspects of Noise Pollution (with I. Feller, Institute for Research on Human Resources, April 1973), 159pp. Also Report #DOT-TST-73-3 (1973).

(1) Walters, A.A., J of Transport Economics, v12, p125, 1978.
(2) Langley, C.J., Land Economics, v52, p54, 1976.
(3) EPA, Economic Welfare Impacts of Urban Noise, 1976.

The Effects of Mobile-Source Air and Noise Pollution on Residential Property Values (Institute for Research on Human Resources, April 1975), 248pp. Also cited as U.S. Department of Transportation, Report #DOT-TST-7576 (1975).

(1) Checka, J.E., J of Environmental Management, v8, p249, 1979.
(2) Alexandre, A., J of Transport Economics, v14, p205, 1980.
(3) Asch, P., Land Economics, v54, p278, 1978.
(4) Maler, K.G., J of Environmental Economics, v4, p355, 1977.
(5) Rock, S.M., Transportation J, v17, p32, 1977.
(6) Small, K.A., J of Transport Economics, v11, p109, 1977.
(7) Smith, V.K., Regional Studies, v11, p47, 1977.
(8) Walters, A.A., J of Transport Economics, v12, p125, 1978.
(9) Touchton, S.A., Technology in Society, v3, p349, 1981.
(10) Gamble, H.B.,Effects of the Accident at Three Mile Island,NRC,1981, p20.
(11) Langdon, F.J., International Research Appl, v31, p237, 1982.
(12) Gamble, H.B., J of Regional Science, v22, p457, 1982.
(13) Brady, G.L., J of Environmental Management, v16, p191, 1983.
(14) Morrall, J.F., in J.C. Miller and B. Yandle (eds), Benefit-Cost Analyses of Social Regulation (AEI, 1979): p48, passim.
(15) Pearce, D.W., Progress in Resource Mgmt Env, v1, p219, 1979.
(16) Bragdon, C.R., Noise Pollution (Gale, 1979): p330.
(17) Freeman, A.M., Air and Water Pollution: A Benefit-Cost Assessment (Wiley, 1982): p115.
(18) Tomassoni, M.E., Economic Impact of Air Pollution and Aircraft Noise on Residential Property Values (CPL, 1978): p2.
(19) Crandall, R.W,et al., Regulating the Automobile (Brookings, 1986): p113.
(20) OECD, Conference on Noise Abatement Policies (OECD, 1980): p47.
(21) Smith,V., Economic Consequences of Air Pollution(Ballinger, 1976): p104
(22) Smith, R.S., The Occupational Safety and Health Act (AEI, 1976): p47.
(23) Pearce, D.W., The Valuation of Social Cost (Allen, 1978): p66.
(24) Freeman, A.M., The Benefits of Air and Water Pollution Control (Council on Environmental Quality, 1979): p129.
(25) Witte, A.D., in J.T. Black (ed), Urban Land Markets (ULI, 1980): p158.
(26) Alexandre, A., in P.M. Nelson (ed), Transportation Noise Reference Book (Butterworth, 1987): p23/9.
(27) Rubinfeld, D., in A. Friedlaender, Approaches to Controlling Air Pollution (MIT, 1978): p266.
(28) Stempler, S., in T.Fay, Noise and Health (New York Academy, 1991): p108.
(29) Pearce, D., in Y.Hayashi(ed),Environment and Transport(Elgar,1999): p114
(30) Palmquist, R., International Yearbook Env. Econ. (Elgar, 2002): p161.

Economic Analysis of Transportation Noise Abatement (Ballinger, 1978), 265pp.

(1) Alexandre, A., J of Transport Economics, v14, p205, 1980.
(2) Bagby, D.G., J of American Planning Assoc, v46, p88, 1980.
(3) Freeman, A.M., Scandinavian Economic J, v81, p154, 1979.
(4) McMillan, M.L., Land Economics, v56, p315, 1980.
(5) Muskin, J.B., J of Environmental Economics, v5, p333, 1978.
(6) Mieszkowski, P., J of Urban Economics, v5, p425, 1978.

(7) Pitfield, D.E., Annals of Regional Science, v15, p145, 1981.
(8) Palmquist, R.B., J of Urban Economics, v11, p333, 1982.
(9) Taylor, S.M., J of Sound and Vibration, v80, p523, 1982.
(10) Nelson, A.C., Urban Studies, v22, p439, 1985.
(11) Broder, I., Evaluation Review, v12, p291, 1988.
(12) Desaigues, B., Rev Econ, v41, p269, 1990.
(13) Kawakami, S., Papers in Regional Science, v63, p31, 1987
(14) Pennington, G., J of Transport Economics, v24, p49, 1990.
(15) Jursik, K., Environmental Comment, v79, p15, 1979.
(16) Freeman, A.M., in D.Segal (ed), The Economics of Neighborhood (Academic Press, 1979): p217.
(17) Freeman, A.M., The Benefits of Environmental Improvement: Theory and Practice (Johns Hopkins for RFF, 1979): p163, passim.
(18) Bragdon, C.R., Noise Pollution (Gale, 1979): p463.
(19) Fisher, A.C., Resource and Environmental Economics (Cambridge, 1981): p219.
(20) Freeman, A.M., in V.K. Smith (ed), Advances in Applied Microeconomics (JAI, 1981): p48.
(21) Pearce, D., in T. O'Riordan and R.K. Turner (eds), Progress in Resource Management and Environmental Planning (John Wiley, 1983): p216.
(22) Pearce, D.W., Environmental Policy Benefits (OECD, 1989): p81.
(23) OECD, Conference on Noise Abatement Policies (OECD, 1980): p47.
(24) Broder, I., Regulation of Transportation Noise (AEI, 1987): p38, passim.
(25) Harrison, D., in T.C. Schelling (ed), Incentives for Environmental Protection (MIT, 1983): p343.
(26) Frankel, M., Appraisal J, v59, p102, 1991.
(27) Cell, D.C., in D.E. Mann (ed), Environmental Policy Implementation (Heath, 1982): p171.
(28) Cell, D.C., The Noise Charge Approach to Reducing Airport Noise (Council on Wage and Price Stability, 1977): p16.
(29) Hall, F.L., Transportation Research Record, v1143, p1, 1987.
(30) Fiorentino, C., in S.E. Jorgensen and W.J. Mitsch, Ecological Modelling in Environmental Management, Part B (Elsevier, 1983): p212.
(31) Pearce, D., Ambio, v13, p28, 1984.
(32) Federal Aviation Administration, Aviation Noise Effects, 1985, p102
(33) Alexandre, A., in P.M. Nelson (ed) Transportation Noise Reference Book (Butterworth, 1987): p23/9.
(34) Nash, C. in R. Turner (ed.), Sustainable Environmental Economics and Management (Westview, 1988), p142.
(35) Uyeno, D., J Transport Econ Policy, v27, p3, 1993.
(36) Freeman, A.M., The Measurement of Environmental Values (RFF, 1993): p419.
(37) Page, G.W., J Amer Planning, v59, p473, 1993.
(38) Small, K., Urban Transportation Economics (Harwood: 1992): p175.
(39) Small, K.E., Urban Transportation Economics (Harwood, 2002), p175.
(40) Bateman, I. In R.Turner (ed.), Sustainable Environmental Economics and Management (Westview, 1993), p264.
(41) Abelson, P., Transport Rev, v15, p265, 1995.
(42) Buchel, S., Urban Studies, v32, p1199, 1995.
(43) Pommerehne, W., in D. Bos (ed), Welfare and Efficiency in Public Economics (Springer, 1988), p399.
(44) Acks, K., Real Estate Review, v25, p51, 1995.
(45) Morioka, T., Science Total Env, v190, p92, 1996.
(46) Lee, D.B.,in D. Grenne, (eds), The Full Costs and Benefits of Transportation (Springer, 1997), p144.
(47) van den Bergh, J, Meta-Analysis in Environmental Economics (Kluwer, 1997, p213.
(48) Lusht, K., Real Estate Valuation (Irwin, 1997), p4.
(49) Schipper, Y., Journal of Air Transport Management, v4, p124, 1998.
(50) Delucchi, M., J. Transport and Statistics, v1, p24, 1998.
(51) Forkenbrock, D., Transportation Research A, v33, p505, 1999.
(52) Morrison, S., J. Law and Economics, v42, p723, 1999.
(53) Schipper,Y., Market Structure and Environmental Cost in Aviation (Tinbergen Institute, 1999), p200.
(54) Garrod, G., Economic Valuation of the Environment (Elgar, 1999), p121.

(55) Freeman, A., in Y.Hayashi(ed), Environment and Transport(Elgar, 1999), p135
(56) Delucchi, M., J. Transport Economics and Policy, v34, p168, 2000.
(57) Espey, M., Growth and Change, v31, p419, 2000.
(58) Noise Pollution Clearing House, Drowning in Noise, 2000, p59.
(59) Taylor, L., Land Economics, v76, p550, 2000.
(60) Strand, J., Transportation, v28, p156, 2001
(61) Schipper, Y., J. Air Transport Management, v7, p169, 2001.
(62) Schipper, Y., Environ. Costs in Euro. Air Transport (Elgar, 2001), p. 188.
(63) Schipper, Y., Transportation Research B, v37, p699, 2003.
(64) Theebe, M., J. Real Estate Finance Economics, v28, p209, 2004.
(65) Aviation Noise Law Bibliography, "Noise Impacts on Property Values," 2002.
(66) Navrud, S., State of the Art on Economic Valuation of Noise, p8, 2002.
(67) Rodrigue, J-P., Transport Geography on the Web (Hofstra, 2004), Ch. 8.
(68) Schipper, Y., in R. Florax (ed), Comparative Environmental Economic Assessment (Elgar, 2002), p. 245.
(69) United Nations, Integrating Econ and Environ Policies (UN, 2002), p58.
(70) Benito, A., Journal of Aircraft, v23, p313, 1986.
(71) Rahnatian, M., Int. J Environ. Science and Technology, v1, p18, 2004.
(72) United Nations, Integrating Economic and Environmental Policies, ST/ESCAP/2273 (UN, 2004), p58.
(73) Small, K., Urban Transportation Economics (2007, forthcoming).

"Airport Noise, Location Rent, and the Market for Residential Amenities," Journal of Environmental Economics and Management, 6 (December 1979): 320-31.

(1) Smith, V.K., Regional Studies, v11, p47, 1977.
(2) Walters, A.A., J of Transport Economics, v12, p125, 1978.
(3) Muskin, J.B., J of Environmental Economics, v5, p333, 1978.
(4) Borg, E., Acta Oto-Lar, v10, p5, 1981.
(5) Brookshire, D.S., American Economic Review, v72, p165, 1982.
(6) Hageman, R.K., Natural Resources J, v21, p789, 1981.
(7) Abelson, P.W., J of Environmental Economics, v12, p195, 1985.
(8) Brookshire, D.S., J of Political Economy, v93, p369, 1985.
(9) MacDonald, D.N., Land Economics, v63, p361, 1987.
(10) MacDonald, D.N., J of Risk and Insurance, v57, p654, 1990.
(11) Broder, I., Regulation of Transportation Noise (AEI, 1987) p84, passim.
(12) Kneese, A.V., Measuring Benefits of Clean Air and Water (RFF, 1984): p145.
(13) Brookshire, D.S., in G.S. Tolley (ed), Environmental Policy, v2 (Ballinger, 1982): p192.
(14) Alexandre, A., in P.M. Nelson (ed), Transportation Noise Reference Book (Butterworth, 1987): p23/9.
(15) Morey, M., The Effects of Aircraft Noise, ANL/EAIS/TM-44, 1990, p15.
(16) Brookshire, D., in Environmental Economics: A Reader (Martins,1992): p218.
(17) Uyeno, D., J Transport Econ Policy, v27, p3, 1993.
(18) Murdoch, J., J Amer Real Estate Urban Econ, v21, p184, 1993.
(19) Peiser, R., J Property Research, v11, p157, 1994.
(20) Clark, D., J Environmental Economics Mgt, v27, p252, 1994.
(21) Kula, E., Economics of Natural Resources, 2nd edn (Chapman: 1994): p362.
(22) Oates, W., The Economics of the Environment (Elgar, 1992): p470.
(23) Appraisal Institute, Hazardous Materials Contamination (1992), p21.
(24) OECD, Project and Policy Appraisal (OECD, 1994), p332.
(25) Clark, D., Growth and Change, v28, p496, 1997.
(26) Metz, W., Risk Analysis, v17, p571, 1997.
(27) Johnson, K., Transportation Research D, v2, p231, 1997.
(28) Tomkins, J., Urban Studies, v35, p243, 1998.
(29) Boardman, A., Cost-Benefit Analysis (Prentice-Hall, 1996), p459.
(30) Hayashi, Y., The Environment and Transport (Elgar, 1999): p.xx.
(31) van den Bergh, J., Handbook of Environmental Economics (Elgar,1999),

p808.
(32) Button, K, Journal of Transportation and Statistics, v2, p87, 1999.
(33) Brookshire, D., in Environmental Valuation (Elgar, 1999), p. 83.
(34) Ofiara, D., Marine Pollution Bulletin, v42, p725, 2001.
(35) Ofiara, D., Economic Losses from Marine Pollution (Island, 2001), p226.
(36) Boyle, M., J. Real Estate Literature, v9, p143, 2001.
(37) Bell, R., Appraisal Journal, v69, p319, 2001.
(38) Aviation Noise Law Bibliography, "Noise Impacts on Property Values," 2002.
(39) Navrud, S., State of the Art on Economic Valuation of Noise, p8, 2002.
(40) Coulson, N., J. Housing Research, v13, p173, 2003.
(41) Chau, K., Habitat International, v6, p559, 2005.
(42) Haurin, D., J Housing Research, v13, p150, 2003.
(43) Milla, K., J of Agricultural and Applied Econ, June 2005
(44) Wong, P., Expanding Affordable Homeownership with Private Capital (Milken Institute, 2004), p159.
(45) Nijkamp, P., in New Trends in European Air Traffic (Lund U.,2003), p66.

