# EFFECTS OF AIRCRAFT NOISE ON RESIDENTIAL PROPERTY VALUES:

## NAVAL AIR STATION (NAS) OCEANA and

## NAVAL AUXILIARY LANDING FIELD (NALF) FENTRESS

---

**EXPERT REPORT OF**
**JON P. NELSON, Ph.D.**

**September 26, 2005**

---

## I. INTRODUCTION AND QUALIFICATIONS

1. My name is Jon P. Nelson. I reside at 642 Glenn Road, State College, PA 16803. I was employed by the Pennsylvania State University from August 1969 to June 30, 2004. I was promoted to the academic rank of Professor of Economics in 1978 and retired in June 2004 with the rank of Professor Emeritus of Economics. I am presently engaged in private consulting and economic research. My research expertise is the areas of organization of industry, public policy toward business, economics of regulation, applied microeconomic analysis, and environmental economics. During my academic career, I regularly taught courses on industrial organization, antitrust and regulatory economics, microeconomic theory, and environmental economics. From 1986 to 1993, I was director of graduate studies in my department. My curriculum vita is attached to this report.

2. I received my Ph.D. degree in Economics in 1970 from the University of Wisconsin. My major fields of concentration during graduate study were industrial organization and econometrics. Industrial organization is the sub-field of economics that studies markets and industries, and evaluates the extent to which they are functioning in an economically efficient manner. Economics of regulated industries, which includes air transportation, is one of the topical areas of industrial organization. Econometrics is the sub-field of economics that studies the application of statistical methods to economic data and mathematical models.

3. During the past 35 years, the focus of my research has been industry and market regulation, including environmental regulation and policy. I have written three books and more than 70 articles on these topics, including articles on the effects of aircraft noise on residential property values. My peer-reviewed articles have appeared regularly in scholarly journals such as the *Journal of Econometrics, Review of Economics and Statistics*, *Journal of Law and Economics*, *Journal of Regulation, Journal of Regional Science, Quarterly Review of Economics and Business*, *Southern Economic Journal*, *Empirical Economics*, *Contemporary Economic Policy*, *Applied Economics*, *Antitrust Bulletin*, *Journal of Environment and Development*, and other peer-reviewed journals and collected volumes.

4. My research expertise includes the evaluation of transportation noise and its control. I have published one book and nine articles and chapters on this topic. My book is entitled *Economic Analysis of Transportation Noise Abatement* (Ballinger 1978). My articles and chapters have appeared in *Noise Abatement: Policy Alternatives for Transportation* (National Academy of Sciences 1977); *Journal of Environmental Economics and Management* (1979, 1985); *Journal of Transport Economics and Policy* (1980, 1982, 2004); *Advances in Applied Microeconomics* (JAI Press 1981); *Resource Management and Environmental Planning* (Wiley 1983); and *Interagency Symposium on Research in Transportation Noise Proceedings* (Stanford 1973). As a mark of importance, these writings have been cited more than

300 times by other researchers in economics, transportation, and real estate. Two of my articles have been reprinted in collected volumes, which is another mark of their importance. The 1979 article was reprinted in *The Environment and Transport* (Hayashi et al. 1999) and the 1980 article was reprinted in *Classics in Transport Analysis: Air Transport* (Forsyth et al. 2002). In January 2004, I published a peer-reviewed meta-analysis of airport noise and property values, which was the lead article in the *Journal of Transport Economics and Policy* (Nelson 2004; attachment 2).

5. During 1976-77, I was a member of the Committee on Appraisal of Societal Consequences of Transportation Noise Abatement, National Academy of Sciences, and I contributed to two chapters in the Committee's final report (DeVany et al. 1977a, 1977b). I received three research grants from the U.S. Department of Transportation to investigate the effects of mobile-source pollution on residential property values, including aircraft noise (1972-73, 1974-75, and 1977-78). I have published several other articles that examine adverse effects of pollution on residential property values, including peer-reviewed articles appearing in the *Southern Economic Journal* (1977); *Journal of Urban Economics* (1978); and *Land Economics* (1981). I have acted as a technical consultant to several organizations concerned with noise and other pollutants, including the Pennsylvania Low-Emissions Vehicle Commission (1993).

6. I have experience with the collection of data on residential property values and the measurement of aircraft noise levels for economic studies; I have performed several econometric analyses of the empirical relationship between aircraft noise and residential property values; I have examined the costs and benefits of aircraft noise abatement policies; and I have extensively reviewed the academic literatures in economics and real estate that deal with the effects of noise on residential property values in the United States, Canada, and other countries (Nelson 1978, 1980, 1982, 2004).

7. This report contains my evaluation of the effects on residential property values resulting from aircraft noise exposure, including the impact of the realignment of F/A-18 C/D fleet squadrons and fleet replacement squadrons (FRS) to Naval Air Station (NAS) Oceana, Virginia, and Naval Auxiliary Landing Field (NALF) Fentress, Virginia. This decision was effective during 1998-1999. The Navy's realignment decision was followed by the publication of additional environmental policies, including a revised AICUZ map for Oceana and Fentress (1999); a draft EIS for the basing of F/A-18 E/F (Super Hornet) aircraft at these fields (July 2002); revised land use compatibility guidelines for Navy installations (December 2002); and a *Joint Land Use Study* for the Hampton Roads area (Hampton Roads PDC, April 2005). In September 2003, the Navy announced its intentions to homebase eight F-18 E/F fleet squadrons (96 aircraft) and the FRS (24 aircraft) at NAS Oceana.

8. My rate of compensation as an expert is $200 per hour, and my compensation is not dependent on my method of evaluation or the conclusions researched from my evaluation. My opinions

and conclusions are solely my own. During 1998-2000, I was retained by the plaintiffs in three cases involving restrictions on commercial speech. I have not testified in other cases in the past five years. I have been swore in and accepted as an expert witness by federal and state courts and state regulatory agencies.

9. For this report, I reviewed academic and government studies that analyze aircraft noise control, including many studies of the effects of aircraft noise on residential property values. I also collected basic data on the economies of Virginia Beach and Chesapeake, Virginia. As part of my evaluation, I was provided with copies of (1) Wyle Laboratories, *Aircraft Noise Study for the 1995 BRAC Realignment of Navy F/A-18 Aircraft*, WR 97-10 (September 1997, February 1998); (2) Wyle Laboratories, *Aircraft Noise Study for Naval Air Station Oceana and Auxiliary Landing Field Fentress*, WR 94-18 (July 1994); (3) U.S. Department of the Navy, *Final Environmental Impact Statement: Realignment of F/A-18 Aircraft and Operational Functions from Naval Air Station Cecil Field, Florida, to Other East Coast Installations* (March 1998a); (4) U.S. Department of the Navy, *Record of Decision and General Conformity Determination for Realignment of F/A-18 Aircraft and Operational Functions from Naval Air Station (NAS) Cecil Field, Florida, to other East Coast Installations* (May 18, 1998b); (5) U.S. Department of the Navy, *AICUZ Program Procedures and Guidelines for Department of the Navy Air Installations*, OPNAVINST 11010.36A (April 1988) and OPNAVINST 11010.36B (December 2002); (6) U.S. Department of the Navy, *Final Environmental Impact Statement (FEIS) for the Introduction of F/A-18 E/F (Super Hornet) Aircraft to the East Coast of the United States* (July 2003); and (7) Wyle Laboratories, *Noise Study for the Introduction of F/A-18 E/F to the East Coast*, Vol. 1, WR 02-08 (April 2003). I examined the web site for NAS Oceana, <http://www.nasoceana.navy.mil>, which includes reports on the Air Installations Compatible Use Zones (AICUZ) for NAS Oceana and NALF Fentress. In addition, I visited the web site for the Navy's F/A-18 E/F EIS Project at <http://www.efaircraft.ene.com>. I also obtained the Hampton Roads Planning District Commission, *Hampton Roads Joint Land Use Study* (April 2005) at <http://www.vbgov.com/dept/planning>. This study continues to use the 1999 AICUZ noise map for planning purposes (Hampton PDC, 2005 at 3-5).

## II. NOISE EXPOSURE DUE TO ARS-2

**ARS-2 substantially increased aircraft operations at NAS Oceana and NALF Fentress, including touch-and-go, FCLP, and nighttime operations.**

10. The 1993 and 1995 Defense Base Closure and Realignment Commissions (BRAC) directed the closure of NAS Cecil Field, Florida. During 1998-99, the Department of the Navy (DoN) realigned

its aircraft and personnel to NAS Oceana, Virginia (156 aircraft) and Marine Corps Air Station Beaufort, South Carolina (24 aircraft). This realignment scenario is **ARS-2** among the five alternative scenarios considered for transfer of the F/A-18 aircraft. NAS Oceana is located approximately 12 miles southeast of Norfolk, Virginia, in the City of Virginia Beach. NAS Oceana has two sets of crossing parallel runways – three measuring 8,000 feet in length and one measuring 12,000 feet. NALF Fentress is about 7 miles southwest of NAS Oceana in the City of Chesapeake, Virginia, and is used primary by aircraft based at NAS Oceana for Field Carrier Landing Practice (FCLP) patterns. NALF Fentress has one 8,000 foot runway equipped to simulate an aircraft carrier flight deck (Wyle, 1998 at 2-1). Aircraft operations at NALF Fentress normally occur at a pattern altitude of 800 feet (Hampton Roads PDC, 2005 at 2-8). Some of the analysis treats the two airfields together because NALF Fentress is located close to NAS Oceana, and it is used primarily as a practice field for aircraft based at NAS Oceana (Wyle, 1998 at 3-1). NAS Oceana occupies 5,331 acres of land, which increases to 6,820 acres with the Dam Neck Annex. Obstruction clearances and flight easements add an additional 3,680 acres (DoN, 2003 at 3-16; http://www.globalsecurity.org). NALF Fentress occupies a total of 2,560 acres.

11. Wyle Labs defined the 1997 baseline scenario for the **ARS-2** analysis as a single-siting of eleven Atlantic Fleet F-14 squadrons (150 aircraft), one FRS, and one Navy F/A-18 adversary squadron at NAS Oceana (Wyle, 1998 at 3-1). The aircraft mix for the baseline included 198 aircraft (Wyle, 1998 at 3-4). Baseline and projected annual operations were computed using the Naval Aviation Simulation Model (NASMOD). Calendar year 1997 (CY97) was the time period for the baseline analysis and CY99 was used for the **ARS-2** analysis. However, in the Navy's most recent EIS report (DoN, 2003 at 3-9), the baseline was updated to CY00 in anticipation of the arrival of F/A-18 E/F aircraft. Separate operational data were identified for each airfield in CY97 and CY00. While the projected data in the most recent EIS report are tentative, I have compared the CY00 operational data to the projected CY99 data used in the earlier reports by Wyle. The differences are modest. The Navy claims that noise exposed areas and populations changed as a result of operational changes that occurred after the arrival in 1998-99 of the F/A-18 C/D aircraft (DoN, 2003 at 3-9). However, following the analysis in the Hampton Roads *Joint Land Use Study* (2005), I use the 1999 AICUZ noise zones for areas and populations.

12. Baseline operations in 1997 at NAS Oceana were about 109,000 annual flight operations (Wyle, 1998 at Table 3-1). F-14 fleet and FRS aircraft accounted for 86% of NAS Oceana baseline operations, including 49,000 touch-and-go operations. NALF Fentress had about 105,000 annual flight operations in 1997 (Wyle, 1998 at Table 3-2). F-14 fleet and FRS aircraft accounted for 59% of NALF Fentress operations, including 55,000 FCLP operations. In 1997, about 7% of NAS Oceana operations (7,000) and 33% of NALF Fentress operations (35,000) occurred at night.

13. **ARS-2** substantially increased aircraft operations at NAS Oceana from the CY97 baseline value of 109,000 (Wyle, 1998 at Tables E-1 and 4-16). The total number of operations in CY00 was 207,722, including 25,294 operations (12.2%) during the nighttime hours (DoN, 2003 at 3-4). The realignment of F/A-18 fleet and FRS aircraft accounted for more than 98,000 new operations in CY00, including FCLP and touch-and-go operations. Total nighttime operations at NAS Oceana rose dramatically to 25,000 annually, or about 68 operations per night.

14. **ARS-2** substantially increased aircraft operations at NALF Fentress from the CY97 baseline of 105,000 (Wyle, 1998 at Tables E-1 and 4-17). The total number of operations in CY00 was 135,190, including 54,850 operations (40.6%) at night (DoN, 2003 at 3-4). The realignment of F/A-18 fleet and FRS aircraft accounted for more than 30,000 new operations in CY00, including FCLP and touch-and-go operations. Total nighttime operations at NALF Fentress rose dramatically to 55,000 annually, or more than 150 operations per night.[1]

**The increase in airfield operations from ARS-2 dramatically increased the residential populations exposed to noise levels of 65 dB or greater. More than 23,000 people are exposed to noise levels of 80 dB or more, which is a level of exposure with the potential for serious adverse health and welfare consequences.**

15. Wyle Labs computed baseline and **ARS-2** noise exposures using the NOISEMAP 6.5 computer program (Wyle, 1998 at 4-34). At a minimum, NOISEMAP has the capability to compute noise levels in 5 decibel increments, referred to as “noise zones” or “noise intervals.” The noise metric used for assessing noise exposure in the vicinity of airfields and airports is the Day-Night Average Sound Level (DNL or Ldn), expressed in A-weighted decibels (dB). DNL is an *average* sound level generated by all aircraft and aviation-related operations during an average 24-hour period, with a 10 dB penalty for nighttime noise events.[2] Several other noise metrics are computed that capture special features of

---

[1] A comparison of projected operations for CY99 and updated values for CY00 indicates that the earlier EIS reports (DoN 1998a, b; Wyle 1998) contained a slight overestimate of total operations at Oceana, and an underestimate of nighttime operations. At Oceana, the CY99 estimate was 219,000 operations compared to a CY00 value of 208,000 (Wyle, 1998 at 4-16). CY99 nighttime operations were estimated at 18,000 annually compared to CY00 operations of 25,000. At Fentress, total operations were 144,000 for CY99 and 135,000 for CY00. Due to capacity constraints at Fentress, nighttime operations were 55,000 for both CY99 and CY00.

[2] The DNL is the Equivalent Sound Level (Leq), with a 10 dB penalty for nighttime noise. The Leq is the energy-averaged sound level integrated over a specified time period. Leq provides a single number measure of sound *averaged* over a time period, where “equivalent” means that the acoustical energy of the steady state sound equals the energy associated with an actual varying sound level. DNL was selected by the EPA as the uniform descriptor of cumulative sound energy that best correlates with health and welfare effects of noise, including annoyance, community noise exposure, and land use compatibility (FICON, 1992b at B-16).

military aircraft operations, such as sporadic operations, low altitude flights, high speeds, and the "surprise" effect resulting from high-speed low-altitude operations (Wyle, 1998 at 1-3).

16. Typical background noise levels in urban areas are in the interval 50-60 dB during daytime hours and 40 dB during nighttime (Nelson, 1978 at 22). A 50-60 dB sound corresponds to the noise level from light traffic at 100 feet or an air conditioner at 100 feet. A food blender or garbage disposal at three feet produces a sound level of about 80 dB. Because the ear's pattern of response is more nearly logarithmic in nature, decibels are measured on a logarithmic scale. The psychological perception of loudness roughly doubles with each 10 dB increase (Nelson, 1978 at 16). A 90 dB sound is perceived to be twice as loud as an 80 dB sound, four times louder than a 70 dB sound, and eight times louder than a 60 dB sound. At 1,000 feet, F-14 arrivals or departures produce maximum sounds of 83 and 97 dB, respectively. F-18 arrivals or departures produce maximum sounds of 104 dB and 108 dB, respectively, at 1,000 feet (DoN, 1998a at Figure 3.1-21). Hence, F-18 aircraft are four times as loud as F-14 aircraft on arrival and twice as loud on departure.

