00001

IN THE:

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, *
et al., *
Plaintiffs, *
*
vs. * No. 01-201L
*
THE UNITED STATES OF AMERICA, *
Defendant. *
* * * * * * * * * * * * * * * * *

The deposition of JON P. NELSON was taken on Wednesday, December 21, 2005, commencing at 9:30 a.m., at Quinn Gordon & Wolf, 102 West Pennsylvania Avenue, Suite 402, Towson, Maryland, before Alfred A. Betz, Court Reporter and Notary Public.

* * * * * * * * * * * * * * * * *

Reported by:
Alfred A. Betz, Certified LiveNote Reporter

00003

Whereupon --

JON P. NELSON,

a witness, called for examination, having been first duly sworn, was examined and testified as follows:

EXAMINATION BY MR. BRYANT:

Q. Good morning, Dr. Nelson. My name is Steve Bryant from the Department of Justice and I'm representing the defendant in this case. If you could please first state your name and address, full name and address?

A. My name is Jon middle initial P Nelson. First name is spelled J-O-N. I live at 642 Glenn Road, State College, Pennsylvania.

Q. I assume you've been deposed before; is that correct?

A. Yes.

Q. So I don't need to go through the sort of general instructions on depositions and that kind of thing?

A. I leave that up to you.

00004

Q. Okay. I think we're comfortable with it. If at any time you don't understand a question or you need a break or something of that nature just say the word. We can certainly accommodate that. First I'd like to turn to your CV that you submitted with your report on September 26, I believe the date was, of this year. Is that CV updated? Has anything happened since you submitted that with your report?

A. I don't believe so. I may have attended a conference that's not on there but I believe it's up to date.

Q. Okay. And it says here that you're a professor emeritus of economics at Penn State University starting July of '04. What is the status of professor emeritus? What does that mean exactly?

A. That means I'm retired from the university. I retain an academic title. I have access to the campus library, computer, that sort of material.

00005

Q. Okay. And how long were you a professor at Penn State?

A. 35 years. I started in August of 1969.

Q. And if you could just sort of go through what you did there, the positions that you held, the areas that you taught and actually how you -- sort of go through the progress of the positions that you held at Penn State.

A. Well, my initial appointment was at the instructor level. I hadn't completed my dissertation. It took me another six months to do that. So I then attained the rank of assistant professor. I was promoted to associate level in I believe 1975 and full professor in I believe it was 1978. My major teaching duties were in the areas of industrial organization, microeconomic theory, environmental economics. I taught a variety of other courses both at the graduate and undergraduate level. Antitrust economics and regulation, an honors course, a course in policy analysis, various things like that. The major

focus of my research was regulation of business in a variety of contexts, antitrust and regulation, environmental controls, a little bit on taxation. So I would say the general thrust of my work was applied, empirical and focused on regulation of business.

Q. Okay. What is the title Faculty Marshal? What is that?

A. Oh! I was selected by a student who was the top student in the college that year to accompany him at graduation. So he was the top, he was selected as the top student in the college, I was one of his faculty, I was an instructor of his and he picked me to accompany him at graduation.

Q. Was that sort of a personal thing as well as, was there anything sort of associated with -- I mean, is there anything other than as a faculty marshal having to do with dealing with the faculty, or appointing positions or anything of that nature or is it just with him selecting you as an honor to join him at his graduation?

A. It was just that.
Q. Okay.
A. He was a straight A student going on to Harvard Law. He picked me as a result of being in my class.
Q. Okay.
A. I left out that I was also a Director of Graduate Studies in my department so I did that position from 1986 to I believe 1993.
Q. And what does that entail?
A. That means that I do the recruitment of graduate students, I sometimes bring them to campus for interviews, I make appointments for graduate students as teaching assistants. I would be the person who would organize the comprehensive exams and pick faculty to administer the exams. So it would be all the kind of administrative duties that go along with the graduate program. I would have a secretary that I work with and appoint various other committees for things like admissions and honors, awards and so forth.

00008

Q. You mentioned your dissertation. What was your dissertation in?

A. My dissertation? My dissertation was on the steel industry.

Q. And what specifically about the steel industry?

A. I was interested in issues primarily of investment and location and I would say technological change in the industry.

Q. And your undergraduate degree was in economics at the University of Wisconsin?

A. That's correct.

Q. Did you also obtain a masters at any point?

A. Yes. At Wisconsin once you pass comprehensive exams they awarded you a masters degree. So it wasn't anything more than that.

