**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| CAROL AND ROBERT TESTWUIDE, *et al*., | ) | |
| *Plaintiffs*, | ) | |
| v. | ) | No.: 01-201L<br>(Honorable Victor J. Wolski) |
| THE UNITED STATES OF AMERICA, | ) | |
| *Defendant*. | ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION IN LIMINE TO EXCLUDE CERTAIN WITNESSES AND EXHIBITS**

Plaintiffs submit this memorandum in opposition to the Government's motion in limine by which it seeks to exclude at trial: (1) the testimony of Robert J. Smith, (2) some exhibits numbering between 50 and 75 from both Plaintiffs' exhibit list and the joint exhibit list, (3) the testimony of 12 property owner witnesses on Plaintiffs' witness list, and (4) a demonstration of Interactive Sound Information System ("ISIS") software. The basis for the Government's motion as to the Plaintiffs' witnesses, exhibits and the ISIS software are relevance and undue prejudice under FRE 401 and 403. (Motion at p. 3; 7; 9).[1] The basis for excluding Mr. Smith's testimony is an alleged failure to make a formal request pursuant to 32 C.F.R. Part 725, a regulation pertaining to the release of official information by Navy personnel in litigation. The motion is without merit.

1 Although the Government cites to FRE 401, that rule simply defines relevant evidence. FRE 402 is the rule that makes evidence that is not relevant inadmissible.

**1.**

**The Witnesses, Exhibits and ISIS Software are Relevant and Admissible**

FRE 401 defines relevant evidence as "evidence having ***any tendency*** to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. (emphasis supplied). This is not a high threshold to meet, as the Court pointed out at the pretrial conference just last week. Nevertheless, the Government asserts that the "ultimate issues at trial are whether NAS Oceana aircraft have directly overflown the test plaintiff properties at low altitudes to the point of substantially interfering with the use and enjoyment of those properties, and have diminished the value of the test plaintiff properties." (Motion at p. 4). Any evidence, so the Government argues, that does not bear on those limited issues is not relevant.

The Government's position is untenable. Indeed, it does not even pass the red-faced test. The Government fails to correctly identify the elements of a taking by invoking the narrow circumstances enunciated in *United States v. Causby,* 328 U.S. 256 (1946). Once again, the Government refuses to accept, as it must, the decision in [Argent] as controlling this case. The "ultimate facts" as established by *Branning v. United States,* 228 Ct.Cl. 240, 654 F.2 88 (Fed. Cir. 1981) and *Argent v. United States,* 124 F.3d 1277 (Fed. Cir. 1997) include (1) whether the entire course of conduct at NAS Oceana constitutes a peculiarly burdensome pattern of activity, (2) whether the noise and vibration resulting from that activity has substantially interfered with the use and enjoyment of the Plaintiffs' property such that the Government has taken an avigation easement from the Plaintiffs, and (3) what amount of just compensation are the Plaintiffs entitled to receive. Specifically included in these "ultimate facts" is interference with use and enjoyment, which the

Government argues is not relevant to this case. (See Motion at p. 8)("Accordingly, exhibits and testimony regarding . . . loss of use and enjoyment of property must be excluded.").

Encompassed within these "ultimate facts" are a myriad of other facts the proof of which produces relevant evidence. The standard for determining relevance is not limited to "ultimate facts", rather it is as set forth in FRE 401, "any fact that is of consequence to the determination of the action." Indeed, by way of example, the Government stated at the pretrial conference that it intended to raise the statute of limitations and revised noise exposure contours at trial. The facts that bear on these issues include the level of flight activity and resulting noise and vibration in 1981 as compared to the present levels, and the location, altitude, and number of flights, particularly touch-and-go and FCLP patterns. Contrary to the Government's argument, these and many more facts are of consequence to the determination of this case, and evidence as to these facts is relevant and should be admitted.

At the pre-trial conference, the Court admonished the parties that it intends to adopt a broad view of relevant evidence because this trial is a "test case" for the remaining two thousand plus properties. Not only does the Government's motion run contrary to the Court's admonition, but it proposes a constriction of relevant evidence not contemplated by Rule 401 of the Federal Rules of Evidence.

**Plaintiffs' Witnesses**

The Government focuses on two of the twelve witnesses, Karen Green and Charles Nash. Herk Stokely, who the Government also proposes to exclude, is barely mentioned beyond his appearance on the list of those to be excluded. Herk Stokely, as the excerpts from his deposition and summary contained in Plaintiffs' opposition to summary judgment (Ex. A) demonstrate, has lived in his present home since 1967. He has also flown touch and go operations at Oceana as a Naval

aviator. Mr. Stokely is also an aeronautical engineer who is now retired from the Naval Aviation Depot in Norfolk, Virginia. He has taken video taped decibel readings of the flights in question in this proceeding showing not only the single event level of noise over his property, but the altitude and frequency of such overflights during flight operations. Mr. Stokely is also personally familiar with the Levensons who are test case Plaintiffs. (Ex. B, Depo. pp. 26, 27). He has spent many hours at their home. (*Id.*) By contrast, the Government has designated excerpts of the deposition of Gregory Whitley, a non-test case Plaintiff, who has never been to the home of the Levensons and does not know them, but believes he would know Hal Levenson's face if he saw him. (Ex. C, Depo. p. 59). The Government's effort to exclude Herk Stokely, but to include Gregory Whitley as witnesses in this case is duplicitous at best.