"Airports and Property Values: A Survey of Recent Evidence," Journal of Transport Economics and Policy, 14 (January 1980): 37-52.

(1) Langdon, F.J., Environment and Planning-A, v10, p1015, 1978.
(2) Walters, A.A., J of Transport Economics, v12, p125, 1978.
(3) Alexandre, A., J of Transport Economics, v14, p205, 1980.
(4) Langdon, F.J., Int Review Appl Psych, v31, p237, 1982.
(5) Jaffe, A.J., AREUEA J, v12, p378, 1984.
(6) Abelson, P.W., J of Environmental Economics, v12, p195, 1985.
(7) Frankel, M., J of Environmental Economics, v12, p117, 1985.
(8) Feitelson, E., Transportation Research-A, v23, p349, 1989.
(9) Pennington, G., J of Transport Economics, v24, p49, 1990.
(10) Williams, A.W., Transport Rev, v11, p311, 1991.
(11) Pearce, D., in T. O'Riordan and R.K. Turner (eds), Progress in Resource Management and Environmental Planning (John Wiley, 1983): p216.
(12) Tomassoni, M.E., Economic Impact of Air Pollution and Aircraft Noise on Residential Property Values (CPL, 1978): p5.
(13) Hyman, D., Public Finance, 2nd edn (Dryden, 1987): p108.
(14) Hyman, D., Public Finance, 3rd edn (Dryden, 1990): p125.
(15) Pearce, D.W., The Valuation of Social Cost (Allen-Unwin, 1978): p52.
(16) Pearce, D.W., Environmental Policy Benefits (OECD, 1989): p81.
(17) OECD, Conference on Noise Abatement Policies (OECD, 1980): p47.
(18) Broder, I., Regulation of Transportation Noise (AEI, 1987): p84, passim.
(19) Harrison, D., in T.C. Schelling (ed), Incentives for Environmental Protection (MIT, 1983): p343.
(20) Morey, M., The Effects of Aircraft Noise, ANL/EAIS/TM-44, 1990, p15.
(21) Frankel, M., Appraisal J, v59, p106, 1991.
(22) Abelson, P., Economic Evaluation of Roads (APP, 1986): p141.
(23) Uno, K. (ed), Environmental Accounting (Kluwer, 1998): p431.
(24) Kuik, O.J., Benefits of Environ Measures (Kluwer, 1992): p125.
(25) Pearce, D., Ambio, v13, p28, 1984.
(26) Alexandre, A., in P.M. Nelson (ed), Transportation Noise Reference Book (Butterworth, 1987): p23/9.
(27) Schmid, A., Benefit-Cost Analysis (Westview, 1989): p325.
(28) Stempler, S.in T.Fay, Noise and Health (New York Academy, 1991): p108.
(29) Uyeno, D., J Transport Econ Policy, v27, p3, 1993.
(30) Pearce, D., Economic Values and the Natural World (MIT Press: 1993):p121.
(31) OECD, Project and Policy Appraisal (OECD, 1994), p332.
(32) Willis, K., J Property Research, v10, p215, 1993.
(33) Do, A., J Real Estate Finance and Econ, v9, p135, 1994.
(34) Collins, A., J Transport Economics Policy, v28, p197, 1994.
(35) Levesque, T., J Transport Economics Policy, v28, p210, 1994.
(36) Do, A., J Real Estate Finance and Econ, v10, p261, 1995.
(37) Pearce, D., in D. Greenway (ed), Companion to Contemporary Economic Thought (Routledge, 1991), p340.
(38) Callan, S., Environmental Economics and Management (Irwin, 1995), p.692.

(39) Pearce, D., in D. Greenway (ed.), Guide to Modern Economics (Routledge, 1996), p241.
(40) Lesser, J., Environmental Economics and Policy (Addison, 1997), p311.
(41) Feitelson, E., Transportation Research-Part D, v1, p.1, 1996.
(42) Levinson, D., Annals of Regional Science, v31, p189, 1997.
(43) vandenBergh, J., Urban Studies, v34, p927, 1997.
(44) Johnson, K., Transportation Research D, v2, p231, 1997.
(45) Boardman, A., Annals of Regional Science, v31, p299, 1997.
(46) Lusht, K., Real Estate Valuation (Irwin, 1997): p38.
(47) van den Bergh,J,et al.(eds),Meta-Analysis in Env Econ (Kluwer,1997), p213.
(48) Schipper, Y., Journal of Air Transport Management, v4, p124, 1998.
(49) Kula, E., Economics of Natural Resources, the Environment and Politics, 2nd ed. (Chapman & Hall, 1994), p362.
(50) Levinson, D., Transport Reviews, v18, p215, 1998.
(51) Bjornlund, H., Water Resources Research, v34, p1563, 1998.
(52) Chan, S-H., J Real Estate Research, v15, p131, 1998.
(53) Button, K., Socio-Economic Planning Sciences, v31, p240, 1997.
(54) Pearce, D.W., in A Guide to Modern Economics (Routledge, 1996), p198.
(55) Button, K., Environment Plan C, v16, p517, 1998.
(56) Morrison, S., J. Law and Economics, v42, p723, 1999.
(57) Kaufman, H., Choices, v13, p43, 1998.
(58) Schipper,Y., Mkt Struc & Env Cost in Aviation (Tinbergen Inst. 1999), p200.
(59) Garrod, G., Economic Valuation of the Environment (Elgar, 1999), p121.
(60) Boardman, A., Cost-Benefit Analysis (Prentice-Hall, 1996), p459.
(61) Pearce,D., in Y.Hayashi(ed), Environment and Transport (Elgar, 1999): p114.
(62) Jereon, C.,Handbook of Environmental Resource Econ (Elgar, 1999): p808.
(63) Morrell, P., Transport Research D, v5, p320, 2000.
(64) Morrell, P., Transportation Research Record, v1703, p31, 2000.
(65) Espey, M., Growth and Change, v31, p419, 2000.
(66) Bal, F., European J. of Operations Research, v128, p364, 2001.
(67) Strand, J., Transportation, v28, p156, 2001.
(68) Lu, C., Transport Reviews, v21, p395, 2001.
(69) Smith, V., Environmental and Res Econ, v22, p271, 2002.
(70) Schipper, Y., Environ. Costs in Euro. Air Transport (Elgar, 2001), p. 188.
(71) Forsyth, P., Air Transport: Classics in Analysis (Elgar, 2002), p. xviii.
(72) Cidell, J., Groundside Effects of Air Transportation (CTS, 2001), p. 20.
(73) Cottis, N., Environmental and Health Impact of Aviation (EU, 2001), p38.
(74) des Rosiers, F., J Real Estate Research, v23, p200, 2002.
(75) Pearce, D., Annual Rev Energy Environment, v27, p81, 2002.
(76) Palmquist, R., International Yearbook of Env Economics (Elgar 2002): p161.
(77) Bateman, I., Land Economics, v79, p235, 2003.
(78) Schipper, Y., Transportation Research B, v37, p669, 2003.
(79) Fik, T,, Real Estate Economics, v31, p623, 2003.
(80) Wardman, M., Transportation Research D, v9, p27, 2004.
(81) Theebe, M., J. Real Estate Finance Economics, v28, p209, 2004.
(82) Aviation Noise Law Bibliography, “Noise Impacts on Property Values,” 2002.
(83) Navrud, S., State of the Art on Economic Valuation of Noise, p8, 2002.
(84) Rodrigue, J-P., Transport Geography on the Web (Hofstra, 2004), Ch. 8.
(85) McMillen, D., J Urban Economics, v55, p627, 2004.
(86) Mathis, M., Valuing Nature (HARC, 2003), p.72.
(87) Schipper, Y., in R. Florax (ed), Comparative Environmental Economic Assessment (Elgar, 2002), p. 245.

(88) Gillen, D., in D. Hensher (ed), Handbook of Transport and the Environment (Elsevier, 2003), p. 95.
(89) van Praag, B., Economic Journal, v115, p224, 2005.
(90) Baranzini, A., Urban Studies, v42, p633, 2005.
(91) Orszag, P., Quantifying the Benefits of More Stringent Noise Regulations

(SEBAGO and Northwest Airlines, 2000), p18.
(92) Reginster I, Environment and Planning-A, v37, p1067, 2005.
(93) des Rosiers, R., J Property Investment & Finance, v17, p44, 1999.
(94) Hsu, C-I, Transportation Research-D, 10, p304, 2005.
(95) Orford, S., Valuing the Built Environment (Ashgate, 1999), p208.
(96) Lu, C., Transportation, v33, p45, 2006.
(97) Burns, M., J Business & Economics Research, v2, p2, 2004.
(98) McMillen, D., Economic Perspective (Chicago FED), v28, p28, 2004.
(99) Estache, A. (ed), Privatization and Regulation of Transport Infrastructure (World Bank Institute, 2000), p293.
(100) Carlsson, F., Int J of Transport Economics, v30, p1, 2003.
(101) Rich, J., Int J of Environmental Studies, v61, p19, 2004.
(102) Cherie, H., Transport Reviews, v21, p377, 2001.
(103) Whitney, J., Environmental Impact Assessment: The Canadian Experience (U. of Toronto, 1985), p192.
(104) Jud, G., J Real Estate Finance & Economics, v33, p91, 2006.
(105) Boardman, A.E.,et al., Cost-Benefit Analysis (Prentice-Hall,2005), pxxx.
(106) Reicher, A. in K. Wang, Real Estate Valuation Theory (Kluwer, 2002), p283.

"Measuring Benefits of Environmental Improvements: Aircraft Noise and Hedonic Prices," in V. K. Smith (ed) Advances in Applied Microeconomics (JAI Press, 1981): 51-75.

(1) Smith, V.K., Advances in Applied Microeconomics (JAI Press, 1981): p8.
(2) Taylor, S.M., J Sound and Vibration, v80, p523, 1982.
(3) Young, T., J Agricultural Econ, v37, p349, 1986.
(4) Alexandre, A., in P.M. Nelson (ed), Transportation Noise Reference Book (Butterworth, 1987): p23/9.
(5) Uyeno, D., J Transport Econ Policy, v27, p3, 1993.
(6) Pommerehne, W., in D. Bos (ed), Welfare and Efficiency in Public Economics (Springer, 1988): p399.
(7) Feitelson, E., Transportation Research-Part D, v1, p1, 1996.
(8) Schipper, Y., Journal of Air Transport Management, v4, p124, 1998.
(9) Schipper,Y., Market Structure and Environmental Cost in Aviation (Tinbergen Institute, 1999), p200.
(10) Morell, P., Transport Research D, v5, p320, 2000.
(11) Morrell, P., Transportation Research Record, v1703, p31, 2000.
(12) Lu, C., Transport Reviews, v21, p395, 2001.
(13) Cottis, N., Environmental and Health Impact of Aviation (EU, 2001), p38.
(14) Schipper, Y., Environ. Costs in Euro. Air Transport (Elgar, 2001), p. 188.
(15) Schipper, Y., Transportation Research B, v37, p669, 2003.
(16) Aviation Noise Law Bibliography, "Noise Impacts on Property Values," 2002. http://www.netvista.net/~hpb/biblio-3.html
(17) Luc, C., Transportation, v33, p45, 2006.