17. Human annoyance due to noise is generally taken to be a function of both the overall sound-intensity level and fluctuations in the level produced by significant intrusive sounds (EPA, 1971 at 113; Nelson, 1978 at 18). A 3 dB change in sound level represents a doubling of the sound energy. Changes in DNL greater than 3 dB are regarded as an indicator of the need for further analysis of noise impacts (FICON, 1992b at 3-15; DoN, 2003 at 4-43). At noise levels above 65 dB, changes as small as 1.5 dB may be significant due to the effects on human annoyance (FICON, 1992a at 1-4). **ARS-2** increased the outdoor noise exposure in the vicinity of the two airfields by 8 to 20 dB (Wyle, 1998 at 4-37; DoN, 1998b at 11). Considerable economic evidence exists that demonstrates that this change in exposure produces damages that will be reflected in residential property values.

18. The 1997 baseline noise contours show two distinct regions of noise exposure – one for each airfield (Wyle, 1998 at Figure 3-16). At NAS Oceana, the 65 DNL contour extends about 1.5 miles to the east and west of the NAS boundary at the widest points. At NALF Fentress, the 65 DNL contour extends about 1.5 miles to the west and 3 miles to the east of the NALF boundary at the widest points (Wyle, 1998 at 3-2). Under baseline conditions, 14,300 acres of land are in the DNL 65+ zone. As a consequence of **ARS-2**, the land area enclosed by DNL 65+ increases to more than 58,000 acres (Wyle, 1998 at Table 4-20).

19. There is a dramatic increase in the number of people exposed to unacceptably high levels of aircraft noise in the vicinity of Oceana and Fentress. About 23,000 people are exposed to noise levels of DNL 80 and above (DNL 80+), which is a severe level of noise exposure with the potential for temporary hearing loss and substantial adverse effects on the community environment (FICON, 1992b at 3-8). An

additional 97,000 people are exposed to noise levels in the 65 to 79 dB zone, which is a substantial level of noise that interferes with speech, concentration, learning, sleep, and tranquility. A noise level of 65 dB has been accepted by the Navy and other organizations as the maximum noise level at which interference with residential activities and land use normally occurs (DoN, 2002 at 8).

20. Table 1 shows the effects of **ARS-2** on off-base land areas and populations. Due to **ARS-2**, the population within DNL 65+ rose from 28,000 in 1997 to more than 120,000 people in 1999. Table 1 also shows two separate populations that will be the subject of the property value analysis below. First, the population within the DNL 65-79 zone, which rose from 28,000 people in 1997 to 97,000 people in 1999. Second, the population within the DNL 80+ zone that rose to 23,000 people in 1999, compared to only four people in 1997.

**Table 1. Noise-Exposed Land Acres and Population near NAS Oceana and NALF Fentress under ARS-2**

| Noise Zone (dB) | Baseline Acres (CY97) | ARS-2 Acres (CY99) | Baseline Population (CY97) | ARS-2 Population (CY99) | Pop. Change, 97-99 | Pop. Percent Change |
|---|---|---|---|---|---|---|
| DNL 65-70 | 9,217 | 18,933 | 19,823 | 40,877 | 21,054 | 106.2 |
| DNL 70-75 | 4,428 | 13,209 | 7,837 | 32,635 | 24,798 | 316.4 |
| DNL 75-80 | 618 | 10,817 | 366 | 23,732 | 23,366 | not calc. |
| DNL 80-85 | 35 | 8,901 | 4 | 13,607 | 13,603 | not calc. |
| DNL 85+ | 0 | 6,510 | 0 | 9,812 | 9,812 | not calc. |
| **Totals by Zone:** | | | | | | |
| **Total: DNL 65-79** | 14,263 | 42,959 | 28,026 | 97,244 | 69,218 | 247.0 |
| **Total: DNL 80+** | 35 | 15,411 | 4 | 23,419 | 23,415 | not calc. |
| **Total: DNL 65+** | 14,298 | 58,370 | 28,030 | 120,663 | 92,633 | 330.5 |

*Source*: Wyle (1998 at Table 4-20). Acres are off-station and exclude other military and water areas. Population estimates are based on 1990 Census population densities of about 1.5-2.0 people per acre. The recent EIS report used 2000 Census population densities of about 2.0-2.5 people per acres. Much of the available residential land areas around Oceana are developed, but this is less true at Fentress (Hampton Roads PDC, 2005 at 2-9).

**Land use compatibility guidelines adopted by several federal agencies, including the FAA and Department of the Navy, indicate that noise levels above DNL 75 are clearly unacceptable for residential purposes, and levels of DNL 65-75 are normally unacceptable.**

21. The realignment of aircraft under **ARS-2** substantially increased noise exposure levels in the vicinity of NAS Oceana and NALF Fentress. When noise exposure rises above DNL 65, there is a

noticeable increase in individual annoyance and community complaints.[3] With this in mind, guidelines for compatible residential land use have been established by several federal agencies, including the U.S. Navy (1978, 1988, 2002). The U.S. Department of Housing and Urban Development (HUD) has guidelines for safe noise environments within a building. HUD's "Site Acceptability Standards" show that exterior noise in the 65-75 dB zone is normally unacceptable for guaranteed loans, and 75 dB and higher levels are clearly unacceptable (24 *Code of Federal Regulations,* Part 51, "Environmental Criteria and Standards," at 340). The Federal Aviation Administration (FAA) has regulations that identify land uses that are normally incompatible with various levels of noise exposure. The FAA's "Land Use Compatibility" standard shows that noise levels of 65-75 dB are incompatible with residential land uses (other than mobile homes), unless noise attenuation measures are used (14 *Code of Federal Regulations*, Part 150, "Airport Noise Compatibility Planning," at 87). Above 75 dB, residential land use is considered unacceptable due to interference with normal activities, even with the application of noise mitigation measures (GAO, 2000a at 23). The U.S. Department of Defense (DoD) and U.S. Department of the Navy (DoN) have a long-standing program for land use compatibility around military airfields, labeled the Air Installation Compatible Use Zones (AICUZ) program (DoN 1978, 1988, 2002). The Navy's guidelines indicate that residential housing is "discouraged" at 65-69 dB, "strongly discouraged" at 70-74 dB, and "incompatible" with 75 dB and above (DoN, 2002 at 20 and Table 2).

22. In June 1980, the U.S. Federal Interagency Committee on Urban Noise (FICUN) published the *Guidelines for Considering Noise in Land Use Planning and Control* (FICUN 1980). The FICUN guidelines adopted DNL as the standard noise metric. These guidelines indicate that residential land use is discouraged at DNL 65-69; strongly discouraged at DNL 70-74; and incompatible with DNL 75 and above (FICUN, 1980 at 6). The 1990 U.S. Federal Interagency Committee on Noise (FICON), which included the DoN and FAA, recommended continued use of the DNL metric and the compatibility guidelines. As a consequence, land use compatibility criteria used by the HUD, FAA, DoD, and DoN are similar (FICON, 1992b at 3-21; EPA, 1982b at ii). However, outdoor noise exposure due to lifestyle differences is not directly accounted for by these criteria, which is important for the residential areas that surround the two Naval airfields.

23. An American National Standard for land use compatibility has been established by the S12 (Noise) Accredited Standards Committee of the Acoustical Society of America (ASA), which included

---

[3] The modified "Schultz curve" displays the percent of exposed persons highly annoyed as a function of DNL (Schultz 1978). It is widely recognized that annoyance due to aircraft noise and community reaction can occur at noise levels that are below 65 dB (FICON, 1992b at 3-17; DoN, 2002 at 8). About 6-14% of the population will be highly annoyed by noise levels in the 60-65 dB zone (FICON, 1992b at 3-6). There is evidence that aircraft noise is more annoying than other transportation noises (Finegold et al., 1994 at 27).

the Department of Transportation and Department of the Navy. The 1998 revision of these guidelines is the *Sound Level Descriptors for Determination of Compatible Land Use*, ANSI S12.9-1998/Part 5 (ASA 1998). The guidelines were approved by the American National Standards Institute, Inc. (ANSI). For single-family residential land that involves extensive outdoor use, the Standards Committee recommends that DNL 55-65 is marginally compatible and DNL 65+ is incompatible (ASA, 1998 at 3). As indicated above, **ARS-2** exposes more than 120,000 people to DNL levels of 65 dB and greater, compared to 28,000 people prior to the realignment of F-18 C/D aircraft to NAS Oceana.

24. Table 2 summarizes the federal agency and ASA guidelines. Federal agencies have established a uniform standard for compatibility of noise levels and residential land use. These agencies, including the FAA and U.S. Navy, regard noise exposure in excess of 65 dB as an environment that is normally unsuitable for residential use. Above 75 dB, the environment is clearly unsuitable for residential use. The ANSI standard of the Acoustical Society of America, which incorporates lifestyle factors, uses 65 dB as the upper limit for extensive outdoor residential living. The ASA standard shows the importance of accounting for lifestyle factors as part of the evaluation of the effects of noise exposure, which is critical for the land areas near the two Naval airfields. As shown below, economic studies of the effects of aircraft noise on residential property values demonstrate a negative effect of noise exposure above a background noise level of 55-60 dB.

**Table 2. Residential Land Use: Federal Compatibility Guidelines, Day-Night Sound Level (DNL)**

| **Agency** | **65-70 dB** | **70-75 dB** | **75-80 dB** | **80-85 dB** | **85+ dB** |
|---|---|---|---|---|---|
| **HUD: 24 CFR Part 51** | Normally Unacceptable | | Unacceptable | | |
| **FAA: 14 CFR Part 150** | No (1) | No (1) | No | No | No |
| **DoN: AICUZ** (2) | No (1) | No (1) | No | No | No |
| **FICUN & FICON** | No (1) | No (1) | No | No | No |
| **ASA: Residential, Extensive Outdoor Use Guideline** | Residential Use is Incompatible at 65 dB and above | | | | |

*Notes:* (1) Marginally compatible if indoor noise attenuation is used. "No" means non-compatible or not suitable (DoN, 1978 at 4-25). (2) DoN (2002 at Table 2); Web site for NAS Oceana at http://www.nasoceana.navy.mil. The Navy's revised AICUZ guidelines include a broad provision for protection of public welfare (DoN, 2002 at 13).

25. The guidelines for the Navy's AICUZ program clearly recognize the significance of noise exposures beginning at 65 dB and the critical nature of noise exposures of 75 dB or greater. The revised program guidelines (DoN 2002) include a new requirement for long-term analysis of aircraft operations. The Navy's revised guidelines also emphasize protection of general welfare of the community, which is a broader goal than health and safety considerations:

> The study recommendations shall be based on current operations and the best available (5- to 10-year) projections of operations that best support long-range planning controls to protect the *health, safety and welfare* of the community and the future operational integrity of the air installation (DoN, 2002 at 13; emphasis added).

26. Because noisy environments are undesirable to many individuals, existing single-family and other residences in the vicinity of a noisy airfield will be less valuable; that is, the adverse effects of noise will be (negatively) capitalized into the value of residential properties and registered in market-determined housing prices and rents. This effect can be measured using econometric methods and economic data on residential values at differing noise exposure levels. The measurement of these adverse effects is part of a large empirical literature on pollution and property values. The next section of this report reviews selected aspects of this literature and develops the general model of the effects of aircraft noise on property values. This is followed by a meta-analysis of the empirical evidence on the effects of aircraft noise on property values, which is used to derive monetary measures of the adverse and lasting effects of noise. Meta-analysis is a quantitative technique used to synthesize a comparable set of empirical results. Lastly, I discuss special features of **ARS-2**, including the unique operational features of Navy aircraft and the mild climate that affect residential living and lifestyles in Virginia Beach and Chesapeake, Virginia.

## III. AIRCRAFT NOISE AND PROPERTY VALUES

**Economic studies of residential property values have examined the adverse effects on values of numerous pollutants, including aircraft noise.**

27. Noise is unwanted or unpleasant sound. At 65 dB and above, the most common human effects associated with aircraft noise are annoyance, speech and learning interference, and sleep disturbance. In turn, these effects disrupt normal daily activities, such as conversation, television viewing, school work, productivity, outdoor recreation and living, and family activities. Annoyance is the adverse psychological response to a given noise exposure, including the anxiety or apprehension that the noise may cause (FICON, 1992b at 3-4). At noise levels above 75 dB, the Environmental Protection Agency (EPA, 1982a at 12) cautions that severe health effects may occur for some portion of the population, including temporary hearing loss. Those persons who are frequently outdoors are of greatest concern, including young children, retired people in warm climates, and persons in certain outdoor occupations (EPA, 1982a at 55; Suter, 1991 at 14). **ARS-2** resulted in more than 23,000 people being exposed to severe noise levels of 80+ dB in CY99, compared to only four people in CY97.

28. Economists regard pollution as a negative "external cost" (externality) of production and consumption activities – an uncompensated third-party effect – whereby the polluter causes harm, inconvenience, annoyance, and other damages to the polluted. Aircraft noise is a classic example of an external social cost. Because market prices do not directly reflect these damages, the economic activities in question (e.g., aircraft operations) are subject to "market failure." This term means that the level of the economic activity fails to achieve an efficient allocation of resources as measured by the sum of the transaction surplus in the market *less* the amount of the uncompensated third-party damage costs. In general, market failures are not self-correcting due to costs of transaction and the public-good nature of pollution abatement efforts.

29. "Market failure" therefore reflects the absence of an explicit market for corrective actions that could reduce or avoid third-party damages – the market for tranquility is missing.[4] This means that direct estimation of demand schedules for tranquility (or externality avoidance) is not possible. As a consequence, economists resort to a variety of methods – direct and indirect – to measure the uncompensated costs of externalities. These methods include studies using surveys, political referendums, expenditures on mitigation (e.g., soundproofing), impacts on wages, and effects on residential property values (Freeman 1993; Palmquist 1991). Evaluation of the effects of pollution on property values using regression analysis – the "hedonic property value" method – is discussed in undergraduate and graduate textbooks in environmental economics (Tietenberg, 2000 at 41; Kolstad, 2000 at 313); urban economics (O'Sullivan, 2000 at 368; DiPasquale and Wheaton, 1996 at 189); cost-benefit analysis (Boardman, 1996 at 459; Gramlich, 1990 at 71); and real estate valuation (Chinloy, 1988 at 40; Lusht, 1997 at 139). A recent EPA report, *Guidelines for Preparing Economic Analyses*, also contains a discussion of this method (EPA, 2000 at 77).