Q. Okay. Turning to your other experience that you have listed on your CV it says Pennsylvania Office of the Attorney General from 1985 to 2005. Are you still serving with them

00009

or --

A. I have been working on a case for them. I haven't heard anything from them about it in the last several months but I have an issue I'm working on for them right now, yes.

Q. Have you worked with them on several cases or just --

A. Yes. They've all been -- well, I shouldn't say all. I guess most of them have been antitrust cases, price fixing cases, merger cases, resale price maintenance case, that kind of case.

Q. What is the current case you're working on?

A. Current case I'm working on concerns the Harrisburg airport. The airport authority wants to condemn some property that's currently being used for a private parking lot so that the airport authority would be the only provider of parking within the immediate vicinity of the airport.

Q. What is your role in that case?

A. Typically they retain me to define the

00010

market area and to determine any damages associated with the action.

Q. Is that a direct condemnation case? Do you know what that means when I say that?

A. I'm not sure I'm using the correct legal language in this case, exactly what the airport authority wants to do in this case.

Q. And your role is evaluating the -- what exactly are you doing in terms of evaluating damages? What do you mean by that?

A. I've proposed to them that we do a survey. Whether or not they'll go through with it depends upon how the airport authority reacts to the Complaint that the Attorney General's Office has filed. But they have had me look at what's the market area, the relevant market for this, for airport parking in Harrisburg. I have proposed that we conduct a survey, the formal title would be a cojoint analysis, C-O-J-O-I-N-T would be the spelling for cojoint, as a way of determining whether, how individuals make their decisions with

00011

regard to their use of parking their airports.

Q. What kind of survey would this be?

A. It would be a survey of individuals who park at various airports -- what I proposed, I don't know if they'll do this, what I proposed is that we would survey individuals parking at several airports in Pennsylvania, since the airport authority in Harrisburg is not likely to allow the Attorney General's Office to do it on their property. So we would interview individuals at several airports who would use either short term or long term parking. The issue at Harrisburg is largely one of long term parking.

Q. So this is an issue of it's currently a private parking lot and the Pennsylvania airport or Harrisburg Airport Authority wants to convert it into a public parking lot for the purposes of owned by the --

A. No. They want to get rid of the parking and have the parking only be their short term and long term parking on airport property.

Q. What do they want to do with that property? Do you know?

A. I don't know.

Q. That case has nothing to do with jet noise or anything of that nature, I assume?

A. No. It has no environmental aspect that I'm aware of currently.

Q. Okay. You did three research grants for the Department of Transportation; is that right?

A. That's correct.

Q. And can you tell me about a quick synopsis of each of those?

A. Okay. Sometime in 1972 a colleague of mine was contacted by a person in the Department of Transportation and we were asked to survey the literature on aircraft noise impacts and to think about the issue of how you would evaluate aircraft noise impacts.

Q. Impacts on residential property values or something in addition to that?

A. As I recall, the focus was by and large

residential property values. And so there wasn't very much literature at that time. There was a little bit of literature on an airport in England, Roskil Commission, I think it was, and the airports. I don't believe it was called Roskil. And so we did a report for them, presented it to an office in DOT, did an oral presentation and submitted a written report giving our overview and evaluation of the literature at that point in time. So this would have been the very early 1970s, '72, '73, the report was submitted sometime in '73.

Q. And the literature that you reviewed were those hedonic studies or something else?

A. I didn't look at that report in preparing for this deposition so I don't recall how many of them were hedonic studies and how many of them might have been other kinds of studies. I just don't recall the exact studies we examined.

Q. But you do recall that some of them were hedonic studies that you evaluated at the time?

A. Yes. I certainly recall that a study by

00022

example of a question where they would be tied together and you would have expertise in answering that question?

MR. QUINN: Objection.

Q. You can answer the question.

A. All right. I could imagine a question asking about the effects of aircraft noise and so I've, I have professional expertise in examining the effects of aircraft noise that would involve again the use of those measures.

Q. When you say the effects of the noise what type of effects are you talking about?

A. Property value effects.

Q. Property values. Are you talking about also effects on humans, sort of sensitivity to noise and that kind of thing?

A. I have not done original studies in that area. I have used and have read various literature on the effects of aircraft noise so that I have to have some background knowledge of what noise, how noise is measured, what people in acoustics do in

00023

examining people's annoyance due to noise. I think that kind of background knowledge is necessary for many economic studies. In examining the steel industry I had to read a lot of literature, a lot of engineering literature on the steel industry. I had to have access to a book called The Making, Shaping and Treating of Steel. And so when I do an economic study I do not confine myself solely to the economics literature.