The same principle applies to the Government's motion to exclude Thomas Askins. Mr. Askins is a former Naval aviator and commercial airline pilot. (Ex. D). He has also taken decibel meter readings, and video tapes of pattern flights in the vicinity of and over his home in Virginia Beach. (Ex. E, Depo. pp. 21, 22).

Jeffrey McCreary lives within a block of the Levensons. In fact, his home is much closer to the home of a test case Plaintiff than any of the fact witnesses named by the Government in this proceeding.

Similarly, all of the remaining fact witnesses the Government proposes to exclude, have experienced aircraft operations over and around their properties before and after the arrival of the F/A-18 C/D aircraft at Oceana.

The evidence in this proceeding is expected to be, from these fact witnesses and others, that the jet aircraft operating out of Oceana do not adhere to tightly controlled flight tracks akin to trains

on a track, but rather vary their flight patterns over a broad area around Oceana, affected by pilot skill, wind and weather conditions, and the number of aircraft in a pattern.

The witnesses selected to testify on behalf of the test case Plaintiffs are not so numerous as to burden the Court with unnecessarily cumulative evidence. Their testimony is particularly important in view of the Government's express intention to adduce contrary evidence in an effort to convince the Court that its aircraft do adhere to tightly controlled tracks. The testimony and exhibits of the witnesses the Government proposes to exclude quite clearly has a tendency to make the fact of low level, frequent and loud overflights and flights in the vicinity of the test case Plaintiffs' homes more probable than not in full satisfaction of Rule 401 of the Federal Rules of Evidence.

Other than its bald assertion that the twelve witnesses it proposes to exclude have no relevant testimony or evidence to adduce, the Government has offered no support whatever for the exclusion of Thomas Askins, Nancy Darling (Ex. F), Louis Figari (Ex. G), William Gilbert, Robert Goodwin (Ex. H), James Gregory, Carl Helvie (Ex. I), Randy Keel, Jeffrey McCreary (Ex. J) or Charles Nash (Ex. K). The Government's assertion that a witness must either know a test case Plaintiff or a test case Plaintiff's property in order to possess relevant evidence is baseless and without foundation. To the extent the Government's motion implies that Herk Stokely and Thomas Askins do not possess such knowledge, its motion is false.

The Government also challenges the testimony of these witnesses under FRE 403, which states:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

The Government asserts that the testimony of these witnesses, even if relevant, is redundant and should be excluded. The Government fails to acknowledge that the so-called "redundancy," these witnesses who live near test case plaintiffs will testify to experiences identical to the test case plaintiffs, corroborates testimony that the Government challenges. The Government has named witnesses for trial who will testify that the noise exposure of the test case Plaintiffs is not that great, flights rarely pass over or near the test case Plaintiffs' properties, and in other similar ways contrary to the testimony of the test case Plaintiffs themselves. These witnesses corroborate that the flights are over and near their properties despite the "flight tracks" and the noise is as disruptive to the use and enjoyment of their properties as the test case Plaintiffs say. This is not redundant. The Government makes this testimony necessary. As to any waste of time, the Plaintiffs plan to present their case in less time than the Government, despite all these "redundant" witnesses. There is no basis to exclude this relevant testimony under FRE 403.

**Plaintiffs' Exhibits**

The Government makes the same arguments regarding the 50 – 75 exhibits that it seeks to exclude as it did with regard to the Plaintiffs' witnesses. The same narrow construction of relevance that dooms the Government's argument as to the witnesses does the same as to the exhibits. Moreover, the Government makes sweeping broad conclusions that should only be made in context, not in the abstract in a motion in limine. *See*, *PR Contractors, Inc. v. U.S.***,** 69 Fed.Cl. 468, 469-70 (Fed.Cl. 2006), quoting . *Jonasson v. Lutheran Child & Family Servs.,* 115 F.3d 436, 440 (7th Cir.1997)("Thus, while ["t]he prudent use of the *in limine* motion sharpens the focus of later trial proceedings and permits the parties to focus their preparation on those matters that will be considered ···· [s]ome evidentiary submissions [ ] cannot be evaluated accurately or sufficiently by the trial judge in such a procedural environment.").

A clear example of the deficiency of this argument is the reference to newspaper articles. The Government states that they "are clearly hearsay and should be excluded on this ground."[2] Of course, there are more than 20 exceptions to the hearsay rule in the Federal Rules of Evidence, and many more nuances to those exceptions. Moreover, newspaper articles are admitted at trials. *See Wathen v. U. S.***,** 208 Ct.Cl. 342, 527 F.2d 1191, 1199 (Ct.Cl. 1975)(newspaper articles admitted to demonstrate discredit to the IRS; also admitted over hearsay objection to prove the truth of what was asserted in the articles.).

Similarly, the evidence that the Government purchased easements over surrounding properties is relevant for many purposes, including, the value the Government itself has placed on easements. Admiral Fallon's testimony before Congress included statements about the litigation and the Government's estimate of the amount it would have to pay if it lost at trial. This evidence is also relevant to the value of the easements. Virtually every exhibit is probative of a fact that is of consequence to this case. The Government's view of relevance is too narrow and is not the law.

**ISIS Software**

Plaintiffs began making arrangements with the Government to use ISIS to demonstrate noise exposure at trial. Those arrangements never came to fruition and Plaintiffs have not indicated that they will even use ISIS. The Government has made extensive use of the ISIS noise program before community groups, civic associations, and the City of Virginia Beach as a demonstration of the community noise exposure generated by the F/A-18 C/D and other jet aircraft. For the first time, in this motion, it argues that ISIS does not replicate the noise generated by the F/A-18 C/D.