"Highway Noise and Property Values: A Survey of Recent Evidence," Journal of Transport Economics and Policy, 16 (May 1982): 117-138.

(1) Guy, D.C., AREUEA J, v13, p378, 1985.
(2) Kamerud, D.A., Transportation Research Record, No. 1033, p21, 1985.
(3) Broder, I., Evaluation Review, v12, p291, 1988.
(4) Button, K.J., Prog Plann, v32, p135, 1989.
(5) Feitelson, E., Transportation Research-A, v23, p349, 1989.
(6) Williams, A.W., Transport Rev, v11, p311, 1991.
(7) Pearce, D., in T. O'Riordan and R.K. Turner (eds), Progress in Resource Management and Environmental Planning (Wiley, 1983): p216.
(8) Palmquist, R., in J.B. Braden and C.D. Kolstad (eds), Measuring the Benefits of Environmental Quality (North-Holland, 1991), p95.
(9) Broder, I., Regulation of Transportation Noise (AEI, 1987): p84, passim.
(10) Pearce, D.W., Environmental Policy Benefits (OECD, 1989): p81.
(11) Bartik, T.J., in E.S. Mills (ed), Handbook of Regional Science and Urban Economics, Vol. II (North-Holland, 1987): p1253.

(12) Abelson, P., Economic Evaluation of Roads (APP, 1986): p141.
(13) Kuik,O.J., Assessment of Benefits of Env. Measures (Kluwer,1992):p125
(14) Pearce, D., Ambio, v13, p28, 1984.
(15) Alexandre, A., Transport Noise Reference Book (Butterworth, 1987): p23/9.
(16) Hughes, W.T., J of Regional Science, v32, p487, 1992.
(17) Baughan, C.J., in P.M. Nelson (ed), Transportation Noise Reference Book (Butterworth, 1987): p22/15.
(18) Hughes, W.T., Appraisal Journal, v61, p534, 1993
(19) Payne, B.A., Natural Resources J, v27, p581, 1987.
(20) Stempler, S., in T.Fay, Noise and Health (New York Academy:1991): p108.
(21) Uyeno, D., J Transport Econ Policy, v27, p3, 1993.
(22) Pearce, D.W., Economic Values and the Natural World (MIT Press: 1993): p121
(23) Willis, K., J Property Research, v10, p215, 1993.
(24) Verhoef, E., Transportation Research A, v28, p273, 1994.
(25) OECD, Project and Policy Appraisal (OECD, 1994), p332.
(26) Pearce, D., in D. Greenway (ed), Companion to Contemporary Economic Thought (Routledge, 1991), p340.
(27) DeBorger, B., J Transport Economics Policy, v30, p31, 1996.
(28) Smith, V., Estimating Economic Values for Nature (Elgar, 1996): p317.
(29) Pearce, D., in Guide to Modern Economics (Routledge, 1996), p241.
(30) Lesser, J., Environmental Economics and Policy (Addison, 1997), p312.
(31) Mayeres, I., Transport Research D, v1, p111, 1996.
(32) Malpezzi, S., J Housing Research, v7, p240, 1996.
(33) Abelson, P., Project Appraisal and Valuation (St. Martins, 1996), p.288.
(34) Burrington, S., NYU Environmental Law J., v5, p691, 1996.
(35) Levinson, D., Annals of Regional Science, v31, p189, 1997.
(36) Moore, L., in The Benefits of Open Space (GSWA, 1997), p8-17, 1997.
(37) Mayeres, I., Transportation Research-Part D, v1, p111, 1996.
(38) Levinson, D., Transport Reviews, v18, p215, 1998.
(39) Pijawka, K., J Plan Educ Res. v18, p113, 1998.
(40) Levinson, D. Transportation Research D, v3, p222, 1998.
(41) Pearce, D.W.,in D.Greenaway, Guide to Modern Econ (Routledge,1996), p198.
(42) Lake, I., Computers, Environ. & Urban Systems, v22, 1998, p135.
(43) Garrod, G., Economic Valuation of the Environment (Elgar, 1999), p121.
(44) Boardman, A., Cost-Benefit Analysis (Prentice-Hall, 1996), p460.
(45) Mayeres, I., in Y.Hayashi(ed), Environment and Transport (Elgar, 1999):p353
(46) Noise Pollution Clearing House, Drowning in Noise, 2000, p59.
(47) Lake, I., Environment and Planning C, v18, p681, 2000.
(48) Strand, J., Transportation, v28, p156, 2001.
(49) Ozbay, K., J Transportation and Statistics, v4, 2001.
(50) Huang, J,, J. Real Estate Finance Economics, v22, p219, 2001.
(51) Pearce, D., Annual Rev Energy Environment, v27, p81, 2002.
(52) Malpezzi, S.,Housing Economics and Public Policy (Blackwell, 2003), p308.
(53) Blair, J., J Plan Educ Research v21, p40, 2001.
(54) Flynn, J., Risk, Media and Stigma (Earthscan, 2001), p. 383.
(55) ten Siethoff, B., Transportation Res Record, v1812, p191, 2002.
(56) Hidano, N., Economic Valuation of the Environment (Elgar 2002), p87.
(57) Perman, R., Natural Res. and Environ. Econ, 3ed (Pearson, 2003), p681.
(58) Theebe, M., J Real Estate Finance Economics, v28, p209, 2004.
(59) Navrud, S., State of the Art on Economic Valuation of Noise, p8, 2002.
(60) Rodrigue, J-P., Transport Geography on the Web (Hofstra, 2004), Ch. 8.
(61) Palmquist, R., in K-G Maler & J. Vicent(eds.), Handbook of Environmental Economics, vol 2, 2005, p763.
(62) Mathis, M., Valuing Nature (HARC, 2003), p.72.
(63) Gillen, D., in D. Hensher (ed), Handbook of Transport and the Environment (Elsevier, 2003), p. 95.
(64) Baranzini, A., Urban Studies, v42, p633, 2005.
(65) Orszag, P., Quantifying the Benefits of More Stringent Noise Regulations (SEBAGO and Northwest Airlines, 2000), p15.
http://www.sbgo.com/2000%20Testimony,%20Speeches,%20and%20Papers.htm(66)

Becker, N., J of Environmental Planning and Mgt.,v46, p97, 2003.
(67) Damigos, D., J of Cleaner Production, v14, p234, 2006.
(68) Mikelbank, B. Annals of Regional Science, v38, p705, 2004.
(69) Rich, J., Int J of Environmental Studies, v61, p19, 2004.
(70) Mayeres, I., Tijschrift voor Economie en Mgt (in English) 38, p225, 1993.
(71) Agency for Nuclear Projects, A Mountain of Trouble: A Nation at Risk (State of Nevada, 2002), App.I, p35.
(72) Damigos, D., Environmental Geology, v50, p202, 2006.

"Housing Values, Census Estimates, Disequilibrium and the Environmental Cost of Airport Noise" (w/ P.H. O'Byrne and J.J. Seneca), Journal of Environmental Economics and Management, 12 (June 1985): 169-178.

(1) Pennington, G., J of Transport Economics, v24, p49, 1990.
(2) Gruenspecht, H.K. and Lave, L.B., in R. Schmalensee and R.D. Willig (eds), Handbook of Industrial Organization, Vol. II (North-Holland, 1989): p1548.
(3) Broder, I., Regulation of Transportation Noise (AEI, 1987): p86, passim.
(4) Coffin, D.A., Eastern Economic J, v15, p228, 1989.
(5) Ketkar, K., Applied Economics, v24, p647, 1992.
(6) Hughes, W.J., J of Regional Science, v32, p487, 1992.
(7) Kula, E., Economics of Natural Resources, 2nd edn (Chapman: 1994): p362.
(8) Uyeno, D., J Transport Econ Policy, v27, p3, 1993.
(9) Hanley, N., Cost-Benefit Analysis and the Environment (Elgar, 1993): p82.
(10) Collins, A., J Transport Economics Policy, v28 p197, 1994.
(11) Levesque, T., J Transport Economics Policy, v28, p210, 1994.
(12) OECD, Project and Policy Appraisal (OECD, 1994), p332.
(13)-(14) Hanley, N., Environmental Economics (Oxford, 1996, 1997): p423.
(15) Twomey, J. in Transport and Urban Development, (Elgar, 1995), p211.
(16) Johnson, K., Transportation Research D, v2, p231, 1997.
(17) Boardman, A., Annals of Regional Science, v31, p299, 1997.
(18) van den Bergh, J., et al. (eds), Meta-analysis in Environmental Economics (Kluwer, 1997), p213.
(19) Moore, L., in The Benefits of Open Space (GSWA, 1997), p8-17, 1997.
(20) Tomkins, J., Urban Studies, v35, p243, 1998.
(21) Schipper, Y., Journal of Air Transport Management, v4, p124, 1998.
(22) Delucchi, M., Journal of Transport and Statistics, v1, p24, 1998.
(23) Morrison, S., J. Law and Economics, v42, p723, 1999.
(24) Schipper,Y., Market Structure and Environmental Cost in Aviation (Tinbergen Institute, 1999), p200.
(25) Boardman, A., Cost-Benefit Analysis (Prentice-Hall, 1996), p460.
(26) Espey, M., Growth and Change, v31, p419, 2000.
(27) Strand, J., Transportation, v28, p156, 2001.
(28) Ofiara, D., Marine Pollution Bulletin, v42, p725, 2001,
(29) Ofiara, D., Economic Losses from Marine Pollution (Island, 2001), p226.
(30) Schipper, Y., Environ. Costs in Euro. Air Transport (Elgar, 2001), p. 188.
(31) Boyle, M., J Real Estate Literature, v9, p143, 2001.
(32) Cidell, J., Groundside Effects of Air Transportation (CTS, 2001), p. 20.
(33) Cottis, N., Environmental and Health Impcat of Aviation (EU, 2001), p38.
(34) Palmquist, R., International Yearbook of Env Economics (Elgar 2002): p161.
(35) Aviation Noise Law Bibliography, "Noise Impacts on Property Values," 2002.
(36) Baden, B., Alternatives to the Whistle (Chaddick Institute, 2000),
(37) Navrud, S., State of the Art on Economic Valuation of Noise, p8, 2002.
(38) Rosiers, F., J Real Estate Research, v23, p200, 2002.
(39) McMillen, D., J Urban Economics, v55, p627, 2004.

(40) Gillen, D., in D. Hensher (ed), Handbook of Transport and the Environment (Elsevier, 2003), p. 95.
(41) Barreiro, J., Applied Economics, v37, p1233, 2005.

(42) Department of Transportation, FAA, Final Environmental Impact Statement for Washington Dulles (Washington, DC, 2005), v1, Appendix B.
(43) Rosiers, F., J. Property Insurance & Finance, v17, p44, 1999.
(44) McMillen, D., Economic Perspectives (Chicago FED), v28, p28, 2004.
(45) van der Straaten, J., Indian J Applied Economics 7, p323, 1998.
(46) Jud, G., J Real Estate Finance & Economics, v33, p91, 2006.

Meta-Analysis of Airport Noise and Hedonic Property Values: Problems and Prospects, Journal of Transport Economics and Policy, 38, 2004, 1-27.

(1) Wyle Laboratories, Acoustics Group, Research Reports on Noise, 2004, http://www.wyleacoustics.com/acre6.html
(2) Bristow, A., Applied Environmental Economics Conference, p22, 2004.
(3) Carlsson, F., Transportation Research D, v9, p373, 2004.
(4) Baranzini, A., Urban Studies, v42, p633, 2005.
(5) Anon., Noise Notes, v3, p4, 2004.
(6) Department of Transportation, FAA, Final Environmental Impact Statement for Washington Dulles (Washington, DC, 2005), v1, Appendix B.
(7) Woose Inc, Woose Report on the Ohio State Airport (Columbus, 2005). http://www.WOOSE.org
(8) Hsu, C-I, Transportation Research-D, 10, p304, 2005.
(9) Cushing-Daniels, B., Transportation Research D, v10, p357, 2005.
(10) Lu, C., Transportation, v33, p45, 2006.
(11) Hoehn, J., Benefits Transfer in EPA, Benefits Transfer and Valuation Databases (National Center for Environmental Economics, Washington, DC 2005).
(12) Jud, G., J Real Estate Finance & Economics, v33, p91, 2006.
(13) Brooker, P., Aeronautical Journal, v110, p517, 2006.