30. Consider two residential properties that are identical in all respects, except that the first house is located close to an airfield and the other is not (Nelson 1981). A *but for* analysis establishes that the adverse environment will result in a market value for the first house that is lower than the market value of the second house. This occurs because potential buyers reduce their demand for the first house relative to the second house, reflecting the discounted present value of the costs of future annoyance,

---

[4] Airport noise problems have been dealt with by purchase of residential properties. Under the FAA's Part 150 Noise Compatibility Program, 240 airports received over $2.7 billion in AIP-grants for noise-related projects (GAO, 2000b at 80). Many of these projects are directed at noise levels of 75 dB and above. A GAO study of eight airports in 1989 found that $94 million had been spent in Atlanta on purchase of residential properties; $144 million in Los Angeles; and $100 million in Memphis (GAO 1989). The Seattle-Tacoma Airport spent over $260 million acquiring homes and land and insulating homes (GAO, 1998 at 3). The Navy's AICUZ program also provides for the acquisition of land or restrictive easements (DoN, 2002 at 33; EPA 1977b).

speech and learning interference, sleep disturbance, reductions in the quality of outdoor living, and loss of tranquility. A measure of these noise-induced damages is the difference between the market-determined value of the first house as compared to the second house. The *but for* analysis can be extended to analyze different levels of noise exposure (above background), since it has been established that annoyance and other adverse effects of noise rise predictably with increased exposure levels (EPA 1982a; FAA 1985; FICON 1992a, 1992b). Although there is a missing market for tranquility, there is a complementary market wherein individuals register their willingness to pay to avoid different levels of aircraft noise exposure. Hence, consumers reveal the implicit value that they place on tranquility by the explicit choices that they make in the housing market. The willingness to pay for tranquility is a part of the asset price of the "housing bundle," and econometric techniques (regression analysis) are available that unbundle complex products and thereby reveal the implicit or "hedonic price" for tranquility. A large empirical literature has developed using this method.

31. Using the hedonic price model and regression analysis, economists and real estate researchers have empirically investigated the adverse effects on residential properties of numerous forms of pollution. Several surveys of this large literature are available, including Bartik and Smith (1987) on urban amenities; Boardman et al. (1997) for external costs; Donnelly (1991) and Boyle and Kiel (2001) for environmental disamenities; Farber (1998) for health and amenity risks; Smith and Huang (1993, 1995) for air pollution; Nelson (1978, 1982) for highway noise; and Nelson (1978, 1980, 2004) for airport noise. Follain and Jimenez (1985), Freeman (1993), Palmquist (1991, 2005), and EPA (2000) provide useful surveys of methodological issues. This technique also is widely used in the field of real estate valuation, and articles appear regularly in real estate journals that apply regression analysis to housing values and residential amenities and disamenities. For example, recent articles in *The Appraisal Journal* estimate the value of proximity to water (Benson et al. 2000), adverse effects of a Superfund site (Reichert 1997), and adverse effects of nearby railroad tracks (Simons and El Jaouhari 2004).

32. Econometric studies that investigate the determinants of residential property values are collectively referred to as "hedonic price" or "hedonic property value" studies (EPA, 2000 at 77). It is rare that two residential properties are identical in all respects, except for the pollutant in question. Consequently, in order to isolate a given hedonic price, it is necessary to control statistically for other influences on property values, such as the size of house and lot, quality of construction, design of the house, merits of the neighborhood, quality of local schools, crime rates, governmental services, and so forth. Some of these characteristics will vary little within a given data set, and separate measurement is not required to explain the observed variation in property values. In other cases, the excluded characteristics are uncorrelated ("orthogonal") with the included pollutant, and do not bias the resulting

estimate of the hedonic price for the pollutant in question. Random errors in the measurement of property values are captured in the regression error term, and do not bias the estimates.

33. Given differences in statistical methods, samples, time periods, and urban locations, empirical studies have not produced a singular value for the effects of aircraft noise on property values. Indeed, it would be very surprising if they did because demand-supply conditions for housing markets tend to be local or regional, rather than national. Nevertheless, I show below that there is a broad scientific consensus on the measurable effects of aircraft noise. All *hedonic price studies* have shown that aircraft noise has a negative effect on residential property values, and central tendencies clearly exist for the monetary damages. The technique of meta-analysis can be used to synthesis the damage estimates and increase the reliability of summary measures for a set of comparable estimates.

**Annoyance due to noise exposure can be incorporated in the economic model of housing demand and supply, which underlies hedonic property value studies for aircraft noise.**

34. Each house and lot represents a unique combination of characteristics and attributes, which means that the decision to purchase a given property is complex. However, if the characteristics are provided in various combinations, it is possible to estimate an implicit price function that shows how the values of properties vary *due to* changes (only) in a given characteristic. This is the *but for* relationship. Formally, let V be a sample of observations on housing prices; S is a vector of structural variables (house size, number of bedrooms, lot size, etc.); L is a vector of locational variables; T is a vector of local taxes; G is a vector of local government services; and E is a vector of local neighborhood environmental-quality variables (Nelson, 2004 at 6). The market-determined asset value of the houses in the sample is given by $V = V(S, L, T, G, E)$. The marginal implicit price for each characteristic represents the increase in expenditures required to obtain one more unit of that characteristic, holding constant other variables that affect the value of a house. The method of regression analysis is used to insure the constancy of other influences on property values. Mathematically, the marginal price is the partial derivative of the V relationship with respect to the j-th characteristic, or $\partial V/\partial E_j$. The marginal price function can be linear or non-linear (Nelson, 2004 at 6).

35. Many empirical studies employ a non-linear function for property values. For aircraft noise, the hedonic function can be represented by $V = b_0 Z^{b1} A^{b2} u_1$, where V is the property value; Z is the set of physical and locational characteristics (that is, S, L, T, and G); A is subjective annoyance due to aircraft noise; $u_1$ is a stochastic error term; and $b_0$, $b_1$, and $b_2$ are parameters of the relationship. Subjective annoyance can be approximated by the following semi-logarithmic relationship: $A = c_0 e^{c1(DNL)} u_2$, where DNL is the day-night sound level in decibels; $u_2$ is a stochastic error term; e is the natural log base; and $c_0$

and $c_1$ are parameters of the semi-logarithmic relationship.[5]

36. Taking natural logs, and substituting for ln A, yields the following logarithmic relationship: $\ln V = d_0 + d_1(\ln Z) + d_2\, DNL + u_3$, where $d_2 = b_2c_1$, etc. (Nelson, 2004 at 6). This relationship is estimated using regression techniques. The regression coefficient $d_2 \times 100$ ($= \partial V/\partial DNL \bullet 1/V$) represents the percentage decrease in a given property value resulting from a one dB increase in noise exposure on the DNL scale. For this relationship, the marginal implicit price is given by $\partial V/\partial(DNL) = d_2V$, and the noise-housing price elasticity is $d_2(DNL)$.

**The main findings of aircraft noise studies can be summarized by defining a Noise Depreciation Index (NDI), which shows the percentage depreciation per dB.**

37. The main findings of empirical studies of aircraft noise can be summarized, with some adjustments, by means of a Noise Depreciation Index (NDI), which was originally developed by Walters (1975 at 102). For two properties that differ *but for* their level of noise exposure, the absolute amount of housing depreciation per dB (the unit cost of noise) is given by D = (difference in the total noise discount) ÷ (difference in noise exposure in dB). Dividing D by the price of the given house (or an average house price), the percentage rate of deprecation is given by NDI = (D ÷ property value) × 100 = (difference in total percentage deprecation) ÷ (difference in noise exposure in dB). This is the same result as $d_2 \times 100$ in the logarithmic model of residential property values.

38. Many empirical studies use the logarithmic model, and these studies directly estimate the NDI. The coefficient on DNL multiplied by 100 is the percentage change in a given property value due a one dB change in noise exposure (above background). Depending on the functional form, some studies estimate the marginal implicit price or the noise-housing price elasticity. In these cases, appropriate mathematical relationships are used to recover estimates of the NDI. Some empirical studies use an older noise metric, the Noise Exposure Forecast (NEF). The relationship between DNL and NEF is given by DNL = NEF + 35 dB (EPA, 1982a at B-3). The summaries below reflect this adjustment, and all noise levels are expressed using the DNL noise metric.

## IV. EMPIRICAL STUDIES OF AIRCRAFT NOISE AND PROPERTY VALUES

39. Several summaries of empirical studies of civilian aircraft noise and property values are available, including Nelson (1978, 1980, 2004) and FAA (1985). For this report, I will first summarize

---

[5] This annoyance relationship is not precisely the modified "Schultz curve" (Finegold et al. 1994), which covers all forms of transportation noise. The Schultz curve includes low levels of noise exposure (40-50 dB), which provide the non-linear left-hand tail of the curve. These noise exposure levels are omitted from aircraft noise studies or included in the background level. The semi-log function is due to Bishop (1966).

the NDI results in the FAA's (1985) report on *Aviation Noise Effects*. Second, I will summarize my recent meta-analysis (Nelson 2004), which updates and extends my earlier reviews for U.S. and Canadian airports. All of the empirical studies cover noise from civilian aircraft and the residential environment at civilian airports. All of the studies apply the hedonic model. The next section of this report, **Section V**, discusses special features of military aircraft operations and the residential living environment of Virginia Beach and Chesapeake, Virginia. In **Section V**, I also summarize the results from two survey studies of the effects of aircraft noise on residential property values, which are especially important for noise exposure levels of 80 dB and above. The monetary damages developed below isolate the effect of aircraft noise on property values, holding constant other influences such as accessibility and general growth of nominal housing values. Where the passage of time is important, researchers have included variables to account for general changes in housing market demand and supply and other macro-economic conditions.

**The FAA found that aircraft noise decreases the value of residential property by approximately -1% per dB. This estimate is based on results from seven hedonic studies that use data for civilian aircraft and airports.**

40. The FAA's (1985 at 100) report on *Aviation Noise Effects* includes a discussion of the effects of aircraft noise on the value of residential property located around civilian airports. The FAA selected 10 best estimates of the NDI from the range of available values, including three estimates for 1960 and seven estimates for 1967-70. The three NDI values for 1960 are about -2% per dB, which reflects adjustments in housing markets due to early growth of commercial jet aircraft as a mode of transport. The values for 1967-70 include estimates of -1.5% for San Francisco and -1.0% for Washington, D.C., which may reflect climate and other lifestyle considerations in these areas. After omitting the three estimates from the 1960s, the FAA's range of estimates is -0.6% to -1.5% per dB (FAA, 1985 at 101). The FAA (1985 at 101) concluded that noise decreases the value of property by approximately -1% per decibel. As shown below, the FAA's estimate of the NDI is well within the range of values found by more recent empirical studies of the aircraft noise-property value relationship.[6]

**Empirical studies produce a range of estimates for the NDI from -0.3% to -1.5% per dB. The simple mean NDI is -0.75% per dB, which is close to the FAA's estimate. This estimate is based on information from 23 U.S. and Canadian airports and 33 estimates of the NDI.**

---

[6] The FAA notes that "... all research conducted in this area found negative effects from aviation noise ... researchers have been careful to consider [other factors] and to normalize their influences in research studies" (FAA, 1985 at 100).

41. Since the publication of my survey article (Nelson 1980), there have been additional studies of the empirical relationship between aircraft noise and property values. In Nelson (2004), I updated and extended my earlier survey using the technique of meta-analysis. Table 3 displays the results from 20 hedonic studies that cover 23 different civilian airports in the U.S. and Canada, and includes studies using sample data from 1967 to 1995. A total of 33 best estimates of the NDI is presented. Two independent estimates are available for Atlanta, Dallas, Reno, San Francisco, St. Louis, and Washington, D.C. A variety of data are employed, including data for census tracts, census blocks, disaggregated census blocks, and individual housing sales (e.g., Multiple Listing Service data). The NDI estimates also reflect a variety of model specifications and variables, which capture sample differences in housing and neighborhood characteristics, employment accessibility, airport accessibility, governmental services, and other economic and environmental features. As previously mentioned, it is not expected that the NDI will have a singular value, and the range of NDI values is -0.28 to -1.49%. The simple mean NDI in Table 3 is -0.75% per dB (Nelson, 2004 at 14). This average implies that each dB increase in noise exposure will reduce property values by -0.75%, holding constant other housing and land characteristics. This value is in substantial agreement with the FAA's estimate of -1.0% per dB.

42. The hedonic estimates in Table 3 uniformly indicate that aircraft noise is negatively capitalized into residential property values. Twenty-seven of 31 estimates are statistically significant at the 95% level or better (estimates for JFK and La Guardia Airports are missing standard errors). This is a far greater number of significant negative estimates than could possibly be attributed to chance. The coefficient standard errors and other statistical measures (e.g., R-square) are found in my attached article.

**The technique of meta-analysis can be used to synthesize the set of NDI estimates contained in Table 3. A meta-regression analysis produces a best estimate for the mean NDI of -0.7% per dB. This value is not affected by moderating and mediating variables such as sample size, sample year, mean property value, or airport accessibility.**

43. Meta-analysis is a statistical procedure for integrating and synthesizing the quantitative results contained in a set of studies of a given empirical relationship or outcome. That is, meta-analysis is "an analysis of the results of statistical analyses" (Hedges and Olkin, 1985 at 13). According to Hedges and Olkin (1985 at 1), "replication of experimental results has long been a central feature of scientific inquiry, and it raises questions concerning how [best] to combine the results obtained." Meta-analysis was developed in the early 1980s and applied originally in psychology and education (Cook et al. 1992; Cooper and Hedges 1994). It is now widely applied in the physical sciences and other areas of the social sciences. In economics, meta-analysis has been applied to environmental issues (Smith and Huang 1995; van den Bergh 1997), recreation demand (Rosenberger and Loomis 2000), gasoline demand

**Table 3. Summary of Noise Depreciation Indexes (NDI) for 23 Airports**

| **Hedonic Study – Airport** | **DNL** | **Sample Size (N) and Data (Year)** | **NDI** |
|---|---|---|---|
| BAH-FAA (1994 at 18) – Baltimore | 60 & 70 dB | N = 30; individual houses (1990) | -1.07 |
| BAH-FAA (1994) – Los Angeles | 60 & 70 dB | N = 24; individual houses (1991) | -1.26 |
| BAH-FAA (1994) – NYC JFK | 60 & 70 dB | N = 30; individual houses (1993); no std. error | -1.20 |
| BAH-FAA (1994) – NYC La Guardia | 60 & 70 dB | N = 30; individual houses (1993); no std. error | -0.67 |
| Blaylock (1977 at 84) – Dallas | 55-90 dB | N = 4264; disaggregated census blocks (1970) | -0.99* |
| DeVany (1976 at 213) – Dallas | 55-85 dB | N = 1270; census blocks (1970) | -0.80* |
| Dygert (1973) – San Francisco | 60-80 dB | N = 128; census tracts (1970) | -0.50* |
| Dygert (1973 at 113) – San Jose | 60-80 dB | N = 198; census tracts (1970) | -0.70* |
| Emerson (1972) – Minneapolis | 60-80 dB | N = 222; individual houses (1967) | -0.58* |
| Espey & Lopez (2000) – Reno | 60-75 dB | N = 1596; individual houses (1991-95) | -0.28 |
| Fromme (1978) – Washington, DC | 55-70 dB | N = 28; census tracts (1970) | -1.49* |
| Levesque (1994 at 207) – Winnipeg | 75+ dB | N = 1635; individual houses (1985-86) | -1.30* |
| Mark (1980 at 112) – St. Louis | 70 & 80 dB | N = 6553; individual houses (1969-70) | -0.56* |
| Maser et al. (1977) – Rochester urban<br>Rochester suburban | 65+ dB<br>65+ dB | N = 398; individual houses (1971)<br>N = 990; individual houses (1971) | -0.86*<br>-0.68* |
| McMillian (1980) – Edmonton | 55-70 dB | N = 352; individual houses (1976) | -0.51* |
| Mieszkowski et al. (1978) – Toronto<br>Toronto (Etobicoke) | 55-70 dB<br>55-70 dB | N = 509; individual houses (1969-73)<br>N = 611; individual houses (1969-73) | -0.87*<br>-0.95* |
| Myles (1997 at 21) – Reno | 55-75 dB | N = 4332; individual houses (1991) | -0.37* |
| Nelson (1978) – Washington, DC | 55-70 dB | N = 52; census tracts (1970) | -1.06 |
| Nelson (1979, 1980) – Buffalo | 60-80 dB | N = 126; census blocks (1970) | -0.52* |
| Nelson (1979, 1980) – Cleveland | 60-80 dB | N = 185; census blocks (1970) | -0.29* |
| Nelson (1979, 1980) – New Orleans | 60-80 dB | N = 143; census blocks (1970) | -0.40* |
| Nelson (1979, 1980) – St. Louis | 60-80 dB | N = 113; census blocks (1970) | -0.51* |
| Nelson (1979, 1980) – San Diego | 60-80 dB | N = 125; census blocks (1970) | -0.74* |
| Nelson (1979, 1980) – San Francisco | 60-80 dB | N = 153; census blocks (1970) | -0.58* |
| Nelson (1979, 1980, 1981) – six airports | 60-80 dB | N = 845; census blocks (1970) | -0.55* |
| O'Byrne et al. (1985) – Atlanta (houses)<br>Atlanta (census blocks) | 65-80 dB<br>60-80 dB | N = 96; individual houses (1979-80)<br>N = 248; census blocks (1970) | -0.67*<br>-0.64* |
| Price (1974) – Boston | 60-80 dB | N = 270; apt. rentals by census tracts (1970) | -0.81* |
| Tarassof (1993 at 83) – Montreal | 55-70 dB | N = 427; individual houses (1989-90) | -0.65* |
| Uyeno et al. (1993 )–Vancouver (houses)<br>Vancouver (condos) | 60-75 dB<br>60-75 dB | N = 645; individual houses (1987-88)<br>N = 907; individual condos (1987-88) | -0.65*<br>-0.90* |

*Notes:* Derived from Nelson (2004 at 12), attached. Asterisks indicate statistically significant at the 95% level.