Q. So would you consider yourself an expert in the effect of noise on people?

A. No. I'm not an expert in that. What I've stated is that I have to have background knowledge of the literature in that area. I certainly do not do original studies of that issue.

Q. Now I'd like to turn to some experience you've had in litigation. You have been involved with Mr. Quinn in another case; is that right?

A. That's correct.

Q. How many cases have you been contracted by this law office?

00024

A. Just the one other case.

Q. What was that case about?

A. It was a case involving the pricing and sale of automobiles. New automobiles.

Q. And can you tell me a little more about that?

A. Yes. The auto dealership in question would include on the sales, the window sticker of the automobile would include, I'm going to use the term protection package but I don't recall if that is exactly the title that was used by the dealership, that would lead the individual to believe that this was a part of the invoice, the manufacturer's suggested retail price, the MSRP would lead the individual to believe that this was a part of the MSRP rather than a dealer add-on. And so the case was to bring this issue as a legal matter so that individuals could recover damages for overcharges.

Q. Did you testify at trial in that case?

A. No, I didn't. My work was limited to

00047

report examine the effect of the addition of aircraft and/or military personnel on property values around a military air station?

A. No. All of the studies are concerned with civilian airports.

Q. Civilian airports, as you said. Are you aware of any published or unpublished studies that examine the effect of the addition of aircraft and/or military personnel on property values around a military air station?

A. The only studies I can recall are the ones we've been discussing, Fidel's study of two air bases and the, I again have looked at the web site and may have a paper dealing with the --

Q. El Toro?

A. -- El Toro airport.

Q. Okay. What have you been asked to do in connection with this litigation?

A. I was asked back in 2000 to examine the effects on property values of the realignment of F/A18 C/D aircraft to Oceana and Fentress. I was

00048

not asked to do an original study of the issue. Rather, I was asked to give my professional judgment as to, based on analysis, as to what would be the impact on property values from this realignment. I did not do an original study in my first report in 2001. I relied on my earlier survey of the literature. And also examined, as one should, what were the special features that might distinguish Oceana and Virginia Beach from the set of studies that I looked at at that time.

In my second report of September 2005 I then added the additional information from my meta analysis which had been contained in my rebuttal back in 2002 and used that as the basis for my evaluation.

Q. You said you didn't do an original study. I take that to mean that you didn't do a hedonic study of the community surrounding the naval air stations Oceana and Chesapeake; is that what you're saying?

A. That's correct.

00049

Q. Do you think it is better to have more reliable, I should say, to have studied the empirical data at Virginia Beach as opposed to relying on your meta analysis that's contained in your article and your reports in this case?

MR. QUINN: Objection. Better for what?

Q. I said more reliable for the impact on property values surrounding Oceana.

A. I could see doing a study of Virginia Beach using hedonic methodology that would contain information about what's special or unique in terms of the Virginia Beach environment and Oceana and Fentress as naval air bases. However, in both cases we're talking about residential properties and I have in front of me 20 studies all of which find negative impacts of noise. And so the kind of study I've conducted is sometimes referred to as a benefits transfer.

Housing is somewhat unique in that it's traded infrequently. And so one can use external information to try to evaluate the impacts rather

than relying solely on a study which might contain incomplete information, it might contain information that changes over time as has tended to occur in this case. It might be information which is subject to revision. So I can see that there is value in both kinds of studies, both those that examine the, quote, impact area directly and those that provide information about other areas subject to a similar set of forces.

Q. I'll go back to my question. Which would be more reliable in your opinion, a hedonic study of Virginia Beach to estimate the noise depreciation index as you have done in other locations, or relying on your meta analysis of the various studies that you just mentioned?

MR. QUINN: Objection. Asked and answered.

Q. You can answer the question. Which do you believe is more reliable?

A. Reliable is a broad term. Someone in econometrics might use it differently than you are

perhaps using it. I have already stated that I believe there are flaws in the methodology used by Dr. Fidel and so if it was Dr. Fidel's methodology being applied in, quote, a hedonic study I do not think that would be reliable as compared to the studies that have been done previous on other residential environments. We're again talking about a residential environment and that's the basic impact area. So it would depend upon in part on how that study was conducted.