Plaintiffs object, however, to the Governments' suggestion of a site visit to hear the jets as they fly. Plaintiffs have no confidence that the flights on any given day or part of a day will be

2 This is the only mention of a basis for exclusion other than relevance or undue prejudice with regard to the witnesses or

indicative of the noise exposure to the Plaintiffs' properties. The Government has control over flight activity and can manipulate patterns, altitude, power settings, flaps, landing gear and any number of factors in the operation of its aircraft. If such a site visit is made, Plaintiffs reserve the right to use ISIS to demonstrate noise exposure consistent with the noise levels in the testimony of the witnesses and the Government's publications.

**2.**

**Robert Smith Can be Called to Testify**

32 C.F.R. 725 is inapplicable in this case. Several Navy witnesses are expected to testify in this case, and the Government has never invoked the procedures under the regulation. The regulation was promulgated to protect federal employees from being compelled to obey a subpoena. In this case, numerous federal employees from the civil service as well as active duty Navy personnel have been deposed, responded to discovery, and are listed as witnesses to appear at trial without invoking any unique procedure. Indeed, Robert Smith has been identified as lead counsel for the trial of this case and is expected to be in Court throughout the entire trial. The Government has also identified two Navy lawyers to testify in this case, Jude Klena and John Lauterbach.

Although the Court, in *Sparton Corporation v. United States*, 44 Fed.Cl 557 (1999), imposed a three part burden upon the plaintiff to demonstrate (1) that no other means existed than to depose the government attorney to obtain the information sought, (2) that the information sought was relevant and non-privileged, and (3) that the information was crucial to the preparation of the plaintiff's case, the attorney involved in that case was not involved in matters crucial to the case.

---

exhibits.

In this case, the Government advised the Court at the pre-trial conference that it intends to introduce evidence of revisions to the noise contours at Oceana after this suit was filed. Robert Smith has played an integral role in every aspect of noise analysis from the date the F/A-18 C/Ds were transferred from Cecil Field, Florida, beginning in 1998 to the present. He has also been an active participant in the decision to explore the revisions of the noise contours, the studies and interviews leading to the revisions of the noise contours, and the publication of revised noise contours. In view of the Government's express intention to present evidence in its case regarding a project in which Mr. Smith played a substantial supervisory role, Plaintiffs urge the Court to reserve a decision on whether or not Mr. Smith can be called to testify until the Government rests. At that time, if Plaintiffs propose to call Mr. Smith to testify regarding the Government's revisions of the noise contours, the Court will be in a better position to determine the necessity and propriety of his testimony with regard to those revisions.

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request the Court to deny Defendant's Motion in Limine to Certain Witnesses and Exhibits.

Respectfully submitted,

/s/ Jack E. Ferrebee
Jack E. Ferrebee
Hofheimer/Ferrebee, P.C.
1060 Laskin Road, Suite 12-B
Virginia Beach, Virginia 23451
(757) 425-5200
jferrebee@hoflaw.com

Counsel of Record for Plaintiffs

Of Counsel:

Kieron F. Quinn
Martin E. Wolf
Quinn, Gordon & Wolf, Chtd.
102 W. Pennsylvania Avenue
Suite 402
Towson, Maryland 21204
(410) 825-2300
kfquinn@quinnlaw.com
mwolf@quinnlaw.com

Charles R. Hofheimer
Kristen D. Hofheimer
Hofheimer/Ferrebee, P.C.
1060 Laskin Road, Suite 12-B
Virginia Beach, Virginia 23451
(757) 425-5200
chofheimer@hoflaw.com
khofheimer@hoflaw.com

Thomas Shuttleworth
Stephen C. Swain
Lawrence Woodward
Charles B. Lustig
Shuttleworth, Ruloff, Swain
Haddad & Morecock
4525 South Blvd., Suite 300
Virginia Beach, Virginia 23452
(757) 671-6000
tshuttleworth@srgslaw.com
sswain@srgslaw.com
lwoodward@srgslaw.com
clustig@srgslaw.com

EXHIBIT A

**<u>Herk Stokely</u>**

Herk Stokely flew for the Navy for a single tour after graduation from college. He left the Navy in 1963, and in 1965 he went to work for the Naval Aviation Depot in Norfolk, Virginia as an aeronautical engineer. (Exhibit 2B, Stokely Deposition. p. 5-7). His primary responsibility as a civilian Navy employee was maintenance of Navy aircraft. He worked extensively on the F-8, the A-6 and the F-14. (*id.* p. 9).

He and his family have lived at 1504 North Horseshoe Circle since 1967. His home is about two miles to the center of Oceana and about a mile and a half from its perimeter. (*id.* p. 9-10).

After he left active duty he flew in the reserves and operated out of Oceana, mostly flying A-4s (*id.* p. 10-11).

He is familiar with the flight paths and operational requirements at Oceana because he has flown them all and because they have changed very little since he flew there (*id.* p. 15, 22).

Despite the fact that his house is well outside the stated flight patterns, planes fly directly over his house when they are using runway 5 and conducting FCLPs. If he is outside working in his garden he puts on "earmuff type" ear protection. He has a competent sound meter and has recorded decibel levels in his yard up to 117 dB for the F/A-18s. (*id.* p. 24-25).