WORKING PAPER SERIES

# Airport-Related Noise, Proximity, and Housing Prices in Atlanta

**Jeffrey P. Cohen**
**and**
**Cletus C. Coughlin**

Working Paper 2005-060A
http://research.stlouisfed.org/wp/2005/2005-060.pdf

August 2005

FEDERAL RESERVE BANK OF ST. LOUIS
Research Division
411 Locust Street
St. Louis, MO 63102

---

The views expressed are those of the individual authors and do not necessarily reflect official positions of the Federal Reserve Bank of St. Louis, the Federal Reserve System, or the Board of Governors.

Federal Reserve Bank of St. Louis Working Papers are preliminary materials circulated to stimulate discussion and critical comment. References in publications to Federal Reserve Bank of St. Louis Working Papers (other than an acknowledgment that the writer has had access to unpublished material) should be cleared with the author or authors.

Photo courtesy of The Gateway Arch, St. Louis, MO. www.gatewayarch.com

**Airport-Related Noise, Proximity, and Housing Prices in Atlanta**

Jeffrey P. Cohen
Assistant Professor of Economics
Barney School of Business
University of Hartford
jcohen@hartford.edu

Cletus C. Coughlin
Deputy Director of Research and Vice President
Research Division
Federal Reserve Bank of St. Louis
coughlin@stls.frb.org

August 2005

**Abstract**
Using hedonic pricing models, we focus on the effects of proximity and noise on housing prices in neighborhoods near Hartsfield-Jackson Atlanta International Airport. We find that proximity to the Atlanta airport is related positively to housing prices and that airport-related noise is associated with lower prices. Relative to this latter result, estimates are generated showing evidence of a shrinking noise discount between 1995 and 2002. An important question is whether this result reflects a reduced effect of a given noise level on house prices or declining noise levels in the areas subject to relatively more noise. One explanation is that soundproofing of houses in noisy areas has increased their values. A lack of data, however, prevents definitive statements concerning the importance of soundproofing. A second explanation is that the trend reflects the limitations of the underlying noise contours. Over time, houses in the neighborhoods near the airport have been subjected to less airport-related noise. Evidence is presented consistent with this explanation.

JEL Codes: Q53, Q51, R31, L93
Keywords: noise, airports, housing prices, hedonic pricing, proximity

The authors thank Deborah Roisman for excellent research assistance and the City of Atlanta Department of Aviation for noise contour data. The views expressed are those of the individual authors and do not necessarily reflect official positions of the Federal Reserve Bank of St. Louis, the Federal Reserve System, or the Board of Governors.

*Introduction*

Due to the flight paths of arriving and departing aircraft, noise is spatially concentrated in areas near airports. A common way to explore the impact of this geographically-concentrated externality is to estimate its effects on housing prices. Our research focuses on the impact of airport-related noise, as well as proximity, on housing prices during 1995-2002 in neighborhoods near Hartsfield-Jackson Atlanta International Airport, the world's busiest passenger airport.[1]

We estimate a hedonic pricing model. Noise and proximity are simply two of many attributes that affect the value of a housing unit. Such models have been used for many years in housing price studies, with numerous studies attempting to estimate the effect of amenities as well as disamenities on housing prices.[2] There have been several hedonic airport noise studies, but only a small number of recent studies have examined noise effects of U.S. airports on housing prices.[3]

Coinciding with our focus on the connection between noise and housing prices is the simultaneous consideration of the impact of proximity. Brueckner (2003) found that metropolitan area employment was related to the level of air traffic (i.e., passenger enplanements). Thus, it is reasonable to ask how residents might be affected by closer proximity to those airport-related jobs. Access to airport-related jobs and air

[1] The airport was renamed to honor a former Atlanta mayor, Maynard H. Jackson, in October 2003. For the period we examine, the airport was generally identified as simply Hartsfield.
[2] For example, see Greenbaum et al. (2005) – crime, Anstine (2003) – environmental disamenities associated with emissions from manufacturing facilities, and Benson et al. (1998) – environmental amenities such as the value of an ocean, lake, or mountain view.
[3] The hedonic price method, which relies on revealed preference, is the most common approach for assessing the cost of noise. This cost has been examined to a very limited extent via three other methods—artificial neural networks, contingent valuation, and happiness surveys. See Collins and Evans (1994), Feitelson et al. (1996), and van Praag and Baarsma (2005), respectively. Similar to hedonic pricing models, the use of artificial neural networks relies on revealed preference. The other methods rely to some degree on subjective, survey-based information.

transportation services can become capitalized into the value of a house. Ignoring the value of accessibility in the present context could bias the estimates of the impact of noise.

In a survey of early work on airport-related noise and housing prices, Nelson (1980) noted that most studies had found a reduction in property values between 0.4 and 1.1 percent per decibel of additional noise. In a more recent survey, Nelson (2004) found a smaller range—0.5 to 0.64— for the reduction in property values per decibel of additional noise. The results of two recent studies of specific airports are especially relevant to our analysis. McMillen (2004a) found that residential property values for homes within a 65 decibel noise contour band of Chicago's O'Hare Airport were about nine percent lower than otherwise similar homes.[4] Similarly, Espey and Lopez (2000) identified a significant decrease in the prices of homes subject to greater noise levels. They found a $2400 difference in the price of a home in Reno-Sparks, Nevada, in areas where the noise level reaches at least 65 decibels.

To date only one previous study has examined the effect of noise at the Atlanta airport on property values. O'Byrne, Nelson and Seneca (1985) examined the prices of properties near the Atlanta airport for 1970-72 and 1979-80 using hedonic price models. Noise negatively affected price in both sets of regressions. Moreover, despite using prices based on individual house sales in one period and owner-appraised Census block aggregates in the other period, their results revealed similar estimates of the noise discount for the two periods.

---

[4] Nonetheless, because the noise associated with aircraft is diminishing over time, McMillen (2004a) estimated that residential real estate prices for houses near O'Hare would rise if an additional runway were built.

Our research will update and improve upon the results of O'Byrne et al. concerning the impact of noise associated with the Atlanta airport. Noise levels and the geographic distribution of noise affecting nearby neighborhoods have changed due to the expansion of the airport, specific attempts by the aircraft authorities to mitigate noise, and the development of quieter aircraft. As we will demonstrate, the changing geographic distribution complicates our attempt to generate insights concerning how noise has affected housing prices.

A noteworthy advance over prior studies is that we produce results concerning how the impact of noise on housing prices has changed over time at a specific airport. In an early survey of airport-related noise estimates and housing prices, Nelson (1980) concluded that the impact of noise was relatively stable across studies; however, a recent review by Schipper et al. (1998) of 19 studies found much variation among the estimates produced by the studies. Much of this variation could be explained by differences across studies in terms of either the characteristics of the sample population (e.g., mean house price) or the study (e.g., time period, country, and specification). In an even more recent meta-analysis based on an expanded sample of 33 hedonic estimates of the noise discount for 23 airports in the United States and Canada, Nelson (2004) concluded that variability in estimated noise discounts was related to the country in which the airport was located and to the specification of the hedonic model.

In contrast to prior studies, we use price data from one source over a moderately long time period to explore how the impact of noise near the Atlanta airport has changed over time. Based on noise levels for 1995, the magnitude of the noise discount appears to have shrunk over time. This empirical result, however, might be misleading. The

evidence that we are able to generate suggests that a changing distribution of noise is, at least, partially responsible for this result. In other words, the estimated shrinking noise discount reflects the fact that actual noise levels have declined in some areas near the Atlanta airport rather than that a given noise level is affecting housing prices to a smaller degree. Due to a lack of data, we were unable to assess the impact of soundproofing programs on the noise discount over time.

*Data and Model*

The standard categories of explanatory variables used in studies of housing prices are the structural features of the housing units, location characteristics, and attributes of the social and natural environment. To estimate the impact of specific determinants on housing prices, we combined data from various sources. The data consist of noise contour maps for the neighborhoods surrounding the airport, demographic data on a block-group basis for average income and percent of housing occupied by blacks, as well as data for single family house sales, including sales prices, the geographic location, and housing characteristics.

Noise contour files for 1995 and 2003 have been obtained from the City of Atlanta Department of Aviation, and they are in a format that enabled them to be read into ArcView Geographic Information Systems (GIS) software.[5] ArcView GIS software enables the user to read noise contour maps and match up the corresponding noise data with other geo-coded data corresponding to individual properties, such as distance to the airport and other demographic data. The noise contour maps are based on a standard measure of noise used by the Federal Aviation Administration and other federal agencies.

[5] Nelson (2004) refers to GIS studies as the "next generation of hedonic studies", with the first generation having looked at Census tract data, and the second generation focusing on individual sale price data. For an overview of applying GIS to various economic issues, see Bateman et al. (2002).

This measure, the yearly day-night sound level (DNL), is measured in decibels. Because an increase of 10 decibels is equivalent to a ten-fold increase in sound, a ten-unit increase in the DNL can be viewed similarly.

Nelson (2004) notes that normal background noise levels in urban areas are approximately 50-60 decibels during daytime hours and 40 decibels during nighttime. A DNL of 65 decibels is the Federal Aviation Administration's lower limit for defining a significant noise impact on people.[6] At 65 decibels and above, individuals experience the disruption of normal activities, such as speaking, listening, learning, and sleeping. A DNL of 75 decibels or more is viewed as incompatible with single family housing.[7]

Our analysis uses two noise contours, one for 65 decibels and one for 70 decibels. Single family dwelling sale price data for the years 1995 through 2002 have been purchased from First American Real Estate Services for the Atlanta neighborhoods that fall in the 65 DNL and 70 DNL boundaries, as well as within a half mile outside of the 65 DNL boundary, which is termed the "buffer zone."[8] [9] Relative to the buffer zone, we expect to find that, all else equal, houses subjected to more noise will sell for lower prices.

[6] Research on noise suggests that roughly 12 percent of people subjected to a DNL of 65 decibels report that they are "highly annoyed" by transportation noise. Annoyance is defined as the adverse psychological response to noise. Meanwhile, about 3 percent are highly annoyed when subjected to a DNL of 55 decibels and nearly 40 percent are highly annoyed at a DNL of 75 decibels. See *Federal Register* (2000).
[7] Nelson (2004) notes that since 1979 federal agencies have regarded land subjected to DNLs ranging from 65 to 74 decibels as "normally" incompatible with residential use, while land exposed to a DNL of less than 65 decibels is regarded as "normally" compatible with residential land use.
[8] There were 28 sales in the 75 decibel noise contour that we have chosen to eliminate from the sample.
[9] There are 3 reasons why we chose the 0.5 mile buffer zone as opposed to looking at the entire Atlanta metropolitan area. First, other airport noise studies have handled analogous problems in a similar manner. Second, we wanted to examine the impact of additional noise relative to some base that exhibits some noise. Third, other parts of Atlanta may face dramatically different housing price determinants than the area surrounding the airport.

The geographic area that we examine and the relevant noise contours for 1995 are shown in Figures 1 and 2. The airport lies ten miles south of downtown Atlanta. The area under consideration covers parts of three counties—Fulton, Clayton, and DeKalb. The number of home sales total 2,370; however, none of these sales occurred in DeKalb County.

Housing sale prices are deflated by the National Association of Realtors median housing price index for Atlanta, with 1995 median sales price for Atlanta as the base year. Between 1995 and 2002 this index increased 50 percent, substantially larger than the 20 percent increase in the consumer price index. In addition to the sales price, housing characteristics such as the numbers of stories, bedrooms, baths, fireplaces, lot size, and the age of the dwelling were contained in the purchased dataset. Table 1 lists all the variables used in our analysis and how these variables were measured, while Table 2 contains summary information of our data.[10] We expect each of the housing characteristics variables, with the exception of the age of the dwelling, to be related positively to housing prices. An increase in the age of a house, holding all other things constant, should tend to reduce its price.