(Espey 1996, 1998), taxation (Phillips and Goss 1995), and many other empirical areas. Summaries of economic applications of meta-analysis are found in Stanley (2001) and Stanley and Jarrell (1989); see also Finkelstein and Levin (2001).

44. In order to conduct a meta-analysis, several steps are necessary (Hedges and Olkin, 1985 at 9; Cooper and Hedges, 1994 at 9). First, the relevant empirical literature must be identified, including unpublished works and statistically weak results. Second, a common "effect size" must be available or can be constructed from each of the studies. The effect size used here is the noise depreciation index or NDI. Third, from the relevant literature, the investigator must extract and code the indicators and variables that ". . . predict outcomes, potential mediators of effects, and the differences in how outcomes are conceptualized" (Cook and Hedges 1994 at 11). Fourth, statistical techniques are applied to the effect size, which summarizes the set of estimates and explains any systematic differences in effect sizes. Weighting of the effect sizes according to the precision of the estimate is emphasized. Hence, standard errors of the effect sizes are a necessary part of the analysis.

45. My 2004 article includes several levels of analysis. First, I compute simple (unweighted) mean and median NDIs. Second, I compute two weighted means that use as weights the inverse variance of each estimate. Hence, more precise estimates in Table 3 are given greater weight. Both fixed-effects and random-effects means are computed, which allows for different sampling and statistical procedures by empirical investigators. Third, a meta-regression analysis is conducted that seeks to identify systematic differences among the estimates that can be traced to measurable differences in sampling and statistical techniques. In the regression analysis, seven variables were identified that might systematically increase (or decrease) a given NDI estimate relative to the other estimates. These variables are: (1) sample country (USA or Canada); (2) sample time period (before or after 1970); (3) sample size (log of number of observations); (4) data type (census data or individual sales); (5) mean property value (in 2000 US dollars); (6) functional form (logarithmic or linear) and (7) airport accessibility (accounted for in the study or not). The meta-regression analysis reveals that only the sample country and functional form are important statistically (Nelson, 2004 at 19).

46. Table 4 summarizes the results of the meta-analysis. The full set of results is found in the attached copy of my article. The unweighted estimates tend to be somewhat larger (i.e., more negative) than the weighted estimates, reflecting the inclusion of JFK and La Guardia Airports. The fixed-effects and random-effects weighted means are very close in magnitude (-0.58 and -0.59). The meta-regression using the inverse variance weights produces the smallest estimate, -0.51, but this estimate does not employ the optimal set of weights (Saxonhouse 1976). The meta-regression using inverse standard error weights yields a synthetic NDI of -0.67 (std. error = 0.20). The 95% confidence interval associated with

this estimate is -0.67 ± 1.96 (0.20) = -0.28 to -1.06. Among the estimates reported in Table 3, the 95% confidence interval includes all NDI values with the exception of four values (Baltimore, Los Angeles, Washington, D.C., and Winnipeg). The large negative estimates for JFK and La Guardia Airports are not included in the regression analysis due to lack of standard errors.

**Table 4. Summary of the Meta-Analysis of Airport Noise and Property Values**

| Statistical Measure | NDI value (std.dev.) | Comments on Measure |
|---|---|---|
| Simple mean NDI (unwt.) | -0.75 (0.30)* | Ignores precision; includes JFK and La Guardia |
| Median NDI (unwt.) | -0.67 | Ignores precision; includes JFK and La Guardia |
| Fixed-effect mean NDI (weighted) | -0.58 (0.04)* | Uses inverse variance weights; sampling error only |
| Random-effect mean NDI (weighted) | -0.59 (0.04)* | Uses inverse variance weights adjusted for between-study variability of estimates |
| Meta-regression coefficient. (unwt.) | -0.83 (0.31)* | White's correction for heteroskedasticity |
| Meta-regression coefficient (wt.) | -0.51 (0.14)* | Wt. regr. with inverse variance weights |
| Meta-regression coefficient (wt.) | -0.67 (0.20)* | Wt. regr. with optimal inverse standard error weights |

*Source*: Nelson (2004); attached. Asterisks indicate statistically significant at the 95% level.

47. An NDI of -0.67% per dB is consistent with my earlier review of the empirical literature. For example, in Nelson (1980), I found that the simple mean NDI for a sample of twelve airports was -0.62% (Nelson, 1980 at 43). In a pooled statistical analysis for six airports, I reported a mean NDI of -0.55% (Nelson, 1979 at 327). Recent studies for other countries also agree with this result. For example, a recent study for Geneva, Switzerland used geographical information system (GIS) data and found a noise discount of -0.7% per dB (Baranzini and Ramirez 2005). Lastly, studies of airport expansions and closures also have found property value effects from anticipated changes in noise exposure (Jud and Winkler 2005; Konda 2002). While these studies do not estimate an NDI, they do serve to demonstrate that market dynamics do not greatly alter the negative effects. In summary, 27 of 31 estimates of the NDI are negative and statistically significant at the 95% level or better. This is convincing evidence that aircraft noise is negatively capitalized into residential property values. A synthesis of this evidence using meta-analysis yields an NDI of about 0.7% per additional dB (above background noise levels).

**Combing the results in Table 4 and the FAA's (1985) estimate, the best NDI estimates are -0.7% to -1.0% per dB. These values measure the diminution in property values due to a one dB increase in noise exposure (DNL) above the background noise level (50-60 dB), and should be applied to noise exposure for residential properties located in the 65-79 dB zone.**

48. In Table 3, the background noise level in most studies is about 60 dB. The maximum noise level in most studies is 80 dB. The change in noise exposure due to **ARS-2** was about 8 to 20 dB (Wyle, 1998 at 4-37). Using these values and the NDI estimate of -0.70% per dB, a 5 dB change in noise due to **ARS-2** reduces a given property value by -3.5% (= -0.70% × 5); a 10 dB change in exposure reduces a given property value by -7%; and a 15 dB change in exposure reduces a given property value by -10.5%. At the FAA's (1985) higher value of -1.0% per dB, the diminution estimates are -5%, -10%, and -15%, respectively.

49. In order to illustrate the general calculation of monetary damages using the mean NDI, information was obtained on the assessed value of an average residential property in Virginia Beach. According to the Office of Real Estate Assessor, all residences (non-apartment units) had an average assessed value of $129,800 in January 2000 (City of Virginia Beach, 2000 at 6), compared to $125,290 in January 1999. The average assessed value for July 1, 1999 was about $127,545. Hence, based on an average assessed value of $128,000, the diminution in value due to **ARS-2** is $4,480 to $6,400 for a 5 dB change; $8,960 to $12,800 for a 10 dB change in exposure; and $13,440 to $19,200 for a 15 dB change. As discussed below, it is an important policy question whether or not properties exposed to 75+ dB can continue to be used for residential purposes. In the next section, I show that the adverse effect of **ARS-2** will be at the upper limit of these estimates, or -1% per dB change in exposure. I also demonstrate that the NDI is larger for residential properties exposed to 80 dB or more.

50. Average assessed residential property values in Virginia Beach rose by 3.60% between January 1999 and January 2000. Average assessed values rose to $158,400 in 2003 (FY 2004). Compared to 2000, this is a compound growth rate of 6.9% per annum. The rate of increase from 2003 to 2004 was 11.7%. The rate of increase from 2004 to 2005 was 22.3%. In the past two years, property values rose rapidly in Virginia Beach (City of Virginia Beach, 2005 at 7). However, this factor only affects the general level of nominal values, and does not change the supply and demand for housing in noisy areas. The correct economic issue is the difference in housing values at different noise exposure levels. Suppose that due to **ARS-2** a residential property valued at $100,000 in 1998 was reduced in value by 20% or $20,000. Growth of property values over time means that this property might have a value at $133,500 in 2005. A similar $100,000 house in a quiet area would be worth about $167,000. While both nominal values increased by 67%, the difference in relative values is 20% in 1999 and 2005.

## V. SPECIAL EFFECTS OF MILITARY AIRCRAFT NOISE

**The special effects of military aircraft noise that exceeds 75 dB are not fully captured by the NDI values of -0.7% and -1.0% per dB change in noise exposure.**

51. Only three of the hedonic studies in Table 3 include noise exposures in excess of 80 dB, and even the populations exposed to 75-80 dB are limited in most studies. Hence, most of the studies in Table 3 fail to consider severe noise exposure of 80 dB and above. For example, O'Byrne et al. (1985) examine the effects of aircraft noise in the vicinity of Atlanta's Hartsfield International Airport. For 1970 census blocks, only 12% of the observations are in the 75-80 dB zone, and for 1979-80 individual house sales, only 7% of the observations are in the 75-80 dB zone. As shown in Table 1, **ARS-2** subjected 23,000 people to 80+ dB. In this section, I examine evidence indicating that property value losses due to miliary aircraft noise will be seriously understated if the special effects of severe noise exposure are not considered. For this purpose, I review the evidence on: (1) survey studies that show that housing markets near airports are segmented by noise exposure in excess of 75 dB; (2) the adverse effects of severe noise levels on human health and welfare; (3) the unique features of Navy aircraft operations; and (4) the residential living environment and lifestyle of Virginia Beach and Chesapeake, Virginia.

52. The discussion that follows is based on the assumption that the land areas exposed to 80+ dB will continue to be used for some residential purposes. It is not clear that this should be the case. Four U.S. federal agencies – EPA, HUD, FAA, and the Department of the Navy – have established explicit guidelines for noise exposure of 75+ dB, which indicate that such levels of exposure are incompatible with residential land use. For example, in its *National Strategy for Noise Control*, one of EPA's specific national goals was expressed at follows:

> Reduce environmental noise exposure of the population to a DNL value of no more than 75 dB immediately, using all available tools, except in those isolated cases where this would impose hardship. This will essentially eliminate risk of hearing loss due to environmental noise, and reduce the extreme annoyance and activity interference for the population most severely affected (EPA, 1977a at 14).

53. The FAA's Part 150 guidelines also are explicit about the scope and purpose of limiting residential land use at a DNL of 75 dB or greater at civilian airports. According to the FAA, the purpose of an airport's noise compatibility program will be:

> To develop comprehensive and implementable noise reduction techniques and land use controls which, to the maximum extent feasible, will confine severe aircraft YDNL values of DNL 75 dB or greater to areas included within the airport boundary (14 *Code of Federal Regulations* Part150, January 1, 2000 at 89).

54. The Department of the Navy's AICUZ guidelines also strongly discourage residential use near airfields at DNL 70-75, and recommends that the greatest degree of compatible use controls should be used at DNL of 75 dB and above (DoN, 2002 at 16; DoN, 2003 at 3-38). Hence, the discussion that follows is based on the strong assumption that some of the land areas at 80 dB or greater will continue to be used for residential purposes. This assumption is clearly in violation of policy positions taken by several U.S. federal agencies, including the U.S. Navy.

**Two survey studies of aircraft noise and property values indicate that housing markets are segmented at 75-80 dB and above. At severe noise levels of 80+ dB, the NDI is -0.85% to -1.50% per dB change in exposure.**

55. Frankel (1991) examined the effect of aircraft noise on property values in the vicinity of Chicago's O'Hare Airport. Rather than using the hedonic price method, Frankel surveyed 200 realtors and 70 appraisers from 35 suburban communities surrounding O'Hare Airport. Two of the survey questions addressed the issue of valuation of properties exposed to different levels of aircraft noise. At background noise levels (60-65 dB), 49% of the survey respondents estimated that this noise level would have little or no effect on property values (Frankel, 1991 at 103). However, at severe noise levels (75-80 dB and above), only 2.3% of the respondents thought there would be no effect, and 41% estimated that property values would decline by 25% or more. At severe noise levels, the median reductions for single-family homes were 21.6% for realtors and 16.5% for appraisers. The mean reductions were 16.4% and 12.7%, respectively (Frankel, 1991 at 105). Using the medians and a difference of 15 dB over the background, the NDI for single-family homes at severe noise levels is -1.10% to -1.44% per dB (Frankel, 1991 at 107). Using the means, the NDI is -0.85 to -1.09% per dB for houses located at 75-80 dB and above.

56. Frankel (1991 at 107) compares the survey results with estimates obtained from hedonic price studies. He uses a mean NDI estimate from Nelson (1980), and compares that NDI value and his survey estimates at four different noise levels (62.5, 67.5, 72.5, and 77.5 dB). At the two lower noise levels, the hedonic price estimates and the survey estimates are similar. However, at the two higher noise levels, Frankel (1991 at 107) concludes that the hedonic estimates fall below the survey estimates. Frankel (1991 at 107) offers several possible explanations for this result, including a nonlinear NDI; differences in local residential markets and airport environments; interactions between housing characteristics and aircraft noise; and asymmetric information in housing markets, which limits the efficient operation of the market. Frankel (1991 at 108) concludes that the NDI at noise levels of 80+ dB is about -0.90% per dB. This conclusion is supported by two studies in Table 3 that included more ample information on noise levels above 80 dB. The study by Blaylock (1977) for Dallas obtained an NDI of -0.99% and the study by Levesque (1994) for Winnipeg obtained an NDI of -1.30% per dB.