Q. I'm talking about not a study that would be done by Dr. Fidel or anybody else for that matter. I mean a hedonic study, a hedonic model that you would design yourself which would you view as more reliable, that hedonic study or your meta analysis estimated noise depreciation index? That's the question I'm asking.

A. If I had access to adequate data on both properties and noise I could do a study that I think would follow the same methodology I have laid out in previous papers and would rely more heavily

00052

on that analysis than on a pure meta analysis. The meta analysis, however, is now the way in which the literature has been tending in terms of summarizing information about empirical results and so it's not information which is separate and apart from the hedonic study I might conduct.

Q. So you're saying, then, that you would view a hedonic study that you modeled and performed with data that you could obtain from Virginia Beach to be more reliable the noise depreciation index you would estimate from that study as opposed to your meta analysis; is that correct?

MR. QUINN: Objection. Asked and answered, and that's a mischaracterization of the answer.

Q. Is that correct or no?

A. Well, I would conduct a study using the same methodology that I have carried out. But I'll point out in responding to your question that there's 20 studies on the page in front of me.

Q. You did --

00053

A. All of them --

MR. QUINN: Please don't interrupt.

A. -- showing a negative impact. So I would think that a study done for Virginia Beach would come up with the same basic conclusion. There's a negative effect of noise on residential property values.

Q. Okay. So you think the meta analysis is equally reliable as an actual hedonic study of Virginia Beach itself; is that what you're saying?

A. I don't know the precise meaning of "equal."

Q. If you had to choose between two noise depreciation indexes, one that you obtained estimated from a study of the data from Virginia Beach or the noise depreciation index you would have gathered from your studies in your meta analysis, which would you select?

A. Well, this I believe is a hypothetical question because I don't believe that you're going to provide me with the data to do this study. But

00054

I would use the two sets of information together,
one to guide the analysis and the other one to come
up with what I believe would be a negative impact
for Virginia Beach.

Q. What do you mean "guide the analysis"?

A. That I've said that there are, there is a
procedure which I've tried to spell out both in my
reports and in my previous publications as to how I
would begin examining this issue.

Q. In other words, a methodology of creating
that hedonic model for Virginia Beach; is that what
you mean?

A. Yes.

Q. So the procedures for identifying such a
model would coincide with what you've said in your
meta analysis and some of your other hedonic
studies. I understand that. But what I'm trying
to find an answer to is whether you would, let's
assume, for example, that the hedonic study that
you produced for Virginia Beach came out with a
noise appreciation index of .2 percent per dB as

00055

opposed to your -- is that possible that that could happen?

A. Yes, it's possible that that could happen.

Q. Is it possible that it could come back with a .01 percent noise appreciation index estimated?

A. It's a hypothetical question so let me give you a hypothetical answer. It could come back with a noise depreciation of minus 1 percent at equally -- equally as well in terms of a hypothetical.

Q. So my question is if you had a result that came back with, let's say, the .2 percent NDI would you rely on that as being the noise appreciation index for Virginia Beach or your meta analysis estimate of .7 percent?

A. As a hypothetical, it's a negative number and it's from a valid hedonic study of Virginia Beach and so I would rely on that number as a hypothetical.

Q. I want to step back for -- well, you mentioned various potential problems with the hedonic study that could be conducted at Virginia Beach. Measurement issues, revisions of data, those kinds of things. Is it possible that one or more or all of those types of problems affect every one of the 20 studies that you cite in your meta analysis?

A. Yes. All empirical studies have problems that can be pointed out in terms of the quality of the data, the econometric procedures and other kinds of concerns. When I say something is a problem, however, it doesn't mean that it changes the results in a dramatic way. And so some of the studies that are listed in my report will look at the same airport but with somewhat different data or with different data and with somewhat different procedures and so you can examine the same airport more than once, which has been done. So one of the advantages of doing a meta analysis as a way of summarizing a body of empirical results is that

00057

biases always can go in both directions. You can have a positive bias to a number as well as a negative bias to a number, not as though it pushes the results in only one direction. A value of minus .28 might be biased downward for various reasons. A value of minus 1.49 might be biased upward for various reasons. And so the advantage of the meta analysis is it gives you more reliable indication of the central tendency of a set of empirical results rather than relying on either judgment as to the best number or relying only on one study for the best number.