When the planes are conducting FCLPs he tries not to go to bed until after 11 which is when Oceana is supposed to stop operating. If he does go to bed before 11 p.m., it is difficult or even impossible to fall asleep. (*id.* p. 26).

The only plaintiff that he knows in the case is Hal Levenson who was also active in CCAJN. He is familiar with Mr. Levenson's property because the CCAJN board met at Mr.

Levenson's house on occasion. From Mr. Stokely's observations the noise at the Levenson house is very similar to his own.

The most dramatic noise events prior to the arrival of the F/A-18 was the preparation for the first Gulf War in 1991which involved A-6s and F-14s. It was very loud and constant but for a "relatively short period of time" however in 1991. (*id.* p. 30-33).

Q. Would you say that your experience with the jet noise now is similar to 1991?
A. At times, yes.
Q. What do you mean at times?
A Primarily when they are conducting FCLP operations, and when the wind is tending towards the east, which is the pattern that brings the planes over and around and near my home.
Q. When the planes are coming over or near your home, do you know which runway they are using at Oceana?
A. Yes. That would be runway 5. Although other runways, particularly 32, brings them over my home on take off. But the FCLP pattern over my home is when they are using runway 5.

(*id.* p. 32)

He has performed sound readings at his home since CCAJN was formed prior to the arrival of the F/A-18s.

Q. Have the sound readings stayed the same on average over the last nine years?
A. No. No.
Q. Can you describe how they have changed over time?
A. There are more single noise events that are louder.
Q. What do you mean by single noise event?
A. That one airplane going overhead making its own noise.
Q. And can you give me a comparison of sound readings of a single noise event in '96 and a single noise event now?
A. Before the F-18s came, it was very unusual to see a sound reading much over 100 decibels. After the F-18s came, it was quite common to experience sound readings at my house well above 100 decibels.
Q. How much above 100 decibels?
A. The highest one I have read was 117. So they would fall in the range between 100 and 117.

(*id.* p. 42-43)

Mr. Stokely is not a plaintiff in the lawsuit. He feels that because he had a career with the Navy, and he is a Navy annuitant, he has no desire to receive money from the Navy other than his retirement. (*id.* p. 45)

Q. When did you -- from your home, when did you first notice that FCLPs were being flown at Oceana?
A. The Navy flew FCLPs at Oceana on occasion the entire time that I have lived at my house.
Q Why did you ask Captain Zobel, I believe, if they were moving FCLPs from Fentress to Oceana?
A. I asked him that question because FCLPs at Oceana had been an exceptional event in the past. And at -- and in that time, which was between the two EIS, somewhere in there, FCLP at Oceana became routine almost. It seemed to me routine. They were there doing FCLPs very frequently; whereas, in the past it had been relatively infrequent.

(*id.* p. 45) [the First EIS was 1998; the Second was EIS 2002]

He knows that the altitude during the FCLP is supposed to be 1,000 feet but many of the planes fly between 600 and 800 feet. (*id.* p. 49-50).

Q. Somewhere between 600 and 1,000?
A. Yes. There are just enough of them that fly at 1,000 you can really tell.
Q. How can you tell the difference between 600, 800, or 1,000?
A. Well, there are two ways. One is to use my experience as an observer. The other way is to, since you know how long the plane is, it's fairly easy to construct a small device which allows you to essentially measure the length of the aircraft, the apparent length of the aircraft when it's overhead to get a distance. Something about this big, at about 30 inches.
Q. Okay. We're going to have to describe what you are doing for the court reporter.
A. Something that is about an inch long and about a distance close to 30 inches would represent an F-18 at about 1,000 feet if the plane fit between the markers.
Q. How do you know that?
A. It's geometry. If the airplane is 60 feet long, for small angles it's just proportionate. So 3 feet or 1,000 feet it's just a simple proportion.
Q. So you would have to know how long an F/A-14 was or F/A-18 was to get that calculation?
A. Yes.

(*id.* p. 50-51)

The planes at Oceana also fly over his house often when conducting touch and go operations.

Q If they are not flying FCLPs in or around your home, how are they flying around your home?
A Well, they still do landing practice. They do -- pilots returning from their training missions, if they have time in their schedule and sufficient fuel remaining, will often do a few touch and goes at the end of their flight. And Navy pilots, in essence, every landing is FCLP, but they only have a limited time and a limited amount of fuel, so they will make two or three or four and land. And it's not like grinding around the pattern for hours as it is when there's FCLP practice.
Q. When they are doing this landing practice, the planes are still flying in and around your home?
A Oh, yes. If they are using runway 5.

****

Q. We were talking about the FCLPs and the landing practice in and around your home. Do you believe that an FCLP and a touch and go are essentially the same thing?
A. Well, I think I made the statement that for a Navy pilot every landing is FCLP. Landing on a carrier in a high performance airplane is so demanding that nobody passes up an opportunity to practice a carrier landing. And the runway has the carrier landing device set up on it all the time. And if it's not operating, the pilots would consider it unusual and not a desirable situation. So the short answer to your question is, yes, they are essentially the same except for the duration and the intensity of the operation. However, with that said, generally when planes are coming back from an operational training flight, not FCLP, there are a smaller number of planes in the landing pattern, probably one or two, possibly maybe three at a time, and since the planes have to take their spacing off one another, they would tend to be further from my house because the pattern would not have expanded so dramatically beyond the one that's specified in the EIS. See, patterns in the EIS are no where near my home. But once you get more than a few planes in the pattern, and they have to take their interval off one another, the pattern expands and the next thing you know it's over my house. I have even seen them substantially beyond my house, especially at night. I have seen them flying directly over the Virginia Beach General Hospital.
Q. So do you believe the patterns in the EIS are not accurate?
A. The pattern in the EIS is highly idealized, the pattern that would be flown by a single plane flown by an expert pilot who observed all the approach

speeds and that sort of thing. The way they are idealized makes it very unrealistic for real operations. However, it does make the noise zones much smaller on the map.