The demographic data is from the Bureau of the Census. Specifically, the block group data for the years 1995-1999 came from the 1990 Summary Tape File 3 – Sample data, and the 2000-2002 block group data came from the 2000 Summary Tape File 3 – Sample data. With respect to the neighborhood characteristics, we expect that the sign on the median income coefficient should be positive due to neighborhood effects. In other

[10] Following Pennington et al. (1990) and Espey and Lopez (2000), dummy variables are used for measuring selected structural housing characteristics, such as the numbers of bedrooms, bathrooms, and fireplaces.

words, houses in neighborhoods where residents have higher incomes should result in higher housing prices. Despite some research finding a negative relationship, such as O'Byrne et al. (1985), our expectation concerning the sign of the coefficient relating the percentage of housing occupied by blacks to housing prices is somewhat tenuous.[11] Possible changes in racial attitudes as well as differences in the composition of the neighborhoods we examine versus O'Byrne et al. (1985) preclude a firm prior concerning this relationship.

In addition to noise and neighborhood characteristics, the location of a house is likely to affect its price via some other characteristics. Whether the house is located in Fulton County or Clayton County is potentially important. The benefits and costs of services provided at the county level can differ across counties and can affect housing prices. *A priori*, we have no expectation as to whether this public sector variable should be relatively more favorable to housing prices in Fulton County or Clayton County.

Finally, we use ArcView to calculate another potentially important location characteristic — the distance between each property address and the airport. As found in some of the previous airport noise studies, after accounting for airport noise, we expect that less distance from the airport should result in higher housing prices, due to more convenient access to jobs at the airport and air transportation service.[12] [13] Ignoring the

---

[11] Greenbaum et al. (2005) found a positive relationship between housing prices and the percentage of white population for neighborhoods in Columbus, Ohio.

[12] Proximity to an airport may have positive (due to accessibility) as well as negative (due to noise) effects on property values. In a study of an airport in Manchester, England, Tomkins et al. (1998) found that the benefits of easy access to the airport outweighed the costs of living near the airport. In contrast, Espey and Lopez (2000) found proximity to an airport in Reno, Nevada to be a disamenity.

[13] Numerous studies have related property values to the distance from rail stations. Bowes and Ihlanfeldt (2001, p. 3) conclude that "the majority do find that rail stations have a positive (but relatively modest) impact on nearby property values." In the case of rail stations, Bowes and Ihlanfeldt examine four factors related to proximity that might affect property values. The positive factors are the transportation access

value of accessibility to the airport could bias the estimated noise effect downward (i.e., to showing a lessened effect). Thus, the model is a hedonic housing price model, with the individual housing characteristics, noise exposure, neighborhood characteristics, the county in which the house is located, and distance to the airport as the explanatory variables.

*Results – A First Cut Using 1995 Noise Contours*

We estimated numerous hedonic housing price models. Lacking *a priori* knowledge of the appropriate functional form, we estimated three different specifications—a double log form, a semi-log form, and a linear form.[14] Our empirical results can be separated into two parts—one part consists of results of models without noise time trends and the other part with noise time trends. We begin by examining the results of models without a noise time trend.

Table 3 contains the results of models using the noise contours for 1995. In terms of the variation in housing prices, the estimated models explain from 44 percent of the variation in the case of the double log form to 37 percent for the linear form. The results indicate that nearly every individual variable performed as expected. We begin by examining the results for the variables not related to the Atlanta airport.

Regardless of functional form, variables measuring the structural characteristics of houses exhibited the expected impact on housing prices and, virtually without exception, were statistically significant, often at the 1 percent level. For example, the dummy

---

advantage provided by rail stations and the increased retail activity stemming from rail stations. The negative factors are crime and environmental disamenities, such as noise, pollution, and the unsightliness of rail stations. In their study of Atlanta's rail system, all four factors affected property values, with the relative importance varying by distance from downtown and the median income of the neighborhood.

[14] As Gayer et al. (2002) note, Box-Cox transformations are also frequently used in hedonic pricing studies.

variable differentiating houses with two or more stories from other houses, *dStories*, was found to be a positive, statistically significant determinant of housing prices. The dummy variables differentiating houses based on the number of bedrooms, *beds_3*, *beds_4*, and *beds_5*, were all related positively to housing prices and, except for *beds_3* in the linear form, were statistically significant. Moreover, the size of the estimated coefficients increased as the number of bedrooms increased, which is what one would expect. The results for the number of bathrooms are similar to the results for the number of bedrooms. The dummy variables differentiating houses based on the number of bathrooms, *baths_2* and *baths_3*, were all related positively to housing prices, increased in size with the number of bathrooms, and were statistically significant. The dummy variable differentiating houses with two or more fireplaces from other houses, *dFire_2*, was related positively to housing prices and was statistically significant. Indicating that newer houses tend to sell for higher prices than older houses, the variable measuring the age of the house, *log_age* in the double log specification and *age* in the other specifications, was related negatively to housing prices; however, this variable was not statistically significant for the semi-log and linear specifications. Finally, indicating that larger lots were associated with higher housing prices, the variable measuring lot size, *log_acres* in the double log specification and *acres* in the other specifications, was related positively to housing prices and was statistically significant.

Turning to the neighborhood characteristics, the variable measuring the median household income in the neighborhood in which a house was sold, *log_medhhinc* in the double log specification and *med_hhinc* in the other specifications, was related positively to housing prices and was statistically significant. Meanwhile, the percentage of homes

in a neighborhood occupied by blacks, *perc_tenureblack*, was related positively to housing prices and, except for the semi-log specification, was statistically significant. This positive relationship is contrary to the findings of O'Byrne et al. (1985).

Whether a house is located in Fulton County rather than Clayton County appears to affect its price. The dummy variable measuring county location, *fulton*, was related positively to housing prices and was statistically significant. Identifying the precise reasons for this result is beyond the scope of our analysis; however, two facts about publicly-provided services suggest reasons for this result. First, at least in recent years, public elementary and secondary schools in Fulton County tended to outperform similar schools in Clayton County. For example, the Fulton County system met the 2004-2005 Adequate Yearly Progress standard, one of the cornerstones of the federal No Child Left Behind Act. Meanwhile, the Clayton County system did not meet this standard.[15] Second, the Center for Digital Government, a national research and advisory institute on information technology policies and best practices in local and state government, has identified Fulton County as among the top ten leading counties in its use of digital technology.[16] Meanwhile, Clayton County was not mentioned.

The remaining results concern the variables related to the airport—distance and noise. The distance from a house to the airport affects the price of the house. The variables measuring that distance, *log_distance* in the double log specification and *distance* in the other specifications, were related negatively to housing prices and were statistically significant. Our results are consistent with findings by Tomkins et al. (1998) that proximity to the airport in Manchester, England, and by McMillen (2004a) that

[15] See www.gadoe.org.
[16] See www.centerdigitalgov.com.

proximity to Chicago's O'Hare Airport were amenities, but are inconsistent with a finding by Espey and Lopez (2000) that proximity to the airport in Reno, Nevada, was a disamenity.

Turning to the results with respect to airport noise, the results are consistent with expectations, but are far from overwhelming. Regardless of the functional form, airport noise is related negatively to housing prices and the relative magnitudes of the coefficients for *db65_95* and *db70_95* are as expected with a larger noise discount for the noisier location. However, the relationship is statistically significant for only three of the six possibilities.[17]

As noted above, we include the distance variable in our final specification because the parameter estimate was statistically significant. Also, we find that excluding proximity tends to shrink the estimated impact of noise on housing prices. For example, based on the model in Table 3, the parameter estimates for the 65 decibel noise contour for the log, semi-log, and linear functional forms when proximity is excluded (included) are: -0.008 (-0.016), -0.011 (-0.023), and -2,741.55 (-3,649.05). The parameter estimates for the 70 decibel noise contour are: -0.024 (-0.060), -0.010 (-0.044), and -1,410.67 (-4,041.68). In addition, excluding proximity tends to reduce the statistical significance of noise for housing prices. These results are similar for the remaining models in this paper, so we have chosen not to repeat this consistent finding when we discuss these other models.

*Potential Biases Stemming from Changing Noise Contours*

[17] Note that our assessment of statistical significance is based on a two-sided hypothesis test. In the present case, in light of the theoretical relationship of a negative relationship between noise and the price of a house, a one-sided test can be justified. In that case, four of the six possibilities show statistical significance, with the other two being very close to significance at the ten percent level.

One question that deserves scrutiny is whether there are potential biases from the use of the 1995 contours for the entire period. A comparison of the 1995 contours with contours estimated for 2003 suggest that the noise contours have changed systematically between 1995 and 2003. Figure 3 shows how the 65 decibel noise contour has changed between 1995 and 2003. Generally speaking, the 65 decibel noise contour has shifted closer to the ends of the runways. This change and a similar change for the 70 decibel noise contour have resulted from a combination of technological changes, regulatory policy, and airport authority efforts to reduce the effects of noise.[18]

Prior to 1968 aircraft noise was not regulated on a national basis in the United States. Following Congressional authorization, the Federal Aviation Administration promulgated standards requiring that the best available noise reduction technology be used in new designs of civil subsonic turbojet aircraft. Aircraft satisfying this standard were categorized as Stage 2 aircraft, while those not meeting this standard were classified as Stage 1 aircraft. In 1977, the Federal Aviation Administration adopted more stringent noise standards that applied to all newly manufactured aircraft. Aircraft meeting the new standards, which only apply to commercial subsonic jet aircraft over 75,000 pounds, were classified as Stage 3 aircraft. Following passage of the Airport Noise and Capacity Act in 1990, all commercial jets operating in the United States were required to be Stage 3 compliant by December 31, 1999. Thus, one implication to be drawn from phasing-in the Stage 3 requirement is that houses initially identified as located in the 65 decibel 1995 noise contour might well be in the buffer zone near the end of the time period we examine.

---

[18] Additional information on this topic can be found on the airport's website: www.atlanta-airport.com. After reaching the site, navigate through "Airport Information," "Environmental," and then "Noise and Operations Monitoring System" (NOMS).

The preceding discussion indicates that both the 70 decibel and 65 decibel noise contours shrink over time so that some houses become subject to less noise. Meanwhile, the buffer zone becomes a relatively larger share of the area under consideration and it too is becoming subjected to less noise. Thus, on average, the houses in each of these areas should tend to increase in value. Because the estimation of the noise discount is relative to the buffer zone, it is unclear whether the estimated noise discount using the 1995 contours for 1995-2002 will tend to be biased high, biased low, or even unbiased if the effects on price are identical in each area.

The existence of the 2003 contours provides two other ways to reconfigure the dataset for estimation purposes. One approach is to use the 2003 contours for the entire period. Because the 70 and 65 decibel noise contours shrink between 1995 and 2003, the number of house sales in our dataset in these two zones also declines. The number of house sales in the 70 decibel noise contour declines from 249 to 67, while the decline in the 65 decibel noise contour is from 1,113 to 748. Because the overall geographic area is unchanged, the number of house sales in the buffer zone increases from 1,008 to 1,555.

What can we say about the noise that houses in the three areas are subject to over time? First, the houses in the 70 decibel noise contour are subject to roughly the same noise level in 1995 as they were in 2002. Second, the houses in the 65 decibel noise contour are subject to at least the same noise level, with some houses subjected to more at some time during the period. The reason for this observation is that some houses that began the period in the 70 decibel noise contour are identified in the 65 decibel noise contour by 2003. Third, the houses in the buffer zone based on the 2003 contours are subject to conflicting effects. The houses that were also in the buffer zone based on the

1995 contours are subjected to less noise over time. However, some houses that were subjected to noise levels of 65 decibels or higher early in the period are viewed as being subjected to less noise because they are in the buffer zone based on the 2003 definition. It is unclear how these two effects affect the buffer zone and, consequently, whether and how the 70 decibel and 65 decibel noise discount estimates are biased.

A second way to use the 2003 noise contours is to combine them with the 1995 noise contours. The resulting sample consists of houses in the 70 decibel contour using both the 1995 and 2003 noise contours, houses in the 65 decibel contour for both noise contours, and houses in the buffer zone for both noise contours. The dummy variables identifying houses in the 65 and 70 decibel noise contours using 1995 and 2003 measures are *db6565* and *db7070*, respectively. Houses classified as switching noise areas between 1995 and 2003 were deleted.[19]

As a result, the sample size decreased from 2370 to 1643. In addition, as indicated in Table 4, the distribution of houses across the three noise areas changed. The location of houses in this sample is shown in Figure 4. The percentage of houses in the buffer zone increased by nearly 19 percentage points, while the percentage of houses in the 65 and 70 decibel noise contours declined by roughly 12 and 6 percentage points, respectively. Some minor changes can also be observed in the means of the variables. Not surprisingly, with the relative decline of the houses in the 65 and 70 noise contours, the mean of the adjusted sales price rose as did the distance from the airport.