57. A second survey study was conducted by Feitelson et al. (1996). The authors' survey design was based on 10 noise scenarios and a telephone survey of 426 homeowners and 274 renters in three communities near a major hub airport. This study employed Contingent Valuation (CV) survey methods to analyze two interrelated decisions by homeowners. First, respondents were asked to state their willingness to buy a house at different noise levels. Second, if a respondent was willing to buy a house, they were next asked to state their willingness to pay to avoid different aircraft noise exposures. Renters were asked similar questions about their willingness to rent and the rental premium for quiet. Thus, valuation is modeled as the outcome of a two-stage process: (1) the respondent determines whether he or she is willing to consider buying a residence; and (2) if the answer to this question was affirmative, then the respondent is asked to state their willingness to pay for the residence and its associated level of noise exposure. Hence, survey responses are obtained for the number of individuals who are unwilling to buy noisy properties at any price. If this number is large, the resulting housing market is "thin," or segmented (Feitelson et al., 1996 at 4; Frankel, 1991 at 100).

58. Feitelson et al. (1996 at 10) find that a larger number of individuals are unwilling to purchase a home (or rent) at severe noise levels, especially if overflights are involved. Almost half (45.1%) of the survey respondents were unwilling to buy a home that was exposed to severe noise and subject to overflights. For renters, the similar figure was 34.7%. Feitelson et al. (1996 at 11) conclude that the survey responses imply that the housing market near airports is segmented. An increasingly larger number of buyers are unwilling to consider the purchase of a property as the noise level rises, at any discount from the sale price. Comparing background noise exposure to severe noise exposures (15-25 dB difference), Feitelson et al. (1996 at 12) derive an NDI estimate of -2.4% to -4.1% per dB for homeowners and -1.8% to -3.0% per dB for renters. Compared to hedonic price estimates, the higher NDI includes the loss of use value incurred by homeowners who experience a severe noise exposure and who wish to sell their house. Excluding the zero valuation responses, Feitelson et al. (1996 at 11) derive an NDI at severe noise levels of -1.5% to -2.4% per dB for house prices and -0.9% to -1.5% per dB for rentals. These values agree substantially with the estimates obtained by Frankel (1991).

59. Both survey studies yield estimates that exceed the mean NDI of -0.7% per dB derived in Table 4. Combining the results in the two survey studies, a conservative range of estimates for the NDI at 80+ dB is -0.85 to -1.5% per dB. Hence, an average $128,000 residence located at 65 dB in CY99 was diminished in value by $16,320 to $28,800 if the change in noise exposure due to **ARS-2** was 15 dB and $21,760 to $38,400 if the change was 20 dB.

**The Environmental Protection Agency found that a DNL of 75 dB and above is associated with potentially severe health and welfare effects. A recent study of noise and school environments found that aircraft noise impaired children's reading comprehension and recognition memory. Because school quality is a factor that determines property values, this finding is potentially important for residents of Virginia Beach and Chesapeake, Virginia, and future property values.**

60. The EPA's (1982a at 52) *Guidelines for Noise Impact Analysis* examines the possible effects of DNL values that exceed 75 dB. EPA (1982a at 56) recommends that if outdoor noise exposure exceeds three hours a day at a DNL of 75 dB or above, it is important to look for potential severe health effects. First, for some people, noise-induced hearing loss begins to occur at 75 dB. The adverse effect of noise on hearing rapidly accelerates as noise exposure increases, and the possibility of hearing loss is an indicator of other adverse health and welfare effects (EPA, 1982a at 55). Second, those persons who are frequently outdoors are at greatest risk, including young children, retired persons living in warm climates, and persons in certain outdoor occupations. The adverse effects on human health and welfare of DNL 75+ can be summarized as follows (EPA, 1982a at C-1):

| **Type of Adverse Effect** | **Magnitude of Effect at 75 dB and Above** |
|---|---|
| ! Hearing Loss | May begin to occur in sensitive individuals, depending on actual noise levels received at-ear. |
| ! Risk of non-auditory health effects | Noise is one of several factors producing stress-related health effects, such as high-blood pressure. |
| ! Speech – indoor | Some disturbance of normal conversation. Sentence intelligibility is approximately 98% at 60 dB indoors (2m). |
| ! Speech – outdoor | Very significant disturbance of normal voice conversation. Speech intelligibility is zero at 2m at 75 dB outdoors. |
| ! High Annoyance | Approximately 37% of the population will be highly annoyed at 75 dB, 53% at 80 dB, and 72% at 85 dB. |
| ! Community Reaction | Very severe. Significant complaints and vigorous actions. |
| ! Community Attitudes | Noise is likely to be the most important of all adverse aspects of the community environment. |

61. Second, with respect to noise-induced sleep loss, Suter (1991 at 21) states that sleep interference is one of the critical components of community annoyance. Sleep loss can produce short-term adverse effects, such as mood changes and decrements in task performance the next day, with the possibility of more serious effects on health and well-being if sleep loss continues over long periods (Suter, 1991 at 21). Sleep interference will tend to occur at maximum outdoor sound levels of 65 dB or

greater. Based on a survey of the sleep disturbance literature, Finegold et al. (1994 at 29) recommend that "flight operations with a large number of nighttime events may require that supplemental information, such as an estimate of sleep disturbance, be included in environmental impact analyses." This information is required in addition to the 10 dB penalty for nighttime noise that is incorporated into outdoor DNL values. These adverse effects will be greater at 80+ dB, which implies a greater effect on residential property values than is reflected in Table 4 or the FAA's (1985) estimate.

62. Third, a number of studies investigate the effects of noise on children's health and welfare. The most recent in this long line of studies examined the adverse effects of aircraft noise on cognitive performance of children (Stansfield et al. 2005). The investigators note that children (ages 9-10) are particularly vulnerable to the effects of noise because noise interferes with learning at a critical developmental stage, and because children have less capacity to anticipate, understand, and cope with stressors. The study found that exposure to chronic aircraft noise impaired reading comprehension and recognition memory. Because school quality is a factor that determines residential property values, this finding is potentially important for the residential areas in the vicinity of the two airfields.

**Navy aircraft have unique operating and safety features that will exacerbate the effects of noise on the exposed population and on residential property values.**

63. Navy aircraft have several unique noise characteristics (Wyle, 1998 at 1-3), which imply that NDI estimates based on civilian aircraft will understate the adverse effects of increased noise exposure on property values. First, single-event noise levels are much greater for F-18 aircraft, which do not have the noise suppression equipment required for civilian jet aircraft. Second, military aircraft are granted a waiver from FAA civilian regulations. These aircraft have combat training requirements that occur over land and water at low altitudes and high speeds. Due to high speeds and low altitudes, military aircraft "seem to come from nowhere with a great noise and just as quickly disappear again" (Wyle, 1998 at 1-3). A "surprise" effect occurs under these conditions, which contributes to annoyance. Third, military aircraft operate in a sporadic fashion in designated low-altitude airspaces and along Military Training Routes (DoN, 1998a at 3.1-8). Fourth, Navy jet aircraft operate in formations that are different from Air Force jet aircraft. For example, Navy aircraft are required to practice landing at full power to simulate aircraft carrier operations (EPA, 1977b at 3-12), which means that FCLP noise levels are close to maximum departure-arrival levels (DoN, 1998a at 4.8-12). Fifth, another unique feature is the frequency of nighttime operations, which in CY00 accounted for about 25,000 operations at NAS Oceana and 55,000 operations at NALF Fentress. FCLP operations are often conducted at night with several aircraft in the pattern at low altitudes (DoN, 1988 at 9). These unique operating characteristics do not imply that

noise exposure is being measured incorrectly for **ARS-2**, since corrections to DNL values are possible for intrusiveness, frequency of operations, and nighttime events. The issue is that these characteristics are unique to Navy aircraft, and are not fully captured by empirical studies of the effects of civilian aircraft noise on residential property values. These characteristics mean that the NDI values derived above are likely to be conservative estimates of the effect of **ARS-2** on property values at both substantial noise levels (65-79 dB) and severe noise levels (80+ dB). Lastly, safety and accident considerations are more important for military aircraft, which means that Accident Potential Zones (APZ) are an important part of land compatibility planning (DoN, 2002 at 9).

**Virginia Beach and Chesapeake, Virginia, are residential living environments that are associated with warmer weather and outdoor living activities. These activities will be seriously or critically affected by the increased noise exposure due to ARS-2.**

64. The noise exposure guidelines established by EPA (1973, 1974, 1977a, 1982a) and other federal agencies are primarily designed to protect the public health with an adequate margin of safety. Primary consideration is given to the effects of noise on hearing, speech communication, sleep loss, mental health, productivity, and related health concerns. The effect of noise on public welfare is a broader concern, which includes effects on activities where people value tranquility or the absence of significant intrusive sounds. For example, EPA (1974 at 28) states that "a quiet environment is necessary in both urban and rural residential areas to prevent activity interference and annoyance, and to permit the hearing mechanism to recuperate if it is exposed to higher levels of noise during other periods of the day." Because outdoor activities are varied, EPA criteria/levels documents and other annoyance studies (Wyle, 1998 at A-1) do not always identify the types of activities that people find most disturbed by aircraft noise. Some evidence on this point is found in a few social surveys. EPA (1971 at 107) reports the results from a social survey of people living within 12 miles of the major airports in Chicago, Dallas, Denver, and Los Angeles. Given the large survey areas, the percentage of people who rated an activity as extremely disturbed by aircraft noise were as follows: TV/radio reception, 21%; conversation, 15%; telephone use, 14%; *relaxing outside*, 13%; relaxing inside, 11%; sleep, 8%; reading, 6%, and eating, 4%. Another example is found in the HUD (1972) report on aircraft noise impacts, which includes an "activity sensitivity analysis." Outdoor activities are critically affected by DNL levels of 80 dB and above and seriously affected by DNL levels of 60-79 dB (HUD, 1972 at 62). A "critical impact" means that the activity cannot be performed acceptably, and a "serious impact" means that the activity can be performed only with difficulty. Further, FAA (1985 at 21) states that noise is considered more disturbing in the summer because windows are likely to be open and recreational activities take place outdoors. Finegold et al. (1994 at 27) report that aircraft noise is more annoying than other forms of transportation

noise because aircraft noise virtually surrounds a home, whereas street noise is more directed. This difference tends to be ignored in social surveys, but clearly would be very important for outdoor activities, such as backyard relaxation, play, and family recreation. Hence, there are reasons to find that aircraft noise will interfere substantially with outdoor living, and this effect will increase the diminution of property values resulting from **ARS-2**.

65. The Cities of Virginia Beach and Chesapeake are located in an area with a warmer climate, where outdoor living and outdoor recreation are a significant attraction for many people. The average daily high temperature is 67º in April, 76º in May, 80º in September, and 70º in October. The temperate maritime climate is influenced by the nearby Gulf Stream. Virginia Beach is the one of the fastest growing cities on the East Coast and the largest city in the state of Virginia with nearly 500,000 residents. The median age of the residents in 2000 was 32.7 years. Virginia Beach is a popular destination for tourists, with an estimated 2.5 million annual visitors. Due to the mild climate, the beach season extends from spring through fall, which encourages a long visitor season. Water-based recreation attractions include sailing, power boating, surfing, swimming, fishing, diving, and sightseeing. Virginia Beach has 38 miles of shoreline, 28 miles of public beaches, 79 miles of scenic waterways, 60 miles of biking trails, 11 public golf courses, 18 marinas with public access, and three fishing piers. Virginia Beach also has more than 4000 acres of parklands, including 154 neighborhood parks (DoN, 1998a at 3.1). In October 1999, *Entrepreneur* magazine ranked the Virginia Beach area among the top 10 "Best U.S. Cities for Starting a Business." As a result, many residents are drawn to the area for the mild climate, outdoor-oriented quality of life, and economic opportunities; <http://www.vbgov.com> and <http://en.wikipedia.org/wiki/Virginia_Beach%2C_Virginia>.

66. Chesapeake is one of the fastest growing cities in Virginia, with a 2000 population of 199,000; <http://www.chesapeake.va.us>. The city is less than 20 miles from the Atlantic Ocean and is located on Chesapeake Bay. The population of Chesapeake is relatively young, with a median age of 34.7 years. Chesapeake citizens enjoy access to numerous neighborhood and community parks (DoN, 1998a at 3.1). Chesapeake is a family-oriented city, and it has earned recognition as one of the *50 Fabulous Places to Raise Your Family*. Many family-oriented activities are outdoor activities, including backyard play, family recreation, and weekend relaxation.

67. Although some operating hours are restricted, NAS Oceana and NALF Fentress are 24-hour airfields, operating seven days a week. The quality of some portion of the above recreation activities will be adversely affected by severe noise levels and increased aircraft noise exposure. In addition, other normal outside activities, such as backyard play and weekend relaxation, will be disrupted by increased noise exposure. These adverse welfare effects received no mention in the reports by the FAA (1985) and

Wyle Labs (1994, 1997, 1998, 2003), or in the Navy's Final Environmental Impact Statements (DoN 1998a, 2003) and AICUZ study. Due to the mild climate, young populations, and the family-oriented nature of the two Cities, the low-end NDI values (-0.7% and -0.85% per dB) are likely to understate the effect that military aircraft noise and **ARS-2** will have on residential property values.

68. As a result of the mild climate of Virginia Beach and Chesapeake; the unique operating features of Navy aircraft; the adverse health and welfare effects of severe noise levels of 80 dB and above; and the results of survey studies, the NDI for the 65-79 dB zone is -1.0% per dB change in noise exposure and the NDI for 80 dB and above is -1.5% per dB change in noise exposure. In addition to the FAA (1985) study, these values are based on 20 econometric studies that examine residential property values in the vicinity of 23 different airports in the U.S. and Canada, and two survey studies. Using meta-analysis, the cumulative results in the 20 studies provide convincing evidence that aircraft noise has negative effects on property values. This evidence is not affected by differences across studies due to sampling time period, sample size, data type, mean property value, or airport accessibility. In sum, housing market transactions are efficient processes that reveal the negative values that homeowners place on the disamenities associated with aircraft noise.

## VI. SUMMARY AND CONCLUSIONS

69. Based on my evaluation of the change in operations, change in noise exposure, and potential for adverse effects of military aircraft noise, I conclude the following with regard to the adverse effects of **ARS-2** on residential property values:

(1) Under **ARS-2**, the realignment of 156 F/A-18 Fleet and FRS aircraft to NAS Oceana and NALF Fentress substantially increased aircraft operations at the two airfields. Based on operational data for 1997 and 2000, total air station and airfield operations increased by 91% and 29%, respectively. Nighttime operations at Oceana rose dramatically from 7,000 to 25,000. Nighttime operations at Fentress rose from 35,000 to 55,000, or more than 150 operations per night. Navy F-18 aircraft are more than twice as loud as F-14 aircraft.

(2) The increase in operations dramatically increased the populations exposed to substantial and severe noise levels. The population exposed to 65-79 dB rose from 28,000 people in 1997 to more than 97,000 people in 1999. The population exposed to 80+ dB rose from only four people in 1997 to more than 23,000 people. Depending on location, the change in noise exposure in the vicinity of the two airfields is 8 to 20 dB (Wyle, 1998 at 4-37; DoN, 1998b at 11). A change in noise exposure of more than 1.5 to 3 dB is significant due to the effects on annoyance and community response.

(3) Land use compatibility guidelines adopted by several federal agencies, including the FAA and Department of the Navy, indicate that land areas subjected to noise levels between 65-75 dB are normally incompatible with residential land use, and noise levels above 75 dB are clearly incompatible with residential land use. The 1998 Standard of the Acoustical Society of America, which included

representatives of the Department of the Navy, takes into account lifestyle differences. The American National Standard is that DNL of 65+ is incompatible with residential use where extensive outdoor living takes place (ASA 1998). Recent changes in the Navy's AICUZ guidelines recognize the importance of human welfare in addition to health and safety concerns.