I'm sorry, I've forgotten your question.

Q. The question was you mentioned the various potential problems with the hedonic study if it were to be done at Virginia Beach. You were asked not to do one but if you were to do one you sort of laid out some problems with a study there. The question was is it possible that one or more or all of the problems you have exist in the studies that you're citing?

00058

A. As a hypothetical, yes, it's possible. Some studies are conducted more adequately than other studies. In doing the meta analysis I tried to take account of some of the problems in some studies.

Q. So is it sort of your opinion that throwing all these in together sort of in the wash together that the problems with each of them will be negated by putting them all, averaging them out; is that what you're saying?

A. Not entirely. One of the things, one of the issues in a hedonic study is what numerical values to include. And so in my meta analysis I tried to evaluate each study individually and I put a lot of weight on what the author said about his or her conclusions. So I try to start with the author's judgment about the quality of different estimates in selecting a value to include in the meta analysis.

The second thing that's done in my meta analysis is that the observations are weighted by

00059

their standard error. And so more precise estimates are given greater weight in the summary measures as compared to less precise measurements. Both of these, especially the second one, are a more formal methodology than what you're suggesting which is that studies are included if they're available without any regard to their strengths or weaknesses as econometric studies.

Q. Is it possible that the variability you're finding in your studies, and I think it is pretty significant, the range is from .28 percent per dB all the way up to 1.49 percent, is it possible that the variability in those noise appreciation index estimates is due to real differences among the market study rather than some kind of bias that you're inferring?

A. Yes. That's possible.

Q. Several of these -- would you like a break?

A. I'm okay for another half hour.

Q. Okay.

the data they employed.

Q. Is there any reason why you didn't cite them in your report that was filed just a couple months ago?

A. Well, they are not in the meta analysis and so I relied on the meta analysis results and the meta analysis is drawn from my published article which has gone through peer review. At the time neither of these articles was published. I didn't know about them when I did the meta analysis. So I didn't then go ahead and mention them in my report. I could mention lots of studies I guess in their report but I relied on the meta analysis results.

Q. Just asking the question, not implying anything.

A. Okay. Sorry.

Q. We talked earlier about whether you recommended that a hedonic model of Virginia Beach be done, hedonic study be performed in this case, that you do it. You indicated that it wasn't

00123

required, that your piece of this part of the litigation is to show noise impact occurs associated with airports. My first question, though, is did you recommend, though, that a hedonic model, hedonic study be done for Virginia Beach?

A. I didn't recommend it. We may have discussed back in 2000 whether or not it would be a requirement that I do such a study, that being that I couldn't do anything without doing such a study and I said I thought I could rely on my published results from 1980 plus additional information on Oceana and Virginia Beach.

Q. Who are those discussions with?

A. Mr. Quinn.

Q. And tell me about those discussions, if you would. What did you, what was said between the two of you?

A. I think he asked me would it be possible to evaluate the impact of noise in lieu of doing a study of the area, of just that area, and I

they look at property values and noise exposure at one point in time or at least for a short duration of time, maybe two years. There's one exception to that which is the Reno airport study or one of the Reno airport studies.

Q. Do you know which one it is, Myles or --

A. It's the other one.

Q. Espey and Lopez. So that's a change.

A. No, they're not looking at changes, they just have, because Reno is a fairly small airport and I suppose a small residential area, they collected property value data over a longer period of time to increase their sample size.

Q. '91 to '95?

A. Yes.

Q. Okay.

A. So the other studies are what is referred to as cross-sectional studies. They more or less pick one point in time and measure the variation and noise across geographic space rather than over time.

00146

Q. And for that study you mentioned --

A. So if I could finish.

Q. I'm sorry.

A. If I could finish my point. The change in noise is still present. It's just a change over geographic space rather than a change over time.

Q. So the Espey and Lopez Reno one where they gathered data from '91 to '95 do you know if that was, if within that '91 to '95 timeframe if there was an expansion of the airport or increase in operations or some sort of increase in the noise exposure on those properties or was it viewed as being roughly the same throughout?

A. I don't recall the exact setting in the Reno airport. There may have been some changes proposed or going on that they were concerned about. But I'd have to look back at the study to see the details.

Q. Did any of the studies you cited in your report and article analyze potential noise impacts based on a prediction of what noise would be in the

00147

future as measured by the DNL metric?