Q. Why do you say that?

A. What?

Q. That the flight pattern in the EIS makes the noise zone smaller?

A. Because the flight pattern is much smaller than the pattern that the Navy actually flies, and because of the fact that the noise zones are based on the pattern in the EIS, the patterns being smaller, thus the noise zones are smaller.

(*id.* p. 56-59)

He knows that the Navy actually flies far outside the patterns because they are coming directly over his house, yet his house is more than a mile from the nearest flight pattern. Moreover, if the planes are a mile away from his house the noise level on his sound meter is far below that which he has recorded when they pass directly over his house (*id.* p. 59)

Q. And I think you mentioned that there was – it just seemed like there was an increase in FCLPs. Do you remember when that occurred?

A. Let me see how specific I can be about that. The first EIS, the one for the F-18 C and D coming from Cecil Field, the basis of that EIS was that only occasionally FCLP would be done at Oceana. And only when it was necessary for one of those exceptional reasons that I mentioned. There was actually a statement in the EIS that said that. And the number of FCLP operations that were estimated in that first EIS was something between 4 and 5,000 per year. 4,400, 4,500, something like that. At the time that I asked Captain Zobel that question, the intensity of FCLP at Oceana had increased dramatically. It prompted my question. The answer Captain Zobel gave us at that time was that in that particular year, over 20,000 had been conducted at Oceana.

(*id.* p. 62-63)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, )
et al., )
)
Plaintiffs, )
)
v. ) NO. 01-201L
) Judge Victor J. Wolski
THE UNITED STATES OF AMERICA, )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION
OF HERBERT A. STOKELY
TAKEN ON BEHALF OF THE DEFENDANT

Virginia Beach, Virginia

July 25, 2005

Appearances:

HOFHEIMER/FERREBEE, P.C.
By: KRISTEN D. HOFHEIMER, ESQUIRE
And
QUINN, GORDON & WOLF
By: KIERON QUINN, ESQUIRE
Counsel for the Plaintiffs

00026

11 at night, depending on the weather and the wind direction so on and so forth, the planes will often be over my house, or nearby. On the other hand, if the wind is from another direction, they are over other people's houses.
Q. Have you ever been woken up at night by the jets?
A. I'm a very good sleeper. I do often defer my bedtime until they quiet down because it is disturbing to try to go to sleep when they are flying, so I would normally try to go to sleep after 11. If I did need to go to sleep earlier, the answer to your question is yes, it has disturbed me. If not impossible.
Q. To fall asleep?
A. When the planes are directly overhead during FCLP.
Q. Do you know the plaintiffs in this case?
A. Hal Levinson told me that he was a plaintiff. Other than that, no, I don't. Or I don't know who they are. So I may know them, but I don't know who they are.
Q. Do you know where Mr. Levinson lives?
A. Yes.
Q. Would you say you are familiar with his property?
A. Yes.
Q. Where does he live in relation to you?
A. He lives, I would think, about two miles perhaps west of me.

Q. Have you seen jets fly in or around his home?
A. His experience with the jets is very much like mine.
Q. From your observation?
A. Uh huh.
Q. I'm sorry. You'll have to answer yes or no.
A. What was the question?
Q. I was asking if your -- if you were gauging that from your experience?
A. That is from my experience, yes.
Q. From your observation at his home?
A. Yes.
Q. We're not able to record the nods of the head.
A. I understand. Please help me as I do this.
Q. It's no problem. I do that too.
And Mr. Levinson is also a member of CCAJN; is that right?
A. Yes.
Q. Does he talk to you about jet noise?
MR. QUINN: I can't hear a thing.
A. Mr. Levinson is a member of the CCAJN board of directors, as I am. Most commonly we meet at Mr. Levinson's house. So, yes, we definitely have talked about jet noise together. And I have spent many hours at his home in CCAJN meetings and am quite familiar with the environment there.

00001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, )
et al., )
Plaintiffs, )
)
v. ) No. 01-201L
)Judge Victor J. Wolski
THE UNITED STATES OF AMERICA, )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION OF

GREGORY D. WHITLEY

TAKEN ON BEHALF OF THE DEFENDANT

VIRGINIA BEACH, VIRGINIA

JANUARY 13, 2006

Appearances:

HOFHEIMER/FERREBEE, PC
By: JACK E. FERREBEE, ESQUIRE
Counsel for Plaintiffs

U.S. DEPARTMENT OF JUSTICE
By: STEVEN D. BRYANT, ESQUIRE
Counsel for Defendant

homes?

A. Actually her brother-in-law.

Q. Her brother-in-law, okay, I see, built the homes.

A. She knew of the model and that they were put together with.

Q. What type of house is it, style?

A. Two story. I don't, you know --

Q. Colonial or --

A. I wouldn't -- I don't know.

Q. Okay.

A. Two story, a lot of brick.

Q. I'm going to take just a few minute break and we might be -- if we're not done, we're very close to it.

(Recess.)