[19] McMillen (2004b) follows another approach to analyze whether homes have risen faster in neighborhoods where noise exposure has changed over time. He assigns dummy variables to properties that switched sides of the 65db noise contour over time, and for the most part finds that on average the houses that switch sides of the noise contour over time do not significantly appreciate.

Neighborhood characteristics also changed. The percentage of houses in the neighborhood occupied by blacks fell, while the median household income rose.

What can we say about potential bias using this sample? Using this reduced sample, it is clear that houses in the 70 decibel and 65 decibel noise contours are subject to roughly the same noise levels throughout the period. (More precisely, the houses in the 70 decibel noise contour are subject to at least 70 decibels of noise throughout the period, with some houses subjected to slightly less noise at the end of the period than at the beginning.) Meanwhile, houses in the buffer zone are likely to be subject to less noise over time. Because the houses in the buffer zone are expected to be affected only minimally by noise, an argument can be made that any reduction in noise for these houses is likely to have a negligible effect on their price. This is especially pertinent due to the construction of this sample. Thus, relative to the buffer zone, the noise discount estimates, to the extent that any bias exists, should be biased high.

*Results Incorporating 2003 Noise Contours*

First, we focus on the results based on the two samples that use the 2003 noise contours. Table 5 contains the results using the entire dataset with the 2003 noise contours defining the noise levels for the entire sample period. Table 6 contains the results using the sample restricted to housing sales that occur in the same noise contour using both the 1995 and 2003 noise contours. In light of our focus on the noise discount estimates, we focus our discussion on the variables related to the airport, especially the noise discount estimates.[20]

[20] Generally speaking, the results in Tables 3, 5, and 6 for the "non-noise" variables are very similar. The key difference in terms of statistical significance between the results in Tables 3 and 5 is that *perc_tenureblack* is not statistically significant in the linear form in Table 5, while it is statistically significant in Table 3. The key differences between the results in Table 6 relative to Tables 3 and 5 is that

The results in Tables 5 and 6 continue to indicate that the distance from a house to the airport affects the price of a house. The variables measuring distance, *log_distance* and *distance*, are related negatively to housing prices and are statistically significant. Comparing the parameter estimates, one sees that in Table 6 the marginal value of proximity is much larger than in Tables 3 and 5.

The parameter estimates for the noise variables in Table 5 are, as expected, negative. Moreover, the magnitudes of the estimates for the 70 decibel noise contour exceed those for the 65 decibel noise contour. However, in only two of the six cases is the relationship between noise and housing price statistically significant. In Table 6, there are stronger results. Not only are the parameter estimates negatively signed and of the appropriate relative magnitudes, but in five of the six cases the relationship is statistically significant. The estimates for each functional form and for both noise levels are larger (in absolute value) in Table 6 than in Tables 3 and 5.

Recall from the prior discussion that a case can be made that the estimates in Table 6 are biased high. Thus, these estimates provide an upper bound on the noise discount. The coefficient for the 65 decibel noise contour in the double log specification has a value of -0.025, which implies that after accounting for other physical and neighborhood characteristics, houses in this noise contour sold for about 2.5 percent less on average than houses in the buffer zone.[21] Meanwhile, the coefficient for the 70 decibel noise contour suggests a noise discount of 8.6 percent.

---

*fulton* is no longer statistically significant and *beds_5* is no longer statistically significant in the double log and semi-log forms.

[21] The estimated coefficients for the noise contours using the double log and semi-log functional forms are approximately equal to the noise discount. In percentage terms, the noise discount equals $(e^{\beta} - 1) \times 100$, where e is the base of the natural exponential function and β is the parameter relating noise to housing price.

For the semi-log specification, the noise variables are statistically significant with the coefficients for the 65 and 70 decibel noise contour zones equal to -0.038 and -0.099, respectively. Thus, the noise discount for houses in the 70 decibel noise contour, 9.4 percent, is more than double that of houses in the 65 decibel noise contour. In contrast to our noise discount finding of 3.7 percent, Espey and Lopez (2000) estimated a noise discount of 2 percent for houses in the 65 decibel noise contour for the Reno airport, while McMillen (2004a) estimated a 9 percent noise discount for houses in the 65 decibel noise contour for Chicago's O'Hare Airport. In addition to examining different geographic areas, different time periods of other studies may account for some of these differences between their findings and our results.

Finally, for the linear specification, the results presented in Table 6 indicate noise discounts for the 65 and 70 decibel noise contours of $4,725 and $12,491, respectively. With the average adjusted price of a home in the buffer zone equal to $74,414, the sales prices of homes in the 65 and 70 decibel noise contour bands are roughly 6.3 and 16.8 percent, respectively, lower than in the buffer zone.[22] In contrast to our finding of 6.3 percent, Espey and Lopez (2000) estimated a noise discount of slightly more than 2 percent for houses in the 65 decibel noise contour for the Reno airport.

*Results - A Changing Noise Discount?*

The next question that we explore is whether the noise discount has changed over time.[23] The preceding discussion suggests that our empirical finding of a changing noise discount might be due to the changing noise patterns surrounding the airport. However,

---

[22] Consistent with a general finding by Schipper et al. (1998), the estimated impact of noise on housing prices tends to be larger for the linear specification relative to double log and semi-log specifications.
[23] We also examined time trends for the other independent variables. Our results revealed no linear time trend between these variables and housing sales prices.

this factor is not really causing a change in the noise discount, but rather reflects the impact of less noise. There are reasons for why the actual noise discount might change over time. Moreover, it is not clear whether this noise discount is more likely to increase or decrease over time. With increasing incomes and with noise being a disamenity, then it is likely that the noise discount should tend to increase over time. On the other hand, airport authorities were pursuing policies during the time period under consideration to reduce the effects of noise.[24] For example, houses within the noise contours were soundproofed. Such efforts should make the purchase of these houses more desirable and, consequently, reduce the noise discount.

Tables 7 through 9 contain the results of adding a time trend for the 65 decibel noise contour to the models estimated previously.[25] Adding the time trends only affected the results concerning the noise contours. The overall explanatory power of the models remained unchanged and the other individual variables were affected only minimally.

Turning to the noise-related results, the statistical evidence suggests that if the measured noise discount within the 65 decibel noise contour has changed at all, it has shrunk over time. In Table 7, which uses the 1995 noise contours throughout the sample period, for the double log specification, the estimated discount in 1995 was 6.2 percent. In other words, houses in the 65 decibel noise contour sold for 6.2 percent less than otherwise comparable houses in the buffer zone. This discount tended to shrink at a rate

[24] According to the authorities at the Atlanta Airport (http://www.atlanta-airport.com/sublevels/airport_info/noise.htm): "The DOA's Noise Mitigation Program's purpose is to be proactive in addressing eligible noise-impacted properties inside the approved noise contours. This program provides assistance to the communities surrounding HJAIA by continuing to reduce noise-sensitive uses inside the 70 DNL through acquisition/relocation, and complete acoustical treatment for the remaining noise-sensitive uses inside the 65 DNL, thereby enhancing their living conditions."

[25] We also ran regressions with a time trend for the 70 decibel noise contour. With the exception of the sample using the 1995 noise contours, these models performed poorly. The time trend for the 70 decibel noise contour exhibited no consistent sign and was not statistically significant. In addition, adding this time trend resulted in the 70 decibel noise dummy to become insignificant.

of roughly 1.2 percentage points per year.[26] As a result, our estimates suggest that the noise discount had been eliminated by 2002. A similar result was found using the semi-log functional form. For the linear functional form, the time trend in the 65 decibel contour, while tending to shrink the noise discount, was not statistically significant.

The results contained in Table 8, which use the 2003 noise contours for the entire 1995-2002 sample period, also provide evidence of a shrinking noise discount. For each functional form the time trend is positive and, in each case, is also statistically significant. Similar to the results in Table 7, the estimates suggest that the noise discount was eliminated by the end of the sample period. Finally, the results contained in Table 9, which use only the houses that are in the same noise contour in both the 1995 and 2003 noise contours, provide, at best, only weak support for a shrinking noise discount. The time trend, albeit positive, does not indicate a statistically significant relationship between the trend of the noise discount and housing prices.

The tentative results in Tables 7 through 9 suggest that the noise discount might have shrunk over time. Two explanations can justify our statistical results. First, the soundproofing efforts of the Atlanta Airport Authority might have reduced the irritation associated with airport noise and increased the attractiveness of the properties in the noise contours relative to those in the buffer zone. If so, then the estimated trend is a real phenomenon because the discount shrinks for houses in the 65 decibel noise contour.

Second, we cannot rule out measurement error as a cause of our results. The finding of a shrinking noise discount for certain houses is due to the fact that these houses

[26] Note that the parameter estimates for 1995 indicate that the noise discount was larger for the 65 decibel noise contour than for the 70 decibel noise contour. This is likely an artifact of a linear time trend. In this case after one year the noise discount for the 65 decibel noise contour is estimated to be less than the noise discount for the 70 decibel noise contour.

are subject to less noise at the end of the estimation period relative to the beginning of the period. Because houses are assets, the prices of houses reflect various expectations of future conditions, one of which is likely to be the physical environment.[27] It is reasonable to think that those involved in the housing market were aware, at least to some extent, of the changing noise patterns surrounding the airport and that this information affected housing prices.

A case can be made that the results associated with the reduced sample are less likely to be afflicted with measurement error. If so, then the results in Table 9 might be preferred in terms of identifying the real noise discount. Most likely measurement error has contributed to the finding of shrinking noise discount. While it remains possible that the real noise discount has shrunk, the results in Table 9 do not indicate a statistically significant trend.

*Conclusion*

Our research produces results on two dimensions of housing prices near the Atlanta airport. Our findings with respect to proximity can be stated succinctly. Proximity to the airport is related positively to housing prices. Moreover, when this variable is excluded, the estimated impact of noise on housing prices is much less in absolute value than when this variable is included. Thus, our evidence suggests that ignoring the value of accessibility to the Atlanta airport likely biases the estimated noise effect to showing a lessened impact.

Consistent with previous airport noise studies, including the prior study of the Atlanta airport by O'Byrne et al. (1985), we find that airport-related noise having a "significant noise impact on people" is associated with lower housing prices. Our point

[27] For example, Gayer et al. (2002) found that housing prices responded to environmental risk information.

estimate of the noise discount is sensitive to both the functional form and the noise contours used to classify houses. For example, using the double-log specification, the noise discount for houses in the 70 decibel noise contour ranges from 5.8 percent to 8.6 percent. Generally speaking, the linear specification yields the largest estimate of the noise discount. Using the 2003 noise contours for the entire sample period, the noise discount for houses in the 70 decibel noise contour ranges from 5.4 percent to 10.6 percent. As expected, using the restricted sample yields the largest noise discounts, with the noise discount ranging from 8.6 percent to 16.8 percent.

Turning to the results for houses in the 65 decibel noise contour, houses sell for, at most, 6.3 percent less than comparable houses in the buffer zone. Our estimates for the discount for houses in the 65 decibel noise contour tend to fall between the recent estimates of Espey and Lopez (2000) for the Reno airport and of McMillen (2004a) for Chicago's O'Hare Airport.

A novel feature of our research was our attempt to identify whether and how this noise discount has changed over time. Our analysis produced results that warrant additional scrutiny. Using the noise levels for either 1995 or 2003, the noise discount for the 65 decibel noise contour is estimated to have shrunk to virtually zero between 1995 and 2002. However, using what we term the reduced sample, such a statement for the noise discount is much less tenable.

Two explanations, which are not mutually exclusive, could account for this time trend. One is that the soundproofing of houses in noisy areas could increase the attractiveness of purchasing houses in these areas relative to less noisy areas. Thus, the noise discount would shrink over time. The second explanation is that the estimated time

trend reflects the difficulty of measuring noisy areas accurately. It appears that over time the noisy geographic areas have tended to shrink. Thus, some houses have effectively switched from noisy to less noisy areas. Consequently, while the impact of noise on these houses has been reduced, the impact of a given noise level on housing prices has not necessarily changed.

We lack sufficient data to rule out the impact of soundproofing. This is an issue that warrants additional research. What appears to be clear, however, is that changing noise contours do play a role in our estimated results. More generally, changing noise contours might well affect the estimates of airport noise studies using data for multiple years.

REFERENCES

Anstine, Jeff (2003) "Property Values in a Low Populated Area when Dual Noxious Facilities are Present," *Growth and Change* 34(3), 345-358.