(4) Noise has adverse effects on normal daily living activities. At 65 dB and above, the most common human effects are annoyance, speech and learning interference, and sleep disturbance. These adverse effects disrupt normal daily activities, such as conversation, television viewing, school work, productivity, outdoor living, and family recreation activities. At noise exposure levels above 75 dB, there also are damages from temporary hearing loss and greater effects on outdoor living and human welfare. These adverse effects are greatest for children, retired persons in warm climates, and persons in certain outdoor occupations.

(5) Aircraft noise is a classic example of an external social cost – an uncompensated side-effect of production and consumption activities. Purchase of land or restrictive easements is one solution to this problem, and this solution is illustrated by expenditures made at several civilian airports. Direct estimation of a demand or willingness-to-pay schedule for tranquility is not possible. However, housing markets are complementary to levels of noise exposure. The value of tranquility is part of the market-determined price of housing, and econometric techniques are available to unbundle complex products and thereby reveal the implicit or hedonic price of tranquility. A large empirical literature is available in economics that estimates the implicit price model for housing characteristics, including disamenities.

(6) Empirical estimation techniques incorporate the annoyance due to noise exposure above background levels. The main findings from hedonic property value studies can be expressed in terms of a Noise Depreciation Index (NDI). The NDI captures in a single number the percentage decrease in a given property from a one dB increase in noise exposure, holding constant other determinants of housing values. This is the *but for* relationship. The FAA's (1985) report, *Aviation Noise Effects*, concluded that the NDI is -1.0% per dB increase in noise exposure. Based on a meta-analysis of 33 estimates of the NDI for 23 different airports, the NDI for aircraft noise is about -0.7% per dB. Combining these two estimates, the diminution of residential property values from aircraft noise exposure is -0.7% to -1.0% per dB for properties in the 65-79 dB zone. The higher value of -1.0% per dB is appropriate due to the unique operating features of Navy aircraft and the outdoor quality of life associated with the mild climate and recreation opportunities of Virginia Beach and Chesapeake, Virginia.

(7) Available evidence indicates that the NDI is higher at severe noise levels above 75 dB. Two survey studies show that housing markets are segmented at noise exposures of more than 75 dB. A conservative range of estimates from these two studies is an NDI of -0.85% per dB to -1.5% per dB for residential properties exposed to 80 dB or greater. The higher value of -1.5% per dB is appropriate due to the unique operating features of Navy aircraft and the outdoor quality of life associated with the mild climate and recreation opportunities of Virginia Beach and Chesapeake, Virginia.

(8) The importance of a higher NDI value for 80+ dB is reinforced by the greater adverse health and welfare effects of severe noise levels; the unique operating features of Navy aircraft; and the outdoor lifestyle associated with the mild climate of Virginia Beach and Chesapeake, Virginia. Severe noise exposure has the potential to substantially affect human welfare derived from outdoor recreation, backyard play, and weekend relaxation in the out-of-doors. Some outdoor activities are critically affected and cannot be performed acceptably if aircraft noise levels exceed 80 dB (HUD, 1972 at 62). School performance of young children also can suffer if adequate mitigation efforts are not undertaken.

(9) The July 1999 average assessed residential value in Virginia Beach was about $128,000. This value is used to illustrate the determination of monetary damages. Using the NDI of -1.0% per dB for an average property exposed to 60-64 dB in CY98, the monetary damage will be $6,400 for a 5 dB increase in exposure; $12,800 for a 10 dB increase; and $19,200 for a 15 dB increase due to **ARS-2**.

(10) Damages will be greater for properties exposed to 80+ dB. Using an NDI of -1.5% per dB for an average property exposed to 65-70 dB in CY98, the monetary damage will be $19,200 for a 10 dB increase in exposure; $28,800 for a 15 dB increase; and $38,400 for a 20 dB increase due to **ARS-2**.

I declare and affirm under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

____________________________

Jon P. Nelson, Ph.D.

**REFERENCES**

Acoustical Society of America, *Quantities and Procedures for Description and Measurement of Environmental Sound – Part 5: Sound Level Descriptors for Determination of Compatible Land Use*, ANSI S12.9-1998/Part 5 (New York: ASA, January 1998).

Baranzini, A. and J.V. Ramirez, "Paying for quietness: The impact of noise on Geneva rents," *Urban Studies* **42**, 2005, 633-46.

Bartik, T.J. and V.K. Smith, "Urban amenities and public policy," in E.S. Mills (ed.), *Handbook of Regional and Urban Economics* (Amsterdam: North-Holland, 1987), pp. 1207-54.

Benson, E.D., J.L. Hansen, and A.L. Schwartz, "Water views and residential property values," *Appraisal Journal* **68**, 2000, 260-71.

Bishop, D.E., "Judgements of the relative and absolute acceptability of aircraft noise," *Journal of the Acoustical Society of America* **40**, 1966, 108-22.

Blaylock, J.E., *Airport Noise and Housing Values: An Investigation into the Hedonic Theory of Housing and the Value of Quiet*, Unpublished Ph.D. dissertation, Texas A&M University, 1977.

Boardman, A.E., *Cost-Benefit Analysis* (Upper Saddle River, NJ: Prentice-Hall, 1996).

Boardman, A.E., D.H. Greenberg, A.R. Vining, and D.L. Weimer, "Plug-in shadow price estimates for policy analysis," *Annals of Regional Science* **31**, 1997, 299-324.

Boyle, M.A. and K.A. Kiel, "A Survey of House Price Hedonic Studies of the Impact of Environmental Externalities," *Journal of Real Estate Literature* **9**, 2001, 117-44.

Chinloy, P., *Real Estate: Investment and Financial Strategy* (Boston: Kluwer, 1988).

City of Virginia Beach, Office of Real Estate Assessor, *Annual Report to the Virginia Beach City Council for Fiscal Year 2000 - 2001* (Virginia Beach, VA: February 18, 2000).

City of Virginia Beach, Office of Real Estate Assessor, *Annual Report to the Virginia Beach City Council for Fiscal Year 2005 - 2006* (Virginia Beach, VA: February 17, 2005).

Cook, T.D., et al., *Meta-Analysis for Explanation: A Casebook* (New York: Russell Sage Foundation, 1992).

Cooper, H. and L.V. Hedges, "Research synthesis as a scientific enterprise," in H. Cooper and L.V. Hedges (eds.), *The Handbook of Research Synthesis* (New York: Russell Sage Foundation, 1994).

DeVany, A.S. and J.P. Nelson, "Monetary measures of the benefits of abatement: Property-value analysis," in National Academy of Sciences, *Noise Abatement: Policy Alternatives for Transportation* (Washington, DC: NAS, 1977a), pp. 126-60.

DeVany, A.S., J.P. Nelson, and A.A. Walters, "Cost-benefit analysis: Some illustrations," in National Academy of Sciences, *Noise Abatement: Policy Alternatives for Transportation* (Washington, DC: NAS, 1977b), pp. 183-206.

DiPasquale, D. and W.C. Wheaton, *Urban Economics and Real Estate Markets* (Englewood Cliffs, NJ: Prentice Hall, 1996).

Donnelly, W.A., "A survey in applied environometrics: The hedonic valuing of environmental amenities," *Environment International* **17**, 1991, 547-58.

Espey, M., “Explaining the variation in elasticity estimates of gasoline demand: A meta-analysis,” *Energy Journal* **17**, 1996, 49.60.

Espey, M., “Gasoline demand revisited: An international meta-analysis,” *Energy Economics* **20**, 1998, 273-95.

Farber, S., “Undesirable facilities and property values: A summary of empirical studies,” *Ecological Economics* **24**, 1998, 1-14.

Feitelson, E.I, R.E. Hurd, and R.R. Mudge, “The impact of airport noise on willingness to pay for residences,” *Transportation Research-D* **1**, 1996, 1-14.

Finegold, L.S, C.S. Harris, and H.E. von Gierke, “Community annoyance and sleep disturbance: Updated criteria for assessing the impacts of general transportation noise on people,” *Noise Control Engineering* **42**, 1994, 25-30.

Finkelstein, M.O. and B. Levin, “Meta-analysis,” in *Statistics for Lawyers*, 2nd ed. (New York: Springer, 2001), pp. 249-54.

Follain, J.R. and E. Jimenez, “Estimating the Demand for Housing Characteristics: A Survey and Critique,” *Regional Science and Urban Economics* **15**, 1985, 77-107.

Forsyth, P. et al. (eds.), *Classics in Transport Analysis: Air Transport* (New York: Elgar, 2002), pp. 613-28.

Frankel, M., “Aircraft noise and residential property values: Results of a survey study,” *Appraisal Journal* **59**, 1991, 96-110.

Freeman, A.M., “Property value models,” in *The Measurement of Environmental and Resource Values: Theory and Methods* (Washington, DC: Resources for the Future, 1993), pp. 367-420.

Gramlich, E.M., *A Guide to Benefit-Cost Analysis*, 2nd ed. (Englewood Cliffs, NJ: Prentice Hall, 1990).

Hampton Roads Planning District Commission, *Hampton Roads Joint Land Use Study* (Virginia Beach, VA: Hampton Roads PDC, April 2005).

Hayashi, Y., et al. (eds.), *The Environment and Transport* (New York: Elgar Publishing, 1999), pp. 81-92.

Hedges, L.V. and I. Olkin, *Statistical Methods for Meta-Analysis* (New York: Academic Press, 1985).

Jud, G.D. and D.T. Winkler, “The announcement effect of an airport expansion on housing prices,” Unpublished working paper, University of North Carolina, Greensboro, April 2005.

Kolstad, C.D., *Environmental Economics* (New York: Oxford University Press, 2000).

Konda, L.S., “A comparison of methodologies to measure effects of airport siting decisions,” Unpublished working paper, University of Texas at Austin, October 2002.

Levesque, T., “Modelling the effects of airport noise on residential housing markets: A case study of Winnipeg International Airport,” *Journal of Transport Economics and Policy* 28, 1994, 199-210.

Lusht, K.M., *Real Estate Valuation: Principles and Applications* (Chicago: Irwin, 1997).

National Academy of Sciences, *Noise Abatement: Policy Alternatives for Transportation* (Washington, DC: NAS, 1977).

Nelson, J.P., *Economic Analysis of Transportation Noise Abatement* (Cambridge: MA, Ballinger, 1978).

Nelson, J.P., "Airport noise, location rent, and the market for residential amenities," *Journal of Environmental Economics and Management* **6**, 1979, 320-31.

Nelson, J.P., "Airports and property values: A survey of recent evidence," *Journal of Transport Economics and Policy* **14**, 1980, 37-52.

Nelson, J.P., "Measuring benefits of environmental improvements: Aircraft noise and hedonic prices," in V.K. Smith (ed.), *Advances in Applied Microeconomics* (Greenwich, CN: JAI Press, 1981), pp. 51-75.

Nelson, J.P., "Highway noise and property values: A survey of recent evidence," *Journal of Transport Economics and Policy* **16**, 1982, 117-38.

Nelson, J.P., "Meta-analysis of airport noise and hedonic property values: Problems and prospects," *Journal of Transport Economics and Policy* **38**, 2004, 1-28.

O'Byrne, P.H., J.P. Nelson, and J.J. Seneca, "Housing values, census estimates, disequilibrium and the environmental cost of airport noise: A case study of Atlanta," *Journal of Environmental Economics and Management* **12**, 1985, 169-78.

O'Sullivan, A., *Urban Economics*, 4th ed. (Chicago: Irwin, 2000).

Palmquist, R.B., "Hedonic methods," in J.B. Braden and C.D. Kolstad (eds.), *Measuring the Demand for Environmental Quality* (New York: North-Holland, 1991), pp. 77-120.

Palmquist, R.B., "Property value models," in K.-G. Maler and J. Vincent (eds.), *Handbook of Environmental Economics: Valuing Environmental Changes*, vol. 2 (Amsterdam: North Holland, 2005 forthcoming). Available at <http://www4.ncsu.edu/~palmq/RecentWorkingPapers.htm>.

Phillips, J.M. and E.P. Goss, "The effect of state and local taxes on economic development: A meta-analysis," *Southern Economic Journal* **62**, 1995, 320-33.

Reichert, A.K., "Impact of a toxic waste Superfund site on property values," *Appraisal Journal* **65**, 1997, 381-92.

Rosenberger, R.S. and J.B. Loomis, "Using meta-analysis for benefit transfer: In-sample convergent validity tests of an outdoor recreation database," *Water Resources Research* **36**, 2000, 1097-107.

Saxonhouse, G., "Estimated Parameters as Dependent Variables," *American Economic Review* **66**, 1976, 178-83.

Schultz, T.J., "Synthesis of social surveys on noise annoyance," *Journal of the Acoustical Society of America* **64**, 1978, 377-405.

Simons, R.A. and A. El Jaouhari, "The effect of freight railroad tracks and train activity on residential property values," *Appraisal Journal* **72**, 2004, 223-33.

Smith, V.K. and J-C. Huang, "Hedonic models and air pollution: Twenty-five years and counting," *Environmental and Resource Economics* **3**, 1993, 381-94.

Smith, V.K. and J-C. Huang, "Can markets value air quality? A meta-analysis of hedonic property value models," *Journal of Political Economy* **103**, 1995, 209-27.

Stanley, T.D., "Wheat from chaff: Meta-analysis as quantitative literature review," *Journal of Economic Perspectives* **15**, 2001, 131-50.

Stanley, T.D. and S.B. Jarrell, "Meta-regression analysis: A quantitative method of literature surveys," *Journal of Economic Surveys* **3**, 1989, 161-70.

Stansfield, S.A., et al., "Aircraft and road traffic noise and children's cognition and health: A cross-national study," *The Lancet* **365**, 2005, 1942-49.

Suter, A.H., *Noise and Its Effects* (Washington, DC: Administrative Conference of the United States, November 1991). Available at http://www.nonoise.org/library.

Tietenberg, T., *Environmental and Natural Resource Economics*, 5th ed. (Boston: Addison-Wesley, 2000).

U.S. Department of Housing and Urban Development, *Aircraft Noise Impact-Planning Guidelines for Local Agencies*, PB-213020 (Washington, DC: HUD, November 1972).

U.S. Department of the Navy, *Planning in the Noise Environment*, NAVFAC P-970 (Washington, DC: DoN, June 1978).

U.S. Department of the Navy, *AICUZ Program Procedures and Guidelines for Department of the Navy Air Installations*, OPNAVINST 11010.36A (Washington, DC: DoN, April 1988).

U.S. Department of the Navy, *Final Environmental Impact Statement: Realignment of F/A-18 Aircraft and Operational Functions From Naval Air Station Cecil Field, Florida, to Other East Coast Installations* (Washington, DC: DoN, NFEC, March 1998a).

U.S. Department of the Navy, *Record of Decision and General Conformity Determination for Realignment of F/A-18 Aircraft and Operational Functions from Naval Air Station (NAS) Cecil Field, Florida, to other East Coast Installations* (Norfolk, VA: DoN, NFEC, May 18, 1998b).

U.S. Department of the Navy, *AICUZ Program Procedures and Guidelines for Department of the Navy Air Installations*, OPNAVINST 110010.36B (Washington, DC: DoN, December 2002).

U.S. Department of the Navy, *Final Environmental Impact Statement (FEIS) for the Introduction of F/A-18 E/F (Super Hornet) Aircraft to the East Coast of the United States* (Washington, DC: DoN, July 2003).

U.S. Department of the Navy, "Record of Decision for Introduction of F/A-18 E (Super Hornet) Aircraft to the East Coast of the United States," *Federal Register* 68 (175), September 10, 2003, 53353-359.