A. None of the studies that are used in my meta analysis, to the best of my recollection, are concerned with that issue. The change or variation in noise again is present is just a variation across geographic space rather than over time or an anticipated impact of one sort or another.

Q. Do all of the studies use a retrospective analysis of what noise as measured by the DNL metric was at some time in the past?

A. Well, there's probably some variation in this. Most studies are trying to match up the noise measurement as close as they can with the rest of the sample data. But they're not -- and I'm certain there's some variation on that. The noise data might be for, I don't know, the year prior to the collection of the data on property values, to cite a hypothetical case. But I would say that most studies the attempt is to match the noise measurement as close as possible to the data on the properties.

00148

Q. Okay. So the airport's there, the houses are there, and based on that noise depreciation index is determined based on which contour you're in and exposure you're experiencing.

A. But let me, if I could correct that, the noise depreciation index applies to a range of noise outcomes, roughly 65 to 79.9 dB. It doesn't depend on which noise contour you're in. It is a value expressed per decibel of noise exposure.

Q. Okay.

A. There's probably some variation that over the studies because people have tried to do things like investigating the effects of accessibility as you're closer or further away from the airport. But the values I have recorded are not tied to a particular noise contour.

Q. And when someone buys a property at whatever one dB increment is within one of those contours they, according to your theory, would be buying it at a discount depending on whether it was 65, 70, or 75 one dB per, I guess one dB increase

00149

from -- what would be the threshold, the beginning of that, where the NDI would begin?

A. Well, I'll stick to 65 because that's the basis for the complaint and I think that the 55 to 60 is background noise levels in most areas. The upper limit that I have applied the values in these tables to, with some modification, would be 79.9 dB if I can use that fineness of measurement. For reasons I tried to indicate in my reports there's just a lack of abundant data on 80 decibels and above.

Q. So someone buys a property in this 70 contour, at 70 we'll say, so that's 5 whatever the NDI is, let's say it's one percent per dB, so they get a 5 percent discount on their house of what it would be outside of the contours or, you know, on the 55 to 60 as you said. None of these studies, is it correct to say none of these studies are measuring okay, then the airport expands over the next year, new airplanes come in and the noise exposure changes, that house that was at 70 is now

75. None of your studies evaluate a previously discounted house and how it changes if there is, if the discount would be increased or anything, they just don't study that, do they?

A. The variation in noise is captured by variation cross-sectionally, that is, over space. So one's attempting to remove the time element. I think there are a lot of advantages to doing that for just the kinds of reasons you're pointing out, that there is a lot more things you'd have to control for if you were to include variation over time as well as variation cross-sectionally. Exactly the sorts of criticisms that I have found are applied to Dr. Dale-Johnson's report using a different procedure.

Q. Isn't change in noise over space as you called it also accompanied by change in neighborhood and other property characteristics while a change in noise over time can be measured in the same neighborhood for houses with the same or similar characteristics?

A. The change over time is limited to I believe Dale-Johnson's study and a dissertation done at the University of Maryland by Nancy Knickerbocker who also did a repeat sales analysis although I believe she also includes some hedonic analysis as well. So I'm only aware of two studies that I can think of that have used a repeat sales analysis and I'm not certain that Knickerbocker's study includes a change in noise level. I believe it does not, which means we're only talking about Dale-Johnson's study as pursuing that methodology.

Q. Shift gears yet again. The meta analysis produced a, or you came up with a .7 percent estimated NDI.

A. Yes.

Q. And you then looked at an FAA study and then increased it to .1 percent. Is that across the board or just for Oceana?

A. That's for Oceana. Once I summarize the existing set of studies, then I'm engaged in what's called a benefits transfer analysis. So I'm

00202

attempting to tailor the value I use as the NDI to any special circumstances associated with the impact airport or in this case to Oceana. And so I discuss in my reports the special features of naval aircraft to the extent that I was aware of them and their operation and the special features of Virginia Beach and Chesapeake that I thought would be important in coming up with a final value.

In this case I am employing professional judgment. I've been working on this issue off and on as we indicated earlier since 1972. I have conducted several studies, several hedonic studies of other airports and so when I say judgment I mean a professional judgment, not a flip of the coin. I wrote out in enough detail I think exactly what was my thinking in going from .7 to .1.

Q. Now --

A. Or excuse me, not from .7 to .1 but from .7 to 1.

Q. I'm with you. That professional judgment that you're relying on does not include any studies