BY MR. BRYANT:

Q. Mr. Whitley, do you know a Hal and Elaine Levenson?

A. I know who he is. I don't know him. If I saw him, I would be able to tell you that's Hal Levenson, that's not Hal Levenson. Other than that --

Q. Have you ever been to his house?

A. No.

EXHIBIT D

**Thomas Askins**

Thomas Askins lives at 879 Wynwood Drive in Virginia Beach. He built his house in 1976 and has lived there ever since. Mr. Askins retired as an airline pilot from Trans World Airlines after 32 years from 1966 until 1998. (Exhibit 4B, Askins Deposition. p. 5-6).

From 1961 until 1966 Mr. Askins was a pilot in the United States Navy. During his single term in the Navy he was stationed in Jacksonville, Florida and at Naval Air Station Norfolk.

Q. Can you just describe your personal experience when you got here, when you built that home in 1976 and moved there, what in your opinion – in terms of your specific home, tell me what your experience was in terms of the noise from the military jets that were based at Oceana?
A. Well, it was evident that jets were here. We were living near an airport.
Q. Obviously, you were based at Oceana?
A. I was based at NAS Norfolk. Of course, I knew Oceana was here. I knew all about it, exactly where it was. The home I moved from Kings Grant probably doesn't have any jet noise at all. It's a pretty good distance from here. I don't ever remember hearing a plane flying over that. When I moved here, the jets were here.
Q. What jets do you recall?
A. Probably the Phantom, F-4s, and the Intruder, A-6. I just don't – in that period of time, I just don't remember the noise being as intrusive, as loud as it became after all of the Hornets started coming in from Jacksonville.

(*id.* p. 8-9)

****

Q. What was your experience with jet noise or the frequency of the overflights or the military jets flying by your home; did it increase or the noise level change?
A. When the F-14s came in relation to the F-4s and A-6s? Probably about the same frequency. The F-14 seems to be a somewhat quieter airplane.
Q. In comparison to which jet?
A. Probably somewhat quieter than the A-6. It was a little bit louder. The F-4 when it took off on afterburner, it was fairly loud. But I don't think any – in my opinion neither of these airplanes are as loud as the current Hornet and Super Hornet, which it seems to be louder.

(*id.* p. 10)

Between 1976 and 1998 Mr. Askins never called Oceana to complain about noise. (*id.* p. 13). Starting in 1998 the overflights of Mr. Askins' home seemed to have increased (*id.* p. 15). Since 1998 the noise has been "very, very loud." So loud that one cannot talk on the phone, outside and "I mean it's so loud that you just can't function." (*id.* p. 15-16).

Since 1998 Mr. Askins may have called Oceana complaining of noise but doesn't remember the details.

A. Yes. In fact, I can't – I might have even called them a time or two. I really can't remember. I discussed doing it but just never did it. I think I even tried a couple of times when you couldn't get in. The lines were – they weren't answering or it was busy, one of the two.

Q. Can you recall when you were tempted to make those phone calls what you were experiencing – what you were experiencing or what was of concern to you? Was it a time of day? Was it the frequency of the overflights. Just the noise?

A. About -- I think it was two years ago. Might have been three years ago, they were doing one of the air shows. A jet flew right over my house and they – something went supersonic. I think it was probably the gases coming out of the engine, and I thought the jet had crashed in our yard. It was like a huge, thunderous crash, and we all just ducked for cover, and I looked up just in time to see the jet taking off here with full afterburner. You could see the trail. It just like disappeared. It was extremely loud. That's when I really -- that was the scariest maneuver that I ever saw. It seems like during the air show practice it's really horrendous because they come over at huge -- at great air speed with full power at very low altitudes. And it's a little scary.

(*id.* p. 18-19)

Mr. Askins accurately describes the difference between FCLP and Touch and Go as follows:

A. The FCLP is carrier landing practice. It's designed to teach the, either the novice aviator or the guys trying to go back and requalify to fly very precisely onto the carrier and to get him acclimated to flying down a precise glide slope. When I was in we used a meatball. I don't know what they use any more. It's monitored by an officer who is the – they used to call him paddles. Now it's the – I can't remember what they call him now. Anyway, he's the guy who grades the approach. And then if you pass and you are ready to go, then you go to the ship and land. A touch and go could be the same thing. It's a random event, really.

> You make your approach, touch down, reconfigure the airplane for take off, add power, go around, take off again.

(*id.* p. 19).

Mr. Askins is not a plaintiff in the litigation. (*id.* p. 31).

Mr. Askins compares the F/A-18 C/D to the A-6 as follows:

> A. The A-6 –
> Q. Let's do A-6 comparison?
> A. -- was a fairly loud airplane.
> Q. In comparison to the F-14?
> A. I think of it as being louder than the F-14.
> Q. How about in comparison to the F-18C/Ds.
> A. I don't know of any airplane that is that loud. Maybe the Concorde.

(*id.* p. 34)

00001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAROL AND ROBERT TESTWUIDE, )
et al., )
)
Plaintiffs, )
)
v. ) NO. 01-201L
) Judge Victor J. Wolski
THE UNITED STATES OF AMERICA, )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION
OF THOMAS H. ASKINS, JR.,
TAKEN ON BEHALF OF THE DEFENDANT

Virginia Beach, Virginia
August 2, 2005

Appearances:

HOFHEIMER/FERREBEE, P.C.
By: KRISTEN D. HOFHEIMER, ESQUIRE
Counsel for the Plaintiffs

00021

Q. Okay.

A. Well, my yard is heavily wooded, so I can't really look over and see them where they are from my house. But I can see them when they come right over, so I don't know if it's the same jet or 15 of them. I just don't know. There is no way for me to know.