Bateman, I.J., A.P. Jones, A.A. Lovett, I.R. Lake, and B.H. Day (2002) "Applying Geographical Information Systems (GIS) to Environmental and Resource Economics," *Environmental and Resource Economics* 22 (1-2), 219-269.

Benson, E., J. Hansen, A. Schwartz, Jr., and G. Smersh (1998) "Pricing Residential Amenities: The Value of a View," *Journal of Real Estate Finance and Economics* 16(1), 55-73.

Bowes, David R. and Keith R. Ihlanfeldt (2001) "Identifying the Impacts of Rail Transit Stations on Residential Property Values," *Journal of Urban Economics* 50(1), 1-25.

Brueckner, Jan K. (2003) "Airline Traffic and Urban Economic Development," *Urban Studies* 40(8), 1455-1469.

Collins, Alan and Alec Evans (1994) "Aircraft Noise and Residential Property Values: An Artificial Neural Network Approach," *Journal of Transport Economics and Policy* 28(2), 175-197.

Espey, Molly and Hilary Lopez (2000) "The Impact of Airport Noise and Proximity on Residential Property Values," *Growth and Change* 31(3), 408-419.

Federal Register (July 14, 2000), 65(136), 43802-43824.

Feitelson, Eran I., Robert E. Hurd, and Richard R. Mudge (1996) "The Impact of Airport Noise on Willingness to Pay for Residences," *Transportation Research: Part D: Transport and Environment* 1(1), 1-14.

Gayer, Ted, James T. Hamilton, and W. Kip Viscusi (2002) "The Market Value of Reducing Cancer Risk: Hedonic Housing Prices with Changing Information," *Southern Economic Journal* 69(2), 266-289.

Greenbaum, Robert T., Tricia L. Petras, and George E. Tita (2005) "Do Changes in Crime Rates Affect Housing Prices? A Neighborhood Level Analysis," paper presented at the American Real Estate and Urban Economics Association Annual Meetings, Philadelphia, PA, January 7-9.

McMillen, Daniel P. (2004a) "Airport Expansions and Property Values: The Case of Chicago O'Hare Airport," *Journal of Urban Economics* 55(3), 627-640.

___________ (2004b) "House Prices and the Proposed Expansion of Chicago's O'Hare Airport," Federal Reserve Bank of Chicago *Economic Perspectives* 28(3), 28-39.

Nelson, Jon P. (1980) "Airports and Property Values: A Survey of Recent Evidence," *Journal of Transport Economics and Policy* 14(1), 37-52.

___________ (2004) "Meta-Analysis of Airport Noise and Hedonic Property Values: Problems and Prospects," *Journal of Transport Economics and Policy* 38(1), 1-28.

O'Byrne, Patricia Habuda, Jon P. Nelson, and Joseph J. Seneca (1985) "Housing Values, Census Estimates, Disequilibrium, and the Environmental Cost of Airport Noise: a Case Study of Atlanta," *Journal of Environmental Economics and Management* 12(2), 169-178.

Pennington, G., N. Topham, and R. Ward (1990) "Aircraft Noise and Residential Property Values Adjacent to Manchester International Airport," *Journal of Transport Economics and Policy* 24(1), 49-59.

Schipper, Youdi, Peter Nijkamp, and Piet Rietveld (1998) "Why do aircraft noise value estimates differ? A meta-analysis," *Journal of Air Transport Management* 4(2), 117-124.

Tomkins, J., N. Topham, J. Twomey and Robert Ward (1998) "Noise versus Access: The Impact of an Airport in an Urban Property Market," *Urban Studies* 35(2), 243-258.

Van Praag, Bernard M.S. and Barbara E. Baarsma (2005) "Using Happiness Surveys to Value Intangibles: The Case of Airport Noise," *Economic Journal* 115(500), 224-246.

Table 1
Variables in Hedonic Regressions

| Name | Definition |
|---|---|
| *adj_price* | House sale price deflated by median housing price index for Atlanta. |
| *db65_95 (db65_03)* | Dummy variable equal to one for houses within the 65 decibel day-night sound level 1995 (2003) noise contour; zero otherwise. |
| *db70_95 (db70_03)* | Dummy variable equal to one for houses within the 70 decibel day-night sound level 1995 (2003) noise contour; zero otherwise. |
| *time_65_95 (time_65_03)* | Interaction term: db65_95 (db95_03) x time, with db65_95 (db95_03) as defined above and with time = 0 for 1995 sales, time = 1 for 1996 sales, …, time = 7 for 2002 sales. |
| *dStories* | Dummy variable equal to one for houses with more than one story; zero otherwise. |
| *beds_3* | Dummy variable equal to one for houses with three bedrooms; zero otherwise. |
| *beds_4* | Dummy variable equal to one for houses with four bedrooms; zero otherwise. |
| *beds_5* | Dummy variable equal to one for houses with five or more bedrooms; zero otherwise. |
| *baths_2* | Dummy variable equal to one for houses with two bathrooms; zero otherwise. |
| *baths_3* | Dummy variable equal to one for houses with three or more bathrooms; zero otherwise. |
| *dFire_2* | Dummy variable equal to one for house with two or more fireplaces; zero otherwise. |
| *age** | Age of house in years at the time of its sale. |
| *acres** | Lot size in acres. |
| *distance** | Distance in miles from house to airport. |
| *perc_tenureblack* | Percentage of homes in the neighborhood in which a house was sold occupied by blacks; only two years of data are available: 1990 Census data is used for sales in 1995-1999 and 2000 Census data is used for sales in 2000-2002. |
| *med_hhinc** | Median household income in the neighborhood in which a house was sold; only two years of data are available: 1990 Census data is used for sales in 1995-1999 and 2000 Census data is used for sales in 2000-2002. |
| *fulton* | Dummy variable equal to one for houses located in Fulton County; zero for houses located in Clayton County. |
| *db6565* | Dummy variable equal to one for houses with the 65 decibel day-night sound level noise contour for both 1995 and 2003; zero otherwise. |
| *db7070* | Dummy variable equal to one for houses with the 70 decibel day-night sound level noise contour for both 1995 and 2003; zero otherwise. |
| *time_6565* | Interaction term: db6565 x time, with db6565 as defined above and with time = 0 for 1995 sales, time = 1 for 1996 sales, …, time = 7 for 2002 sales. |

* These variables are also expressed in natural logarithmic form, which is indicated by "log_" prefix.

| Table 2: Summary Statistics, Full Sample -- 2370 Observations | | |
|---|---|---|
| | **Count** | **Frequency** |
| House Sales in the buffer zone -- 1995 contours | 1008 | 42.53 |
| House Sales in 65 db zone -- 1995 contours | 1113 | 46.96 |
| House Sales in 70 db zone -- 1995 contours | 249 | 10.51 |
| House Sales in the buffer zone -- 2003 contours | 1555 | 65.61 |
| House Sales in 65 db zone -- 2003 contours | 748 | 31.56 |
| House Sales in 70 db zone -- 2003 contours | 67 | 2.83 |
| | | |
| House Sales in Fulton County | 1117 | 47.13 |
| House Sales in Clayton County | 1253 | 52.87 |
| 1 story | 2143 | 90.42 |
| 2 or more stories | 216 | 9.11 |
| 3 bedrooms | 1589 | 67.05 |
| 4 bedrooms | 261 | 11.01 |
| 5+ bedrooms | 52 | 2.19 |
| 1 bathroom | 1055 | 44.51 |
| 2 bathrooms | 950 | 40.08 |
| 3+ bathrooms | 365 | 15.40 |
| 0 or 1 fireplace | 2297 | 96.92 |
| 2+ fireplaces | 73 | 3.08 |
| | | |
| | | |
| | **Mean** | **Std. Dev.** |
| dist | 3.61 | 1.00 |
| age | 37.85 | 16.04 |
| acres | 0.40 | 0.37 |
| adj_price | $71,692.37 | $37,785.67 |
| perc_tenureblack | 46.72 | 30.66 |
| med_hhinc | $29,828.44 | $ 8,593.14 |

**Table 3: Models Without Noise Time Trend -- Full Sample -- 1995 Contours**

| | Log | Semi-log | Linear |
|---|---|---|---|
| db65_95 | -0.016 | -0.023 | -3649.05*** |
| | [1.21] | [1.63] | [2.84] |
| db70_95 | -0.060** | -0.044* | -4041.68 |
| | [2.55] | [1.75] | [1.27] |
| log_distance | -0.189*** | | |
| | [5.16] | | |
| distance | | -0.041*** | -3229.06*** |
| | | [3.42] | [2.79] |
| dStories | 0.115*** | 0.132*** | 16575.36*** |
| | [3.41] | [3.83] | [4.93] |
| beds_3 | 0.081*** | 0.081*** | 2846.47 |
| | [3.92] | [3.92] | [1.41] |
| beds_4 | 0.147*** | 0.162*** | 12954.03*** |
| | [4.77] | [5.13] | [3.79] |
| beds_5 | 0.192*** | 0.199*** | 23272.52*** |
| | [2.97] | [3.01] | [2.59] |
| baths_2 | 0.147*** | 0.166*** | 9417.34*** |
| | [8.64] | [9.45] | [6.59] |
| baths_3 | 0.316*** | 0.356*** | 27736.13*** |
| | [9.88] | [10.66] | [7.45] |
| dFire_2 | 0.212*** | 0.220*** | 24266.76*** |
| | [4.88] | [5.03] | [3.47] |
| log_age | -0.046*** | | |
| | [4.93] | | |
| age | | -0.001 | -56.7 |
| | | [1.65] | [0.69] |
| log_acres | 0.140*** | | |
| | [7.90] | | |
| acres | | 0.104*** | 9266.05*** |
| | | [3.32] | [2.73] |
| log_med_hhinc | 0.199*** | | |
| | [6.45] | | |
| med_hhinc | | 0.000*** | 0.35*** |
| | | [6.79] | [4.99] |
| perc_tenureblack | 0.001** | 0.001 | 57.46* |
| | [2.39] | [1.43] | [1.86] |
| fulton | 0.075*** | 0.113*** | 8675.42*** |
| | [2.77] | [4.32] | [3.77] |
| Constant | 9.328*** | 10.786*** | 52685.30*** |
| | [29.37] | [155.66] | [7.84] |
| Observations | 2370 | 2370 | 2370 |
| R-squared | 0.44 | 0.42 | 0.37 |
| Robust t statistics in brackets | | | |
| * significant at 10%; ** significant at 5%; *** significant at 1% | | | |

| Table 4: Summary Statistics, Reduced Sample -- 1643 Observations | | |
|---|---|---|
| | **Count** | **Frequency** |
| House Sales in the buffer zone | 1008 | 61.35 |
| House Sales in 65 db zone | 568 | 34.57 |
| House Sales in 70 db zone | 67 | 4.08 |
| House Sales in Fulton County | 856 | 52.10 |
| House Sales in Clayton County | 787 | 47.90 |
| 1 story | 1475 | 89.77 |
| 2 or more stories | 158 | 9.62 |
| 3 bedrooms | 1057 | 64.33 |
| 4 bedrooms | 190 | 11.56 |
| 5+ bedrooms | 40 | 2.43 |
| 1 bathroom | 1326 | 80.71 |
| 2 bathrooms | 667 | 40.60 |
| 3+ bathrooms | 270 | 16.43 |
| 0 or 1 fireplace | 1579 | 96.10 |
| 2+ fireplaces | 64 | 3.90 |
| | | |
| | | |
| | **Mean** | **Std. Dev.** |
| dist | 3.54 | 1.10 |
| age | 39.05 | 17.52 |
| acres | 0.41 | 0.38 |
| adj_price | $ 73,624.65 | $38,315.04 |
| perc_tenureblack | 44.23 | 30.82 |
| med_hhinc | $ 30,383.43 | $ 9,391.25 |