U.S. Environmental Protection Agency, *Effects of Noise on People*, NTID300.7 (Washington, DC: EPA, December 1971).

U.S. Environmental Protection Agency, *Public Health and Welfare Criteria for Noise*, EPA 550/9-73-002 (Washington, DC: EPA, July 1973).

U.S. Environmental Protection Agency, *Information on Levels of Environmental Noise Requisite to Protect Public Health and Welfare with an Adequate Margin of Safety*, EPA 550/9-74-004 (Washington, DC: EPA, March 1974).

U.S. Environmental Protection Agency, *Toward a National Strategy for Noise Control* (Washington, DC: EPA, April 1977a).

U.S. Environmental Protection Agency, *Department of Defense: Air Installations Compatible Use Zones (AICUZ) Program*, EPA 550/9-77-353 (Washington, DC: EPA, April 1977b).

U.S. Environmental Protection Agency, *Guidelines for Noise Impact Analysis*, EPA 550/9-82-105 (Washington, DC: EPA, April 1982a).

U.S. Environmental Protection Agency, *Airport Noise – Land-Use Compatibility by the Year 2000*, EPA 550/9-82-344 (Washington, DC: EPA, August 1982b).

U.S. Environmental Protection Agency, *Guidelines for Preparing Economic Analyses*, EPA 240-R-00-003, (Washington, DC: EPA, September 2000).

U.S. Federal Aviation Administration, *Aviation Noise Effects*, ADA-154319 (Washington, DC: FAA, March 1985). Available at http://www.nonoise.org/library.

U.S. Federal Interagency Committee on Noise, *Federal Agency Review of Selected Airport Noise Analysis Issues, Volume I, Policy Report* (Washington, DC: FICON, August 1992a). Available at http://www.fican.org.

U.S. Federal Interagency Committee on Noise, *Federal Agency Review of Selected Airport Noise Analysis Issues, Volume II, Technical Report* (Washington, DC: FICON, August 1992b). Available at http://www.fican.org.

U.S. Federal Interagency Committee on Urban Noise, *Guidelines for Considering Noise in Land Use Planning and Control*, PB81-214124 (Washington, DC: FICUN, June 1980).

U.S. General Accounting Office, *Aircraft Noise: Eight Airports' Efforts to Mitigate Noise*, GAO/RCED-89-189 (Washington, DC: GAO, September 1989).

U.S. General Accounting Office, *Airport Improvement Program: FAA Complying with Requirement for Local Involvement in Noise Mitigation Projects*, GAO/RCED-99-41 (Washington, DC: GAO, December 1998).

U.S. General Accounting Office, *Aviation and the Environment: FAA's Role in Major Airport Noise Programs*, GAO/RCED-00-98 (Washington, DC: GAO, April 2000a).

U.S. General Accounting Office, *Aviation and the Environment: Airport Operations and Future Growth Present Environmental Challenges*, GAO/RCED-00-153 (Washington, DC: GAO, August 2000b).

van den Bergh, J.C.J.M., et al., *Meta-Analysis in Environmental Economics* (Boston: Kluwer, 1997).

Walters, A.A., *Noise and Prices* (London: Oxford University Press, 1975).

Wyle Laboratories, *Aircraft Noise Study for Naval Air Station Oceana and Auxiliary Landing Field Fentress*, WR 94-18 (Arlington, VA: Wyle and NFEC, July 1994).

Wyle Laboratories, *Aircraft Noise Study for the 1995 BRAC Realignment of Navy F/A-18 Aircraft*, WR 97-10 (Arlington, VA: Wyle and NFEC, September 1997 and February 1998).

Wyle Laboratories, *Noise Study for the Introduction of F/A-18E/F to the East Coast*, Vol. 1, WR 02-08 (Arlington, VA: Wyle, April 2003).

Attachment #1

**September 2005**

**VITAE**

**JON P. NELSON**

**TELEPHONE:** voice: 814-237-0157
fax: Call first
e-mail: jpn@psu.edu
web page: http://econ.la.psu.edu/people/biographies/nelson_bio.htm

**MAIL ADDRESS:** 642 Glenn Road
State College, PA 16803

**ALT. ADDRESS:** 608 Kern Bldg.
Department of Economics
Pennsylvania State University
University Park, PA 16802

**ACADEMIC DEGREES:** B.S., Economics - University of Wisconsin, 1964
Ph.D., Economics - University of Wisconsin, 1970

**EMPLOYMENT:** Professor Emeritus of Economics, July 2004 -
Professor, The Pennsylvania State University, 1978-2004
Director of Graduate Studies, Department of Economics, 1986-1993
Research Associate, Institute for Policy Research & Evaluation, 1970-2001
Associate Professor, Pennsylvania State Univ., 1973-1978
Assistant Professor, Pennsylvania State Univ., 1969-1973

**HONORS:** Faculty Marshall, College of the Liberal Arts, Spring 2003
Teaching Award, Department of Economics, Fall 2002
National Institute on Alcohol Abuse Grant Panels, 1989-1991, 1994
National Academy of Sciences Committees, 1976-77, 1979-80
National Science Foundation Panel, 1978
American Iron & Steel Institute Fellowship, 1968-69
Ford Foundation Fellowship, 1967-68

**OTHER EXPERIENCE:** Consultant: PA Office of Attorney General (1985-05), U.S. Department of Labor (1974-76), U.S. Department of Transportation (1973-74), National Science Foundation (1972-83), NIAAA (1989-94), RW Johnson (2003-05), Pitt News (1999); researcher, Wis. Dept. of Resource Dev. (1964-65); teaching assistant, U. Wisconsin (1965-67); and various private consultancies.

**COURSES TAUGHT:** Industrial organization, antitrust & regulation, law & economics, microeconomic theory, environmental economics, economic statistics, policy analysis, honors seminar.

**RESEARCH AREAS:** Applied microeconomics, market structure & conduct, antitrust & regulation, technological change, advertising economics, cost-benefit analysis, environmental economics.

**RESEARCH GRANTS:** NSF (1970-72); U.S. Department of Labor (1974-75); U.S. Department of Transportation (1973, 1974-75, 1977-78); U.S. Bureau of Mines (1975-77); U.S. Public Health Service (1987-88); Pennsylvania LEV Commission (1993); National Institute of Standards and Technology (1996). Author/coauthor of ten final research reports; cum. support: $409,892.

**PSU COMMITTEES:** **Liberal Arts:** Promotion & Tenure (1988-90), Instant Tenure (1993-96), Sabbatical Leaves (1984-86), Research (1982-83, 1985-88), Headship Search (1994-95), Faculty Marshall (2003). **Economics:** Personnel & Tenure (1976-78, 1982-84, 1990-92, 1995-97), Recruiting Committee (1994-95), Academic Programs (1972-74, 1979-81, 1985-93, 2000-02), Policy & Planning (1974-76, 1979-80, 1982-83, 1990-91), Graduate Aid & Admissions (1972-74, 1984-93). **Graduate School:** Fellowships (1989-90), Dept. Review Committees (1974-75), Search Committee (1977-78), Programs & Courses (1992-94), Graduate Council (1992-94).

**PROGRAM APPEARANCES:** Program appearances include AISI Steel Economics Seminar (1973, 1979), Eastern Economic Association (1974, 1977, 1982, 1988, 2000), Econometric Society (1970, 1975, 1984), Industrial Organization Society (1995), Midwest Economic Association (1992), Pennsylvania Economic Association (1974, 1987, 1988, 1994), REMI Users Conference (1993), Southern Economic Association (1978, 1980, 1985, 1996, 2005), Western Economic Association (1974, 1979, 1993, 1997, 2001), National Alcoholic Beverage Control Association (2005), and various other professional meetings.

**EDITORIAL WORK:** **Associate Editor:** Journal of Economic Behavior & Organization, 1996-99. **Frequent referee:** Journal of Environmental Economics & Management, Journal of Economic Behavior & Organization, Journal of Economic Education, Review of Economics & Statistics. **Occasional referee:** Alcohol Research & Health, American Economic Review, American Real Estate & Urban Economics Journal, Applied Economics, B.E. Journals in Economic Analysis & Policy, Business Economics, Cato Journal, Contemporary Economic Policy, Eastern Economic Journal, Economic Inquiry, Engineering Economist, European Journal of Political Economy, Health Economics, Journal of the Air Pollution Control Association, Journal of Economics & Business, Journal of Financial Services Research, Journal of Health Economics, Journal of Human Resources, Journal of Industrial Economics, Journal of Law & Economics, Journal of Policy Analysis & Management, Journal of Real Estate Finance & Economics, Journal of Regulatory Economics, Journal of Transport Economics & Policy, Land Economics, Review of Industrial Organization, Southern Economic Journal. **Manuscript reviewer:** American Enterprise Institute, Harvard University Press, JAI Press, Penn State University Press, Resources for the Future, Transportation Research Board, and various commercial book publishers. **Proposal & report reviewer:** NSF, NIAAA, and RW Johnson Foundation.

**GRADUATE STUDENTS:** Ph.D. dissertations directed [9]; M.A. essays [21]; Undergrad Honors essays [5].

**AFFILIATIONS:** American Economic Association, Industrial Organization Society, Western Economic Assoc.

**TESTIMONY:** Three Mile Island class action hearing (8/81); Pennsylvania Liquor Control Board hearing (7/85); Pennsylvania Low-Emissions Vehicle Commission hearing (8/93); The Pitt News hearing on a newspaper advertising ban (4/99).

**WORKING PAPERS:**
"Cigarette Advertising Regulation: A Meta-Analysis" (January 2005).
"Alcohol Advertising in Magazines: Effects of Price & Audience Size" (April 2005).
"How Similar are Youth and Adult Alcohol Behaviors? Panel Evidence" (August 2005).

**PUBLICATIONS:** ***A. INDUSTRIAL ORGANIZATION, ANTITRUST & REGULATION***

**BOOK*:* *Industrial Organization*** (Penn State University, World Campus, 2003), 254pp.

**ARTICLES & CHAPTERS:**

1) "An Interregional Recursive Programs Model of Production, Investment, and Technological Change," **Journal of Regional Science**, April 1971, 33-47.

2) "Regional Concentration in the Steel Industry," **Northeast Regional Science Review**, Spring 1972, 218-225.

3) "An Interregional Recursive Programming Model of the Iron and Steel Industry," in G. Judge & T. Takayama (eds.), **Studies in Economic Planning Over Space and Time** (North-Holland, 1973), pp. 368-393.

4) "A Class of Dynamic Models for Describing and Projecting Industrial Development" (w/ R. Day), **Journal of Econometrics**, June 1973, 155-190. (Reprinted in R. H. Day, *The Divergent Dynamics of Economic Growth*, Cambridge University Press, 2004, pp. 97-114.)

**ARTICLES**:
(continued)

5) "Forecasting Aggregate Supply of Coal Miners" (w/ E. Cohn & G. Neumann), **Socio-Economic Planning Sciences**, October 1974, 293-299.

6) "Energy Conservation Policies of the Federal Energy Office" (w/ T. Ferrar), **Science**, February 1975, 644-646.

7) "Forecasting Aggregate Demand for Coal Miners" (w/ E. Cohn & G. Neumann), **Applied Economics**, June 1975, 81-92.

8) "The Demand for Space Heating Energy," **Review of Economics and Statistics**, November 1975, 508-512.

9) "Climate and Energy Demand: Fossil Fuels," in T. A. Ferrar (ed.), **The Urban Costs of Climate Modification** (Wiley, 1976), pp. 123-137.

10) "Behavioral, Suboptimizing Models of Industrial Production, Investment and Technological Change" (w/ R. Day, et al.), in **Modelling Economic Change: The Recursive Programming Approach** (North-Holland, 1978), pp. 55-118.

11) "Tax Policy, Capital Shortages, and Iron and Steel Investment Behavior" (w/ G. Neumann), in **Steel Industry Economics** (University of Washington, 1979), pp. 43-63.

12) "A Comparison of Alternative Econometric Models of Iron and Steel Investment Behavior" (w/ G. Neumann), **Review of Economics and Statistics**, February 1980, 122-127.

13) "Tax Policy and Steel Industry Investment Behavior: An Econometric Analysis" (w/ G. Neumann), **Quarterly Review of Economics and Business**, Autumn 1980, 19-34.

14) "Safety Regulation and Firm Size: Effects of the Coal Mine Health and Safety Act of 1969" (w/ G. Neumann), **Journal of Law and Economics**, October 1982, 183-199. (Summarized in American Enterprise Institute, *Regulation*, 1983, p. 46.)

15) "An Analysis of Ramsey Pricing in Electric Utilities" (w/ M. Roberts & E. Tromp), in M. Crew (ed.), **Regulating Utilities in an Era of Deregulation**, (Macmillan, 1987), pp. 85-109.

16) "Ramsey Numbers and the Role of Competing Interest Groups in Electric Utility Regulation" (w/ M. Roberts), **Quarterly Review of Economics and Business**, 1989, 21-42.

17) "Comparative Antitrust Damages in Bid-Rigging Cases: Some Findings from a Used Vehicle Auction," **Antitrust Bulletin**, Summer 1993, 369-394.

18) "Market Structure and Incomplete Information: Price Formation in a Repeated English Auction," **Journal of Economic Behavior and Organization**, December 1995, 421-437.

19) "Estimating the Spillover Benefits of Industrial Modernization Programs" (w/ I. Feller), in **Manufacturing Modernization: Learning from Evaluation Practices and Results** (Georgia Tech University, 1997), pp. 199-221.

20) "The Microeconomics of Manufacturing Modernization Programs" (w/ I. Feller), **Research Policy**, November 1999, 807-818. http://www.sciencedirect.com/science

21) "Consumer Bankruptcies and Chapter Choice: State Panel Evidence," **Contemporary Economic Policy**, October 1999, 552-564.

22) "Consumer Bankruptcies and the Bankruptcy Reform Act: A Time-Series Intervention Analysis, 1960-1997," **Journal of Financial Services Research**, August 2000, 181-200. http://www.kluweronline.com/issn/0920-8550/current

**ARTICLES**:
(continued)

***B. ENVIRONMENTAL DAMAGES, NOISE ABATEMENT & HOUSING MARKETS***

**BOOK:** ***Economic Analysis of Transportation Noise Abatement*** (Ballinger, 1978), 265pp. (Summarized in FAA, *Aviation Noise Abatement*, March 1985, 99-102.)

**ARTICLES & CHAPTERS**:

23) "The Economic Costs of Airport Noise: Theory and Measurement" (w/ I. Feller), in **Interagency Symposium on University Research in Transportation Noise Proceedings**, Stanford University, March 1973, pp. 727-743.

24) "Accessibility and the Value of Time in Commuting," **Southern Economic Journal**, January 1977, 1321-1329.

25) "Monetary Measures of the Benefits of Abatement: Property-Value Analysis" (w/ A. DeVany), in National Academy of Sciences, **Noise Abatement: Policy Alternatives for Transportation** (NAS, 1977), pp. 126-160.

26) "Cost-Benefit Analysis: Some Illustrations" (w/ A. DeVany & A. Walters), in National Academy of Sciences, **Noise Abatement: Policy Alternatives for Transportation** (NAS, 1977), pp. 160-82 and pp. 183-206.

27) "Residential Choice, Hedonic Prices, and the Demand for Urban Air Quality," **Journal of Urban Economics**, July 1978, 357-369.