Q. From your vantage point, since you mention it's heavily wooded, you really couldn't gauge the altitude. Could you see the markings of the plane, the side number or at least the squadron number? Could you see any markings on the plane from where you are standing?

A. Well, you can see markings on them, but I don't know --

Q. Can you distinguish what the markings were to the point that you --

A. No.

Q. Let's say at any point in time from 1976 to the present day, have you ever done noise recordings of the jets that are flying by your home?

A. Yes.

Q. Okay. And describe at what times did you do those recordings?

A. Well, I have a voice -- I mean a noise monitor I bought at Radio Shack, and I would do that from time to time. I really didn't keep a log of it. One day several

years ago --
Q. How long have you been doing that with the noise monitor, in terms -- when did you start? You said it's on and off?
A. Probably five years ago.
Q. Go ahead.
A. On one occasion, when the jets were flying over very, very low and very loud, and I believe it was an FCLP pattern, they were coming over the house and also right off of Laskin Road. Down where the intersection of Laskin and Winwood is, there's a church, a Lutheran church -- I think it's Lutheran -- my son and I went down and took videos of the jets coming over, and I gave a rendition of them and we took the noise meter and listened to them.
Q. So you did a noise recording and a video recording?
A. Yes.
Q. The video recording was how long ago did you say? Was that two years ago?
A. Yes, a couple of years ago. Maybe three. Two or three. Two. I think I gave it to Jack, I believe, but I don't know. It's all dated on the thing.
Q. Okay. But you believe you gave it to Mr. Ferrebee?
A. I believe I did.

EXHIBIT F

**Nancy Darling**

Nancy Darling has lived at 909 Goldsboro Avenue in Virginia Beach since 1993. When she purchased the house she believes that the closing documents indicated that she was in the second "noise zone" under AICUZ. (Exhibit 19B, Darling Deposition. p. 4, 10).

Until the F/A-18s arrived in 1998-1999, Ms. Darling had little difficulty with aircraft noise. She had no problem with phone conversations or being able to watch television, or keep her windows open during the day or at night. Her experience changed "significantly and intolerably" in 1998 and 1999 when the eight squadrons of F/A-18s were moved from Cecil Field. (*id.* p. 13-15). After they arrived she could not keep her windows open, have a telephone conversation or conduct business outside of her home. It is virtually impossible to be outside gardening, reading or entertaining people on the patio when the jets are flying. (*id.* p. 15-16).

She believes that the homes in her neighborhood have not appreciated nearly as much as other homes in Virginia Beach outside of the noise zones and does not believe that she could get a comparable house in a quiet area of Virginia Beach for the same price that she could sell hers for. (*id.* p. 22, 26-27).

Sometimes the planes fly directly over her home and sometimes to either the left or the right. (*id.* p. 25).

She has purchased a decibel meter and has recorded 123 dB recently near her home. (*id.* p. 28-29). She also believes that the hearing loss she has suffered is a result of the jet noise. (*id.* p. 31). She is considering selling her house and moving and the only reason she would do so is the jet noise. (*id.* p. 33). Her address puts her close to the property of the test case Plaintiff, Theodore Dingle on Carolina Avenue (*id.* p. 36). Ms. Darling is a Plaintiff in this case.

EXHIBIT G

**Louis Figari**

Mr. and Mrs. Figari live at 624 Secotan Road in Virginia Beach where they have lived since December 1991. (Exhibit 18B, Figari Deposition. p. 5).

Mr. Figari is a commercial airline pilot with Continental Airlines, and when he was in the Navy he flew the F-4 Phantom. (*id.* p. 7). After he left active duty in the Navy he stayed in the Naval Reserves for 20 years. (*id.* p. 12).

He built his present home, and before he purchased the lot he observed flight activity nearby. Very seldom did the flights overfly his home site. (*id.* p. 22-23). From the time he moved into the home until the F/A-18s arrived, noise was not a problem. The planes flying out of Oceana prior to that time were the A-6 and F-14. (*id.* p. 24-25).

Mr. Figari's home in the Croatan neighborhood is not supposed to be in a flight pattern, but very occasionally prior to the F/A-18, when there were numerous airplanes in the pattern, a plane would fly over or near his house. (*id.* p. 27-28).

After the arrival of the F/A-18s, the noise has affected his ability to listen to the radio and television and conduct phone conversations. When the F/A-18s fly over and around his house they are flying at between 800 and 1,000 feet. (*id.* p. 29-30).

He describes the current living conditions in his home as tolerable until an F/A-18 flies over. (*id*. p. 37).

EXHIBIT H

**Robert Goodwin**

Robert Goodwin has lived for 29 years at 909 Pillow Drive in Virginia Beach in the Southern Points neighborhood. He spent 20 years on active duty in the Navy, retiring in 1973. He then worked as a civilian with the Navy, retiring again in 1995. (Exhibit 17B, Goodwin Deposition. p. 4-5).