**Table 5: Models Without Noise Time Trend -- Full Sample -- 2003 Contours**

| | Log | Semi-log | Linear |
|---|---|---|---|
| db65_03 | -0.017 | -0.015 | -1821.73 |
| | [1.19] | [0.98] | [1.14] |
| db70_03 | -0.065** | -0.055 | -7854.81*** |
| | [2.01] | [1.64] | [2.96] |
| log_distance | -0.179*** | | |
| | [4.99] | | |
| distance | | -0.038*** | -3052.57*** |
| | | [3.27] | [2.73] |
| dStories | 0.117*** | 0.132*** | 16289.67*** |
| | [3.48] | [3.87] | [4.89] |
| beds_3 | 0.078*** | 0.080*** | 2724.6 |
| | [3.83] | [3.86] | [1.37] |
| beds_4 | 0.144*** | 0.161*** | 12957.19*** |
| | [4.71] | [5.11] | [3.84] |
| beds_5 | 0.189*** | 0.198*** | 23361.62** |
| | [2.92] | [2.98] | [2.57] |
| baths_2 | 0.146*** | 0.167*** | 9737.64*** |
| | [8.59] | [9.50] | [6.76] |
| baths_3 | 0.316*** | 0.358*** | 27974.62*** |
| | [9.91] | [10.76] | [7.56] |
| dFire_2 | 0.214*** | 0.221*** | 24342.13*** |
| | [4.96] | [5.05] | [3.48] |
| log_age | -0.046*** | | |
| | [4.86] | | |
| age | | -0.001 | -47.89 |
| | | [1.53] | [0.59] |
| log_acres | 0.139*** | | |
| | [7.92] | | |
| acres | | 0.103*** | 9333.77*** |
| | | [3.30] | [2.76] |
| log_med_hhinc | 0.199*** | | |
| | [6.42] | | |
| med_hhinc | | 0.000*** | 0.38*** |
| | | [6.89] | [5.59] |
| perc_tenureblack | 0.001** | 0 | 40.65 |
| | [1.96] | [1.05] | [1.30] |
| fulton | 0.087*** | 0.124*** | 10026.68*** |
| | [3.25] | [4.84] | [4.51] |
| Constant | 9.302*** | 10.763*** | 49497.87*** |
| | [29.13] | [159.94] | [7.68] |
| Observations | 2370 | 2370 | 2370 |
| R-squared | 0.44 | 0.42 | 0.37 |
| Robust t statistics in brackets | | | |
| * significant at 10%; ** significant at 5%; *** significant at 1% | | | |

**Table 6: Model Without Noise Time Trend -- Reduced Sample -- 95/03 contours**

| | Log | Semi-log | Linear |
|---|---|---|---|
| db6565 | -0.025 | -0.038** | -4725.48*** |
| | [1.50] | [2.16] | [2.80] |
| db7070 | -0.090*** | -0.099*** | -12490.77*** |
| | [2.63] | [2.82] | [4.33] |
| log_distance | -0.288*** | | |
| | [6.77] | | |
| distance | | -0.085*** | -6486.35*** |
| | | [6.01] | [4.91] |
| dStories | 0.164*** | 0.182*** | 18666.84*** |
| | [4.98] | [5.48] | [5.53] |
| beds_3 | 0.094*** | 0.096*** | 3444.13 |
| | [3.70] | [3.71] | [1.35] |
| beds_4 | 0.128*** | 0.137*** | 11492.31*** |
| | [3.38] | [3.52] | [2.74] |
| beds_5 | 0.122 | 0.116 | 12910.31* |
| | [1.61] | [1.54] | [1.87] |
| baths_2 | 0.174*** | 0.192*** | 11570.18*** |
| | [8.44] | [9.11] | [6.86] |
| baths_3 | 0.351*** | 0.381*** | 29223.73*** |
| | [10.07] | [10.60] | [9.79] |
| dFire_2 | 0.196*** | 0.200*** | 18574.81*** |
| | [4.38] | [4.48] | [4.10] |
| log_age | -0.037*** | | |
| | [3.96] | | |
| age | | -0.001* | -59.27 |
| | | [1.71] | [0.88] |
| log_acres | 0.121*** | | |
| | [5.95] | | |
| acres | | 0.110*** | 10418.43*** |
| | | [3.38] | [2.74] |
| log_med_hhinc | 0.219*** | | |
| | [6.52] | | |
| med_hhinc | | 0.000*** | 0.52*** |
| | | [7.71] | [7.53] |
| perc_tenureblack | 0.001*** | 0.001** | 91.38** |
| | [3.34] | [2.55] | [2.55] |
| fulton | 0.016 | 0.035 | 4289.35 |
| | [0.50] | [1.13] | [1.57] |
| Constant | 9.172*** | 10.905*** | 58897.29*** |
| | [26.43] | [141.79] | [9.67] |
| Observations | 1643 | 1643 | 1643 |
| R-squared | 0.45 | 0.44 | 0.39 |

Robust t statistics in brackets

* significant at 10%; ** significant at 5%; *** significant at 1%

**Table 7: Model With Noise Time Trend -- Full Sample -- 1995 Contours**

| | Log | Semi-log | Linear |
|---|---|---|---|
| db65_95 | -0.064*** | -0.075*** | -6056.79*** |
| | [2.82] | [3.20] | [3.06] |
| db70_95 | -0.054** | -0.038 | -3775.93 |
| | [2.30] | [1.51] | [1.18] |
| time_65_95 | 0.012*** | 0.013*** | 603.25 |
| | [2.77] | [2.89] | [1.58] |
| log_distance | -0.174*** | | |
| | [4.66] | | |
| distance | | -0.037*** | -3041.32*** |
| | | [3.01] | [2.62] |
| dStories | 0.108*** | 0.120*** | 16034.74*** |
| | [3.19] | [3.46] | [4.78] |
| beds_3 | 0.080*** | 0.080*** | 2784.23 |
| | [3.89] | [3.87] | [1.38] |
| beds_4 | 0.148*** | 0.164*** | 13043.61*** |
| | [4.82] | [5.18] | [3.81] |
| beds_5 | 0.195*** | 0.205*** | 23518.70*** |
| | [2.98] | [3.05] | [2.61] |
| baths_2 | 0.149*** | 0.167*** | 9480.72*** |
| | [8.77] | [9.55] | [6.62] |
| baths_3 | 0.319*** | 0.356*** | 27729.91*** |
| | [9.98] | [10.68] | [7.45] |
| dFire_2 | 0.211*** | 0.223*** | 24403.01*** |
| | [4.87] | [5.11] | [3.50] |
| log_age | -0.045*** | | |
| | [4.85] | | |
| age | | -0.001* | -60.5 |
| | | [1.76] | [0.73] |
| log_acres | 0.145*** | | |
| | [8.00] | | |
| acres | | 0.109*** | 9524.65*** |
| | | [3.47] | [2.78] |
| log_med_hhinc | 0.180*** | | |
| | [5.75] | | |
| med_hhinc | | 0.000*** | 0.32*** |
| | | [6.04] | [4.42] |
| perc_tenureblack | 0.001 | 0 | 46.61 |
| | [1.63] | [0.74] | [1.42] |
| fulton | 0.088*** | 0.126*** | 9240.91*** |
| | [3.16] | [4.68] | [4.02] |
| Constant | 9.509*** | 10.796*** | 53113.32*** |
| | [29.46] | [156.67] | [7.89] |
| Observations | 2370 | 2370 | 2370 |
| R-squared | 0.44 | 0.42 | 0.37 |
| Robust t statistics in brackets | | | |
| * significant at 10%; ** significant at 5%; *** significant at 1% | | | |

**Table 8: Model With Noise Time Trend -- Full Sample -- 2003 Contours**

| | Log | Semi-log | Linear |
|---|---|---|---|
| db65_03 | -0.068*** | -0.076*** | -6984.28*** |
| | [2.63] | [2.89] | [2.60] |
| db70_03 | -0.059* | -0.048 | -7254.97*** |
| | [1.82] | [1.42] | [2.71] |
| time_65_03 | 0.012** | 0.015*** | 1240.15** |
| | [2.27] | [2.71] | [2.15] |
| log_distance | -0.170*** | | |
| | [4.68] | | |
| distance | | -0.036*** | -2829.78** |
| | | [3.02] | [2.54] |
| dStories | 0.113*** | 0.124*** | 15589.52*** |
| | [3.34] | [3.60] | [4.63] |
| beds_3 | 0.078*** | 0.078*** | 2604.43 |
| | [3.80] | [3.80] | [1.31] |
| beds_4 | 0.145*** | 0.162*** | 13050.08*** |
| | [4.74] | [5.14] | [3.86] |
| beds_5 | 0.191*** | 0.203*** | 23778.58*** |
| | [2.94] | [3.03] | [2.60] |
| baths_2 | 0.148*** | 0.168*** | 9866.31*** |
| | [8.64] | [9.55] | [6.77] |
| baths_3 | 0.319*** | 0.358*** | 27975.68*** |
| | [9.96] | [10.80] | [7.59] |
| dFire_2 | 0.213*** | 0.223*** | 24525.04*** |
| | [4.95] | [5.12] | [3.51] |
| log_age | -0.045*** | | |
| | [4.76] | | |
| age | | -0.001* | -54.07 |
| | | [1.65] | [0.67] |
| log_acres | 0.141*** | | |
| | [8.02] | | |
| acres | | 0.107*** | 9639.88*** |
| | | [3.39] | [2.84] |
| log_med_hhinc | 0.184*** | | |
| | [5.68] | | |
| med_hhinc | | 0.000*** | 0.33*** |
| | | [5.97] | [4.48] |
| perc_tenureblack | 0.001 | 0 | 25.02 |
| | [1.44] | [0.52] | [0.79] |
| fulton | 0.095*** | 0.132*** | 10699.49*** |
| | [3.54] | [5.17] | [4.95] |
| Constant | 9.446*** | 10.776*** | 50652.91*** |
| | [28.43] | [160.99] | [7.89] |
| Observations | 2370 | 2370 | 2370 |
| R-squared | 0.44 | 0.42 | 0.37 |

Robust t statistics in brackets

* significant at 10%; ** significant at 5%; *** significant at 1%

**Table 9: Model With Noise Time Trend -- Reduced Sample -- 95/03 contours**

| | Log | Semi-log | Linear |
|---|---|---|---|
| db6565 | -0.053* | -0.072** | -5598.95* |
| | [1.71] | [2.22] | [1.69] |
| db7070 | -0.086** | -0.095*** | -12381.14*** |
| | [2.52] | [2.68] | [4.26] |
| time_6565 | 0.007 | 0.008 | 212.75 |
| | [1.10] | [1.28] | [0.34] |
| log_distance | -0.282*** | | |
| | [6.60] | | |
| distance | | -0.083*** | -6435.48*** |
| | | [5.81] | [4.99] |
| dStories | 0.160*** | 0.175*** | 18494.43*** |
| | [4.82] | [5.22] | [5.42] |
| beds_3 | 0.093*** | 0.095*** | 3416.85 |
| | [3.68] | [3.68] | [1.35] |
| beds_4 | 0.130*** | 0.139*** | 11545.11*** |
| | [3.41] | [3.55] | [2.73] |
| beds_5 | 0.124 | 0.12 | 13004.78* |
| | [1.62] | [1.57] | [1.87] |
| baths_2 | 0.175*** | 0.193*** | 11589.62*** |
| | [8.46] | [9.12] | [6.82] |
| baths_3 | 0.352*** | 0.381*** | 29226.26*** |
| | [10.07] | [10.59] | [9.78] |
| dFire_2 | 0.196*** | 0.201*** | 18600.97*** |
| | [4.38] | [4.53] | [4.12] |
| log_age | -0.037*** | | |
| | [3.91] | | |
| age | | -0.001* | -59.85 |
| | | [1.74] | [0.89] |
| log_acres | 0.124*** | | |
| | [5.92] | | |
| acres | | 0.112*** | 10482.35*** |
| | | [3.42] | [2.73] |
| log_med_hhinc | 0.211*** | | |
| | [6.04] | | |
| med_hhinc | | 0.000*** | 0.51*** |
| | | [7.15] | [7.13] |
| perc_tenureblack | 0.001*** | 0.001** | 88.58** |
| | [2.99] | [2.22] | [2.35] |
| fulton | 0.021 | 0.04 | 4423.90* |
| | [0.65] | [1.30] | [1.68] |
| Constant | 9.250*** | 10.909*** | 58993.94*** |
| | [25.64] | [142.00] | [9.60] |
| Observations | 1643 | 1643 | 1643 |
| R-squared | 0.45 | 0.44 | 0.39 |
| Robust t statistics in brackets | | | |
| * significant at 10%; ** significant at 5%; *** significant at 1% | | | |

# Figure 1
# The Location of Hartsfield-Jackson Atlanta International Airport



# Figure 2
# The Location of Houses in the Full Sample



# Figure 3
# The Shift of the 65 Decibel Noise Contour: 1995 Versus 2003



# Figure 4
# The Location of Houses in the Reduced Sample