28) "Airport Noise, Location Rent, and the Market for Residential Amenities," **Journal of Environmental Economics and Management**, December 1979, 320-331. (Reprinted in *The Environment and Transport*, Y. Hayashi, et al. (eds.), Elgar, 1999, pp. 81-92.)

29) "Airports and Property Values: A Survey of Recent Evidence," **Journal of Transport Economics and Policy**, January 1980, 37-52. (Reprinted in *Classics in Transport Analysis: Air Transport*, P. Forsyth, et al. (eds.), Elgar, 2002, pp. 613-28.)

30) "Measuring Benefits of Environmental Improvements: Aircraft Noise and Hedonic Prices," in V.K. Smith (ed.), **Advances in Applied Microeconomics** (JAI, 1981), pp. 51-75.

31) "Three Mile Island and Residential Property Values: Empirical Analysis and Policy Implications," **Land Economics**, August 1981, 363-372. (Cited in M.O. Finkelstein & B. Levin, *Statistics for Lawyers*, Springer-Verlag, 1st ed., 1990, p397; 2nd ed., 2001, p440.)

32) "Highway Noise and Property Values: A Survey of Recent Evidence," **Journal of Transport Economics and Policy**, May 1982, 117-138.

33) "Monetary Evaluation of Noise Nuisance" in T. O'Riordan & R. Turner (eds.), **Progress in Resource Management and Environmental Planning** (Wiley, 1983), pp. 201-209.

34) "Housing Values, Census Estimates, Disequilibrium and the Environmental Cost of Airport Noise: A Case Study of Atlanta" (w/ P. O'Byrne & J. Seneca), **Journal of Environmental Economics and Management**, June 1985, 169-178.

35) "Economic Development and Air Pollution Abatement: A State-Level Policy Simulation of the 1990 Clean Air Act," **Journal of Environment and Development**, March 1997, 61-84.

36) "Airport Noise, Location Rent, and the Market for Residential Amenities," in **The Environment and Transport**, in Y. Hayashi, (ed.), Elgar, 1999, pp. 81-92 (Reprint).

**ARTICLES**: (continued)

37) "Western Rangelands Reform: An Analysis of the 1996 Senate Vote on Federal Grazing Fees" (w/ G. Fennemore), **Contemporary Economic Policy**, July 2001, 322-335. http://cep.oupjournals.org/content/vol19/issue3/index.shtml

38) "Airports and Property Values: A Survey of Recent Evidence," in **Classics in Transport Analysis: Air Transport**, in P. Forsyth, et al. (eds.), Elgar, 2002, pp. 613-28 (Reprint).

39) "Green Voting and Ideology: LCV Scores and Roll-Call Voting in the U.S. Senate, 1988-1998," **Review of Economics and Statistics**, August 2002, 518-529. http://econpapers.hhs.se/article/tprrestat/

40) "Meta-Analysis of Airport Noise and Hedonic Property Values: Problems and Prospects," **Journal of Transport Economics and Policy**, January 2004, 1-27.

***C. ADVERTISING ECONOMICS & ALCOHOL DEMAND***

**BOOK:** ***Advertising and Differentiated Products: Advances in Applied Microeconomics, Volume 10***, editors M.R. Baye and J.P. Nelson (JAI Press & Elsevier Science, 2001), 295 pp. http://www.elsevier.com/inca/publications/store/6/2/2/4/0/9

**ARTICLES & CHAPTERS:**

41) "State Monopolies and Alcoholic Beverage Consumption," **Journal of Regulatory Economics**, March 1990, 83-98. (Cited 829 F. Supp 546, *44 Liquormart v. R.I.*, 1993.)

42) "Effect of Regulation on Alcoholic Beverage Consumption," **Alcohol and Drug Abuse Reviews**, Fall 1990, 223-243.

43) "Advertising and U.S. Alcoholic Beverage Consumption: System-Wide Estimates" (w/ J. Moran), **Applied Economics**, December 1995, 1225-1236.

44) "Economic and Demographic Factors in U.S. Alcohol Demand: A Growth-Accounting Analysis," **Empirical Economics**, March 1997, 83-102.

45) "Broadcast Advertising and U.S. Demand for Alcoholic Beverages," **Southern Economic Journal**, April 1999, 774-790.

46) "Hard at Play! The Growth of Recreation in Consumer Budgets, 1959-1998," **Eastern Economic Journal**, Winter 2001, 35-53.

47) "Do Advertising Bans Work? An International Comparison" (w/ D.J. Young), **International Journal of Advertising**, 20(3), 2001, 273-296.

48) "The Long-Run Demand for Alcohol and the Advertising Debate: A Cointegration Analysis" (w/ E. Coulson & J. Moran), in **Advertising and Differentiated Products** (JAI Press & Elsevier Science, 2001), pp. 31-54.

49) "Alcohol Advertising and Advertising Bans: A Survey of Research Methods, Results, and Policy Implications," in **Advertising and Differentiated Products**, (JAI, 2001), pp. 239-95.

50) "Advertising Bans, Monopoly, and Alcohol Demand: State Panel Evidence," **Review of Industrial Organization**, Feb. 2003, 1-25. http://www.kluweronline.com/issn/0889-938X.

51) "Cigarette Demand, Structural Change, and Advertising Bans: International Evidence, 1970-1995," **Contributions to Economic Analysis & Policy**, 2(1), August 2003, 1-27. http://www.bepress.com/bejeap/contributions/vol2/iss1/art10/

**ARTICLES**:
(continued)

52) "Youth Smoking Prevalence in Developing Countries: Effect of Advertising Bans," **Applied Economics Letters**, 10(13), October 2003, 805-11. http://www.tandf.co.uk/journals/routledge/13504851.htm

53) "Advertising Bans in the United States," in **EH.Net Encyclopedia** (R. Whaples, ed.), May 2004, 29pp. http://www.eh.net/encyclopedia/contents/Nelson.AdBans.php

54) "Beer Advertising and Marketing Update: Structure, Conduct, and Social Costs," **Review of Industrial Organization**, 26(3), May 2005, 269-306. Invited paper. http://www.kluweronline.com/issn/0889-938X/contents

55) "Advertising, Alcohol, and Youth," **Regulation: Cato Review of Business & Government**, 28(2), Summer 2005, 40-47. http://www.cato.org/pubs/regulation/index.html

**D. NOTES, REVIEWS & OTHER ARTICLES**

57) "A Note on the Economics of Metallurgical Coke Production," **Management Science**, December 1971, 237-239.

58) **Economic Aspects of Airport Environments**, Council of Planning Librarians, Chicago, July 1972, 18pp.

59) "Residential and Commercial Demand for Space Heating Energy," in **Proceedings of the Pennsylvania Conference of Economists**, Bloomsburg State College, April 1975, 1-20.

60) "Energy Conservation Policies of the Federal Energy Office: Reply" (w/ T. Ferrar), **Science**, 19 September 1975, 1015.

61) "Econometric Analysis of the Effects of Climate on Energy Demand," in **Economic and Social Measures of Climate Change**, Institute for Defense Analyses, September 1975, Ch. 3.

62) Review of *The Economics of Professional Team Sports* (by H. G. Demmert), **Antitrust Bulletin** ,Winter 1975, 939-942.

63) "Economic Considerations of Highway Noise Impact on Land," in **Final Report of the Highway Noise Research Workshop**, Florida Atlantic University, August 1977, pp. 60-63.

64) "Accessibility and the Value of Time in Commuting: Reply," **Southern Economic Journal**, July 1978, 298-300.

65) Review of *Steel Production: Processes, Products, and Residuals* (by C. S. Russell & W. J. Vaughan), **The Engineering Economist**, Spring 1979, 191-192.

66) "Economic Solutions" in **Final Report on the Evaluation of Current Environmental Research and Establishment of Priorities**, EPA & PSU, October 1979, 57-60.

67) "Estimating Demand Functions for Product Characteristics: Comment," **Journal of Consumer Research**, September 1982, 219-220.

68) Review of *Clean Coal/Dirty Air* (by B. A. Ackerman & W. T. Hassle), **Southern Economic Journal**, October 1982, 587-589.

**NOTES & REVIEWS:** (continued)

69) Review of *Energy, Economics and the Environment* (by H. E. Daly & A. F. Umana), **Natural Resources Journal**, October 1982, 1186-1188.

70) "Comment on 'Can Government Regulate Safety? The Coal Mine Example'" (w/ G. Neumann), **American Political Science Review**, December 1982, 876-878.

71) "Real Income, Grade Inflation, Simultaneity, and Teaching Evaluations" (w/ K. Lynch), **Journal of Economic Education**, Winter 1984, 21-37.

72) Review of *The Diffusion of Mature Technologies* (by G. F. Ray), **Journal of Economic Behavior and Organization**, September 1986, 332-334.

73) **Economic Aspects of Alcohol Consumption and Traffic Fatalities**, Vance Bibliographies, September 1988, 33 pp.

74) "Perspective on Alcohol Advertising: Brand Recall or Market Expansion?" **Dimensions**, Penn State University, Spring 1997, 1-3.

75) Review of *The U.S. Brewing Industry: Data and Economic Analysis* (by V.J. Tremblay and C.H. Tremblay), in **EH. Net Book Reviews,** May 2005, 1-4.
http://eh.net/bookreviews/library/0941.shtml

**RESEARCH GRANTS & REPORTS:**

1) National Science Foundation Grant No. ME24-206, February 1970 - February 1971 (Research Associate w/I. Feller, P.I.). *State Organization of Research and Development*. Final Report (February 1971, 254pp.). $15,000.

2) Pennsylvania Science and Engineering Foundation ,Grant No. 105-ME24-208, August 1971- August 1972 (Co-P.I. w/ I. Feller). *Research and Development Activities and Regional Economic Growth*. Final Report (August 1972, 249pp.). $52,239.

3) U.S. Department of Transportation, Grant No. DOT-0S-20196, August 1972 - February 1973. (Co-P.I. w/ I. Feller). *Economic Aspects of Noise Pollution*. Final Report No. DOT-TST-73-3 (April 1973, 159pp.). $29,938.

4) U.S. Department of the Interior Grant, No. GO122097, February 1973 - June 1974. (Research Associate w/E. Cohn, P.I.). *Manpower in the Bituminous Coal Industry*. Final Report (September 1973, 298pp.).

5) U.S. Department of Transportation, Grant No. DOT-OS-40094 (P.I.), April 1974 -April 1975 (P.I.). *The Effects of Mobile-Source Air and Noise Pollution on Residential Property Values.* Final Report No. DOT-TST-75-6. (April 1975, 248pp.). $58,000.

6) U.S. Department of Labor, Contract No. 41-USC-252, September 1974 - April 1975 (Co-P.I. w/ G. Neumann). *Labor Productivity and the Coal Mine Health and Safety Act*. Final Report (April 1975, 67pp.). $12,000.

7) U.S. Department of the Interior, Contract No. J0255006, September 1975 - September 1977 (Co-P.I. w/ G. Neumann). *Capital Requirements in the U.S. Iron and Steel Industry*. Final Report (September 1977, 458pp.). $75,801.

8) U.S. Department of Transportation, Contract No. DOT-OS-7006, August 1977 - August 1978 (P.I.). *Aircraft Noise and the Market for Residential Housing*. Final Report No. DOT/RSPA/DPB-50/78/24. (September 1978, 155pp.). $42,998.

**RESEARCH GRANTS**: (continued)

9) National Institute on Alcohol Abuse and Alcoholism Grant No. 1-R23-AA07099-01, February 1987 - February 1988 (P.I.). *The Effects of Legal Restrictions on Alcohol Consumption*. Final Report (February 1988, 81pp.). $52,016.

10) Pennsylvania Low-Emissions Vehicle Commission , Contract No. PTI-9193, May 1993 - August 1993 (Co-P.I. w/ K. Goulias & T. Litzinger). *Low Emission Vehicle Technical Study*. Final Report (August 1993, 248pp.). $40,000.

11) National Institute of Standards and Technology, Contract No. 50SBNB5C9009, March 1996 - August 1996 (Co-P.I. w/ I. Feller). *Feasibility Study for Estimating the Social Savings from MTC Projects*. Final Report (August 1996, 30pp.). $43,900. Cumulative, $409,892.

**CITATION COUNTS:** My published works have been cited more than 950 times.

**TESTIMONY:** Three Mile Island class action hearing (8/81); Pennsylvania Liquor Control Board hearing (7/85); Pennsylvania Low-Emissions Vehicle Commission hearing (8/93); The Pitt News hearing (4/99).

**CONSULTING & LITIGATION:** I have experience in three main areas: (1) antitrust damage assessments; (2) environmental damage assessments, including noise; and (3) advertising regulation and the First Amendment, especially as applied to alcohol and tobacco. In most instances, one or more reports were prepared. I was deposed in two cases involving bans of billboard advertising of alcohol (7/98, 5/00), and testified under oath in two other cases (8/81, 4/99). I also testified under oath at two public hearings before state regulatory agencies (7/85, 8/93). My major consultancies (& recent personal contacts) include:

**Advertising Economics & Commercial Speech**

- Pennsylvania Office of Attorney General, Antitrust Section (Harrisburg, PA; James Donahue), price advertising ban by the PA Liquor Control Board, 1985. Testified before LC Board, 7/85.
- Silcox Communications (Washington, DC; Marcia Silcox), various advertising and taxation issues, 1997-2003.
- Deutsch, Levy & Engel (Chicago, IL; Phillip Zisook), billboard ban case, 1998-2000. Deposed, 7/98.
- The Pitt News (Pittsburgh, PA), newspaper advertising ban case, 1999. Testified at hearing, 4/99.
- Greines, Martin, Stein & Richland (Beverly Hills, CA; Rex Heinke), billboard ban case, 1999-2000. Deposed, 5/00.
- King & Spalding / Cadwalader, Wikersham & Taft (NYC, NY; Steven G. Brody), billboard ban case, 2000-2001.
- Shook, Hardy & Bacon (Kansas City; MO; Tina Smith, Gene Peck & Mark Dover), various advertising and regulation issues, 2001-2005.

**Antitrust & Regulatory Economics**

- Pennsylvania Office of Attorney General, Antitrust Section (Harrisburg, PA; James Donahue), merger resale price maintenance & price fixing cases; exclusionary practices, 1983-2005.
- National Association of Attorneys General (Madison, WI; 31 plaintiff states), contact lens price fixing case, 1999.
- Constantine & Partners (New York City, NY), resale price maintenance case, 1997.
- Public Service of New Hampshire (Portsmouth, NH), rate increase filing for Seabrook nuclear power plant, 1987.
- Electric Power Research Institute (Iowa City, IA), restructuring & embedded cost issues, 1999.
- Quinn, Gordon, & Wolf (Towson, MD; Kieron Quinn), auto pricing case, 2004.

**CONSULTING & LITIGATION** (continued)

**Environmental Economics & Property Value Damages**

- Pepper, Hamilton & Sheetz (Philadelphia; Harrisburg, PA), Three Mile Island
- damages, 1981, testified at TMI hearing, 8/81; gasoline pipeline rupture impact, 1983.
- Hodges & Hodges (Atlanta, GA), airport noise impact, 1982.
- Buchanan Ingersol (Pittsburgh, PA), radioactive waste impact, 1983.
- Pennsylvania Low-Emissions Vehicle Commission (Harrisburg, PA), LEV impact analysis for Commonwealth of PA, 1993. Testified at Commission hearing, 8/93.
- Quinn, Gordon, & Wolf (Towson, MD; Kieron Quinn), airport noise impact, 2000-2002, 2005.