When he purchased his home in 1976 it was quiet and peaceful, and was about three to four miles from Naval Air Station Oceana, which at the time consisted mostly of A-6s and A-4s. (*id.* p. 6-7). In 1976 he had occasional disruptions due to aircraft operations. Those disruptions increased somewhat when the F-14 aircraft was delivered and then more when the F/A-18s came to Oceana. (*id.* p. 9). The noise became “louder and louder” over the period of 1998-1999 as the F/A-18 squadrons moved to Oceana. (*id.* p. 13). He experiences some direct overflights over his home. (*id.* p. 15).

Toward the end of the period of the arrival of the F/A-18s in 1998-1999 he began the process of replacing all of the windows in his home, a project that was finished in 2002. (*id.* p. 25).

In his knowledge of the various Naval aircraft he would rate the A-6 as the least noisy followed by the F-14, then the F-4 with the noisiest being the F/A-18. (*id.* p. 29).

EXHIBIT I

**Carl Helvie**

Carl Helvie is a retired Professor Emeritus at Old Dominion University. For 28 years, until 2000, he lived at 421 Lake Drive in Virginia Beach, (Exhibit 20B, Helvie Deposition. p.3, 5-6). He has a Bachelors Degree in Nursing and a Doctorate in Public Health from the Johns Hopkins School of Public Health.

In December 2000 he moved from his home to Hampton, Virginia solely to get away from the jet noise. (*id.* p. 5, 36). Except for the last two years, his Lake Drive home was quiet and only occasionally did he hear any jets at all. (*id*. p. 13, 17).

During the last two years at Lake Drive, from December 1998 through December 2000, there was a dramatic change. The first time he noticed it was when one of the jets flew directly over his house so low that he thought it was going to hit a tree in his yard. (*id*. p. 21-23). During that two-year period, overflights became common and very intrusive. Inside his house he could not carry on a conversation, talk on the phone or watch television. Similarly he could not concentrate on developing his classes or research papers. (*id*. p. 25-26). Mr. Helvie is a plaintiff in this case.

EXHIBIT J

**Jeffrey McCreary**

Mr. McCreary and his wife have lived at 804 Lord Leighton Court in Virginia Beach since 1996. Prior to that time they lived for 20 years in a mobile home community at 2901 Finch Avenue in Virginia Beach close to Oceana. (Exhibit 16B, McCreary Deposition. p. 4).

When they moved into their present residence in 1996 the flight patterns at Oceana kept the aircraft well away from the McCreary's residence – probably more than a mile (*id*. p. 8). Beginning in mid-1997 the aircraft began to fly wider and wider until, in the summer of 1999, the flight patterns often brought the aircraft directly over the McCreary's home. (*id*.. p. 11-12). He can pinpoint the summer of 1999 because he was giving an outdoor party for one of his children who was graduating from school and the children had to come indoors because of the noise of the planes flying directly over their house (*id.* p. 12-13, 18-19).

When he moved into the mobile home community on Finch Avenue in 1976 he worked at Oceana Naval Air Station as an Aviation Administration Maintenance Man, Second Class. He and his wife purchased that mobile home because the price was low and it was close to Oceana where he worked. They simply put up with the high noise. (*id.* p. 27-28).

Mr. and Mrs. McCreary moved to the present address on Lord Leighton Court specifically to get away from the noise and to move to a quiet neighborhood. Before they moved Mr. McCreary researched the neighborhood using the maps in the local library, talked to people in the vicinity of the home that was for sale, and rode their bicycles in the area. (*id.* p. 36, 38-40).

Since the planes began to fly directly over and adjacent to their new home they have replaced all of the windows and despite the fact that they love to garden, they spend less time outside. (*id.* p. 12-13, 44)

While he was in the Navy as an aviation maintenance man, he worked on a number of naval aircraft. He considers the F-14 to be louder than the F-4. (*id*. p. 31-32).

EXHIBIT K

**Charles K. Nash**

Charles Nash lives at 2617 Boush Quarter in Virginia Beach where he has lived since 1993. (Exhibit 15B, Nash Deposition. p. 4-5).

After the arrival of the F/A-18s in 1998-1999, Mr. Nash replaced all of the windows in his house with double-pane, gas filled windows, and he also added insulation in the attic. After the arrival of the F/A-18s but prior to the new windows and insulation, he could not talk on the telephone or watch television. The noise becomes most intense when the jets are using runway 14 left and 14 right. When the jets use runway 5 they will pass to the east of his house but when they use runway 14 they come directly overhead at very low altitude. (*id.* p. 9-12).

Mr. Nash was in the Navy from 1963 to 1985. He was a Sensor operator on various patrol aircraft. (*id.* 13-14). He looked at an older AICUZ map when he purchased his home, which depicted his address to be on the outer fringes of the lower noise zone. (*id.* p. 18).

Between 1993 and the fall of 1998 the noise wasn't bad. When the F/A-18s came in the noise became very intrusive and it was at that time that he decided they had to add the windows and the insulation. (*id*. p. 21).

Mr. Nash is a plaintiff in the present litigation, and he is also a member of CCAJN.

The difference between the noise produced by the F-14 and that of the F/A-18 is that the F/A-18 is louder. It is "piercing." "I can't quite describe it. It's – you could have a very loud noise and then you could have one that really hurts. And the F/A-18s hurt." (*id.* p. 40). In comparing the F/A-18 to the A-6 he says that the A-6s are "pretty loud" airplanes but that the F/A-18s are "not just loud, but they are painful." (*id*. p. 41).